# DOCUMENT 3

# EXHIBIT A

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
evan.werbel@bakerbotts.com
tom.carter@bakerbotts.com
drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION

This Document Relates to:

ALL INDIRECT PURCHASER ACTIONS

Master File No. 4:07-cv-05944-JST (N.D. Cal.)

MDL No. 1917

**IRICO DEFENDANTS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO INDIRECT PURCHASER PLAINTIFFS' THIRD SET OF INTERROGATORIES TO IRICO GROUP CORPORATION AND IRICO DISPLAY DEVICES CO., LTD.**

PROPOUNDING PARTY: Indirect Purchaser Plaintiffs

RESPONDING PARTIES: Irico Group Corporation
Irico Display Devices Co., Ltd.

SET NUMBER: Third (3)

Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation ("Irico Group") and Irico Display Devices Co, Ltd. ("Irico Display," collectively, "Irico" or "Irico Defendants") hereby provide these supplemental responses to the Indirect Purchaser Plaintiffs' ("Plaintiff") Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., dated July 7, 2021 ("Interrogatories"), as modified by the Special Master's December 22, 2021 Order Re DPPs' Motion to Compel Interrogatory Further Answers (ECF No. 5978). Irico reserves the right to amend or supplement these Supplemental Objections and Responses (the "Responses") to the extent allowed by the Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California ("Local Rules"). Subject to and without waiving any of Irico's General and Specific Objections as set forth below, Irico is willing to meet and confer with Plaintiff regarding such General and Specific Objections.

The following Responses are made only for purposes of this case. The Responses are subject to all objections as to relevance, materiality and admissibility, and to any and all objections on any ground that would require exclusion of any response if it were introduced in court. All evidentiary objections and grounds are expressly reserved.

**GENERAL OBJECTIONS**

Irico makes the following General Objections to Plaintiff's Interrogatories:

1. Irico's Responses are based upon information available to and located by Irico as of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states that it has conducted a diligent search, reasonable in scope, of those files and records in its possession, custody, or control believed to likely contain information responsive to Plaintiff's Interrogatories.

2. No express, incidental, or implied admissions are intended by these Responses and should not be read or construed as such.

3. Irico does not intend, and its Responses should not be construed as, an agreement or acquiescence with any characterization of fact, assumption, or conclusion of law contained in or implied by the Requests.

4.      Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiff.

5.      Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

6.      Irico objects to Plaintiff's Interrogatories to the extent that they request duplicative discovery in violation of the Order Re Discovery And Case Management Protocol, ECF No. 1128. *See* Order Re Plaintiffs' Motions To Compel Supplemental Discovery From Toshiba And Panasonic, ECF No. 4128, at 4 ("The Discovery Protocol (ECF No 1128), requires parties to coordinate discovery and not file duplicative discovery. . . . The benefit redounds to all parties on both sides of the litigation, by conserving the efforts required by plaintiffs and protecting defendants against unnecessary duplication of effort.") (Report and Recommendation adopted in full at ECF No. 4256).

7.      Irico objects to Plaintiff's Interrogatories to the extent they seek information that is not relevant or disproportionate to the needs of the case.

8.      Irico objects to Plaintiff's Interrogatories to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or amend its Responses.

9.      Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case.

10.      Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint

defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico will provide only information that it believes to be non-privileged and otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any information or responsive documents subject to any such doctrine, privilege, protection or immunity from production shall not constitute a general, inadvertent, implicit, subject-matter, separate, independent or other waiver of such doctrine, privilege, protection or immunity from production.

11.     Irico objects to Plaintiff's Interrogatories to the extent that they call for information that is not in the possession, custody, or control of Irico. Irico also objects to the extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties, including but not limited to any of Irico's subsidiary or affiliated companies.

12.     Irico objects to Plaintiff's Interrogatories to the extent that responding would require Irico to violate the privacy and/or confidentiality of a third party or confidentiality agreement with a third party.

13.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily available from other sources.

14.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information or documents concerning transactions outside the United States. Such Requests are unduly burdensome and disproportionate to the needs of the case as Plaintiffs' class definition is confined to "individuals and entities that indirectly purchased Cathode Ray Tube Products . . . in the United States" (see Indirect Purchaser Plaintiffs' Fifth Consolidated Amended Complaint ("Complaint") dated September 19, 2019).

15.     Irico objects to Plaintiff's Interrogatories to the extent that compliance would require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body of foreign jurisdictions.

16. Irico's responses, whether now or in the future, pursuant to Plaintiff's Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

17. Irico objects to Plaintiff's Interrogatories to the extent that they are compound and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

18. Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for legal conclusions.

19. Irico objects to the Interrogatories to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

20. Irico objects to the Interrogatories to the extent they seek information or documents that cannot be removed or transmitted outside China without violating the laws and regulations of that country, including but not limited to restrictions on the transmission of state secrets or trade secrets as those terms are defined under Chinese law.

21. Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

**GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1. Irico objects to the definition of "DPPs' Written Discovery" (Definition No. 1) on the grounds that it is vague, ambiguous and overly broad.

2. Irico objects to the definition of "IPPs' Written Discovery" (Definition No. 2) on the grounds that it is vague, ambiguous and overly broad.

3. Irico objects to the definition of "Document" (Definition No. 3) to the extent it seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, any Order of this Court, or any other applicable laws.

4. Irico objects to the definitions of "Including" and "Relating" (Definition No. 4) on

the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to the extent that it seeks information protected by the attorney client or other applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or foreign law.

5.      Irico objects to the definitions of "You" and "Your" (Definition No. 5) to the extent that Plaintiff defines those terms to include the Irico's "present and former members, officers, agents, employees, and all other persons acting or purporting to act on their behalf, including all present and former members, officers, agents, employees, and all other persons exercising or purporting to exercise discretion, making policy, and make decisions." This definition is overbroad, unduly burdensome, vague, and ambiguous. In particular, Irico objects to this definition to the extent it purports to request information beyond the possession, custody, or control of Irico Group or Irico Display, including but not limited to information in the possession of non-parties and third parties where Irico lacks any duty to obtain or otherwise search for the information and for whom the Court lacks personal jurisdiction. Irico also objects to the inclusion of all "present or former employees, officers, directors, agents . . . or any other person acting on [the] behalf [of]" Irico within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

6.      Irico objects to Instruction No. 1 (related to disclosure of additional information) to the extent it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 26(e).

7.      Irico objects to Instruction No. 2 (related to production of business records) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 33(d), Rule 26(b). Irico further objects to this Instruction to the extent that

it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any Orders of the Court.

8. Irico objects to Instruction No. 3 (related to privileged information) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 33(d), Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any Orders of the Court, and on the grounds that it is vague, ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the extent it seeks information that would disclose personal confidential information and/or violate any and all rights of privacy under the United States Constitution or Article I of the Constitution of the State of California, or any other applicable law or state constitution, or that is otherwise prohibited from disclosure because to do so would cause Irico to violate legal and/or contractual obligations to any other persons or entities.

**SPECIFIC RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 2**

State whether Irico implemented a litigation hold to preserve potentially discoverable evidence relating to the alleged misconduct in this litigation. If your answer is in the affirmative:

(a) state the date (or dates) that the litigation hold notice was issued;

(b) state the date when the litigation hold was implemented;

(c) describe in detail the scope of the litigation hold, including the categories of documents, electronically stored information (ESI), or other tangible evidence that are subject to the litigation hold;

(d) identify the recipients of the litigation hold notice; and

(e) describe any steps taken to ensure compliance with the litigation hold.

**RESPONSE TO INTERROGATORY NO. 2**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this interrogatory to the

extent that it requests the disclosure of information protected by the attorney-client privilege or attorney work product doctrine.

Subject to and without waiving the objections stated above, Irico responds that, in summer 2008, the company orally instructed key employees to preserve documents related to sales of CRT to the United States. It was determined that Irico possessed no such documents. As discussed in more detail below, all documents required to be maintained under Chinese law were preserved at that time. Around September 2017, when Irico reentered the litigation for the purposes of contesting jurisdiction and asserting a foreign sovereign immunity defense, Irico confirmed the need to preserve existing documents relevant to the litigation from the time period 1995 to 2007 with managers from each operational department, including finance and accounting, legal, HR, and sales. The managers conveyed this message orally to relevant employees under their supervision.

In addition to the preservation efforts described above, and as Irico has explained in other discovery responses, *see* Irico's Supplemental Objections and Responses to Interrogatory No. 16 as stated in Irico Defendants' Fourth Supplemental Objections and Responses to Direct Purchaser Plaintiffs' First Set of Interrogatories, pursuant to Chinese law, the Ministry of Finance and State Archives Administration requires companies like Irico to maintain and preserve certain documents and materials, including but not limited to original invoices for sales, accounting books, general ledgers, financial accounting reports, and bank statements. *See* IRI-CRT-00000900. Irico is not aware of such archived records from 1995-2007 being destroyed given the retention periods required by the Chinese government. In addition, Irico's internal practices included the maintenance of additional archives of material related to operational documents, administrative documents, technical records and communications with agencies of the PRC government and Chinese Communist Party.[1] Irico is not aware of any such records from the 1995 to 2007 time period that were preserved in the various archives being destroyed.

///

///

[1] Additional information regarding the documents maintained in Irico's archives can be found in Irico's December 18, 2020 letter to Plaintiffs regarding discovery issues.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2**

On December 22, 2021, the Special Master issued the Order Re DPPs' Motion to Compel Interrogatory Further Answers, ECF No. 5978, directing Irico to "to furnish supplemental responses to Interrogatory No 2 as set forth below" and listing eleven (11) enumerated paragraphs. In this Supplemental Response, Irico repeats below each issue identified by the Special Master, corresponding to the enumerated paragraphs, and responds as follows:

**ISSUE NO. 1**

With respect to the communications or work product that Irico objected to identifying in its response to Interrogatory No 2, Irico is directed to identify the dates of any such communications or work product, the parties thereto, the subjects thereof and sufficient information to enable the PPs and the undersigned to determine whether a claim of privilege or protection is warranted.

**RESPONSE TO ISSUE NO. 1**

With respect to Irico's objection to discovery of any privileged communications or work product requested by Interrogatory No. 2, Irico responds that it is not objecting to or withholding any information on such a basis and therefore is not identifying any information in response to Issue No. 1.

**ISSUE NO. 2**

Identify by names and positions at Irico at all times from 2007 to the present the "key employees" referred to in Irico's response to Interrogatory No 2.

**RESPONSE TO ISSUE NO. 2**

Irico provides the following information about known "key employees" referenced in response to Interrogatory No. 2.

- Tao Kui
    - 05/2001 – 09/2013
        - Irico Group, Party Secretary and Deputy General Manager
    - 03/2013
        - Member of the Party Leading Group of China Electronics Information Industry Group Co., Ltd.
    - 05/2013 – approx. 2014
        - Irico Group, Party Secretary and Director (*retired*)

- Wang Ximin
  - 2007 – 09/2011
    - Irico Display, General Manager
  - 09/2011 – 09/2013
    - Irico Group, General Economist and General Manager of Shaanxi Branch (*retired*)

- Shen Xiaolin
  - 08/2004 – 11/2007
    - Irico Group, Sales Company, General Manager
  - 11/2007 – 01/2009
    - Irico Display, Assistant to General Manager and General Manager of Sales Department
  - 01/2009 – 09/2013
    - Irico Display, Deputy General Manager, and General Manager of Sales Department
  - 09/2013 – 10/2015
    - Zhuhai Caizhu Limited Company, Managing Director (*retired*)

- Liu Maihai
  - Title as of June 2008
    - Irico Group Electronics Co., Ltd., Sales Director
  - Irico has been unable to confirm employment information for Liu Maihai, other than his title in June 2008 when the 2008 Litigation Committee was formed (see Response to Issue No. 3). Irico believes that Liu Maihai left Irico within several years of the filing of the lawsuit.

- Liang Yuan
  - Title as of June 2008
    - Irico Group Electronics Co., Ltd., Head of Overseas Department and Assistant to the General Manager of the Marketing Department
  - Irico has been unable to confirm employment information for Liang Yuan, other than her title in June 2008 when the 2008 Litigation Committee was formed (see Response to Issue No. 3). Irico believes that Liang Yuan left Irico within several years of the filing of the lawsuit.

Irico has conducted a search for more detailed employment information for Liu Maihai and Liang Yuan, including a review of Irico's HR files, but has not been able to find information beyond that listed above. Likewise, Irico cannot confirm the exact date that Tao Kui retired from Irico but, based on the best recollection of its available employees, believes that it is around 2014.

As discussed below in Irico's Response to Issue No. 4, each of these employees also communicated with employees under their supervisions in an effort to identify and preserve documents related to potential Irico sales of CRTs to the United States, if any such records existed.

**ISSUE NO. 3**

State how Irico determined that the persons identified in Irico's response to No 2, above, were determined to be "key employees."

**RESPONSE TO ISSUE NO. 3**

The Irico employees identified in Irico's Response to Issue No. 2, above, were members of a group of Irico employees appointed to oversee Irico's response to the litigations in the above referenced action (the "2008 Litigation Committee") in June 2008. The other members of the committee were Gao Rongguo, Director, Corporate Management Department, Irico Group, and Yan Yunlong, Legal Affairs Manager, Corporate Management Department, Irico Group. The employees identified in Irico's Response to Issue No. 2 were those with managerial responsibility for the departments at Irico that Irico believed would have documents related to potential Irico sales of CRTs to the United States, if any such records existed. Each of these individuals then selected the employees under their supervision who might have information regarding Irico sales of CRTs to United States, if any.

**ISSUE NO. 4**

Explain how the 2008 "oral instruction" referred to in Irico's response to Interrogatory No 2 was conveyed; specifically, Irico is required to identify by name and position all persons who conveyed the "oral instruction," the dates each such person conveyed the "oral instruction," the persons by names and positions at the time to whom the "oral instruction" was conveyed, the offices, facilities or other locations at which the "oral instruction" was conveyed, the content of the "oral instruction" and all reasons upon which Irico contends the "oral instruction" was effective if Irico so contends.

**RESPONSE TO ISSUE NO. 4**

The 2008 Litigation Committee held a meeting in August 2008 at Irico Group's headquarters building in Xianyang City during which the instructions to preserve documents were discussed. The instructions were conveyed to the employees identified in Irico's Response to Interrogatory No. 2 at this and subsequent meetings. At that time Irico understood that, given the instant litigation arose under the antitrust laws of the United States, the focus of the litigation was

on sales of CRTs to the United States. The individuals identified in the Response to Issue No. 2 were tasked to search for documents and to identify other employees under their supervision and instruct them to search for documents that might relate to the Irico sales in the United States and to preserve such documents, if any existed. Irico believes that these efforts to search for and preserve documents would have occurred immediately after the above-referenced meetings of the 2008 Litigation Committee in August or September 2008.

Irico has conducted a thorough search for additional information requested by the Court in Issue No. 4 but has been unable to find additional information. Specifically, it cannot find documents detailing the specific information and its answers are based on the recollections of Yan Yunlong, the only remaining Irico employee with knowledge of the dissemination of the oral instruction in 2008. All of the members of the 2008 Litigation Committee other than Yan Yunlong have retired or otherwise departed the company.

Yan Yunlong recalls that the employees identified in the Response to Issue No. 2 contacted relevant employees and searched for documents, but that no documents relevant to the sales of CRTs by Irico to the United States were identified at that time. Despite best efforts, Irico has been unable to identify the specific individuals contacted by the employees identified in Response to Issue No. 2.

Irico believes that the oral instructions provided at the time were sufficient to preserve documents related to potential sales by Irico to the United States. Irico acknowledges that at the time it misunderstood the scope of document preservation in connection with the litigation in the United States and cannot be certain that all documents related to Irico's global sales of CRTs were preserved.

**ISSUE NO. 5**

Identify the information that confirms, or the basis to believe, that the "oral instruction" referred to in Irico's response to Interrogatory No 2 was adequate to prevent the destruction of evidence that otherwise would have been preserved in compliance with an otherwise adequate litigation hold.

**RESPONSE TO ISSUE NO. 5**

Irico does not contend that the oral instruction in 2008 was effective in preserving all documents related to its global sales of CRTs, however, because Irico did not sell CRTs to the United States, Irico's search at the time did not identify any documents concerning Irico's sales of CRTs to the United States and thus no documents on this topic were lost or destroyed.

**ISSUE NO. 6**

If the summer 2008 "oral instruction" referred to in Irico's response to Interrogatory No 2 had not been limited to "sales of CRT to the United States," but rather to sales of CRT without regard to location, identify all documents and information that otherwise would been preserved.

**RESPONSE TO ISSUE NO. 6**

Irico has made best efforts to identify specific documents and information that might have been preserved if the "oral instruction" in 2008 had not been limited to the United States. Nearly all of the employees knowledgeable about what types of documents related to Irico's sales of CRTs were created and/or maintained during the relevant time period are no longer employed by, and are not available to, Irico. Identifying such specific documents that existed in 2008 is nearly impossible given the time that has elapsed and the lack of employees with knowledge of these issues. As discussed, Irico regularly preserved documents and information in its archives pursuant to Chinese law and its internal practices so extensive information regarding Irico's global sales of CRTs was preserved regardless of the oral instruction provided in 2008. These categories of preserved documents are detailed in Irico's Response to Issue Nos. 7 and 11 and include several categories of documents related to sales of CRTs, including but not limited to accounting records, invoices, planning documents, some production and sales reports, and travel and entertainment reimbursements. In terms of documents that would not have been preserved in the archives, Irico identifies the following types of documents regarding Irico's global sales of CRTs that are more likely to have existed in the summer of 2008:

- Sales reports containing general CRT market information;
- CRT sales contracts with customers;
- Recent correspondence with customers regarding CRT sales; and,

- Handwritten working notes regarding recent internal and customer meetings attended by members of Irico's sales team.

Irico has not been able to verify that specific documents in these categories existed in summer of 2008. As noted above, there may have been other categories of documents that existed at the time of the oral litigation hold in 2008, but Irico cannot identify those documents at this time.

**ISSUE NO. 7**

Identify by type all documents and information related to sales of CRT without regard to location during the period 1997 to 2007 that were required to be preserved in accordance with applicable Chinese law.

**RESPONSE TO ISSUE NO. 7**

During the period 1997 to 2007 Chinese law required companies such as Irico to retain hard-copy documents that contained financial information derived from Irico's sales of CRTs such as accounting books, general ledgers, and financial accounting reports, however, the only documents directly related to sales of CRTs that were required to be maintained under Chinese law were original invoices for sales of CRTs.

**ISSUE NO. 8**

Identify by type all documents related to sales of CRT without regard to location during the period 1997 to 2007 that Irico generated, but was not required by Chinese authorities to preserve, and describe the information that such documents contained.

**RESPONSE TO ISSUE NO. 8**

Irico has attempted to locate information regarding the types of documents related to the sales of CRTs that Irico would have generated during the period 1997 to 2007 that were not required to be preserved by Chinese authorities. As discussed above, nearly all of the employees knowledgeable about what types of documents related to Irico's sales of CRTs were created and/or maintained during the period 1997 to 2007 are no longer employed by, and are not available to, Irico. Consistent with its retention practices, Irico believes that most of those documents would not have been retained in the ordinary course of business and were unlikely to

have existed at the end of 2007. Identifying such specific documents, let alone their contents, is nearly impossible given the time that has elapsed and the lack of employees with knowledge of these issues. The information found by Irico regarding regularly prepared materials is detailed below. Irico believes that it is likely that other categories of documents were generated but not retained due to changes in Irico's business over the course of the relevant time period. For example, Irico exited CDT production around 2002, and believes that it may not have retained materials related to the sales of CDTs through 2007. Additionally, Irico stopped production of various types of CPTs during the relevant time period, and re-deployed that space for other uses. Finally, there may have been periodic or "one off" materials prepared during this time period, but Irico is not aware of such materials today.

Sales reports containing general CRT market information

The sales department prepared weekly- and monthly-summaries of information collected by its employees. Irico has been unable to determine whether such reports were created during the period 1997 to 2004. The reports focused on Irico's customers, who were primarily Chinese television manufacturers. Both the weekly- and monthly-reports generally included information regarding customers, competitors and general market information. It is not clear how long those materials were kept after their creation, and Irico is unable to determine whether such materials would have existed at the time of the instruction to preserve.

CRT sales contracts with customers

Irico entered into sales contracts with some customers regarding its sales of CRTs. Some contracts pertained to general terms for sales to that customer, including post-sale issues such as shipping terms and procedures. Others pertained to specific transactions and included information such as product description, product quantity, unit price, and invoice total. Irico believes that it is unlikely that many of these documents existed at the end of 2007 because Irico exited CDT production around 2002, and stopped production of various types of CPTs during the relevant time period.

///

///

Correspondence with customers regarding CRT sales

Although Irico primarily communicated with customers face-to-face or over the phone, it believes that some communications with customers would have taken place via facsimile. The contents of these facsimiles varied but generally contained information related to a customer's purchase of CRTs that would be captured in the original sales invoice such as type, quantity, and price. Facsimiles were not required to be maintained under Chinese law and were routinely discarded in the ordinary course of Irico's business. Irico believes that it is unlikely that many of these documents existed at the end of 2007 because Irico exited CDT production around 2002 and stopped production of various types of CPTs during the relevant time period.

Handwritten working notes

Irico understands that individual employees may have taken handwritten notes while performing their job functions. Irico believes that these were regularly discarded by the employees during the course of their employment. For example, Wang Zhaojie and Wang Ximin regularly discarded such notes during the course of their employment but cannot recall any specifics regarding those instances. The notes most likely covered the employees' regular activities as members of Irico's sales department including notes of internal meetings, customer contacts, and customer meetings. Wang Zhaojie also recalls taking notes related to individual sales transactions (such as customer, quantity, and price) but discarded those notes shortly after the sales documents were prepared. Irico believes that it is unlikely that many of these notes existed at the end of 2007 because Irico exited CDT production around 2002, and stopped production of various types of CPTs during the relevant time period. Additionally, by 2008 many employees connected to Irico's sales were no longer employed by Irico, some of whom left much earlier in the relevant time period.

Emails

Although Irico did not begin to use email until toward the end of the relevant time period, many employees did not have their own email account at any time during the relevant time period, and the company did not rely on email as a primary form of communication during any point in the relevant time period. Irico is aware of emails sent or received on the following topics:

- Notices from Irico regarding corporate policies.

- Notices from the Chinese Communist Party.

- CRT manufacturing—Irico understands that its manufacturing plants sent periodic emails related to the production of CRTs that may have discussed the quantity of CRTs produced for a given time period, quality issues, and problems or incidents that affected the production output. Irico understands that these were not sent on a routine basis (i.e., daily, weekly, or monthly), but rather more sporadically because as an organization Irico made no effort to routinize its use of email in the regular course of business.

- Planning for Meetings of the China CPT Industry Association—Irico understands that emails were exchanged between Irico and other Chinese CRT manufacturers regarding the scheduling and planning of meetings of the China CPT Industry Association, a trade organization for manufacturers of CPTs.

As noted in its prior discovery responses, Irico's email storage capacity was very limited during the relevant time period, and each individual account had limited capacity as well. This meant that the users of the accounts had to constantly delete emails in order to continue receiving new emails. In addition to the account-level limitations, Irico's central email server likewise had limited email storage and Irico was forced to routinely delete emails from the server in order to create sufficient storage capacity for the company to continue to receive emails. During regular working periods emails were deleted from the server three to five days after they were sent or received on average, depending on the volume of email traffic. During periods of lower email activity, such as during Chinese holidays, emails would be deleted less frequently and it is possible that email for up to a fourteen day period would be retained on the company's return from the holiday before Irico needed to resume a more regular schedule as business activities returned to normal. For these reasons, and Irico's exit from many segments of the CRT market prior to 2008, Irico is not able to determine whether email created during the relevant time period existed at the end of 2007, or the volume or type of such email.

///

Sales Data

Irico did not utilize electronic databases to store information related to sales of CRTs in a systematic or routine manner, but between 1999 and 2002 Irico Group's finance department sporadically entered information utilizing a database software called Newgrand. Specifically, during those years Irico entered partial revenue information from its sales of CRTs. During the period April 2006 through end of the 2007, Irico Display's finance department utilized a database program called Kingdee to track revenue and other accounting data related to sales of CRTs. All of these Newgrand and Kingdee data were produced to Plaintiffs during FSIA discovery. Irico does not believe that either database was, or is, a complete dataset for the period of time that those data were entered, as electronic databases are not among the categories of information required to be maintained under Chinese accounting laws and therefore were not considered important sources of information to Irico. But Irico is not aware of any Newgrand or Kingdee data that existed from the time period 1997 to 2007 but has not been provided to Plaintiffs.

Corporate Archives

As described previously and in the below Response to Issue No. 11, Irico also preserved various documents in its archives pursuant to its internal practices, some of which also related to sales of CRTs, including but not limited to planning documents, financial reports and some production and sales reports, which have not been detailed here.

**ISSUE NO. 9**

With respect to the 2017 "oral instruction" referred to in Irico's response to Interrogatory No 2, Irico is required to identify by name and position all persons who conveyed the "oral instruction," the dates each such person conveyed the "oral instruction," the persons by names and positions at the time to whom the "oral instruction" was conveyed, the offices, facilities or other locations at which the "oral instruction" was conveyed, the content of the "oral instruction" and all reasons upon which Irico contends the "oral instruction" was effective if Irico so contends.

**RESPONSE TO ISSUE NO. 9**

The 2017 oral instruction was conveyed by Zhang Wenkai, Deputy Director, Legal Affairs Department for Irico Group. The oral instruction asked the employees to preserve all existing and

identified information related to Irico's CRTs from 1995 to 2007 (without a geographic limitation, i.e., not solely related to sales of CRTs to the United States), and to preserve any newly found materials. The instruction was conveyed in meetings or discussions that occurred in September and October 2017; Irico has reviewed its available files but has been unable to determine the exact dates of the meetings. Mr. Zhang separately communicated the oral instruction to the following employees:

- Zhong Yuming: Business Manager, Human Resources Department, Irico Group.
  - Mr. Zhang met with Mr. Zhong in person in the offices of the Human Resources Department located at Irico Group's headquarters, 1 Caihong Road, Qindu District, Xianyang City, Shaanxi Province, People's Republic of China.
- Yang Hua: Director, Finance Department, Irico Group.
  - Mr. Zhang met with Ms. Yang in person in the offices of the Finance Department located at Irico Group's headquarters, 1 Caihong Road, Qindu District, Xianyang City, Shaanxi Province, People's Republic of China.
- Wang Zhaojie: General Manager, Irico Group New Energy Co., Ltd. Formerly Mr. Wang was Director of Sales, Irico Sales Company and Irico Sales Department.
  - Mr. Zhang called Mr. Wang, who was not in his office at the time of the call. Mr. Zhang believes that Mr. Wang was traveling in Hefei, Anhui Province, People's Republic of China.
- Su Xiaohua: Vice General Manager of Xianyang Irico Photovoltaic Technology Company; Vice General Manager of Irico Photoelectric Materials Company. Formerly Mr. Su was the Vice General Manager, Planning, Irico Sales Company and Irico Sales Department.
  - Mr. Zhang and Mr. Su both recall that the instruction occurred during a phone call, but neither can recall where Mr. Su was at the time of the call. Mr. Su recalls that he was away from his office because his office was in Irico Group's headquarters building, as was Mr. Zhang's, and he would

have met directly with Mr. Zhang if he had been in the office.

- Li Mei: Head of Archives, Irico Group.
  - Mr. Zhang met with Ms. Li in person in the offices of the Archives Department, located in the Information Center building on Irico Group's main campus, 1 Caihong Road, Qindu District, Xianyang City, Shaanxi Province, People's Republic of China.
- Gao Xiangfeng: Director, Information Center, Irico Group.
  - Mr. Zhang met with Mr. Gao in person in the offices of the Information Center, located in the Information Center building on Irico Group's main campus, 1 Caihong Road, Qindu District, Xianyang City, Shaanxi Province, People's Republic of China.

The 2017 oral instruction was effective because the employees identified above were the remaining employees that Irico determined were likely to have access to, or were designated representatives of departments that maintained, documents from 1995 to 2007 that existed at the time that the instruction was communicated in September or October 2017. Furthermore, Irico is not aware of any potentially responsive documents from the time period 1995 to 2007 that were lost or destroyed after September 2017.

**ISSUE NO. 10**

Inasmuch as Irico's response to Interrogatory No 2 states that Irico is not aware of the destruction of "original invoices for sales, accounting books, general ledgers, financial accounting reports, and bank statements" from 1995 to 2007, Irico shall state whether it is prepared to produce all such materials to the PPs? If not, why not?

**RESPONSE TO ISSUE NO. 10**

By agreement between the parties, Irico has produced the identified, responsive materials from accounting books, general ledgers, financial reports, and bank statements, and will be producing Excel files summarizing the information contained in original invoices for sales pursuant to a forthcoming stipulation between the parties.

As Irico has previously explained to the Court and to Plaintiffs, Irico's accounting

archives as described in its Response to Interrogatory No. 2 are voluminous and contain significant amounts of information unrelated to its production or sales of CRTs, including information related to the public functions entrusted to Irico by the Chinese government, including the provision of primary and secondary public schools, the local police department, a hospital, public transportation, and public recreational facilities (*see* Irico Group Corp.'s Mot. to Dismiss for Lack of Subject Matter Jur. at 5, ECF No. 5312), and other non-CRT business interests. Irico and Plaintiffs have been meeting and conferring throughout the discovery period regarding these documents regarding the burden of production outweighing the benefits of producing all of these materials, including for Plaintiffs as said production would require Plaintiffs to review and analyze a large volume of non-responsive information. As discussed above, the Parties have agreed on the scope of production of these materials.

**ISSUE NO. 11**

Irico is directed to describe its "internal practices" for the maintenance of "material related to operational documents, administrative documents, technical records and communications with agencies of the PRC government and Chinese Communist Party."

**RESPONSE TO ISSUE NO. 11**

As discussed in more detail below and previously described in its initial response to Interrogatory No. 2, Irico preserves documents within its corporate archives related to four main categories: operational documents, administrative documents, technical records and communications with agencies of the PRC government and Chinese Communist Party. Documents preserved in these categories apply not only to the portion of Irico's business concerning production and sales of CRTs, but also those related to the public functions entrusted to Irico by the Chinese government, including the provision of primary and secondary public schools, the local police department, a hospital, public transportation, and public recreational facilities (*see* Irico Group Corp.'s Mot. to Dismiss for Lack of Subject Matter Jur. at 5, ECF No. 5312), and also other non-CRT business interests. Once a document is passed to the archives department of Irico, a member of the archives team enters the document into the archives. The documents are physically placed into bound-books, or into folders within bound books, and the

books are stored in the archives department at Irico's headquarters. Once placed in the archives, the documents may not be damaged or destroyed without specific authorization.

Within each of the four categories described above, Irico maintains the following types of documents in its corporate archives:

- Operational documents:
  - Documents related to business decisions, including:
    - Strategic planning and long-term forecasting.
    - Development plans.
    - Work plans.
    - Changes in management.
    - Communications to or from government agencies regarding the above topics.
  - Documents related to accounting and finance, including:
    - Financial reports.
    - Financial planning.
    - Audited financial statements.
    - Loan applications.
    - Accounting policies.
    - Transfers of financial interests in other companies.
    - Communications to or from government agencies regarding any of the above topics.
  - Annual production and sales reports from 1995 to 2004.
  - Status reports for procurement of raw materials.
  - Communications to or from governmental entities regarding enterprise decisions.
  - Adjustments to corporate form, including subsidiaries.
- Administrative documents:
  - Documents related to administrative matters, including:

- Year-end summaries of work completed in the prior year.
        - Work plans for the coming year.
        - Award notices.
        - The minutes of annual administrative meetings and board of directors' meetings.
        - Requests for approval of corporate development initiatives, changes to corporate form, and capital expenditures.
        - Decisions on requests for approval of corporate development initiatives, changes to corporate form, and capital expenditures by governmental entities, including the State-owned Assets Supervision and Administrative Commission of the State Council (SASAC), and the Shaanxi provincial government.
    - Documents related to HR matters, including:
        - Notices of the appointment to, or removal from, positions issued by various departments within the Chinese government including the Department of Personnel and Education, the Ministry of Information and Industry, the Economy and Trade Commission.
        - Notices of the appointment to, or removal from, positions issued by Shaanxi provincial authorities.
        - Notices of the appointment to, or removal from, positions issued by the government of the city of Xianyang.
        - Notices of the appointment to, or removal from, positions issued by Irico.
        - Policies issued by Irico and its subdivisions regarding HR matters.
    - Documents related to Irico's provision of educational facilities.
    - Documents related to environmental issues.
- Technical records:
    - Quality management.

- Labor-related matters.
- Energy-related matters.
- Production security.
- Technology.
- Environmental protection.
- Metering work.
- Standardization.
- File information.

- Chinese Communist Party-related matters:
  - Meeting minutes and plans of the Party.
  - Administrative matters.
  - Public relations matters.
  - Discipline and inspection matters.
  - Labor union matters.
  - Communist Youth League matters.
  - Association matters.

**INTERROGATORY NO. 4**

State when and how You first learned of potential anticompetitive conduct concerning the pricing of Cathode Ray Tubes.

**RESPONSE TO INTERROGATORY NO. 4**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects to the undefined terms "potential," "concerning" and "pricing" as they render the interrogatory vague and ambiguous. Irico also objects to the undefined term "anticompetitive conduct" on the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overbroad.

Subject to and without waiving the objections stated above, Irico responds that it first learned of the allegations in Plaintiff's Complaint on December 25, 2007, when it received a summons from the United States District Court for the Northern District of California in the matter

*Figone v. L.G. Electronics, Inc.*, 07-cv-6381.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4**

Pursuant to the Special Master's December 22, 2021 Order Re DPPs' Motion to Compel Interrogatory Further Answers, ECF No. 5978, the Court has ordered Irico to respond to the following request:

> State when Irico had reason to believe that manufacturers or distributors of CRT had at any time after 1997 communicated with one another about prices or output of CRT and how Irico came to this belief.

Subject to and without waiving any of the objections as stated in its original response, Irico is not aware of any evidence or testimony that Irico learned of competitor communmications discussing prices or output of CRTs prior to August 1998. Irico further responds that one of its employees may have learned of competitor communications regarding pricing of CRTs in early-August 1998. The documents of an alleged co-conspirator, Chunghwa Picture Tubes, indicate that Irico was invited to participate in a meeting with other manufacturers of CDTs on August 5, 1998 in Shenzhen, People's Republic of China. Irico has not been able to determine its employees' actual knowledge or understanding of the communications at that meeting, or the extent to which they may have involved communications about prices or output of CRTs, because the Irico employee who was alleged to have attended the August 5 meeting (again, based on a document produced by Chunghwa Picture Tubes), Wang Zhaojie does not remember attending the meeting or any details of the meeting. All other known employees of the Sales Company from that time period are no longer employed by, and no longer available to, Irico.

Dated: January 21, 2022                                     BAKER BOTTS L.L.P.

                                                            */s/ John M. Taladay*

                                                            John M. Taladay (*pro hac vice*)
                                                            Evan J. Werbel (*pro hac vice*)

Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
       tom.carter@bakerbotts.com
       drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

**CERTIFICATE OF SERVICE**

**In re: Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917**

I declare that I am employed in Washington, District of Columbia. I am over the age of eighteen years and not a party to the within case; my business address is: Baker Botts L.L.P., 700 K Street, N.W., Washington, D.C. 20001.

On January 21, 2022, I served the following document(s) described as:

**IRICO DEFENDANTS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO INDIRECT PURCHASER PLAINTIFFS' THIRD SET OF INTERROGATORIES TO IRICO GROUP CORPORATION AND IRICO DISPLAY DEVICES CO., LTD.**

on the following interested parties in this action:

R. Alexander Saveri (rick@saveri.com)
Geoffrey C. Rushing (grushing@saveri.com)
Matthew D. Heaphy (mheaphy@saveri.com)
SAVERI & SAVERI, INC.
706 Sansome St # 200
San Francisco, CA 94111

*Lead Counsel for the Direct Purchaser Plaintiffs*

Mario N. Alioto (malioto@tatp.com)
Lauren C. Capurro (laurenrussell@tatp.com)
TRUMP ALIOTO TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123

*Lead Counsel for the Indirect Purchaser Plaintiffs*

Dan Birkhaeuser
(dbirkhaeuser@bramsonplutzik.com)
BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
2125 Oak Grove Rd, Suite 125
Walnut Creek, CA 94598

*Counsel for the Indirect Purchaser Plaintiffs*

[X] (BY ELECTRONIC MAIL) I caused such documents to be sent to the persons at the email addressed listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 21, 2022, in Rockville, Maryland.

*/s/ Andrew L. Lucarelli*
Andrew L. Lucarelli

# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

IN RE: CATHODE RAY TUBE (CRT) ) MASTER FILE NO.
ANTITRUST LITIGATION ) CV-07-5944 JST
_______________________________)
)
THIS DOCUMENT RELATES TO: )
)
ALL INDIRECT PURCHASER ACTIONS )
ALL DIRECT PURCHASER ACTIONS )
)
DEFENDANTS. )
_______________________________)

VIDEOTAPED DEPOSITION OF YAN YUNLONG
VOLUME II
WEDNESDAY, SEPTEMBER 28, 2022
MACAU S.A.R., CHINA

FILE NO. SF 5436476
REPORTED BY MARK McCLURE, CRR
CAL CSR 12203

VIDEOTAPED DEPOSITION OF YAN YUNLONG, VOLUME II, TAKEN AT 8:06 A.M., CHINA STANDARD TIME, WEDNESDAY, SEPTEMBER 28, 2022, MACAU S.A.R., CHINA, VIA VERITEXT REMOTE TECHNOLOGY, BEFORE MARK McCLURE, C.S.R. #12203, CERTIFIED SHORTHAND REPORTER IN AND FOR THE STATE OF CALIFORNIA.

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFFS, ALL INDIRECT PURCHASERS:

(APPEARING BY VIDEOCONFERENCE)
TRUMP, ALIOTO, TRUMP & PRESCOTT
BY: LAUREN CAPURRO, ESQ.
120 HOLSTROM CIRCLE
NOVATO, CALIFORNIA 94947-2072
415.860.5051
LAURENRUSSELL@TATP.COM

(APPEARING BY VIDEOCONFERENCE)
BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER
BY: DANIEL BIRKHAEUSER, ESQ.
2125 OAK GROVE ROAD, SUITE 125
WALNUT CREEK, CALIFORNIA 94598-2534
925.945.0200
DBIRKHAEUSER@BRAMSONPLUTZIK.COM

FOR THE PLAINTIFFS, ALL DIRECT PURCHASERS:

(APPEARING BY VIDEOCONFERENCE)
SAVERI & SAVERI
BY: RICK SAVERI, ESQ.
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
415.217.6810
RICK@SAVERI.COM

APPEARANCES OF COUNSEL: CONTINUING

(APPEARING BY VIDEOCONFERENCE)
SAVERI & SAVERI
BY: DAVID HWU, ESQ.
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
415.217.6810
DHWU@SAVERI.COM

FOR THE PLAINTIFFS, ALL DIRECT PURCHASERS:

(APPEARING BY VIDEOCONFERENCE)
SAVERI & SAVERI
BY: MATTHEW HEAPHY, ESQ.
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
415.217.6810
MHEAPHY@SAVERI.COM

(APPEARING BY VIDEOCONFERENCE)
SAVERI & SAVERI
BY: GEOFFREY C. RUSHING, ESQ.
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
415.217.6810
GRUSHING@SAVERI.COM

FOR THE DEFENDANTS, IRICO, AND THE WITNESS, YAN YUNLONG:

(APPEARING BY VIDEOCONFERENCE)
BAKER BOTTS, LLP
BY: THOMAS E. CARTER, ESQ.
700 K STREET NW
WASHINGTON, DC 20001
202.639.7909
TOM.CARTER@BAKERBOTTS.COM

(APPEARING BY VIDEOCONFERENCE)
BAKER BOTTS, LLP
BY: EVAN WERBEL, ESQ.
700 K STREET NW
WASHINGTON, DC 20001
202.639.1323
EVAN.WERBEL@BAKERBOTTS.COM

APPEARANCES OF COUNSEL: CONTINUING

FOR THE DEFENDANTS, IRICO, AND THE WITNESS, YAN YUNLONG:

(APPEARING BY VIDEOCONFERENCE)
NORTON ROSE FULBRIGHT U.S., LLP
BY: KAYLEE YANG, ESQ.
555 CALIFORNIA STREET, SUITE 3300
SAN FRANCISCO, CALIFORNIA 94104
628.231.6827
KAYLEE.YANG@NORTONROSEFULBRIGHT.COM

ALSO PRESENT:

AMANDA LIN, MAIN INTERPRETER

JOHN MACDONELL, VIDEOGRAPHER

WEDNESDAY, SEPTEMBER 28, 2022, 8:06 A.M.

08:06

THE VIDEOGRAPHER: We're on the record. 08:06

It's 8:06 a.m., China time, on September 28, 2022. 08:07

This is the deposition of Yan Yunlong, Volume II. We're here in the CRT Antitrust Litigation. 08:07

I'm John McDonell, the videographer with Veritext. Before the court reporter swears the witness -- or actually, I'll hand it to the reporter now to deal with the instructions. 08:07

AMANDA LIN, KAYLEE YANG and DAVID HWU
were sworn to interpret the Chinese language.

YAN YUNLONG,
having been sworn, was examined
and testified as follows:

THE VIDEOGRAPHER: Would you like to begin with appearances? 08:08

MR. BIRKHAEUSER: For the plaintiffs, my name is Dan Birkhaeuser. I'm with Bramson, Plutzik & Birkhaeuser, and I represent the Indirect Purchaser plaintiffs in this case. 08:08

MS. CAPURRO: Lauren Capurro, of Trump, Alioto, Trump & Prescott, and I also represent the Indirect Purchaser plaintiffs. 08:09 08:09 08:09

MR. SAVERI: My name is Rick Saveri, and I represent the Direct Purchaser plaintiffs. 08:09 08:09

THE WITNESS: Okay, good morning. 08:09

MR. RUSHING: Good morning, Mr. Yan. 08:09

My name is Geoff Rushing. I represent the Direct Purchaser plaintiffs with the other attorneys in the room. 08:09 08:09 08:10

THE WITNESS: Good morning. 08:10

MR. HEAPHY: This is Matthew Heaphy for Direct Purchaser plaintiffs. Good morning. 08:10 08:10

THE WITNESS: Good morning. 08:10

MR. HWU: This is David Hwu, also on behalf of the Direct Purchaser plaintiffs. 08:10 08:10

THE WITNESS: Good morning. 08:10

MR. CARTER: Good morning, Mr. Yan. I'm Tom Carter, with Baker Botts, LLP, representing the Irico defendants and the witness. 08:10 08:10 08:10

THE WITNESS: Good morning. 08:11

MR. WERBEL: Good morning. This is Evan Werbel, also on behalf Baker Botts, for the defendants. 08:11 08:11

MS. YANG: Good morning, Mr. Yan. I'm Kaylee Yang, from Norton Rose Fulbright, and I represent the 08:11 08:11

Irico defendants and the witness. 08:12

THE WITNESS: Good morning. 08:12

08:12

EXAMINATION 08:12

BY MR. BIRKHAEUSER: 08:12

Q. Mr. Yan, during yesterday's deposition, you told me about a document that was prepared by the litigation group, and I asked you to produce it today at the deposition. 08:12

Do you have that document? 08:12

A. No, that's my personal, private document. I will not be able to look into it and check it until I return to Xianyang. 08:13

Q. Did you ask anyone to look for it? 08:13

A. It's not proper to do so. 08:13

Q. So the answer is "no"? 08:13

A. Correct. 08:13

MR. CARTER: Dan, we have an update on that document if you want to get it at some point. 08:13

BY MR. BIRKHAEUSER: 08:13

Q. I want to bring you back in time to 2007 and mid-2008 when Irico was forming the litigation group. 08:14

And I want to ask you whether -- during that time frame, did Irico create any backup tapes of its computer system? 08:14

A. I do not know. 08:14

Q. Did Irico, in 2008, create a mirror image of its computer system? 08:14 08:15

A. I don't know. 08:15

Q. Did you instruct Irico to create a mirror image of its computer system in 2008? 08:15 08:15

A. No. 08:15

Q. Did the litigation committee instruct Irico to create a mirror image of its computer system? 08:15 08:15

A. I do not recall clearly. 08:15

Q. What's your best memory, as you sit here today? 08:16 08:16

A. I'm trying very hard to try to remember, so whatever I can recall, I would definitely tell you. 08:16 08:16

Q. As you sit here today, you do not recall instructing -- strike that. 08:16 08:16

As you sit here today, you do not recall the litigation committee instructing Irico to create a mirror image of its computer system, is that true? 08:16 08:16 08:16

A. Correct. 08:16

Q. As you sit here today, you do not recall anyone instructing Irico, in 2008, to create any backup of Irico's computer system, is that correct? 08:17 08:17 08:17

A. I do not remember that clearly. 08:17

Q. As you sit here today, it's your best 08:17

recollection that Irico did not create any backup tapes of its computer system in 2008, is that correct? 08:17 08:17

A. I do not recall. 08:17

Q. Did Irico query its computer system in 2008 to discover whether any documents existed that are relevant to this litigation? 08:18 08:18 08:18

MR. CARTER: Object to form. 08:18

THE WITNESS: I do not recall clearly. 08:18

BY MR. BIRKHAEUSER: 08:18

Q. Do you recall instructing Irico to query its computer system in 2008 to discover any relevant documents to this litigation? 08:18 08:19 08:19

MR. CARTER: Object to form. 08:19

THE WITNESS: I do not recall. 08:19

BY MR. BIRKHAEUSER: 08:19

Q. Do you recall the litigation committee instructing Irico to query its computer system to discover any documents that are relevant to this litigation in 2008? 08:19 08:19 08:19 08:19

MR. CARTER: Object to form. 08:19

THE WITNESS: I do not recall these details. 08:20

BY MR. BIRKHAEUSER: 08:20

Q. Did Irico create any catalog of documents that were created after 2008 relating to this lawsuit? 08:20 08:20

MR. CARTER: Object to form. 08:20

THE WITNESS: No. 08:20

BY MR. BIRKHAEUSER: 08:20

Q. Did Irico create any backup tapes in the year 08:20 2017 of its computer system? 08:21

A. We would definitely have backups of the 08:21 information that resides in our computer system. For 08:21 example, the financial information, we would have backup 08:21 of that information, but we would not have backups for 08:21 the information that does not exist in our computer 08:22 system. 08:22

Q. Did Irico ever take a mirror image of its 08:22 computer system in the year 2017? 08:22

MR. CARTER: Object to form. 08:22

THE WITNESS: I'm not an expert on computers. 08:22 Regarding the data in our computer system, I remember 08:23 the plaintiffs have served us the interrogatory 08:23 questions and we consulted the IT person in charge, as 08:23 well as our IT engineers to ask for the details, and 08:23 they have responded, and as for the details of the 08:23 content of the responses, I do not recall clearly. 08:23

BY MR. BIRKHAEUSER: 08:23

Q. My question is whether Irico took a mirror 08:23 image of its computer system in the year 2017? 08:23

MR. CARTER: Object to form. 08:23

THE WITNESS: I am not clear about that. 08:23

BY MR. BIRKHAEUSER: 08:23

Q. Did you ever instruct Irico to take a mirror image of Irico's computer system in the year 2017? 08:23 08:24

MR. CARTER: Object to form. 08:24

THE WITNESS: No. 08:24

BY MR. BIRKHAEUSER: 08:24

Q. To your knowledge, did anyone else ever instruct Irico to take a mirror image of its computer system in the year 2017? 08:24 08:24 08:24

MR. CARTER: Object to form. 08:24

THE WITNESS: I'm not clear about that. 08:24

BY MR. BIRKHAEUSER: 08:24

Q. To your knowledge, did anyone ever instruct Irico to take a mirror image of its computer system in the year 2017? 08:24 08:24 08:24

MR. CARTER: Object to form. 08:24

THE WITNESS: I do not know. 08:25

BY MR. BIRKHAEUSER: 08:25

Q. You're not aware of anyone else instructing Irico to take a mirror image of its computer system in the year 2017, is that correct? 08:25 08:25 08:25

A. I'm not clear about that. 08:25

Q. Did Irico ever query its computer system in the year 2017 to discover information that may be relevant to this action? 08:25 08:25 08:25

MR. CARTER: Form. 08:25

THE WITNESS: Based on what I know, I am aware that at least queries have been made into our computer system for financial information. 08:26

BY MR. BIRKHAEUSER: 08:26

Q. My question related to data that may be relevant to this case, and my question is whether you ever instructed Irico to query its computer system in the year 2017 to discover information that may be relevant to this case? 08:26

MR. CARTER: Object to form. 08:27

THE WITNESS: We did look for the information. 08:27

BY MR. BIRKHAEUSER: 08:27

Q. I'm going to ask one more time. 08:27

Did you ever instruct Irico to query its computer system in the year 2017 to discover information that may be relevant to this case? 08:27

MR. CARTER: Object to form. 08:27

THE WITNESS: I personally did not. 08:28

BY MR. BIRKHAEUSER: 08:28

Q. Are you aware of anybody else instructing Irico to query its computer system in 2017 to discover information that may be relevant to this case? 08:28

MR. CARTER: Object to form. 08:28

THE WITNESS: I do not recall clearly. 08:29

BY MR. BIRKHAEUSER: 08:29

Q. As you sit here today, you cannot give me the name of anyone, besides yourself -- strike that. 08:29

As you sit here today, you cannot give me the name of anyone that queried Irico's computer system in 2017 to discover information that may be relevant to this case? 08:29

MR. CARTER: Object to form. 08:29

THE WITNESS: That's correct. 08:30

THE VIDEOGRAPHER: Mr. Birkhaeuser, would you like to take a quick breather to fix that echo problem? 08:30

MR. BIRKHAEUSER: I think we should go off the record. 08:30

THE VIDEOGRAPHER: Thank you. 08:30

We're off the record. It's 8:29 a.m. 08:30

(Discussion off the record.) 08:30

THE VIDEOGRAPHER: We are back on the record. It's 8:34 a.m. 08:34

BY MR. BIRKHAEUSER: 08:34

Q. Mr. Yan, in 2007, did Irico's computer system have an auto-delete function? 08:35

MR. CARTER: Object to form. 08:35

THE WITNESS: I do not know. 08:35

BY MR. BIRKHAEUSER: 08:35

Q. And I think I asked that question poorly so 08:35

let me try again. 08:35

In 2007, did Irico's email system have an auto-delete function? 08:35

MR. CARTER: Object to form. 08:35

THE WITNESS: I don't know. 08:35

BY MR. BIRKHAEUSER: 08:35

Q. All right. Did Irico instruct IT in either 2007 or 2008 to turn off any auto-delete function of its email system? 08:35 08:36

MR. CARTER: Object to form. 08:36

THE WITNESS: I don't know. 08:36

BY MR. BIRKHAEUSER: 08:36

Q. Are you aware of any instruction given to Irico's IT employees to turn off any auto delete function on Irico's email system in 2007 and 2008? 08:36

MR. CARTER: Object to form. 08:36

THE WITNESS: I'm not aware of that. 08:37

BY MR. BIRKHAEUSER: 08:37

Q. Are you aware of any such instruction given Irico's IT employees in 2017 to turn off any auto-delete function? 08:37

MR. CARTER: Object to form. 08:37

THE WITNESS: I'm not aware of that. 08:37

BY MR. BIRKHAEUSER: 08:37

Q. If you look in today's Marked Exhibits folder, 08:37

you will see that I have marked Exhibit 8607. 08:37

I would ask you to review Exhibit 8607, and please let me know when you're done. 08:38 08:38

A. My computer just got disconnected from the network so I'm trying to reconnect. 08:38 08:38

MR. BIRKHAEUSER: Could we take a quick break? 08:38

THE WITNESS: Okay, it's working now. 08:38

BY MR. BIRKHAEUSER: 08:38

Q. Excellent. 08:38

Are you able to view Exhibit 8607? 08:38

A. Let me refresh my screen. 08:39

MAIN INTERPRETER: The witness has it. 08:39

THE WITNESS: It's in a very small font and I can't read it clearly. 08:39 08:39

BY MR. BIRKHAEUSER: 08:39

Q. Do you see the magnifying glass in the top left corner of the document? 08:39 08:39

Would you please press that until it's as large as you desire. 08:40 08:40

A. Okay. 08:40

Q. My question to you is: Do you recognize Exhibit 8607? 08:40 08:40

A. I do not recall clearly. 08:40

Q. Okay. Let me represent to you that this is a document that was provided to plaintiffs in this 08:40 08:40

litigation purporting to be a list of documents Irico is withholding from production based on the attorney-client privilege. 08:40 08:40 08:40

A. Got it. 08:41

Q. Did you assist Irico's lawyers in preparing a list of documents upon which Irico was claiming the attorney-client privilege? 08:41 08:41 08:41

A. What time frame are we talking about? 08:41

Q. The dates -- what time frame was this document prepared? Was that your question? 08:42 08:42

I believe this document was prepared within the last year. 08:42 08:42

A. I do not recall clearly. 08:42

Q. Do you recall searching Irico's files to remove documents reflecting communications with Irico's lawyers so that they would not be produced to plaintiffs in this litigation? 08:42 08:42 08:43 08:43

MR. CARTER: Object to form. 08:43

THE WITNESS: I do not recall clearly. 08:43

BY MR. BIRKHAEUSER: 08:43

Q. Do you have any memory whatsoever? 08:43

A. No. 08:43

Q. Do you see the first entry in which your name occurs? 08:43 08:43

It is four rows from the top. 08:43

A. Yes. 08:44

Q. Who is Mr. Joseph Chan? 08:44

A. I do not know this person. 08:44

Q. Do you know whether Mr. Joseph Chan is an attorney at the Pillsbury law firm? 08:44

A. I do not remember if he was this person. 08:44

MR. BIRKHAEUSER: Would any of Irico's current counsel like to make a representation to the witness? 08:44

Hearing no such -- 08:45

MR. CARTER: Dan, that's my understanding, is that Joseph was one of the Pillsbury attorneys. 08:45

THE WITNESS: Then it should be that person that's reflected in the document that I remember. 08:45

BY MR. BIRKHAEUSER: 08:45

Q. Do you remember meeting someone named Joseph Chan from Pillsbury approximately two months after Irico was served with the complaint in this case? 08:45

A. I have a very poor ability identifying and remembering English names, but if I am given a Chinese name, then I will be able to clearly remember that I did, in fact, meet an attorney whose last name was Chan, C-h-a-n, and that person was a Chinese person. 08:46

Q. When did you meet a Chinese lawyer named Chan? 08:46

A. I do not remember when. 08:47

Q. Do you recall receiving an email from someone 08:47

named Joseph Chan on or about February 15th, 2008? 08:47

A. I do not remember this clearly, but for any emails that I have exchanged with someone whose last name is Chan, they are all in the hard drive that I had previously, and I turned it all over to our attorneys. 08:47 08:47 08:48 08:48

Q. Let me read to you the description of the email that appears in English on Exhibit 8607. 08:48 08:48

A. Okay. 08:48

Q. It says: "Email thread prepared in the course of litigation and containing legal advice from counsel regarding CRT litigation status and strategy." 08:48 08:48 08:48

After my reading of that description of the email, does that refresh your recollection as to the contents of this email from Joseph Chan? 08:49 08:49 08:49

MR. CARTER: Objection. Potentially calls for attorney-client privileged information. 08:49 08:49

Instruct the witness that he can answer but not to reveal any legal advice or litigation strategy beyond the description contained on this document. 08:49 08:49 08:49

THE WITNESS: I do not remember clearly. It has been a long time. 08:50 08:50

BY MR. BIRKHAEUSER: 08:50

Q. Okay. It was not my question whether you remember clearly. 08:50 08:50

I want to ask you if the description of this 08:50

document refreshes your recollection in any way about its contents. 08:50 08:50

MR. CARTER: Objection. Same instruction to the witness. 08:50 08:50

THE WITNESS: I do not recall clearly. 08:51

BY MR. BIRKHAEUSER: 08:51

Q. Do you have any recollection of the contents of this document, email from Mr. Chan? 08:51 08:51

MR. CARTER: Same objection. Same instruction. 08:51 08:51

THE WITNESS: It has been a very long time. I truly do not recall. 08:51 08:51

BY MR. BIRKHAEUSER: 08:51

Q. Okay. The next document I want to show you is, I believe, the next entry that has your name as an addressee, and it is identified as P, a whole bunch of zeros, and the number 7. 08:51 08:51 08:51 08:52

A. I see it. 08:52

Q. Do you recall receiving on or about August 18th an email from Mr. Kevin Hee? 08:52 08:52

A. I do not remember clearly. 08:52

Q. The description of that email is an "Email prepared in the course of litigation and containing legal advice from counsel Joseph Tiffany regarding document preservation." 08:53 08:53 08:53 08:53

Does that refresh your recollection as to the contents of the email that's been identified as P, many zeros, and a seven? 08:53

MR. CARTER: Objection. Potentially calls for attorney-client privileged information. Instruct he can answer the question but not to reveal the substance of any legal advice. 08:54

THE WITNESS: I do not remember. 08:54

BY MR. BIRKHAEUSER: 08:54

Q. Do you know who Kevin Hee is? 08:54

A. I do not know this person. I do not remember. 08:54

Q. Do you know who Joseph Tiffany is? 08:54

A. I believe this refers to Mr. Chan that was referenced in the previous row. 08:54

Q. Do you know a Kevin Hee? 08:54

A. The spelling of this last name, C-h-a-n, is a little off. 08:55

Q. Do you know a Kevin Hee? 08:55

A. No. 08:55

Q. So this email we've been discussing purports to attach a memorandum, and it says a "Memorandum prepared in the course of litigation and containing legal advice from counsel Joseph Tiffany regarding document preservation." 08:55

My question to you is: Do you have any 08:55

of a certain kind of CRT would be produced? 11:16

A. No. 11:16

Q. Did you have any information or involvement in decisions to shut down production of certain types of CRTs? 11:16

MR. CARTER: Form. 11:16

THE WITNESS: No. 11:17

BY MR. RUSHING: 11:17

Q. And did you have any knowledge or involvement in the sales activity for CRTs at that time? 11:17

MR. CARTER: Object to form. 11:17

THE WITNESS: I did not have knowledge. 11:17

BY MR. RUSHING: 11:17

Q. Did you have any knowledge or involvement between March 2001 to November 2003 of any meetings that Irico personnel were having with Irico's competitors about CRTs? 11:17

MR. CARTER: Object to form. 11:17

THE WITNESS: I did not have knowledge. 11:18

BY MR. RUSHING: 11:18

Q. Did you have any knowledge or involvement between March 2001 to November 2003 of any of the considerations that went into the pricing of any CRTs sold by Group or Display? 11:18

MR. CARTER: Object to form. 11:18

THE WITNESS: I did not know about that. 11:18

BY MR. RUSHING: 11:18

Q. And then after that, you went to work on the Chang An project from November of 2003 through September of 2004, is that correct? 11:19

A. Yes. 11:19

Q. And during that time, did you have any knowledge or involvement in decisions regarding the production of CRTs by Group? 11:19

MR. CARTER: Object to form. 11:19

THE WITNESS: I did not know about that. 11:19

BY MR. RUSHING: 11:19

Q. And during that time while you were working on the Chang An project from November 2003 through September of 2004, did you have any knowledge or involvement of the decisions relating to the sales, marketing or pricing of CRTs by Group? 11:20

MR. CARTER: Object to form. 11:20

THE WITNESS: I did not have knowledge and I was not involved. 11:20

BY MR. RUSHING: 11:20

Q. Okay. I want to jump now to the time -- or when you were involved on the litigation task force, I guess, beginning in 2007. 11:21

MR. CARTER: Object to form. 11:21

BY MR. RUSHING: 11:21

Q. I believe you testified that you were involved in the retention -- in the decision to retain the law firm of -- strike that. 11:21 11:21 11:21

I believe you testified that you were involved in the decision to retain the Pillsbury law firm in this matter, is that correct? 11:21 11:21 11:21

MR. CARTER: Object to form. 11:21

THE WITNESS: I was not involved in the decision-making process or the decision. I was aware of this and I was involved in the process, but I did not have a say in the final decision. 11:22 11:22 11:22 11:22

BY MR. RUSHING: 11:22

Q. Did there come a time when the Pillsbury law firm -- strike that. 11:22 11:22

Did there come a time when Group dismissed the Pillsbury law firm? 11:22 11:22

MR. CARTER: Object to form. 11:22

THE WITNESS: Yes. 11:22

BY MR. RUSHING: 11:22

Q. And when was that? 11:22

A. I do not recall clearly. 11:22

Q. What's your best recollection? 11:23

A. It was probably around the second half of 2008. 11:23 11:23

Q. And was that the same -- strike that. 11:23

And did Irico make a decision at the same time to withdraw from participating in this litigation? 11:23 11:23

MR. CARTER: Objection. Calls for potentially attorney-client privileged information. I instruct the witness that he can answer but not to reveal any privileged discussions regarding any legal advice or litigation strategy. 11:23 11:24 11:24 11:24 11:24

THE WITNESS: To put it more precisely, we were waiting. 11:24 11:24

BY MR. RUSHING: 11:24

Q. So you're saying Irico did not -- strike that. 11:25

Are you saying that Irico did not withdraw from the litigation? 11:25 11:25

A. That's correct. 11:25

Q. But Irico stopped participating in the litigation at that time, correct? 11:25 11:25

A. I said earlier that Irico was waiting for the plaintiff -- or plaintiffs to file a separate lawsuit against just Irico. Then we will make corresponding responses. 11:25 11:26 11:26 11:26

Q. Do you recall that, at that time, the plaintiffs had served discovery on Irico? 11:26 11:26

Strike that. 11:26

Do you recall that at the time Irico stopped 11:26

participating -- strike that. 11:27

Do you recall that at the time Irico dismissed the Pillsbury law firm that discovery had been propounded on Irico? 11:27 11:27 11:27

MR. CARTER: Object to form. 11:27

THE WITNESS: I don't remember that. 11:27

BY MR. RUSHING: 11:27

Q. I want to go back to the -- you said yesterday that you prepared a meeting minute relating to the task force on litigation in 2007, is that correct? 11:27 11:28 11:28

MR. CARTER: Object to form. 11:28

THE WITNESS: My memory is not that clear. The meeting minute that I discussed yesterday, the name of it was not very precise. Too much time has elapsed since then so it created great difficulty on me on trying to remember the details. I could only talk about my general recollection. 11:28 11:28 11:29 11:29 11:29 11:29

BY MR. RUSHING: 11:29

Q. What was the name of the document? 11:29

A. I do not recall clearly. 11:29

Q. Did it have a name? 11:29

A. Yes. 11:29

Q. What's your best recollection of the name? 11:29

A. I don't recall the name clearly, but I believe it should say something like a personal recommendation 11:30 11:30

to the litigation working group, matters related to the CRT antitrust litigation, something like that. 11:30 11:30

Q. And was it a handwritten document? 11:30

A. I don't recall clearly, but I think it was drafted on a computer. 11:31 11:31

Q. And you drafted it, is that correct? 11:31

A. Yes. 11:31

Q. Did you draft it on an Irico computer? 11:31

A. It was -- it was on my own computer that was issued to me by the company. 11:31 11:31

Q. And was that computer part -- was that computer -- strike that. 11:31 11:31

Was the computer on which you drafted the document part of the Irico network? 11:31 11:31

MR. CARTER: Object to form. 11:31

THE WITNESS: No. 11:32

BY MR. RUSHING: 11:32

Q. Your computer was not connected to any other computers? 11:32 11:32

MR. CARTER: Object to form. 11:32

THE WITNESS: That's correct. 11:32

BY MR. RUSHING: 11:32

Q. So it was not connected to the Irico intranet that you discussed yesterday? 11:32 11:32

MR. CARTER: Object to form. 11:32

to testify in April, or was he still expressing reservations? 13:31

MR. CARTER: Object to form. 13:31

THE WITNESS: He did not give a very straightforward "yes" or a consent to agree to testifying, but according to our understanding, he was reluctant even though -- but he still agreed to testify. 13:31 13:31 13:32 13:32

BY MR. RUSHING: 13:32

Q. And then at some point, he informed you that he would not agree to testify, is that correct? 13:32 13:32

When I say "you," I mean someone at Irico who was involved in the scheduling of his deposition. 13:32 13:32

MR. CARTER: Object to form. 13:32

BY MR. RUSHING: 13:32

Q. Strike that. Let me re-ask the question. 13:32

And then at some time after April of this year, did he inform Irico that he was unwilling to give a deposition in the case? 13:32 13:32 13:33

A. At some point in April, he informed us that he was going to leave Irico, and he told us that he was not able to make time to be deposed in this case as a witness. 13:33 13:33 13:33 13:33

Also, he repeatedly emphasized that he himself personally did not have anything to do with the CRT antitrust litigation, and he did not have any 13:34 13:34 13:34

understanding about the circumstances surrounding the situation. 13:34 13:34

Q. And then, did he, in fact -- strike that. 13:34

He did, in fact, leave Irico, is that correct? 13:34

A. Yes. 13:34

Q. And do you know where he is now? 13:34

A. I heard that he's now working in a private company in a city or town called Nanxun. I'm not sure if you know that place. 13:35 13:35 13:35

And I'm not sure if that's in Zhejiang or Jiangsu province. 13:35 13:35

Q. So he resigned from all Irico-related companies, is that correct? 13:35 13:35

A. Correct. 13:36

Q. Do you know what the job transfer and settlement group at IGE-Irico New Energy -- the office for managing retirees and former employees at CNEIEC -- strike that. 13:36 13:36 13:36 13:36

Do you know what the job transfer and settlement group at IGE-Irico New Energy is? 13:36 13:36

MR. CARTER: Object to form. 13:36

MAIN INTERPRETER: Counsel, do you mind repeating that question for the interpreter? 13:36 13:36

BY MR. RUSHING: 13:36

Q. Is there a company affiliated with Irico known 13:36

as the job transfer and settlement group, or similar name? 13:36 13:36

MR. CARTER: Object to form. 13:36

THE WITNESS: I do not know. 13:37

BY MR. RUSHING: 13:37

Q. Do you know what the office for managing retirees and former employees at CNEIEC is? 13:37 13:37

A. I don't know. 13:37

Q. Is there a department or group that manages retirees and former employees? 13:37 13:37

MR. CARTER: Object to form. 13:38

THE WITNESS: Are you talking about an internal department at Irico Group or just any department or division having that responsibility generally in society? 13:38 13:38 13:38 13:38

BY MR. RUSHING: 13:38

Q. I'm talking about something affiliated with Irico Group, and I don't know if it's a department or a division or a subsidiary of some sort. 13:38 13:38 13:38

A. There is an Office for Retiree and Departing Employees. That's the name of the office under Irico Group. 13:39 13:39 13:39

Q. And what is the purpose of that office? 13:39

A. It is to manage the people who have retired prior to the implementation of the labor contract and 13:39 13:40

labor employment system for enterprises in China. 13:40

Q. How does it manage the people? Does it pay them a pension or do anything like that? 13:40

MR. CARTER: Object to form. 13:40

THE WITNESS: I'm not clear about the specifics of the management. 13:41

BY MR. RUSHING: 13:41

Q. Do you know if Mr. Su is entitled to any sort of pension or retirement payments from Irico? 13:41

A. He cannot be entitled to that. 13:41

Q. Why is that? 13:41

A. Mr. Su opted to join the country's labor society insurance system, so all his pensions and retirement payment would have to come from that social system. 13:42

Q. And Irico has no -- there's no -- strike that. 13:42

So Group -- strike that. 13:42

So there were no Irico companies that have any responsibility for making any payment to Mr. Su or to the labor society insurance system on behalf of Mr. Su, is that correct? 13:42

MR. CARTER: Object to form. 13:42

THE WITNESS: That's correct. 13:43

BY MR. RUSHING: 13:43

Q. Does Irico have a pension system for some of 13:43

this report was written, to the best of your knowledge, in 2005? 17:50

MR. RUSHING: Objection to form. Lacks foundation. 17:50

MR. BIRKHAEUSER: Objection. Leading. 17:50

THE WITNESS: It was accurate. 17:50

BY MR. CARTER: 17:50

Q. That paragraph concludes with: "At present, Caihong Limited has formally handled the procedures related to import and export business in the first half of 2005, from then on Caihong Limited's import and export business is completed independently by itself." 17:50

Do you see that? 17:50

A. I see it. 17:50

Q. Is this related to the restructuring of Irico's import and export business that happened that you discussed regarding the IPO of Irico Electronics? 17:51

MR. RUSHING: Objection to the form. Lacks foundation. 17:51

MR. BIRKHAEUSER: Objection. Leading. 17:51

THE WITNESS: Yes. Yes. 17:51

MR. CARTER: Could we get the time on the record, please. 17:52

THE VIDEOGRAPHER: We are at seven hours and seven minutes. 17:52

MR. CARTER: Okay. Shall we adjourn here for the day, Geoff? 17:52 17:52

MR. RUSHING: Yes. 17:52

MR. CARTER: All right. 17:52

THE VIDEOGRAPHER: We are off the record. It's 5:51 p.m. 17:52 17:52

(The deposition concluded at 5:51 p.m., China Standard Time.)

--oOo--

STATE OF CALIFORNIA )
COUNTY OF SANTA BARBARA ) ss.

I, Mark McClure, C.S.R. No. 12203, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is a true, correct, and complete transcript of said proceedings;

That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript { } was {X} was not required.

I further certify that I am not interested in the event of the action.

Witness my hand this 12th day of October, 2022.

Certified Shorthand Reporter
State of California
CSR No. 12203

# EXHIBIT C



January 24, 2023

Certification

Welocalize Translations

TRANSLATOR'S DECLARATION:

I, Samuel Chong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: P-00000004

*(Digital or printed signature here above the line)*

Samuel Chong

Project Number: BBLLP_2301_P0001

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

From: Chan, Joseph W.K <joseph.chan@pillsburylaw.com> on behalf of Chan, Joseph W.K
Sent: Friday, February 15, 2008 1:30AM
To: yan
Cc: Secretary Tao; Mr. Gao; Callan, Terrence A; Tiffany, Joseph R; Chan, Joseph W.K
Subject: RE:CRT Litigation

Dear Mr. Yan.

Your February 4 email has been received, thank you. We hope you had a pleasant Spring Festival holiday.

Finally, it is essential that Irico does not destroy or dispose of any potentially relevant documents, whether in paper, electronic or any other form. We recommend that you issue written instructions to the members of your company to retain all such documents as soon as possible. We would be pleased to advise on appropriate written instructions.

We very much look forward to working with you on this matter.

Best regards!

Yongjian Chen

Yongnan Chen | Managing Partner
Pillsbury Winthrop Shaw Pittman LLP

Direct: 86.21.6335.1128 | Tel: 86.21.6335.1160
Fax: 86.21.6335.1178 | Cell: 86.13917040385
Room 4305, Bund Center | 222 East Yan'an Road, Shanghai, China | 200002

Email: joseph.chen@pillsburylaw.com
www.pillsburylaw.com





3



4



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or the Pillsbury Winthrop Shaw Pittman Help Desk at Tel: 800-477-0770 x4860 immediately by telephone or by return E-mail and delete this message, along with any attachments, from your computer. Thank you.
* Internal Revenue Service regulations generally provide that, for the purpose of avoiding federal tax penalties, a taxpayer may rely only on formal written advice meeting specific requirements. Any tax advice in this message does not meet those requirements. Accordingly, any such tax advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding federal tax penalties that may be imposed on you or for the purpose of promoting, marketing or recommending to another party any tax-related matters.

| | |
|---|---|
| From: | Chan, Joseph W. K <joseph.chan@pillsburylaw.com> on behalf of Chan, Joseph W. K |
| Sent: | Friday, February 15, 2008 1:30 AM |
| To: | yan |
| Cc: | **陶书记**; **高总**; Callan, Terrence A.; Tiffany, Joseph R.; Chan, Joseph W. K |
| Subject: | RE: CRT**诉讼** |

**尊敬的闫先生：**

**您**2**月**4**日邮件已收悉，谢谢。希望您度过了愉快的春节假期。**

**最后，**Irico**请勿损毁或处置任何书面、电子或任何其他形式的潜在相关文件，这点十分必要。我们建议贵方尽快向公司成员发出保留所有该等文件的书面指示。我们将非常乐意就适当的书面指示提出建议。**

**我们非常期待就此事项与贵方合作。**

**顺颂商祺！**

**陈永坚**

陈永坚 | 主管合伙人
美国必百瑞律师事务所

直线: 86.21.6335.1128 | 电话: 86.21.6335.1166
传真: 86.21.6335.1170 | 手机: 86.13917040883
外滩中心4205室 | 中国上海南京西路222 | 200002

电子邮件: joseph.chan@pillsburylaw.com
www.pillsburylaw.com



3

CONFIDENTIAL IRI-SUPP-000003



4

CONFIDENTIAL IRI-SUPP-000004



The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or the Pillsbury Winthrop Shaw Pittman Help Desk at Tel: 800-477-0770 x4860 immediately by telephone or by return E-mail and delete this message, along with any attachments, from your computer. Thank you.

* Internal Revenue Service regulations generally provide that, for the purpose of avoiding federal tax penalties, a taxpayer may rely only on formal written advice meeting specific requirements. Any tax advice in this message does not meet those requirements. Accordingly, any such tax advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding federal tax penalties that may be imposed on you or for the purpose of promoting, marketing or recommending to another party any tax-related matters.

# EXHIBIT D



January 24, 2023

Certification

Welocalize Translations

TRANSLATOR'S DECLARATION:

I, Samuel Chong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: P-00000005

*(Digital or printed signature here above the line)*

Samuel Chong

Project Number: BBLLP_2301_P0001

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

**From:** yan <yanyunlong@ch.com.cn> on behalf of yan
**Sent:** Friday, February 15, 2008 2:52 AM
**To:** Secretary Tao; Mr. Gao
**Cc:** Xiaoyan Guo
**Subject:** Fw:CRT Litigation

----- Original Message -----
**From:** Chan, Joseph W. K.
**To:** yan
**Cc:** Secretary Tao; Mr. Gao; Callan, Terrence A; Tiffany, Joseph R; Chan, Joseph W.K
**Sent:** Friday, February 15, 2008 2:30PM
**Subject:** RE: CRT Litigation

Dear Mr. Yan.

Your February 4 email has been received, thank you. We hope you had a pleasant Spring Festival holiday.

Finally, it is essential that Irico does not destroy or dispose of any potentially relevant

documents, whether in paper, electronic or any other form. We recommend that you issue written instructions to the members of your company to retain all such documents as soon as possible. We would be pleased to advise on appropriate written instructions.

[REDACTED] We very much look forward to working with you on this matter.

Best regards!

Yongjian Chen

**Yongjian Chen | Managing Partner**
**Pillsbury Winthrop Shaw Pittman LLP**

———————————————————————————

Direct. 86.21.6335.1128 | Tel. 86.21.6335.1166
Fax. 86.21.6335.1178 | Cell. 86.13917040385
Room 4305, Bund Center | 222 East Yan'an Road, Shanghai, China | 200002

Email: joseph.chan@pillsburylaw.com
www.pillsburylaw.com





4



The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or

> > > copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or the Pillsbury Winthrop Shaw Pittman Help Desk at Tel: 800-477-0770 x4860 immediately by telephone or by return E-mail and delete this message, along with any attachments, from your computer. Thank you.
> > > * Internal Revenue Service regulations generally provide that, for the purpose of avoiding federal tax penalties, a taxpayer may rely only on formal written advice meeting specific requirements. Any tax advice in this message does not meet those requirements. Accordingly, any such tax advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding federal tax penalties that may be imposed on you or for the purpose of promoting, marketing or recommending to another party any tax-related matters.
> > > ==============================================================

**From:** yan <yanyunlong@ch.com.cn> on behalf of yan
**Sent:** Friday, February 15, 2008 2:52 AM
**To:** 高总; 陶书记
**Cc:** 郭晓燕
**Subject:** Fw: CRT诉讼

----- Original Message -----
From: Chan, Joseph W. K.
To: yan
Cc: 陶书记 ; 高总 ; Callan, Terrence A. ; Tiffany, Joseph R. ; Chan, Joseph W. K.
Sent: Friday, February 15, 2008 2:30 PM
Subject: RE: CRT诉讼

尊敬的闫先生:

您2月4日邮件已收悉，谢谢。希望您度过了愉快的春节假期。

最后，Irico请勿损毁或处置任何书面、电子或任何其他

形式的潜在相关文件，这点十分必要。我们建议贵方尽快向公司成员发出保留所有该等文件的书面指示。我们将非常乐意就适当的书面指示提出建议。

我们非常期待就此事项与贵方合作。

顺颂商祺！

陈永坚

**陈永坚 | 主管合伙人**
美国必百瑞律师事务所
————————————————————————————————————————
直线. 86.21.6335.1128 | 电话. 86.21.6335.1166
传真. 86.21.6335.1178 | 手机. 86.13917040385
外滩中心4305室 | 中国上海延安东路222 | 200002

电子邮件: joseph.chan@pillsburylaw.com
www.pillsburylaw.com



3

CONFIDENTIAL IRI-SUPP-000008



4

CONFIDENTIAL IRI-SUPP-000009



The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or

copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or the Pillsbury Winthrop Shaw Pittman Help Desk at Tel: 800-477-0770 x4860 immediately by telephone or by return E-mail and delete this message, along with any attachments, from your computer. Thank you.
* Internal Revenue Service regulations generally provide that, for the purpose of avoiding federal tax penalties, a taxpayer may rely only on formal written advice meeting specific requirements. Any tax advice in this message does not meet those requirements. Accordingly, any such tax advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding federal tax penalties that may be imposed on you or for the purpose of promoting, marketing or recommending to another party any tax-related matters.
==========================================================

# EXHIBIT E

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

IN RE: CATHODE RAY TUBE (CRT) ) MASTER FILE NO.
ANTITRUST LITIGATION ) CV-07-5944 JST
______________________________)
)
THIS DOCUMENT RELATES TO: )
)
ALL INDIRECT PURCHASER ACTIONS )
ALL DIRECT PURCHASER ACTIONS )
)
DEFENDANTS. )
______________________________)

VIDEOTAPED DEPOSITION OF YAN YUNLONG
VOLUME I
TUESDAY, SEPTEMBER 27, 2022
MACAU S.A.R., CHINA

FILE NO. SF 5436473

REPORTED BY MARK McCLURE, CRR
CAL CSR 12203

VIDEOTAPED DEPOSITION OF YAN YUNLONG, VOLUME I, TAKEN AT 8:04 A.M., CHINA STANDARD TIME, TUESDAY, SEPTEMBER 27, 2022, MACAU S.A.R., CHINA, VIA VERITEXT REMOTE TECHNOLOGY, BEFORE MARK McCLURE, C.S.R. #12203, CERTIFIED SHORTHAND REPORTER IN AND FOR THE STATE OF CALIFORNIA.

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFFS, ALL INDIRECT PURCHASERS:

(APPEARING BY VIDEOCONFERENCE)
TRUMP, ALIOTO, TRUMP & PRESCOTT
BY: LAUREN CAPURRO, ESQ.
120 HOLSTROM CIRCLE
NOVATO, CALIFORNIA 94947-2072
415.860.5051
LAURENRUSSELL@TATP.COM

(APPEARING BY VIDEOCONFERENCE)
BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER
BY: DANIEL BIRKHAEUSER, ESQ.
2125 OAK GROVE RD., SUITE 125
WALNUT CREEK, CALIFORNIA 94598-2534
925.945.0200
DBIRKHAEUSER@BRAMSONPLUTZIK.COM

FOR THE PLAINTIFFS, ALL DIRECT PURCHASERS:

(APPEARING BY VIDEOCONFERENCE)
SAVERI & SAVERI
BY: RICK SAVERI, ESQ.
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
415.217.6810
RICK@SAVERI.COM

APPEARANCES OF COUNSEL: CONTINUING

SAVERI & SAVERI
BY: DAVID HWU, ESQ.
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
415.217.6810
DHWU@SAVERI.COM

FOR THE PLAINTIFFS, ALL DIRECT PURCHASERS:

(APPEARING BY VIDEOCONFERENCE)
SAVERI & SAVERI
BY: MATTHEW HEAPHY, ESQ.
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
415.217.6810
MHEAPHY@SAVERI.COM

(APPEARING BY VIDEOCONFERENCE)
SAVERI & SAVERI
BY: GEOFFREY C. RUSHING, ESQ.
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
415.217.6810
GRUSHING@SAVERI.COM

FOR THE DEFENDANTS, IRICO, AND THE WITNESS, YAN YUNLONG:

(APPEARING BY VIDEOCONFERENCE)
BAKER BOTTS, LLP
BY: THOMAS E. CARTER, ESQ.
700 K STREET NW
WASHINGTON, DC 20001
202.639.7909
TOM.CARTER@BAKERBOTTS.COM

(APPEARING BY VIDEOCONFERENCE)
NORTON ROSE FULBRIGHT U.S., LLP
BY: KAYLEE YANG, ESQ.
555 CALIFORNIA STREET, SUITE 3300
SAN FRANCISCO, CALIFORNIA 94104
628.231.6827
KAYLEE.YANG@NORTONROSEFULBRIGHT.COM

ALSO PRESENT:

AMANDA LIN, MAIN INTERPRETER

TERRY WEISS, VIDEOGRAPHER

TUESDAY, SEPTEMBER 27, 2022, 8:04 A.M.

08:04

THE VIDEOGRAPHER: Good morning. 08:04

We're on the record at 8:04 a.m. on September 27, 2022. 08:04

Audio and video recording will continue to take place unless all parties agree to go off the record. 08:04

The quality of the recording depends on the quality of the camera of the witness, and the internet connection of the participants. 08:04

This is the videorecorded deposition of Yan Yunlong, in the matter In Regards to the Cathode Ray Tube Antitrust Litigation, filed in the United States District Court, Northern District of California, Oakland Division, Case CV-07-5944 JST. 08:04

This deposition is being held via Zoom remote meeting. 08:04

My name is Terry Weiss, from Veritext Legal Solutions, and I'm your videographer. Our court reporter today is Mark McClure, from the firm Veritext Legal Solutions. 08:04

I'm not related to any party in this action, nor am I financially interested in the outcome. 08:05

Counsel and everyone attending remotely will 08:05

now state their appearances and affiliations for the record. 08:05

If there are any objections to proceeding, please state them at the time of your appearance, beginning with the noticing attorney. 08:05

MR. BIRKHAEUSER: Good morning, Mr. Yan. My name is Dan Birkhaeuser. I'm with Bramson, Plutzik, Mahler & Birkhaeuser, and we represent the Indirect Purchaser plaintiffs. 08:05

MS. CAPURRO: Good morning. I'm in the room here with Mr. Birkhaeuser. My name is Lauren Capurro, of Trump, Alioto, Trump & Prescott, and I also represent the Indirect Purchaser plaintiffs. 08:05

MR. SAVERI: Good morning. This is Rick Saveri on behalf of the Direct Purchaser plaintiffs. I'm also in the room with Mr. Birkhaeuser. 08:06

THE WITNESS: Okay. 08:06

MR. RUSHING: Mr. Yan, my name is Geoff Rushing. I also represent the Direct Purchaser plaintiffs. 08:06

MR. HWU: My name is David Hwu, and I also represent the Direct Purchaser plaintiffs. 08:06

MR. HEAPHY: This is Matthew Heaphy, also for Direct Purchaser plaintiffs. Good morning. 08:07

MR. CARTER: Good morning. Thomas Carter, 08:07

with Baker Botts, LLP, representing Irico defendants and the witness. 08:07 08:07

MS. YANG: This is Kaylee Yang. I'm having some connection issues with my video, and I'm with Norton Rose Fulbright, on behalf of the defendants, Irico defendants and the witness. 08:07 08:07 08:07 08:07

AMANDA LIN, KAYLEE YANG and DAVID HWU

were sworn to interpret the Chinese language.

08:08

YAN YUNLONG 08:08

having been sworn, was examined

and testified as follows:

EXAMINATION

BY MR. BIRKHAEUSER:

Q. Good morning, again, at least your time, Mr. Yan. 08:08 08:08

And again, my name is Dan Birkhaeuser and I'm going to be asking you some questions first. 08:08 08:08

A. Okay. 08:09

Q. I would like to begin by asking you what you did to prepare for this deposition. 08:09 08:09

Can you tell me what you did to prepare? 08:09

A. My attorney or attorneys did a brief 08:09

BY MR. BIRKHAEUSER: 13:42

Q. How frequently would the legal department make appearances in court on the company's behalf before 2011? 13:42 13:42 13:43

A. Two to three lawsuits a year, approximately. 13:43

Q. And under what conditions would the legal department represent the company in court? 13:43 13:43

A. When the legal relationship involved in the case is clearer and the merits or facts of the case are clearer, we would represent the company on our own in order to save some money. 13:43 13:43 13:44 13:44

Q. Okay. I'm looking again at your résumé, 8601. 13:44

A. Okay. 13:44

Q. So we just looked at the time period from 2011 to 2020 in which you were the deputy general counsel of Irico Group, right? 13:44 13:44 13:44

A. Yes. 13:44

Q. Then, I wonder if you can explain to me why, at the same time, you were deputy director, Irico Group administration and legal affairs department for 2013 to 2016, and director of Irico Group legal affairs department from 2016 to present. 13:44 13:44 13:45 13:45 13:45

A. At that time, in 2013, I was the deputy director of the administration and legal affairs department. 13:45 13:45 13:45

Q. Is it fair to say that these other two positions were positions you held in addition to being deputy general counsel? 13:46

A. It's not like that. It was that my managerial role was transferred from the Enterprise Management Department to the Irico Group office, so I was actually working, serving a position in the administration and legal affairs department under the Group. 13:46 13:47

Q. Okay. 13:47

A. Let me say one thing. 13:47

In 2013, it was the time when CEIEC performed the major reorg of the Irico Group, so the job functions and organizations within Irico were -- went through a major change. 13:47

Q. When you say "CEIEC," did you mean China National Electronics? 13:48

A. CEC. 13:48

Q. What does CEC stand for? 13:48

A. China Electronics Information Industry Company. 13:48

Q. Okay. Getting back to your duties as deputy director of Irico Group administration and legal affairs department, did you perform job functions in that role that were different than your role as general counsel to Irico Group? 13:48 13:49

A. No. 13:49

Q. As general counsel of Irico Group, did you provide advice to Irico's board of directors? 13:49

A. Yes. 13:49

Q. And during what time period did you provide advice to Irico's board of directors? 13:50

A. That question is too broad. 13:50

Q. Can you give me your best estimate? 13:50

A. For example, when the Group company announces major external investment projects, it will have to go under the review by the board of directors, and the legal department would be asked to provide consultation on those reviews to see if there are any legal risks associated with the project. 13:51

And me working as the general counsel, I would provide the legal advices or legal opinions to the board of directors. 13:51

Q. Currently, as general counsel of Irico Group, who do you report to? 13:51

A. As the general counsel, currently, I report to our general manager. 13:52

Q. And who is your most immediate subordinate? 13:52

A. You're talking about my subordinate, right? 13:52

Q. Yes, I am. 13:52

A. It would be the deputy director in my legal 13:52

affairs department. 13:52

Q. And who's the deputy director of the legal affairs department currently? 13:52

A. Wenkai Zhang. 13:52

Q. I'm going to ask you some questions about the production of documents to the plaintiffs in the litigation that brings us here today, the CRT antitrust case. 13:53

A. Okay. 13:53

Q. First of all, I want to ask you about documents that you yourself produced to the plaintiffs personally. 13:53

MR. CARTER: Object to form. 13:54

BY MR. BIRKHAEUSER:

Q. So did you ever search your own files to locate documents to be produced to the plaintiffs in this case? 13:54

A. Yes. 13:54

Q. Do you remember when you first searched your files for documents to produce in this case? 13:54

MAIN INTERPRETER: Interpreter needs a moment. 13:55

THE WITNESS: It was when we were working on the motion for state sovereignty immunity that we were looking for documents for production. 13:55

BY MR. BIRKHAEUSER: 13:55

Q. Did you tell me that was in 2018? 13:56
A. I think so. 13:56
Q. Okay. What exactly did you look for? 13:56
A. I looked at the hard drive that was included in my computer, and also the paper documents in my personal files. 13:56 13:56 13:57
Q. So when you say "the paper documents," where exactly did you look? 13:57 13:57
A. Those were kept by me personally. 13:57
Q. Do you have file cabinets or file drawers in your office? 13:57 13:57
A. Yes. 13:57
Q. Do you maintain those files yourself or do you have an assistant that maintains them for you? 13:57 13:57
A. I maintained those myself. 13:57
Q. Do you remember if you first conducted a search of your own personal documents after you returned from the United States? 13:57 13:58 13:58
MR. CARTER: Object to form. 13:58
THE WITNESS: I do not recall the time frame clearly. 13:58 13:58
BY MR. BIRKHAEUSER: 13:58
Q. Okay. So when you searched your own files, what exactly did you look for? 13:58 13:58
A. I was looking for all of the information in 13:58

the documents that I kept for the information related to this CRT antitrust litigation. 13:59 13:59

Q. You said you looked at the hard drive of your computer? 13:59 13:59

A. Yes. 13:59

Q. Did you just scroll through documents and look, or did you perform some sort of search? 13:59 13:59

A. Prior to that, my computer was actually already disposed of. I just kept the hard drive of that computer. And after the big boss announced that the litigation has started and we are now in the discovery process, I just turned over all the information and files kept on my hard drive. 13:59 14:00 14:00 14:00 14:00 14:00

Q. So did you look through the hard drive itself? 14:00

A. I did not have time to look at it. 14:00

Q. Who's the big boss that you just mentioned? 14:00

A. Our counsel who represented us. 14:00

Q. Which -- 14:01

MS. YANG: Amanda, I think Mr. Yan said "Baker Botts." 14:01 14:01

MAIN INTERPRETER: Sorry. 14:01

MR. BIRKHAEUSER: Oh, instead of "big boss"? 14:01

MAIN INTERPRETER: Right. 14:01

MR. BIRKHAEUSER: Got it. Same difference. Okay. 14:01 14:01

I'm getting another document for you. 14:01

I'm going to introduce Exhibit 8602, which is IRC-CRT 00005996. 14:02

(Exhibit 8602 marked for identification.)

THE WITNESS: I do not see it. 14:03

BY MR. BIRKHAEUSER: 14:03

Q. If you go to the folder that says "Marked Exhibits," you should see that as the third exhibit in that folder. 14:03

A. I got it. 14:03

Q. Okay. Sometimes you need to refresh that folder. 14:03

A. Okay. 14:03

Q. Okay. So can you take a look at that exhibit and tell me when you recognize it. 14:03

A. I finished reading the Chinese portion of this document. 14:04

What is your question? 14:04

Q. Do you recognize Exhibit 8602? 14:05

A. Yes. 14:05

Q. I'm going to represent to you that this document and one other document were specifically identified as coming from your file. 14:05

Do you recall locating this document in your files? 14:05

A. I don't recall. 14:05

Q. Do you recall giving this document to your lawyers to produce to plaintiffs? 14:05 14:06

A. If this document was originally in my hard drive, I believe I turned all of them over, but as to whether or not this one was produced to the plaintiffs, I do not know. 14:06 14:06 14:06 14:06

Q. Well, I can tell you that it was produced to the plaintiffs and we know that because it has a number in the lower right-hand corner that we call a Bates number. 14:06 14:06 14:06 14:06

A. Okay. 14:07

Q. If you see a document and it starts with IRI-CRT, and it contains a number thereafter, that is a document that Irico produced to plaintiffs in this case. 14:07 14:07 14:07

A. Okay. 14:07

Q. Can you tell me generally what Exhibit 8602 is? 14:07 14:07

A. This letter relates to a response that is sought in regards to an investigation that the European Commission is conducting on the anticompetition practices of the glass bulbs used for cathode ray tubes, CRT, color picture tube, CPT, cathode display tubes, CDT, in the European Union/European economic area. 14:08 14:08 14:08 14:08 14:08 14:09

Q. So just to be clear, this Exhibit 8602 is not 14:09

Q. Did you provide a copy of this report to your lawyers? 15:18
A. I think it was provided. 15:18
Q. Did you ever speak with employees in the sales department yourself to investigate the allegations in the complaint? 15:18 15:19 15:19
A. At that time, we formed a task force group to respond to the litigation. In that group, it had two colleagues from the sales department, so we did talk to them about some of the background and situation of the litigation, including the main allegations involved in the case. 15:19 15:20 15:20 15:20 15:20 15:20
Q. Did Pillsbury interview Irico employees after the complaint was served on Irico? 15:20 15:20
A. Yes. 15:20
Q. Did Pillsbury speak with the employees in the sales department? 15:21 15:21
A. No. 15:21
Q. Did it speak with employees in the overseas sales department? 15:21 15:21
MR. CARTER: Object to form. 15:21
THE WITNESS: No. 15:21
BY MR. BIRKHAEUSER: 15:21
Q. Was there any written report prepared about Irico's investigation of facts about the allegations of 15:21 15:21

the complaint other than this report by the person that Irico contracted with? 15:21

MR. CARTER: Object to form. 15:21

THE WITNESS: No. 15:22

BY MR. BIRKHAEUSER: 15:22

Q. At the time you were investigating the facts of the complaint, did any Irico employee tell you that they had attended meetings with Irico's competitors? 15:22

A. They did. 15:22

Q. And what kind of investigation did you do as to the meetings that Irico had with its competitors? 15:23

A. We did not conduct any special investigation. We simply confirmed whether or not there was such a fact. 15:23

Q. Who told you that Irico employees attended meetings with Irico's competitors? 15:23

A. At that time, it was Liu Maihai, Shen Xiaolin, and there was another person who used to work for CEIEC, and that person's name was Liang Yuan. That's it. 15:24

Q. Did Shen Xiaolin tell you that Mr. Shen had attended a meeting of CEOs and presidents of CRT competitors in Shanghai in November of 2006? 15:25

MR. CARTER: Object to form. 15:25

THE WITNESS: It was not as detailed as to exactly which meeting. 15:25

BY MR. BIRKHAEUSER:

Q. Did anyone tell you how many meetings that Irico employees had had with Irico's competitors? 15:25 15:25

A. No. 15:26

Q. Were you preliminary responsible for gathering information to give to Pillsbury after you were served with the complaint? 15:26 15:26 15:26

MR. CARTER: Object to form. 15:26

THE WITNESS: No. Actually, after we were served the complaint, we did several things. 15:27 15:27

The first one was -- we formed an internal working group to lead the work of conducting the investigation with respect to this litigation. It was a task force working group. 15:27 15:28 15:28 15:28

Secondly, we engaged Pillsbury as the counsel to represent us, but at that time several law firms were pitching us for the case, and we later talked with them and engaged Pillsbury as our outside counsel. 15:28 15:28 15:28 15:28

The third one we did -- the third thing we did was that we conducted an investigation to see if we actually sold any products in the U.S. market, and the information we got was no. So we asked Pillsbury to try to talk and reason with the plaintiffs that it was a mistake to sue Irico, and we asked them to remove us from the defendants. 15:28 15:28 15:28 15:28 15:28 15:28 15:28

The fourth thing that we did was to notify all the relevant people based on the request from Pillsbury, and those people were asked to preserve all the information and documents related to the case. 15:29

During that process, Pillsbury related a very important piece of information to us. It told us that it was actually a class action and the plaintiffs in the case were trying to form a group of plaintiffs to conduct the litigation, and the defendants were also trying to form a group, and Pillsbury's advice to us was that we join the defendants group. So, internally, in the company, we also held some discussions on that advice. 15:30

And the company held several rounds of discussions on that issue in order to understand the situation, but the situation with Irico is different from that with other companies in the defendants' group. Those other companies were big multinational companies and the U.S. market was their main market. They not only had CRT products in the U.S. market, they also had the TV whole sets in the U.S. market, and Irico, at that time, had neither, so it was to the disadvantage of Irico to join and form the defendants group. 15:31 15:32

And also, at that time, the U.S. government was conducting, actually, criminal investigations in the 15:32

antitrust litigation proceeding against those companies. Some of them already even pleaded guilty, and Irico conducted some self-evaluation, and we believed that we have not done anything to violate the antitrust law in the U.S. 15:33

So for us to join and form the defendants group would be what the Chinese would say "down the drain with them," and we rejected the proposal or suggestion from Pillsbury. 15:33

We also knew that it would be a long process for the plaintiffs and the defendants to form the litigation groups and to actually go through the proceeding, so we were waiting for the plaintiffs to file an independent, separate lawsuit against Irico, and we wanted to wait until that time before we conducted any relevant investigation. 15:34

It would be unnecessary or pointless for us to conduct any investigation before a separate or independent lawsuit was filed against us by the plaintiffs. 15:35

That's it. 15:35

MR. BIRKHAEUSER: Okay. I'm going to move to strike that answer. 15:35

BY MR. BIRKHAEUSER:

Q. Let me ask my question again, and if you could 15:35

listen very carefully to the question and just answer the question. 15:35

A. Okay. 15:35

Q. Were you primarily responsible for gathering information to give to Pillsbury after Irico was served with a complaint? 15:35

MR. CARTER: Object to form. 15:36

THE WITNESS: No, I was working as a contact person between Irico and Pillsbury. That was it. 15:36

BY MR. BIRKHAEUSER:

Q. Were you personally the primary contact person between Irico and Pillsbury? 15:36

A. Yes. 15:36

Q. You mentioned that Irico formed a litigation group in 2008, after it was served with a complaint. 15:36

A. Yes. 15:37

Q. Do you know what interrogatories are? 15:37

A. I don't know. 15:37

Q. Are you aware that Irico has responded in writing to written questions that plaintiffs have asked in this litigation? 15:37

A. I don't remember that clearly. 15:37

MR. BIRKHAEUSER: Okay. I'm introducing Exhibit 8605. 15:38

(Exhibit 8605 marked for identification.) 15:39

BY MR. BIRKHAEUSER: 15:39

Q. Can you tell me when you can view that document. 15:39

A. 8605, right? 15:39

Q. Yes, 8605. 15:39

A. I see it now. 15:39

Q. Okay. And let me just represent to you that these are written answers to questions that we asked Irico, and this document, 8605, is Irico's response. 15:39

And I will also represent to you that I asked Irico's counsel whether there was a Chinese version of this response, and I was told that if I read it to you in English, that you would be familiar with the contents. Okay. 15:40

The first thing I would like to do is to direct your attention to the bottom of page 8 and the information is set forth as "Response to Issue No. 2." 15:41

A. Okay. 15:41

Q. And I want to point this out to you because in some of the later information that Irico provides, it refers back to this Issue No. 2. 15:41

So, specifically, it's referring back to the following names: Tao Kui. 15:42

A. Right. 15:42

Q. And then on page 9, Wang Ximin, Shen Xiolin, 15:42

Liu Maihai, Liang Yuan? 15:42

A. Yes. 15:42

Q. And I apologize profusely for the mispronunciations. 15:42

A. Okay. 15:43

Q. So if you turn to page 10 in response to Issue No. 3, I will just read to you the response so that it can be translated. Okay? 15:43

A. Okay. 15:43

Q. "The Irico employees identified in Irico's response to Issue No. 2 above" -- 15:43

MAIN INTERPRETER: Counsel, you can finish that. I'll just wait for you. 15:43

BY MR. BIRKHAEUSER: 15:43

Q. -- "were members of a group of Irico employees appointed to oversee Irico's response to the litigations in the above referenced action (the '2008 Litigation Committee') in June 2008." 15:44

A. Yes. 15:44

Q. Is it true that Irico formed a litigation committee in June of 2008? 15:44

A. I believe so. 15:44

Q. When did that group first meet? 15:45

A. I don't recall when. 15:45

Q. Was it sometime after June 2008? 15:45

A. I think a meeting was held at the time of its formation. 15:45

Q. Okay. I should continue reading the response to Issue No. 3, which says: "The other members of the committee were Gao Rongguo, Director, Corporate Management Department, Irico Group, and Yan Yunlong, Legal Affairs Manager, Corporate Management Department, Irico Group." 15:45

A. Right, yes. 15:46

Q. Were there any other employees that were in the litigation group? 15:46

A. None. 15:46

Q. How many times did it meet? 15:46

A. I do not recall the exact number of times, but whenever we had an issue, regardless of the scale, even a minor one, we would just meet. And sometimes when we did have a meeting, not all the members would attend. 15:47

Q. Who was your supervisor at this time? 15:47

A. Gao Rongguo. 15:47

Q. Were any minutes held of the litigation committee meetings? 15:47

MR. CARTER: Object to form. 15:47

THE WITNESS: No. 15:47

BY MR. BIRKHAEUSER: 15:47

Q. Did anyone take notes? 15:47

A. No one would do that because most of it was last-minute work. 15:48
Q. Was anyone in charge of the committee? 15:48
A. Yes, it was Tao Kui. Mr. Tao was the highest ranking leader on this committee. 15:48
Q. What was Mr. Tao's position at this time? 15:48
A. The deputy general manager of the Group. 15:48
Q. Did Mr. Wang inform the committee that he had met with competitors? 15:48
A. Mr. Wang? Are you referring to Wang Ximin? 15:49
Q. I am. 15:49
A. I don't remember. 15:49
Q. Did Mr. Tao inform the committee that he met with competitors? 15:49
A. No. Mr. Tao did not meet with competitors. 15:49
Q. Did he inform the committee that he met with competitors? 15:49
A. He himself said that he did not have any business exchanges or dealings with competitors. 15:50
Q. Did Ms. Liang inform the committee that she met with competitors? 15:50
A. She did. She did mention that. 15:50
Q. And what did she say? 15:50
A. I don't remember what she said. 15:50
Q. What competitors did she say she communicated 15:50

with? 15:50

A. I don't know. It's impossible for me to remember all those details. 15:50

Q. And there were no notes? 15:50

A. None. 15:51

Q. Did Ms. Liang inform the committee that she met with Chunghwa? 15:51

A. According to my recollection, no. 15:51

Q. Did Ms. Liang inform the committee that she sent confidential Irico documents to competitors? 15:51

A. She did not. 15:51

Q. Did any non-committee members ever attend the meetings? 15:51

A. Non-committee members, no. 15:52

Q. Did the committee ever generate any reports? 15:52

A. No. 15:52

Q. Did the committee ever generate any other documents? 15:52

A. No. 15:52

Q. Did the committee review any documents? 15:52

A. Review documents, no. 15:52

Q. And by that I mean internal -- strike that. 15:52

Did the committee ever review any of Irico's internal documents? 15:52

A. No. 15:53

Q. Did the committee ever communicate -- strike that. 15:53

Did the committee members ever communicate with each other by email? 15:53 15:53

A. No. 15:53

On the second thought, it came to my memory that the committee had generated a document before, and it was after Pillsbury told us about the Group's efforts among the defendants, and the committee briefly met and talked about it, and we came to the conclusion that we would give up responding to the litigation before the plaintiffs filed any independent lawsuit against us. 15:54 15:54 15:54 15:54 15:54 15:54 15:54

According to my recollection, that should be the only document. 15:55 15:55

And also, when that document was being signed, some of the committee members were on business trips, so we did not obtain all the signatures of the committee members. That's it. 15:55 15:55 15:55 15:55

Q. Did the committee members ever communicate with each other by email? 15:55 15:55

A. As I recall, I probably had email exchanges with Liu Maihai, but with others, I don't remember clearly. And I think I had email exchanges with Gao Rongguo as well. 15:55 15:56 15:56 15:56

Sometimes I needed to forward the documents 15:56

sent to me from Pillsbury to Gao Rongguo and Liu Maihai. That's it. 15:56 15:56

Q. Did you have email exchanges with Mr. Liu about matters that the litigation committee discussed? 15:56 15:57

A. No. 15:57

Q. Did you have email exchanges with Mr. Gao about matters that the litigation committee discussed? 15:57 15:57

A. We would not do so. 15:57

Q. The one thing the committee discussed was preserving documents, correct? 15:57 15:57

A. Correct. 15:58

Q. Let me direct your attention to Irico's response to Issue No. 4, which is on page 10. It's on page 10 of Exhibit 8605. I'll read it for you. 15:58 15:58 15:58

"The 2008 Litigation Committee held a meeting in August 2008 at Irico Group's headquarter building in Xianyang City, during which the instructions to preserve documents were discussed." 15:58 15:58 15:58 15:59

A. Right. 15:59

Q. That's correct? 15:59

A. Right. 15:59

Q. And then it says: "The instructions were conveyed to the employees identified in Irico's Response to Interrogatory No. 2 at this and subsequent meetings." 15:59 15:59 15:59

A. Right. 16:00

Q. The people identified in Interrogatory 2 are the members of the committee, correct? 16:00 16:00
A. Including but not limited to the members of the committee. 16:00 16:00
Q. Well, the second sentence says that the instructions were conveyed to people that were members of the committee, is that right? 16:00 16:00 16:01
A. Right, correct. 16:01
Q. Did Irico convey this instruction to preserve documents in an email to all employees? 16:01 16:01
A. No. 16:01
Q. So any instruction to employees was done orally, correct? 16:01 16:01
A. Correct. 16:01
Q. Irico could have sent a companywide email instructing employees to preserve documents, could it not? 16:02 16:02 16:02
A. We could not satisfy that criteria. 16:02
Q. Irico had companywide email in 2008, is that correct? 16:02 16:02
A. Yes. 16:02
Q. And the instruction that was conveyed in 2008 was to preserve documents relating to U.S. sales, is that right? 16:02 16:03 16:03
A. Yes. 16:03

Q. Did you personally inform any other Irico employees to preserve documents? 16:03

MR. CARTER: Object to form. 16:03

THE WITNESS: I conveyed Pillsbury's suggestion and advices on preserving documents to all the committee members on the committee meetings. 16:03 16:04 16:04

BY MR. BIRKHAEUSER:

Q. What was Pillsbury's suggestion and advice on preserving documents? 16:04 16:04

MR. CARTER: Objection. Calls for attorney-client privileged information. Instruct not to answer. 16:04 16:04 16:04

BY MR. BIRKHAEUSER:

Q. After the August 2008 discussion in the litigation committee, did you personally talk to any other Irico employee and tell them to preserve documents relating to U.S. sales? 16:04 16:04 16:04 16:05

A. Earlier, I said that I talked to the committee members on the litigation committee verbally. 16:05 16:05

Q. Did you personally talk to anybody that was not a member of the committee, telling them to preserve documents? 16:05 16:05 16:05

A. No. 16:06

Q. Earlier, you said that the committee prepared a document relating to the other defendants in this 16:06 16:06

case. 16:06

What was that document called? 16:06

A. It was the meeting minute. 16:06

Q. And what did you do with the meeting minutes? 16:06

A. I drafted the document and I approached various committee members for their signatures. 16:07

Q. And once you obtained all the signatures that you obtained, what did you do with the document? 16:07

A. I stored the document in the files of the legal affairs department. 16:07

Q. What was the document called? 16:07

A. I said previously it was called "Meeting Minute." 16:07

Q. Oh, okay. That was the actual title of the document? 16:07

A. Correct. 16:07

Q. Did it say "Meeting minutes of the litigation committee"? 16:08

A. Probably not that standard -- not that detailed. 16:08

Q. Do you know whether that document exists today? 16:08

A. It should still be around. 16:08

Q. Did you give it to your lawyers to produce to the plaintiffs in this case? 16:08

A. At that time, based on our consideration, we believed the document was not relevant to the case, so I'm not sure if it was actually shown to our attorneys or provided to our attorneys. The attorneys would see all of the documents on-site if we had those documents to show them, but I'm not sure if they saw this document on-site or not. 16:09 16:09 16:09 16:09 16:09 16:09 16:09

Q. Okay. Well, it's plaintiffs' contention that it is relevant to this case, and I would ask that the document be produced for tomorrow's session of your deposition. 16:09 16:10 16:10 16:10

Would you discuss that with your lawyers at Baker Botts and try to make that possible for tomorrow morning? 16:10 16:10 16:10

A. It's a tight schedule. 16:10

Q. Right. 16:11

So before I leave that subject, you testified that you communicated Pillsbury's instructions about document preservation to the litigation committee? 16:11 16:11 16:11

A. Right. 16:11

Q. Did the litigation committee follow Pillsbury's instructions exactly? 16:11 16:11

A. Yes. 16:11

Q. And were those written instructions that Pillsbury prepared? 16:11 16:12

A. There were oral instructions, as well as instructions sent via emails. 16:12

Q. I'm speaking of instructions that Irico was given by Pillsbury. 16:12

Was that your answer, that Pillsbury gave both oral instructions, as well as email instructions? 16:12

A. Correct, yes. 16:12

MR. BIRKHAEUSER: I've just introduced Exhibit 8606. 16:13

(Exhibit 8606 marked for identification.) 16:13

BY MR. BIRKHAEUSER: 16:13

Q. If you can take a look at that document and tell me if you've ever seen it before. 16:13

A. Sure. 16:13

Q. I will tell you in English this document is entitled "Pretrial Order No. 1," and I will represent to you that it is an order that was entered by the Court in the case that brings us here today. 16:14

A. Okay. 16:14

Q. Have you seen Exhibit 8606 before? 16:14

A. I do not have any memory of it. 16:14

Q. Very quickly, I want to point you to paragraph 13 on page 5. I'll read to you. "All parties and their counsel are reminded of their duty to preserve evidence that may be relevant to this action." 16:16

A. Okay. 16:16

Q. Does that refresh your recollection as to whether you received an order from this Court outlining Irico's duty to preserve evidence that may be relevant to the case? 16:16

MR. CARTER: Object to form. 16:16

THE WITNESS: No. 16:16

MR. BIRKHAEUSER: Okay. I need to take a short break. 16:16

May we break for five minutes, or if the witness would prefer to break for longer, that would be all right. 16:17

THE WITNESS: Yes. 16:17

MR. BIRKHAEUSER: All right. Off the record. 16:17

THE VIDEOGRAPHER: We are going off the record. The time is 4:17. 16:17

(A short recess was taken.) 16:17

THE VIDEOGRAPHER: We are now back on the record. The time is 4:28. 16:27

BY MR. BIRKHAEUSER:

Q. Mr. Yan, I want to focus you again. We are talking about the 2008 litigation committee. 16:28

Just to orient you, Mr. Wang Ximen told the committee that he had attended meetings with competitors, correct? 16:28

A. Yes. 16:28

Q. And Mr. Shen Xiaolin informed the committee that he had attended meetings with competitors, right? 16:28 16:28

A. Yes. 16:28

Q. Did Mr. Liu Maihai inform the committee that he had attended meetings with competitors? 16:29 16:29

A. No. 16:29

Q. What information about meetings with competitors did Mr. Liu have? 16:29 16:29

A. I don't know. 16:29

Q. And Ms. Liang informed the committee that she had communicated with competitors, correct? 16:29 16:29

A. I have some recollection about that. 16:29

Q. Did any other committee members inform the committee that they had attended meetings with competitors? 16:29 16:29 16:30

A. No one else, and regarding the earlier answer and question, there's a correction for me to make. 16:30 16:30

As to whether or not Wang Ximin mentioned to the committee that he had meetings with competitors, my memory in that regard is a little vague. 16:30 16:30 16:30

Q. Okay. Did the committee learn that any other Irico employees had met with competitors in the CRT industry? 16:30 16:30 16:30

A. Can you please repeat the question? 16:31

Q. Sure. 16:31

MR. BIRKHAEUSER: Would the reporter read it back, please. 16:31

(Record read by reporter: 16:31

"QUESTION: Okay. Did the committee learn that any other Irico employees had met with competitors in the CRT industry?") 16:30

THE WITNESS: No, it did not know. 16:31

BY MR. BIRKHAEUSER:

Q. Did either Mr. Wang or Mr. Shen tell the committee that they had attended meetings with other employees of Irico? 16:32

MR. CARTER: Object to form. 16:32

THE WITNESS: No, and at that time, the focus of the committee was on the core issue as to whether or not Irico sold any products in the U.S., so no discussion was made on the details of meeting attendance. 16:33

BY MR. BIRKHAEUSER: 16:33

Q. And the instruction that emanated from the committee in August of 2008 was to preserve documents relating to U.S. sales, correct? 16:33

A. Yes. 16:33

Q. Irico did not instruct its employees to 16:33

preserve documents from meetings with competitors, right? 16:33

A. That's not the case. 16:33

Q. I'm talking about in August of 2008. 16:33

In August of 2008, the instruction from the committee was to preserve documents relating to sales to the U.S., not documents relating to meetings with competitors, right? 16:33 16:34 16:34 16:34

A. That's not true. As I tried to recall the details, I'm not sure whether it was in August 2008, only one instance, but I do remember that I did convey the request and instructions from Pillsbury at the committee meetings, more than once, and asked those committee members to reach out to the people who might have information and details about antitrust litigations or attending meetings to paying attention to and preserve all the information related to U.S. sales and their attendance in meetings, particularly with special focus on the U.S. sales, because we were in a litigation against some U.S. entities. 16:34 16:35 16:35 16:35 16:35 16:35 16:35 16:36 16:36 16:36 16:36 16:36

Q. You didn't mention anything about meetings in your prior answer, did you? 16:36 16:36

MR. CARTER: Object to form. 16:36

THE WITNESS: At that time, I did convey and follow the instructions and request from Pillsbury and 16:37 16:38

conveyed those requests and instructions at the litigation committee meetings and asked them to preserve all the information, as well as the information of their attendance of the industry meetings. 16:38

I gave very clear and specific instruction to preserve the information and evidence related to attending the industry meetings. However, at that time Irico had more than 14,000 employees. It was not possible for me to reach out and notify each and every employee, and also, I did not know exactly who to notify. All I can do is to go through committee members, but there is a tricky part to doing that. 16:39

On one hand, those committee members -- they are the senior leadership of the company. On the other hand, people such as Liu Maihai, Shen Xiaolin, Liang Yuan, Wang Ximin -- they were the people who understood the situation of antitrust, and I could only rely on them to reach out to the relevant people that they were aware of in order to keep the relevant information and documents related to the case. That was roughly what the situation was. 16:39

BY MR. BIRKHAEUSER:

Q. Well, again, are you going to tell me exactly what Pillsbury instructed Irico to preserve? 16:39

MR. CARTER: Objection. Calls for 16:39

attorney-client privileged information. Instruct the witness not to answer. 16:40 16:40

BY MR. BIRKHAEUSER: 16:40

Q. Are you going to follow that instruction? 16:40

A. Yes. 16:40

Q. You told me before that you personally didn't inform anyone, other than committee members, to preserve documents. 16:40 16:40 16:40

Is that still your testimony? 16:40

A. Yes. 16:40

Q. Were you present when any other committee members instructed their employees to preserve documents? 16:40 16:40 16:41

A. No. 16:41

Q. Okay. There was another committee -- strike that. 16:41

Was the 2008 litigation committee ultimately responsible for producing documents to the plaintiffs in this case? 16:41 16:41 16:41

MR. CARTER: Object to form. 16:41

THE WITNESS: I do not understand this question. 16:42 16:42

BY MR. BIRKHAEUSER:

Q. Are you aware that over the last year and a half, Irico has produced documents to plaintiffs in this 16:42 16:42

case? 16:42

A. I'm aware of that. 16:42

Q. Okay. Was the litigation committee that was formed in 2008 responsible for Irico's production of documents? 16:42

MR. CARTER: Object to form. 16:42

THE WITNESS: No. 16:43

BY MR. BIRKHAEUSER: 16:43

Q. Who was responsible for producing -- strike that. 16:43

What Irico employee or employees were responsible for producing documents to plaintiffs? 16:43

A. Attorney Zhang -- Wenkai Zhang. 16:43

Q. And is that someone -- okay. Mr. Zhang is your subordinate, is that right? 16:43

A. Yes, yes. 16:43

Q. If you could turn back to document Exhibit 8605, and I'm going to direct your attention to Issue No. 9, starting on page 17. 16:44

A. 8605, right?

Q. And I will read it to you. These are Irico's responses to interrogatories. 16:45

A. Yes. 16:45

Q. Okay. According to these interrogatory responses, there was another instruction to Irico 16:45

STATE OF CALIFORNIA )
COUNTY OF SANTA BARBARA ) ss.

I, Mark McClure, C.S.R. No. 12203, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is a true, correct, and complete transcript of said proceedings;

That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript { } was { } was not required.

I further certify that I am not interested in the event of the action.

Witness my hand this 12 day of October, 2022.

Certified Shorthand Reporter
State of California
CSR No. 12203

# EXHIBIT F



January 24, 2023

Certification

Welocalize Translations

TRANSLATOR'S DECLARATION:

I, Samuel Chong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: P-00000006

*(Digital or printed signature here above the line)*

Samuel Chong

Project Number: BBLLP_2301_P0001

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

From:       yau <yauyautong@rch.com.cn> on behalf of yau
Sent:       Monday, June 23, 2006 4:35 AM
To:         Secretary Tse; Maihai Lin; Yuan Liang; Xiaobo; Shen Mu; Gao
Subject:    Fwr (Running Alert - This may be a spam) CRT Litigation Progress

—— Original Message ——
From:
To:
Cc:
Sent: Monday, June 23, 2006 4:16 PM
Subject: (Running Alert - This may be a spam) CRT Litigation Progress

Attorney Yau

Hello!

[text redacted]

[text redacted]

[text redacted]

[text redacted]

[text redacted]

2. The court issued its first pretrial order on April 4, 2008, with Article 43 being the most critical to Irico, which sets out the court's requirements for preservation of evidence (including information in electronic form). As we have discussed with Irico, this is an extremely important statutory requirement. If some potentially relevant information is lost or destroyed, this could have very serious consequences for Irico. The pretrial order is attached for your review. We have also attached a Chinese translation of Article 43 for your reference.

[text redacted]

[text redacted]

CONFIDENTIAL                    Translation                    IRI-SUPP-000017E



Regards!

Best wishes!

**Kevin Xi** | PRC Legal Consultant
Pillsbury Winthrop Shaw Pittman LLP

---

Tel: 86.21.6335.1108 | Fax: 86.21.6335.1178
Suite 4305, Bund Center 222 Yan An Road East | Shanghai 200002
Email: kevin.xi@pillsburylaw.com
www.pillsburylaw.com

2

CONFIDENTIAL Translation IRI-SUPP-000013E

Case 3:07-cv-05944-SC Document 230 Filed 04/04/2008 Page 1 of 7

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In Re: Cathode Ray Tube (CRT) Antitrust Litigation

This Document Relates to:

ALL ACTIONS

Case No. 07-5944 SC
MDL No. 1917

PRETRIAL ORDER NO. 1

On April 4, 2008, the Court conducted a status conference in this multidistrict litigation ("MDL") proceeding. After considering the materials submitted by the parties at the conference and good cause appearing, the Court hereby establishes the following pretrial procedures.

**PRACTICE AND PROCEDURE ORDER UPON TRANSFER PURSUANT TO § 1407(a) (REVISED)**

1. This order shall govern the practice and procedure in those actions transferred to this Court by the Judicial Panel on Multidistrict Litigation (MDL Panel) pursuant to its order of February 15, 2008, as well as all related actions originally filed in this Court or transferred or removed to this Court. This order shall also govern the practice and procedure in any tag-along actions transferred to this Court by the MDL Panel pursuant to Rule 7.4 of the Rules of Procedure of the MDL Panel subsequent to

Case 3:07-cv-05944-SC Document 230 Filed 04/04/2008 Page 2 of 7

United States District Court
For the Northern District of California

the filing of the final transfer order by the Clerk of this Court and any related actions subsequently filed, transferred or removed to this Court.

2. The actions described in paragraph 1 of this Order are consolidated for pretrial purposes.

**ESTABLISHMENT OF MASTER DOCKET AND FILE**

3. The files of all direct purchaser actions and indirect purchaser actions shall be maintained in the master file, Case No. C-07-5944 SC MDL No. 1917. Every pleading filed in direct purchaser actions and indirect purchaser actions shall bear the above caption. When a pleading or paper is intended to be applicable to all actions, the words “All Actions” shall appear immediately after the words “This Document Relates to:” in the caption above. When a pleading or paper is intended to be applicable only to all direct purchaser actions, the words “All Direct Purchaser Actions” shall appear in the caption. When a pleading or paper is intended to be applicable only to all indirect purchaser actions, the words ”All Indirect Purchaser Actions” shall appear in the caption.

4. All pleadings and submissions in these actions shall be e-filed both in the master docket and in the individual case docket(s) of any individual case(s) to which the submission pertains. All submissions filed in these actions shall bear the identification “Case No. C-07-5944 SC MDL No. 1917,” and when such a submission relates to all of these actions, following “Case No. C-07-5944 SC MDL No. 1917," shall be the notation “ALL CASES.” If a submission does not relate to all of these actions, the docket

number of the individual action or actions assigned by the Clerk of the Court shall follow "Case No. C-07-5944 SC MDL No. 1917." The chambers copy of each document e-filed in these cases must clearly indicate the docket number assigned by the electronic case filing system to each such document.

**APPEARANCES**

5. Counsel who have not yet entered an appearance shall electronically file a Notice of Appearance in the master docket and in the individual case docket(s) of any individual case(s). Counsel who appeared in a transferor court prior to their case being transferred to this Court need not enter an additional appearance before this Court.

6. Attorneys admitted to practice and in good standing in any United States District Court are admitted pro hac vice in this litigation. Pursuant to Rule 1.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, association of local counsel is not required.

**COMMUNICATIONS WITH THE COURT AND COUNSEL**

7. Unless otherwise ordered by the Court, all substantive communications with the Court shall be e-filed.

8. The Court recognizes that cooperation by and among plaintiffs' counsel and by and among defendants' counsel is essential for the orderly and expeditious resolution of this litigation. The communication of information among and between plaintiffs' counsel and among and between defendants' counsel shall not be deemed a waiver of the attorney-client privilege or the protection afforded attorney work-product. Nothing contained

United States District Court
For the Northern District of California

in this provision shall be construed to limit the rights of any party or counsel to assert the attorney-client privilege or attorney work-product doctrine.

**FILING AND SERVICE OF PAPERS AND PLEADINGS**

9. These cases are subject to Electronic Case Filing ("ECF"), pursuant to General Order 45, Section VI, which requires that all documents in such a case be filed electronically. General Order, Section IV(A) provides that "[e]ach attorney of record is obligated to become an ECF User and be assigned a user ID and password for access to the system upon designation of the action as being subject to ECF." If he or she has not already done so, counsel shall register forthwith as an ECF User and be issued an ECF User ID and password. Forms and instructions can be found on the Court's website at https://ecf.cand.uscourts.gov/cand/index.html. All documents can be e-filed in the master file, Case No. C-07-5944 SC MDL No. 1917.

10. Papers that are filed electronically through the Court's ECF system are deemed served on all parties as of the date of filing. All other service of papers shall be governed by the Federal Rules of Civil Procedure unless otherwise agreed by the parties.

11. Permission to file briefs in excess of the page limits set forth in Rule 7 of the Local Rules will not be routinely granted in these cases. Stipulations allowing oversized briefs will not be approved unless submitted at least five (5) court days before the first brief addressed in the stipulation is due.

12. All parties are to make best efforts to resolve

United States District Court
For the Northern District of California

Case 3:07-cv-05944-SC Document 230 Filed 04/04/2008 Page 5 of 7

scheduling and other procedural issues by conferring with opposing counsel in the case(s) before contacting the court.

**EVIDENCE PRESERVATION**

13. All parties and their counsel are reminded of their duty to preserve evidence that may be relevant to this action. The duty extends to documents, data and tangible things in the possession, custody and control of the parties to this action, and any employees, agents, contractors, carriers, bailees, or other non-parties who possess materials reasonably anticipated to be subject to discovery in this action. “Documents, data, and tangible things” shall be interpreted broadly to include writings, records, files, correspondence, reports, memoranda, calendars, diaries, minutes, electronic messages, voicemail, e-mail, telephone message records or logs, computer and network activity logs, hard drives, backup data, removable computer storage media such as tapes, discs and cards, printouts, document image files, Web pages, databases, spreadsheets, software, books, ledgers, journals, orders, invoices, bills, vouchers, check statements, worksheets, summaries, compilations, computations, charts, diagrams, graphic presentations, drawings, films, charts, digital or chemical process photographs, video, phonographic, tape or digital recordings or transcripts thereof, drafts, jottings and notes, studies or drafts of studies or other similar such material. Information that serves to identify, locate or link such material, such as file inventories, file folders, indices, and metadata, is also included in this definition. Until the parties reach an agreement on a preservation plan or the Court

United States District Court
For the Northern District of California

orders otherwise, each party shall take reasonable steps to preserve all documents, data, and tangible things containing information potentially relevant to the subject matter of this litigation. In addition, counsel shall exercise all reasonable efforts to identify and notify parties and non-parties of their duties, including employees of corporate or institutional parties, to the extent required by the Federal Rules of Civil Procedure.

**PROTECTIVE ORDER**

14. The parties shall meet and confer regarding a protective order for this proceeding. Within 30 days of the entry of an Order appointing interim lead class counsel, the parties shall present a stipulated protective order, or in the event a stipulation cannot be reached, their respective proposals.

**DISCLOSURES**

15. Within 30 days of the entry of this Order, the parties shall complete a Rule 26(f) conference and shall make initial disclosures within 14 days thereafter.

**ALTERNATIVE DISPUTE RESOLUTION**

16. Within 30 days of the entry of an Order appointing interim lead class counsel, the parties shall discuss the selection of an alternative dispute resolution process.

**FURTHER CASE MANAGEMENT CONFERENCE**

17. The Court shall conduct a Status Conference on July 11, 2008 at 10:00 A.M. The parties shall electronically file a Joint Case Management Statement ten (10) court days prior thereto.

///

///

Case 3:07-cv-05944-SC Document 250 Filed 04/04/2008 Page 7 of 7

United States District Court
For the Northern District of California

**APPLICABILITY OF ORDER**

18. This Order shall apply to all actions subsequently filed in, or transferred to, this district that are related to this MDL proceeding. Any party objecting to the application of this Order to a subsequently filed or transferred case shall file a motion for relief supported by good cause within 30 days of the case being added to the master docket.

DATED: April 4, 2008

UNITED STATES DISTRICT JUDGE

Article 13      Preservation of Evidence

The parties to the litigation and their agents were informed of their duty to preserve evidence that may be relevant to this case. This liability extends to documents, data and tangible things in the possession, custody or control of the parties to this action and any employee, agent, contractor, carrier or custodian, or other outsider in possession of material reasonably expected to be within the scope of the factual inquiry in this case. "Documents, data and tangible things" shall be interpreted broadly to include handwriting, records, archives, newsletters, reports, memos, calendars, diaries, minutes, electronic messages, voice mail, e-mail, telephone message records or logs, computer and network activity logs, hardware drives, data backups, removable computer storage media such as tapes, disks and cards, printouts, image files of text, Web pages, databases, spreadsheets, software, books, ledgers, ledger books, orders, invoices, bills, vouchers, check statements, worksheets, summaries, compilations, calculations, diagrams, charts, diagrams, drawings, films, sketches, digital or chemically manipulated photographs, videos, tape or digitally recorded recordings or copies thereof, drafts , notes or notebooks, papers or draft papers, or other similar materials. Any information for the purpose of discovering, locating, or linking the above material, such as file lists, folders, directories, and metadata, is also included in this definition. Unless the parties agree on a preservation plan or the court orders otherwise, each party shall take reasonable steps to preserve all documents, data, and tangible objects containing information that may be relevant to the subject matter of the case. In addition, the agent shall make reasonable efforts to determine and inform the parties and outsiders, including employees of the company or entity, of their relevant responsibilities, to the extent required by federal civil procedure law.

| | |
|---|---|
| **From:** | yan <yanyunlong@ch.com.cn> on behalf of yan |
| **Sent:** | Monday, June 23, 2008 4:35 AM |
| **To:** | 陶书记; 刘麦海; 梁援; 申小琳; 高总 |
| **Subject:** | Fw: (瑞星提示-此邮件可能是垃圾邮件)CRT诉讼进展情况 |

----- Original Message -----
**From:** Xi, Kevin
**To:** yan
**Cc:** Chan, Joseph W. K.
**Sent:** Monday, June 23, 2008 4:16 PM
**Subject:** (瑞星提示-此邮件可能是垃圾邮件)CRT诉讼进展情况

闫律师，

您好！ ██████████████████████████████████████
████████████████████████████████████

■ ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

5.  法院在2008年4月4日发布了首个预审令，其中第13条对彩虹最为关键，其规定了法庭对证据保全的要求（包括电子形式的信息）。正如我们与彩虹所讨论的，这是一项极为重要的法定要求。若一些潜在的相关信息丢失或毁损，这会对彩虹产生非常严重的后果。这里附上预审令供您查阅。同时我们也附上第13条的中文翻译，供您参考。

████████████████████████████████████████

████████████████████████████████████████

CONFIDENTIAL                                                           IRI-SUPP-000012

顺颂

百务顺遂！

**Kevin Xi |** PRC Legal Consultant
**Pillsbury Winthrop Shaw Pittman LLP**
————————————————————————————————
Tel: 86.21.6335.1108 | Fax: 86.21.6335.1178
Suite 4305, Bund Center 222 Yan An Road East | Shanghai 2000002
Email: kevin.xi@pillsburylaw.com
**www.pillsburylaw.com**

Case 3:07-cv-05944-SC Document 230 Filed 04/04/2008 Page 1 of 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In Re: Cathode Ray Tube (CRT) Antitrust Litigation

This Document Relates to:

ALL ACTIONS

Case No. 07-5944 SC
MDL No. 1917

PRETRIAL ORDER NO. 1

On April 4, 2008, the Court conducted a status conference in this multidistrict litigation ("MDL") proceeding. After considering the materials submitted by the parties at the conference and good cause appearing, the Court hereby establishes the following pretrial procedures.

**PRACTICE AND PROCEDURE ORDER UPON TRANSFER PURSUANT TO § 1407(a) (REVISED)**

1. This order shall govern the practice and procedure in those actions transferred to this Court by the Judicial Panel on Multidistrict Litigation (MDL Panel) pursuant to its order of February 15, 2008, as well as all related actions originally filed in this Court or transferred or removed to this Court. This order shall also govern the practice and procedure in any tag-along actions transferred to this Court by the MDL Panel pursuant to Rule 7.4 of the Rules of Procedure of the MDL Panel subsequent to

United States District Court
For the Northern District of California

Case 3:07-cv-05944-SC Document 230 Filed 04/04/2008 Page 2 of 7

United States District Court
For the Northern District of California

the filing of the final transfer order by the Clerk of this Court and any related actions subsequently filed, transferred or removed to this Court.

2. The actions described in paragraph 1 of this Order are consolidated for pretrial purposes.

**ESTABLISHMENT OF MASTER DOCKET AND FILE**

3. The files of all direct purchaser actions and indirect purchaser actions shall be maintained in the master file, Case No. C-07-5944 SC MDL No. 1917. Every pleading filed in direct purchaser actions and indirect purchaser actions shall bear the above caption. When a pleading or paper is intended to be applicable to all actions, the words “All Actions” shall appear immediately after the words “This Document Relates to:” in the caption above. When a pleading or paper is intended to be applicable only to all direct purchaser actions, the words “All Direct Purchaser Actions” shall appear in the caption. When a pleading or paper is intended to be applicable only to all indirect purchaser actions, the words ”All Indirect Purchaser Actions” shall appear in the caption.

4. All pleadings and submissions in these actions shall be e-filed both in the master docket and in the individual case docket(s) of any individual case(s) to which the submission pertains. All submissions filed in these actions shall bear the identification “Case No. C-07-5944 SC MDL No. 1917,” and when such a submission relates to all of these actions, following “Case No. C-07-5944 SC MDL No. 1917," shall be the notation “ALL CASES.” If a submission does not relate to all of these actions, the docket

Case 3:07-cv-05944-SC Document 230 Filed 04/04/2008 Page 3 of 7

United States District Court
For the Northern District of California

number of the individual action or actions assigned by the Clerk of the Court shall follow "Case No. C-07-5944 SC MDL No. 1917." The chambers copy of each document e-filed in these cases must clearly indicate the docket number assigned by the electronic case filing system to each such document.

**APPEARANCES**

5. Counsel who have not yet entered an appearance shall electronically file a Notice of Appearance in the master docket and in the individual case docket(s) of any individual case(s). Counsel who appeared in a transferor court prior to their case being transferred to this Court need not enter an additional appearance before this Court.

6. Attorneys admitted to practice and in good standing in any United States District Court are admitted pro hac vice in this litigation. Pursuant to Rule 1.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, association of local counsel is not required.

**COMMUNICATIONS WITH THE COURT AND COUNSEL**

7. Unless otherwise ordered by the Court, all substantive communications with the Court shall be e-filed.

8. The Court recognizes that cooperation by and among plaintiffs' counsel and by and among defendants' counsel is essential for the orderly and expeditious resolution of this litigation. The communication of information among and between plaintiffs' counsel and among and between defendants' counsel shall not be deemed a waiver of the attorney-client privilege or the protection afforded attorney work-product. Nothing contained

in this provision shall be construed to limit the rights of any party or counsel to assert the attorney-client privilege or attorney work-product doctrine.

**FILING AND SERVICE OF PAPERS AND PLEADINGS**

9. These cases are subject to Electronic Case Filing ("ECF"), pursuant to General Order 45, Section VI, which requires that all documents in such a case be filed electronically. General Order, Section IV(A) provides that "[e]ach attorney of record is obligated to become an ECF User and be assigned a user ID and password for access to the system upon designation of the action as being subject to ECF." If he or she has not already done so, counsel shall register forthwith as an ECF User and be issued an ECF User ID and password. Forms and instructions can be found on the Court's website at https://ecf.cand.uscourts.gov/cand/index.html. All documents can be e-filed in the master file, Case No. C-07-5944 SC MDL No. 1917.

10. Papers that are filed electronically through the Court's ECF system are deemed served on all parties as of the date of filing. All other service of papers shall be governed by the Federal Rules of Civil Procedure unless otherwise agreed by the parties.

11. Permission to file briefs in excess of the page limits set forth in Rule 7 of the Local Rules will not be routinely granted in these cases. Stipulations allowing oversized briefs will not be approved unless submitted at least five (5) court days before the first brief addressed in the stipulation is due.

12. All parties are to make best efforts to resolve

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

scheduling and other procedural issues by conferring with opposing counsel in the case(s) before contacting the court.

**EVIDENCE PRESERVATION**

13. All parties and their counsel are reminded of their duty to preserve evidence that may be relevant to this action. The duty extends to documents, data and tangible things in the possession, custody and control of the parties to this action, and any employees, agents, contractors, carriers, bailees, or other non-parties who possess materials reasonably anticipated to be subject to discovery in this action. “Documents, data, and tangible things” shall be interpreted broadly to include writings, records, files, correspondence, reports, memoranda, calendars, diaries, minutes, electronic messages, voicemail, e-mail, telephone message records or logs, computer and network activity logs, hard drives, backup data, removable computer storage media such as tapes, discs and cards, printouts, document image files, Web pages, databases, spreadsheets, software, books, ledgers, journals, orders, invoices, bills, vouchers, check statements, worksheets, summaries, compilations, computations, charts, diagrams, graphic presentations, drawings, films, charts, digital or chemical process photographs, video, phonographic, tape or digital recordings or transcripts thereof, drafts, jottings and notes, studies or drafts of studies or other similar such material. Information that serves to identify, locate or link such material, such as file inventories, file folders, indices, and metadata, is also included in this definition. Until the parties reach an agreement on a preservation plan or the Court

Case 3:07-cv-05944-SC Document 230 Filed 04/04/2008 Page 6 of 7

orders otherwise, each party shall take reasonable steps to preserve all documents, data, and tangible things containing information potentially relevant to the subject matter of this litigation. In addition, counsel shall exercise all reasonable efforts to identify and notify parties and non-parties of their duties, including employees of corporate or institutional parties, to the extent required by the Federal Rules of Civil Procedure.

**PROTECTIVE ORDER**

14. The parties shall meet and confer regarding a protective order for this proceeding. Within 30 days of the entry of an Order appointing interim lead class counsel, the parties shall present a stipulated protective order, or in the event a stipulation cannot be reached, their respective proposals.

**DISCLOSURES**

15. Within 30 days of the entry of this Order, the parties shall complete a Rule 26(f) conference and shall make initial disclosures within 14 days thereafter.

**ALTERNATIVE DISPUTE RESOLUTION**

16. Within 30 days of the entry of an Order appointing interim lead class counsel, the parties shall discuss the selection of an alternative dispute resolution process.

**FURTHER CASE MANAGEMENT CONFERENCE**

17. The Court shall conduct a Status Conference on July 11, 2008 at 10:00 A.M. The parties shall electronically file a Joint Case Management Statement ten (10) court days prior thereto.

///

///

United States District Court
For the Northern District of California

**APPLICABILITY OF ORDER**

18. This Order shall apply to all actions subsequently filed in, or transferred to, this district that are related to this MDL proceeding. Any party objecting to the application of this Order to a subsequently filed or transferred case shall file a motion for relief supported by good cause within 30 days of the case being added to the master docket.

DATED: April 4, 2008

[signature]
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

第 13 条　　　　证据保全

诉讼各方及其代理人被告知其保全证据之责任可能与本案有关。该责任及于本案中诉讼各方以及任何雇员、代理、订约人、运送人或者保管人或者其他占有经过合理预期属于本案事实调查范围之材料的案外人所占有、保管或控制的文件、数据和有形物。“文件、数据和有形物”应被扩大解释为包括手迹、记录、存档、通讯、报告、备忘录、日历、日记、纪要、电子讯息、语音邮件、电子邮件、电话留言记录或日志、计算机和网络活动日志、硬件驱动器、数据备份、可移除的计算机存储介质例如磁带、盘片和卡，打印输出、文本的图像文件、网页、数据库、电子表格、软件、书、分类帐、分录簿、订单、发票、帐单、凭证、支票对帐单、工作表、摘要、编撰、计算、示意图、图表、图示、图画、胶片、草图、数字或化学处理的照片、视频、磁带或者数字记录的录音或其副本、草稿、便条或笔记、论文或者论文草稿或其他类似材料。为了发现、定位或者联系上述材料的任何信息，例如文件清单、文件夹、目录和元数据，也包括在此定义中。除非各方就保全计划达成协议或者法庭另有命令，每一方均应当采取合理措施保全含有和本案的标的可能有关系的所有文件、数据和有形物。此外，代理人应当在联邦民事程序法要求的范围内，尽合理努力确定并告知各方和案外人，包括公司或单位之雇员其相关责任。

# EXHIBIT G

**Irico Defendants' Log of Privileged Documents**

| IDENTIFIER | DATE | AUTHOR | ADDRESSEE(S) | COPYEE(S) | BLIND COPYEE(S) | DESCRIPTION | DEFENSE | REDACTED | PRODUCTION BATES |
|---|---|---|---|---|---|---|---|---|---|
| P-00000001 | 2004-03-25 | Jun He Law Offices* | Xing Daoqing | | | MEMORANDUM PREPARED BY COUNSEL REGARDING CORPORATE STRUCTURING AND SECURITIES LAW ISSUES | AC | YES | IRI-CRT-00007595 - IRI-CRT-00007835 |
| P-00000002 | 2004-09-09 | Gong Rui* | Irico Electronics Board of Directors | | | BOARD MINUTES CONTAINING LEGAL ADVICE REGARDING CORPORATE GOVERNANCE ISSUES | AC | YES | IRI-CRT-00010053 - IRI-CRT-00010082 |
| P-00000003 | 2004-09-09 | Gong Rui* | Irico Electronics Board of Directors | | | BOARD MINUTES CONTAINING LEGAL ADVICE REGARDING CORPORATE GOVERNANCE ISSUES | AC | YES | IRI-CRT-00010093 - IRI-CRT-00010119 |
| P-00000004 | 2008-02-15 | Joseph Chan* | Yan Yunlong* | Tao Kui<br>Gao Rongguo<br>Terrence Callan*<br>Joseph Tiffany*<br>Joseph Chan* | | EMAIL THREAD PREPARED IN THE COURSE OF LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING CRT LITIGATION STATUS AND STRATEGY | AC/AWP | NO | |
| P-00000005 | 2008-02-15 | Yan Yunlong* | Tao Kui<br>Gao Rongguo | Guo Xiaoyan | | EMAIL THREAD PREPARED IN THE COURSE OF LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL JOSEPH CHAN* REGARDING CRT LITIGATION STATUS AND STRATEGY | AC/AWP | NO | |
| P-00000006 | 2008-06-23 | Yan Yunlong* | Tao Kui<br>Liu Maihai<br>Yuan Liang<br>Shen Xiaolin<br>Gao Rongguo | | | EMAIL THREAD PREPARED IN THE COURSE OF LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL TERRENCE CALLAN* AND JOSEPH TIFFANY* REGARDING CRT LITIGATION STATUS AND STRATEGY | AC/AWP | NO | |
| P-00000007 | 2008-08-18 | Kevin Hee* | Yan Yunlong* | Joseph Tiffany*<br>Philip Simpkins*<br>Joseph Chan*<br>Terrence Callan* | | EMAIL PREPARED IN THE COURSE OF LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL JOSEPH TIFFANY* REGARDING DOCUMENT PRESERVATION | AC/AWP | NO | |
| P-00000008 | 2008-08-18 | Kevin Hee* | Yan Yunlong* | Joseph Tiffany*<br>Philip Simpkins*<br>Joseph Chan*<br>Terrence Callan* | | ATTACHED MEMORANDUM PREPARED IN THE COURSE OF LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL JOSEPH TIFFANY* REGARDING DOCUMENT PRESERVATION | AC/AWP | NO | |
| P-00000009 | 2018-11-05 | Kaylee Yang* | Zhang Wenkai* | Kong Xueping**<br>Wu Xiaojun**<br>John Taladay*<br>Erik Koons*<br>Stuart Plunkett*<br>Yan Yunlong* | | EMAIL PREPARED IN THE COURSE OF LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DOCUMENT PRESERVATION | AC/AWP | NO | |
| P-00000010 | 2018-11-05 | Kaylee Yang* | Zhang Wenkai* | Kong Xueping**<br>Wu Xiaojun**<br>John Taladay*<br>Erik Koons*<br>Stuart Plunkett*<br>Yan Yunlong* | | ATTACHED DRAFT NOTICE PREPARED IN THE COURSE OF LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DOCUMENT PRESERVATION | AC/AWP | NO | |

AC = ATTORNEY-CLIENT PRIVILEGE
AWP = ATTORNEY WORK PRODUCT

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

* DENOTES COUNSEL FOR THE IRICO DEFENDANTS
** DENOTES COUNSEL FOR CHINA ELECTRONICS CORPORATION

# EXHIBIT H



January 24, 2023

Certification

Welocalize Translations

TRANSLATOR'S DECLARATION:

I, Samuel Chong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: P-00000007

*(Digital or printed signature here above the line)*

Samuel Chong

Project Number: BBLLP_2301_P0001

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

---

**From:** Xi, Kevin <kevin.xi@pillsburylaw.com> on behalf of Xi, Kevin
**Sent:** Monday, August 18, 2008 3:47 AM
**To:** yan
**Cc:** Tiffany, Joseph R.; Simpkins, Philip A.; Chan, Joseph W. K.; Callan, Terrence A.
**Subject:** (Reuixing Alert - This may be a spam) CRT Antitrust Litigation - Information Retention Notice

Attorney Yan.

Hello. As stated on the phone, attached is a memorandum and notice of information retention from the U.S. Court regarding the preservation of evidence requirements.

Best regards!

**Kevin Xi** | PRC Legal Consultant
**Pillsbury Winthrop Shaw Pittman LLP**
——————————————————————————————————
Tel: 86.21.6335.1108 | Fax: 86.21.6335.1178
Suite 4305, Bund Center 222 Yan An Road East | Shanghai 2000002
Email: kevin.xi@pillsburylaw.com
**www.pillsburylaw.com**

**From:** Xi, Kevin <kevin.xi@pillsburylaw.com> on behalf of Xi, Kevin
**Sent:** Monday, August 18, 2008 3:47 AM
**To:** yan
**Cc:** Tiffany, Joseph R.; Simpkins, Philip A.; Chan, Joseph W. K.; Callan, Terrence A.
**Subject:** (瑞星提示-此邮件可能是垃圾邮件)显像管反垄断诉讼—信息保存通知

闫律师，

您好。如电话中所述，随函附上美国法院对于证据保全要求的备忘录和信息保存通知。

顺颂

商琪！

**Kevin Xi |** PRC Legal Consultant
**Pillsbury Winthrop Shaw Pittman LLP**
————————————————————————————————
Tel: 86.21.6335.1108 | Fax: 86.21.6335.1178
Suite 4305, Bund Center 222 Yan An Road East | Shanghai 2000002
Email: kevin.xi@pillsburylaw.com
**www.pillsburylaw.com**



February 22, 2023

Certification
                                Welocalize Translations

     TRANSLATOR'S DECLARATION:

     I, Samuel Chong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: P-00000008

*(Digital or printed signature here above the line)*

Samuel Chong

Project Number: BBLLP_2301_P0001

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

pillsbury

Pillsbury Winthrop Shaw Pittman LLP
2475 Hanover Street | Palo Alto, CA 94304-1114 | tel 650.233.4500 | fax 650.233.4545

Memorandum

To: Mr. Yunlong Yan

From: Joseph R. Tiffany II

Cc: Terrence A. Callan
Philip A. Simpkins

Sent: August 7, 2008

C/M#: 043250-0000001

Subject: CRT Antitrust Litigation - Notice of Information Retention

---

Based on our prior communications and the Court Order on Preservation of Evidence (see Attachment I), we believe that Irico Group Corporation and Irico Display Devices Co., Ltd. (collectively, "Irico") have notified the appropriate Irico personnel regarding the retention of information potentially relevant to the subject matter of the CRT Antitrust Litigation at issue. The purpose of this memorandum is to advise Irico to distribute forms and documents to employees in addition to the notifications already previously made, which are intended to remind Irico personnel of the importance of complying with U.S. law requiring the preservation of potentially relevant information.

The "Notice of Information Retention" (the "Notice") in Annex II shall be distributed to all Irico personnel who may reasonably obtain any information and documents described in the Notice. In identifying the specific Irico personnel who should receive this notice, you should start with the "persons most knowledgeable" that we asked you to identify in our July 14, 2008, memorandum entitled "Request for Information Regarding the CRT Antitrust Litigation." In addition to the "persons most knowledgeable " described above, this notice shall be distributed to any employee (including directors, officers, executives, managers and other employees) who may reasonably have documents or electronic information relating to any of the subjects identified in the notice. Finally, this notice shall also be distributed to the appropriate Irico personnel responsible for information technology and records management. The above individuals in charge should be aware of the requirements described in this notice and should consider what steps to take to avoid the loss of any potentially relevant information in the course of the CRT antitrust litigation. The retention of all potentially relevant documents is extremely important, and we recommend that you provide this notice to an employee if you are in doubt as to whether he or she may have potentially relevant documents. Please contact us if you have any questions or would like to discuss who may have custody of potentially relevant documents.

For your convenience, we have created documents in the same format for distribution to Irico Group Corporation and Irico Display Devices Co., Ltd. employees. You may also amend this notice into two different document formats to be sent to the personnel of each of the two Irico companies as defendants if you wish to do so. You will find a space on the last page of this notice that requires each Irico employee receiving the notice to fill in his or her signature and title. By signing this notice, each employee acknowledges that he or she has read and will comply with this notice. The purpose of requiring employee signatures is to emphasize to employees the importance of complying with this notice and to provide written evidence that Irico has taken appropriate steps to comply with its information retention obligations in the proceeding. One copy of this notice is for each employee to keep and another copy is for the employee to sign and return. Please also provide us with a copy of the employee's signed notice, and we recommend that Irico retain a copy as well. We recommend that you create a list of all employees who received this notice so that you can identify each employee who received it. This list may also be used to

periodically remind each employee of his or her obligation to maintain documents and information, and may be updated to include new employees who will join Irico in the future and who will also receive this notice. Please send us this list for our records.

As mentioned above, this notice identifies the specific types of information that we believe we need to preserve at this stage. As the litigation progresses and we learn more about Irico's business, we may notify you of additional types of information that need to be retained. Subsequent developments in the litigation (including subsequent court decisions) will also result in certain types of information described in the notice no longer being required to be retained. However, please be sure to consult with us when you take any steps to release any of the types of information listed in the notice from retention.

We are still awaiting a response from Irico to the initial request for information we sent to you on July 22, 2008. Your response will provide us with the necessary information to help us determine if additional measures are needed for information retention. In addition, we have stated that it is important for us to obtain this information in order to try to convince plaintiff's counsel to remove Irico from the lawsuit. We hope to receive this information from you as soon as possible.

Please contact us if you have any questions regarding this Notice or any other aspect of the CRT antitrust litigation.

Annex I

Preservation of Evidence

The parties to the litigation and their agents were informed of their duty to preserve evidence that may be relevant to this case. This liability extends to documents, data and tangible things in the possession, custody or control of the parties to this action and any employee, agent, contractor, carrier or custodian, or other outsider in possession of material reasonably expected to be within the scope of the factual inquiry in this case. "Documents, data and tangible things" shall be interpreted broadly to include handwriting, records, archives, newsletters, reports, memos, calendars, diaries, minutes, electronic messages, voice mail, e-mail, telephone message records or logs, computer and network activity logs, hardware drives, data backups, removable computer storage media such as tapes, disks and cards, printouts, image files of text, Web pages, databases, spreadsheets, software, books, ledgers, ledger books, orders, invoices, bills, vouchers, check statements, worksheets, summaries, compilations, calculations, diagrams, charts, diagrams, drawings, films, sketches, digital or chemically manipulated photographs, videos, tape or digitally recorded recordings or copies thereof, drafts , notes or notebooks, papers or draft papers, or other similar materials. Any information for the purpose of discovering, locating, or linking the above material, such as file lists, folders, directories, and metadata, is also included in this definition. Unless the parties agree on a preservation plan or the court orders otherwise, each party shall take reasonable steps to preserve all documents, data, and tangible objects containing information that may be relevant to the subject matter of the case. In addition, the agent shall make reasonable efforts to determine and inform the parties and outsiders, including employees of the company or entity, of their relevant responsibilities, to the extent required by federal civil procedure law.

Annex II

Information Retention Notice

As you may already know, Irico Group Corporation and Irico Display Devices Co., Ltd. ("Irico") have been sued in the United States in connection with their sales of CRTs and products containing CRT ("CRT Products "). This lawsuit is known as the CRT Antitrust Lawsuit. Plaintiffs claim that Irico and several other companies that sell CRT and CRT products conspired to artificially inflate the prices of CRT and CRT products sold in the U.S. Irico denies that it engaged in any unlawful conduct and believes it will prevail in its case.

Irico, as a defendant in the CRT antitrust litigation, must ensure that all potentially relevant information regarding Irico's CRT business is retained. This Information Retention Notice is intended to confirm and emphasize our prior instructions regarding record retention.

All documents and information (in physical and electronic form) described below must be retained until the termination of this Information Retention Notice. This Information Retention Notice applies to information and documents stored in personal offices, shared file cabinets, and outside locations. It also includes digital or electronic information retained in all locations (including desktop computers, laptops, home computers, personal digital assistants, server files, removable devices, cell phones, etc.). Please read the attached instructions for retaining electronic information. If you have any questions or problems with compliance instructions, please contact [insert name and contact information of the Irico employee answering the question].

Any information covered by this Information Retention Notice shall not be destroyed. Irico's normal retention/destruction procedures for such information will be discontinued. **Destruction of any document or information subject to this Information Retention Notice is strictly prohibited.**

In order to clarify the information and documents that you must keep, we are providing the following list. You may not hold some or most of the types of documents listed below, and we provide you with a complete list here so that if you or any other Irico employee you supervise holds information or documents that fall into any of the categories listed below, you will understand the scope of documents that are subject to this Information Retention Notice.

**Information and documents that meet the following three criteria must be preserved and not discarded or deleted, unless otherwise notified:**

1. Period: a document or information created from January 1, 1995 to the present, or relating to or about this period; and
2. Product: relating to or concerning (a) CRT or (b) semi-finished and finished products containing CRT, such as televisions containing CRT, ("CRT Products"); and
3. Subject matter: documents or information relating to or concerning one or more of the following twelve areas:
   (a) Marketing and pricing data - revenue, sales, customer lists, dealer lists, sales agent or broker lists, prices, pricing guidelines, pricing policies, pricing strategies, quotations, offers, discounts, rebates, market shares, profits, marketing, marketing plans, market forecasts, or other business plans discussing any of

the foregoing subjects with respect to CRTs or CRT Products shipped to or sold in the United States;

(b) Sales and transaction data - invoices, orders, sales or supply contracts, sales and transaction data, and databases regarding CRTs or CRT Products shipped to or sold in the United States;

(c) Production and Costs - production, capacity, facility, inventory, costs or expenses relating to CRTs or CRT Products shipped to or sold in the United States;

(d) Market research - market studies or reports discussing the sale, price, competition, competitors or production of CRTs or CRT Products in the United States or worldwide, whether provided by Irico, consultants or other third parties;

(e) Communications, Agreements or Meetings with Competitors - Communications, agreements, understandings or meetings between Irico employees, agents or representatives, and employees, agents or representatives of Irico competitors (or between Irico competitors) regarding CRTs or CRT products sold in the United States or worldwide;

(f) Distributor and Buyer Communications - Communications, agreements or understandings between two or more distributors or resellers of CRTs or CRT products or two or more buyers of CRTs or CRT Products for sale in the United States or worldwide.

(g) Internal or external communications and telephone and facsimile records - documents that certify, reflect, or relate to communications with Irico or with third parties relating to any of the subjects in (a) through (f) above (e.g., emails, faxes, facsimile records, telephone messages, telephone bills, recorded or voicemail messages, telephone or meeting notes, memoranda, meeting summaries, or meeting notes);

(h) Calendars and diaries - calendars, journals, daily business schedules, trip reports, notepads, phone books, appointment planners and task lists;

(i) Expense reports and travel documents - expense reports and receipts, and travel-related documents, including itineraries, passports and visas;

(j) Corporate financial information - annual and quarterly financial reports, shareholder reports and financial statements;

(k) Personnel records - personnel records or data for current or former employees involved with CRTs or CRT Products in the U.S. or worldwide; or

(l) Document Retention – Document retention policies and procedures.

Irico takes its responsibility to preserve information related to litigation and government investigations very seriously. Failure to preserve evidence may subject Irico or its employees to potentially severe sanctions. You should be aware that your failure to comply with this Information Retention Notice may subject you to disciplinary action by Irico, including dismissal.

pillsbury

If you are in possession of any documents or electronic information covered by this information retention notice, or if you are aware of a shared space where such documents or information are stored, please retain such documents or information until further notice and notify [insert Irico contact list] of the existence and location of such documents or information. If you have any questions or are unsure whether this information retention notice applies to you or to documents or information in your possession, please contact [insert Irico contact list].

U.S. law firm Pillsbury Winthrop Shaw Pittman LLP has been retained as an external counsel to represent Irico in this matter. A representative of the firm may be in touch with you.

We would like you to confirm that you have read this Information Retention Notice and will comply with the instructions regarding the retention of information. Please sign this information retention notice in the space provided below and return it to [insert Irico contact name] before [date].

Thank you for your cooperation.

I have read and will comply with this information retention notice.

____________________________
Signature

____________________________
Name

____________________________
Title

____________________________
Date



Pillsbury Winthrop Shaw Pittman LLP
2475 Hanover Street | Palo Alto, CA 94304-1114 | tel 650.233.4500 | fax 650.233.4545

**备忘录**

至: 闫云龙先生

发件人: Joseph R. Tiffany II

抄送: Terrence A. Callan
Philip A. Simpkins

日期: 2008 年 8 月 7 日

C/M#: 043250-0000001

主题: 显像管反垄断诉讼—信息保存通知

---

基于我们的先前通讯和证据保存法院令（见附件一），我们相虹彩虹集团公司和彩虹显示器件股份有限公司（以下合称“彩虹”）已经就保留与显像管反垄断诉讼争议标的潜在相关的信息通知适当的彩虹人员。本备忘录旨在建议彩虹在先前已进行的通知外，再向员工分发格式文件，旨在提醒彩虹人员遵守美国法律要求保存潜在相关信息的重要性。

附件二中的“信息保存通知”（“通知”）应向所有可能合理获得通知中描述的任何信息和文件的彩虹人员进行分发。在确定应收取本通知的具体彩虹人员时，贵方应从“最知悉人员”着手，在我们 2008 年 7 月 14 日题为“关于显像管反垄断诉讼信息请求”的备忘录中，我们已要求贵方进行确定。除上述“最知悉人员”外，还应将本通知向任何可能合理拥有与通知中确定的任何主题相关的文件或电子信息的员工（包括董事、高管、行政主管、经理和其他员工）进行分发。最后，本通知还应向负责信息技术和记录管理的适当彩虹人员分发。上述负责人应知悉本通知所述的要求并应考虑采取何种措施来避免在显像管反垄断诉讼进行过程中丢失任何潜在相关信息。保存所有潜在相关文件极为重要，若贵方对某位员工是否可能拥有潜在相关文件存有疑问时，我们建议贵方向其提供本通知。若贵方有任何问题，或想就潜在相关文件的保管人选进行讨论，请与我们联系。

为贵方方便起见，我们制作了相同格式的文件供您分发给彩虹集团公司和彩虹显示器件股份有限公司员工。若贵方希望将本通知修改成两份不同的文件格式分别向作为被告的两家彩虹公司的人员发送，也是可以的。您会发现，本通知最后一页留有要求收到通知的每位彩虹员工填写其签名和职务的空格。各员工通过签署本通知确认其已经阅读并将遵守本通知。要求员工签名旨在向员工强调遵守本通知的重要性，并提供彩虹已经采取适当措施履行其在诉讼中的信息保存义务的书面证据。本通知一份供每位员工用以留存，另一份供员工签署并归还。也请向我们提供一份员工签名的通知，我们也建议彩虹保留一份。我们建议贵方制作一份记录所有收到本通知的员工名单，以便确认每位收到通知的员工。此名单

pillsbury

还可以用以定期提醒每位员工保存文件和信息的义务，并可进行更新以添加将来加入彩虹的新员工，这些新员工也将收到本通知。请将这份名单发送给我们供我们存档。

如上所提到的，本通知确定了我们认为在现阶段需要保存的信息的具体种类。随着诉讼的推进以及我们对彩虹业务的进一步了解，我们可能会通知贵方需要保留的其他信息种类。诉讼的后续发展（包括后续法院裁定）还将导致通知中描述的某些信息种类无需再进行保留。但是，贵方在对通知中所列的任何信息种类采取任何措施解除保存时，请务必向我们进行咨询。

我们还在等待彩虹就我们在 2008 年 7 月 22 日向贵方发送的初步信息请求作出回复。贵方的回复将为我们提供必要的信息，以帮助我们确定是否还需采取其他措施进行信息保存。此外，我们曾指出过，我们必须获得这些信息以便尽力说服原告律师将彩虹从诉讼中取消。我们希望能尽快从贵方收到这些信息。

若贵方就本通知或显像管反垄断诉讼的任何其他方面有任何疑问，请与我们联系。

www.pillsburylaw.com Page 2
CONFIDENTIAL IRI-SUPP-000024



附件一

证据保全

诉讼各方及其代理人被告知其保全证据之责任可能与本案有关。该责任及于本案中诉讼各方以及任何雇员、代理、订约人、运送人或者保管人或者其他占有经过合理预期属于本案事实调查范围之材料的案外人所占有、保管或控制的文件、数据和有形物。“文件、数据和有形物”应被扩大解释为包括手迹、记录、存档、通讯、报告、备忘录、日历、日记、纪要、电子讯息、语音邮件、电子邮件、电话留言记录或日志、计算机和网络活动日志、硬件驱动器、数据备份、可移除的计算机存储介质例如磁带、盘片和卡，打印输出、文本的图像文件、网页、数据库、电子表格、软件、书、分类帐、分录簿、订单、发票、帐单、凭证、支票对帐单、工作表、摘要、编撰、计算、示意图、图表、图示、图画、胶片、草图、数字或化学处理的照片、视频、磁带或者数字记录的录音或其副本、草稿、便条或笔记、论文或者论文草稿或其他类似材料。为了发现、定位或者联系上述材料的任何信息，例如文件清单、文件夹、目录和元数据，也包括在此定义中。除非各方就保全计划达成协议或者法庭另有命令，每一方均应当采取合理措施保全含有和本案的标的可能有关系的所有文件、数据和有形物。此外，代理人应当在联邦民事程序法要求的范围内，尽合理努力确定并告知各方和案外人，包括公司或单位之雇员其相关责任。

pillsbury

附件二

<u>信息保存通知</u>

你可能已经知道，彩虹集团公司和彩虹显示器件股份有限公司（“彩虹”）就其销售显像管和包含显像管的产品（“显像管产品”）在美国被起诉。本诉讼称为显像管反垄断诉讼。原告主张彩虹和其他几家销售显像管和显像管产品的公司共谋人为地抬高在美国销售的显像管和显像管产品的价格。彩虹否认其参与过任何非法行为，并相信其会胜诉。

彩虹作为显像管反垄断诉讼中的被告，必须确保对关于彩虹显像管业务的所有潜在相关信息进行保存。本信息保存通知旨在确认和强调我们先前对保存记录作出的指示。

必须保存以下描述的所有文件和信息（有形和电子形式），直至本信息保存通知终止。本信息保存通知适用于存放在个人办公室、共享文档柜和外部场所的信息和文件。还包括保留在所有地方（包括台式电脑、笔记本电脑、家用电脑、个人数字助理、服务器文档、可移动设备、手机等）的数字或电子信息。请阅读附件中保存电子信息的说明。若你对遵守说明有任何疑问或问题，请联系【插入回答问题的彩虹员工的姓名和联系信息。】

不得销毁本信息保存通知中涉及的任何信息。彩虹对上述信息的正常保留/销毁程序即告中止。<u>严格禁止损毁受限于本信息保存通知的任何文件或信息。</u>

为了使你明确必须保存的信息和文件，我们现提供以下清单。你可能并不持有如下所列的某些或多数文件种类，我们在此向你提供完整清单，这样在你或你监督的任何其他彩虹员工持有属于任何如下种类的信息或文件时，你就会明白受限于本信息保存通知的文件范围。

<u>符合以下三项标准的信息和文件必须进行保存，不得丢弃或删除，除非另有通知：</u>

1. <u>期间</u>：自 1995 年 1 月 1 日至今创建的，文件或信息，或涉及或关于此期间的文件或信息；且

2. <u>产品</u>：涉及或关于(a)显像管或(b)包含显像管的半成品和成品，如包含显像管的电视机，（“显像管产品”）；且

3. <u>标的</u>：涉及或关于以下十二个领域中一个或多个的文件或信息：

   (a) <u>营销和价格数据</u> – 关于运往美国或在美国销售的显像管或显像管产品的收入、销售额、客户名单、经销商名单、销售代理或经纪商名单、价格、定价方针、定价政策、定价战略、报价、发盘、折扣、回扣、

pillsbury

市场份额、利润、营销、营销计划、市场预测、或其他讨论任何上述主题的商业计划；

(b) 销售和交易数据 – 关于运往美国或在美国销售的显像管或显像管产品的发票、订单、销售或供应合同、销售和交易数据、以及数据库；

(c) 生产和成本 – 关于运往美国或在美国销售的显像管或显像管产品的产量、产能、设备、存货、成本或费用；

(d) 市场研究 – 讨论美国或全球显像管或显像管产品销售、价格、竞争、竞争者或生产的市场研究或报告，无论是由彩虹、顾问或其他第三方提供；

(e) 与竞争者的通讯、协议或会议 – 彩虹员工、代理人或代表，与彩虹竞争者员工、代理人或代表（或彩虹竞争者间的）之间的关于在美国或全球销售的显像管或显像管产品的通讯、协议、谅解或参与的会议；

(f) 经销商和买方通讯 – 两个以上显像管或显像管产品的经销商或转销商或两个以上买方间关于在美国或全球销售的显像管或显像管产品的通讯、协议或谅解；

(g) 内部或外部通讯及电话和传真记录–证明、反映、或涉及与彩虹进行通讯或与第三方通讯的与上述(a)至(f)中的任何主题相关的文件（如电子邮件、传真、传真记录、电话留言、电话帐单、录音或语音邮件、电话或会议记录、备忘录、会议摘要或会议记要）；

(h) 日历和日记 – 日历、日记、日常商务时间表、旅行报告、记事本、电话簿、约会计划本和任务表；

(i) 费用报告和旅行文件 – 费用报告和收据，及旅行相关文件，包括行程表、护照和签证；

(j) 公司财务信息 – 年度和季度财务报告、股东报告和财务报表；

(k) 人员记录 – 涉及美国或全球显像管或显像管产品的在职或离职员工的人员记录或数据；或

(l) 文件保留 – 文件保留政策和程序。

彩虹非常重视其保存与诉讼和政府调查相关的信息的责任。若未能保存证据，彩虹或其员工会被潜在地施加严厉制裁。你应意识到若你不能遵守本信息保存通知，彩虹会对你进行纪律处罚，包括开除。

pillsbury

若你持有本信息保存通知中涉及的任何文件或电子信息，或你知悉存放该等文件或信息的共享区域，请在得到进一步通知前保存该等文件或信息并就该等文件或信息的存在和处所通知【插入彩虹联系人名单】。若你有任何问题或者无法确定本信息保存通知是否适用于你或你所持有的文件或信息，请联系【插入彩虹联系人名单】。

美国必百瑞律师事务所已被聘为外部顾问在此事项中代表彩虹。该所的代表可能会联系你。

我们希望你确认你已经阅读本信息保存通知并将遵守关于信息保存的说明。请在以下空白处签署本信息保存通知并于【日期】前归还【插入彩虹联系人姓名】。

谢谢你的配合。

我已经阅读并将遵守本信息保存通知。

____________________________
签名

____________________________
姓名

____________________________
职务

____________________________
日期

# EXHIBIT I



Pillsbury Winthrop Shaw Pittman LLP
2475 Hanover Street | Palo Alto, CA 94304-1114 | tel 650.233.4500 | fax 650.233.4545

**MEMORANDUM**

To: Mr. Yan Yun Long

From: Joseph R. Tiffany II

cc: Terrence A. Callan
Philip A. Simpkins

Date: August 7, 2008

C/M#: 043250-0000001

Re: CRT Antitrust Litigation -- Information Preservation Notice

---

Based on our previous communications and the Court's Order regarding preservation of evidence (a copy of which we attach), we assume that IRICO Group Corporation and IRICO Display Devices Co., Ltd. (hereinafter referred to collectively as "IRICO") have already instructed appropriate IRICO personnel regarding the requirement to retain information that is potentially relevant to the subject matter of the CRT Antitrust Litigation. The purpose of this memorandum is to recommend that IRICO supplement such prior instructions with a form that is designed to remind IRICO personnel of the importance of preservation of potentially relevant information in compliance with United States legal requirements.

The attached "Information Preservation Notice" ("Notice") should be distributed to all personnel of IRICO who would be reasonably likely to have access to any of the information and documents described in the Notice. When identifying the specific IRICO personnel who should receive the Notice, you should start with the "persons most knowledgeable" that we asked you to identify in our memorandum to you dated July 14, 2008 and entitled "Request for Information Pertaining to CRT Antitrust Litigation." In addition to these "persons most knowledgeable," the Notice should also be distributed to any additional employees (including directors, officers, executives, managers and other employees) who are reasonably likely to have documents or electronic information relating to any of the subjects identified in the Notice. Finally, this Notice should be distributed to appropriate personnel responsible for IRICO's Information Technology and for IRICO's records management. The personnel with responsibility in these two areas need to be aware of the requirements of the Notice and to consider what steps should be implemented to avoid the loss of any potentially relevant information while the CRT Antitrust Litigation is pending. As it is extremely important that all potentially relevant documents be preserved, we would advise you to provide the Notice to an employee if there is any doubt as to whether the employee may have potentially relevant documents. Please contact us if you have any questions or would like to discuss the identification of the custodians of potentially relevant documents.



For your convenience, we have prepared a single form of Notice that is intended to be distributed to personnel of both IRICO Group Corporation and IRICO Display Devices Co., Ltd.  If you would prefer to revise the Notice to provide two separate forms of Notice specifically addressed to personnel of each of the two IRICO entities named as defendants, that is also satisfactory.

As you will see, the Notice contains blanks on the final page for the signatures and titles of each IRICO employee who receives the Notice.  By signing the Notice, each employee will be confirming that he or she has read it and will comply with it.  The purpose of obtaining signatures is to emphasize to employees the importance of compliance with the Notice and to provide documentary evidence that IRICO has taken appropriate steps to comply with its obligations to preserve information in the litigation.  Each employee should be provided with a copy of the Notice to retain and an additional copy to sign and return.  We would like to receive a copy of each signed Notice and we suggest that copies also be retained by IRICO.  We suggest that you maintain a list of all employees to whom the Notice is distributed that you can use to confirm that you have received signed copies from each such employee.  This list can also be used to circulate periodic reminders of the obligation to preserve documents and information and can be updated to include any new employees who join IRICO in the future and who should also receive a copy of the Notice.  Please forward us a copy of this list for our records.

As mentioned above, the Notice identifies specific categories of information that we believe need to be preserved at this time.  As the litigation proceeds and we learn more about IRICO's business, we may advise you of additional categories of information that need to be retained.  Subsequent developments in the litigation (including subsequent rulings of the Court) may also lead to the conclusion that certain categories of information described in the Notice do not need to be retained.  However, you should be sure to consult with us before IRICO takes any action to cease preservation of any of the categories of information that are listed in the Notice.

We also note that we are looking forward to receiving IRICO's responses to the preliminary requests for information that we forwarded to you on July 22, 2008.  Those responses will provide us with information that will assist us in determining whether additional measures should be implemented regarding the preservation of information.  In addition, as we noted, we must have the requested information in order to pursue our effort to persuade plaintiff's counsel that IRICO should be dismissed from the litigation.  We hope to receive this information from you soon.

Please contact us if you have any questions regarding this Notice or any other aspect of the CRT Antitrust Litigation.

# EXHIBIT K

**INFORMATION PRESERVATION NOTICE**

As you may be aware, IRICO Group Corporation and IRICO Display Devices Co., Ltd. ("IRICO") have been sued in the United States concerning IRICO's sale of Cathode Ray Tubes ("CRTs") and products containing CRTs ("CRT Products"). This litigation is referred to as the CRT Antitrust Litigation. The Plaintiffs claim that IRICO and a number of other companies that sell CRTs and CRT Products conspired to artificially inflate the price of CRTs and CRT Products sold within the United States. IRICO denies that it has engaged in any unlawful conduct and is confident that it will prevail in the litigation.

As IRICO is a defendant in the CRT Antitrust Litigation, it is important to make sure that we preserve all potentially relevant information that relates to our CRT business. The purpose of this Information Preservation Notice is to confirm and emphasize our previous instructions for the preservation of these records.

All documents and data (in both physical and electronic format) described below must be preserved until this Information Preservation Notice is terminated. This Information Preservation Notice applies to information and documents that may be stored in personal offices, shared file cabinets, and off-site locations. It also covers digital or electronic information in all locations where such information may be retained, including desktop computers, laptops, home computers, personal digital assistants, server files, removable media, cellular telephones, etc. Please review the attached instructions for preserving email messages. If you have any questions or problems following these instructions, please contact [INSERT NAME AND CONTACT INFORMATION OF IRICO EMPLOYEE WHO WILL RESPOND TO QUESTIONS.]

Nothing covered by this Information Preservation Notice may be destroyed. The normal retention/destruction procedures of IRICO for this type of information are now suspended. **Destruction of any documents or information that are subject to this Information Preservation Notice is strictly prohibited**.

In order to help you identify the information and documents that must be preserved, we are providing the following list. You may not have some or many of the categories of documents identified below, but the complete list is being given to you so that you are aware of the scope of documents subject to this Information Preservation Notice if you or any other IRICO employees you supervise have information or documents that fall within any of these categories.

**The information and documents that must be preserved until further notice, and may not be discarded or deleted, are those that meet the following three criteria:**

1. Time Period: Documents or information created from January 1, 1995 to the present, or that refer or relate to that time period; and

2. Products: Documents or information that refer or relate to either (a) CRTs or (b) intermediate goods and finished goods and products that contain CRTs, such as televisions containing CRTs ("CRT Products"); and

3. Subject Matter: Documents or information that refer or relate to one or more of the following twelve subject areas:

(a) Marketing and Price Data – revenue, sales, customer lists, distributor lists, sales agent or broker lists, prices, pricing guidelines, pricing policies, pricing strategies, bids, offers, price quotes, discounts, rebates, market shares, margins, profits, marketing, marketing plans, market forecasts, or other business plans discussing any of these topics, that relate to CRTs or CRT Products shipped to or sold in the U.S.;

(b) Sales and Transaction Data – invoices, purchase orders, sales or supply contracts, sales and transaction data, and databases that relate to CRTs or CRT Products shipped to or sold in the U.S.;

(c) Production and Costs – production volume, production capacity, facilities, inventory, costs, or expenses that relate to CRTs or CRT Products shipped to or sold in the U.S.;

(d) Market Studies – market studies or reports discussing CRTs or CRT Products sales, prices, competition, competitors, or production in the U.S. or worldwide, whether produced by IRICO, consultants, or other third parties;

(e) Communications, Agreements, or Meetings with Competitors – communications, agreements, or understandings between, or meetings attended by, any employee, agent, or representative of IRICO, or any employee, agent, or representative of a competitor of IRICO (or between two competitors of IRICO), relating to CRTs or CRT Products sold in the U.S. or worldwide;

(f) Distributor and Purchaser Communications – communications, agreements, or understandings between two or more distributors or resellers or two or more purchasers of CRTs or CRT Products and relating to CRTs or CRT Products sold in the U.S. or worldwide;

(g) Internal or External Communications and Telephone and Fax Records – documents evidencing, reflecting, or referring to communications with IRICO or communications with any other party that relate to any of the topics in items (a) through (f) (e.g., emails, facsimile transmissions, facsimile logs, telephone messages, telephone bills, recordings or voice mails, notes from telephone calls or meetings, memos, meeting summaries or minutes);

(h) Calendars and Diaries – calendars, diaries, daily business schedules, trip reports notepads, phone directories, appointment books, and tasks lists;

(i) Expense Reports and Travel Documents – expense reports and receipts, and travel-related documents, including itineraries, passports, and visas;

(j) Corporate Financial Information – annual and quarterly financial reports, shareholder reports, and financial statements;

(k) Personnel Records – personnel records or data for current or former employees involved with CRTs or CRT Products in the U.S. or worldwide; or

(l) Document Retention – document retention policies and procedures.

IRICO takes very seriously its responsibilities to preserve information in connection with litigation and government investigations. Failure to preserve evidence can potentially result in significant sanctions being imposed against IRICO or individual employees. You should be aware that the failure to comply with this Information Preservation Notice may result in disciplinary action being taken against you by IRICO, including dismissal.

If you have any documents or electronic information that are covered by this Information Preservation Notice, or you are aware of shared areas storing such documents or data, please preserve such documents and information until further notice and notify [INSERT NAME OF IRICO CONTACT PERSON] of the existence and location of such documents or data. Please also contact [INSERT NAME OF IRICO CONTACT PERSON] if you have any questions or are not sure whether this Information Preservation Notice applies to you or to documents or information that you may have in your control.

The law firm of Pillsbury Winthrop Shaw Pittman LLP has been retained as outside counsel to represent IRICO in this matter. You may be contacted by a representative of that law firm.

We ask that you confirm that you have read this Information Preservation Notice and will comply with the instructions regarding preservation of information. Please sign the attached copy of this Information Preservation Notice in the space provided below and return it to [INSERT NAME OF IRICO CONTACT PERSON] by [Date].

Thank you for your cooperation.

I have read this Information Preservation Notice and will comply with it.

____________________________
Signature

____________________________
Print Name

____________________________
Title

____________________________
Date

# EXHIBIT J



Pillsbury Winthrop Shaw Pittman LLP
2475 Hanover Street | Palo Alto, CA 94304-1114 | tel 650.233.4500 | fax 650.233.4545

**MEMORANDUM**

To: Mr. Yan Yun Long

From: Joseph R. Tiffany II

cc: Terrence A. Callan
Philip A. Simpkins

Date: August 7, 2008

C/M#: 043250-0000001

Re: Preservation of Documents and Electronically Stored Information

As we have previously advised, the Court has issued an Order that requires all parties in the CRT Antitrust Litigation to preserve potentially relevant information (copy of excerpt from Pretrial Order No. 1 attached). We assume that you have implemented measures to be sure that IRICO is adhering to this Order. This memorandum discusses in further detail IRICO's obligations regarding the preservation of documents, email and other electronically stored information.

1.   Overview of the Requirement to Preserve Potentially Relevant Information.

As set forth in the Court's Order, the legal duty to preserve information broadly includes "documents, data and tangible things." In general, there are two types of information that must be preserved: (1) information maintained on paper or in any other tangible form (e.g., files, invoices, charts, notes, diaries, calendars, etc., which will be referred to as "documents);" and (2) email and other electronically stored information ("ESI"). The requirement to preserve documents requires identification of potentially relevant materials and appropriate instructions to employees with access to such information. For example, if IRCO maintains paper copies of invoices relating to sales of CRT to customers in the United States, the custodians of such records should be instructed that such records within the applicable time period must be preserved until further notice.

The preservation of ESI involves similar issues (e.g., identifying what information needs to be retained and issuing appropriate instructions to IRICO employees). The preservation of ESI, however, involves some important additional considerations. The special requirements pertaining to the preservation of ESI are discussed below in Section 3 of this Memorandum.

2.   The Information Preservation Notice.

We are providing a separate memorandum recommending that IRICO circulate an "Information Preservation Notice" to IRICO personnel with access to potentially relevant documents and ESI.

pillsbury

The Information Preservation Notice describes the categories of information that should be preserved and is intended to supplement IRICO's prior instructions on this subject and remind IRICO employees of the importance of retaining such information. The Information Preservation Notice should be supplemented by periodic oral instructions to appropriate IRICO personnel and careful monitoring of compliance.

3. Special Requirements for the Preservation of ESI.

As e-mail and other forms of ESI have become the principal sources of business information, the requirement to preserve and product ESI in litigation has become one of the most significant and complicated issues in the discovery process in U.S. courts. It has also become one of the most contentious aspects of current U.S. litigation and has led to the imposition of substantial sanctions and penalties for parties who are found to have failed to take proper measures to preserve and produce relevant ESI.[1] Accordingly, it is very important for IRICO to take proper steps to preserve ESI, as well as information in other forms.

In order for us to provide you with comprehensive advice regarding the preservation of ESI, we will need to have a thorough understanding of IRICO's computer systems. We will provide you a separate memorandum requesting the information that we will need in order to provide you with further advice on the subject of document preservation. For present purposes, we will provide recommendations as to measures that should be implemented to avoid the inadvertent loss of potentially relevant ESI. We assume that you may have questions regarding these recommendations and are available to discuss the subject of ESI preservation at your convenience.

(a) Suspension of any automatic deletion of ESI.

Some computer systems have features that provide for the automatic deletion of information on a periodic basis. For example, a computer system might automatically delete one-week old emails and purge deleted emails after two weeks. If IRICO's computer system (or any of its computer systems if there is more than one) has any such automatic deletion feature and if IRICO has not already suspended this feature with regard to any ESI that is potentially relevant to the CRT Antitrust Litigation[2], we recommend that it do so as quickly as possible.

[1] In a recent case involving Qualcomm and Broadcom, the Court ordered Qualcomm to pay Broadcom's litigation costs–approximately $8.5 million–for failure to produce ESI in the discovery phase of the case. *Qualcomm v. Broadcom Corp.*, 2008 WL66932 (S.D.Cal.Jan.7, 2008).

[2] The Information Preservation Notice being provided to you separately contains a detailed description of the types of potentially relevant information that should be preserved.



      (b) Identification of Potentially Relevant ESI.

In making sure that IRICO has taken adequate steps to preserve potentially relevant ESI, it is important to consider all possible types of ESI (some or many of which IRICO may not use). This includes, without limitation, the following types of electronic data:

1. Email (including attachments);
2. Word processing documents;
3. Spreadsheets;
4. Presentation documents (PowerPoint);
5. Graphics;
6. Animations;
7. Images;
8. Audio, video and audiovisual recordings; and
9. Voicemail.

IRICO should also consider all types of platforms, including, without limitation, the following:

1. Databases;
2. Networks;
3. Computer systems, including legacy systems (hardware and software);
4. Servers;
5. Archives;
6. Back-up or disaster recovery systems;
7. Tapes, discs, drives, cartridges and other storage media;
8. Laptops;
9. Personal computers;
10. Internet data;
11. Personal digital assistants ("PDAs");
12. Handheld wireless devices;
13. Mobile telephones;
14. Paging devices; and
15. Audio systems, including voicemail.

# EXHIBIT L

BAKER BOTTS LLP

700 K STREET, NW
WASHINGTON, D.C.
20001-5736

TEL +1 202.639.7700
FAX +1 202.639.7890
BakerBotts.com

AUSTIN
BRUSSELS
DALLAS
DUBAI
HOUSTON
LONDON
MOSCOW
NEW YORK
PALO ALTO
RIYADH
SAN FRANCISCO
**WASHINGTON**

February 13, 2023

Evan Werbel
TEL: 202.639.1323
FAX: 202.585.4077
evan.werbel@bakerbotts.com

VIA E-MAIL (RICK@SAVERI.COM,
LAURENRUSSELL@TATP.COM)

R. Alexander Saveri
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111

Lauren C. Capurro
Trump Alioto Trump & Prescott LLP
2280 Union Street
San Francisco, CA 94123

Re: In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Master File No. 07-CV-944-JST

Dear Rick and Lauren:

Pursuant to the Special Master's February 9, 2023 Report & Recommendation on Irico's Documents Submitted for *In Camera* Review, defendants Irico Group Corp. and Irico Display Devices Co., Ltd. (collectively, "Irico") hereby produce the documents submitted to the Special Master with approved redactions, Bates stamped IRI-SUPP-000001 through IRI-SUPP-000036. Additional information regarding these documents follows below.

- IRI-SUPP-000001 through IRI-SUPP-000005: This document corresponds with the document originally listed as P-00000004 on Irico's February 23, 2022 Log of Privileged Documents ("Privilege Log"). A certified translation is also enclosed as IRI-SUPP-000001E through IRI-SUPP-000005E.
- IRI-SUPP-000006 through IRI-SUPP-000011: This document corresponds with the document originally listed as P-00000005 on Irico's Privilege Log. A certified translation is also enclosed as IRI-SUPP-000006E through IRI-SUPP-000011E.
- IRI-SUPP-000012 through IRI-SUPP-000021: This document corresponds with the document originally listed as P-00000006 on Irico's Privilege Log. A certified translation is also enclosed as IRI-SUPP-000012E through IRI-SUPP-000021E.

- IRI-SUPP-000022: This document corresponds with the document originally listed as P-00000007 on Irico's Privilege Log. A certified translation is also enclosed as IRI-SUPP-000022E.
- IRI-SUPP-000023 through IRI-SUPP-000028: This document corresponds with the document originally listed as P-00000008 on Irico's Privilege Log.
- IRI-SUPP-000029 through IRI-SUPP-0000030: This document was found in Pillsbury's internal casefile, and we have no indication it was sent to Irico. It appears to be an English-language version of a portion of the document originally listed as P-00000008 on Irico's Privilege Log.
- IRI-SUPP-000031through IRI-SUPP-000033: This document was found in Pillsbury's internal casefile, and we have no indication it was sent to Irico. It appears to be an English-language version of a portion of the document originally listed as P-00000008 on Irico's Privilege Log.
- IRI-SUPP-000034 through IRI-SUPP-000036: This document was found in Pillsbury's internal casefile, and we have no indication it was ever sent to Irico.

Please feel free to contact me if you have any questions.

Sincerely,

*/s/ Evan Werbel*
Evan Werbel

cc: Geoffrey C. Rushing
Matthew D. Heaphy
David Y. Hwu
Mario N. Alioto
Daniel E. Birkhauser

Enclosure

# EXHIBIT M

Guido Saveri (22349)
*guido@saveri.com*
R. Alexander Saveri (173102)
*rick@saveri.com*
Geoffrey C. Rushing (126910)
*grushing@saveri.com*
Cadio Zirpoli (179108)
*cadio@saveri.com*
Matthew D. Heaphy (227224)
*mheaphy@saveri.com*
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, California 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Lead Counsel for Direct Purchaser Plaintiffs*

MARIO N. ALIOTO, ESQ. (56433)
LAUREN C. CAPURRO, ESQ. (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
E-mail: malioto@tatp.com
laurenrussell@tatp.com

*Lead Counsel for the Indirect Purchaser Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-CV-5944-JST<br><br>MDL No. 1917 |
| This Document Relates To:<br><br>*ALL ACTIONS* | **AMENDED NOTICE OF DEPOSITION OF DEFENDANTS IRICO GROUP CORPORATION AND IRICO DISPLAY DEVICES CO., LTD. PURSUANT TO FED. R. CIV. P. 30(b)(6)** |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Direct Purchaser Plaintiffs ("DPPs") and Indirect Purchaser Plaintiffs ("IPPs") (together "Plaintiffs") will take the deposition of the person or persons designated by Defendants Irico Group Corporation and Irico Display Devices Co., Ltd. ("Defendant"). The deposition will commence on March 4, 2019 at 9:00 a.m. at [location in Hong Kong to be determined], and will continue day to day until completed.

The deposition will be taken before a notary public or other person authorized to administer oaths under applicable law, and will be conducted pursuant to Rule 30 of the Federal Rules of Civil Procedure. Pursuant to Rule 30(b)(3), Plaintiffs reserve the right to record the deposition testimony by videotape and instant visual display in addition to recording the testimony stenographically. Plaintiffs reserve the right to use the videotape deposition at the time of trial.

Defendant is advised that Rule 30(b)(6) requires them to produce one or more witnesses at the stated location and time who are aware of and prepared to testify about the Defendant's knowledge, and not just information personally known by them, of the topics referred to in the Schedule of Deposition Topics attached hereto as Exhibit A. If the designated representative or representatives do not have such knowledge, they are required to acquire it through whatever reasonable investigation may be necessary.

DATED: February 5, 2019

By: /s/ R. Alexander Saveri

Guido Saveri
R. Alexander Saveri
Geoffrey C. Rushing
Cadio Zirpoli
Matthew D. Heaphy
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, California 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Lead Counsel for Direct Purchaser Plaintiffs*

Joseph W. Cotchett
COTCHETT, PITRE & McCARTHY, LLP

840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Steven F. Benz
Gregory G. Rapawy
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK,
    P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999

*Attorneys for Direct Purchaser Plaintiffs*

DATED: February 5, 2019                 By: */s/ Mario N. Alioto*
                                        MARIO N. ALIOTO, ESQ. (56433)
                                        LAUREN C. RUSSELL, ESQ. (241151)
                                        TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
                                        2280 Union Street
                                        San Francisco, CA  94123
                                        Telephone:  (415) 563-7200
                                        Facsimile: (415) 346-0679
                                        E-mail: malioto@tatp.com
                                        laurenrussell@tatp.com

                                        *Lead Counsel for the Indirect Purchaser Plaintiffs*

                                        Christopher Micheletti
                                        Qianwei Fu
                                        ZELLE LLP
                                        44 Montgomery Street, Suite 3400
                                        San Francisco, CA 94104
                                        D (415) 633-1906
                                        F (415) 693-0770
                                        Email: cmicheletti@zelle.com
                                        qfu@zelle.com

                                        *Attorneys for Indirect Purchaser Plaintiffs*

**EXHIBIT A**

**Definitions**

1. The term "Defendant" means defendants Irico Group Corporation and Irico Display Devices Co., Ltd.

2. The term "Irico" means defendants Irico Group Corporation and Irico Display Devices Co., Ltd.

3. The term "Group" means defendant Irico Group Corporation.

4. The term "Display" means defendant Irico Display Devices Co., Ltd.

5. The term "Person" or "Persons" means any natural person, corporation, or partnership, proprietorship, joint venture, or any business, legal, or government entity, organization, or association.

6. "You" or "Your" mean the responding Defendant, its predecessors, successors, subsidiaries, departments, divisions, and/or affiliates, including without limitation any organization or entity which the responding Defendant manages or controls, together with all present and former directors, officers, Employees, agents, representatives or any Persons acting or purporting to act on behalf of the responding Defendant.

7. "Or" and "and" should be construed so as to require the broadest possible response. If, for example, an interrogatory calls for information about "A or B" or "A and B," You should provide all information about A and all information about B, as well as all information about A and B collectively. In other words, "or" and "and" should be read as "and/or."

8. The terms "Document" or "Documents" means the original and any non-identical copy of all items subject to discovery under Rule 34 of the Federal Rules of Civil Procedure. This definition includes any written, printed, reproduced, graphic, photographic, electronic, audio, visual, or video records, however produced or reproduced, of any kind or description, whether prepared by You or by any other Person, that is in Your possession, custody, or control, including, but not limited to, the following: emails; correspondence; memoranda; travel records; summaries; agreements; electronically stored information; papers; notes; books; invoices, letters; facsimiles; intra- and interoffice communications; transcripts; minutes or other records of Meetings; reports;

affidavits; statements; legal pleadings; calendars; appointment books; diaries; notebooks; telephone logs; records of telephone conversations; compilations; work papers; graphs; charts; blueprints; sales, advertising, and promotional literature; agreements; pamphlets; brochures; circulars; manuals; instructions; ledgers; drawings; sketches; photographs; screen shots; video recordings; audio recordings; film and sound reproductions; internal or external web sites; compact discs; computer files and disks; and social media communications, including, but not limited to, information posted on or transmitted through social networking platforms (*e.g.*, LinkedIn, Facebook, MySpace and Instagram), digital file-sharing services (*e.g.*, Flickr), blogs and microblogs (*e.g.*, Twitter), Voice Over Internet Protocol services (*e.g.*, Skype), and/or instant messages.

9. “Employee” means, without limitation, any current or former officer, director, executive, manager, secretary, staff member, messenger, agent or other Person who is or was employed by Defendant.

10. The term cathode ray tube, or “CRT,” means both (a) color picture tubes (“CPTs”), which are CRTs used primarily in color televisions; and (b) color display tubes (“CDTs”), which are CRTs used primarily in color computer monitors.

11. The term “CRT Products” means electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).

12. The term “Class Period” means the period from March 1, 1995 through November 25, 2007.

13. The term “Relevant Time Period” means the period from January 1, 1995 through the present.

14. The term “Communication” or “Communications” means, without limitation, any disclosure, transfer, or exchange of information, opinions, ideas or thoughts, by any means, face-to-face Meetings, written, recorded, electronically, orally or otherwise, at any time or place under any circumstances. This definition shall include communication via social media, including, but not limited to, information, opinions, ideas, or thoughts, posted on or transmitted through social networking platforms (*e.g.*, LinkedIn, Facebook, MySpace and Instagram), digital file-sharing

services (*e.g.*, Flickr), blogs and microblogs (*e.g.*, Twitter), Voice Over Internet Protocol services (*e.g.*, Skype), and/or instant messages.

15. The term "Date" or "Dates" means the exact day, month and year, if ascertainable, or the best available approximation, including any relationship to other known events (designate whether exact or approximate).

16. The term "Meeting" means, without limitation, any assembly, convocation, encounter, or contemporaneous presence of two or more Persons for any purpose, whether planned or arranged, scheduled or not.

17. The term "China" means the People's Republic of China.

18. The term "Saveri Declaration" refers to the Declaration of R. Alexander Saveri in Support of Direct Purchaser Plaintiffs' Opposition to the Irico Defendants' Motion to Set Aside Default, ECF Nos. 5228-1–5228-2, filed on December 15, 2017.

19. The term "Leitzinger Report" refers to the expert reports of Jeffrey J. Leitzinger, Ph.D., dated November 6, 2014 and September 1, 2016 and filed as Exhibits D and E, respectively, to the Declaration of R. Alexander Saveri in Support of Plaintiffs' Application for Default Judgment by the Court Against the Irico Defendants, ECF Nos. 5191-1–5191-2, on August 14, 2017.

20. The term "Zhang Declaration" refers to the Declaration of Wenkai Zhang in Support of Irico's Motion to Set Aside Default, ECF No. 5215-1, filed on October 25, 2017.

**Schedule of Topics for Examination**

Witnesses with knowledge of the following matters during the Relevant Time Period (unless a time period is specified otherwise):

1. The corporate formation, ownership, and purpose of Group and Display, including any basis for any contention by Irico that Group and Display engage in a public activity, and including any changes in status.

2. Supervision of either Group or Display by officials of the People's Republic of China, including any specific instances of supervision or control that Irico contends are relevant to alleged organ status of Display.

3. The inter-defendant Communications identified in Exhibit 11 to the Saveri Declaration or in the Leitzinger Report involving Irico, including any related internal Communications on or about the same Dates.

4. Any sales, attempted sales, or contemplated sales by Irico, directly or indirectly, to the United States during the Class Period, including, but not limited to, sales through China National Electronics Imp. & Exp. Caihong Co., Irico Group Electronics Co. Ltd., Xian Irico Display Technology Co., Ltd., Irico (USA) Inc., and/or the Irico HuangQi Company.

5. All Documents and Communications that Wenkei Zhang reviewed or relied on in preparing his Declaration.

6. The preservation, or not, of evidence by Group and/or Display relevant to their FSIA defenses or the merits of this case, from 2008 to present.

7. The activities of Irico (USA) Inc. related to CRTs or CRT Products.

8. Any status, obligations, or privileges that Group or Display had under the law of the People's Republic of China during the period from 2006 to 2008.

9. The basis for the statement in the Zhang Declaration that "Irico declined to answer [the DPP's complaint] because it believed that Irico Group and Irico Display were immune from suit in the United States."

10. A complete description of Your transactional sales files for CRTs and/or CRT Products, including the transactional data for CRT and/or CRT Product sales produced by You in this action and the information contained in such data.

11. Group's and/or Display's monitoring of consumer market for CRT Products during the Class Period, including the use of market data, reports, studies or analyses generated internally or obtained from third parties.

12. Group's and/or Display's sales of CRTs to the following entities, including sales to related entities that manufactured and sold CRT Products during the Class Period: Changhong, Konka, TCL, Skyworth, Hisense, Haier, XOCECO (厦门华侨电子), Soyea (数源科技), Yisheng (深圳溢胜), LG Electronics (Shenyang), Hangzhou Jinlipu (杭州金利普), Shenzhen Techtop,

Suntrue, Starlight (or Starlite), Hangzhou Huashan, Suzhou Youshida (苏州优视达), and China National Electronics Import & Export Caihong Co. (中国电子进出口彩虹公司).

13. Any Communications that Group and/or Display or any affiliate of Group and/or Display had with customers concerning any sales, contemplated sales, pricing, or shipments to the United States during the Class Period.

14. Knowledge of Group and/or Display or any affiliate of Group and/or Display regarding customers' sale of CRT Products to the United States during the Class Period.

15. The worldwide market share of Group and/or Display for CRTs or CRT Products during the Class Period.

16. The relationship, including any direct or indirect ownership and/or control, between China National Electronics Imp. & Exp. Caihong, Co., Xian Irico Display Technology Co., Ltd., Irico (USA) Inc., and/or the Irico HuangQi Company on the one hand, and Group and/or Display on the other.

17. The ownership of Irico (USA) Inc., including any direct or indirect ownership and/or control, by China National Electronics Imp. & Exp. Caihong, Co., Group and/or Display.

18. The nature and extent of the search for Documents and/or information by Group and Display in response to Plaintiffs' discovery requests.

# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - -

IN RE: )
)
CATHODE RAY TUBE (CRT) )
ANTITRUST LITIGATION )Master File No.:
)07-CV-5944-JST
)
)MDL No. 1917
)
)
)

- - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF ZHANG WENKAI

HIGHLY CONFIDENTIAL

VOLUME I

MONDAY, MARCH 4, 2019

AT: 09.00 a.m.

Taken at:

Kobre & Kim
6/F ICBC Tower
3 Garden Road
Central
Hong Kong

Court Reporter:

Amanda Tolton
Accredited Real-time Reporter

A P P E A R A N C E S

Appearing for the Direct Plaintiffs:

STEVEN BENZ
BENJAMIN MARGO
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK
Sumner Square
1615 M Street, NW, Suite 400
Washington, DC 20046
Telephone: 202.326.7929

DAVID HWU
SAVERI & SAVERI
706 Sansome Street
San Francisco, CA 94111
Telephone: 415.217.6810

MICHAEL MONTAÑO
COTCHETT, PITRE & MCCARTHY
San Francisco Airport Office Centre
840 Malcolm Road
Burlingame, CA 94010
Telephone: 650.697.6000

Appearing for the Indirect Plaintiffs:

MS QIANWEI FU
ZELLE LLP
44 Montgomery Street
Suite 3400
San Francisco CA 94104
Telephone: 415.633.1906

Appearing for the Defendant:

MR. ANDREW LUCARELLI
YAN ZHANG
THE WARNER
1299 Pennsylvania Avenue
Washington, D.C.,20004-2400
Telephone: 202.639.1108

VIDEOGRAPHER:

Inga Kornev

INTERPRETER:

Kuang-Shai Chao

Also Present:

Ms. Lauren Capurro; Trump, Alioto, Trump and Prescott

Mr. Wu Xiao Jue

Ms. Shao Tin-tin

P R O C E E D I N G S

(09.03 a.m.)

VIDEOGRAPHER: Good morning. Here begins Volume 1, Media No. 1 in the deposition of Wenkai Zhang in the matter of In Re Cathode Ray Tube (CRT) Antitrust Litigation in the United States District Court, Northern District of California, San Francisco Division, Master File No. 07-cv-5944-JST, MDL No.:1917.

Today's date is March 4, 2019, and the time on the video monitor is 9:04 a.m. The certified video operator today is Inga Kornev contracted by U.S. Legal Support. This video deposition is taking place at Kobre & Kim, ICBC Tower, 3 Garden Road, Central, Hong Kong.

Counsel, please voice identify yourselves and state whom you represent.

MR. BENZ: Steven Benz of the law firm Kellog, Hansen, PLLC, in Washington, D.C., for the Direct Purchaser Plaintiffs.

MR. HWU: David Hwu of the law firm Saveri & Saveri from San Francisco for Direct Purchaser Plaintiffs.

MS. FU: Qianwei Fu from Zelle LLP in San Francisco for the Indirect Purchaser Plaintiffs.

Q. Mr. Zhang, over the course of your career, have you participated in meetings conducted in English?

A. No.

Q. Have you understood any of my questions so far in English?

A. No. No, I only rely on the translator.

Q. What languages -- what language do you use with your attorney? That's Mr. Lucarelli.

A. I didn't communicate with Mr. Lucarelli directly, because there are other counsels and then we relied on the other counsel to communicate.

(Exhibit 8389 marked for identification)

(Exhibit 8390 marked for identification)

COURT REPORTER: Sorry, counsel, this is two separate exhibits; is that correct?

MR. BENZ: Two separate exhibits.

BY MR. BENZ:

Q. Mr. Zhang, I've handed you two exhibits. The first exhibit is marked 8389. This is the amended notice of deposition of Wenkai Zhang. This is a notice that allows me to ask questions of you in your personal capacity.

Also Mr. Zhang, we've handed you what's been marked as Exhibit 8390. This is the amended notice

of deposition of defendants Irico Group Corporation and Irico Display Devices Company Ltd. pursuant to federal rules of civil procedure 30(b)(6). This 30(b)(6) notice allows me to ask questions of you about certain topics that are listed here on behalf of Irico Group Corporation and Irico Display.

MR. BENZ: And, Drew, just for the record, to be clear, I know we've had some correspondence about that; but with respect to the 30(b)(6) notice, Mr. Zhang has been designated for Topic 5, Topic 6, Topic 9, Topic 10, Topic 16, Topic 17 and Topic 18; is that correct?

MR. LUCARELLI: That is correct. Although to the extent that Topic 16 might get into any issues related to sales, Mr. Wang has been designated on that topic.

MR. BENZ: Understood. And we've had correspondence to that effect.

BY MR. BENZ:

Q. So, Mr. Zhang, do you understand that you are here also to testify on behalf of Irico Group and Irico Display for topics 5, 6, 9, 10, 16, 17, and 18?

INTERPRETER: The witness asked me to repeat the item numbers.

A. Yes.

BY MR. BENZ:

Q. Mr. Zhang, did you look at any documents prior to testifying today to prepare for your deposition?

A. Well, it is -- when I joined this project, it was September, 2017. I kind of coordinate and collect relevant documents on behalf of Irico. So it is fair to say most of the document produced, I have personally read those documents. Since most of the documents, all -- it's fair to say that all of those documents I have read and coordinate before, so that I didn't read any document specifically for the preparation of this document -- this deposition.

Q. Okay. Did you meet with your lawyers to prepare for this deposition?

A. Yes.

Q. Who did you meet with?

A. Two gentlemens on the table here, and another counsel who can speak Chinese.

Q. Can you give us their names, please?

A. Yes, this gentleman sit right next to me, normally I -- we call him "Drew."

Q. That's Drew Lucarelli?

A. Yes, we normally just call him Drew.

Q. Who else did you meet with?

 Q. That's a nonresponsive answer. I'll take that up with your counsel.

MR. BENZ: At this point, I'm going to -- Ms. Fu will be asking questions and we'll transition seats.

VIDEOGRAPHER: Shall we stay on the record or go off the record?

MR. BENZ: Stay on the record.

MS. FU: Can we take a five-minute break?

MR. BENZ: Take a break.

VIDEOGRAPHER: This marks the end of Media No. 6 in the deposition of Zhang Wenkai. Going off the record. The time is 2:48.

(2.48 p.m.)

(Break taken.)

(3.01 p.m.)

VIDEOGRAPHER: We are back on the record. Here begins Media No. 7 in the deposition of Zhang Wenkai. The time is 3:01.

A. Can I interrupt? With regard to the counsel's question prior to the break, I didn't interpret it quite well, so I would like to make a correction.

EXAMINATION BY MS. FU:

 Q. What was the previous question?

A. So the question is regarding -- with regard to whether we have produced a original financial record as a discovery for this litigation.

Q. What kind of clarification would you like to make?

A. The correct answer should be because of the difficult situation, in a practical difficult situation, we didn't provide original record.

Q. Can you explain what kind of difficult situation that prevented you from providing the original documents to counsel?

A. Because there are a large amount of the records. Plus that it lasts for a very, very long period, whereas the forms are not consistent. Because that record not only just cover our sales record, it also cover many receipts regarding the expenses. And also the record of our cost. So there's no way we can differentiate those record. It is beyond our capacity to have a comprehensive screen of every document. That's it.

Q. I want to step back a little bit.

A. Okay.

Q. Mr. Zhang, we met earlier today. My name is Qianwei Fu and I represent the Indirect Purchaser

Plaintiffs. I'm going to ask you some questions this afternoon. Is it okay?

Yes.

A. My question is was your question was in the limit of the 8390, yes, then it's okay.

Q. Do you understand you're still under oath today right now with regard to the questions that I'm going to ask you and your answers to my questions?

A. Yes.

Q. Can you turn to Exhibit 8390? That's the amended notice of deposition of Irico Group Corporation and Irico Display Devices pursuant to Federal Rule of Civil Procedure 30(b)(6).

A. Yes.

Q. Can you take a look at topics No. 6 and Topic No. 18.

Are you -- are you prepared and qualified to testify those topics?

A. Yes.

Q. I'm going to ask you some questions about document preservation, which is Topic 6.

During the time period between 1995 and 2008, did Irico have a standard document retention policy in place?

A. Are you referring to hard copy or any other

form of the document?

Q. Do you understand what a retention policy is?

A. In China, the term "retention" referred to the hard copy, which means a printed or paper document.

Q. During the time period between 1995 through 2008, did Irico have an established protocol for retaining information or documents for operational or regulatory compliance needs?

A. I'm not quite sure I follow your question. If you are referring to the hard copy or the paper printed copy, based on our -- the regulatory compliance for the accounting and the documents, we do have a protocol. With regard to the term "information," I'm not quite sure whether those information are printed on the paper or non-paper information, I'm not quite sure.

Q. I'm referring to anything in writing.

A. Because when you say -- because when you say "writing," so when regarding so the document or the form, if it is writing or printed on the paper, then, yes, we do have a protocol. However, if the writing is through computer which is a digital form, then there's no rules about the government require us to

maintain or retain those documents.

Q. So are you saying Irico, during the time period between 1995 to 2008, have a retention policy regarding hard copy documents?

A. Yes, for hard copy or paper printed, we do have a policy.

Q. What about electronically stored information or electronic records?

A. No, we don't have that system, because the government don't ask us to do that.

Q. And let's talk about the policy regarding hard copy documents.

Is that a formal written policy?

A. Yes, we do have a so-called document retention system.

Q. And is that in writing?

A. You mean the system? Yes, we do have that system or policy.

Q. Do you have a copy of that policy?

A. I saw that document before, but I don't have it with me right now.

Q. But you have it somewhere in the company?

A. Yes.

Q. Can you -- strike that.

When was that policy put in place?

 A. I don't remember, because I only saw the title is -- the title is called something called the "document retention system." With regard to the effectiveness date, I have no recollection.

Q. Has the policy changed during the time period between 1995 and 2008?

A. I don't know.

Q. So this document retention policy you just described, did you review this policy for your deposition?

A. I just took a glance. I saw such a title on the document. I didn't read through the detailed information.

Q. Have you reviewed this policy before your deposition, before your depo preparation?

A. Yes, I also took a glance. I did aware there is such a document exist. I only knew the title, but I didn't look it through.

Q. What do you recall about this policy? Can can you give me any detail about this written policy?

A. Basically, it mentioned about the expiry date for those retention document. And there's a procedure to access those or to read those documents. And then the job description regarding the person who has -- who is in charge of those document

maintenance. That's so much I can remember.

Q. You mentioned the length of the required retention. What is that?

A. It's not less than ten years.

Q. Do you know what categories of documents are covered by policy?

A. It didn't mention what kind of a document need to be retained or filed. But I asked the person in charge of those document maintenance. From what my understanding is that each department will submit relevant documents regularly. They would maintain those documents based on the document submitted from various departments.

MR. HWU: Can I ask the interpreter to try to render the witness' answer one more time, please. Thank you.

A. So the various Irico subsidiary and the departments will compile documents regularly and submit the document to the archive or document retention room, then people in the document retention room will maintain those documents for a period no less than ten years.

BY MS. FU:

Q. That's not the question I asked. I asked: What types of documents, what categories of

documents, are covered by this retention policy.

A. I thought you ask the documents require the -- the policy. Are you asking the document required by the policy to give -- maintain for no less than ten years or what kind of document we have in the retention room?

Q. I'm asking both.

Let's start with the first one. What does the policy -- what does the policy require -- what types of documents are required by the policy to be retained for no less than ten years?

A. Well, I didn't read through the policy in detail, so, actually, I really don't know what type or category of document are required to keep our maintenance for more than ten years.

Q. What categories of documents are actually maintained by Irico under the policy?

A. There are four categories with regard to some documents or written. One is external documents from the government, including some of the status or some of the certificate or approval later from the government. There is another category that is the manufacturing technology information. The other category is regarding the function of the party or the task conducted by the Communist Party. The other

category is regarding the administrative management. Basically, we have four different categories. On top of that, we have an original financial document. These are the documents in the retention room.

Q. What about Irico's annual reports, business plans?

A. Are you referring to the Irico Group or the Irico Display?

Q. Both.

A. The annual report for the Irico Group is not maintained in that document room. It is the Finance Department who kept those annual report. For example, the compiled or combined annual report as well as a financial statement are kept in the Finance Department.

Q. How long does Irico keep those annual reports?

A. I asked the people in the Accounting Department, there's no requirement with regard to the expiry date to maintain those financial statements. But we do maintain a very comprehensive retention for all the financial receipts or documents.

Q. When you say you maintain a very comprehensive retention -- very comprehensive record of all the financial receipts and documents, do those

 receipts, financial receipts and documents go back to when Irico was established?

A. I'm not quite sure. It will be okay if we have a very comprehensive retention of the financial documents from the period 1995 to 2007.

Q. What about Irico Display, does Irico maintain all the financial records and receipts for Irico Display between 1995 and 2008?

MR. LUCARELLI: Object to form.

A. Yes, they are all kept very comprehensively.

BY MS. FU:

Q. Did the government have any document retention requirement that Irico had to follow?

A. The act of document and act of accounting from People's Republic of China.

Q. Can you describe what kind of records are required under the accounting law and the accountant law -- strike that.

Can you describe what kind of documents are required by the archives law and accounting law for records to follow?

MR. LUCARELLI: Object to form.

INTERPRETER: The witness is asking the interpreter to repeat the question.

(Interpreter re-translates.)

A. So there is no option. We have to follow every act stated by the government.

BY MS. FU:

Q. So with regard to the types of documents that Irico -- strike that.

Without limiting to the 1995 through 2008 time period, does Irico transfer documents or records to the government?

MR. LUCARELLI: Object to form.

INTERPRETER: The witness is asking the interpreter to repeat the question.

(Interpreter re-translates.)

A. I'm not quite sure regarding documents or records, but I'm pretty positive sure that we never transfer our financial document to the government, or financial receipts.

BY MS. FU:

Q. Without limiting to the 1995 through 2008 time period, does Irico transfer its document to any third parties?

A. The same as the previous question: I'm not quite sure we have ever transferred those documents or record to the third party, but I'm quite sure that we never transferred those original financial record to the third party.

 Q. So we talk about this retention policy with regard to hard documents for the time period from 1995 to 2008. Does Irico have a document retention policy today?

A. It is the document retention system I mentioned.

Q. Is the document retention policy that Irico has today the same as when it had during 1995 to 2008?

A. I don't know.

Q. In connection with this litigation, did Irico issue a litigation hold notice requesting its employees do not destroy any potentially discoverable documents or data?

A. In what time frame are you referring to regarding this notice?

Q. I'm referring to when Irico was served with the plaintiff's complaints.

A. We did not aware that it is something we need to do.

Q. When did Irico know it was a party to this lawsuit?

A. I don't remember the exact date, but maybe around 2007 or 2008.

Q. So is it your testimony today that from

around 2007 to 2008 until present Irico never issued a written notice to its employees requesting them not destroy any potentially discovery documents or data?

MR. LUCARELLI: Object to form.

A. Should I answer? Yes. Because I involve this -- this case since 2017. So back in 2007 and 2000 -- or 2008, whether we have issued such notice, I have no knowledge about it. So based on my understanding, after I joined the case from 2017, we never issue an official notice with that regard. However, in various meeting, we did mention something like that.

BY MS. FU:

Q. Mr. Zhang, I'm not asking about your personal knowledge. I'm asking: Has Irico ever issued a written policy -- strike that.

I'm asking: Has Irico ever issued a written legal notice requesting its employees not destroy any potential discovery documents or data?

A. Let me think about it. I'm not quite sure with regard to whether we issued such as a notice back in 2007or 2008.

Q. Did you have any discussion with internal employees about this topic?

A. You mean not to destroy those potential

documents?

Q. Correct.

A. Yeah, we did mention that during the meeting.

Q. What was discussed?

A. That is ask everybody to maintain the existing document and cannot amend or modify or delete those documents.

Q. When was that meeting held?

A. Should be early September 2017. On the first floor in our Group building or Group office.

Q. Are you aware of any prior discussions before that meeting?

MR. LUCARELLI: Object to form.

A. I don't know.

Can we take a break?

BY MS. FU:

Q. No. How about in ten minutes; is that okay?

A. Okay.

Q. Mr. Zhang, do you understand that as part of this litigation, plaintiffs have served a jurisdictional discovery request to Group and Display?

Check interpreter.

Let me repeat that question. Do you

understand, as part of this litigation, plaintiffs have served jurisdictional discovery requests to Group and Display?

INTERPRETER: The witness is asking the interpreter to repeat the question.

(Interpreter re-translates.)

A. Yes, I do aware.

BY MS. FU:

Q. Do you have an understanding of the attempts Irico made to locate documents responsive to plaintiff's discovery request?

A. I'm not quite sure I follow your question. Are you asking me how I search those documents?

Q. Do you understand that in response to plaintiff's discovery request, Irico has produced documents and provided information in this case?

A. I do aware that Irico is supposed to provide -- I do aware that Irico is supposed to provide relevant information based on the reasonable and the legitimate request from the plaintiff.

Q. And is it your understanding that Irico has produced certain documents and provided certain information responsive to plaintiff's discovery requests?

MR. LUCARELLI: Object to form.

A. I didn't follow your question.

BY MS. FU:

Q. My question is: Do you understand that in connection with this litigation, Irico has produced certain documents and provided certain information based upon the plaintiff's discovery request?

MR. LUCARELLI: Object to form.

INTERPRETER: May I rephrase my interpretation?

(Interpreter re-translates.)

A. I do aware that under the reasonable and legitimate request from the plaintiff, we have submit relevant information.

BY MS. FU:

Q. For those documents produced or information provided to the plaintiffs, how did Irico go about locating those documents and information?

MR. LUCARELLI: Object to form.

A. Are you referring to how I -- how we search or relocate those document and information?

BY MS. FU:

Q. I'm asking Irico's methodology and attempts and efforts in locating those documents and information?

A. Method and efforts? I'll try my best to

the record. The time is 6:30.

(6.30 p.m.)

(Break taken.)

(6.39 p.m.)

VIDEOGRAPHER: We are back on the record. This is Media No. 10 in the deposition of Zhang Wenkai. The time is 6:39.

BY MS. FU:

Q. Mr. Zhang, we're done questioning today. Thank you very much for your time. We will resume tomorrow.

A. Okay.

VIDEOGRAPHER: Shall we go off the record?

MS. FU: Yes.

MR. LUCARELLI: Yes.

VIDEOGRAPHER: Okay. This marks the end of Media No. 10 in the deposition of Zhang Wenkai and Volume 1 of the deposition of Zhang Wenkai. Going off the record. The time is 6:40.

(Whereupon, the deposition adjourned at 6.40 p.m.)

CERTIFICATE OF COURT REPORTER

I, Amanda Tolton, an Accredited Real-time Reporter, hereby certify that the testimony of the witness Zhang Wenkai in the foregoing transcript, numbered pages 1 through 116, taken on this 4th day of March, 2019 was recorded by me in machine shorthand and was thereafter transcribed by me; and that the foregoing transcript is a true and accurate verbatim record of the said testimony.

I further certify that I am not a relative, employee, counsel or financially involved with any of the parties to the within cause, nor am I an employee or relative of any counsel for the parties, nor am I in any way interested in the outcome of the within cause.

Signed: Amanda Tolton ........................

Name: Amanda Tolton

Date: ........................

# EXHIBIT O

**SAVERI & SAVERI, INC.**
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

*Trump Alioto Trump & Prescott*
ATTORNEYS LLP
2001 Union Street, Suite 482
San Francisco, California 94123
(415) 563-7200
FAX (415) 346-0679

April 15, 2022

**VIA EMAIL**

The Honorable Vaughn R. Walker
Law Office of Vaughn R. Walker
Four Embarcadero Center, Suite 2200
San Francisco, CA 94111
vrw@judgewalker.com

**Re:** ***In re Cathode Ray Tube (CRT) Antitrust Litigation* – MDL No. 1917, Master File No. 07-CV-5944-JST**

Dear Judge Walker:

The Indirect Purchaser Plaintiffs ("IPPs") and Direct Purchaser Plaintiffs ("DPPs") (together "Plaintiffs") hereby move to compel Defendants Irico Group Corporation and Irico Display Devices Co., Ltd. (collectively, "Irico") to produce documents responsive to Request No. 1 of IPPs' Third Request for Production of Documents.

IPPs' RFP No. 1 seeks production of "All Documents relating or referring to the preservation of Documents relevant to this litigation."[1] Irico has objected and refuses to produce its only responsive documents based on the attorney-client privilege. *Id*. While attorney-client communications are ordinarily privileged, where (as here) there is preliminary evidence of spoliation and possible sanctions are at issue, courts have compelled production of attorney-client communications regarding evidence preservation. *Al Otro Lado, Inc. v. Wolf*, No. 317CV02366BASKSC, 2020 WL 4432026, at *2 (S.D. Cal. July 31, 2020) (citing cases).

The evidence of spoliation here is overwhelming. Despite being represented by a well-respected U.S. law firm whose lawyers specifically advised Irico regarding evidence preservation, Irico claims to have "misunderstood" its obligations to preserve relevant evidence. Irico admits it gave only an oral instruction to its employees to preserve evidence *more than eight months* after service of IPPs' complaint, and that the scope of

---

[1] Irico's' Objections and Responses to IPPs' Third Request for Production of Documents, including their Privilege Log identifying the communications between Irico and its former counsel regarding evidence preservation, are attached as Exhibit A to the Declaration of Lauren Capurro that accompanies this letter (the "Capurro Decl.").

that instruction fell far short of what the law required—extending only to evidence relating to U.S. CRT sales. Irico's litigation hold communications with its counsel are the only existing documentary evidence relating to Irico's evidence preservation efforts (or lack thereof). They are directly relevant to whether Irico intended to deprive Plaintiffs of evidence relevant to this litigation, or whether its inadequate litigation hold was merely negligent. Accordingly, Irico should be ordered to produce those communications so that the Court may assess what sanctions are appropriate under Rule 37(e) and/or its inherent powers. *See, e.g.*, Fed. R. Civ. P. 37(e)(2) (the sanctions available for spoliation of evidence depend upon whether "the party acted with the intent to deprive another party of the information's use in the litigation.").

The parties' efforts to "meet and confer" on these issues were unsuccessful. Capurro Decl., ¶ 3.

## I. The Procedural History Demonstrates Overwhelming Evidence Of Spoliation

### A. Irico Has Not Produced Documents Responsive to Many of Plaintiffs' Key Discovery Requests

As Your Honor is already aware from the various motions to compel that Plaintiffs have been required to file, Irico has failed to provide documents or information responsive to many of Plaintiffs' key discovery requests. For example, Irico has not produced *any* of its own records of competitor meetings despite (1) several other defendants producing evidence that Irico representatives attended over 100 conspiratorial meetings during the relevant period; (2) Irico's Rule 30(b)(6) representative, Mr. Wang, admitting that he attended "many, many meetings" with Irico's competitors;[2] and (3) Irico travel and expense records showing that its employees traveled to cities on dates when other defendants' records show that those employees attended conspiratorial meetings.[3]

Similarly, Plaintiffs have identified Irico emails and other Irico documents dated from 2006 and 2007 (*i.e.*, not long before this litigation began, and which are more likely to have existed in Irico's files when its evidence preservation obligations were triggered) in other defendants' productions.[4] Irico has recently admitted that some of these

---

[2] Capurro Decl. ¶ 4, Ex. B (92:19–24 ("Wang Dep. Tr. (Day 3)")); *see also id.* ¶ 5, Ex. C at p. 8, 11–12 (Irico Defs.' Sixth Suppl. Objs. & Resps. to DPPs' First Set of Interrogs., No. 5 (Jan. 7, 2022) (admitting to attending six of the meetings that Plaintiffs have identified in other defendant's productions)).

[3] *See* Capurro Decl. ¶ 5, Ex. C at p. 12-13.

[4] *See, e.g.*, Capurro Decl. ¶ 6, Ex. D (CHU00734728 (A June 27, 2007 email produced by Chunghwa from Irico's competitor, SEG Hitachi, to Irico's Yao Jun and other CRT competitors inviting them to attend a July 5, 2007 "meeting of general managers in the industry.")); *id.* ¶ 7, Ex. E (CHU00082243 (A July 2, 2007 email dated from Irico's Liang Yuan (email address: jill-yy@163.com) to Chunghwa attaching CHU00082244

documents—many of which contain highly sensitive, confidential information about Irico's future business plans—were authored by Irico employees.[5] Yet, Irico has not produced any of these documents. Capurro Decl. ¶ 8. Nor has it produced *any* emails or other custodial documents from any of its key employees. *Id*. Indeed, Irico's discovery responses confirm that its email servers were regularly overwritten, and employees' computers were recycled when they left the company, long after Irico's duty to preserve evidence was triggered.[6]

### B. Irico's Discovery Responses Concede That Irico Failed To Implement A Proper Litigation Hold And That Relevant Evidence Was Not Preserved

As a result of Irico's deficient document production, Plaintiffs have sought to discover whether Irico properly implemented a litigation hold, what documents and data would have existed at the time the duty to preserve relevant evidence was triggered, and the circumstances of the loss or destruction of that evidence. On December 22, 2021, Your Honor recommended that the Court grant Plaintiffs' motion to compel and ordered Irico to provide detailed information regarding its evidence preservation efforts (or lack thereof), and its loss or destruction of relevant information. ECF No. 5977. The Court adopted Your Honor's recommendation by Order dated January 6, 2022. ECF No. 5978.

In response to Your Honor's Order, Irico admitted that even though it was served with IPPs' complaint on December 25, 2007, it did not implement a litigation hold until

---

(spreadsheets with China's CPT makers' production data and referencing "the industry's exchanged materials" and "the industry's exchanged data"), CHU00082287 (summary of the Qingdao meeting in June 2007), and CHU00082292 (slides re the trend of China's glass). Irico admits that jill-yy@163.com is an email address used by one of its officers or employees during the Relevant Period. *See* Capurro Decl. ¶ 8, Ex. F (Irico Defs.' Objs. & Resps. to IPPs' First Set of RFA's, Responses to RFA No. 1) at p. 5-6.

[5] *See* Capurro Decl.. ¶ 8, Ex. F (Irico Defs.' Responses to RFA No. 4). For example, Irico admits that the document bates stamped CHU00123502-17E (*id*. ¶ 9, Ex. G) and produced by Irico's competitor Chunghwa Picture Tubes, was authored by Irico employees. *Id*. This "Regular Marketing Meeting Report" dated June 13, 2005, contains Irico's analysis of the CRT and CRT television markets as of May 2005 including, *inter alia*, Irico's and other CRT and TV makers' production, sales, pricing, inventory, and export data. At CHU00123506E, a table details "CRT Makers' Production Suspension/Limitation Plans for June 2005," *i.e*., their *future* production plans. At CHU001235010E, another table details, "**CPT pricing: Industry's Settled Price Range in Recent Months**," including a "Prediction for Jun 05." (Emphasis added). In addition to corroborating the evidence of Irico's participation in the conspiracy, this document also demonstrates that Irico monitored and analyzed the global CRT and CRT product markets, including exports. Thus, this document supports IPPs' position that Irico knew its CRTs were being used to manufacture large quantities of CRTs for the U.S. market.

[6] *Id*. ¶ 10, Ex. H (Irico's Fifth Suppl. Obj. & Resps. To DPPs' First Set Interrogs.) at p. 8.

August or September 2008—eight to nine months *after* the duty to preserve was triggered.[7] Given Irico's claim that its email system only preserved emails for a few days, Irico's failure to implement a litigation hold until 8-9 months after it was served, together with its failure to produce any emails, meeting reports, or other highly relevant "Sales Company" marketing and sales reports, compels the conclusion that relevant evidence was destroyed during this period.

Moreover, Irico's litigation hold was woefully inadequate. *First*, the scope of the hold fell far short of what an adequate hold should have been in this case. Rather than instructing its key employees to preserve all information "potentially relevant to the subject matter of this litigation[,]" as required by Pretrial Order No. 1 (ECF No. 230 ¶ 13) and well-established case law, Irico inexplicably instructed its employees to search for and preserve only information relating to "Irico sales of CRTs to the United States."[8] Furthermore, Irico's employees found no such information.[9] Thus, Irico effectively preserved nothing and allowed the emails and computers of key employees to be recycled or overwritten, and hard copy documents to be lost or destroyed. Indeed, Irico concedes that its 2008 litigation hold was inadequate to preserve relevant information.[10]

*Second*, Irico's inadequate instruction was given orally, which courts have consistently held to be insufficient. *See, e.g.*, *Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 46 (D.D.C. 2019) ("[I]t is well recognized that an oral litigation hold is insufficient to

---

[7] Capurro Decl. ¶ 11, Ex. I (Irico Defs.' Suppl. Objs. & Resps. To IPPs' Third Set Interrogs., Resp. to No. 4) p. 23-24 (admitting that it was served with IPPs' complaint on Dec. 25, 2007), and Suppl. Resp. to Interrogatory No. 2, Issue No. 4 (stating that it formed a "2008 Litigation Committee" in June 2008, and that "efforts to search for and preserve documents would have occurred. . . in August or September 2008")).

[8] Capurro Decl. ¶ 11, Ex. I (Irico Defs.' Suppl. Objs. & Resps. To IPPs' Third Set of Interrogs., Resp. to No. 2, Issue No. 4) at p. 10-11.

[9] Capurro Decl. Ex. I at p. 11 ("Yan Yunlong recalls that the employees identified in the Response to Issue No. 2 contacted relevant employees and searched for documents, but that no documents relevant to the sales of CRTs by Irico to the United States were identified at that time.").

[10] Capurro Decl. Ex. I at p. 11 ("Irico acknowledges that at the time it misunderstood the scope of document preservation in connection with the litigation in the United States and cannot be certain that all documents related to Irico's global sales of CRTs were preserved."); *id*. at p. 12 ("Irico does not contend that the oral instruction in 2008 was effective in preserving all documents related to its global sales of CRTs"). *id*. at p. 12-13 (identifying the types of documents that would have been preserved if Irico's oral instruction had not been limited to "sales of CRTs to the United States," including "sales reports containing general CRT market information; CRT sales contracts with customers; Recent correspondence with customers regarding CRT sales; and Handwritten working notes regarding recent internal and customer meetings attended by members of Irico's sales team.").

reasonably protect against the spoliation of evidence.") (citations omitted). Moreover, there is no contemporaneous record of what was done to preserve relevant evidence and therefore whether any spoliation of evidence was willful or merely negligent. *See DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 947 (N.D. Ill. 2021) ("Case law 'illustrates the importance of lawyers taking a thoroughly documented leadership role in directing client compliance with the often-rigorous demands of e-discovery.' This is particularly true when preservation efforts are likely to be challenged . . . . Indeed, documentation of the litigation hold process is so important that the Sedona Conference established a guideline addressing why and how to document this process.") (citations omitted).

Irico's inability to provide much of the additional information ordered by the Court regarding its 2008 oral litigation hold illustrates the problems caused by failing to document evidence preservation efforts. For example, in response to Issue No. 4, Irico failed to identify *any* of the Irico employees who were instructed to search for and preserve evidence of Irico's CRT sales to the United States.[11] In addition, Irico states that it "cannot find documents detailing the specific information [ordered by the Court] and its answers are based on the recollections of Yan Yunlong," Irico's Legal Affairs Director, who was also a member of the 2008 Litigation Committee. Capurro Decl. Ex. I at p. 10, 11. Mr. Yan is "the only remaining Irico employee with knowledge of the dissemination of the oral instruction in 2008. All of the members of the 2008 Litigation Committee other than Yan Yunlong have retired or otherwise departed the company." *Id.*, Ex. I at p. 11.

**C. Irico's Responses To IPPs' Third Set Of RFPs And Fourth Set Of Interrogatories Suggest That Irico Defied Its Former Counsel's Instructions Regarding Evidence Preservation**

IPPs' Third Set of RFPs seek documents relating or referring to Irico's document preservation efforts. RFP No. 1 seeks: "All Documents relating or referring to the preservation of Documents relevant to this litigation." Capurro Decl. ¶ 2, Ex. A at 6. RFP Nos. 2 and 3 specifically seek documents relating or referring to Irico's 2008 and 2017 oral instructions to their employees to preserve documents. *Id*., Ex. A at p. 6-7.

As to RFP Nos. 2 and 3, Irico responded that after a reasonable search, no responsive documents were identified. *Id*. As for RFP No. 1, however, Irico objected and refused to produce responsive documents on attorney-client privilege grounds, referring Plaintiffs to a Privilege Log served with its response. *Id*., Ex. A at 6. The Privilege Log identifies five communications between Irico's Yan Yunlong and other Irico employees and Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") attorneys from February 15, 2008 through August 18, 2008. *Id*., Ex. A at 9 (Privilege Log). Three of the communications are described as emails "containing legal advice from counsel . . .

[11] Capurro Decl. Ex. I at p. 11 ("Despite best efforts, Irico has been unable to identify the specific individuals contacted by the employees identified in Response to Issue No. 2.").

regarding CRT litigation status and case strategy," but the August 18, 2008 email and attached memorandum "contain[] legal advice from counsel Joseph Tiffany regarding document preservation." *Id.* Because Irico claims to have no responsive *non-privileged* documents relating to evidence preservation, these litigation hold communications are the only contemporaneous evidence of Irico's document preservation efforts in 2008.

Irico's responses to IPPs' Fourth Set of Interrogatories confirm this fact. *First*, in response to IPPs' Interrogatory No. 3, Irico responds that "it retained Pillsbury to represent Irico in this case on or about January 24, 2008." Capurro Decl. ¶ 12, Ex. J (Irico Defendants' Obj. & Resps. To IPPs' Fourth Set of Interrogatories) at 14. *Second*, in response to IPPs' Interrogatory No. 4, Irico responds that Yan Yunlong was the only individual who communicated with Pillsbury attorneys on Irico's behalf regarding this case after Irico was served with IPPs' complaint. *Id*. *Finally*, and most significantly for this motion, in response to IPPs' Interrogatory No. 6, Irico responded that "it consulted with its former counsel, Pillsbury Winthrop Shaw & Pittman, LLP, regarding document preservation, but not on the specific decision in determining to preserve only documents relating to sales of CRTs to the United States in mid-2008." *Id*., Ex. J at 15. These responses suggest that Irico may have defied Pillsbury's instructions regarding evidence preservation in determining the scope of its litigation hold.

Plaintiffs have notified Irico that they wish to depose Mr. Yan, and Irico has agreed to produce him before the end of May. Irico's interrogatory responses indicate that Mr. Yan (apparently) does not recollect many specifics regarding Irico's evidence preservation efforts. Without the Pillsbury correspondence, his deposition will likely simply confirm his claimed lack of recollection. *Id.* ¶ 13.

## II. <u>Courts Compel Production Of Litigation Hold Communications Where, As Here, Plaintiffs Make A Preliminary Showing Of Spoliation</u>

Litigation hold letters are discoverable—even if otherwise privileged—where the moving party makes "a sufficient preliminary showing of spoliation[.]" *Al Otro Lado, Inc.*, 2020 WL 4432026, at *2 (citing cases).

"Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake v. UBS Warburg*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003). Failure to do so can result in spoliation of evidence, "which the Ninth Circuit defines as 'the 'destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation.'" *Al Otro Lado, Inc. v. Wolf*, 2020 WL 4432026, at *2 (quoting *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009)).

Federal courts have the inherent power to sanction a party for spoliation of evidence. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). Sanctions for spoliation are also available under Fed. R. Civ. P. 37. *Id*. Sanctions for the spoliation of Electronically Stored Information ("ESI") are governed solely by Fed. R. Civ. P. 37(e).

*See Newberry v. Cty. of San Bernardino*, 750 F. App'x 534, 537 (9th Cir. 2018) (quoting Fed. R. Civ. P. 37 Advisory Committee Notes to the 2015 Amendment) ("The detailed language of Rule 37(e) 'therefore foreclose[d] reliance on inherent authority' to determine whether terminating sanctions were appropriate.").

The severity of the sanction under Rule 37(e) depends, in part, on whether the spoliator "acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2); *Matthew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-CV-04236-BLF, 2016 WL 2957133, at *1 (N.D. Cal. May 23, 2016) ("If the party that lost the evidence 'acted with the intent to deprive another party of the information's use in the litigation,' more severe sanctions are available under Rule 37(e)(2)"). Similarly, to levy sanctions for spoliation under a court's inherent authority, "the Court must find that the offending party destroyed evidence with notice that the evidence may be relevant to pending litigation." *Moore v. Gilead Scis., Inc.*, No. C 07-03850 SI, 2012 WL 669531, at *3 (N.D. Cal. Feb. 29, 2012). In addition, courts must consider "the level of culpability of the spoliator." *Id*.; *see also id*. at *4 (quoting *Leon*, 464 F.3d at 959) ("A party's destruction of evidence qualifies as 'willful' spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'").

Courts have recognized that "the content of a litigation hold notice is relevant to a determination of whether the spoliation was willful or merely negligent." *Al Otro Lado, Inc*., 2020 WL 4432026, at *2; *City of Colton v. Am. Promotional Events, Inc.*, No. CV0906630PSGSSX, 2011 WL 13223880, at *5 (C.D. Cal. Nov. 22, 2011) ("Discovery of litigation hold letters . . . may be, as here, an initial step that allows a party to investigate and possibly prove spoliation, so that the court may determine whether sanctions are warranted."); *Thomas v. Cricket Wireless, LLC*, No. 19-CV-07270-WHA(AGT), 2021 WL 1017114, at *5 (N.D. Cal. Mar. 16, 2021) (recognizing that the litigation hold notice was "the only way plaintiffs will get the information they need to further investigate and possibly prove spoliation."); *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 436-37 (S.D.N.Y. 2004) (considering litigation hold communications in concluding that UBS acted willfully in destroying potentially relevant information).

These courts have therefore permitted discovery of litigation hold letter where the moving party makes "a sufficient preliminary showing of spoliation[.]" *Al Otro Lado, Inc.*, 2020 WL 4432026, at *2; *City of Colton*, 2011 WL 13223880, at *2 ("A preliminary showing of spoliation may waive the protection generally afforded litigation hold letters."); *Major Tours, Inc. v. Colorel*, No. CIV 05-3091(JBS/JS), 2009 WL 2413631, at *2 (D.N.J. Aug. 4, 2009) ("Although in general hold letters are privileged, the prevailing view, which the Court adopts, is that when spoliation occurs the letters are discoverable.") (citing cases). The Court should do the same here.

## III. **The Court Should Compel Irico To Produce Its Litigation Hold Communications With Its Former Counsel**

Plaintiffs respectfully request that Your Honor compel Irico to produce the litigation hold communications identified on the Privilege Log. As a threshold matter, it

is Irico's burden to demonstrate that the communications are in fact privileged. *United States ex rel. Barko v. Halliburton Co.*, 74 F. Supp. 3d 183, 187 (D.D.C. 2014) ("The party asserting privilege bears the burden of demonstrating that it applies.").

Even if Irico can demonstrate that the litigation hold communications are privileged, there is no question that Plaintiffs have made "a sufficient preliminary showing of spoliation" to overcome that privilege. *Al Otro Lado, Inc.*, 2020 WL 4432026, at *2. As described above, Irico's duty to preserve evidence relevant to this litigation was triggered no later than December 25, 2007, with the service of IPPs' complaint, and was likely triggered at least several months before then.[12] Irico has admitted that it failed to implement a litigation hold until *eight or nine months after service of the complaint*. *See* Capurro Decl. ¶ 11, Ex. I at 10-11. It has provided no explanation for this delay, which is particularly egregious given Irico's claims that it regularly deleted emails and other ESI due to lack of storage, and did not preserve meeting notes in the ordinary course of business.[13] Irico has produced *no* emails and none of the weekly sales and marketing reports found in other defendants' productions. Thus, it is reasonable to infer that at least some of these highly relevant documents were lost or destroyed as a result of Irico's delay. *See Al Otro Lado, Inc.*, 2020 WL 4432026, at *2 (finding a sufficient preliminary showing of spoliation and ordering production of litigation hold notice where defendant failed to instruct employees to preserve relevant documents until over a year after the litigation began).[14]

Moreover, given that Irico's oral preservation instruction only included documents relating to non-existent CRT sales directly to the United States, Irico effectively implemented *no litigation hold* until it re-entered the case in late 2017, by which point only archived documents remained. According to Irico, "it misunderstood the scope of document preservation in connection with the litigation in the United

---

[12] Plaintiffs believe that Irico's duty to preserve was triggered before service of the complaint (e.g., in early November 2007 when the government investigations into the CRT industry were announced, or in 2006 when the investigations into the LCD industry were announced). However, it is not necessary for the Court to decide this issue for this motion. Plaintiffs reserve the right to argue in subsequent motions that Irico's duty to preserve was triggered before December 25, 2007.

[13] Capurro Decl. ¶ 10, Ex. H at 8.

[14] *See also City of Colton*, 2011 WL 13223880, at *5 (preliminary showing of spoliation justified production of litigation hold notice where, as here, the delay between the time that the duty to preserve arose and the time that litigation hold letters were issued made it probable that relevant evidence was lost); *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 998 (N.D. Cal. 2012) ("By failing to do as little as issue a litigation hold notice to any employees for eight months after its preservation duty arose, and by further delaying issuance of litigation hold notices to several key custodians, the Court finds that Apple acted with not just simple negligence but rather conscious disregard of its duty to preserve.").

States[.]" Capurro Decl. Ex. I at 11 (Response to Issue No. 4). But Irico's recent discovery responses reveal that Irico retained Pillsbury on January 24, 2008,[15] and that Pillsbury sent an email and attached memorandum regarding evidence preservation on August 18, 2008[16]—precisely in the same August/September 2008 time frame that Irico claims to have issued its oral instruction to its employees.[17] Further, Irico admits that "it consulted with its former counsel Pillsbury Winthrop Shaw & Pittman, LLP, regarding document preservation, but not on the specific decision in determining to preserve only documents related to sales of CRTs to the United States in mid-2008." Capurro Decl. Ex. J at 15.

    In other words, Irico received legal advice regarding this litigation from a highly regarded and competent U.S.-based law firm for *seven months* before it took any action to prevent the destruction of evidence relevant to this case. Pillsbury's attorneys would have been well aware of their duties with regard to evidence preservation,[18] and almost certainly would have advised Irico to issue a written litigation hold immediately upon retention. Irico's discovery responses indicate that Irico defied Pillsbury's instructions in formulating its inadequate litigation hold, and chose to communicate orally, ensuring that there would be no record of it. Irico should not be permitted to assert in this litigation that it "misunderstood" its preservation obligations while withholding the advice that will likely prove otherwise, and simultaneously claiming to lack any recollection of the events at issue.

    Indeed, it is unlikely that Pillsbury's August 2008 email and memorandum were its first and only communications to Irico regarding evidence preservation, as Irico's Privilege Log suggests. *See* Capurro Decl., Ex. A at 9. Irico's recent interrogatory responses indicate that there may be other written communications with Pillsbury that are not included in the Privilege Log because they are preserved "in the files of counsel." *Id.*, Ex. J at 15 (Irico's Response IPPs' Fourth Set of Interrogatories, No. 5: "Irico responds that it did occasionally communicate with Pillsbury Winthrop Shaw & Pittman, LLP in writing and that, to the best of its knowledge, those documents have been preserved either in Irico's files *or in the files of counsel*.") (emphasis added). To the extent Pillsbury has additional written communications regarding evidence preservation in its files, Irico is entitled to copies of those and should be compelled to produce those to Plaintiffs as well.

    In sum, as a result of Irico's conduct, the litigation hold communications are directly at issue here, and any attorney-client privilege has been waived. The litigation

---

[15] Capurro Decl. Ex. J at 13-14.

[16] Capurro Decl. Ex. A at 9 (Privilege Log).

[17] Capurro Decl. Ex. I at 11 (Response to Issue No. 4, stating that it formed a "2008 Litigation Committee" in June 2008, and that "efforts to search for and preserve documents would have occurred. . . in August or September 2008").

[18] *See Zubulake*, 229 F.R.D. at 432-434 (describing counsel's duties regarding evidence preservation).

hold communications are the only contemporaneous evidence regarding whether Irico's inadequate, oral litigation hold—which Irico concedes resulted in it failing to preserve broad categories of highly relevant documents—was intentionally formulated by Irico to deprive Plaintiffs of evidence relevant to this litigation. *See Zubulake*, 229 F.R.D. at 436-437 (concluding that defendant acted willfully in destroying potentially relevant information and ordering an adverse inference instruction based, in large part, upon the court's review of attorney-client privileged communications and its finding that defendant "deleted the e-mails in defiance of explicit instructions [from counsel] not to.").

As in *Zubulake*, the Court will need the litigation hold communications to determine whether Irico willfully ignored the advice of counsel in failing to implement a proper litigation hold and allowing the destruction of relevant evidence. This will in turn determine what sanctions are appropriate under Fed. R. Civ. P. 37(e)(2) and the Court's inherent powers.

## IV. Conclusion

For all the foregoing reasons, Plaintiffs respectfully request that Your Honor order Irico to produce all communications with Pillsbury regarding evidence preservation, including any communications that may be stored in Pillsbury's files.

Very truly yours,

*/s/ Lauren C. Capurro*
Lauren C. Capurro
Lead Counsel for the Indirect Purchaser Plaintiffs

*/s/ R. Alexander Saveri*
R. Alexander Saveri
Lead Counsel for the Direct Purchaser Plaintiffs

Cc: John M. Taladay
Evan J. Werbel
Thomas E. Carter
Andrew L. Lucarelli
Kaylee Yang
Mario N. Alioto
Daniel E. Birkhaeuser
Geoffrey C. Rushing
Matthew D. Heaphy

# EXHIBIT P

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
evan.werbel@bakerbotts.com
tom.carter@bakerbotts.com
drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION

This Document Relates to:

*ALL INDIRECT PURCHASER ACTIONS*

Master File No. 07-cv-05944-JST (N.D. Cal.)

MDL No. 1917

**IRICO DEFENDANTS' OBJECTIONS AND RESPONSES TO INDIRECT PURCHASER PLAINTIFFS' FOURTH SET OF INTERROGATORIES TO IRICO GROUP CORPORATION AND IRICO DISPLAY DEVICES CO., LTD.**

PROPOUNDING PARTY: Indirect Purchaser Plaintiffs

RESPONDING PARTIES: Irico Group Corporation
Irico Display Devices Co., Ltd.

SET NUMBER: Four

Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby provides these responses to the Indirect Purchaser Plaintiffs' ("Plaintiffs") Fourth Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., dated December 14, 2021 ("Interrogatories"). Irico reserves the right to amend or supplement these Objections and Responses (the "Responses") to the extent allowed by the Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California ("Local Rules"). Subject to and without waiving any of Irico's General and Specific Objections as set forth below, Irico is willing to meet and confer with Plaintiffs regarding such General and Specific Objections.

The following Responses are made only for purposes of this case. The Responses are subject to all objections as to relevance, materiality and admissibility, and to any and all objections on any ground that would require exclusion of any response if it were introduced in court. All evidentiary objections and grounds are expressly reserved.

These Responses are subject to the provisions of the Stipulated Protective Order issued by the Court on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated "Confidential" in accordance with the provisions of the Protective Order.

**GENERAL OBJECTIONS**

Irico makes the following General Objections to Plaintiffs' Interrogatories:

1. Irico's Responses are based upon information available to and located by Irico as of the date of service of these Responses. In responding to Plaintiffs' Interrogatories, Irico states that it has conducted a diligent search, reasonable in scope, of those files and records in its possession, custody, or control believed to likely contain information responsive to Plaintiffs' Interrogatories.

2. No express, incidental, or implied admissions are intended by these Responses and should not be read or construed as such.

3. Irico does not intend, and its Responses should not be construed as, an agreement or acquiescence with any characterization of fact, assumption, or conclusion of law contained in

or implied by the Requests.

4. Irico has made a good faith and reasonable attempt to ascertain whether information responsive to Plaintiffs' Interrogatories exists and is properly producible, and has produced or made available for examination non-privileged responsive materials located during the course of that reasonable search.

5. To the extent that Irico refers to any pleading, expert report, or other filing in its Specific Responses, Irico incorporates by reference all exhibits and/or evidence cited therein.

6. Irico objects to Plaintiffs' Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiffs.

7. Irico objects to Plaintiffs' Interrogatories to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

8. Irico objects to Plaintiffs' Interrogatories to the extent that they request duplicative discovery in violation of the Order Re Discovery And Case Management Protocol, ECF No. 1128. *See* Order Re Plaintiffs' Motions To Compel Supplemental Discovery From Toshiba And Panasonic, ECF No. 4128, at 4 ("The Discovery Protocol (ECF No 1128), requires parties to coordinate discovery and not file duplicative discovery. . . . The benefit redounds to all parties on both sides of the litigation, by conserving the efforts required by Plaintiffs and protecting defendants against unnecessary duplication of effort.") (Report and Recommendation adopted in full at ECF No. 4256).

9. Irico objects to Plaintiffs' Interrogatories to the extent they seek information that is not relevant or disproportionate to the needs of the case.

10. Irico objects to Plaintiffs' Interrogatories to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico has attempted to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case. If Plaintiffs subsequently asserts an interpretation of any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or

amend its Responses.

11. Irico objects to Plaintiffs' Interrogatories to the extent that they contain terms that are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case.

12. Irico objects to Plaintiffs' Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico provides only information that it believes to be non-privileged and otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any information or responsive documents subject to any such doctrine, privilege, protection or immunity from production shall not constitute a general, inadvertent, implicit, subject-matter, separate, independent or other waiver of such doctrine, privilege, protection or immunity from production.

13. Irico objects to Plaintiffs' Interrogatories to the extent that they call for information that is not in the possession, custody, or control of Irico. Irico also objects to the extent that any of Plaintiffs' Interrogatories seek information from non-parties or third parties, including but not limited to any of Irico's subsidiary or affiliated companies.

14. Irico objects to Plaintiffs' Interrogatories to the extent that responding would require Irico to violate the privacy and/or confidentiality of a third party or confidentiality agreement with a third party.

15. Irico objects to Plaintiffs' Interrogatories to the extent that they seek information that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily available from other sources.

16. Irico objects to Plaintiffs' Interrogatories to the extent that they seek information or documents concerning transactions outside the United States. Such Requests are unduly burdensome and disproportionate to the needs of the case as Plaintiffs' class definition is confined

to "individuals and entities that indirectly purchased Cathode Ray Tube Products . . . in the United States" (see Indirect Purchaser Plaintiffs' Fifth Consolidated Amended Complaint ("Complaint") dated September 19, 2019).

17. Irico objects to Plaintiffs' Interrogatories to the extent that compliance would require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body of foreign jurisdictions.

18. Irico's responses pursuant to Plaintiffs' Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

19. Irico objects to Plaintiffs' Interrogatories to the extent that they are compound and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

20. Irico objects to Plaintiffs' Interrogatories to the extent that they state and/or call for legal conclusions.

21. Irico objects to the Interrogatories to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

22. Irico objects to the Interrogatories to the extent they seek information or documents that cannot be removed or transmitted outside China without violating the laws and regulations of that country, including but not limited to restrictions on the transmission of state secrets or trade secrets as those terms are defined under Chinese law.

23. Irico objects to the Interrogatories to the extent that they are premature and/or implicate expert analysis and disclosures. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 Wl 9558055 (N.D. Cal. May 19, 2011). Irico further objects to each Interrogatory to the extent that it: (a) conflicts with obligations that are imposed by the Federal Rules of Civil Procedure, the Civil Local Rules of this Court, and/or any other applicable rule; (b) seeks information that is the subject of expert testimony; and/or (c) seeks information that is dependent on depositions and documents of third-parties that have not been discovered.

24. Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

**GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1. Irico objects to the definitions of "Including" and "Relating" (Definition No. 1) on the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to the extent that it seeks information protected by the attorney client or other applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or foreign law.

2. Irico objects to the definitions of "You," "Your," and "Irico" (Definition No. 2) to the extent that Plaintiffs defines those terms to include the Irico's "present and former members, officers, agents, employees, and all other persons acting or purporting to act on their behalf, including all present and former members, officers, agents, employees, and all other persons exercising or purporting to exercise discretion, making policy, and make decisions." This definition is overbroad, unduly burdensome, vague, and ambiguous. In particular, Irico objects to this definition to the extent it purports to request information beyond the possession, custody, or control of Irico Group or Irico Display, including but not limited to information in the possession of non-parties and third parties where Irico lacks any duty to obtain or otherwise search for the information and for whom the Court lacks personal jurisdiction. Irico also objects to the inclusion of all "present or former employees, officers, directors, agents . . . or any other person acting on [the] behalf [of]" Irico within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

3. Irico objects to the definition of "Identify" (Definition No. 3) on the grounds that the definition is overly broad, unduly burdensome, and seeks information that is neither relevant nor proportionate to the needs of the case.

4.      Irico objects to the definition of "Document" (Definition No. 5) to the extent it seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, any Order of this Court, or any other applicable laws.

5.      Irico objects to the definition of "CRT" (Definition No. 6) on the grounds that it is vague, ambiguous and overly broad.

6.      Irico objects to Instruction No. 1 (related to disclosure of additional information) to the extent it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 26(e).

7.      Irico objects to Instruction No. 2 (related to production of business records) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 33(d), Rule 26(b). Irico further objects to this Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any Orders of the Court.

8.      Irico objects to Instruction No. 3 (related to privileged information) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 33(d), Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any Orders of the Court, and on the grounds that it is vague, ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the extent it seeks information that would disclose personal confidential information and/or violate any and all rights of privacy under the United States Constitution or Article I of the Constitution of the State of California, or any other applicable law or state constitution, or that is otherwise prohibited from disclosure because to do so would cause Irico to violate legal and/or contractual obligations to any other persons or entities.

**SPECIFIC RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1**

Identify all individuals or Departments within Irico that used or maintained each of the following email addresses during the Relevant Period:

    A.  jingyuan@irico.com.cn

    B.  Jill-yy@163.com

    C.  yliang6699@163.com

    D.  yliang@hotmail.com

    E.  yliang@irico.com.cn

    F.  pqwang@irico.com.cn

  G.  xsgsyxb@ch.com.cn

  H.  yht@ch.com.cn

  I.  yj-xs@ch.com.cn

  J.  ryz@ch.com.cn

  K.  zhangjing@ch.com.cn

  L.  fanxj@ch.com.cn

  M. rggao@irico.com.cn

  N.  xjhao@irico.com.cn

  O.  ly-xs@ch.com.cn

  P.  lg@chyg.com

  Q.  shatao@irico.com.cn

  R.  lumimate@public.xa.sn.cn

  S.  sxl-xs@ch.com.cn

  T.  shs-xs@ch.com.cn

  U.  Is7071@sina.com

  V.  hywen@irico.com.cn

  W. dqxing@ch.com.cn

  X.  hdyang@irico.com.cn

Y. wjp7858@sina.com

Z. zhsw@ch.com.cn

AA. ZLM-XS@ch.com.cn

BB. chks@chinairico.com

CC. zcf@ch.com.cn

**RESPONSE TO INTERROGATORY NO. 1**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not proportional to the needs of the case, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico objects to this Interrogatory on the grounds that it calls for a legal conclusion. Irico objects that the terms "used" or "maintained" is vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not proportionate to the needs of the case.

Subject to and without waiving the foregoing objections, Irico responds as follows:

INTERROGATORY NO. 1A

This email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC").

INTERROGATORY NO. 1B

This email address, which was not issued or managed by Irico, appears to have been used by Liang Yuan.

INTERROGATORY NO. 1C

This email address, which was not issued or managed by Irico, appears to have been used by Liang Yuan.

INTERROGATORY NO. 1D

This email address, which was not issued or managed by Irico, appears to have been used by Liang Yuan.

INTERROGATORY NO. 1E

This email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC").

INTERROGATORY NO. 1F

This email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC").

INTERROGATORY NO. 1G

After conducting a reasonable search, Irico acknowledges that it issued and maintained email addresses with the "@ch.com.cn" domain, however Irico cannot identify a specific Irico employee who used this email address during the Relevant Period.

INTERROGATORY NO. 1H

After conducting a reasonable search, Irico acknowledges that it issued and maintained email addresses with the "@ch.com.cn" domain, however Irico cannot identify a specific Irico employee who used this email address during the Relevant Period.

INTERROGATORY NO. 1I

This email address was used by Yao Jun.

INTERROGATORY NO. 1J

After conducting a reasonable search, Irico acknowledges that it issued and maintained email addresses with the "@ch.com.cn" domain, however Irico cannot identify a specific Irico employee who used this email address during the Relevant Period.

INTERROGATORY NO. 1K

After conducting a reasonable search, Irico acknowledges that it issued and maintained email addresses with the "@ch.com.cn" domain, however Irico cannot identify a specific Irico employee who used this email address during the Relevant Period.

INTERROGATORY NO. 1L

After conducting a reasonable search, Irico acknowledges that it issued and maintained email addresses with the "@ch.com.cn" domain, however Irico cannot identify a specific Irico employee who used this email address during the Relevant Period.

INTERROGATORY NO. 1M

This email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC").

INTERROGATORY NO. 1N

This email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC").

INTERROGATORY NO. 1O

This email address was used by Liang Yuan.

INTERROGATORY NO. 1P

This email address, which was not issued or managed by Irico, appears to be associated Kunshan Caihong Yingguang Electronics Co., Ltd. Irico does not have additional detail regarding that company's use of this email address or who within the company used the email address.

INTERROGATORY NO. 1Q

This email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC").

INTERROGATORY NO. 1R

This email address, which was not issued or managed by Irico, appears to be associated with Shaanxi IRICO Phosphor Material Co. Ltd. Irico does not have additional detail regarding

that company's use of this email address or who within the company used the email address.

INTERROGATORY NO. 1S

This email address was used by Shen Xiaolin.

INTERROGATORY NO. 1T

After conducting a reasonable search, Irico acknowledges that it issued and maintained email addresses with the "@ch.com.cn" domain, however Irico cannot identify a specific Irico employee who used this email address during the Relevant Period.

INTERROGATORY NO. 1U

After conducting a reasonable search, Irico cannot determine whether this address was used by an Irico employee during the Relevant Period. This email domain was not maintained by Irico, who issued and maintained email addresses with the "@ch.com.cn" domain.

INTERROGATORY NO. 1V

This email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC").

INTERROGATORY NO. 1W

This email address was used by Xing Daoqin.

INTERROGATORY NO. 1X

This email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC").

INTERROGATORY NO. 1Y

After conducting a reasonable search, Irico cannot determine whether this address was used by an Irico employee during the Relevant Period. This email domain was not maintained by Irico, who issued and maintained email addresses with the "@ch.com.cn" domain.

INTERROGATORY NO. 1Z

This email address was used by Zhang Shaowen.

INTERROGATORY NO. 1AA

After conducting a reasonable search, Irico acknowledges that it issued and maintained email addresses with the "@ch.com.cn" domain, however Irico cannot identify a specific Irico employee who used this email address during the Relevant Period.

INTERROGATORY NO. 1BB

After conducting a reasonable search, Irico cannot determine whether this address was used by an Irico employee during the Relevant Period. This email domain was not maintained by Irico, who issued and maintained email addresses with the "@ch.com.cn" domain.

INTERROGATORY NO. 1CC

This email address was used by Zou Changfu.

**INTERROGATORY NO. 2**

Identify all email addresses used or maintained by Irico employees during the Relevant Period that are not set forth in Interrogatory No. 1 above.

**RESPONSE TO INTERROGATORY NO. 2**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not proportional to the needs of the case, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico objects to this Interrogatory on the grounds that it calls for a legal conclusion. Irico objects that the terms "used" and "maintained" are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not proportionate to the needs of the case.

Subject to and without waiving the foregoing objections, Irico responds that it does not maintain a comprehensive list of email addresses used or maintained by Irico employees during the Relevant Period in the normal course of its business. Irico further responds that its departments or employees used email addresses with the domain @ch.com.cn during the Relevant Period. For addresses assigned to individual employees, the email address typically consisted of parts of the first and last name of the employee.

Irico has been able to identify the following email addresses that were used or maintained by Irico employees during the Relevant Period that are not set forth in Interrogatory No. 1 above: antx@ch.com.cn; bjjtbgs@ch.com.cn; blbgs@ch.com.cn; chlj@ch.com.cn; chltb@ch.com.cn; chrdbgs@ch.com.cn; chtw@ch.com.cn; chuntao@ch.com.cn; chuxh@ch.com.cn; chxning@ch.com.cn; chyy@ch.com.cn; cq-bgs@ch.com.cn; crgs@ch.com.cn; cwc@ch.com.cn; cwccpl@ch.com.cn; cwcyh@ch.com.cn; dlcbgs@ch.com.cn; dongj@ch.com.cn; dongzf@ch.com.cn; dwxcb@ch.com.cn; dwzzb@ch.com.cn; Dzqbgs@ch.com.cn; fdcsyb@ch.com.cn; fmq@ch.com.cn; fzghb@ch.com.cn; gcgs@ch.com.cn; gechao@ch.com.cn; gfbgs@ch.com.cn; gfoffice@ch.com.cn; gfzjb@ch.com.cn; ghswb@ch.com.cn; gmq@ch.com.cn; hansheng@ch.com.cn; hrj@ch.com.cn; jcma@ch.com.cn; jtbgs@ch.com.cn; jtfls@ch.com.cn; jtgzb@ch.com.cn; jtjszx@ch.com.cn; ksbgs@ch.com.cn; lgm@ch.com.cn; limiao@ch.com.cn; liuxi@ch.com.cn; liuyw@ch.com.cn; lsbgs@ch.com.cn; lsk@ch.com.cn; luhb@ch.com.cn; lwd@ch.com.cn; nanying@ch.com.cn; office@ch.com.cn; pjc@ch.com.cn; psg@ch.com.cn; pxzx@ch.com.cn; qdf@ch.com.cn; rggao@ch.com.cn; rjc@ch.com.cn; rsnn@ch.com.cn; scbgs@ch.com.cn; sjb@ch.com.cn; stock@ch.com.cn; sungzh@ch.com.cn; sxh@ch.com.cn; sxl-xs@ch.com.cn; szhybgs@ch.com.cn; taokui@ch.com.cn; tlj@ch.com.cn; tohaobo@ch.com.cn; txh@ch.com.cn; wanglm@ch.com.cn; wangxf@ch.com.cn; wbcbgs@ch.com.cn; weixj@ch.com.cn; wjp@ch.com.cn; wxm@ch.com.cn; wyq@ch.com.cn; wzbgs@ch.com.cn; wzj-xs@ch.com.cn; yanyunlong@ch.com.cn; yczgw@ch.com.cn; Ygf_bgs@ch.com.cn; yws@ch.com.cn; yzl@ch.com.cn; zccwc@ch.com.cn; zcgac@ch.com.cn; zcgh@ch.com.cn; zcjcc@ch.com.cn; zcn@ch.com.cn; zhangw@ch.com.cn; zhc@ch.com.cn; zhczbgs@ch.com.cn; zlbbgs@ch.com.cn; and Zx.office@ch.com.cn.

**INTERROGATORY NO. 3**

State the date that You retained Pillsbury Withrop Shaw & Pittman, LLP ("Pillsbury") to represent You in this case.

**RESPONSE TO INTERROGATORY NO. 3**

Irico incorporates its General Objections as set forth above. Irico further objects to the Interrogatory to the extent that it purports to seek information protected under the attorney-client

privilege or the attorney work product doctrine.

Subject to and without waiving the foregoing objections, Irico responds that it retained Pillsbury to represent Irico in this case on or about January 24, 2008.

**INTERROGATORY NO. 4**

Identify all Persons who communicated with Pillsbury attorneys on Your behalf regarding this case after You were served with the IPPs' complaint on December 25, 2007.

**RESPONSE TO INTERROGATORY NO. 4**

Irico incorporates its General Objections as set forth above. Irico further objects to the Interrogatory to the extent that it purports to seek information protected under the attorney-client privilege or the attorney work product doctrine.

Subject to and without waiving the foregoing objections, Irico identifies the following individuals who communicated with Pillsbury attorneys on Irico's behalf regarding this case after Irico was served with the IPPs' complaint on December 25, 2007: Yan Yunlong.

**INTERROGATORY NO. 5**

State whether any of Your communications with Pillsbury attorneys regarding this case were in writing, and if so, whether those Documents have been preserved. If any such communications have not been preserved:

a. Identify each Person or document custodian whose communications with Pillsbury were destroyed, discarded, erased, deleted, purged or lost;

b. State the date on which each responsive document was destroyed, discarded, erased, deleted, purged or lost;

c. Identify each person or document custodian who had any role or responsibility in destroying, discarding, erasing, purging, deleting, or losing of each such document or information; and

d. Describe in detail the circumstances under which each such document was destroyed, discarded, erased, deleted, purged, or lost.

**RESPONSE TO INTERROGATORY NO. 5**

Irico incorporates its General Objections as set forth above. Irico further objects to the

Interrogatory to the extent that it purports to seek information protected under the attorney-client privilege or the attorney work product doctrine.

Subject to and without waiving the foregoing objections, Irico responds that it did occasionally communicate with Pillsbury Winthrop Shaw & Pittman, LLP in writing and that, to the best of its knowledge, those documents have been preserved either in Irico's files or in the files of counsel.

**INTERROGATORY NO. 6**

State whether You consulted with Your former counsel, Pillsbury Withrop Shaw & Pittman, LLP ("Pillsbury"), in determining to preserve only "documents related to sales of CRTs to the United States" in mid-2008?

**RESPONSE TO INTERROGATORY NO. 6**

Irico incorporates its General Objections as set forth above. Irico further objects to the Interrogatory to the extent that it purports to seek information protected under the attorney-client privilege or the attorney work product doctrine.

Subject to and without waiving the foregoing objections, Irico responds that it consulted with its former counsel, Pillsbury Winthrop Shaw & Pittman, LLP, regarding document preservation, but not on the specific decision in determining to preserve only documents related to sales of CRTs to the United States in mid-2008.

**INTERROGATORY NO. 7**

As to each of the Defenses set forth in Your Answers to IPPs' Fifth Consolidated Complaint (ECF Nos. 5873, 5875):

a. State all facts that You rely on to support Your contention;

b. Identify each Person You contend has knowledge of facts that support Your contention; and

c. Identify each Document You contend supports Your contention

**RESPONSE TO INTERROGATORY NO. 7**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

not proportional to the needs of the case, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico objects to this Interrogatory on the grounds that it calls for a legal conclusion. Irico objects that the term "support" is vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not proportionate to the needs of the case. Irico also objects to this Interrogatory on the grounds that it contains impermissible subparts as Irico has identified forty-one defenses in its Answer to the Plaintiffs' Complaint. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to Plaintiffs' Interrogatories to the extent that they request duplicative discovery in violation of the Order Re Discovery And Case Management Protocol, ECF No. 1128. *See* Order Re Plaintiffs' Motions To Compel Supplemental Discovery From Toshiba And Panasonic, ECF No. 4128, at 4 ("The Discovery Protocol (ECF No 1128), requires parties to coordinate discovery and not file duplicative discovery. . . . The benefit redounds to all parties on both sides of the litigation, by conserving the efforts required by Plaintiffs and protecting defendants against unnecessary duplication of effort.") (Report and Recommendation adopted in full at ECF No. 4256). Plaintiffs' request is duplicative, in part or in whole, of the following discovery requests: Interrogatory No. 7 of Indirect Purchaser Plaintiffs' First Set of Interrogatories; Interrogatory Nos. 17-20 of Direct Purchaser Plaintiffs' First Set of Interrogatories; and, Interrogatory Nos. 16-23 of Direct Purchaser Plaintiffs Arch Electronics, Inc.'s First Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd.

Subject to and without waiving the foregoing objections, Irico responds as follows:

**<u>INTERROGATORY RESPONSE AS TO IRICO'S FIRST DEFENSE</u>**

The Complaint fails to state a claim upon which relief can be granted.

**<u>RESPONSE</u>**

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that Irico withdraws its First Defense.

**INTERROGATORY RESPONSE AS TO IRICO'S SECOND DEFENSE**

Plaintiffs' claims for any foreign purchases, if any, should be dismissed to the extent that they are barred, in whole or in part, because Plaintiffs have failed to allege facts sufficient to support a claim under the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a.

**RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico further objects to this interrogatory to the extent that it improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

Subject to and without waiving the objections stated above, Irico contends that Plaintiffs have failed to allege facts sufficient to support a claim under the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a. At all relevant times, the North American CRT market was unique and separate from other foreign markets, including China. In supporting its claims, Plaintiffs rely on alleged meetings and communications that occurred outside the United States that discuss and relate to CRTs sold outside the United States. Plaintiffs have not established how it is entitled to any relief under FTAIA based on their purchases of either CRT products outside of the United States or their purchase of CRT products containing CRTs manufactured and/or purchased outside the United States. Irico also identifies the following evidence under FRCP 33(d): Irico Group Corporation's Amended Motion to Dismiss Claims of Indirect Purchaser Plaintiffs for Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)), March 19, 2019; Irico Display Devices Co., Ltd.'s Amended Motion to Dismiss Claims of Indirect Purchaser Plaintiffs for Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)), March 19, 2019; Irico Defendants' Reply in Support of Amended Motions to Dismiss Claims of Indirect Purchaser Plaintiffs for Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)), May 13, 2019.

**INTERROGATORY RESPONSE AS TO IRICO'S THIRD DEFENSE**

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because the alleged conduct of [Group or Display] that is the subject of the Complaint either occurred outside the jurisdiction of the Court or was neither directed to nor affected persons, entities, trade or commerce in the United States, or both.

**RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico further objects to this interrogatory to the extent that it improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

Subject to and without waiving the objections stated above, and despite the Interrogatory's demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence has been brought in the above captioned matter that indicates that Irico manufactured, sold, or distributed CRTs in the United States during the class period. In particular, Irico will be producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the United States. Irico also identifies the following evidence under FRCP 33(d): Direct Purchaser Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs, July 14, 2021; Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co., Ltd., March 6-8, 2019.

Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

Zhaojie and Su Xiaohua.

**INTERROGATORY RESPONSE AS TO IRICO'S FOURTH DEFENSE**

Plaintiffs' claims should be dismissed for uncertainty and vagueness and because their claims are ambiguous, and/or unintelligible. [Group or Display] avers that Plaintiffs' claims do not describe the events or legal theories with sufficient particularity to permit [Group or Display] to ascertain what other defenses may exist. [Group or Display] therefore reserves the right to amend its Answer to assert additional defenses and/or supplement, alter, or change its Answer and/or defenses upon the discovery of more definitive facts upon the completion of its investigation and discovery.

**RESPONSE**

Irico further objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion.

Subject to and without waiving the objections stated above, Irico contends that Plaintiffs' Complaint names the following entities under the title "Irico:" Irico Group Corporation, Irico Display Devices Co., Ltd., and Irico Group Electronics Co., Ltd. Despite naming these three corporate entities, Plaintiffs throughout their complaint make allegations against "Irico" that purportedly refer to all three corporate entities collectively. For example, Plaintiffs make allegations in its Complaint that use the term "Irico" in the following paragraphs: 2, 150, and 185. Plaintiffs attempt to use a single term to refer to one, several, or all of the "Irico Entities" makes every such instance ambiguous and unintelligible regarding any specific allegation for Irico Group's or Irico Display's conduct.

**INTERROGATORY RESPONSE AS TO IRICO'S FIFTH DEFENSE**

Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part, because Plaintiffs have failed to allege fraud or fraudulent concealment with sufficient particularity.

**RESPONSE**

Irico further objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico also objects to this interrogatory to the extent that it improperly tries to

shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that Irico withdraws its Fifth Defense.

**INTERROGATORY RESPONSE AS TO IRICO'S SIXTH DEFENSE**

Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part, because Plaintiffs have failed to allege conspiracy with sufficient particularity.

**RESPONSE**

Irico further objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico also objects to this interrogatory to the extent that it improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that Irico withdraws its Sixth Defense.

**INTERROGATORY RESPONSE AS TO IRICO'S SEVENTH DEFENSE**

Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part, by the applicable statute(s) of limitations.

**RESPONSE**

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that it affirms its prior response. *See* Irico Defendants' Second Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, June 25, 2021.

**INTERROGATORY RESPONSE AS TO IRICO'S EIGHTH DEFENSE**

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because the actions or practices of [Group or Display] that are the subject of the Complaint were undertaken unilaterally for legitimate business reasons and in pursuit of [Group or Display]'s independent interests and those of its customers, and were not the product of any contract, combination or conspiracy between Group and any other person or entity.

**RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion.

Subject to and without waiving the objections stated above, Irico contends that its acts or practices were undertaken unilaterally for legitimate business reasons and in pursuit of Irico's independent interests. In addition, Irico asserts no evidence has been brought in the above captioned matter that indicates that its actions were not undertaken unilaterally for legitimate business reasons and in pursuit of Irico's independent interests. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Irico relies on the following evidence to support its contention that at all times its acts or practices were undertaken unilaterally for legitimate business reasons and in pursuit of Irico's independent interests: Reply Brief of Irico In Support of Motion to Set Aside Default at 10-11, ECF No. 5229; Exs. A – F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF Nos. 5229-02 through -07; IRI-CRT-00010133; IRI-CRT-00010449; IRI-CRT-00010468; IRI-CRT-00026812; IRI-CRT-00030226; IRI-CRT-00030865; IRI-CRT-00031457; BMCC-CRT000002761; BMCC-CRT000002762; CHU00029175E; CHU00029179E; CHU00029259E; CHU00030067E; CHU00030777E; CHU00030941E; CHU00030973E; CHU00031018E; CHU00031032; CHU00031044E; and, CHU00031070E.

Irico further contends that Irico's pricing-related conduct was compelled by the Chinese government and based on duly enacted laws and/or regulations of the People's Republic of China. Irico relies on the following evidence to support this contention:

- The State Planning Commission and the State Economic and Trade Commission issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-02.

- Notice of the State Planning Commission on Issuing the "Measures for the Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial Implementation)" – effective as of March 1, 1999. *See* https://law.lawtime.cn/d448076453170.html.

- Notice of the State Planning Commission and the Ministry of Information Industry on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex. B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-03.

- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.

- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-04.

- Notice on the issuance of the average production cost of certain types of color TV industries issued by the Ministry of Information Industry on August 25, 2000. *See* Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-06.

- Notice on the issuance of the average production cost of some industries of color picture tubes issued by the Ministry of Information Industry on September 14, 2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-07.

Irico identifies the following employees as having knowledge regarding this Interrogatory: Wang Zhaojie and Su Xiaohua.

**INTERROGATORY RESPONSE AS TO IRICO'S NINTH DEFENSE**

Plaintiffs' claims and claims of any putative class members are barred, in whole or in part, because Plaintiffs and/or certain members of the putative classes have failed to allege "antitrust injury" – i.e., injury that is of the type the antitrust laws were intended to remedy.

**RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico further objects to this interrogatory to the extent that it improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

Subject to and without waiving the objections stated above, Irico asserts that Plaintiffs have not established facts that demonstrate that they were actually or proximately injured by reason of any act or omission by Irico. Irico further states that Plaintiffs were not actually or proximately injured by reason of any act or omission by Irico because Irico did not conspire or enter into any agreements regarding the price of CRTs in the United States market, and did not violate any of the laws set forth in the Plaintiffs' Amended Complaint.

Irico states that because Plaintiffs seek to recover for purchases of CRT products as indirect purchasers, Plaintiffs have failed to meet their burden of demonstrating they were injured in a way that the antitrust laws were enacted to prevent. The Ninth Circuit has established that in the absence of a direct relationship with the defendants, a Plaintiffs must be a participant in the allegedly restrained market in order to have suffered "antitrust injury." *See Am. Ad. Mgmt., Inc. v. General Tel. Co.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("Antitrust injury requires the Plaintiffs to have suffered its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury"); see also *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters* ("*AGC*"), 549 U.S. 519, 538 (1983) (antitrust laws are designed to "protect[] the economic freedom of participants in the relevant market").

Additionally, Irico states that Plaintiffs have not come forward with a reliable methodology to prove the existence of the amount, if any, of pass-through injury to all members of the class. Although not limited to the following, Irico relies on the information contained in the Expert Report of Janusz A. Ordover, Ph.D., August 5, 2014 (IPP Action) at 14-36, and the Expert Report of Janusz A. Ordover, Ph.D., August 5, 2014 (Various DAP Actions) at 14-30.

Irico further states that various retailers have testified that they did not uniformly pass through any price increases in CRT Products to consumers. This evidence further establishes that Plaintiffs have not and cannot show which members, if any, of the indirect purchaser class have suffered any alleged injury. Although not limited to the following, Irico relies on the following information: Deposition Tr. of Brian Stone, Dec. 3, 2012 ("Stone Dep. Tr."), at 117:4-22 ("Cost increases that a manufacturer is intending to push across may not be reflected in the overall pricing for the end consumer based upon Best Buy's company's strategy, intent of that product category, the product availability, and the overall competitive nature of the . . . space."); id. at 167:21-169:1 ("There could be instances where due to competitive pricing forces costs could go up, but retail pricing may not be able to go up based upon in-country availability of products, competitive forces, seasonality."); Rule 30(b)(6) Deposition of Office Depot July 24, 2014 ("Office Depot 30(b)(6) Dep. Tr."), at 147:16-148:7 ("[W]e will look at the market, we will look at what's in the market, look at the competitive intelligence of what people are carrying, what they are selling production for, what's in our current assortment, what we're charging for that, and in most cases you cannot increase and pass, the customers just won't buy it because it will be overpriced."); Rule 30(b)(6) Deposition Tr. of Interbond Corp. of America, d/b/a Brandsmart USA (through witness Larry Sinewitz), Feb. 6, 2014 ("Interbond 30(b)(6) Dep. Tr."), at 287:13-20; Deposition Tr. of Aimee Fields, June 4, 2014 ("Fields Dep. Tr."), at 125:12-126:3; Rule 30(b)(6) Deposition Tr. of Fry's Electronics (through witness Raj Seth) (rough transcript), Aug. 27, 2014 ("Fry's 30(b)(6) Dep. Tr."), at 182:6-184:10; Rule 30(b)(6) Deposition Tr. of TigerDirect, Inc. (through witness George Ali) (rough transcript), Aug. 28, 2014 ("TigerDirect 30(b)(6) Dep. Tr.").

**INTERROGATORY RESPONSE AS TO IRICO'S TENTH DEFENSE**

Plaintiffs' claims and claims of any putative class members are barred, in whole or in part, because any acts or practices of [Group or Display] that are the subject of the Complaint were cost justified or otherwise economically justified and resulted from a good faith effort to meet competition or market conditions.

**RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion.

Subject to and without waiving the objections stated above, Irico contends that its acts or practices were cost justified or otherwise economically justified, and resulted from a good faith effort to meet competition or market conditions. In addition, Irico asserts no evidence has been brought in the above captioned matter that indicates any action or practice of Irico was not cost justified, otherwise economically justified, or did not result from a good faith effort to meet competition or market conditions. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Irico relies on the following evidence to support its contention that at all times its acts or practices were cost justified or otherwise economically justified, and resulted from a good faith effort to meet competition or market conditions: Reply Brief of Irico In Support of Motion to Set Aside Default at 10-11, ECF No. 5229; Exs. A – F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF Nos. 5229-02 through -07; IRI-CRT-00010133; IRI-CRT-00010449; IRI-CRT-00010468; IRI-CRT-00026812; IRI-CRT-00030226; IRI-CRT-00030865; IRI-CRT-00031457; BMCC-CRT000002761; BMCC-CRT000002762; CHU00029175E; CHU00029179E; CHU00029259E; CHU00030067E; CHU00030777E; CHU00030941E; CHU00030973E; CHU00031018E; CHU00031032; CHU00031044E; and, CHU00031070E.

Irico identifies the following employees as having knowledge regarding this Interrogatory: Wang Zhaojie and Su Xiaohua.

**INTERROGATORY RESPONSE AS TO IRICO'S ELEVENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because the alleged conduct of [Group or Display] that is the subject of the Complaint was caused by, due to, based upon, or in response to directives, laws, regulations, policies, and/or acts of governments, governmental agencies and entities, and/or regulatory agencies, and such is non-actionable or privileged.

**RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion.

Subject to and without waiving the objections stated above, Irico contends that Irico's pricing-related conduct was compelled by the Chinese government and based on duly enacted laws and/or regulations of the People's Republic of China. Irico relies on the following evidence to support this contention:

- The State Planning Commission and the State Economic and Trade Commission issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-02.
- Notice of the State Planning Commission on Issuing the "Measures for the Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial Implementation)" – effective as of March 1, 1999. *See* https://law.lawtime.cn/d448076453170.html..
- Notice of the State Planning Commission and the Ministry of Information Industry on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex.

B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-03.

- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.
- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-04.
- Notice on the issuance of the average production cost of certain types of color TV industries issued by the Ministry of Information Industry on August 25, 2000. *See* Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-06.
- Notice on the issuance of the average production cost of some industries of color picture tubes issued by the Ministry of Information Industry on September 14, 2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-07.

Irico identifies the following employees as having knowledge regarding this Interrogatory: Wang Zhaojie and Su Xiaohua.

**INTERROGATORY RESPONSE AS TO IRICO'S TWELFTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because the alleged conduct of [Group or Display] that is the subject of the Complaint was caused by or in response to duly enacted laws and/or regulations of the People's Republic of China and is therefore protected under the foreign sovereign compulsion doctrine, the act of state doctrine, and international comity.

**RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See*

*Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion.

Subject to and without waiving the objections stated above, Irico contends that Irico's pricing-related conduct was compelled by the Chinese government and based on duly enacted laws and/or regulations of the People's Republic of China. Irico relies on the following evidence to support this contention:

- The State Planning Commission and the State Economic and Trade Commission issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-02.
- Notice of the State Planning Commission on Issuing the "Measures for the Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial Implementation)" – effective as of March 1, 1999. *See* https://law.lawtime.cn/d448076453170.html.
- Notice of the State Planning Commission and the Ministry of Information Industry on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex. B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-03.
- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.
- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to

the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-04.

- Notice on the issuance of the average production cost of certain types of color TV industries issued by the Ministry of Information Industry on August 25, 2000. *See* Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-06.
- Notice on the issuance of the average production cost of some industries of color picture tubes issued by the Ministry of Information Industry on September 14, 2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-07.

Irico identifies the following employees as having knowledge regarding this Interrogatory: Wang Zhaojie and Su Xiaohua.

**<u>INTERROGATORY RESPONSE AS TO IRICO'S THIRTEENTH DEFENSE</u>**

Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part, because no Plaintiffs has been injured in its business or property by reason of any action of Group.

**<u>RESPONSE</u>**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico further objects to this interrogatory to the extent that it improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

Subject to and without waiving the objections stated above, Irico asserts that Plaintiffs have not established facts that demonstrate that they were actually or proximately injured by reason of any act or omission by Irico. Irico further states that Plaintiffs were not actually or proximately injured by reason of any act or omission by Irico because Irico did not conspire or enter into any agreements regarding the price of CRTs in the United States market, and did not

violate any of the laws set forth in the Plaintiffs' Amended Complaint.

Irico states that because Plaintiffs seek to recover for purchases of CRT products as indirect purchasers, Plaintiffs have failed to meet their burden of demonstrating they were injured in a way that the antitrust laws were enacted to prevent. The Ninth Circuit has established that in the absence of a direct relationship with the defendants, a Plaintiffs must be a participant in the allegedly restrained market in order to have suffered "antitrust injury." *See Am. Ad. Mgmt., Inc. v. General Tel. Co.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("Antitrust injury requires the Plaintiffs to have suffered its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury"); see also *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters* ("*AGC*"), 549 U.S. 519, 538 (1983) (antitrust laws are designed to "protect[] the economic freedom of participants in the relevant market").

Additionally, Irico states that Plaintiffs have not come forward with a reliable methodology to prove the existence of the amount, if any, of pass-through injury to all members of the class. Although not limited to the following, Irico relies on the information contained in the Expert Report of Janusz A. Ordover, Ph.D., August 5, 2014 (IPP Action) at 14-36, and the Expert Report of Janusz A. Ordover, Ph.D., August 5, 2014 (Various DAP Actions) at 14-30.

Irico further states that various retailers have testified that they did not uniformly pass through any price increases in CRT Products to consumers. This evidence further establishes that Plaintiffs have not and cannot show which members, if any, of the indirect purchaser class have suffered any alleged injury. Although not limited to the following, Irico relies on the following information: Deposition Tr. of Brian Stone, Dec. 3, 2012 ("Stone Dep. Tr."), at 117:4-22 ("Cost increases that a manufacturer is intending to push across may not be reflected in the overall pricing for the end consumer based upon Best Buy's company's strategy, intent of that product category, the product availability, and the overall competitive nature of the . . . space."); id. at 167:21-169:1 ("There could be instances where due to competitive pricing forces costs could go up, but retail pricing may not be able to go up based upon in-country availability of products, competitive forces, seasonality."); Rule 30(b)(6) Deposition of Office Depot July 24, 2014

("Office Depot 30(b)(6) Dep. Tr."), at 147:16-148:7 ("[W]e will look at the market, we will look at what's in the market, look at the competitive intelligence of what people are carrying, what they are selling production for, what's in our current assortment, what we're charging for that, and in most cases you cannot increase and pass, the customers just won't buy it because it will be overpriced."); Rule 30(b)(6) Deposition Tr. of Interbond Corp. of America, d/b/a Brandsmart USA (through witness Larry Sinewitz), Feb. 6, 2014 ("Interbond 30(b)(6) Dep. Tr."), at 287:13-20; Deposition Tr. of Aimee Fields, June 4, 2014 ("Fields Dep. Tr."), at 125:12-126:3; Rule 30(b)(6) Deposition Tr. of Fry's Electronics (through witness Raj Seth) (rough transcript), Aug. 27, 2014 ("Fry's 30(b)(6) Dep. Tr."), at 182:6-184:10; Rule 30(b)(6) Deposition Tr. of TigerDirect, Inc. (through witness George Ali) (rough transcript), Aug. 28, 2014 ("TigerDirect 30(b)(6) Dep. Tr.").

**INTERROGATORY RESPONSE AS TO IRICO'S FOURTEENTH DEFENSE**

Plaintiffs' claims and claims of any putative class members are barred, in whole or in part, because any alleged injuries and/or damages were not legally or proximately caused by any acts or omissions of [Group or Display] and/or were caused, if at all, solely and proximately by the conduct of third parties including, without limitations, the prior, intervening or superseding conduct of such third parties.

**RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion.

Subject to and without waiving the objections stated above, Irico contends that Irico's pricing-related conduct was compelled by the Chinese government and based on duly enacted laws and/or regulations of the People's Republic of China. Irico relies on the following evidence to support this contention:

- The State Planning Commission and the State Economic and Trade Commission issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-02.
- Notice of the State Planning Commission on Issuing the "Measures for the Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial Implementation)" – effective as of March 1, 1999. *See* https://law.lawtime.cn/d448076453170.html.
- Notice of the State Planning Commission and the Ministry of Information Industry on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex. B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-03.
- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.
- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-04.
- Notice on the issuance of the average production cost of certain types of color TV industries issued by the Ministry of Information Industry on August 25, 2000. *See* Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-06.
- Notice on the issuance of the average production cost of some industries of color picture tubes issued by the Ministry of Information Industry on September 14,

2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-07.

Irico identifies the following employees as having knowledge regarding this Interrogatory: Wang Zhaojie and Su Xiaohua.

**INTERROGATORY RESPONSE AS TO IRICO'S FIFTEENTH DEFENSE**

To the extent that any actionable conduct occurred, Plaintiffs claims and the claims of any putative class members against [Group or Display] are barred because all such conduct would have been committed by individuals acting *ultra vires.*

**RESPONSE**

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that it affirms its prior response. *See* Irico Defendants' Second Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, June 25, 2021.

**INTERROGATORY RESPONSE AS TO IRICO'S SIXTEENTH DEFENSE**

Plaintiffs' claims should be dismissed to the extent they are barred, in whole or in part, because any injury or damage alleged in the Complaint, which [Group or Display] specifically denies, was passed on to persons or entities other than the Plaintiffs and/or was passed on by Plaintiffs to other parties.

**RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico further objects to this interrogatory to the extent that it improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

Subject to and without waiving the objections stated above, Irico asserts that Plaintiffs have not established facts that demonstrate that they were actually or proximately injured by reason of any act or omission by Irico. Irico further states that Plaintiffs were not actually or

proximately injured by reason of any act or omission by Irico because Irico did not conspire or enter into any agreements regarding the price of CRTs in the United States market, and did not violate any of the laws set forth in the Plaintiffs' Amended Complaint.

Irico states that because Plaintiffs seek to recover for purchases of CRT products as indirect purchasers, Plaintiffs have failed to meet their burden of demonstrating they were injured in a way that the antitrust laws were enacted to prevent. The Ninth Circuit has established that in the absence of a direct relationship with the defendants, a Plaintiffs must be a participant in the allegedly restrained market in order to have suffered "antitrust injury." *See Am. Ad. Mgmt., Inc. v. General Tel. Co.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("Antitrust injury requires the Plaintiffs to have suffered its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury"); see also *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters* ("*AGC*"), 549 U.S. 519, 538 (1983) (antitrust laws are designed to "protect[] the economic freedom of participants in the relevant market").

Irico further states that various retailers have testified that they did not uniformly pass through any price increases in CRT Products to consumers. This evidence further establishes that Plaintiffs have not and cannot show which members, if any, of the indirect purchaser class have suffered any alleged injury. Although not limited to the following, Irico relies on the following information: Deposition Tr. of Brian Stone, Dec. 3, 2012 ("Stone Dep. Tr."), at 117:4-22 ("Cost increases that a manufacturer is intending to push across may not be reflected in the overall pricing for the end consumer based upon Best Buy's company's strategy, intent of that product category, the product availability, and the overall competitive nature of the . . . space."); id. at 167:21-169:1 ("There could be instances where due to competitive pricing forces costs could go up, but retail pricing may not be able to go up based upon in-country availability of products, competitive forces, seasonality."); Rule 30(b)(6) Deposition of Office Depot July 24, 2014 ("Office Depot 30(b)(6) Dep. Tr."), at 147:16-148:7 ("[W]e will look at the market, we will look at what's in the market, look at the competitive intelligence of what people are carrying, what they are selling production for, what's in our current assortment, what we're charging for that, and

in most cases you cannot increase and pass, the customers just won't buy it because it will be overpriced."); Rule 30(b)(6) Deposition Tr. of Interbond Corp. of America, d/b/a Brandsmart USA (through witness Larry Sinewitz), Feb. 6, 2014 ("Interbond 30(b)(6) Dep. Tr."), at 287:13-20; Deposition Tr. of Aimee Fields, June 4, 2014 ("Fields Dep. Tr."), at 125:12-126:3; Rule 30(b)(6) Deposition Tr. of Fry's Electronics (through witness Raj Seth) (rough transcript), Aug. 27, 2014 ("Fry's 30(b)(6) Dep. Tr."), at 182:6-184:10; Rule 30(b)(6) Deposition Tr. of TigerDirect, Inc. (through witness George Ali) (rough transcript), Aug. 28, 2014 ("TigerDirect 30(b)(6) Dep. Tr.").

**INTERROGATORY RESPONSE AS TO IRICO'S SEVENTEENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, to the extent they are based on alleged acts, conduct or statements that are specifically permitted by law.

**RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion.

Subject to and without waiving the objections stated above, Irico contends that Irico's pricing-related conduct was compelled by the Chinese government and based on duly enacted laws and/or regulations of the People's Republic of China. Irico relies on the following evidence to support this contention:

- The State Planning Commission and the State Economic and Trade Commission issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-02.
- Notice of the State Planning Commission on Issuing the "Measures for the Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial

Implementation)" – effective as of March 1, 1999. *See* https://law.lawtime.cn/d448076453170.html.

- Notice of the State Planning Commission and the Ministry of Information Industry on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex. B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-03.
- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.
- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-04.
- Notice on the issuance of the average production cost of certain types of color TV industries issued by the Ministry of Information Industry on August 25, 2000. *See* Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-06.
- Notice on the issuance of the average production cost of some industries of color picture tubes issued by the Ministry of Information Industry on September 14, 2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-07.

Irico identifies the following employees as having knowledge regarding this Interrogatory: Wang Zhaojie and Su Xiaohua.

**INTERROGATORY RESPONSE AS TO IRICO'S EIGHTEENTH DEFENSE**

Plaintiffs' claims should be dismissed, in whole or in part, because Plaintiffs and/or certain members of the putative class failed to take all necessary, reasonable, and appropriate actions to mitigate their alleged damages, if any.

**RESPONSE**

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that it affirms its prior response. *See* Irico Defendants' Second Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, June 25, 2021.

**INTERROGATORY RESPONSE AS TO IRICO'S NINETEENTH DEFENSE**

Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part, because Plaintiffs and/or certain members of the putative class would be unjustly enriched if they were allowed to recover any part of the damages alleged in the Amended Complaint.

**RESPONSE**

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that it affirms its prior response. *See* Irico Defendants' Second Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, June 25, 2021.

**INTERROGATORY RESPONSE AS TO IRICO'S TWENTIETH DEFENSE**

Without admitting that Plaintiffs are entitled to recover damages in this matter, Group is entitled to set off from any recovery Plaintiffs may obtain against Group any amount paid to Plaintiffs by any other Defendants who have settled, or do settle, Plaintiffs' claims in this matter.

**RESPONSE**

Irico further objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion.

Subject to and without waiving the objections stated above, Irico states that a Plaintiffs who recovers damages from one co-conspirator, whether by verdict or settlement, may not recover those same damages again from another co-conspirator. *See* Order Granting Final

Approval, ECF No. 5786 (approving IPP settlements with Philips, Panasonic, Hitachi, Toshiba, Samsung, and Thomson/TDA); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 348 (1971); *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1389 (9th Cir. 1987); *Husky Refining Co. v. Barnes*, 119 F.2d 715, 716 (9th Cir. 1941); *In re Piper Aircraft*, 792 F. Supp. 1189, 1190-91 (N.D. Cal. 1992). While Irico maintains that the evidence does not prove that it conspired or entered into any agreements regarding the price of CRTs in the United States market, or violated any of the laws set forth in IPPs' Complaint, if it were proven that Irico conspired or agreed to fix prices, as alleged, any recovery would need to be reduced by settlements with other defendants in this or related matters.

Additionally, Irico states that applicable state law prohibits duplicative recovery by multiple direct or indirect purchasers. *See, e.g.*, N.Y. Gen. Bus. Law § 340(6) ("In actions where both direct and indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for damages that the illegal overcharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of damages."); *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787 (2010) (holding that under California law, "[i]n instances where multiple levels of purchasers have sued, or where a risk remains they may sue . . . if damages must be allocated among the various levels of injured purchasers, the bar on consideration of the pass-on evidence must necessarily be lifted . . . ."); Haw. Rev. Stat. § 480-13 (2011) ("In class actions or de facto class actions where both direct and indirect purchasers are involved, or where more than one class of indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for compensatory damages that the illegal overcharge has been passed on or passed back to others who are themselves entitled to recover so as to avoid the duplication of recovery of compensatory damages."); Neb. Rev. Stat. § 59-821.01 (2012) ("A defendant may prove, as a partial or complete defense to a claim for damages under sections 59-801 to 59-831 and this section, that the illegal overcharge or undercharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of such damages . . . ."); N.D. Cent. Code § 51-08.1-08 ("In any action for damages under this section, any defendant, as a partial or complete defense against a claim for

damages, is entitled to prove that the Plaintiffs purchaser, or seller in the chain of manufacture, production, or distribution, who paid any overcharge or received any underpayment passed on all or any part of the overcharge or underpayment to another purchaser or seller in that action.").

**INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-FIRST DEFENSE**

To the extent that any actionable conduct occurred for which [Group or Display] is liable, some or all of Plaintiffs' claims against [Group or Display] are barred because [Group or Display] withdrew from and/or abandoned any alleged conspiracy and thus Plaintiffs cannot establish liability or compensable damages as a matter of law on the basis that, among other things, [Group or Display] withdrew and/or abandoned any alleged conspiracy prior to the commencement of the limitations period set forth in applicable statutes of limitations.

**RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures have not been completed. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion.

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds as follows: Based on further investigation, Irico renews its Twenty-First Defense. Irico understands that Plaintiff has alleged a single global conspiracy encompassing all CRTs, including both color picture tubes ("CPTs") and color display tubes ("CDTs") sold during the Relevant Period. Irico denies participating in any such conspiracy, and also contends that the conspiracy as alleged by plaintiffs is inappropriately broad as it includes multiple categories of CRTs, including different sizes and types, that are not functional substitutes in use. *See* Heiser (Hitachi) Dep. 46:24-47:23; Michael Son (SDI) Dep. 318:20-319:9; Jae In Lee (SDI) Dep. 212:1-213:2; Chih Chun Liu (Chunghwa) Dep. 502:2-19; Phillip Johnson Dep. 27:6-28:6. Irico contends that, if any CRT-related conspiracy existed, as a matter of economic feasibility it could not encompass both CPTs and CDTs.

Irico contends that it ceased production and sale of CDTs no later than 2004 and thus

could not have participated in any conspiracy to fix prices or restrain production of CDTs, if any such conspiracy existed, after that time. Irico identifies the following evidence in support of its Twenty-First Defense: IRI-CRT-00031179 through -31215; witnesses Wang Zhaojie and Su Xiaohua. Irico further refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT sales records.

**INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-SECOND DEFENSE**

Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part, by the doctrines of waiver and/or estoppel.

**RESPONSE**

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that it affirms its prior response. *See* Irico Defendants' Second Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, June 25, 2021.

**INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-THIRD DEFENSE**

Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part, by the equitable doctrine of laches.

**RESPONSE**

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that it affirms its prior response. *See* Irico Defendants' Second Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, June 25, 2021.

**INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-FOURTH DEFENSE**

Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part, by the equitable doctrine of unclean hands.

**RESPONSE**

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that it affirms its prior response. *See* Irico Defendants' Second

Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, June 25, 2021.

**INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-FIFTH DEFENSE**

Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part, by Plaintiffs' and/or certain members of the putative class acquiescence and/or confirmation of any and all conduct and/or omissions alleged as to [Group or Display].

**RESPONSE**

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that it affirms its prior response. *See* Irico Defendants' Second Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, June 25, 2021.

**INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-SIXTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, by the doctrine of accord and satisfaction.

**RESPONSE**

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that it affirms its prior response. *See* Irico Defendants' Second Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, June 25, 2021.

**INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-SEVENTH DEFENSE**

The Amended Complaint should be dismissed on the grounds of forum non conveniens.

**RESPONSE**

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that Irico withdraws its Twenty-Seventh Defense.

**INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-EIGHTH DEFENSE**

Plaintiffs' claims and claims of any putative class members against Group are barred to the extent that they have agreed to arbitration or chosen a different forum for the resolution of their claims.

**RESPONSE**

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that Irico withdraws its Twenty-Eighth Defense.

**INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-NINTH DEFENSE**

Plaintiffs' claims for injunctive relief should be dismissed because Plaintiffs and/or certain members of the putative class have available an adequate remedy at law.

**RESPONSE**

Irico further objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico also objects to this interrogatory to the extent that it improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

Subject to and without waiving the objections stated above, Irico contends that Plaintiffs' claims for injunctive relief should be dismissed because Plaintiffs have an available adequate remedy at law. *See Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998) ("Injunctive relief is proper only if monetary damages or other legal remedies will not compensate the Plaintiffs for their injuries."). To be entitled to an injunction, Plaintiffs must establish that there is a threat of injury. However, there is no continuing harm or continuing injury that could be enjoined. Plaintiffs also do not allege that there was a continuing conspiracy after 2007. Therefore, there are no grounds for an injunction. Although not limited to the following, Irico relies on the following evidence to support the contention that Plaintiffs' claims for injunctive relief should be dismissed: Defendants' Motion to Dismiss the State of Florida's Complaint, July 3, 2012 (ECF No. 1248) and Stipulation and Order Dismissing the Claims of Plaintiffs State of Florida, December 10, 2012 (ECF No. 1480).

**INTERROGATORY RESPONSE AS TO IRICO'S THIRTIETH DEFENSE**

Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part, for failure to join indispensable parties.

**RESPONSE**

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that it affirms its prior response. *See* Irico Defendants' Second Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' First Set of

Interrogatories, June 25, 2021.

**INTERROGATORY RESPONSE AS TO IRICO'S THIRTY-FIRST DEFENSE**

Plaintiffs' claims and claims of any putative class members are barred, in whole or in part, to the extent they seek an improper multiple punitive award for a single wrong because such an award would violate [Group or Display]'s rights guaranteed by the Due Process clause of the Fifth Amendment of the United States Constitution.

**RESPONSE**

Irico further objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico also objects to this interrogatory on the grounds that it is premature at this stage in the proceedings as damages have not been awarded.

Subject to and without waiving the objections stated above, Irico states that a Plaintiffs who recovers damages from one co-conspirator, whether by verdict or settlement, may not recover those same damages again from another co-conspirator. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 348 (1971); *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1389 (9th Cir. 1987); *Husky Refining Co. v. Barnes*, 119 F.2d 715, 716 (9th Cir. 1941); *In re Piper Aircraft*, 792 F. Supp. 1189, 1190-91 (N.D. Cal. 1992). While Irico maintains that the evidence does not prove that it conspired or entered into any agreements regarding the price of CRTs in the United States market, or violated any of the laws set forth in Plaintiffs' Complaint, if it were proven that Irico conspired or agreed to fix prices, as alleged, any recovery would need to be reduced by settlements with other defendants in this or related matters.

Additionally, Irico states that applicable state law prohibits duplicative recovery by multiple direct or indirect purchasers. *See, e.g.*, N.Y. Gen. Bus. Law § 340(6) ("In actions where both direct and indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for damages that the illegal overcharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of damages."); *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787 (2010) (holding that under California law, "[i]n instances where multiple levels of purchasers have sued, or where a risk remains they may sue . . . if damages must be allocated among the various levels of injured purchasers, the bar

on consideration of the pass-on evidence must necessarily be lifted . . . ."); Haw. Rev. Stat. § 480-13 (2011) ("In class actions or de facto class actions where both direct and indirect purchasers are involved, or where more than one class of indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for compensatory damages that the illegal overcharge has been passed on or passed back to others who are themselves entitled to recover so as to avoid the duplication of recovery of compensatory damages."); Neb. Rev. Stat. § 59-821.01 (2012) ("A defendant may prove, as a partial or complete defense to a claim for damages under sections 59-801 to 59-831 and this section, that the illegal overcharge or undercharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of such damages . . . ."); N.D. Cent. Code § 51-08.1-08 ("In any action for damages under this section, any defendant, as a partial or complete defense against a claim for damages, is entitled to prove that the Plaintiffs purchaser, or seller in the chain of manufacture, production, or distribution, who paid any overcharge or received any underpayment passed on all or any part of the overcharge or underpayment to another purchaser or seller in that action.").

**INTERROGATORY RESPONSE AS TO IRICO'S THIRTY-SECOND DEFENSE**

Plaintiffs' claims and claims of any putative class members are barred, in whole or in part, to the extent they seek an improper multiple punitive award for a single wrong because such an award would violate [Group or Display]'s rights guaranteed by the Due Process provision of the Fourteenth Amendment of the United States Constitution.

**RESPONSE**

Irico further objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico also objects to this interrogatory on the grounds that it is premature at this stage in the proceedings as damages have not been awarded.

Subject to and without waiving the objections stated above, Irico states that a Plaintiffs who recovers damages from one co-conspirator, whether by verdict or settlement, may not recover those same damages again from another co-conspirator. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 348 (1971); *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1389 (9th Cir. 1987); *Husky Refining Co. v. Barnes*, 119 F.2d 715, 716 (9th Cir. 1941); *In re*

*Piper Aircraft*, 792 F. Supp. 1189, 1190-91 (N.D. Cal. 1992). While Irico maintains that the evidence does not prove that it conspired or entered into any agreements regarding the price of CRTs in the United States market, or violated any of the laws set forth in Plaintiffs' Complaint, if it were proven that Irico conspired or agreed to fix prices, as alleged, any recovery would need to be reduced by settlements with other defendants in this or related matters.

Additionally, Irico states that applicable state law prohibits duplicative recovery by multiple direct or indirect purchasers. See, e.g., N.Y. Gen. Bus. Law § 340(6) ("In actions where both direct and indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for damages that the illegal overcharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of damages."); *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787 (2010) (holding that under California law, "[i]n instances where multiple levels of purchasers have sued, or where a risk remains they may sue . . . if damages must be allocated among the various levels of injured purchasers, the bar on consideration of the pass-on evidence must necessarily be lifted . . . ."); Haw. Rev. Stat. § 480-13 (2011) ("In class actions or de facto class actions where both direct and indirect purchasers are involved, or where more than one class of indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for compensatory damages that the illegal overcharge has been passed on or passed back to others who are themselves entitled to recover so as to avoid the duplication of recovery of compensatory damages."); Neb. Rev. Stat. § 59-821.01 (2012) ("A defendant may prove, as a partial or complete defense to a claim for damages under sections 59-801 to 59-831 and this section, that the illegal overcharge or undercharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of such damages . . . ."); N.D. Cent. Code § 51-08.1-08 ("In any action for damages under this section, any defendant, as a partial or complete defense against a claim for damages, is entitled to prove that the Plaintiffs purchaser, or seller in the chain of manufacture, production, or distribution, who paid any overcharge or received any underpayment passed on all or any part of the overcharge or underpayment to another purchaser or seller in that action.").

**INTERROGATORY RESPONSE AS TO IRICO'S THIRTY-THIRD DEFENSE**

Plaintiffs' claims and claims of any putative class members are barred, in whole or in part, to the extent they seek an improper multiple punitive award for a single wrong because such an award would violate [Group or Display]'s rights guaranteed by the Equal Protection provision of the Fourteenth Amendment of the United States Constitution.

**RESPONSE**

Irico further objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico also objects to this interrogatory on the grounds that it is premature at this stage in the proceedings as damages have not been awarded.

Subject to and without waiving the objections stated above, Irico states that a Plaintiffs who recovers damages from one co-conspirator, whether by verdict or settlement, may not recover those same damages again from another co-conspirator. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 348 (1971); *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1389 (9th Cir. 1987); *Husky Refining Co. v. Barnes*, 119 F.2d 715, 716 (9th Cir. 1941); *In re Piper Aircraft*, 792 F. Supp. 1189, 1190-91 (N.D. Cal. 1992). While Irico maintains that the evidence does not prove that it conspired or entered into any agreements regarding the price of CRTs in the United States market, or violated any of the laws set forth in Plaintiffs' Complaint, if it were proven that Irico conspired or agreed to fix prices, as alleged, any recovery would need to be reduced by settlements with other defendants in this or related matters.

Additionally, Irico states that applicable state law prohibits duplicative recovery by multiple direct or indirect purchasers. See, e.g., N.Y. Gen. Bus. Law § 340(6) ("In actions where both direct and indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for damages that the illegal overcharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of damages."); *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787 (2010) (holding that under California law, "[i]n instances where multiple levels of purchasers have sued, or where a risk remains they may sue . . . if damages must be allocated among the various levels of injured purchasers, the bar on consideration of the pass-on evidence must necessarily be lifted . . . ."); Haw. Rev. Stat. § 480-

13 (2011) ("In class actions or de facto class actions where both direct and indirect purchasers are involved, or where more than one class of indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for compensatory damages that the illegal overcharge has been passed on or passed back to others who are themselves entitled to recover so as to avoid the duplication of recovery of compensatory damages."); Neb. Rev. Stat. § 59-821.01 (2012) ("A defendant may prove, as a partial or complete defense to a claim for damages under sections 59-801 to 59-831 and this section, that the illegal overcharge or undercharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of such damages . . . ."); N.D. Cent. Code § 51-08.1-08 ("In any action for damages under this section, any defendant, as a partial or complete defense against a claim for damages, is entitled to prove that the Plaintiffs purchaser, or seller in the chain of manufacture, production, or distribution, who paid any overcharge or received any underpayment passed on all or any part of the overcharge or underpayment to another purchaser or seller in that action.").

**INTERROGATORY RESPONSE AS TO IRICO'S THIRTY-FOURTH DEFENSE**

Plaintiffs' claims and claims of any putative class members are barred, in whole or in part, to the extent they seek an improper multiple punitive award for a single wrong because such an award would violate [Group or Display]'s rights guaranteed by the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution.

**RESPONSE**

Irico further objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico also objects to this interrogatory on the grounds that it is premature at this stage in the proceedings as damages have not been awarded.

Subject to and without waiving the objections stated above, Irico states that a Plaintiffs who recovers damages from one co-conspirator, whether by verdict or settlement, may not recover those same damages again from another co-conspirator. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 348 (1971); *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1389 (9th Cir. 1987); *Husky Refining Co. v. Barnes*, 119 F.2d 715, 716 (9th Cir. 1941); *In re Piper Aircraft*, 792 F. Supp. 1189, 1190-91 (N.D. Cal. 1992). While Irico maintains that the

evidence does not prove that it conspired or entered into any agreements regarding the price of CRTs in the United States market, or violated any of the laws set forth in Plaintiffs' Complaint, if it were proven that Irico conspired or agreed to fix prices, as alleged, any recovery would need to be reduced by settlements with other defendants in this or related matters.

Additionally, Irico states that applicable state law prohibits duplicative recovery by multiple direct or indirect purchasers. See, e.g., N.Y. Gen. Bus. Law § 340(6) ("In actions where both direct and indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for damages that the illegal overcharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of damages."); *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787 (2010) (holding that under California law, "[i]n instances where multiple levels of purchasers have sued, or where a risk remains they may sue . . . if damages must be allocated among the various levels of injured purchasers, the bar on consideration of the pass-on evidence must necessarily be lifted . . . ."); Haw. Rev. Stat. § 480-13 (2011) ("In class actions or de facto class actions where both direct and indirect purchasers are involved, or where more than one class of indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for compensatory damages that the illegal overcharge has been passed on or passed back to others who are themselves entitled to recover so as to avoid the duplication of recovery of compensatory damages."); Neb. Rev. Stat. § 59-821.01 (2012) ("A defendant may prove, as a partial or complete defense to a claim for damages under sections 59-801 to 59-831 and this section, that the illegal overcharge or undercharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of such damages . . . ."); N.D. Cent. Code § 51-08.1-08 ("In any action for damages under this section, any defendant, as a partial or complete defense against a claim for damages, is entitled to prove that the Plaintiffs purchaser, or seller in the chain of manufacture, production, or distribution, who paid any overcharge or received any underpayment passed on all or any part of the overcharge or underpayment to another purchaser or seller in that action.").

**INTERROGATORY RESPONSE AS TO IRICO'S THIRTY-FIFTH DEFENSE**

Plaintiffs' claims and claims of any putative class members are barred, in whole or in part, to the extent they seek an improper multiple punitive award for a single wrong because such an award would violate [Group or Display]'s rights guaranteed by the Excessive Fines provision of the Eighth Amendment of the United States Constitution.

**RESPONSE**

Irico further objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico also objects to this interrogatory on the grounds that it is premature at this stage in the proceedings as damages have not been awarded.

Subject to and without waiving the objections stated above, Irico states that a Plaintiffs who recovers damages from one co-conspirator, whether by verdict or settlement, may not recover those same damages again from another co-conspirator. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 348 (1971); *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1389 (9th Cir. 1987); *Husky Refining Co. v. Barnes*, 119 F.2d 715, 716 (9th Cir. 1941); *In re Piper Aircraft*, 792 F. Supp. 1189, 1190-91 (N.D. Cal. 1992). While Irico maintains that the evidence does not prove that it conspired or entered into any agreements regarding the price of CRTs in the United States market, or violated any of the laws set forth in Plaintiffs' Complaint, if it were proven that Irico conspired or agreed to fix prices, as alleged, any recovery would need to be reduced by settlements with other defendants in this or related matters.

Additionally, Irico states that applicable state law prohibits duplicative recovery by multiple direct or indirect purchasers. See, e.g., N.Y. Gen. Bus. Law § 340(6) ("In actions where both direct and indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for damages that the illegal overcharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of damages."); *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787 (2010) (holding that under California law, "[i]n instances where multiple levels of purchasers have sued, or where a risk remains they may sue . . . if damages must be allocated among the various levels of injured purchasers, the bar on consideration of the pass-on evidence must necessarily be lifted . . . ."); Haw. Rev. Stat. § 480-

13 (2011) ("In class actions or de facto class actions where both direct and indirect purchasers are involved, or where more than one class of indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for compensatory damages that the illegal overcharge has been passed on or passed back to others who are themselves entitled to recover so as to avoid the duplication of recovery of compensatory damages."); Neb. Rev. Stat. § 59-821.01 (2012) ("A defendant may prove, as a partial or complete defense to a claim for damages under sections 59-801 to 59-831 and this section, that the illegal overcharge or undercharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of such damages . . . ."); N.D. Cent. Code § 51-08.1-08 ("In any action for damages under this section, any defendant, as a partial or complete defense against a claim for damages, is entitled to prove that the Plaintiffs purchaser, or seller in the chain of manufacture, production, or distribution, who paid any overcharge or received any underpayment passed on all or any part of the overcharge or underpayment to another purchaser or seller in that action.").

**INTERROGATORY RESPONSE AS TO IRICO'S THIRTY-SIXTH DEFENSE**

To the extent any recovery by Plaintiffs or members of the putative class would be duplicative of recovery by other Plaintiffs and other lawsuits, subjecting [Group or Display] to the possibility of multiple recoveries, such recovery is barred by the Fifth and Eighth Amendments to the United States Constitution.

**RESPONSE**

Irico further objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico also objects to this interrogatory on the grounds that it is premature at this stage in the proceedings as damages have not been awarded.

Subject to and without waiving the objections stated above, Irico states that a Plaintiffs who recovers damages from one co-conspirator, whether by verdict or settlement, may not recover those same damages again from another co-conspirator. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 348 (1971); *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1389 (9th Cir. 1987); *Husky Refining Co. v. Barnes*, 119 F.2d 715, 716 (9th Cir. 1941); *In re Piper Aircraft*, 792 F. Supp. 1189, 1190-91 (N.D. Cal. 1992). While Irico maintains that the

evidence does not prove that it conspired or entered into any agreements regarding the price of CRTs in the United States market, or violated any of the laws set forth in Plaintiffs' Complaint, if it were proven that Irico conspired or agreed to fix prices, as alleged, any recovery would need to be reduced by settlements with other defendants in this or related matters.

Additionally, Irico states that applicable state law prohibits duplicative recovery by multiple direct or indirect purchasers. See, e.g., N.Y. Gen. Bus. Law § 340(6) ("In actions where both direct and indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for damages that the illegal overcharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of damages."); *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787 (2010) (holding that under California law, "[i]n instances where multiple levels of purchasers have sued, or where a risk remains they may sue . . . if damages must be allocated among the various levels of injured purchasers, the bar on consideration of the pass-on evidence must necessarily be lifted . . . ."); Haw. Rev. Stat. § 480-13 (2011) ("In class actions or de facto class actions where both direct and indirect purchasers are involved, or where more than one class of indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for compensatory damages that the illegal overcharge has been passed on or passed back to others who are themselves entitled to recover so as to avoid the duplication of recovery of compensatory damages."); Neb. Rev. Stat. § 59-821.01 (2012) ("A defendant may prove, as a partial or complete defense to a claim for damages under sections 59-801 to 59-831 and this section, that the illegal overcharge or undercharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of such damages . . . ."); N.D. Cent. Code § 51-08.1-08 ("In any action for damages under this section, any defendant, as a partial or complete defense against a claim for damages, is entitled to prove that the Plaintiffs purchaser, or seller in the chain of manufacture, production, or distribution, who paid any overcharge or received any underpayment passed on all or any part of the overcharge or underpayment to another purchaser or seller in that action.").

**INTERROGATORY RESPONSE AS TO IRICO'S THIRTY-SEVENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs may not recover damages, if any, based on sales outside of the United States.

**RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion.

Subject to and without waiving the objections stated above, Irico contends that Plaintiffs' claims are barred in whole or in part to the extent that they are based on sales outside of the United States. Irico contends that a certain unknown percentage of the CRTs contained within the CRT products that Plaintiffs purchased were purchased from other countries. This contention is based on the fact that Plaintiffs cannot identify which company manufactured the CRT within the relevant CRT products. In the absence of knowing who manufactured the CRTs within its products, Plaintiffs likewise cannot identify whether those CRTs were purchased from outside the United States. Whether the CRTs themselves were purchased outside of the United States is relevant in determining if Plaintiffs' claims are barred because Plaintiffs alleged that it was injured on account of a price fixing conspiracy regarding CRTs as opposed to CRT products.

Although not limited to the following, Irico relies on the following evidence to support that Plaintiffs' claims are barred to the extent that they are based on sales outside of the United States: Expert Report of Janusz A. Ordover, Ph.D., (IPP Report), August 5, 2014; Expert Report of Robert D. Willig, August 5, 2014; Expert Report of Margaret E. Guerin-Calvert, August 5, 2014; and Expert Report of Prof. Dennis W. Carlton, August 5, 2014.

**INTERROGATORY RESPONSE AS TO IRICO'S THIRTY-EIGHTH DEFENSE**

Plaintiffs' claims should be dismissed because the alleged damages sought are too speculative and uncertain, and cannot be practicably ascertained or allocated.

**RESPONSE**

Irico further objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico also objects to this interrogatory to the extent that it improperly tries to shift the pleading and evidentiary burden that Plaintiffs' alone carry to Irico.

Subject to and without waiving the objections stated above, Irico responds by stating that Plaintiffs' alleged damages are speculative and uncertain because Irico did not conspire or enter into any agreements regarding the price of CRTs in the United States market, and did not violate any of the laws set forth in Plaintiffs' Complaint.

Irico further states that because Plaintiffs seek to recover for purchases of CRT Products as indirect purchasers, Plaintiffs' alleged damages are inherently speculative and/or uncertain due to a number of factors – such as the cost of other components that collectively make up CRT Products – that would have influenced the price that Plaintiffs paid for a CRT Product. Any apportionment of damages in this case will be exceedingly complex given the multi-layered and complex distribution, manufacturing and retail channels that existed in the market. Indeed, the different layers between Plaintiffs' allegations of injury and any alleged constraints in the CRT market inject levels of uncertainty in the price ultimately paid by the consumer for the downstream product, even if Plaintiffs could prove up an alleged overcharge for one component therein. See, e.g., Expert Report of Janusz A. Ordover, Ph.D., August 5, 2014 at 7–9; see also Defs.' Mem. in Opp'n to Mot. of Plaintiffs for Class Certification 12–13, ECF No. 1538; Decl. of Dr. Janet S. Netz 29–33, ECF No. 1527; Decl. of Robert D. Willig ¶¶ 120–21, ECF No. 1615. Irico further states that the testimony of numerous retailers – that they did not uniformly pass through any price increases in CRT Products to consumers – makes the proof of such injury to specific class members inherently speculative. See, e.g., Stone Dep. Tr. at 117:4-22, 167:21-169:1; Office Depot Dep. Tr. at 147:16-148:7; Interbond 30(b)(6) Dep. Tr. at 287:13-20; Fields Dep. Tr. at 125:12-126:3; Fry's 30(b)(6) Dep. Tr. at 182:6-184:10; TigerDirect 30(b)(6) Dep. Tr. at 114:5-115:13.

**INTERROGATORY RESPONSE AS TO IRICO'S THIRTY-NINTH DEFENSE**

Any award of restitution or monetary recovery pursuant to California Business and Professions §§ 17200, et seq. would constitute a taking of property without just compensation in

violation of the Takings Clause of the U.S. Constitution and of Article 1, Section 19 of the California Constitution.

**RESPONSE**

Irico further objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico also objects to this interrogatory on the grounds that it is premature at this stage in the proceedings as damages have not been awarded.

**INTERROGATORY RESPONSE AS TO IRICO'S FORTIETH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs have failed to plead special damages with specificity as required by the laws of the various States cited.

**RESPONSE**

Irico further objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico also objects to this interrogatory to the extent that it improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

**INTERROGATORY RESPONSE AS TO IRICO'S FORTY-FIRST DEFENSE**

Plaintiffs' claims should be dismissed to the extent they are barred, in whole or in part, because any injury or damage alleged in the Complaint was not incurred by or passed on to Plaintiffs, or was incurred by or passed on to persons or entities other than Plaintiffs.

**RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico further objects to this interrogatory to the extent that it improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

Subject to and without waiving the objections stated above, Irico states that Plaintiffs have not come forward with a reliable methodology to prove the existence of the amount, if any, of pass-through injury to all members of the class, and expressly incorporates by reference the information contained in the Expert Report of Janusz A. Ordover, Ph.D., August 5, 2014 (IPP

Action) at 14-36, and the Expert Report of Janusz A. Ordover, Ph.D., August 5, 2014 (Various DAP Actions) at 14-30.

Irico further states that numerous retailers have testified that they did not uniformly pass through any price increases in CRT Products to consumers, and this evidence further demonstrates that Plaintiffs have not and cannot show which members, if any, of the indirect purchaser class have suffered any alleged injury. See, e.g., Deposition Tr. of Brian Stone, Dec. 3, 2012 ("Stone Dep. Tr."), at 117:4-22 ("Cost increases that a manufacturer is intending to push across may not be reflected in the overall pricing for the end consumer based upon Best Buy's company's strategy, intent of that product category, the product availability, and the overall competitive nature of the . . . space."); id. at 167:21-169:1 ("There could be instances where due to competitive pricing forces costs could go up, but retail pricing may not be able to go up based upon in-country availability of products, competitive forces, seasonality."); Deposition Tr. of Randall Wick, July 24, 2014 ("Wick Dep. Tr."), at 147:16-148:7 ("[W]e will look at the market, we will look at what's in the market, look at the competitive intelligence of what people are carrying, what they are selling production for, what's in our current assortment, what we're charging for that, and in most cases you cannot increase and pass, the customers just won't buy it because it will be overpriced."); Rule 30(b)(6) Deposition Tr. of Interbond Corp. of America, d/b/a Brandsmart USA (through witness Larry Sinewitz), Feb. 6, 2014 ("Interbond 30(b)(6) Dep. Tr."), at 287:13-20; Deposition Tr. of Aimee Fields, June 4, 2014 ("Fields Dep. Tr."), at 125:12-126:3; Rule 30(b)(6) Deposition Tr. of Fry's Electronics (through witness Raj Seth) (rough transcript), Aug. 27, 2014 ("Fry's 30(b)(6) Dep. Tr."), at 182:6-184:10; Rule 30(b)(6) Deposition Tr. of TigerDirect, Inc. (through witness George Ali) (rough transcript), Aug. 28, 2014 ("TigerDirect 30(b)(6) Dep. Tr."), at 114:5-115:13.

**INTERROGATORY NO. 8**

If Your response to any of the IPPs' Requests for Admissions served concurrently herewith is anything other than an unqualified admission:

a. State all facts supporting Your denial;

b. Identify each Person who provided facts relating to Your response;

c.      Identify each Document You consulted to formulate Your response

**RESPONSE TO INTERROGATORY NO. 8**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico also reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and objections in each of its Specific Responses to Requests for Admission as set forth in Irico Defendants' Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Requests for Admission, served herewith. Irico further objects to this interrogatory as overbroad and unduly burdensome, as Plaintiffs has not demonstrated how the benefit of such information outweighs the significant burden to Irico of responding to each denial of the 119 RFAs (including subparts) propounded by Plaintiffs.

Subject to and without waiving the foregoing objections, Irico responds as follows:

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1A**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent

company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1B**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico did not authorize its employees to use non-Irico email addresses to conduct business, and Irico did not control this email address in any way. Based on the foregoing, Irico cannot confirm that this email address was used by an Irico "officer or employee."

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1C**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico did not authorize its employees to use non-Irico email addresses to conduct business, and Irico did not control this email address in any way. Based on the foregoing, Irico cannot confirm that this email address was used by an Irico "officer or employee."

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1D**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico did not authorize its employees to use non-Irico email addresses to conduct business, and Irico did not control this email address in any way. Based on the foregoing, Irico cannot confirm that this email address was used by an Irico "officer or employee."

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1E**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available

documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1F**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico

issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1G**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 1G, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1H**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 1H, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1J**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 1J, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1K**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 1K, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1L**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 1L, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1M**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1N**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1P**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly

burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms “unqualified” and “supporting” because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 1P, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1Q**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms “unqualified” and “supporting” because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain “@irico.com.cn” maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China

National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1T**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 1T, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1U**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its

response to Request for Admission No. 1U, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1V**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms “unqualified” and “supporting” because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain “@irico.com.cn” maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. (“CNEIECC”), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1X**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms “unqualified” and “supporting” because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1Y**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 1Y, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1AA**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available

documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 1AA, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 1BB**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 1BB, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2A**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available

documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2B**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico did not authorize

its employees to use non-Irico email addresses to conduct business, and Irico did not control this email address in any way. Based on the foregoing, Irico cannot confirm that this email address was used by an Irico "officer or employee."

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2C**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico did not authorize its employees to use non-Irico email addresses to conduct business, and Irico did not control this email address in any way. Based on the foregoing, Irico cannot confirm that this email address was used by an Irico "officer or employee."

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2D**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico did not authorize its employees to use non-Irico email addresses to conduct business, and Irico did not control this email address in any way. Based on the foregoing, Irico cannot confirm that this email address was used by an Irico "officer or employee."

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2E**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2F**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2G**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 2G, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2H**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 2H, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2J**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 2J, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2K**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 2K, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2L**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 2L, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2M**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2N**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2P**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 2P, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2Q**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks

information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms “unqualified” and “supporting” because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain “@irico.com.cn” maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. (“CNEIECC”), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2R**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms “unqualified” and “supporting” because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 2R, which contains a complete basis for its response to

this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2T**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 2T, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2U**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 2U, which contains a complete basis for its response to

this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2V**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms “unqualified” and “supporting” because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain “@irico.com.cn” maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. (“CNEIECC”), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2X**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms “unqualified” and “supporting” because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this email address was not used by an Irico employee during the course of their employment with Irico, nor was the email domain "@irico.com.cn" maintained by Irico during the Relevant Period. Irico issued and maintained email addresses with the domain @ch.com.cn during the Relevant Period. Irico understands that this email domain (@irico.com.cn) was used by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2Y**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 2Y, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2AA**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument

or legal conclusion. Irico further objects to the use of the terms “unqualified” and “supporting” because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 2AA, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 2B**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms “unqualified” and “supporting” because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 2B, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 5A**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument

or legal conclusion. Irico further objects to the use of the terms “unqualified” and “supporting” because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this business card was not used by an Irico employee during the course of their employment with Irico during the Relevant Period. These business cards appear to have been issued by another company, China National Electronics Import & Export Caihong Co. (“CNEIECC”), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 5B**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms “unqualified” and “supporting” because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its response to Request for Admission No. 5B, which contains a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 5C**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available

documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this business card was not used by an Irico employee during the course of their employment with Irico during the Relevant Period. These business cards appear to have been issued by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 5D**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this business card was not used by an Irico employee during the course of their employment with Irico during the Relevant Period. These business cards appear to have been issued by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 6A**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this business card was not used by an Irico employee during the course of their employment with Irico during the Relevant Period. These business cards appear to have been issued by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 6C**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this business

card was not used by an Irico employee during the course of their employment with Irico during the Relevant Period. These business cards appear to have been issued by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 6D**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico responds that this business card was not used by an Irico employee during the course of their employment with Irico during the Relevant Period. These business cards appear to have been issued by another company, China National Electronics Import & Export Caihong Co. ("CNEIECC"), which was an independent company that was not owned or controlled by Irico during the Relevant Period.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 7**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its foregoing objections, Irico responds that it has already detailed its efforts to discover the status of documents around the time that Irico received Plaintiffs' Complaint on December 25, 2007 and refers Plaintiffs to the Irico Defendants' Supplemental Responses to Indirect Purchaser Plaintiffs Third Set of Interrogatories, January 21, 2022.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 8**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its foregoing objections, Irico responds that it has already detailed its efforts to discover the status of documents in mid-2008 and refers Plaintiffs to the Irico Defendants' Supplemental Responses to Indirect Purchaser Plaintiffs Third Set of Interrogatories, January 21, 2022.

**RESPONSE RE: REQUEST FOR ADMISSION NOS. 10-15**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its responses to Request for Admission Nos. 10 through 15, which contain a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 16**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico refers Plaintiffs to the following evidence under FRCP 33(d): Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co., Ltd., March 6-8, 2019.

Irico identifies the following persons with knowledge regarding this Interrogatory: Wang Zhaojie and Su Xiaohua.

**RESPONSE RE: REQUEST FOR ADMISSION NOS. 17-26**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available

documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its responses to Request for Admission Nos. 17 through 26, which contain a complete basis for its response to this Interrogatory.

**RESPONSE RE: REQUEST FOR ADMISSION NOS. 27-32**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its responses to Request for Admission Nos. 27 through 32, which contain a complete basis for its response to this Interrogatory.

Dated: February 23, 2022

BAKER BOTTS L.L.P.

*<u>/s/ John M. Taladay</u>*

John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
        evan.werbel@bakerbotts.com
        tom.carter@bakerbotts.com
        drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# EXHIBIT Q

BAKER BOTTS LLP

700 K STREET, N.W.
WASHINGTON, D.C.
20001

TEL +1 202.639.7700
FAX +1 202.639.7890
BakerBotts.com

AUSTIN
BRUSSELS
DALLAS
DUBAI
HOUSTON
LONDON
MOSCOW
NEW YORK
PALO ALTO
RIYADH
SAN FRANCISCO
**WASHINGTON**

May 9, 2022

VIA E-MAIL [VRW@JUDGEWALKER.COM]

John Taladay
TEL: 2026397909
FAX: 2026391165
john.taladay@bakerbotts.com

The Honorable Vaughn R. Walker
Law Office of Vaughn R. Walker
Four Embarcadero Center, Suite 2200
San Francisco, CA 94111

Re: In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Master File No. 07-CV-944-JST

Dear Judge Walker:

## I. INTRODUCTION

Plaintiffs here seek an extreme and unwarranted intrusion into the attorney-client privilege. Their motion to compel invites the Special Master to break the sanctity of the attorney-client privilege based on half-baked arguments that are not supported by the case law or the facts.

First, Plaintiffs inexplicably attempt to push the burden to Irico to demonstrate that the communications Plaintiffs seek are privileged. The Ninth Circuit, however, has consistently held that a privilege log is a sufficient *prima facie* showing that documents are protected by the attorney-client privilege. The burden therefore lies with Plaintiffs to make a sufficient showing to the Special Master that the documents are not privileged, a task they do not even attempt.

Second, Plaintiffs attempt to conflate this motion to compel with a non-existent discovery sanctions motion to muddle the findings required to warrant the unprecedented remedy they seek. Here, Plaintiffs have failed to make a preliminary showing of spoliation sufficient to justify even a limited production of a litigation hold notice, much less the more extreme measures they seek here. Plaintiffs purport to establish that Irico would have been in possession of relevant documents at the time of its preservation efforts by citing documents in the possession of other parties and by using misleading quotes from Irico's 30(b)(6) deposition witness. However, this evidence is insufficient to establish that Irico was in possession of those documents at the time of any preservation obligations arose. Plaintiffs also try to portray Irico as a bad actor that intentionally destroyed relevant documents. In truth, Irico was a state-owned Chinese-entity that did its best to comply with unfamiliar laws and discovery standards in the United States by searching for materials relevant to any potential sales to the United States and following Chinese document retention practices.

Finally, and most importantly, even if Plaintiffs put forward sufficient evidence to establish a preliminary showing of spoliation, which they have not, Plaintiffs have failed to

identify a single case where a court has required the production of communications between lawyers prior to the issuance of a litigation hold, as opposed to requiring only the production of the litigation hold itself and related instructions given to employees. The cases they do cite prescribe only the production of a litigation hold notice and, as Plaintiffs acknowledge, Irico has confirmed that it did not issue a written litigation hold notice. Irico has also provided the specific details on the scope of the oral litigation hold that was issued, so even giving full weight to the cases cited Plaintiffs, Irico has already provided the information required by those courts.

The Special Master should refuse Plaintiffs' efforts to violate Irico's attorney-client privilege and thus deny Plaintiffs' motion.

## II. ARGUMENT

The attorney-client privilege is "the most sacred of all legally recognized privileges, and its preservation is essential to the just and orderly operation of our legal system." *United States v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997). The privilege protects "confidential communications between attorneys and clients, which are made for the purpose of giving legal advice." *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011). The communications containing legal advice related to a litigation hold that Plaintiffs seek to discover are protected by the attorney-client privilege. *Adkisson v. Jacobs Eng'g Grp., Inc.*, No. 3:13-CV-505-TAV-HBG, 2021 WL 149841, at *8 (E.D. Tenn. Jan. 15, 2021) (citations omitted).

In very limited circumstances, Courts have required the production of otherwise privileged litigation hold notices only after a court makes a preliminary finding of spoliation. *See Thomas v. Cricket Wireless, LLC*, No. 19CV07270WHAAGT, 2020 WL 7344742, at *2 (N.D. Cal. Dec. 14, 2020). To make that preliminary finding, Plaintiffs must provide evidence demonstrating that Irico destroyed documents that Irico controlled and that should have preserved in anticipation of litigation. *See Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 287 (N.D. Cal. 2015) ("The party requesting spoliation sanctions bears the burden of proving all…elements of the claim.") (citing *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir.1991)); *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1138 (N.D. Cal. 2012) (holding that one element for determining spoliation is if the "party having control over the evidence had an obligation to preserve it at the time it was destroyed…"); *Saller v. QVC, Inc.*, No. CV 15-2279, 2016 WL 4063411, at *5 (E.D. Pa. July 29, 2016) (holding that documents lost prior to the reasonable anticipation of litigation are not indicative of a failure to take reasonable steps to preserve evidence). Plaintiffs have failed to make the required showing to justify breaking the "most sacred of all legally recognized privileges." *Bauer*, 132 F.3d at 510.

Even if the Special Master were to determine that Plaintiffs have satisfied the burden of proving spoliation, the remedy they seek here is inappropriate and extreme. The cases cited by Plaintiffs ultimately required the Defendant to produce only the relevant litigation hold notices and related instructions regarding implementation of the hold. No case required the further

intrusion into the attorney-client privilege that Plaintiffs seek here of requiring production of communications between lawyers about a litigation hold notice or the duty to preserve.

**A. The Documents at Issue Are Clearly Privileged**

Plaintiffs are seeking clearly privileged communications comprised of legal advice related to a potential litigation hold. *See Adkisson*, 2021 WL 149841, at *8. Irico has produced a privilege log to Plaintiffs listing correspondence containing legal advice from one or more attorneys from Irico's litigation counsel in 2008, Pillsbury, Winthrop, Shaw & Pittman LLP, during the course of the instant litigation, provided to Irico's in-house counsel, and identified those documents as subject to the attorney-client privilege and attorney work product doctrine. *See* Declaration of Lauren C. Capurro In Support of Plaintiffs' Motion to Compel ("Capurro Decl."), Ex. A. The Ninth Circuit has consistently recognized that producing a privilege log is sufficient to make a *prima facie* showing that the attorney-client privilege protects the types of documents at issue. *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992); *Dole v. Milonas,* 889 F.2d 885, 888 n. 3, 890 (9th Cir.1989); *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, No. 16CV00236WHODMR, 2019 WL 1950377, at *2 (N.D. Cal. May 1, 2019).

Plaintiffs have not attempted to argue that the documents here are not privileged, nor have Plaintiffs pointed to any evidence that Irico failed to maintain privilege on these documents. The Special Master should ignore any suggestion by Plaintiffs that Irico has any further burden to prove that the documents at issue are privileged or that that Irico has in any way waived that privilege.

**B. Plaintiffs Fail to Meet Their Burden of Demonstrating a Preliminary Showing of Spoliation to Warrant Any Intrusion into the Attorney-Client Privilege**

Plaintiffs attempt to usurp the role of the Special Master and reach their own unsupported conclusion that there is clear evidence of spoliation by Irico. That conclusion is incorrect and not in accord with the record in this case.

1. The existing record does not support a conclusion that relevant documents existed at the time Irico's duty to preserve arose.

Plaintiffs' attempt to establish a preliminary showing of spoliation fails on its face because Plaintiffs' brief is bereft of any evidence that establishes Irico's *control* of relevant documents at the time Irico's duty to preserve arose. As a threshold issue, Plaintiffs concede that Irico did not possess (and therefore did not destroy) documents regarding potential sales of CRTs to the United States by Irico. Mot. at 4. Since both parties agree that Irico did not possess documents regarding sales to the United States, Irico did not fail to preserve those documents.

Plaintiffs can make no legitimate claim as to a preliminary showing of spoliation of documents regarding potential CRT sales by the Irico to the United States.

Plaintiffs' central argument turns on the existence of documents created by other Defendants, along with a smattering of documents purportedly authored by Irico employees and produced by other Defendants earlier in the litigation. *See* Mot. at 2. Following Plaintiffs' logic, the existence of those documents in other Defendants' files necessarily means that Irico must have possessed such documents and failed to preserve them. Plaintiffs' argument is, at best, pure speculation and not evidence that such documents existed in Irico's files at the time a duty to preserve arose. *See Point Blank Sols., Inc. v. Toyobo Am., Inc.*, No. 09-61166-CIV, 2011 WL 1456029, at *21 (S.D. Fla. Apr. 5, 2011) ("The court cannot simply *assume* that, because Point Blank is in possession of certain e-mails between Toyobo and Point Blank that Toyobo did not produce in this case, that other e-mails between the companies or internal Toyobo emails must have existed and were not produced.") (emphasis in original). To make a preliminary showing of spoliation, Plaintiffs must point to evidence that was in Irico's control at the time the duty to preserve arose.[1] *See Lofton*, 308 F.R.D. at 287; *Apple*, 881 F. Supp. 2d at 1138. Plaintiffs have pointed to no such evidence.

Plaintiffs' claims regarding the alleged spoilation of documents related to Irico's attendance at industry meetings is but one of many overreaches Plaintiffs undertake in their contortions to identify specific records that Irico destroyed documents after any preservation obligations arose. Plaintiffs erroneously rely on the fact that other Defendants took meeting notes to support their argument that Irico must have created and maintained its own meeting notes. Again, however, the mere fact that other Defendants have copies of alleged conspiracy meeting notes *does not* mean that Irico regularly took or maintained meeting notes. In fact, Plaintiffs have not shown that all other alleged participants in these meetings took notes at the meetings.

Plaintiffs further attempt to bolster their suggestion that Irico must have taken notes at these industry meetings by citing to Irico's Rule 30(b)(6) representative, Mr. Zhaojie Wang, attendance at meetings and by referring to Irico travel records. However, this "evidence" does not establish that Irico took notes at industry meetings let alone that any such notes were regularly maintained by the company. Plaintiffs conveniently ignore the testimony by Mr. Wang that they solicited where Mr. Wang denied taking notes at such meetings:

> Q. Did you typically take notes of these meetings with your competitors?

---

[1] Plaintiffs suggest, with no support, that Irico's duty to preserve may have attached prior to service of IPPs' complaint. Mot. at 8, fn 12. Irico strongly disagrees that this issue is implicated in the present motion. Irico also disagrees with Plaintiffs' allegations and reserves all arguments regarding the timing of Irico's duty to preserve.

> […]
>
> A. Such meeting is just a meeting for information exchange. I wouldn't consider it is valuable. So we won't consider it is an issue.

Capurro Decl., Ex. B at 57:5-10.

Plaintiffs also ignore Mr. Wang's testimony that, even if such contemporaneous records were created, Irico would not maintain records of meetings of the type that he attended in any formal manner:

> Q Irico has not produced a report of this meeting in this case, correct?
>
> […]
>
> A. First of all, this is something happened too long ago, and the fact is that this is only information exchange meeting. And rather not important document. What we have done is we have tried our best to find as much evidence as possible. We have done a lot of effort to search the evidence. Whereas this is not an important evidence. This is just an information exchange. We would not keep such report as an important document.

Capurro Decl., Ex. B at 70:3-14.

Plaintiffs also suggest that documents found in other Defendants' files somehow confirm that those same documents existed in Irico's files at the time the duty to preserve arose. Mot. at 2-3. This argument is similarly unpersuasive. At the Special Master's direction, Irico has already responded in detail as to documents created during the relevant period and provided explanation as to why those documents were likely no longer in Irico's control by the end of 2007. *See, e.g.,* Capurro Decl., Ex. I at 13; ("Irico believes that [documents related to the sales of CRTs, including the types cited by Plaintiffs] would not have been retained in the ordinary course of business"). Plaintiffs' arguments regarding the evidentiary value of purported Irico emails found in other Defendants' files are particularly unconvincing given that the dates of the cited emails are all in the first half of 2007 or earlier. Irico's discovery responses make clear that Irico only maintained emails for several days, or in rare cases a week or two, due to acute limitations in storage capacity. *See id.* at 16. Accordingly, any emails that were sent by Irico employees in the first half of 2007 would have long since been overwritten in the ordinary course of Irico's business and would not have been in Irico's control in late-2007. In any event, Plaintiffs cite to no authority supporting their proposition that the existence of a handful of documents linked to Irico in other Defendants' files means that those documents existed in Irico's files at the end of 2007, let alone that it supports a broader finding about Irico's preservation practices. *See*, *e.g.*,

*Point Blank*, 2011 WL 1456029, at *21 ("The court cannot simply *assume* that, because Point Blank is in possession of certain e-mails between Toyobo and Point Blank that Toyobo did not produce in this case, that other e-mails between the companies or internal Toyobo emails must have existed and were not produced.") (emphasis in original).

Plaintiffs have failed to make an adequate showing that any of the relevant information was under Irico's control at the time Irico's duty to preserve arose.[2] Therefore, Plaintiffs have failed to show that Irico had a duty to preserve any of the relevant evidence. Without establishing Irico's duty to preserve the relevant evidence, Plaintiffs have failed to make a preliminary showing of spoliation.

2. Irico's confusion around document preservation does not provide evidence of spoliation.

Even if Irico possessed relevant documents at the time Irico's duty to preserve arose (which Plaintiffs have not proven), Irico's conduct is indicative of a party that lacks understanding of the antitrust laws of the United States and regarding document preservation in the United States, not of a party attempting to destroy relevant documents.

Irico comported itself in a manner appropriate with its limited understanding of the law and customs of the United States. As a Chinese State-Owned Entity, Irico was not experienced with litigation in courts in the United States. Served with a complaint from a country alleging antitrust violations in a foreign jurisdiction to which it did not sell product, Irico undertook measures that it believed to be appropriate under the circumstances. Given the focus on the United States, Irico's efforts to preserve relevant documents included instructing key employees to identify documents related to sales of CRTs to the United States. *See* Capurro Decl, Ex. I at 7.

In addition to the preservation efforts described above, Irico closely followed the document preservation requirements under Chinese law. Pursuant to Chinese law, the Ministry of Finance and State Archives Administration requires companies like Irico to maintain and preserve certain documents and materials, including original invoices for sales, accounting books, general ledgers, financial accounting reports, and bank statements. *Id*. Irico faithfully followed those requirements.[3] *Id*. Additionally, Irico followed its internal practice of maintaining archives of material related to operational documents, administrative documents, technical records, and communications with agencies of the PRC government and the Chinese Communist

[2] Plaintiffs appear to suggest that additional responsive documents may exist in the files of Irico's counsel at the outset of the litigation, Pillsbury, Winthrop, Shaw & Pittman LLP. Mot. at 9. Irico confirms that it searched available records and located no additional documents beyond those listed on the privilege log.

[3] The travel and expense records on which Plaintiffs rely to suggest attendance by Irico employees at certain industry meetings were preserved in the archives of Irico pursuant to these obligations. *See* Capurro Decl., Ex. I at 10.

Party. *Id.*; *see also id.* at 20-21. Irico has already produced responsive, non-privileged documents from these sources and is not aware of any of the preserved documents in the various archives being destroyed. *Id*. at 7.

Plaintiffs have failed to make a preliminary showing of spoilation. Breaking the attorney-client privilege therefore is not warranted.

**C. Plaintiffs' Efforts to Obtain Communications between Attorneys Prior to the Issuance of a Litigation Hold is Unprecedented and Unwarranted**

Plaintiffs are seeking disclosure of all privileged communications relating to the initial discussed related to document preservation in this litigation. *See* Mot. at 1. Irico is not aware of any case where the sanctity of the privilege protections were abandoned to the extent sought by Plaintiffs here. The cases Plaintiffs rely upon certainly do not go that far and require production of only the litigation hold notices themselves (or in rare cases instructions given to employees regarding implementation of a litigation hold), rendering them neither instructive nor controlling. In fact, Irico has already provided Plaintiffs with the information regarding preservation efforts required to be produced in the cases that they cite. Irico disclosed that no written litigation hold was issued in 2007 or 2008. Irico has also disclosed that the oral litigation hold notice was limited to materials relating to potential sales of CRTs in the United States. There is no further information that that Plaintiffs could obtain by breaking the attorney-client privilege to the extent seek to do here Irico that was required to be disclosed in the cases they cite.

For example, Plaintiffs rely heavily on *Al Otro Lando*, but Plaintiffs' reliance is misplaced. *See Al Otro Lado, Inc. v. Wolf*, No. 317CV02366BASKSC, 2020 WL 4432026 (S.D. Cal. July 31, 2020); Mot. at 1, 6-8. In *Al Otro Lando*, the court did not order the Defendants to produce all privileged communications regarding document preservation; rather the court specifically ordered the production of only the litigation hold notice. *See id.* at *2 ("defendants are ordered to lodge the litigation hold notice for the Court's in camera inspection within 7 days of the date of this order."). Irico has already provided the same information to Plaintiffs, and the court did not require any other communications surrounding the litigation hold to be produced.

Plaintiffs also cite to *Major Tours, Inc. v. Colorel*, No. CIV 05-3091(JBS/JS), 2009 WL 2413631 (D.N.J. Aug. 4, 2009); Mot. at 7. But in that case, the court ordered the production of the litigation hold letters only and specifically limited the production to "the portions of the letter that refer to litigation hold or preservation issues." *Id.* at *2. The court went on to hold that "the remainder of the letter is protected by the attorney-client privilege and work-product doctrine." *Id*. Again, this case dealt with only the litigation hold letters themselves, providing no support for discovery of other communications surrounding a party's litigation hold efforts.

The pattern continues with Plaintiffs' reliance on *City of Colton* and *Thomas*. *See City of Colton v. Am. Promotional Events, Inc.*, No. CV0906630PSGSSX, 2011 WL 13223880 (C.D. Cal. Nov. 22, 2011) (ordering production of "the litigation hold letters"); *See Thomas*, 2021 WL

7344742 at *5 (order production of "litigation hold letters issued in connection with" the case); Mot. at 7-8. In neither case did the court order the non-moving party to produce its other privileged communications surrounding a litigation hold notice.[4]

Finally, Plaintiffs' reliance on *Zubulake* is similarly misplaced. *Zubulake v. UBS Warburg*. 229 F.R.D. 422 (S.D.N.Y. 2004), Mot. at 6, 9-10. *Zubulake* is not a case concerning a preliminary finding of spoliation[5], nor is there any indication that the court there found sufficient grounds to break privilege on legal communications in the lead up to defendants' issuance of a litigation hold. Instead, the court in *Zubulake* was examining defendants' conduct that took place after defendants issued a litigation hold and whether employees followed the litigation hold requirements. No communications between counsel similar to those Plaintiffs seek to obtain here were required to be produced by the court in *Zubulake*. *See* 229 F.R.D. at 436-37.

Plaintiffs fail to point to a single case where, a court ordered the production of privileged communications between attorneys prior to the issuance of a litigation hold. In the cases that Plaintiffs cite, the courts specifically limited production of privileged communications to litigation hold letters and related instructions only. Plaintiffs' discovery in this matter has already elicited all available details of the instructions provided by Irico regarding its litigation hold efforts, including that no written litigation hold notice was issued by Irico. *See* Capurro Decl., Ex. I at 10-12. Accordingly, the Special Master here should not violate the sanctity of attorney-client privileged communications between Irico and its counsel.

## III. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion should be denied.

Sincerely,

*/s/ John Taladay*
John Taladay

cc: Jay Weil (jay.weil@fedarb.com)
R. Alexander Saveri (rick@saveri.com)
Geoffrey C. Rushing (geoff@saveri.com)

---

[4] Plaintiffs' citation to *Apple Inc. v. Samsung Electronics*, 888 F. Supp. 2d 976 (N.D. Cal. 2012) is also inapposite given that Judge Koh's opinion did not address any issues related to attorney-client privilege, let alone the discoverability of properly privileged pre-litigation hold communications.

[5] *Zubulake* dealt with a sanctions motion for spoliation of electronically stored information under Fed. R. Civ. P. 37. *See* 229 F.R.D. at 430.

BAKER BOTTS LLP
The Honorable Vaughn R. Walker - 9 -

Matthew D. Heaphy (mheaphy@saveri.com)
Mario N. Alioto (malioto@tatp.com)
Lauren C. Capurro (laurenrussell@tatp.com)
Daniel E. Birkhaeuser (dbirkhaeuser@bramsonplutzik.com)

# EXHIBIT R

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202) 639-7700
(202) 639-7890 (fax)
Email: john.taladay@bakerbotts.com
evan.werbel@bakerbotts.com
tom.carter@bakerbotts.com
drew.lucarelli@bakerbotts.com

*Attorneys for Defendants*
*Irico Group Corp. and*
*Irico Display Devices Co., Ltd.*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION, | Master File No. 07-cv-05944-JST |
| | MDL No.: 1917 |
| THIS DOCUMENT RELATES TO: | |
| *ALL DIRECT PURCHASER ACTIONS* | **DECLARATION OF YAN YUNLONG RE DEPOSITION TESTIMONY AND IRICO DEFENDANTS' INTERROGATORY RESPONSES** |
| *ALL INDIRECT PURCHASER ACTIONS* | |

I, Yan Yunlong, declare as follows:

本人，闫云龙，声明如下：

1. I am a citizen of the People's Republic of China and reside in Shaanxi Province, People's Republic of China.

本人是中华人民共和国公民，居住地为中华人民共和国陕西省。

2. I am currently the General Counsel of Irico Group Corp. ("Irico Group") and the Director of Irico Group's Legal Affairs Department. I have been involved in the management of this litigation since 2008. I was a member of a Litigation Committee established by Irico Group Corp. in June 2008 to coordinate Irico Group Corp. and Irico Display Devices Co., Ltd.'s ("Irico Display," collectively "Irico") response to this litigation. At the time the Litigation Committee was formed, I served as Legal Affairs Manager for Irico Group's Enterprise Management Department.

本人目前是彩虹集团公司（"彩虹集团"）的总法律顾问和彩虹集团法务部部长。本人自2008年以来一直参与此诉讼的管理工作。彩虹集团公司于2008年为了协调彩虹集团公司和彩虹显示器件股份有限公司（"彩虹显示"，统称"彩虹"）对此案的应诉而成立了诉讼委员会，本人是诉讼委员会的成员之一。诉讼委员会成立时，我担任彩虹集团企业管理部法务经理。

3. I was deposed in this matter from September 27 through September 29, 2022. I also provided input for Irico's responses to Indirect Purchaser Plaintiffs' 3rd and 4th Sets of Interrogatories served by Irico on August 13, 2021, January 21, 2022, and February 23, 2022.

本人于2022年9月27日至9月29日期间就此案作证。我还为彩虹于 2021 年 8 月 13 日、2022 年 1 月 21 日和 2022 年 2 月 23 日就间接购买者原告对彩虹的第三和第四组质询的回复提供了意见。

4. In the process of reviewing the transcript of my deposition testimony and the interrogatory responses, I realized that I was confused regarding some questions and gave inaccurate testimony contained within pages 123 through 139 of the transcript, as well as inaccurate input for the interrogatory responses listed above. This information related to certain events in 2008 following the formation of the Litigation Committee, specifically

relating to Irico's efforts to preserve documents for the litigation.

在审阅我的证词笔录和质询回答的过程中，我意识到我对一些问题没弄清楚，并在证词笔录的第 123 页至 139 页中提供了一些不准确的证词，同时上述质询回复中也存在错误。该信息与 2008 年诉讼委员会成立后的某些情况有关，特别是有关彩虹为诉讼保存文件所做的努力。

5. I submit this Declaration to clarify and correct my testimony and recollections regarding these events.

我提交本声明以澄清和纠正我对这些情况的证词和回忆。

6. In August 2008, I received an email from Irico's outside counsel at the time, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"), attaching a document containing Pillsbury's privileged legal advice to Irico regarding preservation of documents for the litigation.

2008 年 8 月，我收到了彩虹当时的外部律师 Pillsbury Winthrop Shaw Pittman LLP（"Pillsbury"）的一封电子邮件，其附件包含了 Pillsbury 就此诉讼的文件保存问题向彩虹提供的享有律师客户特权的法律建议。

7. In a subsequent meeting of the Litigation Committee in August 2008, I printed and provided copies of the privileged document from Pillsbury to each of the Litigation Committee members. The Litigation Committee members reviewed the document and discussed the legal advice provided by Pillsbury.

在之后2008年8月的诉讼委会会议上，我打印出向其他所有诉讼委员会的成员们出示了这份享有律师客户特权的文件的副本。诉讼委员会的成员们审阅了此文件并讨论了Pillsbury提供的法律意见。

8. Following this discussion, the Litigation Committee members were tasked with the responsibility of identifying any relevant documents in their possession and preserving any such materials, as well as notifying subordinates who might have any relevant documents to preserve those materials, if any existed. This instruction was given orally.

在讨论之后，交给诉讼委员会成员的任务是，如存在相关材料，则确认他们已掌握的相关材料并予以保存，同时通知可能拥有任何相关文件的下属去保存这些资料。该指示是口头给出的。

9. While the Litigation Committee members did receive copies of and discuss the privileged document from Pillsbury, I do not recall whether the Litigation Committee members discussed the specific categories of documents that each Litigation Committee member would preserve and instruct other employees to preserve. It is my understanding that each Litigation Committee member determined independently which subordinates should be contacted regarding the preservation efforts and what information regarding preservation should be relayed to each employee. Any statement to the contrary in my testimony or Irico's interrogatory responses is inaccurate.

虽然诉讼委员会的成员们的确收到了Pillsbury具有律师客户特权的文件的副本，并进行了讨论，但我不记得诉讼委员会成员是否讨论过每位诉讼委员会成员将保存和指示其他员工保存的文件的特定类别。据我了解，每位诉讼委员会成员都独立确定应就保全工作联系哪些下属，以及应将哪些保全的相关信息传达给员工。在我证词中或彩虹的质询回复中的任何相反陈述都是不准确的。

10. I do not recall further discussion with the Litigation Committee members in 2008 on the issue of document preservation after this meeting.

我不记得在2008年这次会议后诉讼委员会成员还就文件保存问题进行过进一步的讨论。

Executed this 18th day of November, 2022, in Xianyang, Shaanxi Province, People's Republic of China.

于 2022 年 11 月 18 日在中华人民共和国陕西省咸阳市签署。

Mr. Yan Yunlong

闫云龙先生

# EXHIBIT S

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
evan.werbel@bakerbotts.com
tom.carter@bakerbotts.com
drew.lucarelli@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION

This Document Relates to:

ALL INDIRECT PURCHASER ACTIONS

Master File No. 4:07-cv-05944-JST (N.D. Cal.)

MDL No. 1917

**IRICO DEFENDANTS' THIRD SUPPLEMENTAL OBJECTIONS AND RESPONSES TO INDIRECT PURCHASER PLAINTIFFS' THIRD SET OF INTERROGATORIES TO IRICO GROUP CORPORATION AND IRICO DISPLAY DEVICES CO., LTD.**

PROPOUNDING PARTY: Indirect Purchaser Plaintiffs

RESPONDING PARTIES: Irico Group Corporation; Irico Display Devices Co., Ltd.

SET NUMBER: Third (3)

Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation ("Irico Group") and Irico Display Devices Co, Ltd. ("Irico Display," collectively, "Irico" or "Irico Defendants") hereby provides its third supplemental responses to the Indirect Purchaser Plaintiffs' ("Plaintiff") Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., dated July 7, 2021 ("Interrogatories"), as modified by the Special Master's December 22, 2021 Order Re DPPs' Motion to Compel Interrogatory Further Answers (ECF No. 5978). Irico is supplementing these responses pursuant to its obligations under Rule 26(e) of the Federal Rules of Civil Procedure and based upon newly discovered facts. Irico reserves the right to amend or supplement these Supplemental Objections and Responses (the "Responses") to the extent allowed by the Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California ("Local Rules"). Subject to and without waiving any of Irico's General and Specific Objections as set forth below, Irico is willing to meet and confer with Plaintiff regarding such General and Specific Objections.

The following Responses are made only for purposes of this case. The Responses are subject to all objections as to relevance, materiality and admissibility, and to any and all objections on any ground that would require exclusion of any response if it were introduced in court. All evidentiary objections and grounds are expressly reserved.

## GENERAL OBJECTIONS

Irico makes the following General Objections to Plaintiff's Interrogatories:

1. Irico's Responses are based upon information available to and located by Irico as of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states that it has conducted a diligent search, reasonable in scope, of those files and records in its possession, custody, or control believed to likely contain information responsive to Plaintiff's Interrogatories.

2. No express, incidental, or implied admissions are intended by these Responses and should not be read or construed as such.

3. Irico does not intend, and its Responses should not be construed as, an agreement

or acquiescence with any characterization of fact, assumption, or conclusion of law contained in or implied by the Requests.

4.     Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiff.

5.     Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

6.     Irico objects to Plaintiff's Interrogatories to the extent that they request duplicative discovery in violation of the Order Re Discovery And Case Management Protocol, ECF No. 1128. *See* Order Re Plaintiffs' Motions To Compel Supplemental Discovery From Toshiba And Panasonic, ECF No. 4128, at 4 ("The Discovery Protocol (ECF No 1128), requires parties to coordinate discovery and not file duplicative discovery. . . . The benefit redounds to all parties on both sides of the litigation, by conserving the efforts required by plaintiffs and protecting defendants against unnecessary duplication of effort.") (Report and Recommendation adopted in full at ECF No. 4256).

7.     Irico objects to Plaintiff's Interrogatories to the extent they seek information that is not relevant or disproportionate to the needs of the case.

8.     Irico objects to Plaintiff's Interrogatories to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or amend its Responses.

9.     Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case.

10.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico will provide only information that it believes to be non-privileged and otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any information or responsive documents subject to any such doctrine, privilege, protection or immunity from production shall not constitute a general, inadvertent, implicit, subject-matter, separate, independent or other waiver of such doctrine, privilege, protection or immunity from production.

11.     Irico objects to Plaintiff's Interrogatories to the extent that they call for information that is not in the possession, custody, or control of Irico. Irico also objects to the extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties, including but not limited to any of Irico's subsidiary or affiliated companies.

12.     Irico objects to Plaintiff's Interrogatories to the extent that responding would require Irico to violate the privacy and/or confidentiality of a third party or confidentiality agreement with a third party.

13.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily available from other sources.

14.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information or documents concerning transactions outside the United States. Such Requests are unduly burdensome and disproportionate to the needs of the case as Plaintiffs' class definition is confined to "individuals and entities that indirectly purchased Cathode Ray Tube Products . . . in the United States" (see Indirect Purchaser Plaintiffs' Fifth Consolidated Amended Complaint ("Complaint") dated September 19, 2019).

15.     Irico objects to Plaintiff's Interrogatories to the extent that compliance would require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body

of foreign jurisdictions.

16. Irico's responses, whether now or in the future, pursuant to Plaintiff's Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

17. Irico objects to Plaintiff's Interrogatories to the extent that they are compound and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

18. Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for legal conclusions.

19. Irico objects to the Interrogatories to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

20. Irico objects to the Interrogatories to the extent they seek information or documents that cannot be removed or transmitted outside China without violating the laws and regulations of that country, including but not limited to restrictions on the transmission of state secrets or trade secrets as those terms are defined under Chinese law.

21. Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

## GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1. Irico objects to the definition of "DPPs' Written Discovery" (Definition No. 1) on the grounds that it is vague, ambiguous and overly broad.

2. Irico objects to the definition of "IPPs' Written Discovery" (Definition No. 2) on the grounds that it is vague, ambiguous and overly broad.

3. Irico objects to the definition of "Document" (Definition No. 3) to the extent it seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, any Order of this Court, or any other applicable laws.

4.      Irico objects to the definitions of "Including" and "Relating" (Definition No. 4) on the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to the extent that it seeks information protected by the attorney client or other applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or foreign law.

5.      Irico objects to the definitions of "You" and "Your" (Definition No. 5) to the extent that Plaintiff defines those terms to include the Irico's "present and former members, officers, agents, employees, and all other persons acting or purporting to act on their behalf, including all present and former members, officers, agents, employees, and all other persons exercising or purporting to exercise discretion, making policy, and make decisions." This definition is overbroad, unduly burdensome, vague, and ambiguous. In particular, Irico objects to this definition to the extent it purports to request information beyond the possession, custody, or control of Irico Group or Irico Display, including but not limited to information in the possession of non-parties and third parties where Irico lacks any duty to obtain or otherwise search for the information and for whom the Court lacks personal jurisdiction. Irico also objects to the inclusion of all "present or former employees, officers, directors, agents . . . or any other person acting on [the] behalf [of]" Irico within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

6.      Irico objects to Instruction No. 1 (related to disclosure of additional information) to the extent it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 26(e).

7.      Irico objects to Instruction No. 2 (related to production of business records) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality

of the foregoing, Rule 33(d), Rule 26(b). Irico further objects to this Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any Orders of the Court.

8. Irico objects to Instruction No. 3 (related to privileged information) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 33(d), Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any Orders of the Court, and on the grounds that it is vague, ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the extent it seeks information that would disclose personal confidential information and/or violate any and all rights of privacy under the United States Constitution or Article I of the Constitution of the State of California, or any other applicable law or state constitution, or that is otherwise prohibited from disclosure because to do so would cause Irico to violate legal and/or contractual obligations to any other persons or entities.

**SPECIFIC RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 2**

State whether Irico implemented a litigation hold to preserve potentially discoverable evidence relating to the alleged misconduct in this litigation. If your answer is in the affirmative:

(a) state the date (or dates) that the litigation hold notice was issued;

(b) state the date when the litigation hold was implemented;

(c) describe in detail the scope of the litigation hold, including the categories of documents, electronically stored information (ESI), or other tangible evidence that are subject to the litigation hold;

(d) identify the recipients of the litigation hold notice; and

(e) describe any steps taken to ensure compliance with the litigation hold.

**RESPONSE TO INTERROGATORY NO. 2**

Irico reasserts and incorporates each of the General Objections and Objections to the

Definitions and Instructions set forth above. Irico further objects that this interrogatory to the extent that it requests the disclosure of information protected by the attorney-client privilege or attorney work product doctrine.

Subject to and without waiving the objections stated above, Irico responds that, in summer 2008, the company orally instructed key employees to preserve documents related to sales of CRT to the United States. It was determined that Irico possessed no such documents. As discussed in more detail below, all documents required to be maintained under Chinese law were preserved at that time. Around September 2017, when Irico reentered the litigation for the purposes of contesting jurisdiction and asserting a foreign sovereign immunity defense, Irico confirmed the need to preserve existing documents relevant to the litigation from the time period 1995 to 2007 with managers from each operational department, including finance and accounting, legal, HR, and sales. The managers conveyed this message orally to relevant employees under their supervision.

In addition to the preservation efforts described above, and as Irico has explained in other discovery responses, *see* Irico's Supplemental Objections and Responses to Interrogatory No. 16 as stated in Irico Defendants' Fourth Supplemental Objections and Responses to Direct Purchaser Plaintiffs' First Set of Interrogatories, pursuant to Chinese law, the Ministry of Finance and State Archives Administration requires companies like Irico to maintain and preserve certain documents and materials, including but not limited to original invoices for sales, accounting books, general ledgers, financial accounting reports, and bank statements. *See* IRI-CRT-00000900. Irico is not aware of such archived records from 1995-2007 being destroyed given the retention periods required by the Chinese government. In addition, Irico's internal practices included the maintenance of additional archives of material related to operational documents, administrative documents, technical records and communications with agencies of the PRC government and Chinese Communist Party.[1] Irico is not aware of any such records from the 1995 to 2007 time period that were preserved in the various archives being destroyed.

///

[1] Additional information regarding the documents maintained in Irico's archives can be found in Irico's December 18, 2020 letter to Plaintiffs regarding discovery issues.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2**

On December 22, 2021, the Special Master issued the Order Re DPPs' Motion to Compel Interrogatory Further Answers, ECF No. 5978, directing Irico to "to furnish supplemental responses to Interrogatory No 2 as set forth below" and listing eleven (11) enumerated paragraphs. In this Supplemental Response, Irico repeats below each issue identified by the Special Master, corresponding to the enumerated paragraphs, and responds as follows:

**ISSUE NO. 1**

With respect to the communications or work product that Irico objected to identifying in its response to Interrogatory No 2, Irico is directed to identify the dates of any such communications or work product, the parties thereto, the subjects thereof and sufficient information to enable the PPs and the undersigned to determine whether a claim of privilege or protection is warranted.

**RESPONSE TO ISSUE NO. 1**

With respect to Irico's objection to discovery of any privileged communications or work product requested by Interrogatory No. 2, Irico responds that it is not objecting to or withholding any information on such a basis and therefore is not identifying any information in response to Issue No. 1.

**ISSUE NO. 2**

Identify by names and positions at Irico at all times from 2007 to the present the "key employees" referred to in Irico's response to Interrogatory No 2.

**RESPONSE TO ISSUE NO. 2**

Irico provides the following information about known "key employees" referenced in response to Interrogatory No. 2.

- Tao Kui
  - 05/2001 – 09/2013
    - Irico Group, Party Secretary and Deputy General Manager
  - 03/2013
    - Member of the Party Leading Group of China Electronics Information Industry Group Co., Ltd.
  - 05/2013 – approx. 2014
    - Irico Group, Party Secretary and Director (*retired*)

- Wang Ximin
  - 2007 – 09/2011
    - Irico Display, General Manager
  - 09/2011 – 09/2013
    - Irico Group, General Economist and General Manager of Shaanxi Branch (*retired*)

- Shen Xiaolin
  - 08/2004 – 11/2007
    - Irico Group, Sales Company, General Manager
  - 11/2007 – 01/2009
    - Irico Display, Assistant to General Manager and General Manager of Sales Department
  - 01/2009 – 09/2013
    - Irico Display, Deputy General Manager, and General Manager of Sales Department
  - 09/2013 – 10/2015
    - Zhuhai Caizhu Limited Company, Managing Director (*retired*)

- Liu Maihai
  - Title as of June 2008
    - Irico Group Electronics Co., Ltd., Sales Director
  - Irico has been unable to confirm employment information for Liu Maihai, other than his title in June 2008 when the 2008 Litigation Committee was formed (see Response to Issue No. 3). Irico believes that Liu Maihai left Irico within several years of the filing of the lawsuit.

- Liang Yuan
  - Title as of June 2008
    - Irico Group Electronics Co., Ltd., Head of Overseas Department and Assistant to the General Manager of the Marketing Department
  - Irico has been unable to confirm employment information for Liang Yuan, other than her title in June 2008 when the 2008 Litigation Committee was formed (see Response to Issue No. 3). Irico believes that Liang Yuan left Irico within several years of the filing of the lawsuit.

Irico has conducted a search for more detailed employment information for Liu Maihai and Liang Yuan, including a review of Irico's HR files, but has not been able to find information beyond that listed above. Likewise, Irico cannot confirm the exact date that Tao Kui retired from Irico but, based on the best recollection of its available employees, believes that it is around 2014.

As discussed below in Irico's Response to Issue No. 4, each of these employees also communicated with employees under their supervisions in an effort to identify and preserve documents related to potential Irico sales of CRTs to the United States, if any such records existed.

**ISSUE NO. 3**

State how Irico determined that the persons identified in Irico's response to No 2, above, were determined to be "key employees."

**RESPONSE TO ISSUE NO. 3**

The Irico employees identified in Irico's Response to Issue No. 2, above, were members of a group of Irico employees appointed to oversee Irico's response to the litigations in the above referenced action (the "2008 Litigation Committee") in June 2008. The other members of the committee were Gao Rongguo, Director, Corporate Management Department, Irico Group, and Yan Yunlong, Legal Affairs Manager, Corporate Management Department, Irico Group. The employees identified in Irico's Response to Issue No. 2 were those with managerial responsibility for the departments at Irico that Irico believed would have documents related to potential Irico sales of CRTs to the United States, if any such records existed. Each of these individuals then selected the employees under their supervision who might have information regarding Irico sales of CRTs to United States, if any.

**ISSUE NO. 4**

Explain how the 2008 "oral instruction" referred to in Irico's response to Interrogatory No 2 was conveyed; specifically, Irico is required to identify by name and position all persons who conveyed the "oral instruction," the dates each such person conveyed the "oral instruction," the persons by names and positions at the time to whom the "oral instruction" was conveyed, the offices, facilities or other locations at which the "oral instruction" was conveyed, the content of the "oral instruction" and all reasons upon which Irico contends the "oral instruction" was effective if Irico so contends.

**RESPONSE TO ISSUE NO. 4**

The 2008 Litigation Committee held a meeting in August 2008 at Irico Group's headquarters building in Xianyang City during which the instructions to preserve documents were discussed. The instructions were conveyed to the employees identified in Irico's Response to Interrogatory No. 2 at this and subsequent meetings. At that time Irico understood that, given the instant litigation arose under the antitrust laws of the United States, the focus of the litigation was

on sales of CRTs to the United States. The individuals identified in the Response to Issue No. 2 were tasked to search for documents and to identify other employees under their supervision and instruct them to search for documents that might relate to the Irico sales in the United States and to preserve such documents, if any existed. Irico believes that these efforts to search for and preserve documents would have occurred immediately after the above-referenced meetings of the 2008 Litigation Committee in August or September 2008.

Irico has conducted a thorough search for additional information requested by the Court in Issue No. 4 but has been unable to find additional information. Specifically, it cannot find documents detailing the specific information and its answers are based on the recollections of Yan Yunlong, the only remaining Irico employee with knowledge of the dissemination of the oral instruction in 2008. All of the members of the 2008 Litigation Committee other than Yan Yunlong have retired or otherwise departed the company.

Yan Yunlong recalls that the employees identified in the Response to Issue No. 2 contacted relevant employees and searched for documents, but that no documents relevant to the sales of CRTs by Irico to the United States were identified at that time. Despite best efforts, Irico has been unable to identify the specific individuals contacted by the employees identified in Response to Issue No. 2.

Irico believes that the oral instructions provided at the time were sufficient to preserve documents related to potential sales by Irico to the United States. Irico acknowledges that at the time it misunderstood the scope of document preservation in connection with the litigation in the United States and cannot be certain that all documents related to Irico's global sales of CRTs were preserved.

**ISSUE NO. 5**

Identify the information that confirms, or the basis to believe, that the "oral instruction" referred to in Irico's response to Interrogatory No 2 was adequate to prevent the destruction of evidence that otherwise would have been preserved in compliance with an otherwise adequate litigation hold.

**RESPONSE TO ISSUE NO. 5**

Irico does not contend that the oral instruction in 2008 was effective in preserving all documents related to its global sales of CRTs, however, because Irico did not sell CRTs to the United States, Irico's search at the time did not identify any documents concerning Irico's sales of CRTs to the United States and thus no documents on this topic were lost or destroyed.

**ISSUE NO. 6**

If the summer 2008 "oral instruction" referred to in Irico's response to Interrogatory No 2 had not been limited to "sales of CRT to the United States," but rather to sales of CRT without regard to location, identify all documents and information that otherwise would been preserved.

**RESPONSE TO ISSUE NO. 6**

Irico has made best efforts to identify specific documents and information that might have been preserved if the "oral instruction" in 2008 had not been limited to the United States. Nearly all of the employees knowledgeable about what types of documents related to Irico's sales of CRTs were created and/or maintained during the relevant time period are no longer employed by, and are not available to, Irico. Identifying such specific documents that existed in 2008 is nearly impossible given the time that has elapsed and the lack of employees with knowledge of these issues. As discussed, Irico regularly preserved documents and information in its archives pursuant to Chinese law and its internal practices so extensive information regarding Irico's global sales of CRTs was preserved regardless of the oral instruction provided in 2008. These categories of preserved documents are detailed in Irico's Response to Issue Nos. 7 and 11 and include several categories of documents related to sales of CRTs, including but not limited to accounting records, invoices, planning documents, some production and sales reports, and travel and entertainment reimbursements. In terms of documents that would not have been preserved in the archives, Irico identifies the following types of documents regarding Irico's global sales of CRTs that are more likely to have existed in the summer of 2008:

- Sales reports containing general CRT market information;
- CRT sales contracts with customers;
- Recent correspondence with customers regarding CRT sales; and,

- Handwritten working notes regarding recent internal and customer meetings attended by members of Irico's sales team.

Irico has not been able to verify that specific documents in these categories existed in summer of 2008. As noted above, there may have been other categories of documents that existed at the time of the oral litigation hold in 2008, but Irico cannot identify those documents at this time.

**ISSUE NO. 7**

Identify by type all documents and information related to sales of CRT without regard to location during the period 1997 to 2007 that were required to be preserved in accordance with applicable Chinese law.

**RESPONSE TO ISSUE NO. 7**

During the period 1997 to 2007 Chinese law required companies such as Irico to retain hard-copy documents that contained financial information derived from Irico's sales of CRTs such as accounting books, general ledgers, and financial accounting reports, however, the only documents directly related to sales of CRTs that were required to be maintained under Chinese law were original invoices for sales of CRTs.

**ISSUE NO. 8**

Identify by type all documents related to sales of CRT without regard to location during the period 1997 to 2007 that Irico generated, but was not required by Chinese authorities to preserve, and describe the information that such documents contained.

**RESPONSE TO ISSUE NO. 8**

Irico has attempted to locate information regarding the types of documents related to the sales of CRTs that Irico would have generated during the period 1997 to 2007 that were not required to be preserved by Chinese authorities. As discussed above, nearly all of the employees knowledgeable about what types of documents related to Irico's sales of CRTs were created and/or maintained during the period 1997 to 2007 are no longer employed by, and are not available to, Irico. Consistent with its retention practices, Irico believes that most of those documents would not have been retained in the ordinary course of business and were unlikely to

have existed at the end of 2007. Identifying such specific documents, let alone their contents, is nearly impossible given the time that has elapsed and the lack of employees with knowledge of these issues. The information found by Irico regarding regularly prepared materials is detailed below. Irico believes that it is likely that other categories of documents were generated but not retained due to changes in Irico's business over the course of the relevant time period. For example, Irico exited CDT production around 2002, and believes that it may not have retained materials related to the sales of CDTs through 2007. Additionally, Irico stopped production of various types of CPTs during the relevant time period, and re-deployed that space for other uses. Finally, there may have been periodic or "one off" materials prepared during this time period, but Irico is not aware of such materials today.

Sales reports containing general CRT market information

The sales department prepared weekly- and monthly-summaries of information collected by its employees. Irico has been unable to determine whether such reports were created during the period 1997 to 2004. The reports focused on Irico's customers, who were primarily Chinese television manufacturers. Both the weekly- and monthly-reports generally included information regarding customers, competitors and general market information. It is not clear how long those materials were kept after their creation, and Irico is unable to determine whether such materials would have existed at the time of the instruction to preserve.

CRT sales contracts with customers

Irico entered into sales contracts with some customers regarding its sales of CRTs. Some contracts pertained to general terms for sales to that customer, including post-sale issues such as shipping terms and procedures. Others pertained to specific transactions and included information such as product description, product quantity, unit price, and invoice total. Irico believes that it is unlikely that many of these documents existed at the end of 2007 because Irico exited CDT production around 2002, and stopped production of various types of CPTs during the relevant time period.

///

///

Correspondence with customers regarding CRT sales

Although Irico primarily communicated with customers face-to-face or over the phone, it believes that some communications with customers would have taken place via facsimile. The contents of these facsimiles varied but generally contained information related to a customer's purchase of CRTs that would be captured in the original sales invoice such as type, quantity, and price. Facsimiles were not required to be maintained under Chinese law and were routinely discarded in the ordinary course of Irico's business. Irico believes that it is unlikely that many of these documents existed at the end of 2007 because Irico exited CDT production around 2002 and stopped production of various types of CPTs during the relevant time period.

Handwritten working notes

Irico understands that individual employees may have taken handwritten notes while performing their job functions. Irico believes that these were regularly discarded by the employees during the course of their employment. For example, Wang Zhaojie and Wang Ximin regularly discarded such notes during the course of their employment but cannot recall any specifics regarding those instances. The notes most likely covered the employees' regular activities as members of Irico's sales department including notes of internal meetings, customer contacts, and customer meetings. Wang Zhaojie also recalls taking notes related to individual sales transactions (such as customer, quantity, and price) but discarded those notes shortly after the sales documents were prepared. Irico believes that it is unlikely that many of these notes existed at the end of 2007 because Irico exited CDT production around 2002, and stopped production of various types of CPTs during the relevant time period. Additionally, by 2008 many employees connected to Irico's sales were no longer employed by Irico, some of whom left much earlier in the relevant time period.

Emails

Although Irico did not begin to use email until toward the end of the relevant time period, many employees did not have their own email account at any time during the relevant time period, and the company did not rely on email as a primary form of communication during any point in the relevant time period. Irico is aware of emails sent or received on the following topics:

- Notices from Irico regarding corporate policies.

- Notices from the Chinese Communist Party.

- CRT manufacturing—Irico understands that its manufacturing plants sent periodic emails related to the production of CRTs that may have discussed the quantity of CRTs produced for a given time period, quality issues, and problems or incidents that affected the production output. Irico understands that these were not sent on a routine basis (i.e., daily, weekly, or monthly), but rather more sporadically because as an organization Irico made no effort to routinize its use of email in the regular course of business.

- Planning for Meetings of the China CPT Industry Association—Irico understands that emails were exchanged between Irico and other Chinese CRT manufacturers regarding the scheduling and planning of meetings of the China CPT Industry Association, a trade organization for manufacturers of CPTs.

As noted in its prior discovery responses, Irico's email storage capacity was very limited during the relevant time period, and each individual account had limited capacity as well. This meant that the users of the accounts had to constantly delete emails in order to continue receiving new emails. In addition to the account-level limitations, Irico's central email server likewise had limited email storage and Irico was forced to routinely delete emails from the server in order to create sufficient storage capacity for the company to continue to receive emails. During regular working periods emails were deleted from the server three to five days after they were sent or received on average, depending on the volume of email traffic. During periods of lower email activity, such as during Chinese holidays, emails would be deleted less frequently and it is possible that email for up to a fourteen day period would be retained on the company's return from the holiday before Irico needed to resume a more regular schedule as business activities returned to normal. For these reasons, and Irico's exit from many segments of the CRT market prior to 2008, Irico is not able to determine whether email created during the relevant time period existed at the end of 2007, or the volume or type of such email.

///

Sales Data

Irico did not utilize electronic databases to store information related to sales of CRTs in a systematic or routine manner, but between 1999 and 2002 Irico Group's finance department sporadically entered information utilizing a database software called Newgrand. Specifically, during those years Irico entered partial revenue information from its sales of CRTs. During the period April 2006 through end of the 2007, Irico Display's finance department utilized a database program called Kingdee to track revenue and other accounting data related to sales of CRTs. All of these Newgrand and Kingdee data were produced to Plaintiffs during FSIA discovery. Irico does not believe that either database was, or is, a complete dataset for the period of time that those data were entered, as electronic databases are not among the categories of information required to be maintained under Chinese accounting laws and therefore were not considered important sources of information to Irico. But Irico is not aware of any Newgrand or Kingdee data that existed from the time period 1997 to 2007 but has not been provided to Plaintiffs.

Corporate Archives

As described previously and in the below Response to Issue No. 11, Irico also preserved various documents in its archives pursuant to its internal practices, some of which also related to sales of CRTs, including but not limited to planning documents, financial reports and some production and sales reports, which have not been detailed here.

**ISSUE NO. 9**

With respect to the 2017 "oral instruction" referred to in Irico's response to Interrogatory No 2, Irico is required to identify by name and position all persons who conveyed the "oral instruction," the dates each such person conveyed the "oral instruction," the persons by names and positions at the time to whom the "oral instruction" was conveyed, the offices, facilities or other locations at which the "oral instruction" was conveyed, the content of the "oral instruction" and all reasons upon which Irico contends the "oral instruction" was effective if Irico so contends.

**RESPONSE TO ISSUE NO. 9**

The 2017 oral instruction was conveyed by Zhang Wenkai, Deputy Director, Legal Affairs Department for Irico Group. The oral instruction asked the employees to preserve all existing and

identified information related to Irico's CRTs from 1995 to 2007 (without a geographic limitation, i.e., not solely related to sales of CRTs to the United States), and to preserve any newly found materials. The instruction was conveyed in meetings or discussions that occurred in September and October 2017; Irico has reviewed its available files but has been unable to determine the exact dates of the meetings. Mr. Zhang separately communicated the oral instruction to the following employees:

- Zhong Yuming: Business Manager, Human Resources Department, Irico Group.
    - Mr. Zhang met with Mr. Zhong in person in the offices of the Human Resources Department located at Irico Group's headquarters, 1 Caihong Road, Qindu District, Xianyang City, Shaanxi Province, People's Republic of China.

- Yang Hua: Director, Finance Department, Irico Group.
    - Mr. Zhang met with Ms. Yang in person in the offices of the Finance Department located at Irico Group's headquarters, 1 Caihong Road, Qindu District, Xianyang City, Shaanxi Province, People's Republic of China.

- Wang Zhaojie: General Manager, Irico Group New Energy Co., Ltd. Formerly Mr. Wang was Director of Sales, Irico Sales Company and Irico Sales Department.
    - Mr. Zhang called Mr. Wang, who was not in his office at the time of the call. Mr. Zhang believes that Mr. Wang was traveling in Hefei, Anhui Province, People's Republic of China.

- Su Xiaohua: Vice General Manager of Xianyang Irico Photovoltaic Technology Company; Vice General Manager of Irico Photoelectric Materials Company. Formerly Mr. Su was the Vice General Manager, Planning, Irico Sales Company and Irico Sales Department.
    - Mr. Zhang and Mr. Su both recall that the instruction occurred during a phone call, but neither can recall where Mr. Su was at the time of the call. Mr. Su recalls that he was away from his office because his office was in Irico Group's headquarters building, as was Mr. Zhang's, and he would

have met directly with Mr. Zhang if he had been in the office.

- Li Mei: Head of Archives, Irico Group.
  - Mr. Zhang met with Ms. Li in person in the offices of the Archives Department, located in the Information Center building on Irico Group's main campus, 1 Caihong Road, Qindu District, Xianyang City, Shaanxi Province, People's Republic of China.
- Gao Xiangfeng: Director, Information Center, Irico Group.
  - Mr. Zhang met with Mr. Gao in person in the offices of the Information Center, located in the Information Center building on Irico Group's main campus, 1 Caihong Road, Qindu District, Xianyang City, Shaanxi Province, People's Republic of China.

The 2017 oral instruction was effective because the employees identified above were the remaining employees that Irico determined were likely to have access to, or were designated representatives of departments that maintained, documents from 1995 to 2007 that existed at the time that the instruction was communicated in September or October 2017. Furthermore, Irico is not aware of any potentially responsive documents from the time period 1995 to 2007 that were lost or destroyed after September 2017.

**ISSUE NO. 10**

Inasmuch as Irico's response to Interrogatory No 2 states that Irico is not aware of the destruction of "original invoices for sales, accounting books, general ledgers, financial accounting reports, and bank statements" from 1995 to 2007, Irico shall state whether it is prepared to produce all such materials to the PPs? If not, why not?

**RESPONSE TO ISSUE NO. 10**

By agreement between the parties, Irico has produced the identified, responsive materials from accounting books, general ledgers, financial reports, and bank statements, and will be producing Excel files summarizing the information contained in original invoices for sales pursuant to a forthcoming stipulation between the parties.

As Irico has previously explained to the Court and to Plaintiffs, Irico's accounting

archives as described in its Response to Interrogatory No. 2 are voluminous and contain significant amounts of information unrelated to its production or sales of CRTs, including information related to the public functions entrusted to Irico by the Chinese government, including the provision of primary and secondary public schools, the local police department, a hospital, public transportation, and public recreational facilities (*see* Irico Group Corp.'s Mot. to Dismiss for Lack of Subject Matter Jur. at 5, ECF No. 5312), and other non-CRT business interests. Irico and Plaintiffs have been meeting and conferring throughout the discovery period regarding these documents regarding the burden of production outweighing the benefits of producing all of these materials, including for Plaintiffs as said production would require Plaintiffs to review and analyze a large volume of non-responsive information. As discussed above, the Parties have agreed on the scope of production of these materials.

**ISSUE NO. 11**

Irico is directed to describe its "internal practices" for the maintenance of "material related to operational documents, administrative documents, technical records and communications with agencies of the PRC government and Chinese Communist Party."

**RESPONSE TO ISSUE NO. 11**

As discussed in more detail below and previously described in its initial response to Interrogatory No. 2, Irico preserves documents within its corporate archives related to four main categories: operational documents, administrative documents, technical records and communications with agencies of the PRC government and Chinese Communist Party. Documents preserved in these categories apply not only to the portion of Irico's business concerning production and sales of CRTs, but also those related to the public functions entrusted to Irico by the Chinese government, including the provision of primary and secondary public schools, the local police department, a hospital, public transportation, and public recreational facilities (*see* Irico Group Corp.'s Mot. to Dismiss for Lack of Subject Matter Jur. at 5, ECF No. 5312), and also other non-CRT business interests. Once a document is passed to the archives department of Irico, a member of the archives team enters the document into the archives. The documents are physically placed into bound-books, or into folders within bound books, and the

books are stored in the archives department at Irico's headquarters. Once placed in the archives, the documents may not be damaged or destroyed without specific authorization.

Within each of the four categories described above, Irico maintains the following types of documents in its corporate archives:

- Operational documents:
    - Documents related to business decisions, including:
        - Strategic planning and long-term forecasting.
        - Development plans.
        - Work plans.
        - Changes in management.
        - Communications to or from government agencies regarding the above topics.
    - Documents related to accounting and finance, including:
        - Financial reports.
        - Financial planning.
        - Audited financial statements.
        - Loan applications.
        - Accounting policies.
        - Transfers of financial interests in other companies.
        - Communications to or from government agencies regarding any of the above topics.
    - Annual production and sales reports from 1995 to 2004.
    - Status reports for procurement of raw materials.
    - Communications to or from governmental entities regarding enterprise decisions.
    - Adjustments to corporate form, including subsidiaries.
- Administrative documents:
    - Documents related to administrative matters, including:

IRICO'S 3rd SUPP. OBJS. AND RESPS. TO IPP'S THIRD SET INTERROGATORIES 21 Master File No. 4:07-cv-05944-JST MDL No. 1917

- Year-end summaries of work completed in the prior year.
        - Work plans for the coming year.
        - Award notices.
        - The minutes of annual administrative meetings and board of directors' meetings.
        - Requests for approval of corporate development initiatives, changes to corporate form, and capital expenditures.
        - Decisions on requests for approval of corporate development initiatives, changes to corporate form, and capital expenditures by governmental entities, including the State-owned Assets Supervision and Administrative Commission of the State Council (SASAC), and the Shaanxi provincial government.
    - Documents related to HR matters, including:
        - Notices of the appointment to, or removal from, positions issued by various departments within the Chinese government including the Department of Personnel and Education, the Ministry of Information and Industry, the Economy and Trade Commission.
        - Notices of the appointment to, or removal from, positions issued by Shaanxi provincial authorities.
        - Notices of the appointment to, or removal from, positions issued by the government of the city of Xianyang.
        - Notices of the appointment to, or removal from, positions issued by Irico.
        - Policies issued by Irico and its subdivisions regarding HR matters.
    - Documents related to Irico's provision of educational facilities.
    - Documents related to environmental issues.
- Technical records:
    - Quality management.

- Labor-related matters.
- Energy-related matters.
- Production security.
- Technology.
- Environmental protection.
- Metering work.
- Standardization.
- File information.

- Chinese Communist Party-related matters:
  - Meeting minutes and plans of the Party.
  - Administrative matters.
  - Public relations matters.
  - Discipline and inspection matters.
  - Labor union matters.
  - Communist Youth League matters.
  - Association matters.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2**

Pursuant to the meet and confers with Plaintiffs regarding its Supplemental Response to Interrogatory No. 2, Irico provides the following further supplemental response to Interrogatory No. 2. Irico has agreed to provide such further responses to clarify the record, even though it believes that its Supplemental Response properly addressed the Issues identified in the Special Master's December 22, 2021 Order.

**SUPPLEMENTAL RESPONSE TO ISSUE NO. 2**

- Liang Yuan
  - Title as of June 2008
    - Irico Group Electronics Co., Ltd., Head of Overseas Department and Assistant to the General Manager of the Marketing Department
  - March 2014
    - Left Irico.
  - Irico has been unable to confirm employment information for Liang Yuan, other than her title in June 2008 when the 2008 Litigation Committee was formed (see

Response to Issue No. 3). Irico has likewise not been able to confirm Liang Yuan's titles or positions between June 2008 and March 2014.

**SUPPLEMENTAL RESPONSE TO ISSUE NO. 8**

Sales reports containing general CRT market information

Irico clarifies that the "[t]he . . . weekly- and monthly-summaries of information collected by its employees" described in its Response to Issue No. 8 were created during the period 2005 to 2007.

Emails

Irico clarifies that its corporate email system described in its Repose to Issue No. 8 came online around 2004 or 2005. As stated in prior discovery responses, Irico has been unable to determine the exact date that it began using a corporate email system.

In addition, Irico has recently discovered that the company conducted a limited pilot email test utilizing a Microsoft Exchange server in the early-2000s. As with its corporate email system described above, this test utilized the domain @ch.com.cn. Irico has been unable to determine the exact timeline of the test or the number or identity of users who participated in the test. Irico understands that the test ended prior to Irico's launch of corporate email in the 2004/2005 time period. Irico also understands that no data was retained or transferred when the pilot email test ended.

**THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2**

Irico provides the following supplemental information to amend its response to this Interrogatory served on August 13, 2021, followed by supplemental responses to certain of the eleven (11) enumerated issues included in the Special Master's Order Re DPPs' Motion to Compel Interrogatory Further Answers, ECF No. 5978.

In August 2008, Irico undertook efforts to preserve potentially discoverable evidence relating to Plaintiffs' allegations.  Irico's 2008 Litigation Committee met in August 2008 to review and discuss, among other topics, privileged legal advice received from its former counsel, Pillsbury Winthrop Shaw & Pittman, LLP ("Pillsbury") on August 18, 2008 regarding document preservation.  At this August 2008 meeting, the 2008 Litigation Committee was provided with a copy of the Pillsbury legal advice and was orally instructed to identify and preserve documents

relevant to the litigation, and to instruct their subordinates who may have possessed documents relevant to the litigation to identify and preserve such documents. The list of members of the 2008 Litigation Committee who received this instruction, including all known information regarding their work history from 2007 to present, has been provided in Irico's prior responses to Issue Nos. 2 and 3 on January 21 and March 18, 2022. Each Litigation Committee member determined independently which subordinates should be contacted regarding preservation efforts and what information regarding preservation efforts should be relayed to each employee. Irico has conducted a thorough search for additional information regarding the scope of these oral instructions, including the specific subordinates contacted by the 2008 Litigation Committee Members and the specific scope of the instructions conveyed to any such subordinates, but has not been able to find information beyond that listed above.

**SUPPLEMENTAL RESPONSE TO ISSUE NO. 1**

Irico directs Plaintiff to Irico Defendants' Log of Privileged Documents served on February 23, 2022, Identifier Nos. P-00000007 and P-00000008, for the requested details surrounding privileged information responsive to Issue No. 1. Copies of the privileged document identified as P-00000008 were provided to each member of the 2008 Litigation Committee and discussed at the 2008 Litigation Committee's August 2008 meeting, as described above.

**SUPPLEMENTAL RESPONSE TO ISSUE NO. 2**

The key employees that received instructions in August 2008 to preserve documents relevant to the litigation, and to instruct any subordinates who may have relevant documents to preserve those documents, were comprised of all members of the 2008 Litigation Committee. In addition to the employees identified in Irico's prior responses to Issue No. 2, this included Gao Rongguo, Director, Corporate Management Department, Irico Group, and Yan Yunlong, Legal Affairs Manager, Corporate Management Department, Irico Group.

**SUPPLEMENTAL RESPONSE TO ISSUE NO. 3**

As described in Irico's supplemental response to Issue No. 2 above, instructions to preserve documents relevant to the litigation, and to convey such instructions to subordinates, were given to all members of the 2008 Litigation Committee. These members were determined to

be "key employees" for purposes of document preservation due to their membership on the 2008 Litigation Committee and because they included individuals with managerial responsibility for the departments at Irico that Irico believed may have had documents relevant to the litigation, if any such documents existed.

**SUPPLEMENTAL RESPONSE TO ISSUE NO. 4**

The 2008 Litigation Committee held a meeting in August 2008 at Irico Group's headquarters building in Xianyang City during which the instructions to preserve documents were discussed. The 2008 Litigation Committee gave oral instructions to its members, identified by name and position in Irico's prior responses to Issue Nos. 2 and 3, to preserve documents relevant to the litigation at this meeting. The 2008 Litigation Committee members were also tasked with identifying other employees under their supervision who might have documents relevant to the litigation, and instructing them to preserve any such documents, if any existed. Irico believes that any such instructions from members of the 2008 Litigation Committee to their subordinates would have occurred shortly after the above-referenced meeting of the 2008 Litigation Committee in August or September 2008.

Irico has conducted a thorough search for additional information requested by the Court in Issue No. 4, including the specific individuals contacted by the 2008 Litigation Committee members with instructions to preserve documents, and information regarding the effectiveness of these instructions to preserve documents, but has been unable to find additional information. Specifically, it has been unable to locate any documents reflecting the employees who received further instruction. Irico's answers are based on the recollections of Yan Yunlong, the only remaining Irico employee with knowledge of Irico's document preservation efforts in 2008. All of the members of the 2008 Litigation Committee other than Yan Yunlong have retired or otherwise departed the company.

**SUPPLEMENTAL RESPONSE TO ISSUE NO. 5**

Irico no longer contends that its initial efforts to preserve documents in August 2008 were limited solely to documents regarding sales of CRTs to the United States, but Irico reiterates its initial Response in all other respects.

**SUPPLEMENTAL RESPONSE TO ISSUE NO. 6**

Irico no longer contends that its initial efforts to preserve documents in August 2008 were limited solely to documents regarding sales of CRTs to the United States. Irico otherwise reiterates its initial Response regarding the categories of additional documents that might possibly have existed in the summer of 2008 but for which Irico has not been able to confirm.

Dated: November 23, 2022

BAKER BOTTS L.L.P.

*/s/ John M. Taladay*

John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
tom.carter@bakerbotts.com
drew.lucarelli@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

IRICO'S 3rd SUPP. OBJS. AND RESPS. TO IPP'S THIRD SET INTERROGATORIES 27 Master File No. 4:07-cv-05944-JST MDL No. 1917

# EXHIBIT T

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
evan.werbel@bakerbotts.com
tom.carter@bakerbotts.com
drew.lucarelli@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION

This Document Relates to:

*ALL INDIRECT PURCHASER ACTIONS*

Master File No. 07-cv-05944-JST (N.D. Cal.)

MDL No. 1917

**IRICO DEFENDANTS' SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO INDIRECT PURCHASER PLAINTIFFS' FOURTH SET OF INTERROGATORIES TO IRICO GROUP CORPORATION AND IRICO DISPLAY DEVICES CO., LTD.**

PROPOUNDING PARTY: Indirect Purchaser Plaintiffs

RESPONDING PARTIES: Irico Group Corporation
Irico Display Devices Co., Ltd.

SET NUMBER: Four

IRICO'S 2nd SUPP. OBJS. AND RESPONSES TO IPP'S FOURTH SET INTERROGATORIES — Master File No. 07-cv-05944-JST MDL No. 1917

Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby provides its second supplemental responses to the Indirect Purchaser Plaintiffs' ("Plaintiffs") Fourth Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., dated December 14, 2021 ("Interrogatories"). Irico is supplementing these responses pursuant to its obligations under Rule 26(e) of the Federal Rules of Civil Procedure and based upon newly discovered facts. Irico reserves the right to amend or supplement these Objections and Responses (the "Responses") to the extent allowed by the Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California ("Local Rules"). Subject to and without waiving any of Irico's General and Specific Objections as set forth below, Irico is willing to meet and confer with Plaintiffs regarding such General and Specific Objections.

The following Responses are made only for purposes of this case. The Responses are subject to all objections as to relevance, materiality and admissibility, and to any and all objections on any ground that would require exclusion of any response if it were introduced in court. All evidentiary objections and grounds are expressly reserved.

These Responses are subject to the provisions of the Stipulated Protective Order issued by the Court on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated "Confidential" in accordance with the provisions of the Protective Order.

## GENERAL OBJECTIONS

Irico makes the following General Objections to Plaintiffs' Interrogatories:

1. Irico's Responses are based upon information available to and located by Irico as of the date of service of these Responses. In responding to Plaintiffs' Interrogatories, Irico states that it has conducted a diligent search, reasonable in scope, of those files and records in its possession, custody, or control believed to likely contain information responsive to Plaintiffs' Interrogatories.

2. No express, incidental, or implied admissions are intended by these Responses and should not be read or construed as such.

3.     Irico does not intend, and its Responses should not be construed as, an agreement or acquiescence with any characterization of fact, assumption, or conclusion of law contained in or implied by the Requests.

4.     Irico has made a good faith and reasonable attempt to ascertain whether information responsive to Plaintiffs' Interrogatories exists and is properly producible, and has produced or made available for examination non-privileged responsive materials located during the course of that reasonable search.

5.     To the extent that Irico refers to any pleading, expert report, or other filing in its Specific Responses, Irico incorporates by reference all exhibits and/or evidence cited therein.

6.     Irico objects to Plaintiffs' Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiffs.

7.     Irico objects to Plaintiffs' Interrogatories to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

8.     Irico objects to Plaintiffs' Interrogatories to the extent that they request duplicative discovery in violation of the Order Re Discovery And Case Management Protocol, ECF No. 1128. *See* Order Re Plaintiffs' Motions To Compel Supplemental Discovery From Toshiba And Panasonic, ECF No. 4128, at 4 ("The Discovery Protocol (ECF No 1128), requires parties to coordinate discovery and not file duplicative discovery. . . . The benefit redounds to all parties on both sides of the litigation, by conserving the efforts required by Plaintiffs and protecting defendants against unnecessary duplication of effort.") (Report and Recommendation adopted in full at ECF No. 4256).

9.     Irico objects to Plaintiffs' Interrogatories to the extent they seek information that is not relevant or disproportionate to the needs of the case.

10.     Irico objects to Plaintiffs' Interrogatories to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico has attempted to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information

that is proportionate to the needs of the case. If Plaintiffs subsequently asserts an interpretation of any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or amend its Responses.

11. Irico objects to Plaintiffs' Interrogatories to the extent that they contain terms that are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case.

12. Irico objects to Plaintiffs' Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico provides only information that it believes to be non-privileged and otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any information or responsive documents subject to any such doctrine, privilege, protection or immunity from production shall not constitute a general, inadvertent, implicit, subject-matter, separate, independent or other waiver of such doctrine, privilege, protection or immunity from production.

13. Irico objects to Plaintiffs' Interrogatories to the extent that they call for information that is not in the possession, custody, or control of Irico. Irico also objects to the extent that any of Plaintiffs' Interrogatories seek information from non-parties or third parties, including but not limited to any of Irico's subsidiary or affiliated companies.

14. Irico objects to Plaintiffs' Interrogatories to the extent that responding would require Irico to violate the privacy and/or confidentiality of a third party or confidentiality agreement with a third party.

15. Irico objects to Plaintiffs' Interrogatories to the extent that they seek information that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily available from other sources.

16. Irico objects to Plaintiffs' Interrogatories to the extent that they seek information

or documents concerning transactions outside the United States. Such Requests are unduly burdensome and disproportionate to the needs of the case as Plaintiffs' class definition is confined to "individuals and entities that indirectly purchased Cathode Ray Tube Products . . . in the United States" (see Indirect Purchaser Plaintiffs' Fifth Consolidated Amended Complaint ("Complaint") dated September 19, 2019).

17. Irico objects to Plaintiffs' Interrogatories to the extent that compliance would require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body of foreign jurisdictions.

18. Irico's responses pursuant to Plaintiffs' Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

19. Irico objects to Plaintiffs' Interrogatories to the extent that they are compound and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

20. Irico objects to Plaintiffs' Interrogatories to the extent that they state and/or call for legal conclusions.

21. Irico objects to the Interrogatories to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

22. Irico objects to the Interrogatories to the extent they seek information or documents that cannot be removed or transmitted outside China without violating the laws and regulations of that country, including but not limited to restrictions on the transmission of state secrets or trade secrets as those terms are defined under Chinese law.

23. Irico objects to the Interrogatories to the extent that they are premature and/or implicate expert analysis and disclosures. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 Wl 9558055 (N.D. Cal. May 19, 2011). Irico further objects to each Interrogatory to the extent that it: (a) conflicts with obligations that are imposed by the Federal Rules of Civil Procedure, the Civil Local Rules of this Court, and/or any other applicable rule; (b) seeks information that is the subject of expert testimony; and/or (c) seeks information that is dependent on depositions and documents of third-parties that have not been discovered.

24. Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

**GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1. Irico objects to the definitions of "Including" and "Relating" (Definition No. 1) on the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to the extent that it seeks information protected by the attorney client or other applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or foreign law.

2. Irico objects to the definitions of "You," "Your," and "Irico" (Definition No. 2) to the extent that Plaintiffs defines those terms to include the Irico's "present and former members, officers, agents, employees, and all other persons acting or purporting to act on their behalf, including all present and former members, officers, agents, employees, and all other persons exercising or purporting to exercise discretion, making policy, and make decisions." This definition is overbroad, unduly burdensome, vague, and ambiguous. In particular, Irico objects to this definition to the extent it purports to request information beyond the possession, custody, or control of Irico Group or Irico Display, including but not limited to information in the possession of non-parties and third parties where Irico lacks any duty to obtain or otherwise search for the information and for whom the Court lacks personal jurisdiction. Irico also objects to the inclusion of all "present or former employees, officers, directors, agents . . . or any other person acting on [the] behalf [of]" Irico within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

3. Irico objects to the definition of "Identify" (Definition No. 3) on the grounds that

the definition is overly broad, unduly burdensome, and seeks information that is neither relevant nor proportionate to the needs of the case.

4.      Irico objects to the definition of "Document" (Definition No. 5) to the extent it seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, any Order of this Court, or any other applicable laws.

5.      Irico objects to the definition of "CRT" (Definition No. 6) on the grounds that it is vague, ambiguous and overly broad.

6.      Irico objects to Instruction No. 1 (related to disclosure of additional information) to the extent it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 26(e).

7.      Irico objects to Instruction No. 2 (related to production of business records) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 33(d), Rule 26(b). Irico further objects to this Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any Orders of the Court.

8.      Irico objects to Instruction No. 3 (related to privileged information) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 33(d), Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any Orders of the Court, and on the grounds that it is vague, ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the extent it seeks information that would disclose personal confidential information and/or violate any and all rights of privacy under the United States Constitution or Article I of the Constitution of the State of California, or any other applicable law or state constitution, or that is otherwise prohibited from disclosure because to do so would cause Irico to violate legal and/or

contractual obligations to any other persons or entities.

**SPECIFIC RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 6**

State whether You consulted with Your former counsel, Pillsbury Withrop Shaw & Pittman, LLP ("Pillsbury"), in determining to preserve only "documents related to sales of CRTs to the United States" in mid-2008?

**RESPONSE TO INTERROGATORY NO. 6**

Irico incorporates its General Objections as set forth above. Irico further objects to the Interrogatory to the extent that it purports to seek information protected under the attorney-client privilege or the attorney work product doctrine.

Subject to and without waiving the foregoing objections, Irico responds that it consulted with its former counsel, Pillsbury Winthrop Shaw & Pittman, LLP, regarding document preservation, but not on the specific decision in determining to preserve only documents related to sales of CRTs to the United States in mid-2008.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6**

Subject to and without waiving the foregoing objections, Irico responds that it no longer contends that its initial efforts to preserve documents in August 2008 were limited solely to documents regarding sales of CRTs to the United States.

Dated: November 23, 2022

BAKER BOTTS L.L.P.

*/s/ John M. Taladay*

John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
evan.werbel@bakerbotts.com
tom.carter@bakerbotts.com
drew.lucarelli@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# EXHIBIT U

# Exhibit

# Contents

IRICO GROUP ELECTRONICS COMPANY LIMITED

IRICO



Corporate Profile 2
Financial Highlights 5
Chairman's Statement 7
Management Discussion and Analysis 10
Profiles of Directors, Supervisors and Senior Management 21
Report of the Directors 27
Report of the Supervisory Committee 36
Report of Corporate Governance 37
Report of the Auditors 39
Consolidated Profit and Loss Account 40
Consolidated Balance Sheet 41
Balance Sheet 42
Consolidated Cash Flow Statement 43
Consolidated Statement of Changes in Equity 44
Notes to the Accounts 45

# Corporate Profile

## I. Introduction

IRICO Group Electronics Company Limited (the "Company") was incorporated in Xianyang, Shaanxi Province, the People's Republic of China (the "PRC" or "China") on 10 September 2004. It was established with the contribution made by IRICO Group Corporation, the controlling shareholder and sole promoter of the Company, in respect of its assets of production and sales of color picture tubes ("CPTs") in its related core businesses and, the equity interests in its eight subsidiaries engaged in related operations. The Company's H Shares were successfully listed on the main board of The Stock Exchange of Hong Kong Limited (the "Stock Exchange") on 20 December 2004.

The Company and its subsidiaries (the "Group") are the largest CPTs manufacturer in China and one of the world's major CPTs and CPT components manufacturers. We also have the longest operating history amongst all CPTs manufacturers in China, with over 20 years of experience in CPTs production.

CPT is the core component of a cathode ray tube ("CRT") television set, accounting for about 50% of the aggregate cost of all of the components of a CRT television set. The Group manufactures CPTs with various sizes ranging from 14" to 29" and a majority of CPT components, including glass bulbs, electron guns, deflection yokes, shadow masks and their frames as well as phosphor and frit.

Major customers of the Group include TCL, Skyworth, Konka, Changhong and Hisense, which are major television producers in China.



Case 3:07-cv-05944-JST Document 5440-2 Filed 04/12/19 Page 5 of 84

## 2. Corporate information

### Executive Directors

| | |
|---|---|
| Ma Jinquan | Chairman |
| Tao Kui | Vice-chairman |
| Xing Daoqin | President |
| Guo Mengquan | Executive Director |
| Zhang Shaowen | Executive Director |
| Yun Dajun | Vice president and chief financial controller |

### Non-executive Director

| | |
|---|---|
| Zhang Xingxi | Non-executive Director |

### Independent non-executive Directors

| | |
|---|---|
| Feng Fei | Independent non-executive Director |
| Xu Xinzhong | Independent non-executive Director |
| Feng Bing | Independent non-executive Director |
| Wang Jialu | Independent non-executive Director |
| Zha Jianqiu | Independent non-executive Director |

### Place of business in Hong Kong

Room A, 29th Floor
No. 133 Wanchai Road
Hong Kong

### Principal bankers

Industrial and Commercial Bank of China (Xianyang Branch)
Construction Bank of China (Xianyang Branch)
Industrial and Commercial Bank of China (Xi'an Advanced Technology Development Zone Branch)
Industrial and Commercial Bank of China (Xi'an Branch)

### Legal adviser

Baker & McKenzie
14th Floor, Hutchison House
10 Harcourt Road
Hong Kong

## Joint Company secretaries
Zhang Chunning
Ng Yuk Keung

## Audit committee
Zha Jianqiu
Feng Bing
Feng Fei
Xu Xinzhong
Zhang Xingxi

## Authorised representative
Yun Dajun
Zhang Chunning

## Auditors
PricewaterhouseCoopers

## Registrar of H Shares
Computershare Hong Kong Investor Services Limited
Room 1712-1716, 17th Floor, Hopewell Center
183 Queen's Road East
Hong Kong

## Legal address in the PRC
No. 1 Caihong Road
Xianyang, Shaanxi Province
The People's Republic of China
Postal code: 712021

## Company website
www.irico.com.cn

## Investor and media relations and annual report production
Wonderful Sky Public Relations and Financial Consultant Company Limited
Unit 3103, 31st Floor, Office Tower
Convention Plaza, 1 Harbour Road
Hong Kong

# Financial Highlights

## 1. Results

| | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* |
| Turnover | 3,293,021 | 3,980,378 | 4,269,781 | 4,949,683 |
| Profit before taxation | 152,868 | 510,923 | 623,116 | 650,250 |
| Taxation | 37,292 | 129,891 | 173,936 | 134,468 |
| Profit after taxation | 115,576 | 381,032 | 449,180 | 515,782 |
| Minority interests | 41,265 | 103,929 | 133,355 | 130,455 |
| Profit for the year | 74,311 | 277,103 | 315,825 | 385,327 |
| Earnings per share | RMB0.05 | RMB0.18 | RMB0.21 | RMB0.25 |

## 2. Assets and liabilities

| | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* |
| Non-current assets | 3,227,142 | 2,949,965 | 2,576,435 | 3,574,985 |
| Current assets | 3,317,068 | 3,475,841 | 2,899,241 | 3,528,199 |
| Shareholders' equity | 2,626,643 | 2,816,132 | 2,179,758 | 3,042,450 |
| Minority interests | 845,060 | 912,836 | 1,007,160 | 1,128,866 |
| Non-current liabilities | 491,847 | 385,357 | 14,769 | 11,294 |
| Current liabilities | 2,580,660 | 2,311,481 | 2,273,989 | 2,920,574 |

## 3. Operating indices

| | 2003 | 2004 |
|---|---|---|
| Gearing ratio | 42% | 41% |
| Current ratio | 127% | 121% |
| Interest cover (times) | 12 | 11 |
| Account receivables turnover (days) | 108 | 93 |
| Inventory turnover (days) | 78 | 96 |

Financial Highlights

2003
9%
91%
CPTs
CPT components
2004
10%
90%
CPTs
CPT components

6

IRICO GROUP ELECTRONICS COMPANY LIMITED



# Chairman's Statement

Chairman
Mr. Ma Jinquan

Dear shareholders,

The Company was incorporated following the restructuring on 10 September 2004 and its H Shares were successfully listed on 20 December 2004 on the main board of the Stock Exchange. I am profoundly honoured to be recommended with trust by the Directors to take the position of the Chairman of the first Board. The successful listing of the Company's H Shares is a milestone symbolising the Company having entered into a new phase of development. However, we can sense that the Company will face many different various kinds of challenges in its future development. For this, I deeply feel the great responsibility to be borne by me.

## Overview of results

Last year, the Group continued to take the lead in the colour CPTs market in the PRC and its global market share further expanded. Capitalising its scale advantage, unique cost leverage as a result of its complete support, flexible manufacturing system, all-round product mix, solid customer base and efforts of the Board, management and all employees of the Company, the Group achieved an encouraging operation results and maintained a high profit margin, kept a stable growth in the production, sales and profit of its principal operation colour CPTs and CPT components, though faced by declining prices of CPTs as well as rising prices of certain raw materials.

For the year ended 31 December 2004, the Group sold approximately 13,674,000 sets of colour CPT in aggregate, representing an increase of 23.1% over last year, realised sales revenue of RMB4,949.683 million, representing an increase of 15.9% over last year; Net profit RMB325.327 million, representing an increase of 22% over last year. Earnings per share is RMB0.25. The overall gross profit amounted to 21.3%.

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 388 of 1004

2004 was a remarkable year for the Company, as the Company completed its restructuring and stepped into the international capital market within the year. The Company's H Shares were listed on the main board of the Stock Exchange on 20 December 2004, issuing a total of 485,294,000 H Shares (including sale of 44,120,000 State-owned legal person shares) and raising a total fund of HK$766.8 million (including raised fund of HK$69.7 million from sale of 44,120,000 State-owned legal person shares).

In the past year, the Group continued to strengthen its colour CPTs operation and optimise it product structure. A production line for 21" colour CPTs with an annual production capacity of 2 million set of CPTs was established. The Group also utilised technology renovation to enhance the existing production capacity and product mix of the production line of colour CPTs. Besides, the production line of super large sized CPTs with high definition is under smooth construction. Further, in respect of CPT components, the Group continues to enhance the production capacity of key CPT components. The accomplishment of the supportive projects of glass bulb and shadow mask further reinforced the cost leverage of the Group. Meanwhile, the proportion of external sales of CPT components grew steadily. The sales revenue from CPT components in 2004 increased by 26.5% compared with 2003. In addition, the research and development of the new products of PDPs, colour CPTs, CPT components progressed smoothly, creating satisfactory conditions for the on-going development of the Group.

As the PRC macro-economy is expected to maintain its speedy growth, the disposable income of the general population in the PRC will hopefully increase continuously. This is expected to drive the demand for colour television sets, thus the demand for CPTs will increase accordingly. Integration in the industry will bring about further opportunities for the Group. As production lines of CRT television sets and CPTs in Europe and America shut down and the trend of moving such production lines to developing countries such as the PRC continues, the PRC's role as the centre for manufacturing of colour television sets and CPTs in the world will be further enhanced. The PRC's status as a global manufacturing center for colour television sets and colour CPTs will be further strengthened. The export of colour television sets and CPTs in the PRC will keep growing fast and the Group has excellent prospects for future development.

However, competition in the display industry is becoming intense with declining prices for flat panel television sets as well as the increasing performance. The challenge posed by the development of flat panel display to CRT market will be ever more striking. CRT televisions and CPT industry are facing with intense competition more than ever. Particularly at the beginning of 2005 with sluggish market demand, the price of CPTs further declined while the cost of certain raw materials increased.

Facing a market environment with opportunities and challenges, the Group will fully utilize its competitive leverage to grasp every chance in the coming time. We will mobilise all the employees, economise operations and innovate technology to lower cost as well as to optimise the product mix. The Group strives to develop overseas market and step into global competition with low cost and high quality products, consolidating the leading position of the Group in CPT industry in the PRC, and endeavors to increase its global market shares. Also, the Group will proactively research and develop technology for flat panel display device such as PDPs. By being persistent, accumulating capability and capitalising on opportunities, we will continue to grow.

I have pleasure to extend the gratitude on behalf of the Board to the shareholders, business partners and every sector for their care and support to the Company. I also desire to express my heartfelt gratitude to all management and employees for their dedicated efforts at work. I wish we can exert out synergetic endeavour to overcome various kinds of difficulties in order to achieve the business target of the Company in the coming year.

**IRICO Group Electronics Company Limited**
**Ma Jinquan**
*Chairman*

Xianyang, the PRC
24 March 2005



# Management Discussion and Analysis

## I. Industry review

With the recovery in global economy and the increasing consumption as well as the successful holding of Greece Athens Olympics, the global colour television set market maintained a steady growth in 2004. According to the "Television Systems Market Tracker — Q4 2004" published by Stanford Resources in December 2004, global market sales of colour television sets in 2004 increased by 3.4% to 164 million units as compared with 2003. In 2008, the sales volume of global colour television sets is expected to amount to approximately 203 million units with a compound annual average growth rate of 5.3%.

Despite the noticeable decline in prices of FPD television set and its performance improved during last year, prices of FPD television set are still substantially higher than those of CRT television set of the same size. Most of consumers prefer to choose CRT television set, as there is apparent gradient consumption of colour television set and in terms of overall performance, FPD television set has no noticeable advantages as compared with CRT television set which owns cost performance advantages, although weakened. According to Stanford Resources, CRT television set continued its dominance in the global colour television market in 2004 with sales volume of approximately 148 million units, representing approximately 90% of the total global sales volume for 2004. In 2008, sales volume of CRT television sets is expected to amount to approximately 147 million units, representing 72.4% of the total global sales volume for that year.



## 1. Industry review (continued)

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| LCD | 3,632 | 8,662 | 13,749 | 20,111 | 28,716 | 36,701 |
| PDP | 385 | 1,972 | 3,684 | 5,966 | 8,654 | 11,825 |
| Projection | 5,037 | 5,674 | 6,434 | 6,814 | 7,090 | 7,496 |
| CRT | 149,289 | 149,002 | 151,574 | 150,072 | 147,246 | 147,161 |

*Resource: Stanford Resources December 2004*

With its fast-growing economy, the PRC's GDP for 2004 amounted to RMB13,651.5 billion, representing an increase of 9.5% over last year based on comparable prices. In addition, residential income maintained a steady growth. Following the implementation of series of policies to improve farmers' income and alleviate their burden, farmers' income increased considerably. According to the Chinese National Bureau of Statistics, farmers' income for 2004 amounted to RMB2,936 per capita, up 12% over last year and hitting a historical high since 1997.

The sound macroeconomic background stimulated the rapid growth in demand for colour television sets and CPTs. According to the Chinese National Bureau of Statistics, the PRC output of colour television sets for 2004 increased by 12.4% over 2003 to 73.29 million units, accounting for approximately 45% of the total global output of colour television sets, which demonstrated the position of China as an obvious global centre for manufacturing of colour television sets. According to CCID, the PRC's output of CPTs in 2004 increased by 13% to approximately 64.91 million units as compared with 2003.

The rebounding global economy and international trade has provided a favourable external environment for the PRC export market. With the closure of some foreign production lines of CRT television sets and CPTs or shifting of such production lines to the PRC, the PRC continued to maintain a fast growth in export of CRT television sets and CPTs.

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 392 of 1004

**Export of the PRC colour television sets and CPTs**

| | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| Colour television sets (million units) | 11.63 | 18.82 | 22.77 | 27.72 |
| Growth rate | — | 61.82% | 20.99% | 21.74% |
| CPTs (million units) | 9.36 | 13.47 | 15.95 | 18.13 |
| Growth rate | — | 43.91% | 18.41% | 13.67% |

*Source: CCID, February 2005*

Through substantial efforts in 2004, the Group maintained its leading position in the CPT industry in the PRC with satisfactory business results. The Group has strengthened its global market share, and maintained a continuous and steady growth in its operating revenue and profit.

Sales revenue
Net profit

## CPTs business

The Group currently produces CPTs with various sizes ranging from 14" to 29". As at 31 December 2004, the Group owned 8 production lines of CPTs.

By virtue of technology renovation, the Group improved its production capacity of CPTs production lines and further promoted flexible production capabilities, so as to address the diversifying market needs. A new CPT production line with annual production capacity of 2 million units of 21" CPTs was completed and put into operation, which enhanced large scale production capability of the Group. Meanwhile, faced with the immense commercial opportunities brought by digital television, the Group is constructing a super large-sized (32" - 36" PF 16:9) high definition CPT production line ("K Line") with designed annual production capacity of 1 million units. K Line is expected to commence trial operation in the second half of 2005 and to commence its full scale production in 2006. By then, the Group expects to further optimise the product mix of CPTs.

## CPTs business *(continued)*

During 2004, with its ongoing implementation of the cost-control strategy, the Group capitalised on the advantages of its scale and internal supply of CPT components to reduce production cost, resulting in a year-on-year increase of over 2 million units in production volume. In addition, the Group fully utilised the potential in management, leading to a considerable decline in production cost as compared with 2003. The Group adopted different measures including bidding invitation and purchase estimation to control purchasing prices of materials, thus effectively controlling purchasing costs. Furthermore, we proactively forged strategic alliances with suppliers of energy and raw materials to minimise the impact from cyclical shortages of energy and raw materials. In addition, the production capability for internal supply of CPT components was further enhanced. This has expanded the Group's profit sources by increasing external sales, and also enhanced the cost advantages of overall integration by cutting down internal procurement costs.

The Group placed much efforts in CPTs business and optimisation of product mix, thus accomplishing stable growth in CPTs sales volume and sales revenue. The Group's total CPTs sales volume in 2004 amounted to 13.674 million units, representing an increase of 23.1% over last year, while the CPTs sales revenue aggregated to RMB4,466,767,000, representing an increase of 14.9% over last year.

Sales of CPT

Sales volume of CPT

## CPT components business

During 2004, the Group continued to enhance its internal supply capability of CPT components. The Group constructed two new glass bulb production lines with annual production capacity of 4 million units and shadow mask production line with annual production capacity of 4 million units, and the construction of production line of components for the K line, which include electron guns, large-sized metal components, deflection yokes, and frame, was also in good and steady progress. In addition, the Group has completed the expansion and reconstruction of the existing production lines and the renovation of panel furnace and funnel furnace as scheduled. Due to the implementation of these projects, the Group has achieved the best historical level in its internal supply capability of CPT components such as panels, funnels and shadow masks, thus further strengthening the cost advantage of the Group.

## CPT components business *(continued)*

Based on the satisfaction of internal supply, the Group actively explored the external sale market of CPT components for a better and larger market share, resulting in a desirable achievement of external sale of CPT components. In 2004, the sales revenue of CPT components of the Group amounted to RMB482,916,000, representing an increase of 26.5% as compared with 2003.

Sales of CPT components

## Research and development

In 2004, research and development of the Group has been making smooth progress. In respect of PDPs, the Company had designed and constructed the trial line for PDP display screens which have passed the testing and approval requirements of the PRC Ministry of Information and Industry. The Company has designed and constructed the trial line for 42" PDP display screens, the production of which has been successful. In addition, the circuitry design for PDP televisions have been researched and developed successfully. The Company has the intellectual property rights to its 42" PDP television sets which possess excellent picture quality, thus reaching international standard for similar kind of products and occupying a dominant domestic position. In addition, the development project of phosphors for PDPs had reached the phasic target. In connection with CPTs and components, the projects including the smooth completion in development project of scale production technologies for 29" high definition CPTs, preliminary research of super slim light and high definition CPTs, preliminary research of 28" 16:9 full-flat and high definition CPTs were proceeded under schedule. In addition, the projects regarding the application research of super large-sized screens with high definition CPTs and CPTs for digital television reached a milestone.

## Employees and training

Facing the keen competition in operation environment, the Group is committed to establishing a team with highly efficient and advanced technology, thus maintaining and improving our leading position in domestic CPT industry. As at 31 December 2004, the Group had 20,844 employees. As compared with the data disclosed in the Company's prospectus dated 8 December 2004, the Group had additional 1,700 employees, which is mainly attributable to establishment and expansion of CPTs and CPT component production lines on-stream. Therefore, additional employees were recruited correspondingly.

## Employees and training *(continued)*

| | Number of employees | Percentage in total number of employees (%) |
|---|---|---|
| Management and administrative employees | 577 | 2.8% |
| Financing and audit employees | 108 | 0.5% |
| Sales and business management employees | 115 | 0.6% |
| Other professional and technical employees | 1,025 | 4.9% |
| (including: research and development employees) | 184 | 0.9% |
| Others | 19,019 | 91.2% |
| (including: technical workers | 8,716 | 41.8% |
| Operators | 9,811 | 47.1% |
| Service and supporting personnel | 417 | 2.0% |
| Others) | 75 | 0.4% |
| Total | 20,844 | 100% |

The employees are entitled to the remuneration comparable with local industry in the business operation region.

The Group attaches great importance to employee training and is devoted to establishing an organization with learning culture so as to improve production efficiency and work satisfaction of the employees. Each year the Group formulates detailed training scheme implemented by the human resources department, which covers technical training, advanced study, management education, technology, safety and environment education, corporate culture education and quality management education.

## Major customers

The Group's products are mainly sold to the domestic market, as well as overseas market including Turkey, Indonesia, Hong Kong and Russia. The Group's major customers are the leading CRT television set manufactures such as TCL, Konka, Skyworth, Changhong and Hisense. The Group has established long term and stable relationship with our major customers, including some relationship with Chinese customers extending over ten years long.

## Sales percentage of major customers

| | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| Percentage of the largest customer in total sales (%) | 17.06% | 15.29% | 15.05% | 18.38% |
| Percentage of the top five customers in total sales (%) | 61.98% | 64.61% | 69.62% | 62.16% |

## Intellectual property

On 22 October 2004, the Company entered into an agreement on the transfer of patents and patent application rights with IRICO Group Corporation and IRICO Color Picture Tube Plant, pursuant to which all patents and patent applications rights required for the Company's production and business operation shall be transferred to the Company.

In addition to the acquisition of the above patents, the Company's 41 applications for patents were in process with the State Intellectual Property Office of the PRC in 2004.

Pursuant to the trademark licensing agreement entered into between the Group and IRICO Group Corporation, the Group is authorised to use 24 registered trademarks owned by IRICO Group Corporation.

## Business development plan

The market demand for global CPT televisions sets is still enormous in the foreseeable future. The PRC has gradually become the global television manufacturing centre, particularly for CPTs. The Board expects that the PRC will be able to maintain a fast growth in the export of colour television sets and CPTs.

The Company is faced with numerous difficulties, including the fast development of FPD devices with increasing market share and the fierce competition within the CPT industry, which will place a burden on the sales and selling prices of the Group's production of CPTs. Meanwhile, the Group suffers pressure from increasing prices of certain raw materials and energy required for its production in 2005, which will have an adverse impact on the CPT production of the Group.

Faced with such opportunities and challenges in market environment, the Group's principal business plan for 2005 is as follows:

1. Facing the pressure from lowering price and declining demand, the Company will further develop all-round activities of management renovation and technological innovation, minimise its costs while utilise potential and participate in the global competition with high cost-performance products to secure the Group's leading position in CPT industry in the PRC and raise its global market share.

2. The Group will place more efforts in marketing. In addition to expanding market share in the domestic market, the Group will actively explore the overseas market, aiming to increase the overseas sales of CPTs to over 30% of the Group's total sales volume.

3. Through construction of super large-sized high definition CPT production lines, and technology renovation for the existing CPT production lines, the Company expects to further strengthen CPT business and large scale advantage in order to optimise product mix.

## Business development plan *(continued)*

4. The Group will further enhance its internal supply capability of CPT components. The Group expects to complete the production lines of glass bulbs and shadow masks, as well as the construction of other production lines for CPT components, further enhancing the cost advantage through vertical integration. In addition, the Group expects to increase its domestic and overseas market shares of CPT components for further income.

5. The Company will proactively research and develop new products. As to the PDPs, the Company will capitalise on the success of its 50" PDP screens, speed up the research on PDP-related circuitry and proactively research on the feasibility of large quantity production. As to CPTs and CPT components, the Company will focus on research and development of super large-sized tint series of CPTs, super slim CPTs and related components and materials.

## Overall performance

In 2004, the Group recorded a sustainable and strong growth in operating results as compared with 2003. Turnover for the year ended 31 December 2004 amounted to RMB4,949,683,000, representing an increase of 15.9% over last year. Net profit reached RMB385,327,000, representing an increase of 22% over last year.

## Profit and loss data for 2001-2004

| *(RMB'000)* | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| Turnover | 3,293,021 | 3,999,378 | 4,269,781 | 4,949,683 |
| Sales of CPTs | 3,152,040 | 3,723,889 | 3,888,156 | 4,466,767 |
| Sales of CPT components | 140,981 | 275,489 | 381,625 | 482,916 |
| Cost of sales | (2,697,243) | (3,079,581) | (3,256,959) | (3,896,956) |
| Gross profit | 595,778 | 919,797 | 1,012,822 | 1,052,727 |
| Other revenues | 58,539 | 59,998 | 61,258 | 56,486 |
| Operating expenses | | | | |
| Administrative expenses | (190,480) | (219,788) | (227,275) | (219,008) |
| a) General administrative expenses | (149,990) | (165,942) | (195,665) | (172,028) |
| b) Research and development expenses | (40,490) | (53,846) | (31,610) | (46,980) |
| Distribution expenses | (85,030) | (102,130) | (103,405) | (118,323) |
| Other operating expenses | (120,431) | (69,524) | (73,604) | (79,275) |
| Operating profit | 258,247 | 591,787 | 679,766 | 718,020 |
| Finance costs | (103,737) | (78,853) | (56,588) | (62,966) |
| Profit for the year | 74,311 | 272,103 | 315,825 | 385,327 |

## Turnover and gross profit margin

**Turnover by product** *(RMB'000)*

| Name | | 2003 | 2004 | Increase/ (decrease) | Percentage of change |
|---|---|---|---|---|---|
| CPTs | | 3,888,156 | 4,466,767 | 578,611 | 14.9% |
| including: | Small-sized CPTs | 700,177 | 782,795 | 82,618 | 11.8% |
| | Medium-sized CPTs | 2,881,360 | 3,614,760 | 733,400 | 25.5% |
| | Large-sized CPTs | 306,619 | 69,212 | (237,407) | -77.4% |
| CPT components | | 381,625 | 482,916 | 101,291 | 26.5% |
| Total | | 4,269,781 | 4,949,683 | 679,902 | 15.9% |

**Sales volume by product** *(Units)*

| Name | 2003 | 2004 | Increase/ (decrease) | Percentage of change |
|---|---|---|---|---|
| Small-sized CPTs | 3,917,886 | 4,555,099 | 637,213 | 16.3% |
| Medium-sized CPTs | 6,887,396 | 9,043,451 | 2,156,055 | 31.3% |
| Large-sized CPTs | 304,338 | 75,484 | (228,854) | -75.2% |
| Total | 11,109,620 | 13,674,034 | 2,564,414 | 23.1% |

**Average selling price by product** *(RMB / Unit)*

| Name | 2003 | 2004 | Increase/ (decrease) | Percentage of change |
|---|---|---|---|---|
| Small-sized CPTs | 179 | 172 | (7) | -3.9% |
| Medium-sized CPTs | 418 | 400 | (18) | -4.3% |
| Large-sized CPTs | 1,007 | 917 | (90) | -8.9% |

With strengthened marketing efforts in 2004, the Group recorded satisfactory turnover for its operations as planned. The Group sold approximately 13,674,000 units of CPTs, representing an increase of 23.1% as compared with previous year, and its revenue reached RMB4,466,767,000, representing an increase of 14.9% as compared with last year. Sales revenue of spare parts amounted to RMB482,916,000, representing an increase of 26.5% over last year.

## Turnover and gross profit margin *(continued)*

The overall gross profit rate of the Group decreased from 23.7% of 2003 to 21.3% of 2004. This was mainly due to: 1) a further decrease in the average selling prices of CPTs in 2004 as compared with 2003 resulting from fierce competition in the PRC market of colour television sets; 2) the surge in prices of certain raw materials; and 3) the production line with annual production capacity of 2 million sets of 21" CPTs was completed ahead of schedule, as compared with the production line of CPT components, resulting in an increase in the external purchase of CPT components and thus, a reduction in the gross profit rate.

## Administrative expenses

The Group's administrative expenses in 2004 decrease by RMB8,267,000, or 3.64%, to RMB219,008,000 from RMB227,275,000 in 2003, mainly as a result of the allocation of some of the administration to the production as the adjustment of organisation structure and the disposal of property and land led to the decrease in property tax and land tax.

## Finance costs

The Group's finance costs for 2004 recorded RMB62,966,000, representing an increase of RMB6,378,000, or 11.27%, from RMB56,588,000 in 2003, which is mainly attributable to the increase in bank loan interests accrued on the increased bank loans.

## Net current assets and financial resources

As at 31 December 2004, the Group's cash and cash equivalents aggregated to RMB1,096,516,000, representing an increase of 46.8% from RMB747,186,000 as at 31 December 2003. The Group paid a total of RMB1,313,432,000 in capital expenditure during the year ended 31 December 2004. Net cash flow generated from operating activities and financing activities was RMB623,370,000 and RMB1,014,038,000 respectively, and net cash flow used in investing activities amounted to RMB1,288,078,000.

As at 31 December 2004, the Group's borrowings totalled RMB1,420,000,000 as compared with RMB1,060,000,000 as at 31 December 2003. The borrowings were all due within one year. Bank loans of approximately RMB300,000,000 (2003: RMB260,000,000) are secured by certain buildings and machinery of the Group amounting to RMB321,973,000 (2003: RMB359,273,000) as at 31 December 2004. Bank loans of approximately RMB200,000,000 were secured by bank deposits of RMB21,000,000 and trade bills receivable of RMB41,319,000 of the Group as at 31 December 2004.

## Net current assets and financial resources *(continued)*

For the year ended 31 December 2004, turnover period for accounts receivable of the Group was 93 days, representing a decrease of 15 days from 108 days for the year ended 31 December 2003, which was mainly attributable to its strengthened collection of the accounts receivable.

For the year ended 31 December 2004, inventory turnover period for the Group was 86 days, representing an increase of 8 days from 78 days for the year ended 31 December 2003, which was mainly attributable to the increased inventories of finished products caused by the release in market demand at the end of 2004.

## Taxation

The Group's taxation for 2004 was RMB134,468,000, representing a decrease of 22.7% from RMB173,936,000 in 2003, which was mainly attributable to a deduction of income tax rate from 33% to 15% after the Company's incorporation on 10 September 2004.

## Profit attributable to shareholders and earnings per share

In 2004, the Group's profit attributable to shareholders amounted to RMB385,327,000, representing an increase of 22% from RMB315,825,000 in 2003.

For the year ended 31 December 2004, the Company's weighted average earnings per share was RMB0.25.

## Capital structure

As at 31 December 2004, the Group's borrowings were mainly denominated in Renminbi and US dollars, while its cash and cash equivalents were mainly denominated in Renminbi, Hong Kong dollars and US dollars.

The Group intends to maintain a suitable ratio of share capital to liabilities, so as to ensure an effective capital structure from time to time. As at 31 December 2004, its liabilities including bank loans aggregated to RMB2,931,868,000 with cash and cash equivalents totalling RMB1,096,516,000 and a gearing ratio (defined as: total liabilities / total assets) of 41%.

## Foreign exchange risk

The Group's income and most of its expenses are denominated in Renminbi and US dollars. For the year ended 31 December 2004, there was no material impact on the Group's operation or working capital resulting from exchange rate fluctuations.

# Profiles of Directors, Supervisors and Senior Management

## Executive Directors

| | | |
|---|---|---|
| Ma Jinquan | 52 | Chairman |
| Tao Kui | 52 | Vice-chairman |
| Xing Daoqin | 50 | President |
| Guo Mengquan | 48 | Executive Director |
| Zhang Shaowen | 43 | Executive Director |
| Yun Dajun | 50 | Vice president and chief financial controller |

## Non-executive Director

| | | |
|---|---|---|
| Zhang Xingxi | 48 | Non-executive Director |

## Independent non-executive Directors

| | | |
|---|---|---|
| Feng Fei | 43 | Independent non-executive Director |
| Xu Xinzhong | 41 | Independent non-executive Director |
| Feng Bing | 38 | Independent non-executive Director |
| Wang Jialu | 44 | Independent non-executive Director |
| Zhu Jianqiu | 36 | Independent non-executive Director |

## Executive Directors

**Mr. Ma Jinquan** (馬金泉) is an executive Director and the chairman of the Company. He is responsible for the overall management of the Company. Mr. Ma had joined in October 1978 the businesses and entities which became part of the Company. Mr Ma graduated from Northwestern Polytechnical University (西北工業大學) with a bachelor degree in aviation and aerospace industry. In 1992, he was awarded a special government allowance of the People's Republic of China. Mr. Ma is a senior engineer at a professor level. He acted as a director of IRICO Group Corporation since December 1998 and as the vice-chairman of the Board and vice-president of IRICO Group Corporation from November 2000 to February 2001 and has been acting as the general manager of IRICO Group Corporation since March 2001. Before that, he was the executive deputy factory manager of Shaanxi Color Picture Tube Plant (陝西彩色顯像管總廠), the executive deputy general manager of IRICO Electronics Group Corporation (彩虹電子集團公司), the factory manager of Huanghe Machinery Plant (黃河機械廠), the chairman and general manager of Huanghe Mechanical and Electrical Joint Stock Company Limited (黃河機電股份有限公司), and the vice-chairman and vice president of IRICO Group Corporation. In addition, he also served as the chairman of IRICO Display Devices Co., Ltd. Mr. Ma has over 20 years of extensive experience in management and operation.

**Mr. Tao Kui** (陶魁) is an executive Director and the vice-chairman of the Company. He is responsible for the investment and planning management of the Company. Mr. Tao had joined in September 1978 the businesses and entities which became part of the Company. He graduated from South East University (東南大學) (formerly known as Nanjing Institute of Technology) with a bachelor degree in electrical vacuum devices and is qualified as a senior engineer. Mr. Tao acted as a director of IRICO Group Corporation from November 1995 to February 2001 and as the deputy general manager of IRICO Group Corporation since March 2001. Before that, he was the factory manager of both the phosphor powder factory and the glass factory under Shaanxi Colour Picture Tube Plant, a director of IRICO Group Corporation and the deputy factory manager of CPT Plant. Mr. Tao has over 20 years extensive corporate operation and management experience in the Chinese CPT industry.

**Mr. Xing Daoqin** (邢道欽) is an executive Director and the president of the Company. He is responsible for the daily production and operation of the Company. Mr. Xing had joined in February 1982 the businesses and entities which became part of the Company. He graduated from Xian Jiaotong University (西安交通大學) with a bachelor degree in automation. In 1996, Mr. Xing was awarded a special government allowance for experts by the State Council of the Peoples Republic of China. He is a senior engineer at a professor level. Mr. Xing has been acting as the deputy general manager of IRICO Group Corporation since March 2001. Before that, he was the factory manager of Caihong Glass Factory under CPT Plant, the head of the Electronic Glass Department of IRICO Group Corporation and the deputy factory manager of CPT Plant. Mr. Xing has been engaged in the Chinese CPT industry for more than 20 years and has profound knowledge on the technologies for production of CPT equipment and components, and extensive experience in corporate operation and management.

**Mr. Guo Mengquan** (郭盟權) is an executive Director. He is responsible for marketing and sales of the Company. Mr. Guo had joined in September 1983 the businesses and entities which became part of the Company. He graduated from Northwestern Polytechnical University (西北工業大學) with a bachelor degree in control and manipulation of aviation fluid mechanics and from Shaanxi MBA College with an MBA degree. He is a senior engineer at a professor level. Mr. Guo has been acting as the deputy general manger of IRICO Group Corporation since March 2001. Before that, he was the factory manager of the glass plant under CPT Plant. Mr. Guo has over 20 years of experience in the manufacture of CPT components and corporate operation and management.

**Mr. Zhang Shaowen** (張少文) is an executive Director. He is responsible for technology management of the Company. Mr. Zhang had joined in August 1981 the businesses and entities which became part of the Company. He graduated from the Party School of Shaanxi Provincial Committee (陝西省委黨校) with a bachelor degree in economic management. He is a senior engineer. Mr. Zhang has been acting as the deputy general manager of IRICO Group Corporation since March 2001. Before that, he was the factory manager of both the shadow masks factory and the No. 1 CPT Plant under CPT Plant. Mr. Zhang has been engaged in the Chinese CPT industry for over 20 years and has extensive experience in corporate operation and management.

**Mr. Yun Dajun** (雲大俊) is an executive Director, the vice-president and chief financial controller of the Company. He is responsible for the financial management of the Company. Mr. Yun joined the Company in September 2004. He graduated from National Taiwan University (國立台灣大學) with a bachelor degree in business management. Prior to joining the Company, Mr. Yun acted as the director of finance (Greater China) in BEA Systems HK Ltd., the director of finance and administration and deputy managing director of Compaq in the PRC region and the finance director of Amdocs Development Limited Beijing Representative Office. He also worked for various companies including IBM Company. Mr. Yun was chosen as the "Outstanding Financial Officer" (「傑出財務主持人」) by Financial Executives Institute of the Republic of China (中華財務主持人協會) in 1993.

**Mr. Zhang Xingxi** (張興希) is a non-executive Director and currently the chief economist of IRICO Group Corporation. Mr. Zhang had joined in August 1981 the businesses and entities which became part of the Company. He graduated from the Faculty of Economics at Beijing Normal University (北京師範大學) with the postgraduate study in business administration. He was the general manager of Caihong Hotel (彩虹賓館) in Xianyang City, Shaanxi Province, the general manager of Hainan Caihong Industrial and Trading Corporation (海南彩虹工貿總公司), the manager of both the Audit Department and Human Resources Department of IRICO Group Corporation.

**Mr. Feng Fei** (馮飛) is an independent non-executive Director and currently the director and a researcher of the Industrial and Economic Research Unit of the Development and Research Center under the State Council (國務院發展研究中心產業經濟研究部). Mr. Feng joined the Company in September 2004. He graduated from Tianjin University (天津大學) with a doctoral degree in engineering. He conducted a postdoctoral research on mechanical and electrical engineering at Qinghua University (清華大學). Mr. Feng was awarded a special allowance by the State Council. He also served as the consultant to the relevant government authorities of Guangdong Province as well as the adviser of Hainan Airlines (海南航空集團) and State Power Corporation (國家電力公司).

**Mr. Xu Xinzhong** (徐信忠) is an independent non-executive Director and currently a professor in Finance in Guanghua Management College of Beijing University (北京大學) and the dean of its faculty of finance. Mr. Xu joined the Company in September 2004. Mr. Xu obtained his bachelor degree in meteorology from Beijing University, his MBA degree from Aston University in the United Kingdom and his doctoral degree in finance from Lancaster University in the United Kingdom. He worked as a lecturer and senior lecturer of the Faculty of Accounting and Finance at Manchester University in the United Kingdom and was a professor and a chair in finance of the Faculty of Management at Lancaster University in the United Kingdom. Mr. Xu has been acting as a professor of Guanghua Management College of Beijing University and the dean of its Faculty of Finance since January 2002. Mr. Xu was also awarded the Prize for the Best Manuscript (最佳論文獎) by British Accounting Review in 1997.

**Mr. Feng Bing** (馮兵) is an independent non-executive Director and currently an executive director and the deputy general manager of China Financial and Consulting Company (中華財務諮詢公司). Mr. Feng joined the Company in September 2004. He obtained his bachelor degree in computer software from Northwestern Polytechnical University, his master degree in engineering from Calculation Technology Research Institute of Chinese Academy of Sciences (中國科學院計算技術研究所) and his masters of science degree in finance from the School of Management at Syracuse University. He was a part-time tutor in optional practical training of the Faculty of Commerce at Syracuse University and a senior manager of Deloitte Touche Tohmatsu in the United States.

**Mr. Wang Jialu** (王家路) is an independent non-executive Director and a partner of Zhong Lun Law Firm (中倫金通律師事務所). Mr. Wang joined the Company in September 2004. He completed his course for master degree in business administration from Guanghua Management College of Beijing University and the course for juris doctor from Marburg University of Germany, and received his LLM degree from the law school of Marburg University of Germany. He was an arbitrator in the Beijing Arbitration Commission (北京仲裁委員會), a part-time lecturer for master degree course in the Law Faculty of Beijing University, an executive of the Foreign Affairs Committee of the Beijing Law Society (北京律師協會外事委員會) and a member of the Standing Committee of Venture Capital Professional of the Chinese Technology Finance Development Association (中國科技金融促進會風險投資專業委員會).

**Mr. Zha Jianqiu** (查劍秋) is an independent non-executive Director. He is currently the chairman of Sinohope Certified Public Accountants (北京[illegible]會計師事務所), a chief accountant, a senior accountant and is qualified as a CPA and a CPV registered in China. Mr. Zha joined the Company in September 2004. He graduated from Guanghua Management College of Beijing University with a MBA degree in business administration. Mr. Zha worked at the Personnel and Education Division of the National Audit Office of the Peoples Republic of China (審計署), and was the departmental deputy manager and the deputy director (deputy chief accountant) of China Huajian Audit Firm (中國華建會計事務所). From 2001 and 2003, he was the deputy director of Tianzhi Zixin Accounting Firm (天職孜信會計師事務所) and the head of its management and consulting department.

**Mr. Wang Ximin** (王西民) was appointed as an assistant to the president of the Company with effect from 10 September 2004. He is responsible for the production and operation management of the Company. Mr Wang had joined in September 1978 the businesses and entities which became part of the Company. Mr. Wang received his bachelor degree in electrical vacuum devices from Xian Jiaotong University and his master degree in business administration (MBA) from the Shaanxi MBA College (陝西工商管理碩士學院) in 2001. He is a senior engineer. Prior to joining the Company, Mr. Wang has been acting as the head of the Production Department of IRICO Group Corporation since April 2001. Before that, he was appointed as the No. 1 deputy director of the Technology Department of Shaanxi Color Picture Tube Plant, the manager of Caihong Sales Company under CPT Plant and the deputy head of the Technology Center of CPT Plant.

**Mr. Zhang Chunning** (張春寧) is a joint Company secretary with effect from 10 September 2004. He is responsible for the board affairs, securities management, legal and investors' relationship of the Company. Mr. Zhang graduated from the Faculty of Chemistry at Northwestern University in 1985 with a bachelor degree in science (chemistry) and from Xian Jiaotong University with a master degree in management (business administration). He is now pursuing his doctorate education in management (business administration) at Xian Jiaotong University, with studies on relevant financial, business strategy and marketing issues. He has in particular 16 years of business and management experience in the colour picture tube industry. He had joined the businesses and entities which became part of the Company since 1985, and understands the business and daily operations of the Company. Before that, he was the deputy officer and officer of the No. 2 factory of CPT Plant, the acting factory manager and factory manager of Caihong Phosphor Factory under CPT Plant, the general manager of Shaanxi Rainbow Phosphor Material Co. Ltd. (陝西彩虹熒光材料有限公司).

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 405 of 1004

**Mr. Ng Yuk Keung** (吳育強) was appointed as a joint Company secretary and the Company's qualified accountant with effect from 26 November 2004. Mr. Ng graduated from The University of Hong Kong with a bachelor degree in management studies and economics and a master degree in global business management and E-commerce. Mr. Ng is a professional accountant and a member of the Hong Kong Institute of Certified Public Accountants. He worked with PricewaterhouseCoopers for over 12 years from 1988 to 2001. Mr. Ng was the chief financial officer of the International School of Beijing-Shunyi (北京順義國際學校) from 2001 to 2003, and has been retained by Australian Business Lawyers as a special consultant on accounting matters since 2004. Mr. Ng had been involved in many initial public offerings of PRC enterprises when working with PricewaterhouseCoopers, and had organized seminars on fund raising exercises in the PRC.

| | | |
|---|---|---|
| Niu Xinan (牛新安) | 44 | Chairman of the Supervisory Committee |
| Fu Jiuquan (符九全) | 36 | Shareholder Supervisor |
| Zhang Weichuan (張偉川) | 51 | Employee Supervisor |
| Sun Haiying (孫海鷹) | 62 | Independent Supervisor |
| Wu Xiaoguang (吳曉光) | 49 | Independent Supervisor |

**Mr. Niu Xinan** (牛新安) was appointed as the chairman of the Supervisory Committee with effect from 10 September 2004. Mr. Niu had joined in August 1981 the businesses and entities which became part of the Company. He received his bachelor degree in the administrative management from Northwestern University and is a senior engineer. Mr. Niu has been acting as the party's vice-secretary and secretary to the disciplinary committee of IRICO Group Corporation. In June 2002, he was elected as the chairman of the labor union of IRICO Group Corporation. Before that, Mr. Niu was the factory manager of No. 1 CPT factory under Shaanxi Colour Picture Tube Plant and the deputy director of its design institute, the manager of Display Devices Department and the factory manager of No. 1 CPT Factory under Shaanxi Colour Picture Tube Plant, the factory manager of the Inner Mongolia Television Factory (內蒙古電視機廠) and the deputy factory manager of CPT Plant. Mr. Niu has extensive corporate operation and management experience in the Chinese CPT industry.

**Mr. Fu Jiuquan** (符九全) was appointed as a shareholders Supervisor with effect from 10 September 2004 and currently the deputy chief accountant of IRICO Group Corporation. Mr. Fu had joined in July 1990 the businesses and entities which became part of the Company. Mr. Fu graduated from Guilin Electronic Industry College (桂林電子工業學院) with a bachelor degree in finance and accounting. He is a senior accountant. He was appointed as the director of the Finance Division of CPT Plant and the manager of the Assets Finance Department of IRICO Group Corporation.

**Mr. Zhang Weichuan** (張偉川) was appointed as an employee Supervisor with effect from 10 September 2004. Mr. Zhang had joined in August 1978 the businesses and entities which became part of the Company. He is currently the head of the Technology and Quality Department of the Company. Mr. Zhang graduated from Northwestern Telecommunication Engineering College (西北電訊工程學院) with a bachelor degree in electrical vacuum devices. He is a senior engineer at a researcher level. He was the director of the Quality Assurance Department of CPT Plant, the deputy chief engineer of CPT Plant and the manager of the Technology and Quality Department of the IRICO Group Corporation.

**Mr. Sun Haiying** (孫海鷹) was appointed as an independent Supervisor with effect from 10 September 2004 and currently the head and a professor of the Environmental Science and Engineering Technical Centre of Xian Jiaotong University, a member of the Standing Committee of the Chinese People's Political Consultative Conference and the head of the Department of Science and Technology of Shaanxi Province, an adjunct professor of the Institute for Enterprises of the Hong Kong Polytechnic University. Mr. Sun graduated from the Northwestern University in geography and was director of the Shaanxi Province Meteorological Bureau (陝西省氣象局), the director of Shaanxi Province Science and Technology Department (陝西省科學技術廳). He was a group leader of the Planning Strategy Study Group under the State Mid- and Long-term Science and Technology Development Planning Team (國家中長期科學和技術發展規劃領導小組規劃戰略研究專題組) in August 2004.

**Ms. Wu Xiaoguang** (吳曉光) was appointed as an independent Supervisor with effect from 10 September 2004. She is currently a deputy professor of the Management Faculty at Xian Jiaotong University. She received her bachelor degree in economics from the Economic Management College of Northwestern University. Ms. Wu was retained as a professor of the Chinese (Hainan) Reform and Development Research Institute (中國海南改革發展研究院), the chairman and general manager of Xian Wanguantong Financial Management Consulting Co., Ltd. ([illegible]), an expert consultant of Shaanxi Province Venture Capital Association (陝西省創業投資協會). Ms. Wu is the chief editor of a MBA teaching material "Theory and Practice of Taxation" (《稅收理論與實務》) and was awarded an outstanding prize of teaching in Shaanxi Province ([illegible]).

**Mr. Zhang Chunning** (張春寧) was appointed a joint Company secretary with effect from 10 September 2004, and his biographical details are set out above.

**Mr. Ng Yuk Keung** (吳育強) was appointed as a joint Company secretary with effect from 26 November 2004, and his biographical details are set out above.

**Mr. Ng Yuk Keung** (吳育強) was appointed as the Company's qualified accountant with effect from 26 November 2004, and his biographical details are set out above.

# Report of the Directors

The Board hereby presents the report of the Directors and the audited accounts of the Group for the year ended 31 December 2004 to the shareholders.

## Principle operations

The Group is principally engaged in the production and sales of CPTs and CPT components.

## Results and financial status

The annual results of the Group for the year ended 31 December 2004 and its financial status as at the same day prepared in accordance with accounting principles generally accepted in Hong Kong ("HK GAAP") are set out on page 40 to page 82 of this annual report.

## Dividends

Subsequent to the reorganisation of the Group, in accordance with the relevant PRC laws and regulations, and the Articles of Association of the Company, the retained profit available for distribution by the Company is deemed to be the lower of the amount determined in accordance with the Accounting Standards and Accounting System for Business Enterprises in the PRC ("PRC GAAP") and the amount determined in accordance with HK GAAP. In accordance with the Company's accounting policies, dividend income is recognized upon determination of rights to claim payments. As a result, as at 31 December 2004, the 2004 final dividend to be paid by the subsidiaries are not reflected in the Company's accounts in accordance with HK GAAP, and there is no retained profit available for distribution after deduction of the special dividend under the reorganisation. Details are set out in note 9 and 31 to the accounts of the annual report and the Company's prospectus dated 8 December 2004.



The consolidated results and summary of assets and liabilities of the Group for the past four years are set out on page 5 of the annual report.

During the year, the Group's purchase of goods and services from its largest supplier represented approximately 7% while its purchase from the five largest suppliers represented approximately 25%. The Group's sales of goods and services to its largest customer represented approximately 18%, while its sales to the five largest customers accounted for approximately 62%.

The Group has purchased certain goods and / or services from certain companies, and these suppliers were connected persons of the Company. Details are set out in note 34 to the accounts.

Details of fixed assets of the Group in the year are set out in note 14 to the accounts.

Details of the reserves of the Group and of the Company during the year are set out in note 31 to the accounts.

The Company had not redeemed any of its shares during the year. Neither had the Company nor any of its subsidiaries purchased or sold any of its issued shares during the year.

The particulars of Directors and Supervisors during the year and up to the date of this report are as follows:

## Executive Directors

| | |
|---|---|
| Ma Jinquan | Chairman |
| Tao Kui | Vice chairman |
| Xing Daoqin | President |
| Guo Mengquan | Executive Director |
| Zhang Shaowen | Executive Director |
| Yun Daqin | Vice president and chief financial controller |

## Non-executive Directors

| | |
|---|---|
| Zhang Xingxi | Non-executive Director |

## Independent non-executive Directors

| | |
|---|---|
| Feng Fei | Independent non-executive Director |
| Xu Xinzhong | Independent non-executive Director |
| Feng Bing | Independent non-executive Director |
| Wang Jialu | Independent non-executive Director |
| Zha Jianqiu | Independent non-executive Director |

## Supervisors

| | |
|---|---|
| Niu Xinan | Chairman of the Supervisory Committee |
| Fu Jiuquan | Shareholder Supervisor |
| Zhang Weichuan | Employee Supervisor |
| Sun Haiying | Independent Supervisor |
| Wu Xiaoguang | Independent Supervisor |

The profiles of Directors, Supervisors and senior management are set out on page 21 to page 26 of this annual report.

The existing Directors and Supervisors of the Company were elected at the Annual General Meeting held on 9 September 2004. The terms of appointment were three years and till 2007. All the existing Directors and Supervisors will continue to serve their office.

Details of the remuneration of directors and the five highest paid individuals of the Group are set out in note 11 to the accounts.

Save for the connected transactions as stated in this report, no contracts concerning the management and administration of the whole or any substantial part of the business of the Company were entered into or existed during the year.

As at 31 December 2004, none of the Directors, Supervisors, chief executives or members of senior management of the Company and their respective associates had any interest or short position in the shares, underlying shares and/ or debentures (as the case may be) of the Company and / or any of its associated corporations (within the meaning of Part XV of the Securities and Futures Ordinance (the "SFO")) which was required to be notified to the Company and the Stock Exchange pursuant to the provisions of Divisions 7 and 8 of Part XV of the SFO (including interest and short positions which any such Director, Supervisor, chief executive or member of senior management was taken or deemed to have under such provisions of the SFO), or which was otherwise required to be entered in the register of interests to be kept by the Company pursuant to section 352 of the SFO, or which was otherwise required to be notified to the Company and the Stock Exchange pursuant to the Model Code for Securities Transactions by Directors of Listed Companies as set out in Appendix 10 to the Rules Governing the Listing of Securities on the Stock Exchange (the "Listing Rules") in force as at 31 December 2004.

During the year of 2004 and as at 31 December 2004, none of the Directors, Supervisors, chief executives or members of senior management of the Company or any of their respective spouses or children under 18 years of age were granted any right, and the Company had not made any arrangement enabling any of them, to subscribe for any share capital or debt securities of the Company.

Save for the services contracts entered into by the Directors and Supervisors in relation to their services to the Company, no contract of significance or proposed contracts of significance, to which the Company or any of its subsidiaries, holding companies or jointly controlled entities was a party and in which a Director or Supervisor of the Company had a material interest, whether directly or indirectly, subsisted at the end of the financial year or at any time during the financial year.

No Director or Supervisor has entered into any service contract with the Company which is not terminable by the Company within one year without payment of compensation (other than statutory compensation).

Details of the share capital of the Company are set out in note 30 to the accounts.

So far as the Directors are aware, each of the following persons, not being a Director, Supervisor, chief executive or member of the Company's senior management, had an interest or short position in the Company's shares or underlying shares (as the case may be) as at 31 December 2004 and as entered in the register of interests to be kept pursuant to section 336 of the SFO:

IRICO Group Corporation had interests in 1,455,880,000 Domestic Shares of the Company (representing 100% of the Domestic Share capital), whereas HKSCC Nominees Limited had interests in 483,674,000 H Shares of the Company (representing 99.67% of the H Share capital).

Notes:

J. P. Morgan Chase & Co. through its controlled corporations had interests in 42,364,000 H Shares of the Company (representing approximately 8.73% of the H Share capital), which included a lending pool of 8,622,000 H Shares.

Pictet Asset Management on behalf of Pictet Funds Asian Equities had direct interests in 43,000,000 H Shares of the Company (representing approximately 8.86% of the H Share capital).

Derby Steven F., Goldfarb Lawrence and Lamar Steven M. through their controlled corporations had interests in 49,554,000 H Shares of the Company (representing approximately 10.21% of the H Share capital).

Morgan Stanley through its controlled corporations had interests in 154,266,000 H Shares of the Company (representing approximately 31.79% of the H Share capital) and a short position in 73,000,000 H Shares of the Company (representing approximately 15.04% of the H Share capital). Of the aforesaid interests and short position, the holding of 145,068,000 H Shares and a short position of 73,000,000 H Shares was duplicated as a result of the following holding.

China International Capital Corporation (Hong Kong) Limited ("CICCHK") and China International Capital Corporation Hong Kong Securities Limited ("CICC Securities") had direct interests in 145,068,000 H Shares of the Company (representing approximately 29.89% of the H Share capital). In addition, CICCHK was also holding a short position in 73,000,000 H Shares of the Company (representing approximately 15.04% of the H Share capital). The aforesaid interests and short position in the Company's H Shares were principally as a result of the stabilising actions undertaken by CICCHK during the period from 20 December 2004 to 12 January 2005 as detailed in the prospectus of the Company dated 8 December 2004 and the announcement of the Company dated 17 January 2005. Central Huijin Investment Company Limited, Morgan Stanley and their controlled corporations were taken to be interested in the said interests and short position by virtue of their respective shareholding interests in CICCHK and CICC Securities.

The Company has issued H Shares in December 2004, which were listed on the the Stock Exchange on 20 December 2004. The net proceeds raised (after deduction of fees and payable to the PRC National Social Security Fund) amounted to approximately HK$642,000,000.

The net proceeds raised are being used in accordance with the section headed "Use of Net Proceeds" set out in the Company's prospectus dated 8 December 2004. For the year ended 31 December 2004, the actual use of proceeds raised by the Company are set out as follows:

| **Use of proceeds** | **Planned** *(HK$ million)* | **Actual** *(HK$ million)* |
|---|---|---|
| Part of the total investment in the large screen CPT production company (K-Line) | 157 | 142 |
| Repayment to IRICO Group Corporation to offset the same amount previously drawn on the current account of IRICO Group Corporaton as part of the total investment in K-Line mentioned above | 157 | 97 |
| Part of the total capital expenditure in the production line of CPT components | 162 | 0 |
| Research and development of CPTs, CPT components and new display devices | 94 | 30 |
| Working capital for new projects | 75 | 68 |
| General operating capital | remaining capital | 0 |

As of 31 December 2004, the Group had no designated deposits in any financial institutions in the PRC. All of the Group's bank deposits are lodged in commercial banks in the PRC, and the Group is in compliance with the relevant laws and regulations.

For the year ended 31 December 2004, there were various continuing connected transactions between the Group and IRICO Group Corporation, Xian Guangxin Electronic Co., Ltd. ("Xian Guangxin"), IRICO Display Technology Co., Ltd. ("IRICO Display"), Xianyang IRICO Electronics Parts Co., Ltd. ("IRICO Shawdow Mask"), Shaanxi Rainbow Phosphor Material Co., Ltd. ("IRICO Phosphor"), Xianyang Caifan Packaging Material Company Limited ("Xianyang Caifan"), details of which are set out in the Company's prospectus dated 8 December 2004.

Pursuant to Rule 14A.42(3) of the Listing Rules, the Stock Exchange has granted to the Company a waiver from strict compliance with the otherwise applicable announcement and / or independent shareholders' approval requirements in connection with these continuing connected transactions (the "Waiver").

For the year ended 31 December 2004, the approved annual cap and the actual revenue or expenditure in respect of each continuing connected transactions are set out below:

| | Approved annual cap for 2004 *RMB'000* | Actual revenue or expenditure for 2004 *RMB'000* |
|---|---|---|
| Supply of fuel, coal, industrial chemicals products and raw materials to IRICO Group Corporation | 66,277 | 66,081 |
| Supply of industrial chemicals products, parts and raw materials to IRICO Display, IRICO Phosphor and IRICO Shadow Mask | 204,391 | 183,551 |
| Purchase of foam plastics, gloves, wood brackets, convergence magnets and raw materials from IRICO Group Corporation | 172,193 | 168,024 |
| Purchase of phosphor and shadow mask from IRICO Phosphor and IRICO Shadow Mask | 104,458 | 80,579 |
| Purchase of packaging materials, adhesive tapes and plastic materials from Xianyang Caifan | 43,739 | 43,389 |
| Utilities obtained from IRICO Group Corporation | 426,750 | 420,781 |
| Social and ancillary services obtained from IRICO Group Corporation | | |
| (a) Schools | 10,106 | 10,036 |
| (b) Social welfare facilities | 2,814 | 2,814 |
| (c) Security services | 800 | 214 |
| (d) Environmental hygiene and landscaping services | 1,200 | 1,000 |
| Rental payable to IRICO Group Corporation | 30,827 | 30,827 |
| Land use rights leasing fees payable to IRICO Group Corporation | 4,218 | 4,218 |
| Equipment leasing fees payable to Xian Guangxin | 1,500 | 1,500 |
| Trademark licensing fees payable to IRICO Group Corporation | 5,215 | 4,950 |

The independent non-executive Directors had reviewed these continuing connected transactions and confirmed to the Board that these transactions have been entered into:

(1) in the ordinary and usual course of business of the Group;

(2) either on normal commercial terms or, if there are not sufficient comparable transactions to judge whether they are on normal commercial terms, on terms no less favourable to the Company than terms available to or from (as appropriate) independent third parties; and

(3) in accordance with the relevant agreement governing them on terms that are fair and reasonable and in the interests of the shareholders of the Company as a whole.

The auditors of the Company had provided a letter to the Directors of the Company confirming that the continuing connected transactions:

(1) had received the approval by the Board of the Company;

(2) were in accordance with the pricing policies disclosed in the Company's prospectus dated 8 December 2004;

(3) had been entered into in accordance with the relevant agreements governing these transactions; and

(4) had not exceeded the caps set out in the Waiver.

In respect of these continuing connected transactions, the Company confirmed that it had complied with the relevant requirements set out in the Waiver and Chapter 14A of the Listing Rules.

As at 31 December 2004, details of bank loans of the Group are set out in note 27 to the accounts.

There are no provisions for pre-emptive rights under the Company's articles of association or relevant laws and regulations which could oblige the Company to offer new shares on a pro-rata basis to existing shareholders.

Details of the subsidiaries of the Company are set out in note 36 to the accounts.

During the year, the Group did not have any provision of external guarantees.

The Group was not involved in any litigation or arbitration of material importance during the year.

To the best knowledge of the Directors, the Company has complied with the Code of Best Practice ("Code of Best Practice"), as set out in Appendix 14 to the Listing Rules, throughout the year.

The Company has adopted the Model Code set out in Appendix 10 to the Listing Rules as the code of conduct regarding securities transactions by the Directors (the "Model Code"). Having made specific enquiry of all Directors, the Company has confirmed that all Directors have complied with the requirements set out in the Model Code.

Based on the information that is publicly available to the Company and within the knowledge of the Directors, as at the date of this report, there is sufficient public float of more than 25% of the Company's issued shares as required under the Listing Rules.

The accounts have been audited by PricewaterhouseCoopers who retire and, being eligible, offer themselves for re-appointment. A resolution reappointing PricewaterhouseCoopers as the auditors of the Company will be proposed at the forthcoming Annual General Meeting.

By order of the Board
**Ma Jinquan**
*Chairman*

Xianyang, the PRC
24 March 2005

# Report of the Supervisory Committee

**Dear shareholders,**

The Supervisory Committee was established on 9 September 2004. During the year, all members of the supervisory committee have honestly, duly and diligently performed their duties in compliance with the Company Law of the People's Republic of China, the Listing Rules and the Articles of Association of the Company.

The Supervisory Committee participated in the Board meetings and the significant events, reviewed the financial, daily management and operating activities of the Company and provided their opinions. The Supervisory Committee is satisfied with the operating performance of the Company in 2004 and has found no detriment to the interests of the shareholders and the Company or breach of the Articles of Association and relevant laws.

The Supervisory Committee has reviewed the report of the Directors, audited accounts and profit distribution plan and other matters to be proposed at the 2004 annual general meeting and is of opinion that there is no irregularities.

The Supervisory Committee has watched over members of the Board, the chief executive and senior managment in performing their duties, and is of opinion that members of the Board, the chief executive and other senior management members have been performing their duties in a diligent and honest manner and in the interests of the shareholders and the Company. The operation of the Company is sound.

The Supervisory Committee is confident in the prospect of the Company and will proceed to carry out effective supervision on the operation of the Company to safeguard the interests of the shareholders as a whole and the Company.

By order of the Supervisory Committee
**Niu Xin'an**
*Chairman of the Supervisory Committee*

Xianyang, The PRC
24 March 2005

# Report of Corporate Governance

## Corporate governance practices

For the year ended 31 December 2004, in the opinion of the Board, the Company has complied with the Code of Best Practice as set out in Appendix 14 to the Listing Rules and proactively reviewed its internal control in accordance with the principles and provisions set out in the Code on Corporate Governance Practices of the Listing Rules. The Company will comply with such principles and provisions.

## Model Code

The Company has adopted the Model Code as set out in Appendix 10 to the Listing Rules as the code for securities transactions by Directors of the Company. The Company has confirmed that all Directors have complied with the requirements set out in the Model Code.

## The Board

### Composition and appointment

The first Board was elected at the inauguration meeting and the first general meeting on 9 September 2004. The Board comprises 12 Directors, including 5 independent non-executive Directors, 6 executive Directors and 1 non-executive Director. Names and biographies of the Directors are set out on page 21 to 26 of this annual report. The term of office for all the Directors (including non-executive Directors and independent non-executive Directors) is 3 years and they are eligible for re-election upon expiry.

The Directors confirmed that there was no connection amongst the Directors, that should be disclosed relating to finance, business, relation or other significant events or relevant matters. The Board confirmed that the independence and eligibility of the independent non-executive Directors are in compliance with the relevant requirements of the Listing Rules.

The Board has effectively overseen and monitored the activities of the Company and the decisions were made in the best interests of the Company. In 2004, the Board convened a total of four meetings, performing its duties in considering the appointment of the general manager, listing of H Shares, financial and other matters under the provisions of the Articles of Association of the Company. Real-time teleconference system was adopted at each meeting to increase the attendance rate. The average attendance rate was 97%.

## Composition and appointment *(continued)*

Statistics of Directors' attendance at the Board meetings:

| Name of director | Attendance | | Title |
|---|---|---|---|
| | Times | Rate | |
| Ma Jinquan | 4/4 | 100% | Executive Director, Chairman |
| Tao Kui | 4/4 | 100% | Executive Director, Vice Chairman |
| Xing Daoqin | 4/4 | 100% | Executive Director, Chief executive |
| Guo Mengquan | 4/4 | 100% | Executive Director |
| Zhang Shaowen | 4/4 | 100% | Executive Director |
| Yun Dajun | 4/4 | 100% | Executive Director |
| Zhang Xingxi | 4/4 | 100% | Non-executive Director |
| Feng Fei | 4/4 | 100% | Independent non-executive Director |
| Xu Xinzhong | 4/4 | 100% | Independent non-executive Director |
| Feng Bing | 3/4 | 75% | Independent non-executive Director |
| Wang Jialu | 4/4 | 100% | Independent non-executive Director |
| Zha Jianqiu | 4/4 | 100% | Independent non-executive Director |

## Chairman and chief executive

Two executive Directors, Mr. Ma Jinquan and Mr. Xing Daoqin, serve as the Chairman and the Chief Executive of the Company respectively. The Chairman is responsible for convening the Board meetings and promoting the corporate governance of the Company, whereas the chief executive participates in the significant decision-making and the day-to-day management of the Company.

## Audit committee

The audit committee comprises four independent non-executive Directors and one non-executive Director. Mr. Zha Jianqiu, an independent non-executive Director, serves as the chairman of the audit committee. Under the requirements set out by the Board, the audit committee adopts and complies with "A Guide for Effective Audit Committees" issued by the Hong Kong Institute of Certified Public Accountants. Responsibilities of the audit committee include:

(1) to be in charge of the appointment of external auditors, auditing expenses and any matters regarding the resignation or dismissal of the external auditors;

(2) to discuss with the external auditors on the nature and scope of audit prior to the commencement of the auditing procedures; and

(3) to review the interim and annual accounts.

The audit committee has reviewed the auditing performance, the internal controls and the audited accounts of the Company for the year ended 31 December 2004.

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 419 of 1004

PRICEWATERHOUSECOOPERS

羅兵咸永道會計師事務所

PricewaterhouseCoopers
22nd Floor Prince's Building
Central, Hong Kong

**TO THE SHAREHOLDERS OF IRICO GROUP ELECTRONICS COMPANY LIMITED**
*(A joint stock company incorporated in the People's Republic of China with limited liability)*

We have audited the accounts on page 40 to 82 which have been prepared in accordance with accounting principles generally accepted in Hong Kong.

## Respective responsibilities of directors and auditors

The Company's directors are responsible for the preparation of accounts which give a true and fair view. In preparing accounts which give a true and fair view it is fundamental that appropriate accounting policies are selected and applied consistently.

It is our responsibility to form an independent opinion, based on our audit, on those accounts and to report our opinion solely to you, as a body, and for no other purpose. We do not assume responsibility towards or accept liability to any other person for the contents of this report.

## Basis of opinion

We conducted our audit in accordance with Statements of Auditing Standards issued by the Hong Kong Institute of Certified Public Accountants. An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the accounts. It also includes an assessment of the significant estimates and judgements made by the directors in the preparation of the accounts, and of whether the accounting policies are appropriate to the circumstances of the Company and the Group, consistently applied and adequately disclosed.

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance as to whether the accounts are free from material misstatement. In forming our opinion we also evaluated the overall adequacy of the presentation of information in the accounts. We believe that our audit provides a reasonable basis for our opinion.

## Opinion

In our opinion the accounts give a true and fair view of the state of affairs of the Company and the Group as at 31st December 2004 and of the profit and cash flows of the Group for the year then ended and have been properly prepared in accordance with the disclosure requirements of Hong Kong Companies Ordinance.

**PricewaterhouseCoopers**
Certified Public Accountants

Hong Kong, 24th March 2005

# Consolidated Profit and Loss Account

For the year ended 31st December 2004

| | Note | 2004 Rmb'000 | 2003 Rmb'000 |
|---|---|---|---|
| Turnover | 1 | 4,949,683 | 4,269,781 |
| Cost of sales | | (3,896,956) | (3,256,959) |
| Gross profit | | 1,052,727 | 1,012,822 |
| Other revenues | 3 | 56,486 | 61,258 |
| Other income | | 15,413 | 9,970 |
| Distribution expenses | | (113,323) | (103,405) |
| Administrative expenses | | (219,008) | (227,275) |
| Other operating expenses | 4 | (79,275) | (73,604) |
| Operating profit | 5 | 713,020 | 679,766 |
| Finance costs | 6 | (62,966) | (56,588) |
| Share of results of associated companies | | 196 | (62) |
| Profit before taxation | | 650,250 | 623,116 |
| Taxation | 7 | (134,468) | (173,936) |
| Profit after taxation | | 515,782 | 449,180 |
| Minority interests | | (130,455) | (133,355) |
| Profit attributable to shareholders | 8 | 385,327 | 315,825 |
| Dividend / profit distribution | 9 | 204,923 | 146,084 |
| Earnings per share | 10 | Rmb 0.25 | Rmb 0.31 |

# Consolidated Balance Sheet

As at 31st December 2004

| | Note | 2004<br>Rmb'000 | 2003<br>Rmb'000 |
|---|---|---|---|
| Non-current assets | | | |
| Intangible assets | 13 | 67,074 | 112,605 |
| Fixed assets | 14 | 3,455,686 | 2,407,636 |
| Associated companies | 16 | 18,218 | 18,022 |
| Long-term investments | 17 | 24,060 | 30,000 |
| Deferred taxation | 29 | 9,947 | 8,172 |
| | | 3,574,985 | 2,576,435 |
| Current assets | | | |
| Inventories | 18 | 930,556 | 705,818 |
| Accounts receivable | 19 | 654,546 | 258,101 |
| Trade bills receivable | 20 | 628,015 | 1,023,684 |
| Other receivables, deposits and prepayments | | 181,526 | 110,854 |
| Other investments | 22 | 4,640 | 4,024 |
| Due from related parties | 23 | 11,400 | 50,074 |
| Cash and bank balances | 25 | | |
| — pledged | | 21,000 | — |
| — unpledged | | 1,096,516 | 743,186 |
| | | 3,528,199 | 2,899,241 |
| Current liabilities | | | |
| Accounts payable | 26 | 561,607 | 431,779 |
| Other payables and accruals | | 444,939 | 566,988 |
| Trade bills payable | | 96,171 | 129,287 |
| Due to related parties | 23 | 372,303 | 62,386 |
| Due to minority shareholders | 24 | 4,436 | 10,046 |
| Short-term bank loans | 27 | 1,420,000 | 630,000 |
| Current portion of long-term bank loans | | — | 430,000 |
| Taxation payable | | 21,118 | 13,503 |
| | | 2,920,574 | 2,273,989 |
| Net current assets | | 607,625 | 625,252 |
| Total assets less current liabilities | | 4,182,610 | 3,201,687 |
| Financed by: | | | |
| Share capital | 30 | 1,941,174 | 1,500,000 |
| Reserves | 31 | 1,101,276 | 679,758 |
| Shareholders' equity | | 3,042,450 | 2,179,758 |
| Minority interests | | 1,128,866 | 1,007,160 |
| Non-current liabilities | | | |
| Deferred income | 28 | 11,294 | 14,769 |
| | | 4,182,610 | 3,201,687 |

**Ma Jinquan**
*Chairman*

**Yun Dajun**
*Director*

# Balance Sheet

As as 31st December 2004

| | Note | 2004 Rmb'000 |
|---|---|---|
| Non-current assets | | |
| Intangible assets | 13 | 21,534 |
| Fixed assets | 14 | 1,486,838 |
| Investments in subsidiaries | 15 | 1,812,275 |
| | | 3,320,647 |
| Current assets | | |
| Inventories | 18 | 487,847 |
| Accounts receivable | 19 | 238,367 |
| Trade bills receivable | 20 | 130,862 |
| Other receivables, deposits and prepayments | | 146,082 |
| Loan to a subsidiary | 21 | 30,000 |
| Due from related parties | 23 | 3,421 |
| Cash and bank balances | 25 | |
| — pledged | | 21,000 |
| — unpledged | | 460,465 |
| | | 1,518,044 |
| Current liabilities | | |
| Accounts payable | 26 | 342,352 |
| Other payables and accruals | | 290,451 |
| Trade bills payable | | 48,662 |
| Due to related parties | 23 | 268,292 |
| Due to minority shareholders of subsidiaries | 24 | 1,455 |
| Short-term bank loans | 27 | 990,000 |
| Taxation payable | | 4,993 |
| | | 1,946,205 |
| Net current liabilities | | (428,161) |
| Total assets less current liabilities | | 2,892,486 |
| Financed by: | | |
| Share capital | 30 | 1,941,174 |
| Reserves | 31 | 947,616 |
| Shareholders' equity | | 2,888,790 |
| Non-current liabilities | | |
| Deferred income | 28 | 1,389 |
| Deferred taxation | 29 | 2,307 |
| | | 3,696 |
| | | 2,892,486 |

**Ma Jinquan**
*Chairman*

**Yun Dajun**
*Director*

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 423 of 1004

# Consolidated Cash Flow Statement

For the year ended 31st December 2004

| | Note | 2004<br>Rmb'000 | 2003<br>Rmb'000 |
|---|---|---|---|
| Operating activities | | | |
| Cash generated from operations | 33(a) | 814,964 | 579,246 |
| Interest paid | | (62,966) | (56,588) |
| Net PRC enterprise income tax paid | | (128,628) | (135,999) |
| Net cash from operating activities | | 623,370 | 386,659 |
| Investing activities | | | |
| Purchase of fixed assets and intangible assets | | (1,313,432) | (431,843) |
| Proceeds from disposal of fixed assets | | 11,494 | 1,044 |
| Proceeds from disposal of other investments | | 105,808 | 190,807 |
| Increase in investments in an associated company | | — | (77,000) |
| Proceeds from disposal of long-term investments | | — | 690 |
| Increase in other investments | | (117,201) | (107,124) |
| Acquisition of a subsidiary, net of cash acquired | 33(b) | 19,333 | — |
| Decrease in due from related parties and minority shareholders — non-trade | | — | 671,462 |
| Dividend received | | 396 | — |
| Interest received | | 5,524 | 20,721 |
| Net cash (used in) / from investing activities | | (1,288,078) | 268,757 |
| Financing activities | 33(c) | | |
| Draw-down of short-term bank loans | | 1,620,000 | 630,000 |
| Repayment of short-term bank loans | | (830,000) | (720,000) |
| Draw-down of long-term bank loans | | — | 160,000 |
| Repayment of long-term bank loans | | (430,000) | (130,000) |
| Dividends paid to ultimate holding company | | (146,084) | (87,614) |
| Dividends paid to minority shareholders | | (35,172) | (49,107) |
| Contribution from minority shareholders | | 18,768 | 10,348 |
| Increase / (decrease) in due to related parties and minority shareholders — non-trade | | 133,560 | (271,368) |
| Increase in pledged bank balance | | (21,000) | — |
| Cash distributed to ultimate holding company | | — | (200,000) |
| Proceeds from issuance of shares by the Company | | 741,039 | — |
| Share issuance costs paid | | (37,073) | — |
| Net cash from / (used in) financing activities | | 1,014,038 | (657,741) |
| Increase / (decrease) in cash and bank balances | | 349,330 | (2,325) |
| Unpledged cash and bank balances at beginning of the year | | 747,186 | 749,511 |
| Unpledged cash and bank balances at end of the year | | 1,096,516 | 747,186 |

# Consolidated Statement of Changes in Equity

For the year ended 31st December 2004

| | Share capital *Rmb'000* | Capital reserve *Rmb'000* | Statutory surplus reserve *Rmb'000* | Statutory public welfare fund *Rmb'000* | Retained profit *Rmb'000* | Total *Rmb'000* |
|---|---|---|---|---|---|---|
| **2004** | | | | | | |
| As at 1st January 2004 | 1,500,000 | 679,758 | — | — | — | 2,179,758 |
| Profit for the year | — | — | — | — | 385,327 | 385,327 |
| Special dividend | — | — | — | — | (204,923) | (204,923) |
| Issue of shares | 441,174 | — | — | — | — | 441,174 |
| Premium on issue of shares | — | 299,865 | — | — | — | 299,865 |
| Share issuance costs | — | (63,490) | — | — | — | (63,490) |
| Contribution from ultimate holding company (note 33(b)) | — | 4,739 | — | — | — | 4,739 |
| Transfer to reserves | — | — | 15,687 | 7,843 | (23,530) | — |
| As at 31st December 2004 | 1,941,174 | 920,872 | 15,687 | 7,843 | 156,874 | 3,042,450 |
| **2003** | | | | | | |
| As at 1st January 2003 | 1,500,000 | 1,316,132 | — | — | — | 2,816,132 |
| Profit for the year | — | — | — | — | 315,825 | 315,825 |
| Profit distribution | — | — | — | — | (146,084) | (146,084) |
| Capitalisation upon Reorganisation | — | 169,741 | — | — | (169,741) | — |
| Distribution to ultimate holding company upon Reorganisation | — | (806,115) | — | — | — | (806,115) |
| As at 31st December 2003 | 1,500,000 | 679,758 | — | — | — | 2,179,758 |

## 1 Group reorganisation and basis of preparation

IRICO Group Electronics Company Limited (the "Company") was incorporated in the People's Republic of China (the "PRC") on 10th September 2004 as a joint stock company with limited liability under the PRC laws as a result of a group reorganisation (the "Reorganisation") effective as of 31st December 2003 with details set out in the Accountants' Report to the Company's prospectus dated on 8th December 2004. The Company issued 1,500,000,000 ordinary shares of RMB1 per share to IRICO Group Corporation in exchange for the core assets and businesses of IRICO Group Corporation relating to production and sale of colour picture tubes ("CPTs") and CPT-related components and materials ("Transferred Businesses"). In addition, the Company completed its initial public offering and placing of shares on 20th December 2004. As a result, the issued share capital of the Company increased from 1,500,000,000 shares to 1,941,174,000 shares. Gross fund raised amounted to approximately HK$767 million (equivalent to approximately RMB816 million).

The Reorganisation is accounted for using merger accounting as permitted by the Hong Kong Statement of Standard Accounting Practice No. 27 "Accounting for group reconstructions" issued by the Hong Kong Institute of Certified Public Accountants ("HKICPA"). The consolidated accounts for the years ended 31st December 2003 and 2004 present the consolidated results and the state of affairs of the Group as if the Reorganisation was effective at the beginning of the earliest period presented.

The accounts have been prepared under the historical cost convention as modified by the revaluation of other investments, in accordance with the accounting principles generally accepted in Hong Kong and comply with Hong Kong Financial Reporting Standards ("HKFRSs"). The HKICPA has issued a number of new and revised HKFRSs which are effective for accounting periods beginning on or after 1st January 2005. The Group has not early adopted these new HKFRSs in the accounts for the year ended 31st December 2004. The Group has already commenced an assessment of the impact of these new HKFRSs but is not yet in a position to state whether these new HKFRSs would have a significant impact on its results of operations and financial position.

As the Company was incorporated on 10th September 2004, there are no comparative figures for the Company's balance sheet as at 31st December 2004.

## 2 Principal accounting policies

The principal accounting policies adopted in the preparation of these accounts are set out below:

### (a) Consolidation

The consolidated accounts include the accounts of the Company and its subsidiaries made up to 31st December.

Subsidiaries are those entities in which the Company, directly or indirectly, controls more than one half of the voting power; has the power to govern the financial and operating policies; to appoint or remove the majority of the members of the board of directors; or to cast majority of votes at the meetings of the board of directors.

The results of subsidiaries acquired or disposed of during the year are included in the consolidated profit and loss account from the effective date of acquisition or up to the effective date of disposal, as appropriate.

All significant intercompany transactions and balances within the Group are eliminated on consolidation.

The gain or loss on the disposal of a subsidiary represents the difference between the proceeds of the sale and the Group's share of its net assets together with any unamortised goodwill or negative goodwill and any related accumulated foreign currency translation reserve.

Minority interests represent the interests of outside shareholders in the operating results and net assets of subsidiaries.

In the Company's balance sheet the investments in subsidiaries are stated at cost less provision for impairment losses. The results of subsidiaries are accounted for by the Company on the basis of dividends received and receivable.

## 2 Principal accounting policies *(continued)*

### (b) Associated companies

An associated company is a company, not being a subsidiary or a joint venture, in which an equity interest is held for the long-term and significant influence is exercised in its management.

The consolidated profit and loss account includes the Group's share of the results of associated companies for the year, and the consolidated balance sheet includes the Group's share of the net assets of the associated companies and any unamortised goodwill / negative goodwill on acquisition.

Equity accounting is discontinued when the carrying amount of the investment in an associated company reaches zero, unless the Group has incurred obligations or guaranteed obligations in respect of the associated company.

Unrealised gains on transactions between the Group and its associates are eliminated to the extent of the Group's interest in the associates; unrealised losses are eliminated unless the transaction provides evidence of an impairment of the asset transferred.

### (c) Fixed assets and depreciation

Fixed assets are stated at cost less accumulated depreciation and accumulated impairment losses.

Depreciation of fixed assets is calculated to write off the cost of the assets less accumulated impairment losses and estimated residual values using a straight line method over their estimated useful lives as follows:

| | |
|---|---|
| Land use rights | over the unexpired lease term |
| Buildings | 10-40 years |
| Machinery for electronics production | 15 years |
| Machinery for glass production | 6 years |
| Other machinery | 18 years |
| Office equipment and others | 5 years |

No depreciation is provided on construction in progress.

Major costs incurred in restoring fixed assets to their normal working condition are charged to the profit and loss account. Improvements are capitalised and depreciated over their expected useful lives to the Group.

## 2 Principal accounting policies *(continued)*

### (c) Fixed assets and depreciation *(continued)*

The gain or loss on disposal of a fixed asset is the difference between the net sales proceeds and the carrying amount of the relevant asset, and is recognised in the profit and loss account.

At each balance sheet date, both internal and external sources of information are considered to assess whether there is any indication that fixed assets are impaired. If any such indication exists, the recoverable amount of the asset is estimated and where relevant, an impairment loss is recognised to reduce the asset to its recoverable amount. Such impairment losses are recognised in the profit and loss account. The impairment loss is written back to the profit and loss account when the circumstances and events that led to the write-down cease to exist and there is persuasive evidence that the new circumstances and events will persist for the foreseeable future.

### (d) Intangibles

Expenditure on licenses is capitalised and amortised using the straight-line method over their useful lives but not exceeding 20 years.

Where an indication of impairment exists, the carrying amount of any intangible asset is assessed and written down immediately to its recoverable amount.

### (e) Investments

(i) Long-term investments

Long-term investments are equity investments held for an identified long term purpose and are stated at cost less any provision for impairment losses. The carrying amounts of individual investments are reviewed at each balance sheet date to assess whether the fair values have declined below the carrying amounts. When a decline other than temporary has occurred, the carrying amount of such investments will be reduced to its fair value. The impairment loss is recognised as an expense in the profit and loss account. This impairment loss is written back to profit and loss account when the circumstances and events that led to the write-downs or write-offs cease to exist and there is persuasive evidence that the new circumstances and events will persist for the foreseeable future.

(ii) Other investments

Other investments are investments held for trading purpose and are stated at fair value. At each balance sheet date, the net unrealised gains or losses arising from the changes in fair value of other investments are recognised in the profit and loss account. Profits or losses on disposal of other investments, representing the difference between the net sales proceeds and the carrying amounts are recognised in the profit and loss account as they arise.

## 2 Principal accounting policies *(continued)*

### (f) Inventories

Inventories comprise stocks and work-in-progress and are stated at the lower of cost and net realisable value. Cost, calculated on the weighted-average basis, comprises materials, direct labour and an appropriate proportion of production overhead expenditure. Net realisable value is determined on the basis of anticipated sales proceeds less estimated selling expenses.

### (g) Accounts receivable

Provision is made against accounts receivable to the extent they are considered to be doubtful. Accounts receivable in the balance sheet are stated net of such provision.

### (h) Cash and cash equivalents

Cash and cash equivalents are carried in the balance sheet at cost. For the purposes of the cash flow statement, cash and cash equivalents comprise cash on hand and deposits held at call with banks.

### (i) Provisions

Provisions are recognised when the Group has a present legal or constructive obligation as a result of past events, it is probable that the outflow of resources will be required to settle the obligation, and a reliable estimate of the amount can be made. The Group recognises a provision for repairs or replacement of products still under warranty at the balance sheet date.

### (j) Deferred taxation

Deferred taxation is provided in full, using the liability method, on temporary differences arising between the tax bases of assets and liabilities and their carrying amounts in the accounts. Taxation rates enacted or substantively enacted by the balance sheet date are used to determine deferred taxation.

Deferred tax assets are recognised to the extent that it is probable that future taxable profit will be available against which the temporary differences can be utilised.

### (k) Contingent liabilities

A contingent liability is a possible obligation that arises from past events and whose existence will only be confirmed by the occurrence or non-occurrence of one or more uncertain future events not wholly within the control of the Group. It can also be a present obligation arising from past events that is not recognised because it is not probable that outflow of economic resources will be required or the amount of obligation cannot be measured reliably.

A contingent liability is not recognised but is disclosed in the notes to the accounts. When a change in the probability of an outflow occurs so that outflow is probable, they will then be recognised as a provision.

Case 3:07-cv-05944-JST Document 5440-2 Filed 04/15/19 Page 52 of 94

## 2 Principal accounting policies *(continued)*

### (l) Operating leases

Leases where substantially all the risks and rewards of ownership of assets remain with the lessors are accounted for as operating leases and rentals payable net of any incentives received from the leasing company are charged to the profit and loss account evenly over the periods of the respective leases.

### (m) Borrowing costs

Borrowing costs that are directly attributable to the acquisition, construction or production of an asset that necessarily takes a substantial period of time to get ready for its intended use or sale are capitalised as part of the cost of that asset. All other borrowing costs are charged to the profit and loss account in the period in which they are incurred.

### (n) Foreign currencies

Transactions in foreign currencies are translated at exchange rates ruling at the transaction dates. Monetary assets and liabilities denominated in foreign currencies at the balance sheet date are translated at rates of exchange ruling at that date. Exchange differences arising in these cases are dealt with in the profit and loss account.

### (o) Employee benefits

The full time employees of the Group are covered by various government-sponsored pension plans under which the employees are entitled to a monthly pension based on certain formulae. These government-sponsored pension plans are responsible for the pension liability to these retired employees. The Group contributes on a monthly basis to these pension plans. Under these plans, the Group has no legal or constructive obligation for retirement benefits beyond the contributions made. Contributions to these plans are expensed as incurred. Voluntary payments made to certain former employees and which were not made pursuant to a formal or informal plan are expensed as paid.

Full time employees are also entitled to participate in various government-sponsored housing funds. The Group contributes on a monthly basis to these funds based on certain percentages of the salaries of the employees. The Group's liability in respect of these funds is limited to the contributions payable in each period.

## 2 Principal accounting policies *(continued)*

### (p) Research and development expenses

Research expenditure is recognised as an expense as incurred. Costs incurred on development projects relating to the design and testing of new or improved products are recognised as intangible assets when it is probable that the project will be a success considering its commercial and technological feasibility, and only if the cost can be measured reliably. Other development expenditures are recognised as an expense as incurred. Development costs previously recognised as an expense are not recognised as an asset in subsequent periods.

### (q) Grants

Grants related to income are deferred and are recognised in the profit and loss account on a systematic basis to match with the related costs which they are intended to compensate, otherwise grants with no future related costs are recognised on receipt basis.

Grants relating to the purchase of fixed assets are included in non-current liabilities as deferred income and are credited to profit and loss account on a straight line basis over the expected lives of the related assets.

### (r) Revenue recognition

Sale of goods is recognised on the transfer of risks and rewards of ownership, which generally coincide with the time when the goods are delivered to customers.

Interest income is recognised on a time proportion basis, taking into account the principal amounts outstanding and interest rates applicable.

Dividend income is recognised when the right to receive payment is established.

Service income is recognised when the relevant service is rendered.

Operating lease rental income is recognised on a straight-line basis over the period of leases.

### (s) Segment Information

A business segment is a distinguishable component of the Group that is engaged in providing products or services and is subject to risks and rewards that are different from those of other segments. The Group's revenues, expenses, assets, liabilities and capital expenditures are primarily attributable to the production and sale of CPT. The business segment of other CPT components contributed less than 10 per cent of the revenues, results and total assets of the Group and are not reported separately.

The Group's principal market is Mainland China and its sales to ultimate overseas customers were conducted through certain export agent companies in the Mainland before 13th October 2004. After 13th October 2004, the Company obtained the export right from related authorities and directly sold its products to overseas markets. However, the direct export sales made by the Group contributed less than 10 percent of the revenues and results of the Group. Accordingly, no geographical segment is presented.

# Notes to the Accounts

## 3 Turnover and revenues

The Group is principally engaged in the manufacturing of colour picture tube ("CPT") for coloured television sets; related CPT components including glass bulbs, electron guns, shadow masks and their frames, deflection yokes, frit, anode buttons, phosphor, etc and provision of related packaging, engineering and trading services. Revenues recognised during the year are as follows:

| | 2004 Rmb'000 | 2003 Rmb'000 |
|---|---|---|
| Turnover | | |
| Sales of CPTs | **4,466,767** | 3,888,156 |
| Sales of CPT components | **482,916** | 381,625 |
| | **4,949,683** | 4,269,781 |
| Other revenues | | |
| Interest income | **5,524** | 20,721 |
| Sales of raw materials, scraps and packaging materials | **47,154** | 34,309 |
| Other service income | **2,472** | 5,345 |
| Dividends from long-term investments | **396** | — |
| Rental income | **940** | 883 |
| | **56,486** | 61,258 |
| | **5,006,169** | 4,331,039 |

## 4 Other operating expenses

| | 2004 Rmb'000 | 2003 Rmb'000 |
|---|---|---|
| Cost of raw materials and scraps sold | **11,528** | 8,690 |
| Cost of other services provided | **31** | 4,510 |
| Loss on disposal of fixed assets | **7,153** | (3,104) |
| Other PRC taxes including education and construction levies | **24,872** | 25,396 |
| Provision for doubtful debts | **302** | 1,182 |
| Write-down of inventories to net realisable value | **10,278** | 10,936 |
| Donation | **749** | 2,588 |
| Realised and unrealised losses on other investments | **11,834** | — |
| Loss on disposal of a long-term investments | — | 3,309 |
| Impairment loss on a long-term investments | **5,940** | — |
| Others | **6,606** | 3,889 |
| | **79,275** | 73,604 |

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 433 of 1004

## 5 Operating profit

| | 2004<br>*Rmb'000* | 2003<br>*Rmb'000* |
|---|---|---|
| Operating profit is stated after (crediting) / charging the following: | | |
| Wages and salaries | **409,638** | 417,050 |
| Retirement benefit contributions | **46,769** | 38,792 |
| Welfare and other expenses | **69,861** | 53,886 |
| Total staff costs excluding directors' emoluments | **526,268** | 509,728 |
| Cost of inventories sold (including cost of raw materials and scraps sold) | **3,822,721** | 3,167,837 |
| Auditors' remuneration | **2,083** | 474 |
| Depreciation | **242,819** | 285,587 |
| Amortisation of intangible assets | **54,150** | 50,315 |
| Operating lease rentals in respect of machinery and equipment | **1,500** | 1,300 |
| Operating lease rentals in respect of land use rights and buildings | **35,045** | — |
| Provision for warranty | **12,973** | 16,533 |
| Research and development costs | **46,980** | 31,610 |
| Grant received and amortisation of deferred income on grant received | **(4,688)** | (4,387) |
| Gain on disposal of other investments | **(1,037)** | (2,982) |
| Write-back of provision for doubtful debts | **(5,200)** | — |

## 6 Finance costs

| | 2004<br>*Rmb'000* | 2003<br>*Rmb'000* |
|---|---|---|
| Interest on bank loans wholly repayable within five years | **55,360** | 48,629 |
| Finance charge on discounting of bills to banks | **7,606** | 7,759 |
| | **62,966** | 56,388 |

Case 3:07-cv-05944-JST Document 3440-2 Filed 04/12/16 Page 58 of 84

## 7 Taxation

| | 2004 Rmb'000 | 2003 Rmb'000 |
|---|---|---|
| PRC enterprise income tax ("EIT") | | |
| Company and subsidiaries | | |
| — Current | 136,243 | 164,207 |
| — Deferred (note 29) | (1,775) | 9,729 |
| | 134,468 | 173,936 |

The provision for PRC current EIT is calculated based on the statutory income tax rate of 33% of the assessable income of the Company and its subsidiaries as determined in accordance with the relevant PRC income tax rules and regulations for the year except for the Company and certain subsidiaries described in the note below. All corresponding EIT relating to the taxable profit during the year have been recognised in the consolidated profit and loss account.

The Group's effective tax rate differs from the statutory rate principally due to following factors:

| | 2004 Rmb'000 | 2003 Rmb'000 |
|---|---|---|
| Profit before taxation | 650,250 | 623,116 |
| Calculated at statutory rate of 33% | 214,583 | 205,628 |
| Income under tax exemption and reduction (note a) | (80,155) | (25,430) |
| Income not subject to taxation | (2,876) | (2,067) |
| Expenses not deductible for taxation purpose | 2,916 | 2,513 |
| Tax credit arising from purchase of equipment locally in the PRC | — | (6,708) |
| | 134,468 | 173,936 |

Case 3:07-cv-05944-JST Document 5440-2 Filed 04/12/19 Page 37 of 94

## 7 Taxation *(continued)*

Note:

Companies are entitled to the preferential tax treatment for Opening Up of Western China ("OUWC Policy") if they are engaged in the projects listed in the Catalogue for Industries, Products and Technologies Currently and Particularly Encouraged by the State for Development (as amended in 2000) as their principal business and the revenue from the principal operations account for over 70% of their total revenue. The applicable reduced preferential EIT rate under the OUWC Policy is 15%. From 10th September 2004 to 31st December 2004, the operations of the Company have met the requirement under the OUWC Policy, and accordingly, EIT has been provided at 15% from 10th September 2004 to 31st December 2004.

IRICO Display Devices Co., Ltd., a subsidiary of the Company, has obtained the approval from the relevant authorities for its entitlement to the OUWC Policy for the year ended 31st December 2003. Accordingly, EIT was accrued for and paid at a rate of 15% for the year ended 31st December 2003. For the year ended 31st December 2004, the operations of IRICO Display Devices Co., Ltd. have met the requirements under the OUWC Policy, and accordingly, EIT has also been provided at 15%.

Xian IRICO Zixun Co., Ltd. was granted the status of high technology company. It is exempted from EIT for 2001 and 2002 and is required to pay EIT at a rate of 15% in 2003 and 2004.

Caizhu (Zhongshan) Electronic Glass Plant was established in 1992 without active operation until 2002. It has been granted the status of high technology company since 2003, and accordingly, EIT was provided at 15% in 2003 and 2004.

Zhuhai Caizhu Industrial Co., Ltd. and Caizhu Jinshun Electronic Industry Co., Ltd. are registered in a special economic zone and are entitled to pay income tax at 15% for 2003 and 2004.

Kunshan Caihong Yingguang Electronics Co., Ltd. is registered in a technological economic development zone and is required to pay EIT at a rate of 15% in 2003 and 2004.

Nanjing Reide Phosphor Co., Ltd., Xianyang IRICO Electronic Shadow Mask Co., Ltd. and IRICO Display Technology Co., Ltd. are Sino-foreign equity joint ventures engaging in the production business and are exempted from taxation for the first two profitable years and a 50% relief from the national PRC income tax rate (also exempted from paying the 3% local income tax) for the next three profitable years thereafter. As a result, Nanjing Reide Phosphor Co., Ltd., which was established in 2002, is still in the exemption period. Xianyang IRICO Electronic Shadow Mask Co., Ltd., established in 2003 is in the pre-operating stage and has no assessable income. IRICO Display Technology Co., Ltd., which was established in 2004, is still in the exemption period.

## 8 Profit attributable to shareholders

The profit attributable to shareholders is dealt with in the accounts of the Company to the extent of RMB189,918,000.

## 9 Dividend / profit distribution

| | 2004 | 2003 |
|---|---|---|
| | *Rmb'000* | *Rmb'000* |
| Special dividend (note (a)) | **204,923** | — |
| Profit distribution (note (b)) | — | 146,084 |
| | **204,923** | 146,084 |

Notes:

(a) As described in note 1 to the accounts, the Reorganisation of the Group was consummated on 31st December 2003 but the formal incorporation of the Company was on 10th September 2004 ("Incorporation Date"). According to the "Provisional Regulations Concerning the Management of State Capital and Certain Accounting Treatment for Enterprises Restructuring into Companies" from the Ministry of Finance of the PRC, all the net profit accrued from the operations of the Transferred Businesses transferred to the Company, as reported under the relevant accounting principles and financial regulations applicable to PRC enterprises ("PRC GAAP"), prior to the Incorporation Date was attributable to the ultimate parent company. As a result, the Company was required to make a special distribution which represents the net profit determined under PRC GAAP accrued from the Transferred Businesses from 1st January 2004 to 9th September 2004 (one day before the Incorporation Date, "Immediate Pre-incorporation Date") amounting to RMB204,923,000, to the ultimate parent company (see also Note 31). The special dividend was recorded in due to the ultimate holding company as at 31st December 2004.

(b) The profit distribution for the year ended 31st December 2003 represented profit distribution paid by the Group to the ultimate holding company prior to the establishment of the Company. The rates of dividend and the number of shares ranking for dividends are not presented for these profit distributions as such information is not meaningful.

No final dividend was declared or proposed for the year ended 31st December 2004.

## 10 Earnings per share

The calculation of basic earnings per share is based on the Group's profit attributable to shareholders of RMB385,327,000 (2003: RMB315,825,000) and based on the weighted average of 1,516,922,000 (2003: 1,500,000,000) shares in issue, assuming that the 1,500,000,000 shares issued pursuant to the Reorganisation had been in issue throughout both years.

There were no dilutive potential shares during the years ended 31st December 2003 and 2004 and accordingly no diluted earnings per share is presented.

# 11 Directors' and senior managements' emoluments

## (a) Directors' emoluments

Details of emoluments paid and payable to the directors of the Company by the Group in respect of their services rendered for managing the businesses of the Group during the year are as follows:

| | 2004<br>*Rmb'000* | 2003<br>*Rmb'000* |
|---|---|---|
| Fees | 163 | — |
| Salaries and allowances | 1,996 | 160 |
| Discretionary bonuses | — | 1,384 |
| Retirement benefit contributions | 38 | 26 |
| | 2,197 | 1,570 |

No directors waived or agreed to waive any emolument during the year. Fee paid to independent non-executive directors amounted to RMB163,000 for the year (2003: Nil).

The remuneration of the directors fell within the following bands:

| | Number of directors 2004 | 2003 |
|---|---|---|
| Nil to RMB1,000,000 | 12 | 12 |

## (b) Supervisors' emoluments

| | 2004<br>*Rmb'000* | 2003<br>*Rmb'000* |
|---|---|---|
| Fees | 55 | — |
| Salaries and allowances | 920 | 70 |
| Discretionary bonuses | — | 672 |
| Retirement benefit contributions | 21 | 12 |
| | 996 | 754 |

## 11 Directors' and senior managements' emoluments *(continued)*

### (c) Five highest paid individuals

The five individuals whose emoluments were the highest in the Group for the year ended 31st December 2004 include 5 directors (2003: 4) whose emoluments are reflected in the analysis presented in (a) above. The emoluments payable to the remaining individual for the year ended 31st December 2003 were as follows:

| | **2004** | 2003 |
|---|---|---|
| | ***Rmb'000*** | *Rmb'000* |
| Salaries and allowances | — | 23 |
| Discretionary bonuses | — | 248 |
| Retirement benefit contributions | — | 4 |
| | — | 275 |

During the year, no emoluments were paid by the Group to any of the directors or the five highest paid individuals as an inducement to join or upon joining the Group or as compensation for loss of office (2003: Nil).

## 12 Retirement benefit schemes and housing benefits

The retirement benefits of full time employees of the Group are covered by various government-sponsored pension plans under which the employees are entitled to monthly pensions made by the Group to these plans ranging from 18% to 20% of the employees' basic salary for the year.

The Group has no other obligations for the payment of retirement and other post-retirement benefits of employees or retirees other than the payments disclosed in note 5 and note 11 above.

Full time employees are also entitled to participate in various government-sponsored housing funds. The Group was required to contribute on a monthly basis to these funds based on 5% of the salaries of the employees before 30th June 2004. Effective from 1st July 2004, the Group increased its housing fund contribution ratio to 20% of the salaries of the employees. The Group's liability in respect of these funds is limited to the contributions payable in each year. Contribution amounted to RMB11,696,000 for the year ended 31st December 2004 (2003: RMB3,255,000).

## 13 Intangible assets

| | Group | | Company |
|---|---|---|---|
| | **2004** | 2003 | **2004** |
| | ***Rmb'000*** | *Rmb'000* | ***Rmb'000*** |
| **Licences for technical knowledge** | | | |
| At beginning of the year / upon incorporation | **112,605** | 145,979 | **22,412** |
| Additions | **8,619** | 16,941 | **2,576** |
| Amortisation | **(54,150)** | (50,315) | **(3,454)** |
| At end of the year | **67,074** | 112,605 | **21,534** |
| Represented by: | | | |
| Cost | **330,638** | 322,019 | **93,178** |
| Accumulated amortisation | **(263,564)** | (209,414) | **(71,644)** |
| | **67,074** | 112,605 | **21,534** |

# Notes to the Accounts

## 14 Fixed assets

Group

| | Land use rights and buildings in the PRC RMB'000 | Machinery for electronics production RMB'000 | Machinery for glass production RMB'000 | Other machinery RMB'000 | Office equipment and others RMB'000 | Construction in progress RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|---|
| **Cost** | | | | | | | |
| At 31st December 2003 | 471,218 | 2,397,551 | 646,603 | 691,244 | 102,630 | 198,407 | 4,507,653 |
| Additions | 10,019 | 27,317 | — | 57,854 | 14,651 | 1,184,972 | 1,294,813 |
| Acquisition of a subsidiary | — | 126 | — | 4,577 | — | — | 4,703 |
| Transfer from construction in progress ("CIP") | 7,249 | 204,665 | 226,450 | 33,490 | 4,217 | (476,070) | — |
| Disposals | (4,087) | (27,419) | (78,524) | (73,172) | (9,808) | — | (193,011) |
| At 31st December 2004 | 484,399 | 2,602,240 | 794,529 | 723,995 | 111,689 | 907,309 | 5,624,159 |
| **Accumulated depreciation** | | | | | | | |
| At 31st December 2003 | 163,124 | 1,056,925 | 413,542 | 395,847 | 70,579 | — | 2,100,017 |
| Charge for the year | 24,540 | 90,021 | 67,615 | 46,515 | 10,128 | — | 242,819 |
| Disposals | (890) | (22,427) | (72,161) | (70,391) | (8,495) | — | (174,364) |
| At 31st December 2004 | 186,774 | 1,128,519 | 408,996 | 371,971 | 72,212 | — | 2,168,472 |
| **Net book value** | | | | | | | |
| At 31st December 2004 | 297,633 | 1,473,721 | 385,533 | 352,024 | 39,477 | 307,309 | 3,455,686 |
| At 31st December 2003 | 308,094 | 1,340,626 | 233,061 | 295,397 | 32,051 | 198,407 | 2,407,636 |

## 14 Fixed assets *(continued)*

**Company**

| | Machinery for electronics production *RMB'000* | Machinery for glass production *RMB'000* | Other machinery *RMB'000* | Office equipment and others *RMB'000* | Construction in progress *RMB'000* | Total *RMB'000* |
|---|---|---|---|---|---|---|
| **Cost** | | | | | | |
| Upon incorporation | 754,824 | 260,617 | 370,652 | 71,550 | 698,558 | 2,156,201 |
| Additions | 11,173 | — | 29,285 | 2,433 | 130,538 | 173,429 |
| Transfer from CIP | 193,698 | 226,450 | 25,032 | 4,071 | (449,251) | — |
| Disposals | (7,061) | — | (1,674) | (5,318) | — | (14,053) |
| At 31st December 2004 | 951,834 | 487,067 | 423,295 | 72,736 | 379,845 | 2,214,777 |
| **Accumulated depreciation** | | | | | | |
| Upon incorporation | 385,556 | 243,002 | 124,536 | 52,724 | — | 615,818 |
| Charge for the period | 8,811 | 2,757 | 8,693 | 2,502 | — | 22,763 |
| Disposals | (5,611) | — | (897) | (4,134) | — | (10,642) |
| At 31st December 2004 | 388,756 | 245,759 | 132,332 | 51,092 | — | 827,939 |
| **Net book value** | | | | | | |
| At 31st December 2004 | 563,078 | 241,308 | 290,963 | 21,644 | 379,845 | 1,386,838 |
| Upon incorporation | 369,268 | 17,615 | 246,116 | 18,826 | 698,558 | 1,540,383 |

At 31st December 2004, the net book value of the fixed assets pledged as security for the Group's short term bank loans (note 27) amounted to RMB321,973,000 (2003: RMB359,273,000).

| | **2004** *Rmb'000* | 2003 *Rmb'000* |
|---|---|---|
| The Group's interests in land use rights and their net book values are analysed as follows: | | |
| Medium term lease (10 to 50 years) | **39,171** | 27,493 |
| Short term lease (below 10 years) | **325** | 4,107 |
| | **39,496** | 31,600 |

## 15 Investments in subsidiaries

| | Company 2004 *Rmb'000* |
|---|---|
| Investments, at cost | |
| – Listed company in the PRC | 1,082,418 |
| – Unlisted | 729,857 |
| | 1,812,275 |

The Group's interest in a listed subsidiary in the PRC represents domestic legal person shares which are not freely transferable on the stock market under the prevailing PRC listing rules. Market value is not presented for those shares as such information is not meaningful.

Particulars on the Company's subsidiaries are detailed in note 36.

## 16 Associated companies

| | Group 2004 *Rmb'000* | 2003 *Rmb'000* |
|---|---|---|
| Group share of net assets, unlisted | 18,218 | 18,022 |

Particulars on the Group's associated companies are detailed in note 36.

## 17 Long-term investments

| | Group 2004 *Rmb'000* | 2003 *Rmb'000* |
|---|---|---|
| Unlisted investments, at cost | 33,500 | 33,621 |
| Provision for impairment loss | (9,440) | (3,621) |
| | 24,060 | 30,000 |

Long-term investments substantially comprise the investment in equity interests in Western Trust & Investment Co., Ltd. The directors consider that the underlying value of these investments were not less than their carrying value as at 31st December 2004.

## 18 Inventories

| | Group | | Company |
|---|---|---|---|
| | 2004 | 2003 | 2004 |
| | *Rmb'000* | *Rmb'000* | *Rmb'000* |
| Raw materials | **243,496** | 241,390 | **158,811** |
| Work in-progress | **281,152** | 204,397 | **139,149** |
| Finished goods | **415,585** | 269,751 | **191,816** |
| Consumables | **8,001** | 7,132 | **5,471** |
| | **948,234** | 722,670 | **495,247** |
| Write-down to net realisable value | **(17,678)** | (17,352) | **(7,400)** |
| | **930,556** | 705,318 | **487,847** |

At 31st December 2004, inventories that were carried at net realisable value amounted to approximately RMB 120,940,000 (2003: RMB83,065,000).

## 19 Accounts receivable

The Group offers credit terms to its customers ranging from cash on delivery to 90 days. Ageing analysis of accounts receivable at year end are as follows:

| | Group | | Company |
|---|---|---|---|
| | 2004 | 2003 | 2004 |
| | *Rmb'000* | *Rmb'000* | *Rmb'000* |
| 0 to 90 days | **605,884** | 222,029 | **235,812** |
| 91 to 180 days | **44,403** | 20,952 | **271** |
| 181 to 365 days | **4,259** | 15,569 | **2,284** |
| Over 1 year | **3,006** | 107,970 | **1,530** |
| | **657,552** | 366,520 | **239,897** |
| Provision for doubtful debts | **(3,006)** | (108,419) | **(1,530)** |
| | **654,546** | 258,101 | **238,367** |

# Notes to the Accounts

## 20 Trade bills receivable

| | Group | | Company |
|---|---|---|---|
| | **2004** | 2003 | **2004** |
| | ***Rmb'000*** | *Rmb'000* | ***Rmb'000*** |
| 0 to 180 days | **628,015** | 1,023,684 | **130,862** |

As at 31st December 2004, trade bills receivable amounting to RMB41,319,000 was pledged to secure short-term bank loans (note 27).

## 21 Loan to a subsidiary

| | Company |
|---|---|
| | **2004** |
| | ***Rmb'000*** |
| Loan to a subsidiary | **30,000** |

Loan to a subsidiary is unsecured, carry interest at 5.31% per annum and repayable on 9th November 2005.

## 22 Other investments

| | Group | |
|---|---|---|
| | **2004** | 2003 |
| | ***Rmb'000*** | *Rmb'000* |
| Funds - listed in the PRC | **2,955** | — |
| Stocks - listed in the PRC | **—** | 2,074 |
| Bonds - listed in the PRC | **1,685** | 2,000 |
| | **4,640** | 4,074 |

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 445 of 1004

## 23 Due from / (to) related parties

| | Note | Group 2004 Rmb'000 | Group 2003 Rmb'000 | Company 2004 Rmb'000 |
|---|---|---|---|---|
| **Due from** | | | | |
| Trade balances: | (a) | | | |
| China National Electronics Imp. & Exp. Caihong Company | | — | 31,453 | — |
| Shenzhen Hongyang Industry & Trade Co., Ltd. | | **7,949** | 3,884 | — |
| Shenzhen IRICO-ROYAL Info-Electronics Ltd. | | **3,421** | 6,641 | **3,421** |
| Shaanxi IRICO Construction Engineering Co. Ltd. | | — | 8,096 | — |
| Shenzhen IRICO Electronic Co. Ltd. | | **30** | — | — |
| | | **11,400** | 50,074 | **3,421** |
| **Due to** | | | | |
| Trade balances: | (a) | | | |
| China National Electronics Imp. & Exp. Caihong Company | | — | 30,361 | — |
| China Electronic Devices Industry (Shenzhen) Co., Ltd. | | — | 2,854 | — |
| Caihong Labour Services Company | | **10,218** | 12,605 | **2,214** |
| Shenzhen IRICO Electronics Co., Ltd. | | **7,126** | 4,149 | **2,100** |
| Shaanxi IRICO Construction Engineering Co., Ltd. | | — | 209 | — |
| Xian IRICO Plastic Industry Co., Ltd. | | **827** | 998 | — |
| Xianyang Caihong Adhesive Belt Co., Ltd. | | **1,390** | 515 | **453** |
| Xianyang Caihong Electronic Materials Co. | | **293** | — | — |
| Xianyang Caihan Package Material Company | | **1,577** | — | — |
| Sakurai Dereshikogyo Co., Ltd. | | **1,694** | — | — |
| | | **23,125** | 51,691 | **4,767** |
| Non-trade balances: | (b) | | | |
| China National Electronics Imp. & Exp. Caihong Company | | — | 8,264 | — |
| Hainan IRICO Industry and Trading Co., Ltd. | | — | 2,431 | — |
| The ultimate holding company | | **349,178** | — | **263,525** |
| | | **349,178** | 10,695 | **263,525** |
| | | **372,303** | 62,386 | **268,292** |

*Notes:*

(a) The trade balances in respect of sales and purchases are under the Group's normal trading terms.

(b) Except for amounts of Rmb79,000,000 (2003: Nil) of the Group due to the ultimate holding company as at 31st December 2004 which carry interest at 5.31% per annum and are repayable on 9th November 2005, the non-trade balances are unsecured, interest free and have no fixed repayment terms (note 34(j)).

## 24 Due to minority shareholders

| | Group | | Company |
|---|---|---|---|
| | 2004 | 2003 | 2004 |
| | *Rmb'000* | *Rmb'000* | *Rmb'000* |
| Trade balances | **4,436** | 10,046 | **1,455** |

The trade balances in respect of purchases are under the Group's normal trading terms.

## 25 Cash and bank balances

| | Group | | Company |
|---|---|---|---|
| | 2004 | 2003 | 2004 |
| | *Rmb'000* | *Rmb'000* | *Rmb'000* |
| Pledged balances | **21,000** | — | **21,000** |
| Unpledged balances | **1,096,516** | 747,186 | **460,465** |
| Cash and bank balances | **1,117,516** | 747,186 | **481,465** |

All the cash and bank balances are denominated in Renminbi and deposited with banks in the PRC except for the equivalent amount of RMB215,149,000 (2003: RMB798,000) at 31st December 2004 which is denominated in foreign currencies. The conversion of these Renminbi denominated balances into foreign currencies is subject to the rules and regulations of foreign exchange control promulgated by the PRC government.

As at 31st December 2004, cash and bank balances included deposit of RMB21,000,000 which was pledged to secure short-term bank loans (note 27).

## 26 Accounts payable

| | Group | | Company |
|---|---|---|---|
| | 2004 | 2003 | 2004 |
| | *Rmb'000* | *Rmb'000* | *Rmb'000* |
| 0 to 90 days | **559,390** | 417,028 | **342,281** |
| 91 to 180 days | **1,616** | 9,340 | **—** |
| 181 to 365 days | **186** | 5,114 | **—** |
| Over 1 year | **415** | 297 | **71** |
| | **561,607** | 431,779 | **342,352** |

## 27 Short-term bank loans

| | Group | | Company |
|---|---|---|---|
| | 2004 | 2003 | 2004 |
| | *Rmb'000* | *Rmb'000* | *Rmb'000* |
| Secured (note (a)) | 500,000 | 260,000 | 200,000 |
| Unsecured (note (b)) | 920,000 | 370,000 | 790,000 |
| | 1,420,000 | 630,000 | 990,000 |

*Notes:*

(a) Bank loans of approximately RMB300 million (2003: RMB260 million) are secured by certain buildings and machinery of the Group (note 14) as at 31st December 2004. Bank loans of approximately RMB200 million were secured by certain amounts of bank deposits (note 25) and trade bills receivable (note 20) of the Group as at 31st December 2004.

(b) Bank loans of approximately RMB270 million as at 31st December 2003 were guaranteed by the ultimate holding company. Such guarantee was released during 2004.

(c) Bank loans bore interests ranging from 3.51% to 5.02% (2003: 4.05% to 5.31%) per annum for the year ended 31st December 2004.

(d) As at 31st December 2004, the unutilised banking facilities of the Group amounted to approximately RMB570 million.

## 28 Deferred income

Deferred income represents grant received from the United Nations by the Group for its ODS (Ozone Depleting Substance) cleansing replacement project for acquiring machineries to treat the ozone depleting substance produced during the production process. This deferred income is amortised to the profit and loss account on a straight-line basis over the expected lives of the corresponding assets of 5 years.

## 29 Deferred taxation

Deferred taxation is calculated in full on temporary differences under the liability method using principal taxation rates of 33% except for certain subsidiaries mentioned in note 7 which are subject to tax concession to pay income tax at 15%.

The movements on the deferred tax liabilities / (assets) are as follows:

| | Group | | Company |
|---|---|---|---|
| | **2004** | 2003 | **2004** |
| | ***Rmb'000*** | *Rmb'000* | ***Rmb'000*** |
| At beginning of the year / upon incorporation | **(8,172)** | 135,357 | **—** |
| Deferred taxation (credited) / charged to profit and loss account | **(1,775)** | 9,729 | **2,307** |
| Distribution upon Reorganisation | **—** | (153,258) | **—** |
| At end of the year | **(9,947)** | (8,172) | **2,307** |
| Deferred tax assets | **(28,041)** | (23,729) | **(230)** |
| Deferred tax liabilities | **18,094** | 15,557 | **2,537** |
| Net deferred tax (assets) / liabilities as shown in balance sheet | **(9,947)** | (8,172) | **2,307** |

The movements in deferred tax liabilities and assets (prior to offsetting of balances within the same taxation jurisdiction) are as follows:

**Group**

Deferred tax liabilities

| | **Accelerated tax depreciation** | **Different tax rate enacted for undistributed profits of a subsidiary** | **Total** |
|---|---|---|---|
| | *RMB'000* | *RMB'000* | *RMB'000* |
| At 31st December 2002 | 141,948 | 100,293 | 242,241 |
| Charged to profit and loss account | 14,649 | 19,462 | 34,111 |
| Distribution upon Reorganisation | (141,040) | (119,755) | (260,795) |
| At 31st December 2003 | 15,557 | — | 15,557 |
| Charged to profit and loss account | 2,537 | — | 2,537 |
| At 31st December 2004 | 18,094 | — | 18,094 |

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 449 of 1004

## 29 Deferred taxation *(continued)*

**Group**

Deferred tax assets

| | Depreciation and amortisation RMB'000 | Provision for doubtful debts, inventories and impairment of fixed assets and long-term investments RMB'000 | Accrual for staff benefits and welfare RMB'000 | Elimination of unrealised profit from intra-group transactions RMB'000 | Others RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|
| At 31st December 2002 | (20,201) | (68,757) | (3,675) | (195) | (14,260) | (105,088) |
| Credited to profit and loss account | (3,570) | (2,993) | (6,815) | (6,879) | (5,222) | (28,482) |
| Derecognition upon Reorganisation | 14,705 | 69,342 | 3,906 | — | 19,582 | 107,519 |
| At 31st December 2003 | (8,116) | (1,966) | (6,575) | (7,072) | — | (23,729) |
| (Credited) / charged to profit and loss account | (2,214) | (1,260) | 514 | (1,354) | — | (4,312) |
| At 31st December 2004 | (10,330) | (3,226) | (6,059) | (8,426) | — | (28,041) |

**Company**

Deferred tax liabilities

| | Accelerated tax depreciation *RMB'000* |
|---|---|
| Upon incorporation | 2,087 |
| Charged to profit and loss account | 450 |
| At 31st December 2004 | 2,537 |

# Notes to the Accounts

## 29 Deferred taxation *(continued)*

**Company**

Deferred tax assets

| | Provision for doubtful debts, inventories and impairment of fixed assets and long-term investments | Accrual for staff benefits and welfare | Total |
|---|---|---|---|
| | *RMB'000* | *RMB'000* | *RMB'000* |
| Upon incorporation | (1,799) | (1,771) | (3,570) |
| Charged to profit and loss account | 1,569 | 1,771 | 3,340 |
| At 31st December 2004 | (230) | — | (230) |

## 30 Share capital

| | Number of domestic shares of RMB 1 each | Number of H shares of RMB 1 each | Total number of shares of RMB1 each | RMB'000 |
|---|---|---|---|---|
| Issued and fully paid: | | | | |
| Upon the Reorganisation | 1,500,000 | — | 1,500,000 | 1,500,000 |
| Domestic shares converted to H shares | (44,120) | 44,120 | — | — |
| Allotted and issued upon listing of H shares | — | 441,174 | 441,174 | 441,174 |
| At 31st December 2004 | 1,455,880 | 485,294 | 1,941,174 | 1,941,174 |

The Company was incorporated on 10th September 2004 with an initial share capital of RMB1,500,000,000, all of which were credited as fully paid, in consideration for the transfer of the relevant assets, liabilities and equity interests in various entities to the Company pursuant to the Reorganisation referred to in note 1. These domestic shares rank pari passu in all aspects with each other.

The share capital presented in the consolidated balance sheet as at 31st December 2003 represented the initial share capital issued by the Company in exchange of the relevant assets, liabilities and interests in various entities pursuant to the Reorganisation, which was deemed to have been in issue at the beginning of earliest period presented, in accordance with the basis of preparation set out in note 1.

## 30 Share capital *(continued)*

During the year, the Company completed its initial public offering and placing of 485,294,000 H shares with a par value of RMB1.00 each at a price of HK$1.58(equivalent to RMB1.68) per H share in cash for an aggregate consideration of HK$767 million(equivalent to approximately RMB816 million), which comprised 441,174,000 new H Shares issued by the Company and 44,120,000 shares issued to the ultimate holding company pursuant to an approval from the State Assets Commission to convert such relevant domestic shares owned by the ultimate holding company into H shares as part of the public offering. As a result, the issued share capital of the Company increased to 1,941,174,000 shares, comprising 1,455,880,000 domestic shares and 485,294,000 H shares, representing 75% and 25% of the issued capital respectively.

The H shares rank pari passu in all respects with the domestic shares and rank equally for all dividends or distributions declared, paid or made except that all dividends in respect of H shares are to be paid by the Company in Hong Kong dollars and H shares may only be subscribed for by, and traded in Hong Kong dollars between legal or natural persons of any other country other than the PRC. The transfer of the domestic shares is subject to such restrictions as the PRC laws may impose from time to time.

## 31 Reserves

**Group**

| | Capital reserve Rmb'000 (note (b)) | Statutory surplus reserve Rmb'000 (note (e)) | Statutory public welfare fund Rmb'000 (note (f)) | Retained profit Rmb'000 (note (c), (d)) | Total Rmb'000 |
|---|---|---|---|---|---|
| **2004** | | | | | |
| As at 1st January 2004 | 679,758 | — | — | — | 679,758 |
| Profit for the year | — | — | — | 385,327 | 385,327 |
| Special dividend | — | — | — | (204,923) | (204,923) |
| Premium on issue of shares | 299,865 | — | — | — | 299,865 |
| Share issuance costs | (63,490) | — | — | — | (63,490) |
| Contribution of ultimate holding company (note 33(b)) | 4,739 | — | — | — | 4,739 |
| Transfer to reserves | — | 15,687 | 7,843 | (23,530) | — |
| As at 31st December 2004 | 920,872 | 15,687 | 7,843 | 156,874 | 1,101,276 |
| **2003** | | | | | |
| As at 1st January 2003 | 1,316,132 | — | — | — | 1,316,132 |
| Profit for the year | — | — | — | 315,825 | 315,825 |
| Profit distribution | — | — | — | (146,084) | (146,084) |
| Capitalisation upon Reorganisation | 169,741 | — | — | (169,741) | — |
| Distribution to ultimate holding company upon Reorganisation (note (a)) | (806,115) | — | — | — | (806,115) |
| As at 31st December 2003 | 679,758 | — | — | — | 679,758 |

## 31 Reserves *(continued)*

**Company**

| | Capital reserve *Rmb'000* *(note (b))* | Statutory surplus reserve *Rmb'000* *(note (e))* | Statutory public welfare fund *Rmb'000* *(note (f))* | Retained profit/ (accumulated loss) *Rmb'000* *(note (c), (d))* | Total *Rmb'000* |
|---|---|---|---|---|---|
| Upon incorporation | 726,248 | — | — | 85,776 | 812,024 |
| Profit for the period | — | — | — | 104,140 | 104,140 |
| Special dividend | — | — | — | (204,973) | (204,973) |
| Premium on issue of shares | 299,865 | — | — | — | 299,865 |
| Share issuance costs | (63,490) | — | — | — | (63,490) |
| Transfer to reserves | — | 15,687 | 7,843 | (23,530) | — |
| As at 31st December 2004 | 962,623 | 15,687 | 7,843 | (38,587) | 947,566 |

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 453 of 1004

Note:

(a) This represented net assets not transferred to the Company from the ultimate holding company upon Reorganisation effective as of 31st December 2003. The Group was not liable for the ownership, creditor's rights, rights, interests, liabilities and obligations (including any potential liabilities and obligations) of these net assets which were retained by the ultimate holding company after the Reorganisation.

(b) As described in note 1, the accounts of the Group for the years ended 31st December 2003 and 2004 have been prepared as if the Group had been in existence throughout the years and as if the relevant assets, liabilities, equity interests in various entities were transferred to the Company by the ultimate holding company on 1st January 2003. Upon incorporation of the Company on 10th September 2004, the historical net value of the assets, liabilities and interests transferred to the Company were converted into the Company's capital as described in note 30 with all the then existing reserves eliminated and the resulting difference dealt with in the capital reserve. Accordingly, a capital reserve, being the difference between the amount of share capital issued and historical net value of the assets, liabilities and interests transferred to the Company, was presented in the reserves of both the Group and the Company. Separate class of reserves, including retained profits, of the Group prior to the incorporation of the Company were not separately disclosed as all these reserves have been capitalised and incorporated in the capital reserve of the Group and the Company pursuant to the Reorganisation.

(c) As described in note 1 and 9 to the accounts, the consummation of the Reorganisation was on 31st December 2003. As a result, the net profit derived from the Transferred Businesses from 1st January 2004 to the Immediate Pre-incorporation Date, amounting to RMB85,776,000 was also reported as the profit of the Company for 2004. Retained profit of the Group and the Company upon incorporation of the Company represents the undistributed profit of the Group. Pursuant to the Reorganisation, undistributed profit of the Group for the period from 1st January 2004 to 9th September 2004 was attributable to the ultimate holding company and the Company has agreed to distribute such amount to the ultimate holding company by way of a special dividend (see also note 9). Accordingly, the amount was not capitalised by the Group and the Company upon incorporation of the Company.

(d) Subsequent to the Reorganisation, in accordance with the relevant PRC regulations and Articles of Association of the Company, retained profit available for distribution by the Company will be deemed to be the lower of the amounts determined in accordance with the PRC GAAP and the amount determined in accordance with HKFRS. As at 31st December 2004, there is no retained profit available for distribution.

(e) Statutory surplus reserve

In accordance with the relevant PRC laws and financial regulations, every year the Company is required to transfer 10% of the profit after taxation determined in accordance with PRC GAAP to the statutory surplus reserve until the balance reaches 50% of the paid-up share capital. Such reserve can be used to reduce any losses incurred and to increase share capital. Except for the reduction of losses incurred, any other usage should not result in this reserve balance falling below 25% of the registered capital. The Company decided to make a 10% transfer as statutory surplus reserve for the year ended 31st December 2004.

(f) Statutory public welfare fund

In accordance with the relevant PRC laws and financial regulations, every year the Company is required to transfer between 5% to 10% of the profits after taxation determined in accordance with PRC GAAP to the statutory public welfare fund. The use of this fund is restricted to capital expenditure for employees' collective welfare facilities, the ownership in respect of which belongs to the Group. The statutory public welfare fund is not available for distribution to shareholders except under liquidation. Once the capital expenditure on staff welfare facilities has been made, an equivalent amount must be transferred from statutory public welfare fund to the discretionary surplus reserve, a reserve which can be used to reduce any losses incurred or to increase share capital. The Company decided to make a 5% transfer as statutory public welfare fund for the year ended 31st December 2004.

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 454 of 1004

## 32 Commitments

### (a) Capital expenditure commitments

| | 2004 *Rmb'000* | 2003 *Rmb'000* |
|---|---|---|
| Authorised but not contracted for | | |
| — Construction and renovation of production lines for CPTs | **200,308** | 133,670 |
| — Construction and renovation of production lines for CPT components | **181,569** | 600,280 |
| — Land use rights | **—** | 6,630 |
| | **381,877** | 740,580 |
| Contracted but not provided for | | |
| — Construction and renovation of production lines for CPTs | **136,983** | 77,926 |
| — Construction and renovation of production lines for CPT components | **161,056** | 242,952 |
| | **298,039** | 320,878 |
| | **679,916** | 1,061,458 |

### (b) Operating lease commitments

The future aggregate minimum lease rental expense under non-cancellable operating leases are payable in the following periods:

| | Land use rights and buildings | | Machinery and equipment | |
|---|---|---|---|---|
| | 2004 *Rmb'000* | 2003 *Rmb'000* | 2004 *Rmb'000* | 2003 *Rmb'000* |
| First year | **35,334** | — | **1,500** | 750 |
| Second to fifth years | **35,190** | — | **750** | — |
| | **70,524** | — | **2,250** | 750 |

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 455 of 1004

## 33 Notes to consolidated cash flow statement

### (a) Cash generated from operations

| | 2004<br>Rmb'000 | 2003<br>Rmb'000 |
|---|---|---|
| Operating profit | 713,020 | 679,766 |
| Interest income | (5,524) | (20,721) |
| Dividend income | (396) | — |
| Loss on disposal of fixed assets | 7,153 | 15,104 |
| Provision for / (write-back of) doubtful debts | (4,898) | 1,192 |
| Write-down of inventories to net realisable value | 10,276 | 10,936 |
| Realised and unrealised loss / (gain) on other investments | 10,777 | (2,983) |
| Loss on disposal of long-term investments | — | 3,309 |
| Impairment loss on long-term investments | 5,940 | — |
| Depreciation | 242,819 | 205,587 |
| Amortisation of deferred income on grants received | (3,475) | (2,613) |
| Amortisation of intangible assets | 54,150 | 50,315 |
| Operating profit before changes in working capital | 1,029,844 | 1,017,882 |
| Decrease / (increase) in accounts and trade bills receivable | 48,902 | (295,811) |
| Increase in inventories | (226,741) | (260,984) |
| (Increase) / decrease in other receivables, deposits and prepayments | (67,405) | 22,658 |
| Decrease in due from related parties and minority shareholders — trade | 38,674 | 9,812 |
| Increase in accounts and trade bills payable | 40,958 | 154,547 |
| Decrease in other payables and accruals | (15,092) | (81,188) |
| (Decrease) / increase in due to related parties and minority shareholders — trade | (34,176) | 12,330 |
| Net cash generated from operations | 814,964 | 579,246 |

## 33 Notes to consolidated cash flow statement *(continued)*

### (b) Acquisition of a subsidiary

| | 2004 *RMB'000* |
|---|---|
| Net assets acquired: | |
| Fixed assets | 4,703 |
| Inventories | 8,775 |
| Accounts and other receivables | 48,047 |
| Cash and bank balances | 37,583 |
| Accounts and other payables | (68,464) |
| Minority interests | (7,655) |
| | 22,989 |
| Contribution from ultimate holding company | (4,739) |
| | 18,250 |
| Satisfied by cash | 18,250 |

Analysis of the net inflow in respect of the acquisition of a subsidiary

| | 2004 *RMB'000* |
|---|---|
| Cash consideration | (18,250) |
| Cash and bank balances acquired | 37,583 |
| Net cash inflow in respect of the acquisition a subsidiary | 19,333 |

## 33 Notes to consolidated cash flow statement *(continued)*

### (c) Analysis of changes in financing during the year

| | Share capital and capital reserve RMB'000 | Amounts due to related companies — non-trade RMB'000 | Minority interests RMB'000 | Short-term and long-term bank loans RMB'000 | Dividend payable RMB'000 | Pledged bank balances RMB'000 |
|---|---|---|---|---|---|---|
| At 31st December 2002 | 2,816,137 | 242,093 | 912,836 | 1,160,000 | 87,614 | — |
| Profit distribution declared | (146,084) | — | — | — | 146,084 | — |
| Minority share of profit | — | — | 133,355 | — | — | — |
| Dividend payable to minority shareholders | — | — | (272) | — | — | — |
| Transfer from retained profit | 315,325 | — | — | — | — | — |
| Distribution to ultimate holding company upon Reorganisation | (806,115) | — | — | — | — | — |
| Cash outflow from financing | (200,000) | (231,398) | (38,759) | (100,000) | (87,614) | — |
| At 31st December 2003 | 2,179,758 | 10,695 | 1,007,160 | 1,060,000 | 146,084 | — |
| Special dividend declared | — | 204,923 | — | — | — | — |
| Minority share of profit | — | — | 130,455 | — | — | — |
| Minority interests arising from acquisition of a subsidiary | — | — | 7,655 | — | — | — |
| Contribution from ultimate holding company | 4,728 | — | — | — | — | — |
| Unpaid share issuance costs | (26,417) | — | — | — | — | — |
| Cash inflow/(outflow) from financing | 708,866 | 133,560 | (16,404) | 360,000 | (146,084) | (21,000) |
| At 31st December 2004 | 2,862,086 | 349,178 | 1,128,866 | 1,420,000 | — | (21,000) |

## 34 Related party transactions

Significant related party transactions, which in the opinion of the directors, were carried out in the normal course of the Group's business are as follows:

| (Income) / expenses | Note | 2004 RMB'000 | 2003 RMB'000 |
|---|---|---|---|
| Purchase of raw materials and services | (a) | | |
| China National Electronics Imp. & Exp. Caihong Company | (b) | 246,526 | 454,455 |
| Caihong Labour Services Company | | 103,447 | 94,329 |
| Shaanxi IRICO General Service Corporation | | 50,082 | 40,299 |
| Xianyang Caihan Packaging Materials Co., Ltd | | 26,416 | 29,676 |
| Shenzhen IRICO Electronics Co. Ltd | | 12,874 | 15,821 |
| Xianyang Caihong Adhesive Belt Co., Ltd | | 5,242 | 5,671 |
| Xian Caihong Plastic Co., Ltd. | | 11,731 | 2,854 |
| Shenzhen Hongyang Industry & Trade Company | | 1,621 | — |
| | | 457,939 | 643,105 |
| Sale of goods | (a) | | |
| China National Electronics Imp. & Exp. Caihong Company | (b) | (347,015) | (638,156) |
| Shenzhen Hongyang Industry & Trade Company | | (32,920) | (30,265) |
| IRICO Utilities Plant | | (32,248) | (22,774) |
| Shaanxi IRICO General Service Corporation | | (592) | (397) |
| Shenzhen IRICO-ROYAL Info-Electronics Ltd | | (585) | (471) |
| Caihong Labour Services Company | | (154) | (169) |
| Shenzhen IRICO Electronics Co. Ltd | | (56) | — |
| Xian IRICO Electric Co., Ltd | | (109) | — |
| | | (413,601) | (692,226) |
| Rental expense to Xian Guangxin Electronics Co., Ltd | (c) | 1,500 | 1,500 |
| Trademark licence fee to the ultimate holding company | (d) | 4,950 | 2,950 |
| Utility charges to IRICO Utilities Plant | (e) | 420,761 | 344,886 |
| Rental expense to the ultimate holding company | (f) | 35,045 | — |
| Social and ancillary service charges to the ultimate holding company | (g) | 14,064 | — |
| Management fee from the ultimate holding company | (h) | (8,172) | (10,941) |
| Loans from the ultimate holding company | (i) | (79,000) | — |
| Interest income | | — | (11,751) |

## 34 Related party transactions *(continued)*

Notes:

(a) Sales to and purchases from related parties were conducted at prices not less than cost and with terms mutually agreed by both contract parties.

(b) Sales to and purchase from China National Electronics Imp. & Exp. Caihong Company were discontinued before the listing of the Company.

(c) Rental expense of machinery and equipment at RMB125,000 per month paid to Xian Guangan Electronics Co., Ltd., a fellow subsidiary of the Group, was determined based on the terms stipulated in a lease agreement entered into between the parties involved. The lease agreement was signed on 28th June 2001 for a period of three years and was renewed for another two and a half years up to 31st December 2006.

(d) Licence fee for using the trademark owned by the ultimate holding company was paid by the Group, at 0.1% of sales based on the terms stipulated in agreements. In accordance with the agreement signed by one of the subsidiaries, IRICO Display Devices Co. Ltd., the term is initially for five years from 1999 but renewable automatically unless terminated by either party with a three-month prior notice, and it was revised to end on 31st December 2006. In accordance with the agreement signed by the rest entities of the Group, the licence fee is to be paid from 1st January 2004 and the agreement is for a term of 3 years up to 31st December 2006 unless terminated by either party with a three-month prior notice.

(e) Various kinetic energy charges were paid / payable by the companies of the Group to IRICO Utility Plants based on the agreed rates for the years ended 31st December 2003 and 2004 respectively.

(f) From 1st January 2004, the Group is required to pay RMB11 per square metre per annum for the use of land use rights and RMB8 and RMB30 per square metre per month for the use of buildings in Xianyang and Beijing respectively pursuant to the Premises Leasing Agreement. Accordingly, rental charges for the year ended 31st December 2004 amounted to RMB35,045,000.

(g) Social and ancillary service charges for the provision of staff welfare services are paid / payable to the ultimate holding company on a cost reimbursement basis.

(h) Management fee received/receivable from IRICO Utilities Plant, a unit of the IRICO Colour Picture Tube Plant held by the ultimate holding company, was levied based on 3% of the sales amount of IRICO Utilities Plant for financing and management service provided by the Group as agreed by the parties involved. This transaction was discontinued upon the incorporation of the Company.

(i) Pursuant to an agreement entered into on 16th December 2004, the Company transferred its titles of certain loans to subsidiaries to the ultimate holding company on 19th December 2004 and offset its amount due to the ultimate holding company. Such loans amount to RMB79,000,000 as at 31st December 2004, which are unsecured, carry interest at 5.31% per annum and are repayable on 9th November 2005 (note 23(b)).

## 35 Ultimate holding company

The directors regard IRICO Group Corporation, a company established in China, as being the ultimate holding company.

## 36 Particulars of subsidiaries and associated companies

As at 31st December 2004, the Company has direct and indirect interests in the following subsidiaries and associated companies, all of which were established in the PRC.

| Company name | Registered capital | Attributable equity interest | Principal activities |
|---|---|---|---|
| **Subsidiaries** | | | |
| *Directly held* | | | |
| IRICO Display Devices Co., Ltd. | RMB21,148,600 | 56.14% | Production and development of the electronic products and raw materials for colour display devices |
| IRICO Kunshan Industry Co., Ltd. (note (1)) | RMB60,000,000 | 80% | Production of the rubber parts of CPTs |
| Shaanxi IRICO Phosphor Material Co., Ltd. | RMB90,000,000 | 45% | Production of phosphor for various types of CPTs |
| Xian IRICO Zixun Co., Ltd. (note (2)) | RMB130,000,000 | 45% | Production and sales of the parts and components for display devices and the electronic communication products |
| Xianyang Caijin Electronic Device Co., Ltd. | RMB25,000,000 | 87.16% | Production and sales of pin, anode button, multi-form and frit for CPTs |
| Xianyang IRICO Electronic Parts Co., Ltd. | RMB55,000,000 | 60% | Sales of shadow mask, frames and electronic products for CPTs |
| Xianyang IRICO Electronics Shadow Mask Co., Ltd. | US$35,000,000 | 75% | Development and production of the flat shadow mask and the coordinating products for CPTs |
| Zhuhai Caizhu Industrial Co., Ltd. (note (3)) | RMB50,000,000 | 90% | Manufacture of electronic devices and components |

## 36 Particulars of subsidiaries and associated companies *(continued)*

| Company name | Registered capital | Attributable equity interest | Principal activities |
|---|---:|---:|---|
| Subsidiaries *(continued)* | | | |
| IRICO Display Technology Co., Ltd. | US$12,500,000 | 75% | Production and sale of CPTs, black and white picture tubes and ancillary electronic components |
| Xianyang IRICO Digital Display Co., Ltd. (note (d)) | RMB650,000,000 | 51% | Production and sales of CPTs |
| *Indirectly held:* | | | |
| Beijing Goldenbridge Translation Networks Co., Ltd. | RMB40,000,000 | 70% | Provision of technical service relating to network information |
| Caihui Jinyuan Electronic Industry Co., Ltd. | RMB10,000,000 | 75% | Production and sales of frit for CPTs |
| Caihu (Zhongshan) Electronic Glass Plant | RMB5,500,000 | 100% | Development of special paper products, and the production of frit for CPTs |
| Kunshan Caihong Yingguang Electronics Co., Ltd. | US$4,500,000 | 60% | Production of precision alloy and other products for colour and black and white picture tubes |
| Nanjing Huide Phosphor Co., Ltd. | US$443,300 | 45% | Production and processing of recycled phosphor and related products for various types of CRT |
| **Associated companies — indirectly held** | | | |
| Caihua Development Co., Ltd. | RMB10,000,000 | 42.5% | Sales of household electrical appliances |
| Xian IRICO Plastic Industry Co., Ltd. | RMB10,000,000 | 30% | Production of deflection yoke spacers and balancers for colour display devices |
| Xian New Century International Club Co., Ltd. | RMB46,000,000 | 41.67% | Provision of catering services and the operation of amenity centers |

## 36 Particulars of subsidiaries and associated companies *(continued)*

Notes:

(1) The company is a stated-owned enterprise established in the PRC on 20th June 1990 and converted to a limited liability company on 7th September 2004. It is directly held by the Company at 80% and indirectly held at 7.5%.

(2) The company is directly held by the Company at 45% and indirectly held at 31%.

(3) The company is a state-owned enterprise established in the PRC on 9th January 1990 and converted to a limited liability company on 2nd September 2004.

(4) The company is directly held by the Company at 51% and indirectly held at 26%.

## 37 Approval of accounts

The accounts were approved by the board of directors on 24th March 2005.

# EXHIBIT V

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/12/19 Page 1 of 168

# Exhibit 4



Case 3:07-cv-05944-JST Document 5440-5 Filed 04/12/19 Page 2 of 160

IRICO
彩虹集團電子股份有限公司
IRICO GROUP ELECTRONICS COMPANY LIMITED*
(A joint stock company incorporated in the People's Republic of China with limited liability)
(Stock Code: 0438)
Annual Report
2007
* For identification only

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/12/19 Page 3 of 166

# Content

| | page |
|---|---|
| Overview | 2 |
| Financial Highlights | 4 |
| Chairman's Statement | 6 |
| Management Discussion and Analysis | 9 |
| Profiles of Directors, Supervisors and Senior Management | 21 |
| Report of the Directors | 29 |
| Report of the Supervisory Committee | 45 |
| Corporate Governance Report | 47 |
| Independent Auditor's Report | 65 |
| Consolidated Income Statement | 67 |
| Consolidated Balance Sheet | 68 |
| Balance Sheet | 70 |
| Consolidated Statement of Changes in Equity | 72 |
| Consolidated Cash Flow Statement | 73 |
| Notes to the Financial Statements | 75 |
| Five Year Financial Summary | 161 |
| Corporate Information | 162 |

# Overview

## 1. Background as a National Enterprise

IRICO Group Electronics Company Limited ("IRICO" or the "Company") was incorporated in Xianyang, Shaanxi Province, the PRC on 10 September 2004. The Company's controlling shareholder, IRICO Group Corporation (holding 75% equity interest of the Company), is a large state-owned enterprise directly under the State-owned Assets Supervision and Administration Commission of the State Council.

The Company and its subsidiaries (the "Group") position themselves primarily in the field of electronic display devices and related parts and components (collectively, "components"). With its main production base situated in Xianyang City, Shaanxi Province, the Group also has subsidiaries and production facilities in Xian, Kunshan, Zhuhai, Nanjing and Shenzhen.

## 2. Smooth Strategic Transformation

Following the global trend of evolution of the display device technology, the Group's business focus is in the process of switching from the traditional colour picture tubes ("CPT") to the booming flat panel display ("FPD") devices and its related components. To-date, the Group's new business structure is formed which encompasses key areas including display devices, electronic glass, luminous materials and metallic parts and the Group's strategic transformation is progressing smoothly.

## 3. The First Domestic TFT-LCD Glass Substrate Manufacturer

The first domestic production line of the fifth generation of glass substrate for LCD (TFT-LCD) with proprietary intellectual property right owned by IRICO Group Corporation through Shaanxi IRICO Electronics Glass Co., Ltd. (陝西彩虹電子玻璃有限公司) commenced construction at the beginning of the reporting period. The glass furnace was ignited as scheduled on 28 December 2007 and was being heated up. The glass furnace commenced production in late March 2008 with the first unit of products expected to be rolled out in the first half of 2008. This will be the first PRC TFT-LCD glass substrate manufactured in a self-sustained manner. To-date, product certification and exchanges on technical specifications have attained remarkable progress with the downstream panel manufacturers.

In accordance with the acquisition agreement entered into between the Company and IRICO Group Corporation on 17 August 2007, the Group will soon acquire the 69.53% equity interest in Shaanxi IRICO Electronics Glass Co., Ltd. held by IRICO Group Corporation. Upon completion of the acquisition, the Group will become the first domestic TFT-LCD glass substrate manufacturer and a major player in the global new FPD devices industry. This will pose as a breakthrough development in the Group's transformation process.

## Overview (Continued)

### 4. Global Major Production Base of Luminous Materials

Luminous materials are a kind of basic material with wide application and high technological content. The Company has accumulated over 20 years' experience in terms of technology, talent, brand name and network in the area of luminous materials and is a major global manufacturer thereof.

The Group's project on energy saving lamps utilizing trichromatic phosphor (energy saving lamp phosphor) achieved noticeable progress in 2007. The sales volume recorded a year-on-year increase of 90% while the market share increased from 17% to 22%. The Group continued to maintain a leading position in the PRC and there is further room of development in the future. New products developed by the Company including cold cathode fluorescent lamp phosphor (CCFL phosphor) for LCD backlight were launched in 2007, while the development of new products such as plasma display device panel ("PDP") fluorescent phosphor (PDP phosphor) was conducted smoothly. These businesses are expected to have further development in 2008.

### 5. A Leading Enterprise in Domestic CPT Industry

In 2007, the Group fully capitalised on its various competitive edges such as presence of manufacturing stations, economy of scale and strong control over the production chain. It sold 15,327,000 CPTs during the year, representing a year-on-year increase of 2.09%, being a record-high, and advancing its PRC market share to 27.3% in 2007 from 22.3% in 2006. The Company continues to remain as an industry leader. Its global market share increased to 13.8% in 2007 from 12% in 2006 as well, bringing a stable cash flow to the Group and providing a strong financial back-up for the Group in realising the Group's goals of developing new products and strategic transformation.



# Financial Highlights

## 1. Results

| | 2007 (RMB'000) | 2006 (RMB'000) | Increase/ (decrease) (RMB'000) | Percentage of change (%) |
|---|---|---|---|---|
| Turnover | **3,358,990** | 3,861,710 | (502,720) | (13.02) |
| Cost of Sales | **(3,002,987)** | (3,356,160) | 353,173 | (10.52) |
| Gross Profit | **356,003** | 505,550 | (149,547) | (29.58) |
| Gross Profit Margin (%) | **10.60%** | 13.09% | (2.49%) | N/A |
| Operating (Loss) / Profit | **94,178** | 250,337 | (156,159) | (62.38) |
| Operating Profit Margin | **2.80%** | 6.48% | (3.68%) | N/A |
| Profit of the year attributable to the equity holders of the Company | **66,511** | 129,512 | (63,001) | (48.64) |
| Net Profit Margin (%) | **2.0%** | 3.4% | (1.37%) | (43.23) |
| Earnings per share of the year attributable to equity holders of the Company (expressed in RMB per share) — basic | **0.03** | 0.07 | (0.04) | (57.14) |
| Dividend per share (RMB) | **0** | 0 | 0 | 0 |

# Financial Highlights (Continued)

## 2. Financial position

| | 2007 (RMB'000) | 2006 (RMB'000) |
|---|---|---|
| Property, plant and equipment | **2,009,640** | 2,497,426 |
| Net current assets | **901,174** | 445,810 |
| Cash and bank balances | **363,617** | 479,503 |
| Total liabilities | **1,783,723** | 2,274,446 |
| Short-term bank borrowings | **962,684** | 932,676 |
| Total equity | **3,300,147** | 3,216,611 |

## 3. Operating indices

| | 2007 | 2006 |
|---|---|---|
| Returns per share (annual) | **3.43%** | 0.67% |
| Inventory turnover (days) | **84** | 69 |
| Trade receivable turnover (days) | **157** | 141 |
| Trade payable turnover (days) | **69** | 63 |
| Current ratio | **1.57** | 1.20 |
| Debt equity ratio | **0.92** | 1.17 |



# Chairman's Statement

**Dear Shareholders,**

Following the global trend of evolution of the display device technology, the business focus of the Group has been shifting from the traditional CPT to the booming FPD and related components. At present, a new business structure of the Group comprising display devices, electronic glass, luminous materials and metallic components as core products has taken its form.

2007 marked an important year of strategic transformation for the Group. Guided by the strategic thinking of "reinforcing CPT and exploring new businesses", the staff of the Group are determined and dedicated to their work. On the one hand, being one of the few competitive global CPT manufacturing enterprises, the Group's production yield and sales of CPT both attained a record high, securing the Group as a domestic industry leader and providing stable cash flow for the Group. On the other hand, there was good progress made in the group's strategic transformation with new businesses such as the luminous materials contributing to a greater extent to the Group's revenue and profits while the TFT-LCD glass substrate business is also progressing well. It is expected that the new businesses will bring about a breakthrough to the Group's business growth.

# Chairman's Statement (Continued)

In 2007, sales of the Group amounted to RMB3,358,990,000, while gross profit margin was 10.60% and profit attributable to equity holders amounted to RMB66,511,000. In spite of a decline in the Group's results as compared to 2006, we consider it a normal phenomenon arising from industry re-alignment pursuant to the strategic transformation of the Group. We firmly believe that, with the further centralization of global CPT business in the more-competitive enterprises and following the rapid development of the Group's new businesses along with our strategic transformation, the Group will be embarking on a distinct episode.

## Reinforcing CPT and gathering momentum

We believe that given the large customer base of the CRT (cathode ray tube, CPT being a type of CRT) television-set market and a disparate gap existing among different countries and social groups in terms of living standards, CRT television sets will remain as a core integral part of the global television-set market in the relatively distant future.

As a top-tier enterprise in the CPT industry in the PRC, we adopt "reinforcing CPT" as an important strategy. The Group fully capitalized on its various competitive edges such as presence of manufacturing stations, economy of scale and strong control over the production chain, and continued to adopt a series of pro-active and effective operational strategies including overall cost control, marketing-driven and technology innovation initiatives that further enhanced the competitiveness of the Group in the CPT industry. During the year, under the global climate where the CPT industry kept shrinking, the Group sold 15,327,000 units of CPTs, which grew by 2.03% over 2006 and attained a record high. The domestic market share reached 27.5% in 2007, securing the Group as an industry leader, bringing a stable cash flow to the Group and providing a strong financial back-up for the Group in realizing the Group's goals of developing new products and strategic transformation.

## Strategic transformation bringing about a breakthrough

In 2007, the Group was progressing well in its strategic transformation and attained a breakthrough.

First and foremost, the first production line of the fifth generation of glass substrate for LCD(TFT-LCD) with proprietary intellectual property rights owned by IRICO Group Corporation through Shaanxi IRICO Electronics Glass Co., Ltd. commenced construction at the beginning of the reporting period. On 28 December 2007, the glass furnace was ignited and being heated up as scheduled and commenced production in late March 2008 with the first unit of product expected to be rolled out in the first half of 2008. This will be the first piece of TFT-LCD glass substrate manufactured by a PRC Company in a self-sustained manner. To-date, product certification and exchanges on technical specifications with the downstream panel manufacturers have attained marked progress.

# Chairman's Statement (Continued)

## Strategic transformation bringing about a breakthrough *(continued)*

In accordance with the acquisition agreement entered into between the Company and IRICO Group Corporation on 17 August 2007, the Group will soon acquire 69.53% equity interest in Shaanxi IRICO Electronics Glass Company Limited held by IRICO Group Corporation. Upon completion of the acquisition, the Group will become the first domestic TFT-LCD glass substrate manufacturer as well as a major player in the global new FPD industry. Further, with the launch of the phase 2 glass substrate project, there will be breakthrough development in the Group's strategic transformation.

Besides, in relation to the luminous materials industry, the energy saving lamp phosphor business of the Group recorded relatively strong growth during the reporting period. The 2007 sales volume recorded a year-on-year increase of 90%, representing an increase in market share from 17% to 22%, maintaining our domestic leading position and posing further development prospects. New products researched and developed by the Group including CCFL phosphor powder were launched in the market in 2007 while development of new products such as PDP phosphor powder was progressing smoothly. These businesses are expected to have further development in 2008.

In respect of the FPD devices, the Group has commenced the PDP production through the joint venture with Sichuan Changhong Electrical Group Co., Ltd. Further, the Group also proactively plans for the development of other FPD devices.

## Bright prospects looking ahead

We will rely on the strong support provided to the state-owned enterprises, and rich resources such as technology, talents and customers which the Group has accumulated over years. We will further inspire our staff's determination and dedication, under the strategic guidance of reinforcing CPT and exploring new businesses, to realize breakthrough in the corporate transformation in a year with rapid growth in 2008.

As a result of the successful production of the TFT-LCD glass substrate product, launch of the phase 2 project, rapid development of the luminous materials business, flourishing of the metallic components processing and development in the FPD devices domain, the Group will have an even brighter future, bringing higher returns for the shareholders.

## Acknowledgement

I have the pleasure to extend my gratitude on behalf of the board of directors to the Company's shareholders, business partners and members of the community for their care and support for the Company, and to express my heartfelt gratitude to all of our management members and employees for their dedicated hard work.

**IRICO Group Electronics Co., Ltd.**
**Xing Daoqin**
*Chairman*

Xianyang, the PRC
24 April 2008

# Management Discussion and Analysis

## 1. Analysis on the Industry

During the reporting period, there continued to be on-going adjustments of the display devices industry.

In 2007, the output volume of CRT television sets amounted to 107,000,000 units globally, representing 54% of the global output of all kinds of television sets. As for the PRC, being the largest production base in the world, the total output volume of CPT enterprises in the PRC reached 52,580,000 units in the reporting period; it is estimated that the proportion of output volume of PRC CPT companies will further increase in the global CPT market towards 2010. Technological advancement such as super-slimming, flattening and digitalization fortified the price-competitiveness of products resulting in strong demand in certain CPT market segments during the reporting period.

### Breakdown of the 2007 global output volume of television sets adopting different technology

PDP
6%
RPTV
1%
LCD
39%
CRT
54%

Source: Displaysearch, research report on global television market, 07Q4

### Estimation of output volume of different types of television sets (Unit:'000 sets)

| | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| CRT television sets | 106,799 | 90,889 | 78,853 | 68,692 |
| FPD television sets | 87,021 | 112,179 | 131,599 | 150,901 |
| RP television sets | 1,842 | 827 | 413 | 196 |
| Total | 195,662 | 203,895 | 210,865 | 219,788 |

Source: Displaysearch, research report on global television market, 07Q4

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 475 of 1004

# Management Discussion and Analysis (Continued)

## I. Analysis on the Industry *(continued)*

During the reporting period, the TFT-LCD panel's prospects looked quite promising, which effectively promoted the potentials of the LCD-related components including glass substrates and CCFL backlight modules, thereby offering significant room for development in the future for the Group's businesses in glass substrates and luminous materials.

The global market size for TFT-LCD glass substrates approached 150,000,000 square meters in 2007, representing a year-on-year increase of 30%. Moreover, as a result of the strong demand, there was supply shortage of glass substrates experienced in 2007. As the PRC is becoming the major production base for TFT-LCD globally, further investments in new panel lines or operations expansions were emerging. This boosted the demand for TFT-LCD glass substrates to 7,780,000 square meters in the PRC in 2007, representing a year-on-year increase of 45%. However, since production line on glass substrates still does not exist in the PRC, there is positive outlook for the glass substrates industry in the PRC.

Market demand for global TFT-LCD glass substrates (1,000 sq.m)

Source: iSuppli, 2008Q1

## Management Discussion and Analysis (Continued)

### 1. Analysis on the Industry *(continued)*

Luminous materials are another strength of the Group's current business, especially in the areas of energy saving lamp phosphor, CCFL phosphor and PDP phosphor. There were good development prospects in the luminous materials markets for these segments in 2007. For the markets of energy saving lamps and energy saving lamp phosphor, the PRC's standing as the largest global production base of energy saving lamps was strengthened in 2007, with 2,900,000,000 units of energy saving lamps produced during the year, representing a year-on-year increase of 18% and boosting the domestic output volume of lamp phosphor to 3,500 tonnes in 2007. For the market of CCFL phosphor, being the core technological content for large-sized LCD panels adopting the backlight modules, the global output volume of CCFL backlight modules for large-sized LCD panels reached 346,000,000 units in 2007, representing a year-on-year increase of 22% ; of which, more than half were manufactured in the PRC. This undoubtedly brought enormous commercial opportunities for the current almost non-existent CCFL phosphor industry in the PRC.

In respect of the metallic components aspects, during the reporting period, benefiting from the booming consumer market of home appliances and vehicles, their supplementary market segments such as stamped metal parts, high precision corrosive parts, high precision masks and special moulds indicated growth trends to different extent. As such, not only will these products attain substantial market growth and investment potentials, they will also earn higher added value to the product.

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/12/19 Page 14 of 166

# Management Discussion and Analysis (Continued)

## 1. Analysis on the Industry *(continued)*

Going forward, in 2008, the Group, as a leading enterprise in the CPT industry, will further enhance the competitiveness of its CPT business and ensure its sound operations in the area of CPT and its component business in 2008 through its comprehensive supplementary services, effective cost control and branding-oriented marketing. Further, the national policy of "Promotion of Household Appliances towards Rural Areas" as decreed by the PRC Government at the end of 2007 will have positive impact on the Group's CPT business.

In the new business fields of electronic glass that the Company is embarking on, the domestic and international markets for TFT-LCD glass substrates over the coming few years will maintain steady growth, especially in the PRC market which will experience apparent sellers' market. It is estimated that the market demand will reach 12,790,000 square meters in 2010, favouring promotion of the Group's business in this area.

In the field of luminous materials, the PRC Government recently decreed a policy of fiscal subsidy and on government purchases specific for energy saving lamps. This will accelerate the growth of the domestic industry of energy saving lamps, which will provide positive drive to the Group's business on energy saving lamp phosphor. The Company estimates that the domestic market of energy saving lamp phosphor will reach 4,000 tonnes in 2008. While the market of CCFL backlight modules for LCD display is forecasted to maintain a steady growth, the output volume of CCFL backlight modules for large sized LCD panels is expected to reach 390,000,000 units in 2008 and an annual growth rate of 13.6% is expected to be maintained thereafter. Further, with more and more production lines of CCFL backlight modules being transferred to the PRC, it is anticipated that there will be tremendous market opportunities for the Group's CCFL phosphor business.

## 2. Business Review

### (1) Operation Highlights

The sales revenue of the Group in 2007 was RMB3,358,890,000, a decrease of RMB502,720,000 from 2006. Operating profit in 2007 was RMB94,178,000, representing a decrease of RMB156,159,000 as compared to 2006. Gross profit margin was 10.60%, representing a decrease of 2.5 percentage points as compared to the previous year (2006: 13.09%). Profits attributable to equity holders amounted to RMB66,511,000 in 2007, representing a decrease of RMB63,001,000 from 2006.

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/12/19 Page 15 of 180

# Management Discussion and Analysis (Continued)

## 2. Business Review *(continued)*

### (2) Display Devices Businesses

- CPT and components business

In 2007, the Group managed to attain a record high in its production and sales. The Group sold 15,327,000 units of CPT in total in 2007, representing an increase of 304,000 units, or approximately 2.03%, relative to 2006. The Group's output volume of CPT increased by 5 percentage points in 2007 and accounted for 27.3% of the total output volume of the PRC CPT manufacturers, securing its leading position in the industry. The Group's global market share rose by 1.6 percentage points to 13.6% over last year, being the third largest globally.

In 2007, the Group continued to adopt a series of operational strategies including cost-focused, marketing-driven and technology innovation initiatives to further enhance the Group's competitiveness in the CPT sector. The Group has also reinforced its cost competitiveness through measures including target cost management, technological upgrade, energy saving and emission control. We also strengthened controls over the market forecast aspects as well as initiatives to expand the international market and achieved satisfactory sales results. With regard to technology innovation, we have commenced mass production of our new product of 74cmPFAK CPT, while critical technological breakthrough has been achieved on the 54cmPFUS super slim, 61cmWPF super slim and 74cmPF slim new CPT products which are expected to commence production in 2008. As a result, the Group's product mix is further enhanced.

In 2007, the Group obtained satisfactory results in environmental protection as well as emission reduction. The Group put more emphasis on its environmental protection and emission reduction efforts, established special task force, formulated recycling and emission reduction plans and defined various policies.

- FPD business

The joint investment project on PDP production line between the Group and Sichuan Changhong Electrical Group Co., Ltd. commenced construction on 29 April 2007. Various aspects of the project were progressing smoothly. Meanwhile, the Group also takes initiatives in planning the industry development on other FPD devices.

# Management Discussion and Analysis (Continued)

## 2. Business Review *(continued)*

### (3) TFT-LCD Electronic Glass Substrate Business

The TFT-LCD glass substrate project commenced construction on 16 January 2007. The phase I project required investment of RMB800 million in building a production line of glass substrates for the fifth-generation TFT-LCD with an annual production capacity of 750,000 square meters. The project was initially established and concocted by IRICO Group Corporation in which the Company has entered into an equity acquisition agreement with IRICO Group Corporation in acquiring interests in Shaanxi IRICO Electronics Glass Co., Ltd. and such acquisition is close to completion.

To-date, the project is progressing smoothly. The glass furnace was ignited and heated up as scheduled on 28 December 2007 while production commenced in late March, 2008. The first unit of TFT-LCD glass substrate is expected to roll-out in the first half of 2008, which will be the first unit of TFT-LCD glass substrate manufactured by a PRC enterprise in a self-sustained manner. Product certification and exchanges about technological specifications have attained a milestone development with the downstream panel manufacturers. The Group will become a major TFT-LCD electronic glass manufacturer.

### (4) Luminous Materials Business

The Group's sales of energy saving lamp phosphor in 2007 increased by 90% over 2006, accounting for 22% of the PRC market share in 2007, relative to 17% in 2006, and continued to maintain the domestic leading position. In 2007, the production capacity expansion for energy saving lamp phosphor was completed, raising the annual production capacity to 1,000 tonnes, which will further increase our market share on energy saving lamp phosphor. After enormous efforts of and repeated testings by our technicians, CCFL phosphor had received customer recognition, realizing the first batch supply of 3.73 tonnes. There will also be further development potentials for new products such as PDP phosphor.

### (5) Metallic Components Business

The Group established a metallic components department in 2007, which had integrated the human and equipment resources of various subsidiary companies in the metallic punching and processing functions, aiming to optimize resources allocation, business expansion, competitive edge and efficiency. Currently, the Group is actively seeking development opportunities in the metallic component sectors including vehicles, aircraft and home appliances, some of which have already attained progress.

# Management Discussion and Analysis (Continued)

## 3. Future Prospects

Following the global trend of evolution of the display device technology, the Group is shifting its business focus from the traditional CPT business to the thriving FPD devices and its related components. A new business structure of the Group comprising display device components, electronic glass, luminous materials and metallic components has already been formed.

The Group will soon complete the equity acquisition of the TFT-LCD glass substrate project from IRICO Group Corporation, thereafter the Group will become the first TFT-LCD glass substrate manufacturer in the PRC. Upon the successful launch of phase I of the project, the Group will soon initiate phase II of the project, which will render us to become a major TFT-LCD glass substrate manufacturer in the industry.

The Group will continue to reinforce its leading manufacturer position in the global luminous materials sector. Following further expansion in the energy saving lamp phosphor business and rapid development of new products including CCFL phosphor and PDP phosphor, the luminous materials business of the Group will be further advanced.

The Group will maintain its leading position in the CPT industry domestically and internationally. Through a series of operational strategies including marketing-driven, technology innovation and cost-focused initiatives, the competitiveness of our CPT business will continue to improve, bringing stable cash flow to the Company and providing a good foundation for the Group's next step of strategic transformation.

# Management Discussion and Analysis (Continued)

## 4. Financial Review

### (1) Results performance

**Profit and loss data for 2003 - 2007** *(RMB'000)*

| | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| Turnover | 4,269,781 | 4,949,683 | 3,927,500 | 3,861,710 | **3,358,990** |
| Sales of CPTs | 3,888,156 | 4,466,767 | 3,441,096 | 3,342,888 | **2,914,351** |
| Sales of CPT components | 381,625 | 482,916 | 486,404 | 518,822 | **444,639** |
| Cost of sales | (3,256,959) | (3,896,956) | (4,357,371) | (3,356,160) | **(3,002,987)** |
| Gross profit | 1,012,822 | 1,052,727 | (429,871) | 505,550 | **356,003** |
| Operating expenses | | | | | |
| Administrative expenses | (227,275) | (219,008) | (278,875) | (241,113) | **236,132** |
| a) General administrative expenses | (195,665) | (172,028) | (241,935) | (215,196) | **213,454** |
| b) Research and development expenses | (31,610) | (46,980) | (36,940) | (25,917) | **(22,678)** |
| Distribution expenses | (103,405) | (113,323) | (152,565) | (150,343) | **(162,073)** |
| Other operating expenses | (73,604) | (79,275) | (36,968) | (38,381) | **(42,055)** |
| Operating profit | 679,766 | 713,020 | (839,381) | 250,337 | **94,178** |
| Finance costs | (56,588) | (62,966) | (70,096) | (61,849) | **(66,729)** |
| Profit for the year | 315,825 | 385,327 | (754,547) | 129,512 | **66,511** |

# Management Discussion and Analysis (Continued)

## 4. Financial Review *(continued)*

### (1) Results performance *(Continued)*

**Turnover by product** *(RMB'000)*

| Name | | 2007 | 2006 | Increase/ (decrease) | Percentage of change |
|---|---|---|---|---|---|
| CPTs | | **2,914,351** | 3,342,888 | (428,536) | (12.82%) |
| Including: | Small-sized CPTs | **536,149** | 660,975 | (124,826) | (18.89%) |
| | Medium-sized CPTs | **2,233,224** | 2,673,542 | (440,318) | (16.47%) |
| | Large-sized CPTs | **144,978** | 8,370 | 136,608 | 1,632.08% |
| CPT components | | **444,639** | 518,822 | (74,184) | (14.30%) |
| Total | | **3,358,990** | 3,861,710 | (502,720) | (13.02%) |

**Sales volume by product** *(Unit)*

| Name | | 2007 | 2006 | Increase/ (decrease) | Percentage of change |
|---|---|---|---|---|---|
| Including: | Small-sized CPTs | **4,494,320** | 4,727,121 | (232,801) | (4.92%) |
| | Medium-sized CPTs | **10,478,558** | 10,279,499 | 199,059 | 1.94% |
| | Large-sized CPTs | **353,946** | 15,996 | 337,950 | 2112.72% |
| Total | | **15,326,824** | 15,022,616 | 304,208 | 2.03% |

**ASP by product** *(RMB/Unit)*

| Name | | 2007 | 2006 | Increase/ (decrease) | Percentage of change |
|---|---|---|---|---|---|
| Including: | Small-sized CPTs | **119** | 140 | (21) | (14.68%) |
| | Medium-sized CPTs | **213** | 260 | (47) | (18.06%) |
| | Large-sized CPTs | **410** | 523 | (114) | (21.72%) |

# Management Discussion and Analysis (Continued)

## 4. Financial Review *(continued)*

### (2) Change over last year and reasons

- In 2007, the Group recorded a turnover of RMB3,358,990,000, representing a decrease of RMB502,720,000, or 13.02% from 2006. Turnover of the CPT business amounted to RMB2,914,351,000, representing a year-on-year decrease of 12.82% from 2006. Turnover of the component business decreased by RMB74,194,000, or 14.30% to RMB444,639,000. The overall gross profit margin of the Group decreased from 13.09% of 2006 to 10.60% of 2007. In 2007, the supply of CPT in the market was greater than the demand thereof resulting in falling sales price of CPT and loss in gross profit. The Company enhanced the product mix and strengthened various cost reduction measures.

- Administrative expenses

  The Group's administrative expenses in 2007 decreased by RMB4,981,000, or 2.07%, to RMB236,132,000 from RMB241,113,000 of 2006. The decrease in administrative expenses was mainly due to adjustment arising from deducting the difference of employee benefits accrual for the year 2007 from the balance of employee benefits in accordance with the accounting standards.

- Finance costs

  The Group's finance costs for 2007 recorded RMB66,729,000, representing an increase of RMB4,880,000, or 7.89%, from RMB61,849,000 of 2006 which was mainly attributable to increases in bank loans as well as loan interest rate during the year.

# Management Discussion and Analysis (Continued)

## 4. Financial Review *(continued)*

### (3) Net current assets and financial resources

As at 31 December 2007, the Group's cash and bank balances aggregated to RMB363,617,000, representing a decrease of 24.17% from RMB479,503,000 as at 31 December 2006. As at 31 December 2007, the Group's borrowings totalled RMB962,684,000 as compared to RMB932,676,000 as at 31 December 2006. The borrowings would all be due within one year.

As at 31 December 2007, the Group's short-term bank loans amounting to approximately RMB200,000,000 (as at 31 December 2006: RMB140,000,000) were secured by the Group's properties, plants and equipment with a net book value of RMB195,538,000 (as at 31 December 2006: RMB205,027,000). As at 31 December 2007, the short-term bank loans guaranteed by the Company's ultimate holding company, IRICO Group Corporation, amounted to RMB250,500,000 (as at 31 December 2006: RMB640,000,000).

For the year ended 31 December 2007, the turnover for accounts receivable of the Group was 157 days, representing an increase of 16 days from 141 days for the year ended 31 December 2006, which was mainly attributable to a slight increase of sales towards the end of the year. This resulted in an increase in the account receivables balance due within three months. For the year ended 31 December 2007, the inventory turnover for the Group was 84 days, representing an increase of 15 days from 69 days for the year ended 31 December 2006, which was mainly attributable to the more intense competition in the CPT market.

### (4) Capital Structure

As at 31 December 2007, the Group's borrowings were mainly denominated in Renminbi and US dollar, while its cash and bank balances were mainly denominated in Renminbi, Hong Kong dollar and US dollar. The Group intends to maintain a suitable ratio of share capital to liabilities, to ensure an effective capital structure from time to time. As at 31 December 2007, its liabilities including bank loans aggregated to RMB1,783,723,000 while cash and bank balances totalled RMB363,617,000 and a gearing ratio (total liabilities/total assets) was 45%.

# Management Discussion and Analysis (Continued)

## 4. Financial Review *(continued)*

### (5) Dividend

The Company's dividend policy will remain unchanged. In light of the absence of accumulated surplus in 2007, the board of directors resolved not to distribute any final dividend.

### (6) Foreign exchange risk

The Group's income and most of its expenses are denominated in Renminbi and US dollar. For the 12 months ended 31 December 2007, exchange rate fluctuations resulted in an increase in operating costs of RMB6,820,000.

### (7) Commitments

As at 31 December 2007, capital commitments of the Group amounted to RMB27,550,000 (31 December 2006: RMB153,810,000), which were mainly financed by the Group's working capital.

### (8) Contingent liability

As at 31 December 2007, the Group had no material contingent liability.

### (9) Pledged assets

As at 31 December 2007, the Group had bank loans of RMB200,000,000, secured by its properties, plants and equipment with a net book value of approximately RMB195,538,000.

# Profiles of Directors, Supervisors and Senior Management

## Directors

### Executive Directors

| | | |
|---|---|---|
| Xing Daoqin | 53 | Chairman |
| Tao Kui | 55 | Vice Chairman |
| Guo Mengquan | 51 | |
| Zhang Shaowen | 46 | |
| Niu Xinan | 47 | |
| Li Shikun | 47 | Chief Financial Officer |

### Non-executive Director

| | |
|---|---|
| Zheng Xingxi* | 51 |

### Independent Non-executive Directors

| | |
|---|---|
| Xu Xinzhong* | 44 |
| Feng Bing* | 41 |
| Wang Jialu | 47 |
| Lv Hua* | 51 |
| Zhong Pengrong* | 55 |

* Member of the Audit Committee

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 487 of 1004

# Profiles of Directors, Supervisors and Senior Management (Continued)

## Directors *(continued)*

**Mr. Xing Daoqin (邢道欽)**, aged 53, is an Executive Director and the Chairman of the Company. Mr. Xing joined the Company in February 1982. He graduated from Xi'an Jiaotong University (西安交通大學) with a bachelor degree in automation. In 1996, Mr. Xing was awarded a special government allowance for experts by the State Council of the PRC. He is a senior engineer at a professor level. Mr. Xing was the deputy general manager of IRICO Group Corporation since March 2001 and has been the general manager of IRICO Group Corporation since July 2005. Before that, he was the factory manager of Caihong Glass Factory under CPT Plant, the head of the Electronic Glass Department of IRICO Group Corporation and the deputy factory manager of CPT Plant. Since November 2007, Mr. Xing has served as the Chairman of IRICO Display Devices Co., Ltd.

**Mr. Tao Kui (陶魁)**, aged 55, is an Executive Director and the Vice Chairman of the Company. Mr. Tao had joined the Company in September 1978. He graduated from South East University (東南大學) (formerly known as Nanjing Institute of Technology) with a bachelor degree in electrical vacuum devices and is qualified as a senior engineer. Mr. Tao acted as a director of IRICO Group Corporation from November 1995 to February 2001 and as the deputy general manager of IRICO Group Corporation since March 2001. Before that, he was the factory manager of both the phosphor powder factory and the glass factory under Shaanxi CPT Plant, a director of IRICO Group Corporation and the deputy factory manager of CPT Plant.

**Mr. Guo Mengquan (郭盟權)**, aged 51, is an Executive Director. Mr. Guo joined the Company in September 1985. He graduated from Northwestern Polytechnical University (西北工業大學) with a bachelor degree in control and manipulation of aviation fluid mechanics and from Shaanxi MBA College with an MBA degree. He is a senior engineer at a professor level. Mr Guo has been acting as the deputy general manger of IRICO Group Corporation since March 2001 and was the Chairman of IRICO Group Electronics Company Limited from August 2005 to December 2007. Before that, he was the factory manager of the glass plant under CPT Plant. Since November 2007, Mr. Guo has served as the Vice Chairman of IRICO Display Devices Co., Ltd.

**Mr. Zhang Shaowen (張少文)**, aged 46, is an Executive Director. He is responsible for technology management of the Company. Mr. Zhang joined the Company in August 1981. He graduated from the Party School of Shaanxi Provincial Committee (陝西省委黨校) with a bachelor degree in economic management. He is a senior engineer. Mr. Zhang has been acting as the deputy general manager of IRICO Group Corporation since March 2001. Before that, he was the factory manager of both the shadow masks factory and the No. 1 CPT Plant under CPT Plant.

# Profiles of Directors, Supervisors and Senior Management (Continued)

## Directors *(continued)*

**Mr. Niu Xinan (牛新安)**, aged 47, was appointed as an Executive Director of the Company on 26 June 2006. Mr. Niu joined the Company in August 1981. He graduated from Northwestern University (西北大學) with a bachelor degree in administrative management and is a senior engineer. Mr. Niu has been serving as the party's Vice-secretary and Secretary to the disciplinary committee of IRICO Group Corporation. In June 2002, he was elected as the Chairman of the labor union of IRICO Group Corporation. Before that, Mr. Niu was the factory manager of No. 1 CPT factory under Shaanxi CPT Plant and the deputy director of its design institute, the manager of Display Devices Department and the factory manager of No. 1 CPT factory under Shaanxi CPT Plant, the factory manager of the Inner Mongolia Television Factory (內蒙古電視機廠) and the deputy factory manager of CPT Plant. Mr. Niu was appointed as a supervisor of the Company in the first general meeting of the Company on 9 September 2004 and was elected the chairman of the Supervisory Committee of the Company in its first meeting. He retired from the positions of the chairman of the Supervisory Committee and supervisor in the third meeting of the first Supervisory Committee on 5 August 2005.

**Mr. Li Shikun (李世坤)**, aged 47, is currently an Executive Director, the Chief Financial Controller of the Company and an accountant. He was appointed as the vice president and investment director of Trade Management Incorporation from 2005 to February 2007. From 2003 to 2005, he was President and Vice President of the operation management of Beijing headquarter of North West Securities. From 2004 to 2007, he was also the deputy secretary of Capital Enterprise Reform and Development Research Society (首都企業改革與發展研究會). From 2001 to 2003, he was the General Manager of Beijing Yushi Rongxin Investment Consultancy Limited (北京明世融信投資顧問公司). From 1996 to 2001, he was Vice President of Tairun Investment Management Company (泰潤投資管理公司). From 1997 to 1998, he was a professional researcher in China Academy of Social Science specialized in monetary banks. From 1993 to 1995, he was the Beijing Chief Representative of Canada Lin's Group. From 1990 to 1993, he was the financial controller of Kenang Company (科能公司) of Chinese Academy of Science. From 1983 to 1989, he had worked in Langfang Hubei Province of Administrative Office (河北省廊坊行政公署) (currently known as Langfang Municipal Government).

**Mr. Zhang Xingxi (張興希)**, aged 51, is a Non-executive Director of the Company. Mr. Zhang joined the Company in August 1981. He graduated from the Faculty of Economics at Beijing Normal University (北京師範大學) with the postgraduate study in business administration. He was the general manager of Caihong Hotel (彩虹賓館) in Xianyang City, Shaanxi Province; the general manager of Hainan Caihong Industrial and Trading Corporation (海南彩虹工貿總公司), the manager of both the Audit Department, Human Resources Department, Chief Economist and the manager of the Estate Management Department of IRICO Group Corporation.

# Profiles of Directors, Supervisors and Senior Management (Continued)

## Directors *(continued)*

**Mr. Xu Xinzhong (徐信忠)**, aged 44, is an Independent Non-executive Director of the Company and currently a professor in Finance in Guanghua Management College of Beijing University and Dean of its Faculty of Finance. Mr. Xu joined the Company in September 2004. Mr. Xu obtained his bachelor degree in meteorology from Beijing University (北京大學), his MBA degree from Aston University in the United Kingdom and his doctoral degree in finance from Lancaster University in the United Kingdom. He worked as a lecturer and senior lecturer of the Faculty of Accounting and Finance at Manchester University in the United Kingdom and was a professor and a chair in Finance of the Faculty of Management at Lancaster University in the United Kingdom. Mr. Xu has been acting as a professor of Guanghua Management College of Beijing University and Dean of its Faculty of Finance since January 2002. Mr. Xu was also awarded the Krize for the Best Manuscript (最佳論文獎) by British Accounting Review in 1997.

**Mr. Feng Bing (馮兵)**, aged 41, is an Independent Non-executive Director of the Company and currently an Executive Director and the deputy general manager of China Financial and Consulting Company (中華財務諮詢公司). Mr. Feng joined the Company in September 2004. He obtained his bachelor degree in computer software from Northwestern Polytechnical University, his master degree in engineering from Calculation Technology Research Institute of Chinese Academy of Sciences (中國科學院計算技術研究所) and his master's of science degree in finance from the School of Management at Syracuse University. He was a part-time tutor in optional practical training of the Faculty of Commerce at Syracuse University and a senior manager of Deloitte Touche Tohmatsu in the United States.

**Mr. Wang Jialu (王家路)**, aged 47, is an Independent Non-executive Director of the Company and a partner of Commerce & Finance Law Office (通商律師事務所). Mr. Wang joined the Company in September 2004. He completed his course for master degree in business administration from Guanghua Management College of Beijing University and the course for juris doctor from Marburg University of Germany, and received his MBA degree from Beijing University and the LLM degree from the law school of Marburg University of Germany. He is an arbitrator in the Beijing Arbitration Commission (北京仲裁委員會) and an adjunct lecturer for master degree course in the Law Faculty of Beijing University.

**Mr. Lv Hua (呂華)**, aged 51, is an Independent Non-executive Director of the Company. He has a PhD degree. He is a certified accountant and a certified tax consultant in the PRC. He currently serves as the chairman (chief accountant) of Xian Xigema Certified Public Accountant Firm Limited as well as the vice chairman of Shaanxi Certified Public Accountants Association (陝西省註冊會計師協會), the vice chairman of Shaanxi Asset Appraisal Association, the executive member of Shaanxi Research Society of Restructuring the Economic Systems (陝西省體制改革研究會) and the vice chairman of General Chamber of Commerce of Xian City (西安市工商聯合會). He was consecutively awarded various titles such as "Excellent Youth Entrepreneur in Shaanxi Province" (陝西省傑出青年企業家), "New Long March Pioneer of Shaanxi Province" (陝西省新長征突擊手), "Top Ten News Figures of Finance and Financial System in Shaanxi Province" (陝西省財政・金融系統十大新聞人物) and "Top 10 Excellent Economic Figures of Shaanxi" (陝西十大傑出經濟人物).

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 490 of 1004

# Profiles of Directors, Supervisors and Senior Management (Continued)

## Directors *(continued)*

**Mr. Zhong Pengrong (鍾朋榮)**, aged 55, an Independent Non-executive Director of the Company. Mr. Zhong is the chairman of Beijing Shiye Consultancy Centre as well as professors of various universities such as Northwest University, Central University of Finance and Economics and Zhongnan University of Economics and Law. He also works as an economic consultant for numerous sizable enterprises and regional governments, formulating strategic proposal and restructuring proposal of over a hundred of enterprises alongside strategic development plans for more than sixty cities at regional and county level. Mr. Zhong graduated at the Zhongnan University of Economics and Law and was awarded a master degree of economic problems and direction of the PRC (中國經濟問題方向). Apart from working in the investigation and research office of the Central Office (中央書記處調研室), he has also issued hundreds of essays on economy on news papers such as "People's Daily", "Economic Daily, PRC" and "Guang Ming Daily". Various books written by him were published, such as "100 National Measures" (百縣治國大計), "Macro-economic theory" (宏觀經濟學) and "Research on inflation in China" (中國通貨膨脹研究).

## Supervisors

**Mr. Fu Jiuquan (符九全)**, aged 38, was appointed as the Chairman of Supervisory Committee of the Company with effect from 5 August 2005 and currently the deputy chief accountant of IRICO Group Corporation. Mr. Fu joined in July 1990 the Company. Mr. Fu graduated from Guilin Electronic Industry College (桂林電子工業學院) with a bachelor degree in finance and accounting. He is a senior accountant. He was appointed as the director of the Finance Division of CPT Plant and the manager of the Assets Finance Department of IRICO Group Corporation.

**Mr. Zhang Weichuan (張渭川)**, aged 53, was appointed as an employee Supervisor with effect from 10 September 2004. He graduated from Northwestern Telecommunication Engineering College (西北電訊工程學院) with a bachelor degree in electrical vacuum devices. He is a senior engineer at a researcher level. He joined the Company in August 1976 and has served as the director of the Quality Assurance Department of CPT Plant, the deputy chief engineer of CPT Plant, the manager of the Technology and Quality Department of the IRICO Group Corporation and the manager of the Strategic Planning Department of the Company.

**Mr. Zhang Zhankui (張佔魁)**, aged 57, was appointed as a shareholder Supervisor of the Company with effect from 26 June 2006. Mr. Zhang graduated from Chengdu Telecommunication Engineering College (成都電訊工程學院) with a bachelor degree in electronic engineering specialized equipment and automation and is a senior engineer. He joined the Company in August 1982. Mr. Zhang is currently the Chief of the Supervisory Division of IRICO Group Corporation. He was the deputy factory manager and factory manager of the power factory, head of Power and Energy Operation Division, deputy chief engineer and head of Human Education Division of CPT Plant, factory manager of No. 1 Xi'an Wireless Communication Plant, general manager of Xi'an IRICO Electronic Industrial Co. Ltd., and head of Human Resources Department of IRICO Group Corporation.

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 491 of 1004

# Profiles of Directors, Supervisors and Senior Management (Continued)

## Supervisors *(continued)*

**Mr. Sun Haiying(孫海鷹)**, aged 64, was appointed as an independent Supervisor with effect from 10 September 2004 and is currently the head and a professor of the Environmental Science and Engineering Technical Centre of Xi'an Jiaotong University, a member of the Standing Committee of the Chinese People's Political Consultative Conference and the head of the Department of Science and Technology of Shaanxi Province, an adjunct professor of the Institute for Enterprises of the Hong Kong Polytechnic University. Mr. Sun graduated from the Northwestern University in geography and was director of the Shaanxi Province Meteorological Bureau (陝西省氣象局), the director of Shaanxi Province Science and Technology Department (陝西省科學技術廳). He was a group leader of the Planning Strategy Study Group under the State Mid- and Long-term Science and Technology Development Planning Team (國家中長期科學和技術發展規劃領導小組的規劃戰略研究專題組) in August 2004.

**Ms. Wu Xiaoguang (吳曉光)**, aged 50, was appointed as an independent Supervisor with effect from 10 September 2004. She is currently a deputy professor of the Management Faculty at Xi'an Jiaotong University. She received her bachelor degree in economics from the Economic Management College of Northwestern University. She was a graduate majoring in accounting in management school of Xian Jiaotong University, and was awarded a master degree of business administration upon graduation at the Faculty of Business of The Hong Kong Polytechnic University. Ms. Wu is a part-time professor of the Chinese (Hainan) Reform and Development Research Institute (中國(海南)改革發展研究院), the chairman and general manager of Xi'an Wanguantong Financial Management Consulting Co., Ltd., an expert consultant of Shaanxi Province Venture Capital Association. She holds positions as expert consultant in Beijing Jinrui Junan Taxation Co., China Tax Consulting Information Web, China Industry and Economic News Web and Beijing Zhongbao Weiye Information Consulting Firm.

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 492 of 1004

# Profiles of Directors, Supervisors and Senior Management (Continued)

## Senior Management

**Mr. Zhang Junhua (張君華)**, aged 49, is the President of the Company. He is fully responsible for management on the Company's operation. Mr. Zhang joined the Company in December 1984. He graduated from Shaanxi Mechanical College with a bachelor's degree in machinery manufacturing and is a senior engineer. At present, he serves as chairman of Xi'an New Century Club, chairman and general manager of Xianyang IRICO Digital Display Technology Co., Ltd and chairman of Xi'an Caihui Display Technology Co., Ltd. Before that, he had acted as deputy head and head of Metering & Energy-Conservation Department of No. 2 CPT Factory under CPT Plant, assistant to the general manager, the deputy general manager, general manager and vice chairman of IRICO Display Devices Co., Ltd. He was the Vice President of the Company from 5 August 2005 to December 2007.

**Mr. Zhang Chunning (張春寧)**, aged 48, is the Vice President of the Company. He is responsible for the operation of production, safety and environmental protection, technology and quality and innovation of new products respectively. Mr. Zhang graduated from the Faculty of Chemistry at Northwestern University in 1985 with a bachelor degree in science (chemistry) and from Xi'an Jiaotong University with a master degree in management (business administration). He is now pursuing his doctorate education in management (business administration) at Xi'an Jiaotong University. Mr. Zhang joined the Company in 1985. He has 16 years of business and management experience in the CPT industry. Before that, he was the deputy officer and officer of the No. 2 Factory under Shaanxi CPT Plant, the acting factory manager and factory manager of Caihong Phosphor Factory under CPT Plant, the general manager of Shaanxi IRICO Phosphor Materials Co., Ltd. (陝西彩虹熒光材料有限公司), the assistant to the president of the Company and the Joint Company Secretary of the Company.

**Mr. Zou Changfu (鄒昌福)**, aged 49, is the assistant to the president of the Company and is engaged in purchasing materials. Mr. Zou was born in 1959 and received a degree in engineering and is a senior engineer. He was the general manager in the head office of IRICO Kunshan Holdings ([illegible]) and the chairman of IRICO Yingguang Electrics Limited Company (彩虹熒光電子有限公司). He has been the general manager of the Purchase Department of the Company since December 2005.

**Mr. Ge Di (葛迪)**, aged 49, is the assistant to the president of the Company and mainly engages in purchasing in the Metal Part Department. Mr. Ge, born in 1959, is a senior engineer with a college degree. He was the factory manager of CPT Plant from 2003 to March 2007. Furthermore, he has been the supervisor of IRICO Display Devices Co., Ltd. since September 2005, the manager of Metal Part Department of IRICO Group Electronics Company Limited since March 2007, the chairman of Cai Qin Electrical Devices Company Limited (彩秦電子器件有限公司) since March 2007.

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 493 of 1004

# Profiles of Directors, Supervisors and Senior Management (Continued)

## Senior Management *(continued)*

**Mr. Wei Xiaojun (魏小軍)**, aged 50, is currently acting as the assistant to the president and mainly engages in innovative business management. Mr. Wei was born in 1958. He obtained a degree of engineering and is a senior engineer. He was the general manager of head office in Shanxi IRICO General Service Corporation Co., Ltd. from 2003 to November 2005, the general manager of IRICO Kunshan Holdings Limited (昆山彩虹實業有限公司).

**Mr. Liu Xiaodong (劉曉東)**, aged 36, is currently the Joint Company Secretary of the Company. He is responsible for the securities management, the legal matters and investors' relationship of the Company. Born in 1972, he graduated at Economic Management College of Northwestern University with a Phd degree and is a senior economist. He held positions as the technician and management staff of No.1 CPT Plant under CPT Plant, secretary to the general manager of IRICO Group Corporation. Since March 2002, he has been the secretary to the board of IRICO Display Devices Co., Ltd. Since January 2008, he has been the Joint Company Secretary of IRICO Group Electronics Company Limited.

**Mr. Lam Chun Lung (林晉龍)**, aged 35, was appointed as the Company's qualified accountant and Joint Company Secretary with effect from 26 August 2006. Mr. Lam graduated from The Hong Kong University of Science and Technology with a first honour bachelor degree in business administration (accounting) in May 1998, and from the City University of Hong Kong with a master degree in business administration in July 2006. He had been the head of auditing in S C To & Co. (杜昭明會計師事務所) and accounts and finance manager of Colliers Jardine International. Mr. Lam is a member of The Association of Chartered Certified Accountants and Hong Kong Institute of Certified Public Accountants.

## Changes of Directors, Supervisors and Senior Management

On details of changes of directors, supervisors and senior management, please refer to the "Directors, Supervisors and Senior Management" section within the Report of the Directors.

# Report of the Directors

The Board hereby presents the report of the Directors and the audited financial report of the Group for the year ended 31 December 2007 to the shareholders.

## Principal operations

The Group is principally engaged in the production and sales of display devices (CPT and FPD) and its components, electronic glass, phosphor materials and metallic products.

## Results and dividend

The sales of the Group in 2007 was RMB3,358,990,000, operating profit was RMB94,178,000, gross profit margin was10.60% and profit attributable to equity holders amounted to RMB66,511,000.

The annual results of the Group for the year ended 31 December 2007 and its financial status as at the same day prepared in accordance with accounting principles generally accepted in Hong Kong are set out on page 65 to 161 of this annual report.

The Company's dividend policy will remain unchanged. In light of the absence of accumulated surplus in 2007, the Board has decided not to distribute any final dividend.

## Charitable contributions

In 2007, the Group made charitable donations in a sum of approximately RMB140,000 (2006: nil).

## Five year financial summary

A summary of the published results and assets, liabilities and minority interests of the Group for the last five years, as extracted from the audited financial statements and adjusted (if applicable), is set out on page 161 of this annual report. This summary does not form part of the audited financial statements.

## Property, plant and equipment

Details of the movements of property, plant and equipment of the Group in the year are set out in note 17 to the financial statements.

# Report of the Directors (Continued)

## Share capital

Details of the changes in the Company's share capital, together with the reasons therefor, are set out in note 31 to the financial statements.

## Purchase, redemption and sale of shares of the Company

Save as disclosed in this annual report, neither has the Company nor any of its subsidiaries purchased, redeemed or sold any of its shares during the year.

## Reserves

Details of the movements of reserves of the Company and of the Group during the year are set out in note 32 to the financial statements.

## Major customers and suppliers

The percentage of purchases from and sales to the major suppliers and customers of the Group is set out as follows:

### Purchase

— largest supplier 3.6%

— five largest suppliers 13.4%

### Sales

— largest customer 15.5%

— five largest customers 50.7%

Due to the variety of the Company's production materials, the Company has not yet identified an established supplier with strength sufficient to provide a relatively high proportion of raw materials. Hence, the five largest suppliers represent 13.4% in total. None of the Directors, their respective associates or any shareholder who, as far as the Directors are aware, holds 5% or more of the Company equity interests had any interest in the above-mentioned major suppliers and customers.

# Report of the Directors (Continued)

## Directors, Supervisors and Senior Management

Directors and Supervisors of the Company for the year were as follows:

**Executive Directors:**

| | | |
|---|---|---|
| Xing Daoqin | *Chairman* | re-appointed on 9 September 2007 (Term of office of last session expired) |
| Tao Kui | *Vice Chairman* | re-appointed on 9 September 2007 (Term of office of last session expired) |
| Guo Mengquan | | re-appointed on 9 September 2007 (Term of office of last session expired) |
| Zhang Shaowen | | re-appointed on 9 September 2007 (Term of office of last session expired) |
| Niu Xinan | | re-appointed on 9 September 2007 (Term of office of last session expired) |
| Li Shikun | *Chief Financial Controller* | appointed on 9 September 2007 |

**Non-executive Directors:**

| | |
|---|---|
| Zhang Xingxi | re-appointed on 9 September 2007 (Term of office of last session expired) |
| Yun Dahjiimin | resigned on 8 September 2007 |

**Independent Non-executive Directors:**

| | |
|---|---|
| Xu Xinzhong | re-appointed on 9 September 2007 (Term of office of last session expired) |
| Feng Bing | re-appointed on 9 September 2007 (Term of office of last session expired) |
| Wang Jialu | re-appointed on 9 September 2007 (Term of office of last session expired) |
| Lv Hua | appointed on 9 September 2007 |
| Zhong Pengrong | appointed on 9 September 2007 |
| Feng Fei | resigned on 8 September 2007 |
| Zha Jianqiu | resigned on 8 September 2007 |

**Supervisors:**

| | |
|---|---|
| Fu Jiuquan | re-appointed on 9 September 2007 (Term of office of last session expired) |
| Zhang Zhankui | re-appointed on 9 September 2007 (Term of office of last session expired) |
| Zhang Weichuan | re-appointed on 9 September 2007 (Term of office of last session expired) |
| Sun Haiying | re-appointed on 9 September 2007 (Term of office of last session expired) |
| Wu Xiaoguang | re-appointed on 9 September 2007 (Term of office of last session expired) |

Brief biographical details of Directors, Supervisors and Senior Management are set out on page 21 to 28.

Each of the independent non-executive Directors has issued a confirmation in respect of the factors set out in Rule 3.13 of the Listing Rules concerning his independence pursuant to Rule 3.15 of the Listing Rules. The Company considers all of the independent non-executive Directors to be independent.

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 497 of 1004

# Report of the Directors (Continued)

## Directors, Supervisors and Senior Management *(continued)*

The existing Second Session of the board of Directors (the "Board") and Supervisory Committee of the Company were elected at the general meeting held on 20 August 2007, with a term of 3 years. Upon expiry of their term of office, the Directors and Supervisors can offer themselves for re-election at the general meeting.

The term of directorship of twelve Directors of the First Session of the Board expired on 8 September 2007, nine of them were re-elected as Directors of the Second Session of the Board with effect from 9 September 2007, including Xing Daoqin, Tao Kui, Guo Mengquan, Zhang Shaowen, Niu Xinan, Zhang Xingxi, Feng Bing, Xu Xinzhong and Wang Jialu while Zhong Pengrong, Li Shikun and Lv Hua were appointed as new Directors of the Second Session of the Board in replacement of three Directors (Yun Dah Jiunn, Feng Fei, Zha Jianqiu) whose terms had expired.

On 8 September 2007, the term of office of five Supervisors of the First Session of the Supervisory Committee of the Company expired, and all of the five Supervisors (Fu Jiuquan, Zhang Zhankui, Zhang Weichuan, Sun Haiying, Wu Xiaoguang) were re-elected as Supervisors of the Second Session of the Supervisory Committee.

On 27 December 2007, Mr. Guo Mengquan resigned from the office as President of the Company, and Mr. Wang Ximin and Mr. Li Miao respectively resigned from the office as Vice President of the Company. The original Vice President Mr. Zhang Junhua was appointed as President of the Company, and the original Joint Company Secretary Mr. Zhang Chunning was appointed as the Vice-President of the Company. On 28 December 2007, the Company also appointed respectively Mr. Zou Changfu, Mr. Ge Di and Mr. Wei Xiaojun respectively as Assistants to the President. On 18 January 2008, Mr. Liu Xiaodong was appointed as the Joint Company Secretary of the Company. Mr. Lam Chun Lung will remain as the other Joint Company Secretary of the Company.

## Report of the Directors (Continued)

## Remuneration of Directors and the five highest paid individuals

Details of the remuneration of directors and the five highest paid individuals of the Group are set out in note 10 to the financial statements.

There were no arrangements under which a Director or Supervisor of the Company had waived or agreed to waive any remuneration in respect of the year ended 31 December 2007.

## Share Appreciation Rights Plan

Pursuant to the Share Appreciation Rights Plan of the Company (details of which were set out in the Company's prospectus dated 8 December 2004), up to 31 December 2007, the following Directors, Supervisor and senior management members were granted share appreciation rights by the Company as follows:

| Name | Number of Share Appreciation Rights *(Shares)* | Note |
|---|---|---|
| Xing Daoqin | 2,200,000 | Director |
| Tao Kui | 1,860,000 | Director |
| Guo Mengquan | 1,660,000 | Director |
| Zhang Shaowen | 1,400,000 | Director |
| Niu Xinan | 800,000 | Director |
| Li Shikun | 300,000 | Director |
| Zhang Weichuan | 520,000 | Supervisor |
| Zhang Junhua | 890,000 | Senior Management |
| Zhang Chunning | 970,000 | Senior Management |
| Zou Changfu | 720,000 | Senior Management |
| Wei Xiaojun | 400,000 | Senior Management |
| Ge Di | 820,000 | Senior Management |

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/12/19 Page 38 of 160

# Report of the Directors (Continued)

## Share Appreciation Rights Plan *(continued)*

Note: In 2008, the Company also granted share appreciation rights to the following Directors, Supervisors and senior management.

Directors: Mr. Xing Daoqin for 700,000 shares, Mr. Tao Kui for 530,000 shares, Mr. Guo Mengquan for 400,000 shares, Mr. Zhang Shaowen for 400,000 shares, Mr. Niu Xinan for 400,000 shares. Supervisors: Mr. Fu Jiuquan for 650,000 shares and Mr. Zhang Weichuan for 400,000 shares; and senior management: Mr. Zhang Junhua for 530,000 shares, Mr. Zhang Chunning for 300,000 shares, Mr. Zou Changfu for 400,000 shares, Mr. Ge Di for 300,000 shares, Mr. Wei Xiaojun for 300,000 shares and Mr. Liu Xiandong for 300,000 shares.

## Directors' and Supervisors' interests in contracts

At end of the year and any time during the year, save for the service contract in relation to the Company's business, none of the Company, its holding company or subsidiaries entered into any contract of significance in which the Director or Supervisor of the Company held, either directly or indirectly, any material interest.

## Directors' and Supervisors' Service contracts

Each of the Directors and Supervisors has entered into a service contract with the Company. No Director or Supervisor of the Company has entered into a service contract with the Company which is not terminable by the employer within a year without payment of any compensation (other than statutory compensation).

## Interests and short positions of Directors, Chief Executive and Supervisors in shares of the Company or its associated corporations

Save as the interests mentioned in the section headed "Share Appreciation Rights Plan" above, during the year ended 31 December 2007, none of the Directors, or chief executive or supervisors or their respective associates had any interests or short positions in the shares, underlying shares and/or debentures of the Company and/or any of its associated corporations (within the meaning of Part XV of the Securities and Futures Ordinance (the "SFO")) which are (a) required to be notified to the Company and the Stock Exchange pursuant to the provisions of Divisions 7 and 8 of Part XV of the SFO; (b) required to be recorded in the register of interests kept by the Company pursuant to section 352 of the SFO; (c) required to be notified to the Company and the Stock Exchange pursuant to the Model Code as set out in Appendix 10 to the Rules Governing the Listing of Securities on the Stock Exchange (the "Listing Rules"), which was effective from 30 June 2006.

During the year ended 31 December 2007, none of the Directors, chief executive, supervisors, senior management, their spouses or children under the age of 16 was given the right to acquire shares, underlying shares or debentures of the Company or its associated corporations (within the meaning of the SFO).

## Interests and short positions of substantial shareholders and other parties

So far as the Directors are aware, each of the following persons, not being a Director, chief executive, Supervisor, or member of the Company's senior management, had an interest or short position in the Company's shares or underlying shares (as the case may be) as at 31 December 2007 and as entered in the register of interests to be kept pursuant to section 336 of the SFO:

IRICO Group Corporation had interests in 1,455,880,000 Domestic Shares of the Company (representing 100% of the Domestic Share capital), whereas HKSCC Nominees Limited had interests in 484,529,990 H Shares of the Company (representing 99.84% of the H Share capital).

*Notes:*

As at 31 December 2007, based on the information available to Directors and so far as the Directors are aware, HKSCC Nominees Limited held 484,529,990 H Shares, among which:

Derby Steven P., Goldfarb Lawrence and Lamar Steven M. through their controlled corporations had interests in 49,554,000 H Shares of the Company (representing approximately 10.21% of the H Share capital).

J.P. Morgan Chase & Co. through its controlled corporations had interests in 33,742,000 H Shares of the Company (representing approximately 6.95% of the H Share capital).

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/12/19 Page 38 of 100

# Report of the Directors (Continued)

## Interests and short positions of substantial shareholders and other parties *(continued)*

Montpelier Asset Management Limited had interests in 30,294,000 H Share of the Company (representing approximately 6.24% of the H Share capital).

Pictet Asset Management Limited on behalf of Pictet Funds Asian Equities had direct interests in 27,488,000 H Shares of the Company (representing approximately 5.66% of the H Share capital).

Atlantis Investment Management Ltd had interests in 24,500,000 H Shares of the Company (representing approximately 5.05% of the H Share capital).

## Management contracts

No contracts concerning the management and administration of the whole or any substantial part of the business of the Company were entered into or existed during the year.

## Designated deposit and overdue time deposit

As at 31 December 2007, the Group had no designated deposits in any financial institutions in the PRC. All of the Group's bank deposits are lodged in commercial banks in the PRC, and are in compliance with the relevant laws and regulations. There were also no instances where the Group had failed to collect any of the time deposits upon maturity.

## Employees, Retirement benefits and Other benefits

As at 31 December 2007, the Group had 9,218* employees with various talents, of whom approximately 5.5% were management and administrative personnel, 7.5% were technological personnel, 0.9% were accounting and audit personnel, 0.8% were sales and marketing personnel, 82.5% were production employees and 2.8% were others. The employment and remuneration policy including retirement benefits and other benefits of the Company remained the same as set out in the Company's prospectus dated 8 December 2004. With full enthusiasm in work, the Group's employees are committed to ensure the high quality and reliability of products and services.

* Excluding service despatch workers

## Connected transactions

The connected transactions recorded during the year and up to the date of this report are as follows:

### 1. Continuing connected transactions during the year

For the year ended 31 December 2006, there were various continuing connected transactions between the Group and IRICO Group Corporation, IRICO Display Technology Co., Ltd. ("IRICO Display"), Xianyang IRICO Electronics Shadow Mask Co., Ltd. ("IRICO Shadow Mask"), Shaanxi Rainbow Phosphor Material Co., Ltd. ("IRICO Phosphor"), Xianyang Caihui Packaging Material Company Limited ("Xiangyang Caihui"), details of which are set out in the Company's prospectus dated 8 December 2004.

Pursuant to Rule 14A.43(3) of the Listing Rules, the Stock Exchange has granted to the Company a waiver from strict compliance with the otherwise applicable announcement and/or independent shareholders' approval requirements in connection with these continuing connected transactions (the "Waiver").

# Report of the Directors (Continued)

## Connected transactions *(continued)*

### 1. Continuing connected transactions during the year *(continued)*

For the year ended 31 December 2007, the approved annual cap and the actual revenue or expenditure in respect of each of the continuing connected transactions are set out below:

| Item | | Approved annual cap for 2007 *RMB'000* | Transaction amount for 2007 *RMB'000* |
|---|---|---|---|
| (i) | Supply of fuel, coal, industrial chemicals products and raw materials to IRICO Group Corporation | 75,500 | 35,092 |
| (ii) | Supply of parts and raw materials to IRICO Display, IRICO Phosphor and IRICO Shadow Mask | 797,800 | 419,589 |
| (iii) | Purchase of foam plastics, gloves, wood brackets and raw materials from IRICO Group Corporation | 121,000 | 120,488 |
| (iv) | Purchase of phosphor and chadowm mask from IRICO Phosphor and IRICO Shadow Mask | 240,000 | 162,166 |
| (v) | Purchase of packaging materials, adhesive tapes and plastic materials from Xianyang Caihan | 54,400 | 42,531 |
| (vi) | Utilities obtained from IRICO Group Corporation | 620,000 | 397,229 |
| (vii) | Social and ancillary services obtained from IRICO Group Corporation | | |
| | (a) IRICO School | — | — |
| | (b) Social welfare facilities | 2,240 | — |
| | (c) Security services | 800 | — |
| | (d) Environmental hygiene and landscaping services | 1,200 | 100 |
| (viii) | Rental payable to IRICO Group Corporation | 46,234 | 35,742 |
| (ix) | Land use rights leasing fees payable to IRICO Group Corporation | 4,603 | 4,536 |
| (x) | Trademark licensing fees payable to IRICO Group Corporation | 4,500 | 3,476 |

# Report of the Directors (Continued)

## Connected transactions *(continued)*

### 1. Continuing connected transactions during the year *(continued)*

The Independent Non-executive Directors had reviewed these continuing connected transactions and confirmed to the Board that these transactions have been entered into:

(1) in the ordinary and usual course of business of the Group;

(2) either on normal commercial terms or, if there are not sufficient comparable transactions to judge whether they are on normal commercial terms, on terms no less favourable to the Company than terms available to or from (as appropriate) independent third parties; and

(3) in accordance with the relevant agreement governing them on terms that are fair and reasonable and in the interests of the shareholders of the Company as a whole.

The auditors of the Company had provided a letter to the Directors of the Company confirming that the continuing connected transactions:

(1) had received the approval by the Board of the Company;

(2) were in accordance with the pricing policies of the Company;

(3) had been entered into in accordance with the relevant agreements governing these transactions; and

(4) had not exceeded the caps set out in the Waiver.

In respect of these continuing connected transactions, the Company confirmed that it had complied with the relevant requirements set out in the Waiver and Chapter 14A of the Listing Rules.

### 2. One-off Connected transactions

(a) As mentioned in the announcement of the Company dated 7 March 2007, the Company entered into an agreement with IRICO Shadow Mask, a subsidiary of the Company, of which the Company held 75% equity interest, pursuant to which the Company transferred to IRICO Shadow Mask all the equipment for shadow mask production and other related equipment held by the Company before entering into such agreement (the "Shadow Mask Agreement"). The Shadow Mask Agreement was effective on the date when it was signed (please refer to the announcement of the Company dated 7 March 2007 for the relevant terms of the Shadow Mask Agreement).

# Report of the Directors (Continued)

## Connected transactions *(continued)*

### 2. One-off Connected transactions *(continued)*

(b) As mentioned in the announcement of the Company dated 1 August 2007, the Company and/or its connected parties entered into the following transactions:

(i) On 27 July 2007, IRICO Display and Xian Caihui Display Technology Co., Ltd. ("Caihui") entered into the IRICO Display Transfer Agreement in respect of the transfer of the Kinescope Assets by IRICO Display to Caihui. As disclosed in the Company's announcement dated 28 February 2008, the transaction under the IRICO Display Transfer Agreement has been completed.

(ii) (a) On 27 July 2007, A Share Company and IRICO Group Corporation ("Group Corporation") entered into, (i) the A-P New Century Agreement regarding the transfer by A Share Company of its 41.67% equity interest in Xian New Century International Club Co., Ltd. ("New Century") to the Group Corporation , and (ii) the A-P K-Line Agreement regarding the transfer by A Share Company of its 49% equity interest in Xianyang IRICO Digital Display Co., Ltd. ("K-Line Company") to the Group Corporation and (b) on 27 July 2007, the Company and the Group Corporation entered into the H-P K-Line Agreement in respect of the transfer by the Company of its 51% equity interest in K-Line Company to the Group Corporation. As disclosed in the Company's announcement dated 28 February 2008, the transactions under the A-P New Century Agreement, the A-P K-Line Agreement and the H-P K-Line Agreement have been completed.

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/12/19 Page 43 of 186

# Report of the Directors (Continued)

## Connected transactions *(continued)*

### 2. One-off Connected transactions *(continued)*

(c) As mentioned in the announcement of the Company dated 17 August 2007, the Company entered into an acquisition agreement with IRICO Group ("Acquisition Agreement"), pursuant to which IRICO Group agreed to sell and the Company agreed to purchase, subject to the fulfillment of certain conditions, the 69.53% equity interests held by IRICO Group in Shaanxi IRICO Electronics Glass Company Limited ("IRICO Glass") for a total consideration of approximately RMB279.58 million ("Acquisition"). Upon completion of the Acquisition, IRICO Glass will become a non-wholly owned subsidiary of the Company. The Acquisition Agreement will be effective when approval of the acquisition is obtained from the Independent Shareholders at the extraordinary general meeting of the Company and State-owned Assets Supervision and Administration Commission ("SASAC") respectively. To-date, the approval from the independent shareholders has been obtained and the final approval of the Acquisition by SASAC, one of the conditions precedent to the Acquisition Agreement, is still under process and has not been obtained. The Company and IRICO Group have agreed in writing to extend the last date for fulfilling such conditions to 30 June 2008.

## Bank loans

As at 31 December 2007, details of bank loans of the Group are set out in note 30 to the financial statements.

## Pre-emptive rights

There are no provisions for pre-emptive rights under the Company's Articles of Association or relevant laws and regulations which could oblige the Company to offer new shares on a pro-rata basis to existing shareholders.

## Subsidiaries

Details of the subsidiaries of the Company are set out in note 21 to the financial statements.

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/12/19 Page 44 of 150

# Report of the Directors (Continued)

## External guarantee

The Group does not have any external guarantee during the year.

## Provision for Impairment of Fixed Assets

The Board appointed an independent professional valuer to evaluate the value of the production facilities and construction in progress. A provision for impairment of property, plant and equipment of the Group amounting to approximately RMB2,530,000 was made for 2007 (2006: RMB867,205,000). Details of the provision for impairment of fixed assets and set out in note 17 to the financial statements.

## Material litigation

As at 31 December 2007, save as disclosed below, the Directors were not aware of any other litigation or claim of material importance pending or threatened against any member of the Group.

### 1. The dispute between Xianyang Xingyun Mechanical Company Limited ("Xingyun") and the Company

In respect of the litigation between Xingyun and the Company previously disclosed, the status is as follows:

On 11 April 2007, the Company received a writ of summons ((2007) Shaan Min Er Chu Zi No 10) from the People's High Court of Shaanxi, and was informed that Xingyun brought an action for a second time against the Company in respect of the same matter.

The Company made a written submission to the Court denying all liabilities in response to the allegations made by Xingyun. The Company believes that Xingyun's claim for litigations had no legal and factual basis, therefore its claim should be dismissed. On 23 November 2007, the People's High Court of Shaanxi issued the civil verdict ((2007) Shaan Min Er Chu Zi No 10), the Court ruled that the claim by Xingyun against the Company demanding for compensation to its investment and other losses totalling RMB30,010,000 was not established and should be dismissed. At present, Xingyun has filed an appeal to the People's Supreme Court of the PRC. The Company has received a writ of summons from the People's Supreme Court on 15 April 2008.

## Report of the Directors (Continued)

### Material litigation *(continued)*

2. Baystar Capital II, LP et al. v. Core-Pacific Yamaichi International (HK) Ltd. et al., Case No 05 1091 ABC (CWx) (filed in the United States District Court for the Central District of California) (the "Baystar Litigation").

In respect of the litigation with Baystar previously disclosed, the status is as follows:

The Company filed a motion for summary judgment on 15 May 2006. On 9 August 2006 the Court partly dismissed the motion.

Upon completion of the discovery procedure, summary judgment commenced for Core Pacific and Baystar. The Court granted Core Pacific's motion and dismissed the rights appeal that may be implied in all the litigations of Core Pacific. Shortly thereafter, Core Pacific approached the Company and offered to dismiss the claim for damages against the Company. No payment or compensation in respect of the litigation is required from the Company. The Company accepted the offer and signed the settlement proposal with the relevant parties on 5 October, 2007. Therefore, the litigation has ended.

The result of the above litigations has no material impact on the 2007 consolidated financial statements of the Group.

### Contingent Liabilities

As at 31 December 2007, the Group had no significant contingent liabilities.

### Code on Corporate Governance Practices

The Board has reviewed the documents regarding the Company's adoption of relevant corporate governance practices, and is of the opinion that the documents are in compliance with the principles and code provisions of the Code on Corporate Governance Practices (the "Code") as set out in Appendix 14 to the Rules Governing the Listing of Securities on the Main Board of the Stock Exchange of Hong Kong Limited (the "Listing Rules").

The Directors are not aware of any information that would reasonably reflect the non-compliance of the Company or any of its Directors with the Code at any time in the year ended 31 December 2007. The Board considers that the Company has fully complied with the principles and code provisions set out in the Code during such period.

# Report of the Directors (Continued)

## Model Code

The Company has adopted the Model Code set out in Appendix 10 to the Listing Rules. Having made specific enquiry of all Directors, the Company has confirmed that all Directors have complied with the requirements set out in the Model Code.

## Public float

Based on the information that is publicly available to the Company and within the knowledge of the Directors, as at the date of this report, the Directors believe that the relevant minimum percentage applicable to listed securities was maintained throughout the reporting period.

## Audit Committee

The Audit Committee of the Company has reviewed the Group's consolidated financial statements for the year ended 31 December 2007, including accounting principles adopted by the Group.

## Auditors

The financial statements of the Company have been audited by SHINEWING (HK) CPA Limited who retire and, being eligible, offer themselves for re-appointment subject to approval by shareholders at the annual general meeting to be held on 30 June 2008.

The Company has appointed SHINEWING (HK) CPA Limited as the auditors of the Company at the annual general meeting held on 29 June 2007, in place of the retiring auditors of the Company, PricewaterhouseCoopers, Certified Public Accountants ("PwC"). The main reason for the proposed change of auditors is that the Company and PwC could not reach an agreement on the audit fees for the financial year ended 31 December 2007.

By order of the Board
**Xing Daoqin**
*Chairman*

Xianyang, the PRC
24 April 2008

# Report of the Supervisory Committee

In 2007, in compliance with the Company Law of the People's Republic of China ("Company Law") and the Articles of Association of the Company, all members of the Supervisory Committee of the Company have complied with the principle of integrity, responsible to all shareholders and sincerely performed the duties of Supervisor to protect the interests of the shareholders. They supervised the operation and financial status of the Company and the performance of duties by the senior management in 2007. I hereby present the report of 2007 as follows:

In 2007, pursuant to the requirement of the Articles of Association, the Supervisory Committee reviewed financial reports regularly. In 2007, the Supervisory Committee held two meetings, to fully review the audited 2006 annual financial report and the 2007 interim financial report respectively of the Company, and to consider and pass the 2006 report of the Supervisory Committee. The convening of the two meetings was in compliance with the relevant requirements of the Company Law and the Articles of Association of the Company.

In 2007, the Supervisors of the Company attended all Board meetings and general meetings of the shareholders.

In respect of the details of change of session of the Supervisory Committee, refer to the "Directors, Supervisors and Senior Management" section within the Report of the Directors.

Pursuant to the PRC and other relevant laws and regulations and the Articles of Association of the Company, the Supervisory Committee performed serious supervision and examination on the procedures of Board meetings, resolutions, the execution by the Board of the resolutions passed in general meetings, the performance of duties by the senior management and the internal control system of the Company and its thorough execution.

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 511 of 1004

# Report of the Supervisory Committee (Continued)

The Supervisory Committee considered that the Directors and senior management of the Company operated strictly in compliance with the Company Law and Securities Law of the PRC, the Articles of Association of the Company and other relevant regulations and rules of Hong Kong. The Committee members performed their duties with integrity and diligence, and executed various resolutions and authorization passed in general meetings, to ensure that the operation of various businesses complies with the requirements of laws and regulations. Through the establishment of a series of rules, the Company further improved the corporate legal structure and the internal management system and established and improved the internal control system. In the process of the examination of the financial status of the Company and the supervision of the performance of the duties of the Directors and senior management of the Company, the Supervisory Committee did not find any behaviour in prejudice to the interest of the Company and the Shareholders, nor any behaviour in contravention to laws and regulations, the Articles of Association of the Company and various rules and systems.

The Supervisory Committee is confident in the prospect of the Company and will proceed to carry out effective supervision on the operation of the Company to safeguard the interests of the shareholders and the Company as a whole.

By order of the Supervisory Committee
**Fu Jiuquan**
*Chairman of the Supervisory Committee*

Xianyang, the PRC
24 April 2008

# Corporate Governance Report

Sound corporate governance is the foundation for the healthy development of an enterprise as well as confidence for investors. In 2007, the Company persisted on good corporate governance principles, enhanced the standard of corporate governance and advanced the stability of operations and healthy development of the Company.

## 1. Corporate Governance Practices

Improvement of the internal control system was made by the Company by reviewing the Code on Corporate Governance Practices (the "Code") to cater for the constant development and evolvement of corporate governance.

The Code sets out the principles of good corporate governance and two levels of recommendation, namely:

- Code Provisions, with which issuers are expected to comply or to give considered reasons for any deviation.

- Recommended Best Practices, which are for guidance only, save that issuers are encouraged to comply with. The Board has reviewed the Company's corporate governance practices. For the year ended 31 December 2007, the Company has adopted and complied with all the principles and Code Provisions and nearly all the Recommended Best Practices set out in the Code.

The Company has implemented the Code Provisions and nearly all the Recommended Best Practices in the Code. The Company's code on corporate governance practices includes, without limitation to, the Articles of Association passed at the shareholders' general meeting on 9 September 2004 and Work Rules for the Board, Organisation Rules for the Audit Committee, the Articles of the Nomination Committee, Organisation Rules for the Strategic Committee and Organisation Rules for the Remuneration Committee passed on 25 August 2005. The Board also formulated Management Methods for Information Disclosure, Management Mechanism for Investor Relations and Management Mechanism for Implementation of Resolutions of the Board as relevant work rules of the Company.

The Company's code on corporate governance practices exceeds the requirements of the Stock Exchange and is more strict than the Code Provisions set out in the Code in many aspects, which mainly include the following:

- The Company has established Audit Committee, the Remuneration Committee, the Nomination Committee and the Strategic Committee.

- Apart from one Non-Executive director, all other members of the Audit Committee are Independent Non-Executive Directors.

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/12/19 Page 56 of 166

# Corporate Governance Report (Continued)

## 2. The Board

### Duties of the Board

The Board is responsible for providing leadership and monitoring the Company's affairs. All Directors are liable to act in the best interests of the Company and collectively assume the responsibility for overseeing and monitoring the Company's affairs. The Board makes regular assessment on the management's business prospects and results as well as exercises other power in accordance with the Articles of Association, which mainly includes:

- To oversee the implementation of resolutions passed at shareholders' general meetings;
- To approve the Company's business plans and investment schemes;
- To formulate the Company's annual financial budget schemes;
- To formulate the Company's profit distribution plan;
- To formulate the Company's basic management system;
- To approve the Company's accounting policies and adjustment to the same;
- To approve various announcements including financial statements.

# Corporate Governance Report (Continued)

## 2. The Board *(continued)*

### Constitution

During the reporting period, the second Board comprising 12 Directors was elected in the extraordinary general meeting held on 20 August 2007, which includes 1 Non-executive Director, 5 Independent Non-executive Directors and 6 Executive Directors. All Directors must retire at the third annual general meeting after being appointed and are then eligible for re-election. Newly appointed Directors are subject to election at the first general meeting after being appointed. The personal information of the Directors are set out in the section headed Profile of the Directors and Senior Management of this report. The same information is also set out in the website of the Company.

Directors are elected in general meetings with a term of three years from the date of their elections until the expiry of their terms.

All Directors shall, upon their initial appointment, report to the Board in respect of the number and nature of any office assumed by them in other companies or institutions and the term of office, as well as disclose to the Company names of such companies or institutions. If the Board considers a Director has a conflict interest in any proposal under consideration, such Director shall report his/her interests and abstain from voting and may, when necessary, apply for absence. The Board requires Directors to confirm whether there is any connected transaction between the Directors or their respective associates and the Company or its subsidiaries at each financial reporting period. Any material transactions relating to connected parties, which have been confirmed, will be disclosed in notes to the financial statements of an annual report.

The Independent Non-executive Directors of the Company possess wide professional expertise and experience, and can fully perform their important function of supervision and balance to protect the interests of the shareholders and the Company as a whole. There are five (over one-third) independent Non-executive Directors. In determining the independence of a Non-executive Director, the Director is considered independent only after the Broad have confirmed that there is not any direct or indirect material relationship between the Director and the Company. A Director is considered not independent after he/she has been a Director over nine years. The Board considers that the independent Non-executive Directors are able to make independent judgment effectively and satisfy the guideline on assessing independence set out in Rule 3.13 of the Listing Rules.

The Company complies with the requirement concerning the appointment of sufficient independent Non-executive Directors and that at least one of them should possess appropriate professional qualification or accounting or relevant financial expertise set out Rule 3.10(1) and 3.10(2).

The Company has made appropriate arrangement to insure against the possible legal action that the Directors and senior management may be involved. The Board reviews annually on the insurance arrangement.

# Corporate Governance Report (Continued)

## 2. The Board *(continued)*

### The Chairman and the Chief Executive

The Chairman is responsible for operation and management of the Board while the President takes charge of the day-to-day management of the Company's business. To ensure a balanced distribution of functions and authorisations, roles of the Chairman and the President are explicitly differentiated. The Chairman is taken up by Xing Daoqin and the President is taken up by Zhang Junhua. Under the assistance of the Vice Chairman, the Chairman leads and oversees the operation of the Board to ensure the performance of Board being in the best interests of the Company.

Under the assistance of the Vice President and the assistants to the President, the President is responsible for managing the day-to-day affairs of the Company, organising and implementing resolutions of the Board and reporting to the Board on the Company's overall operation. As the chief manager of the Company's day-to-day affairs, the President is responsible for the annual business plan and investment schemes and formulation of the Company's basic management rules. He/She also takes the direct responsibility for the Company's operation.

The President, the Vice President, the assistants to the President and the Chief Financial Controller make concerted efforts to collaborate with administrative departments of the Company to ensure the Board's and the Board committees' access to complete, reliable and proper information so that the Directors can make decisions with adequate information and to ensure proper implementation of the Board's resolutions. The President monitors the Company's operation and financial results with a view to plans and budget and passes on their opinions to the Board on material events.

### Joint Company Secretary

The Joint Company Secretary reports to the Board. All Directors are entitled to the Joint Company Secretary's services. He / She shall notify the Board the latest information on governance and oversight on a regular basis, assist the Chairman of the Board in preparation of the agenda, and prepare and despatch meeting documents on a timely and comprehensive basis so as to ensure the efficiency and validity of the Board meetings. Under the assistance of the Company's lawyer, the Joint Company Secretary is in charge of announcement of annual and interim reports and information disclosure in accordance with the Listing Rules and relevant rules of the Company. He / She makes a regular enquiry to the Company's financial department for information on connected transactions to secure the compliance with Listing Rules in respect of such transactions.

## 2. The Board *(continued)*

### Joint Company Secretary *(continued)*

The Joint Company Secretary is also in charge of preparing and keeping minutes of meetings of the Board and the Board committees together with any relevant documents, which will be provided and disclosed to all Directors for their inspection at any reasonable time. All matters under consideration including any enquiry and objection by Directors shall be minuted in details. Within a reasonable timeframe upon closing a meeting, a minute draft shall be despatched to all Directors for their comments.

### Board meetings

The Chairman is responsible for approving agenda of each Board meeting and effectually convenes the Board meeting, taking into consideration, where appropriate, other matters proposed by Directors for inclusion in the agenda. Assisted by the Company Secretary, the Chairman seeks to ensure all Directors' proper access to accurate, timely and sufficient information on the proposals to be considered by the Board to enable their wise decisions. While a 14 days' notice of a regular Board meeting is given, the agenda and the meeting documents attached are circulated at least 3 days prior to the holding of a Board meeting or a meeting of any special committee.

The Chairman encourages the Directors to be fully engaged in the Board's affairs and make contributions to the functions of the Board. The Board adopts sound corporate governance practices and procedures and takes appropriate steps to inspire the Directors' open and frank communication so as to ensure Non-executive Directors' enquiries with each Executive Director and communication between them are effective.

It is expressly provided in the Work Rules for the Board that, in the event that a substantial shareholder or Director of the Company has a conflict of interests in the matter to be considered at the Board meeting, such matter shall not be dealt with by Board committees or by way of circulation. Any Director who has a conflict of interests in the matters to be considered shall abstain from voting.

# Corporate Governance Report (Continued)

## 2. The Board *(continued)*

### Board meetings *(continued)*

Five Board meetings are held in 2007. The details of attendance at Board meetings are as follows:

| Directors | Board meeting (times of attendance in person / times of meetings held during the office of the directors) |
|---|---|
| Xing Daoqin | 5/5 |
| Tao Kui | 5/5 |
| Guo Mengquan | 3/5 |
| Zhang Shaowen | 3/5 |
| Niu Xinan | 4/5 |
| Li Shikun* | 1/1 |
| Zhang Xingxi | 5/5 |
| Yun Dah Juinn** | 2/4 |
| Feng Fei** | 2/4 |
| Xu Xinzhong | 4/5 |
| Feng Bing | 4/5 |
| Wang Jialu | 3/5 |
| Zha Jianqiu** | 3/4 |
| Lv Hua* | 0/1 |
| Zhong Pengrong* | 1/1 |

Note: * assumed office on 9 September 2007; ** left on 8 September 2007

In accordance with the Articles of Association, Directors, when necessary, may propose to convene an extraordinary Board meeting. They may also, when they consider necessary, obtain the Company's information and independent expert opinion, where expenses incurred are borne by the Company.

## 2. The Board *(continued)*

### Board committees

Four specialized committees are established under the Board, namely the Strategic Committee, the Audit Committee, the Nomination Committee and the Remuneration Committee. Their terms of reference are determined in accordance with the principles set out in the Code. The Board committees report to the Board. In order to perform their duties, the Board committees have the authority to appoint lawyers, investment bank, accountants or other professionals to provide professional advice if necessary, the expenses of which are borne by the Company.

### Nomination Committee

The Nomination Committee is chaired by Mr. Xing Daoqin. The committee members include Mr. Tao Kui, Mr. Guo Mengquan, Mr. Niu Xinan, Mr. Feng Bing, Mr. Xu Xinzhong and Mr. Wang Jialu. The committee provides the Board with its advice on appointment of directors, assessment of the Board's composition and re-election of the Board in accordance with certain agreed standards. The relevant standards include a director's proper professional knowledge and experience in the industry, personal integrity and commitment of adequate time. The Nomination Committee is responsible for choosing and recommendation of director candidates, including consideration of recommendations by others and, when necessary, making use of public recruitment.

By reference to the Recommendation A.4 of the Code, the Board formulated the Organisation Rules of the Nomination Committee.

In 2007, the Nomination Committee held one meeting to consider the candidates for the new senior management (President, Vice President and Secretary to the Board) of IRICO together with the proposal to be approved by the Board. The attendance details of each of the committee members of the Nomination Committee in 2007 are as follows:

| Directors | Meetings of Nomination Committee (times of attendance in person / times of meetings held) |
|---|---|
| Xing Daoqin | 1/1 |
| Tao Kui | 1/1 |
| Guo Mengquan | 1/1 |
| Niu Xinan | 1/1 |
| Xu Xinzhong | 1/1 |
| Feng Bing | 1/1 |
| Wang Jialu | 0/1 |

# Corporate Governance Report (Continued)

## 2. The Board *(continued)*

### Audit Committee

The Audit Committee assumes the responsibilities for audit of the Company's financial reports, review of internal control and corporate governance work and provision of relevant advice to the Board. Independent Non-executive Directors represent four fifths of the members of the Audit Committee. The Audit Committee is chaired by Mr. Lv Hua, an Independent Non-executive Director. Mr. Lv has proper qualifications and financial experience (Mr. Lv was appointed as the Company's Director and Chairman of the Audit Committee on 9 September 2007. Mr. Zha Jianqiu was the previous Chairman of the Audit Department and left his office on 8 September 2007).

By reference to the recommendations in A Guide for Effective Audit Committees issued by Hong Kong Institute of Certified Accountants and C.3 of the Code, the Board has formulated the Organisation Rules of the Audit Committee.

In 2007, the Audit Committee convened five meetings with an average attendance rate of 100%. The senior management and external auditors were invited to these meetings.

In 2007, the Audit Committee:

- reviewed the Company's financial statements and interim results announcement for the six months ended 30 June 2007, together with the proposals to be approved by the Board;
- considered the financial statements and the annual results announcement of the Company for the year ended 31 December 2006, together with the proposals to be approved by the Board;
- considered the report in relation to the execution of connected transactions for the year ended 31 December 2006, together with the proposals to be approved by the Board;
- considered the audit fees and remuneration payable to the external auditors for the year ended 31 December 2007, together with the proposals for the auditors' re-appointment to be approved by the Board;
- reviewed matters in relation to audit, internal control and financial reporting with the senior management and external auditors of the Company.

# Corporate Governance Report (Continued)

## 2. The Board *(continued)*

### Audit Committee *(continued)*

The attendance details are as follows:

| Directors | Meetings of Audit Committee (times of attendance in person / times of meetings held during the respective office of the directors) |
|---|---|
| Zhang Xingni | 5/5 |
| Xu Xinzhong | 5/5 |
| Feng Bing | 5/5 |
| Feng Fei** | 5/5 |
| Zha Jianqiu** | 5/5 |
| Zhong Pengrong* | 0/0 |
| Lv Hua* | 0/0 |

Note: *assumed office on 9 September 2007; ** left on 8 September 2007

### Remuneration Committee

The Remuneration Committee is chaired by Mr. Tao Kui. The committee members include Mr Zhang Shaowen, Mr. Wang Jialu and Mr. Lv Hua.

The Remuneration Committee is responsible for approval of remuneration policies for all directors and senior management members, including yearly distribution of share appreciation rights pursuant to the Company's share appreciation rights plan. Each year, the committee reviews the current remuneration policy and proposes to the Board to change the remuneration policy and system. It also assists the Company to formulate fair and transparent remuneration policies for directors and senior management and determination of their remuneration.

During the reporting period, the Remuneration Committee conducted a written resolution and passed the Directors' and senior management's share appreciation rights plan for the year. During the year, all committee members of the Remuneration Committee conducted more than three informal discussions on the remuneration-related affairs.

Remuneration policy for Executive Directors: The remuneration portfolio policy for Executive Directors is designed to link Executive Directors' remuneration with their performance and the Company's missions to inspire their performance and re-election. In accordance with the Articles of Association, directors may not determine or approve their own remunerations.

# Corporate Governance Report (Continued)

## 2. The Board *(continued)*

### Remuneration Committee *(continued)*

The five Executive Directors of the Company are the functionaries who fall within the management of the state-owned Asset Supervision and Administration of the State Council, and hence are subject to *Provisional Management Methods for Remunerations of Enterprise Representatives* and *Provisional Assessment Methods for Appraisal of Operating Results of Enterprise Representatives* issued in 2004. These five directors' remunerations consist of basic salary, performance-linked salary and long-term incentive-linked salary. The basic salary is the annual basic income of a functionary, which is determined by reference to the business scale of the enterprise, responsibilities, and the average salary of local enterprises, the industry and the enterprise itself. The performance-basic salary is linked with the operating results appraisal and based on the performance-linked salary, which is determined by reference to the appraisal grade and scores for the annual operating results of the enterprise representative. After the appraisal results are obtained, 60% of the performance-linked salary is paid while the payment of the remaining 40% will be deferred to the second year of re-election or resignation.

Based on their individual performance and the Company's operating status, the Remuneration Committee approved the share appreciation rights to be granted to the Executive Directors pursuant to the share appreciation rights plan as approved by shareholders.

Remuneration policy for Non-executive Directors: Remunerations of Non-executive Directors are subject to approval by the Company's shareholders' general meeting and determined after taking into consideration of the complexity of the matters to be handled by them and their duties. Pursuant to the service contract entered into between the Company and the Non-executive Directors, the Company pays Non-executive Directors the out-of-pocket expenses incurred in performance of their duties (including attendance at the Company's meetings).

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 522 of 1004

# Corporate Governance Report (Continued)

## 2. The Board *(continued)*

### Remuneration Committee *(continued)*

A director's remuneration includes the amount paid by the Company and its subsidiaries for their management of affairs of the Company and its subsidiaries. Remunerations paid to each director of the Company in 2007 were as follows:

| Name | Position | Currency | 2007 Remuneration and allowance | 2007 Director's fee | 2007 Retirement benefits contribution | Remarks |
|---|---|---|---|---|---|---|
| Xing Daojin | Chairman | RMB | 281,933.50 | | 13,087.26 | |
| Tao Kui | Vice Chairman | RMB | 281,831.50 | | 13,087.26 | |
| Guo Mengquan | Director | RMB | 253,396.00 | | 13,087.26 | |
| Zhang Shaowen | Director | RMB | 249,046.50 | | 13,087.26 | |
| Niu Xinan | Director | RMB | — | — | — | not received remuneration from the Company |
| Li Yikun | Executive Director, Chief Financial Controller | RMB | 305,000.00 | — | — | |
| Zhang Xingxi | Non-Executive Director | RMB | — | — | — | not received remuneration from the Company |
| Xu Xinzhong | Independent Director | RMB | — | 100,000 | — | |
| Feng Bing | Independent Director | RMB | — | 100,000 | — | |
| Wang Jialu | Independent Director | RMB | — | 100,000 | — | |
| Lv Hua | Independent Director | RMB | — | — | — | not received remuneration in the reporting period as a director of the Company |
| Zhong Pengrong | Independent Director | RMB | — | — | — | not received remuneration in the reporting period as a director of the Company |
| Zhu Jianqiu | Former independent director | RMB | — | 100,000 | — | left on 8 September 2007 |
| Fang Pei | Former independent director | RMB | — | 100,000 | — | left on 8 September 2007 |
| Yan Guo Xiong | Former director | RMB | — | — | — | left on 8 September 2007 |
| Sub-total | | RMB | 1,371,407.50 | 500,000.00 | 52,349.04 | |
| | | HKD | — | — | — | |

# Corporate Governance Report (Continued)

## 2. The Board *(continued)*

### Remuneration Committee *(continued)*

Pursuant to applicable regulations of the PRC, the Company currently participates in a series of pension schemes organized by the provincial and municipal governments, pursuant to which all production plants of Company must contribute to such pension schemes according to certain proportions of the salaries, bonus and various allowance of the employees. As the production plants are located in different regions, the proportion of the contributions to the remuneration of the employees are also different.

## 3. Statement of financial responsibility of the Board

The Board prepares the Company's financial statements and takes the responsibility for the completeness and legitimacy of the financial statements as well as the efficiency of the Company's internal control system and risk management process. The President is responsible for the daily management of the operation of the Company. The Board makes periodic reviews on the functions of and the rights authorised to the President to ensure such arrangements are proper and in compliance with the Articles of Association.

The Directors confirmed their responsibility to prepare financial statements for the Company for each financial year, to report truly and fairly on the financial status of the Group, and to comply with applicable accounting standards and adopt appropriate accounting policies in the preparation of the financial statements. The Directors are responsible for the safe-keeping of the accounts of the Company which disclose the financial status of the Company in reasonable accuracy and assist the Company in preparing financial statements in accordance with laws, regulations and applicable accounting standards.

For auditors' reporting responsibilities, please refer to the auditors' report.

# Corporate Governance Report (Continued)

## 4. Securities transactions by Directors

The Board has adopted the Model Code as set out in Appendix 10 to the Listing Rules as the code of conduct regarding securities transactions by directors of the Company. The Model Code is also applicable to special employees who may have certain price sensitive information that has been not disclosed, including such employees in the Company's subsidiaries and parent company. Upon appointment, any director of the Company is delivered a Model Code. After that, the Model Code is delivered twice a year, namely, one month prior to the Board meeting to approve the Company's interim results and one month prior to the Board meeting to approve the Company's annual results, together with an indicative notice to remind the Directors that they may not deal in the Company's shares until the results announcement.

All Directors of the Company confirm that as at 31 December 2007, all Directors and the specific employees who may have certain price sensitive information that has not been disclosed complied with the Model Code and none of the said persons has interests or short positions which are required to notify the Company and the Stock Exchange, or incur any conduct in violation of regulations.

## 5. Control mechanism

### Internal control and internal audit

**Internal control system**

The Board is fully in charge of the Company's internal control system. It is responsible for ensuring the Company has adequate internal control systems to monitor its overall financial and operational status, hence avoiding material financial omission or loss and omission or risk in relation to operation controls. Through its Audit Committee, the Board makes periodic review on the effectiveness of the internal control system. In 2007, the Company enhanced the quality of its internal control system which operated effectively during the year. The Company also audited the effectiveness of the internal control system, which includes controls over finance, operations, regulation compliance and risk management. Relevant results have been reported to the Board through the Audit Committee.

The Company's internal control system plays a key role in risk management which is crucial for the achievement of its business objectives. The internal control system and work process are formulated to prevent unauthorized use or disposal of the Company's assets and to ensure proper maintenance of true and adequate accounting records and relating financial information. While the internal control procedures are designed to manage and properly control, but not remove, the risks of failing to achieve business objectives. The Company's internal control provides reasonable, but not absolute, assurance against material mis-statement or loss.

Case 3:07-cv-05944-JST Document 5440-5 Filed 05/29/19 Page 62 of 160

# Corporate Governance Report (Continued)

## 5. Control mechanism *(continued)*

### Internal control and internal audit *(continued)*

**Internal control system** *(continued)*

The Board confirms that the Company has set up procedures and systems for efficient recognition, assessment and management of material operating risks, with support from Board committees and senior management. The Audit Committee believes that the Company's internal control system and accounting system are designed to safeguard the security of material assets, to facilitate the recognition and monitoring of the Company's operating risks, the execution of material transactions under management's authorisation and the reliable disclosure of financial statements; and that the established control system is functioning constantly to identify, evaluate and manage the material risks faced by the Company.

**Internal audit**

The Company has set up an internal audit department, which is responsible for overseeing the Company's internal controls, ensures the achievement of the corporate goals and conducts independent reviews.

The internal audit department gives its prudent opinion as to whether the Company's operations have a comprehensive and efficient risk management system and reports to the Audit Committee accordingly. In 2007, all internal audit reports and opinions are submitted to the President, the Chief Financial Controller and other Executive Directors of the Company as well as the senior management of the department being audited. The audit department also follows up on the issues identified during the audit and conducts follow-up audit to ensure that all issues have been satisfactorily resolved. In addition, a regular dialogue is maintained between the audit department and the external auditors so that both are aware of the significant factors that may affect their respective scope of work.

# Corporate Governance Report (Continued)

## 5. Control mechanism *(continued)*

### Internal control and internal audit *(continued)*

**Risk management**

One of the Board's responsibilities is to raise the risk awareness across the Company's business operations. The Board properly implements the operating risk management procedures across the Company and formulates policies and procedures which provide a framework for identification and management of risks. The Board fulfils its oversight role over the Company and its subsidiaries in the following areas:

- establishment of the risk management system of the Company;
- identification, assessment and management of the material risks faced by various units of the Company;
- review and assessment of the adequacy of the Company's risk management process, system and internal control;
- review and monitoring of compliance with the Company's risk management process, system and internal control including compliance with prudential and legal requirements governing the business of the Company.

The risk management activities include review of detailed financial and operational reports, budgets and business plans provided by the management, review by the Board of actual results against the budgets, ongoing work of the internal audit function and regular business audits by Executive Directors and the executive management teams of each core business division. While the said procedures are designed to identify and manage the risks which may impose adverse impact on realization of the Group's business prospects, they do not provide absolute assurance against any material mis-statement or loss.

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/12/19 Page 64 of 100

# Corporate Governance Report (Continued)

## 5. Control mechanism *(continued)*

### Internal control and internal audit *(continued)*

**Risk management** *(continued)*

The Board is fully in charge of overseeing the operations of the Company's business units. Personnel with proper experience and skills are appointed to the board of directors of the Company's subsidiaries and associated companies to attend their board meetings and to oversee the operations of those companies. Monitoring activities include review and approval of business strategies, budgets and plans as well as setting of key business performance targets. The identification, evaluation and report on the likelihood and potential financial impact of material business risks are left to the management of such companies.

Executive Directors hold monthly meetings with executive and business senior management members to review the integrated financial status and operations against the budgets and estimation and to estimate and evaluate risk factors so as to formulate and adjust business strategies.

**External auditors and their remuneration**

As approved in the annual general meeting held on 29 June 2007, the Board appointed Shinewing (HK) CPA Limited as the auditors of the Company, to replace the retiring auditors of the Company, PricewaterhouseCoopers, Certified Public Accountants ("PwC"). The main reason for the change of auditors is that the Company and PwC could not reach an agreement on the audit fees for the financial year ended 31 December 2007.

The Audit Committee reviewed the letter from Shinewing (HK) CPA Limited to confirm its independence and objectiveness, held meetings with the firm to discuss the audit scope and fees, and approved scope and fees for any non-audit service provided by the firm.

For the year ended 31 December 2007, the remuneration of the external auditors amounted to RMB2,330,000, all of which was for audit service. No non-audit service fee was incurred for the year. The audit fee has been approved by the Audit Committee and the Board.

## 5. Control mechanism *(continued)*

### Interests of shareholders and investor relations

**General meeting**

The Company encourages shareholders' attendance at shareholders' general meetings and gives at least a 45 days' notice of such meetings. The Chairman and Directors may attend the meetings to answer questions about the Company's businesses. All shareholders have rights to request the convening of an extraordinary general meeting and put forward proposals for shareholders' consideration in accordance with the Articles of Association. At the annual general meeting, each matter is put forward in the form of a separate proposal and voted by way of poll based on the number of shares. Voting results of the annual general meeting are released in the form of announcements and set out on the respective websites of the Stock Exchange and the Company.

On 29 June 2007, the 2006 Annual General Meeting was held at the conference room on the 1st floor of the office building of the Company in Xianyang, Shaanxi Province.

On 20 August 2007, an extraordinary general meeting was held at the conference room of the Company on the 1st floor of the office building of the Company in Xianyang, Shaanxi Province.

On 24 October 2007, an extraordinary general meeting, H Shareholders Class Meeting and Domestic Shareholder Class Meeting were held at the conference room on the 1st floor of the office building of the Company in Xianyang, Shaanxi Province.

On 1 November 2007, an extraordinary general meeting was held at the conference room on the 1st floor of the office building of the Company in Xianyang, Shaanxi Province.

Details of the above general meetings are set out in the respective websites of the Stock Exchange and the Company.

The Company Secretary is responsible for day-to-day contacts between the Board and substantial shareholders. Investors and the public may access the Company's website for detailed information on the Company's businesses. The Company's interim and annual results announcements can also be downloaded from the Company's website.

According to the information available to the Company and as far as the Directors are aware, at least 25% of the Company's total issued share capital is held by public shareholders.

# Corporate Governance Report (Continued)

## 5. Control mechanism *(continued)*

### Information disclosure and investor relations

The Company formulated and implemented the Management Methods on Information Disclosure and the Rules for Investor Relations Management, aiming to further standardize its information disclosure system to ensure the accuracy, completeness and timeliness of information disclosure and to provide investors with high-quality services. The Board Office, with the Company Secretary as its head, formulates the procedures for gathering, verification and reporting of internal operating data and other information as well as the procedures for preparation and review of periodic reporting.

The Company undertakes that it shall make impartial disclosure and full and transparent reporting. The ultimate duty of the Chairman is to ensure efficient communication with the investors and the Board's understanding of the opinions of substantial shareholders. After the Company's announcement of its interim and annual results, the Board is committed to provide shareholders with clear and comprehensive results information of the Group by publishing interim and annual reports. The senior management shall preside over presentations and attend the meetings with institute investors and financial analysts for intercommunication in respect of the Company's results and business prospects, which is a regular function of investor relations. In addition, the Company arranges for roadshow for analysts and investors, from time to time, to foster intercommunication and understanding between the investors and the management of the Company. Field visits by analysts and investors are welcomed for inspecting plants and business premises of the Company. In 2007, the Company and investors and/or analysts held 15 meetings and 2 roadshows in Hong Kong and 1 roadshow in Japan.

The Company is committed to increase transparency and improve investor relations and has attached much importance to shareholders' responses in this regard. For any inquiry and advice, shareholders can contact the Company Secretary through the hotline (+86 29 3333 2866) or by email lxd@ch.com.cn or raise the questions at the annual general meeting or the extraordinary general meeting. Inquiry can also be made through the above means to the Company Secretary for procedures concerning the convening of an annual general meeting or extraordinary general meeting and putting forward a proposal.

By order of the Board
*Joint Company Secretaries*
**Liu Xiaodong**
**Lam ChunLung**

Xianyang, Shaanxi
24 April 2008

# Independent Auditor's Report

TO THE SHAREHOLDERS OF
IRICO GROUP ELECTRONICS COMPANY LIMITED
*(A joint stock company established in the People's Republic of China with limited liability)*

We have audited the consolidated financial statements of IRICO Group Electronics Company Limited (the "Company") and its subsidiaries (collectively the "Group") set out on pages 67 to 160, which comprise the consolidated and company balance sheets as at 31 December 2007, and the consolidated income statement, the consolidated statement of changes in equity and the consolidated cash flow statement for the year then ended, and a summary of significant accounting policies and other explanatory notes.

## Directors' responsibility for the consolidated financial statements

The directors of the Company are responsible for the preparation and the true and fair presentation of these consolidated financial statements in accordance with Hong Kong Financial Reporting Standards issued by the Hong Kong Institute of Certified Public Accountants and the disclosure requirements of the Hong Kong Companies Ordinance. This responsibility includes designing, implementing and maintaining internal control relevant to the preparation and the true and fair presentation of the financial statements that are free from material misstatement, whether due to fraud or error; selecting and applying appropriate accounting policies; and making accounting estimates that are reasonable in the circumstances.

## Auditor's responsibility

Our responsibility is to express an opinion on these consolidated financial statements based on our audit and to report our opinion solely to you, as a body, and for no other purpose. We do not assume responsibility towards or accept liability to any other person for the contents of this report. We conducted our audit in accordance with Hong Kong Standards on Auditing issued by the Hong Kong Institute of Certified Public Accountants. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance as to whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and true and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by the directors, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

# Independent Auditor's Report

## Opinion

In our opinion, the consolidated financial statements give a true and fair view of the state of affairs of the Company and of the Group as at 31 December 2007 and of the Group's profit and cash flows for the year then ended in accordance with Hong Kong Financial Reporting Standards and have been properly prepared in accordance with the disclosure requirements of the Hong Kong Companies Ordinance.

**SHINEWING (HK) CPA Limited**
*Certified Public Accountants*
**Ip Yu Chak**
Practising Certificate Number: P04798

Hong Kong
24 April 2008

# Consolidated Income Statement

Year Ended 31 December 2007

| | Notes | 2007 RMB'000 | 2006 RMB'000 |
|---|---|---|---|
| Turnover | 8 | 3,358,990 | 3,861,710 |
| Cost of sales | | (3,002,987) | (3,356,160) |
| Gross profit | | 356,003 | 505,550 |
| Other operating income | 9 | 178,435 | 174,624 |
| Selling and distribution costs | | (162,073) | (150,343) |
| Administrative expenses | | (236,132) | (241,113) |
| Other operating expenses | | (42,055) | (38,381) |
| Finance costs | 11 | (66,729) | (61,849) |
| Share of results of associates | 22 | 9,093 | (945) |
| Gain on partial disposal of a subsidiary | 21 | 25,858 | — |
| Gain on disposal of a subsidiary | 36 | 1,969 | — |
| Gain on disposal of an associate | 22 | 16,208 | — |
| Profit before taxation | | 80,577 | 187,543 |
| Taxation | 12 | (8,420) | (19,828) |
| Profit for the year | 13 | 72,157 | 167,715 |
| Attributable to: | | | |
| Equity holders of the Company | | 66,511 | 129,512 |
| Minority interests | | 5,646 | 38,203 |
| | | 72,157 | 167,715 |
| Earnings per share (expressed in RMB per share) — basic | 15 | 0.03 | 0.07 |
| Dividend | 16 | — | — |



# Consolidated Balance Sheet

As at 31 December 2007

| | Notes | 2007<br>RMB'000 | 2006<br>RMB'000 |
|---|---|---|---|
| **Non-current assets** | | | |
| Property, plant and equipment | 17 | 2,009,640 | 2,497,428 |
| Investment property | 18 | 4,697 | — |
| Leasehold land and land use rights | 19 | 45,563 | 35,971 |
| Intangible assets | 20 | 4,433 | 11,615 |
| Interests in associates | 22 | 333,650 | 232,220 |
| Available-for-sale investments | 23 | 24,060 | 24,060 |
| | | 2,422,043 | 2,801,294 |
| **Current assets** | | | |
| Inventories | 24 | 698,490 | 631,915 |
| Trade receivables | 25 | 1,463,798 | 1,512,293 |
| Other receivables, deposits and prepayments | 26 | 135,922 | 66,053 |
| Bank balances and cash | 27 | 363,617 | 479,503 |
| | | 2,661,827 | 2,689,764 |
| **Current liabilities** | | | |
| Trade payables | 28 | 575,413 | 575,718 |
| Other payables and accruals | 29 | 215,313 | 726,511 |
| Tax payables | | 4,305 | 6,701 |
| Current portion of long-term payables | 35 | 2,938 | 2,347 |
| Short-term bank borrowings | 30 | 962,684 | 932,678 |
| | | 1,760,653 | 2,243,953 |
| **Net current assets** | | 901,174 | 445,810 |
| | | 3,323,217 | 3,247,104 |

# Consolidated Balance Sheet

As at 31 December 2007

| | Note | 2007 RMB'000 | 2006 RMB'000 |
|---|---|---|---|
| **Capital and reserves** | | | |
| Share capital | 31 | **1,941,174** | 1,941,174 |
| Other reserves | 32 | **766,146** | 766,146 |
| Accumulated losses | | **(459,911)** | (526,422) |
| Equity attributable to equity holders of the Company | | **2,247,409** | 2,180,898 |
| Minority interests | | **1,052,738** | 1,035,713 |
| **Total equity** | | **3,300,147** | 3,216,611 |
| **Non-current liabilities** | | | |
| Deferred income | 33 | **1,023** | 4,344 |
| Deferred income tax liabilities | 34 | **12,797** | 15,577 |
| Long-term payables | 35 | **9,250** | 10,572 |
| | | **23,070** | 30,493 |
| | | **3,323,217** | 3,247,104 |

The consolidated financial statements on pages 67 to 160 were approved and authorised for issue by the Board of directors on 24 April 2008 and are signed on its behalf by:

**Xing Daoqin**
*Chairman*

**Guo Mengquan**
*Director*

# Balance Sheet

Year Ended 31 December 2007

| | Notes | 2007 RMB'000 | 2006 RMB'000 |
|---|---|---|---|
| **ASSETS** | | | |
| **Non-current assets** | | | |
| Property, plant and equipment | 17 | 803,483 | 1,223,420 |
| Intangible assets | 20 | 2,648 | 9,402 |
| Investments in subsidiaries | 21 | 1,036,496 | 1,102,227 |
| Investment in an associate | 22 | 360,000 | 250,000 |
| | | 2,202,627 | 2,585,049 |
| **Current assets** | | | |
| Inventories | 24 | 273,623 | 315,765 |
| Trade receivables | 25 | 679,018 | 585,872 |
| Other receivables, deposits and prepayments | 26 | 84,938 | 42,742 |
| Loan to a subsidiary | 21 | — | 40,000 |
| Bank balances and cash | 27 | 160,821 | 221,729 |
| | | 1,198,400 | 1,206,108 |
| **Current liabilities** | | | |
| Trade payables | 28 | 402,933 | 377,258 |
| Other payables and accruals | 29 | 181,924 | 595,930 |
| Current portion of long-term payables | 35 | 744 | 962 |
| Short-term bank borrowings | 30 | 628,684 | 563,704 |
| | | 1,214,285 | 1,537,854 |
| **Net current liabilities** | | (15,885) | (331,746) |
| | | 2,186,742 | 2,253,303 |

## Balance Sheet

Year Ended 31 December 2007

| | Note | 2007 RMB'000 | 2006 RMB'000 |
|---|---|---|---|
| **Capital and reserves** | | | |
| Share capital | 31 | **1,941,174** | 1,941,174 |
| Other reserves | 32 | **986,153** | 986,153 |
| Accumulated losses | | **(748,114)** | (689,740) |
| **Total equity** | | **2,179,213** | 2,237,587 |
| **Non-current liabilities** | | | |
| Deferred income | 33 | **—** | 534 |
| Deferred income tax liabilities | 34 | **5,403** | 6,117 |
| Long-term payables | 35 | **2,126** | 9,065 |
| | | **7,529** | 15,716 |
| | | **2,186,742** | 2,253,303 |

**Xing Daoqin**
*Chairman*

**Guo Mengquan**
*Director*

# Consolidated Statement of Changes in Equity

Year Ended 31 December 2007

| | | Attributable to equity holders of the Company | | | | | |
|---|---|---|---|---|---|---|---|
| | Note | Share capital RMB'000 | Other reserves RMB'000 | (Accumulated losses) / retained earnings RMB'000 | Total RMB'000 | Minority interests RMB'000 | Total equity RMB'000 |
| Balance at 1 January 2006 | | 1,941,174 | 944,402 | (655,934) | 2,229,642 | 630,984 | 3,060,628 |
| Profit for the year | | — | — | 129,512 | 129,512 | 38,203 | 167,715 |
| Negative reserve arising from share reform | 33 | — | (176,083) | — | (176,083) | 191,022 | 14,939 |
| Dividends declared to minority shareholders by certain subsidiaries | | — | — | — | — | (19,720) | (19,720) |
| Acquisition of additional interests of a subsidiary from a minority shareholder | | — | (2,173) | — | (2,173) | (4,726) | (6,899) |
| Balance at 31 December 2006 and 1 January 2007 | | 1,941,174 | 766,146 | (526,422) | 2,180,898 | 1,035,713 | 3,216,611 |
| Profit for the year | | — | — | 66,511 | 66,511 | 5,646 | 72,157 |
| Dividends declared to minority shareholders by certain subsidiaries | | — | — | — | — | (15,743) | (15,743) |
| Partial disposal of a subsidiary | | — | — | — | — | 27,122 | 27,122 |
| Balance at 31 December 2007 | | 1,941,174 | 766,146 | (459,911) | 2,247,409 | 1,052,738 | 3,300,147 |

# Consolidated Cash Flow Statement

Year Ended 31 December 2007

| | Notes | 2007 RMB'000 | 2006 RMB'000 |
|---|---|---|---|
| **OPERATING ACTIVITIES** | | | |
| Profit before taxation | | 80,577 | 187,543 |
| Adjustments for: | | | |
| Impairment loss (reversal of impairment loss) on trade and other receivables | | 1,300 | (1,580) |
| Write-down of inventories | | 3,376 | 1,720 |
| Depreciation of property, plant and equipment and investment property | | 290,281 | 337,461 |
| Amortisation of leasehold land and useful rights and intangible assets | | 9,189 | 7,907 |
| Impairment loss on property, plant and equipment | | 2,630 | 67,205 |
| Impairment loss on intangible assets | | — | 30,260 |
| Net loss (gains) on disposal of property, plant and equipment | | 142,609 | (21,748) |
| Dividend income from available-for-sale investment | | (566) | — |
| Gains on disposal of intangible assets | | — | (113,573) |
| Reversal of provision of staff welfare | | (72,488) | — |
| Interest income | | (5,482) | (6,521) |
| Finance costs | | 66,729 | 61,849 |
| Reversal of write-down of inventories | | (10,678) | — |
| Write off of an intangible asset | | 241 | — |
| Share of results of associates | | (9,093) | 945 |
| Amortisation of deferred income on grants received | | (3,321) | (7,475) |
| Gain on disposal of an associate | | (16,208) | — |
| Gain on partial disposal of a subsidiary | | (25,858) | — |
| Gain on disposal of a subsidiary | | (1,969) | — |
| Operating cash flow before movements in working capital | | 451,269 | 547,993 |
| (Increase) decrease in inventories | | (62,087) | 55,807 |
| Decrease (increase) in trade and other receivables, deposits and prepayments | | 8,164 | (42,467) |
| Decrease in trade and other payables and accruals | | (411,881) | (105,665) |
| Decrease in long-term payables | | (731) | (5,586) |
| Cash generated from operations | | (15,266) | 450,082 |
| Income tax paid | | (13,473) | (24,943) |
| **NET CASH FROM OPERATING ACTIVITIES** | | (28,739) | 425,139 |

# Consolidated Cash Flow Statement

Year Ended 31 December 2007

| | Notes | 2007 RMB'000 | 2006 RMB'000 |
|---|---|---|---|
| **INVESTING ACTIVITIES** | | | |
| Purchase of property, plant and equipment | | (133,861) | (105,741) |
| Proceeds from disposal of a subsidiary | 36 | 130,613 | — |
| Contribution to / acquisition of an associate | | (110,000) | (10,000) |
| Proceeds from partial disposal of a subsidiary | | 52,980 | — |
| Proceeds from disposal of an associate | | 31,411 | — |
| Decrease (increase) in pledged bank deposits | | 30,009 | (30,000) |
| Purchases of land use rights | | (12,396) | — |
| Interest received | | 5,482 | 6,521 |
| Dividend income received from available-for-sale investment | | 566 | — |
| Purchase of an intangible assets | | (361) | (6,905) |
| Dividend received from an associate | | 360 | — |
| Proceeds on disposal of property, plant and equipment | | 523 | 1,489 |
| Acquisition of additional interests of a subsidiary from a minority shareholder | | — | (6,899) |
| **NET CASH USED IN INVESTING ACTIVITIES** | | (4,674) | (151,544) |
| **FINANCING ACTIVITIES** | | | |
| Bank borrowings raised | | 1,049,596 | 743,292 |
| Repayments of borrowings | | (1,019,588) | (1,070,799) |
| Interest expense paid | | (66,729) | (61,849) |
| Dividends paid to minority shareholders | | (15,743) | (23,093) |
| Increase in amounts due to related parties and minority interests - non-trade | | — | 504 |
| **NET CASH USED IN FINANCING ACTIVITIES** | | (52,464) | (411,939) |
| NET DECREASE IN CASH AND CASH EQUIVALENTS | | (85,877) | (138,344) |
| CASH AND CASH EQUIVALENTS AT THE BEGINNING OF THE YEAR | | 449,494 | 587,838 |
| **CASH AND CASH EQUIVALENTS AT THE END OF THE YEAR, REPRESENTED BY BANK BALANCE AND CASH** | 27 | 363,617 | 449,494 |

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 1. GENERAL

IRICO Group Electronics Company Limited (the "Company") was incorporated in the People's Republic of China (the "PRC") on 10 September 2004 as a joint stock company with limited liability under the PRC laws. The Company's shares were listed in The Stock Exchange of Hong Kong Limited (the "Stock Exchange") on 20 December 2004. The address of its registered office is No.1 Caihong Road, Xianyang, Shaanxi Province, PRC.

The Company and its subsidiaries (collectively referred to as the "Group") is engaged in the manufacturing of colour picture tubes ("CPTs") for colored television sets, related CPT components including glass bulbs, electron guns, shadow masks and their frames, deflection yokes, frit, anode buttons, phosphor, etc and provision of related packaging, engineering and trading services. The principal activities of its subsidiaries are set out in note 21.

The directors consider that IRICO Group Corporation, a state-owned enterprise established in the PRC, to be the Company's parent company and ultimate holding company.

These financial statements are presented in thousands of units of Renminbi ("RMB") which is the same as the functional currency of the Group.

## 2. APPLICATION OF NEW AND REVISED HONG KONG FINANCIAL REPORTING STANDARDS ("HKFRSs")

In the current year, the Group has applied, for the first time, the following new standards, amendment and interpretations ("new HKFRSs") issued by the Hong Kong Institute of Certified Public Accountants ("HKICPA"), which are effective for the Group's financial year beginning on 1 January 2007.

| | |
|---|---|
| Hong Kong Accounting Standard 1 ("HKAS") (Amendment) | Capital Disclosures |
| HKFRS 7 | Financial Instruments: Disclosures |
| HK(IFRIC) — Interpretation ("Int") 7 | Applying the Restatement Approach under HKAS 29 Financial Reporting in Hyperinflationary Economies |
| HK(IFRIC) — Int 8 | Scope of HKFRS 2 |
| HK(IFRIC) — Int 9 | Reassessment of Embedded Derivatives |
| HK(IFRIC) — Int 10 | Interim Financial Reporting and Impairment |

The adoption of the new HKFRSs had no material effect on how the results and financial position for the current or prior accounting periods have been prepared and presented. Accordingly, no prior period adjustment has been required.

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 2. APPLICATION OF NEW AND REVISED HONG KONG FINANCIAL REPORTING STANDARDS ("HKFRSs") *(continued)*

The Company has not early applied the following new and revised standards, amendment interpretations that have been issued but are not yet effective as at 31 December 2007

| | |
|---|---|
| HKAS 1 (Revised) | Presentation of Financial Statements[1] |
| HKAS 23 (Revised) | Borrowing Cost[1] |
| HKAS 27 (Revised) | Consolidated and Separate Consolidated Financial Statements[2] |
| HKFRS 2 (Amendment) | Share-based Payment – Vesting Conditions and Cancellations[1] |
| HKFRS 3 (Revised) | Business Conbinations[2] |
| HKFRS 8 | Operating Segments[1] |
| HK(IFRIC)-INT 11 | HKFRS 2: Group and Treasury Share Transactions[3] |
| HK(IFRIC)-INT 12 | Service Concession Arrangements[4] |
| HK(IFRIC)-INT 13 | Customer Loyalty Programmes[5] |
| HK(IFRIC)-INT 14 | HKAS 19 – The Limit on a Defined Benefit Asset, Minimum Funding Requirements and Their Interaction[4] |

[1] Effective for annual periods beginning on or after 1 January 2009.

[2] Effective for annual periods beginning on or after 1 July 2009.

[3] Effective for annual periods beginning on or after 1 March 2007.

[4] Effective for annual periods beginning on or after 1 January 2008.

[5] Effective for annual periods beginning on or after 1 July 2008.

The directors of the Company anticipate that the application of these standards or interpretations will have no material impact on the results and the financial position of the Group.

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 3. SIGNIFICANT ACCOUNTING POLICIES

The consolidated financial statements have been prepared under the historical cost basis except for certain financial instruments, which are measured at fair values, as explained in the accounting policies set out below.

The consolidated financial statements have been prepared in accordance with HKFRSs issued by the HKICPA. In addition, the consolidated financial statements include applicable disclosures required by the Rules Governing the Listing of Securities on the Stock Exchange and by the Hong Kong Companies Ordinance.

### (a) Basis of consolidation

The consolidated financial statements incorporate the financial statements of the Company and entities controlled by the Company (its subsidiaries). Control is achieved where the Company has the power to govern the financial and operating policies of an entity so as to obtain benefits from its activities.

The results of subsidiaries acquired or disposed of during the year are included in the consolidated income statement from the effective date of acquisition or up to the effective date of disposal, as appropriate.

Where necessary, adjustments are made to the financial statements of subsidiaries to bring its accounting policies into line with those used by other members of the Group.

All intra-group transactions, balances, income and expenses are eliminated on consolidation.

Minority interests in the net assets of consolidated subsidiaries are presented separately from the Group's equity therein. Minority interests in the net assets consist of the amount of those interests at the date of the original business combination and the minority's share of changes in equity since the date of the combination. Losses applicable to the minority in excess of the minority's interest in the subsidiary's equity are allocated against the interests of the Group except to the extent that the minority has a binding obligation and is able to make an additional investment to cover the losses. The Group applies a policy of treating transactions with minority interests as transactions with equity owners of the Group.

## 3. SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### (b) Investments in subsidiaries

A subsidiary is an entity that is controlled by the Company, where the Company has the power to govern the financial and operating policies of such entity so as to obtain benefits from its activities.

In the Company's balance sheet, the investments in subsidiaries are stated at cost less impairment loss. The results of the subsidiaries are accounted for by the Company on the basis of dividends received and receivable.

### (c) Investments in associates

An associate is an entity over which the investor has significant influence and that is neither a subsidiary nor an interest in a joint venture. Significant influence is the power to participate in the financial and operating policy decisions of the investee but is not control or jointly control over those policies.

The results and assets and liabilities of associates are incorporated in these consolidated financial statements using the equity method of accounting. Under the equity method, investments in associates are carried in the consolidated balance sheet at cost as adjusted for post-acquisition changes in the Group's share of the net assets of the associates, less any identified impairment loss. When the Group's share of losses of an associate equals or exceeds its interest in that associate (which includes any long-term interests that, in substance, form part of the Group's net investment in the associate), the Group discontinues recognising its share of further losses. An additional share of losses is provided for and a liability is recognised only to the extent that the Group has incurred legal or constructive obligations or made payments on behalf of that associate.

Where a group entity transacts with an associate of the Group, profits and losses are eliminated to the extent of the Group's interest in the relevant associate.

In the Company's balance sheet, investment in an associate is stated at cost, as reduced by any identified impairment loss. The result of an associate is accounted for by the Company on the basis of dividends received and receivable during the year.

# 3. SIGNIFICANT ACCOUNTING POLICIES *(continued)*

## (d) Revenue recognition

Revenue is measured at the fair value of the consideration received or receivable and represents amounts receivable for goods sold and services provided in the normal course of business, net of discounts and sales related taxes.

Revenue from sales of goods is recognised when the goods are delivered and title has passed.

Rental income, including rental invoiced in advance from properties let under operating leases, is recognised on a straight-line basis over the period of the relevant lease.

Interest income from a financial asset is accrued on a time basis, by reference to the principal outstanding and at the effective interest rate applicable, which is the rate that exactly discounts the estimated future cash receipts through the expected life of the financial asset to that asset's net carrying amount.

Dividend income is recognised when the right to receive the dividend is established.

## (e) Property, plant and equipment

Properties, plant and equipment (other than construction in progress) at cost less subsequent accumulated depreciation and any accumulated impairment losses.

Depreciation is provided to write off the cost of an item of property, plant and equipment other than construction in progress over their estimated useful lives and after taking into account their estimated residual value, using the straight-line method.

Construction in progress includes property, plant and equipment in the course of construction for production or for its own use purposes. Construction in progress is carried at cost less any recognised impairment loss. Construction in progress is classified to the appropriate category of property, plant and equipment when completed and ready for intended use. Depreciation of these assets, on the same basis as other property assets, commences when the assets are ready for their intended use.

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 545 of 1004

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 3. SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### (e) Property, plant and equipment *(continued)*

An owner-occupied property is transferred to investment property at fair value because its use has changed as evidenced by end of owner-occupation. The difference between the fair value and the carrying amount at the date of transfer, if any, is recognised in property revaluation reserve in accordance with HKAS 16 "Property, plant and equipment". On the subsequent sale or retirement of the asset, the relevant revaluation reserve will be transferred directly to retained profits.

An item of property, plant and equipment is derecognised upon disposal or when no future economic benefits are expected to arise from the continued use of the asset. Any gain or loss arising on derecognition of the asset (calculated as the difference between the net disposal proceeds and the carrying amount of the item) is included in the consolidated income statement in the year in which the item is derecognised.

### (f) Investment property

Investment property is property held to earn rental and/or for capital appreciation.

On initial recognition, investment property is measured at cost, including any directly attributable expenditure. Subsequent to initial recognition, investment property is stated at cost less subsequent accumulated depreciation and any cumulated impairment losses. Depreciation is charged so as to write off the cost of investment property using the straight line method.

An investment property is derecognised upon disposal or when the investment property is permanently withdrawn from use or no future economic benefits are expected from its disposal. Any gain or loss arising on derecognition of the asset (calculated as the difference between the net disposal proceeds and the carrying amount of the asset) is included in the consolidated statement in the year in which the item is derecognised.

## 3. SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### (g) Leasing

Leases are classified as finance leases whenever the terms of the lease transfer substantially all the risks and rewards of ownership to the lessee. All other leases are classified as operating leases.

**The Group as lessor**

Rental income from operating leases is recognised in the consolidated income statement on a straight-line basis over the term of the relevant lease. Initial direct costs incurred in negotiating and arranging an operating lease are added to the carrying amount of the leased asset and recognised as an expense on a straight-line basis over the lease term.

**The Group as lessee**

Rentals payable under operating leases are charged to profit or loss on a straight-line basis over the term of the relevant lease. Benefits received and receivable as an incentive to enter an operating lease are recognised as a reduction of rental expenses over the lease term on a straight-line basis.

### (h) Leasehold land and building

The land and building elements of a lease of land and building are considered separately for the purpose of lease classification, unless the lease payments cannot be allocated reliably between the land and building elements, in which case, the entire lease is generally treated as a finance lease and accounted for as property, plant and equipment. To the extent the allocation of the lease payments can be made reliably, leasehold interests in land are accounted for as operating leases.

## 3. SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### (i) Foreign currencies

In preparing the financial statements of each individual group entity, transactions in currencies other than the functional currency of that entity (foreign currencies) are recorded in the respective functional currency (i.e. the currency of the primary economic environment in which the entity operates) at the rates of exchanges prevailing on the dates of the transactions. At each balance sheet date, monetary items denominated in foreign currencies are retranslated at the rates prevailing on the balance sheet date. Non-monetary items carried at fair value that are denominated in foreign currencies are retranslated at the rates prevailing on the date when the fair value was determined. Non-monetary items that are measured in terms of historical cost in a foreign currency are not retranslated.

Exchange differences arising on the settlement of monetary items, and on the translation of monetary items, are recognised in profit or loss in the period in which they arise, except for exchange differences arising on a monetary item that forms part of the Company's net investment in a foreign operation, in which case, such exchange differences are recognised in equity in the consolidated financials statements. Exchange differences arising on the retranslation of non-monetary items carried at fair value are included in profit or loss for the period except for differences arising on the retranslation of non-monetary items in respect of which gains and losses are recognised directly in equity, in which cases, the exchange differences are also recognised directly in equity.

### (j) Borrowings costs

All borrowing costs are recognised as and included in finance costs in the consolidated income statement in the period in which they are incurred.

### (k) Government grants

Government grants are recognised as income over the periods necessary to match them with the related costs. Grants related to depreciable assets are presented as deferred income from the carrying amount of the relevant asset and are released to income over the useful lives of the assets. Grants related to expense items are recognised in the same period as those expenses are charged in the consolidated income statement and are reported separately as "other operating income".

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 3. SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### (l) Retirement benefit costs

Payments to state-managed retirement benefit schemes are charged as an expense when employees have rendered service entitling them to the contributions.

**Pension and housing obligations**

The full time employees of the Group are covered by various government-sponsored pension plans under which the employees are entitled to a monthly pension based on certain formulas. These government-sponsored pension plans are responsible for the pension liability to these retired employees. The Group contributes on a monthly basis to these pension plans. Under these plans, the Group has no legal or constructive obligation for retirement benefits beyond the contributions made. Contributions to these plans are expensed as incurred. Voluntary payments made to certain former employees and which were not made pursuant to a formal or informal plan are expensed as paid.

Full time employees are also entitled to participate in various government-sponsored housing funds. The Group contributes on a monthly basis to these funds based on certain percentages of the salaries of the employees. The Group's liability in respect of these funds is limited to the contributions payable in each period.

**Termination benefits**

Termination benefits are payable when employment is terminated by the Group before the normal retirement date, or whenever an employee accepts voluntary redundancy in exchange for these benefits. The Group recognises termination benefits when it is demonstrably committed to either: terminating the employment of current employees according to a detailed formal plan without possibility of withdrawal; or providing termination benefits as a result of an offer made to encourage voluntary redundancy.

**Early retirement benefits**

Employee early retirement benefits are recognised in the period in which the Group enters into an agreement with the employee specifying the terms of early retirement or after the individual employee has been advised of the specific terms. The specific terms vary among the early retired employees depending on various factors including position and length of services. Early retirement benefits falling due more than 12 months after the balance sheet date are discounted to present value.

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 3. SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### (m) Taxation

Income tax expense represents the sum of the tax currently payable and deferred tax.

The tax currently payable is based on taxable profit for the year. Taxable profit differs from profit as reported in the income statement because it excludes items of income or expense that are taxable or deductible in other years and it further excludes income statement items that are never taxable or deductible. The Group's liability for current tax is calculated using tax rates that have been enacted or substantively enacted by the balance sheet date.

Deferred tax is recognised on differences between the carrying amounts of assets and liabilities in the consolidated financial statements and the corresponding tax base used in the computation of taxable profit, and is accounted for using the balance sheet liability method. Deferred tax liabilities are generally recognised for all taxable temporary differences and deferred tax assets are recognised to the extent that it is probable that taxable profit will be available against which deductible temporary differences can be utilised. Such assets and liabilities are not recognised if the temporary difference arises from goodwill or from the initial recognition (other than in a business combination) of other assets and liabilities in a transaction that affects neither the taxable profit nor the accounting profit.

Deferred tax liabilities are recognised for taxable temporary differences arising on investments in subsidiaries and associates, except where the Group is able to control the reversal of the temporary difference and it is probable that the temporary difference will not reverse in the foreseeable future.

Deferred tax is calculated at the tax rates that are expected to apply in the period when the liability is settled or the asset is realised. Deferred tax is charged or credited to the profit or loss, except when it relates to items charged or credited directly to equity, in which case the deferred tax is also dealt with in equity.

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 3. SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### (n) Intangible assets

**Intangible assets acquired separately**

Intangible asset acquired separately and with finite useful lives are carried at costs less accumulated amortisation and any accumulated impairment losses. Amortisation for intangible assets with finite useful lives is provided on a straight-line basis over their estimated useful lives. Alternatively, intangible assets with indefinite useful lives are carried at cost less any subsequent accumulated impairment losses (see the accounting policy in respect of impairment losses on tangible and intangible assets below).

Gains or losses arising from derecognition of an intangible asset are measured at the difference between the net disposal proceeds and the carrying amount of the asset and are recognised in the consolidated income statement when the asset is derecognised.

**Licences for technical knowledge**

Expenditure on licenses is capitalised and amortised using the straight-line method over their useful lives, but not exceeding 20 years.

**Computer software**

Acquired computer software licences are capitalised on the basis of the costs incurred to acquire and bring to use the specific software. These costs are amortised over their estimated useful lives of 5 years.

Costs associated with developing or maintaining computer software programs are recognised as an expense as incurred.

**Research and development expenditure**

Expenditure on research activities is recognised as an expense in the period in which it is incurred.

An internally-generated intangible asset from development expenditure is recognised only if it is anticipated that the development costs incurred on a clearly-defined project will be recovered through future commercial activity. The resultant asset is amortised on a straight-line basis over its useful life, and carried at cost less subsequent accumulated amortisation and any accumulated impairment losses.

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 3. SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### (n) Intangible assets *(continued)*

**Research and development expenditure** *(continued)*

The amount initially recognised for internally-generated intangible asset is the sum of the expenditure incurred from the date when the intangible asset first meets the recognition criteria. Where no internally-generated intangible asset can be recognised, development expenditure is charged to profit or loss in the period in which it is incurred.

Subsequent to initial recognition, internally-generated intangible asset is reported at cost less accumulated amortisation and accumulated impairment losses, on the same basis as intangible assets acquired separately.

### (o) Inventories

Inventories are stated at the lower of cost and net realisable value. Cost is calculated using the weighted average method.

### (p) Financial instruments

Financial assets and financial liabilities are recognised on the balance sheet when a Group entity becomes a party to the contractual provisions of the instrument. Financial assets and financial liabilities are initially measured at fair value. Transaction costs that are directly attributable to the acquisition or issue of financial assets and financial liabilities (other than financial assets and financial liabilities at fair value through profit or loss) are added to or deducted from the fair value of the financial assets or financial liabilities, as appropriate, on initial recognition. Transaction costs directly attributable to the acquisition of financial assets or financial liabilities at fair value through profit or loss are recognised immediately in profit or loss.

**Financial assets**

The Group's financial assets are mainly classified into loans and receivables and available-for-sale financial assets. All regular way purchases or sales of financial assets are recognised and derecognised on a trade date basis. Regular way purchases or sales are purchases or sales of financial assets that require delivery of assets within the time frame established by regulation or convention in the marketplace. The accounting policies adopted in respect of the relevant category of financial assets to the Group are set out below.

Income is recognised on an effective interest basis for debt instruments.

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 3. SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### (p) Financial instruments *(continued)*

**Loans and receivables**

Loans and receivables are non-derivative financial assets with fixed or determinable payments that are not quoted in an active market. At each balance sheet date subsequent to initial recognition, loans and receivables (including trade and bills receivables, other receivables, deposits and bank balances) are carried at amortised cost using the effective interest method, less any identified impairment losses (see accounting policy on impairment loss on financial assets below).

**Effective interest method**

The effective interest method is a method of calculating the amortised cost of a financial asset and of allocating interest income over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash receipts (including all fees on points paid or received that form an integral part of the effective interest rate, transaction costs and other premiums or discounts) through the expected life of the financial asset, or, where appropriate, a shorter period.

Income is recognised on an effective basis for debt instruments.

**Available-for-sale financial assets**

Available-for-sale financial assets are non-derivatives that are either designated or not classified as financial assets at fair value through profit or loss, loans and receivables or held-to-maturity investments. The Group designated its unlisted investment in the equity interests in Western Trust & Investment Co., Ltd., a state controlled trust enterprise as available-for-sale financial assets. They are included in non-current assets since the directors of the Company do not have intention to dispose of the investment within 12 months of the balance sheet date.

At each balance sheet date subsequent to initial recognition, available-for-sale financial assets are measured at fair value. Changes in fair value are recognised in equity, until the financial asset is disposed of or is determined to be impaired, at which time, the cumulative gain or loss previously recognised in equity is removed from equity and recognised in profit or loss (see accounting policy on impairment loss on financial assets below).

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 3. SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### (p) Financial instruments *(continued)*

**Available-for-sale financial assets** *(continued)*

For available-for-sale equity investments that do not have a quoted market price in an active market and whose fair value cannot be reliably measured and derivatives that are linked to and must be settled by delivery of such unquoted equity instruments, they are measured at cost less any identified impairment losses at each balance sheet date subsequent to initial recognition (see accounting policy on impairment loss on financial assets below).

**Impairment loss of financial assets**

Financial assets are assessed for indicators of impairment at each balance sheet date. Financial assets are impaired where there is objective evidence that, as a result of one or more events that occurred after the initial recognition of the financial asset, the estimated future cash flows of the financial assets have been impacted.

For an available-for-sale equity investment, a significant or prolonged decline in the fair value of that investment below its cost is considered to be objective evidence of impairment.

For all other financial assets, objective evidence of impairment could include:

- significant financial difficulty of the issuer or counterparty; or

- default or delinquency in interest or principal payments; or

- it becoming probable that the borrower will enter bankruptcy or financial reorganisation.

For certain categories of financial asset, such as trade and bills receivables, and other receivables, assets that are not assessed not to be impaired individually are subsequently assessed for impairment on a collective basis. Objective evidence of impairment for a portfolio of receivables could include the Group's past experience of collecting payments, an increase in the number of delayed payments in the portfolio past the average credit period and observable changes in national or local economic conditions that correlate with default on trade and bills receivables, and other receivables.

# 3. SIGNIFICANT ACCOUNTING POLICIES *(continued)*

## (p) Financial instruments *(continued)*

**Impairment loss of financial assets** *(continued)*

For financial assets carried at amortised cost, an impairment loss is recognised in profit or loss when there is objective evidence that the asset is impaired, and is measured as the difference between the asset's carrying amount and the present value of the estimated future cash flows discounted at the original effective interest rate.

For financial assets carried at cost, the amount of the impairment loss is measured as the difference between the asset's carrying amount and the present value of the estimated future cash flows discounted at the current market rate of return for a similar financial asset. Such impairment loss will not be reversed in subsequent periods.

The carrying amount of the financial asset is reduced by the impairment loss directly for all financial assets with the exception of trade and bills receivables and other receivables, where the carrying amount is reduced through the use of an allowance account. Changes in the carrying amount of the allowance account are recognised in profit or loss. When a trade and bills receivables and other receivable, is considered uncollectible, it is written off against the allowance account. Subsequent recoveries of amounts previously written off are credited to profit or loss.

For financial assets measured at amortised cost, if, in a subsequent period, the amount of impairment loss decreases and the decrease can be related objectively to an event occurring after the impairment losses was recognised, the previously recognised impairment loss is reversed through profit or loss to the extent that the carrying amount of the asset at the date the impairment is reversed does not exceed what the amortised cost would have been had the impairment not been recognised.

Impairment losses on available-for-sale equity investments will not be reversed in profit or loss in subsequent periods. Any increase in fair value subsequent to impairment loss is recognised directly in equity.

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 3. SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### (p) Financial instruments *(continued)*

**Financial liabilities and equity**

Financial liabilities and equity instruments issued by a group entity are classified according to the substance of the contractual arrangements entered into and definitions of a financial liability and an equity instrument.

An equity instrument is any contract that evidences a residual interest in the assets of the Group after deducting all of its liabilities. The Group's financial liabilities are classified as other financial liabilities. The accounting policies adopted in respect of financial liabilities and equity instruments are set out below.

**Other financial liabilities**

Other financial liabilities including trade and bills payables, other payables, bank borrowings and long-term payables are subsequently measured at amortised cost, using the effective interest method.

**Effective interest method**

The effective interest method is a method of calculating the amortised cost of a financial liability and of allocating interest expense over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash payments through the expected life of the financial liability, or, where appropriate, a shorter period.

Interest expense is recognised on an effective interest basis.

**Equity instruments**

Equity instruments issued by the Company are recorded at the proceeds received, net of direct issue costs.

## 3. SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### (p) Financial instruments *(continued)*

**Derecognition**

Financial assets are derecognised when the rights to receive cash flows from the assets expire or, the financial assets are transferred and the Group has transferred substantially all the risks and rewards of ownership of the financial assets. On derecognition of a financial asset, the difference between the asset's carrying amount and the sum of the consideration received or receivable and the cumulative gain or loss that had been recognised directly in equity is recognised in profit or loss. If the Group retains substantially all the risks and rewards of ownership of a transferred assets, the Group continues to recognise the financial asset and recognise a collateralised borrowing for proceeds received.

Financial liabilities are decognised when the obligation specified in the relevant contract is discharged, cancelled or expires. The difference between the carrying amount of the financial liability derecognised and the consideration paid or payable is recognised in profit and loss.

### (q) Land use rights

Payment for obtaining land use rights is considered as operating lease payment. Land use rights are stated at cost less accumulated amortisation and accumulated impairment losses, amortisation is charged to consolidated income statement over the period of the rights using the straight-line method.

### (r) Provisions

Provisions are recognised when the Group has a present obligation as a result of a past event, and it is probable that the Group will be required to settle that obligation. Provisions are measured at the directors' best estimate of the expenditure required to settle the obligation at the balance sheet date, and are discounted to present value where the effect is material.

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/12/19 Page 94 of 180

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 3. SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### (s) Impairment losses on tangible and intangible assets

At each balance sheet date, the Group reviews the carrying amounts of its tangible and intangible assets to determine whether there is any indication that those assets have suffered an impairment loss. In addition, intangible assets with indefinite useful lives and intangible assets not yet available for use are tested for impairment annually, and whenever there is an indication that they may be impaired. If the recoverable amount of an asset is estimated to be less than its carrying amount, the carrying amount of the asset is reduced to its recoverable amount. An impairment loss is recognised as an expense immediately.

Where an impairment loss subsequently reverses, the carrying amount of the asset is increased to the revised estimate of its recoverable amount, but so that the increased carrying amount does not exceed the carrying amount that would have been determined had no impairment loss been recognised for the asset in prior years. A reversal of an impairment loss is recognised as income immediately.

## 4. CRITICAL ACCOUNTING JUDGMENTS AND KEY SOURCES OF ESTIMATION UNCERTAINTY

In the application of the Group's accounting policies, which are described in note 3, the directors of the Company are required to make judgments, estimates and assumptions about the carrying amounts of assets and liabilities that are not readily apparent from other sources. The estimates and associated assumptions are based on historical experience and other factors that are considered to be relevant. Actual results may differ from these estimates.

The estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to accounting estimates are recognised in the period in which the estimate is revised if the revision affects only that period, or in the period of the revision and future periods if the revision affects both current and future periods.

### Allowance for inventories

The management of the Group reviews an aging analysis at each balance sheet date, and makes allowance for obsolete and slow-moving inventory items. The management estimates the net realisable value for finished goods based primarily on the latest invoice prices and current market conditions. The Company carries out an inventory review on a product-by-product basis at each balance sheet date and makes allowance for obsolete items.

## 4. CRITICAL ACCOUNTING JUDGMENTS AND KEY SOURCES OF ESTIMATION UNCERTAINTY *(continued)*

### Income taxes

Determining income tax provisions involves judgment on the future tax treatment of certain transactions. The Group carefully evaluates tax implications of transactions and tax provisions are set up accordingly. The tax treatment of such transactions is reconsidered periodically to take into account all changes in tax legislations. Where the final tax outcome of these transactions is different from the amounts that were initially recorded, such differences will affect the income tax and deferred tax provisions in the period in which such determination is made.

### Estimated impairment of non-financial assets

The Group tests annually whether non-financial assets have suffered any impairment in accordance with accounting policies stated in note 3 to the consolidated financial statements. The recoverable amounts of non-financial assets have been determined based on value-in-use calculations. These calculations require the use of estimates.

The Group tests annually whether property, plant and equipment are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset exceeds its recoverable amount. The recoverable amount of an asset or a cash-generating unit is determined based on value-in-use calculations prepared on the basis of management's assumptions and estimates taking into account the existing business expansion plan going forward, the current sales orders on hand and other strategic new business development.

For the year ended 31 December 2007, the management had reviewed the Group's property, plant and equipment for impairment. The impairment loss for property, plant and equipment are recognised for the amounts by which the carrying amounts exceed their recoverable amounts, in accordance with the Group's accounting policy. The recoverable amounts of property, plant and equipment have been determined based on value-in-use calculations. These calculations require the use of estimates such as the future revenue and discount rates. During the year ended 31 December 2007, the Group recognised an impairment loss of approximately RMB2,630,000 in respect of property, plant and equipment (Note 17).

For the year ended 31 December 2006, the Group provided for an impairment loss of RMB857,205,000 (note 17) in respect of property, plant and equipment. The items being written down to recoverable amount due to there being business situation concerns over future profitability. The recoverable amounts of different production plants, cash generating units to which the property, plant and equipment belong, have been determined based on value-in-use calculations using cash flow projections determined by an independent professional valuer.

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/12/19 Page 58 of 186

# NOTES TO THE FINANCIAL STATEMENTS

## 4. CRITICAL ACCOUNTING JUDGMENTS AND KEY SOURCES OF ESTIMATION UNCERTAINTY *(continued)*

### Impairment of available-for-sale financial assets

The Group follows the guidance of HKAS 39 to determine when an available-for-sale financial asset is impaired. This determination requires significant judgment. In making this judgment, the Group evaluates, among other factors, the duration and extent to which the fair value of an investment is less than its cost; and the financial health of and near-term business outlook for the investee, including factors such as industry and sector performance, changes in technology and operational and financing cash flow.

If all of the declines in fair value below cost were considered significant or prolonged, the Group would suffer an additional loss in the consolidated income statement for the year ended 31 December 2007.

### Contingent liabilities in respect of litigations

The Group has been involved in two litigations (note 37). Contingent liabilities arising from these litigations have been assessed by the directors with reference to legal advice.

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 5. CAPITAL RISK MANAGEMENT

The Group manages its capital to ensure that entities in the Group will be able to continue as a going concern while maximising the return to stakeholders through the optimisation of debt and equity balance. The Group's overall strategy remains unchanged from prior year.

The capital structure of the Group consists of debt, which includes the borrowings disclosed in note 30, cash and cash equivalents and equity attributable to equity holders of the Company, comprising issued share capital, reserves and retained earnings.

The Group reviews the capital structure on a regular basis and monitors on the basis of the gearing ratio. As part of this review, the Group considers the cost of capital and the risks associated with each class of capital. Gearing ratio is calculated as the proportion of total liabilities to total assets.

The Group aimed at maintaining a gearing ratio of not more than 50%. Based on the recommendations of the Group's directors, the Group intends to maintain a suitable ratio of share capital to liabilities, so as to maintain an effective capital structure from time to time. The gearing ratios at 31 December 2007 and 2006 were as follows:

| | 2007<br>*RMB'000* | 2006<br>*RMB'000* |
|---|---|---|
| Total debt (a) | **962,684** | 932,676 |
| Net debt (b) | **599,067** | 483,182 |
| Total equity | **3,300,147** | 3,216,611 |
| Total capital (based on total debts) (c) | **4,262,831** | 4,149,287 |
| Total capital (based on net debt) (d) | **3,899,214** | 3,699,793 |
| Total debt to total capital ratio (%) | **22.6** | 22.5 |
| Net debt to total capital ratio (%) | **15.4** | 13.1 |

There is no material change in the above gearing ratios in 2007.

Notes:

(a) Total debt equals to bank borrowings.

(b) Net debt equals to total debt less bank balances, cash and other liquid funds.

(c) Total capital (based on total debt) equals to total debt plus total equity.

(d) Total capital (based on net debt) equals to net debt plus total equity.

# 6. FINANCIAL INSTRUMENTS

## 6a. Financial risk management objectives and policies

The Group's major financial instruments include equity investments, bank borrowings, trade and bills receivables, other receivables, bank balances, trade and bills payables, other payables and long-term payables. Details of the financial instruments are disclosed in respective notes. The risks associated with these financial instruments include market risk (currency risk, interest rate risk and other price risk), credit risk and liquidity risk. The policies on how to mitigate these risks are set out below. The management manages and monitors these exposures to ensure appropriate measures are implemented on a timely and effective manner.

**Market risk**

*Foreign exchange risk*

The Group mainly operates in the PRC. Revenue and majority of its operating costs and cost of sales are denominated in RMB. Certain bank balances of the Group are denominated in the United States dollars ("USD"). Such USD denominated bank balances are exposed to fluctuations in the value of RMB against USD in which these bank balances are denominated. Any significant appreciation / depreciation of the RMB against these foreign currency may result in significant exchange gain / loss which would be recorded in the consolidated income statement.

*Sensitivity analysis*

As of 31 December 2007, if RMB had strengthened / weakened 5% against USD, with all other variables held constant, profit for the year would have been approximately 2,622,000 (2006: 2,054,000) lower / higher, mainly as a result of foreign exchange losses / gains on translation of USD denominated bank balances equivalents.

**Credit risk**

As at 31 December 2007, the Group's maximum exposures to credit risk which will cause a financial loss to the Group due to failure to discharge an obligation by the counterparties is arising from the carrying amount of the respective recognised financial assets as stated in the consolidated balance sheet.

The credit risk on liquid funds is limited because the counterparties are banks with high credit ratings assigned by international credit-rating agencies.

The Group's concentration of credit risk by geographical locations is mainly in the PRC, which accounted for approximately 87% (2006: 82%) of the total trade receivables as at 31 December 2007.

# 6. FINANCIAL INSTRUMENTS *(continued)*

## 6a. Financial risk management objectives and policies *(continued)*

**Credit risk** *(continued)*

The Group has concentration of credit risk as 9% (2006: 10%) and 18% (2006: 21%) of the total trade receivables was due from the Group's largest customer and the five largest customers respectively. Sales to the largest customer and aggregate sales to the five largest customers represents 16% (2006: 19%) and 51% (2006: 65%) of total turnover respectively.

The Group has policies in place to ensure that sale of products are made to customers with an appropriate credit history. The Group also performs periodic credit evaluations of its customers and believes that adequate impairment loss or trade receivables has been made in the consolidated financial statements.

**Liquidity risk**

In the management of the liquidity risk, the Group monitors and maintains a level of cash and cash equivalents deemed adequate by the management to finance the Group's operations and mitigate the effects of fluctuations in cash flows. The management monitors the utilisation of bank borrowings and ensures compliance with loan covenants.

Prudent liquidity risk management implies maintaining sufficient cash, the availability of funding through an adequate amount of committed credit facilities and the ability to close out market positions. Due to the dynamic nature of the underlying businesses, senior management aims to maintain flexibility in funding by keeping committed credit lines available.

The following table details the Group's remaining contractual maturity for its financial liabilities. For non-derivative financial liabilities, the table has been drawn up based on the undiscounted cash flows of financial liabilities based on the earliest date on which the Group can be required to pay.

| | On demand or within 1 year *RMB'000* | More than 1 year *RMB'000* | Total undiscounted cash flows *RMB'000* | Carrying amount at 31/12/2007 *RMB'000* |
|---|---|---|---|---|
| 2007 | | | | |
| Trade payables | 575,413 | — | 575,413 | 575,413 |
| Long-term payables | 2,938 | 9,250 | 12,188 | 12,188 |
| Short-term bank borrowings | 1,012,199 | — | 1,012,199 | 962,684 |
| | 1,590,550 | 9,250 | 1,599,800 | 1,550,285 |

# 6. FINANCIAL INSTRUMENTS *(continued)*

## 6a. Financial risk management objectives and policies *(continued)*

**Liquidity risk** *(continued)*

| | On demand or within 1 year | More than 1 year | Total undiscounted cash flows | Carrying amount at 31/12/2007 |
|---|---|---|---|---|
| | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* |
| 2006 | | | | |
| Trade payables | 575,718 | — | 575,718 | 575,718 |
| Long-term payables | 2,347 | 10,572 | 12,919 | 12,919 |
| Short-term bank borrowings | 960,193 | — | 960,193 | 932,676 |
| | 1,538,258 | 10,572 | 1,548,830 | 1,521,313 |

**Interest rate risk**

The Group has interest-bearing assets mainly in the form of bank balances, but the Group's income and operating cash flows are substantially independent of changes in market interest rates.

The interest rate risk arises from bank borrowings. The short-term bank borrowings are interest bearing at fixed rates between 5.31% to 7.65% (2006: 3.78% to 6.22%) and are repayable according to the contract terms.

# 6. FINANCIAL INSTRUMENTS *(continued)*

## 6b. Fair value

The fair value of financial assets and financial liabilities are determined as follows:

- The fair value of financial assets and financial liabilities with standard terms and conditions and traded on active liquid markets are determined with reference to quoted market bid prices and ask prices respectively; and

- The fair value of other financial assets and financial liabilities are determined in accordance with generally accepted pricing models based on discounted cash flow analysis using prices or rates from observable current market transactions as input.

The directors of the Company consider that the carrying amounts of financial assets and financial liabilities recorded at amortised cost in the consolidated financial statements approximate their fair values.

## 6c. Categories of financial instruments

| | **2007** *RMB'000* | 2006 *RMB'000* |
|---|---|---|
| **Financial assets** | | |
| Loans and receivables | | |
| (including cash and cash equivalents) | | |
| Trade receivables | **1,463,798** | 1,512,292 |
| Other receivables and deposits | **113,976** | 33,641 |
| Bank balances and cash | **363,540** | 479,400 |
| | **1,941,314** | 2,025,333 |
| Available-for-sale financial assets | **24,060** | 24,060 |
| **Financial liabilities** | | |
| Financial liabilities measured at amortised cost | | |
| Trade payables | **575,413** | 575,718 |
| Other payables | **184,670** | 682,918 |
| Long-term payables | **12,188** | 12,919 |
| Short-term bank borrowings | **962,684** | 932,676 |
| | **1,734,955** | 2,204,231 |

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/15/19 Page 102 of 166

# 7. SEGMENT INFORMATION

## a. Business segments

The Group's revenues, expenses, assets, liabilities and capital expenditures are primarily attributable to the production and sales of CPT. The directors consider that there is only one business segment for the Group.

## b. Geographical segments

The Group's principal market is in the PRC. The direct exports sales made by the Group contributed to less than 10% of the total revenues and results of the Group (2006 : 10%). Accordingly, no geographical segment is presented.

# 8. TURNOVER

The Group is principally engaged in the manufacturing of CPT for colored television sets, related CPT components including glass bulbs, electron guns, shadow masks and their frames, deflection yokes, frit, anode buttons, phosphor, etc.

| | 2007 *RMB'000* | 2006 *RMB'000* |
|---|---|---|
| Sales of CPTs and CPT components | 3,358,990 | 3,861,710 |

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 9. OTHER OPERATING INCOME

| | 2007<br>*RMB'000* | 2006<br>*RMB'000* |
|---|---|---|
| Sales of raw materials, scraps and packaging materials | **43,746** | 19,498 |
| Net gains on disposal of property, plant and equipments | **—** | 21,748 |
| Gains on disposal of intangible assets *(note 20)* | **—** | 113,573 |
| Interest income | **5,482** | 6,521 |
| Amortisation of deferred income on grants received | **3,321** | 3,475 |
| Government grants *(Note a)* | **25,485** | — |
| Proceeds from collection of written off trade receivables | **5,138** | 700 |
| Reversal of write-down of inventories | **10,678** | — |
| Rental income | **1,429** | 1,317 |
| Reversal of impairment loss on trade receivables | **—** | 1,580 |
| Reversal of provision for staff welfare | **72,488** | — |
| Dividend income from available-for-sale investment | **566** | — |
| Others | **10,102** | 6,212 |
| | **178,435** | 174,624 |

*Note (a)*: The amount represented compensation received from the PRC government recognised by the Group in respect of compensation for relocation of certain factory premises of the Company's subsidiary.

## 10. EMPLOYEE BENEFIT EXPENSE

| | 2007<br>*RMB'000* | 2006<br>*RMB'000* |
|---|---|---|
| Wages and salaries | **331,441** | 332,880 |
| Retirement benefit contributions | | |
| — pension obligations *(note)* | **45,768** | 45,942 |
| — one-off termination benefits | **3,813** | 20,598 |
| — early retirement benefits *(note 35)* | **630** | (3,957) |
| Welfare and social security costs | **57,568** | 78,447 |
| | **439,220** | 473,910 |

*Note*: As stipulated by the rules and regulations in the PRC, the Group has participated in state-sponsored defined contribution retirement plans for its employees in the PRC. The Group and the eligible employees are required to contribute 20% and 7%, respectively, of the employee's basic salary. The state-sponsored retirement plans are responsible for the entire pension obligations payable to retired employees. The Group has no further pension obligation beyond the above contributions.

Case 3:07-cv-05944-JST Document 5415-5 Filed 04/13/19 Page 104 of 166

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 10. EMPLOYEE BENEFIT EXPENSE *(continued)*

### Directors' and senior management's emoluments

The remuneration of each director for the year ended 31 December 2007 is set out below:

| Name of director | Fee | Salary and allowance | Employer's contribution to pension scheme | Total |
|---|---|---|---|---|
| | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* |
| **Executive directors** | | | | |
| Mr. Xing Daoqing | — | 290 | 10 | 300 |
| Mr. Tao Kui | — | 290 | 10 | 300 |
| Mr. Guo Mengquan | — | 261 | 10 | 271 |
| Mr. Zhang Shaowen | — | 257 | 10 | 267 |
| Mr. Niu Xinan | — | 265 | — | 265 |
| Mr. Li Shikun *(note i)* | — | 305 | — | 305 |
| **Non-executive directors** | | | | |
| Mr. Zhang Xingxi | — | 240 | — | 240 |
| Mr. Feng Fei *(note ii)* | 100 | — | — | 100 |
| Mr. Xu Xinzhong | 100 | — | — | 100 |
| Mr. Feng Bin | 100 | — | — | 100 |
| Mr. Wang Jialu | 100 | — | — | 100 |
| Mr. Zhu Jianqiu *(note ii)* | 100 | — | — | 100 |
| Mr. Le Hua *(note i)* | — | — | — | — |
| Mr. Zhong Pengrong *(note i)* | — | — | — | — |
| Mr. Yun Dah Jiunn *(note ii)* | — | — | — | — |
| | 500 | 1,908 | 40 | 2,448 |

*Notes:*

(i) Appointed on 9 September 2007

(ii) Resigned on 8 September 2007

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 10. EMPLOYEE BENEFIT EXPENSE *(continued)*

### Directors' and senior management's emoluments *(continued)*

The remuneration of every director for the year ended 31 December 2006 is set out below:

| Name of director | Fee | Salary and allowance | Employer's contribution to pension scheme | Total |
|---|---|---|---|---|
| | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* |
| **Executive directors** | | | | |
| Mr. Xing Daoqing | — | 227 | 9 | 236 |
| Mr. Tao Kui | — | 239 | 9 | 248 |
| Mr. Guo Mengquan | — | 211 | 9 | 220 |
| Mr. Zhang Shaowen | — | 207 | 9 | 216 |
| Mr. Niu Xinan *(note i)* | — | 203 | 9 | 212 |
| **Non-executive directors** | | | | |
| Mr. Zhang Xingxi | — | 320 | 17 | 337 |
| Mr. Yun Dah Jiunn *(note ii)* | — | 810 | — | 810 |
| Mr. Feng Fei | 100 | — | — | 100 |
| Mr. Xu Xinzhong | 100 | — | — | 100 |
| Mr. Feng Bin | 100 | — | — | 100 |
| Mr. Wang Jialu | 100 | — | — | 100 |
| Mr. Zha Jianqiu | 100 | — | — | 100 |
| | 500 | 2,217 | 62 | 2,779 |

Notes:

(i) Appointed on 29 June 2006.

(ii) Mr. Yun Dah Jiunn has been re-designated as a non-executive director with effect from 27 December 2006. Mr. Yun Dah Jiunn has also resigned from his office as chief financial controller of the Company.

# 10. EMPLOYEE BENEFIT EXPENSE *(continued)*

## Directors' and senior management's emoluments *(continued)*

Except for Mr. Zhang Xingxi's and Mr. Niu Xinan's emoluments which are afforded by IRICO Group, other directors of the Company received no emolument from IRCO Group. No apportionment has been made as the directors consider that it is impracticable to apportion this amount between their services to the Group and their services to IRCO Group.

No directors of the Group waived or agreed to waive any emolument during both years.

## Five highest paid individuals

The five individuals whose emoluments were the highest in the Group for the year include one director (2006: three) whose emoluments are reflected in the analysis presented above. The emoluments payable to the remaining four individuals (2006: two) during the year are as follows:

| | **2007** | 2006 |
|---|---|---|
| | ***RMB'000*** | *RMB'000* |
| Basic salaries, housing allowances, other allowances and benefits in kind | **1,251** | 555 |
| Retirement benefit contributions | **41** | 9 |
| | **1,292** | 564 |

The emoluments fell within the following band:

| | **Number of individuals** | |
|---|---|---|
| | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* |
| Emolument band | | |
| Nil to RMB1,000,000 | **4** | 2 |

During the year, no emolument was paid by the Group to any of the directors or the five highest paid individuals as an inducement to join or upon joining the Group or as compensation for loss of office (2006: Nil).

Case 3:07-cv-05944-JST Document 5413-5 Filed 04/12/19 Page 107 of 186

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 11. FINANCE COSTS

| | 2007 RMB'000 | 2006 RMB'000 |
|---|---|---|
| Interest expense on short-term bank borrowings | **50,159** | 56,512 |
| Interest expense to ultimate holding company *(note 39)* | **1,755** | 1,648 |
| Finance charge on discounted trade bills to banks | **14,815** | 3,689 |
| | **66,729** | 61,849 |

## 12. TAXATION

No provision for Hong Kong Profits Tax has been made as the Group's income neither arises in, nor is derived from, Hong Kong for the two years ended 31 December 2007 and 2006.

The provision for PRC current enterprise income tax ("EIT") is calculated based on the statutory income tax rate of 33% (2006: 33%) of the assessable income of the Group as determined in accordance with the relevant PRC income tax rules and regulations for the year except for the Company and certain subsidiaries described below. All corresponding EIT relating to the taxable profit during the year have been recognised in the consolidated income statement.

| | 2007 RMB'000 | 2006 RMB'000 |
|---|---|---|
| Current income taxation | **11,200** | 19,949 |
| Deferred income tax *(note 34)* | **(2,780)** | (121) |
| | **8,420** | 19,828 |

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 12. TAXATION *(continued)*

Tax charge for the year can be reconciled to the profit per the consolidated income statement as follows:

| | **2007** *RMB'000* | 2006 *RMB'000* |
|---|---|---|
| Profit before tax | **80,577** | 187,543 |
| Tax at the domestic income tax rate of 33% (2006: 33%) | **26,590** | 61,889 |
| Tax effect of share of (profit) loss of associates | **(3,001)** | 312 |
| Expenses not deductible and income not taxable for tax purposes | **(7,142)** | 824 |
| Income under tax exemption and reduction *(note)* | **(21,795)** | (49,307) |
| Utilisation of tax losses previously not recognised | **(8,318)** | (28,278) |
| Tax effect of deductible temporary differences not recognised | **22,086** | 34,388 |
| Tax charge for the year | **8,420** | 19,828 |

*Note:*

Companies are entitled to the preferential tax treatment for Opening Up of Western China ("OUWC Policy") if they are engaged in the projects listed in the Catalogue for Industries, Products and Technologies Currently and Particularly Encouraged by the State for Development (as amended in 2000) as their principal business and the revenue from the principal operations account for over 70% of their total revenue. The applicable reduced preferential EIT rate under the OUWC Policy is 15%. From 10 September 2004, date of incorporation of the Company, the operations of the Company have met the requirements under the OUWC Policy, and accordingly EIT has been provided at 15% since then.

The operations of IRICO Display Devices Co., Ltd. ("IRICO Display") have met the requirements under the OUWC Policy for the two years ended 31 December 2007 and 2006, and accordingly, EIT has also been provided at 15%.

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 12. TAXATION *(continued)*

*Note: (continued)*

Xian IRICO Zixun Co., Ltd. was granted the status of high technology company. It is exempted from EIT for 2001 and 2002 and is required to pay EIT at a rate of 15% from 2003 to 2005. The operations of Xian IRICO Zixun Co., Ltd. have also met the requirements under the OUWC Policy for the two years ended 31 December 2007 and 2006 and accordingly, EIT has also been provided at 15%.

Zhuhai Caizhu Industrial Co., Ltd. and Caizhu Jinshun Electronic Industry Co., Ltd. are registered in a special economic zone and are entitled to pay EIT at 15% in 2007 and 2006.

Kunshan Caihong Yingguang Electronics Co., Ltd. is registered in a technological economic development zone and is required to pay EIT at a rate of 15% in 2007 and 2006.

Nanjing Beida Phosphor Co., Ltd., Xianyang IRICO Electronics Shadow Mask Co., Ltd. and IRICO Display Technology Co., Ltd. are Sino-foreign equity joint ventures engaging in the production business and are exempted from taxation for the first two profitable years and a 50% relief from the national PRC income tax rate (also exempted from paying the 3% local income tax) for the next three profitable years thereafter. As a result, Nanjing Beida Phosphor Co., Ltd., which was established in 2002, is entitled to pay EIT at 12% from 2006. Xianyang IRICO Electronics Shadow Mask Co., Ltd., which was established in 2003, has sufficient current year's profit to set off against previous years' accumulated losses and thus has no assessable income. IRICO Display Technology Co., Ltd., which was established in 2004, is still in the exemption period for the year ended 31 December 2007.

During the 5th Session of the 10th National People's Congress, which was concluded on 16 March 2007, the PRC Corporate Income Tax Law (the "New Corporate Income Tax Law") was approved and will become effective on 1 January 2008. The New Corporate Income Tax Law introduces a wide range of changes which include, but are not limited to, the unification of the income tax rate for domestic-invested and foreign-invested enterprises at 25%. The subsidiaries which are enjoying the tax holiday will continue until expiry while the preferential tax rates disclosed above will continue after the New Corporate Income Tax Law. The tax rate of the subsidiaries of which are now subjecting to tax rate of 33% will change to 25% from 1 January 2008.

## 13. PROFIT FOR THE YEAR

| | 2007<br>*RMB'000* | 2006<br>*RMB'000* |
|---|---|---|
| Profit for the year has been arrived at after charging and after crediting: | | |
| Cost of inventories recognised as an expense | **3,002,987** | 3,356,160 |
| Depreciation for property, plant and equipment | **290,063** | 337,461 |
| Depreciation for investment property | **218** | — |
| Amortisation of leasehold land and land use rights | **1,087** | 970 |
| Amortisation of intangible assets | **7,302** | 6,937 |
| Employee benefit expense (included directors' and supervisors' emoluments) | **439,220** | 473,910 |
| Impairment losses on property, plant and equipment (included in administrative expenses; 2006: included in cost of sales) | **2,630** | 67,205 |
| Impairment losses on intangible assets | **—** | 30,260 |
| Impairment losses on trade and other receivables | **1,300** | — |
| Net loss on disposal of property, plant and equipment | **142,609** | — |
| Research and development expenses | **22,678** | 25,917 |
| Write-down of inventories | **3,376** | 1,720 |
| Write off of an intangible asset | **241** | — |
| Operating lease rentals in respect of land use rights | **3,797** | 4,094 |
| Operating lease rentals in respect of property, plant and equipment | **31,380** | 37,336 |
| Net exchange losses | **17,335** | 12,216 |
| Provision for warranty (note 29) | **25,348** | 11,844 |
| Auditors' remuneration | **3,671** | 5,442 |
| Share of tax of associates (included in share of result of associates) | **3,001** | (313) |

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/12/19 Page 111 of 186

# NOTES TO THE FINANCIAL STATEMENTS

## 14. LOSS ATTRIBUTABLE TO EQUITY HOLDERS OF THE COMPANY

The loss attributable to equity holders of the Company is dealt with in the financial statements of the Company to the extent of approximately RMB58,374,000 (2006: RMB9,956,000).

## 15. EARNINGS PER SHARE

The calculation of basic earnings per share is based on the Group's profit attributable to equity holders of approximately RMB66,511,000 (2006: RMB129,512,000) and based on the weighted average of 1,941,174,000 (2006: 1,941,174,000) shares in issue.

There were no dilutive potential shares during the two years ended 31 December 2007 and 2006 and accordingly, no diluted earnings per share is presented.

## 16. DIVIDEND

No dividend was paid or proposed during the year ended 31 December 2007, nor has any dividend been proposed since the balance sheet date (2006 : Nil).

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 17. PROPERTY, PLANT AND EQUIPMENT

### The Group

| | Buildings RMB'000 | Machinery for electronics production RMB'000 | Machinery for glass production RMB'000 | Other machinery RMB'000 | Office equipment and others RMB'000 | Construction in progress RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|---|
| At 1 January 2006 | | | | | | | |
| Cost | 437,618 | 2,884,203 | 878,938 | 861,163 | 114,101 | 734,044 | 5,910,067 |
| Accumulated depreciation and impairment loss | (199,572) | (1,381,512) | (501,856) | (434,589) | (75,130) | (395,972) | (2,988,631) |
| Carrying value | 238,046 | 1,502,691 | 377,082 | 426,574 | 38,971 | 338,072 | 2,921,436 |
| Year ended 31 December 2006 | | | | | | | |
| Opening carrying value | 238,046 | 1,502,691 | 377,082 | 426,574 | 38,971 | 338,072 | 2,921,436 |
| Additions | — | 30,530 | — | 28,114 | 1,960 | 37,624 | 98,228 |
| Transfers / reclassification | 25,780 | 223,312 | 35,874 | 13,265 | 2 | (298,233) | — |
| Transfer to inventories | — | — | — | — | — | (17,659) | (17,659) |
| Transfer to intangible assets | — | — | — | — | — | (27,917) | (27,917) |
| Disposals | — | (14,760) | — | (54,798) | (2,440) | — | (71,998) |
| Depreciation charge | (16,536) | (156,592) | (97,069) | (56,683) | (10,581) | — | (337,461) |
| Impairment charge | — | (56,735) | (8,715) | (1,755) | — | — | (67,205) |
| Closing carrying value | 247,290 | 1,528,446 | 307,172 | 354,721 | 27,912 | 31,987 | 2,497,428 |
| At 31 December 2006 | | | | | | | |
| Cost | 463,398 | 3,438,324 | 970,522 | 794,321 | 104,697 | 31,987 | 5,803,149 |
| Accumulated depreciation and impairment loss | (216,108) | (1,909,878) | (663,350) | (439,600) | (76,785) | — | (3,305,721) |
| Carrying value | 247,290 | 1,528,446 | 307,172 | 354,721 | 27,912 | 31,987 | 2,497,428 |

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 576 of 1004

# 17. PROPERTY, PLANT AND EQUIPMENT *(continued)*

**The Group** *(continued)*

| | Buildings RMB'000 | Machinery for electronics production RMB'000 | Machinery for glass production RMB'000 | Other machinery RMB'000 | Office equipment and others RMB'000 | Construction in progress RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|---|
| Year ended 31 December 2007 | | | | | | | |
| Opening carrying value | 247,299 | 1,525,446 | 307,172 | 354,724 | 27,912 | 31,887 | 2,497,428 |
| Additions | 5,359 | 71,627 | 10,782 | 33,061 | 6,576 | 6,454 | 133,863 |
| Transfer to investment property | (4,915) | — | — | — | — | — | (4,915) |
| Disposals | (160) | (96,116) | (20,283) | (11,096) | (15,452) | (25) | (143,132) |
| Depreciation charge | (16,988) | (140,864) | (62,624) | (60,090) | (9,517) | — | (290,083) |
| Impairment charge | — | — | — | (2,630) | — | — | (2,630) |
| Disposal of a subsidiary | — | (158,241) | (22,331) | (322) | (15) | — | (180,909) |
| Closing carrying value | 230,606 | 1,204,852 | 212,716 | 313,644 | 9,506 | 38,316 | 2,009,640 |
| At 31 December 2007 | | | | | | | |
| Cost | 463,480 | 2,714,682 | 912,424 | 802,259 | 85,536 | 38,316 | 5,016,697 |
| Accumulated depreciation and impairment loss | (232,874) | (1,509,830) | (699,708) | (488,615) | (76,030) | — | (3,007,057) |
| Carrying value | 230,606 | 1,204,852 | 212,716 | 313,644 | 9,506 | 38,316 | 2,009,640 |

# 17. PROPERTY, PLANT AND EQUIPMENT *(continued)*

**The Company**

| | Machinery for electronics production RMB'000 | Machinery for glass production RMB'000 | Other machinery RMB'000 | Office equipment and others RMB'000 | Construction in progress RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|
| At 1 January 2006 | | | | | | |
| Cost | 1,215,784 | 571,476 | 459,612 | 76,817 | 147,198 | 2,470,887 |
| Accumulated depreciation and impairment loss | (474,382) | (278,130) | (164,511) | (50,982) | (75,648) | (1,043,653) |
| Carrying value | 741,402 | 293,346 | 295,101 | 25,835 | 71,550 | 1,427,234 |
| Year ended 31 December 2006 | | | | | | |
| Opening net book amount | 741,402 | 293,346 | 295,101 | 25,835 | 71,550 | 1,427,234 |
| Additions | 14,855 | — | 1,348 | 802 | 10,418 | 27,423 |
| Transfers / reclassification | 9,473 | 35,674 | (16,508) | — | (28,639) | — |
| Transfer to inventories | — | — | — | — | (17,659) | (17,659) |
| Disposals | (14,703) | — | (54,647) | (1,295) | — | (70,645) |
| Depreciation charge | (74,122) | (36,967) | (21,372) | (6,153) | — | (138,614) |
| Impairment reversal / (charge) | 4,416 | (8,715) | — | — | — | (4,299) |
| Closing carrying value | 681,321 | 283,518 | 203,922 | 19,189 | 35,470 | 1,223,420 |
| At 31 December 2006 | | | | | | |
| Cost | 1,223,675 | 663,060 | 336,881 | 71,464 | 35,470 | 2,330,550 |
| Accumulated depreciation and impairment loss | (542,354) | (379,542) | (132,959) | (52,275) | — | (1,107,130) |
| Carrying value | 681,321 | 283,518 | 203,922 | 19,189 | 35,470 | 1,223,420 |

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 578 of 1004

# 17. PROPERTY, PLANT AND EQUIPMENT *(continued)*

**The Company** *(continued)*

| | Machinery for electronics production | Machinery for glass production | Other machinery | Office equipment and others | Construction in progress | Total |
|---|---|---|---|---|---|---|
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Year ended 31 December 2007 | | | | | | |
| Opening net book amount | 691,321 | 283,518 | 203,922 | 19,189 | 35,470 | 1,223,420 |
| Additions | 52,424 | 35,520 | 2,712 | 1,239 | — | 91,895 |
| Disposals | (343,080) | — | (10,524) | (10,111) | — | (363,725) |
| Depreciation charge | (67,389) | (38,727) | (15,106) | (6,905) | — | (148,107) |
| Closing carrying value | 303,286 | 280,311 | 181,004 | 3,412 | 35,470 | 803,483 |
| At 31 December 2007 | | | | | | |
| Cost | 698,337 | 698,580 | 280,396 | 55,773 | 35,470 | 1,768,556 |
| Accumulated depreciation and impairment loss | (395,051) | (418,269) | (99,392) | (52,361) | — | (965,073) |
| Carrying value | 303,286 | 280,311 | 181,004 | 3,412 | 35,470 | 803,483 |

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/15/19 Page 116 of 166

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 17. PROPERTY, PLANT AND EQUIPMENT *(continued)*

Depreciation on property, plant and equipment is calculated using the straight-line method to allocate their costs to their residual values over their estimated useful lives, as follows:

| | |
|---|---|
| Buildings | 10 - 40 years |
| Machinery for electronics production | 15 years |
| Machinery for glass production | 6 - 18 years |
| Other machinery | 18 years |
| Office equipment and others | 5 years |

The Group's depreciation charge of approximately RMB273,213,000 (2006 : RMB302,453,000) has been included in cost of sales, RMB462,000 (2006 : RMB731,000) in selling and distribution costs and RMB16,388,000 (2006 : RMB34,277,000) in administrative expenses.

During the year, the directors conducted a review of the Group's production machinery and determined that a number of those assets were impaired, due to technical obsolescence. Accordingly, impairment losses of RMB2,630,000 has been recognised in respect of other machinery and included in administrative expense.

The Group's impairment charge of approximately RMB67,205,000 had been included in cost of sales for the year ended 31 December 2006. The events and circumstances that led to the recognition of the impairment loss and the discount rates used in the current estimate of value in use are disclosed in note 4.

As at 31 December 2007, short-term bank borrowings of the Group amounting to approximately RMB200,000,000 (2006 : RMB140,000,000) are secured by the Group's buildings and machineries with the carrying amount of approximately RMB195,538,000 (2006 : RMB205,027,000) (note 30).

## 18. INVESTMENT PROPERTY — Group

| | RMB'000 |
|---|---|
| **COST** | |
| At 1 January 2006, 31 December and 1 January 2007 | — |
| Transferred from property, plant and equipment during the year and at 31 December 2007 | 4,915 |
| **ACCUMULATED DEPRECIATION** | |
| At 1 January 2006, 31 December and 1 January 2007 | — |
| Charge for the year and at 31 December 2007 | 218 |
| **CARRYING VALUE** | |
| At 31 December 2007 | 4,697 |

The above investment property was depreciated on a straight-line basis at 33% per annum.

The investment property as at 31 December 2007 was located in the PRC and was held to earn rentals or for capital appreciation. The investment property is carried at cost less subsequent accumulated depreciation and any accumulated impairment losses.

In the opinion of the directors of the Company, the fair value of the Company's investment property at 31 December 2007 was approximated to its carrying value with reference to the recent market prices for similar properties.

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 581 of 1004

116 彩虹集團電子股份有限公司
IRICO GROUP ELECTRONICS COMPANY LIMITED

NOTES TO THE FINANCIAL STATEMENTS
YEAR ENDED 31 DECEMBER 2007

## 19. LEASEHOLD LAND AND LAND USE RIGHTS — GROUP

The Group's interests in leasehold land and land use rights represent prepaid operating lease payments and their carrying values are analysed as follows:

| | *RMB'000* |
|---|---|
| **COST** | |
| At 1 January 2006 and 1 January 2007 | 46,859 |
| Additions | 12,396 |
| At 31 December 2007 | 59,255 |
| **ACCUMULATED AMORTISATION** | |
| At 1 January 2006 | 8,948 |
| Amortisation charge | 970 |
| At 31 December 2006 and 1 January 2007 | 9,918 |
| Amortisation charge | 1,887 |
| At 31 December 2007 | 11,805 |
| **CARRYING VALUE** | |
| At 31 December 2007 | 47,450 |
| At 31 December 2006 | 36,941 |

Case 3:07-cv-05944-JST Document 5410-5 Filed 04/12/19 Page 119 of 156

## 19. LEASEHOLD LAND AND LAND USE RIGHTS — GROUP *(continued)*

| | 2007<br>*RMB'000* | 2006<br>*RMB'000* |
|---|---|---|
| Outside Hong Kong, held on leases of: | | |
| — between 10 to 50 years | **41,525** | 36,659 |
| — less than 10 years | **5,925** | 282 |
| | **47,450** | 36,941 |
| Analysed for reporting purposes as: | | |
| — current asset (included in other receivables, deposits and prepayments) | **1,887** | 970 |
| — non-current asset | **45,563** | 35,971 |
| | **47,450** | 36,941 |

As at 31 December 2007, short-term bank borrowings of the Group amounting to approximately RMB200,000,000 (2006 : RMB140,000,000) are secured by the Group's land use rights with the carrying value of approximately RMB20,387,000 (2006 : RMB21,012,000) (note 30).

The official property title certificate for certain of the Group's land use right with carrying amount of approximately RMB6,400,000 (2006: Nil) has not yet been issued by the relevant local government authorities. The directors are of the opinion that the Group's right and interest in such land use right will not be therefore severely prejudiced and the application of the title certificate is in progress.

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 20. INTANGIBLE ASSETS

**The Group**

| | Licences for technical knowledge *RMB'000* | Computer software *RMB'000* | Total *RMB'000* |
|---|---|---|---|
| **At 1 January 2006** | | | |
| Cost | 332,037 | 1,543 | 333,580 |
| Accumulated amortisation and impairment | (319,207) | (383) | (319,590) |
| Net carrying value | 12,830 | 1,160 | 13,990 |
| **Year ended 31 December 2006** | | | |
| Opening net carrying value | 12,830 | 1,160 | 13,990 |
| Additions | 5,134 | 1,771 | 6,905 |
| Transfer in from construction in progress | 27,917 | — | 27,917 |
| Charge for the year | (6,423) | (514) | (6,937) |
| Impairment loss recognised in the year | (30,260) | — | (30,260) |
| Closing net carrying value | 9,198 | 2,417 | 11,615 |
| **At 1 January 2007** | | | |
| Cost | 365,088 | 3,314 | 368,402 |
| Accumulated amortisation and impairment | (355,890) | (897) | (356,787) |
| Net carrying value | 9,198 | 2,417 | 11,615 |

## 20. INTANGIBLE ASSETS *(continued)*

**The Group** *(continued)*

| | Licences for technical knowledge *RMB'000* | Computer software *RMB'000* | Total *RMB'000* |
|---|---|---|---|
| **Year ended 31 December 2007** | | | |
| Opening net carrying value | 9,198 | 2,417 | 11,615 |
| Additions | 241 | 120 | 361 |
| Charge for the year | (6,570) | (732) | (7,302) |
| Write off for the year | — | (241) | (241) |
| Net carrying value | 2,869 | 1,564 | 4,433 |
| At 31 December 2007 | | | |
| Cost | 365,329 | 3,002 | 368,331 |
| Accumulated amortisation and impairment | (362,460) | (1,438) | (363,898) |
| Net carrying value | 2,969 | 1,564 | 4,433 |

120 彩虹集團電子股份有限公司
IRICO GROUP ELECTRONICS COMPANY LIMITED

NOTES TO THE FINANCIAL STATEMENTS
YEAR ENDED 31 DECEMBER 2007

## 20. INTANGIBLE ASSETS *(continued)*

The Company

| | Licences for technical knowledge *RMB'000* | Computer software *RMB'000* | Total *RMB'000* |
|---|---|---|---|
| **At 1 January 2006** | | | |
| Cost | 94,575 | 1,543 | 96,118 |
| Accumulated amortisation and impairment | (85,263) | (383) | (85,646) |
| Net carrying value | 9,312 | 1,160 | 10,472 |
| **As at 31 December 2006** | | | |
| Opening net carrying value | 9,312 | 1,160 | 10,472 |
| Additions | — | 1,760 | 1,760 |
| Charge for the year | (2,324) | (506) | (2,830) |
| Closing net carrying value | 6,988 | 2,414 | 9,402 |
| **At 1 January 2007** | | | |
| Cost | 94,575 | 3,135 | 97,710 |
| Accumulated amortisation and impairment | (87,587) | (721) | (88,308) |
| Net carrying value | 6,988 | 2,414 | 9,402 |

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 20. INTANGIBLE ASSETS *(continued)*

**The Company** *(continued)*

| | Licences for technical knowledge *RMB'000* | Computer software *RMB'000* | Total *RMB'000* |
|---|---|---|---|
| **Year ended 31 December 2007** | | | |
| Opening net carrying value | 6,988 | 2,414 | 9,402 |
| Additions | — | 120 | 120 |
| Charge for the year | (4,752) | (732) | (5,484) |
| Disposals | (1,149) | (241) | (1,390) |
| Net carrying value | 1,087 | 1,561 | 2,648 |
| **At 31 December 2007** | | | |
| Cost | 80,746 | 2,823 | 83,569 |
| Accumulated amortisation and impairment | (79,659) | (1,262) | (80,921) |
| Net carrying value | 1,087 | 1,561 | 2,648 |

The above intangible assets have definite useful lives. Such intangible assets are amortised on a straight-line basis over the following periods:

| | |
|---|---|
| Licences for technical knowledge | 20 years |
| Computer software | 5 years |

The Group's amortisation of approximately RMB6,570,000 (2006: RMB6,423,000) has been included in cost of sales and RMB732,000 (2006: RMB514,000) in the administrative expenses in the consolidated income statement.

The impairment charge of approximately RMB30,260,000 for the purchased technical knowledge for manufacturing of super large-sized CPTs was recognised for the Group during the year ended 31 December 2006 and included in cost of sales in the consolidated income statement since the directors consider that the Group will no longer produce the super large-sized CPTs.

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/15/19 Page 124 of 186

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 21. INVESTMENTS IN SUBSIDIARIES - COMPANY

### A. Investments in subsidiaries

| | 2007<br>*RMB'000* | 2006<br>*RMB'000* |
|---|---|---|
| Investments, at cost : | | |
| Shares in a listed company in the PRC | **596,169** | 624,793 |
| Unlisted shares | **440,327** | 477,434 |
| | **1,036,496** | 1,102,227 |
| Market value of listed shares | **1,122,312** | 513,119 |

As at 31st December 2007, the Group's shares in a listed company in the PRC represent a 41.08% equity interest in IRICO Display Device Co., Ltd. ("IRICO Display"), a company listed on the Shanghai Stock Exchange.

During the year ended 31 December 2007, the Company disposed of its 1.82% equity interests in IRICO Display at a total consideration of RMB52,980,000 through the Shanghai Stock Exchange, and resulted in a gain on partial disposal of approximately RMB25,858,000.

Prior to the share reform, the Company had a 66.14% equity interest in IRICO Display.

# 21. INVESTMENTS IN SUBSIDIARIES - COMPANY *(continued)*

## A. Investments in subsidiaries *(continued)*

As at 31 December 2007, the Company has direct and indirect interests in the following subsidiaries, all of which were established and operate in the PRC. The particulars of the subsidiaries are set out below:

| Name | Registered capital | Principal activities | Interest directly held by the Company | Interest indirectly held through subsidiaries |
|---|---|---|---|---|
| IRICO Display | RMB421,148,800 | Production and development of the electronic products and raw materials for colour display devices | 41.08% | – |
| IRICO Kunshan Industry Co., Ltd. | RMB80,000,000 | Production of the rubber parts of CFTs | 80% | 10% |
| Shaanxi IRICO Phosphor Material Co., Ltd. ("IRICO Phosphor") | RMB80,000,000 | Production of phosphor for various types of CPTs | 45% | – |
| Xian IRICO Zixun Co., Ltd. | RMB130,000,000 | Production and sales of the parts and components for display devices and the electronic communication products | 100% | – |
| Xianyang Caihin Electronic Device Co., Ltd. | RMB25,000,000 | Production and sales of pin anode button, multi-form and frit for CPTs | 87.16% | – |
| Xianyang IRICO Electronic Parts Co., Ltd. | RMB55,000,000 | Sales of shadow mask, frames and electronic products for CRTs | 60% | – |

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 21. INVESTMENTS IN SUBSIDIARIES - COMPANY *(continued)*

### A. Investments in subsidiaries *(continued)*

| Name | Registered capital | Principal activities | Interest directly held by the Company | Interest indirectly held through subsidiaries |
|---|---|---|---|---|
| Xianyang IRICO Electronic Shadow Mask Co., Ltd | US$5,000,000 | Development and production of the flat shadow mask and its coordinating products for CPTs | [illegible] | — |
| Zhuhai Caihui Industrial Co., Ltd | RMB50,000,000 | Manufacture of electronic devices and components | 90% | — |
| IRICO Display Technology Co., Ltd. | US$2,500,000 | Production and sale of CPTs, black and white picture tubes and ancillary electronic components | 75% | — |
| Caizhu [illegible] Electronic Industry Co., Ltd. | RMB10,000,000 | Production and sales of ink for CPTs | — | [illegible] |
| Kunshan Caihong Yingguang Electronics Co., Ltd | US$8,500,000 | Production of precession alloy and other products for color and black and white picture tubes | — | 50% |
| [illegible] Phosphor Co., Ltd. | US$443,300 | Production and processing of recycled phosphor and related products for various types of CPTs | — | [illegible] |
| Xian Caihui Display Technology Co., Ltd | RMB10,000,000 | R&D, design, manufacture, sales of CPTs, deflection yoke and related component and part as well as the after sale services for the sold product | — | 100% |

### B. Loan to a subsidiary

For the year ended 31 December 2006, the loan to a subsidiary was unsecured, carried interest at 6.12% per annum and was fully repaid on 14 June 2007.

# 22. INTERESTS IN ASSOCIATES

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Cost of investment in associates — unlisted equity interests in the PRC | — | — | **250,000** | — |
| Opening carrying amount | **232,220** | 17,339 | — | — |
| Additions | **110,000** | 215,826 | **110,000** | 250,000 |
| Share of associates profits less dividends received | **8,733** | (945) | — | — |
| | **350,953** | 232,220 | **360,000** | 250,000 |
| Less: carrying amount of associates disposal during the year | **(17,303)** | — | — | — |
| | **333,650** | 232,220 | **360,000** | 250,000 |

On 27 July 2007, the Group disposed of its 41.67% equity interests in an associate, Xian New Century International Club Co., Ltd., to IRICO Group at a consideration of RMB31,410,780 and recorded a gain on disposal of an associate of approximately RMB16,208,000 in the consolidated income statement.

In October 2007, Xian IRICO Plastic Industry Co., Ltd., an associate in which the Group had 30% equity interests, was deregistered. On the date of deregistration, the net assets shared by the Group amounted to approximately RMB2,100,000, which was set off against the outstanding payable of the same amount by the Group, resulting in no gain or loss on deregistration.

## 22. INTERESTS IN ASSOCIATES *(continued)*

The Group's interests in associates, all of which are unlisted, are as follows:

| Name | Country of incorporation | Assets | Liabilities | Revenues | Group's share of profits of associates |
|---|---|---|---|---|---|
| | | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* |
| **2007** | | | | | |
| Sichuan Century Shuanghong Display Devices Co., Ltd. ("Sichuan Shuanghong") | PRC | 650,070 | 199,979 | 100,133 | 6,337 |
| Xian New Century International Club Co., Ltd. *(Note)* | PRC | — | — | 17,549 | 1,784 |
| Shenzhen Ruisheng Phosphor Material Co., Ltd. | PRC | 3,604 | 471 | 3,958 | 972 |
| | | 653,674 | 200,450 | 121,640 | 9,093 |

*Note:* The amount included in the revenue and profit of Xian New Century International Club Co., Ltd. for the period from 1 January 2007 to the date of which Xian New Century International Club Co., Ltd. ceased to be an associate of the Group.

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 592 of 1004

## 22. INTERESTS IN ASSOCIATES *(continued)*

| Name | Country of incorporation | Assets RMB'000 | Liabilities RMB'000 | Revenues RMB'000 | Group's share of profits of associates RMB'000 |
|---|---|---|---|---|---|
| 2006 | | | | | |
| Sichuan Shuanghong | PRC | 209,112 | 16,456 | — | (1,636) |
| Xian New Century International Club Co., Ltd. | PRC | 20,941 | 7,533 | 13,604 | 271 |
| Shenzhen Rusheng Phosphor Material Co., Ltd. | PRC | 2,967 | 456 | 3,526 | 1,207 |
| Xian IRICO Plastic Industry Co., Ltd. | PRC | 2,100 | — | 2,072 | (787) |
| | | 235,120 | 24,445 | 19,202 | (945) |

The particulars of the associates of the Group at 31 December 2007 are set out below:

| Name | Registered capital | Principal activities | Interest directly held by the Company | Interest indirectly held through subsidiaries |
|---|---|---|---|---|
| Sichuan Shuanghong (note) | RMB180,000,000 | Production, research and development and sale of plasma display panels ("PDP") and related materials | 20% | — |
| Shenzhen Rusheng Phosphor Material Co., Ltd. | RMB4,000,000 | Production, research & red, green and blue phosphor materials | — | 40% |

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 593 of 1004

## 22. INTERESTS IN ASSOCIATES *(continued)*

*Note:*

On 27 March 2005, the Company and Sichuan Changhong Group Corporation ("Changhong Group") contributed cash of RMB1,000,000 each to form a company named "Beijing Century Shuanghong Display Devices Co., Ltd." with registered capital of RMB2,000,000. In July 2006, Beijing Century Shuanghong Display Devices Co., Ltd. was renamed as Sichuan Shuanghong.

On 10 October 2006, the Company and Changhong Group entered into an Increased Contributions Agreement for increasing the registered capital of Sichuan Shuanghong (the "Increased Contribution Agreement"). Pursuant to the Increased Contributions Agreement, the Group agreed to make additional capital contributions of RMB350,000,000, comprising cash of RMB110,000,000, tangible assets of RMB98,000,000 and intangible assets of RMB142,000,000 (the "Transaction Price") to Sichuan Shuanghong. The values of the tangible and intangible assets were negotiated and determined between the Company and Changhong Group on an arm's length basis with reference to a valuation report prepared by an independent professional valuer in the PRC.

Immediately following such increase in capital contributions, the registered capital of Sichuan Shuanghong would be increased to RMB1,800,000,000 of which RMB360,000,000 (20%) and RMB1,440,000,000 (80%) were attributable from the Company and Changhong Group respectively. The increased capital was scheduled to be contributed by both parties in accordance to the requirements as stated in the Company Law of the PRC.

Pursuant to the Increased Contributions Agreement, the Company had contributed RMB240,000,000 by way of injection of tangible and intangible assets in November 2006 and cash of RMB99,000,000. The Group recognised the gain on disposal of these tangible and intangible assets after considering the elimination of the 20% share of Group's unrealised valuation surplus of RMB171,000,000 (i.e. RMB34,200,000) based on the equity accounting method. Thus, the gain on disposal of property, plant and equipments was RMB23,000,000 and the gain on disposal of intangible assets was RMB114,000,000.

In May and June 2007, the Group contributed a total of RMB110,000,000 by way of cash into Sichuan Shuanghong.

## 23. AVAILABLE-FOR-SALE INVESTMENTS - GROUP

| | 2007 RMB'000 | 2006 RMB'000 |
|---|---|---|
| Unlisted investments | 33,500 | 33,500 |
| Impairment loss | (9,440) | (9,440) |
| | 24,060 | 24,060 |

At the balance sheet date, the unlisted investments substantially comprise of the investment in equity interests in Western Trust & Investment Co., Ltd. ("WTI"), a state controlled trust enterprise. WTI has a number of investments in unlisted enterprises which have no available information concerning their market values. These investments held by WTI are stated at cost in WTI's book.

The available-for-sale investments are measured at cost less impairment at each balance sheet date because the range of reasonable fair value estimates is so significant that the directors of the Company are of the opinion that their fair values cannot be measured reliability.

## 24. INVENTORIES

| | The Group | | The Company | |
|---|---|---|---|---|
| | 2007 RMB'000 | 2006 RMB'000 | 2007 RMB'000 | 2006 RMB'000 |
| Raw materials | 173,677 | 190,775 | 101,423 | 146,338 |
| Work in progress | 41,406 | 170,158 | 3,048 | 66,213 |
| Finished goods | 424,286 | 271,311 | 117,672 | 105,157 |
| Consumables | 72,813 | 20,665 | 52,783 | 4,926 |
| | 712,182 | 652,909 | 274,926 | 322,634 |
| Write-down to net realisable value | (13,692) | (20,994) | (1,303) | (6,869) |
| | 698,490 | 631,915 | 273,623 | 315,765 |

During the year ended 31 December 2007, there was an increase in the realisable value of raw materials due to market shortage in raw materials. As a result, a reversal of write-down of inventories of approximately RMB10,678,000 has been recognised in other operating income.

## 25. TRADE RECEIVABLES

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Trade receivables | | | | |
| — third parties | **493,524** | 344,065 | **164,735** | 92,929 |
| — related parties *(note 39)* | **239,545** | 335,923 | **52,096** | 88,470 |
| — subsidiaries of the Company | **—** | — | **197,615** | 286,929 |
| | **733,069** | 679,988 | **414,446** | 468,328 |
| Less: impairment losses | **(12,621)** | (11,466) | **(47,165)** | (58,900) |
| Trade receivables — net | **720,448** | 668,522 | **367,281** | 409,428 |
| Trade bills receivables | | | | |
| — third parties | **426,982** | 220,980 | **91,777** | 40,307 |
| — related parties *(note 39)* | **316,368** | 622,790 | **219,960** | 136,137 |
| | **743,350** | 843,770 | **311,737** | 176,444 |
| | **1,463,798** | 1,512,292 | **679,018** | 585,872 |

As at 31 December 2006 and 2007, the ageing of trade bills receivables are all within 180 days.

# 25. TRADE RECEIVABLES *(continued)*

The Group allows an average credit period ranging from cash on delivery to 90 days to its trade customers. The following is an aged analysis of trade receivables net of impairment loss at the reporting date:

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| 0-90 days | **612,190** | 602,211 | **222,703** | 308,341 |
| 91-180 days | **62,313** | 57,640 | **64,946** | 93,961 |
| 181-365 days | **38,694** | 4,001 | **64,314** | 6,363 |
| Over 365 days | **7,251** | 4,670 | **15,318** | 763 |
| | **720,448** | 668,522 | **367,281** | 409,428 |

Ageing of trade receivables which are past due but not impaired:

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| 91-180 days | **62,313** | 57,640 | **64,946** | 93,961 |
| 181-365 days | **38,694** | 4,001 | **64,314** | 6,363 |
| Over 365 days | **7,251** | 4,670 | **15,318** | 763 |
| | **108,258** | 66,311 | **144,578** | 101,087 |

The Group's neither past due nor impaired trade receivables mainly represent sales made to a large number of diversified and recognised and creditworthy customers. Customers who trade on credit terms are subject to credit verification procedures. No impairment provision is required for the past due balance based on the historical payment records. The Group does not hold any collateral over those balances.

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 597 of 1004

## 25. TRADE RECEIVABLES *(continued)*

At each of the balance sheet date, the Group's trade receivables were individually determined to be impaired. The individually impaired receivables are recognised based on the credit history of its customers, such as financial difficulties or default in payments, and current market conditions. Consequently, specific impairment provision was recognised. The movement in the provision for impairment of trade receivable is as follows:

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Balance at beginning of the year | **11,466** | 13,229 | **58,900** | 11,963 |
| Impairment losses recognised | **3,878** | — | **—** | 46,937 |
| Amounts recovered during the year | **(2,723)** | (1,763) | **(11,735)** | — |
| Balance at end of the year | **12,621** | 11,466 | **47,165** | 58,900 |

## 26. OTHER RECEIVABLES, DEPOSITS AND PREPAYMENTS

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Other receivables | **114,691** | 35,114 | **83,181** | 27,027 |
| Less: Impairment loss | **(2,441)** | (2,795) | **(662)** | (345) |
| Deposits and prepayments | **23,672** | 33,734 | **2,419** | 16,060 |
| | **135,922** | 66,053 | **84,938** | 42,742 |

## 26. OTHER RECEIVABLES, DEPOSITS AND PREPAYMENTS *(continued)*

Movement in the impairment loss of other receivables:

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Balance at beginning of the year | **2,296** | 2,112 | **345** | — |
| Impairment losses recognised | **145** | 183 | **317** | 345 |
| Balance at end of the year | **2,441** | 2,295 | **662** | 345 |

## 27. BANK BALANCES AND CASH

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Pledged balances | — | 30,009 | — | 30,009 |
| Unpledged balances | | | | |
| — time deposits | **24,500** | 30,000 | — | — |
| — other bank balances and cash | **339,117** | 419,494 | **160,821** | 191,720 |
| | **363,617** | 479,503 | **160,821** | 221,729 |

All the bank balances and cash are denominated in RMB and deposited with banks in the PRC except for the equivalent amounts of approximately RMB52,531,000 (2006: RMB110,763,000) at 31 December 2007 which is denominated in foreign currencies. The conversion of these RMB denominated balances into foreign currencies is subject to the rules and regulations of foreign exchange control promulgated by the PRC government.

As at 31 December 2006, bank balances and cash of the Group and the Company included deposit of RMB30,009,000 which was pledged to secure trade bills payable (2007: Nil).

The effective interest rate on time deposits was 2.52% to 3.78% (2006: 2.25%). These pledged deposits have a maturity from 180 days to 365 days (2006: 180 days to 365 days).

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 599 of 1004

## 28. TRADE PAYABLES

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Trade payables | | | | |
| — third parties | **402,399** | 335,690 | **213,783** | 185,446 |
| — related parties *(note 39)* | **103,024** | 212,241 | **40,978** | 138,685 |
| — subsidiaries of the Company | **—** | — | **78,182** | 25,340 |
| | **505,423** | 547,931 | **332,943** | 349,471 |
| Trade bills payables | | | | |
| — third parties | **33,458** | 2,150 | **33,458** | 2,150 |
| — related parties *(note 39)* | **36,532** | 25,637 | **36,532** | 25,637 |
| | **69,990** | 27,787 | **69,990** | 27,787 |
| | **575,413** | 575,718 | **402,933** | 377,258 |

At 31 December 2007 and 2006, the ageing analysis of trade payables are as follows:

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| 0-90 days | **472,486** | 497,373 | **314,799** | 343,452 |
| 91-180 days | **8,151** | 12,237 | **8,762** | 3,812 |
| 181-365 days | **8,655** | 17,145 | **3,283** | 606 |
| Over 365 days | **16,131** | 21,176 | **6,098** | 1,601 |
| | **505,423** | 547,931 | **332,942** | 349,471 |

# 29. OTHER PAYABLES AND ACCRUALS

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Amount due to ultimate holding company *(note 39)* | **35,371** | 340,095 | **33,648** | 310,659 |
| Provisions of warranty *(note)* | **3,972** | 5,537 | **6** | 3,514 |
| Others | **175,970** | 380,879 | **148,270** | 281,757 |
| | **215,313** | 726,511 | **181,924** | 595,930 |

*Note:*

Movements of the provisions of warranty are as follows:

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Opening carrying amount | **5,537** | 3,939 | **3,514** | 3,939 |
| Charged in the consolidated income statement *(note 13)* | **25,348** | 11,844 | **21,245** | 4,094 |
| Utilised during year | **(26,913)** | (10,246) | **(24,753)** | (4,519) |
| Closing carrying amount | **3,972** | 5,537 | **6** | 3,514 |

Under the terms of the Group's sales agreements, the Group will rectify product defects arising within three years from the date of sales. Provision is therefore made for the best estimate of the expected settlement under these agreements in respect of sales made within the year prior to the balance sheet date. The amount of provision takes into account the Group's recent claim experience and the Group only makes provision where a claim is probable.

## 30. SHORT-TERM BANK BORROWINGS

| | The Group | | The Company | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Secured | **200,000** | 140,000 | — | — |
| Unsecured | | | | |
| Guaranteed by the ultimate holding company | **250,500** | 640,000 | **136,500** | 470,000 |
| Advanced from banks on discounted trade receivables | **262,184** | 58,972 | **242,184** | — |
| Unguaranteed | **250,000** | 93,704 | **250,000** | 93,704 |
| | **962,684** | 932,676 | **628,684** | 563,704 |

As at 31 December 2007, short-term bank borrowing of approximately RMB200,000,000 (2006: RMB140,000,000) are secured by certain land use rights (note 19), and buildings and machineries of the Group (note 17).

As at 31 December 2007, the Group and the Company's unguaranteed bank borrowings are secured by certain land and buildings with carrying values of approximately RMB184,711,000 of its ultimate holding company. No assets pledge was provided by the ultimate holding company to the Company and the Group for the year ended 31 December 2006.

As at 31 December 2007, all borrowings were denominated in RMB. As at 31 December 2006, approximately RMB93,704,000 of bank borrowings were denominated by USD while the remaining were denominated in RMB.

## 30. SHORT-TERM BANK BORROWINGS *(continued)*

As at 31 December 2007 and 2006, all short-term bank borrowings are based on fixed interest rate. The effective interest rates as at the balance sheet date were as follows:

| | **2007** | 2006 |
|---|---|---|
| Short-term bank borrowings per annum | **5.31% – 7.65%** | 3.78% – 6.22% |

As at 31 December 2007, the unutilised banking facilities of the Group amounted to approximately RMB191,099,000 (2006: RMB187,025,000).

## 31. SHARE CAPITAL

| | **As at 31 December 2006 and 2007** | |
|---|---|---|
| | **Number of shares** | **Amount** *RMB'000* |
| Issued and fully paid : | | |
| Domestic shares of RMB1 Yuan each | 1,455,880,000 | 1,455,880 |
| H shares of RMB1 Yuan each | 485,294,000 | 485,294 |
| | 1,941,174,000 | 1,941,174 |

The H shares rank pari passu in all respects with the domestic shares and rank equally for all dividends or distributions declared, paid or made except that all dividends in respect of H shares are to be paid by the Company in Hong Kong dollars and H shares may only be subscribed for by, and traded in Hong Kong dollars between legal or natural persons of any other country other than the PRC. The transfer of the domestic shares is subject to such restrictions as the PRC laws may impose from time to time.

## 32. OTHER RESERVES

### The Group

| | Capital reserve *(Note (i))* *RMB'000* | Statutory surplus reserve *(Note (ii))* *RMB'000* | Statutory public welfare fund *(Note (iii))* *RMB'000* | Total *RMB'000* |
|---|---|---|---|---|
| At 1 January 2006 | 920,872 | 15,687 | 7,843 | 944,402 |
| Negative reserve arising from share reform *(note (iv))* | (176,083) | — | — | (176,083) |
| Acquisition of additional interests of a subsidiary from a minority shareholder | (2,173) | — | — | (2,173) |
| Transfers | — | 7,843 | (7,843) | — |
| At 31 December 2006 and at 31 December 2007 | 742,616 | 23,530 | — | 766,146 |

### The Company

| | Capital reserve *(Note (i))* *RMB'000* | Statutory surplus reserve *(Note (ii))* *RMB'000* | Statutory public welfare fund *(Note (iii))* *RMB'000* | Total *RMB'000* |
|---|---|---|---|---|
| At 1 January 2006 | 962,623 | 15,687 | 7,843 | 986,153 |
| Transfers | — | 7,843 | (7,843) | — |
| At 31 December 2006, at 1 January 2007 and 31 December 2007 | 962,623 | 23,530 | — | 986,153 |

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 32. OTHER RESERVES *(continued)*

Notes:

(i) Capital reserve

Upon incorporation of the Company on 10 September 2004, the historical net value of the assets, liabilities and interests transferred to the Company were converted into the Company's capital with all the then existing reserves eliminated and the resulting difference dealt with in the capital reserve. Accordingly, a capital reserve, being the difference between the amount of share capital issued and historical net value of the assets, liabilities and interests transferred to the Company, was presented in the reserves of both the Group and the Company. Separate class of reserves, including retained profits, of the Group prior to the incorporation of the Company were not separately disclosed as all these reserves have been capitalized and incorporated in the capital reserve of the Group and the Company.

(ii) Statutory surplus reserve

In accordance with the relevant PRC laws and financial regulations, every year the Company is required to transfer 10% of the profit after taxation determined in accordance with accounting principles and financial regulations applicable to PRC enterprises ("PRC GAAP") to the statutory surplus reserve until the balance reaches 50% of the paid-up share capital. Such reserve can be used to reduce any losses incurred and to increase share capital. Except for the reduction of losses incurred, any other usage should not result in this reserve balance falling below 25% of the registered capital.

(iii) Statutory public welfare fund

In accordance with the relevant PRC laws and financial regulations, every year the Company is required to transfer between 5% to 10% of the profits after taxation determined in accordance with PRC GAAP to the statutory public welfare fund. The use of this fund is restricted to capital expenditure for employees' collective welfare facilities, the ownership in respect of which belongs to the Group. The statutory public welfare fund is not available for distribution to shareholders except under liquidation. Once the capital expenditure on staff welfare facilities has been made, an equivalent amount must be transferred from statutory public welfare fund to the discretionary surplus reserve, a reserve which can be used to reduce any losses incurred or to increase share capital.

In accordance with the revised PRC regulations which is effective from 1 January 2006 and a circular issued by the Ministry of Finance (Cai Qi [2006] No.67), the Company is not required to provide for statutory public welfare fund out of appropriation of profit after taxation. The remaining balance as at 1 January 2006 is transferred into statutory surplus reserve.

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 32. OTHER RESERVES *(continued)*

*Notes: (continued)*

(iv) Negative reserve arising from share reform

Under the share reform, which was approved by the shareholders of IRICO Display on 18 July 2006, the Company offered 4.2 unlisted shares in IRICO Display for every 10 listed shares held on 27 July 2006 in consideration for such holders of listed shares to agree that all the IRICO Display's unlisted shares be converted into listed shares.

The Company transferred a total of 51,403,687 unlisted shares in IRICO Display to listed shareholders, representing approximately 12.21% of the total issue shares of IRICO Display and approximately 21.78% of the Company's unlisted shares in IRICO Display. The Company also transferred a total of 4,361,148 unlisted shares to listed shareholders on behalf of 15 unlisted shareholders who did not pay for their consideration.

In the Group's consolidated financial statements, the above share reform reduced capital reserve attributable to the shareholders of the Company by approximately RMB176,083,000 and increased minority interests by the same amount. The share paid on behalf of the 15 unlisted shareholders of RMB14,939,000 are recorded as amount due from these shareholders and increased minority interests by approximately RMB14,939,000.

## 33. DEFERRED INCOME

Deferred income represents grant received from the United Nations by the Group for its ozone depleting substance clearing replacement project for acquiring machineries to treat the ozone depleting substance produced during the production process. This deferred income is amortised to the consolidated income statement on a straight-line basis over the expected lives of the corresponding assets of 5 years.

# 34. DEFERRED TAXATION

Deferred taxation is calculated in full on temporary differences under the liability method using principal taxation rates of 25% (2006: 33%) except for certain subsidiaries mentioned in note 11 to the consolidated financial statements which are subject to tax concession to pay income tax at 15% (2006: 15%).

The gross movement on the deferred income tax account is as follows:

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Opening carrying amount | **15,577** | 15,698 | **6,117** | 3,614 |
| (Credited) debited to the consolidated income statement | **(2,780)** | (121) | **(714)** | 2,503 |
| Closing carrying amount | **12,797** | 15,577 | **5,403** | 6,117 |

The movement in deferred tax assets and liabilities during the year, without taking into consideration the offsetting of balances within the same tax jurisdiction, is as follows:

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 34. DEFERRED TAXATION *(continued)*

Deferred tax liabilities:

| | The Group Accelerated tax depreciation | The Company Accelerated tax depreciation |
|---|---|---|
| | *RMB'000* | *RMB'000* |
| At 1 January 2006 | 15,698 | 3,614 |
| (Credited) debited to the consolidated income statement | (121) | 2,503 |
| At 31 December 2006 and 1 January 2007 | 15,577 | 6,117 |
| Credited to the consolidated income statement | (2,780) | (714) |
| At 31 December 2007 | 12,797 | 5,403 |

The deferred tax liabilities are to be recovered after more than 12 months.

Deferred income tax assets are recognised for tax loss carry-forwards and other deductible temporary differences to the extent that the realisation of the related tax benefit through the future taxable profits is probable. The Group has deductible temporary differences of approximately RMB 321,040,000 (2006: RMB229,253,000) where, in the opinion of the directors, it is not probable that sufficient taxable profits will be available within the utilisation periods to allow utilisation of the tax losses and other deductible temporary differences. The Group's unrecognised deferred tax assets in respect of tax losses will expire in 2012.

## 35. LONG-TERM PAYABLES

Long-term payables mainly represent early retirement allowance payable to the employees of the Group.

The maturity profile of the long-term payables was as follows.

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Opening carrying amount | **12,919** | 18,505 | **10,027** | 13,355 |
| Utilised during year | **(1,361)** | (1,629) | **(1,361)** | (651) |
| Debited (credited) to consolidated income statement *(note 10)* | **630** | (3,957) | **(5,796)** | (2,677) |
| Closing carrying amount | **12,188** | 12,919 | **2,870** | 10,027 |
| Less: current portion included in current liabilities | **(2,938)** | (2,347) | **(744)** | (962) |
| Non-current portion | **9,250** | 10,572 | **2,126** | 9,065 |

The provision mainly represented early retirement allowance payable to the employees of the Group. Compensation for early retirement is recognised in the earlier of the periods in which the Group established a constructive obligation and created a valid expectation on the employee, entered into an agreement with the employee specifying the terms, or after the individual employee has been advised of the specific terms.

The fair values of payables equal their carrying amount, as the impact of discounting is not significant. The fair values are based on cash flows discounted using a rate based on five-year bank borrowings rate of 6.34% (2006: 6.12%).

## 36. DISPOSAL OF A SUBSIDIARY

On 27 July 2007, the Group entered into an agreement with IRICO Group, the Company's ultimate holding company, for the disposal of its 72.02% equity interest in a subsidiary, Xianyang IRICO Digital Display Co., Ltd., a company engaged in the production and sales of CPTs. The net assets of Xianyang IRICO Digital Display Co., Ltd. at the date of disposal were as follows:

| | 2007<br>RMB'000 |
|---|---|
| Net assets disposed of: | |
| Property, plant and equipment | 180,909 |
| Inventories | 2,814 |
| Trade receivables | 5,424 |
| Bank balances and cash | 16,568 |
| Trade payables | (25,034) |
| Tax payables | (123) |
| Net assets | 180,558 |
| Gain on disposal of a subsidiary | 1,969 |
| Total consideration | 182,527 |
| Satisfied by: | |
| Cash | 147,181 |
| Other receivables | 35,346 |
| | 182,527 |
| Net cash inflow arising from disposal: | |
| Cash consideration | 147,181 |
| Bank balances and cash disposed of | (16,568) |
| | 130,613 |

## 36. DISPOSAL OF A SUBSIDIARY *(continued)*

During the year ended 31 December 2007, the disposed subsidiary contributed to approximately RMB10,279,000 to the Group's profit, contributed net operating cash flow RMB9,977,000 and received approximates to RMB14,454,000 from investing activities.

## 37. MATERIAL LITIGATIONS

**The dispute between Xianyang Xingyun Mechanical Company Limited ("Xingyun") and the Company**

On or about 19 June 2006, Xingyun brought an action against the Company in the People's High Court of Shaanxi. The Company received a notice ((2006) Shaan Min Chu Zi No. 16) from the court on 20 June 2006 requesting the Company to respond to the action and produce evidence in relation thereto.

On 28 July 2003, five Confirmation Agreements on Parts and Materials ("Confirmation Agreements") were entered into between Xingyun and the IRICO Colour Picture Tube Plant No. 1 CPT plant (彩虹彩色顯像管總廠彩管一廠) ("No. 1 CPT Plant"). According to the five Confirmation Agreements, Xingyun shall provide No. 1 CPT Plant with 5 types of parts samples including 37cm CPT model L shadow mask frame and anti-implosion band for mass pre-sale quality confirmation. In around February 2005, since the parties failed to agree on the price of bulk provision of goods upon the completion of the Confirmation Agreements, No. 1 CPT Plant notified Xingyun to suspend the provisions of parts as agreed in the Confirmation Agreements. Xingyun believes that this caused a total loss of RMB30,300,000 which was incurred from the investments in the construction of facilities and the purchase of materials.

The hearing of the case has ended. On 27 December 2006, the Company received a civil verdict ((2006) Shaan Min Er Chu Zi No. 16) from the People's High Court of Shaanxi. The court ruled that the claim by Xingyun against the Company to bear its investment loss of RMB26,340,000 and its claim against the Company to bear its production loss of RMB3,960,000 were not justified and were dismissed. The court also ruled that, according to the principle of fairness, the Company should acquire finished products, semi-finished products and raw materials held by Xingyun in the value of RMB3,880,000 according to the quantities, types and prices determined by both parties. Those finished products, semi-finished products and raw materials can still be utilised in the process of production by the Company, and therefore no loss would be incurred.

The period allowed the appeal stipulated in the civil verdict ((2006) Shaan Min Er Chu Zi No. 16) expired on 14 January 2007, and Xingyun has not filed an appeal to the People's Supreme Court of the PRC within such stipulated period.

Case 3:07-cv-05944-JST Document 5440-1 Filed 04/12/19 Page 146 of 186

## 37. MATERIAL LITIGATIONS *(continued)*

On 11 April 2007, the Company received a writ of summons ((2007) Shaan Min Er Chu Zi No.10)) from the People's High Court of Shaanxi, and was informed that Xingyun brought an action for a second time against the Company in respect of the same matter.

The Company made a written submission to the Court denying all liabilities in response to the allegations made by Xingyun. The Company believes that Xingyun's claim for litigations had no legal and factual basis, therefore its claim should be dismissed. On 23 November 2007, the People's High Court of Shaanxi issued the civil verdict ((2007) Shaan Min Er Chu Zi No. 10). The Court ruled that the claim by Xingyun against the Company demanding for compensation to its investment and other losses totaling RMB30,010,000 was not established and should be dismissed. At present, Xingyun has filed an appeal to the People's Supreme Court of the PRC. The Company has received a writ of summons from the People's Supreme Court on 15 April 2008.

**Baystar Capital II, LP et al. v. Core-Pacific Yamaichi International (HK) Ltd. et al., Case No 05 1091 ABC (CWx) (filed in the United States District Court for the Central District of California) (the "Baystar Litigation")**

On or about 11 February 2005, BayStar Capital Management, LLC and BaystarCapital II, LP (hereinafter collectively referred to as "Baystar"), holders of the Company's H shares, commenced a litigation against Core-Pacific Yamaichi International (H.K.) Limited, et.al (hereinafter referred to as "CPYI"), one of the underwriters that offered the Company's H shares to investors in the United States pursuant to Rule 144A of the Securities Act of the USA. Baystar alleges that it entered into a strategic business development agreement with CPYI, pursuant to which CPYI acted as an investment consultant to Baystar in the greater China area. Baystar claims that CPYI breached the agreement and its fiduciary duties to Baystar. In addition, Baystar alleges that CPYI made material misrepresentations and omissions to Baystar, in violation of United States federal and state securities laws and the common law. Baystar has not commenced any action against the Company.

On or about 20 May 2005, CPYI commenced a third-party action against the Company and the lead underwriter of the Company, as part of the Baystar Litigation. CPYI seeks contractual and common law indemnification and / or contribution from the Company in the event that CPYI is found liable to Baystar.

## 37. MATERIAL LITIGATIONS *(continued)*

A copy of the third-party complaint was served by Law Debenture Society on the Company on or about 11 June 2005. The Company has retained a law firm to represent the Company in the litigation. On 18 August 2005, such law firm filed a motion to dismiss the third-party complaint in its entirety. On 13 October 2005, the Court granted in part and denied in part the motion to dismiss. Thereafter, on 7 November 2005, the Company filed an answer to CPYI's claims, denying all liability.

Because no party has identified a single material misrepresentation or omission made by the Company in the offering circular, the Company filed a motion for summary judgment on 15 May 2006. On 9 August 2006 the Court partly dismissed the motion, and the discovery procedure and the expected litigation procedure continued to proceed. Pursuant to the schedule approved by the Court, the closing date of the discovery procedure was postponed to 1 December 2006. The trial by jury was started on 1 May 2007.

Upon completion of the discovery procedure, summary judgment commenced for Core Pacific and Baystar. The Court granted Core Pacific's motion and dismissed the rights appeal that may be implied in all the litigations of Core Pacific. Shortly thereafter, Core Pacific approached the Company and offered to dismiss the claim for damages against the Company. No payment of compensation in respect of the litigation is required from the Company. The Company accepted the offer and signed the settlement proposal with the relevant parties on 9 October, 2007. Therefore, the litigation has ended.

The result of the above litigations has no material impact on the 2007 financial statement of the Group.

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 38. COMMITMENTS

Capital expenditure at the balance sheet date but not yet incurred is as follows:

| | The Group | |
|---|---|---|
| | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* |
| Authorised but not contracted for | | |
| — Construction and renovation of production lines for CPTs | — | 19,694 |
| — Construction and renovation of production lines for CPT components | — | 4,387 |
| | — | 24,081 |
| Contracted but not provided for | | |
| — Investment in an associate | — | 110,000 |
| — Construction and renovation of production lines for CPTs | — | 18,797 |
| — Construction and renovation of production lines for CPT components | **27,550** | 932 |
| | **27,550** | 129,729 |
| | **27,550** | 153,810 |

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 614 of 1004

# 38. COMMITMENTS *(continued)*

**As lessee**

The future aggregate minimum lease payments under non-cancelable operating leases are as follows:

| | The Group | | | | The Company | | | |
|---|---|---|---|---|---|---|---|---|
| | Land use rights | | Property, plant and equipment | | Land use rights | | Property, plant and equipment | |
| | 2007 | 2006 | 2007 | 2006 | 2007 | 2006 | 2007 | 2006 |
| | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* |
| Not later than one year | 4,603 | 4,603 | 35,315 | 32,688 | 3,584 | — | 23,677 | — |
| Later than one year and not later than five years | 4,603 | 9,206 | 34,858 | 65,337 | 3,584 | — | 23,677 | — |
| | 9,206 | 13,809 | 70,173 | 98,025 | 7,168 | — | 47,354 | — |

The Group and the Company leases its land use rights and property, plant and equipment under operating lease arrangements with leases negotiated for terms of an average of three and three years respectively.

**As lessor**

At the balance sheet date, an investment property is leased out for a period of 3 years from the date of commencement of operation of a lessee that occupies the property and the lease did not have any renewal options given to the lessee. The rental yield for the year ended 31 December 2007 is 30.4%. The Group had contracted with tenants for the following future minimum lease payments:

| | The Group | |
|---|---|---|
| | 2007 | 2006 |
| | *RMB'000* | *RMB'000* |
| Within one year | 419 | — |
| In the second to fifth years inclusive | 192 | — |
| | 611 | — |

## 39. RELATED-PARTY TRANSACTIONS

The Group is controlled by IRICO Group Corporation (incorporated in the PRC), which owns 75% of the Company's shares. The remaining 25% of the shares are widely held.

Related parties include IRICO Group Corporation and its subsidiaries (other than the Group), associates and jointly controlled entities (hereinafter collectively referred to the "IRICO Group"), corporations in which the Company is able to control, jointly control or exercise significant influence, key management personnel of the Company and IRICO Group Corporation and their close family members. IRICO Group Corporation does not produce financial statements available for public use.

IRICO Group Corporation is controlled by PRC government. In accordance with HKAS 24 "Related Party Disclosures", other state-owned enterprises and their subsidiaries, directly or indirectly controlled by the PRC government are also regarded as related parties of the Group and defined as "Other state controlled enterprise". For purpose of related transaction disclosure, the Group has in place procedures to assist the identification of the immediate ownership structure of its customers and suppliers as to whether they are state-owned companies. Many state-owned enterprises have multi-layered corporate structure and the ownership structures change over time as a result of transfers and privatisation programs. Nevertheless, in the opinions of Directors, the majority of the Group's activities have been conducted with other state controlled enterprises in the Group's ordinary course of business. In the meantime, the meaningful information relating to related party transactions has been adequately disclosed.

## 39. RELATED-PARTY TRANSACTIONS *(continued)*

The following transactions were carried out with related parties:

### A. Sale of goods

| | 2007<br>*RMB'000* | 2006<br>*RMB'000* |
|---|---|---|
| Sales of goods to the IRICO Group *(note (i))*: | | |
| — The utilities plant of the ultimate holding company | **75,378** | 4,810 |
| — Shenzhen Hongyang Industry & Trade Company | **12,239** | 9,612 |
| — Rui Bo Electronics (HK) Limited | **3,324** | 5,044 |
| — Caihong Labour Services Company | **3,066** | 340 |
| — Shaanxi IRICO General Service Corporation | **501** | 346 |
| — Shaanxi IRICO Construction Engineering Co., Ltd | **4** | 4 |
| | **94,512** | 20,156 |
| Other state controlled enterprises | **1,138,139** | 2,258,081 |

*Note:*

(i) Sales to related parties were conducted at prices not less than cost and with terms mutually agreed by both contracting parties.

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 617 of 1004

# 39. RELATED-PARTY TRANSACTIONS *(continued)*

## B. Purchases of goods and provision of services

| | 2007<br>*RMB'000* | 2006<br>*RMB'000* |
|---|---|---|
| Purchases of goods from the IRICO Group *(note (i))* | | |
| — Shaanxi IRICO General Service Corporation | 41,933 | 49,866 |
| — Caihong Labour Services Company | 37,384 | 74,387 |
| — Xianyang Caiilan Packaging Materials Co., Ltd. | 17,787 | 32,613 |
| — Xianyang Caihong Adhesive Belt Co., Ltd | 2,300 | 5,539 |
| — Shenzhen Hongyang Industry & Trade Company | 49 | 1,086 |
| — Xian Caihong Plastic Co., Ltd | — | 10,513 |
| | 99,453 | 174,004 |
| Other state controlled enterprises | 534,888 | 609,045 |
| Purchases of property, plant and equipments | | |
| The IRICO Group | | |
| — Xian Caihong Plastic Co., Ltd | — | 3,408 |
| — Shenzhen Hongyang Industry & Trade Company | — | 1,059 |
| | — | 4,467 |
| Other state controlled enterprises | — | 12,766 |

## 39. RELATED-PARTY TRANSACTIONS *(continued)*

### B. Purchases of goods and provision of services *(continued)*

| | **2007** **RMB'000** | 2006 *RMB'000* |
|---|---|---|
| Provision of services from the IRICO Group | | |
| — Utility charges to the utilities plant of the ultimate holding company *(note (ii))* | **397,229** | 454,899 |
| — Rental expense to the ultimate holding company *(note (iii))* | **35,048** | 39,883 |
| — Trademark license fee to the ultimate holding company *(note (v))* | **3,476** | 3,828 |
| — Environmental expenses to Caihong Labour Service Company | **100** | — |
| — School expense to IRICO School *(note (vi))* | **—** | 6,066 |
| — Social and ancillary service charges from the ultimate holding company *(note (vi))* | **—** | 3,316 |
| — Shaanxi IRICO Engineering Audit Company | **—** | 260 |
| | **435,853** | 508,252 |
| Other state controlled enterprises | — | — |

# 39. RELATED-PARTY TRANSACTIONS *(continued)*

## B. Purchases of goods and provision of services *(continued)*

Notes:

(i) Purchases from related parties were conducted at prices not less than cost and with terms mutually agreed by both contract parties.

(ii) Various kinetic energy charges were paid / payable by the companies of the Group to the utilities plant of the ultimate holding company based on the agreed rates for the two years ended 31 December 2007 and 2006 respectively.

(iii) From 1 January 2004, the Group is required to pay RMB11 per square metre per annum for the use of land use rights and RMB9 and RMB30 per square metre per month for the use of buildings in Xianyang and Beijing respectively, pursuant to the Premises Leasing Agreement. Accordingly, rental charges for the year ended 31 December 2007 amounted to RMB35,046,000 (2006: RMB39,863,000).

(iv) At 6 November 2006, IRICO School has been transferred to the local government of Xianyang. Accordingly, the school expense to IRICO School is ceased from that date.

(v) Licence fee for using the trademark owned by the ultimate holding company was paid by the Group, at 0.1% of sales based on the terms stipulated in agreements. In accordance with the agreement signed by one of the subsidiaries, IRICO Display Devices Co. Ltd., the term is initially for five years from 1998 but renewable automatically unless terminated by either party with a three-month prior notice, and it was revised to end on 31 December 2006. In accordance with the agreement signed by the rest entities of the Group, the license fee is to be paid from 1 January 2004 and the agreement is for a term of 3 years up to 31 December 2006 unless terminated by either party with a three-month prior notice, and it was renewed for a term of 3 years up to 31 December 2009.

(vi) Social and ancillary service charges for the provision of staff welfare services are paid / payable to the ultimate holding company on a cost reimbursement basis.

## C. Compensation

In 2006, Caihong Labour Services Company provided certain materials to the Group for trial production on new products. Due to the quality issue of those materials, Caihong Labour Service Company paid compensation of RMB10,007,000 in accordance with related contracts.

# 39. RELATED-PARTY TRANSACTIONS *(continued)*

## D. Balance with ultimate holding company

### (i) Loans from the ultimate holding company - Group

| | **2007** | 2006 |
|---|---|---|
| | ***RMB'000*** | *RMB'000* |
| Opening carrying amount | **29,000** | 30,048 |
| Loans borrowed | **—** | 29,000 |
| Repayment | **(30,755)** | (31,696) |
| Interest expense *(note 11)* | **1,755** | 1,648 |
| Closing carrying amount | **—** | 29,000 |

Pursuant to an agreement entered into on 16 December 2004, the Company transferred its titles of certain loans to subsidiaries to the ultimate holding company on 19 December 2004 and offset its amount due to the ultimate holding company. This balance is recorded in the non-trade payables due to the ultimate holding company.

Loans from the ultimate holding company are unsecured, due within one year and with interest rate 6.12% (2006: 6.12%) per annum.

### (ii) Amount due to the ultimate holding company

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Other payables and accruals<br>The ultimate holding company | **35,371** | 340,095 | **33,648** | 310,659 |

As at 31 December 2006, except for amount of RMB29,000,000 of the Group due to the ultimate holding company which carried interest at 6.12% per annum and fully repaid on 12 December 2007, the remaining non-trade balances as at 31 December 2006 and 2007 are unsecured, interest-free and have no fixed repayment terms.

Case 3:07-cv-05944-JST Document 5410-5 Filed 04/15/19 Page 159 of 183

## 39. RELATED-PARTY TRANSACTIONS *(continued)*

### D. Balance with ultimate holding company *(continued)*

**(iii) Director's emolument afforded by the ultimate holding company**

An executive director of the Company, Mr. Zhang Xing Xi and Mr. Niu Xinan's emoluments are afforded by the Group's ultimate holding company, IRICO Group Corporation (note 10).

**(iv) Guarantees granted or assets pledged by the ultimate holding company**

As at 31 December 2007, the ultimate holding company granted a guarantee and pledged certain of its land and buildings to the Company and the Group for certain bank borrowings (note 30).

### E. Key management compensation

| | 2007 *RMB'000* | 2006 *RMB'000* |
|---|---|---|
| Salaries and other short-term employee benefits | **3,810** | 3,091 |
| Fees | **500** | 500 |
| Retirement benefits contributions | **101** | 84 |
| | **4,411** | 3,675 |

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 39. RELATED-PARTY TRANSACTIONS *(continued)*

### F. Year-end balances arising from sales / purchases of goods / provision of services

| | The Group | | The Company | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Trade receivables from related parties *(note)* | | | | |
| The IRICO Group | | | | |
| — Xianyang IRICO Digital Display Co., Limited | 2,719 | — | 2,719 | — |
| — Shenzhen Hongyang Industry & Trade Company | 2,670 | 2,984 | 2,670 | — |
| — Shaanxi IRICO Electronics Glass Company Limited | 1,371 | — | 1,371 | — |
| — Shaanxi IRICO General Service Corporation | 3 | — | 3 | — |
| — Caihong Labour Service Company | — | 5,332 | — | — |
| | 6,763 | 8,316 | 6,763 | — |
| Other state controlled enterprises | 549,150 | 950,397 | 265,293 | 224,607 |
| | 555,913 | 958,713 | 272,056 | 224,607 |
| Representing: | | | | |
| Trade receivables *(note 25)* | 239,545 | 335,923 | 52,096 | 88,470 |
| Trade bills receivables *(note 25)* | 316,368 | 622,790 | 219,960 | 136,137 |
| | 555,913 | 958,713 | 272,056 | 224,607 |

Case 4:07-cv-05944-JST Document 6401-1 Filed 07/10/24 Page 623 of 1004

## 39. RELATED-PARTY TRANSACTIONS *(continued)*

### F. Year-end balances arising from sales / purchases of goods / provision of services *(continued)*

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Trade payables from related parties (note) | | | | |
| The IRICO Group | | | | |
| — The utilities plant of the ultimate holding company | **16,200** | 104,965 | **—** | 75,864 |
| — Caihong Labour Service Company | **11,021** | 3,702 | **421** | 2,574 |
| — Shaanxi IRICO General Service Corporation Co., Ltd. | **9,814** | 5,079 | **279** | 870 |
| — The utilities holding company | **8,652** | 8,387 | **8,652** | 8,215 |
| — Xianyang Caihong Package Material Company | **6,825** | 3,581 | **3,618** | 1,664 |
| — Shenzhen Hongyang Industry & Trade Co., Ltd. | **2,979** | 744 | **2,960** | 291 |
| — Xianyang Caihong Adhesive Belt Co., Ltd | **1,349** | 724 | **—** | 392 |
| — Xianyang Caihong Plastic Co., Ltd. | **—** | 2,100 | **—** | — |
| — Xianyang Caihong Electronic Materials Co | **—** | 147 | **—** | — |
| | **56,840** | 129,429 | **15,930** | 89,810 |
| Other state controlled enterprises | **82,716** | 108,449 | **61,580** | 74,513 |
| | **139,556** | 237,878 | **77,510** | 164,322 |
| Representing | | | | |
| Trade payables (note 28) | **103,024** | 212,241 | **40,978** | 138,685 |
| Trade bills payables (note 28) | **36,532** | 25,637 | **36,532** | 25,637 |
| | **139,556** | 237,878 | **77,510** | 164,322 |

Note:

The trade balances in respect of sales and purchases are under the Group's normal trading terms.

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 39. RELATED-PARTY TRANSACTIONS *(continued)*

### G. Bank balances in and loans from state controlled banks

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Bank balances in state controlled banks | **317,438** | 478,480 | **159,870** | 221,578 |
| Short-term borrowings from state controlled banks | **792,684** | 932,676 | **528,684** | 563,704 |

| | 2007 | 2006 |
|---|---|---|
| | ***RMB'000*** | *RMB'000* |
| Interest income from state controlled banks | **5,371** | 6,521 |
| Interest and finance costs to state controlled banks | **44,075** | 56,513 |

Case 3:07-cv-05944-JST Document 5440-5 Filed 04/15/19 Page 162 of 186

# NOTES TO THE FINANCIAL STATEMENTS

YEAR ENDED 31 DECEMBER 2007

## 40. MAJOR NON-CASH TRANSACTIONS

During the year ended 31 December 2007, the Group disposed of its 72.02% equity interest in Xianyang IRICO Digital Display Co., Ltd. to IRICO Group at a consideration of approximately RMB182,527,000 of which RMB35,346,000 was unsettled and included in other receivables as at 31 December 2007.

On 29 July 2007, the Company entered into an exchange agreement with IRICO Display, whereby the Company has agreed to transfer certain of its property, plant and equipment with carrying values of approximately RMB348,246,000 to IRICO Display. Pursuant to the agreement, IRICO Display has agreed to transfer property, plant and equipment of approximately RMB66,601,000 and paid a total cash consideration of approximately RMB221,207,000 to the Company.

## 41. EVENTS AFTER THE BALANCE SHEET DATE

As mentioned in the announcement of the Company dated 17 August 2007, the Company and IRICO Group entered into an acquisition agreement, pursuant to which IRICO Group agreed to sell and the Company agreed to purchase the 69.5308% equity interests held by IRICO Group in Shaanxi IRICO Electronics Glass Company Limited for a total consideration of approximately RMB279.58 million, of which will be settled by the issue of no more than 386,000,000 new H shares of the Company. The transaction has not been completed at the date of this report and is subject to the approval by the State-Owned Assets Supervisor and Administration Commission.

# FIVE YEAR FINANCIAL SUMMARY

| | For the year ended 31 December | | | | |
|---|---|---|---|---|---|
| | **2007** | 2006 | 2005 | 2004 | 2003 |
| | ***RMB'000*** | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* |
| Results | | | | | |
| Turnover | **3,358,990** | 3,861,710 | 3,927,500 | 4,949,663 | 4,269,781 |
| Profit / (loss) before taxation | **80,577** | 187,543 | (911,956) | 650,250 | 623,116 |
| Taxation | **(8,420)** | (19,828) | (48,377) | (134,468) | (173,936) |
| Profit before minority interests | **72,157** | 167,715 | (960,333) | 515,782 | 449,180 |
| Minority interests | **5,646** | 38,203 | (205,786) | 130,455 | (133,355) |
| Net profit / (loss) attributable to equity holders of the year | **66,511** | 129,512 | (754,547) | 385,327 | 315,825 |
| Assets, liabilities and minority interests | **7,920,331** | 8,801,216 | 9,361,210 | 11,200,106 | 8,771,594 |
| Total assets | **5,083,870** | 5,491,057 | 5,795,426 | 7,121,278 | 5,475,676 |
| Total liabilities | **1,783,723** | 2,274,446 | 2,734,800 | 2,949,962 | 2,288,758 |
| Minority interests | **1,052,738** | 1,035,713 | 830,984 | 1,128,866 | 1,007,160 |

# Corporate Information

## Introduction

### Executive Directors

Xing Daoqin — *Chairman*
Tao Kui — *Vice Chairman*
Guo Mengquan
Zhang Shaowen
Niu Xinan
Li Shikun — *Chief Financial Controller*

### Non-executive Director

Zhang Xingxi

### Independent Non-executive Directors

Xu Xinzhong
Feng Bing
Wang Jialu
Zhong Pengrong
Lv Hua

### Audit Committee

Lv Hua
Feng Bing
Zhong Pengrong
Xu Xinzhong
Zhang Xingxi

### Joint Company Secretaries

Liu Xiaodong
Lam Chun Lung

# Corporate Information (Continued)

## Introduction *(continued)*

### Qualified accountant
Lam Chun Lung

### Authorised representative
Niu Xinan
Liu Xiaodong

### Legal address in the PRC
No. 1 Caihong Road
Xianyang, Shaanxi Province
The People's Republic of China
Postal code 712021

### Place of business in Hong Kong
Room 3103, 31st Floor
Convention Tower, 1 Wanchai Road
Hong Kong

### Company website
www.irico.com.cn

### Legal adviser
Baker & McKenzie
14th Floor, Hutchison House
10 Harcourt Road
Hong Kong

### Auditors
Shine Wing (HK) CPA Limited
16/F, United Centre, 95 Queensway,
Hong Kong

# Corporate Information (Continued)

## Introduction *(continued)*

### Principal bankers

Industrial and Commercial Bank of China (Xianyang Branch)
Construction Bank of China (Xianyang Branch)
Industrial and Commercial Bank of China (Xian Advanced Technology Development Zone Branch)
Industrial and Commercial Bank of China (Xian Branch)

### Registrar of H Shares

Computershare Hong Kong Investor Services Limited
Room 1712 – 1716, 17th Floor, Hopewell Centre
183 Queen's Road East
Hong Kong

### Investor and media relations

Wonderful Sky Financial Group
Unit 3103, 31st Floor, Office Tower
Convention Plaza, 1 Harbour Road
Hong Kong

# EXHIBIT W

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
evan.werbel@bakerbotts.com
tom.carter@bakerbotts.com
drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION

This Document Relates to:

ALL DIRECT PURCHASER ACTIONS

Master File No. 4:07-cv-05944-JST (N.D. Cal.)

MDL No. 1917

**IRICO DEFENDANTS' FIFTH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DIRECT PURCHASER PLAINTIFFS' FIRST SET OF INTERROGATORIES**

PROPOUNDING PARTY: Direct Purchaser Plaintiffs

RESPONDING PARTIES: Irico Group Corporation
Irico Display Devices Co., Ltd.

SET NUMBER: One

IRICO'S FOURTH SUPP. OBJECTIONS AND RESPONSES TO DPP'S FIRST SET INTERROGATORIES

Master File No. 4:07-cv-05944-JST
MDL No. 1917

Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby provides this supplemental response to the Direct Purchaser Plaintiffs' ("Plaintiff") First Set of Interrogatories, dated March 12, 2010 ("Interrogatories"). Irico reserves the right to amend or supplement these Objections and Responses (the "Responses") to the extent allowed by the Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California ("Local Rules"). Subject to and without waiving any of Irico's General and Specific Objections as set forth below, Irico is willing to meet and confer with Plaintiff regarding such General and Specific Objections.

The following Responses are made only for purposes of this case. The Responses are subject to all objections as to relevance, materiality and admissibility, and to any and all objections on any ground that would require exclusion of any response if it were introduced in court. All evidentiary objections and grounds are expressly reserved.

These Responses are subject to the provisions of the Stipulated Protective Order issued by the Court on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated "Confidential" in accordance with the provisions of the Protective Order.

## GENERAL OBJECTIONS

Irico makes the following General Objections to Plaintiff's Interrogatories:

1. Irico's Responses are based upon information available to and located by Irico as of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states that it has conducted, or will conduct, a diligent search, reasonable in scope, of those files and records in its possession, custody, or control believed to likely contain information responsive to Plaintiff's Interrogatories.

2. No express, incidental, or implied admissions are intended by these Responses and should not be read or construed as such.

3. Irico does not intend, and its Responses should not be construed as, an agreement or acquiescence with any characterization of fact, assumption, or conclusion of law contained in or implied by the Interrogatories.

IRICO'S FOURTH SUPP. OBJECTIONS AND RESPONSES TO DPP'S FIRST SET INTERROGATORIES 1 Master File No. 4:07-cv-05944-JST MDL No. 1917

4.      To the extent that Irico responds to Plaintiff's Interrogatories by stating that Irico will produce or make available for examination responsive information or documents, Irico does not represent that any such information or documents exist. Irico will make a good faith and reasonable attempt to ascertain whether information responsive to Plaintiff's Interrogatories exists and is properly producible, and will produce or make available for examination non-privileged responsive materials to the extent any are located during the course of a reasonable search.

5.      Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiff.

6.      Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

7.      Irico objects to Plaintiff's Interrogatories to the extent they seek information that is not relevant or disproportionate to the needs of the case.

8.      Irico objects to Plaintiff's Interrogatories to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or amend its Responses.

9.      Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case.

10.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico will provide only information that it believes to be non-privileged and

otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any information or responsive documents subject to any such doctrine, privilege, protection or immunity from production shall not constitute a general, inadvertent, implicit, subject-matter, separate, independent or other waiver of such doctrine, privilege, protection or immunity from production.

11. Irico objects to Plaintiff's Interrogatories to the extent that they call for information that is not in the possession, custody, or control of Irico. Irico also objects to the extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties, including but not limited to any of Irico's subsidiary or affiliated companies.

12. Irico objects to Plaintiff's Interrogatories to the extent that responding would require Irico to violate the privacy and/or confidentiality of a third party or confidentiality agreement with a third party.

13. Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily available from other sources.

14. Irico objects to Plaintiff's Interrogatories to the extent that they seek information or documents concerning transactions outside the United States. Such Interrogatories are unduly burdensome and irrelevant to this pending action as Plaintiffs' purported class definition is confined to "all persons . . . who directly purchased a Cathode Ray Tube Product . . . in the United States" (see Direct Purchaser Plaintiffs' Consolidated Amended Complaint dated March 16, 2009).

15. Irico objects to Plaintiff's Interrogatories to the extent that compliance would require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body of foreign jurisdictions.

16. Irico's responses, whether now or in the future, pursuant to Plaintiff's Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific

objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

17.     Irico objects to Plaintiff's Interrogatories to the extent that they are compound and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

18.     Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for legal conclusions.

19.     Irico objects to the Interrogatories to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

20.     Irico objects to the Interrogatories to the extent they seek information or documents that cannot be removed or transmitted outside China without violating the laws and regulations of that country, including but not limited to restrictions on the transmission of state secrets or trade secrets as those terms are defined under Chinese law.

21.     Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

## GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Irico objects to the definitions of "Defendant," "You," "Your," and "Yourself" (Definition Nos. 1 and 3) to the extent that Plaintiff defines those terms to include the Irico's "present or former employees, officers, directors, agents, predecessors, successors, parents, subsidiaries, affiliates, joint ventures or any other person acting on their behalf." This definition is overbroad, unduly burdensome, vague, and ambiguous. Irico also objects to the inclusion of all "present or former employees, officers, directors, agents . . . or any other person acting on [the] behalf [of]" Irico within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

2.     Irico objects to the definition of "Document" (Definition No. 4) to the extent it

seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, or any other applicable laws.

3. Irico objects to the definition of "Employee" (Definition No. 5) on the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to the extent that it seeks information protected by the attorney client or other applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or foreign law.

4. Irico objects to the definitions of "CRT" and "CRT Product" (Definition No. 6) on the grounds that they are vague, ambiguous and overly broad. Irico further objects to the use of the term "CRT Products" to the extent that it is inconsistent with the definition of "CRT Products" as set forth in Plaintiff's pleadings.

5. Irico objects to the definition of the "Relevant Time Period" (Definition No. 7) as overbroad, unduly burdensome, and beyond the applicable statute of limitations.

6. Irico objects to the definition of "Communication" (Definition No. 8) on the grounds that it is vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure.

7. Irico objects to the definition of "Meeting" (Definition No. 10) on the grounds that the definition is overly broad, unduly burdensome, and seeks information that is neither relevant nor proportionate to the needs of the case.

8. Irico objects to Instruction No. 1 (related to identification of persons) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any orders of the Court, and on the grounds that it is vague,

ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the extent it seeks information that would disclose personal confidential information and/or violate any and all rights of privacy under the United States Constitution or Article I of the Constitution of the State of California, or any other applicable law or state constitution, or that is otherwise prohibited from disclosure because to do so would cause Irico to violate legal and/or contractual obligations to any other persons or entities.

9. Irico objects to Instruction No. 2 (related to identification of an entity other than a natural person) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

10. Irico objects to Instruction No. 3 (related to the production of business records in response to an interrogatory pursuant to Federal Rule of Civil Procedure 33(d)) on the grounds that it is unduly burdensome and purports to impose burdens and obligations upon Irico beyond those required by the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

## SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

### INTERROGATORY NO. 16

State whether any documents or information responsive to this set of interrogatories were destroyed, discarded, erased, deleted, purged, or otherwise lost. If Your answer is in any way in the affirmative:

(a) describe in detail the contents of each such document or information and the date it was destroyed, discarded, erased, deleted, purged or lost;

(b) identify each person who had any role or responsibility in destroying, discarding, erasing, purging, deleting or losing of each such document or information; and

(c) describe in detail the circumstances under which each such document or information was destroyed, discarded, erased, deleted, purged, or lost.

### RESPONSE TO INTERROGATORY NO. 16

Irico reasserts and incorporates each of the General Objections and Objections to the

Definitions and Instructions set forth above.

Subject to and without waiving the objections stated above, Irico responds that it will conduct a reasonable search for information responsive to this Interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 16 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows:

**Hard-Copy Documents**

Pursuant to Chinese law, the Ministry of Finance and State Archives Administration requires companies like Irico to maintain and preserve certain accounting archives, including but not limited to original invoices for sales, accounting books, general ledgers, financial accounting reports, and bank statements. *See* IRI-CRT-00000900. Irico followed and continues to follow these requirements. In addition, Irico's internal practices included the maintenance of additional archives of material related to operational documents, administrative documents, technical records and communications with agencies of the PRC government and Chinese Communist Party.[1] Irico is not aware of records from the 1995 to 2007 time period that were preserved in the various archives being destroyed. Irico understands that hard copy documents not preserved in the archives were not required to be maintained in the ordinary course of business during the period 1995 to 2007. Irico does not have records regarding the specific hard copy documents that would have existed at the time the complaint was served on Irico and were not preserved in the archives during the time of 1995 to 2007.

In its search for potentially responsive, hard copy files outside of the archives, Irico has learned of a few possible circumstances in which certain Irico hard copy files may have been unintentionally lost or destroyed. Irico is not aware whether any of the documents lost in the events described below were: a) created in the time period 1995 through 2007, or b) relevant or

[1] Additional information regarding the documents maintained in Irico's archives can be found in Irico's December 18, 2020 letter to Plaintiffs regarding discovery issues.

responsive to any of the discovery requests issued to Irico during the course of this litigation. The specific instances at issue include:

- A warehouse fire at the headquarters of Irico Group in 2017, which is believed to have resulted in the loss of some financial documents;
- The 2012 move of the offices of the Irico Sales Company[2] from the Irico CRT Plant No. 1 to other offices at Irico Group's headquarters during which certain hard copy files may not have been transferred; and,
- A subsequent renovation of the offices housing the disbanded Irico Sales Company in 2014 in which historical records may have been lost.

Irico is continuing to review its hard copy files and will update its response to this interrogatory if it identifies additional responsive information.

**Electronic Documents**

Based on its present knowledge, Irico understands that electronic documents were not regularly maintained in an electronic format by the company in the ordinary course of business during the period 1995 to 2007. There was no obligation under Chinese law to preserve electronic documents or data. Because no such obligation existed and Irico had limited electronic storage capacity, any documents required to be maintained under Chinese law, including original invoices for CRT sales, accounting books, general ledgers, financial accounting reports, and bank statements, or in the Corporate Archives of Irico, were printed and transferred to the archives. Irico further understands that it regularly overwrote existing electronic data due to limited storage capacity during that time period. For example, Irico believes that its servers overwrote email data every three to five days on average due to storage limits for the period including and prior to 2007.

Irico has reviewed and produced all responsive data from relevant and available computers from the time period 1995 to 2007. Irico is aware that computers of departed employees and/or older versions of computers were recycled. Irico is not aware of whether any

[2] Although the translated name of this unit is Irico Sales Company, it was not a separately incorporated entity.

of the recycled computers contained: a) any data whatsoever; b) any documents created in the time period 1995 through 2007, or c) any documents relevant or responsive to any of the discovery requests issued to Irico during the course of this litigation.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 16 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows:

Irico is no longer in the CRT business and most employees and management from that line of business have since left the company.  Identifying specific documents that might have existed between 1995 and 2007 is not always possible given the limited knowledge of available resources.  Irico has provided information, and now provides additional information, some of which is beyond the scope of the specific requests in Interrogatory 16 to provide additional context regarding the available responsive information.

**Hard-Copy Documents**

Irico has not identified any specific, responsive hard-copy documents from the 1995 to 2007 period that were lost or destroyed after the complaint was served on Irico.  Based on its further investigation, Irico has determined that the following types of documents may have been created between 1995 to 2007 and not preserved in Irico's archives, but Irico is unable to determine whether any individual documents in these categories may have been responsive, whether or how individual documents were lost or destroyed, or the date of such loss, if it occurred:

- Sales reports containing general CRT market information (*see* Wang Zhaojie Mar. 6, 2019 Dep. Tr. 37:20-38:18);
- CRT sales contracts with customers;
- Correspondence with customers regarding CRT sales; and
- Handwritten working notes taken by individual employees during the course of performing their job functions, including Wang Zhaojie and Wang Ximin.

Since the above categories of documents were not required to be preserved under the

Chinese regulations nor under Irico's own internal practices, Irico does not believe that these records were maintained in any systematic format and employees have confirmed that they regularly discarded these materials.

Based on its further investigation, Irico has also determined the following regarding previously disclosed incidents of unintentional loss of hard copy documents:

- The warehouse fire at Irico headquarters occurred in August 2017 and resulted only in the loss of accounting receipts from transactions occurring between 2016 and 2017; and
- The 2012 office move and subsequent 2014 renovation of the Irico Sales Company offices did not result in the loss of any documents required to be preserved under Chinese law or Irico's internal practices, including any original copies of sales invoices or expense receipts. The Irico Sales Company was closed in 2004. At that time, records required to be preserved under Chinese regulations or Irico's internal practices were stored in the archives, pursuant to previously discussed practices. Records of the Irico Sales Company that were not required to be maintained under Chinese regulations or Irico's internal practices were likely not preserved from the period preceding the closure of the Company in 2004, as Irico began a reduction in sales and administrative staff at that time and transitioned remaining staff to selling on behalf of Irico Electronics and Display. If such records existed and were not destroyed in or soon after 2004, they may not have been maintained upon the office move in 2012. At present, Irico has no way of knowing exactly what records, if any, might have remained in the former offices of Irico Sales Company, since several years had passed at the time of the office move since any such records were reviewed or utilized.

Irico is continuing to review its hard copy files and will update its response to this interrogatory if it identifies additional responsive information.

**Email Systems**

Irico began using email in approximately the 2004-2005 time period. At first, Irico issued

email addresses only at the departmental level rather than to individual employees. Thus, for example, the Sales Department personnel would share a single email address issued to that department. Over time, Irico expanded the issuance of individual emails according to business need and consistent with the available email storage capacity at that time.

At the time that Irico first introduced email through at least the end of 2007, electronic documents generally, and email specifically, were not widely used. At that time, the company had limited storage available to an individual user, whose accounts typically allowed for storage of only 1-2 MB of email. As a result of this limited storage, email users, depending on the volume of email received, would need to delete emails frequently in order to allow for the delivery of additional email.

In addition to limited individual account capacity, Irico's email server likewise had limited storage capacity. Due to this limited capacity, the server itself would need to overwrite the oldest emails in order to keep the server from reaching its storage capacity. The frequency of this process varied depending on the volume of email that the company received. During periods of higher email activity, email would be overwritten every 3-5 days on average. During periods of lower activity, such as during the Chinese New Year holiday, emails over a longer period may be stored, for example closer to 14 days. In any event, Irico had a back-end server policy to delete all emails older than 20 days from the time that Irico started using email through at least the end of 2007.

**Other Electronic Systems**

Irico did not use a networked computer system during the period 1995 – 2007. Likewise, Irico did not have any centralized storage systems for electronic documents.

**Handheld Devices**

Irico did not issue electronic handheld devices to its employees, nor did Irico reimburse employees for a personal cell phone or expenses related to it. If an employee chose to use a personal cell phone for business, Irico had no control or oversight regarding that device, and Irico did not deploy any enterprise software related to handheld devices. Irico has asked remaining current employees who may be relevant to the issues raised by DPPs whether they have any cell

phone invoices from the 1995 to 2007 timeframe, but no such documents have been located.

Dated: July 7, 2021

BAKER BOTTS L.L.P.

*/s/ John M. Taladay*

John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
evan.werbel@bakerbotts.com
tom.carter@bakerbotts.com
drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

**CERTIFICATE OF SERVICE**

**In re: Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917**

I declare that I am employed in Washington, District of Columbia. I am over the age of eighteen years and not a party to the within case; my business address is: Baker Botts L.L.P., 700 K Street, N.W., Washington, D.C. 20001.

On July 7, 2021, I served the following document(s) described as:

**IRICO DEFENDANTS' FIFTH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DIRECT PURCHASER PLAINTIFFS' FIRST SET OF INTERROGATORIES**

on the following interested parties in this action:

Guido Saveri (guido@saveri.com)
R. Alexander Saveri (rick@saveri.com)
Geoffrey C. Rushing (grushing@saveri.com)
Matthew D. Heaphy (mheaphy@saveri.com)
SAVERI & SAVERI, INC.
706 Sansome St # 200
San Francisco, CA 94111

*Lead Counsel for the Direct Purchaser Plaintiffs*

Mario N. Alioto (malioto@tatp.com)
Lauren C. Capurro (laurenrussell@tatp.com)
TRUMP ALIOTO TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123

*Lead Counsel for the Indirect Purchaser Plaintiffs*

Joseph Goldberg (jg@fbdlaw.com)
FREEDMAN BOYD HOLLANDER GOLDBERG URIAS & WARD P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
D (505) 305-1263

*Counsel for the Indirect Purchaser Plaintiffs*

Dan Birkhaeuser
(dbirkhaeuser@bramsonplutzik.com)
BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
2125 Oak Grove Rd, Suite 125
Walnut Creek, CA 94598

*Counsel for the Indirect Purchaser Plaintiffs*

[X] (BY ELECTRONIC MAIL) I caused such documents to be sent to the persons at the email addressed listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is true and correct. Executed on July 7, 2021, in Washington, D.C.

*/s/ Thomas E. Carter*
Thomas E. Carter

# EXHIBIT X

John Taladay (*pro hac vice*)
john.taladay@bakerbotts.com
Erik Koons (*pro hac vice*)
erik.koons@bakerbotts.com
BAKER BOTTS LLP
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone: (202)-639-7700
Facsimile: (202)-639-7890

Stuart C. Plunkett (State Bar No. 187971)
stuart.plunkett@bakerbotts.com
BAKER BOTTS LLP
101 California Street, Suite 3600
San Francisco, California 94111
Telephone: (415) 291-6200
Facsimile: (415) 291-6300

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>ALL DIRECT PURCHASER ACTIONS | Master File No. 3:07-cv-05944-SC (N.D. Cal.)<br><br>MDL No. 1917<br><br>**IRICO DEFENDANTS' FOURTH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DIRECT PURCHASER PLAINTIFF STUDIO SPECTRUM, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS** |

PROPOUNDING PARTY: Direct Purchaser Plaintiff Studio Spectrum, Inc.

RESPONDING PARTIES: Irico Group Corporation
Irico Display Devices Co., Ltd.

SET NO.: One

Pursuant to Federal Rules of Civil Procedure 26 and 34, Irico Group Corporation and Irico Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby responds to the Direct Purchaser Plaintiff Studio Spectrum, Inc.'s ("Plaintiff") First Set of Requests for Production of Documents ("Requests"). Irico reserves the right to amend or supplement these Objections and Responses (the "Responses") to the extent allowed by the Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California ("Local Rules"). Subject to and without waiving any of Irico's General and Specific Objections as set forth below, Irico is willing to meet and confer with Plaintiff regarding such General and Specific Objections.

The following Responses are made only for purposes of this case. The Responses are subject to all objections as to relevance, materiality and admissibility, and to any and all objections on any ground that would require exclusion of any response if it were introduced in court. All evidentiary objections and grounds are expressly reserved.

These Responses are subject to the provisions of the Stipulated Protective Order that the Court issued on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated "Confidential" in accordance with the provisions of the Protective Order.

**GENERAL OBJECTIONS**

Irico makes the following General Objections to Plaintiff's Requests:

1. Irico's Responses are based upon information available to and located by Irico as of the date of service of these Responses. In responding to Plaintiff's Requests, Irico states that it has conducted, or will conduct, a diligent search, reasonable in scope, of those files and records in its possession, custody, or control believed to likely contain information responsive to Plaintiff's Requests.

2. No express, incidental, or implied admissions are intended by these Responses and should not be read or construed as such.

3. Irico does not intend, and its Responses should not be construed as, an agreement or acquiescence with any characterization of fact, assumption, or conclusion of law contained in or implied by the Requests.

4.     To the extent that Irico responds to Plaintiff's Requests by stating that Irico will produce or make available for examination responsive information or documents, Irico does not represent that any such information or documents exist. Irico will make a good faith and reasonable attempt to ascertain whether information responsive to Plaintiff's Requests exists and is properly producible, and will produce or make available for examination non-privileged responsive materials to the extent any are located during the course of a reasonable search.

5.     Irico objects to Plaintiff's Requests to the extent that they are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiff.

6.     Irico objects to Plaintiff's Requests to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

7.     Irico objects to Plaintiff's Requests to the extent they seek information or documents that are not relevant to jurisdictional issues or disproportionate to the needs of the case in resolving such jurisdictional issues.

8.     Irico objects to Plaintiff's Requests to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such vague or ambiguous Requests so as to provide for the production of responsive information or documents that are proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of any Request that differs from Irico's understanding, Irico reserves the right to supplement or amend its Responses.

9.     Irico objects to Plaintiff's Requests to the extent that they contain terms that are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous Requests so as to provide for the production of responsive information or documents that are proportionate to the needs of the case.

10.    Irico objects to Plaintiff's Requests to the extent that they seek information or documents that are protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other

applicable privilege or immunity. Irico will provide only information that it believes to be non-privileged and otherwise properly discoverable. None of Irico's responses is intended nor should be construed as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any information or responsive documents subject to any such doctrine, privilege, protection or immunity from production shall not constitute a general, inadvertent, implicit, subject-matter, separate, independent or other waiver of such doctrine, privilege, protection or immunity from production.

11.     Irico objects to Plaintiff's Requests to the extent that they call for information or documents that are not in the possession, custody, or control of Irico. Irico also objects to the extent that any of Plaintiff's Requests seek information from non-parties or third parties, including but not limited to any of Irico's subsidiary or affiliated companies.

12.     Irico objects to Plaintiff's Requests to the extent that responding would require Irico to violate the privacy and/or confidentiality of a third party or confidentiality agreement with a third party.

13.     Irico objects to Plaintiff's Requests to the extent that they seek information or documents that are publicly available, already in Plaintiffs' possession, custody, or control, or more readily available from other sources.

14.     Irico objects to Plaintiff's Requests to the extent that they seek information or documents concerning transactions outside the United States. Such Requests are unduly burdensome and irrelevant because they do not relate to actions by Irico in or causing a direct effect in the United States.  Such Requests are also unduly burdensome and irrelevant to this pending action as Plaintiffs' class definition is confined to "all persons . . . who directly purchased a Cathode Ray Tube Product . . . in the United States" (see Direct Purchaser Plaintiffs' Consolidated Amended Complaint).

15.     Irico objects to Plaintiff's Requests to the extent that compliance would require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body of foreign jurisdictions.

16. Irico's responses, whether now or in the future, pursuant to Plaintiff's Requests should not be construed as either (i) a waiver of any of Irico's general or specific objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

17. Irico objects to Plaintiff's Requests to the extent that compliance would require Irico to seek information or documents stored on backup or archived databases or other systems that are not readily accessible or otherwise no longer active.

18. Irico objects to Plaintiff's Requests to the extent that they state and/or call for legal conclusions.

19. Irico objects to the Requests to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

20. Irico objects to the Requests to the extent they seek documents that cannot be removed or transmitted outside China without violating the laws and regulations of that country, including but not limited to restrictions on the transmission of state secrets or trade secrets as those terms are defined under Chinese law.

21. Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

**GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1. Irico objects to the definition of "Communication" (Definition No. 3) on the grounds that it is vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure.

2. Irico objects to the definitions of "Document" (Definition No. 8) and "Electronically stored information" (Definition No. 9) to the extent they seek to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, or any other applicable laws.

3. Irico objects to the definition of “Employee” (Definition No. 10) on the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to the extent that it seeks information protected by the attorney client or other applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or foreign law.

4. Irico objects to the definition of “Meeting” (Definition No. 12) on the grounds that the definition is overly broad, unduly burdensome, and seeks information or documents that are neither relevant nor proportionate to the needs of the case.

5. Irico objects to the definition of “relating to,” “regarding,” and “with respect to” (Definition No. 15) to the extent that such terms seek the discovery of information or documents that are disproportionate to the needs of the case in determining jurisdictional issues. Irico further objects to these terms to the extent that they seek to improperly expand the scope of information or documents relevant to the issues set forth in Plaintiff’s pleadings. Irico also objects to these definitions because responding to such vague, overly broad, and ambiguous Requests would be unduly burdensome.

6. Irico objects to the definitions of “You” and “Your” (Definition No. 16) to the extent that Plaintiff defines those terms to include the Irico’s “predecessors, successors, subsidiaries, departments, divisions, and/or affiliates.” This definition is legally incorrect, overbroad, unduly burdensome, vague, and ambiguous. Irico also objects to the inclusion of “all present and former directors, officers, Employees, agents, representatives or any Persons acting or purporting to act on behalf of” Irico within this definition to the extent it purports to encompass information or documents that are protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

7. Irico objects to the definition of the “Relevant Time Period” (Definition No. 17) as overbroad, unduly burdensome, beyond the applicable statute of limitations, and beyond the

relevant time period for determining jurisdictional issues.

8. Irico objects to the definition of "CRT" (Definition No. 19) on the grounds that it is vague, ambiguous and overly broad.

9. Irico objects to Instruction No. 1 as overly broad and unduly burdensome on the grounds that it encompasses time periods outside of those relevant for resolving jurisdictional issues.

10. Irico objects to each and every Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

**SPECIFIC RESPONSES TO REQUESTS FOR PRODUCTION**

**REQUEST NO. 9**

All documents related to the sale or pricing of CRTs in the United States (including but not limited to any actual, planned, or contemplated sales of CRTs in the United States by Group, Display, or any affiliate of Group or Display, either directly or indirectly) during the Class Period.

**RESPONSE TO REQUEST NO. 9**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this request seeks information and documents beyond the scope of what is relevant to resolving jurisdictional issues and beyond that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel. Irico also objects that this request is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues, including as to the request for "all documents related to . . . ." Irico also objects that this request calls for information and documents that are privileged under the attorney-client privilege and work product doctrine. Irico also objects to this request as overbroad as to the time period called for; the only relevant inquiry is Irico's status as of November 26, 2007.

Subject to and without waiving the objections stated above, Irico will produce responsive, non-privileged documents, if any, sufficient to identify any sales of CRTs in the United States by Group or Display during the Class Period.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 9**

Pursuant to the Special Master's August 2, 2018 order (Dkt. No. 5320), but without waiving the objections stated above, Irico will produce or make available for inspection non-privileged documents, if any, related to the sale or pricing of CRTs in the United States during the Class Period by any party whether related or not, including Irico Electronics, Xian Irico Display Technology Co., Ltd and China National Electronics Import & Export Caihong Co., and any other entity that exported Irico's CRT products into the United States. Irico will provide a summary description of any documents it makes available for inspection.

**SECOND SUPPLEMENTAL RESPONSE TO REQUEST NO. 9**

Pursuant to the Special Master's August 2, 2018 order (Dkt. No. 5320), in addition to the foregoing, but without waiving the objections stated above, Irico will produce or make available for inspection non-privileged documents, if any, detailing the legal relationship of Irico and Caihong Co. and any other exporter of Irico's CRT products into the United States throughout the class period.

**THIRD SUPPLEMENTAL RESPONSE TO REQUEST NO. 9**

Subject to and without waiving the objections stated above and pursuant to the Special Master's September 26, 2018 order (Dkt. No. 5331), Irico provides the following description of its search methodology and investigation. Irico conducted a search for information and documents responsive to DPPs' discovery requests, including this request for documents related to the sale or pricing of CRTs in the United States (including but not limited to any actual, planned, or contemplated sales of CRTs in the United States by Group, Display, or any affiliate of Group or Display, either directly or indirectly) during the Class Period.

Irico searched its corporate archives located on the first and third floors of Building 102 of Irico Group Headquarters, 1 Caihong Road, Qindu District, Xianyang, Shaanxi Province, People's Republic of China. These archives contain a total of over 150 file cabinets and over 5,500 file boxes Approximately 700 bound volumes of financial records for Irico Group, dated from 1995 to 2007 and organized chronologically. These financial records include contracts, receipts, invoices, approvals from the government, and approvals issued by Irico Group relating

to operations, suppliers, investment, and financing. Each volume ranges from approximately 100 to 300 pages depending on the volume of transactions in each period. Approximately 150 bound account books for Irico Group, dated from 1995 to 2007and organized chronologically. These account books contain information on Irico Group's sales, assets, operations, and cash flow based on the financial documents described above. Each account book contains approximately 200 to 500 pages.  Irico assigned a team of employees and two Irico accountants to determine the specific contents of the archives and to verify whether they contained information regarding sales into the United States.

Irico searched the financial archive files of Irico Group, which are located at the Caihong Building at 11 Shangdi Xinxi Road, Haidian District, Beijing, People's Republic of China. Irico determined that these archives contain approximately 730 bound volumes of financial records and over 70 account books dated between 1995 and 2007. These documents are organized chronologically and similar in content and size to the financial documents and account books described above at the Irico Group Headquarters location.

Irico searched within Irico Display's corporate archives, stored within the archives of Shaanxi Irico Electronic Glass Co., a subsidiary of Irico Display. Irico determined that the archives included approximately 1,500 bound account books for Irico Display, dated from 1995 to 2007 and organized chronologically. These account books contain information on Irico Display's sales, assets, operations, and cash flow. Each account book contains approximately 200 to 500 pages.

Irico searched for and located other sources of hardcopy documents within its offices. Irico located and searched a store of its historical accounting records kept in paper form in its Beijing office.  Irico also searched accounting records that were stored in Irico Display's office and its warehouse in Xianyang City.

Irico searched for any database containing sales or accounting records. Irico located and searched a database of electronically stored archival accounting data, which included some data from 2004-2007. To do this, Irico logged into a server located at its corporate headquarters and searched for all accounting data concerning Irico Group, Irico Display and Irico Electronics.

Irico searched for any other sources of electronic documents.  Irico located two computer hard drives with files from the relevant period. One hard drive belonged to Mr. Yan, the General Counsel of Irico Group. Although Mr. Yan had discarded his old computer in 2012, he retained its hard drive. Irico hired a technical service to recover as many documents as possible from this old and damaged hard drive. All of the documents eventually recovered from Mr. Yan's hard drive were searched to determine responsiveness. The other hard drive came from the computer of Mr. Wenyang Zhang, the Manager of the Operating Department of Irico Group. Irico searched all files within this hard drive for responsive information.

Irico also interviewed and requested documents from its current and former employees, including:

- Hua Yang, Director of Finance Department, Irico Group

- Mei Li, Director of Archive Management, Irico Group

- Tao Long, Secretary of the Board of Directors, Irico Display

- Mr. Mengquan Guo, Deputy Chairman of the Board, Irico Group

- Mr. Zhaojie Wang, General Manager, Irico Smart Lighting Company

- Yuan Liang, *former* Deputy General Manager of Sales Department, Irico Display

- Xiaolin Shen, *former* Deputy General Manager and General Manager of Sales Department, Irico Display

- Jian-she Wei, *former* General Manager of Sales, Irico Group

None of these former employees separately retained any additional electronic or paper documents from the relevant period.

Irico continues to evaluate the responsiveness of electronic data, as indicated in Irico's Third Supplemental Responses to DPPs' First Set of Interrogatories, and Irico's search of affiliate entities is ongoing.

Dated: October 15, 2018

BAKER BOTTS LLP

*/s/ Stuart C. Plunkett*

Stuart C. Plunkett
Email: stuart.plunkett@bakerbotts.com
BAKER BOTTS L.L.P.
101 California Street, Suite 3600
San Francisco, CA94111
Telephone: (415) 291 6203
Facsimile: (415) 291 6303

John Taladay (*pro hac vice*)
john.taladay@bakerbotts.com
Erik Koons (*pro hac vice*)
erik.koons@bakerbotts.com
BAKER BOTTS LLP
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone: (202)-639-7700
Facsimile: (202)-639-7890

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

IRICO'S FOURTH SUPP. OBJECTIONS AND RESPONSES TO DPP'S FIRST SET OF RFPS

10

Master File No. 3:07-cv-05944-JT
MDL No. 1917

**CERTIFICATE OF SERVICE**

**In re: Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917**

I declare that I am employed in the County of San Francisco, California. I am over the age of eighteen years and not a party to the within case; my business address is: Baker Botts LLP, 101 California Street, Suite 3600, San Francisco, CA 94111.

On October 15, 2018, I served the following document(s) described as:

**IRICO DEFENDANTS' FOURTH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DIRECT PURCHASER PLAINTIFF STUDIO SPECTRUM, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

on the following interested parties in this action:

Guido Saveri (guido@saveri.com)
R. Alexander Saveri (rick@saveri.com)
Geoffrey C. Rushing (grushing@saveri.com)
Cadio Zirpoli (cadio@saveri.com)
Matthew D. Heaphy (mheaphy@saveri.com)
SAVERI & SAVERI, INC.
706 Sansome St # 200,
San Francisco, CA 94111

*Lead Counsel for the Direct Purchaser Plaintiffs*

Mario N. Alioto (malioto@tatp.com)
Lauren C. Capurro (laurenrussell@tatp.com)
Joseph M. Patane (jpatane@tatp.com)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA 94123

*Lead Counsel for the Indirect Purchaser Plaintiffs*

[ ] (BY OVERNIGHT DELIVERY) I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses listed above. I placed the envelope or package for collection and overnight delivery at an office or regularly utilized drop box of the overnight delivery carrier.

[ ] (BY MAIL) by placing a true copy thereof in a sealed envelope with postage fully prepaid and addressed to the persons at the addresses as shown above. I am readily familiar with the business practice of Baker Botts LLP for collection and processing of correspondence for mailing with the United States Postal Service, and the correspondence would be deposited with United States Postal Service that same day in the ordinary course of business.

[X] (BY ELECTRONIC MAIL) I caused such documents to be sent to the persons at the email addressed listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on October 15, 2018 in San Francisco, California.

*/s/ Reilly Stoler*
Reilly T. Stoler

# EXHIBIT Y

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
evan.werbel@bakerbotts.com
tom.carter@bakerbotts.com
drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION

This Document Relates to:

ALL DIRECT PURCHASER ACTIONS

Master File No. 4:07-cv-05944-JST (N.D. Cal.)

MDL No. 1917

**IRICO DEFENDANTS' SIXTH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DIRECT PURCHASER PLAINTIFFS' FIRST SET OF INTERROGATORIES**

PROPOUNDING PARTY: Direct Purchaser Plaintiffs

RESPONDING PARTIES: Irico Group Corporation
Irico Display Devices Co., Ltd.

SET NUMBER: One

Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby provides its sixth supplemental responses to the Direct Purchaser Plaintiffs' ("Plaintiff") First Set of Interrogatories, dated March 12, 2010 ("Interrogatories"). Irico reserves the right to amend or supplement these Objections and Responses (the "Responses") to the extent allowed by the Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California ("Local Rules"). Subject to and without waiving any of Irico's General and Specific Objections as set forth below, Irico is willing to meet and confer with Plaintiff regarding such General and Specific Objections.

The following Responses are made only for purposes of this case. The Responses are subject to all objections as to relevance, materiality and admissibility, and to any and all objections on any ground that would require exclusion of any response if it were introduced in court. All evidentiary objections and grounds are expressly reserved.

These Responses are subject to the provisions of the Stipulated Protective Order issued by the Court on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated "Confidential" in accordance with the provisions of the Protective Order.

## GENERAL OBJECTIONS

Irico makes the following General Objections to Plaintiff's Interrogatories:

1. Irico's Responses are based upon information available to and located by Irico as of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states that it has conducted, or will conduct, a diligent search, reasonable in scope, of those files and records in its possession, custody, or control believed to likely contain information responsive to Plaintiff's Interrogatories.

2. No express, incidental, or implied admissions are intended by these Responses and should not be read or construed as such.

3. Irico does not intend, and its Responses should not be construed as, an agreement or acquiescence with any characterization of fact, assumption, or conclusion of law contained in or implied by the Interrogatories.

4.      To the extent that Irico responds to Plaintiff's Interrogatories by stating that Irico will produce or make available for examination responsive information or documents, Irico does not represent that any such information or documents exist. Irico will make a good faith and reasonable attempt to ascertain whether information responsive to Plaintiff's Interrogatories exists and is properly producible, and will produce or make available for examination non-privileged responsive materials to the extent any are located during the course of a reasonable search.

5.      Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiff.

6.      Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

7.      Irico objects to Plaintiff's Interrogatories to the extent they seek information that is not relevant or disproportionate to the needs of the case.

8.      Irico objects to Plaintiff's Interrogatories to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or amend its Responses.

9.      Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case.

10.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico will provide only information that it believes to be non-privileged and

otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any information or responsive documents subject to any such doctrine, privilege, protection or immunity from production shall not constitute a general, inadvertent, implicit, subject-matter, separate, independent or other waiver of such doctrine, privilege, protection or immunity from production.

11.   Irico objects to Plaintiff's Interrogatories to the extent that they call for information that is not in the possession, custody, or control of Irico. Irico also objects to the extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties, including but not limited to any of Irico's subsidiary or affiliated companies.

12.   Irico objects to Plaintiff's Interrogatories to the extent that responding would require Irico to violate the privacy and/or confidentiality of a third party or confidentiality agreement with a third party.

13.   Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily available from other sources.

14.   Irico objects to Plaintiff's Interrogatories to the extent that they seek information or documents concerning transactions outside the United States. Such Interrogatories are unduly burdensome and irrelevant to this pending action as Plaintiffs' purported class definition is confined to "all persons . . . who directly purchased a Cathode Ray Tube Product . . . in the United States" (see Direct Purchaser Plaintiffs' Consolidated Amended Complaint dated March 16, 2009).

15.   Irico objects to Plaintiff's Interrogatories to the extent that compliance would require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body of foreign jurisdictions.

16.   Irico's responses, whether now or in the future, pursuant to Plaintiff's Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific

objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

17. Irico objects to Plaintiff's Interrogatories to the extent that they are compound and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

18. Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for legal conclusions.

19. Irico objects to the Interrogatories to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

20. Irico objects to the Interrogatories to the extent they seek information or documents that cannot be removed or transmitted outside China without violating the laws and regulations of that country, including but not limited to restrictions on the transmission of state secrets or trade secrets as those terms are defined under Chinese law.

21. Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

**GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1. Irico objects to the definitions of "Defendant," "You," "Your," and "Yourself" (Definition Nos. 1 and 3) to the extent that Plaintiff defines those terms to include the Irico's "present or former employees, officers, directors, agents, predecessors, successors, parents, subsidiaries, affiliates, joint ventures or any other person acting on their behalf." This definition is overbroad, unduly burdensome, vague, and ambiguous. Irico also objects to the inclusion of all "present or former employees, officers, directors, agents . . . or any other person acting on [the] behalf [of]" Irico within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

2. Irico objects to the definition of "Document" (Definition No. 4) to the extent it

seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, or any other applicable laws.

3. Irico objects to the definition of "Employee" (Definition No. 5) on the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to the extent that it seeks information protected by the attorney client or other applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or foreign law.

4. Irico objects to the definitions of "CRT" and "CRT Product" (Definition No. 6) on the grounds that they are vague, ambiguous and overly broad. Irico further objects to the use of the term "CRT Products" to the extent that it is inconsistent with the definition of "CRT Products" as set forth in Plaintiff's pleadings.

5. Irico objects to the definition of the "Relevant Time Period" (Definition No. 7) as overbroad, unduly burdensome, and beyond the applicable statute of limitations.

6. Irico objects to the definition of "Communication" (Definition No. 8) on the grounds that it is vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure.

7. Irico objects to the definition of "Meeting" (Definition No. 10) on the grounds that the definition is overly broad, unduly burdensome, and seeks information that is neither relevant nor proportionate to the needs of the case.

8. Irico objects to Instruction No. 1 (related to identification of persons) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any orders of the Court, and on the grounds that it is vague,

ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the extent it seeks information that would disclose personal confidential information and/or violate any and all rights of privacy under the United States Constitution or Article I of the Constitution of the State of California, or any other applicable law or state constitution, or that is otherwise prohibited from disclosure because to do so would cause Irico to violate legal and/or contractual obligations to any other persons or entities.

9. Irico objects to Instruction No. 2 (related to identification of an entity other than a natural person) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

10. Irico objects to Instruction No. 3 (related to the production of business records in response to an interrogatory pursuant to Federal Rule of Civil Procedure 33(d)) on the grounds that it is unduly burdensome and purports to impose burdens and obligations upon Irico beyond those required by the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

## SPECIFIC RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1**

State the name, address, and relationship to You of each person who prepared or assisted in the preparation of the responses to these interrogatories. (Do not identify anyone who simply typed or reproduced the responses.)

**RESPONSE TO INTERROGATORY NO. 1**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico also objects to the extent that this request calls for information and documents that are privileged under the attorney-client privilege and work product doctrine.

Subject to and without waiving the objections stated above, Irico responds that the following employees assisted in the preparation of these responses:

- Wenkai Zhang

Irico will supplement its response to this interrogatory with any additional individuals who assist with preparation of supplemental responses.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 1 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico responds that the following additional employees assisted in the preparation of these responses:

- Yan Yunlong

**INTERROGATORY NO. 3**

Identify each employee with pricing authority who attended any trade association during the Relevant Time Period relating to CRT and/or CRT Products and state with respect to each employee:

(a) the trade association attended;

(b) the dates of attendance;

(c) any offices, chairs or committee positions held in each of the trade associations; and

(d) the dates which those offices, chairs or committee positions were held.

**RESPONSE TO INTERROGATORY NO. 3**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.

Subject to and without waiving the objections stated above, Irico responds that it will conduct a reasonable search for information responsive to this Interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 3 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico has been able to confirm the attendance of the specific individuals listed below at trade association

meetings during the Relevant Period.

Wang Zhaojie attended meetings of the China CPT Industry Association on the following dates: November 6, 1998; April 2, 1999; December 9, 1999; April 6, 2000; and September 14, 2000. Mr. Wang recalls attending other meetings of the China CPT Industry Association during the Relevant Period but cannot recall any specific dates. Wang Zhaojie did not hold any offices, chairs or committee positions in the China CPT Industry Association.

Wang Ximin attended meetings of the China CPT Industry Association during the Relevant Period but cannot recall any specific dates. Wang Ximin did not hold any offices, chairs or committee positions in the China CPT Industry Association.

**INTERROGATORY NO. 5**

Identify any meeting or communication between You and other producers of CRT and/or CRT Products during the Relevant Time Period, including the named Defendants in this coordinated proceeding, regarding CRT and/or CRT Product pricing, price increase announcements, terms or conditions of sales, profit margins or market share, production levels, inventory, customers, auctions, reverse auctions, dynamic bidding events, or sales, and for each such meeting or communication:

(a) provide the date and location of the meeting or communication;

(b) identify the person(s) who initiated, called, organized, attended or participated in the meeting or communication;

(c) describe the subject matter discussed and any information you provided or received;

(d) describe every action taken by you as a result of the meeting or communication; and

(e) identify all persons with knowledge relating to the meeting or communication.

**RESPONSE TO INTERROGATORY NO. 5**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico also objects that this interrogatory is duplicative and cumulative of other requests served on Irico, including during jurisdictional

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DPP'S FIRST SET INTERROGATORIES 8 Master File No. 4:07-cv-05944-JST MDL No. 1917

discovery.

Subject to and without waiving the objections stated above, Irico responds that it has already provided information responsive to this interrogatory to Plaintiff in its responses to jurisdictional discovery, including Irico's response to Request No. 10 of Direct Purchaser Plaintiff Studio Spectrum, Inc's First Set of Requests for Production. Irico will conduct a reasonable search for additional information responsive to this interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 5 set forth above. Irico also objects to this interrogatory to the extent it purports to require Irico to respond beyond the scope of the modification to Interrogatory No. 5 removing CRT Products from the scope of this interrogatory, as stated in the February 5, 2021 letter from R. Alexander Saveri to John Taladay.

Subject to and without waiving the foregoing objections, Irico states as follows: Wang Zhaojie identifies the following meetings or communications with other producers of CRTs:

- November 6, 1998 meeting in Xi'an, People's Republic of China to discuss China CDT market information attended by Wang Zhaojie.
- April 2, 1999 meeting in Nanjing, People's Republic of China to discuss China CDT market information attended by Wang Zhaojie.
- April 6, 2000 meeting in Xiamen, People's Republic of China to discuss China CDT market information attended by Wang Zhaojie.
- A meeting taking place on an unknown date at a SEG Hitachi factory in Shenzhen, People's Republic of China, attended by Wang Zhaojie.

Wang Zhaojie believes that he may have attended additional meetings with other producers of CRTs between 1998-2000, but he cannot recall the specifics of those meetings. Such meetings may have occurred in Beijing and Changsha, People's Republic of China. Wang Zhaojie did not attend any meetings outside of China. Wang Zhaojie believes he met with one or more representatives of the following Chinese CRT producers: Shenzhen or Tianjin Samsung

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DPP'S FIRST SET INTERROGATORIES 9 Master File No. 4:07-cv-05944-JST MDL No. 1917

SDI, Shanghai Yongxin, Changsha LG, Fuzhou Chunghwa, Beijing Matsushita, Shenzhen SEG

Hitachi, and/or Dongguan Fudi.  He could not recall the specific entities that participated in each

individual meeting.  Wang Zhaojie could not recall the names of the individual(s) from the

various entities who attended each meeting, but believes the various attendees included Wong

Lian (Changsha LG), Yang Guojun (Shenzhen SEG Hitachi), Li Mingzhi (either Shenzhen or

Tianjin Samsung SDI), and/or J.S. Lu (Fuzhou Chunghwa).  The subject matter of these

communications and meetings involved information on Chinese CRT issues and market

conditions.  Irico believes these meetings were largely connected to the China CPT Industry

Association.

In addition, Su Xiaohua, then the Deputy General Manager for Planning in the Irico Sales

Company, recalls attending an event, with an unknown Irico employee, hosted by Skyworth, a

Chinese television manufacturer and customer of Irico, at which he interacted with other CRT

manufacturers.  This event was organized by Skyworth and involved companies from throughout

Skyworth's supply chain, not just CRT manufacturers.  Irico is not aware of any discussions with

other CRT manufacturers at this meeting regarding pricing, price increase announcements, terms

or conditions of sales, profit margins or market share, production levels, inventory, other

customers, auctions, reverse auctions, dynamic bidding events, or sales.

Irico continues to conduct a reasonable search for information responsive to Interrogatory

No. 5 as reflected in the March 31, 2021 Special Master's Order re DPPs' Motion to Compel

Responses to Interrogatory Nos. 4 & 5, ECF No. 5919. Irico will provide an additional

supplemental response by May 10, 2021.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5**

Irico reasserts and incorporates each of the General Objections, Objections to the

Definitions and Instructions, and specific objections to Interrogatory No. 5 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Wang

Ximin believes that he attended no more than a few meetings with other producers of CRTs

during the relevant period but cannot recall the specifics of those meetings.  Such meetings may

have occurred in Xianyang or Dongguan, People's Republic of China.  Wang Ximin did not

attend any meetings outside of China. Wang Ximin believes he met with one or more representatives of the following Chinese CRT producers during these few meetings but cannot recall specifically: Shenzhen Samsung SDI, Shanghai Yongxin, Changsha LG, Fuzhou Chunghwa, Beijing Matsushita, Shenzhen SEG Hitachi, Nanjing LG Philips and/or Dongguan Fudi. Wang Ximin could not recall the names of the individual(s) from the various entities who attended each meeting or who attended each of the few meetings, but he believes the various attendees would have included Yang Guojun (SEG Hitachi), Zhu Danlin (Shanghai Yongxin), Fang Wenqiang (Beijing Matsushita), Qian Xiaolan (Dongguan Fudi), and/or Yang Xiangjie (Fuzhou Chunghwa). Wang Ximin also believes he may have spoken with some of these representatives of other Chinese CRT producers by phone on a few occasions during the relevant period but cannot recall the specifics of any such phone calls. The subject matter of these communications and meetings involved information on Chinese CRT issues and market conditions. Irico believes these meetings were largely connected to the China CPT Industry Association.

**THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 5 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico identifies the following additional meetings or communications with other producers of CRTs:

- December 9, 1999 meeting in Suzhou, People's Republic of China attended by Wang Zhaojie. Mr. Wang does not recall the content of the meeting but recalls that Song Shizhen accompanied him on this trip.
- January 13, 2000 meeting in Xi'an, People's Republic of China. Irico's records indicate that Yao Jun incurred a fee related to a CDT industry meeting at the Hotel Royal Xi'an on January 13, 2000. Following a reasonable search for other responsive information, Irico could not ascertain any details of this meeting.
- September 14, 2000 meeting in Changsha, People's Republic of China attended by Wang Zhaojie. Mr. Wang does not recall the content of the meeting but recalls

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DPP'S FIRST SET INTERROGATORIES 11 Master File No. 4:07-cv-05944-JST MDL No. 1917

that it was organized by LG and also attended by Yang Zhen, a representative of another CRT producer.

Irico also provides the following information based on its review of its travel reimbursement records from the Relevant Period:

- Irico understands that Plaintiff alleges that a meeting between CRT producers took place in Fuzhou, People's Republic of China on October 9, 1998. Irico's records indicate that Wei Jianshe traveled to Fuzhou on or around this date. Following a reasonable search for other responsive information, Irico could not confirm that Mr. Wei met with competitors during this trip, nor could it confirm the details of the meeting as alleged by plaintiffs.
- Irico understands that Plaintiff alleges that meetings between CRT producers took place in Beijing, People's Republic of China on December 8 through 10, 1998. Irico's records indicate that Li Weisheng and Ma Jinquan traveled to Beijing on or around these dates. Following a reasonable search for other responsive information, Irico could not confirm that Li Weisheng or Ma Jinquan met with competitors during this trip, nor could it confirm the details of the meeting as alleged by plaintiffs.
- Irico understands that Plaintiff alleges that a meeting between CRT producers took place on June 22, 1999. Irico's records indicate that Li Weisheng traveled to Shanghai, People's Republic of China on or around this date. Following a reasonable search for other responsive information, Irico could not confirm that Mr. Li met with competitors during this trip, nor could it confirm the details of the meeting as alleged by plaintiffs.
- Irico understands that Plaintiff alleges that a meeting between CRT producers took place in Nanjing, People's Republic of China on August 5, 1999. Irico's records indicate that Wang Zhaojie traveled to Nanjing on or around this date. Mr. Wang did not recall attending this alleged meeting. Following a reasonable search for other responsive information, Irico could not confirm that Mr. Wang met with

competitors during this trip, nor could it confirm the details of the meeting as alleged by plaintiffs.

- Irico understands that Plaintiff alleges that a meeting between CRT producers took place in Tianjin, People's Republic of China on October 12, 1999. Irico's records indicate that Wang Zhaojie traveled to Tianjin on or around this date. Mr. Wang did not recall attending this alleged meeting. Following a reasonable search for other responsive information, Irico could not confirm that Mr. Wang met with competitors during this trip, nor could it confirm the details of the meeting as alleged by plaintiffs.
- Irico understands that Plaintiff alleges that a meeting between CRT producers took place in Nanjing, People's Republic of China on November 9, 2000. Irico's records indicate that Zhang Hushan traveled to Nanjing on or around this date. Following a reasonable search for other responsive information, Irico could not confirm that Zhang Hushan met with competitors during this trip, nor could it confirm the details of the meeting as alleged by plaintiffs.
- Irico understands that Plaintiff alleges that a meeting between CRT producers took place in Shanghai, People's Republic of China on November 21, 2006. Irico's records indicate that Shen Xiaolin traveled to Shanghai on or around this date. Following a reasonable search for other responsive information, Irico could not confirm that Shen Xiaolin met with competitors during this trip, nor could it confirm the details of the meeting as alleged by plaintiffs.

**INTERROGATORY NO. 6**

Identify each instance during the Relevant Time Period in which You or any other producer of CRT and/or CRT Products, including the named defendants in this coordinated proceeding, instituted a price increase or decrease for CRT and/or CRT Products, and for each such instance:

(a) when such price increase or decrease was announced publicly;

(b) when such price increase or decrease was implemented;

(c) the amount of the price increase or decrease;

(d) whether such price increase or decrease was withdrawn;

(e) each person with responsibility for implementing such price increase or decrease or its withdrawal; and

(f) any explanation given for such price increase or decrease or withdrawal.

**RESPONSE TO INTERROGATORY NO. 6**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico also objects to the extent that this interrogatory calls for information regarding "any other producer" and thus seeks information outside of Irico's possession, custody or control.

Subject to and without waiving the objections stated above, Irico responds that it will conduct a reasonable search for information responsive to this Interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 6 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico has not identified any systematic tracking of its CRT prices or information on the announcement, implementation, withdrawal, or explanations for CRT price changes during the Relevant Period. Irico refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT and CRT Product sales records. Irico further directs Plaintiff to documents IRI-CRT-00004295-303; IRI-CRT-00005349-400; IRI-CRT-00005401-515; IRI-CRT-00008843-880 IRI-CRT-00010133-204; IRI-CRT-00028958-964; IRI-CRT-00030226-241; and IRI-CRT-00030462-503 for the answer to this Interrogatory under Federal Rule of Civil Procedure 33(d). Irico has conducted a reasonable search for other information responsive to this Interrogatory and has located no additional information beyond that described above.

**INTERROGATORY NO. 7**

Identify and describe all joint ventures, partnerships or other cooperative business

relationships, during the Relevant Time Period, relating to CRT and/or CRT Products between You and any other CRT or CRT Products producer.

**RESPONSE TO INTERROGATORY NO. 7**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico also objects that this interrogatory is duplicative and cumulative of other requests served on Irico, including during jurisdictional discovery.

Subject to and without waiving the objections stated above, Irico responds that it has already provided information responsive to this interrogatory to Plaintiff in its responses to jurisdictional discovery, including documents produced in response to Request No. 2 of Direct Purchaser Plaintiff Studio Spectrum, Inc.'s First Set of Requests for Production. Irico will conduct a reasonable search for additional information responsive to this interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 7 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows:

**Shenzhen Irico-Huangqi Information Electronics Co. Ltd.**

Shenzhen Irico-Huangqi Information Electronics Co. Ltd. ("Irico Huangqi") was formed on July 2, 1996 as a joint venture between Irico Group and Hong Kong Riyili Co., Ltd. From July 2, 1996 to August 15, 2002, Irico Group held 60% of the equity of Irico Huangqi and Hong Kong Riyili Co., Ltd. held 40%. From August 15, 2002 until Irico Huangqi's dissolution in 2006, Irico Group held 33.13% of the company's equity, Gansu Languang Technology Corp. held 41.37%, and Hexin Technology Co., Ltd. held 25%. Irico Huangqi was formally dissolved in 2006 and its remaining assets sold at auction.

Irico Huangqi's approved scope of business included the research, development, manufacture, and sale of monitors, peripheral equipment, and other electronic devices. Irico Huangqi's primary business was the manufacture and sale of computer monitors, at least some of

which were manufactured using CDTs sold by Irico to Irico Huangqi. Irico Huangqi did not sell CRTs (except as integrated into monitors) and to Irico's knowledge did not export any products outside of China.

**Irico (USA) Inc.**

Irico (USA) Inc. ("Irico USA") was incorporated in California on July 5, 1995 as a joint venture between Irico (Hong Kong) Co. ("Irico Hong Kong"), China National Electronics Import & Export Caihong Co. ("CNEIECC"), an independent state-owned entity, and two U.S. individuals named Xueli Huang and Mike Huang. Irico Hong Kong held a 45.7% stake in Irico USA, while CNEIECC held at 34.3% stake and Xueli and Mike Huang each held 10%. On February 26, 1998, Xueli and Mike Huang divested from Irico USA, leaving Irico Hong Kong and CNEIECC as the sole owners. In 1999, CNEIECC sold its ownership stake to Irico Group. On March 9, 2000, Irico Group authorized Liu Feng, General Manager of Irico USA, to sell Irico USA and return the resulting funds to Irico Group. However, on April 10, 2001, Irico understands that Liu Feng sold the entire company to California-based INB Co. and absconded with the proceeds. At the time of the transaction, Liu Feng was listed as the operator of INB Co. Then, on May 7, 2001, shortly after the transfer, Sun Xiaolin replaced Liu Feng as the registered operator of INB Co. Irico USA was dissolved on February 28, 2003.

According to the Shaanxi Province People's Government decree establishing Irico USA, the purpose of establishing Irico USA was to expand provincial exports of electromechanical products to North America and to develop trade, investment, and cooperation between China and the United States. (*See* IRI-CRT-00003498.) Irico understands from CNEIECC invoice records produced during jurisdictional discovery that CNEIECC sold small volumes of Irico CRTs to Irico USA on several occasions between 1996 and 1999. However, the invoices indicate that all such sales were shipped to countries other than the United States, including South Africa, Egypt, and China (*see* IRI-CRT-00003561 through -597) with no products delivered to the United States or any United States customer. Irico is not aware of Irico USA ever manufacturing, marketing, selling, or distributing any CRTs or CRT Products in the United States.

Irico further directs Plaintiff to document IRI-CRT-00003490 for the answer to this

Interrogatory under Federal Rule of Civil Procedure 33(d).

**INTERROGATORY NO. 8**

Identify every channel used by You to sell, market, or distribute CRT and/or CRT Products during the Relevant Time Period. If You used different channels at different points within the Relevant Time Period, identify when You used each channel to sell, market, or distribute CRT and/or CRT Products.

**RESPONSE TO INTERROGATORY NO. 8**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects to the undefined term "channel" as vague, ambiguous, and subject to multiple interpretations. Irico also objects that this interrogatory is duplicative and cumulative of other requests served on Irico, including during jurisdictional discovery.

Subject to and without waiving the objections stated above, Irico responds that it has already provided information responsive to this interrogatory to Plaintiff in its responses to jurisdictional discovery, including Irico's response to Interrogatory No. 18 of Indirect Purchaser Plaintiff's First Set of Interrogatories. Irico will conduct a reasonable search for additional information responsive to this interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 8 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: From 1995 to 2004, Irico Group and Irico Display sold CRTs through the Irico Sales Company, an entity within Irico Group that was responsible at that time for sales of all companies under Irico Group. Sales during this period were made almost exclusively in China (99.2%) and negotiated by the Irico Sales Company and recorded under the name of the specific company that produced the CRT, *i.e.*, Irico Group or Irico Display. Neither Irico Group nor Irico Display exported any products to North America.

Following a corporate restructuring in 2004 that included the formation of Irico Group

Electronics Co. Ltd. ("Irico Electronics"), the Irico Sales Company transitioned to a sales department responsible for the sales of Irico Display and Irico Electronics, and Irico Group ceased the sale of CRTs under its own name. Starting at that time and continuing through the remainder of the Relevant Period, sales by Irico Display and Irico Electronics were made directly by each company. During this period, Irico Display and Irico Electronics also sold some CRTs internally to Xi'an Caihui Display Technology Co. Ltd. ("Xi'an Caihui") and Xi'an Cairui Display Technology Co. Ltd. ("Xi'an Cairui"), subsidiaries of Irico Display and Irico Group, respectively, located within the Xi'an Export Processing Zone for the purpose of enjoying preferential tax policies on their exports. Neither Xi'an Caihui nor Xi'an Cairui exported any products to the United States during the Relevant Period.

**INTERROGATORY NO. 9**

Identify every channel used by you to purchase CRT and/or CRT Products during the Relevant Time Period. If You used different channels at different points within the Relevant Time Period, identify when You used each channel to purchase CRT or CRT Products.

**RESPONSE TO INTERROGATORY NO. 9**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects to the undefined term "channel" as vague, ambiguous, and subject to multiple interpretations.

Subject to and without waiving the objections stated above, Irico responds that it will conduct a reasonable search for information responsive to this Interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 9 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico has conducted a reasonable search for information responsive to this Interrogatory and has located no information regarding purchases by Irico of CRTs or CRT Products.

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DPP'S FIRST SET INTERROGATORIES 18 Master File No. 4:07-cv-05944-JST MDL No. 1917

**INTERROGATORY NO. 10**

Identify the CRT and/or CRT Products that You manufactured or produced for each month within the Relevant Time Period, including the brand name, product number, and intended use.

**RESPONSE TO INTERROGATORY NO. 10**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico also objects that this interrogatory is duplicative and cumulative of other requests served on Irico, including during jurisdictional discovery.

Subject to and without waiving the objections stated above, Irico responds that it has already provided information responsive to this interrogatory to Plaintiff in its responses to jurisdictional discovery, including Irico's response to Interrogatory No. 16 of Indirect Purchaser Plaintiffs' First Set of Interrogatories. Irico will conduct a reasonable search for additional information responsive to this interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 10 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT sales records, which contain information on specific sizes and types of CRTs sold by Irico at specific times during the Relevant Period. Irico further directs Plaintiff to documents IRI-CRT-00031179 through -31215 for the answer to this Interrogatory under Federal Rule of Civil Procedure 33(d).

**INTERROGATORY NO. 11**

Identify the CRT and/or CRT Products You sold, marketed, or distributed for each month within the Relevant Time Period, including the brand name, product number, and intended use.

**RESPONSE TO INTERROGATORY NO. 11**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico also objects that this interrogatory is

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DPP'S FIRST SET INTERROGATORIES 19 Master File No. 4:07-cv-05944-JST MDL No. 1917

duplicative and cumulative of other requests served on Irico, including during jurisdictional discovery.

Subject to and without waiving the objections stated above, Irico responds that it has already provided information responsive to this interrogatory to Plaintiff in its responses to jurisdictional discovery, including Irico's response to Interrogatory No. 17 of Indirect Purchaser Plaintiffs' First Set of Interrogatories. Irico will conduct a reasonable search for additional information responsive to this interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 11 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT sales records, which contain information on specific sizes and types of CRTs sold by Irico at specific times during the Relevant Period. Irico has conducted a reasonable search for other information responsive to this Interrogatory and has located no additional information beyond that summarized in the spreadsheet.

**INTERROGATORY NO. 12**

Provide Your sales of CRT and/or CRT Products to the United States and globally for each month from January 1, 1991 to the present. For each month during this period, state the volume of sales, the U.S. dollar value of sales, the unit sale price, the per unit cost to produce CRT and/or CRT Products, the per unit cost to distribute CRT and/or CRT Products (including overseas freight, tariff, customs, duties, inland freight, storage, insurance, dealer commissions), and the per unit profit earned.

**RESPONSE TO INTERROGATORY NO. 12**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects to this interrogatory as overbroad and unduly burdensome as it requests information outside of Plaintiff's purported "Relevant Time Period." Irico also objects that this interrogatory is duplicative and cumulative of

other requests served on Irico, including during jurisdictional discovery.

Subject to and without waiving the objections stated above, Irico responds that it has already provided information responsive to this interrogatory to Plaintiff in its responses to jurisdictional discovery, including Irico's responses to Request No. 9 of Direct Purchaser Plaintiff Studio Spectrum, Inc.'s Requests for Production and Interrogatories No. 1 and 3 of Indirect Purchaser Plaintiffs' Second Set of Interrogatories. Irico will conduct a reasonable search for additional information responsive to this interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 12 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT and CRT Product sales records. Irico has conducted a reasonable search for other information responsive to this Interrogatory and has located no additional information beyond that summarized in the spreadsheet(s).

**INTERROGATORY NO. 13**

If You offered different prices to different markets, or on a spot market versus contract basis, during the Relevant Time Period, so indicate in the statistical data supplied in response to Interrogatory No. 6.

**RESPONSE TO INTERROGATORY NO. 13**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects to the terms "markets," "spot markets" and "contract basis" as vague, ambiguous, and subject to multiple interpretations.

Subject to and without waiving the objections stated above, Irico responds that it will conduct a reasonable search for information responsive to this Interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 13 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT and CRT Product sales records. Irico has conducted a reasonable search for other information responsive to this Interrogatory and has located no additional information beyond that summarized in the spreadsheet(s).

**INTERROGATORY NO. 14**

Provide Your aggregate purchases (in both number of units and revenue in U.S. dollars) of CRT and/or CRT Products for each month from January 1, 1991 to the present.

**RESPONSE TO INTERROGATORY NO. 14**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects to this interrogatory as overbroad and unduly burdensome as it requests information outside of Plaintiff's purported "Relevant Time Period."

Subject to and without waiving the objections stated above, Irico responds that it will conduct a reasonable search for information responsive to this Interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 14 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico has conducted a reasonable search for information responsive to this Interrogatory and has located no information regarding purchases by Irico of CRTs or CRT Products.

**INTERROGATORY NO. 15**

Provide Your aggregate purchases (in units and U.S. dollars) of CRT or CRT Products from each of the other named defendants in this coordinated proceeding, for the purpose of resale, for each month during from January 1, 1991 to the present.

**RESPONSE TO INTERROGATORY NO. 15**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects to this interrogatory as overbroad and unduly burdensome as it requests information outside of Plaintiff's purported "Relevant Time Period."

Subject to and without waiving the objections stated above, Irico responds that it will conduct a reasonable search for information responsive to this Interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 15 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico has conducted a reasonable search for information responsive to this Interrogatory and has located no information regarding purchases by Irico of CRTs or CRT Products.

Dated: January 7, 2022

BAKER BOTTS L.L.P.

*/s/ John M. Taladay*

John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
evan.werbel@bakerbotts.com
tom.carter@bakerbotts.com
drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200

(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

**CERTIFICATE OF SERVICE**

**In re: Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917**

I declare that I am employed in Washington, District of Columbia. I am over the age of eighteen years and not a party to the within case; my business address is: Baker Botts L.L.P., 700 K Street, N.W., Washington, D.C. 20001.

On January 7, 2022, I served the following document(s) described as:

**IRICO DEFENDANTS' SIXTH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DIRECT PURCHASER PLAINTIFFS' FIRST SET OF INTERROGATORIES**

on the following interested parties in this action:

R. Alexander Saveri (rick@saveri.com)
Geoffrey C. Rushing (grushing@saveri.com)
Matthew D. Heaphy (mheaphy@saveri.com)
SAVERI & SAVERI, INC.
706 Sansome St # 200
San Francisco, CA 94111

*Lead Counsel for the Direct Purchaser Plaintiffs*

Mario N. Alioto (malioto@tatp.com)
Lauren C. Capurro (laurenrussell@tatp.com)
TRUMP ALIOTO TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123

*Lead Counsel for the Indirect Purchaser Plaintiffs*

Joseph Goldberg (jg@fbdlaw.com)
FREEDMAN BOYD HOLLANDER GOLDBERG URIAS & WARD P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
D (505) 305-1263

*Counsel for the Indirect Purchaser Plaintiffs*

Dan Birkhaeuser
(dbirkhaeuser@bramsonplutzik.com)
BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
2125 Oak Grove Rd, Suite 125
Walnut Creek, CA 94598

*Counsel for the Indirect Purchaser Plaintiffs*

[X] (BY ELECTRONIC MAIL) I caused such documents to be sent to the persons at the email addressed listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is true and correct. Executed on January 7, 2022, in Washington, D.C.

*/s/ Thomas E. Carter*
Thomas E. Carter

# EXHIBIT Z

**From:** DENIS HUANG [huangzy@cptf.com.cn]
**Sent:** Tuesday, February 13, 2007 4:02 AM
**To:** SALES胡美芳
**Subject:** ??: file

**Attachments:** 西安??理????.doc; 西安??理???.ppt

有些了解即可！

DENIS HUANG 2007/2/13

---

发件人: yliang6699 [mailto:yliang6699@126.com]
发送时间: 2007年2月8日 12:25
收件人: huangzy@cptf.com.cn
主题: file

Dear mr.Huang

(See attached file: 西安显示器会议记录.doc)(See attached file: 西安显示器会汇报.ppt)
liang yulin

---

HYPERLINK "http://www.126.com/" 0膜加入吗? 1.9亿用户正在使用网易邮箱 www.126.com

 7657





STATE of NEW YORK )
) ss:
COUNTY of NEW YORK )

***CERTIFICATE OF ACCURACY***

This is to certify that the attached document, *"CHU00047658 - CHU00047662"* originally written in *Chinese* is to the best of our knowledge and belief, a true, accurate and complete translation into *English*.

Dated: December 17, 2014

Allison Carey
Consortra Translations

Sworn to and signed before ME this
17th day of December
2014

Notary Public

JAMES G. MAMERA
Notary Public- State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires December 4, 2018

Your legal translation partner

**January 23, 2007 CPT Industry General Manager (Xi'an) Meeting Minutes**

**Meeting Time**: January 23, 2007

**Meeting Location**: Fanglin Fragrant Garden Hotel, Xi'an

**Attending units and personnel**:

**Beijing Matsushita**: Wenqiang Fan, Xinwen Huang, Hai Huang
**Xianyang IRICO**: Daoqin Xing, Mengquan Guo, Ximin Wang, Xiaolin Shen, Jun Yao, Gaowen Xu
**SEG Hitachi**: Guojun Yang, Peng Guo
**LPD**: Chang Gi Kim, Jiangnan Yu
**Changsha Shuguang**: Yaping Yang, Jing Feng
**Nanjing Huafei:** Jianzhong Sheng, Dezhu Zhang, Minghui Xu
**Shanghai Novel:** Wei Sun, Zhiping Xu, Qing Ye
**Samsung SDI**: Yihuan Wu, Yun Xie
**CPT:** Xiaoyan Liu

Meeting **Chair**: Secretary-General Guojun Yang

**Content**:
Chairman Daoqin Xing delivered welcome speech:

2006 was a difficult year for the industry. In 2005, global market shrank, but Chinese market grew. However, in 2006, the Chinese market also shrank. Companies are facing transformation, and CRT will be concentrated in China, India and the surrounding areas in the future. As a community of interests, all should jointly explore how to develop the industry. (To effectively integrate resources).

Wenqiang Fan, President of the Association, read the letter that Thomson (Seligent) explained the reason of their absence from this meeting.

Information personnel representative reported the market conditions of 2006 and 2007 and elaborated the severe market trends (see attachment for details).

Moderator: 2006's inventory carried over to 2007; therefore, 2007 has 2-month extra production capacity (the Shanghai Meeting had suggested one month shutdown). Facing the significant increase of the current inventory and the decline of prices, all are very clear that we should discuss the next step. It is reported that, by the end of 2006, the inventory was 5 to 6 million in the industry, and it is estimated that the inventory will be over 10 million in January 2007. We hope to form a guideline document to make  the CPT industry well survive. All companies must operate under the industry's decision. Recently, I heard that several LCD companies want to cooperate and I think the industry's joint action is the right direction. I hope that all attending executives work together to consume the inventory of 10 million in the industry as soon as possible.

President of the Association: From a global point of view, the display industry is in a stalemate, and the development of FPD is in a transition stage. LCD's global investment peak period has passed, and now LCD is entering its second phase (integration phase). The total production capacity of LCD should be able to fix in 2010. Our original pessimistic projection is that in 2010, LCD will be 170 million and CRT will be 70 million. Now we do not think so (LCD capacity is expected to be 80-90 million); it will not be more than 100 million. Global TV demand is 220 million sets, of which 110 million are FPD, and 110 million are CRT (mostly Chinese companies'). The production lines in Southeast Asia will be gradually reduced (in 2007, China CPT supply will possibly rise to 60% while Southeast Asia shares 30% and other areas share10%). Chinese enterprises should work together and keep harmony to a great extent and to eliminate minor differences. Cooperation is the gist. Currently, five large color TV makers work together, so they have very big strength. Our CPT industry analyzes more on our industry rather than color TV, LCD and globe market. 2007 is a new year and we should specify the industry rules.

Moderator: All (including SDI) are facing difficulties, but we did not analyze the reason causing the current difficulties. Color TV makers cooperated, and CPT inventory soared up high since July. Prices of all materials increase. All of the current inventory is the materials purchased at high prices; cost pressure is very high, so we should work together.

**Executives of respective companies spoke on the meeting topics as follows:**

Novel: We support the Industry Association's decision. We hope the industry can work jointly to cope with and to face the difficulties in survival, and may consider less about the legal aspects. We suggest that the Association set a unified price and control outputs. FPD production is also limited. With respect to Shanghai TFT, the original plan was to expand capacity by 70% to 80%, but now its capacity is also shrinking.

SEG: We plan to shut down the whole plant for 20 days; after that, we will shut down for 10 days depending on the circumstances. (Secretary-General Guojun Yang will not be responsible for SEG's CPT sales any more from January 1. He will be primarily responsible for sales of Hitachi LCD screens as an agent.)

Huafei: Our company has higher requirement on inventory. We have stopped production for one week before the New Year's Day, and will stop production for two weeks or longer around Spring Festival period based on types. We think that coordination by the industry still has some effects. Huafei will control production, sales and inventory based on own interests and the industry's interests.

LPD: LPD Korea will stop production of 4 lines in Q1 this year (in January stopped 3 lines; among four production lines, 2.5 lines are CPT lines). Part of the purchase orders and production plan will be transferred to Huafei and Changsha. The Chinese plants' status becomes more important than it was before. The industry must control inventory.

LG: In December, 21 "/ 25" were shut down for 10 days. Shutting down by the industry's members individually is not strong enough. We suggest the industry should arrange shutdowns uniformly.

CPT: Fuzhou plant plans to produce 4.5 to 6 million pieces in 2007 and the types will be 14" and 21". Currently, Fuzhou has a total of eight production lines; it has converted one line for producing 14 "CPT (capacity is 1.6 million/year) and two lines for producing 21"CPT (capacity is1.2 million/year) (it plans to use the technology of producing CDT short tubes to produce 21" short tubes after July 2007). We also plan to convert the 4th line, but it depends on the market condition after 2008. After Fuzhou plant starts to produce CPT, CPT Malaysia will reduce part of the outputs. It is anticipated that after a number of years, CPT can keep one plant only. However, when the plant was established in the early stage, its equipment, etc., was supervised by the customs. Now the supervision period has not yet expired, so it is expected to be a longer wait for the shutdown time. CPT's slogan is "fighting to the last single soldier." CPT originally had five CPT plants, but now it has plants in Fuzhou, China and Malaysia only (it closed its plants in Taoyuan, Taiwan, United Kingdom, and Yangmei, Taiwan one after another).

CPT currently has six plants in China, including a LCD module. It also acquired XOCECO to do the whole machine business. Its next step does not preclude the possibility of establishing a new whole machine plant (currently it is also negotiating with BOE).

SDI: Samsung produces strictly based on its purchase orders and arranges shutdown gradually; SDI considers LCD as its competitor. It has the least inventory in the CPT industry.

IRICO: We paid much attention to the essence of the Shanghai Meeting and limit production for 10 to 20 days. We will arrange our production, sales and inventory according to the essence of this meeting. The Industry Association has made great contributions to the nation and the industry. However, it should make some constraints on the current industry situation and should foresightedly understand how to make the industry out of the plight. We also suggest the Industry Association to change its name to "Display Devices Industry Association," etc., to recruit new members and to expand its field of vision.

Beijing Matsushita: We called for meeting with the upstream and the downstream together, preferably led by the color TV makers. We must make the color TV makers know that maintaining the development of CRT industry is an important proposition of TV makers. In 2003, BMCC originally planned to further build a plant in Beijing, and it finally canceled the plan, which now appears to be wise. We hope that CPT will also consider that when it transferred to the Fuzhou plant, it adjusts the production capacity of the Malaysia plant to keep the overall balance. We also suggested that Malaysia plant export more to Europe. (Malaysia has tariff advantages, China - Europe 14 / Malaysia - Europe 7.9). In 2006, BMCC made its efforts to increase export, and export accounted for 55% of the sales. BMCC stopped production during the New Year's Day for three days. Currently, BMCC has over130 models; therefore, it is more difficult to control inventory. This year it needs to clean up its models to raise the overall capability to respond to the market. We hope that in 2007 the industry can control the balance between production and sales; the industry needs to increase exports and enhance global competitiveness. Regarding the matter on request for the government’s restoration of export tax refund, what the industry previously did has not aimed at the right target. Currently, we have already contacted a consulting firm under the Ministry of Finance to promote this. If it is successful, they will charge certain fee. If not, they will not charge at all.

Secretary-General Yang: The policy of this meeting: limit production, reduce inventory, and keep price.
President of the Association Fan: The meeting needs to form a press release so that all

speak with one voice. (Please pay attention to information security and information propaganda, and keep the meeting content from spreading outside.)

2007 shutdown schedule and expected inventory during the Spring Festival

| | **February** | **Estimated inventory volumes at the end of February** |
|---|---|---|
| **SEG Hitachi** | 10th to 28th | 400,000 |
| **Shanghai Novel** | 16th to 28th | 400,000 |
| **Nanjing Huafei** | 16th to 28th | 300,000 |
| **Changsha LG** | 10th to 25th | 250,000 |
| **Chunghwa Picture Tubes** | 15th to 28th | 0 |
| **Samsung SDI** | 15th to 28th | 200,000 |
| **IRICO** | 15th to 28th | 500,000 |
| **Beijing Matsushita** | 16th to 25th | 500,000 |

The meeting decided to convene the Industry's Department Chief Meeting after the Spring Festival.

# 2007 年 1 月 23 日彩管行业总经理（西安）会议记录

**会议时间**：2007 年 1 月 23 日

**会议地点**：西安　芳林苑宾馆

**与会单位及人员**：

北京松下　范文强　黄新文　黄海

咸阳彩虹　邢道钦　郭盟权　王西民　申小琳　姚军　徐高文

赛格日立　杨国钧　郭　鹏

LPD　金昌起　于江南

长沙曙光　杨亚平　冯靖

南京华飞　盛建忠　张德柱　许明晖

上海永新　孙　伟　徐志平　叶　青

三星 SDI　吴翊焕　谢　云

中华映管　刘晓燕

**会议主持**：杨国钧秘书长

**内容**：

邢道钦董事长致欢迎词：

2006 年是行业艰难的一年，2005 年全球市场萎缩，但中国市场有所增长，而 2006 年中国市场同时也有萎缩。企业面临着转型，未来 CRT 集中在中国、印度及周边地区，大家作为利益共同体，应该联手探讨行业如何发展。（资源有效整合）

范文强会长致辞并宣读汤姆逊（新骏）对于本次未出席此次会议原因说明的函件。

信息员代表汇报 06 及 07 年市场情况，阐述严峻的市场趋势（详见附件）

主持人：06 年的库存带到了 07 年，07 年多了 2 个月的产能（上海会议时曾建议停产 1 个月）对于目前的库存大幅上升，价格下跌，大家都十分清楚，应该探讨下一步该如何走。根据报告，06 年底行业存在 500～600 万库存，07 年 1 月估计会超过 1000 万，希望能够形成一个纲领性的文件，让彩管行业好好生存。所有企业在行业的决定下工作，最近听说几家 LCD 企业要联手，我觉得行业联手行为是对的，希望在座各位老总群策群力，尽快消化行业 1000 万库存。

会长：从全球来看，显示行业正处于胶着状态，FPD 发展到了一个转型期，LCD 全球投入的高峰期已经过去，现在进入第二阶段（整合阶段）。2010 年 LCD 的总产能应该能定住了，原来我们悲观预计到 2010 年 LCD 有 1.7 亿，CRT7000 万，现在觉得未必如此（预计 LCD 产能在 8000～9000 万），不会达到 1 亿以上。全球 TV 需求为 2.2 亿台，其中 1.1 亿为 FPD，CRT 有 1.1 亿（以中国企业为主）。东南亚生产线会逐步减少（07 年中国 CPT 供应可能会上升到 60%，东南亚 30%，其它 10%）。中国企业应坐在一起，存大同，去小异，联手是主题。目前五大彩电厂联手，力度很大，我们彩管行业分析自己的行业比较多，对彩电、LCD 及全球分析比较少。07 年是新的一年，大家应该指定行业规矩。

主持人：大家都面临困难（包括 SDI），但是没对造成目前困难的原因分析，彩电厂联手，彩管库存从 7 月猛涨，材料价格全面涨价，现在的库存都是高价下采购的材料，成本压力很大，因此应当联手。

**以下各个公司老总就会议议题发言**

永新：支持行业协会的决定，希望行业能够联合应对，面对生存的窘境，在法律方面可以考虑少一些，建议协会可以统一价格，控制产量；FPD 也限产，上海 TFT 原来计划扩产 70%～80%，现在产能也萎缩。

赛格：全厂计划停产 20 天，其后根据情况停产 10 天。（杨国钧秘书长从 1 月 1 日开始不再负责赛格的彩管销售，主要销售代理日立液晶屏。）

华飞：公司对库存的要求比较高，元旦前已经停产 1 周，春节前后会根据品种停产 2 周或者更久。认为行业协调还是有一定作用力，华飞会从自身及行业利益出发控制产销存。

LPD： LPD 韩国今年 1 季度将停产 4 条线（1 月停 3 条，4 条生产线其中 2.5 条是 CPT 线），部分订单及生产计划将向华飞及长沙转移，中国工厂地位较之之前更为重要，行业一定要控制库存。

LG：12 月 21"/25"停产 10 天。行业成员各自分头停产的力度不够，建议行业统一安排停产；

中华： 07 年福州工厂计划生产 450~600 万只，品种是 14" 及 21".目前福州共有 8 条生产线，已经改造 1 条生产 14"CPT（产能 160 万/年），2 条生产 21"CPT（产能 120 万/条/年）(07 年 7 月份以后计划用生产 CDT 短管的技术生产 21"短管），另还

计划改造第 4 条线，不过要看 08 年后市场情况来定.福州工厂投产 CPT 后，马来西亚中华将减少部分产量，预计若干年以后，中华映管只能保存一个工厂，但因为早期建厂时设备等受到海关监管，监管期还没有达到，所以关闭的时间将是一个较长的预期。中华的口号是"战到最后的一兵一卒"。华映原有五家 CPT 工厂，现在只剩中国福州、马来西亚（先后关闭台湾桃园、英国、台湾杨梅）。华映目前在中国有 6 家工厂，其中包括有 LCD 模组，还收购厦华，做整机业务，下一步不排除建立新的整机厂（目前和京东方也在谈洽）。

SDI：三星是严格按照订单生产，逐步安排停产；SDI 认为竞争对手是 LCD，是彩管行业库存最少的。

彩虹：重视上海会议精神，限产维持 10～20 天，会根据此次会议精神安排产销存。行业协会为国家及行业做出了很大贡献，但就目前行业情况应做出一些约束，要前瞻性的了解如何使行业走出困境。并且建议行业协会更名，如"显示器件行业协会"等等，吸收新会员，扩大视野。

北京松下：呼吁上下游一起开会，最好有彩电厂牵头。要让彩电厂认识到维持 CRT 行业发展是 TV 厂的重要命题。03 年的时候，北松原计划在北京再盖工厂，最后取消了决议，现在看来是明智的。希望华映也能考虑，在向福州工厂转移的同事，马来西亚工厂调整产能，整体平衡。同时建议马来西亚工厂多往欧洲出口。（马来西亚有关税优势，中国——欧洲 14/马来西亚——欧洲 7.9）。06 年北松加大出口力度，出口占销售 55%。北松元旦停 3 天，目前北松有 130 多个型号，库存比较

难控制，今年要专门清理品种，提高整体对应市场的能力。希望 07 年行业能控制产销平衡，行业要增加出口，增强全球竞争力。关于申请国家恢复出口退税的事宜，以前行业所做的工作没有对准目标，目前已经联系了一个财政部下属的咨询公司进行推广，如果成功，将要收取一定费用，不成功分文不取。

杨秘书长：此次会议方针： 限产、压库、保价

范会长： 会议形成新闻稿，以便大家统一口径。(注意信息安全和信息宣传，会议内容不要外传。)

07 年春节期间停产时间及预期库存

| | 2 月 | 预计 2 月底库存量 |
|---|---|---|
| 赛格日立 | 10 日~28 日 | 40 万 |
| 上海永新 | 16 日~28 日 | 40 万 |
| 南京华飞 | 16 日~28 日 | 30 万 |
| 长沙 LG | 10 日~25 日 | 25 万 |
| 中华映管 | 15 日~28 日 | 0 |
| 三星 SDI | 15 日~28 日 | 20 万 |
| 彩虹 | 15 日~28 日 | 50 万 |
| 北京松下 | 16 日~25 日 | 50 万 |

会议决定：春节后召开行业部长会议。



STATE of NEW YORK )
) ss:
COUNTY of NEW YORK )

***CERTIFICATE OF ACCURACY***

This is to certify that the attached document, *"CHU00047663 - CHU00047674"* originally written in *Chinese* is to the best of our knowledge and belief, a true, accurate and complete translation into *English*.

Dated: December 17, 2014

Allison Carey
Consortra Translations

Sworn to and signed before ME this 17th day of December, 2014.

Notary Public

JAMES G. MAMERA
Notary Public- State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires December 4, 2018

Your legal translation partner

New York, NY | Washington, DC | Houston, TX | San Francisco, CA | Hong Kong



2007 Q1 CRT Industry General Managers Conference
Xi'an
January 23, 2007

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00047663E_Translation

# Conference Agenda

9:00-9:30 President Xing's Welcome Speech and Conference Chairman's Welcome Speech

9:30-10:00 Report on Industry's Current Status

10:00-11:00 Statements by Industry Leaders

12:20- Luncheon Reception Hosted by Irico

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL                                                      CHU00047664E_Translation

# Conference Topics

- Review and analysis of market demand and supply for 2006

- Data for 2007 Q1 and market forecast for 2007

- Strengthening  communication and cooperation in CRT industry; together welcoming market challenges

- Collective planning of long-term development for CRT industry

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00047665E_Translation

# 2006 Demand and Supply Analysis

- In 2006, our industry showed growth in a recovery mode. Compared with 2005, there was an 11.5% increase in production; 6.7% increase in sales; 3.87% decrease in domestic sales; and a 128% increase in inventory.
- The restructuring and closing in overseas CRT makers caused a 27% increase in export (including same day import and export activities at the same port). However, due to the 2006 CRT import far exceeded the forecasted amount (net import 11.12M), which is a result of mostly the CRT dumping effect from Malaysia and Thailand (factories in these two countries have been closed by the end of 2006; the effect will be limited for 2007.), the volume of imports has far exceeded expectation in 2006 .
- Because color TV makers made purchases in advance in the second Quarter, and cleared the strategic inventory in the fourth Quarter, this year has seen neither a weak off-season nor a strong peak season.
- Because the changes in supply and demand have made the CRT inventory to increase every month in the fourth season, reaching over 3,000,000 by the end of the year.

[auto date]

# 2006 Market Supply and Demand Analysis

2006 Supply and Demand Trend of Color TV and CRT

Color TV Makers' Production Forecast

Unit of measure:10,000 pieces/10,000 sets

| Month | 06.01 | 06.02 | 06.03 | 06.04 | 06.05 | 06.06 | 06.07 | 06.08 | 06.09 | 06.10 | 06.11 | 06.12 | Estimate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHONGHONG | 70 | 53 | 50 | 52 | 47 | 58 | 62 | 61 | 80 | 80 | 80 | 90 | 783 |
| SKYWORTH | 60 | 28 | 32 | 55 | 55 | 52 | 68 | 73 | 80 | 85 | 76 | 78 | 742 |
| KONKA | 75 | 40 | 35 | 60 | 50 | 67 | 70 | 74 | 90 | 100 | 105 | 105 | 871 |
| TTE | 95 | 60 | 107 | 111 | 90 | 95 | 92 | 113 | 119 | 120 | 110 | 95 | 1207 |
| HI SENSE | 55 | 13 | 20 | 50 | 45 | 59 | 50 | 65 | 75 | 75 | 72 | 80 | 659 |
| HAIER | 45 | 15 | 20 | 30 | 25 | 30 | 45 | 51 | 70 | 45 | 50 | 60 | 486 |
| Above Total | 400 | 209 | 264 | 358 | 312 | 361 | 387 | 437 | 514 | 505 | 493 | 508 | 4748 |
| Projected Total Color TV Production | 533 | 322 | 406 | 519 | 446 | 501 | 545 | 652 | 714 | 673 | 657 | 635 | 6604 |
| Net import of CRT | 80 | 70 | 76 | 87 | 75 | 77 | 405 | 125 | 132 | 110 | 90 | 85 | 1112 |
| Available domestic CRT quantity | 453 | 252 | 330 | 432 | 371 | 424 | 440 | 527 | 582 | 563 | 567 | 550 | 5492 |

CRT Production Forecast

| THOMSON | 75 | 59 | 69 | 80 | 69 | 78 | 83 | 99 | 100 | 93 | 86 | 80 | 971 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LPD-HE | 60 | 61 | 64 | 66 | 57 | 71 | 78 | 80 | 79 | 81 | 80 | 75 | 852 |
| LPD-OG | 57 | 54 | 60 | 58 | 60 | 64 | 59 | 64 | 63 | 62 | 63 | 50 | 714 |
| NOVEL | 51 | 36 | 30 | 31 | 33 | 43 | 44 | 43 | 48 | 41 | 50 | 42 | 492 |
| LRLOO | 99 | 79 | 109 | 117 | 111 | 130 | 130 | 135 | 135 | 135 | 132 | 112 | 1424 |
| BMOC | 71 | 63 | 75 | 74 | 72 | 77 | 82 | 83 | 77 | 88 | 80 | 70 | 912 |
| SDI | 78 | 62 | 68 | 79 | 92 | 96 | 105 | 105 | 105 | 102 | 96 | 79 | 1067 |
| SEG | 46 | 37 | 48 | 50 | 46 | 51 | 53 | 50 | 59 | 57 | 59 | 55 | 611 |
| Projected Total CRT Production | 537 | 451 | 523 | 555 | 540 | 640 | 634 | 659 | 666 | 659 | 646 | 563 | 7043 |
| Net export | 64 | 78 | 95 | 87 | 82 | 81 | 97 | 97 | 98 | 89 | 70 | 56 | 994 |
| Current Month Difference between CRT Import and CRT Export | 16 | -8 | -19 | 0 | -7 | -4 | 8 | 28 | 34 | 21 | 20 | 29 | |
| Domestic Supply of CRT | 473 | 373 | 428 | 468 | 458 | 529 | 537 | 562 | 568 | 570 | 576 | 507 | 6049 |
| Monthly Difference between Supply and Demand | 20 | 121 | 98 | 36 | 87 | 105 | 97 | 35 | -14 | 7 | 9 | -43 | |
| CRT Inventory | 159 | 280 | 378 | 414 | 501 | 606 | 703 | 738 | 724 | 730 | 739 | 696 | |
| Inventory per Industry Exchanged Data | 154 | 196 | 244 | 263 | 238 | 231 | 225 | 198 | 169 | 170 | 221 | 317 | |
| Grey Inventory | 5 | 84 | 134 | 151 | 263 | 375 | 478 | 540 | 555 | 560 | 518 | 379 | |

[auto date]

# 2006 Market Supply and Demand Analysis Chart

600
500
400
300
0
800
700
600
500
400
300
200
100
0
453
473
373
252
330
428
432
468
537
562
582
568
563
570
567
578
550
507
1
2
3
4
5
6
7
8
9
10
11
12
Available domestic CRT quantity
CRT domestic supply quantity
CRT Inventory
Inventory per Industry Exchanged Data
[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL CHU00047668E_Translation

# 2006 CRT Supply and Demand Balancing Chart

# 2007 Q1 Market Forecast

- Currently, most makers have not made definite production plans for the rest of Q1. If the CRT industry continues to operate at full load, the supply and demand situation will further deteriorate. In addition, the impact of price surge in raw materials will cause crisis for CRT sales in Q1 in 2007.

- With the 2007 Chinese Lunar New Year being in late February, the peak season for color TV sales will be later than previous years. At the same time, color TV makers are even more cautious about the purchase of CRT and color TV productions, in order to reach their goal of limiting production and control inventory.

- In 2007, there will be more companies entering the Chinese CRT industry. The production capacity will increase 12.7% more than 2006 (10,800,000 pieces).

[auto date]

# 2007 Market Supply and Demand Analysis

2007 Supply and Demand Trend for Color TV and CRT

Color TV Makers' Production Forecast

Unit of Measure: 10,000 pieces/10,000 sets

| Month | 07.01 | 07.02 | 07.03 | 07.04 | 07.05 | 07.06 | 07.07 | 07.08 | 07.09 | 07.10 | 07.11 | 07.12 | Estimate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHONGHONG | 50 | 20 | 20 | 40 | 50 | 50 | 50 | 50 | 80 | 75 | 75 | 90 | 650 |
| SKYWORTH | 50 | 25 | 30 | 50 | 50 | 50 | 55 | 65 | 80 | 85 | 80 | 80 | 700 |
| KONKA | 70 | 50 | 50 | 60 | 50 | 70 | 70 | 80 | 100 | 120 | 120 | 110 | 950 |
| TTE | 95 | 60 | 100 | 110 | 90 | 95 | 90 | 100 | 110 | 120 | 120 | 110 | 1200 |
| H SENSE | 50 | 15 | 20 | 50 | 45 | 50 | 50 | 65 | 75 | 75 | 75 | 80 | 650 |
| HAI ER | 45 | 15 | 20 | 30 | 30 | 30 | 45 | 50 | 60 | 60 | 60 | 55 | 500 |
| Total Above | 360 | 185 | 240 | 340 | 315 | 345 | 360 | 410 | 505 | 535 | 530 | 525 | 4650 |
| Projected total Color TV Production | 486 | 285 | 369 | 493 | 450 | 486 | 514 | 621 | 711 | 733 | 716 | 665 | 6529 |
| CRT net import | 50 | 30 | 30 | 50 | 60 | 60 | 80 | 80 | 80 | 80 | 50 | 50 | 700 |
| Available domestic CRT | 436 | 255 | 339 | 443 | 390 | 426 | 434 | 541 | 631 | 653 | 666 | 615 | 5829 |

CRT Production Forecast

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THOMSON | 65 | 55 | 65 | 80 | 70 | 80 | 85 | 95 | 95 | 100 | 100 | 100 | 990 |
| LPD-HE | 65 | 50 | 60 | 65 | 55 | 70 | 75 | 80 | 80 | 80 | 80 | 78 | 838 |
| LPD-OG | 45 | 40 | 50 | 60 | 60 | 60 | 60 | 60 | 65 | 65 | 65 | 65 | 695 |
| NOVEL | 25 | 25 | 30 | 35 | 35 | 45 | 45 | 45 | 50 | 50 | 50 | 50 | 485 |
| LRLOO | 100 | 80 | 130 | 140 | 140 | 130 | 140 | 140 | 140 | 140 | 140 | 140 | 1560 |
| BMOC | 70 | 40 | 50 | 70 | 65 | 70 | 80 | 80 | 80 | 90 | 90 | 90 | 875 |
| SDI | 65 | 60 | 70 | 80 | 80 | 80 | 85 | 90 | 90 | 100 | 100 | 100 | 1000 |
| SEG | 50 | 35 | 50 | 50 | 50 | 50 | 50 | 50 | 60 | 60 | 60 | 55 | 620 |
| CPT | 10 | 20 | 20 | 30 | 40 | 45 | 45 | 50 | 50 | 50 | 50 | 50 | 460 |
| Projected Total CRT Production | 495 | 405 | 525 | 610 | 595 | 630 | 665 | 690 | 710 | 735 | 735 | 728 | 7523 |
| Net export | 60 | 70 | 90 | 90 | 85 | 90 | 100 | 100 | 100 | 100 | 70 | 60 | 1015 |
| Current Month Difference between CRT Import and CRT Export | -10 | -40 | -60 | -40 | -25 | -30 | -20 | -20 | -20 | -20 | -20 | -10 | |
| Domestic Supply of CRT | 435 | 335 | 435 | 520 | 510 | 540 | 565 | 590 | 610 | 635 | 665 | 668 | 6508 |
| Monthly Difference between Supply and Demand | -1 | 80 | 96 | 77 | 120 | 114 | 131 | 49 | -21 | -18 | -1 | 53 | |
| CRT Inventory | 695 | 775 | 871 | 948 | 1068 | 1182 | 1313 | 1362 | 1340 | 1322 | 1321 | 1375 | |
| Inventory per Industry Exchanged Data | 400 | 350 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | |
| Grey Inventory | 295 | 425 | 571 | 648 | 768 | 882 | 1013 | 1062 | 1040 | 1022 | 1021 | 1075 | |

[auto date]

# 2007 Industry Supply and Demand Analysis Chart

800
700
600
500
400
300
200
100
0
1600
1400
1200
1000
800
600
400
200
0
1
2
3
4
5
6
7
8
9
10
11
12
520
540
565
690
610
615
335
339
380
541
256
Available domestic CRT
Domestic CRT supply
CRT Inventory
Inventory per Industry Exchanged Data

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL CHU00047672E_Translation

# 2007 Summary of the Global Supply and Demand Relationship for CRT/Color TV

- With worldwide CRT industry reducing production and closing lines/plants , it is estimated that by 2006, the worldwide CRT supply will be approximately 160,000,000 pieces. Compared with the worldwide CRT demand of 150,000,000 sets of color TV, the CRT's supply and demand relationship maintains a state of equilibrium.
- The Chinese CRT industry's position in the worldwide market is becoming increasingly more prominent, accounted for nearly 50% of the worldwide supply.

**Color Picture Tube Supply** **Color TV Production** **Color TV Demand** **Europe** **America** **Asia/Pacific Region** **China**

[auto date]

# Thank You, Everyone!

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL CHU00047674E_Translation



2007年Q1彩管行业总经理会议
西安
2007年1月23日
[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL CHU00047663

CONFIDENTIAL – GRAND JURY MATERIAL

# 会议议程

- 9:00～ 9:30 邢总致欢迎辞、会长讲话
- 9:30～10:00 行业现状通报
- 10:00～11:00 与会领导发言
- 12:20～ 彩虹设午宴

CHU00047664

CONFIDENTIAL – GRAND JURY MATERIAL

会议议题

- 2006年市场供求分析回顾
- 2007年Q1及2007年市场预测
- 彩管行业加强沟通与协作,共同迎接市场挑战
- 共谋彩管行业长远发展

[auto date]

CHU00047665

CONFIDENTIAL – GRAND JURY MATERIAL

# 2006年供求关系分析

•2006年行业处于恢复性增长。产量比2005年同比增长11.5%，销量同比增长6.7%，内销同比减少3.87%；库存同比增长128%。

•国外彩管重组和关闭，使得国内彩管出口（包括一日游）增长27%。但是2006年彩管进口量大于预期值(净进口1112万)，主要受马来西亚和泰国向国内倾销彩管的影响(由于此两地工厂已于'06年末关闭,对'07年影响有限)

•由于彩电厂在第二季度提前采购，在第四季度消化战略库存，使得本年度彩管销售呈现淡季不淡，旺季不旺的局面。

•由于供求变化使得彩管库存在第四季度逐月上升，截止年底超过300万。

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL

# 2006年市场供求分析表

## 2006年彩电彩管供求趋势

万只/万台

彩电厂生产预测

| 月份 | 06.01 | 06.02 | 06.03 | 06.04 | 06.05 | 06.06 | 06.07 | 06.08 | 06.09 | 06.10 | 06.11 | 06.12 | 预计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHONGHONG | 70 | 53 | 50 | 52 | 47 | 58 | 62 | 61 | 80 | 80 | 80 | 90 | 783 |
| SKYWORTH | 60 | 28 | 32 | 55 | 55 | 52 | 68 | 73 | 80 | 85 | 76 | 78 | 742 |
| KONKA | 75 | 40 | 35 | 60 | 50 | 67 | 70 | 74 | 90 | 100 | 105 | 105 | 871 |
| TCL | 95 | 60 | 107 | 111 | 90 | 95 | 92 | 113 | 119 | 120 | 110 | 95 | 1207 |
| HISENSE | 55 | 13 | 20 | 50 | 45 | 59 | 50 | 65 | 75 | 75 | 72 | 80 | 659 |
| HAIER | 45 | 15 | 20 | 30 | 25 | 30 | 45 | 51 | 70 | 45 | 50 | 60 | 486 |
| 以上 TOTAL | 400 | 209 | 264 | 358 | 312 | 361 | 387 | 437 | 514 | 505 | 493 | 508 | 4748 |
| 彩电生产推总 | 533 | 322 | 406 | 519 | 446 | 501 | 545 | 652 | 714 | 673 | 657 | 635 | 6604 |
| 其中净进口彩管量 | 80 | 70 | 76 | 87 | 75 | 77 | 105 | 125 | 132 | 110 | 90 | 85 | 1112 |
| 可使用国产彩管量 | 453 | 252 | 330 | 432 | 371 | 424 | 440 | 527 | 582 | 563 | 567 | 550 | 5492 |

彩管生产预测

| 月份 | 06.01 | 06.02 | 06.03 | 06.04 | 06.05 | 06.06 | 06.07 | 06.08 | 06.09 | 06.10 | 06.11 | 06.12 | 预计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THOMSON | 75 | 59 | 69 | 80 | 69 | 78 | 83 | 99 | 100 | 93 | 86 | 80 | 971 |
| LPD-HF | 60 | 61 | 64 | 66 | 57 | 71 | 78 | 80 | 79 | 81 | 80 | 75 | 852 |
| LPD-CG | 57 | 54 | 60 | 58 | 60 | 64 | 59 | 64 | 63 | 62 | 63 | 50 | 714 |
| NOVEL | 51 | 36 | 30 | 31 | 33 | 43 | 44 | 43 | 48 | 41 | 50 | 42 | 492 |
| IRICO | 99 | 79 | 109 | 117 | 111 | 130 | 130 | 135 | 135 | 135 | 132 | 112 | 1424 |
| BMCC | 71 | 63 | 75 | 74 | 72 | 77 | 82 | 83 | 77 | 88 | 80 | 70 | 912 |
| SDI | 78 | 62 | 68 | 79 | 92 | 96 | 105 | 105 | 105 | 102 | 96 | 79 | 1067 |
| SEG | 46 | 37 | 48 | 50 | 46 | 51 | 53 | 50 | 59 | 57 | 59 | 55 | 611 |
| 彩管生产推总 | 537 | 451 | 523 | 555 | 540 | 640 | 634 | 659 | 666 | 659 | 646 | 562 | 7043 |
| 净出口 | 64 | 78 | 95 | 87 | 82 | 81 | 97 | 97 | 98 | 89 | 70 | 56 | 994 |
| 本月彩管进出口差 | 16 | -8 | -19 | 0 | -7 | -4 | 8 | 28 | 34 | 21 | 20 | 29 | |
| 彩管国内供应量 | 473 | 373 | 428 | 468 | 458 | 529 | 537 | 562 | 568 | 570 | 576 | 507 | 6049 |
| 每月供求差 | 20 | 121 | 98 | 36 | 87 | 105 | 97 | 35 | -14 | 7 | 9 | -43 | |
| CRT库存量 | 159 | 280 | 378 | 414 | 501 | 606 | 703 | 738 | 724 | 730 | 739 | 696 | |
| 行业交换资料库存 | 154 | 196 | 244 | 263 | 238 | 231 | 225 | 198 | 169 | 170 | 221 | 317 | |
| 灰色库存 | 5 | 84 | 134 | 151 | 263 | 375 | 478 | 540 | 555 | 560 | 518 | 379 | |

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL

# 2006年市场供求分析图

[auto date]

CHU00047668

CONFIDENTIAL – GRAND JURY MATERIAL

# 2006年彩管供求关系平衡图

[auto date]

CHU00047669

CONFIDENTIAL – GRAND JURY MATERIAL

# 2007年Q1市场预测

•目前各家尚未对后续1Q的生产作出明确的计划，如果CRT行业仍满负荷生产，供求关系将进一步恶化，并且受原材料涨价影响，2007年Q1彩管销售将出现危机。

•2007年的春节在2月中下旬，彩电销售旺季比往年延迟，同时彩电厂的彩管采购和彩电生产将更加谨慎,以限产压库为宗旨。

•2007年中国彩管行业会有新加入者，产能将比2006年增加12.7%（1080万只）。

CHU00047670

CONFIDENTIAL – GRAND JURY MATERIAL

# 2007年市场供求分析表

## 2007年CRT彩电彩管供求趋势

万只/万台

彩电厂生产预测

| 月份 | 07.01 | 07.02 | 07.03 | 07.04 | 07.05 | 07.06 | 07.07 | 07.08 | 07.09 | 07.10 | 07.11 | 07.12 | 预计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHONGHONG | 50 | 20 | 20 | 40 | 50 | 50 | 50 | 50 | 80 | 75 | 75 | 90 | 650 |
| SKYWORTH | 50 | 25 | 30 | 50 | 50 | 50 | 55 | 65 | 80 | 85 | 80 | 80 | 700 |
| KONKA | 70 | 50 | 50 | 60 | 50 | 70 | 70 | 80 | 100 | 120 | 120 | 110 | 950 |
| TTE | 95 | 60 | 100 | 110 | 90 | 95 | 90 | 100 | 110 | 120 | 120 | 110 | 1200 |
| HI SENSE | 50 | 15 | 20 | 50 | 45 | 50 | 50 | 65 | 75 | 75 | 75 | 80 | 650 |
| HAIER | 45 | 15 | 20 | 30 | 30 | 30 | 45 | 50 | 60 | 60 | 60 | 55 | 500 |
| 以上 TOTAL | 360 | 185 | 240 | 340 | 315 | 345 | 360 | 410 | 505 | 535 | 530 | 525 | 4650 |
| 彩电生产推总 | 486 | 285 | 369 | 493 | 450 | 486 | 514 | 621 | 711 | 733 | 716 | 665 | 6529 |
| 其中净进口彩管量 | 50 | 30 | 30 | 50 | 60 | 60 | 80 | 80 | 80 | 80 | 50 | 50 | 700 |
| 可使用国产彩管量 | 436 | 255 | 339 | 443 | 390 | 426 | 434 | 541 | 631 | 653 | 666 | 615 | 5829 |

彩管生产预测

| 月份 | 07.01 | 07.02 | 07.03 | 07.04 | 07.05 | 07.06 | 07.07 | 07.08 | 07.09 | 07.10 | 07.11 | 07.12 | 预计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THOMSON | 65 | 55 | 65 | 80 | 70 | 80 | 85 | 95 | 95 | 100 | 100 | 100 | 990 |
| LPD-HF | 65 | 50 | 60 | 65 | 55 | 70 | 75 | 80 | 80 | 80 | 80 | 78 | 838 |
| LPD-CG | 45 | 40 | 50 | 60 | 60 | 60 | 60 | 60 | 65 | 65 | 65 | 65 | 695 |
| NOVEL | 25 | 25 | 30 | 35 | 35 | 45 | 45 | 45 | 50 | 50 | 50 | 50 | 485 |
| IRICO | 100 | 80 | 130 | 140 | 140 | 130 | 140 | 140 | 140 | 140 | 140 | 140 | 1560 |
| BMCC | 70 | 40 | 50 | 70 | 65 | 70 | 80 | 80 | 80 | 90 | 90 | 90 | 875 |
| SDI | 65 | 60 | 70 | 80 | 80 | 80 | 85 | 90 | 90 | 100 | 100 | 100 | 1000 |
| SEG | 50 | 35 | 50 | 50 | 50 | 50 | 50 | 50 | 60 | 60 | 60 | 55 | 620 |
| CPT | 10 | 20 | 20 | 30 | 40 | 45 | 45 | 50 | 50 | 50 | 50 | 50 | 460 |
| 彩管生产推总 | 495 | 405 | 525 | 610 | 595 | 630 | 665 | 690 | 710 | 735 | 735 | 728 | 7523 |
| 净出口 | 60 | 70 | 90 | 90 | 85 | 90 | 100 | 100 | 100 | 100 | 70 | 60 | 1015 |
| 本月彩管进出口差 | -10 | -40 | -60 | -40 | -25 | -30 | -20 | -20 | -20 | -20 | -20 | -10 | |
| 彩管国内供应量 | 435 | 335 | 435 | 520 | 510 | 540 | 565 | 590 | 610 | 635 | 665 | 668 | 6508 |
| 每月供求差 | -1 | 80 | 96 | 77 | 120 | 114 | 131 | 49 | -21 | -18 | -1 | 53 | |
| CRT库存量 | 695 | 775 | 871 | 948 | 1068 | 1182 | 1313 | 1362 | 1340 | 1322 | 1321 | 1375 | |
| 行业交换资料库存 | 400 | 350 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | |
| 灰色库存 | 295 | 425 | 571 | 648 | 768 | 882 | 1013 | 1062 | 1040 | 1022 | 1021 | 1075 | |

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL

# 2007年市场供求分析图

[auto date]

CHU00047672

CONFIDENTIAL – GRAND JURY MATERIAL

# 2007年全球彩管/彩电供求关系总述

- 全球彩管线体的减产及关闭线体，预计到2006年，全球彩管可供应量约有1亿6千万只，相比CRT彩电全球1亿5千万台的总需求量，彩管供求关系保持基本平衡状态。
- 中国彩管在全球的市场地位越来越重要。供应量接近50%。

[auto date]



# 谢谢各位！

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL CHU00047674

# DOCUMENT 4

# EXHIBIT AA

PARK
IP TRANSLATIONS

June 29, 2012

**Certification**

**Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of the document with bates number: CHU00734728E.

Abraham I. Holczer

Project Manager

Park Case # 29567

134 W. 29th Street 5th Floor • New York, N.Y. 10001
Phone: 212-581-8870 • Fax: 212-581-5577

**[TRANSLATION]**

*From: S.J. YANG [yangsj@cptf.com.cn]*
*Sent: Thursday, June 28, 2007 12:58 AM*
*To: 'humf@cptf.com.cn'; 'huangzy'*
*Subject:* [corrupted characters, unintelligible]

It's inconvenient for *CPT* to attend.

---

From: Mei-Fang Hu [*mailto: humf@cptf.com.cn*]
Sent: June 28, 2007 7:55
To: *huangzy; yangsj*
Subject: Forward: Regarding convening a meeting of general managers in the industry

Director of Sales, Director Huang:
The following asks for opinions regarding a color tube plants general managers meeting.
Mei-Fang Hu

---

Mei-Fang Hu
2007-06-28

---

From: *guopeng@seg-hitachi.com*
Sent: 2007-06-27 23:06:47
To: *huang-hai@bmcc.panasonic.com.cn; yj-xs@ch.com.cn; juny7086@163.com*
Cc: *jing.feng@lgp-d.com; fengjing916@163.com; mei.jin@samsung.com; humf@cptf.com.cn; wangzw@seligent.com; wangzw@seligent.com.cn; dgwangzhiwei@163.com; ShanShan.Wu@tdco.com; xyz_126@163.com; yun.xie@samsung.com; peng.xin@tdco.com; minghui.xu@lgphilips-displays.com; yeqing76@21cn.com; yeqing@sva-snc.com; yeqing76@163.com; annieyu@lgphilips-displays.com; annieyu@lpdisplays.com*
Subject: Regarding convening a meeting of general managers in the industry

Brothers and sisters all:
Received a phone call from Secretary-General Guo-Jun Yang today, which said that Chairman Wen-Qiang Fan has requested to plan to convene a meeting of general managers in the industry in Dongguan on July 5th. He has already asked Xiang-Jie Yang of Thomson (or Xinjun) who has agreed. (Skyworth will host a meeting on July 4th; at that time everybody ought to come). So everybody please ask for an opinion from respective general managers within this week.
Thanks!

The brothers and sisters who received this email please reply to me.

Marketing Department of Shenzhen SEG-Hitachi Color Display Devices Co.
Peng Guo

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

**From:** S.J.YANG [yangsj@cptf.com.cn]
**Sent:** Thursday, June 28, 2007 12:58 AM
**To:** 'humf@cptf.com.cn'; 'huangzy'
**Subject:** 湘葩: 壽衾欸羲倢珛粍冪熗頗祜

CPT不方便參加

---

**发件人:** 胡美芳 [mailto:humf@cptf.com.cn]
**发送时间:** 2007年6月28日 7:55
**收件人:** huangzy; yangsj
**主题:** 转发: 关于召开行业总经理会议

**行销长、黄处：**
**以下为彩管厂总经理会议针求意见。**
**胡美芳**

---

胡美芳
2007-06-28

---

**发件人：** guopeng@seg-hitachi.com
**发送时间：** 2007-06-27 23:06:47
**收件人：** huang-hai@bmcc.panasonic.com.cn; yj-xs@ch.com.cn; juny7086@163.com
**抄送：** jing.feng@lgp-d.com; fengjing916@163.com; mei.jin@samsung.com; humf@cptf.com.cn; wangzw@seligent.com; wangzw@seligent.com.cn; dgwangzhiwei@163.com; ShanShan.Wu@ttdco.com; xyz_126@163.com; yun.xie@samsung.com; peng.xin@ttdco.com; minghui.xu@lgphilips-displays.com; yeqing76@21cn.com; yeqing@sva-snc.com; yeqing76@163.com; annieyu@lgphilips-displays.com; annieyu@lpdisplays.com
**主题：** 关于召开行业总经理会议

**各位兄弟姐妹：**
**今天接到杨国钧秘书长的电话，说是范文强会长要求，并征求过汤姆逊（或者是新俊）杨向杰的同意，拟于7月5日在东莞召开行业总经理会议，（7月4日创维召开某会议，届时大家应该都会来），所以请大家在本周内征求各自总经理的意见，谢谢！**

**请收到此邮件的兄弟姐妹回信给我。**

**深圳赛格日立彩色显示器件有限公司市场部**
**郭鹏**

# EXHIBIT BB

**From:** jill-yy@163.com
**Sent:** Thursday, January 18, 2007 3:51 AM
**To:** yangsj; Yang Sheng Jen - Sales Assistant Vice President
**Subject:** □辦⊖□?儀

**Attachments:** ??冊??Conferenceminutes20061121.doc; ??例????料（06-12-21）.doc

Exhibit
Wang 8568

CONFIDENTIAL – GRAND JURY MATERIAL CHU00102751



June 20, 2012

**Certification**

**Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of the document with bates numbers range: CHU00102752E – CHU00102754.

Abraham I. Holczer

Project Manager

134 W. 29th Street 5th Floor • New York, N.Y. 10001
Phone: 212-581-8870 • Fax: 212-581-5577

[TRANSLATION]

**Meeting Minutes of 2006 Color Tube Industry Presidents' Meeting**

Meeting date: November 21, 2006

Meeting location: Shanghai, Huaxia Hotel

Attending companies and personnel:

| | |
|---|---|
| BMCC | Wenchiang Fan, Heng Zheng Guang Ze [Japanese name in Chinese phonetics], Dalin Li, Yongchun Chi, Liman Lu, Hai Huang |
| Xianyang Irico: | Xiaolin Shen |
| SEG Hitachi: | Guojun Yang, Jianmin Huang, Peng Guo |
| Changsha Shuguang: | Yaping Yang, Jing Feng |
| *LPD* | Zugoun Han, Yingyuan Lu, Jiangnan Ding |
| Nanjing Huafei: | Jianzhong Sheng, Dezhu Zhang, Minghui Xu |
| Novel: | Wei Sun, Lei Lee, *Qing* Ye |
| Samsung *SDI*: | Hoo Mok Ha, Chong Huan Lee, Yun Xie, Jing Wen [Korean names in Chinese phonetics] |
| Thomson: | Dade Han, Peng Xin |
| Xin Ion: | Xiangjie Hang, Zhiwei Wang |

Main content:

Chief Secretary Yang chaired the meeting and began with opening speech.
Chief Fan spoke: This Presidents' meeting is a key meeting, each of us are here to discuss and study about next year's market trend, strive for stability of the environment and seeking a industry of healthy development.

**Agenda I: Information collector reported the current color TV and color tube industry condition and forecast of the future market (Details refer to *PPT*).**

Chief Secretary Yang: As for the market reports from the information collectors, the following comments were mentioned: In future market reports, impact analysis on *CRT* to color television in flat color television market should be included. In 2007, the *CRT* capacity increase will create significant problems for the sale of *CRTs*, reason being the extremely shortage of materials, glass bulbs price increase due to capacity decrease. Screen capacity decrease by 15.9%, cone capacity reduced by 19.3%. Currently, the issue in which requires urgent resolution is how should *CRT* be developed from now on? How to limit production and protect prices? In order to keep profitability, the *CRT* market in 2007 should realize optimization of capacity and does not need to produce in large volume. Based on understanding, there are a few *LCD* lines starting to expand capacity. 32*LCD* screen price reduced by 10%--comparing to the previous 34*FS*, the price is even lower. Therefore, the suggestion is: while facing the

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

worsening market of *Q1* in 2007 and the declined exports in Christmas 2006, and with next year's Chinese new year being later than usual, color tubes sales will have a longer slow season the pressure on sales is significant, but, in *Q2* this year, some color tube companies dumped their color tubes with low prices, currently, the color television makers are still digesting these inventories, the impact is very bad. Therefore, it is recommended to the color tube makers to take more action on realistic issues for the sake of the customers and the market.

**Agenda II: How to go into in-depth communication among the Color Tube Industry and together face the challenge of *Q4* 2006 and *Q1* 2007?**

Chief Secretary Yang: As far as *Q4* 2006 and *Q1* 2007 market condition are concerned, how to have self-discipline in the industry? How to respond to *Q1* 2007 while maintaining *Q4* pricing? Chief Secretary asked for comments from respective companies.

BMCC Heng Zhen: it is more difficult in *Q4* 2006, end of 2005 and beginning of 2006 around Chinese New Year. Production has been adjusted based on what was agreed upon. As far as the added capacities are concerned, how will respective makers collectively resolve this issue? Most important issue is that respective makers should categorize production types.

Samsung Ha: *Q4* 2006 will be over soon, what is more important is to focus on *Q1* 2007 condition. Samsung group's policy is to transfer business unit leaders each year at the beginning of each year, I hope I will not be responsible for the sales of color tubes of China next year. Based on internal information of Samsung, it is shown that 2010 China domestic *LCD* demand exceeded 20M. Currently, domestic *CTV* demand is less than 40M, domestic color tube capacity is over 70M. As to the publicly announced information, Chunghwa Picture Tubes converted 3 production lines, Samsung has no plan currently, I would like to listen to all of your opinion. As for the current supply and demand conditions, respective color tube makers should have mutual information exchanges for the profitability of the company and to jointly formulate a good plan. There is room for reduction on *LCD* cost, but *CRT* material costs are not optimistic. *CRT* industry should consider these elements: strengthen information communication for the overall industry chain. Based on *SDI* internal analysis, *CDT* price was reduced 14%, but the cost only reduced 3%. It is expected that *CPT* will face similar situation as *CDT*. Therefore, it is hereby suggested that makers should seek cooperation in pricing, and jointly resolve the issue of pricing on materials.

Shuguang Yang: In 2007, the company's business plan indicated that corresponding to the decrease in 2006, *Q1* 2007 cost should increase, it was estimated that the price will not be maintained. As for 2007

English words found in the original text are *italicized*
Translator's remarks are indicated in brackets [ ].

*Q1*, when talking about production limits, gray inventory is very large, the reliability and accuracy of said data is yet to be verified. Based on understanding, some of the domestic major color television factories have heavy inventories, normal production can be maintained even if they did not make any purchases for two months.

Chief Secretary Yang: In October 2006, *CPT* production volume was 6.55Mpcs, what should be the production volume in January 2007 in order to satisfy the market, maintain the price and maintaining inventory?

Shuguang Yang: Large screen *LCD* price dropped, under 32 and 34, *CRT* will all be impacted and be pressured.

Samsung Ha: *Q1* condition is worrisome, we need to resolve this during our meeting, whether we can sustain our prices until the end of the year requires industry to take proper measures.

Huafei Sheng: Facing the impact by *LCD*, the industry should reconsider the production limits to protect pricing as suggested before. At the same time of maintaining prices, whether it will provide more entry opportunities for the newly jointed makers, and under these circumstances, we should increase exports and resist imports. *Q3* 2006 industry price increase has brought opportunities for imports, long term consideration should be given as to how to get them to back out. Based on the experience from past years, production is usually greater than sales in the first half of the year, and the second half of the year would have sales greater than production. Based on past experience, respective color tube makers would convert line to speed up production, how should that be controlled?

Irico Sheng: Production limits -- if the production is stopped, it will bring opportunities for the new *CPT* factories, how should the industry resist imports? Currently Irico is expanding exports, expecting to export 6M this year. Based on understanding, Northern Europe and Central Europe regions do not have any concept on flat screen yet, the main stream is still *CRT*. *CRT* market allocation is 70%-80%, flat screen 20% or so. Based on understanding, Northern Europe has 24M *CRT* color television demands. Production limits and price limits are less probable in China. Prices would be loosen just because entering into a slow season, *CTV* makers know the trend and implemented price squeeze strategy. How can the industry have a healthy development? I would like to clarify, currently Irico *K* line has no production plan for the time being due to cost considerations. 28/29 inches will be produced on the old lines.

Thomson Han: Color tube makers are being sandwiched between the suppliers and the customers, the upstream materials continues to increase, downstream *CTV* factories are continually squeezing prices. If the production is limited to protect the price, it will provide opportunities for the newcomers and import tubes. Currently, there is no better way than limit production to cure the condition of oversupply. Dongguan factory ceased production 7 days in November, it is not because of lack of sales, and it was because we did not want to produce too much, hoping to control prices. *Q1* 2007 market is very tough, primary opportunity would be to export. Currently China region capacity is increasing, but capacity in other regions

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

worldwide is decreasing. Based on understanding, Western Europe will have demands of 12M-15M next year, part of them will be supplied from China, also agreeable to limit production to protect the price.

Novel Sun: I suggest respective makers study the issues in the market report generated by the information collectors. 1. Provide resolution to respond to the issues for *Q4 2006* and *Q1 2007* market, the reason for increased inventories, and why is capacity being added? 2. How to resolve the issue on newly added capacity?

Chief Fan: Regarding EU's anti-dumping, the two makers being sued have already bankrupted. *CRT* production volume in Europe is 11M, among which Thomson has 6M, Samsung 5M, but the demands for Western Europe market is 15M, Russian market demand is 10M.

As for the anti-dumping suit for China's color tubes export to Europe has been dismissed (11/16), but the color television restriction has not been cancelled. If the color televisions are using color tubes from China, whether it is under the restriction is yet to be studied. Since *LCD*'s power consumption is three times as much as *CRT*, UK suggested to sell color television in different levels, and set *LCD* color television as level 3. As to the newly added capacity for Chunghwa and Changzhou Baoma, a strategy can be discussed to categorize them into types.

Xinjun Yang: Regarding to communicate with the newcomers in the industry, should we use conversational format?

Chief Secretary Yang: Changzhou Baoma infringed intellectual property; it is not possible for them to create impact for the industry. As for CPTF, the country was exporting all *CRT* made initially, now Fuzhou can do *CPT* business, and is a major shareholder of Huaxia, the industry hopes to be able to send representative to discuss with them and invite them into the industry to unify standards. Whether CPTM will decrease production, and do they have in-depth understanding of the impact on worldwide market? The reason for the trade differential came from Malaysia is that they shipped the tubes to China, and put them into a set for export, 12% tariff was applied.

Chief Fan: What changes are there for the capacity of CPTM?

Samsung Hu: According to my understanding, CPTM stopped one line, CPTF opened 3 lines, SDIM stopped 1 line in December.

Chief Secretary Yang: The purpose for this meeting is to hope that makers will not suffer a loss by the end of the year. I would suggest to use the strategy of production limitation to protect prices. As far as what was mentioned in the information collectors' report regarding newly added capacity, we will not consider Irico and Changzhou Baoma for the time being, and we will invite CPTF into the industry.

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

**Agenda III: What is the opinion from respective makers regarding inventory increases, what is your view on *Q1* 2007?**

Xinjun Yang: Limit production to protect prices in *Q1* 2007, and reconsider total input volume for *Q1* market.

Chief Secretary Yang: Setup production based on sales and do not expand production blindly.

Irico Shen: I would suggest to stop production during Chinese New Year holiday period, with a win/win situation for the company and the employees.

Samsung Ha: Character of slow season. Oversupply, *CPT* factory gets large order (unit price for large order is dropped more than 5%), sign low price contract with *CPT* factory.

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

If these types of large orders are accepted, sacrificing industry price will bring significant impact for industry development. When the industry operating environment is not favorable, *CTV* makers' will make harsher demands, for example, Changhong *VMI*'s payment method, such *VMI* methods may change payment due date which will severely impact the healthy development of the industry.

**Agenda IV: How to deal with the trend of *Q4* materials procurement?**

Chief Secretary Yang:

| | |
|---|---|
| Screen capacity reduced by 23.7% | Cone capacity reduced by 19.3% |
| Anci stopped 11 lines and started 14 lines | Anci stopped 4 lines |
| Xu Electronics stopped 2 lines | Changsha stopped 1 line |
| Shijiazhuang stopped 1 line | Shijiazhuang stopped 1 line |
| Total lines stopped 14, started 45 | Total stopped 6 lines and started 19 |

Estimated total annual production of screens 96.44M, Cones production at 86.44M.

Copper price increased. *DY* price increased, especially for 21" it increased by US6. Although color tube price has increased, but in fact it was only converted into materials price ups, the tube itself did not have much profits.

Chief Secretary Yang: First of all, inventory has to be reduced to zero, and ultimately come to an appropriate reserved inventory. Currently, there are 5-6M extra capacity, and the entire industry shall consume this capacity by limiting production. It is recommended to cease production and limit production in order to ease the seriously oversupplied situation for color tubes in 2007, each maker shall consolidate its own condition and stop production for an accumulated 30 days for the whole year.

As to Chief Secretary Yang's recommendation, each has expressed comments as follow:

Novel Sun: Agreed.

Xinjun Yang: Voluntarily reduce capacity, follow the rules of the game, and agree with Chief Secretary's recommendation.

BMCC Heng Zhen: Support the healthy development of the industry as a priority, agree to Chief Secretary's proposal to invite CPTF into the industry. In addition, it is hoped that each company would try to increase export volume, but would need to understand the composition of the current import data of 11M.

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

Samsung Hu: The decision to completely stop production is out of his authority, it is to be determined.

Shuguang Yang: Need to be confirmed.

Huafei Sheng: Based on market condition, respective companies shall initialize active and flexible strategy in stopping production; since by stopping production blindly brings significant impact on any company, it can be based on model types and consolidated golden week/summer vacation types of methods to confirm the condition of stopped production.

Ined Yao: Agreed to limit production, and agrees with Huafei's suggestion. Proposed to immediately implement limited production and stop production in *Q4*. As far as Fuzhou, he agreed to Chief Secretary Yang's recommendation, as far as CPTM exported to China close to 6M color tubes, he is considering whether there exists a anti-dumping issue.

Chief Secretary Yang: Material prices are increasing, especially the foreign materials factories, this is a disadvantage to CPTM. Currently, the entire *CRT* industry focus is on China. Domestic cost has the most competitive edge, if the domestic factories suffer losses, the foreign factories for sure will lose money. Therefore, it is proposed to each company accumulatively stop overall production for 1 month, and take up industry monitoring mechanism.

Chief Fan's proposal resolution draft: detailed in *WORD* document.

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

**2006年彩管行业总经理会议会议纪要**

会议时间：2006年11月21日
会议地点：上海 华夏宾馆
与会单位及人员：
北京松下 范文强 横枕光则 李大林 迟永红 卢亚曼 黄海
咸阳彩虹 申小康
赛格日立 杨国钧 贾建民 郭鹏
长沙曙光 杨亚平 冯靖
LPD 韩在瑨 卢濬元 于江南
南京华飞 盛建忠 张德柱 许明晖
上海永新 孙伟 李雷 叶青
三星SDI 河俊穆 李昌焕 谢云 文静
汤姆逊 韩达德 章鹏
新骏 杨向杰 王志伟

主要内容：
杨秘书长主持，致开幕词。
范会长致辞：这次总经理会议是一次关键的会议，大家在此研讨明年的市场形势，力求稳定环境，寻求行业健康发展。

**议题一：信息员代表汇报当前彩电彩管行业现状及今后市场的预测（详见PPT）。**
杨秘书长：针对信息员的市场汇报，提出如下意见：以后的市场汇报应增加平板彩电市场对CRT彩电的冲击分析；07年CRT产能增加，会对CRT销售产生重大问题，原因在于材料奇缺，玻壳因产能下降而涨价，屏的产能下降15。9%，锥的产能下降19。3%。现在急需解决的问题，CRT今后该如何发展？如何限产保价？为了保持利润，在07年的CRT市场应实现产能最优化而不靠大量生产。据了解，目前有几条LCD线上马，产能扩大。32LCD屏价格下降10%，与以前34FS相比，价格还要便宜。因此，建议面对07年Q1市场恶化，06年圣诞节出口萎缩的局面，明年春节比较晚，彩管销售淡季较长，销售压力很大。但是，今年Q2有些彩管企业低价抛售的彩管，现在彩电厂还在消化这些库存，影响很不好。所以，建议各彩管厂家为了客户和市场多做一点实事。

**议题二：彩管行业如何深入沟通协作，共同迎战06年Q4和0 7年Q1**
杨秘书长：针对06年Q4和07年Q1的市场情况，行业如何自律？维持Q4的价格，如何应对07年Q1？请各个公司发表意见。
北松 横枕：06年Q4比较困难。05年年底和06年年初春节前后，已按约定调整生产。对于新增生产能力，各家如何联合解决此问题。最重要的一点是，各家尽量区分生产品种。
三星 河：06年Q4即将过去，更重要是关注07年Q1的情况。三星集团规定每年年初事业部门领导调任，我希望明年不再负责中国彩管销售任务。据三星内部资料显示，2010年中国国内LCD需求超过2000万。目前国内CTV需求在4000万以下，国内彩管产能在7000万以上。针对刚发表市场资料，中华映管改造3条生产线，三星暂时没有方案，想听听各家的意见。针对目前供求关系情况，各彩管厂家应互相交流信息，为求公司利润，共同谋划好的方案，LCD在成本上有下降的空间，而CRT资材价格不容乐观，CRT行业应考虑此方面因素，加强整个产业链的信息沟通。据SDI内部分析，CDT价格下降14%，而成本仅下降3%，预计CPT将出现与CDT类似情况。因此，建议各家在价格方面寻求合作，共同解决材料价格问题。
曙光 杨：07年公司事业计划相对06年有下降，07年Q1成本上涨，预计不能保价，针对07

年 Q1，谈限产问题，灰色库存很大，这个数据的可靠性和准确性需要再考究。据了解，国内一些大彩电厂库存大，即使两个月不采购，也可维持正常生产。

杨秘书长：06 年 10 月份 CPT 产量 655 万只，07 年 1 月分产量应为多少才能满足市场，保价保库存？

曙光 杨：大屏幕 LCD 价格下降，32 34 以下 CRT 都会受到冲击，受到积压。

三星 河：担心 Q1 的情况，我们开会需要解决，我们是否可以把价格挺到年底，需要行业措施。

华飞 盛：面对 LCD 的冲击，提议的限产保价措施，行业需要重新思考一下，保价的同时是否给新入行者更多机会增加了进口，在此情况下，我们应增加出口，抵挡进口。06 年 Q3 行业涨价给进口带来了机会，如何让其退出，应做长远的考虑。根据往年的经验，上半年是产大于销，下半年销大于产。按以往经验，各彩管厂会改造提速。如何控制？

彩虹 申：限产——如果停产会给新增 CPT 厂带来机会，行业应如何抵制进口？彩虹目前扩大出口，预计今年出口 600 万。据了解，北欧 中欧地区消费者对平板无概念，主流还是 CRT，CRT 市场分额 70%-80%。平板 20%左右。据了解，北欧市场有 2400 万 CRT 彩电需求。中国限产限价可能性小，因为刚进入淡季，价格就有所松动，CTV 厂家掌握了动向，实行了压价策略。行业应如何健康发展？澄清一下，目前彩虹 K 线因考虑成本原因，暂无生产计划。28/29 英寸在老线上生产。

汤姆逊 韩：彩管厂正处于供应商与客户夹缝之间，上游材料在不断涨价，下游 CTV 厂在不断压价。如果限产保价，会给新加入者和进口管机会。目前供大于求的情况，不采取限产，也没有更好的办法。东莞工厂 11 月停产 7 天，不是因为卖不出去，而是不想生产太多，希望控制价格。07 年 Q1 市场很困难，主要机会是出口。目前中国地区产能在增加，而全球其它地区产能在减少。据了解，明年西欧的需求在 1200-1500 万，部分来自中国，对于限产保价表示赞同。

永新 孙：建议各家对信息员的市场汇报提出的问题进行探讨：一 针对 06 年 Q4 07 年 Q1 市场提出解决问题的相应对策，库存增加原因，为什么新增产能？二 如何解决新增的产能？

范会长：针对欧盟反倾销，起诉的两家已经倒闭，欧洲 CRT 产量有 1100 万，其中汤姆逊 600 万三星 500 万，而西欧市场需求 1500 万，俄罗斯市场需求 1000 万。

有关中国彩管出口欧洲的反倾销已经撤消（11/16），但是对彩电的限制还没有取消。如果彩电用来自中国彩管，是不是还是受到限制，还需要研究。鉴于 LCD 能耗是 CRT 的三倍，英国建议彩电进行分级销售，将 LCD 彩电定于三级。针对新增产能中华映管和常州宝马，实行分品种协商策略。

新骏 杨：针对行业的新加入者，是否采用对话形式。

杨秘书长：常州宝马因侵犯知识产权，对行业不可能造成影响。福州中华，当初国家全部外销，做 CDT。现在福州可以做 CPT 业务，又是厦华的大股东。行业希望能够派代表与他们协商，邀请其入行，统一规范。华映马来西亚是否会减产，对全球的影响应深入了解？贸易逆差来自于马来西亚的原因，他们出口管子到中国，再作成整机再出口，要收取 12%的关税。

范会长：华映马来西亚有什么产能上的变化？

三星 河：据了解，华映马来西亚停 1 条线，中华福州开 3 条线，三星 马来西亚 12 月份停 1 条线。

杨秘书长：本次会议的目的是希望各家在年底不亏损，建议采取限产保价的策略。

对于信息员报告中提到新增的产能，目前可不考虑彩虹和常州宝马。中华福州邀请其入行。

**议题三：针对库存上升，07 年 Q1，请各家提提看法？**

新骏 杨：07 年 Q1 限产保价，对于 Q1 市场整体投放量，需再整体考虑。

杨秘书长：以销定产，不盲目扩大生产。

彩虹 申：建议春节期间停产，来限产保价，给公司和员工带来双赢的局面。

三星 河：淡季特点：供大于求，CTV 厂拿大单（大单价格下降 5%以上）与 CPT 厂低价签定合

同。如果接受此类大单，牺牲行业价格，将会给行业发展带来很大影响。同行业经营环境不善，CTV厂家要求越来越苛刻，例如长虹 VMI 结算方式，这些例如 VMI 方式或者变更付款期限，都严重影响了行业的健康发展。

**议题四：如何针对 Q4 材料采购形势？**

杨秘书长：

| 屏产能下降 23。7% | 锥 产能下降 19。3% |
|---|---|
| 安彩停 11 条 开 14 条 | 安彩停 4 条 |
| 湘电子 停 2 条 | 长沙停 1 条 |
| 石家庄 停 1 条 | 石家庄停 1 条 |
| 共计停 14 条 开 45 条 | 共计停 6 条开 19 条 |

预计全年屏生产 9644 万，锥生产 8644 万。

铜价格上涨，DY 价格上涨，尤其是 21 上涨 6 个美金。彩管虽然涨价，其实只是转移到材料涨价，本身没有赚多少钱。

杨秘书长：首先要作到无库存，然后作到适当的储备库存。目前多余的 500-600 万产能，整个行业采取限产方式把它消耗掉。建议为了缓和 2007 年彩管严重供大于求的局势，会议提议停产限产，每家结合自身情况全年整体停产累计 30 天。

对于杨秘书长的建议，各家表态：

永新 孙：表示赞同。

新骏 杨：主动将产能降低，遵守游戏规则，赞同秘书长的意见。

北松 横枕：首先支持行业的健康发展，对于秘书长提出的邀请中华福州入行表示赞同。另外，希望各公司尽量增加出口，针对目前的进口数据 1100 万，需要了解一下构成。

三星 河：完全停产超过他的决策范围，待定。

曙光 杨：需要再确定。

华飞 盛：根据市场情况，各公司采取主动灵活的停产策略，因为任何公司盲目的停产影响很大，可根据品种和结合黄金周/长假等方式来确定停产情况。

彩虹 姚：对于限产表示赞同，同意华飞的建议。提议 Q4 马上实施限产 停产。对于福州的事宜，赞同杨秘书长的建议，针对中华马来西亚出口到中国将近 600 万的彩管，是否考虑存在反倾销问题。

杨秘书长：现在材料涨价，尤其是国外的材料工厂，这个对中华马来西亚不利，目前整个 CRT 产业的重心在中国。国内成本最具有竞争力，如果国内亏损，国外厂家一定亏损。所以提议全年各个公司累计整体停产 1 个月。并采取行业监督机制。

范会长的提议的决议草案，详细 WORD 文件。





# CERTIFIED TRANSLATION

*Documents Translated For:*

| | |
|---|---|
| Name: **Lauren C. Capurro, Esq.** | Street Address: **2001 Union Street, Suite 482** |
| Firm: **Trump, Alioto, Trump & Prescott, LLP** | City/State/Zip: **San Francisco / CA / 94123** |

*Description of Document(s):*

| |
|---|
| |
| **Regular Sales and Marketing Meeting** |
| **December 2006** |
| **CHU00102755_FT through CHU00102764_FT** |
| |

| | |
|---|---|
| Source Language: **CHINESE** | Target Language: **ENGLISH** |

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:** Sean Kirschenstein, Director **Date:** December 16, 2021

A copy of the translated version(s) is attached to this statement of certification.

For Internal Use Only: Keep Confidential

# Regular Sales and Marketing Meeting            December

**Sales and Marketing Department 12/20/2006**

Due to the CRT television market's continued weakness, TCL, Konka, Skyworth, and other major makers of whole sets saw their inventory of color TVs rise to 5.46M sets, and their inventory of color tubes rise to 4.32M pieces. The major whole-set makers are all domestic and foreign publicly listed companies, and in order to give their investors a satisfactory annual report, they need to greatly digest their color TV and color tube inventories before the end of the year. So they greatly reduced December production plans and cut back on their color tube purchases, causing the color tube market's sales to be unusually bleak.

**I. Color TV Market**

1.   Domestic CTV market is weak. Konka, Changhong and other whole-set factories have adopted low price promotions for 21" FS and 21"PF. But effects are quite minor; flatscreen TV prices continue to drop, impacting CRT market.

     Sales and Marketing Department's client tracking and market research results show:

     Urban markets: Domestic CTV market sales are light, sales are mainly 29" PF, which represent 36.8% of the market share. Konka, Changhong and other whole-set makers have adopted low price promotions for 21" FS and 21" PF, but have not achieved desired effect. LCD TV prices continue to drop. This is impacting CRT TV markets in first- and second-tier markets.

     Rural Markets: Research conducted on third- and fourth-tier markets in Henan, Shandong, Sichuan, Shaanxi, and other places show that rural color TV markets are still not effectively activated. This may be related to 2007 lunar new year being relatively late. The products sold are mainly 21" to 29" TVs. Pure flat color TV represent an increasing percentage of sales. Currently CTV price decrease pressure is relatively large.

     China Market Monitor's data shows: From January to October 2006 domestic CTV sales totaled 26.571M sets, a 11.5% YOY decrease, of which CRT color TV sales totaled 23.259M sets, a 16.5% YOY decrease. LCD and PDP flatscreen TVs combined sold 3.039M sets, of which LCD sales were 2.615M, a 192.5% YOY increase, and PDP sales were 424K, a 4.9% YOY increase; flatscreen TVs make up 63.2% of total TV sales revenue, continuing to surpass CRT TV revenue.

2.   Export markets continue to trend light

     Based on customs statistics, October Chinese CRT color TV exports were 3.283M sets, 1.9% YOY growth; export revenue was $253.37M USD, a 2.7% YOY decrease; export average unit price was $77.2 USD, a 4.2% YOY decrease.

     From January to October Chinese CRT color TV exports were 24.033M sets, an 8.2% YOY growth. Currently export market has entered slow season. For monthly Chinese CRT color TV export trends from 2003 to 2006, see below graph.

AUTO PAG



**II. Whole-set Makers' Business Condition**

1. 06/05 YOY comparison of production, sales, and inventory for the 7 major makers (total volume)

(Unit: 10K sets, 10K pieces)

| | CTV produced | CTV sales | CTV inventory | CTV exports | CRT inventory |
|---|---|---|---|---|---|
| Nov 2006 | 439.4 | 417.7 | 546 | 134.9 | 432 |
| Nov 2005 | 578.9 | 509.7 | 485.2 | 166.4 | 124.1 |
| '06/'05 | -24.1% | -18.0% | 12.5% | -18.9% | 248.1% |
| Jan to Nov 2006 | 3866.2 | 3933.9 | 546 | 1385 | 432 |
| Jan to Nov 2005 | 4098.1 | 4171.8 | 485.2 | 1392.7 | 124.1 |
| '06/'05 | -5.7% | -5.7% | 12.5% | -0.6% | 248.1% |

2. Nov 2006 / Oct 2006 MOM comparison for the 7 major makers (total volume)

(Unit: 10K sets, 10K pieces)

| | CTV produced | CTV sold | CTV inventory | CTV exports | CRT inventory |
|---|---|---|---|---|---|
| Nov 2006 | 439.4 | 417.7 | 546 | 134.9 | 432 |
| Oct 2006 | 451.2 | 431.9. | 473 | 158.5 | 444.2 |
| Month on Month | -2.6% | -3.3% | 15.4% | -14.9% | -2.7% |

The chart above shows, comparing November to October, CTV production and sales dropped 10.6% and 4.9% respectively, inventory grew 4.1%, CTV exports dropped 6.8%, and CRT inventory grew 6.5%.

3. Jan-Nov 2006 / Jan-Nov 2005 production, sales, and inventory comparison by product type for the 7 major makers.

Jan-Nov 2006 / Jan-Nov 2005 production volume comparison (by product type) for the 7 major makers (Unit: 10K sets)

| | 14" | 15" PF | 21"F S | 21" PF | 21" SS | 25" FS | 25" PF | 28" W | 29" FS | 29" PF | 29" SS | 34" FS | 34" PF | 32" W | 32" SS | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| '06 | 232 .9 | 90. 2 | 1192.2 | 647. 2 | 139. 7 | 301. 7 | 256. 5 | 36.6 | 140. 1 | 677. 8 | 36.6 | 24.6 | 52.5 | 11.7 | 25.7 | 3866 |
| '05 | 342 | 93 | 1235 | 609 | 13 | 424 | 321 | 4 | 212 | 652 | 3 | 54 | 76 | 5 | 1 | 4098 |
| 06/05 | -31 | -3.0 | -3.5% | 6.3% | 974 | -28.8 | -20.1 | 815 | -33.9 | 4.0% | 1120 | -54.4 | -30.9 | 134 | 2470 | -5.7% |

AUTO PAGE

| % | 9% | % | | | 6% | % | % | 0% | % | | .0% | % | % | 0% | .0% | - |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

The above shows, Jan – Nov ’06 production volume dropped 5.7% compared to the same period in ’05, product makeup continued to develop towards flatscreens and wide screens.

Jan-Nov ‘06 / Jan-Nov ‘05 sales comparison (by product type) for the 7 major makers (Unit: 10K sets)

| | 14” | 15” PF | 21” FS | 21”PF | 21”SS | 25” FS | 25” PF | 28” W | 29” FS | 29” PF | 29”SS | 34” FS | 34” PF | 32” W | 32”SS | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ‘06 | 222.8 | 90.3 | 1200.7 | 675 | 129 | 338.3 | 255.7 | 36.3 | 136.5 | 707.1 | 24.9 | 26 | 56.3 | 11.6 | 23.4 | 3933.9 |
| ‘05 | 335 | 80 | 1289 | 616 | 11 | 451 | 328 | 3 | 229 | 654 | 3 | 63 | 86 | 1 | 5 | 4172 |
| 06/05 (%) | -33.5% | 12.9% | -6.9% | 9.6% | 1072.7% | -25.0% | -22.0% | 1110.0% | -40.4% | 8.1% | 730.0% | -58.7% | -34.5% | 1060.0% | 368.0% | -5.7% |

Nov ‘06 / Nov ‘05 CTV inventory comparison (by product type) for the 7 major makers (Unit: 10K sets)

| | 14” | 15” PF | 21”FS | 21”PF | 21” SS | 25”FS | 25” PF | 28”W | 29” FS | 29” PF | 34”FS | 34”PF | 32”W | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ‘06 | 11.1 | 0.5 | 147.6 | 119.1 | 11.5 | 72.9 | 48.8 | 3.2 | 25.3 | 90.8 | 6.2 | 5.3 | 3.7 | 546 |
| ‘05 | 6.7 | 2.3 | 131.1 | 70.9 | 0 | 87.8 | 45.7 | 0 | 23.9 | 98.9 | 4.7 | 11.2 | 0 | 485.2 |
| 06/05 (%) | 65.7% | -78.3% | 12.6% | 68.0% | // | -17.0% | 6.8% | // | 5.9% | -8.2% | 31.9% | -52.7% | // | 12.5% |

We can see from the above chart, Nov ’06 inventory grew 12.5% compared to the same period in ’05. Looking at product type, 14” inventory grew 65.7%, 21”FS inventory grew 12.6%, 21”PF inventory grew 68%.

4. Latest business status of the 7 major makers

(1) TCL

Originally planned to produce 800K sets for December domestic sales. Due to lack of action in CTV sales market, cut production for domestic sales by 100K sets in order to cut CTV inventory. Since Lee Dong Sheng took back control, TCL has adopted a plan to keep lowering inventory. By the end of November, TCL CRT inventory was 400K pieces, its CRT purchases will proceed according to plan.

(2) Konka

Low price promotion for 21”FS and 21”PF CTVs at end of November, but results were small. At end of November CRT inventory was 860K pieces. In November and December Konka’s export orders saw relatively large weakening, with HK Konka having 300K export CRTs in inventory. The Group has asked domestic sales to help export sales digest inventory.

(3) Skyworth

800K pieces of CRT in inventory for domestic sales. Multimedia stored some CRTs for export in the prior period. Now due to weakening export market, purchasing chief Zhao asked domestic sales to assist Multimedia in digesting CRT inventory. Skyworth currently mainly buys 29”PF, 29”SS, 28”PF, 32”PF and 34”PF, etc., basically doesn’t buy other types. Skyworth reached a 29”SS purchase agreement with Samsung,

AUTO PAGE

will buy 50-60K pieces per month, Samsung gave price discount.

(4) Changhong

CRT inventory: 1M pieces. In Dec and Jan ’07 mainly digesting CRT inventory, planning to control CRT inventory to ~150K pieces by end of Jan ’07; In November Changhong’s settled accounts with CRT makers represented very small volumes, and not even a single piece with Novel. CRT purchase volume in December was relatively small.

(5) Hisense

Produced 573K sets, sold 465K sets, had 700K CTV inventory, and 550K CRT inventory in November. These were mainly 21”FS, 21”PF, and 25”FS. They estimate needing until end of Jan ’07 to finish digesting these. Hisense originally planned to produce 1.06M sets in December, but because market sales are poor, now cut to 560K sets. Also, Hisense Purchasing Center implemented SRM system, compressing CRT supply time, reducing demand on cash.

(6) Haier

Planned to produce 480K sets in December, though last December produced 900K sets, a 46.7% reduction YOY. 200K CRT in inventory. Haier is pessimistic about the market in the latter half of the year, and is currently mainly producing 29”PF and 21” ultrathin, buys relatively few CRTs for mid-and-small screens.

(7) XOCECO

CRT inventory: 200K pieces, main suppliers are IRICO, Samsung, and Chunghwa Picture Tubes (CPT). In ’07 the volume supplied by CPT will increase greatly. Relying on their advantage as controlling shareholder, CPT is accelerating new product development at XOCECO. They have already provided sample tubes for the 21”SS, sending a small lot of pilot tubes from Malaysia. They are currently testing heat capability of sample tubes for the 29”AK.

**From all the above, we can see that the domestic CTV market is weak, that the major TV factories have stubbornly high CTV inventories and are therefore cutting December production plans, and are mainly focused on digesting CTV and CRT inventories.**

5. Dec ’06 and Jan and Feb ’07 production forecast for the 7 major TV makers

(Unit: 10K sets)

| | Subtotal | TCL | Konka | Skyworth | Changhong | Hisense | Haier | XOCECO |
|---|---|---|---|---|---|---|---|---|
| Dec ‘06 | 421 | 90 | 73 | 53 | 70 | 56 | 48 | 31 |
| Jan ‘07 | 459 | 95 | 80 | 70 | 70 | 60 | 54 | 30 |
| Feb ‘07 | 312 | 89 | 55 | 37 | 55 | 30 | 28 | 18 |
| Total | 1192 | 274 | 208 | 160 | 195 | 146 | 130 | 79 |

December production plan is 4.21M sets, a large 24% decrease compared to the 5.78M sets produced in Dec ’05.

III. CRT Industry Status

Actual Industry Production and Sales

1. Oct / Nov ’06 business comparison

Oct / Nov ’06 business comparison (total volume) (Units: 10K pieces)

AUTO PAGE

| | Production | Sales | Inventory | Export |
|---|---|---|---|---|
| November 2006 | 653.2 | 558.2 | 405.9 | 220.9 |
| October | 657.2 | 660.4 | 346 | 264.3 |
| MOM change % | -0.6% | -15.5% | 17.3% | -16.4% |

In November the CRT industry's production, sales, and exports fell 0.6%, 15.5%, and 16.4% respectively, and inventory grew 17.3%.

Oct / Nov '06 comparison for the CRT industry (by product type) (Unit: 10K pieces)

| | 14" | 15"PF | 21"FS | 21"PF | 21"SS | 25"FS | 25"PF | 29"FS | 29"PF | 29"SS | 28" | 32" | 34"FS | 34"PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nov production | 53.8 | 3.7 | 184.3 | 111.2 | 45.7 | 49.5 | 31.9 | 13.5 | 117 | 18.8 | 8.6 | 2.4 | 5.8 | 7.3 | 653.5 |
| Oct production | 52.6 | 8.6 | 172.4 | 129.9 | 52.7 | 34 | 31.1 | 16.9 | 122.7 | 20.8 | 4.5 | 3.5 | 3.3 | 4.2 | 657.2 |
| MOM | 2.3% | -57% | 6.9% | -14.4% | -13.3% | 45.6% | 2.6% | -20.1% | -4.6% | -9.6% | 91.1% | -31.4% | 75.8% | 73.8% | -0.6% |
| Nov sales | 41.8 | 5.7 | 146.1 | 90.9 | 38.9 | 41.1 | 30.7 | 10 | 112.8 | 16.6 | 7.4 | 3.3 | 5 | 7.9 | 558.2 |
| Oct sales | 55.6 | 8.1 | 174.1 | 119 | 44.7 | 44.1 | 36.6 | 14.9 | 122.1 | 20.5 | 7 | 3.5 | 4.7 | 5.5 | 660.4 |
| MOM | -24.8% | -29.6% | -16.1% | -23.6% | -13.0% | -6.8% | -16.1% | -32.9% | -7.6% | -19% | 5.7% | -5.7% | 6.4% | 43.6% | - 15.5% |
| Nov export | 39.2 | 5.4 | 56.8 | 50.0 | 18.9 | 7.5 | 2.5 | 8.9 | 23.8 | 5.6 | 0 | 0.4 | 1.4 | 0.5 | 220.9 |
| Oct export | 40.7 | 7.8 | 67.6 | 55.8 | 22.6 | 7.9 | 3.7 | 13.5 | 30.5 | 8.9 | 0 | 1.5 | 1.6 | 2.2 | 264.3 |
| MOM | -3.7% | -30.8% | -16.0% | -10.4% | -16.4% | -5.1% | -32.4% | -34.1% | -22% | -37.1% | // | -73.3% | -12.5% | -77.3% | - 16.4% |
| Nov inventory | 45.8 | 0.7 | 72.6 | 99.3 | 30.8 | 32.7 | 21.9 | 31.2 | 49.9 | 5.2 | 1.5 | 2 | 7.6 | 4.7 | 405.9 |
| Oct export | 43.8 | 2.7 | 44.4 | 84 | 29 | 24.3 | 23.7 | 27.7 | 46.1 | 3 | 0.3 | 2.9 | 6.8 | 7.3 | 346 |
| MOM | 4.6% | -74.1% | 63.5% | 18.2% | 6.2% | 34.6% | -7.6% | 12.6% | 8.2% | 73.3% | 400% | -31% | 11.8% | -35.6% | 17.3% |

November production for all types fell 0.6% MOM, with all types seeing different degrees of decrease except for growth in the 14", 21"FS, 25"FS, 25"PF, 28"PF, 34"FS, and 34"PF. November sales fell 10.2% MOM, with all types seeing a decrease except for growth in the 28"PF, 34"FS, and 34"PF. November exports fell 16.4% MOM, with all types seeing a decrease. November inventory grew 17.3% MOM, with inventory concentrated in the 14", 21"FS, 21"PF, 25"FS, 29"FS, 29"PF and the inventory for these 6 types making up 81.6% of total inventory.

2. Nov '06 CRT industry total production and sales (by company)

China CRT industry Nov '06 business data (Unit: 10K pieces)

| | BMCC | SEG Hitachi | Huafei | Novel | Thomson | LG Shuguang | Samsung | Irico | Total |
|---|---|---|---|---|---|---|---|---|---|
| Production | 80 | 58.5 | 79.6 | 49.7 | 86.3 | 62.8 | 96.1 | 140.5 | 653.5 |
| Sales | 69 | 48.9 | 71.2 | 35.4 | 73.4 | 50 | 89.8 | 120.5 | 558.2 |
| Sales as percentage of production | 86.3% | 83.6% | 89.4% | 71.2% | 85.1% | 79.6% | 93.4% | 85.8% | 85.4% |
| Exports | 32 | 30.1 | 31.3 | 3.9 | 11 | 36.9 | 36.4 | 39.3 | 220.9 |
| Exports as percentage of total sales | 46.4% | 61.6% | 44% | 11% | 15% | 73.8% | 40.5% | 32.6% | 39.6% |
| Inventory | 59.7 | 40.6 | 60.8 | 51 | 65.4 | 31 | 33.4 | 64 | 405.9 |

The above shows: In November, industry production and sales both fell, inventory clearly grew, and sales as a percentage of production was 85.4%.

China CRT industry Jan to Nov '06 business data (Unit: 10K pieces)

| | BMCC | SEG Hitachi | Huafei | Novel | Thomson | LG Shuguang | Samsung | Irico | Total |
|---|---|---|---|---|---|---|---|---|---|

AUTO PAGE

| Production | 850.6 | 549.9 | 775.5 | 449.1 | 898 | 668.2 | 986.1 | 1407 | 6584.4 |
|---|---|---|---|---|---|---|---|---|---|
| Sales | 816.7 | 527.9 | 738.6 | 401.5 | 847 | 652.7 | 968.9 | 1380.3 | 6333.6 |
| Sales as a percentage of production | 96.0% | 96.0% | 95.2% | 89.4% | 94.3% | 97.7% | 98.3% | 98.1% | 96.2% |
| Exports | 377.9 | 350.5 | 349.9 | 69.6 | 310.7 | 373.2 | 372 | 545.5 | 2749.3 |
| Export as percentage of total sales | 46.3% | 66.4% | 47.4% | 17.3% | 36.7% | 57.2% | 38.4% | 39.5% | 43.4% |
| Inventory | 59.7 | 40.6 | 60.8 | 51.0 | 65.4 | 31 | 33.4 | 64.0 | 405.9 |

The above table shows: The CRT industry in January – November still had an oversupply. Sales as a percentage of production was 96.2%. The inventory was 4.059 million pieces.

3. CRT Industry Production and Sales Situation for January – November 2006 (by Product Type)

CRT Industry Business Data for January – November 2006 (by Product Type)                    (Unit: 10K Pcs)

| | 14" | 15"PF | 21"FS | 21"PF | 21"SS | 25"FS | 25"PF | 29"FS | 29"PF | 29"SS | 28" | 32" | 34"FS | 34"PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Production | 594.2 | 58.1 | 1796.1 | 1364.7 | 358.3 | 435.4 | 322.4 | 200.2 | 1139.2 | 114.9 | 43.6 | 36.3 | 47.9 | 73.4 | 6584.4 |
| Percentage | 9.0% | 0.9% | 27.3% | 20.7% | 5.4% | 6.6% | 4.9% | 3.0% | 17.3% | 1.7% | 0.7% | 0.6% | 0.7% | 1.1% | 100.0% |
| Sales | 582.7 | 59.9 | 1734.9 | 1296.3 | 329.9 | 415.9 | 318.6 | 194.4 | 1090.7 | 110.2 | 41.5 | 34.1 | 45.8 | 77.6 | 6332.6 |
| Sales as a percentage of production | 98.1% | 103.1% | 96.6% | 95.0% | 92.1% | 95.5% | 98.8% | 97.1% | 95.7% | 95.9% | 95.2% | 93.9% | 95.6% | 105.7% | 96.2% |
| Exports | 495.4 | 57.4 | 703.4 | 632.2 | 147.9 | 75.2 | 43.9 | 170.7 | 320.4 | 48.3 | 1.4 | 5.9 | 27.3 | 19.9 | 2749.4 |
| Exports as a percentage of total sales | 80.0% | 95.8% | 40.5% | 48.8% | 44.8% | 18.1% | 13.8% | 87.8% | 29.4% | 43.8% | 3.4% | 17.3% | 59.6% | 25.6% | 43.4% |
| Inventory | 45.8 | 0.7 | 72.6 | 99.3 | 30.8 | 32.7 | 21.9 | 31.2 | 49.9 | 5.2 | 1.5 | 2 | 7.6 | 4.7 | 405.9 |

4. CRT Industry Monthly Output Trend Chart (10K Pcs)



5. January – November '06 compared to January – November '05                    (Unit: 10K pcs)

| | Production | Sales | Inventory | Exports |
|---|---|---|---|---|
| Jan – Nov 2006 | 6584.4 | 6332.6 | 405.9 | 2749.4 |
| Jan – Nov 2005 | 5583.4 | 5620.9 | 155.3 | 2308.4 |
| '06/'05 | 17.9% | 12.7% | 161.4% | 19.1% |

It can be seen from the above table that the production, sales, inventory, and exports in the CRT industry in January – November 2006 increased by 17.9%, 12.7%, 161.4%, and 19.1%, respectively, compared with the same period in 2005. The increase in sales was mainly driven by an increase in CRT exports. Domestic CRT market still had an oversupply. The inventory volume of the CRT industry is 4.059 million pieces.                                        AUTO PAGE

6. CRT Makers' Output Forecast for December 2006 (Unit: 10K pcs)

| | 14" | 15"PF | 21"FS | 21"PF | 21"SS | 25"FS | 25"PF | 29"FS | 29"PF | 29"SS | 28" | 32" | 34"FS | 34"PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dec 2006 | 50 | 7 | 163 | 104 | 39 | 49 | 34 | 7 | 124 | 22 | 6 | 3 | 5 | 7 | 620 |
| Nov 2006 | 53.8 | 3.7 | 184.3 | 111.2 | 45.7 | 49.5 | 31.9 | 13.5 | 117 | 18.8 | 8.6 | 2.4 | 5.8 | 7.3 | 653.5 |
| Nov/Oct | -7.1% | 89.2% | -11.6% | -6.5% | -14.7% | -1.0% | 6.6% | -48.1% | 6.0% | 17.0% | -30.2% | 25.0% | -13.8% | -4.1% | -5.1% |

It is expected that the industry will have 6.2 million CRTs in December, a reduction of 5.1% compared with November. Except for increases in the 15"PF, 25"PF, 29"PF, 29"SS, and 32"PF product types, reductions of various degrees are planned for the production of all product types.

To sum up the upstream and downstream production situation, the seven major makers plan to produce 4.21 million sets in December. Calculating based on this, the total domestic output will be approximately 5.07 million sets. Yet the CRT production plan is 6.2 million pieces, for a CRT oversupply of 1.13 million pieces! Considering the net export is 0.3 million pieces, the CRT industry's inventory will rise to approximately 4.89 million pieces.

7. CRT Pricing

The Industry's Settled Price Ranges in Recent Months: (Unit: Yuan/Pc)

The Industry's Settled Price Ranges in Recent Months: (Unit: Yuan/Pc)

| | 14" | 21" FS | 21" PF | 25" FS | 25" PF | 29" PF |
|---|---|---|---|---|---|---|
| Aug 06 | 165~170 | 260~275 | 300~305 | 315~330 | 450~460 | 590~600 |
| Sep 06 | 165~170 | 265~275 | 305~310 | 330~350 | 450~460 | 580~590 |
| Oct 06 | 165~170 | 270~280 | 310~320 | 330~350 | 450~460 | 580~590 |
| Nov 06 | 160~165 | 265~275 | 310~320 | 330~350 | 450~460 | 580~590 |
| Prediction for Dec 06 | 155~160 | 260~270 | 300~310 | 330~340 | 445~450 | 585~590 |
| Prediction for Jan 07 | 155~160 | 255~265 | 295~305 | 325~335 | 435~445 | 585~590 |

**IV. Volume of IRICO Tubes Shipped**

- Total Shipped Volume

The volume of CRTs shipped in January – November was 13.803626 million pieces (including 5.45472 million pieces exported). The product types are listed below (10,000 pieces):

| 14" | 15" PF | 21" PF | 21" FS | 25" FS | 25" PF | 29" PF | 34" PF |
|---|---|---|---|---|---|---|---|
| 382.2054 | 60.3931 | 248.2222 | 468.1039 | 125.6384 | 94.0461 | 1.5588 | 0.1947 |

Payment of 2.73465 billion yuan was made and received for the goods, and 0.128489 billion USD in foreign exchange was earned from the exports.

For this month, as of the 20th of December, [X] 10,000 pieces have been shipped, including [X] 10,000 pieces exported. Approximately 1 million pieces are expected to be shipped this month. It is expected that approximately 0.3 billion yuan will be paid and received for the goods.

- Rolling Sales Forecast for January 2007 – June 2007 (Please See the Attachment for Details.)

- CRT Exports

1. Export Volume This Month

In December (as of December 20), the shipment of exported CRTs is as follows:

AUTO PAGE

14" CRT: [X] 10,000 pieces; 15" PF CRT: [X] 10,000 pieces; 21" PF CRT: [X] 10,000 pieces; 21" FS CRT: [X] 10,000 pieces; 25" FS CRT: [X] 10,000 pieces. Total this month: [X] 10,000 pieces (including [X] 10,000 pieces by ocean freight). Foreign exchange earned from exports: 6.284 million USD.

2. Market Performance

In December, the ocean shipment volume reduced drastically compared with November. Based on our secured purchase orders, this month's exported CRT shipment volume is expected to reach approximately 260K pieces.

3. Price Trend\

Export market prices: According to a market trend analysis, the prices of all product types are trending downward.

4. CRT Export Volumes and Trends

Monthly Comparisons of Irico CRT Export Shipment Volumes, 2004–2006 Unit: 10K Pcs

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004 | 22.1 | 24.7 | 20 | 21.5 | 23 | 30.6 | 25.3 | 24.5 | 31.5 | 25.7 | 27.1 | 19.2 | 295.2 |
| 2005 | 30.7 | 22.6 | 28.4 | 52.3 | 48.3 | 54.85 | 65.23 | 78.16 | 80.7 | 65.15 | 43.47 | 26.7 | 596.6 |
| 2006 | 9.52 | 20.69 | 64.44 | 63.8 | 51.2 | 57.3 | 54.6 | 62.8 | 63.5 | 59.2 | 39.2 | | 545.4 |

Irico CRT Export Monthly Trends, 2004–2006 Unit: 10K Pcs

5. The Markets

In December, deep processing settlements and ocean export sales continued to fall. The export market outlook in the late period is fairly grim.

Turkish Market:

VESTEL Company: Early on, considering that there would be a shortage of resources for some product types because of some CRT makers in Southeast Asia shutting down or going out of business, VESTEL made anticipatory purchases. However, currently, its CRT inventory is high since the market situation is not as good as expected. It is expected that the digestion will last till February 2007. In addition, since Christmas and New Year's are approaching, all companies and customers are preparing for long vacations. Currently, it has no purchase plans.

The VESTEL Company has demand for 21"SS and 29"AK; arrangements are being made for sample sending. In addition, VESTEL has provided us with the 14"chassis that it commonly uses in the hope that the matching CRT will be provided.

Eastern European Market:

AUTO PAGE

ROLSEN: 21"SS sample tubes failed their certification. The reason is the focus voltage is low and does not match the chassis that the customer commonly uses. It is necessary to change the flyback transformer. Regarding 14" DC16A, we are striving to get the first batch of purchase orders. However, the customer still hopes that the focus voltage issue can be improved.

SHIVAKI Company: 12"SS sample tubes have passed their certification. We're working on the first batch of purchase orders for 2304 pieces.

SOKOL Company: The first batch of purchase orders for 2304 pieces for the 14"DC16A have been received.

**Indian Market:**

PERMEDIA Company of India: A group including Mr. CHAWLA, company president, visited Irico. The two parties signed an agreement authorizing PRTMEDIA Company to be the agent for Irico's Indian market. This company has a close relationship with manufacturers in the color TV and CRT industries in India, and it has extensive CRT marketing experiences. It has served as an agent for Thomson Company for more than twenty years and sold CRTs to all major Indian color TV enterprises. In this current arrangement, the two parties agreed that we will first start with Irico's 14" and 15"PF CRTs and focus on breaking into the two major color TV manufacturers VIDEOCOM and ONIDA. The plan is to export 0.3 million CRTs to Indian market.

Our Indian customer the ALLIANCE Company: Told us that defects in the 14" CRTs reached 6%. Phenomena seen involved convergence, color purity, fire ignition, etc. The customer requested that engineers be sent to handle the defects.

The Indian color TV manufacturing industry expects to produce 12.5 million color TV sets in 2006. Of these, 14"/15" PF will account for 17%, 21"/21" PF will account for 65%; 29"PF will account for 7-8%; the remaining will be LCD and PDP products.

**Other Markets:**

We are vigorously developing the EU market and currently preparing to send sample tubes. We expect to enter the batch purchase stage in March 2007.

**Exports of Materials and Parts**

As of December 20, the foreign exchange earned from exports this year was 19.0037 million USD.

1. The total export of DY products was 2.8 million pieces. The expected export in January 2007: 200K pieces.
2. The total export of frame glass powder was 313.2 tons. The expected export in January 2007: 20 tons.
3. The total export of ZnS raw powder was 620 tons. The expected export in January 2007: 15 tons.
4. The total export of fluorescent powder was 296 tons. The expected export in January 2007: 10 tons.

● **New Product Market**

◆ New Product Advancement:

1. 21" PF Ultra Slim

Changhong and Konka: Completed all certifications.

TCL: Conducted tape-out of 20 pieces on November 29. Passed the aging test. Now contacting headquarters about the next step, the purchase orders.

Skyworth: The sample tubes that need to be re-certified were shipped via air on December 14.

Hisense: Sample tubes passed their certification. Conducted tape-out of 30 pieces on December 4. Everything's fine. The aging test is in progress.

Hefei Haier: The certification for the first-generation ultra slim has been stopped.

XOCECO: On December 11, tested the sample tubes sent and concluded that they meet requirements.

Guangdong Changhong: The sample tubes passed their certification. Now following up with the tape-out for a small batch of 24 pieces.
Suzhou Bosun: The sample tubes basically passed the certification; however, the edge convergence is fairly poor.

2. 25" PFAK

Changhong, TCL, Hefei Haier, XOCECO: Completed all certifications.
Skyworth: The reshipped sample tubes passed their certification. On November 3, sent in an order for the tape-out of a small batch of 24 pieces. The manufacturing of the 24 pieces has not been completed yet.
Konka: The tape-out of a medium batch met requirements. The company will be purchasing a large quantity later.
Hisense: Sent in a December purchase order for 1,000 pieces. Requested the goods arrive on December 12. Guiyang Hisense's tape-out of 200 pieces met requirements. The next step is to first use up the inventory of 400 pieces. Then it will issue purchase orders as planned.
Panda: Conducted tape-out of a large batch of 2480 pieces.
Soyea Technology: A small batch of 40 pieces passed their certification.

Irico Sales and Marketing Department
December 20, 2006

AUTO PAGE

# EXHIBIT CC

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
evan.werbel@bakerbotts.com
tom.carter@bakerbotts.com
drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION

This Document Relates to:

*ALL INDIRECT PURCHASER ACTIONS*

Master File No. 07-CV-5944-JST (N.D. Cal.)

MDL No. 1917

**IRICO DEFENDANTS' OBJECTIONS AND RESPONSES TO INDIRECT PURCHASER PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION TO DEFENDANTS IRICO GROUP CORPORATION AND IRICO DISPLAY DEVICES CO., LTD**

PROPOUNDING PARTY: Indirect Purchaser Plaintiffs.

RESPONDING PARTIES: Irico Group Corporation
Irico Display Devices Co., Ltd.

SET NUMBER: One

Pursuant to Federal Rules of Civil Procedure 26 and 36, Irico Group Corporation and Irico Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby provides this supplemental response to Indirect Purchaser Plaintiffs' ("IPPs" or "Plaintiffs") First Set of Requests for Admission, dated December 15, 2021 ("IPPs' RFAs"). Irico reserves the right to amend or supplement these Objections and Responses (the "Responses") to the extent allowed by the Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California ("Local Rules"). Subject to and without waiving any of Irico's General and Specific Objections as set forth below, Irico is willing to meet and confer with Plaintiff regarding such General and Specific Objections.

The following Responses are made only for purposes of this case. The Responses are subject to all objections as to relevance, materiality and admissibility, and to any and all objections on any ground that would require exclusion of any response if it were introduced in court. All evidentiary objections and grounds are expressly reserved.

These Responses are subject to the provisions of the Stipulated Protective Order that the Court issued on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated "Confidential" in accordance with the provisions of the Protective Order.

## GENERAL OBJECTIONS

Irico makes the following General Objections to IPPs' RFAs:

1. Irico's Responses are based upon information available to and located by Irico as of the date of service of these Responses. In responding to IPPs' RFAs, Irico states that it has conducted a diligent search, reasonable in scope, of those files and records in its possession, custody, or control believed to likely contain information responsive to IPPs' RFAs.

2. No express, incidental, or implied admissions are intended by these Responses and should not be read or construed as such.

3. Irico does not intend, and its Responses should not be construed as, an agreement or acquiescence with any characterization of fact, assumption, or conclusion of law contained in or implied by the RFAs.

4. Irico objects to IPPs' RFAs to the extent that they are overly broad, unduly

IRICO'S OBJECTIONS AND RESPONSES TO IPPS' FIRST SET OF REQUESTS FOR ADMISSION 1 Master File No. 07-CV-5944-JST MDL No. 1917

burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of IPPs.

5. Irico objects to IPPs' RFAs to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

6. Irico objects to IPPs' RFAs to the extent they seek information that is not relevant or disproportionate to the needs of the case.

7. Irico objects to IPPs' RFAs to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such vague or ambiguous RFAs so as to provide for the production of responsive information that is proportionate to the needs of the case. If IPPs subsequently asserts an interpretation of any RFA that differs from Irico's understanding, Irico reserves the right to supplement or amend its Responses.

8. Irico objects to IPPs' RFAs to the extent that they contain terms that are insufficiently or imprecisely defined. Irico has attempted to construe such vague or ambiguous RFAs so as to provide for the production of responsive information that is proportionate to the needs of the case.

9. Irico objects to IPPs' RFAs to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico has provided only information that it believes to be non-privileged and otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any information or responsive documents subject to any such doctrine, privilege, protection or immunity from production shall not constitute a general, inadvertent, implicit, subject-matter, separate, independent or other waiver of such doctrine, privilege, protection or immunity from production.

10. Irico objects to IPPs' RFAs to the extent that they call for information that is not in

IRICO'S OBJECTIONS AND RESPONSES TO IPPS' FIRST SET OF REQUESTS FOR ADMISSION
2
Master File No. 07-CV-5944-JST
MDL No. 1917

the possession, custody, or control of Irico. Irico also objects to the extent that any of IPPs' RFAs seek information from non-parties or third parties, including but not limited to any of Irico's subsidiary or affiliated companies.

11. Irico objects to IPPs' RFAs to the extent that responding would require Irico to violate the privacy and/or confidentiality of a third party or confidentiality agreement with a third party.

12. Irico objects to IPPs' RFAs to the extent that they seek information that is publicly available, already in IPPss' possession, custody, or control, or more readily available from other sources.

13. Irico objects to IPPs' RFAs to the extent that they seek information or documents concerning transactions outside the United States. Such RFAs are unduly burdensome and irrelevant to this pending action as IPPs' class definition is confined to "all persons . . . who directly purchased a Cathode Ray Tube Product . . . in the United States" (see Direct Purchaser Plaintiffs' Consolidated Amended Complaint dated March 16, 2009).

14. Irico objects to IPPs' RFAs to the extent that compliance would require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body of foreign jurisdictions.

15. Irico's responses to IPPs' RFAs should not be construed as either (i) a waiver of any of Irico's general or specific objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

16. Irico objects to IPPs' RFAs to the extent that they state and/or call for legal conclusions.

17. Irico objects to the RFAs to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

18. Irico objects to the RFAs to the extent they seek information or documents that cannot be removed or transmitted outside China without violating the laws and regulations of that country, including but not limited to restrictions on the transmission of state secrets or trade secrets as those terms are defined under Chinese law.

19. Irico objects to each RFAs to the extent that it is premature and/or to the extent that it: (a) conflicts with obligations that are imposed by the Federal Rules of Civil Procedure, the Civil Local Rules of this Court, and/or any other applicable rule; (b) seeks information that is the subject of expert testimony; and/or (c) seeks information that is dependent on depositions and documents of third parties that have not been discovered.

20. Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each RFAs as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

**GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1. Irico objects to the definition of "and" to include "or" and vice versa, and Irico responds according to the natural meaning of "and" and "or."

2. Irico objects to the definition of the term "Reflect(ing) or refer(ing) to" as overbroad, vague, and ambiguous.

3. Irico objects to the definitions of "You," and "Your" to the extent that IPPs defines those terms to include Irico's "subsidiaries, affiliates, and their subsidiaries, and any employees, agents, representatives or any persons acting or purporting to act on Your behalf." This definition is legally incorrect, overbroad, unduly burdensome, vague, and beyond the scope of permissible discovery under the Federal Rules of Civil Procedure. Irico also objects to this definition on the ground that incorporating multiple corporate entities renders each Request that incorporates the term as overbroad and unduly burdensome because it seeks information or documents that are outside the possession, custody, or control of Irico. Irico interprets the terms "YOU," and "Your" as referring only to Irico Group Corporation or Irico Display Devices Co., Ltd.

4. Irico objects to the definitions of "CRT" on the grounds that they are vague, ambiguous and overly broad.

5. Irico objects to the IPPs' RFAs and the instructions therein, including but not limited to General Instructions Nos. 2, 3, and 4 to the extent it seeks to impose requirements that

are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

**SPECIFIC RESPONSES TO REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 1**

Admit each of the following email addresses were used by one of YOUR officers or employees during the Relevant Period (respond separately for each email address):

A. jingyuan@irico.com.cn

B. Jill-yy@163.com

C. yliang6699@163.com

D. yliang@hotmail.com

E. yliang@irico.com.cn

F. pqwang@irico.com.cn

G. xsgsyxb@ch.com.cn

H. yht@ch.com.cn

I. yj-xs@ch.com.cn

J. ryz@ch.com.cn

K. zhangjing@ch.com.cn

L. fanxj@ch.com.cn

M. rggao@irico.com.cn

N. xjhao@irico.com.cn

O. ly-xs@ch.com.cn

P. lg@chyg.com

Q. shatao@irico.com.cn

R. lumimate@public.xa.sn.cn

S. sxl-xs@ch.com.cn

T. shs-xs@ch.com.cn

U. Is7071@sina.com

V. hywen@irico.com.cn

W. dqxing@ch.com.cn

X. hdyang@irico.com.cn

Y. wjp7858@sina.com

Z. zhsw@ch.com.cn

AA. ZLM-XS@ch.com.cn

BB. chks@chinairico.com

CC. zcf@ch.com.cn

**RESPONSE TO REQUEST NO. 1**

Subject to and without waiving its General Objections as stated above, Irico responds as follows:

REQUEST NO. 1A

Deny.

REQUEST NO. 1B

Admit.

REQUEST NO. 1C

Admit.

REQUEST NO. 1D

Admit.

REQUEST NO. 1E

Deny.

REQUEST NO. 1F

Deny.

REQUEST NO. 1G

Irico admits that the domain “@ch.com.cn” was used by Irico as a domain for departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

IRICO’S OBJECTIONS AND RESPONSES TO IPPS’ FIRST SET OF REQUESTS FOR ADMISSION 6 Master File No. 07-CV-5944-JST MDL No. 1917

REQUEST NO. 1H

Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

REQUEST NO. 1I

Admit.

REQUEST NO. 1J

Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

REQUEST NO. 1K

Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

REQUEST NO. 1L

Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

REQUEST NO. 1M

Deny.

REQUEST NO. 1N

Deny.

REQUEST NO. 1O

Admit.

REQUEST NO. 1P

After conducting a reasonable search, Irico cannot determine whether this address was used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore cannot admit or deny the request.

REQUEST NO. 1Q

Deny.

REQUEST NO. 1R

After conducting a reasonable search, Irico cannot determine whether this address was used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore cannot admit or deny the request.

REQUEST NO. 1S

Admit.

REQUEST NO. 1T

Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

REQUEST NO. 1U

After conducting a reasonable search, Irico cannot determine whether this address was used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore cannot admit or deny the request.

REQUEST NO. 1V

Deny.

REQUEST NO. 1W

Admit.

REQUEST NO. 1X

Deny.

REQUEST NO. 1Y

After conducting a reasonable search, Irico cannot determine whether this address was used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore cannot admit or deny the request.

REQUEST NO. 1Z

Admit.

REQUEST NO. 1AA

Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

REQUEST NO. 1BB

After conducting a reasonable search, Irico cannot determine whether this address was used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore cannot admit or deny the request.

REQUEST NO. 1CC

Admit.

**REQUEST FOR ADMISSION NO. 2**

Admit that each of the email addresses listed in Request for Admission No. 1 above (A-CC) were used by one of YOUR officers or employees during the Relevant Period in the regular course of their duties for Irico (respond separately for each email address).

**RESPONSE TO REQUEST NO. 2**

Subject to and without waiving its General Objections above, Irico responds as follows:

REQUEST NO. 2A

Deny.

REQUEST NO. 2B

Deny.

REQUEST NO. 2C

Deny.

REQUEST NO. 2D

Deny.

REQUEST NO. 2E

Deny.

REQUEST NO. 2F

Deny.

REQUEST NO. 2G

Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

REQUEST NO. 2H

Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

REQUEST NO. 2I

Admit.

REQUEST NO. 2J

Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for

IRICO'S OBJECTIONS AND RESPONSES TO IPPS' FIRST SET OF REQUESTS FOR ADMISSION 10 Master File No. 07-CV-5944-JST MDL No. 1917

departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

REQUEST NO. 2K

Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

REQUEST NO. 2L

Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

REQUEST NO. 2M

Deny.

REQUEST NO. 2N

Deny.

REQUEST NO. 2O

Admit.

REQUEST NO. 2P

After conducting a reasonable search, Irico cannot determine whether this address was used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore cannot admit or deny the request.

REQUEST NO. 2Q

Deny.

REQUEST NO. 2R

After conducting a reasonable search, Irico cannot determine whether this address was used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore cannot admit or deny the request.

REQUEST NO. 2S

Admit.

REQUEST NO. 2T

Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

REQUEST NO. 2U

Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

REQUEST NO. 2V

Deny.

REQUEST NO. 2W

Admit.

REQUEST NO. 2X

Deny.

REQUEST NO. 2Y

After conducting a reasonable search, Irico cannot determine whether this address was used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore cannot admit or deny the request.

REQUEST NO. 2Z

Admit.

REQUEST NO. 2AA

Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

REQUEST NO. 2BB

After conducting a reasonable search, Irico cannot determine whether this address was used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore cannot admit or deny the request.

REQUEST NO. 2CC

Admit.

**REQUEST FOR ADMISSION NO. 3**

Admit that 0910-3313103 was a number that Irico used to send and receive documents by facsimile transmission during the Relevant Period.

**RESPONSE TO REQUEST NO. 3**

Subject to and without waiving any of the General Objections above, Irico admits this request.

**REQUEST FOR ADMISSION NO. 4**

Admit that Irico employees authored each of the following documents (respond separately for each document):

A. CHU00124396-399

B. CHU00124400-402

C. CHU00124403-410

D. CHU00124411-412

E. CHU00124413-416

F. CHU00124417-419

G. CHU00124420-421

H. CHU00505498-501

I. CHU00564370-374

J. CHU00102755-764

K. CHU00123489-501

L. CHU00123502-517

M. CHU00124663-674

N. CHU00444555-564

O. CHU00505502-513

**RESPONSE TO REQUEST NO. 4**

Admit as to Requests 4A through 4O.

**REQUEST FOR ADMISSION NO. 5**

Admit that the following documents contain true copies of Irico business cards (respond separately for each document):

A. BMCC-CRT000306758

B. ME 00031378

C. CHU00030303

D. CHU00030304

**RESPONSE TO REQUEST NO. 5**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico specifically objects to this Request to the extent it is overbroad, unduly burdensome, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

Subject to and without waiving the foregoing objections, Irico responds as follows:

REQUEST 5A

Deny.

REQUEST 5B

Irico admits that the business cards bearing the "IRICO" logo on the page stamped "ME 0003138" are true copies of Irico business cards. The other business cards are not Irico business cards, and therefore Irico denies the remainder of the request.

REQUEST 5C

Deny.

REQUEST 5D

Deny.

**REQUEST FOR ADMISSION NO. 6**

Admit that the business cards set forth in Request for Admission 6 above (A-D), were used by Your employees during the Relevant Period (respond separately for each document).

**RESPONSE TO REQUEST NO. 6**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico specifically objects to this Request to the extent it is overbroad, unduly burdensome, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also assumes for purposes of responding to this Request that Plaintiffs meant to refer to "Request for Admission 5 above" rather than "Request for Admission 6 above."

Subject to and without waiving the foregoing objections, Irico responds as follows:

REQUEST 6A

Deny.

REQUEST 6B

Irico admits that the business cards bearing the "IRICO" logo on the page stamped "ME 0003138" were used by Irico employees during the Relevant Period. The other business cards are not Irico business cards, and therefore Irico denies the remainder of the request.

REQUEST 6C

Deny.

REQUEST 6D

Deny.

**REQUEST FOR ADMISSION NO. 7**

Admit that You lost and/or destroyed Documents and/or data relating to Irico's CRT sales, pricing, marketing, and/or production after You were served with the Indirect Purchaser Plaintiff's complaint on December 25, 2007.

**RESPONSE TO REQUEST NO. 7**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico specifically objects to this Request to the extent it is vague, overbroad, and unduly burdensome.

Subject to and without waiving the foregoing objections, Irico refers Plaintiffs to the Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., dated January 21, 2022, which it incorporates by by reference. As detailed in the January 21, 2022 Responses, Irico has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny the request.

**REQUEST FOR ADMISSION NO. 8**

Admit that You lost and/or destroyed Documents and/or data relating to Irico's CRT sales, pricing, marketing, and/or production after You retained the law firm Pillsbury, Winthrop, Shaw & Pittman, LLP in mid-2008.

**RESPONSE TO REQUEST NO. 8**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico specifically objects to this Request to the extent it is vague, overbroad, and unduly burdensome.

Subject to and without waiving the foregoing objections, Irico refers Plaintiffs to the Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., dated January 21, 2022, which it incorporates by reference. As detailed in the January 21, 2022 Responses, Irico has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny the request.

**REQUEST FOR ADMISSION NO. 9**

Admit that Irico Group Electronics Company Limited ("Electronics") was formed by You in September 2004 to handle sales and export functions for all IRICO Companies." ECF

IRICO'S OBJECTIONS AND RESPONSES TO IPPS' FIRST SET OF REQUESTS FOR ADMISSION 16 Master File No. 07-CV-5944-JST MDL No. 1917

No. 5220-10 at 1.

**RESPONSE TO REQUEST NO. 9**

Subject to and without waiving its General Objections, Irico admits this request.

**REQUEST FOR ADMISSION NO. 10**

Admit that Irico's "major customers" during the Relevant Period were TCL Corporation, Skyworth Group Co., Ltd., Konka Group Co., Ltd., Sichuan Changhong Electric Co., Ltd., and Hisense Electric Co., Ltd., as described in the "Global Offering Prospectus" published by Electronics on December 8, 2004 (ECF No. 5440-9 at 26).

**RESPONSE TO REQUEST NO. 10**

Subject to and without waiving its General Objections, Irico admits that the referenced document states that "[o]ur major customers include TCL King Electrical Appliances (Huizhou) Co., Ltd. ("TCL"), Shenzhen Skyworth-RGB Electronics Co. Ltd. ("Skyworth"), Konka Group Co., Ltd. ("Konka"), Sichuan Changhong Electric Co., Ltd. ("Changhong") and Qingdao Hisense Electric Appliance Co., Ltd. ("Hisense"), which are major television set manufacturers in the PRC." Irico further responds that the document speaks for itself and otherwise denies the request.

**REQUEST FOR ADMISSION NO. 11**

Admit that Irico's sales of CPTs to these "major customers" accounted for approximately 59.27% of Irico's total CRT sales in 2001, as stated in the December 8, 2004 Global Offering Prospectus (ECF No. 5440-9 at 26).

**RESPONSE TO REQUEST NO. 11**

Subject to and without waiving its General Objections, Irico admits that the document states that "[f]or the three years ended 31 December 2001, 2002 and 2003 and the six months ended 30 June 2004, the total sales to the above major customers accounted for approximately 59.27%, 59.35%, 63.53% and 67.09%, respectively, of our total sales." Irico further responds that the document speaks for itself and otherwise denies the request.

**REQUEST FOR ADMISSION NO. 12**

Admit that Irico's sales of CPTs to these "major customers" accounted for approximately 59.35% of Irico's total CRT sales in 2002, as stated in the December 8, 2004 Global Offering

Prospectus (ECF No. 5440-9 at 26).

**RESPONSE TO REQUEST NO. 12**

Subject to and without waiving its General Objections, Irico admits that the document states that "[f]or the three years ended 31 December 2001, 2002 and 2003 and the six months ended 30 June 2004, the total sales to the above major customers accounted for approximately 59.27%, 59.35%, 63.53% and 67.09%, respectively, of our total sales." Irico further responds that the document speaks for itself and otherwise denies the request.

**REQUEST FOR ADMISSION NO. 13**

Admit that Irico's sales of CRTs to these "major customers" accounted for approximately 63.53% of Irico's total CRT sales in 2003, as stated in the December 8, 2004 Global Offering Prospectus (ECF No. 5440-9 at 26).

**RESPONSE TO REQUEST NO. 13**

Subject to and without waiving its General Objections, Irico admits that the document states that "[f]or the three years ended 31 December 2001, 2002 and 2003 and the six months ended 30 June 2004, the total sales to the above major customers accounted for approximately 59.27%, 59.35%, 63.53% and 67.09%, respectively, of our total sales." Irico further responds that the document speaks for itself and otherwise denies the request.

**REQUEST FOR ADMISSION NO. 14**

Admit that Irico's sales of CPTs to these "major customers" accounted for approximately 67.09% of Irico's total CRT sales in the first six months of 2004 as stated in the December 8, 2004 Global Offering Prospectus (ECF No. 5440-9 at 26).

**RESPONSE TO REQUEST NO. 14**

Subject to and without waiving its General Objections, Irico admits that the document states that "[f]or the three years ended 31 December 2001, 2002 and 2003 and the six months ended 30 June 2004, the total sales to the above major customers accounted for approximately 59.27%, 59.35%, 63.53% and 67.09%, respectively, of our total sales." Irico further responds that the document speaks for itself and otherwise denies the request.

**REQUEST FOR ADMISSION NO. 15**

Admit that, during the Relevant Period, Irico sold CPTs to (respond separately for each customer):

A. Haier Electrical Appliances Co., Ltd.,

B. Xiamen Overseas Chinese Electronic Co., Ltd.,

C. Soyea Technology Co., Ltd.,

D. Yisheng Technology Co., Ltd.,

E. LG Electronics (Shenyang) Inc.,

F. Hangzhou Jinlipu Electrical Co., Ltd.,

G. Shenzhen Techtop Industrial Co., Ltd.,

H. Suntrue International,

I. Starlight Marketing Macao Commercial Offshore, Ltd., and

J. Hangzhou Huashan Electric Co., Ltd.

**RESPONSE TO REQUEST NO. 15**

Subject to and without waiving its General Objections, Irico responds as follows:

REQUEST 15A

Admit.

REQUEST 15B

Admit.

REQUEST 15C

Admit.

REQUEST 15D

Admit.

REQUEST 15E

Admit.

REQUEST 15F

Admit.

REQUEST 15G

Admit.

IRICO'S OBJECTIONS AND RESPONSES TO IPPS' FIRST SET OF REQUESTS FOR ADMISSION

19

Master File No. 07-CV-5944-JST
MDL No. 1917

REQUEST 15H

Irico states that it has made reasonable inquiry but is unable to find records of sales of Irico CPTs to this entity during the Relevant Period. Irico therefore denies the request.

REQUEST 15I

Admit.

REQUEST 15J

Admit.

**REQUEST FOR ADMISSION NO. 16**

Admit that You knew that Irico's customers manufactured and sold televisions containing Irico's CRTs to customers in the United States during the Relevant Period.

**RESPONSE TO REQUEST NO. 16**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the Request calls for a legal argument or legal conclusion.

Subject to and without waiving the foregoing objections, Irico denies this request.

**REQUEST FOR ADMISSION NO. 17**

Admit that employees of Irico traveled to the United States for business purposes in May 1997, as reflected in IRI-CRT-00025756.

**RESPONSE TO REQUEST NO. 17**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the undefined term "business purposes" renders the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

Subject to and without waiving the foregoing objections, Irico admits that the document states that "总厂 97 年出国团组汇总表" and contains the following entry:

| 序号 | 团组名称 | 出国（境） | 人数 | 出国时间 | 停留时间（天） | 出国任务 |
|---|---|---|---|---|---|---|
| 17 | 彩虹彩色显像管总厂 | 美国 | 1 | 97.05.12 | 720 | 工作 |

Irico further responds that the document speaks for itself, and otherwise denies the request.

IRICO'S OBJECTIONS AND RESPONSES TO IPPS' FIRST SET OF REQUESTS FOR ADMISSION 20 Master File No. 07-CV-5944-JST MDL No. 1917

**REQUEST FOR ADMISSION NO. 18**

Admit that employees of Irico traveled to the United States for business purposes in September 1997, as reflected in IRI-CRT-00025756.

**RESPONSE TO REQUEST NO. 18**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the undefined term "business purposes" renders the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

Subject to and without waiving the foregoing objections, Irico admits that the document states that "总厂 97 年出国团组汇总表" and contains the following entry:

| 序号 | 团组名称 | 出国（境） | 人数 | 出国时间 | 停留时间（天） | 出国任务 |
|---|---|---|---|---|---|---|
| 30 | 彩虹彩色显像管总厂 | 美国 | 2 | 97.09.19 | 12 | 考察 |

Irico further responds that the document speaks for itself, and otherwise denies the request.

**REQUEST FOR ADMISSION NO. 19**

Admit that employees of Irico traveled to the United States for business purposes in November 1997, as reflected in IRI-CRT-00025756.

**RESPONSE TO REQUEST NO. 19**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the undefined term "business purposes" renders the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

Subject to and without waiving the foregoing objections, Irico admits that the document states that "总厂 97 年出国团组汇总表" and contains the following entries:

| 序号 | 团组名称 | 出国（境） | 人数 | 出国时间 | 停留时间（天） | 出国任务 |
|---|---|---|---|---|---|---|
| 14 | 彩虹彩色显像管总厂 | 美国 | 5 | 97.11.26 | 10 | 商务洽谈 |
| 31 | 彩虹彩色显像管总厂 | 美国 | 1 | 97.11.15 | 14 | 考察 |

Irico further responds that the document speaks for itself, and otherwise denies the request.

IRICO'S OBJECTIONS AND RESPONSES TO IPPS' FIRST SET OF REQUESTS FOR ADMISSION 21 Master File No. 07-CV-5944-JST MDL No. 1917

**REQUEST FOR ADMISSION NO. 20**

Admit that employees of Irico traveled to the United States for business purposes in March 1998, as reflected in IRI-CRT-00025758.

**RESPONSE TO REQUEST NO. 20**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the undefined term "business purposes" renders the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

Subject to and without waiving the foregoing objections, Irico admits that the document states that "总厂 98 年出国团组汇总表" and contains the following entries:

| 序号 | 团组名称 | 出国（境） | 人数 | 出国时间 | 停留时间（天） | 出国任务 |
|---|---|---|---|---|---|---|
| 3 | 彩虹彩色显像管总厂 | 美国 | 3 | 98.3.1 | 15 | 考察 |
| 22 | 彩虹彩色显像管总厂 | 美国 | 2 | 98.3.28 | 15 | 验收 |

Irico further responds that the document speaks for itself, and otherwise denies the request.

**REQUEST FOR ADMISSION NO. 21**

Admit that employees of Irico traveled to the United States for business purposes in May 1998, as reflected in IRI-CRT-00025758.

**RESPONSE TO REQUEST NO. 21**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the undefined term "business purposes" renders the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

Subject to and without waiving the foregoing objections, Irico admits that the document states that "总厂 98 年出国团组汇总表" and contains the following entry:

| 序号 | 团组名称 | 出国（境） | 人数 | 出国时间 | 停留时间（天） | 出国任务 |
|---|---|---|---|---|---|---|
| 18 | 彩虹彩色显像管总厂 | 美国 | 2 | 98.5.20 | 10 | 会议 |

Irico further responds that the document speaks for itself, and otherwise denies the

request.

**REQUEST FOR ADMISSION NO. 22**

Admit that employees of Irico traveled to the United States for business purposes in September 1998, as reflected in IRI-CRT-00025758.

**RESPONSE TO REQUEST NO. 22**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the undefined term "business purposes" renders the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

Subject to and without waiving the foregoing objections, Irico admits that the document states that "总厂 98 年出国团组汇总表" and contains the following entry:

| 序号 | 团组名称 | 出国（境） | 人数 | 出国时间 | 停留时间（天） | 出国任务 |
|---|---|---|---|---|---|---|
| 6 | 彩虹彩色显像管总厂 | 美国 | 1 | 98.9.30 | 21 | 培训考察 |

Irico further responds that the document speaks for itself, and otherwise denies the request.

**REQUEST FOR ADMISSION NO. 23**

Admit that employees of Irico traveled to the United States for business purposes in February 1999, as reflected in IRI-CRT-00025759.

**RESPONSE TO REQUEST NO. 23**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the undefined term "business purposes" renders the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

Subject to and without waiving the foregoing objections, Irico admits that the document states that "总厂 99 年出国团组汇总表" and contains the following entry:

| 序号 | 团组名称 | 出国（境） | 人数 | 出国时间 | 停留时间（天） | 出国任务 |
|---|---|---|---|---|---|---|
| 5 | 彩虹彩色显像管总厂 | 美国 | 2 | 99.02.01 | 5 | 参加 SID 会议 |

Irico further responds that the document speaks for itself, and otherwise denies the

request.

**REQUEST FOR ADMISSION NO. 24**

Admit that Ma Jinqaun and other Irico employees traveled to the United States for business purposes from June 6 – 15, 2001, as reflected in IRI-CRT-00023164-66, 23170, and 23175.

**RESPONSE TO REQUEST NO. 24**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the undefined term "business purposes" renders the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

Subject to and without waiving the foregoing objections, Irico admits that IRI-CRT-00023164 states that "转账凭证 2001 年 8 月 23 日 摘要 转：马金泉等人出国费用 金额 36243.61 元." Irico further admits that IRI-CRT-00023165 states that:

人力资源部 请款单 2001 年 5 月 31 日 事由：马金泉 5 人赴美国技术交流 出差地点天数：12 天 金额： 10350 美元

Irico also admits that IRI-CRT-00023166 states as follows:

| 日期 | 所在地 | 天数 |
|---|---|---|
| 6 月 6 日-6 月 8 日 | 旧金山 | 3 |
| 6 月 9 日 | 硅谷 | 1 |
| 6 月 10-6 月 11 | 洛杉矶 | 2 |
| 6 月 12-6 月 13 | 拉斯维加斯 | 2 |
| 6 月 14-6 月 15 | 拉斯维加斯-旧金山-东京-北京 | 2 |

Irico further admits that IRI-CRT-00023170 references "Great Wall Travel Inc." and under the column "DESCRIPTION" lists:

- "6-19/11 RADISSON 2NIGHTS 3ROOMS;"
- "6-12 RIVERIA 1NIGHT 3ROOMS;" and,
- "6-13 TERRIBLE 1NIGHT 3ROOMS."

IRICO'S OBJECTIONS AND RESPONSES TO IPPS' FIRST SET OF REQUESTS FOR ADMISSION 24 Master File No. 07-CV-5944-JST MDL No. 1917

Irico also admits that IRI-CRT-00023175 is stamped "MATSUSONO, 1150 PALOMA AVE, BURLINGAME, CA 94010."

Irico further responds that the document speaks for itself, and otherwise denies the request.

**REQUEST FOR ADMISSION NO. 25**

Admit that Ma Jinqaun and other Irico employees met with Hisense USA Corporation in the United States in June 2001, as reflected in IRI-CRT-0023169 and 23180.

**RESPONSE TO REQUEST NO. 25**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the undefined term "business purposes" renders the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

Subject to and without waiving the foregoing objections, Irico responds that the document speaks for itself, and otherwise denies the request.

**REQUEST FOR ADMISSION NO. 26**

Admit that during the Relevant Period, Irico sought and received a United States safety certification from Underwriter's Laboratory ("UL") for its "Irico brand" CRTs, as reflected in IRI-CRT-00025700, 25703 and 25712.

**RESPONSE TO REQUEST NO. 26**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the undefined term "safety certification" renders the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

Subject to and without waiving the foregoing objections, Irico admits that IRI-CRT-00025700 and IRI-CRT-00025703 state that "工厂生产的"彩虹牌"彩色显像管、显示管等全部采用国际先进标准，并先后通过了 UL、BSI、VDE、CSA、和 ISO9000 等国际质量安全认证." Irico further admits that IRI-CRT-00025712 states that "主导产品"彩虹牌"彩管全部采用国际标准，该产品先后通过了美国 UL、英国 BSI、德国 VDE 和加拿大 CSA 安全认证；" Irico further responds that the document speaks for itself, and otherwise denies the request.

**REQUEST FOR ADMISSION NO. 27**

IRICO'S OBJECTIONS AND RESPONSES TO IPPS' FIRST SET OF REQUESTS FOR ADMISSION 25 Master File No. 07-CV-5944-JST MDL No. 1917

Admit that the documents produced by Irico in this case are true and correct copies of the originals.

**RESPONSE TO REQUEST NO. 27**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the term "authentic" calls for a legal argument or legal conclusion. Irico also objects to this Request on the grounds that it is overly broad, unduly burdensome, and oppressive as it seeks authentication of over one thousand documents with no possibility that such an exhaustive list would ever be used at trial in the above captioned matter. Plaintiffs have asked for authentication of every document produced by Irico during the course of the litigation and have made no effort to provide a narrower list of potential trial documents.

Subject to and without waiving its foregoing objections, Irico is willing to meet and confer with Plaintiffs to discuss a more reasonable list of documents that could potentially be used at trial.

**REQUEST FOR ADMISSION NO. 28**

Admit that the documents produced by Irico in this case are authentic and satisfy Fed. R. Evid. 901.

**RESPONSE TO REQUEST NO. 28**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the term "authentic" calls for a legal argument or legal conclusion. Irico also objects to this Request on the grounds that it is overly broad, unduly burdensome, and oppressive as it seeks authentication of over one thousand documents with no possibility that such an exhaustive list would ever be used at trial in the above captioned matter. Plaintiffs have asked for authentication of every document produced by Irico during the course of the litigation and have made no effort to provide a narrower list of potential trial documents.

Subject to and without waiving its foregoing objections, Irico is willing to meet and confer with Plaintiffs to discuss a more reasonable list of documents that could potentially be used at

trial.

**REQUEST FOR ADMISSION NO. 29**

Admit that the documents produced by Irico in this case were made at or near the time of the event reflected in the document.

**RESPONSE TO REQUEST NO. 29**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the terms "made at" and "near the time" call for a legal argument or legal conclusion. Irico also objects to this Request on the grounds that it is overly broad, unduly burdensome, and oppressive as it seeks authentication of over one thousand documents with no possibility that such an exhaustive list would ever be used at trial in the above captioned matter. Plaintiffs have asked for authentication of every document produced by Irico during the course of the litigation and have made no effort to provide a narrower list of potential trial documents.

Subject to and without waiving its foregoing objections, Irico is willing to meet and confer with Plaintiffs to discuss a more reasonable list of documents that could potentially be used at trial.

**REQUEST FOR ADMISSION NO. 30**

Admit that the documents produced by Irico in this case were made by someone with knowledge of the contents or event reflected in the document.

**RESPONSE TO REQUEST NO. 30**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the term "with knowledge" calls for a legal argument or legal conclusion. Irico also objects to this Request on the grounds that it is overly broad, unduly burdensome, and oppressive as it seeks authentication of over one thousand documents with no possibility that such an exhaustive list would ever be used at trial in the above captioned matter. Plaintiffs have asked for authentication of every document produced by Irico during the course of the litigation and have made no effort to provide a narrower list of potential trial documents.

IRICO'S OBJECTIONS AND RESPONSES TO IPPS' FIRST SET OF REQUESTS FOR ADMISSION 27 Master File No. 07-CV-5944-JST MDL No. 1917

Subject to and without waiving its foregoing objections, Irico is willing to meet and confer with Plaintiffs to discuss a more reasonable list of documents that could potentially be used at trial.

**REQUEST FOR ADMISSION NO. 31**

Admit that the documents produced by Irico in this case were prepared in the regular course of Your business.

**RESPONSE TO REQUEST NO. 31**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the term "regular course of Your business" calls for a legal argument or legal conclusion. Irico also objects to this Request on the grounds that it is overly broad, unduly burdensome, and oppressive as it seeks authentication of over one thousand documents with no possibility that such an exhaustive list would ever be used at trial in the above captioned matter. Plaintiffs have asked for authentication of every document produced by Irico during the course of the litigation and have made no effort to provide a narrower list of potential trial documents.

Subject to and without waiving its foregoing objections, Irico is willing to meet and confer with Plaintiffs to discuss a more reasonable list of documents that could potentially be used at trial.

**REQUEST FOR ADMISSION NO. 32**

Admit that the documents produced by Irico in this case satisfy Fed. R. Evid. 803(6).

**REPONSE TO REQUEST NO. 32**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico further objects to this Request on the grounds that the term "satisfies Fed. R. Evid. 803(6)" calls for a legal argument or legal conclusion. Irico also objects to this Request on the grounds that it is overly broad, unduly burdensome, and oppressive as it seeks authentication of over one thousand documents with no possibility that such an exhaustive list would ever be used at trial in the above captioned matter. Plaintiffs have asked for authentication of every document produced by Irico during the course of the litigation and have made no effort to provide a narrower list of potential

trial documents.

Subject to and without waiving its foregoing objections, Irico is willing to meet and confer with Plaintiffs to discuss a more reasonable list of documents that could potentially be used at trial.

///

///

Dated: February 23, 2022

BAKER BOTTS L.L.P.

*/s/ John M. Taladay*

John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
evan.werbel@bakerbotts.com
tom.carter@bakerbotts.com
drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# EXHIBIT DD



STATE of NEW YORK )
) ss:
COUNTY of NEW YORK )

***CERTIFICATE OF ACCURACY***

This is to certify that the attached document, *"CHU00123502 - CHU00123517"* originally written in *Chinese* is to the best of our knowledge and belief, a true, accurate and complete translation into *English.*

Dated: December 17, 2014

Allison Carey
Consortra Translations

Sworn to and signed before ME this 17th day of December, 2014

Notary Public

JAMES G. MAMERA
Notary Public- State of New York
No. 01MA6157195
Qualified In New York County
My Commission Expires December 4, 2018

Your legal translation partner

Confidential Material and for Internal Use Only

# Regular Marketing Meeting June

Sales Company June 13, 2005

May had been a traditional hot sale month, but we no longer see it this year as in the past. The market overall continues the downturn situation. The domestic sale of the TCL Group, one of the biggest global color TV makers, was only 70% of the same period in May, 2004. The export growth of China color TVs reduced to only 7.1% from the 40% for the same period in last year. Except for the 14" products, all products continue the downturn trend for both domestic and export sales, which has made it difficult to mitigate the pressure of the gigantic CRT inventory. Changhong's bidding has also further worsen the CRT industry. Due to IRICO Group's unanimous determination and cooperation, the sales situation has turned better, and the 14" is in a hot situation in both production and sales. While strengthening the export, we must fully promote the domestic sales of all products and develop markets for new products (including PDP), in order to obtain meaningful results in future bear market.

The summary report below is based on the market for May, 2005 and recent market, production and sales for CRT and color TV and their related situations.

## I. Color TV Market

### 1. Domestic Market

According to the May market survey conducted by IRICO Sales Company field sales staff, , Beijing, Shanghai, and other cities, the rate of increase for flat TV went up to 18.4% among all TV types. Among CRT color TV types, the share of PF TVs was up to 61.7%. The FS CRT TV market has shrunk quickly, maintaining only 17.6% of market share. Details are shown in the following table for the share of certain types of color TV Sales in some Chinese cities in May 2005.

| Type | 14" | 21″ | 21″ PF | 25″ | 25″ PF | 29″ | 29″ PF | 34″ | 34″ PF | PTV | LCD | PDP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beijing | | 4.1 | 9.1 | 1.4 | 11.5 | 5.5 | 27.8 | 0.6 | 1.8 | 0.2 | 16.3 | 20 |
| Shanghai | | 3.7 | 9 | 5.4 | 17.3 | 3.5 | 19.2 | 3.7 | 9.2 | 0 | 18.5 | 10.5 |

| Mianyang | 1 | 10.4 | 6.8 | 6.7 | 4.9 | 8.1 | 32.1 | 3.4 | 8.3 | 9.1 | 6.6 | 1.9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hangzhou | | 8 | 17 | 4.5 | 14.5 | | 40 | | 8 | 1 | 5 | 5 |
| Hefei | 3 | 5.4 | 11.6 | 9.5 | 24.1 | 7.8 | 23.8 | 3.7 | 3.1 | 1.7 | 6.1 | |
| Shenzhen (Sundan) | | 3 | 32 | 1 | 7 | 3 | 17 | 5 | 9 | 1 | 13 | 7 |
| Nanjing | 0.6 | 18.5 | 22.1 | 2.3 | 8.3 | | 35.1 | 1.3 | 8.8 | | | 0.2 |
| Xiamen | 0.9 | 9 | 13 | 4.7 | 11.5 | 4.7 | 30.7 | 0.9 | 9.8 | 0.9 | 8.1 | 4.7 |
| Shenzhen (Huajia) | 0.3 | 7.3 | 8.8 | | 5.5 | | 26.1 | 0.3 | 5.5 | 0.9 | 37 | 8.5 |
| Qingdao | | 12.2 | 14.2 | 3.9 | 5.7 | 2.3 | 41.2 | 0.8 | 5.6 | 1.1 | 10.8 | 2.2 |
| Average | 0.58 | 8.15 | 14.4 | 3.9 | 11.1 | 3.5 | 29.3 | 2 | 6.9 | 1.6 | 12.4 | 6.0 |

As shown in the table, 29”PF has the highest share. If excluding the projection and FPD types, 29”PF accounts for 36.6% in all CRT types.

2. Export Market

From January to April in 2005, the export of CRT color TV increased by 7.06%. The source of the data is from the Customs。

| Total | Others | TCL | LG | Skyworth | Haier | Panda | Samsung | Changhong | Philips | Konka | Prima | Hisense |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 715 | 220 | 117 | 48 | 48 | 54 | 44 | 39 | 32 | 28 | 36 | 27 | 22 |

From January to April in 2004, the export was 6.68 million units, up by 35.31% compared with the same period in the previous year. However, the same period growth in 05 was up only slightly by 7.06%, indicating growth is obviously slowing down for the export of Chinese color TV.

II. TV Makers’ Production, Sales, and Inventory

1. Top Seven Makers' Production, Sales, and Inventory Same Period Comparison between Y05/Y04 (Total Quantity) (Unit: 10K Sets, 10K Pcs )

| | Color TV Production | Color TV Sales | Color TV Inventory | Color TV Exports | CPT Inventory |
|---|---|---|---|---|---|
| May, 05 | 286.71 | 342.01 | 354.7 | 118.51 | 82.14 |
| Y05/Y04 | -11.25% | -17% | 13% | 120.02 | -73% |
| Jan .- May, 05 | 1480.76 | 1834.74 | 354.7 | 388.23 | 82.14 |
| Jan.- May, 04 | 1642.98 | 1906.464 | 312.72 | 469.93 | 301.68 |
| Y05/Y04 | -9.33% | -4% | 13% | -17% | -73% |

The above inventory of color CPT clearly showed that, in 2005, all TV makers adopted the strategy of determining production based on sales, and they used many methods, such as purchase of CPT by order and VMI, to reduce CPT inventory and minimize risks. These TV makers' CPT inventory was then shifted to be CPT makers' inventory. But it was difficult for CPT makers to quickly respond to this huge change of the market, and thus the CPT makers incurred a huge inventory sharp price drop, and much hardship.

2. Top Seven Makers' Production, Sales, and Inventory by-Product Type Comparison in Jan to May between Y05/Y04

Top Seven Makers' Production Comparison for Jan - May between Y05/Y04 (by product type) (Unit: 10K Sets)

| | 14″ | 15″ PF | 21″ FS | 21″ PF | 25″ FS | 25″ PF | 29″ FS | 29″ PF | 34″ FS | 34″ PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Y05 | 120.73 | 14.4 | 374.4 | 196.38 | 157.85 | 152.45 | 86.87 | 306.72 | 29.76 | 41.20 | 1492.76 |
| Y04 | 112.15 | 10.65 | 611.32 | 156.23 | 198.21 | 117.56 | 122.38 | 235.57 | 37.31 | 41.70 | 1646.28 |
| Y05/Y04 | 7.65% | 35.16% | -38.76% | 25.78% | -20.36% | 29.68% | -29.02% | 30.20% | -20.24% | -1.20% | -9.33% |

All the above FS type dropped sharply, 21"FS in particular, the drop was 38.76%r.

3. Sales Volume Comparison for Jan - May between Y05/Y04 (by product type) (Unit: 10K Sets)

| | 14″ | 15″ PF | 21″ FS | 21″ PF | 25″ FS | 25″ PF | 29″ FS | 29″ PF | 34″ FS | 34″ PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Y05 | 121. | 19.7 | 483.0 | 251.6 | 214.6 | 183.4 | 106.4 | 357.3 | 42.86 | 53.9 | 1834.7 |

|  | 61 |  | 9 | 4 | 5 | 5 | 7 | 7 |  |  | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Y04 | 115.05 | 13.054 | 685.82 | 179.93 | 270.01 | 138.26 | 145.99 | 283.34 | 35.71 | 39.3 | 1906.464 |
| Y05/Y04 | 6% | 51% | -30% | 40% | -21% | 33% | -27% | 26% | 20% | 37% | -4% |

4. Color TV Inventory Comparison for Jan - May between Y05/Y04 (by product type) (Unit: 10K Sets)

|  | 14″ | 15″ PF | 21″ FS | 21″ PF | 25″ FS | 25″ PF | 29″ FS | 29″ PF | 34″ FS | 34″ PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Y05 | 8.2 | 2.2 | 125.8 | 37.7 | 55.2 | 28.8 | 35.5 | 45.9 | 7.4 | 7.9 | 354.7 |
| Y04 | 3.2 | 0.9 | 108.8 | 34.1 | 57.1 | 23.6 | 24.59 | 37.73 | 11.5 | 11.2 | 312.72 |
| Y05/Y04 | 156% | 144% | 16% | 11% | -3% | 22% | 44% | 22% | -36% | -29% | 13% |

In summary:

   a. The seven top color TV makers reduced production by 9.3% and sales by 4%, from January to May, 2005, comparted with the same period in 2004. Both production and sales for all FS products dropped sharply while PF products rose sharply.   The color TV inventory increased by 13% compared with the same period in the previous year.

   b. All TV makers arranged production based on orders and they purchased CPTs according to received orders. Both factors increased further difficulty for selling CPT.

   c. TV makers arranged production according to sales and they put great effort on sales to minimize their inventory. As of the end of May, 2005, the CPT inventory was reduced to 82.14 million units.

However, the huge CPT inventory was shifted to all CPT makers. The details are showed below ( nit: 10K Pcs).

| Maker | TCL | Konka | Skyworth | Changhong | Hisense | Haier | Prima | Total |
|---|---|---|---|---|---|---|---|---|
| CPT inventory at end of May | 35.2 | 10 | 22.2 | 3.92 | 7 | 0.32 | 3.5 | 82.14 |

5. Seven Top TV Makers' Production Forecast for June - August, 2005    (Unit: 10K Sets)

|  | Subtotal | Changhong | TCL | Konka | Skyworth | Hisense | Haier | Prima |
|---|---|---|---|---|---|---|---|---|
| June | 325.2 | 58 | 76 | 55 | 45 | 35.2 | 40 | 16 |
| July | 285 | 77 | 67 | 38 | 30 | 20 | 38 | 15 |
| August | 289.5 | 78.8 | 89 | 40 | 30 | 20 | 16.7 | 15 |

II. CPT Industry Situation

1. CPT Industry Operation Update

(1) CPT makers' production suspension (limitation) update

CPT Makers' Production Suspension/Limitation Plans for June 2005

| Maker | Type | Line System | Time Period | # of Days | Approximate Volume Reduced (10K Pcs) | Remarks |
|---|---|---|---|---|---|---|
| IRICO | 21"FS line | 2 | Full month | 30 | 35 | Market impact |
| Samsung (Tianjin + Shenzhen) | 21"FS line | 1 | Basically at month beginning and month end | 7 | 5 | Market impact |
| | 21"PF line | 1 | Basically at month beginning and month end | 4 | 2 | Market impact |
| | 25"FS/29"PF line | 1 | Basically at month beginning and month end | 2 | 1 | Market impact |
| | 29"PF line | 1 | Basically at month beginning and month end | 5 | 3 | Market impact |
| Thomson (Dongguan) | 21"FS (PF) line | 1 | Routine | 1 | 0.6 | Equipment maintenance |
| | 25"FS (PF) line | 1 | Routine | 1 | 0.5 | Equipment maintenance |
| | 29"FS line | 1 | Routine | 1 | 0.5 | Equipment maintenance |
| Thomson (Foshan) | 29"PF/34"FS(PF) line | 1 | 1st to 11 | 11 | 4 | Market impact |
| Hitachi | 21"FS(PF) and 25"FS line | 2 | Alternate suspension between 2 lines | 10 | 10 | Market impact |
| | 29"FS(PF) line | 2 | Alternately suspension between 2 lines | 15 | 7 | Market impact |
| | 34"PF line | 1 | 1st – 15th | 15 | 3 | Market impact |
| LG | 21"FS/PF line | 1 | 1st, 2nd, 11th, 20th, 30th | 13 | 8 | Market impact |
| | 25"FS(PF)/21"PF line | 1 | 21st – 30th | 5 | 3 | Market impact |
| | 29"FS (PF) line | | 1st, 2nd, 11th, 12th, | 17 | 10 | Market impact |

| | | | 17th, 18th, 19th - 30th | | | |
|---|---|---|---|---|---|---|
| Yongxin | 29"SF | 1 | 1st – 30th | 30 | 14 | Market impact |
| | 34"SF line | 1 | 1st – 6th | 14 | 2.9 | Market impact |
| SEG | 21"FS lines | 2 | Basically at month beginning and month end | 19 | 20 | Market impact |
| | 21"PF（FS) line | 1 | Basically at month beginning and month end | 12 | 10 | Market impact |
| | 34"SF(FS) line | 1 | Basically at month beginning and month end | 7 | 6.2 | Market impact |
| BMCC | 21"FS line | 1 | 1st – 20th | 20 | 10 | 25"PF line Equipment adjustment |
| Total | | | | | 153.7 | |

Note: a. The total reduced production volume is estimated as 1.54 million pieces based on capacity.

b. The above production suspension and limitation data is referred to with respect the production lines only and not including switching factor among product types.

(2) The Changhong's bidding in April increased heavy pressure to the CPT pricing market and the pricing has got lower than the industry's average cost. All CPT makers had a hard time to continue. Therefore, when Changhong made the second bidding in the mid-May, price only went down slightly, and all CPT makers found it difficult to bear.

(3) BMCC: in order to reduce its CPT inventory pressure, Matsushita Group decided that 35% of the Panasonic brand TV tubes would use the tubes produced within Matsushita Group.

(4) Huafei: increase the usability of 21" and 29" tubes for the Philips own brand color TVs. At the same time, Philips pressed TCL (Philips is TCL's largest OEM client) to use more Philips CPTs.. This situation caused increased difficulty and slow progress for IRICO in its TCL-Philips project.

(5) Thomson: it has currently become the second largest shareholder of Konka. Therefore, the Konka Group Board of Directors decided to prioritize using Thomson CPTS in the light season.

Currently, IRICO has a distinct disadvantage among the competition. Major CPT makers all produce their own TV brands with internal channels to use their own CPTs. Furthermore our products structure concentrates on small and medium sized screens and focuses on FS. IRICO's decision on its marketing strategy has become an urgent issue.

Y04/Y05 Recent Changes on Average CPT Unit Price

(Yuan/Pc, %)

| | 14" | 21"FS | 21"PF | 25"FS | 25"PF | 29"FS | 29"PF | 34"FS | 34"PF |
|---|---|---|---|---|---|---|---|---|---|
| June 04 | 230 | 382 | 462 | 469 | 749 | 710 | 1032 | 1100 | 1680 |
| June 05 | 180 | 270 | 365 | 370 | 620 | 640 | 730 | 930 | 1400 |
| Y05/Y04 | -22 | -29 | -21 | -21 | -17 | -10 | -29 | -15 | -17 |

IRICO current prices are as follows:

| 14" | 21"FS | 21"PF | 25"FS | 29"PF |
|---|---|---|---|---|
| 190 - 205 | 270 - 290 | 350 - 390 | 370 - 390 | 630 - 650 |

2. Industry's actual Production and Sales Situation

(1) CPT Industry Overall Production and Sales Situation for January - May, 2005 (By Maker)

China CPT Industry Operating Data in May, 2005 (Unit: 10K Pcs)

| Makers | BMCC | SEG Hitachi | Hualei | Yongxin | Thomson | LG Shuguang | Samsung | IRICO | Total |
|---|---|---|---|---|---|---|---|---|---|
| Production | 59.68 | 21.74 | 48.07 | 34.63 | 29.82 | 50.40 | 76.56 | 76.41 | 397.20 |
| Sales | 50.14 | 17.65 | 44.68 | 32.35 | 26.67 | 48.00 | 72.66 | 91.54 | 383.69 |
| Production/Sales Rate | 84.0% | 81.2% | 92.9% | 93.4% | 89.4% | 95.2% | 95.0% | 119.8% | 96.6% |
| Export Portion | 17.40 | 10.40 | 25.44 | 4.28 | 15.48 | 22.80 | 49.70 | 46.25 | 162.75 |
| Export Ratio | 34.7% | 58.9% | 56.9% | 13.2% | 58.0% | 47.5% | 66.0% | 50.5% | 47.6% |
| Inventory | 102.7 | 103.6 | 74.7 | 135.1 | 110.1 | 70.6 | 52.2 | 226.7 | 875.7 |

China CPT Industry Operating Data for January - May, 2005 (Unit: 10K Pcs)

| Makers | BMCC | SEG Hitachi | Huafei | Yongxin | Thomson | LG Shuguang | Samsung | IRICO | Total |
|---|---|---|---|---|---|---|---|---|---|
| Production | 304.6 | 201.2 | 232.1 | 233.5 | 226.6 | 261.4 | 350.6 | 552.2 | 2362.7 |
| Sales | 207.5 | 133.0 | 164.6 | 132.0 | 150.1 | 190.5 | 298.7 | 395.0 | 1671.0 |
| Production/Sales Ratio | 68.1% | 66.1% | 70.9% | 56.6% | 66.2% | 73.0% | 85.2% | 71.5% | 70.8% |
| Export Portion | 62.1 | 60.7 | 73.5 | 23.0 | 51.1 | 66.8 | 126.8 | 185.3 | 651.1 |
| Export Ratio | 29.9% | 45.8% | 44.7% | 17.4% | 34.1% | 34.9% | 42.1% | 46.9% | 38.9% |
| Inventory | 102.7 | 109.6 | 74.7 | 145.4 | 110.1 | 70.6 | 52.2 | 220.7 | 878.7 |

(2) CPT Industry Production and Sales Situation for January - May, 2005 (by Product Type)

CPT Industry Operating Data for January - May, 2005 (by Product Type)
(Unit: 10K Pcs)

| Product Type | 14" | 15"PF | 21"FS | 21"PF | 25"FS | 25"PF | 29"FS | 29"PF | 34"FS | 34"PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Production | 262.1 | 7.6 | 590.6 | 393.5 | 275.2 | 193.5 | 119.6 | 399.5 | 67.7 | 53.7 | 2362.5 |
| Sales | 255.0 | 14.2 | 358.0 | 231.1 | 173.9 | 141.3 | 89.2 | 317.9 | 47.2 | 44.0 | 1671.6 |
| Export Portion | 150.3 | 12.7 | 156.2 | 96.0 | 65.8 | 13.6 | 52.2 | 64.4 | 20.2 | 8.7 | 651.1 |
| Production/Sales Ratio | 97.3% | 186.7% | 60.6% | 58.7% | 63.2% | 73.0% | 74.6% | 79.6% | 69.7% | 82.0% | 70.8% |
| Inventory | 38.8 | 9.1 | 316.3 | 177.6 | 90.9 | 47.9 | 40.5 | 182.9 | 24.7 | 17.0 | 878.7 |

(3) CPT Industry Monthly Production Trend Chart (Unit: 10K Pcs)



(4) Comparison for January- May between Y05/Y04 (Unit: 10K Pcs)

| | Production | Sales | Inventory | Export |
|---|---|---|---|---|
| Jan to May 05 | 2362.7 | 1671.8 | 875.7 | 639.8 |
| Jan to May 04 | 2512.8 | 2472.7 | 104.2 | 672.5 |
| Y05/Y04 | -6% | -34.5% | 740% | -5% |

(5) CPT pricing

Industry's Settled Price Range in Recent Months (Unit: Yuan/Pc)

| | 14" | 21"FS | 21"PF | 25"FS | 29"PF | 29"PF |
|---|---|---|---|---|---|---|
| Dec 04 | 205 - 235 | 350 - 365 | 430 - 460 | 430 - 470 | 690 - 750 | 900 - 960 |
| Mar 05 | 195 - 215 | 300 - 320 | 400 - 420 | 400 - 425 | 650 - 680 | 820 - 850 |
| Apr 05 | 195 - 205 | 270 - 300 | 380 - 400 | 380 - 400 | 620 - 650 | 780 |
| May 05 | 190 - 200 | 260 - 270 | 360 - 400 | 360 - 400 | 600 - 650 | 750 |
| Prediction for Jun 05 | 185 | 265 - 275 | 350 - 370 | 350 - 370 | 590 - 610 | 720 - 750 |

**IV. IRICO Tubes Sales and Export Situation :**

For January - May, 3.95 million CPTs were sold (including 1.853 million pieces for export). The product types are listed below (unit: 10K pcs):

| 14" | 15"PF | 21"PF | 21"(Thick) | 21"FS | 25"FS | 25"PF | 29"PF |
|---|---|---|---|---|---|---|---|
| 172.31 | 14.21 | 31.54 | 7.27 | 81.09 | 42.24 | 45.26 | 1.08 |

1.163 Billion Yuan for recovery of loans was received; 45.0638 million USD for export foreign exchange was received. As of June 12, there were 370.3 thousand tubes shipped, including 160.5 thousand for export. The shipment is expected to reach 0.85 - 1 million pieces by the end of June, and the recovery of loans will be 200 – 300 million Yuan.

Sales Predictions for July, August and September, 2005 (Unit: 10K Pcs)

| | **14"** | **15"PF** | **21"PF** | **21"(Thick)** | **21"FS** | **25"FS** | **25"PF** | **29"PF** | **Total** |
|---|---|---|---|---|---|---|---|---|---|
| July | 50 - 53 | 5 - 7 | 9 - 11 | 2 - 4 | 21 - 23 | 8 - 9 | 7 - 9 | 0.2 - 0.6 | 102.2 - 116.6 |
| August | 51 - 55 | 6 - 8 | 10 - 12 | 4 - 6 | 22 - 25 | 9 - 11 | 9 - 11 | 0.2 - 0.6 | 111.2 - 128.6 |
| September | 53 - 58 | 7 - 9 | 11 - 13 | 5 - 7 | 25 - 30 | 10 - 12 | 10 - 12 | 0.2 - 0.6 | 121.2 - 141.6 |
| Subtotal | **154 - 166** | **18 - 24** | **30 - 36** | **11 - 17** | **68 - 78** | **27 - 32** | **26 - 32** | **0.6 - 1.8** | **334.6 - 386.8** |

▪ CRT Export Situation

1. Export Volume in This Month

In June (as of June 13), the shipment for exported CRT is as follows:

14”FS CRT: 119K Pcs; 15”PF CRT: 25K Pcs; 21”PF CRT: 5.6K Pcs, 21” HS (thick): 7.3K Pcs;

21”FS CRT 19K Pcs; 25”FS CRT: 13K Pcs; 25”PF CRT: 0.6K Pcs

Total in This Month: 191 Thousand Pcs; Foreign Exchange: USD 4.43 Million

Year To Date Export: 2.012 Million Pcs; Foreign Exchange: USD 49.589 Million

2. Market Performance

In this month, the CRT export volume dropped slightly, mainly shown from reduced overseas orders. The portion of domestic deep-processing for export still maintains a stable market. June's CRT export is expected to reach approximate 500 thousand pieces.

3. Price Update

Export market pricing: the market performance shows that the prices for 14"FS and 15"PF are basically stable, but the price for 21"FS has dropped an average of USD 0.9 compared with the previous month.

4. CRT Export Volume and Trend

CPT Monthly Export Shipment Comparison for 2003, 2004 and 2005 (Unit: 10K Pcs)

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2003 | 9.25 | 13.3 | 18 | 20.7 | 23.5 | 30.3 | 24.5 | 39.1 | 41.7 | 27.2 | 38 | 23.3 | 314.8 |
| 2004 | 22.1 | 24.7 | 20 | 21.5 | 23 | 30.6 | 25.3 | 24.5 | 31.5 | 25.7 | 27.1 | 19.2 | 295.2 |
| 2005 | 30.7 | 22.6 | 28.2 | 52.3 | 48.3 | // | // | // | // | // | // | // | 182.3 |

CPT Monthly Export Shipment Diagram for 2003-2004-2005 (Unit: 10K Pcs)



7. Market Situation

The recent market has gone dull and pricing is dropping more quickly. In order to avoid purchase risks, overseas clients prefer to purchase CRT in their adjacent regions, and have all adopted short-term purchasing strategies. This situation is very bad for our overseas export.

In this month, VESTEL requested very low prices and we could not meet its request. The planned June orders were temporarily suspended.

The Southeast Asian market is shrinking due to fluctuation of currency exchange rates, impact of China TV makers and other factors. Currently, the small CRT market share is almost fully monopolized by LG.

Russian ROLSEN Company's Leningrad factory had a fire in May with five lines being damaged. Normal production is expected to resume by the end of this year.

Issues:

PROFILO did not agree to our proposal of reshipping good tubes to replace remaining bad tubes. They requested free tube replacement or direct compensation.

The CRT specifications manual electronic version is only distributed through the Technical Quality/Quality Department, causing problems of many procedures, poor communication and low efficiency.

To analyze from the current overall market situation, we think that the export will not be optimistic in the short term.

(1) Impacted by the upcoming summer vacation in July and August, most European TV makers will suspend productions simultaneously. The June and July overseas orders are expected to decrease.

(2) In the global arena, CRT color TV is heavily pressed by the PDP and LCD markets. Therefore, CRT export will be constrained heavily for the long term.

(3) Being benefited from preferential policies of the Xi'an Export Processing Area, the domestic deep-processing for export still has certain market advantage and relatively stable market share.

At the end of May, we investigated Russian market and wrote a special report. The following characteristics are obtained from the analysis of our tubes' competitiveness in the Russian market:

Strengthens of our tubes in the Russian market:

We have complete equipment system, lower production costs, and more competitive FOB prices.

We have complete product types. Except for 29"SF, we can supply all product types. This is beneficial for our overall marketing.

We developed Russian market relatively earlier, and have established cooperative relationships with most factories.

Weaknesses in our competitiveness

Compared with other multinational companies, such as Samsung, LG-Philips, Hitachi, and Panasonic, IRICO brand is obviously not well known. Under the precondition of same quality and quantity, TVs using Samsung and Philips tubes can sell for better prices.

IRICO is located in the Far East, so its transportation cycle is as long as one month. Adding customs clearance and inland transportation, it will be after two months   when clients receive the tubes. Due to the freight cost continues to rise, our real CIF prices are not better comparted with other suppliers. Both Samsung and LG have factories in Europe, t Southeast Asia, etc., and their freight costs to the major European ports are much cheaper.


6. Suggestions for Expanding the Russian Market Share

(1) Set up a warehouse in St. Petersburg, Russia. With respect to the client, upon making the payment,, they can immediately get the products, avoiding one - two-month long distance transportation.   Particularly under the current situation that CRT prices continuously go down, this arrangement will prevent client from loss incurred during the transportation period.

(2) Because St. Petersburg has a unique customs policy, we may consider building a DY factory in its tax-free zone and move ITC adjustment to the factory. This plan has the following advantages:

We can adjust down the duty-paid prices. Currently, Russian customs applies fixed duty policy to imported CRT, i.e. one same price for all custom clearance. Take 14" for example, although our price is USD 20, the customs still collects duties according to USD 35. However, the Customs has no limitation for bare tubes. We may take some measures on invoicing.

If the above-mentioned manufacture processing is recognized by the Customs, our products would be totally exempt from duties in St. Petersburg. Furthermore, our products would also be duty-free for exporting to other places in Russia. (The current Russian duty is 5%.)


V. New Product Development

1. 21"PF (New AK Material)

In order to improve work efficiency and weaken department boundaries, we relied on the collaborative planning among the Sales Company, the After-Sale Service and the CRT Factory One, to establish the 21"PF CRT (New AK Material) Project Market Promotion Team on June 5, aiming to comprehensively promote this product into the market within the shortest time. At present, we have accomplished good result through joint efforts. See the following table for details.

| No. | Makers | Current Situation | Remarks |
|---|---|---|---|
| 1 | Sichuan Changhong | May 31: A batch of 2000 pcs was finished. June 7: Orders placed. July 8: 10080 pcs were shipped. | |
| 2 | Konka | June 3: A batch of 32 pcs was produced. June 11: aging test was finished. | |
| 3 | Skyworth Multimedia | May 17: A small batch of 20 pcs was finished for testing; June 5: Order for 2240 pcs was placed; June 10: Shipping | |
| 4 | Hefei Haier | June 3: Sample tube confirmation was finished. Producing a small batch of 10 pcs for evaluation. | |
| 5 | Qingdao Hisense | June 9: Pilot line flow for 30 pcs was finished; currently doing high temperature aging test. Remaining issues are (1) low filament voltage, (2) convergence [illegible] and (3) poor line linearity. | |
| 6 | Qingdao Haier | June 1: Finished sample evaluations for four companies (LG, IRICO, SEG and BMCC) planning to use our tubes for making sample TVs for the clients. June 9: place orders for a small batch of 16 pcs for certification and another 2 pcs for TV installation (US). | |
| 7 | Prima | June 10: Sample tube evaluation was finished and the qualification report was issued. | |
| 8 | TCL Philips project | June 1: Tube matching was completed. Tube testing will follow right after. | |

2. 21"TS Flush Tube Neck

TTE Philips Project: 500 pcs were shipped on May 27 for random batch certification; arranging for production on June 1[illegible].

Changhong: tested 120 pcs on May 30; currently doing aging test.

Indian L B Company: prepared 1920 pcs to be shipped in the next few days.

Shanghai Industrial Investment: shipped 2 sample tubes on May 21

Panda Import and Export: shipped one sample tube on May 23

3. 15"PF

Skyworth Multimedia: 20 pcs for test flow on May 28; currently doing aging test.
Panda: shipped 36 pcs for small batch test flow on May 24.

VI. Market Prospects and Sales Ideas

▪ Prospects

1. June and the second quarter are the traditional light season for sales and production of the color TV. All makers put all efforts to promote selling their white appliances, such as air conditioners, during this period. In both urban and rural markets, this is the most depressed period for sale of color TV. This year is even more obvious. All of the makers, retailers and consumers shift their attention completely to the white appliances, like the AC.

2. TV makers commonly reduce production in June. For example, TCL's T-Meile and Inner Mongolia factories arranged a longer production suspension plan. Skyworth closed for half of the month. Line closing to suspend production and expansive production reduction are very popular.

3. Among the common CRTs, 21"FS has a bigger inventory, and SEG Hitachi, etc. keep lowering prices in order to sell them. In addition, Changhong's bidding cruelly suppresses prices causing very high pressure to lower prices. All makers use flexible sales policies, and prices continue to drop. All makers are using the light season to develop new products and modify the equipment.

▪ Sales Ideas

In June, the sales work focused on seizing orders, export, and new products (including PDP) to promote, as well as reducing inventory. The key point is to reduce the 21"FS inventory.

The following chart shows the 21"FS inventory industrywide from August, 2004 to May, 2005.



Although the inventory began to decrease in May, IRICO's inventory pressure will not be relieved in the short term. We are trying all methods to mobilize all aspects and actively promote sales. We believe that under the Group's proper leadership and policy support, IRICO will revive its sales for 21"FS and turn into a promising new prospect.

Note: the unit measurement shown in Chinese in the above chart on the far left side in parentheses is translated as (10,000 pieces).

# EXHIBIT EE



City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document "**CHU00124779-85**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

Dan McCourt

Sworn to before me this
September 12, 2022

Signature, Notary Public

Stamp, Notary Public



# Market Alert

**IRICO Group Sales Company** | **Issue 0518** | **March 09, 2005**

**February 2005 Color Picture Tube Industry Bulletin**

# Inventory Has Been High and Grew Year-on-year by 522%

**I. Great Inventory Pressure**

Based on the "Situation Summary" survey, in February 2005, the inventory of color picture tubes in the entire industry increased drastically from 2 million in January to 5.42 million; this was a growth of 522% as compared to 870,000 pieces in February 2004. There has not been such a large inventory before over the years, especially after the Spring Festival.

Apart from the inventory of 25" PF, which was basically unchanged, and that of 34" FS, which decreased, the inventory of other varieties increased by more than 200%. Of which, the inventory of 21" FS even increased by 1647%! Refer to the figure below for the inventory of each manufacturer and each variety:

Comparison of Inventory Volume of Each Manufacturer in the Industry in February 2005/2004
2005-2
2004-2
(' 0000 pieces)
85
6
61
18
11
9
113
16
24
5
19
4
162
11
81
18
Thomson
BMCC
Huafei
Novel
Samsung SDI
Changsha LG
IRICO
SEG-Hitachi

**Comparison of Inventory Volume of Each Variety in February 2005/2004**

(' 0000 pieces)
2005-2
2004-2
63
216
44
36
41
64

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00124779E
Translation

## II. Analysis of Cause for Large Inventory Volume of 21” FS

- **Main Causes of Large Inventory Volume of 21” FS:**

1. Overly Rapid Growth in Output of Color Picture Tubes

In recent years, the flattening trend has dominated the color television industry and the production of FS color picture tubes has been greatly reduced. The output of 25” FS, 29” FS and 34” FS decreased year by year. For example, the output of 29” FS in 2005 decreased by 70% as compared to that in 2003. However, the output of 21” FS did not decrease but increased year by year.

At the end of 2004, the inventory volume of 21” FS color picture tubes was up to 4 million pieces in color picture tube and color television makers and color picture tube makers did not take measures but still produced them in January and February 2005, causing inventory to soar.

2. Reduced Demand of whole-set makers

In January 2005, only 670,000 sets of 21” FS whole sets were produced, which was a 43% year-on-year decline in output of this type of whole set. However, 1.65 million pieces of 21” FS color picture tubes were produced, causing the supply-demand relationship to be even more imbalanced.

3. Poor Domestic Sales of 21” FS Whole-Sets

21” FS sets are exiting urban markets and the share of 21” FS sets in rural markets is also less than 30%. Merchants unanimously gave feedback that 21” FS sets were not profitable (or gave little profit) and were unwilling to distribute them; this caused whole-set makers to tighten production. Hence, this resulted in the 21” FS market having a gap but manufacturers refusing to supply goods during the Spring Festival.

4. Reduced Export of 21” FS Tubes

The export volume of 21” FS in January decreased year-on-year from 510,000 to 380,000, which was a 25% decrease. For example, a major exporter of 21” FS, SEG-Hitachi, exported 215,000 pieces in January 2004 and only exported 79,000 pieces in January 2005, which was a decline of 64%.

In addition, the proportion of export quantity of 21” FS sets of whole-set makers is also decreasing while that of 21” PF sets is increasing significantly.

At the end of February, inventory increased to 5.42 million pieces, of which, the inventory of 21” FS, which is of great importance to IRICO, was close to 2.158 million pieces, and this was mainly concentrated in IRICO (740,000 pieces), SEG (700,000 pieces) and Novel (380,000 pieces). The three makers had a total of 1.82 million pieces, accounting for 84% of total inventory, while the inventory of 5 other makers only accounted for 16%.

- **Upon analysis, the main reasons that the other makers had a low 21” FS inventory volume were:**

1. They are backed by large international companies and operate according to international practices, so they are more sensitive to inventory and follow the market by carrying out order-based production.

2, They have their own whole-set plants and increase sales of their whole-set plants when the market is not doing well. Historically, when the industry had a higher inventory of color picture tubes the past few times, these few companies digested inventory through their own whole-set plants. For example, all 50,000 pieces of 21” FS produced by Huafei in February were given to Philips Suzhou.

3. These international companies are unwilling to increase inventory volume during off-season of the market. Hence, they started to suspend production and limit production in November so that the inventory volume of factories is kept at an appropriate level.

- **Upon analysis, the reasons that the three makers had a large 21" FS inventory volume are as follows:**

1. The three makers lack own whole-set plants to back and can only fight alone during off-seasons without external assistance.
2. Exports are IRICO's weakness and it is difficult to digest excess resources in China through exports with the domestic sales market not doing well in 2005.
3. The three makers have a relatively high output and do not reduce production during off-season.

- **Thomson has no plans to suspend production as of now. The main reason being:**

After TCL and Thomson set up TTE, TTE pledged to digest 50% of Thomson's color picture tubes. However, this proportion is actually far higher during off-seasons.

**III. Reduced Output of 21 FS"**

Based on industry exchange data, the total output of 21" FS was 1.1 million pieces in February 2005, which decreased by 35% as compared to February 2004, that is, it decreased from 1.72 million pieces to 1.11 million pieces. This indicates that the manufacturers in the industry started to reduce (suspend) production. In addition, the output of 25" FS and 29" FS decreased by 55% and 31%, respectively. This indicates that the companies in the industry were still optimistic about pure flat tubes in a sluggish CRT market.

The table below shows a comparison of the output of each variety in February 2005 *(*10,000 pieces, %)

| Variety | 14 " | 21 " | 21 " PF | 25 " | 25 " PF | 29 " | 29 " PF | 34 " | 34 " PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 04-2 | 30 | 172 | 64 | 82 | 29 | 26 | 54 | 11 | 8 | 473 |
| 05-2 | 40 | 111 | 72 | 37 | 30 | 18 | 70 | 15 | 10 | 403 |
| Year-on-year % | +33 | -35 | +13 | -55 | +3 | -31 | +30 | +25 | +25 | -15 |

**IV. Growth in Export of Color Picture Tubes by 24.5%**

The increase and decrease in export volumes of each variety are as shown in the table below ('10,000 pieces, %)

| Variety | 14 " | 21 " | 21 " PF | 25 " | 25 " PF | 29 " | 29 " PF | 34 " | 34 " PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 04-2 | 21 | 42 | 22 | 6 | 1 | 6 | 3 | 5 | | 106 |
| 05-2 | 33 | 38 | 26 | 9 | 4 | 7 | 12 | 3 | 2 | 132 |
| Year-on-year % | +57 | -10 | +18 | +50 | +300 | +17 | +300 | -40 | | +24.5 |

The table shows that the overall growth was 24.5% and the exports of 25" and above medium and large tubes performed better. In addition, according to the statistics of Customs, the export of color televisions in January grew by 26.4%; exports of color picture tubes and color televisions will continue to maintain large growth, which can relieve some of the pressure.

**Summary of Actual Inventory of Domestic Color Picture Tube Makers in February 2005**
**(Unit: 10,000 pieces)**

| | Thomson | BMCC | Huafei | Novel | Samsung SDI | Changsha LG | IRICO | SEG Hitachi | Total of 2005 | Total of 2004 | 05VS04 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 14" | | 17.3 | | | | | 45.8 | | 63.1 | 8.0 | 788.8% |
| 15"PF | | | | | | | 14.2 | | | | |
| 21"FS | 19.3 | 7.6 | 3 | 58 | 0.5 | 3.3 | 74.1 | 70 | 215.8 | 13.1 | 1647.3% |
| 21"PF | | 9.9 | 3.4 | | 3.8 | 0.8 | 20.5 | 5.4 | 43.9 | 16.3 | 269.4% |
| 25"FS | 11.3 | | 0.7 | 19.0 | | 1.2 | 4.0 | | 36.2 | 11.6 | 312.1% |
| 25"PF | | | | | 1.3 | 0.7 | | | 2.0 | 1.6 | 125.0% |
| 29"FS | 13.6 | 6.4 | 0.3 | 20.0 | | 0.6 | | | 40.6 | 5.5 | 738.2% |
| 29"PF | 14.9 | 5.1 | 1.4 | 32.0 | 5.2 | 2.8 | 3.2 | | 63.8 | 6.9 | 924.6% |
| 31"PF | 0.9 | | | | | | | | 0.9 | 0.0 | |
| 34"FS | | 2.3 | | 4.0 | | | | 5.6 | 11.9 | 19.1 | 62.3% |
| 34"PF | 6.8 | 3.1 | 2.2 | | 1.5 | | | | 13.6 | 5.0 | 271.2% |
| Custody | 18.0 | 10.0 | | | 12.0 | 10.0 | | | 50.0 | | |
| 2005 | 84.8 | 61.3 | 11 | 113 | 24.3 | 18.6 | 162.0 | 81 | 541.8 | | |
| 2004 | 6.2 | 17.0 | 8.8 | 15.8 | 4.9 | 4.3 | 10.9 | 18.3 | | 87.1 | |

| 05VS04 | 1368% | 344% | 97% | 677% | 490% | 433% | 1486% | 399% | | | 642% |
|---|---|---|---|---|---|---|---|---|---|---|---|

*The above table is organized based on customs information channels.

# Summary of Suspension (Reduction) of Production of Each Manufacturer in the Color Picture Tube Industry from October 2004 to March 2005

| Manufacturer | 2004 | | | 2005 | | | Remarks (Source of Data) |
|---|---|---|---|---|---|---|---|
| | October | November | December | January | Production line suspended production in February | March | |
| BMCC | PRT production was halved from 09/25 to 10/08 | Transformation of 21" PF line to be compatible with 25" PF from 11/06 to 11/12 | PRT production was suspended in December, production of 14" and 21" FS was suspended from 12/18 to 12/24 | PRT production was suspended in January Production was suspended on 01/01 | 2/8—2/14 | Production was suspended for 21", 14", 21" PF/29" FS and 21" PF for 4 days | |
| SEG-Hitachi | Production of 21" PF and 34" was reduced from 10/32 [sic] to 11/05 | Equipment was adjusted for 10 days to increase the speed | 12/24—12/31<br><br>Production of 21" FS was reduced by 100,000 | | 2/6—2/16 | Production was suspended for 34" from 03/15 to 03/30 | According to Head of Department Guojun Yang |
| Samsung | | Production was reduced by 10,000 for 29", increased by 10,000 for 25" PF and the production of the other varieties was reduced by a total of 40,000 from 11/06 to 11/12 | 12/11—12/31 Production of Line No. 1 was suspended for transformation 12/18-12-31 Transformation of Line No. 2 | 5 days of New Year's Day holiday Production of 21" FS was suspended from 01/21 to 01/23 | 2/7—2/13 | 21" FS line was transformed to a 21" PF line in Shenzhen; Tianjin: production of 25" PF/29" PF was suspended for 5 days, production of 34" PF was suspended for 11 days; | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Changsha LG | | | Production was suspended for close to half a month | Production of 21" was suspended from 01/01 to 01/13 and from 01/25 to 01/30, production of 29" was suspended from 01/24 to 01/30 and production of 25" was suspended on 01/01 | 2/8—2/14 | Production of 21" FS was suspended for 6 days, production of 29" was suspended for 10 days and production was scheduled to be suspended for 7 days per month in 2 months | According to Vice President and Head of Sales Department Yaping Yang, although inventory pressure is not high, pressure from the headquarters in South Korea due to the suspension of production is higher. |
| Novel | | | | | 2/7-2-16 | Production of 34" PF was reduced from 03/01 to 03/07 and production of 29" FS and 29" PF was suspended from 03/08 to 03/16 | |
| Huafei | | Production of 21" was suspended for 18 days | Production of 29" PF was suspended for 10 days and production of 21" FS was suspended for 12 days in December | | Only 50,000 units of 21" were produced from 02/08 to 02/14 | 21" line was transformed into a slim tube line | According of Head of Sales Department Dezhu Zhang |
| Thomson | | | Production was suspended for 2 days on 12/10 and 12/30 and the 29" line produced 31" PF | Production at Foshan was suspended for 1 day and production was suspended for 2 days at Dongguan between 01/29 and 02/24 | 2/7—2/13 | | |
| **Quantity causing suspension (reduction) in production** | **10** | **28** | **65** | **30** | **180** | **150-200 (estimated)** | |

# 市场 快讯

彩虹集团销售公司 第 0518 期 2005 年 3 月 9 日

## 2005 年 2 月份彩管行业快报

## 库存居高不下，同比增长 522%

### 一、巨大的库存压力

根据《情况汇总》调查表，2005 年 2 月，彩管全行业库存从元月份近 200 万，猛增到 542 万；与 2004 年 2 月 87 万只相比，增长 522%。如此庞大的库存量并且发生在春节过后，是历年所没有的。

除 25 " PF 基本不变和 34 " FS 有减少之外，其它各品种库存增长均在 200%以上。其中 21 " FS 更达到 1647%！各厂家及各品种库存比较见下图：

## 二、21 " FS 库存量大原因分析

- 21 " FS 库存量大主要原因：

1、彩管产量增长太快

近几年，由于彩电纯平化趋势上为主导，FS 型彩管大幅减产，25 " FS、29 " FS、34 " FS 产量逐年下降，比如 05 年 29 " FS 比 03 年减少 70%。但是 21 " FS 不但不减，产量反而逐年增加。

在 2004 年底，21 " FS 彩管在彩管和彩电厂库存量达到 400 万只，但彩管厂没有采取措施，在 05 年 1、2 月仍照样生产，使库存扶摇直上。

2、整机厂需求减少

05 年元月份整机生产 21 " FS 机仅为 67 万台，这一整机产量同比减少 43%；可是 21 " FS 彩管生产 165 万只，使供求关系更加失调。

3、21 " FS 机内销不好

城市市场上 21 " FS 机正在退出，农村市场上 21 " FS 机占有率也不到 30%。商家一致反映 21 " FS 机没有利（或利薄），不愿经销；并由此导致整机厂紧缩生产。于是出现春节期间，21 " FS 市场有缺口而厂家不供货的局面。

4、21 " FS 管出口减少

元月份 21 " FS 出口量同比从 51 万减为 38 万，减少 25%。例如 21 " FS 出口大户赛格日立 04 年元月出口 21.5 万只,05 年元月仅 7.9 万只，减幅为 64%。

另外，整机厂家 21 " FS 机出口数量占比也在下降，21 " PF 机明显上升。

2 月底总库存上升到 542 万只，其中对彩虹生死攸关的 21 " FS，库存量近 215.8 万只，并且主要集中在彩虹（74 万只）、赛格（70 万只）、永新（38 万只）三大家,三家合计 182 万只，占 84%，其余 5 家仅占 16%。

- 21 " FS 库存量少的几家我们分析原因主要是：

1、有国际大公司背景，按国际惯例运作，对库存比较敏感，跟着市场走，按订单生产。

2、有自身整机厂，市场不好时，会加大对自身整机厂的销售。历史上几次行业彩管库存较大时，这几家都是通过自身整机厂来消化库存。比如华飞 2 月份所生产的 21 " FS 5 万只全部给了苏飞。

3、这些国际性公司，不愿在市场淡季时增大库存量，因此从 11 月份开始停产、限产，始终使工厂库存量保持适当水平。

●三大家 21＂FS 库存量大，我们分析原因有以下几点：

1、没有自身整机厂背景，淡季时只能孤军奋战，没有外部援助。

2、出口为彩虹弱项，在 05 年内销市场不好的情况下，难以通过外销手段消化国内过剩的资源。

3、三家产量较大，淡季时也未减产。

● 汤姆逊目前没有停产计划，主要原因是：

TCL 与汤姆逊成立 TTE 公司后，TTE 承诺消化汤姆逊 50%的彩管。但实际在淡季时，还远远超过这个比例。

## 三、21＂FS 产量在减少

根据行业交流数据，2005 年 2 月，21＂FS 总产量 111 万只；与 04 年 2 月相比，减少 35%，即由 172 万只减为 111 万只。说明行业厂家开始有减（停）产行动。另外，25＂FS、29＂FS 分别减少 55%、31%。说明行业各家在低迷的 CRT 市场上，依旧看好纯平管的前景。

下表为 05 年 2 月各品种产量比较（万只、%）

| 品种 | 14＂ | 21＂ | 21＂PF | 25＂ | 25＂PF | 29＂ | 29＂PF | 34＂ | 34＂PF | 合计 |
|---|---|---|---|---|---|---|---|---|---|---|
| 04-2 | 30 | 172 | 64 | 82 | 29 | 26 | 54 | 11 | 8 | 473 |
| 05-2 | 40 | 111 | 72 | 37 | 30 | 18 | 70 | 15 | 10 | 403 |
| 同比% | +33 | -35 | +13 | -55 | +3 | -31 | +30 | +25 | +25 | -15 |

## 四、彩管出口增长 24.5%

各品种出口量增减如下表（万只、%）

| 品种 | 14＂ | 21＂ | 21＂PF | 25＂ | 25＂PF | 29＂ | 29＂PF | 34＂ | 34＂PF | 合计 |
|---|---|---|---|---|---|---|---|---|---|---|
| 04-2 | 21 | 42 | 22 | 6 | 1 | 6 | 3 | 5 |  | 106 |
| 05-2 | 33 | 38 | 26 | 9 | 4 | 7 | 12 | 3 | 2 | 132 |
| 同比% | +57 | -10 | +18 | +50 | +300 | +17 | +300 | -40 |  | +24.5 |

表中显示，总体增长 24.5%，25＂以上中大型管出口较好。另外，海关统计元月份彩电出口增长 26.4%；彩管、彩电出口继续保持较大增长，可缓解部分压力。

2005 年 2 月国内彩管厂实际库存情况汇总（单位：万只）

| | 汤姆逊 | BMCC | 华飞 | 永新 | 三星 SDI | 长沙 LG | 彩虹 | 赛格日立 | 05 合 | 04 合 | 05VS04 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 14" | | 17.3 | | | | | 45.8 | | 63.1 | 8.0 | 788.8% |
| 15"PF | | | | | | | 14.2 | | | | |
| 21"FS | 19.3 | 7.6 | 3 | 38 | 0.5 | 3.3 | 74.1 | 70 | 215.8 | 13.1 | 1647.3% |
| 21"PF | | 9.8 | 3.4 | | 3.8 | 0.8 | 20.7 | 5.4 | 43.9 | 16.3 | 269.4% |
| 25"FS | 11.3 | | 0.7 | 19.0 | | 1.2 | 4.0 | | 36.2 | 11.6 | 312.1% |
| 25"PF | | | | | 1.3 | 0.7 | | | 2.0 | 1.6 | 125.0% |
| 29"FS | 13.6 | 6.1 | 0.3 | 20.0 | | 0.6 | | | 40.6 | 5.5 | 738.2% |
| 29"PF | 14.9 | 5.1 | 1.4 | 32.0 | 5.2 | 2.0 | 3.2 | | 63.8 | 6.9 | 924.6% |
| 31"PF | 0.9 | | | | | | | | 0.9 | 0.0 | |
| 34"FS | | 2.3 | | 4.0 | | | | 5.6 | 11.9 | 19.1 | 62.3% |
| 34"PF | 6.8 | 3.1 | 2.2 | | 1.5 | | | | 13.6 | 5.0 | 271.2% |
| 代保管 | 18.0 | 10.0 | | | 12.0 | 10.0 | | | 50.0 | | |
| 2005 | 84.8 | 61.3 | 11 | 113 | 24.3 | 18.6 | 162.0 | 81 | 541.8 | | |
| 2004 | 6.2 | 17.8 | 8.8 | 15.8 | 4.9 | 4.3 | 10.9 | 18.3 | | 87.1 | |

| 05VS04 | 1368% | 344% | 97% | 677% | 496% | 433% | 1486% | 399% | | | 622% |
|---|---|---|---|---|---|---|---|---|---|---|---|

*上表是根据各种信息渠道整理而成。

CONFIDENTIAL – GRAND JURY MATERIAL

# 2004 年 10 月-2005 年 3 月 彩管行业各家停（减）产情况汇总

| 厂家 | 04 年 | | | 05 年 | | | 备注 |
|---|---|---|---|---|---|---|---|
| | 10 月 | 11 月 | 12 月 | 1 月 | 2 月生产线停产 | 3 月 | (资料来源) |
| 北松 | 9/25—10/8 ，PRT 半产 | 11/6—11/12<br>21＂PF 兼容 25＂PF 改造 | 12 月份 PRT 停产，<br>12/18—12/24<br>14＂、21＂FS 停产 | 1 月 PRT 停产<br>1/1 停产 | 2/8—2/14 | 21＂、14＂、21＂PF/29＂FS、21＂PF 停 4 天 | |
| 赛格日立 | 10/32—11/5，21＂PF、34＂减产 | 设备调整 10 天，提速 | 12/24—12/31<br>21＂FS 减 10 万 | | 2/6—2/16 | 3/15—3/30 停 34＂ | 据杨国钧钧部长讲 |
| 三星 | | 11/6—11/12，29＂减 1 万 ,25＂PF 增 1 万，其它合计总量减 4 万。 | 12/11—12/31<br>1 号线停产改造<br>12/18—12-31<br>2 号线改造 | 元旦放假 5 天，<br>1/21—1/23<br>21＂FS 停产 | 2/7—2/13 | 深圳 21＂FS 转 21＂PF；<br>津：25＂PF/29＂PF 停 5 天，34＂PF 停 11 天； | |

CHU00124784

CONFIDENTIAL – GRAND JURY MATERIAL

| 长沙 LG | | | 停产近半个月 | 1/1—1/3、1/25—1/30 停 21＂，1/24—1/30 停 29＂，1/1 停 25＂ | 2/8—2/14 | 21＂FS 停 6 天，29＂停 10 天，近两个月每月计划停 7 天 | 据付总兼营业部长杨亚平讲，虽然库存压力不大，但停产所引发的来自韩国总部的压力更大。 |
|---|---|---|---|---|---|---|---|
| 永新 | | | | | 2/7—2-16 | 3/1—3/7，34＂PF 减产 3/8—3-16，29＂FS、29＂PF 停产 | |
| 华飞 | | 21＂停 18 天 | 12 月 29＂PF 停 10 天，21＂FS 停 12 天 | | 2/8—2/14 21＂只生产 5 万 | 21＂线改薄型管 | 据营业部长张德柱讲 |
| 汤姆逊 | | | 12/10、30 日停 2 天，29＂线生产 31＂PF | 1/29—2/4 佛山停 1 天，东莞停 2 天 | 2/7—2/13 | | |
| 引起停（减）产数量 | **10** | **28** | **65** | **30** | **180** | **150-200 (预计)** | |

# EXHIBIT FF



City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document "**CHU00124663-74**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

Dan McCourt

Sworn to before me this
September 14, 2022

Signature, Notary Public

Stamp, Notary Public

Exhibit
Wang 8565
Wang Zhaojie - V1

*For internal use only*
*Confidential*

# Regular Sales and Marketing Meeting

# May

Sales Company May [illegible], 2005

April is over and we are now in the middle of May. In terms of the color TV market, the entire "May Day" holiday did not spur the CRT color TV market as anticipated, even for the largest TCL Group, whose domestic sales volume was only 70% of the same "May Day" period in 2004. In addition, the growth in export volume of whole sets decreased to only 5% from 40% in the same period last year. Except for 14", domestic and export sales remain sluggish, making it difficult to relieve the huge inventory pressure of color picture tubes. Changhong's bid has also added to the woes of the color picture tube industry. At present, the situation and future of China's CRT color picture tube industry have attracted a great deal of attention from all sectors of society.

I will report the market, production, sales and inventory of color picture tubes and color TVs, as well as other related situations in April 2005, as follows.

**I. Color TV market**

**1. Domestic sales market**

According to the findings of a local market survey conducted by IRICO Sales Company's salespeople stationed outside in April, the share of flat-screen TVs rose to 15.1% in some cities such as Beijing and Shanghai; among CRT color TVs, PF sets accounted for as high as 64.3%; indicating that the market for FS-type CRT TVs is shrinking rapidly. Please refer to the table below for the variety proportion of color TVs sold in some cities across the country in April 2005 (%).

| Product type | Mianyang | Nanjing | Beijing | Shanghai | Shenzhen | Xiamen | Hangzhou | Xinxiang | Average |
|---|---|---|---|---|---|---|---|---|---|
| 14" | 1.0 | 0.6 | | | | 1.7 | | | 1.1 |
| 21" | 10.0 | 15.2 | 3.0 | 2.4 | 4.0 | 12.3 | 8.8 | 15.7 | 9.0 |
| 21"PF | 6.8 | 16.9 | 8.0 | 10.7 | 39 | 10.5 | 15.0 | 24.3 | 16.6 |
| 25" | 6.2 | 5.4 | 1.1 | 2.7 | 1.0 | 5.3 | 3.5 | 4.7 | 3.8 |
| 25"PF | 5.2 | 12.6 | 12.7 | 18.2 | 7.0 | 11.4 | 13.5 | 20.6 | 12.7 |
| 29" | 8.5 | | 6.8 | 6.4 | 4.0 | 6.1 | | | 6.3 |
| 29"PF | 34.5 | 36.2 | 24.4 | 22.7 | 21 | 27.2 | 40.0 | 25.6 | 28.7 |
| 34" | 2.6 | 0.8 | 0.4 | 2.7 | 5.0 | 1.7 | | | 2.2 |
| 34"PF | 7.5 | 6.4 | 1.6 | 4.0 | 6.0 | 12.2 | 8.0 | 3.9 | 6.3 |
| PTV | 10.0 | | 3.0 | | 1.0 | 1.8 | 1.0 | 1.0 | 3.0 |

| LCD | 3.8 | 5.7 | 18.9 | 22.7 | 8.0 | 6.6 | 6.5 | 1.3 | 8.9 |
|---|---|---|---|---|---|---|---|---|---|
| PDP | 1.0 | 0.2 | 22.1 | 7.5 | 4.0 | 3.9 | 5.0 | | 6.2 |
| Explanation | Higher PTV volume influenced by Changhong | Dominated by 29" PF | Flat-screen accounts for as high as 59% | Flat-screen TV accounts for 50% | 21" PF selling well | 34" PF accounts for 12.2% | 29" PF dominates | Dominated by PF | Flat-screen accounts for 19.1%; PF accounts for 64.3% |

**2. Export market**

Between January and March, CRT color TV exports grew by 5.8% (data from the customs)

| Total | Others | TCL | LG | Skyworth | Haier | Panda | Samsung | Changhong | Philips | Konka | XOCECO | Hisense |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5.17 million sets | | 87 | 48 | 42 | 42 | 29 | 28 | 23 | 22 | 21 | 19 | 18 |

**Between January and March 2004, 4.89 million sets were exported, an increase of 41% over the same period in 2003, and a slight increase of 5.8% over the same period in 2005, indicating that the growth of China's color TV exports has slowed down significantly.**

**II. Production, sales and inventory of whole-set makers**

**1. Comparison of production, sales and inventory of the 7 major makers for the same period in 2005/2004 (total)** **(Unit: 10,000 sets, 10,000 pieces)**

| | Color TV production | Color TV sales | Color TV inventory | Color TV export | Color picture tube inventory |
|---|---|---|---|---|---|
| April 2005 | 275.4 | 259 | 396.4 | 76.2 | 125.8 |
| 05/04 | -25.94% | -17% | 16.4% | 31.6% | -47.4% |
| January – April 2005 | 1206 | 1493 | 396.4 | 282.8 | 125.3 |
| January – April 2004 | 1323 | 1579 | 340.5 | 349.9 | 238.7 |
| 2005/2004 | -8.8 | -5% | 16.4% | -19.2 | -47.4% |



**2. Comparison of production, sales and inventory by variety for the 7 major makers in January – April 2005/2004**

**Comparison of production volume of the 7 major makers in Jamtary – April 2005/2004 (by product type)** **(Unit: 10,000 sets)**

| | 14" | 15" PF | 21" FS | 21" PF | 25" FS | 25" PF | 29" FS | 29" PF | 34" FS | 34" PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | 91.0 | 11.4 | 289.8 | 160.5 | 135.3 | 129.3 | 72.3 | 246.8 | 25.4 | 32.2 | 1206 |
| 2004 | 83.0 | 7.3 | 485.5 | 125.7 | 167.9 | 99.6 | 102.2 | 186.2 | 29.0 | 33.5 | 1323 |
| 05/04 | 9.7% | 57.2% | -40.3% | 27.7% | -19.4% | 29.8% | -29.2% | 32.5% | -12.4% | -4.1% | -8.80% |

**Comparison of sales volume in January – April 2005/2004 (by product type)** **(Unit: 10,000 sets)**

| | 14" | 15" PF | 21" FS | 21" PF | 25" FS | 25" PF | 29" FS | 29" PF | 34" FS | 34" PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | 91.9 | 16.7 | 387.5 | 207.1 | 180.1 | 155.3 | 87.4 | 286.2 | 37.2 | 43.3 | 1493 |
| 2004 | 85.6 | 9.8 | 558.6 | 150.7 | 244.4 | 117.5 | 122.0 | 228.5 | 30.4 | 31.7 | 1579 |
| 05/04 | 7% | 71% | -31% | 37% | -26% | 32% | -28% | 25% | 22% | 36% | -5% |

CONFIDENTIAL -- GRAND JURY MATERIAL



**Comparison of color TV inventories in January – April 2005/2004 (by product type)**

(Unit: 10,000 sets)

| | 14" | 15"PF | 21"FS | 21"PF | 25"FS | 25"PF | 29"FS | 29"PF | 34"FS | 34"PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 05 | 8.4 | 1.7 | 129 | 45.5 | 63.8 | 34.8 | 37.4 | 58.1 | 8.1 | 9.9 | 396.4 |
| 04 | 3.2 | 1.1 | 118.1 | 37.6 | 55.5 | 26.9 | 29.6 | 46.4 | 10 | 12.1 | 340.5 |
| 05/04 | 160% | 55% | 9% | 21% | 15% | 29% | 28% | 25% | -19% | -18% | 16% |

**In summary:**

**a. Between January and April 2005, the production output of the 7 major color TV makers decreased by 8.9% compared to 2004, and sales decreased by 5%. Among them, the production and sales of all varieties of FS sets decreased significantly, PF sets increased to varying degrees, while color TV inventories increased by 16% year on year. This has undoubtedly compounded the difficulties of the sale of color picture tubes.**

**b. The production of color TVs in the whole-set makers is order-based, and the purchase of color picture tubes is placed by order, which aggravates the problem of color picture tube sales.**

**c. The whole-set makers determine the production according to the sales and are vigorously trying to consume the whole set/color picture tube inventory. As of the end of April 2005, the CPT inventory has dropped to 1.28 million pieces. The details are as follows (unit: 10,000 pieces)**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Manufacturer | TCL | Konka | Skyworth | Changhong | Hisense | Haier | XOCECO | Total |
|---|---|---|---|---|---|---|---|---|
| CPT inventory at the end of April | 14.2 | 10 | 23.5 | 50 | 13 | 2.2 | 5.9 | 127.8 |

**5. The production forecast of the 7 major whole-set makers for May – July 2005 (Unit: 10,000 sets)**

| | Subtotal | Changhong | TCL | Konka | Skyworth | Hisense | Haier | XOCECO |
|---|---|---|---|---|---|---|---|---|
| May | 323.8 | 58 | 68 | 50 | 45 | 48 | 39.8 | 15 |
| June | 325.2 | 58 | 76 | 55 | 45 | 35.2 | 40 | 16 |
| July | 250 | 57 | 60 | 38 | 30 | 20 | 38 | 15 |

**III. CRT industry situation**

**1. Business dynamic of the CRT industry**

**Market pressure increased sharply and color TV and color picture tube prices fell sharply.**

**Change in the average unit price of color TVs and color picture tubes in early May (end of April) 2004/2005** (RMB/set, RMB/piece, %)

| | | 14" | 21" FS | 21" PF | 25" FS | 25" PF | 29" FS | 29" PF | 34" FS | 34" PF | 32" LCD | 42" PDP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Color TV | 2004 | 625 | 810 | 1028 | 1158 | 1584 | 1450 | 2267 | 2150 | 4632 | 16800 | 19200 |
| | 2005 | 586 | 740 | 920 | 1010 | 1220 | 1150 | 1940 | 1900 | 3800 | 9900 | 12500 |
| | 05/04 | -6 | -9 | -10 | -13 | -23 | -25 | -14 | -11 | -18 | -41 | -35 |
| Color picture tube | 2004 | 223 | 383 | 475 | 490 | 771 | 780 | 1125 | 1080 | 1960 | | |
| | 2005 | 185 | 265 | 340 | 365 | 600 | 700 | 740 | 840 | 1680 | | |
| | 05/04 | -17 | -31 | -28 | -25 | -22 | -11 | -34 | -22 | -14 | | |

**Note: (1) The market unit prices of color TV are with reference to "CMM" data;**

**(2) The unit price of color picture tube is the current accepted price of the industry following Changhong's bid;**

**(3) IRICO's current pricings are as follows: (RMB/piece, $/piece)**

14" 21" FS 21" PF 25" FS 25" PF

| | | | | | |
|---|---|---|---|---|---|
| Domestic selling price | 190-210 | 280-290 | 380-400 | 375-400 | 620-680 |
| Export selling price | 18-20.5 | 28-30 | 36-38.5 | 36.5-40 | 64-68 |

**2. Industry-specific production and sales**

**(1) Overall production and sales of the CRT industry in January – April 2005 (by manufacturer)**

Operating data of China's CRT industry for April 2005 (Unit: 10,000 pieces)

| | BMCC | SEG-Hitachi | Hualei | Novel | Thomson | LG Shuguang | Samsung | IRICO | Total |
|---|---|---|---|---|---|---|---|---|---|
| Production | 70.10 | 35.25 | 46.74 | 50.00 | 58.66 | 52.40 | 65.69 | 116.70 | 475.53 |
| Sales | 52.20 | 28.76 | 33.63 | 29.35 | 40.05 | 40.50 | 50.53 | 85.69 | 350.71 |
| Sales as a percentage of production | 74.5% | 81.6% | 72.0% | 58.7% | 68.1% | 77.3% | 76.9% | 73.4% | 73.8% |
| Export | 16.50 | 20.42 | 23.28 | 5.32 | 10.82 | 22.40 | 29.39 | 52.23 | 180.06 |
| Inventory | 93.1 | 99.5 | 71.3 | 132.8 | 107.0 | 68.2 | 48.4 | 241.9 | 862.2 |

Operating data of China's CRT industry for January – April 2004 (Unit: 10,000 pieces)

| | BMCC | SEG-Hitachi | Hualei | Novel | Thomson | LG Shuguang | Samsung | IRICO | Total |
|---|---|---|---|---|---|---|---|---|---|
| Production | 245.1 | 179.5 | 184.0 | 198.8 | 197.0 | 211.0 | 274.4 | 475.8 | 1965.6 |
| Sales | 157.4 | 115.4 | 120.0 | 99.7 | 123.4 | 142.6 | 226.1 | 303.5 | 1288.1 |
| Sales a percentage of production | 64.2% | 64.3% | 65.2% | 50.1% | 62.6% | 67.7% | 82.4% | 63.8% | 65.5% |
| Export | 44.7 | 50.5 | 48.1 | 18.7 | 35.7 | 43.8 | 88.1 | 139.41 | 468.51 |
| Inventory | 93.1 | 99.5 | 71.3 | 132.8 | 107.0 | 68.2 | 48.4 | 241.9 | 862.2 |

**(2) Overall production and sales of the CRT industry in January – April 2005 (by product type)**

Operating data of CRT industry for January – April 2005 (by product type)
Unit: 10,000 pieces

| | 14" | 15" PF | 21" FS | 21" PF | 25" FS | 25" PF | 29" FS | 29" PF | 34" FS | 34" PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Production | 149.9 | 4.9 | 388.1 | 221.4 | 173.5 | 129.6 | 77.9 | 255.0 | 51.1 | 39.5 | 1490.0 |
| Sales | 204.7 | 9.6 | 267.4 | 159.9 | 123.3 | 117.3 | 73.6 | 255.0 | 42.0 | 35.4 | 1258.1 |
| Export | 140.01 | 5.8 | 106.9 | 65.3 | 39.6 | 10.2 | 42.2 | 84.5 | 18.7 | 5.2 | 468.51 |
| Sales as a percentage of production | 136% | 196.7% | 68.9% | 72.2% | 71.1% | 90.5% | 94.4% | 100.0% | 82.1% | 89.7% | 84.4% |
| Inventory | 32.3 | 11.0 | 330.7 | 165.0 | 84.1 | 43.5 | 42.3 | 109.6 | 26.2 | 17.4 | 862.2 |

(3) **Monthly production trends of the CRT industry** (10,000 pieces)

(4) **January – April 2005 vs. same period in 2004** (Unit: 10,000 pieces)

| | Production | Sales | Inventory | Export |
|---|---|---|---|---|
| January – April 2005 | 1966 | 1288 | 862.2 | 468 |
| January – April 2004 | 1951 | 1916 | 82.7 | 520 |
| **2005/2004** | **1%** | **-33%** | **943%** | **-10%** |

(5) **CRT pricing:**

**The industry's settled price ranges in the recent months: (Unit: RMB/piece)**

| | 14" | 21" FS | 21" PF | 25" FS | 25" PF | 29" PF |
|---|---|---|---|---|---|---|
| December 2004 | 205-255 | 350-385 | 450-460 | 430-470 | 690-730 | 900-960 |
| February 2005 | 200-220 | 330-350 | 410-420 | 415-440 | 670-700 | 840-900 |
| March 2005 | 195-215 | 300-320 | 400-420 | 400-425 | 650-680 | 820-850 |
| April 2005 | 185-205 | 270-300 | 390-400 | 390-400 | 620-650 | 690 |
| May 2005 forecast | 185-205 | 260-270 | 350-400 | 370-400 | 600-650 | 750-800 |

**IV. Sales of IRICO tubes**

1. Between January and April, 3,034,647 pieces of color picture tubes were sold, of which 1,313,813 pieces were exported. RMB 976.74 million in goods payments were recovered, with foreign exchange earnings from export of USD 33,570,300. As of May 16, 546,300 pieces have been shipped in May, of which: 229,177 pieces were exported. It is expected that 0.9 million – 1 million pieces can be shipped by the end of May and RMB 200 – 300 million in goods payment can be recovered.

**Sales forecast for June, July and August 2005** (Unit: 10,000 pieces)

| | **14"** | **15" PF** | **21" PF** | **21" (thick)** | **21" FS** | **25" FS** | **25" PF** | **29" PF** | **Total** |
|---|---|---|---|---|---|---|---|---|---|
| June | 50-55 | 5-7 | 7-9 | 3-6 | 18-20 | 9-10 | 8-10 | 0.2-0.6 | 100.2-117.6 |
| July | 51-55 | 5-7 | 7-9 | 4-6 | 18-20 | 8-9 | 8-10 | 0.2-0.6 | 101.2-116.6 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| August | 52-57 | 5-7 | 8-10 | 5-10 | 18-20 | 8-10 | 9-12 | 0.2-0.6 | 105.2-126.6 |
| Subtotal | 153-167 | 15-21 | 22-28 | 12-22 | 54-[illegible] | 25-29 | 25-32 | 0.6-1.8 | 308.6-360.8 |

II. CRT export situation

• <u>CRT export</u>

(1) Projected export volume and shipments made in May (as of May 16) are as follows:

303,000 pieces/171,000 pieces of 14" FS color picture tubes, 43,000 pieces/24,000 pieces of 15" PF color picture tubes, 23,000 pieces/23,000 pieces of 21" PF color picture tubes, 2,000 pieces/2,000 pieces of 21" (thick), 90,000 pieces/31,000 pieces of 21" FS color picture tubes, and 45,000 pieces/24,000 pieces of 25" FS color picture tubes. Total shipped: 274,000 pieces, foreign exchange earnings from export: USD 6.636 million.

(2) The number of color picture tubes exported this month still maintained the upward momentum of April, and it is expected that exports in May could exceed 500,000 pieces. The focus remains on the Turkish market and the domestic deep processing transit and export aspect.

(3) Export market price: Compared to April, the price of 14" FS remains unchanged, 15" PF is down by an average of USD 0.2 and 21" FS is down by an average of USD 1.4.

In general, export prices for 14" FS and 15" PF color picture tubes have relatively stabilized, but prices for other sizes of color picture tubes are still on a significant downward trend.

(4) Market situation

In the Turkish market, VESTE is relatively more stable, especially since the number of 21" FS color picture tubes shipped has been increasing steadily, which is a good start to further expand the share of IRICO products other than 14". Sample tubes of 15" PF and 21" PF have been sent and are awaiting test results. If the test is passed, a steady number of orders may be received.

PROFILO and BEKO are still saying that the prices of our color picture tubes are too high, so they have not placed any order for the time being. In order to lay the foundation for future expansion, we have arranged for 15" PF and 21" PF sample tubes to be sent to the above two companies and will follow up the test results.

SHOV is still in the process of starting up its new plant and has not been able to finish its stock of 14" color picture tubes from last year, so orders will be delayed.

The feasibility of setting up a warehouse in Turkey is being discussed.

The Russian market has a relatively low number of orders as it is currently the off-season for the international market. Customers have been asking for price reduction. In particular, they are unhappy with the price of our 21" FS color picture tube. ROLSEN has asked us to resolve the issue of defective tubes from November – December 2004 as soon as possible. (Specific number of defects: 3 pieces of 14", 62 pieces of 21", and 8 pieces of 25" FS.)

Further research is underway for the construction of a plant in Russia.

(5) Suggestions

Recently, there has been an increase in customers' demand in terms of quantity and product type for domestic deep processing transit exports of color picture tubes, and the existing production capacity of Xi'an Cairui is no longer able to meet the demand. The cost of customs transfer through Shanghai Mengtong and Shenzhen Shencai is high and the turnaround time for the goods is also longer. It is recommended to expand the production capacity of Cairui as soon as possible to adapt to the market demand, so as to achieve new breakthroughs in the quantity and variety for the export of our color picture tubes.

- Components export

So far this year, we have made USD 2.47 million in foreign exchange earnings from exports.

(1) A total of 143.8 tons of ZnS raw powder has been exported to LG and Samsung; of which, LG has temporarily stopped purchasing new powder since January because it has started using recycled powder. Exports expected in May: 30 tons.

(2) A total of 560,000 pieces of DY has been exported. The main issue at present is: several overseas manufacturers have begun to develop 21" PF AK material coils. Because the plant is currently developing and switching products, there are many problems and they may not be able to keep to the delivery schedule. Exports expected in May: 100,000 pieces.

(3) A total of 129.6 tons of glass support rod powder has been exported, with 32.4 tons expected to be exported in May. Due to the adjustment and maintenance of the plant equipment, the powder particles have yellowed, and arrangements have been made to resolve the problem, but the export schedule for April and May will have to be slightly delayed.

(4) 9.6 tons of color powder has been exported to Italy and Poland. Expected export this month: 1.08 tons. Red powder export remains an issue as the red powder quota has not been granted.

The development of materials and components is in progress. Samples have been sent to customers and are awaiting feedback.

(5) Indian market

a. Color picture tube: After comparing several agencies, LB India has been selected as the exclusive distributor of IRICO color picture tubes in India and the terms of the agency agreement are being negotiated. The customer has issued a letter of credit for 9,216 pieces of 14" and 1,920 pieces of 21" PF AK color picture tubes. They will also be visiting this month.

b. Phosphor powder: 3 tons of phosphor powder have been exported this month (1 ton each of red, green, and blue powder)

V. New product advancement:

- 21" PF (new AK material)

Changhong: The sample tube was certified on April 30, and 120 pieces were shipped on May 11 for small batch certification.

Konka: The sample tube was certified on May 13.

XOCECO: Completed sample tube certification on May 12 and basically passed. Users mainly reflected about the issue of low brightness.

Qingdao Haier: Two sample tubes were shipped on April 25, and certification has not been arranged.

Hefei Haier: Two sample tubes have been scheduled to undergo certification this week.

Skyworth Multimedia: The sample tube was certified on April 28 and a small batch certification of 20 pieces was carried out on May 13.

Korrigan: One sample tube was shipped on April 28 and being certified.

VESTEL: Two sample tubes were shipped on April 27.

ROSEN [sic: Rolsen]: One sample tube was shipped on April 28.

BEKO: Two sample tubes were shipped on May 10.

TCL: Two North American magnetic field sample tubes were shipped on April 27.

Hisense: One sample tube was shipped on May 13.

- 21" PF (AK material)

Jiangsu Century Digital: Passed a small batch certification of 80 pieces on April 18 and an order of 2,280 pieces was placed on April 20, which were shipped on April 26.

India LB: Two sample tubes were shipped on April 22. They responded on May 11 that the color purity was poor, which is to be confirmed.

PROFILO: Two sample tubes were shipped on May 10.

- 21" FS thick tube neck

TTE: On May 10, the small batch of 24 pieces was certified for the Philips project, while 4 sample tubes for the Latin American magnetic field (2 pieces for 44 geomagnetic and 2 pieces for 55 geomagnetic) were also certified. An order for 500 pieces was placed on May 16 for medium batch certification.

VESTEL: 16 pieces were shipped on May 11 in preparation for small batch certification.

STRAND Ukraine: One sample tube was shipped on May 11.

India LB: Two sample tubes were shipped on April 22. They reverted on May 11 that the DY parameters did not fit the chassis properly.

- 15" PF

AUTO PAGE

TCL: The demand was for 28 pieces of 15" PF03 type, of which 4 pieces were sent to the Singapore R&D center and 24 pieces to TCL Hong Kong, who forwarded them to the Polish factory, all of which were dispatched on May 10.

Vestel: Two pieces of 02A type sample tubes were shipped on March 22, but on April 21, they reverted that the Z-point height was unsuitable for the housing. Two pieces of 01B type sample tubes will be re-sent soon.

Skyworth Multimedia: The sample tube was certified on May 12, and 84 pieces will be shipped on May 16 for small batch certification.

Shanghai Hongdeng: Completed all certifications.

Anhui Weide: Two sample tubes were certified on April 20.

Starlight Electronics: Two pieces of 02A type sample tubes were shipped on March 30, but on April 19, they reverted that the Z-point height was unsuitable for the housing.

BEKO: One sample tube was shipped on May 10.

Jiangsu Aetna: Two pieces of sample tubes were shipped on May 10.

PROFILO: Two pieces of sample tubes were shipped on May 10.

- 14"

Konka, Skyworth Multimedia: Three pieces and one piece of DC 15 type sample tubes were shipped on March 17 to the companies respectively. As the DY was unsuitable, 5 pieces of new DYs were shipped on April 15. Konka tested the new DY and there was no abnormality, and the sample tubes were certified; Skyworth Multimedia tested the new DY but it still did not match. They sent back a set of chassis on April 22 and the DY is being prepared.

Century: One DC05 sample tube was shipped to Egypt on April 22.

TCL: Two pieces of 14" North American magnetic field sample tubes are being certified. The DY parameters do not match the chassis.

Jinlipu: One narrow explosion-proof taped sample tube was shipped on May 13.

- 25" PF

Marubeni: One sample tube was sent out on March 23, and the response on May 10 was that it was too large for the housing and that the brightness was too low.

Skyworth: On April 09, 32 pieces of 25" PF 100 Hz tubes were sent to Skyworth. On April 14, 2 pieces were sent to Skyworth for testing. The wire fitting passed, but the structural fitting did not pass because the existing housing was too small.

- 29" PF

ROLSEN Russia: One 50 Hz COM sample tube was shipped on April 28.

STRAND TRADING Ukraine: One 50 Hz COM sample tube was shipped on May 11.

- 34" PF

One sample tube each was shipped to TCL, Changhong, Hisense, and Skyworth on April 21 – 23.

- 36" PF16: 9

One sample tube each was shipped to TCL, Changhong, and Hisense on April 21 – 23.

VI. Q2 outlook and problems in sales

- <u>Outlook</u>

1. Q2 is the traditional off-season for color TVs. Merchants are dedicating all their efforts to promoting air conditioners and other major appliances. It is the most sluggish period of color TV sales for both the urban and rural markets, and it is exceptionally pronounced this year.

2. General reduction in production by whole-set makers. For example, in addition to maintaining a certain amount of exports, TCL is clearing their inventory for domestic sales and production, and there is no decent purchase plan in June; Skyworth and other makers are reducing

production volumes in May and June; while some manufacturers have shut down their production lines and stopped production.

3. Among the general color picture tubes, the 21" FS inventory is clearing at a slow rate. Various companies are implementing flexible sales policies and prices continue to fall. The companies in the industry are taking advantage of the off-season of the industry to step up new product development and equipment remodeling.

- Problems in sales

1. Inventory pressure - although the plant has made a decision to suspend production of 21" FS, clearing the inventory is still a top priority for sales.

2. Price reduction pressure - due to the large inventory, especially for 21" FS, SEG-Hitachi and others continue to sell at low prices, coupled with Changhong's bid and drastic undercutting, the pressure from price reduction is immense.

3. New product promotion pressure - although efforts have been made to promote and develop the sales of the new products, there are problems with the new products themselves, as a result, the lead time for advancement and normal supply is longer than other companies.

4. 21" PF and 29" PF are the most dominant varieties of CRT color picture tubes and color TVs at present, and it is hoped that IRICO's Production Department will be able to provide stable quality and batch supply.

5. 21" FS (thick) has quality problems such as sparking (Changhong, Konka, etc.), and color spots on shut down (Hisense).

6. The market demand for 25" PF and 29" PF 100 Hz is increasing, and IRICO should achieve stable mass production and supply as soon as possible.

7. Cairui's current production capacity of some varieties (e.g., 15 "PF/21" compatible lines, etc.) cannot fully meet the market demand.

*内部资料 注意保密*

# 营销 例会

**5 月**

销售公司 2005 年 5 月 15 日

四月份已经过去了，五月也进入中旬。整个“五一”假期彩电市场没有给 CRT 彩电带来人们期待的行情，连最大的 TCL 集团，其内销数量仅为 04 年“五一”同期的 70%。另外，整机出口量增长从去年同期 40%减少到仅 5%。除 14＂外，内销外销持续低迷，使彩管巨大的库存压力，迟迟难以缓解。长虹的招标，更使彩管行业雪上加霜。目前，中国 CRT 彩管产业的现状和前途，已经引起社会各界的高度关注。

下面，我把 2005 年 4 月份的市场、彩管彩电产销存及相关情况报告如下。

## 一、彩电市场

### 1、内销市场

根据彩虹销售公司驻外营销员对当地四月份市场调查结果显示，北京、上海等部分城市上，平板电视电视比率上升到 15.1%；在 CRT 彩电当中，PF 机占比高达 64.3%;表明 FS 型 CRT 机市场正在迅速萎缩。详见下表 2005 年 4 月份全国部分城市彩电销售品种占比（%）。

| 品种 | 绵阳 | 南京 | 北京 | 上海 | 深圳 | 厦门 | 杭州 | 新乡 | 平均 |
|---|---|---|---|---|---|---|---|---|---|
| 14＂ | 1.0 | 0.6 | | | | 1.7 | | | 1.1 |
| 21＂ | 10.0 | 15.2 | 3.0 | 2.4 | 4.0 | 12.3 | 8.0 | 16.7 | 9.0 |
| 21＂PF | 8.4 | 16.9 | 8.0 | 10.7 | 39 | 10.5 | 15.0 | 24.3 | 16.6 |
| 25＂ | 6.7 | 5.4 | 1.1 | 2.7 | 1.0 | 5.3 | 3.5 | 4.7 | 3.8 |
| 25＂PF | 5.2 | 12.6 | 12.7 | 18.2 | 7.0 | 11.4 | 13.5 | 20.6 | 12.7 |
| 29＂ | 8.3 | | 6.8 | 6.4 | 4.0 | 6.1 | | | 6.3 |
| 29＂PF | 34.5 | 36.2 | 24.4 | 22.7 | 21 | 27.2 | 40.0 | 23.6 | 28.7 |
| 34＂ | 2.8 | 0.8 | 0.4 | 2.7 | 5.0 | 1.7 | | | 2.2 |
| 34＂PF | 7.5 | 6.4 | 1.6 | 4.0 | 6.0 | 12.2 | 8.0 | 4.9 | 6.3 |
| PTV | 10.0 | | 3.0 | | 1.0 | 1.8 | 1.0 | 1.0 | 3.0 |

AUTO PAGE

| LCD | 3.8 | 5.7 | 16.9 | 22.7 | 8.0 | 6.6 | 6.5 | 1.3 | 8.9 |
|---|---|---|---|---|---|---|---|---|---|
| PDP | 1.0 | 0.2 | 22.1 | 7.5 | 4.0 | 3.9 | 5.0 | | 6.2 |
| 说明 | 受长虹影响PTV量较大 | 29" PF为主导 | 平板高达39% | 平板电视达30% | 21" PF 好销 | 34" PF占12.2% | 29" PF 一枝独秀 | PF机占主导 | 平板占15.1% PF占64.3% |

**2、出口市场**

1-3 月出口 CRT 彩电增长 5.8%（数据来源于海关）

| 合计 | 其它 | TCL | LG | 创维 | 海尔 | 熊猫 | 三星 | 长虹 | 飞利浦 | 康佳 | 厦华 | 海信 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 517 万台 | | 87 | 38 | 32 | 32 | 29 | 28 | 25 | 22 | 21 | 19 | 18 |

**04 年 1-3 月出口 489 万台，较 03 年同比增长 41%，05 年同比仅微增 5.8%；说明中国彩电出口增长明显减缓。**

**二、整机厂产销存**

**1、七大厂 0 5 年/ 0 4 年同期产销存状况对比（总量）　　（单位：万台、万只）**

| | 彩电生产 | 彩电销售 | 彩电库存 | 彩电出口 | 彩管库存 |
|---|---|---|---|---|---|
| 05 年 4 月 | 275.4 | 289 | 396.4 | **76.2** | 125.5 |
| 05/04 | **-25.94%** | **-17%** | 16.4% | **31.6%** | **-47.4%** |
| 05 年 1~4 月 | 1206 | 1493 | 396.4 | **282.8** | 125.5 |
| 04 年 1~4 月 | 1323 | 1579 | 340.5 | 349.9 | 238.7 |
| 05/04 | **-8.9** | **-5%** | 16.4% | **-19.2** | **-47.4%** |

AUTO PAGE



2、七大厂 05 年/04 年 1-4 月分品种产销存状况对比

七大厂 05 年/04 年 1-4 月产量对比（分品种） （单位：万台）

| | 14" | 15"PF | 21"FS | 21"PF | 25"FS | 25"PF | 29"FS | 29"PF | 34"FS | 34"PF | 合计 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 05 年 | **91.0** | **11.4** | **289.8** | **160.5** | **135.3** | **129.3** | **72.3** | **246.8** | **25.4** | **32.2** | **1206** |
| 04 年 | 83.0 | 7.3 | 485.5 | 125.7 | 167.9 | 99.6 | 102.2 | 186.2 | 29.0 | 33.5 | 1323 |
| 05/04 | 9.7% | 57.2% | -40.3% | 27.7% | -19.4% | 29.8% | -29.2% | 32.5% | -12.4% | -4.1% | -8.86% |

3、

05 年/04 年 1-4 月销量对比（分品种） （单位：万台）

| | 14" | 15"PF | 21"FS | 21"PF | 25"FS | 25"PF | 29"FS | 29"PF | 34"FS | 34"PF | 合计 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 05 年 | 91.9 | 16.7 | 387.5 | 207.1 | 180.1 | 155.3 | 87.4 | 286.2 | 37.2 | 43.3 | 1493 |
| 04 年 | 85.6 | 9.8 | 558.6 | 150.7 | 244.4 | 117.5 | 122.0 | 228.5 | 30.4 | 31.7 | 1579 |
| 05/04 | 7% | 71% | -31% | 37% | -26% | 32% | -28% | 25% | 22% | 36% | -5% |

AUTO PAGE



4、

05 年/04 年 1-4 月彩电库存对比（分品种） （单位：万台）

| | 14" | 15" PF | 21" FS | 21" PF | 25" FS | 25" PF | 29" FS | 29" PF | 34" FS | 34" PF | 合计 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 05 | 8.3 | 1.7 | 129 | 45.5 | 63.8 | 34.4 | 37.4 | 58.1 | 8.1 | 9.9 | 396.4 |
| 04 | 3.2 | 1.1 | 118.1 | 37.6 | 55.5 | 26.9 | 29.6 | 46.4 | 10 | 12.1 | 340.5 |
| 05/04 | 160% | 55% | 9% | 21% | 15% | 28% | 26% | 25% | -19% | -18% | 16% |

综上：

a、05 年 1-4 月份七大彩电厂生产较 04 年减少 8.9%，销售减少 5%，其中，各品种 FS 机产销均大幅减少，而 PF 机则有不同程度的提高，而彩电库存则同比增加了 16%。无疑使彩管销售雪上加霜。

b、各整机厂彩电生产按定单生产,采购彩管以定单为单位下单,加剧了彩管销售难度。

c、整机厂以销定产、大力消化整机/彩管库存，截止 05 年 4 月底彩管存降为 128 万只。具体如下（单位；万只）

AUTO PAGE

| 厂家 | TCL | 康佳 | 创维 | 长虹 | 海信 | 海尔 | 厦华 | 合计 |
|---|---|---|---|---|---|---|---|---|
| 4 月底彩存 | 44.2 | 10 | 23.5 | 30 | 14 | 2.2 | 3.9 | 127.8 |

5、七大整机厂 05 年 5-7 月生产预测　　　　（单位：万台）

| | 小计 | 长虹 | TCL | 康佳 | 创维 | 海信 | 海尔 | 厦华 |
|---|---|---|---|---|---|---|---|---|
| 5 月 | 323.8 | 58 | 68 | 50 | 45 | 48 | 39.8 | 15 |
| 6 月 | 325.2 | 58 | 76 | 55 | 45 | 35.2 | 40 | 16 |
| 7 月 | 258 | 57 | 60 | 38 | 30 | 20 | 38 | 15 |

## 三、彩管行业情况

### 1、彩管行业经营动态

市场压力剧增，彩电、彩管价格急剧下滑。

04 年/05 年 5 月初（4 月底）彩电、彩管平均单价变化情况　（元/台、元/只、%）

| | | 14″ | 21″ FS | 21″ PF | 25″ FS | 25″ PF | 29″ FS | 29″ PF | 34″ FS | 34″ PF | 32″ LCD | 42″ PDP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 彩电 | 04 年 | 625 | 810 | 1028 | 1158 | 1584 | 1480 | 2267 | 2150 | 4632 | 16500 | 19200 |
| | 05 年 | 586 | 740 | 920 | 1010 | 1220 | 1150 | 1940 | 1900 | 3800 | 9800 | 12500 |
| | 05/04 | -6 | -9 | -10 | -13 | -23 | -22 | -14 | -11 | -18 | -41 | -35 |
| 彩管 | 04 年 | 223 | 385 | 475 | 490 | 771 | 780 | 1125 | 1080 | 1960 | | |
| | 05 年 | 185 | 265 | 340 | 365 | 600 | 700 | 740 | 840 | 1680 | | |
| | 05/04 | -17 | -31 | -28 | -25 | -22 | -11 | -34 | -22 | -14 | | |

注：（1）彩电市场单价参考《中怡康》资讯；

（2）彩管单价为长虹招标后目前行业公认价格；

（3）彩虹目前价格具体如下：（元/只、$/只）

14″　21″ FS　21″ PF　25″ FS　25″ PF

AUTO PAGE

| | | | | | |
|---|---|---|---|---|---|
| 内销价 | 190-210 | 280-290 | 360-400 | 375-400 | 620-650 |
| 外销价 | 18-20. 5 | 28-30 | 36-38. 5 | 36. 5-40 | 64-68 |

2、行业具体产销情况

（1）05 年 1-4 月彩管行业总体产销状况（分厂家）

中国彩管行业 05 年 4 月份经营数据（单位：万只）

| | BMCC | 赛格日立 | 华飞 | 永新 | 汤姆逊 | LG 曙光 | 三星 | 彩虹 | 合计 |
|---|---|---|---|---|---|---|---|---|---|
| 生产 | 70. 10 | 35. 25 | 46. 74 | 50. 00 | 38. 66 | 52. 40 | 65. 69 | 116. 70 | 475. 53 |
| 销售 | 52. 20 | 28. 76 | 33. 63 | 25. 35 | 34. 05 | 40. 50 | 50. 53 | 85. 69 | 350. 71 |
| 产销率 | 74. 5% | 81. 6% | 72. 0% | 50. 7% | 88. 1% | 77. 3% | 76. 9% | 73. 4% | 73. 8% |
| 其中:出口 | 16. 50 | 20. 12 | 23. 28 | 5. 32 | 10. 82 | 22. 40 | 29. 39 | 52. 23 | 180. 06 |
| 库存 | 93. 1 | 99. 5 | 71. 3 | 132. 8 | 107. 0 | 68. 2 | 48. 4 | 241. 9 | 862. 2 |

中国彩管行业 04 年 1-4 月份经营数据（单位：万只）

| | BMCC | 赛格日立 | 华飞 | 永新 | 汤姆逊 | LG 曙光 | 三星 | 彩虹 | 合计 |
|---|---|---|---|---|---|---|---|---|---|
| 生产 | 245. 1 | 179. 5 | 184. 0 | 198. 8 | 197. 0 | 211. 0 | 274. 4 | 475. 8 | 1965. 6 |
| 销售 | 157. 4 | 115. 4 | 120. 0 | 99. 7 | 123. 4 | 142. 8 | 226. 1 | 303. 5 | 1288. 1 |
| 产销率 | 64. 2% | 64. 3% | 65. 2% | 50. 1% | 62. 6% | 67. 7% | 82. 4% | 63. 8% | 65. 5% |
| 其中:出口 | 44. 7 | 50. 3 | 48. 1 | 18. 7 | 35. 7 | 43. 8 | 88. 1 | 139. 11 | 468. 31 |
| 库存 | 93. 1 | 99. 5 | 71. 3 | 132. 8 | 107. 0 | 68. 2 | 48. 4 | 241. 9 | 862. 2 |

（2）05 年彩管行业 1-4 月产销状况（分品种）

彩管行业 05 年 1—4 月经营数据(分品种) 单位:万只

| | 14" | 15"PF | 21"FS | 21"PF | 25"FS | 25"PF | 29"FS | 29"PF | 34"FS | 34"PF | 合计 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 生产 | 148.9 | 4.9 | 388.1 | 221.4 | 173.5 | 129.6 | 77.9 | 255.0 | 51.1 | 39.5 | 1490.0 |
| 销售 | 204.7 | 9.6 | 267.4 | 159.9 | 123.3 | 117.3 | 73.6 | 255.0 | 42.0 | 35.4 | 1288.1 |
| 其中:出口 | 130.01 | 5.8 | 106.9 | 65.3 | 39.6 | 10.2 | 42.2 | 44.5 | 18.7 | 5.2 | 468. 31 |
| 产销率 | 138% | 196.7% | 68.9% | 72.2% | 71.1% | 90.5% | 94.4% | 100.0% | 82.1% | 89.7% | 86.4% |
| 库存 | 32.3 | 11.0 | 330.7 | 165.0 | 84.1 | 43.5 | 42.3 | 109.8 | 26.2 | 17.4 | 862.2 |

（3）彩管行业月度产量走势图（万只）

AUTO PAGE



（4） 05 年 1-4 月与 04 年同期比较（单位：万只）

| | 生产 | 销售 | 库存 | 出口 |
|---|---|---|---|---|
| 05 年 1~4 月 | 1966 | 1288 | 862.2 | 468 |
| 04 年 1~4 月 | 1951 | 1916 | 82.7 | 520 |
| **05 年/04 年** | **1%** | **-33%** | **943%** | **-10%** |

（5）彩管价格情况：

近几月行业结算价格区间：( 单位：元/只 )

| | 14 " | 21 " FS | 21 " PF | 25 " FS | 25 " PF | 29 " PF |
|---|---|---|---|---|---|---|
| 04 年 12 月 | 205-235 | 350-385 | 430-460 | 430-470 | 690-730 | 900-960 |
| 05 年 2 月 | 200-220 | 330-350 | 410-420 | 415-440 | 670-700 | 840-900 |
| 05 年 3 月 | 195-215 | 300-320 | 400-420 | 400-425 | 650-680 | 820-850 |
| 05 年 4 月 | 185-205 | 270-300 | 380-400 | 380-400 | 620-650 | 690 |
| 05 年 5 月预测 | 185-205 | 260-270 | 350-400 | 370-400 | 600-650 | 750-800 |

**四、彩虹管销售情况**

1、1-4 月份共销售彩管 303.4647 万只，其中出口 131.3813 万只，回收货款 9.7674 亿，出口创汇 3357.03 万美元。5 月份截止 5 月 16 日发货 54.63 万只，其中：出口 22.9177 万只。预计到 5 月底可发货 90-100 万只，可回收货款 2—3 亿元。

05 年 6 月、7 月、8 月份销售预计 （单位：万只）

| | 14″ | 15″ PF | 21″ PF | 21″ (粗) | 21″ FS | 25″ FS | 25″ PF | 29″ PF | 合计 |
|---|---|---|---|---|---|---|---|---|---|
| 6 月 | 50-55 | 5-7 | 7-9 | 3-6 | 18-20 | 9-10 | 8-10 | 0.2-0.6 | 100.2-117.6 |
| 7 月 | 51-55 | 5-7 | 7-9 | 4-6 | 18-20 | 8-9 | 8-10 | 0.2-0.6 | 101.2-116.6 |

AUTO PAGE

| 8 月 | 52-57 | 5-7 | 8-10 | 5-10 | 18-20 | 8-10 | 9-12 | 0.2-0.6 | 105.2-126.6 |
|---|---|---|---|---|---|---|---|---|---|
| 小计 | 153-167 | 15-21 | 22-28 | 12-22 | 54-60 | 25-29 | 25-32 | 0.6-1.8 | **306.6-360.8** |

## 2、 彩管出口情况

- <u>出口彩管部分</u>

（1）5 月份预计出口和已发货（截止 5 月 16 日）情况如下：

14″FS 彩管 30.3 万只/17.1 万只，15″PF 彩管 4.3 万只/2.4 万只,21″PF 彩管 2.3 万只/2.3 万只,21″(粗) 0.2 万只/0.2 万只. 21″FS 彩管 9.0 万只/3.1 万只, 25″FS 彩管 4.5 万只/2.4 万只。共计已发货：27.4 万只，出口创汇：663.6 万美元。

（2）本月出口彩管数量仍保持四月份的上升势头，预计五月份出口可超过 50 万只。重点仍是土耳其市场和国内深加工结转出口部分。

（3）出口市场价格：较四月份，14″FS 持平，15″ PF 平均下降 0.2 美金，21″FS 平均下降 1.4 美金。

从总体情况看，14″FS 和 15″ PF 出口彩管价格已达到相对稳定的水平，但其它尺寸彩管价格仍呈明显下跌趋势。

（4）市场情况

土耳其市场目前 VESTEL 公司较为稳定，尤其是 21″FS 彩管发货数量稳中有增，对于进一步扩大彩虹 14″以外产品的份额奠定了良好的开端。目前已发送 15″PF、21″PF 样管，等待测试结果。如测试合格，可能接到稳定数量的订单。

PROFILO、BEKO 公司仍表示我司彩管价格偏高，暂时没有订单。为了给今后拓展工作奠定基础，我司已安排 15″PF、21″PF 样管发往以上两家公司，将会追踪测试结果。

CONFIDENTIAL – GRAND JURY MATERIAL

SHOV 因目前新厂房仍在启动之中，同时去年 14″彩管库存未能消化完，所以订单还将推迟。

在土耳其设立仓库的可行性正在论证中。

俄罗斯市场因目前处于国际市场淡季，订单数量相对较少。客户纷纷要求降价，尤其是对我司 21″FS 彩管价格很不满意。ROSLEN 公司提出要我司尽快解决 04 年 11-12 月不良管。（具体不良数量：14″ 3 只，21″ 62 只，25″FS 8 只。）

对于在俄罗斯建厂事宜正在进一步调研中。

(5) 建议

近来，客户对国内深加工结转出口彩管的需求数量和品种在不断增加，西安彩瑞现有的生产能力已无法满足，通过上海盟通和深圳神彩转关费用较高，货物周转时间也较长。建议抓紧扩大彩瑞的生产能力，尽早适应市场需求，使得我司出口彩管在数量和品种上有新的突破。

- 部品出口

本年度截至目前出口创汇 247 万美元。

（1）ZnS 生粉累计向 LG、三星出口 143.8 吨；其中 LG 自 1 月份起因为开始使用再生粉，所以新粉暂时停止采购。五月预计出口：30 吨。

（2）DY 目前累计出口 56 万只，目前主要问题：国外几个厂家开始开发 21″PF AK 材线圈，因为工厂目前开发切换产品，问题较多整个交货期不能保证。五月预计出口：10 万只。

（3）支架玻杆粉累计出口 129.6 吨，五月预计可出口 32.4 吨；因工厂设备调整维修后，出现粉粒发黄，已经安排解决，但是四、五月份出口的时间稍微退后。

（4）彩粉出口意大利、波兰 9.6 吨。预计本月可出口：1.08 吨。由于今年仍未申请到红粉配额，所以红粉出口依然是问题。

AUTO PAGE

材料及零部件开发工作正在进展中，客户的送样工作已完成正在等待反馈信息。

（5） 印度市场

a、彩管：经过对几家代理公司的比较，拟选定印度 LB 公司作为彩虹彩管在印度的独家分销商，具体代理协议条款正在商订中。该客户已开出 9216 只 14 和 1920 只 21＂PF AK 材彩管的信用证。本月该客户还将来访。

b、荧光粉：本月出口荧光粉 3 吨（红、绿、蓝粉各 1 吨）

五、新品推进情况：

- 21″ PF（新 AK 材）

长虹：4 月 30 日通过样管认证，5 月 11 日发出 120 只进行小批量认证。
康佳：5 月 13 日通过样管认证。
厦华：5 月 12 日完成样管认证，基本通过，用户唯一提出亮度偏低问题。
青岛海尔：4 月 25 日发出样管 2 只，暂未安排认证。
合肥海尔：计划本周安排 2 只样管认证。
创维多媒体：4 月 28 日通过样管认证，5 月 13 日开始进行 20 只小批量认证。
高力勤：4 月 28 日送去样管 1 只，正在认证中。
VESTEL 公司：4 月 27 日发出样管 2 只。
ROSEN 公司：4 月 28 日发出样管 1 只。
BEKO 公司：5 月 10 日发出样管 2 只。
TCL 公司：4 月 27 日发出北美磁场样管 2 只。
海信：5 月 13 日发出样管 1 只。

- 21″ PF（AK 材）

江苏世纪数码公司：4 月 18 日通过 80 只小批量认证，4 月 20 日直接下订单采购 2280 只，4 月 26 日发出。
印度 L.B 公司：4 月 22 日发出样管 2 只，5 月 11 日回复色纯不良，有待进一步确认。
PROFILO 公司：5 月 10 日发出样管 2 只。

- 21″ FS 粗管颈

TTE 公司：5 月 10 日通过飞利浦项目 24 只小批量认证，同时拉美磁场样管 4 只（其中 44 地磁 2 只，55 地磁 2 只）也通过认证。 5 月 16 日下订单需求 500 只进行中批量认证。
VESTEL 公司：5 月 11 日发出 16 只，准备进行小批量认证。
乌克兰 STRAND 公司：5 月 11 日发出样管 1 只。
印度 L.B 公司：4 月 22 日发出样管 2 只，5 月 11 日回复 DY 参数与机芯配合不合适。

- 15″ PF

AUTO PAGE

TCL： 需求 15"PF03 型 28 只，其中 4 只发往新加坡研发中心，24 只发 TCL 香港公司，由香港公司转发波兰工厂，5 月 10 日已经全部发出。

Vestel 公司：3 月 22 日发出 02A 型号样管 2 只，4 月 21 日回复 Z 点高度与机壳配合不合适，近日将重新发 01B 型样管 2 只。

创维多媒体：5 月 12 日通过样管认证，5 月 16 日发 84 只，准备进行小批量认证。

上海红灯：完成全部认证。

安徽维德公司：4 月 20 日通过样管 2 只。

升冈电子：3 月 30 日发出 02A 型号样管 2 只，4 月 19 日回复 Z 点高度与机壳配合不合适。

BEKO 公司：5 月 10 日发出样管 1 只。

江苏爱田：5 月 10 日发出样管 2 只。

PROFILO 公司：5 月 10 日发出样管 2 只

- 14"

康佳、创维多媒体:：3 月 17 日分别发出 DC15 型号样管 3 只和 1 只，因 DY 不合适，4 月 15 日重新发出新 DY5 只，康佳使用新 DY 试验正常，通过样管认证；创维多媒体使用新 DY 试验仍不匹配，4 月 22 日运回一套机芯，正在重新配备 DY。

Century 公司：4 月 22 日向埃及发出 DC05 样管 1 只。

TCL： 14"北美磁场样管 2 只在认证中，DY 参数与机芯不匹配。

金利普：5 月 13 日发出窄型防爆带样管 1 只。

- 25" PF

丸红公司：3 月 23 日发出样管 1 只，5 月 10 日回复外观尺寸大，与机壳配合不上，另外认为亮度偏低。

创维：4 月 9 日向创维发出 32 只 25"PF100HZ 管，4 月 14 日先向创维送 2 只进行试验，线路配合通过，但是因现用机壳太小，结构配合未通过。

- 29" PF

俄罗斯 ROLSEN 公司：4 月 28 日发出 50HZ COM 样管 1 只。

乌克兰 STRAND TRADING 公司：5 月 11 日发出 50HZ COM 样管 1 只。

- 34" PF

4 月 21 日-23 日，给 TCL、长虹、海信、创维各发出样管 1 只。

- 36" PF16：9

4 月 21 日-23 日，给 TCL、长虹、海信各发出样管 1 只。

六、二季度前景及销售方面存在的问题

- 前景

1、二季度是传统彩电销售淡季，商家倾全力促销空调等白家电。不论城市还是农村市场都是彩电销售最低迷的时期，今年更加明显。

2、整机厂普遍减产。比如 TCL 除维持一定量出口，内销生产采取清库方式，6 月份没有象样的采购计划；创维等 5、6 月份产量逐月递减；有的厂家实行关线和停产。

AUTO PAGE

3、普通彩管中 21 " FS 库存量消化很慢，各家实行灵活销售政策，价格继续下跌；行业各家正在利用淡季加紧新品研制和设备改造。

- <u>销售方面存在问题</u>

1、库存压力——虽然工厂对 21 " FS 作出停产决定，消化库存仍是销售工作当务之急。

2、降价压力——由于库存较大尤其 21 " FS，赛格日立等不断低价抛售，加上长虹招标，残酷压价，降价压力非常大。

3、新品推进压力——有些新品虽然销售方面尽全力推介和开拓，由于新品本身的问题，推进和正常供货周期比其它企业要长。

4、21 " PF、29 " PF 是当前 CRT 彩管和彩电中最主导的品种，希望彩虹生产部门能够提供质量稳定、批量稳定的供货。

5、21 " FS（粗）存在打火（长虹、康佳等）、关机彩斑（海信）等质量问题。

6、25 " PF 和 29 " PF 100Hz 市场需求在增加，彩虹应尽快实现稳定批量生产和供货。

7、彩瑞目前局部品种产能（如 15"PF/21"兼容线等）无法完全满足市场需求。

# EXHIBIT GG



City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document "**CHU00505497**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

Dan McCourt

Sworn to before me this
September 12, 2022

Signature, Notary Public

Stamp, Notary Public



**From:** Ng Wen Shiang - SAL
**Sent:** Thursday, April 27, 2006 1:04 PM
**To:** Shen Jen Yang
**Cc:** Jimmy Chen - SAL; Ng Lee Chiat - SAL
**Subject:** FW: chemml@mail. cptt. tw

Attachments: Information Weekly Issue 107.doc; Regular Sales and Marketing Meeting Material (06-3-22).doc; Industry Information Weekly (Issue 35).doc; Changsha Information Weekly (Horizontal) 0611.doc

Dear Assistant Vice President,

The information provided by Miss Liang is as below.

best regards,
Eric

-----Original Message-----
From: jill-yy [mailto:jill-yy@163.com]
Sent: Thursday, April 27, 2006 3:37 PM
To: Ng Wen Shiang - SAL
Subject: Fw: chemml@mail.cptt.tw

Dear Manager Eric Wu,

Please forward the attached documents to Assistant Vice President Yang.
Sincerely,
jill

Don't you want to try out this summer's "coolest" e-mail?
HYPERLINK "http://www.126.com/"\n Embedding traditional Chinese culture in world-class technology, innovative Ajax technology, 126 "D plan" is now open for experience!

**From:** Ng Wen Shiang - SAL
**Sent:** Thursday, April 27, 2006 1:04 PM
**To:** 楊勝仁
**Cc:** Jimmy Chen - SAL; Ng Lee Chiat - SAL
**Subject:** FW: chemml@mail.cptt.tw

**Attachments:** 信息周报第107期.doc; 营销例会会议资料（06-3-22）.doc; 行业信息周刊(第35期）.doc; 长沙信息周报（横向）0611.doc

協理,

梁小姐提供之資訊如下.

best regards,
Eric

-----Original Message-----
From: jill-yy [mailto:jill-yy@163.com]
Sent: Thursday, April 27, 2006 3:37 PM
To: Ng Wen Shiang - SAL
Subject: Fw: chemml@mail.cptt.tw

Dear Mr Eric 吴经理

附件的文件请转给杨协理
以上
jill

你 不 想 试 试 今 夏 最 "酷" 的 邮 箱 吗 ？
HYPERLINK "http://www.126.com/" \n蕴 涵 中 华 传 统 文 化 于 世 界 一 流 科 技 之 中，创 新 Ajax 技 术，126 "D 计 划" 火 热 体 验 中 ！



City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document "**CHU00505498-501**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

Dan McCourt

Sworn to before me this
September 12, 2022

Signature, Notary Public

Stamp, Notary Public

(For Internal use only Confidential)

# Information Weekly

## Sales and Marketing Department

| Manufacturer | User Information |
|---|---|
| Summary | 1. As May Day is approaching, the color TV market sales have been stable. Except for flat-screen TVs, the price of color TVs has been relatively stable and no significant changes in the market were observed. 2. Last week, Hisense's Secretary Wang and his team visited Novel, Haier, Changhong, LG, Samsung, and SEG to confirm the quantity of subsequent color picture tube (CPT) purchases. Dalin Li from BMCC visited Panda. 3. The production and operation of Panda's color TVs have been difficult. 4. There were still issues of color spots during shutdown and poor degaussing in the 21" FS magnetic field - north during the use by Dongguan Konka. The quality issue of Skyworth's 21" FS has been resolved, and arrangements have been made for the commencement of normal use. As our CPT's ears do not match Hefei Unier's 14" (bonded) TV, Haier has notified that they would stop using our CPT for this model. XOCECO reflected multiple issues of blocked apertures and missing dots in IRICO's 25" FS. If our quality does not improve over time, they will stop purchasing this type of CPT. |
| Overseas | 1. Total purchase quantity under RADIO's new order: 44,704 pieces (14" 25,344 pieces, 15" PF 8,448 pieces, 21" FS 3,168 pieces, 21" PF 6,720 pieces, and 29" PF 1,024 pieces). The estimated shipping date is from the end of April to June 06, and delivery will be carried out in 4 – 5 batches, which has been confirmed by the proforma invoice. Operation has commenced, and 29,216 pieces are expected to be shipped before May 09.<br>2. 512 pieces of ROLSEN's 29" PF have been shipped (the customer was persuaded to accept the stock 00X01E in place of the original 01X01E ordered).<br>3. P/O has been made for 4,224 pieces of SOKOL's 15" PF and 1,024 pieces of 29" PF, and shipping has been scheduled in mid-May.<br>4. A total of 30,000 pieces of START's 21" FS and 21" PF have been pending shipment in Shenzhen for many days. Now the customer is participating in electronics exhibitions in Guangzhou and Hong Kong. After several urgings, they have promised to handle the payment immediately after returning to Ukraine. We will strive to complete shipment by the end of the month. |
| TCL | 1. Last week, the production volume of TCL Huizhou and Great Wall bases was relatively small. The Huizhou base mainly carries out production for the PHILIPS project. Among the six lines, four lines mainly produce 14", 21" and 21" PF, with the production volume of over 40,000 sets, and the CPTs used were primarily from IRICO, Huafei and SEG; and the other two lines produce 34" and 29" PF. The Great Wall base has five lines, of which, two lines produce SKD and the other two lines produce THOMSON project products, which are mainly 15" PF (using over 20,000 pieces of IRICO's 15" PF). |

AUTO PAGE

| | |
|---|---|
| | 2. According to TTE's flat-screen TV development plan, the output of flat-screen TVs will double every year in the next three years. Production has tripled this year to 1.5 million sets. It aims to reach 4 million sets in 2007. In 2008, it will increase output to 8 – 9 million sets. At the same time, it plans to lower the global sales target of CRTs from 30 million sets to 20 million sets in 2006 to focus efforts on taking the flat-screen TV market by storm.<br>3. The Ministry of Commerce has approved the transfer of 5% of the company's shares held by TCL's major shareholder, Huizhou Investment Holdings Co., Ltd., to Philips Electronics China and Alliance Fortune International Limited, respectively. After the transfer is completed, Huizhou Investment Holdings Co., Ltd.'s shareholding in TCL Group will drop to 15.22% but it remains the largest shareholder. |
| Konka | 1. Konka's production plan in May for export sales is about 270,000 units, equivalent to an increase of 20,000 units compared with April.<br>2. Trial of 30 pieces of Dongguan Konka's 21″ FS magnetic field – north was carried out on April 17. After board modification provided by our after-sales service to Dongguan Konka, trial of 30 pieces was carried out, and the results were good.<br>3. A small-batch trial production of 32 pieces of 15″ PFAK was carried out on April 18 for domestic sales; it was arranged to be completed in Dongguan Konka.<br>4. Confirmation of the 14" American magnetic field trial plan: Hong Kong Konka's procurement department originally arranged re-doing trial of 48 pieces in Dongguan Konka on the 19th, but it was not implemented. Hong Kong Konka replied that it will find a way to arrange this as soon as possible.<br>5. 21" FS magnetic field – north was used on April 20. However, there are still some issues such as color spots during shutdown and poor degaussing.<br>6. Although Shenzhen Konka's parts department has not returned the IRICO's 14" and 21" FS tubes, it has ordered the suspension of further purchases, hence our goods could not be shipped. In view of the current situation that stable use of IRICO's tubes has not yet been achieved in Dongguan Konka, Hong Kong Konka hopes that IRICO can exchange and communicate with the leaders of Konka's parts department.<br>7. On April 21, the 21″ PF small DY sample tube was tested in Shenzhen Konka's R&D Center. The results are good, and it is currently under subjective assessment. |
| Skyworth | 1. The quality issue of 21″ FS has been resolved, and arrangements have been made for commencement of normal use. |

| | |
|---|---|
| | 2. The built-in recordable TV successfully developed by Skyworth at the beginning of the year is officially mass-produced, and the initial monthly production can reach 10,000 sets. The average price is expected to be RMB 1,000 – 2,000 higher than that of ordinary TVs.<br>3. Skyworth has set its sights on the rural market, and recently launched a large-scale "New Rural Cinema Project" plan. It plans to invest RMB 10 million to screen movies for 80 million farmers, with the focus on cultivating the rural market from the perspective of cultural public welfare. |
| Changhong | 1. The original planned output in April was 390,000 sets, of which 100,000 sets were planned for export. However, due to the fire in Guangdong Changhong in April and the complete set requirement, the task could not be completed, and currently only about 50,000 sets are produced for export. With the focus on digesting the VMI CPT inventory, the headquarters has also made downward adjustments to the current plan.<br>2. Changhong has realized that the sales of CRT TVs in the third- and fourth-tier markets are obviously declining and the market is shrinking. It may take effective measures in the second half of the year to restore its market share of the third- and fourth-tier markets. |
| Hisense | 1. Huangdao Hisense's production was ongoing last Saturday and Sunday. Among its 11 production lines, seven were producing CRT TVs and four were producing flat-screen TVs on a single-shift, full-load basis. The 21″ FS color TVs currently sold by Guiyang Hisense is doing well in the market.<br>2. In the process of using IRICO's 21″ (thick) [CPTs], Zibo Hisense's [TVs] have poor convergence, and the defective rate is 1%.<br>3. Last week, Secretary Wang and Director Wang of Hisense visited Novel, Huafei, LG, Samsung, and SEG to implement the subsequent CPT purchase matters.<br>4. As May Day is approaching, last week's market sales increased significantly compared to the previous week, with a growth rate of 10 – 13%. At present, the bestselling varieties on the market are 21″ FS (priced at RMB 699), 21″ PF (priced at RMB 899), and 29″ PF HD; the price of special-price TVs has dropped to RMB 1,699, and the sales of 25″ FS and 25″ PF are as usual. |
| Haier | Hefei: 1. The market is still very weak, and orders decreased last week. Adjustments have been made to the production plan. There will only be three days of work this week.<br>2. As the ears does not match 14″ (bonded) TV, Haier has notified that they would stop using the 14″ IRICO tube for this model. |
| XOCECO | 1. Since April, XOCECO's production has gradually increased, and it is expected that the output in May will increase compared with that in April. |

<table>
<tr><td></td><td>2. The 25″ FS currently used by XOCECO was produced by IRICO after February 20. For the tubes produced during this period, the issue of side scatter has been improved, but the multiple issues of blocked apertures and missing dots remain. If the quality does not improve over time, Haier will stop purchasing this variety of IRICO CPT.</td></tr>
<tr><td>Panda</td><td>1. At present, the sales of Panda are very unsatisfactory, and the export sales are almost paralyzed due to personnel adjustments; the domestic sales are also unsatisfactory; only one of the five production lines is currently in production, and production is often stopped. Due to years of losses, the funds are extremely depleted, and this year, Panda Group has not injected new funds into the TV plant as in previous years. At present, the production and operation of TVs is completely reliant on the company's own funds. As of now, Panda's payment to component manufacturers should have been made as early as October last year, and 50% of such payment is in the form of commercial acceptance bill; despite so, Panda has only paid 80% of ten payments due last October.<br>In addition, the city government has asked Panda to start relocating in July. The RMB 100 million relocation subsidy given to Panda in the early stage has been used by Panda for other purposes. Due to the long journey to the new development zone, the transportation and meal allowances for employees will increase. Therefore, the old production lines of Panda will be eliminated due to its inefficiency, but the construction of a new line will require increased investment, and Panda's own funds are extremely tight, hence the production and operation of Panda's color TVs will be difficult.<br>2. Dalin Li of BMCC visited Panda last week.</td></tr>
<tr><td>Soyea</td><td>1. Balanced production was carried out according to sales orders. There was no overtime production of TV sets due to the arrival of the "May Day" Golden Week, and more than 50,000 TV sets are expected to be produced in April.<br>2. During the unpacking last week, two 15″ PFAK IRICO tubes with broken necks were found.</td></tr>
</table>

内部资料
注意保密

# 信息周报

| 厂家 | 用户信息 |
|---|---|
| 综述 | 1、临近五一，彩电市场销量平稳，除平版电视以外，彩电的价格相对稳定，市场变化不明显；2、上周海信股份王书记一行到永新、华飞、长沙 LG、三星、赛格走访，落实后续彩管采购的数量事宜；北松李大林走访熊猫； 3、熊猫彩电生产经营举步维艰；4、21"FS 北磁在东莞康佳上线使用中依然存在关机彩斑、消磁不良等现象；创维 21＂FS 质量问题已解决，已安排开始正常使用；合肥海尔 14"（保税）因使用耳环不匹配，海尔已通知本机型停用我管；厦华反映彩虹 25＂FS 堵孔、欠点的问题较多，如果质量持续没有改善，将停止采购该品种彩管。 |
| 海外 | 1、 RADIO 的新定单共采购数量： 44704 只（14″ 25344 只，15″ PF 8448 只，21″ FS 3168 只，21″ PF 6720 只，29″ PF 1024 只），预计船期从 4 月底到 6 月 6 日，分 4-5 个批次进行，已经通过形式发票确认。现已经开始操作船期预计为 5 月 9 日前的 29216 只；<br>2、 ROLSEN 的 29″ PF 512 只已经发货(说服客户以库存的 00X01E 替代原定的 01X01E）；<br>3、SOKOL 15″ PF 4224 只和 29″ PF 1024 只已下 P/O，计划 5 月中旬船期；<br>4、START 的 21″ HS、21″ PF 共计 3 万只已经在上海等待船运多日，现客户在广州、香港参加电子展，经数次催促后已答应待返回乌克兰后立即办理货款，争取月底前完成船运。 |
| TCL | 1、 上周 TCL 惠州及长城基地生产量较小，惠州基地主要以生产 PHILIPS 项目为主,6 条线中，4 条线主要生产 14″、21″ 和 21″ PF，生产量在 4 万多，彩管主要使用彩虹、华 |

AUTO PAGE

| | |
|---|---|
| | 飞、赛格，二条线生产 14″ 和 29″ PF， 长城基地 5 条线，2 条做 SKD，另外二条做 THOMSON 项目产品，以 15″ PF 为主（用彩虹 15″ PF2 万多）；<br>2、TTE 公司平板电视发展规划，未来 3 年内平板电视机产量每年都翻番。今年产量提高两倍，达到 150 万台。2007 年达到 400 万台。2008 年提高至 800-900 万台。与此同时，计划 2006 年将 CRT 全球销售目标从 3000 万台调低至 2000 万台，强攻平板电视市场；<br>3、商务部已批准 TCL 大股东惠州市投资控股公司向飞利浦电子中国公司及 Alliance Fortune International Limited 分别转让其持有的公司 5%股份，转让完成后，惠州市投资控股公司持有 TCL 集团的股比下降至 15.22%，仍为第一大股东。 |
| 康佳 | 1、康佳外销 5 月份生产计划约 27 万，比 4 月份增加 2 万；<br>2、4 月 17 日莞康 21"FS 北磁 30 只试流，经我方售后服务现场协助莞康进行改板，试流 30 只，情况良好；<br>3、4 月 18 日内销 15″ PFAK 32 只小批量试做单，安排在莞康进行；<br>4、14"美磁试流计划确认：原香康采购部安排于 19 日在莞康重做 48 只试流，但未落实，香康答复想办法尽快安排；<br>5、4 月 20 日 21"FS 北磁上线使用，依然存在关机彩斑、消磁不良等现象；<br>6、深康部品部虽对彩虹 14″ 和 21″ FS 管未做清退，但已下令暂停采购，所以至今不能发货。针对当前彩虹管在莞康还没有达到稳定使用的状况，香康方面希望彩虹能与康佳部品部领导之间进行交流和沟通；<br>7、4 月 21 日 21″ PF 小 DY 样管在深康研发中心测试，情况良好，目前在主观评价中。 |
| 创维 | 1、21＂FS 质量问题已解决，已安排开始正常使用； |

| | |
|---|---|
| | 2、创维在年初开发成功的内置式可录电视正式批量生产，初期月产可达到 1 万台。预计平均价位比普通电视高 1000 元-2000 元；<br>3、创维把目光瞄向农村市场，近日大规模地启动"新农村影院工程"计划，预备投入 1000 万元资金，为 8000 万农民放电影，以文化公益角度切入，着力培育农村市场。 |
| 长虹 | 1、4 月份原计划产量 39 万台，其中计划出口机 10 万台。但是由于广东长虹 4 月份火灾和齐套原因，不能完成任务，目前仅生产出口 5 万台左右。总部也已消化 VMI 彩管库存为主，目前计划也有下调；<br>2、长虹已经意识到 CRT 电视销售在三四级市场呈明显现下降和市场萎缩状态，可能将在下半年采取有效措施来恢复三四级市场的占有率。 |
| 海信 | 1、上周六、周日黄岛海信不休息，有 11 条线生产，其中 7 条生产 CRTTV，4 条线生产平板，单班满负荷生产。贵阳海信目前市场 21＂FS 彩电销售还不错；<br>2、淄博海信在使用彩虹的 21＂（粗）过程中，出现会聚不良，不良率在 1%；<br>3、上周海信股份的王书记和王处长到永新、华飞、LG、三星、赛格走访，落实后续彩管采购事宜；<br>4、临近五一，上周市场销售比前一周有明显增长，增长率在 10-13%。目前市场上好销售的品种是 21＂FS（价格 699 元）、21＂PF（价格 899 元）、29＂PF 高清，特价机已降到 1699 元，25＂FS 及 25＂PF 销售一般。 |
| 海尔 | 合肥：1、市场仍很淡，上周订单减少。生产计划调整。本周工作日三天；<br>2、14"（保税）因使用耳环不匹配，海尔已通知该机型停用 14"彩虹管。 |
| 厦华 | 1、从 4 月以来，厦华的生产逐渐增量，预计 5 月的产量将比 4 月份有所增加； |

AUTO PAGE

| | |
|---|---|
| | 2、现厦华使用的 25 " FS 是彩虹 2 月 20 日以后生产的，这段时间生产的管子，边散的问题有所改善，但是堵孔、欠点的问题较多。如果质量持续没有改善，将停止采购彩虹该品种彩管。 |
| 熊猫 | 1、目前熊猫的销售很不理想，外销方面由于人员调整几乎瘫痪；内销方面销售情况也不尽人意；现五条生产线只有一条在生产，还时常停产。由于连年亏损，资金极度溃乏，再加上今年熊猫集团没有再象往年一样再往电视机厂注入新的资金，现在电视这一块生产经营的资金完全靠自给自足；当前，熊猫给元器件厂家付的款是早在去年 10 月份就该付的，而且 50%是商业承兑，即使如此，熊猫也只付了去年 10 份款的 80%；<br>另外，市政府要求熊猫 7 月份开始搬迁。前期给熊猫的搬迁补贴 1 个亿已被熊猫挪作它用。由于新开发区路途遥远，员工的交通、餐费补贴等费用都要增加，因此，熊猫的老生产线会因效率太低而被淘汰，但建新线又要增加投资，而熊猫的资金本身就极度困难，因此熊猫彩电生产经营举步维艰；<br>2、上周北松李大林走访熊猫。 |
| 数源 | 1、按销售订单均衡生产，没有因“五一”黄金周的到来而加班生产电视机，4 月份预计生产 5 万多台；<br>2、上周开箱发现 2 只 15 " PFAK 彩虹管管颈断。 |

CONFIDENTIAL – GRAND JURY MATERIAL


City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document "CHU00505502-13" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

Dan McCourt

Sworn to before me this
September 14, 2022

Signature, Notary Public

Stamp, Notary Public

*For internal use only*
*Confidential*

# Regular Sales and Marketing Meeting

**March**

Sales and Marketing Department March 22, 2006

March is still the off-season for color TVs. The gradual warming up of the export market did not bring a significant increase in color TV production. At present, the inventory of CRT color TVs in whole-set makers is still relatively high. The combined inventory of the 7 major whole-set makers is more than 4.5 million sets. The business strategy adopted by the major whole-set makers is still to reduce inventory and mitigate risks. That is, for export sales, production is based on purchase orders; for domestic sales market, they continue to take the measures to limit production and reduce inventory. At the same time, the prices of flat-screen TVs fell sharply, which stimulated sales growth. Therefore, the discrepancy in the oversupply of color picture tubes will become more prominent at present and in the future, and price competition will become increasingly fierce.

**I. Color TV market**

**1. The domestic color TV market is in the traditional off-season, the prices of CRT color TVs are basically stable, while the prices of flat-screen TVs have dropped relatively significantly. The market is expected to pick up from mid-April to around May Day.**

Based on the Sales and Marketing Department's customer tracking, market research, and weekly market research findings:

In March, the color TV market showed traditional off-season characteristics, with color TV sales volume shrinking significantly and inventories remaining high.

Urban market: The market is extremely slow, with color TV sales volume down compared to the same period in 2005. According to TCL's announcement on March 17, global sales volume of color TVs (including flat-screen TVs) were 1.308 million sets in February, down 2.3% compared to the same period in 2005 and down 45.4% compared to sales of 2.395 million sets in January. CRT color TV sales prices were basically stable, while flat-screen TV prices fell sharply. Skyworth reduced the prices of several flat-screen TVs by a substantial 30% on February 15, but it had no significant effect on sales. On March 16, Skyworth cut the prices of 42" – 50" LCD and plasma flat-screen TVs by RMB 2,000 – 5,000, with a maximum drop of more than 20%. This is the second time that Skyworth has cut the prices of flat-screen color TVs significantly this year. In addition, Hisense also reduced the price of the 47" LCD TV by RMB 5,000, with retail price at RMB 199.99 million.

Rural market: The market is in its traditional off-season, with small- and medium-sized screens such as 21" FS, 21" PF and 25" FS dominating sales.

Data from CMM show: In January 2006, 5.436 million sets of color TVs were sold in China, up 1.74% year on year, of which 4.914 million sets of CRT color TVs were sold, down 1.86% year on year, while [sales of] flat-screen TVs grew rapidly, with a combined sales of 439,000 sets of LCD and PDP (including 341,000 LCDs and 98,000 PDPs, up 350.83% and 71.35% year on year respectively; flat-screen TVs accounted for 53.86% of the overall TV sales amount, already outpacing the sales amount of CRT color TVs.

**2. Export market stabilized and export volume increased slowly**

After a continuous decline in November and December 2005, color TV exports stopped falling

and stabilized in January 2006. According to customs statistics, China exported 2.117 million sets of CRT color TVs in January, up 4.9% month on month and 25.6% year on year; the export value was USD 169.22 million, up 5.35% year on year; the average export unit price was USD 79.94, down 19.86% year on year.

According to the monthly trend chart of China's CRT color TV exports from 2003 to 2005, color TV exports will gradually increase from March onwards. Please refer to the diagram below.

**Monthly trend of China's CRT color TV exports**

**II. Operating situation of whole-set makers**

**1. Business dynamics of whole-set makers**

In March, the color TV market was still in the off-season, and the production volume of the whole-set makers is hovering at a low level. The main focus is to consume the inventory of color TVs and color picture tubes, and the volume of demand for color picture tubes is mainly determined by the quantity of export orders.

□ TCL has made significant adjustments to its management structure, eliminating all 7 business divisions and establishing 3 new centers, namely the CRT Color TV Center, the Flat-screen TV Center, and the Innovation Center. The purpose of this restructuring is to reduce overheads and management costs, improve operational efficiency and enhance competitiveness by reducing management and flattening the management structure. The 7 business divisions that have been abolished were the Home Appliances Division, the Multimedia Division, the Digital Electronics Division, the Overseas Business Division, the Parts Division and the Telecommunications Division.

On March 09, TCL Group issued an announcement: TCL Finance Limited will be established to provide deposit, loan and settlement services to TCL Group members in order to alleviate the financial constraints of TCL Multimedia and TCL Communications due to the integration of color TV and mobile phone businesses. TCL Finance Limited has a registered capital of RMB 500 million. Among them, TCL Group contributed RMB 310 million, holding 62% of the equity interest of the finance company, TCL King Electrical Appliances (Hohhot) Co., Ltd. contributed RMB 70 million, holding 14% equity interest; TCL Mobile Communication (Hohhot) Co., Ltd. contributed RMB 20 million, holding 4% equity interest. In addition, TCL Finance Limited also introduced the Bank of East Asia as an investor with a contribution of RMB 100 million and holding 20% equity interest.

AUTO PAGE

**2. Comparison of production, sales and inventory of the 7 major makers for the same period in 2006/2005 (total volume)**

(Unit: 10,000 sets, 10,000 pieces)

| | Color TV production | Color TV sales | Color TV inventory | Color TV export | Color picture tube inventory |
|---|---|---|---|---|---|
| February 2006 | 213.7 | 248.7 | 355.5 | 90.15 | 145.58 |
| February 2005 | 255.9 | 263.1 | 370.5 | 49.19 | 131.32 |
| 2006/2005 | -16.5% | -5.5% | -4.0% | 83.3% | 10.8% |
| January – February 2006 | 617.89 | 810.45 | 355.5 | 196.05 | 145.58 |
| January – February 2005 | 725.11 | 908.37 | 370.5 | 124.82 | 131.32 |
| 2006/2005 | -14.8% | -10.8% | -4.0% | 57.1% | 10.8% |

The above table shows that in February 2006, compared with the same period last year, production, sales and inventories dropped by 16.5%, 5.5% and 4.0% respectively, color TV exports and color picture tube inventories increased by 83.3% and 10.8% respectively. In February, the whole-set makers adopted the business strategy of limiting production and reducing inventory, resulting in significant reduction in the purchase of color picture tubes.

**3. Month-on-month operating conditions of the 7 major makers in February 2006/January 2006 (total volume)**

(Unit: 10,000 sets, 10,000 pieces)

| | Color TV production | Color TV sales | Color TV inventory | Color TV export | Color picture tube inventory |
|---|---|---|---|---|---|
| February 2006 | 213.7 | 248.7 | 355.5 | 90.15 | 145.58 |
| January 2006 | 404.40 | 544.0 | 390.1 | 105.90 | 111.54 |
| MoM | -47.2% | -54.3% | -8.9% | -14.9% | 30.5% |

The above table shows that compared with January, there was a decline in the production, sales, inventory and export of color TVs in February. In particular, the decline in production and sales exceeded 45%, and the inventory of color picture tubes increased by 30.5%. Therefore, whole-set makers will continue to reduce the purchase of color picture tubes in order to consume the inventory of color TVs and color picture tubes. Hence, the sales of color picture tubes will remain challenging.

**4. Comparison of production, sales and inventory by product type for the 7 major makers in January – February 2006/Jan – February 2005**

**Comparison of production volumes of the 7 major makers in January – February 2006/January – February 2005 (by product type)** (Unit: 10,000 sets)

| | 14" | 15" PF | 21"F S | 21"P F | 21" slim | 25"F S | 25"P F | 28" w | 29"F S | 29"P F | 29" slim | 34"F S | 34"P F | 32" W | 32" slim | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

[illegible]

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2006 | 31.4 | 10.8 | 187.9 | 102.5 | 7.2 | 57.0 | 46.7 | 5.0 | 25.4 | 119.3 | 0.8 | 5.8 | 10.7 | 2.1 | 3.4 | 616.9 |
| 2005 | 35.3 | 4.3 | 176.1 | 102.2 | 0 | 95.7 | 77.7 | 0 | 45.7 | 151.3 | 0 | 16.5 | 20.2 | 0.8 | 0 | 725.6 |
| 06/05(%) | -11.0% | 151.1% | 6.7% | 0.3% | / | -40.4% | [illegible] | / | -44.4% | -21.2% | / | -64.8% | -47% | 162.5% | / | -15.0% |

The above table shows that the production volume in January – February 2006 dropped by 15% compared with the same period in 2005. The proportion of pure flat color TVs rose to 50.2%, an increase of 1.1% compared to the same period in 2005. In terms of product type and structure, continue to develop toward thinner and widescreen TVs. Color TV manufacturers have successively launched 21", 29", 32" super-slim color TVs and 28" 16:9, 32" 16:9 among other new products, establishing the trend of HD and digitalization.

**Comparison of sales volumes of the 7 major makers in January – February 2006/January – February 2005 (by product type)** (Unit: 10,000 sets)

| | 14" | 15" PF | 21" FS | 21"PF | 21" super slim | 25" FS | 25" PF | 28" W | 29" FS | 29" PF | 29" super slim | 34" FS | 34" PF | 32" W | 32" super slim | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2006 | 31.7 | 11.8 | 233.2 | 131.4 | 4.0 | 101.1 | 58.4 | 8.0 | 34.1 | 168.6 | 0.4 | 6.3 | 15.3 | 2.6 | 3.4 | 810.5 |
| 2005 | 33.7 | 3.7 | 239.6 | 132.9 | 0 | 122.2 | 98.4 | 0 | 52.1 | 179.5 | 0 | 19.1 | 27.1 | 0.6 | 0 | 908.9 |
| 06/05(%) | -5.9% | 218.9% | -2.7% | -1.1% | / | -17.3% | -40.7% | / | -34.5% | -6.1% | / | -67% | -43.5% | 333% | / | -10.8 |

**Comparison of color TV inventories of the 7 major makers in February 2006/February 2005 (by product type)** (Unit: 10,000 sets)

| | 14" | 15" PF | 21"FS | 21"PF | 21" slim | 25"FS | 25"PF | 28"W | 29"FS | 29"PF | 34"FS | 34"PF | 32"W | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2006 | 3.7 | 0.6 | 101.3 | 63.4 | 1.3 | 51.2 | 40.4 | 1.0 | 21.3 | 59.5 | 5.3 | 6.0 | 0.8 | 355.5 |
| 2005 | 6.7 | 2.2 | 117.6 | 31.1 | 0 | 67.2 | 27.7 | 0 | 35.2 | 63.4 | 9.3 | 9.6 | 0.5 | 370.5 |
| 06/05(%) | -44.8% | -72.7% | -13.9% | 103.8% | / | -23.8% | 45.8% | / | -39.8% | -6.5% | -43.0% | -37.5% | 60.0% | -4.0% |

From the above table, we can see that in February 2006, compared with the same period in 2005, color TV inventories fell by 4%, mainly because the whole-set makers adopted the operation mode of limiting production and reducing inventory, as well as order-based production to do their best to reduce the inventory and alleviate risks. In terms of product types, the inventory of 21" PF and 25" PF increased significantly, especially the inventory of 21" PF, which increased significantly by 103.8%.

**V. The latest operating conditions of the 7 major makers**

**(i) TCL**

In February, 570,000 sets were produced, of which 210,000 sets were sold domestically, 360,000 sets were exported, and 550,000 sets were inventoried, leaving an overall inventory of around 1.1

[illegible]

million sets. Production of 700,000 sets is planned for March, of which 300,000 sets will be produced for domestic sales and 400,000 sets for export sales. TCL Group Chairman Dongsheng Li said that TCL is expected to return to profitability in the first quarter and that the company's current focus is on improving its overseas business, where TTE North America has started to make a profit in January – February, but TTE Europe continues to make a loss.

According to the figures released by TCL on March 17, the global sales of color TVs (including flat-screen TVs) were 1.308 million sets in February, down 2.3% compared to the same period in 2005 and down 45.4% compared to sales of 2.395 million sets in January.

**(ii) Konka**

In February, 550,000 sets were produced, of which 420,000 sets were sold domestically, 130,000 sets were produced for export, and 900,000 sets were inventoried. They will continue to control production volume and reduce inventory in March. 450,000 sets are planned for production, of which only 230,000 sets are for domestic sales and 220,000 sets are for export, which is doing well. The current color TV inventory is 900,000 sets.

As production volume was at the lowest in March, Chongqing Konka is not scheduled to start production until March 20, Mudanjiang Konka will be on vacation for the whole month, Shaanxi Konka has reduced production by 70%, Anhui Konka by 60%, while Dongguan Konka maintains stable production volume as their export is doing well.

**(iii) Skyworth**

Due to the very weak market, Skyworth's actual production in February was only 150,000 sets, with 200,000 sets planned for March. Production volume hit a record low for 2 consecutive months, and nearly half of the production in March is carried over from the previous period, so there is actually very little demand for color picture tubes. At present, the proportion of small screens in Skyworth is very low, and it is still in the stage of consuming its color picture tube inventory. It mainly produces large screens and new products. In March, there are only purchase orders for 29" PF and 28" PF 16: 9, 32" PF 16: 9 and other new products. The current inventory of color TVs is 750,000 sets, and the inventory of color picture tubes is 200,000 units.

**(iv) Changhong**

In February, 512,000 sets were produced and 435,000 sets were sold. The Mianyang color TV inventory was 280,000 sets, and the overall inventory was about 920,000 sets. The planned output for March is 400,000 sets, a decrease of 21.8% over February. The export of color TVs is relatively stable. 110,000 sets are expected to be exported in March. From April onwards, Guangdong Changhong will be responsible for export purchases. Changhong has implemented VMI management for color picture tubes and the actual inventory deposited by CRT makers was about 600,000 pieces.

**(v) Hisense**

In February, only 91,000 sets were produced and 232,000 sets were sold, with 580,000 sets of color TVs inventoried and 52,000 pieces of color picture tubes inventoried. Production of 190,000 sets is planned for March.

**(vi) Haier**

Qingdao Haier produced only 75,000 sets in February and exported only 34,000 sets, with an industrial and trade inventory of around 120,000 sets. Production of 114,000 sets is planned for March. Hefei Haier produced 103,000 sets in February and exported 45,000 sets, and a production of 112,000 sets is planned for March.

**(vii) XOCECO**

In February, only 143,000 sets were produced and 139,000 sets were sold, with 144,000 sets of

color TVs inventoried and 25,000 pieces of color picture tubes inventoried. Both domestic and export sales of XOCECO are in a slump and very few orders are received for March, with 140,000 sets expected to be produced and production at semi-saturation. In addition, the production volume of flat-screen TVs has also been greatly reduced.

The approval of Chunghwa Picture Tubes' acquisition of XOCECO shares is still in progress. All varieties of Chunghwa's products, except 34", have been sent to XOCECO, and the 21" FS and 29" PF are in the process of small batch certification.

**In summary, the domestic market is still in the regular off-season, and sales in the export market are gradually increasing. However, the inventory of major color TV manufacturers is still relatively high. Therefore, the management strategy is still to focus on reducing inventory and alleviating risks, resulting in the worsening of sales in the color picture tube market.**

**6. The production forecast of the 7 major whole-set makers for March, April and May 2006**

(Unit: 10,000 sets)

| | Subtotal | TCL | Konka | Skyworth | Changhong | Hisense | Haier | XOCECO |
|---|---|---|---|---|---|---|---|---|
| March 2006 | 230.6 | 70 | 45 | 20 | 40 | 19 | 22.6 | 14 |
| April | 288.5 | 73 | 45 | 37 | 43 | 40 | 35.5 | 15 |
| May | 333.2 | 83 | 50 | 41 | 55 | 45 | 42.2 | 15 |
| Total | 852.3 | 228 | 140 | 98 | 138 | 104 | 100.3 | 44 |

The planned production volume for March is 2.31 million sets, an increase of 8.6% over February. The increase in output is mainly due to the increase in export orders for color TVs, while the domestic market continues to adopt the operational measures of limiting production and reducing inventory.

## III. CRT industry situation

**Industry-specific production and sales**

**1. Comparison of operating conditions in February/January 2006**

**MoM operating conditions in February/January 2006 (total volume)** (Unit: 10,000 pieces)

| | Production | Sales | Inventory | Export |
|---|---|---|---|---|
| February 2006 | 477.1 | 248.7 | 475.1 | 98.1 |
| January | 535.2 | 413.6 | 246.6 | 79.1 |
| MoM increase/decrease % | -10.9% | -39.9% | 92.6% | 24.0% |

In February, the production and sales of the CRT industry dropped by 10.9% and 39.9% respectively, while the inventory increased significantly by 92.6%, and the export increased by 24%.

**February/January 2006 CRT industry MoM (by product type)**

(Unit: 10,000 pieces)

| | 14" | 15"PF | 21"FS | 21"PF | 21" super slim | 25"FS | 25"PF | 29"FS | 29"PF | 29" super slim | 28" | 32" | 34"FS | 34"PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| February production | 42.64 | 1.55 | 129.83 | 96.51 | 10.3 | 45.54 | 33.31 | 14.56 | 87.38 | 2.19 | 1.44 | 2.06 | 3.86 | 5.88 | 477.09 |
| January production | 32.5 | 0.1 | 163.7 | 100.3 | 11.8 | 43 | 35.6 | 21.8 | 99.2 | 1.7 | 0.1 | 6 | 11.5 | 7 | 535.2 |
| MoM | 31.2% | 1450.0% | -20.7% | -3.7% | -12.7% | 5.9% | -6.4% | -33.1% | -11.9% | 28.8% | 1340.0% | -65.7% | -66.3% | -16.0% | -10.9% |
| February sales | 23.46 | 1.45 | 51.08 | 45.08 | 10.71 | 22.56 | 12.83 | 8.52 | 40.12 | 2.27 | 0.0 | 2.47 | 2.97 | 0.19 | 248.66 |

AUTO PAGE

| | 14" | 15"PF | 21"FS | 21"PF | 21" super slim | 25"FS | 25"PF | 29"FS | 29"PF | 29" super slim | 28" | 32" | 34"FS | 34"PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January sales | 22.4 | 1.8 | 115.1 | 76.6 | 9.0 | 35.3 | 32.8 | 24.7 | 73.4 | 3.6 | 0 | 4.1 | 8.2 | 8.7 | 414.6 |
| MoM | -4.7% | -19.4% | -46.4% | -41.1% | 8.2% | -56.1% | -61.9% | -65.5% | -50.8% | 41.0% | // | -30.8% | -63.8% | -51.2% | -39.9% |
| February export | 20.38 | 1.45 | 21.69 | 15.58 | 6.65 | 3.89 | 3.49 | 4.55 | 15.37 | 1.04 | 0 | 0.03 | 1.47 | 2.53 | 98.12 |
| January export | 13.41 | 1.6 | 18.3 | 18 | 2.4 | 2.6 | 4.2 | 8 | 10.4 | 0 | 0 | 0.3 | 3.7 | 1.2 | 79.1 |
| MoM | 52.0% | -9.4% | 18.5% | -13.4% | 177.1% | 49.6% | -16.9% | -43.1% | 47.8% | // | // | -90.0% | -60.3% | 110.8% | 24.0% |
| February inventory | 63.85 | 1.6 | 128.75 | 99.63 | 1.49 | 33.46 | 29.13 | 20.56 | 76.26 | 2.02 | 0.95 | 2.59 | 8.01 | 6.69 | 475.13 |
| January inventory | 44.7 | 1.5 | 60.6 | 48.2 | 1.0 | 10.5 | 8.4 | 14.5 | 39 | 2.1 | 0.1 | 3 | 7.1 | 5.2 | 246.7 |
| MoM | 42.9% | 6.7% | 112.5% | 106.7% | // | 218.9% | 246.8% | 41.8% | 95.5% | -3.8% | // | -13.7% | 12.8% | 28.5% | 92.6% |

Production of all product types decreased MoM by 10.9% in February, except for 14", 15" PF, 29" PF super slim, 28" PF 16: 9. Sales decreased MoM by 39.9% in February, except for 14", 21" PF super slim, and 29" PF super slim, all other product types saw a decrease. Exports increased MoM by 24.0% in February, except for 25" PF and 34" FS, all other product types saw varying degrees of increase. Despite the fewer number of working days in February, inventories increased significantly by 92.6%, mainly for product types of 14", 21" FS, 21" PF, and 29" PF, which accounted for 77.5% of total inventory volume.

2. **Overall production and sales of the CRT industry in February 2006 (by maker)**

**Operating data of China's CRT industry for February 2006**

(Unit: 10,000 pieces)

| | BMCC | SEG-Hitachi | Hualei | Novel | Thomson | LG Shuguang | Samsung | IRICO | Total |
|---|---|---|---|---|---|---|---|---|---|
| Production | 62.53 | 36.65 | 61.15 | 35.51 | 58.96 | 54.2 | 61.48 | 106.59 | 477.09 |
| Sales | 30.31 | 18.76 | 38.09 | 17.5 | 27.32 | 30.1 | 35.9 | 50.69 | 248.66 |
| Sales as a percentage of production | 48.5% | 51.2% | 62.3% | 49.3% | 46.3% | 55.5% | 58.4% | 47.6% | 52.1% |
| Export | 10.31 | 12.61 | 12.06 | 3.57 | 11.49 | 11.3 | 15.82 | 20.96 | 98.12 |
| Export as a percentage of total sales | 34.0% | 67.2% | 31.7% | 20.4% | 42.1% | 37.5% | 44.1% | 41.3% | 39.5% |
| Inventory | 87.0 | 35.4 | 40.0 | 46.5 | 58.6 | 44.1 | 46.7 | 118.7 | 477.1 |

The table above shows that: The industry saw a rapid drop in sales in February, and sales as a percentage of production was only 52.1%. Export decreased, while inventory increased significantly.

**Operating data of China's CRT industry for January – February 2006**

(Unit: 10,000 pieces)

| | BMCC | SEG- | Hualei | Novel | Thomson | LG | Samsung | IRICO | Total |
|---|---|---|---|---|---|---|---|---|---|

| | | Hitachi | | | | Shuguang | | | |
|---|---|---|---|---|---|---|---|---|---|
| Production | 133.13 | 82.75 | 120.75 | 86.21 | 133.78 | 110.8 | 139.48 | 205.39 | 1012.29 |
| Sales | 85.71 | 51.96 | 82.59 | 50.6 | 82.82 | 78.3 | 102 | 127.99 | 662.26 |
| Sales as a percentage of production | 64.4% | 62.8% | 68.4% | 58.7% | 61.9% | 70.7% | 73.1% | 62.3% | 65.4% |
| Export | 19.11 | 23.51 | 20.16 | 6.67 | 22.29 | 23.3 | 31.72 | 30.46 | 177.22 |
| Export as a percentage of total sales | 22.3% | 45.2% | 24.3% | 13.2% | 26.9% | 29.7% | 31.1% | 23.8% | 26.8% |
| Inventory | 87.0 | 33.4 | 40.0 | 46.3 | 50.6 | 44.1 | 46.7 | 118.7 | 475.1 |

The table above shows that: The industry saw a drop in sales in January – February, and the sales as a percentage of production was only 65.4%. Export decreased, while inventory increased significantly.

**3. Production and sales of the CRT industry in January – February 2006 (by product type)**

**Operating data of the CRT industry for January – February 2006 (by product type)**

(Unit: 10,000 pieces)

| | 14" | 15"PF | 21"FS | 21"PF | 21" super slim | 25"FS | 25"PF | 29"FS | 29"PF | 29" super slim | 28" | 32" | 34"FS | 34"PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Production | 75.14 | 1.65 | 293.53 | 197.81 | 22.1 | 88.54 | 68.84 | 36.48 | 186.58 | 3.99 | 1.54 | 8.06 | 15.38 | 12.88 | 1012.29 |
| Percentage | 7.4% | 0.2% | 29.0% | 19.5% | 2.2% | 8.7% | 6.8% | 3.6% | 18.4% | 0.4% | 0.2% | 0.8% | 1.5% | 1.3% | 100.0% |
| Sales | 45.86 | 3.25 | 176.78 | 121.68 | 20.61 | 57.86 | 45.38 | 33.22 | 122.52 | 3.97 | 0.6 | 6.57 | 11.17 | 12.89 | 662.26 |
| Sales as a percentage of production | 61.0% | 197.0% | 60.2% | 61.5% | 93.3% | 65.3% | 65.9% | 91.1% | 65.7% | 99.5% | 39.0% | 81.5% | 72.6% | 100.1% | 65.4% |
| Export | 33.79 | 3.05 | 39.99 | 33.58 | 9.05 | 6.49 | 7.69 | 12.55 | 25.77 | 1.04 | 0 | 0.43 | 5.17 | 3.73 | 177.22 |
| Export as a percentage of total sales | 19.1% | 1.7% | 22.6% | 18.9% | 5.1% | 3.7% | 4.3% | 7.1% | 14.5% | 0.6% | 0 | 0.2% | 2.9% | 2.1% | 100.0% |
| Inventory | 65.88 | 1.6 | 128.75 | 99.63 | 1.49 | 33.49 | 29.14 | 20.56 | 76.26 | 2.02 | 0.95 | 2.59 | 8.01 | 6.89 | 475.15 |

[illegible]

**4 Monthly production volume trends of the CRT industry** (10,000 pieces)

5. **January – February 2006 vs. same period in 2005** (Unit: 10,000 pieces)

| | Production | Sales | Inventory | Export |
|---|---|---|---|---|
| January – February 2006 | 1012.5 | 662.3 | 475.1 | 177.2 |
| January – February 2005 | 968.7 | 770.7 | 400.9 | 238.1 |
| 2006/2005 | 4.5% | -14.1% | 18.5% | -25.6% |

The above table shows that production increased by 4.5%, sales dropped by 14.1%, inventory increased by 18.5%, and export dropped by 25.6% in January – February 2006 of the CRT industry compared with the same period in 2005. Due to the whole-set makers' strategy of limiting production and reducing inventory and the reduction of color picture tube exports, the CRT industry is facing grave challenges in terms of sales.

6. **Production volume forecast of the CRT makers for March 2006** (Unit:10,000 pieces)

| | 14" | 15"PF | 21"FS | 21"PF | 21" super slim | 25"FS | 25"PF | 29"FS | 29"PF | 29" super slim | 32" | 34"FS | 34"PF | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| March 2006 | 59.5 | 5.0 | 129.4 | 95.0 | 15.5 | 43.8 | 32.7 | 18.8 | 65.5 | 16.2 | 5.5 | 3.6 | 7.2 | 495.7 |
| February 2006 | 42.6 | 1.6 | 129.8 | 96.5 | 10.3 | 45.6 | 33.1 | 14.6 | 66.3 | 23.2 | 2.1 | 3.9 | 5.9 | 475.7 |
| March/February | 39.7% | 212.5 | -0.3% | -1.5% | 50.5% | -3.9% | -1.2% | 28.8% | -1.2% | -30.2% | 161.9% | -7.7% | 11.9% | 4.2% |

The CRT industry estimated 4.957 million pieces in March, which is a 4.2% increase over February. Except for the increase in output of 14", 15" PF, 21" PF super slim, 29" FS, and 32" PF 169, the production arrangements for other product types are reduced by varying degrees.

**Based on the situation of upstream and downstream production in March, the 7 major makers plan to produce 2.31 million sets in March. Based on this, it is estimated that the total domestic production volume is about 3 million sets, while the production volume planned for color picture tubes is 4.95 million pieces. The production output of color picture tubes exceeds that of color TVs by 1.95 million pieces! The inventory of the CRT industry will increase to around 6.7 million pieces.**

AUTO PAGE

**7. CRT Pricing:**

The industry's settled price ranges in the recent months: (Unit: RMB/piece)

| | 14" | 21"FS | 21"PF | 25"FS | 25"PF | 29"PF |
|---|---|---|---|---|---|---|
| November 2005 | 170-175 | 270-285 | 325-350 | 350-360 | 485-510 | 620-640 |
| December 2005 | 170-175 | 270-280 | 340-350 | 350-360 | 485-505 | 610-630 |
| January 2006 | 170 – 175 | 275-280 | 320-340 | 350-360 | 480-500 | 610-630 |
| February 2006 | 165 – 170 | 265 – 275 | 320 – 330 | 340 – 350 | 480 – 495 | 610 – 620 |
| March 2006 forecast | 160 – 165 | 265 – 270 | 320 – 330 | 325 – 345 | 475 – 490 | 600 – 620 |
| April 2006 forecast | 160 – 165 | 260 – 270 | 310 – 320 | 320 – 340 | 470 – 485 | 600 – 615 |

**IV. IRICO sales (export) situation**

- Overall sales situation

Between January and February, a total of 1,279,567 pieces of color picture tubes were sold (of which 302,171 pieces were exported) in the following product types (in 10,000 pieces):

| 14" | 15"PF | 21"PF | 21"FS | 25"FS | 25"PF | 29"PF | 34"PF |
|---|---|---|---|---|---|---|---|
| 28.3413 | 3.2565 | 14.9222 | 48.2197 | 22.6379 | 10.4094 | 0.1697 | 0.0024 |

Recovered RMB 451 million in goods payment and generated USD 6,389,359 in foreign exchange earnings from export.

As of March 21 this month, 763,659 pieces have been shipped, of which 342,543 pieces have been exported. It is expected that about 1.2 million pieces will be sold this month, and it is expected that about RMB 200 – 250 million in goods payments will be recovered.

- April 2006 - September 2006 rolling sales forecast (please see attached)

- Color picture tube export situation

**1. This month's export volume**

Shipment of color picture tubes for export in March (as of March 21)

175,483 pieces of 14" color picture tubes, 64,560 pieces of 15" PF color picture tubes, 28,800 pieces of 21" PF color picture tubes, 54,084 pieces of 21" FS color picture tubes, 512 pieces of 29" PF color picture tubes. Total this month: 342,543 pieces (of which 59,760 pieces were ocean exports), with foreign exchange earnings from export of USD 7,764,719.

**2. Market performance**

Export sales in March increased significantly compared with February. Based on the purchase orders currently secured, the export of color picture tubes this month can reach about 460,000 pieces.

**3. Price dynamic**

Export market price. Analysis of market trends showed that export prices for colored picture tubes fell by around USD 1 on average in March.

**4. CRT export quantity and trend**

**Comparison of monthly shipment quantity of IRICO CRTs exported from 2004 to 2006**

Unit: 10,000 pieces

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Yearly cumulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004 | 22.1 | 24.7 | 20 | 21.5 | 23 | 30.6 | 25.3 | 24.5 | 31.5 | 25.7 | 27.1 | 19.2 | 295.2 |
| 2005 | 30.7 | 22.6 | 28.4 | 52.3 | 48.5 | 54.85 | 65.25 | 78.16 | 50.7 | 65.15 | 43.47 | 20.7 | 596.6 |

AUTO PAGE



| 2006 | 9.52 | 20.69 | | | | | | | | | | | 30.21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Monthly trend chart of IRICO exports of color picture tubes from 2004 to 2006** Unit: 10,000 pieces

**5. Market situation**

**Turkish market:** VESTEL seems to be trying to make up for the loss of its Russian plant tire through low-cost purchases, but the main reason for this is due to the low-price promotions in India, Huafei and others, and IRICO's exports to VESTEL are currently at a standstill due to price reasons.

BEKO has largely abandoned the production of small CRT TVs in favor of large screens and LCDs, medium- and small-sized TVs are made through OEM using its acquired GROUNDIG [sic Grundig] brand, but they have designated LG and Chunghwa as their suppliers for LCD screens.

SHOV's production and operation in 2005 – 2006 have been sluggish, and 14" purchases have shifted to India, where prices are low.

**Eastern European market:** CRT makers such as SAMSUNG, LG, Huafei, BMCC and SEG are bullish on the Russian market and have been using aggressive promotional prices to capture the market and expand their shares since February.

VITYAZ's production has contracted, with only 30,000 sets produced in February (4,000 units of 14", 3,000 units of 15" PF, 15,000 units of 21" FS, 5,000 units of 21" PF, and 3,000 units of 29" PF). In March and April, they plan to purchase 4,224 pieces of 15" PF, and the order is being executed.

ROLSEN produced 130,000 in February (of which 30,000 were processed for LG). After IRICO stopped supplying the 21" FSPT tubes, customers were encouraged to choose the 21" FS or 21" FS thick tube neck, but ROLSEN would not accept it. Since SAMSUNG and LG have an edge in terms of variety and cooperation with ROLSEN, we plan to break through the situation as soon as possible by stepping up the recognition of sample tubes for 15" PFCIM, 21" PF and 29" PF and combining them with the supply of 14".

RADIOIMPORT has increased their production output recently, processing on behalf of SHIVAKI, TRONY, SOKOL, TECHNO and so on. SHIVAKI currently has high demand. We need to do a good job of delivering 15" PFCIM on schedule and switching the supply of product types of 21" PF and 29" PF (the 21" PF model 00X01E purchased by them is out of stock and the purchase of 29" PF is being switched to 29" PFCOM).

The February output of RECORD/SOKOL was maintained at around 15,000 sets. Currently, 15" PF is supplied regularly to maintain the relationship and drive the purchase of other varieties.

START is a likely potential customer. Last year, the relationship was affected by the delay in delivery. Through hard work, we have obtained orders for 11,520 pieces of 14", 15,360 pieces of

21"FS thick, and 14,400 pieces of 21" PF recently.

**New markets:** Argentina R/V Company: A 21" FS thick small DY (with DY wire) sample tube is being prepared.

Toshiba Egypt from the African market has placed an order for 3,360 pieces of the 25" FS (DC07), with a further order for 1,152 pieces in April.

**Other markets:** DISTAR Thailand has passed the 21" PF small DY sample tube certification and has placed an order for 1,920 pieces, which are scheduled to be shipped at the end of March.

We had negotiated an export agreement for 10,000 pieces of 14" with Indian agent LB Electronics, but recently LB suddenly said that the market price has changed and was reluctant to place an order. It is said to be affected by the low-price promotion of color picture tubes in Thailand.

**6. Issues and suggestions:**

Russia has now stepped up its inspection of imported goods and announced on February 20 that it will require a fumigation certificate for wooden packaging. Based on the current situation of IRICO, the preparation period for the export of colored picture tubes with fumigation certificates is too long (8 – 10 days from receipt of order to delivery, plus 5 days for transport and loading onboard), which will greatly affect the export to Eastern European countries.

It is recommended to establish a group to visit overseas users as soon as possible to solve quality problems and expand business in a timely manner.

- **Exports of materials and parts**

As of March 20, the foreign exchange earnings from export this year were USD 3.65 million.

1. Cumulative exports of ZnS raw powder amounted to 110 tons, and 20 tons are scheduled to be shipped to Samsung in South Korea on March 25. Exports expected in April: 20 tons.
2. Cumulative exports of DY products amounted to 716,000 pieces, with the following exports expected in April: 160,000 pieces.
3. Cumulative exports of glass support rod powder amounted to 86.4 tons, with the following exports expected in April: 32.4 tons.
4. Cumulative exports of color powder amounted to 52 tons. The recent export situation of phosphor powder has been positive, and customer demand is increasing. IRICO staff often need to work overtime for production to meet the demand. Exports expected in April: 20 tons.
5. Lithuanian market: The price for the low-melting point glass powder has been agreed, and the first batch of order of 18 tons is scheduled to be shipped on March 20. The follow-up batch supply of phosphor powder will be negotiated after the visit in late March.

- New product market

♦ New product advancement:

**I. 21" PF small DY**

**Skyworth, TCL, Panda, Jinlipu:** Completed all certifications.

**Hisense:** Passed a small batch trial of 32 pieces on March 16.

**Changhong:** Passed the third small batch trial of 96 pieces on March 15.

**XOCECO:** Although the certification of small batch of 48 pieces of improved screens was passed on March 13, there were problems with the bending of the four corners of the screen, which would not have passed based on the current criteria of XOCECO, but it could be used for low-priced domestic sets.

**II. 15" PFAK**

**TCL:** On March 03, it passed the certification of large batch of 1,000 pieces of the Thomson project, and 2 sample sets for the Philips project have been sent to Philips for whole set certification.

**Qingdao Haier:** On March 13, 2,304 pieces were shipped, and on March 17, certification of large batch was carried out.

**XOCECO:** Passed the certification of a small batch of 48 pieces on March 22.

**Konka:** The sample tube was certified on March 02, and a small batch certification of 48 pieces was planned on March 11.

**RECORD:** The sample tube was certified on January 20, and a purchase order for 2,112 pieces was placed; scheduled for shipment on March 10.

**Hongdeng:** The sample tube was certified, and a purchase order for 840 pieces was placed; scheduled for shipment on February 21.

**Guangdong Changhong:** Two sample tubes were shipped on March 03.

**III. 25" PF (XEA gun)**

**Skyworth:** The sample tube was certified on February 25, and the small batch certification of 20 pieces was passed on March 10. A medium batch trial of 200 pieces was scheduled on March 17.

**TCL:** Failed sample tube certification on March 06 and re-sent 2 sample tubes on March 08. The tubes were certified on March 13. **XOCECO:** The sample tube was certified on March 01 and no subsequent certification will be scheduled in view of the future launch of the AK tube.

**IV. 29" PFCOM**

**XOCECO:** After increasing the beam current, the 100 HZ sample tube was certified on March 09, and small batch certification will be conducted next.

**V. 34" PF**

**XOCECO:** 12 pieces were sent out on February 21, a small batch trial was carried out on March 07 and the aging test was completed on March 17. No quality problems were found, and the certification report is at the countersigning stage.

**IRICO Sales and Marketing Department**
**March 22, 2006**

AUTO PAGE

*内部资料 注意保密*

# 营销例

**03 月**

**营销部 2006 年 3 月 22 日**

3 月份仍然是彩电销售的淡季，出口市场的逐步转暖并没有带来彩电生产的明显增加。目前整机厂 CRT 彩电库存依然较高，七大厂库存合计大于 450 万台，主要整机厂采取的经营策略仍以减少库存、化解风险为宗旨，即对外销根据订单生产，内销市场则继续采取限产压库的措施；同时平板电视价格大幅下跌，刺激了销量增长。因此当前及今后一段时间彩管供大于求的矛盾将更加突出，价格的竞争日趋激烈。

## 一、彩电市场

**1、国内彩电市场处于传统淡季，CRT 彩电价格基本稳定，平板电视价格下跌幅度较大，预计四月中旬至"五一"前后市场将有所好转。**

根据营销部客户跟踪、市场调查，以及每周市场调研结果显示：

**进入 3 月份，彩电市场呈现传统淡季特征，彩电销量明显萎缩，库存居高不下。**

城镇市场：市场非常清淡，与 05 年同期相比，彩电销量下降。根据 3 月 17 日 TCL 公布 2 月份全球彩电（含平板电视）销售量为 130.8 万台，较 05 年同期下降 2.3%；与 1 月份销售 239.5 万台相比，下降 45.4%。CRT 彩电销售价格基本稳定，平板电视价格大幅下跌，创维 2 月 15 日对几款平板电视大幅降价 30%，但是销售效果不明显。3 月 16 日创维对 42"～50"的液晶、等离子平板电视大幅降价 2000～5000 元，最大降幅度超过 20%，这是创维今年第二次对平板彩电大幅降价。另外，海信也将 47"液晶电视降价 5000 元，零售价格为 19999 万元。

农村市场：市场处于传统淡季，销售品种以 21"FS、21"PF、25"FS 等中小屏幕为主。

中怡康的数据显示：06 年 1 月份国内市场彩电销售 543.6 万台，同比增长 1.74%，其中 CRT 彩电销售 491.4 万台，同比减少 1.86%，平板电视增长迅猛，LCD、PDP 合计销售 43.9 万台（其中 LCD34.1 万、PDP9.8 万，分别同比增长 350.83%、71.35%；平板电视在总体电视销售额中占比 53.86%，已经超过 CRT 彩电的销售额。

**2、出口市场止跌企稳，出口量缓步增加**

AUTO PAGE

彩电出口经过 05 年 11 月、12 月的连续下降后，06 年 1 月份止跌回稳。根据海关统计，1 月份中国 CRT 彩电出口 211.7 万台，环比增长 4.9%，同比增长 25.6%；出口金额 16922 万美元，同比增长 5.35%；出口平均单价为 79.94 美元，同比下跌 19.86%。

根据 03 年～05 年中国 CRT 彩电出口月度走势图，从 3 月份开始彩电出口将逐步增加。请参见下图。

中国CRT彩电出口月度走势

## 二、整机厂经营情况

### 1、整机厂经营动态

□3 月份彩电市场仍处于淡季，各整机厂生产量在低位徘徊，以消化彩电、彩管库存为主，主要根据出口订单数量决定对彩管的需求量。

□TCL 对管理架构造进行了重大的调整，原来的七个事业本部全部撤消，新成立三个中心，即 CRT 彩电中心、平板电视中心、创新中心。这次调整的目的是通过减少管理层，使管理架构更加扁平化，从而降低管理费用和管理成本，提高运作效率，提升竞争力。被撤消的事业本部包括家电事业本部、多媒体事业本部、数码电子事业本部、海外事业本部、部品事业本部、通讯事业本部等七个本部。

□3 月 9 日 TCL 集团发布公告：将成立 TCL 集团财务有限公司，为 TCL 集团成员单位提供存款、贷款、结算等方面服务，以缓解 TCL 多媒体和 TCL 通讯由于整合彩电和手机业务带来的资金紧张问题。TCL 集团财务有限公司注册资本为 5 亿元。其中，TCL 集团出资 3.1 亿元，持有财务公司 62%股权；TCL 王牌电器（呼和浩特）有限公司出资 0.7 亿元，持有 14%的股权；

TCL 移动通信（呼和浩特）有限公司出资 0.2 亿元，持有 4%的股权。另外，TCL 集团财务公司还引入东亚银行成为投资者，后者出资 1 亿元持有 20%的股权。

2、七大厂 0 6 年/ 0 5 年同期产销存状况对比（总量）

（单位：万台、万只）

| | 彩电生产 | 彩电销售 | 彩电库存 | 彩电出口 | 彩管库存 |
|---|---|---|---|---|---|
| 2006 年 2 月 | 213.7 | 248.7 | 355.5 | 90.15 | 145.58 |
| 2005 年 2 月 | 255.9 | 263.1 | 370.5 | 49.19 | 131.32 |
| 06 年/05 年 | -16.5% | -5.5% | -4.0% | 83.3% | 10.8% |
| 2006 年 1-2 月 | 617.89 | 810.45 | 355.5 | 196.05 | 145.58 |
| 2005 年 1-2 月 | 725.11 | 908.37 | 370.5 | 124.82 | 131.32 |
| 06 年/05 年 | -14.8% | -10.8% | -4.0% | 57.1% | 10.8% |

上表显示，06 年 2 月份与去年同期比较，产销存分别减少 16.5%、5.5%、4.0%，彩电出口、彩管库存分别增长 83.3%和 10.8%。2 月份整机厂采取限产压库的经营策略，对彩管的采购量大幅减少。

3、七大厂 0 6 年 2 月/ 0 6 年 1 月经营状况环比（总量）

（单位：万台、万只）

| | 彩电生产 | 彩电销售 | 彩电库存 | 彩电出口 | 彩管库存 |
|---|---|---|---|---|---|
| 2006 年 2 月 | 213.7 | 248.7 | 355.5 | 90.15 | 145.58 |
| 2006 年 1 月 | 404.40 | 544.0 | 390.1 | 105.90 | 111.54 |
| 环比 | -47.2% | -54.3% | -8.9% | -14.9% | 30.5% |

上表显示，2 月份与 1 月份相比，彩电产、销、存、出口均呈现下降，特别是产、销下降幅度均超过 45%，彩管库存增长 30.5%，因此，3 月份整机厂仍将继续减少彩管采购，以消化彩电和彩管库存，彩管销售形势依然严峻。

4、七大厂 06 年 1-2 月/05 年 1-2 月分品种产销存状况对比

七大厂 06 年 1-2 月/05 年 1-2 月产量对比（分品种） （单位：万台）

| | 14" | 15" PF | 21"F S | 21" PF | 21" 薄 | 25" FS | 25" PF | 28" w | 29" FS | 29" PF | 29" 薄 | 34" FS | 34" PF | 32" W | 32" 薄 | 合计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

AUTO PAGE

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06 年 | 31.4 | 10.8 | 187.9 | 102.5 | 7.2 | 57.0 | 46.7 | 5.9 | 25.4 | 119.3 | 0.8 | 5.8 | 10.7 | 2.1 | 3.4 | 616.9 |
| 05 年 | 35.3 | 4.3 | 176.1 | 102.2 | 0 | 95.7 | 77.7 | 0 | 45.7 | 151.3 | 0 | 16.5 | 20.2 | 0.8 | 0 | 725.8 |
| 06/05（%） | -11.0% | 151.1% | 6.7% | 0.3% | // | -40.4% | 5 | // | -44.4% | -21.2% | // | -64.8% | 47% | 162.5% | // | -15.0% |

上表显示，06 年 1-2 月较 05 年同期生产量减少 15%。纯平彩电所占比重上升到 50.2%，较 05 年同期增加 1.1%，品种结构上继续向薄型化和宽屏化方向发展。彩电厂纷纷推出的 21″、29″、32″超薄彩电和 28″ 16：9、32″ 16：9 等新品，高清化、数字化趋势确立。

**七大厂 06 年 1-2 月/05 年 1-2 月销量对比（分品种）** （单位：万台）

| | 14" | 15"PF | 21"FS | 21"PF | 21"超薄 | 25"FS | 25"PF | 28"W | 29"FS | 29"PF | 29"超薄 | 34"FS | 34"PF | 32"W | 32"超薄 | 合计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06 年 | 31.7 | 11.8 | 233.2 | 131.4 | 4.0 | 101.1 | 58.4 | 8.0 | 34.1 | 168.6 | 0.4 | 6.3 | 15.3 | 2.6 | 3.4 | 810.3 |
| 05 年 | 33.7 | 3.7 | 239.6 | 132.9 | 0 | 122.2 | 98.4 | 0 | 52.1 | 179.5 | 0 | 19.1 | 27.1 | 0.6 | 0 | 908.9 |
| 06/05（%） | -5.9% | 218.9% | -2.7% | -1.1% | // | -17.3% | -40.7% | // | -34.5% | -6.1% | // | --67% | -43.5% | 333% | // | -10.8% |

**七大厂 06 年 2 月/05 年 2 月彩电库存对比（分品种）** （单位：万台）

| | 14" | 15"PF | 21"FS | 21"PF | 21"薄 | 25"FS | 25"PF | 28"W | 29"FS | 29"PF | 34"FS | 34"PF | 32"W | 合计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06 年 | 3.7 | 0.6 | 101.3 | 63.4 | 1.3 | 51.2 | 40.4 | 1.0 | 21.2 | 59.3 | 5.3 | 6.0 | 0.8 | 355.5 |
| 05 年 | 6.7 | 2.2 | 117.6 | 31.1 | 0 | 67.2 | 27.7 | 0 | 35.2 | 63.4 | 9.3 | 9.6 | 0.5 | 370.5 |
| 06/05（%） | -44.8% | -72.7% | -13.9% | 103.8% | // | -23.8% | 45.8% | // | -39.8% | -6.5% | -43.0% | -37.5% | 60.0% | -4.0% |

从上表可以看出，06 年 2 月较 05 年同期彩电库存下降 4%，主要是整机厂采取限产压库、接单式生产的运营模式，极力降低库存、化解风险。在品种上，21″PF、25″PF 库存明显增加，特别是 21″PF 库存增长 103.8%，上升幅度较大。

**5、七大厂最新经营状况**

（一）TCL

2 月份产量 57 万台，其中内销生产 21 万台，外销 36 万台，工厂库存 55 万台，整体库存为 110 万台左右。3 月份计划生产 70 万台，其中内销生产 30 万台，外销 40 万台。TCL 集团董事长李东升表示，预计 TCL 第一季度将恢复盈利，公司目前的重心在于改善海外业务，其中 TTE 北美

区 1-2 月已开始赢利，但 TTE 欧洲区继续亏损。

3 月 17 日，TCL 公布 2 月份全球彩电（含平板电视）销售量为 130.8 万台，较 05 年同期下降 2.3%；与 1 月份销售 239.5 万台相比，下降 45.4%。

（二）康佳

2 月份产量 55 万台，其中内销生产 42 万台，外销生产 13 万台，工厂库存 90 万台。3 月份继续控制产量，压缩库存，预计生产 45 万台，其中内销生产仅 23 万台，外销生产 22 万台，出口形势良好。目前彩电库存 90 万台。

由于 3 月份产量达到最低谷，重康计划 3 月 20 日才开班生产，牡康全月放假，陕康减产 70%，安康减产 60%，莞康因外销形势良好，产量基本稳定。

（三）创维

由于市场非常疲软，创维 2 月份实际产量只有 15 万台，3 月份计划 20 万台，产量连续 2 个月创新低，而且 3 月份有将近一半的生产是前期结转下来的，所以彩管需求量很少。目前创维小屏幕比例很低，还处于消化彩管库存阶段，主要生产大屏幕和新产品，3 月份只在 29"PF 和 28"PF16：9、32"PF16：9 等新品上有采购订单。现彩电库存 75 万台，彩管库存 20 万只。

（四）长虹

2 月份生产 51.2 万台，销售 43.5 万台，绵阳彩电库存 28 万台，整体库存约为 92 万台。3 月份计划产量 40 万台，较 2 月份减少 21.8%，彩电出口相对平稳，3 月份预计出口 11 万台，从 4 月份起外销采购将由广东长虹自行负责。长虹对彩管实行 VMI 管理，实际各彩管厂寄存库存达 60 万只左右。

（五）海信

2 月份生产仅 9.1 万台，销售 23.2 万台，彩电库存 58 万台，彩管库存 5.2 万只。3 月份预计生产 19 万台。

（六）海尔

青岛海尔 2 月份产量仅 7.5 万台，出口只有 3.4 万台，工贸库存约 12 万台左右。3 月份计划生产 11.4 万台；合肥海尔 2 月份生产 10.3 万台，出口 4.5 万台，3 月份计划生产 11.2 万台。

（七）厦华

2 月份生产仅 14.3 万台，销售 13.9 万台，彩电库存 14.4 万台，彩管库存 2.5 万只。厦华内外销都很不景气，3 月份接到的订单很少，预计生产 14 万台，生产处于半饱和状态。另外平板电视的生产量也大幅减少。

中华映管收购厦华股份的审批工作仍在进行中，中华映管除 34″以外所有品种都送到厦华，21″FS、29″PF 在已进入小批量认证阶段。

综上，目前内销市场仍然处于常规淡季，外销市场销售逐步增加，但主要大厂彩电库存依然较高，因此采取的经营策略仍以减少库存、化解风险为宗旨，致使彩管市场的销售雪上加霜。

**6、七大整机厂 06 年 3、4、5 月份生产预测**

（单位：万台）

| | 小计 | TCL | 康佳 | 创维 | 长虹 | 海信 | 海尔 | 厦华 |
|---|---|---|---|---|---|---|---|---|
| 2006 年 3 月 | 230.6 | 70 | 45 | 20 | 40 | 19 | 22.6 | 14 |
| 4 月 | 288.5 | 73 | 45 | 37 | 43 | 40 | 35.5 | 15 |
| 5 月 | 333.2 | 85 | 50 | 41 | 55 | 45 | 42.2 | 15 |
| 总计 | 852.3 | 228 | 140 | 98 | 138 | 104 | 100.3 | 44 |

3 月份生产计划量为 231 万台，较 2 月份增长 8.6%，产量的增长主要依赖彩电出口订单的增加，内销市场则继续采取限产压库的经营措施。

**三、彩管行业情况**

**行业具体产销情况**

**1．06 年 2 月/ 1 月经营状况比较**

06 年 2 月/ 1 月份经营状况环比（总量） （单位：万只）

| | 生产 | 销售 | 库存 | 出口 |
|---|---|---|---|---|
| 2006 年 2 月 | 477.1 | 248.7 | 475.1 | 98.1 |
| 1 月 | 535.2 | 413.6 | 246.6 | 79.1 |
| 环比增减% | -10.9% | -39.9% | 92.6% | 24.0% |

2 月份彩管行业生产、销售分别下降 10.9%和 39.9%，库存大幅增长 92.6%，出口增长 24%。

06 年 2 月/ 1 月彩管行业环比（分品种） （单位：万只）

| | 14" | 15"PF | 21"FS | 21"PF | 21"超薄 | 25"FS | 25"PF | 29"FS | 29"PF | 29"超薄 | 28" | 32" | 34"FS | 34"PF | 合计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 月生产 | 42.64 | 1.55 | 129.83 | 96.51 | 10.3 | 45.54 | 33.31 | 14.58 | 87.38 | 2.19 | 1.44 | 2.06 | 3.88 | 5.88 | 477.09 |
| 1 月生产 | 32.5 | 0.1 | 163.7 | 101.3 | 11.8 | 43 | 35.6 | 21.8 | 99.2 | 1.7 | 0.1 | 6 | 11.5 | 7 | 535.2 |
| 环比 | 31.2% | 1450.0% | -20.7% | -4.7% | -12.7% | 5.9% | -6.4% | -33.1% | -11.9% | 28.8% | 1340.0% | -65.7% | -66.3% | -16.0% | -10.9% |
| 2 月销售 | 23.46 | 1.45 | 61.68 | 45.08 | 10.71 | 22.56 | 12.58 | 8.52 | 50.12 | 2.27 | 0.6 | 2.47 | 2.97 | 4.19 | 248.66 |
| 1 月销售 | 22.4 | 1.8 | 115.1 | 76.6 | 9.9 | 35.3 | 32.8 | 24.7 | 72.4 | 1.6 | 0 | 4.1 | 8.2 | 8.7 | 413.6 |
| 环比 | 4.7% | -19.4% | -46.4% | -41.1% | 8.2% | -36.1% | -61.6% | -65.5% | -30.8% | 41.9% | // | -39.8% | -63.8% | -51.8% | -39.9% |
| 2 月出口 | 20.38 | 1.45 | 21.69 | 15.58 | 6.65 | 3.89 | 3.49 | 4.55 | 15.37 | 1.04 | 0 | 0.03 | 1.47 | 2.53 | 98.12 |
| 1 月出口 | 13.41 | 1.6 | 18.3 | 18 | 2.4 | 2.6 | 4.2 | 8 | 10.4 | 0 | 0 | 0.3 | 3.7 | 1.2 | 79.1 |
| 环比 | 52.0% | -9.4% | 18.5% | -13.4% | 177.1% | 49.6% | -16.9% | -43.1% | 47.8% | // | // | -90.0% | -60.3% | 110.8% | 24.0% |

| | 14" | 15"PF | 21"FS | 21"PF | 21"超薄 | 25"FS | 25"PF | 29"FS | 29"PF | 29"超薄 | 28" | 32" | 34"FS | 34"PF | 合计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 月库存 | 63.88 | 1.6 | 128.75 | 99.63 | 1.49 | 33.48 | 29.13 | 20.56 | 76.26 | 2.02 | 0.95 | 2.59 | 8.01 | 6.89 | 475.13 |
| 1 月库存 | 44.7 | 1.5 | 60.6 | 48.2 | 1.9 | 10.5 | 8.4 | 14.5 | 39 | 2.1 | 0.1 | 3 | 7.1 | 5.2 | 246.7 |
| 环比 | 42.9% | 6.7% | 112.5% | 106.7% | // | 218.9% | 246.8% | 41.8% | 95.5% | -3.8% | // | -13.7% | 12.8% | 32.5% | 92.6% |

2 月份各品种生产环比减少 10.9%，除 14″、15″PF、29″PF 超薄、28″PF16：9 外，其它品种均减少；2 月份销售环比减少 39.9%，除 14″、21″PF 超薄、29″PF 超薄外，其它品种销售均减少；2 月份出口环比增长 24.0%，除 25″PF、34″FS 外，其它品种均有不同程度的增幅；尽管 2 月份工作日减少，但库存仍然大幅增长 92.6%，主要库存品种集中在 14″、21″FS、21″PF、29″PF，这 4 个品种的库存量占总库存量的 77.5%。

2．06 年 2 月彩管行业总体产销状况（分厂家）

中国彩管行业 06 年 2 月份经营数据 （单位：万只）

| | BMCC | 赛格日立 | 华飞 | 永新 | 汤姆逊 | LG 曙光 | 三星 | 彩虹 | 合计 |
|---|---|---|---|---|---|---|---|---|---|
| 生产 | 62.53 | 36.65 | 61.15 | 35.51 | 58.98 | 54.2 | 61.48 | 106.59 | 477.09 |
| 销售 | 30.31 | 18.76 | 38.08 | 17.5 | 27.32 | 30.1 | 35.9 | 50.69 | 248.66 |
| 产销率 | 48.5% | 51.2% | 62.3% | 49.3% | 46.3% | 55.5% | 58.4% | 47.6% | 52.1% |
| 其中:出口 | 10.31 | 12.61 | 12.06 | 3.57 | 11.49 | 11.3 | 15.82 | 20.96 | 98.12 |
| 出口占比 | 34.0% | 67.2% | 31.7% | 20.4% | 42.1% | 37.5% | 44.1% | 41.3% | 39.5% |
| 库存 | 87.0 | 33.4 | 40.0 | 46.5 | 58.6 | 44.1 | 46.7 | 118.7 | 475.1 |

上表显示：2 月份，行业销售迅速下降，产销率仅为 52.1%，出口减少，库存大幅上升。

中国彩管行业 06 年 1-2 月份经营数据 （单位：万只）

| | BMCC | 赛格日立 | 华飞 | 永新 | 汤姆逊 | LG 曙光 | 三星 | 彩虹 | 合计 |
|---|---|---|---|---|---|---|---|---|---|
| 生产 | 133.13 | 82.75 | 120.75 | 86.21 | 133.78 | 110.8 | 139.48 | 205.39 | 1012.29 |
| 销售 | 85.71 | 51.96 | 82.88 | 50.6 | 82.82 | 78.3 | 102 | 127.99 | 662.26 |
| 产销率 | 64.4% | 62.8% | 68.6% | 58.7% | 61.9% | 70.7% | 73.1% | 62.3% | 65.4% |
| 其中:出口 | 19.11 | 23.51 | 20.16 | 6.67 | 22.29 | 23.3 | 31.72 | 30.46 | 177.22 |
| 出口占比 | 22.3% | 45.2% | 24.3% | 13.2% | 26.9% | 29.7% | 31.1% | 23.8% | 26.8% |
| 库存 | 87.0 | 33.4 | 40.0 | 46.5 | 58.6 | 44.1 | 46.7 | 118.7 | 475.1 |

上表显示：1-2 月份，行业销售出现下降，产销率仅为 65.4%，出口减少，库存大幅上升。

3．06 年彩管行业 1-2 月产销状况（分品种）

彩管行业 06 年 1-2 月经营数据(分品种) （单位:万只）

| | 14" | 15"PF | 21"FS | 21"PF | 21"超薄 | 25"FS | 25"PF | 29"FS | 29"PF | 29"超薄 | 28" | 32" | 34"FS | 34"PF | 合计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL – GRAND JURY MATERIAL CHU00505508

| 生产 | 75.14 | 1.65 | 293.53 | 197.81 | 22.1 | 88.54 | 68.91 | 36.38 | 186.58 | 3.89 | 1.54 | 8.06 | 15.38 | 12.88 | 1012.29 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 占比 | 7.4% | 0.2% | 29.0% | 19.5% | 2.2% | 8.7% | 6.8% | 3.6% | 18.4% | 0.4% | 0.2% | 0.8% | 1.5% | 1.3% | 100.0% |
| 销售 | 45.86 | 3.25 | 176.78 | 121.68 | 20.61 | 57.86 | 45.38 | 33.22 | 122.52 | 3.87 | 0.6 | 6.57 | 11.17 | 12.89 | 662.26 |
| 产销率 | 61.0% | 197.0% | 60.2% | 61.5% | 93.3% | 65.3% | 65.9% | 91.3% | 65.7% | 99.5% | 39.0% | 81.5% | 72.6% | 100.1% | 65.4% |
| 其中:出口 | 33.79 | 3.05 | 39.99 | 33.58 | 9.05 | 6.49 | 7.69 | 12.55 | 25.77 | 1.04 | 0 | 0.33 | 5.17 | 3.73 | 177.22 |
| 出口占比 | 19.1% | 1.7% | 22.6% | 18.9% | 5.1% | 3.7% | 4.3% | 7.1% | 14.5% | 0.6% | // | 0.2% | 2.9% | 2.1% | 100.0% |
| 库存 | 63.88 | 1.6 | 128.75 | 99.63 | 1.49 | 33.48 | 29.13 | 20.56 | 76.26 | 2.02 | 0.95 | 2.59 | 8.01 | 6.89 | 475.13 |

4. 彩管行业月度产量走势图（万只）

**5. 06 年 1-2 月与 05 年同期比较** （单位：万只）

| | 生产 | 销售 | 库存 | 出口 |
|---|---|---|---|---|
| 2006 年 1-2 月 | 1012.3 | 662.3 | 475.1 | 177.2 |
| 2005 年 1-2 月 | 968.7 | 770.7 | 400.9 | 238.1 |
| 06 年/05 年 | 4.5% | -14.1% | 18.5% | -25.6% |

从上表可以看出，彩管行业 06 年 1-2 月与 05 年同期相比，生产增长 4.5%、销售下降 14.1%、库存增长 18.5%、出口下降 25.6%。由于整机厂限产压库，加上彩管出口的减少，彩管行业面临的销售形势非常严峻。

**6. 彩管厂 06 年 3 月份产量预测** （单位：万只）

| | 14" | 15"PF | 21"FS | 21"PF | 21"超薄 | 25"FS | 25"PF | 29"FS | 29"PF | 29"超薄 | 32" | 34"FS | 34"PF | 合计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06 年 3 月 | 59.5 | 5.0 | 129.4 | 95.0 | 15.5 | 43.8 | 32.7 | 18.8 | 65.5 | 16.2 | 5.5 | 3.6 | 5.2 | 495.7 |

| 06 年 2 月 | 42.6 | 1.6 | 129.8 | 96.5 | 10.3 | 45.6 | 33.3 | 14.6 | 66.3 | 23.2 | 2.1 | 3.9 | 5.9 | 475.7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 月 /2 月 | 39.7 % | 212.5 % | -0.3% | -1.5% | 50.5 % | -3.9% | -1.2% | 28.8 % | -1.2% | -30.2 % | 161 .9% | -7.7% | -11.9 % | 4.2% |

3 月份彩管行业预计 495.7 万只，较 2 月份增长 4.2%，除 14″、15″PF、21″PF 超薄、29″FS、32″PF16：9 生产量增加外，其它品种生产安排均有不同幅度的减少。

**综合 3 月份上下游的生产情况，七大厂 3 月计划生产 231 万台，据此推算国内生产总量约 300 万台，而彩管生产计划为 495 万只，彩管生产量大于彩电生产量 195 万只！彩管行业库存将增加至 670 万只左右。**

**7. 彩管价格情况：**

近几月行业结算价格区间：（单位：元/只）

| | 14 " | 21 " FS | 21 " PF | 25 " FS | 25 " PF | 29 " PF |
|---|---|---|---|---|---|---|
| 05 年 11 月 | 170-175 | 270-285 | 325-350 | 350-360 | 485-510 | 620-640 |
| 05 年 12 月 | 170-175 | 270-280 | 340-350 | 350-360 | 485-505 | 610-630 |
| 06 年 1 月 | 170～175 | 275-280 | 320-340 | 350-360 | 480-500 | 610-630 |
| 06 年 2 月 | 165～170 | 265～275 | 320～330 | 340～350 | 480～495 | 610～620 |
| 06 年 3 月预测 | 160～165 | 265～270 | 320～330 | 325～345 | 475～490 | 600～620 |
| 06 年 4 月预测 | 160～165 | 260～270 | 310～320 | 320～340 | 470～485 | 600～615 |

## 四、彩虹销售(出口)情况

●总体销售情况

1-2 月份共销售彩管 127.9567 万只（其中出口 30.2171 万只），品种如下（万只）：

| 14″ | 15″ PF | 21″ PF | 21″ FS | 25″ FS | 25″ PF | 29″ PF | 34″ PF |
|---|---|---|---|---|---|---|---|
| 28.3413 | 3.2565 | 14.9222 | 48.2197 | 22.6379 | 10.4094 | 0.1697 | 0.0024 |

回收货款 4.51 亿元，出口创汇 638.9359 万美元。

本月截止 3 月 21 日，已发货 76.3659 万只，其中出口 34.2543 万只，预计本月可销售约 120 万只，预计回收货款约 2--2.5 亿元。

●06 年 4 月—06 年 9 月滚动销售预计（请参见附件）

●彩管出口情况

1、 本月出口量

3 月份（截止 3 月 21 日）出口彩管发货情况：

CONFIDENTIAL – GRAND JURY MATERIAL

14″ 彩管 17.5483 万只、15″ PF 彩管 6.456 万只、21″ PF 彩管 2.88 万只、21″ FS 彩管 5.4084 万只、29″ PF 彩管 0.0512 万只。本月合计：34.2543 万只（其中远洋出口 5.976 万只），出口创汇：776.4719 万美元。

2、 市场表现

3 月份出口销量较 2 月份明显增加。从目前所掌握订单情况看，本月出口彩管可达到 46 万只左右。

3、 价格动态

出口市场价格：从市场走势分析，3 月份出口彩管价格平均下跌 1 美元左右。

4、出口彩管数量及走势

2004～2006 年彩虹彩管出口月发货量对比表　　单位：万只

| | 1 月 | 2 月 | 3 月 | 4 月 | 5 月 | 6 月 | 7 月 | 8 月 | 9 月 | 10 月 | 11 月 | 12 月 | 年累计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004 年 | 22.1 | 24.7 | 20 | 21.5 | 23 | 30.6 | 25.3 | 24.5 | 31.5 | 25.7 | 27.1 | 19.2 | 295.2 |
| 2005 年 | 30.7 | 22.6 | 28.4 | 52.3 | 48.3 | 54.85 | 65.23 | 78.16 | 80.7 | 65.15 | 43.47 | 26. 7 | 596.6 |
| 2006 年 | 9.52 | 20.69 | | | | | | | | | | | 30.21 |

2004～2006 年彩虹出口彩管逐月走势图　　单位：万只

5、市场情况

土耳其市场：VESTEL 公司似乎要通过低价采购来弥补其俄罗斯工厂火灾的损失，但主要原因是由于印度、华飞等的低价促销所致，彩虹对 VESTEL 的出口目前因价格原因处于僵持状态。

BEKO 基本放弃小尺寸 CRT 电视的生产，转为大屏幕和 LCD；中、小尺寸电视用其收购的 GROUNDIG 品牌通过 OEM 进行，但 CRT 供应商指定为可为其提供 LCD 屏的 LG 和中华。

SHOV 公司 2005-2006 年度生产经营一直不景气，14″采购转向价格低廉的印度。

东欧市场：SAMSUNG、LG、华飞、北松、赛格等彩管厂都看好俄罗斯市场，2 月起纷纷采用积极的促销价格占领市场、扩大份额。

VITYAZ 处于收缩状态,2 月份产量仅为 3 万台(14"0.4 万、15"PF0.3 万、21"FS1.5 万、21"PF0.5 万、29"PF0.3 万）。3、4 月计划采购 15"PF 各 4224 只，正在落实订单。

ROLSEN 2 月份产量 13 万（其中为 LG 代加工 3 万）。彩虹停供 21"FSPT 管后一直动员客户选择 21"FS 或 21"FS 粗管颈，但 ROLSEN 不愿接受。由于 SAMSUNG、LG 在 ROLSEN 具有品种和合作经营的优势，我们计划通过尽快开展 15"PFCIM 、21"PF、 29"PF 的样管认定工作并结合 14"的供应来打开局面。

RADIOIMPORT 最近加大了产量，为 SHIVAKI、 TRONY、SOKOL、TECHNO 等代加工。目前 SHIVAKI 的需求较旺，我们需要做好 15"PFCIM 的按期交货和 21"PF、29"PF 的品种切换供应工作（其采购的 21"PF 型号 00X01E 已无库存，29"PF 转采购 29"PFCOM）。

RECORD/SOKOL 2 月产量维持在 1.5 万台左右，目前采取按期供应 15"PF 来维系关系，并带动其它品种的采购。

START 是一家比较有潜力的客户，去年曾一度因交货延期而影响关系，近期通过努力拿到了订单，14"11520 只、21"FS 粗 15360 只、21"PF14400 只。

**新市场：**阿根廷 R/V 公司：正在准备 21"FS 粗小 DY（带 DY 引线）样管。

非洲市场的埃及东芝公司已下订单 25"FS（DC07）3360 只，4 月份还有订单 1152 只。

**其它市场：**泰国 DISTAR 公司通过 21"PF 小 DY 样管认证，已下订单 1920 只，计划 3 月底装船。

本月原与印度代理商 LB 电子基本谈妥 14"1 万只出口协议，但近期 LB 突称市场价格有变，而不愿开出订单，据称是受泰国彩管低价促销的影响。

6、问题与建议：

目前俄罗斯加强了对进口商品的检验，2 月 20 日宣布将要求木质包装提供薰蒸证明。以目前彩虹的情况看，带薰蒸证明的彩管出口备货期太长（接单至发货需要 8-10 天，加运输、集港上船需要 5 天），将极大影响对东欧国家的出口。

建议尽快组团出访海外用户，及时解决质量问题和拓展业务。

● **材料及零部件出口情况**

截止 3 月 20 日本年度出口创汇 365 万美元。

1. ZnS 生粉累计出口 110 吨，计划 3 月 25 日向韩国三星发货 20 吨。4 月预计出口：20 吨。

2. DY 产品累计出口 71.6 万只，4 月预计出口：16 万只。

CONFIDENTIAL – GRAND JURY MATERIAL CHU00505512

3. 支架玻杆粉累计出口 86.4 吨，4 月预计出口：32.4 吨。

4. 彩粉累计出口 52 吨，近期荧光粉出口形势看好，客户需求增多，彩虹经常需要加班生产方可满足需求。4 月预计出口：20 吨。

5. 立陶宛市场：低熔点玻璃粉的价格已经商定，第一批订单量 18 吨，3 月 20 日安排发出。荧光粉后续批量供货问题待 3 月下旬访问后商定。

● 新品市场

◆新品推进情况：

**一、21″ PF 小 DY**

**创维、TCL 公司、熊猫、金利普：**完成全部认证。

**海信：** 3 月 16 日通过 32 只小批量试流。

**长虹：** 3 月 15 日通过 96 只第三次小批量试流。。

**厦华：** 3 月 13 日 48 只改进屏虽然通过小批量认证，但存在的问题集中在屏四角弯曲，按目前厦华的标准是无法通过的，但是可以使用在内销低价机上。

**二、15″ PFAK**

TCL：3 月 3 日通过汤姆逊项目 1000 只大批量认证，飞利浦项目已将 2 台样机发飞利浦进行整机认证。

**青岛海尔：** 3 月 13 日发出 2304 只，3 月 17 日进行中、大批量认证。

**厦华：**3 月 22 日通过 48 只小批量认证。

**康佳：**3 月 2 日通过样管认证，计划 3 月 11 日进行 48 只小批量认证。

RECORD **公司：**1 月 20 日通过样管认证，直接下订单采购 2112 只，3 月 10 日发出。

**红灯：**通过样管认证，直接下订单采购 840 只，2 月 21 日发出。

**广东长虹：**3 月 3 日发出 2 只样管。

**三、25″ PF（XEA 枪）**

**创维：**2 月 25 日通过样管认证，3 月 10 日通过 20 只小批量认证，3 月 17 日进行 200 只中批量试流。

TCL：3 月 6 日样管认证不合格，3 月 8 日重新发出 2 只样管，3 月 13 日通过样管认证。**厦华：**3 月 1 日通过样管认证，考虑到未来 AK 管的推出，将不安排进行后续认证。

**四、29″ PFCOM**

**厦华：**提高束流后，3 月 9 日通过 100HZ 样管认证，下一步将进行小批量认证。

**五、34″ PF**

**厦华：**2 月 21 日发出 12 只，3 月 7 日进行小批量试流，3 月 17 日老化试验结束，未发现质量问题，已经进入认证报告会签程序。

彩虹营销部
2006 年 3 月 22 日

AUTO PAGE

CONFIDENTIAL – GRAND JURY MATERIAL CHU00505513

# EXHIBIT HH



December 6, 2021

Certification

Park IP Translations

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of: IPP Motion to Compel - Exhibit 15 and IPP Motion to Compel - Exhibit 16

Taylor Vereen

Project Manager

Project Number: BBLLP_1809_019

15 W. 37th Street 8th Floor
New York, NY 10018
212.581.8870
ParkIP.com

Exhibit
Wang 8571
9/20/2022
Wang Zhaojie - V2

# EXHIBIT 15

# Information Weekly

Sales Company
70th Issue
July 9-15, 2005

| | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|
| TCL | 1. In January to June, a total of [illegible] million, [illegible] million and 1.[illegible] million sets of CTV were produced, sold and exported, with a decrease of [illegible]% and [illegible]% respectively, compared with the same period last year.<br>2. Among them, a total of [illegible] million sets of 21"FS were produced, with a relatively large year-on-year decrease of [illegible]%. A total of 0.[illegible] million sets of 25"FS were produced, which was almost the same as that in last year. [illegible] million sets of 29"PF were produced, with a year-on-year increase of [illegible]%.<br>3. A total of 0.[illegible] million sets of 21"FS were exported, with a year-on-year decrease of [illegible]%. A total of [illegible] million sets were sold overseas, accounting for [illegible]% of total output. | 1. On July 14th, TCL Multimedia Group issued an announcement that they incorporated sales and marketing [illegible] of TCL-Thomson Electronic Limited (TTE) in the North America and Europe held by Thomson at a price of [illegible] million Hongkong dollars.<br>2. From July [illegible] to July [illegible], a large environmental promotion campaign of "I consume and I am environmental—recycling electronic waste in your home" was brought out in each store of Suning and TCL in Beijing. Consumers who have an old color TV at home can buy any new electrical appliance at Suning at a discount by using the old color TV. Among them, consumers who want to buy a TCL color TV can get a discount of [illegible] Yuan to [illegible] Yuan depending on the depreciation condition. Old electrical appliance purchased by Suning and TCL will be sent to a nationally approved old electrical appliance recycling organization for harmless treatment, for which TCL may pay about one million Yuan, taking its responsibility as the world's largest color TV manufacturer. | 1. The priority is given to [illegible] partners, Thomson and [illegible], for purchase of color picture tube;<br>2. A great target is given by OEM department for [illegible] of [illegible] 21"FS [illegible];<br>3. It's required by "[illegible]" software system of TTE company that the supplier should deliver the goods according to the specified time and place, which hasn't been satisfied by [illegible] at present;<br>4. There are frequently [illegible] phenomena for handling of returned tubes;<br>5. [illegible] is ranked second for market share, which is only second to Thomson. | In July, Shenzhen Samsung transformed 29" compatible line body and planned to produce 29" tubes with a shorter [illegible]. |
| Skyworth | 1. It has been officially announced by Skyworth Digital a few days ago that Zhang Xuebin, executive director and president of color TV division, succeeded Wang Dianfu as CEO and Wang Dianfu will only serve as the chairman of the board of directors. Zhang Xuebin, new CEO of Skyworth, denied that Skyworth had evaded tax of [illegible] billion Yuan which was quite inconsistent with the facts.<br>2. It has been officially announced by Skyworth that they will commence production in this week. | 1. A discount of 40% was given to Tongfa special machines and Konka was withdrawn from Suning and no improvement was made by Suning, the price of flat panel LCD TV was continuously decreased.<br>2. The price of TCL 32" was decreased from [illegible] thousand Yuan/set to [illegible] thousand Yuan/set, and the price of TCL [illegible]" was decreased from [illegible] thousand Yuan/set to [illegible] thousand Yuan/set. | 1. Variety and mark of magnetic field of color picture tube for sales overseas should be drawn clearly.<br>2. Supplier of color picture tube of most OEM color TV is determined by the customer in advance. | |

| | | | | |
|---|---|---|---|---|
| **Konka** | | | | |
| **Changhong** | | | | |
| **Hisense** | | | | |
| **Haier** | | | | |

CHO0012439_T

| | | | | |
|---|---|---|---|---|
| | for the early stage are being intensified;<br>2. In this week, three [illegible] were started by [illegible] which were mainly [illegible] 14" and 21" export TV [illegible] | | 2. [illegible] 21"FS (thick) and 21" ([illegible]) made by [illegible] don't match with [illegible] machine core, as they have different pressure difference. If production is planned, it's necessary to increase voltage of high-voltage package at that time;<br>3. There are also quality problems for 29"PF (100Hz) in Hefei [illegible]. Machine core of [illegible] had been taken back yesterday for testing. | 21" light tube and its export volume have exceeded those of [illegible]. Domestic sales of large-screen TV are relatively low. |
| Prima | 1. LCD production amount in this month will hit a new high. 0.1 million sets are planned to be produced; production volume of PDP is very low.<br>2. Supply volume of 34"32" is very low or none. | Customers have little interest in CTV and wait to buy flat panel television with cash in hand. | Products specified in the additional order should be delivered on time. | In the recent three or four months, CRT has been delivered in USD. The price of color picture tube is continuously decreased. |
| Small and medium-sized enterprises in East China | In January to June, a total of 643.43 thousand, 0.6295 million, 112 thousand, and 0.341 million sets of [illegible] color TV had been produced, sold, stocked and exported, with a year-on-year increase of production and marketing of 17% and 4% respectively. Consumed amount of [illegible] tube was increased by 1.88 times on a year-on-year basis and its occupation rate has reached about 25%, raising its rank from the 4th to the 1st together with LG. | On the one hand, air refrigerators are sold well; on the other hand, color TV is hard to be sold. | 1. It's requested that a favorable price should be given to [illegible] 14" and 21"FS (thick) color picture tubes.<br>2. [illegible] started to establish the factory in the last year and several new models were developed by [illegible]. In January to June, they each manufactured 80,000 sets of color TV, using 100% of [illegible] tubes. Hoping to be equally treated as large factories. | LCD manufacturer, LG Philips Company announced on July 11 that they will increase a capital of 2,410 dollars to the subsidiary in Nanjing, China, so as to further expand its production capacity. |
| Suzen | 1. In July, production amount is less than 10 thousand sets. It's predicted to produce 5,000 sets in August.<br>2. At present, as partial color picture tubes are sold at a loss, once the market is [illegible], the price of color picture tube will be increased. Therefore, users may hoard small amount of color picture tubes at a low price in August. | In the Hangzhou home-appliance market, it's very weak. In each day, only 3-5 sets of color TV can be sold, even none. In the weekend, it can be slightly better. Shopping malls are not confident and won't timely pay in complete machine factory, resulting in out of stock of some machines with small and medium-sized screens. | 1. There are returned tubes for Hangzhou [illegible], which should be quickly hauled back to specified trucks as soon as possible.<br>2. [illegible] has a residual payment of more than 300,000 Yuan in the import and export company. Please assist in coordination and transfer it to the [illegible] company for payment. | Manager [illegible] of Novel Color Picture Tube visited Manager [illegible] to discuss about next demand situation for 21"FS with [illegible]. But Manager [illegible] expressed that they have good cooperation with [illegible] at present. We shouldn't be careless and unconcerned and should strengthen [illegible] and services of [illegible]. |
| [illegible] | 1. CT [illegible] [illegible] [illegible] [illegible] | [illegible] | [illegible] | 1. [illegible] predicted [illegible] Color Picture Tube [illegible] |

| | | | | |
|---|---|---|---|---|
| | [illegible] | [illegible] | [illegible] | [illegible] |

CONFIDENTIAL – GRAND JURY MATERIAL [illegible]

# 信 息 周 报

销售公司
第 70 期
05.7.08—7.15.

| | 经营状况 | 彩电市场 | 用户信息反馈 | 行业动态 |
|---|---|---|---|---|
| **TCL** | 1、1-6 月份 CTV 产 467.5 万台，销 524.73 万台、出口 176.9 万台。分别较去年同期减少 2%、7%和 10%；<br>2、其中 21"FS 生产 107 万台同比降幅较大为 50%。25"FS 生产 52 万台同比几乎持平。29"PF 生产 64.7 同比增长了 50%；<br>3、21"FS 出口 59.5 万台同比下降了 53%，外销量 176.9 万台占总产量的 42%。 | 1、7 月 14 日 TCL 多媒体集团发布公告，该公司以 1.071 亿港元收编汤姆逊在 TCL-汤姆逊电子有限公司(TTE)北美、欧洲的销售和市场经营权；<br>2、7 月 13 日至 7 月 31 日在北京苏宁和 TCL 各门店推出"我消费、我环保——回收您家中的电子垃圾"大型环保促销攻势。凡家中有废旧彩电的消费者，都可以到苏宁折价换购任何一款新电器，其中购买 TCL 彩电可根据新旧程度折合 100 元至 500 元不等。而苏宁和 TCL 收购上来的废旧电器，将送到国家认证的废旧电器回收机构进行无害化处理。TCL 为此可能耗资近百万元，承担自己作为全球最大彩电制造商的一份责任。 | 1、采购彩管优先考虑战略伙伴汤姆逊和华飞；<br>2、OEM 部对彩虹 21"FS（粗）不生产感到遗憾；<br>3、TTE 公司"ERP"软件系统要求供应商按规定时间地点交货，目前彩虹还没有达到要求；<br>4、对退货管的办理，常常出现不顺畅的现象；<br>5、彩虹市场占有率仅次于汤姆逊，位居第二。 | 深圳三星 7 月对 29"兼容线体进行改造，将生产 29"短径管。 |
| **创维** | 1、创维数码日前正式宣布，公司执行董事兼彩电事业部总裁张学斌接替王殿甫担任首席执行官，王殿甫仅为董事会主席。创维新任 CEO 张学斌否认创维偷漏税 6.8 亿元，与事实严重不符；<br>2、创维公明工厂本周开工生产。 | 1、永乐特价机 6 折，顺电康佳撤柜，苏宁没有起色；平板液晶电视价格继续走低； 2、TCL32"1.4 万/台降至 1 万元/台，37"从 1.7/台万降到 1.4 万/台。 | 1、外销彩管需要将品种和磁场标识显示清楚；<br>2、绝大部分 OEM 彩电都是由客户事先确定彩管供应商。 | |

CONFIDENTIAL – GRAND JURY MATERIAL

| | | | | |
|---|---|---|---|---|
| 康佳 | 1、1 6 月份彩电产量 292 万台较去年下降 18%，销售 333.5 万台同比减少 6%、出口 91 万台同比下降了 5%；<br>2、第二季度外销彩电 61 万台，较一季度增长了一倍；<br>3、纯平增长，普屏下降例如：21"FS 由 04 年同期 126 万台下降到 05 年的 60.5 万台，下降了 52%，而 21"PF 今年 1—6 月份生产 39 万台，同比增长 31.7%。 | 市场平淡，康佳彩电销售与去年同期 60 万台相比下降了 15%。 | 1、莞康请尽快解决退货管的补退问题；<br>2、香康就彩虹 14"DC15 管专门召开增补协调会，会上要求加快彩虹 14"的认证，小批量试做订单会很快下来。 | 长沙 LG 计划 7 月份 21"线停产 10 天，25"线停产一星期，29"线停产 15 天。 |
| 长虹 | 1、6 月份长虹 CRT 彩电销售总体继续下滑，与去年同期相比（74.2 万台）下降了 31%；整机库存较上月（48.31 万台）增加 6%；<br>2、8 月份内销部分生产减量，只生产 28 万台。 | 1、7 月 8 日到 7 月 11 日创维在成都市区家乐福、人人乐、欧尚、好又多、世纪联华几大超市举行大型的以旧换新活动；<br>2、创维今年的折旧价提升到 300 至 600 元，时间也延长到四天。应对数字信号电视的 16：9 显示格式，创维特推出 16：9 天骄系列参加"模拟电视换数字电视"活动，并且，不论大小，旧电视均按每台 500 元折价换购 16:9 天骄系列。 | 1、要求在发货单上注明长虹的定单号；<br>2、部分 CRT 受潮，目前在跟线，但没有造成太大的不良影响。 | 本周除赛格日立外各彩管厂家业务员均到长虹活动。 |
| 海信 | 黄岛海信生产基本正常，周六、周日正常休息。7 月下旬生产 12 万台左右。 | 1、近日，海信成功地从西门子手中夺回国际知名商标，并在"信誉争新"中击败日本厦普后就证明了中国彩电性价比制胜的势如破竹；<br>2、青岛家电商场主要购买 CTV 特价机，21"FS 699 元，21"PF 899 元，29"PF 1499 元，29"高清 1999 元，这四个品种销的较好。 | 本周使用彩虹管，质量正常。21"PF（新 AK）200 只试流计划安排在 7 月 16 日。 | 1、三星 25"PF（AK），目前，正在海信研发做样管认证；<br>2、三星已来人进行技术支持。 |
| 海尔 | 1、本周生产量有所下降，属正常调整，生产美国的 21"PF（新 AK）出口机正在加紧前期的准备工作；<br>2、合肥海尔本周开三条线生产，主要 14" 21" 出口机。 | 在青岛和合肥家电商场，顾客很少，CTV 彩电和平板电视均销售不畅，但其价格较稳定。 | 1、彩虹 21"（新 AK）样管亮度低，美国工程师已于 15 日飞抵青岛海尔协商；<br>2、合肥海尔彩虹 21" FS（粗）和 21"（新 AK）与海尔机芯不配，压差有别，如果有计划生产，到时需 | 1、LG 和 BMCC 反映彩管销售很困难；<br>2、在合肥海尔 BMCC，三星 21"光管及出口量已大于彩虹，大屏幕 |

| | | | | |
|---|---|---|---|---|
| | | | 调高高压包电压；<br>3、合肥海尔 29″PF（100HZ）也出现质量问题，昨天已将海尔机芯带回测试。 | 内销较小。 |
| **厦华** | 1、本月LCD生产量将创历史新高，准备生产10万台；PDP产量很少。<br>2、34″32″供货量很少或是没有供货。 | 顾客对CTV兴趣不大，对平板电视持币待购。 | 增加订单要按时到货。 | CRT近三四个月全是美元供货，彩管价格不断下滑。 |
| **华东中小户** | 1 6月份熊猫彩电产64.343万台、销62.95万台、存5.12万台、出口34.1万台，产销同比分别增长11%、4%，彩虹管用量同比增长了1.56倍，其占有率已达25%左右，由第四位升至为并列第一位（LG）。 | 一边空调热，另一边彩电凉。 | 1、要求彩虹14″和21″FS（租）彩管给予较优惠价格；<br>2、江奎去年开始建厂，无锡新东开发了几个新机型，1～6月份彩电各生产8万台，100%用彩虹管，希望享受大厂平等待遇。 | 液晶显示器制造商LG飞利浦公司7月11日发布公告，表示将增资2410美元给中国南京的子公司，以进一步扩大产能。 |
| **数源** | 1、7月份生产不足3万台，8月份预计生产0.3万台；<br>2、目前，因彩管部分品种在亏本销售，一旦市场启动，彩管会涨价，所以，用户在8月份有低价少量囤积彩管的可能。 | 杭州家电市场非常淡，每日卖出3 5台彩电，有时甚至一天卖不出一台，双休日稍微好一点，商场也没有信心，不给整机厂及时付款，致使有些中小屏幕机子断货。 | 1、杭州金利普有退货管，请尽快指定车拉回；<br>2、金利普在进出口公司有RMB30多万余款，请协查并转到销售公司抵货款。 | 永新范经理拜访孙总。与金利普商议下一步21″FS需求意向，但孙总表示，与彩虹目前合作良好。我们也不要麻痹大意，加强金利普的攻关和服务。 |
| **综述** | 一、上半年整机厂CTV产销出口呈现三大特点：<br>一是总体指标下降，1～6月彩电7大厂家CTV产1226.18万台，销2012.08万台，出口516.96万台，同比分别减少11%、4%和34%。<br>二是三巨头纷纷落马：1、产量：康佳和长虹同比降幅较大分别为19%和51%；2、销量：TCL、 | 7月份以来，长虹、创维和TCL等厂家纷纷强势出击彩电"以旧换新"，得到了许多消费者的认可和响应，一是激活了彩电淡季的市场，提高其品牌市场占有率，加速彩电的更新换代；二是提高消费者对数字电视和平板电视等高端产品的认知水平；三是有利于掌握消费者的购买心理，为厂家下一步调整产品结构提供了第一手资料。 | 1、彩虹21″（新AK）精管[illegible]度低，美国工程师已于15日飞抵青岛海尔[illegible]。<br>2、TTE公司"KRT"软件系统要求供应商按规定时间地点交货，目前彩虹还未[illegible]有达到要求。<br>4、外销彩管需要新品种和新标签[illegible]；<br>1、绝大部分OEM彩电都是 | 1、上海永新[illegible]十[illegible]线投产，试作21″FS和25″[illegible]（AK）。<br>2、永新[illegible]拜访孙总，与金利普商议下一步21″FS需求意向。 |

| | 康佳和长虹同比降幅分别为 7%、6%和 45%；3、出口量：长虹同比降幅 108%。<br>三是海尔和熊猫逆势呈强：05 年上半年海尔 CTV 产、销和出口分别同比增长 15%、15%和 55%；熊猫 CTV 产和销同比分别增长 11%和 4%。 | | 由客户事先确定彩管供应商。<br>5、中小用户希望在淡季享受大厂平等待遇。 | |
|---|---|---|---|---|

# EXHIBIT II



STATE of NEW YORK )
)
COUNTY of NEW YORK ) ss:

**_CERTIFICATE OF ACCURACY_**

This is to certify that the attached document, *"CHU00124400E - CHU00124402E"*, originally written in *Chinese*, is to the best of our knowledge and belief, a true, accurate and complete translation into *English*.

Dated: March 27, 2019

Seth Wargo
Consortra Translations

Sworn to and signed before ME this 27th day of March, 2019.

Notary Public

JAMES G MAMERA
Notary Public - State of New York
NO. 01MA6167195
Qualified in New York County
My Commission Expires Dec. 4, 2022

Exhibit
Wang 8572
9/20/2022
Wang Zhaojie - v2

Your legal translation partner

# INFORMATION WEEKLY

Sales Company
Issue No.: 74
05.8.06. – 8.12

| | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|
| TCL | The total sales of TCL colour television [illegible] by 7% in the first half of the year. In order to change the adverse condition, much efforts have been made in June and July to increase the export of colour TV to overseas markets and explore new markets, thus making overseas sales of colour TV exceed one million in July. The overseas business of TCL exceed that of the local market. | 1. TCL announced on August 11 that TCL Multimedia Technology Holdings Ltd. (now called TCL Electronics Holdings Limited) and Thomson Company of France had implemented the "Share Option Agreement". 2. The flat-screen LCD TV of TCL has all landed in Brazil, Mexico, Argentina and other South America areas and has become the main sales channel of colour TV. | 1. Please confirm with TCL about the delivery of the defective [illegible] at Thailand: (1) Whether all the expenses to be borne by "Cai Hong"; (2) Whether the agent to be appointed by "Cai Hong" and under arrangement for shipment. 2. There are quality phenomenon on the 14" (local sales). Factory site has been feedback and after-sales strategy has been analyzed in this regard. | |
| Skyworth | Skyworth mainly produced high-end colour TV in the first half of the year. The super- and large-screen TV account for almost half of the production. However, the low average price in the country and the demand for small screen TV still has [illegible] in remote areas. Recently, relative [illegible] efforts has been made for promoting 21" FS and the results is apparent. It is expected that [illegible] demand is quite [illegible] for low priced colour TV in rural areas. | 1. Skyworth recently came to the [illegible] areas. It will jointly organize [illegible] cultural shows with the theme of "Love for Skyworth Cultural Movement" together with CCTV in this week. The aim is to expand the markets in the third, fourth [illegible] cities and villages and towns. Before this, Skyworth has begun a TV [illegible] among all the rural customers. | 1. In August, Skyworth is ready to start [illegible] the colour TV production process. At present, [illegible] have been classified. 2. To deal with the problem during production related to the magnetic [illegible] of 21" PF brought forward by Skyworth. After discussion, the problem will be solved in two ways: (1) Skyworth shall improve the existing [illegible] equipment; (2) Cai Hong shall compensate for the affected production (to be determined). | |
| Konka | Konka is preparing for supplying colour TV for National Day. At present, the inventory is relatively [illegible]. In this week, production will be carried out in full capacity accordingly. As the [illegible] market of colour TV has not been launched, the sales of colour TV of Konka is only so-so. | 1. Konka has completed the development of the [illegible] specifications of 17" to 42" LCD and plasma flat-screen TV. 2. After receiving the order of 30,000 sets of colour TV from Canadian recently, it signed a contract with American home electrical appliance chain company Best Buy for supplying 30,000 sets of LCD TV, thus making a record of the single largest export order. | 1. From August, the required [illegible] will be deducted from the settlement bill, and require Cai Hong to replace all the "[illegible]" [illegible] before the end of month. 2. The delivery date for overseas order of 17" shall be postponed from the original 8th day to the 10th day. 3. Hope to provide information about the 17" PF Cai Hong [illegible] corresponding [illegible] yield. | |

| | | | | |
|---|---|---|---|---|
| | | | | |
| Changhong | 1. Production is basically normal. As restricted by the scale of acceptance by bank, payment will shall be made by [illegible] hereafter. 2. The scheduled production is [illegible] the [illegible] of Changhong. | 1. Changhong gradually shifts from traditional home electrical appliance enterprise to personal [illegible] products and technology, contents and service provider. "World Brand Laboratory" reported that the annual revenue, brand additional value index and brand strength index of Changhong have great increase when compared with those in the same period last year. 2. The overall sales of CRT TV of Changhong has no significant change, but the sales of flat screen TV has a trend to rise and sales of 3 types of flat screen TV has been arranged at some of the first 3 and first 5 [illegible] in Sichuan. | There are [illegible] [illegible] [illegible] Cai Hong 21" FS | In the [illegible] the sales personnel of [illegible] CRT manufacturer will attend [illegible] at Changhong. |
| Hisense | Production volume in August doubled compared to that of July. Currently all subsidiaries are in normal production. Hisense Huangdao will be closed on Sunday and be open on the end of the days. | In this week, the sales volume of CTV was similar to that of last week, with some of improvement in the rural area. Currently the sales volumes of 21" FS, 21" PF, 29" PF (HD) were similar to those of last week, with little fluctuation in the [illegible] of CTV. Sales of flat panel was better than that of last week, the reason being the Beer Festival to be held by Qingdao. | 1. Hisense's purchasing department suggested that in view of the high demand, IRICO is hoped to arrange shipping appropriately lest that production be affected. 2. The CDTs used this week were of normal quality. Trial run of [illegible] Huanghe 21" PF (New A02) when passed. On the 12th batch production of 500 pcs will be carried out. | It was learnt that Shanghai's [illegible] quote of 29" PF to Hisense was USD 54.[illegible] |
| [illegible] | 1. Normal production and stable operation. Slight increase in production volume of two models of 21" and 25" outside screen, other than that everything is normal. 2. Three [illegible] has 9 production lines running and will remain so for 1 week. The production volume will increase and the market will see upward trend, with increasing volume of CRT and new models. | 1. Sales condition is rather low, with a decreasing trend compared to the previous week. There has not been sudden boom in sales. The quantity of regular flat screen TV is low and the majority are flat-screen TV and flat panel display TV. As far as volume is concerned, 21" flat screen TVs sell well. 2. It remains an optimistic attitude towards the market. No [illegible] what will happen next. Currently one is still replenishing supply. If the market turns well during the National Day holiday, one will be confident at the end of the year. | IRICO 21" PF has been recognized from US customers and supply can be commenced. | There has been serious shortage in Changhong Picture Tubes supply [illegible] [illegible] |

| | | | | |
|---|---|---|---|---|
| PRIMA | This week, PRIMA's CRT and LCD have been in production at full capacity, but its PDP production was still very low. At present, the stock level of PRIMA is very low, with no serious funding issues. All the goods for export used to be delivered before September 15. | 1. PRIMA's CRT and LCD have been in production at full capacity, but its PDP production was still very small. At present, the inventory of PRIMA is very small, with no [illegible] fund flows severe problems. All the goods for export would be delivered before September 15. 2. The market of color TV is still weak, basically seeing no change of price. | The orders for September shall be finalized as soon as possible so that the application [illegible] could be [illegible] accordingly. | Samsung has provided PRIMA with 21" short-neck sample tubes and is promoting them actively. |
| Panda | According to Nanjing Panda Sales Company, the 21" FS TV sets are selling well currently and its production planning was added in August. | The best-selling TV sets on the Nanjing market this week were mainly 29" PF 101 and 21" FS TV sets, but sales did not differ much from last week, and prices did not change. | Wang Yonlong reported that [illegible] of the 19 inch export tubes be returned to the factory for replacement. | Nanjing Huafei halted production due to high temperature from 18 to 20 August [illegible] |
| Small and Medium-sized Manufacturers in East China | In order to achieve the annual target of 900,000 sets, Soyea has increased production in the second half of the year and started to mobilize its funds, and planned to produce about 60,000 sets per month from September. | 1. The market has not improved, but dealers have shifted their purchase from summer appliances to stock of TV sets. 2. According to Mr. Zhang, a department director in Soyea and Mr. Tong, a [illegible] chief in Soyea, the market conditions showed no sign of recovery in the second half of the year, but on consideration of the realization of the production target for the whole year, it is necessary to increase production by purchasing color tubes. | 1. The returned tubes from Hangzhou Jinling shall be picked up as soon as possible. 2. UNTAR requested that the freight denominated in RMB be converted into US dollars quickly and then remitted to the designated account. | 1. Shanghai Yuan does not have much stock of 21". 2. Shanghai Yuan has expanded its production plan of 21" PF which halted. 3. [illegible] [illegible] the 29" PF line of Shanghai Yuan would produce 29" PF, and 8000 units of 21" PF have been produced this [illegible]. The production of 21" FS and 19" FS have been terminated. |
| Summary | The reasons for TV set manufacturers' full-capacity production of color TV sets in August are as follows: 1. The price of color tube has dropped to a historic low. 2. The TV set manufacturers need to complete their annual production target. 3. The market price of color TV sets was basically stable in the later period. 4. The color TV sets were positioned to replenish stock for the traditional peak season in August. | 1. The TV set manufacturers and dealers of color TV sets are rapidly replenishing their stocks to [illegible] and [illegible] [illegible] color TV promotion activities. 2. Although there are signs of improvement in the market of color TV set whether it would be prosperous depends on the economy trend and fund recovery of the TV set manufacturers in September. 3. According to the special research results of the Development Research Centre of the State Council, it is estimated that the total demand for color TV sets in rural market this year is 15.8 million, which has started to exceed the total demand in the urban market. | 1. The Samsung Tubes used by Hisense this week were with normal quality. 300 sound units of Hisense Disc 21"PF (Bare AK) have been qualified, with 800 units being produced [illegible]. 2. Random 21"PF has been approved by US customers and would be supplied. 3. The Purchasing Department of Hisense suggested that, in view of the large demand in the near future, the shipment of Random Tubes shall be arranged well for its production not to be affected. | 1. The supply of CPT in Haier has delayed significantly. 2. Shanghai Yuan does not have much stock of 21", it has increased production plan of 21" PF which halted. After [illegible] the 29" PF line would produce 29" PF and 8000 units of 21" PF have been produced [illegible]. The production of 21" FS and 19" FS have been terminated. |

# 信 息 周 报

销售公司
第 74 期
05.8.06. —8.12.

| | 经营状况 | 彩电市场 | 用户信息反馈 | 行业动态 |
|---|---|---|---|---|
| TCL | TCL 彩电销售总量上半年下降 7%，为了扭转不利局面，6 至 7 月份加大了彩电出口的力度，并开辟了新的市场，使得彩电海外销量 7 月份突破了百万大关，，TCL 海外业务现已超过国内业务； | 1、TCL8 月 11 日公告称，子公司 TCL 多媒体已按此前与法国汤姆逊公司达成《换股选择权协议》的实施 ；<br>2、TCL 的平板液晶电视已全线登陆巴西，墨西哥，阿根廷等南美地区，并进入当地彩电销售的主流渠道。 | 1、TCL 关于泰国不良管的发运请确认：<br>（1）是否所有费用由彩虹承担；<br>（2）是否由彩虹指定代理并安排装运；<br>2 、14″（内销）出现打火现象，已分别反馈一厂及售后进行对策分析。 | |
| 创维 | 创维上半年彩电生产主做高端，其中纯平和大屏幕占比近一半，然而，现低收入层占比较大，偏远地区对小屏幕彩电，还有较大的需求潜力。最近对 21"FS 促销力度较大，效果明显，预计后期在农村彩电市场低价位的电视机需求量较大。 | 1、创维最近将目标瞄准农村市场，本周将联手 CCTV 举行数场主题为"创维情·文化行"的系列文艺义演活动。该活动旨在扩大农村三四级城市和乡镇市场。此前，创维还专门推出一系列针对农村消费人群的电视机。 | 1、创维 8 月份准备启动外协加工厂生产彩电，现暂确定 4 家工厂；<br>2、处理创维提出的 21"PF 贴磁块影响生产问题；<br>经沟通后从两方面解决：（1）创维对现有吸盘设施进行改进；（2）彩虹对影响生产进行适当补偿（待定）。 | |
| "康佳 | 康佳彩电正在为国庆节备货，现彩电库存较小，本周按计划满负荷生产，因彩电终端市场还未启动，所以，康佳彩电销售一般。 | 1、康佳平板电视产品完成了从 15 寸到 42 寸各个规格的液晶电视和等离子电视的开发；<br>2、获得家乐福 3 万台彩电 订单之后，近日又与美国家电连锁零售商 Best—buy（百思买）签订了 5 万台液晶电视供货合同，创下了国内平板彩电出口最大单项订单纪录。 | 1、8 月份起，其退货管将从结算单中扣除，要求彩虹在月底前将莞康的退回管补齐；<br>2、外销 15"原交货时间由 8 号可延迟到 10 号；<br>3、希望提供 15"PF 彩虹管相对应磁场的管型情况。 | |

| | | | | |
|---|---|---|---|---|
| | | | | |
| 长虹 | 1、生产基本正常：受银行承兑规模的限制,以后付款仍为现汇。<br>2.、长虹出口量按计划生产较平稳。 | 1、长虹逐步从传统家电企业向个人消费电子产品与技术、内容和服务供应商转型。世界品牌实验室强调，长虹年业务收益额、品牌附加值指数及品牌强度系数，和比去年同期，均出现较大幅度的增长。<br>2、长虹 CRT 电视销售总体上没有较为明显的变化，但是平板销售有上升势头，并已在四川部分二、三级农村市场投放三种型号的平板电视销售。 | 彩虹21"FS出现白场不均的现象。 | 本周各CRT厂家业务人员均到长虹活动。 |
| 海信 | 8月份生产比7月要增加1倍，目前各个分工司都已恢复正常生产。黄岛海信星期日休息，其他时间正常上班。 | 本周彩电销售与上周持平，农村市场有转好的迹象，目前21"FS、21"PF、29"PF（高清）销售与上周持平，CTV的价格变化不大。本周平板销售比上周要好，原因是青岛要举办啤酒节。 | 1、海信采购部提出，鉴于近期需求量较大，希望彩虹安排好发货，避免影响生产；<br>2、本周使用彩虹管，质量正常。黄岛21″PF（新 AK）200 只试流已合格，12 日做 800 只批量生产。 | 据了解上永给海信 25"FS 报价 34.5 美元。 |
| 海尔 | 1、生产正常。经营稳定，21"两个品种，25"普平，产量都有小幅增加，其他正常。<br>2、合肥海尔九条线生产，一周不休息.产量加大,市场略显上升.用彩虹管数量加大。品种增多。 | 1、市场销售依然不旺，和上周相比，基本持平，没有出现突然旺销的现象，商场普平电视不多，纯平和平板占主要的位置，从量上来说，21 寸纯平销得较好；<br>2、对市场谨慎乐观，心里没底。目前积极补库。如果国庆市场好起来，年底就有信心。 | 彩虹21″PF美国客户已经认可，可以供货。 | 中华映管在海尔的供应量明显萎缩。 |

| | | | | |
|---|---|---|---|---|
| **厦华** | 本周厦华 CRT、LCD 都在开足马力生产，PDP 生产量仍很少；目前厦华的库存很少，资历金状况仍十分困难；9 月 15 日以前外销的货都要出完。 | 1、厦华 CRT、LCD 都在开足马力生产，PDP 生产量仍很少；目前厦华的库存很少，资历金状况仍十分困难；9 月 15 日以前外销的货都要出完。<br>2、彩电市场仍十分清淡，彩电的价格基本未动； | 尽快谈定 9 月份订单，以便尽快办理结转申请表。 | 三星已向厦华提供 21"短管颈样管，正在积极促销。 |
| **熊猫** | 据南京熊猫销售公司反映目前 21"FS 电视机很好销售，8 月份追加了其生产计划。 | 本周南京市场上的电视机好销品种主要是 29"PF 高清、21"FS 电视机，但是销量与上周相差不大，价格也没有变化。 | 无锡新东要求把 14 寸 832 只（出口管子）退货管拉回厂退换。 | 南京华飞 8 月 1 日至 8 月 5 日放高温假。 |
| **华东中小户** | 数源为完成全年 60 万目标，下半年加大产量，着手调动资金，从 9 月份起计划每月生产 6 万台左右。 | 1、市场没有好转，但经销商已将资金从夏用电器转向电视机备货采购；<br>2、据数源张部长，田科长认为：下半年市场不容乐观，但考虑到全年生产目标的实现，增量采购彩管，加大生产量，非常必要。 | 1、杭州金利昇有退货管请尽快拉回。<br>2、优势达要求速将运费人民币转换成美元后，汇到指定账户。 | 1、上海永新 21"库存不多；<br>2、上海永新加大了 21"PF 生产计划，但其不过关；<br>3、上海永新 29"FS 线，经改造可生产 29"PF，21"PF 试作了 8000 只，21"FS 和 25"FS 已正常生产。 |
| 综述 | 8 月份整机厂开足马力生产彩电的原因：一是彩管价格已降到历史低位；二是整机厂为完成全年生产目标；三是彩电市场价格后期基本稳定；四是为 8 月份传统旺季增补库存。 | 1、整机厂和彩电经销商正在快速批量补充货源，并采取形式多样的，且具规模的彩电促销活动；<br>2、彩电市场虽然有好转迹象，但研判后市是否旺销关键要看 9 月份整机厂的库存动向和资金回款情况；<br>3、据国务院发展研究中心专项据调研结果显示：预计今年农村彩电市场电视机的需求总量为 1560 万台，开始超过城市市场需求总量。 | 1、海信本周使用彩虹管，质量正常。黄岛 21"PF（新 AK）200 只试流已合格，12 日做 800 只批量生产。<br>2、彩虹 21"PF 美国客户已经认可，可以供货。<br>3、海信采购部提出，鉴于近期需求量较大，希望彩虹按排好发货，避免影响生产； | 1、中华映管在海尔的供应量明显萎缩；<br>2、上海永新 21"FS 库存不多；加大了 21"PF 生产计划，但其不过关；29"FS 线，经改造可生产 29"PF，21"PF 试作了 8000 只，21"FS 和 25"FS 已正常生产。 |

# EXHIBIT JJ



  

# CERTIFIED TRANSLATION

*Documents Translated For:*

| Name: David Y. Hwu | Street Address: 706 Sansome Street |
|---|---|
| Firm: Saveri & Saveri, Inc. | City/State/Zip: San Francisco / CA / 94111 |

*Description of Document(s):*

CHU00124417E - CHU00124419E

| Source Language: SIMPLIFIED CHINESE | Target Language: ENGLISH |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:** Sean Kirschenstein, Director **Date:** February 21, 2019

A copy of the translated version(s) is attached to this statement of certification.

On Feb.21, 2019

Exhibit Wang 8573 9/20/2022 Wang Zhaojie - V2

Internal Material
Confidential

# Information Weekly

**Marketing Department** **Issue 109** **2006.5.8 - 2006.5.14**

| Factory | User information |
|---|---|
| General information | 1. Suffered a great depression after the "May 1 [Labor Day]" holiday in the color television market, various color television factories decreased volume one after another in their production plans in May; 2. TCL delivered poor sales volume with poor financial returns, IRICO has a high inventory of CRTs, one month production suspension at the Chengdu factory; 3. Quality issues occurred in CRTs from Konka, Hefei Haier and Xoceco ; 4. The 21" small DY is undergoing sample tube certification at TCL and Hisense; 5. Changhong launched a series of "Build a New Countryside, Changhong Joyful Journey" activities, and began to launch and operate the third and fourth tier markets. Changhong plans to gradually increase its volume from July to ensure the planned output for the entire year; 6. Samsung has already accepted Hisense and Haier as its key strategic partners. Last week, He Houmu from Samsung paid a visit to Hisense and discussed the collaboration during the later period. |
| Overseas | 1. An order of 44704 units from SHIVAKI has been processed to arrange inland transportation and shipping. During the past two or three months, SHIVAKI enjoyed the most normal operation, enabling a loan payment and on time shipping as scheduled on a basic basis with a relatively large volume and a complete variety of products.<br>2. During the recent period, the sales volume of SOKOL has been increasing steadily, which is noteworthy. In 2005, SOKOL had purchased CRTs of 21" thickness from IRICO, which was interrupted by poor material resources. Now it has been purchasing CRTs from SEG Hitachi; it plans to mobilize its certification and purchase of IRICO CRT models of 21" thickness.<br>3. 3. A total of 30,000 units of 21" thick and 21" PF from START have been waiting for shipment in Shanghai for many days; it had originally been planned to complete the shipping at the beginning of this month, but the payment is still pending, which is said to be a result of the general election in Ukraine. Therefore, we should |
| TCL | 1. Low sales volume, poor financial returns, with a comparatively high CRT inventory of about 70,000 - 800,000 units;<br>2. One-month suspension of production at the Chengdu factory;<br>3. The sample tubes of the small coil 21" thick have been installed on the prototype on May 12;<br>4. 4. During the "May 1" festival, TCL sold nearly 6000 LCDs, which is better than PDP. TCL believes that the LCD market is in an increasing trend, and the ascending trend of LCDs in Europe is greater than domestically in China. TCL expects LCDs to undergo rapid growth. |
| Konka | 1. A small batch of 32 units of 15" PFAK32 has undergone a pilot run on May 7 in Guankang, which were presented in good condition;<br>2. It is reported from Konka's U. S. customers that the 15" PF has an issue of barrel distortion, and IRICO technical personnel are investigating and negotiating countermeasures with Shenzhen Konka R&D personnel. It plans to borrow a core unit and the signal test disc from Konka R&D, and to confirm whether there is any issue on the sample tube, then send a sample tube directly from Xianyang to Konka's Shanghaifor customer's further confirmation (a sample unit left in the last sample that was provided has not yet been sent to the U. S., and the core unit is still available);<br>3. Hong Kong Konka Customs Group requested that all of the used quantities and retained quantities of the "Application Form for Deep Processing Carry-over for the Goods Export Zone of the Customs Export Processing Zone" which were confirmed to be archived by customs in the countries of both parties should be provided;<br>4. In response to the request by Konka Components for the recall of IRICO 14" north magnetic and 21" FS north magnetic tubes, IRICO will send relevant technical supervisors and leaders from No. 1 Plant and Display management leaders to communicate with Konka's technical department and leaders: (1) IRICO products sold to Konka are still in the introductory period, when the performance of color tubes are still in a running in stage with matching models; (2) IRICO will carry out the experiment according to the requirements on magnetic center and magnetic field of Konka color televisions as soon as possible, and will reply to Konka by May 20; (3) the Guankang 14" and 21" FS inventory tubes will not be cleared and returned to the manufacturer; IRICO should provide a feasible solution to Konka's technical department with regard to the existing issues, and the return process can be closed only after the approval of Konka's management; (4) upon use of the inventory tubes later, IRICO shall send technical engineers to the site to jointly study and resolve problems, and shall ask IRICO to compensate for any impact on the production efficiency of Guankang;<br>5. 5. The sales volume of 29" PF and 29" line by line color televisions were large during the "May 1" Festival; and the sales growth of two models of 25" color televisions was not large, of which the buyers |

AUTO PAGE

| | |
|---|---|
| | are mainly from cities; and the sales volume of two 21" models was mediocre. The flat panel televisions are selling well in the Shenzhen television market, where the prices of 46 inch and 47-inch LCD televisions were decreased to below 20,000 yuan, and the 42 inch and 37-inch LCD televisions were decreased to 14,000 yuan and 10,000 yuan, respectively; some 32-inch LCD televisions were decreased to below 5000 yuan. In addition, the price of 42-inch plasma televisions was also decreased to below 8000 yuan. In addition, high definition televisions have become a highlight of the color television sales. Among them, Konka's new double high definition LCD products have brought in a profit of nearly 100 million yuan in 7 days. |
| Skyworth | 1. 200 units of 21" FS produced during the pilot run using a new FBT high voltage transformer have turned out to be good in quality. The engineering department has placed an order for trials of another 2000 units, which is expected to be arranged on the 16th;<br>2. With the momentum of the "Spring Thunder Action" before the "May 1" Festival for the second time, Skyworth's sales of color televisions have seen a "blowout" growth during the "May 1" Festival Golden Week. According to the statistics, among them, the sales of LCD televisions during the "May 1" Festival have increased by 184.08% compared with the same period of last year, and the sales amount has increased by 153.57%. On May 2, LCD sales increased by 179%, and the amount increased by 193%.<br>3. Skyworth launched a new recordable LCD television with video and wireless technology during the "May 1" Festival Golden Week. This LCD television can support real time recording, background recording and recording timing, using a special multimedia coder and decoder, which ensures the quality of saved program images to match that of a DVD. Also, a wireless blue wave technology suitable for fans is applied, so that a user can enjoy the high-fidelity sound of the program alone through wireless headphones without disturbing his or her family. This technology is planned to be applied to other series of televisions in the future;<br>4. Recently, Skyworth Group has obtained the registration certificate for scientific and technological achievements from the Shenzhen Science and Technology and Information Bureau for its three independent research and development achievements as follows: Skyworth D/A compatible color television receiver, Skyworth digital optical background projection for health, and recordable television technology based on an embedded Linux operating system;<br>4. The Huang Hongsheng Case has entered the stage of statements before the case is closed. Huang Hongsheng's attorney, Lin Bingchang, said that he is expecting that the judgment will be declared before May 15. |
| Changhong | 1. CRT televisions saw the launch of high-end televisions and ultra-thin televisions during the "May 1" Festival and launched the 21" FS television for 599 yuan, but the sales were mediocre, which were the same as the same period in the last year.<br>2. During the "May 1" Festival, Changhong flat panel televisions saw a decrease in prices, enjoying good sales momentum. It is understood that the sales of flat panel televisions during the "May 1" Festival reached 800 million yuan;<br>3. Changhong plans to gradually increase its production beginning in July to ensure the realization of planned production throughout the year;<br>4. Changhong launched the "Build a New Countryside, Changhong Joyful Journey" activity, and began to launch and operate the third and fourth tier markets during this month; meanwhile, it is investing in the storefronts and showcases of the third and fourth tier markets to establish a solid foundation to ensure a stable market share in the rural markets;<br>5. The market in Mianyang City declined greatly after the "May 1" Festival, where the CRT televisions had almost no sales except for some high-end televisions in the Jiafulai supermarket, and the flat panel televisions were stable in sales. Due to the price cut of 32" LCD and 37" LCD, the sales volumes of 34" and 29" IRICO televisions have declined. At present, the sales are in an extremely depressed status in rural markets. Although the price of IRICO televisions has been reduced, there has still not been any increase in sales, and according to the dealers in the third and fourth tier, this situation will continue until August - September.<br>6. We are asking IRICO to send 300 units of 25 PF and 200 units of 25" FS to Urumqi using flexible transportation patterns; the Changhong quality department asked IRICO to reply as soon as possible to the feasibility of "ship back the returned tubes after confirmation from 13 points throughout the country". |
| Hisense | 1. During the second half of May, the production was planned to be reduced by 13,000 units, and a total of 173,000 units of CRT televisions were produced. In general, it depends on the sales volume in the market. During the "May 1" Festival, the sales of color televisions will be around 250,000 units from May 1 to 7, of which 42% will be high end televisions;<br>2. 21" thick small DY has been imported into two models, the sample tube has been installed, and currently prototype testing is ongoing;<br>3. Last week, He Houmu from Samsung paid a visit to Haixin to discuss the collaboration during the later period. Samsung has accepted Hisense and Haier as its key strategic partners.<br>4. 4. The market sales returned to the level before the holiday after the spectacular scene during the "May 1" Festival last week. Facing an undesirable market share, CRT televisions have achieved a very low sales volume, compared with a relatively good sales volume for LCD products. According to the market sales staff, during the "May 1" Festival, 29 high definition, and 34 high definition, LCD, and PDP sold well, while some of Hisense's LCD models were even completely sold out, and the market began to enter the offseason after the "May 1" Festival. |

AUTO PAGE

| | |
|---|---|
| Haier | Qingdao: 1. From June to November, there is an export order for 400,000 units of 21" PF, but it is required to use the original type of tube, and we hope that the IRICO leaders will agree on whether to supply the above units as soon as possible;<br>2. At present, many of Haier's orders for products to be exported to Europe have been rejected due to the increasing prices of raw materials, accessories failing to pass ROSH certification, and for other reasons.<br>Hefei: 1. The consistency of the size and positional deviation of the 14" (bonded) tube rings are strictly limited;<br>2. Depressed sales with very low popularity in various supermarkets. |
| Xoceco | 1. In April, the quality of the IRICO tubes was still outside of the required range, reaching 3200 ppm, although on site personnel were handling issues in a timely manner. The quality of 25" FS has improved, but 21" FS reached 3900 ppm, which is still not ideal. Water exists in some units of the 21" FS that were shipped to Xoceco on the May 7 and May 8, causing rust in the explosion-proof belt;<br>2. 2. The models and quantities supplied by Yongxin to Xoceco have been further decreased. |
| Panda | 1. Panda is currently facing an abnormal situation in production and sales, and is also suffering from an extremely difficult dilemma in its funding situation. It has entered a rectification stage, and thus the production volume in May will be very small;<br>2. Huafei pays special attention to avoiding the risks that may be caused by poor management in Panda;<br>3. 3. After the "May 1" Festival, the Nanjing market will go back to a depressed situation; although some promotional activities are still ongoing, nonetheless the market has returned to the pre-holiday situation. |
| Soyea | 1. Production was very busy last week, and the work hours were extended to 9pm every day, with overtime work on Saturdays;<br>2. 2. The color televisions have suffered an extremely depressed market after the "May 1" Festival, with an average of 3 to 5 units being sold for various television brands every day. |
| Jinlipu | 100,000 units of 14" televisions (among which there were 50,000 units of model 110 and 50,000 units of model 139) and 50,000 units of 21" FS were exported in May. |

AUTO PAGE

内部资料
注意保密

# 信息周报

营销部 第 109 期 2006.5.8-2006.5.14

| 厂家 | 用户信息 |
|---|---|
| 综述 | 1、"五一"节过后彩电市场非常萧条，整机厂纷纷减少 5 月份生产计划；2、TCL 销售不好，回款较差，彩管库存较高，成都工厂放假一个月；3、彩虹管在康佳、合肥海尔、厦华出现质量问题；4、21"粗小 DY 在 TCL、海信正在进行样管认证；5、长虹开展"建设新农村，长虹欢乐行"活动，并在本月开始启动和运作三、四级市场。长虹计划从 7 月份开始逐步上量来保证全年计划产量的实现；6、三星已将海信、海尔作为战略重点合作伙伴，上周三星河侯穆来海信拜访，洽谈后期的合作事宜。 |
| 海外 | 1、SHIVAKI 的 44704 只定单，现已经开始陆续安排内陆运输、船运。近两三个月，SHIVAKI 的运做最为正常，数量相对较大、品种齐备，基本可按计划进行货款支付、实现船运；<br>2、近一段时期，SOKOL 的销量稳步上升，值得注意。SOKOL 在 2005 年曾采购彩虹 21 " 粗，后因资源问题中断、现采购赛格日立的管子；计划动员其对彩虹 21 " 粗新型号进行认证及采购。<br>3、START 的 21 " 粗、21 " PF 共计 3 万只已经在上海等待船运多日，原计划月初完成船运，但目前仍没有落实货款，据说是由于乌克兰国内正在进行大选，此批货物需重点关注。 |
| TCL | 1、销售不好，回款较差，彩管库存处于较高位置，约有 70—80 万；<br>2、成都工厂放假一个月；<br>3、彩虹 21"粗小线圈样管 5 月 12 日装样机；<br>4、TCL"五一"期间 LCD 销售近 6000 台，比 PDP 情况要好，TCL 认为 LCD 呈上升状态，在欧洲 LCD 上升状态要比国内更高，TCL 预计 LCD 将呈现高速增长状态。 |
| 康佳 | 1、内销 15 " PFAK32 只小批量试流 5 月 7 日已在莞康进行，情况良好；<br>2、康佳美国客户反映 15 " PF 存在桶形失真，彩虹技术人员与深康研发与设计师商谈对策：从康佳研发借机芯和信号测试光盘回咸阳确认样管是否无问题，然后从咸阳直接再发一只样管到康佳上海客户确认（上次送样留下一台样机未送美国，机芯还在）；<br>3、香康报关组要求提供双方海关已确认备案的所有"海关出口加工区货物出区深加工结转申请表"已用数量及留存数量；<br>4、针对康佳部品要求清退彩虹 14 " 北磁和 21 " FS 北磁管事宜，彩虹派一厂和股份技术主管领导与康佳技术部门及领导进行交流和沟通：（1）彩虹产品在康佳外销上尚属导入期，彩管性能与机型的匹配还处于磨合期；（2）彩虹将尽快针对康佳彩电的磁心和磁场区域要求做摸底实验，5 月 20 日给康佳回复；（3）对莞康 14 " 、21 " FS 库存管不做清退，但目前存在问题彩虹需提供一个可行方案给康佳技术部门，上交康佳领导审批后方可撤销清退通知；（4）库存管再次上线使用时，彩虹要派技术工程师到现场共同研究和解决问题，并要求彩虹对由此影响莞康生产效率作出补偿；<br>5、"五一"期间 29 " PF 和 29 " 逐行彩电销量较大；25 " 两个品种销量增长不大，主要为城 |

| | |
|---|---|
| | 市消费者；21＂两个品种销售一般。深圳彩电市场平板电视销售较好，46 英寸、47 英寸液晶电视的价格降至 2 万元以内，42 英寸和 37 英寸液晶电视则分别降到 1.4 万元和 1 万元，部分 32 英寸液晶电视甚至跌破 5000 元。此外，42 英寸等离子也跌破 8000 元。另外，高清电视成为彩电销售的一大亮点，其中，康佳双倍高清液晶新品，7 天时间就进账近 1 亿元。 |
| 创维 | 1、21＂FS 使用新的高压包试生产 200 只，效果良好，工程部已下单再试做 2000 只，预计安排在 16 日；<br>2、借助"五一"前再次掀起"春雷行动"，创维在"五一"黄金周期间，彩电销售出现"井喷"式增长。其中表现尤为突出的是液晶电视，据统计 5 月 1 日销量较去年同期增长 184.08%，销售金额增长 153.57%；5 月 2 日液晶销量增长 179%，金额增长 193%；<br>3、创维在"五一"黄金周新上市的带录象和无线技术的可录液晶电视，该液晶电视可支持实时录像、后台录像和定时录像，采用专用多媒体编解码，所保存的节目图像质量媲美 DVD 画质；还具有适合球迷的无线蓝波技术，通过无线耳机即可在不打扰家人的同时单独享受节目的高保真音效。该技术以后将运用到其他系列的电视机上；<br>4、近日创维集团又有三项自主研发的科技成果获深圳市科技和信息局科技成果登记证书，它们是：创维数模兼容彩色电视接收机、创维健康数字光学背投、基于嵌入式 Linux 操作系统的可录电视技术；<br>4、黄宏生案已进入结案陈述阶段，黄宏生代理律师林炳昌称预计 5 月 15 日前将做出判决。 |
| 长虹 | 1、CRT 电视在"五一"期间主推高端电视和超薄电视并推出 21″FS 电视 599 元，但销售情况一般，和去年同期持平。<br>2、"五一"期间长虹平板电视在价格方面进行了下调，销售势头较好，据了解"五一"期间平板电视销售额达 8 亿元；<br>3、长虹计划从 7 月份开始逐步上量来保证全年计划产量的实现；<br>4、长虹开展"建设新农村，长虹欢乐行"活动，并在本月开始启动和运作三、四级市场，对三、四级市场店面和展台进行投入，为在农村市场有个稳定的占有率打下坚实的基础；<br>5、绵阳"五一"节后市场下滑很大，在家福来 CRT 电视除个别高端电视外几乎没有销量，平板电视走势平稳。由于 32″LCD、37″LCD 价格下调，导致 34″、29″CRT 电视销量下滑。农村市场目前销售非常淡，虽然 CRT 电视价格下调，但仍没有销量，据三四级市场经销商反映这种状况会持续到 8—9 月份。<br>6、恳请彩虹采取灵活的运输形式将 25″PF300 只、25″FS200 只发往乌鲁木齐；长虹质量部要求彩虹尽快回复"关于从全国 13 个点运回确认后的退货管"的可行性。 |
| 海信 | 1、5 月份下半月生产计划调减了 1.3 万台，CRTTV 总量为 17.3 万台。总体上来说，要看市场的销售情况。五一期间销售，5 月 1-7 日销售彩电 25 万台左右，其中 42%为高端电视；<br>2、21″粗小 DY 已导入两个机型，样管已装机，目前正在做样机测试；<br>3、上周三星河侯穆来海信拜访，洽谈后期的合作事宜，三星已将海信、海尔作为战略重点合作伙伴。<br>4、上周市场销售经过"五一"市场的火暴后，又恢复到了节前的状态。市场销售不理想，CRTTV 销售很淡，LCD 相对好销一些。据市场销售人员讲五一期间，29 高清、34 高清、LCD、PDP 销的较好，海信的 LCD 部分品种都买脱销了，节后市场开始进入淡季。 |

AUTO PAGE

| | |
|---|---|
| 海尔 | 青岛：1、从6 11月份，有 一个21″PF订单40万台的出口订单，但需要原来型号的管子，需彩虹领导尽快商定能否供货；<br>2、海尔目前出口欧洲的单子，很多由于原材料涨价，配件没有通过 ROSH 认证等原因而不能接单。<br>合肥：1、对14″（保税）管耳环的大小，移位的 一致性要求严格；<br>2、销售平淡，各商场人气很淡。 |
| 厦华 | 1、4月彩虹管的质量整体还是超标，达到了3200ppm，由于有跟线人员在线及时处理问题，25 " FS 质量有所改善，但21 " FS 质量达到3900ppm，还是不理想。5月7日、5月8日两天运到厦华的部分21 "FS存在进水的现象，导致防爆带生锈；<br>2、永新给厦华的供货品种、供货量进一步减少。 |
| 熊猫 | 1、熊猫当前的生产、销售都不正常，资金情况极度困难，处于调整时期，5 月份的生产量会很少；<br>2、华飞特别注重防范由于熊猫经营不善可能带来的风险；<br>3、"五一"节后南京市场又进入低迷状态，一些促销活动仍在继续，但市场又恢复到节前状态。 |
| 数源 | 1、上周生产很忙，每天延班到9点，周六不休息；<br>2、"五一"节过后彩电市场非常萧条，每天各品牌电视机平均卖3至5台。 |
| 金利普 | 5月份出口订单14 " 10万只(110型5万只, 139型5万只)，21 " FS5万只。 |

AUTO PAGE

# EXHIBIT KK

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

- - - - - - - - - - - - - - - - - -

IN RE: )
)
CATHODE RAY TUBE (CRT) )Master File No.
ANTITRUST LITIGATION )07-CV-5944-JST
)
)MDL No. 1917
)
)
)

- - - - - - - - - - - - - - - - - -

DEPOSITION OF WANG ZHAOJIE

HIGHLY CONFIDENTIAL

VOLUME II

Thursday, March 7th, 2019

AT: 9.02 am

Taken at:

Kobre & Kim
6/F ICBC Tower
3 Garden Road
Central
Hong Kong

Court Reporter:

Bron Williams
Accredited Real-time Reporter

A P P E A R A N C E S

Appearing for the Direct Plaintiffs:

STEVEN BENZ
BENJAMIN MARGO
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK
Sumner Square
1615 M Street, NW, Suite 400
Washington, DC 20046
Telephone: 202.326.7929

DAVID HWU
SAVERI & SAVERI
706 Sansome Street
San Francisco, CA 94111
Telephone: 415.217.6810

Appearing for the Indirect Plaintiffs:

MS QIANWEI FU
ZELLE LLP
44 Montgomery Street
Suite 3400
San Francisco CA 94104
Telephone: 415.633.1906

MS LAUREN CAPURRO
TRUMP, ALIOTO, TRUMP AND PRESCOTT
2280 Union Street
San Francisco
CA 94123
Telephone: 415.563.7200

Appearing for the Defendant:

STUART PLUNKETT
BRIAN JACOBSMEYER
KAYLEE YANG
YAN ZHANG
BAKER BOTTS LLP
101 California Street
Suite 3600
San Francisco, CA 94111
Telephone: 415.291.6203

Also present: Inga Kornev
Videographer
Ms Shing Tang (Irico rep)
Ms Guo Xiao Yan (Irico rep)

W I T N E S S I N D E X

Witness Page
WANG ZHAOJIE (affirmed) ..............................7
Examination by MR. BENZ (continued) .......7
Examination by MS. CAPURRO ...........55

E X H I B I T I N D E X

No. Description Page
Exhibit 8414 Extract from Chinese ...................17
Government website

Exhibit 8415 Extract from Chinese ..................23
government website
Exhibit 8416 Bates number ..........................28
IRI-CRT-00001026 - Articles of
association
Exhibit 8417 Announcement of ........................37
self-inspection report

Exhibit 8418 Bates number ...........................43
IRI-CRT-0000232 - 2007 annual
report

Page 6

VIDEOGRAPHER: Good morning. Here begins volume II, media number 1 in the deposition of Wang Zhaojie, in the matter of In Re Cathode Ray Tube (CRT) Antitrust Litigation in the United States District Court, Northern District of California, San Francisco Division, Master File Number 07-CV-5944-JST MDL number 1917.

Today's date is March 7, 2019. The time on the video monitor is 9.02 a.m. The certified video operator today is Inga Kornev contracted by US Legal Support. This video deposition is taking place at Kobre & Kim, ICBC Tower, 3 Garden Road, Central, Hong Kong. Counsel please voice identify yourselves and state whom you represent.

MR. BENZ: Steven Benz from the law firm of Kellogg, Hansen PLLC in Washington DC for the direct purchaser plaintiffs.

MR. MARGO: Benjamin Margo from the Kellogg, Hansen law firm for the direct purchaser plaintiffs.

MS. FU: Qianwei Fu from Zelle LLP in San Francisco for the indirect purchaser plaintiffs.

MS. CAPURRO: Lauren Capurro, Trump, Alioto, Trump & Prescott for the indirect purchaser plaintiffs.

MR. HWU: David Hwu from Saveri & Saveri in San Francisco on behalf of the direct purchaser plaintiffs.

MR. PLUNKETT: Stuart Plunkett of Baker Botts on behalf of the Irico defendants and the witness.

Page 7

MS. YANG: Kaylee Yang from Baker Botts LLP on behalf of the defendant, Irico defendant.

MR. JACOBSMEYER: Brian Jacobsmeyer from Baker Botts LLP on behalf of the Irico defendants and the witness.

MS. SHANG: Shang Ting.

MS. GUO: Xiaoyan Guo.

INTERPRETER: Kuang-Shai Chao. I am the interpreter.

VIDEOGRAPHER: The court reporter today is Bron Williams, on behalf of US Legal Support.

Would the reporter please swear in the interpreters and the witness.

INTERPRETER - Mr Kuang-Shai Chao (sworn)

MS QIANWEI FU - (affirmed) - acting as check interpreter

WANG ZHAOJIE

having been duly affirmed testified as follows:

(All answers were given through the interpreter unless otherwise indicated)

BY MR. BENZ:

Q. Good morning, Mr. Wang.

A. Good morning.

Q. If you could pick up Exhibit 8390, the 30(b)(6) deposition notice.

(Previously marked exhibit 8390 shown to the witness)

A. Yes.

Page 8

Q. Do you understand that among the topics that you have been designated to testify by Irico Group, and Irico Display, you have the topics 1, 2, 7, 8, and 15, correct?

A. Yes.

Q. And do you have an understanding that these deposition topics were initially assigned to Mr. Guo?

A. Yes.

MR. PLUNKETT: One of them was not. But that's okay.

MR. BENZ: Which one?

MR. PLUNKETT: 7.

MR. BENZ: 7 was initially assigned to Guo. I have the correspondence if you would like to see it.

MR. PLUNKETT: It was? Okay. My mistake.

MR. BENZ: This is the correspondence.

MR. PLUNKETT: I already said you were right.

MR. BENZ: Okay.

MS. FU: If the interpreter can speak up, because I can't hear you.

INTERPRETER: Okay.

MS. FU: Thank you.

BY MR. BENZ:

Q. Mr. Wang, when did you first find out that you were being assigned topics 1, 2, 7, 8, and 15?

Page 9

MR. PLUNKETT: Object to the form.

A. (Chinese spoken).

INTERPRETER: The witness is asking to repeat the question.

(Chinese spoken).

A. A while ago.

BY MR. BENZ:

Q. On what day did you find out that you were assigned Mr. Guo's topics?

MR. PLUNKETT: Object to the form.

A. A while ago.

MR. BENZ: What is the basis of your objection?

MR. PLUNKETT: Object to the form. One basis is that he doesn't have a translation in front of him. So I think it is inherently confusing to be asking him about topics where he doesn't have a translation, but I just said object to the form.

The other basis is I don't think they are Mr. Guo's topics. They are topics that were, you know, Irico was noticed, not Mr. Guo, and many of the topics are not ones that Mr. Guo testified about in his declaration. So all of that.

BY MR. BENZ:

Q. On what day, Mr. Wang, did you begin your preparation to testify on topics 1, 2, 7, 8, and 15?

Page 74

sell?

A. It was a very short period when we make CDT. I forget -- I cannot recall exactly whether it is 14 inches or 15 inches. I cannot recollect very clearly. All I remember is we just did one product. Maybe it is a pilot product, then we made a necessary adjustment, and then before long we shut down that assembly line.

Q. Do you recall when Irico started manufacturing CDTs?

A. It was too long ago, I don't remember.

With regard to CDT it was a little bit complicated because it was very short, and if the beginning it was just a pilot plant, and then the quality was not very stable, so we shut it down.

So remember we also make 29-inch CDT, but it was also very, very short period, and then the assembly line also closed.

Q. You testified earlier that Irico Group had many, many specifications. Was it part of your job to have an understanding of the different types and specifications of CRTs that your customers may need?

MR. PLUNKETT: Object to the form.

A. (Chinese spoken).

INTERPRETER: The witness has asked me to repeat the question.

Page 75

(Chinese spoken).

A. Yes. Yes, I do need to know whether the customer needs 21-inch or 25-inch, for example.

BY MS. CAPURRO:

Q. Are you familiar with the term bare tube?

INTERPRETER: Let me verify the "bare tube."

BY MS. CAPURRO:

Q. Are you aware that some tubes are sold with a deflection yoke, and they are referred to as ITC tubes?

A. I don't --

MR. HWU: I would like to make a correction. Deflector yoke. (Chinese spoken). (Chinese spoken).

MS. CAPURRO: Sorry, David, it is deflection yoke. Not deflector yoke.

MR. HWU: My mistake.

In which case I would like to make a correction --

A. (Chinese spoken).

MR. HWU: (Chinese spoken).

A. (Chinese spoken).

MR. HWU: Yes.

A. Yes, I do know that. Deflection yoke.

BY MS. CAPURRO:

Q. Just to be clear, you are saying you know what a deflection yoke is, is that correct?

A. Yes, I do know the (Chinese spoken).

Page 76

Deflection yoke. (Chinese spoken).

MR. HWU: Yes.

A. Yes, I do know this deflection yoke, yes.

BY MS. CAPURRO:

Q. So you are aware that some tubes are sold without one, and they are referred to sometimes as a bare tube. B-A-R-E, bare.

A. There are two major components for CRT or for color tube. The first part is the glass, called a glass shell. The second part is a deflection yoke.

Q. Did Irico sell tubes without a deflection yoke?

A. Could you repeat your question one more time?

Q. Did Irico sell tubes without a deflection yoke?

A. I don't know. I don't know if without a deflection yoke, I don't know how the customer is going to use it.

Q. What is the deflection yoke?

A. I cannot describe the detailed technical part, but I can generally describe it.

For display tube there is a glass part. And then on top of this glass tube there was the so-called cover shell (Chinese spoken) --

MR. HWU: I would like to make a correction, the

Page 77

English term is shadow mask.

A. There is a cone made of glass, at the back. And behind the cone there is a so-called electronic gun. Will provide electricity or power. Then the electronic gun will eject so-called electronic beams. Project a beam of electron. So the deflection function is to make those electrons shoot on the shadow mask. So the function or the purpose of deflection yoke is to make sure that the electrons projected from -- through the electronic gun will at precisely heat the area on the shadow mask. Because I'm not a technical person, this is based on my personal understanding throughout the course of my work.

BY MS. CAPURRO:

Q. That's okay. That's all I want, is your personal understanding, and I appreciate you taking the time to give us such a detailed explanation?

A. It is okay.

Q. Were there different types or specifications for deflection yokes?

A. That's a technical issue. I don't know, because I'm only responsible for sales.

Q. So if a customer requested one type of deflection yoke over another you would not have dealt with that, is that correct?

MR. PLUNKETT: Object to the form.

A. I was not in charge of the technical issues, and I also have no knowledge about the technical background. We have a specialized technical team who deal with it, and also they would not pass the information to me.

BY MR. BENZ:

Q. So would the specialized technical team that you refer to, would they have dealt directly with the customer, if they needed a specific type of deflection yoke?

MR. PLUNKETT: Object to the form.

A. I don't know what is the meaning of this question. We don't -- I really have a literally called professional team. But this is just an issue of size, right?

Because different product code will refer to different DY, or so-called deflection yoke. There are many, many codes for deflection yoke. In the beginning we used a larger one and later on we changed to small one, and sometimes we even use the code AK.

BY MS. CAPURRO:

Q. What did AK stand for?

A. I just know AK. I cannot remember what AK stands for because it was too long ago.

Q. Okay. Fair enough. Do you recall that the deflection yoke was added to the tube at the end of the manufacturing process?

MR. PLUNKETT: Object to the form.

A. Your question is relevant to the craftsmanship. This is the part I'm not very familiar.

BY MS. CAPURRO:

Q. Okay. Yesterday you testified that when you were director in the sales department at Irico Group you managed all sales-related business, and you supervised 20 to 30 sales reps, and that they would submit sales reports to you. And those reports contained market information. And market intelligence. What types of market information would those reports contain?

MR. PLUNKETT: Object to the form.

A. (Chinese spoken).

INTERPRETER: (Chinese spoken).

A. For sales rep management, we have a request all the sales rep to provide or submit weekly report. This report basically contained market information. Mainly for market information.

BY MS. CAPURRO:

Q. What types of market information would these reports contain?

A. We just broadly, generally request all the sales rep to provide market informations. So they will go to the market and they will provide that feedback with regard to whatever they feel it is market information.

Q. Would the market information include information about our customers?

A. Yes, sometimes they do provide customers information, but we just ask the sales rep to provide market information. So they would write everything, or anything.

Q. Would it include information about the types of products your customers were manufacturing?

A. Well, basically we just ask a sales rep to submit market related report every week. So they would just write something, and submit it to us. It was too long ago, so I cannot remember all the details with regard to whatever they wrote.

Q. I'm not asking you to remember specific details about specific reports. I'm asking you, in general, for the types of market information that they would include in those reports.

For example, would the market reports include information about your customers' future production plans for CRT televisions or monitors?

A. It was too long ago, so I really cannot remember. All I can recall is that back then, when we managed the sales rep, we do have a system ask them to submit a weekly report. With regard to the content of those reports, I really cannot remember.

Q. Would the market reports include information

relating to Irico Group's competitors?

A. It is a means where how we manage those sales reps, we just establish a system, and request all the sales represents to submit a weekly report, and so when you say market information, it is something probably just heard, they are aware, or based on their understanding. For example, someone might say "I heard this company is going to change their leadership," something like that. With regard to the detailed content of this report, I really cannot remember, because it was too long ago.

Q. Who did the sales reps provide the market reports to?

A. We have a designated person to collect sales reps' weekly report, and compile it and categorize that. So each week they could have different categories.

Q. Who would review those compilations of the weekly market reports?

A. I really not sure about this part. Because I was always on the road. If I were in the office, they would give it to me for review. If I were not in the office, those reports probably just sit on the shelf.

MR. HWU: One correction. "Because I was always on business trips."

INTERPRETER: Yes. "I was always on business." Thank you.

Page 82

BY MS. CAPURRO:

Q. Who else would review those reports, other than you?

A. I don't know.

Q. Would you keep a copy of those written reports in your files?

A. No, after I review it I would just give them back those reports. Because those reports are written by the sales rep. I wouldn't consider they have very high value or very good meaning.

Q. What about the documents into which the weekly reports were compiled? What did you do with those?

MR. PLUNKETT: Object to the form.

A. Back then there were no very stringent rules to handle these documents. So sometimes after I review it I just pass it back, or put it aside, and if I were not in the office, I was on a business trip, they just sit in somewhere. And then when I came back to the office, sometimes they would just give it to me to review, or that. Then because this reports are written by the sales rep, I wouldn't consider they have a very good value. So I just -- we just pass it back.

BY MS. CAPURRO:

Q. Were these reports by the sales reps the only gathering of market data that Irico Group did?

Page 83

MR. PLUNKETT: Object to the form.

A. I didn't follow your question. Could you repeat your question?

Q. You said that the reports by the sales reps didn't have a very good value.

What other sources of market information did you rely upon when you were working as the director of sales in Irico Group?

MR. PLUNKETT: Object to the form.

A. The objective of this weekly report by the sales rep is just a means of sales rep management. Because we ask them to submit the report, and then tell us what they were doing. Otherwise you have no idea what they are doing out there on the field.

BY MS. CAPURRO:

Q. Okay. That didn't really answer my question. My question was: What other sources of market information did you rely on when you were working as the director of sales for Irico Group?

MR. PLUNKETT: Object to -- object to the form.

A. I cannot perform anything related to sales if I only rely on the sales rep written by the sales rep. The source is actually through, first, my conversation with sales. Face-to-face conversation. Or I have a joint call with a sales rep to visit the customers. So these two

Page 84

channels I obtain value market information.

MR. PLUNKETT: You have been going about an hour, just when you are at a natural breaking point.

MS. CAPURRO: Okay.

A. (Chinese spoken).

INTERPRETER: (Chinese spoken).

The witness is asking a break.

MS. CAPURRO: Yes. Let's take a break.

VIDEOGRAPHER: This marks the end of media number 6 in the deposition of Wang Zhaojie, volume II. Going off the record. The time is 4.11.

(Break taken.)

VIDEOGRAPHER: We are back on the record. Here begins media number 7 in the deposition of Wang Zhaojie. Volume II. The time is 4.30.

BY MS. CAPURRO:

Q. Mr. Wang, before we went on the break, you testified that you went on lots of business trips, and you would have conversations with your sales reps, and face-to-face conversations with your customers. And you would visit your customers on site, and through those channels you would obtain valuable market information. Is that correct?

A. (Chinese spoken).

MR. PLUNKETT: Object to the form.

Page 85

INTERPRETER: The answer is "yes".

BY MS. CAPURRO:

Q. From what other sources did you gather market information?

A. I don't remember. It was too long ago.

Q. Would you get market information from third party industry reports? Such as DisplaySearch, or Stanford Resources?

A. Yes.

Q. Do you recall what types of market information would be contained in those third party industry reports?

A. I don't remember.

Q. Did you ever attend any trade association meetings?

A. Your question is not very specific.

Q. Do you know what a trade association meeting is?

A. I don't know what you are referring to.

Q. I'm referring to a meeting attended by people from the CRT or CRT product industry.

MR. PLUNKETT: Object to the form.

BY MS. CAPURRO:

Q. For example, the Consumer Electronics Show, or known as CES, which takes place in early January every year in Las Vegas.

Page 86

A. I never attend it.
Q. Have you heard of the Consumer Electronics Show?
A. Yes, I heard of it.
Q. Were you aware of other Irico employees attending the Consumer Electronics Show?
MR. PLUNKETT: Object to the form.
A. I don't understand.
BY MS. CAPURRO:
Q. Did other Irico employees that you worked with in the sales department ever attend the Consumer Electronics Show?
A. I don't know.
Q. So earlier, whenever I said trade association meeting, I was referring to a meeting like the Consumer Electronics Show. Have you attended any CRT industry conferences like the Consumer Electronics Show in China?
MR. PLUNKETT: Object to the form.
A. Let me think about it. I don't remember I have ever participate the trade show similar to CES in China. Could you be more specific?
BY MS. CAPURRO:
Q. I don't think it is necessary. If you don't remember, it is okay. Is there -- do you recall attending a trade association meeting like the Consumer Electronics Show in any other country?

Page 87

MR. PLUNKETT: Object to the form.
A. Could you repeat your question one more time?
BY MS. CAPURRO:
Q. Did you ever attend a trade -- excuse me, strike that.
Did you ever attend a trade association meeting like the Consumer Electronics Show in any other country?
A. I don't understand your question. Does Korean electronic show count as a trade association meeting or show?
Q. Yes.
A. I did have participate in Korea electronic show.
Q. Okay. And would you have used that meeting as an opportunity to gather market information?
MR. PLUNKETT: Object to the form.
A. I went to the Korean electronics show just to open up my eyes, or open up my horizon.
BY MS. CAPURRO:
Q. Who else would have attended the Korean electronic show?
MR. PLUNKETT: Object to the form.
A. It was very long ago so I don't remember. I can only recollect that I went to Korean electronic show

Page 88

to serve as an observer.
BY MS. CAPURRO:
Q. Do you recall whether there were any of Irico's competitors at the Korean electronic show?
A. It was an electronic show, it covers many, many products. I don't remember. I only can recollect that there is a booth for Samsung and LG. They have a very large screen TV. Maybe it is a liquid crystal TV monitor. The only impression I kept is that Samsung have a very huge TV on their booth. Beyond that, I cannot remember.
Q. Did you know anyone from Samsung or LG at the Korean electronic show?
A. No.
Q. Would Irico Group's customers have attended the Korean electronics show also?
MR. PLUNKETT: Object to the form.
A. I have no impression. It was too long ago. Last time we went there, it is just to open up our eyes.
BY MS. CAPURRO:
Q. What other industry conferences have you attended? Either in China or other countries.
A. No -- could you repeat the question?
Q. What other industry conferences have you attended, either in China or other countries?
A. Could you be more specific?

Page 89

Q. No, I'm trying to ask you a general question about any other conferences you have attended. If you don't remember, that's fine, we can move on.
A. I still consider this question is not very clear.
Q. Okay, we will move on. Did Irico gather information regarding the market for CRT televisions and computer monitors to inform its business?
MR. PLUNKETT: Object to the form.
A. Could you be more specific?
BY MS. CAPURRO:
Q. During your time in the sales department of Irico Group, did Irico gather production information for CRT televisions and computer monitors?
A. I don't know.
Q. Did Irico do market research --
MR. HWU: Excuse me. Correction. "I'm not clear."
BY MS. CAPURRO:
Q. What are you not clear about, Mr. Wang?
A. Your question is too vague. Because it is too vague I don't know how to respond that question.
Q. Did Irico gather supply and demand information regarding CRT televisions or CRT computer monitors?
A. It is part of the sales job to understand the

Page 106

Q. Did Irico -- sorry.
A. It was too long ago.
Q. Do you recall whether Irico added more employees over the course of the class period?
A. I don't remember, it was too long ago.
Q. Irico was one of the leading manufacturers of CPTs in China during the class period, correct?
A. I really don't know how to answer that. First of all it was too long ago. And nobody can remember the status back then.
Q. Would you say it was one of Irico's goals during the class period to increase its market share?
A. I think for any organization, or any corporations, the business goal is to expand the scale and make it stronger. Nobody want to become more smaller. One more comment.
A. (Chinese spoken).
INTERPRETER: Let me clarify when he mentioned Caihong. (Chinese spoken).
A. Like I said, every company want to become stronger and larger. That's the vision of every company. However, for the case of Irico, this particular business line, CRT, which is -- was our core business, and the fact is that it become worse and worse, and in the end we closed it.

Page 107

BY MS. CAPURRO:
Q. You testified earlier it was important to have as much information about the market as possible, correct?
A. Yes, that's correct.
Q. So Irico would have been aware of the main factors influencing supply, demand, pricing and production of CRTs in the Chinese market, correct?
MR. PLUNKETT: Object to the form.
A. As a person engaged in sales management, to supervise the entire sales team it is rather difficult to manage the sales reps. And the fact is that they often are on the road on a business trip. However, it is correct that the more information they can feed back is better they can benefit the business. The fact is that their feedback is much, much worse, or far away from my expectations. If they can submit a report which meets my expectations, then our business should be better.
Q. Isn't it true that imports to and exports from China of CRTs and CRT televisions or monitors would have had an impact on the market for Irico's products?
MR. PLUNKETT: Object to the form.
A. As a person in the sales department, the only thing we considered is that domestic markets, customer demand, for example how much the customer is going to place the order for next month. Sometimes they are there, very

Page 108

good, they can let me know their projection for three months later or six months ahead.
However, we have a sales target. So the only thing we are concerned is the customer's demand.
BY MS. CAPURRO:
Q. Yes, but where your customer's demand is being impacted by the volume of their exports from China, Irico would have been aware of that, correct?
MR. PLUNKETT: Object to the form.
A. Could you repeat your question?
BY MS. CAPURRO:
Q. Where your customer's demand is being impacted by the volume of your exports from China to other countries, Irico would have been aware of that, correct?
A. As a sales department staff, the only thing we know is how much a customer is going to place, for the next month, or what is their next month's PO. We don't understand other issues.
Q. So it is your testimony that Irico had no long-term plans to increase its sales of CPTs, is that correct?
MR. PLUNKETT: Object to the form, mischaracterizes the record.
A. I'm not very clear regarding your question. Would you repeat your question?

Page 109

BY MS. CAPURRO:
Q. You testified that all sales department staff knew was how much the customer was going to request for the next month. And I asked you, so is it your testimony that Irico has no long-term plans to increase its sales of CPTs, such that they have no interest in what the customer's future demand might be?
MR. PLUNKETT: On object to the form, if there is a question pending.
A. I really don't understand what you are asking, because your question has several questions. Could you be more straightforward?
MS. CAPURRO: I think now is probably a good time to break for the day.
We can go off the record.
VIDEOGRAPHER: This marks the end of media number 8 in the deposition of Wang Zhaojie, volume II. Going off the record. The time is 6.19.
(Whereupon, the deposition adjourned at 6.22 pm)

CERTIFICATE OF COURT REPORTER

I, Bron Williams, an Accredited Real-time Reporter, hereby certify that the testimony of the witness WANG ZHAOJIE in the foregoing transcript, numbered pages 1 through 111, taken on this 7th day of March, 2019 was recorded by me in machine shorthand and was thereafter transcribed by me; and that the foregoing transcript is a true and accurate verbatim record of the said testimony.

I further certify that I am not a relative, employee, counsel or financially involved with any of the parties to the within cause, nor am I an employee or relative of any counsel for the parties, nor am I in any way interested in the outcome of the within cause.

Signed: Bron Williams

Name: Bron Williams

Date: ........................

CERTIFICATE OF DEPONENT

I, WANG ZHAOJIE, hereby certify that I have read the foregoing pages, numbered 1through 111, of my deposition of testimony taken in these proceedings on Thursday, March 7th, 2019 and, with the exception of the changes listed on the next page and/or corrections, if any, find them to be a true and accurate transcription thereof.

Signed: ........................

Name: WANG ZHAOJIE

Date: ........................

ERRATA SHEET

Case Name: In Re Cathode Ray Tube Antitrust Litigation

Witness Name: WANG ZHAOJIE

Date: 03/07/2019

Page/Line From To

____/________________________________________

____/________________________________________

____/________________________________________

____/________________________________________

____/________________________________________

____/________________________________________

____/________________________________________

____/________________________________________

____/________________________________________

____/________________________________________

____/________________________________________

____/________________________________________

Subscribed and sworn to before me this 7th day of March, 2019.

__________________________

WANG ZHAOJIE

# EXHIBIT LL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

IN RE: CATHODE RAY TUBE (CRT) ) MASTER FILE NO.
ANTITRUST LITIGATION ) CV-07-5944 JST
_______________________________)
)
THIS DOCUMENT RELATES TO: )
)
ALL INDIRECT PURCHASER ACTIONS )
ALL DIRECT PURCHASER ACTIONS )
)
DEFENDANTS. )
_______________________________)

VIDEOTAPED DEPOSITION OF WANG ZHAOJIE
VOLUME I
TUESDAY, SEPTEMBER 20, 2022
MACAU S.A.R., CHINA

JOB NO. 5436453

REPORTED BY MARK McCLURE, CRR
CAL CSR 12203

VIDEOTAPED DEPOSITION OF WANG ZHAOJIE, VOLUME I, TAKEN AT 8:08 A.M., TUESDAY, SEPTEMBER 20, 2022, CHINA STANDARD TIME, VIA VERITEXT REMOTE TECHNOLOGY, BEFORE MARK McCLURE, C.S.R. #12203, CERTIFIED SHORTHAND REPORTER IN AND FOR THE STATE OF CALIFORNIA.

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF ALL INDIRECT PURCHASERS:

(APPEARING BY VIDEOCONFERENCE)
TRUMP, ALIOTO, TRUMP & PRESCOTT
BY: LAUREN CAPURRO, ESQ.
120 HOLSTROM CIRCLE,
NOVATO, CALIFORNIA 94947-2072
415.860.5051
LAURENRUSSELL@TATP.COM

(APPEARING BY VIDEOCONFERENCE)
BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER
BY: DANIEL BIRKHAEUSER, ESQ.
2125 OAK GROVE ROAD, SUITE 125
WALNUT CREEK, CALIFORNIA 94598-2534
925.945.0200
DBIRKHAEUSER@BRAMSONPLUTZIK.COM

FOR THE PLAINTIFF, ALL DIRECT PURCHASER:

(APPEARING BY VIDEOCONFERENCE)
SAVERI & SAVERI
BY: RICK SAVERI, ESQ.
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
415.217.6810
RICK@SAVERI.COM

(APPEARING BY VIDEOCONFERENCE)
SAVERI & SAVERI
BY: DAVID HWU, ESQ.
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
415.217.6810
DHWU@SAVERI.COM

APPEARANCES OF COUNSEL: CONTINUING

FOR THE PLAINTIFF, ALL DIRECT PURCHASER:

(APPEARING BY VIDEOCONFERENCE)
SAVERI & SAVERI
BY: MATTHEW HEAPHY, ESQ.
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
415.217.6810
MHEAPHY@SAVERI.COM

(APPEARING BY VIDEOCONFERENCE)
SAVERI & SAVERI
BY: GEOFFREY C. RUSHING, ESQ.
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
415.217.6810
GRUSHING@SAVERI.COM

FOR THE DEFENDANT, IRICO, AND THE WITNESS, WANG ZHAOJIE:

(APPEARING BY VIDEOCONFERENCE)
BAKER BOTTS, LLP
BY: ANDREW LUCARELLI, ESQ.
700 K STREET NW
WASHINGTON, DC 20001
202.639.1108
DREW.LUCARELLI@BAKERBOTTS.COM

(APPEARING BY VIDEOCONFERENCE)
NORTON ROSE FULBRIGHT US LLP
BY: KAYLEE YANG, ESQ.
555 CALIFORNIA STREET, SUITE 3300
SAN FRANCISCO, CALIFORNIA 94104
628.231.6827
KAYLEE.YANG@NORTONROSEFULBRIGHT.COM

ALSO PRESENT:

WENKAI ZHANG, IN-HOUSE COUNSEL, IRICO GROUP
MICHELLE TAN, MAIN INTERPRETER
AMANDA LIN, RELIEF MAIN INTERPRETER
RAMON PERAZA, THE VIDEOGRAPHER

TUESDAY, SEPTEMBER 20, 2022, 8:08 A.M.

THE VIDEOGRAPHER: Good morning. 08:08:00

We are on the record at 8:08 a.m. on 08:08:01 September 20, 2022. 08:08:05

This is the videorecorded deposition of 08:08:07 Mr. Wang Zhaojie, In Re: Cathode Ray Tube Antitrust 08:08:09 litigation. 08:08:15

This case was filed in the United States 08:08:16 District Court, Northern District of California, Oakland 08:08:18 Division, Case No. CH-07-5944 JST. 08:08:22

Please note that this deposition is being 08:08:27 recorded visually, and quality of the recording depends 08:08:31 on the quality of camera and internet connection of 08:08:34 participants. 08:08:36

Audio and video recording will take place 08:08:38 unless all parties have agreed to go off the record. 08:08:40

My name is Ramon Peraza, here with our court 08:08:43 reporter, Mark McClure, and the interpreter Michelle 08:08:46 Tan. We're here from Veritext Legal Solutions at the 08:08:49 request of counsel for the plaintiff. 08:08:52

At this time, counsel, please identify 08:08:55 yourselves for the record and state whom you represent. 08:08:56

MS. CAPURRO: Good morning. My name is Lauren 08:09:01 Capurro, of Trump, Alioto, Trump & Prescott and I 08:09:04

represent for All Indirect Purchaser plaintiffs. 08:09:08

Also with me in the room is Daniel Birkhaeuser, of Bramson, Plutzik, Mahler & Birkhaeuser, also on behalf of All Indirect Purchaser plaintiffs. 08:09:11 08:09:14 08:09:17

MR. SAVERI: Rick Saveri, on behalf of All Direct Purchaser plaintiffs. 08:09:20 08:09:25

MR. HWU: Good morning. David Hwu, on behalf of the Direct Purchaser plaintiffs. 08:09:30 08:09:33

MR. HEAPHY: Matthew Heaphy, of Saveri & Saveri, for Direct Purchaser plaintiffs. 08:09:37 08:09:39

MR. LUCARELLI: Good morning. This is Andrew Lucarelli, Baker Botts, LLP, on behalf of the Irico defendants and the witness. 08:09:49 08:09:51 08:09:56

MS. YANG: Good morning. This is Kaylee Yang, from Norton Rose Fulbright LLP, on behalf of Irico defendant and the witness. 08:09:57 08:10:00 08:10:05

THE VIDEOGRAPHER: The court reporter may now swear in the witness and the interpreter. 08:10:09 08:10:11

08:10:11

MICHELLE TAN and KAYLEE YANG 08:10:11

were sworn to interpret the Chinese language. 08:10:11

08:11:01

WANG ZHAOJIE, 08:11:01

having been sworn, was examined 08:11:01

and testified as follows: 08:11:02

MS. CAPURRO: This is Lauren Capurro. 08:11:02

Mr. Court Reporter, we have a check interpreter on the plaintiff's side as well, who needs to be sworn in. 08:11:04 08:11:06 08:11:09

DAVID HWU

was sworn to interpret the Chinese language.

EXAMINATION

BY MS. CAPURRO:

Q. Good morning, Mr. Wang. Nice to see you again. Thank you for traveling all of this way. 08:11:32 08:11:35

Can you please state your full name for the record. 08:11:38 08:11:41

A. Okay, earlier, I was instructed not to touch the settings or anything, but right now there's something just showed up on the screen. 08:12:05 08:12:09 08:12:13

Do I need to tap on that? 08:12:15

Q. No, not yet. I'll tell you when you need to tap on something. 08:12:21 08:12:23

A. Right now, I'm continuously being reminded by the prompt on the screen telling me that, right now, the host of the meeting is hosting the meeting currently. 08:12:33 08:12:43 08:12:47

Do I want to stay in the meeting, or something else? 08:12:50 08:12:53

put this together. 15:28:14

However, based on my work experience, I can tell you clearly and very precisely that even though the information might have come from the competitors, it's not authenticated or truthful information, because for the industry or any industry, it's not possible for us to disclose truthful data and information about our own situation to anyone else in the industry, and that's what everyone in any industry is trying to prevent. 15:28:16 15:28:19 15:28:28 15:28:31 15:28:38 15:28:43 15:28:48 15:28:54

BY MS. CAPURRO: 15:29:01

Q. Mr. Wang, can you point to me where in this document it says that the information regarding your competitors is not true? 15:29:02 15:29:05 15:29:09

A. I cannot point you where. First of all, I did not create this chart, and, secondly, I do not know the source of the data. I was simply explaining to you, based on my work experience, the information that we usually provide to other people in the industry would not be the true information. 15:29:21 15:29:51 15:29:55 15:29:59 15:30:04 15:30:06

So I would just assume that the same situation would go with other people and the information the other people provide us and -- because the information may be involved with some core information, core data of the company. 15:30:09 15:30:12 15:30:16 15:30:24 15:30:27

MS. CAPURRO: You can set that document aside, 15:30:36

Mr. Wang. 15:30:38

I'm going to mark the next exhibit. 15:30:58

I've marked the next exhibit in order, Exhibit No. 8565. It's a document bearing Bates label CHU00124663. 15:31:55 15:31:59 15:32:03

(Exhibit 8565 marked for identification.) 15:32:23

BY MS. CAPURRO: 15:32:23

Q. Mr. Wang, please take a look at the document marked as Exhibit 8565 and let me know when you're ready. You don't need to read the whole document. Again, I'll read to you portions that I want to ask you questions about. 15:32:23 15:32:25 15:32:35 15:32:37 15:32:41

A. Okay. 15:32:52

Q. Are you ready, Mr. Wang? 15:36:40

A. Give me one more moment. 15:36:42

Q. This exhibit number -- what number -- 8565, is entitled "Regular Sales and Marketing Meeting." And in the top right-hand corner, it says "For internal use only. Confidential." It's dated May 15, 2005, and right here, it says "Sales Company." 15:37:41 15:37:48 15:37:52 15:37:55 15:38:00

Isn't that correct? 15:38:02

MR. LUCARELLI: Object to form. 15:38:14

THE WITNESS: That's correct. 15:38:24

BY MS. CAPURRO: 15:38:24

Q. Do you recognize this document, Mr. Wang? 15:38:26

A. I have seen similar ones before. 15:38:33

Q. Is this the type of document that sales -- the sales department within Sales Company produced while you were director of the sales department? 15:38:36 15:38:42 15:38:46

A. Would you rephrase the question, please? 15:38:48

Q. Is this is the type of document that the sales department prepared in around May 2005? 15:39:14 15:39:20

A. I have seen such a document entitled -- regular or routine meeting of sales and marketing. 15:39:25 15:39:48

Q. At the time this document was prepared, you were the director of Irico Group Sales Company, isn't that right? 15:39:52 15:39:54 15:39:59

Or a director, sorry. 15:39:59

A. That's not an accurate description. 15:40:13

Q. What was your title in May of 2005? 15:40:17

MAIN INTERPRETER: Interpreter needs clarification. 15:40:36 15:40:37

THE WITNESS: 2005, I don't quite recall if my title was the assistant to the head of the department or the deputy head of department. 15:40:51 15:40:53 15:40:56

BY MS. CAPURRO: 15:40:56

Q. I think you previously testified that, in 2005, you were a director of the sales department within Irico Sales Company, is that correct? 15:41:02 15:41:04 15:41:08

A. I never said I was a director. 15:41:11

MR. HWU: I think the term -- I think the term "director" has been rendered as "bu zhang." 15:41:35 15:41:41

MAIN INTERPRETER: But the literal translation of "bu zhang" is the "head of a department." Okay. 15:41:47 15:41:48

BY MS. CAPURRO: 15:41:53

Q. Mr. Wang, were you the head of Irico sales department in May 2005? 15:41:54 15:41:57

A. No. 15:42:26

Between the years 2003 and 2009, I was either the assistant to the head of the department or the deputy head of department, but my title at that time was not the head of the department. 15:42:26 15:42:31 15:42:34 15:42:38

Q. Okay. Would you have been involved in the preparation of documents like this? 15:42:43 15:42:51

A. No. 15:43:04

Q. Who would have been responsible for preparing these sales and marketing meeting reports? 15:43:05 15:43:08

A. The marketing department. 15:43:21

Q. The title of the document, "Regular Sales and Marketing Meeting," indicates that this report was prepared in connection with a meeting of not only the marketing department but also the sales department, does it not? 15:43:25 15:43:27 15:43:29 15:43:32 15:43:35

A. Can you be more specific with the question? When you said it relates to the marketing department, as 15:43:36 15:44:15

well as the sales department, are you talking about the information contained here or are you talking about the organizations? What are you referring to? 15:44:19 15:44:23 15:44:26

Q. I'm trying to ascertain who prepared this report and whether it was in connection with a meeting, because the title of the document says "Regular Sales and Marketing Meeting." 15:44:30 15:44:34 15:44:37 15:44:40

MR. LUCARELLI: Object to form. 15:44:57

BY MS. CAPURRO: 15:44:58

Q. Did the sales and marketing department hold regular meetings during this time period in 2005? 15:44:58 15:45:01

A. They did not have regular meetings. 15:45:13

Q. Did they have any meetings? 15:45:30

A. What did you mean by "any meetings"? 15:45:34

Q. Did the sales -- did the people who worked -- did the people who worked in the sales department and the people who worked in the marketing department have meetings together? 15:45:46 15:45:51 15:45:53 15:45:56

A. They would get together for the routine meetings on sales and marketing, but for other times, they would not have meeting together. 15:45:57 15:46:21 15:46:26

Q. So you referred to routine meetings. 15:46:31

What do you mean by that? 15:46:34

A. I'm referring to the routine meetings that are held within the Sales Company -- 15:46:37 15:46:54

MS. CAPURRO: Seven hours? 17:52:08

THE VIDEOGRAPHER: Yes. 17:52:10

MS. CAPURRO: Okay. Let's go off the record. 17:52:11 We can take this up tomorrow. 17:52:14

MR. LUCARELLI: Before we go off the record, 17:52:17 I'd like to designate this transcript as highly 17:52:18 confidential under the protective order. 17:52:22

THE VIDEOGRAPHER: This is the end of today's 17:52:42 deposition of Mr. Wang Zhaojie. We are off the record 17:52:44 at 5:52 p.m. The total number of media used was 13 and 17:52:47 will be retained by Veritext. Thank you. 17:52:53

(The deposition concluded at 5:52 p.m., China Standard Time.)

--oOo--

STATE OF CALIFORNIA )
COUNTY OF SANTA BARBARA ) ss.

I, Mark McClure, C.S.R. No. 12203, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is a true, correct, and complete transcript of said proceedings;

That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript { } was {X} was not required.

I further certify that I am not interested in the event of the action.

Witness my hand this 3rd day of October, 2022.

Certified Shorthand Reporter
State of California
CSR No. 12203

# EXHIBIT MM

## Matthew Heaphy

**From:** Tom.Carter@BakerBotts.com
**Sent:** Tuesday, June 05, 2018 10:05 PM
**To:** Rick Saveri; Cadio Zirpoli; malioto@tatp.com; laurenrussell@tatp.com; jpatane@tatp.com; CMicheletti@zelle.com; Geoff Rushing; Matthew Heaphy
**Cc:** erik.koons@bakerbotts.com; Ashley.Eickhof@BakerBotts.com; stuart.plunkett@bakerbotts.com; kaylee.yang@bakerbotts.com; john.taladay@bakerbotts.com
**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST
**Attachments:** Response to Saveri 2018-04-09 Letter re Potential Deponents.pdf

Dear Counsel:

Please see attached for Irico's responses to the request in your April 9, 2018 letter regarding potential Irico deponents. Irico has identified the employment status (and departure date, if relevant) of 35 out of the 36 individuals named in your list. Irico has been unable to locate information regarding Liu Linghai; if you could share more detail on how Liu Linghai was chosen for your list, that may help with providing the information you requested. All current Irico employees and individuals identified in Irico's interrogatory responses will be represented by us and can be reached through counsel.

Given the large number of former Irico employees on the list, including many that left the company more than 5 years ago, we request that plaintiffs consider the information provided thus far and narrow the list so that Irico can better prioritize the burdensome task of reaching out to each of these former employees to determine if they would accept representation by counsel for Irico.

Thank you,

**Tom Carter**
Associate

Baker Botts L.L.P.
tom.carter@bakerbotts.com
T +1.202.639.7702
F +1.202.585.4085
M +1.202.412.4352

The Warner
1299 Pennsylvania Ave NW
Washington, DC 20004
USA

*Admitted to practice in New York and the District of Columbia.*

**From:** Rick Saveri <Rick@saveri.com>
**Sent:** Monday, April 9, 2018 1:31 PM
**To:** Taladay, John <john.taladay@bakerbotts.com>
**Cc:** Koons, Erik <erik.koons@bakerbotts.com>; Carter, Tom <Tom.Carter@BakerBotts.com>; Eickhof, Ashley <Ashley.Eickhof@BakerBotts.com>; Plunkett, Stuart <stuart.plunkett@bakerbotts.com>; Yang, Kaylee <kaylee.yang@bakerbotts.com>; Geoff Rushing <Geoff@saveri.com>; Matthew Heaphy <mheaphy@saveri.com>
**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

John:  Please see attached letter.

Rick


R. Alexander Saveri
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111
Tel:  (415)  217-6810
Fax:  (415)  217-6813


CONFIDENTIALITY NOTICE

This electronic mail transmission and any attachments contain privileged and confidential information.  The information is intended solely for use by the individual or entity named as the recipient hereof.  If you are not the intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this transmission is prohibited.  If you have received this transmission in error, please immediately delete it and notify us by telephone.


**Confidentiality Notice:**

The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.

# EXHIBIT NN

# Irico's Response to Potential Deponent Information Request

| Name | Name (Chinese) | Current or Former Employee | Date of Departure | Contact Information |
|---|---|---|---|---|
| Chen Di Zhi | [illegible] | Former | Apr. 2002 | |
| Chen Xiaoning | 陈晓宁 | Current | n/a | May be contacted through counsel |
| Duan Cheng | 段诚 | Former | June 2015 | |
| Fang Liang-Jun | [illegible] | Former | June 2012 | |
| Fu Jinquan | [illegible] | Former | Mar. 2011 | |
| Gao Rong-Guo | 高荣国 | Current | n/a | May be contacted through counsel |
| Ge Di | 葛迪 | Former | May 2016 | |
| Guo Mengquan | [illegible] | Former | May 2017 | May be contacted through counsel |
| Li Wei-Sheng | 李卫生 | Former | Jan. 2002 | |
| Liang Yuan | [illegible] | Former | Mar. 2014 | |
| Liu Hongwu | 刘宏武 | Former | Jan. 2014 | |
| Liu Linghai | | | | |
| Liu Xiaodong | [illegible] | Former | May 2010 | |
| Ma Jinquan | [illegible] | Former | Feb. 2005 | |
| Niu Xinan | 牛新安 | Former | Dec. 2015 | |
| Shan or Sa Tao | 沙涛 | Former | Dec. 2002 | |
| Shen Xiaolin | 申小林 | Former | Oct. 2015 | |
| Song Shi-Zhen | [illegible] | Former | Nov. 2004 | |
| Su Xiaohua | 苏晓华 | Current | n/a | May be contacted through counsel |
| Tao Kui | [illegible] | Former | Mar. 2014 | |
| Wang Da-Ming | 王大明 | Former | July 2004 | |
| Wang Li Guang | 王李广 | Former | Apr. 2002 | |
| Wang Ping-Quan | 王平权 | Former | Mar. 2012 | |
| Wang Zhao-Jie | 王照杰 | Current | n/a | May be contacted through counsel |
| Wei Jian-She | [illegible] | Former | Apr. 2018 | |
| Wei Zhuyuan | [illegible] | Former | Sept. 2006 | |

# Irico's Response to Potential Deponent Information Request

| Name | Name (Chinese) | Current or Former Employee | Date of Departure | Contact Information |
|---|---|---|---|---|
| Wen Haiyang | 文海洋 | Former | Sept. 2017 | |
| Xi Jiansheng | [illegible] | Former | Apr. 2008 | |
| Xing Daoqin | [illegible] | Deceased | Dec. 2011 | |
| Xu Gao-Wen | 许高文 | Former | Oct. 2014 | |
| Yao Jun | [illegible] | Former | Apr. 2018 | |
| Zhang Junhua | [illegible] | Current | n/a | May be contacted through counsel |
| Zhang Shaowen | 张少文 | Former | Mar. 2016 | May be contacted through counsel |
| Zhang Hushan | 张虎山 | Former | May 2018 | |
| Zhen Xiao-Hong | [illegible] | Former | Feb. 2014 | |
| Zhu Jun | [illegible] | Former | Dec. 1998 | |

In re Cathode Ray Tube (CRT) Antitrust Litigation – MDL No. 1917 / Master File No. 07-CV-5944-JST
Irico Defendants' Log of Privileged Documents Responsive to December 8, 2022 Order

| IDENTIFIER | DATE | AUTHOR | ADDRESSEE(S) | COPYEE(S) | BLIND COPYEE(S) | DESCRIPTION | PRIVILEGE | REDACTED | PRODUCTION BATES |
|---|---|---|---|---|---|---|---|---|---|
| P-SU-00001 | 9/10/2021 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL REQUEST FROM COUNSEL REGARDING DEPOSITION LOCATION | AC/AWP | | |
| P-SU-00002 | 9/15/2021 | Zhang Wenkai* | Kaylee Yang* | Yan Zhang* | | EMAIL THREAD AND ATTACHED MATERIALS SELECTED BY ATTORNEYS PREPARED DURING THE COURSE OF CRT LITIGATION AND PREPARED AT REQUEST OF COUNSEL REGARDING DEPOSITION LOCATION AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |
| P-SU-00003 | 9/27/2021 | Kaylee Yang* | Zhang Wenkai* | Yan Yunlong*<br>Yan Zhang* | | EMAIL PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00004 | 9/30/2021 | Kaylee Yang* | Zhang Wenkai* | Yan Yunlong*<br>Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION | AC/AWP | | |
| P-SU-00005 | 9/30/2021 | Zhang Wenkai* | Kaylee Yang* | Yan Yunlong*<br>Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND RESPONDING TO INQUIRIES FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00006 | 10/19/2021 | Kaylee Yang* | Zhang Wenkai* | Yan Yunlong*<br>Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION | AC/AWP | | |
| P-SU-00007 | 10/26/2021 | Kaylee Yang* | Zhang Wenkai* | Yan Yunlong*<br>Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND TRAVEL VISA APPLICATION | AC/AWP | | |
| P-SU-00008 | 10/[illegible]/2021 | Zhang Wenkai* | Kaylee Yang* | Yan Yunlong*<br>Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND RESPONDING TO INQUIRIES FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING AND TRAVEL VISA APPLICATION | AC/AWP | | |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

AC – ATTORNEY-CLIENT PRIVILEGE
AWP – ATTORNEY WORK PRODUCT

* DENOTES COUNSEL FOR THE IRICO DEFENDANTS
** DENOTES COUNSEL FOR CHINA ELECTRIC CORPORATION

PAGE 1 OF 13

In re Cathode Ray Tube (CRT) Antitrust Litigation – MDL No. 1917, Master File No. 07-CV-5944-JST
Irico Defendants' Log of Privileged Documents Responsive to December 8, 2022 Order

| IDENTIFIER | DATE | AUTHOR | ADDRESSEE(S) | COPYEE(S) | BLIND COPYEE(S) | DESCRIPTION | PRIVILEGE | REDACTED | PRODUCTION BATES |
|---|---|---|---|---|---|---|---|---|---|
| P-SU-00009 | 11/19/2021 | Kaylee Yang* | Zhang Wenkai*<br>Yan Yunlong* | Yan Zhang* | | EMAIL PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION PREPARATION, AND DEPOSITION SCHEDULING | AC/AWP | YES | IRI-SU-000001-IRI-SU-000004 |
| P-SU-00010 | 11/18/2021 | Kaylee Yang* | Zhang Wenkai*<br>Yan Yunlong* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION PREPARATION, AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00011 | 11/19/2021 | Zhang Wenkai* | Kaylee Yang*<br>Yan Yunlong* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND PREPARED AT REQUEST OF COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00012 | 11/19/2021 | Kaylee Yang* | Zhang Wenkai*<br>Yan Yunlong* | Yan Zhang* | | EMAIL PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION PREPARATION, AND DEPOSITION SCHEDULING | AC/AWP | YES | IRI-SU-000005-IRI-SU-000017 |
| P-SU-00013 | 11/23/2021 | Zhang Wenkai* | Kaylee Yang*<br>Yan Yunlong* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND PREPARED AT REQUEST OF COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00014 | 11/24/2021 | Kaylee Yang* | Zhang Wenkai*<br>Yan Yunlong* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00015 | 11/24/2021 | Kaylee Yang* | Zhang Wenkai*<br>Yan Yunlong* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

AC – ATTORNEY-CLIENT PRIVILEGE
AWP – ATTORNEY WORK PRODUCT

PAGE 3 OF 15

* DENOTES COUNSEL FOR THE IRICO DEFENDANTS
** DENOTES COUNSEL FOR CHINA ELECTRONICS CORPORATION

In re Cathode Ray Tube (CRT) Antitrust Litigation – MDL No. 1917, Master File No. 07-CV-5944-JST
Irico Defendants' Log of Privileged Documents Responsive to December 8, 2022 Order

| IDENTIFIER | DATE | AUTHOR | ADDRESSEE(S) | COPYEE(S) | BLIND COPYEE(S) | DESCRIPTION | [illegible] | [illegible] | PRODUCTION BATES |
|---|---|---|---|---|---|---|---|---|---|
| P-SU-00016 | 11/24/2021 | Zhang Wenkai* | Kaylee Yang*<br>Yan Yunlong* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00017 | 12/9/2021 | Zhang Wenkai* | Kaylee Yang*<br>Yan Yunlong* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND PREPARED AT REQUEST OF COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00018 | 12/13/2021 | Kaylee Yang* | Zhang Wenkai* | Yan Yunlong*<br>Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | YES | RI-SU-000013-RI-SU-000017 |
| P-SU-00019 | 12/19/2021 | Kaylee Yang* | Zhang Wenkai*<br>Yan Yunlong* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION PREPARATION, AND DEPOSITION SCHEDULING | AC/AWP | YES | [illegible] |
| P-SU-00020 | 12/20/2021 | Kaylee Yang* | Yan Yunlong*,<br>Zhang Wenkai* | Yan Zhang* | | EMAIL PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL JOHN TALADAY* REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00021 | 12/20/2021 | Kaylee Yang* | [illegible] | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL JOHN TALADAY* REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00023 | 12/20/2021 | Kaylee Yang* | Zhang Wenkai*<br>Yan Yunlong* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION SCHEDULING | AC/AWP | YES | RI-SU-000024 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

AC – ATTORNEY-CLIENT PRIVILEGE
AWP – ATTORNEY WORK PRODUCT

PAGE 3 OF 13

* ATTORNEYS/COUNSEL FOR THE IRICO DEFENDANTS
** ATTORNEYS/COUNSEL FOR CHINA ELECTRONICS CORPORATION

In re Cathode Ray Tube (CRT) Antitrust Litigation – MDL No. 1917, Master File No. 07-CV-5944-JST
Irico Defendants' Log of Privileged Documents Responsive to December 8, 2022 Order

| IDENTIFIER | DATE | AUTHOR | ADDRESSEE(S) | COPYEE(S) | BLIND COPYEE(S) | DESCRIPTION | PRIVILEGE | REDACTED | PRODUCTION BATES |
|---|---|---|---|---|---|---|---|---|---|
| P-SU-00023 | 12/20/2021 | Zhang Wenkai* | Kaylee Yang* | | | EMAIL AND ATTACHED MATERIALS SELECTED BY COUNSEL PREPARED DURING THE COURSE OF CRT LITIGATION AND PROVIDING CONFIDENTIAL INFORMATION TO COUNSEL FOR THE PURPOSE OF RENDERING LEGAL ADVICE REGARDING COVID-19 PANDEMIC RESTRICTIONS AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00024 | 12/20/2021 | Zhang Wenkai* | Kaylee Yang* | | | EMAIL AND ATTACHED MATERIALS SELECTED BY COUNSEL PREPARED DURING THE COURSE OF CRT LITIGATION AND PROVIDING CONFIDENTIAL INFORMATION TO COUNSEL FOR THE PURPOSE OF RENDERING LEGAL ADVICE REGARDING COVID-19 PANDEMIC RESTRICTIONS AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00025 | 12/22/2021 | Zhang Wenkai* | Kaylee Yang* | Yan Yunlong* | | EMAIL PREPARED DURING THE COURSE OF CRT LITIGATION AND RESPONDING TO REQUESTS FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION SCHEDULING AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |
| P-SU-00026 | 1/5/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00027 | 1/5/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Zhang*<br>Yan Yunlong* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION PREPARATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00028 | 1/9/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00029 | 1/13/2022 | Zhang Wenkai* | Su [illegible] | | | TEXT MESSAGE PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION PREPARATION | AC/AWP | YES | IRI-SU-000105-IRI-SU-000120 |

AC – ATTORNEY-CLIENT PRIVILEGE
AWP – ATTORNEY WORK PRODUCT

* DENOTES COUNSEL FOR THE IRICO DEFENDANTS
** DENOTES COUNSEL FOR CHINA ELECTRIC CORPORATION

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PAGE 4 OF 13

Irico Defendants' Log of Privileged Documents Responsive to December 8, 2022 Order

| IDENTIFIER | DATE | AUTHOR | ADDRESSEE(S) | COPYEE(S) | BLIND COPYEE(S) | DESCRIPTION | DEFENSE | REDACTED | PRODUCTION BATES |
|---|---|---|---|---|---|---|---|---|---|
| P-SU-000030 | 1/24/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-000031 | 1/25/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-000032 | 1/25/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Zhang*<br>Yan Yunlong* | | EMAIL THREAD AND ATTACHED MATERIALS SELECTED BY COUNSEL PREPARED DURING THE COURSE OF CRT LITIGATION AND RESPONDING TO REQUESTS FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-000033 | 2/13/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION PREPARATION, AND DEPOSITION SCHEDULING | AC/AWP | YES | IRI-SU-000035-IRI-SU-000037 |
| P-SU-000034 | 2/14/2022 | Kaylee Yang* | Zhang Wenkai* | | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION PREPARATION | AC/AWP | | |
| P-SU-000035 | 2/15/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Yunlong* | | EMAIL PREPARED DURING THE COURSE OF CRT LITIGATION AND PROVIDING CONFIDENTIAL INFORMATION TO COUNSEL FOR THE PURPOSE OF RENDERING LEGAL ADVICE REGARDING DEPOSITION LOCATION, TRAVEL VISA APPLICATION AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |
| P-SU-000036 | 2/16/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Yunlong*<br>Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION PREPARATION, AND DEPOSITION SCHEDULING | AC/AWP | | |

AC – ATTORNEY-CLIENT PRIVILEGE
AWP – ATTORNEY WORK PRODUCT

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

* DENOTES COUNSEL FOR THE IRICO DEFENDANTS
** DENOTES COUNSEL FOR CHINA ELECTRONICS CORPORATION

In re Cathode Ray Tube (CRT) Antitrust Litigation – MDL No. 1917 / Master File No. 07-CV-5944-JST
Irico Defendants' Log of Privileged Documents Responsive to December 8, 2022 Order

| IDENTIFIER | DATE | AUTHOR | ADDRESSEE(S) | COPYEE(S) | BLIND COPYEE(S) | DESCRIPTION | PRIVILEGE | REDACTED | PRODUCTION BATES |
|---|---|---|---|---|---|---|---|---|---|
| P-SU-000037 | 2/23/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Yunlong* | | EMAIL AND ATTACHED MATERIALS SELECTED BY COUNSEL PREPARED DURING THE COURSE OF CRT LITIGATION AND RESPONDING TO REQUESTS FROM COUNSEL REGARDING DEPOSITION LOCATION AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |
| P-SU-000038 | 2/28/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | YES | IRI-SU-000038-IRI-SU-000040 |
| P-SU-000039 | 3/3/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-000040 | 3/6/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL REQUEST FROM COUNSEL REGARDING DEPOSITION LOCATION AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | YES | IRI-SU-000041-IRI-SU-000044 |
| P-SU-000041 | 3/7/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Zhang*<br>Yan Yunlong* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND PREPARED AT REQUEST OF COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION SCHEDULING, TRAVEL VISA APPLICATION AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |
| P-SU-000042 | 3/8/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-000043 | 3/8/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Zhang*<br>Yan Yunlong* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND RESPONDING TO REQUESTS FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION SCHEDULING, TRAVEL VISA APPLICATION AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

PAGE 6 OF 13

AC – ATTORNEY-CLIENT PRIVILEGE
AWP – ATTORNEY WORK PRODUCT

* DENOTES COUNSEL FOR THE IRICO DEFENDANTS
** DENOTES COUNSEL FOR CHINA ELECTRONICS CORPORATION

| IDENTIFIER | DATE | AUTHOR | ADDRESSEE(S) | COPYEE(S) | BLIND COPYEE(S) | DESCRIPTION | PRIVILEGE | REDACTED | PRODUCTION BATES |
|---|---|---|---|---|---|---|---|---|---|
| P-SU-00044 | 3/9/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00045 | 3/10/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Zhang*<br>Yan Yunlong* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND RESPONDING TO REQUESTS FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION SCHEDULING, TRAVEL VISA APPLICATION AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |
| P-SU-00046 | 3/11/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP | | |
| P-SU-00047 | 3/14/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Zhang*<br>Yan Yunlong* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND RESPONDING TO REQUESTS FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION SCHEDULING, TRAVEL VISA APPLICATION AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |
| P-SU-00048 | 3/23/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Yunlong* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND RESPONDING TO REQUESTS FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION SCHEDULING, TRAVEL VISA APPLICATION AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |
| P-SU-00049 | 4/7/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Yunlong* | | EMAIL PREPARED DURING THE COURSE OF CRT LITIGATION AND PREPARED IN RESPONSE TO REQUEST FROM COUNSEL REGARDING TRAVEL VISA APPLICATION, DEPOSITION LOCATION AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |

In re Cathode Ray Tube (CRT) Antitrust Litigation – MDL No. 1917 Master File No. 07-CV-5944-JST

Irico Defendants' Log of Privileged Documents Responsive to December 8, 2022 Order

| IDENTIFIER | DATE | AUTHOR | ADDRESSEE(S) | COPYEE(S) | BLIND COPYEE(S) | DESCRIPTION | PRIVILEGE | REDACTED | PRODUCTION BATES |
|---|---|---|---|---|---|---|---|---|---|
| P-SU-00050 | 4/10/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* |  | EMAIL AND ATTACHED DRAFT LETTER PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP |  |  |
| P-SU-00051 | 4/15/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Zhang*<br>Yan Yunlong** |  | EMAIL THREAD AND ATTACHED DRAFT LETTER PREPARED DURING THE COURSE OF CRT LITIGATION PREPARED AT REQUEST OF COUNSEL SEEKING LEGAL ADVICE REGARDING TRAVEL VISA APPLICATION | AC/AWP |  |  |
| P-SU-00052 | 4/17/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* |  | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION AND DEPOSITION SCHEDULING | AC/AWP |  |  |
| P-SU-00053 | 4/29/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Yunlong* |  | EMAIL AND ATTACHED MATERIALS SELECTED BY COUNSEL PREPARED DURING THE COURSE OF CRT LITIGATION AND PROVIDING CONFIDENTIAL INFORMATION FOR THE PURPOSE OF RENDERING LEGAL ADVICE TO COUNSEL REGARDING TRAVEL VISA APPLICATION | AC/AWP |  |  |
| P-SU-00054 | 4/27/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Yunlong* |  | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION LOGISTICS, DEPOSITION PREPARATION AND DEPOSITION SCHEDULING | AC/AWP |  |  |
| P-SU-00055 | 4/25/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Yunlong* |  | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND RESPONDING TO REQUESTS FROM COUNSEL REGARDING TRAVEL VISA APPLICATION AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP |  |  |
| P-SU-00056 | 5/5/2022 | Zhang Wenkai* | Su Xiaohan<br>Wang Zhaojie | Yan Yunlong* |  | EMAIL PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOGISTICS AND DEPOSITION SCHEDULING | AC/AWP |  |  |

AC – ATTORNEY-CLIENT PRIVILEGE
AWP – ATTORNEY WORK PRODUCT

* ATTORNEY/COUNSEL FOR THE IRICO DEFENDANTS
** ATTORNEY/COUNSEL FOR CHINA ELECTRONICS CORPORATION

In re Cathode Ray Tube (CRT) Antitrust Litigation – MDL No. 1917, Master File No. 07-CV-5944-JST
Irico Defendants' Log of Privileged Documents Responsive to December 8, 2022 Order

| IDENTIFIER | DATE | AUTHOR | ADDRESSEE(S) | COPYEE(S) | BLIND COPYEE(S) | DESCRIPTION | PRIVILEGE | REDACTED | PRODUCTION BATES |
|---|---|---|---|---|---|---|---|---|---|
| P-SU-00057 | 5/5/2022 | Zhang Wenkai* | Su Xiaohua<br>Wang Zhaojie | Yan Yunlong** | | EMAIL PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOGISTICS AND DEPOSITION SCHEDULING | AC/AWP | YES | IRI-SU-000045-IRI-SU-000048 |
| P-SU-00058 | 5/5/2022 | Zhang Wenkai* | Su Xiaohua<br>Wang Zhaojie | Yan Yunlong** | | EMAIL PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOGISTICS AND DEPOSITION SCHEDULING | AC/AWP | YES | IRI-SU-000049-IRI-SU-000051 |
| P-SU-00059 | 5/5/2022 | Zhang Wenkai* | Su Xiaohua | Yan Yunlong**<br>Wang Zhaojie<br>Baylee Yang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL BAKER BOTTS L.L.P.* REGARDING DEPOSITION PREPARATION | AC/AWP | | |
| P-SU-00060 | 5/6/2022 | Zhang Wenkai* | Su Xiaohua | Yan Yunlong**<br>Baylee Yang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION PREPARED AT REQUEST OF COUNSEL AND CONTAINING LEGAL ADVICE OF COUNSEL BAKER BOTTS LLP REGARDING TRAVEL VISA APPLICATION AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |
| P-SU-00061 | 5/19/2022 | Baylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOGISTICS AND DEPOSITION PREPARATION | AC/AWP | YES | IRI-SU-000065-IRI-SU-000067 |
| P-SU-00062 | 5/19/2022 | Zhang Wenkai* | Baylee Yang* | Yan Zhang*<br>Yan Yunlong** | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOGISTICS | AC/AWP | | |
| P-SU-00063 | 5/19/2022 | Zhang Wenkai* | Baylee Yang* | Yan Zhang*<br>Yan Yunlong** | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION PREPARATION, DEPOSITION LOGISTICS AND DEPOSITION SCHEDULING | AC/AWP | YES | IRI-SU-000063-IRI-SU-000064 |
| P-SU-00064 | 5/24/2022 | Baylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOGISTICS AND DEPOSITION PREPARATION | AC/AWP | YES | IRI-SU-000065-IRI-SU-000067 |

AC – ATTORNEY-CLIENT PRIVILEGE
AWP – ATTORNEY WORK PRODUCT

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

* DENOTES COUNSEL FOR THE IRICO DEFENDANTS
** DENOTES COUNSEL FOR CHINA ELECTRONICS CORPORATION

PAGE 5 OF 13

In re Cathode Ray Tube (CRT) Antitrust Litigation – MDL No. 1917 / Master File No. 07-CV-5944-JST

Irico Defendants' Log of Privileged Documents Responsive to December 8, 2022 Order

| IDENTIFIER | DATE | AUTHOR | ADDRESSEE(S) | COPYEE(S) | BLIND COPYEE(S) | DESCRIPTION | PRIVILEGE | REDACTED | PRODUCTION BATES |
|---|---|---|---|---|---|---|---|---|---|
| P-SU-00065 | 5/25/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Yunlong*<br>Yan Zhang* | | EMAIL PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOGISTICS AND DEPOSITION PREPARATION | AC/AWP | | |
| P-SU-00066 | 5/25/2022 | Zhang Wenkai* | Wang Zhaojie<br>Su Xiaohua | Yan Yunlong*<br>Kaylee Yang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL BAKER BOTTS L.L.P.* REGARDING DEPOSITION PREPARATION | AC/AWP | | |
| P-SU-00067 | 5/25/2022 | Zhang Wenkai* | Su Xiaohua | | | TEXT MESSAGE PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION PREPARATION | AC/AWP | YES | IRI-SU-000003-IRI-SU-000128 |
| P-SU-00068 | 5/25/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Yunlong*<br>Yan Zhang* | | EMAIL THREAD AND ATTACHED MATERIALS SELECTED BY COUNSEL PREPARED DURING THE COURSE OF CRT LITIGATION AND PREPARED AT REQUEST OF COUNSEL REGARDING DEPOSITION PREPARATION, TRAVEL VISA APPLICATION AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |
| P-SU-00069 | 6/7/2022 | Kaylee Yang* | Wu Xiaojun**<br>Yang Xueling** | | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL REQUEST FROM COUNSEL REGARDING RESIGNATION OF SU XIAOHUA AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |
| P-SU-00070 | 6/7/2022 | Zhang Wenkai* | Kaylee Yang* | | | EMAIL PREPARED DURING THE COURSE OF CRT LITIGATION AND RESPONDING TO REQUESTS FROM COUNSEL REGARDING RESIGNATION OF SU XIAOHUA AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |
| P-SU-00071 | 6/10/2022 | Kaylee Yang* | Zhang Wenkai* | | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING RESIGNATION OF SU XIAOHUA AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |
| P-SU-00072 | 6/10/2022 | Kaylee Yang* | Zhang Wenkai* | | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING RESIGNATION OF SU XIAOHUA AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | | |

AC = ATTORNEY-CLIENT PRIVILEGE
AWP = ATTORNEY WORK PRODUCT

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

* DENOTES COUNSEL FOR THE IRICO DEFENDANTS
** DENOTES COUNSEL FOR CHINA ELECTRONICS CORPORATION

PAGE 10 OF 15

In re Cathode Ray Tube (CRT) Antitrust Litigation – MDL No. 1917 Master File No. 07-CV-5944-JST

Irico Defendants' Log of Privileged Documents Responsive to December 8, 2022 Order

| IDENTIFIER | DATE | AUTHOR | ADDRESSEE(S) | COPYEE(S) | BLIND COPYEE(S) | DESCRIPTION | PRIVILEGE | REDACTED | PRODUCTION BATES |
|---|---|---|---|---|---|---|---|---|---|
| P-SU-00073 | 6/10/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL THREAD DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL REQUEST FROM COUNSEL REGARDING RESIGNATION OF SU XIAOHUA | AC/AWP | YES | IRI-SU-000068-IRI-SU-000070 |
| P-SU-00074 | 6/10/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Zhang*<br>Yan Yunlong* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND RESPONDING TO REQUESTS FROM COUNSEL REGARDING RESIGNATION OF SU XIAOHUA | AC/AWP | YES | IRI-SU-000061-IRI-SU-000072 |
| P-SU-00075 | 6/20/2022 | Zhang Wenkai* | Kaylee Yang*<br>Yan Zhang* | Yan Yunlong* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND PREPARED AT REQUEST OF COUNSEL REGARDING DEPOSITION SCHEDULING, COVID-19 PANDEMIC RESTRICTIONS, AND RESIGNATION OF SU XIAOHUA | AC/AWP | YES | IRI-SU-000077-IRI-SU-000079 |
| P-SU-00076 | 6/21/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL AND ATTACHED DRAFT LETTER PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION SCHEDULING, AND RESIGNATION OF SU XIAOHUA | AC/AWP | | |
| P-SU-00077 | 6/21/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING RESIGNATION OF SU XIAOHUA AND COVID-19 PANDEMIC RESTRICTIONS | AC/AWP | YES | IRI-SU-000080-IRI-SU-000082 |
| P-SU-00078 | 6/21/2022 | Zhang Wenkai* | Kaylee Yang*<br>Zhang Wenkai* | Yan Zhang*<br>Yan Yunlong* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND PREPARED AT REQUEST OF COUNSEL REGARDING REGARDING DEPOSITION LOCATION, DEPOSITION SCHEDULING, AND RESIGNATION OF SU XIAOHUA | AC/AWP | | |
| P-SU-00079 | 6/22/2022 | Zhang Wenkai* | Kaylee Yang* | Yan Zhang*<br>Yan Yunlong* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND PREPARED AT REQUEST OF COUNSEL REGARDING RESIGNATION OF SU XIAOHUA | AC/AWP | YES | IRI-SU-000083-IRI-SU-000085 |

In re Cathode Ray Tube (CRT) Antitrust Litigation – MDL No. 1917 / Master File No. 07-CV-5944-JST

Irico Defendants' Log of Privileged Documents Responsive to December 8, 2022 Order

| IDENTIFIER | DATE | AUTHOR | ADDRESSEE(S) | COPYEE(S) | BLIND COPYEE(S) | DESCRIPTION | PRIVILEGE | REDACTED | PRODUCTION BATES |
|---|---|---|---|---|---|---|---|---|---|
| P-SU-00080 | 6/28/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Yunlong*<br>Yan Zhang* | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION SCHEDULING, AND RESIGNATION OF SU XIAOHUA | AC/AWP | YES | IRI-SU-000087-IRI-SU-000094 |
| P-SU-00081 | 6/28/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Zhang* | | EMAIL AND ATTACHED DRAFT FILINGS PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING IRICO MOTION FOR RELIEF FROM DEADLINE FOR WANG AND YAN DEPOSITIONS AND RESIGNATION OF SU XIAOHUA | AC/AWP | | |
| P-SU-00082 | 6/28/2022 | Kaylee Yang* | Wu Xiaojun**<br>[illegible]** | | | EMAIL THREAD PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEPOSITION LOCATION, DEPOSITION SCHEDULING, AND RESIGNATION OF SU XIAOHUA | AC/AWP | YES | IRI-SU-000095-IRI-SU-000102 |
| P-SU-00083 | 6/30/2022 | Kaylee Yang* | Zhang Wenkai*<br>Yan Zhang* | | | EMAIL THREAD AND ATTACHED DRAFT FILINGS PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING IRICO MOTION FOR RELIEF FROM DEADLINE FOR WANG AND YAN DEPOSITIONS AND RESIGNATION OF SU XIAOHUA | AC/AWP | | |
| P-SU-00084 | 7/21/2022 | Kaylee Yang* | Zhang Wenkai* | | | EMAIL THREAD AND ATTACHED DRAFT MOTION PAPERS PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING IRICO MOTION FOR RELIEF FROM DEADLINE FOR WANG AND YAN DEPOSITIONS AND RESIGNATION OF SU XIAOHUA | AC/AWP | | |
| P-SU-00085 | 8/12/2022 | Kaylee Yang* | Zhang Wenkai* | Yan Yunlong*<br>Yan Zhang* | | EMAIL AND ATTACHED LETTER FROM COUNSEL JOHN TALADAY* PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING FAILURE TO PRODUCE IRICO WITNESSES | AC/AWP | | |

AC = ATTORNEY CLIENT PRIVILEGE
AWP = ATTORNEY WORK PRODUCT

* DENOTES COUNSEL FOR THE IRICO DEFENDANTS
** DENOTES COUNSEL FOR CHINA ELECTRONICS CORPORATION

In re Cathode Ray Tube (CRT) Antitrust Litigation – MDL No. 1917 / Master File No. 07-CV-5944-JST

Irico Defendants' Log of Privileged Documents Responsive to December 8, 2022 Order

| [illegible] | DATE | AUTHOR | ADDRESSEE(S) | COPYEE(S) | BLIND COPYEE(S) | DESCRIPTION | PRIVILEGE | REDACTED | PRODUCTION BATES |
|---|---|---|---|---|---|---|---|---|---|
| P-SU-00085 | 8/14/2022 | Kaylee Yang* | Wu Xiaojun** | Kong Xueping** | | EMAIL THREAD AND ATTACHED LETTER FROM COUNSEL JOHN TALADAY* PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEADLINE TO PRODUCE IRICO WITNESSES | AC/AWP | | |
| P-SU-00087 | 8/15/2022 | Kaylee Yang* | Wu Xiaojun** | Kong Xueping** | | EMAIL THREAD AND ATTACHED EMAIL AND LETTER FROM COUNSEL JOHN TALADAY* PREPARED DURING THE COURSE OF CRT LITIGATION AND CONTAINING LEGAL ADVICE FROM COUNSEL REGARDING DEADLINE TO PRODUCE IRICO WITNESSES | AC/AWP | | |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

PAGE 13 OF 13

AC – ATTORNEY-CLIENT PRIVILEGE
AWP – ATTORNEY WORK PRODUCT

* DENOTES COUNSEL FOR THE IRICO DEFENDANTS
** [illegible] CHINA ELECTRONICS CORPORATION

# EXHIBIT OO

**SAVERI & SAVERI, INC.**
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

*Trump Alioto Trump & Prescott*
ATTORNEYS LLP
2280 Union Street
San Francisco, California 94123
(415) 563-7200
FAX (415) 346-0679

August 19, 2022

***VIA EMAIL***

John M. Taladay
Baker Botts LLP
700 K Street, N.W.
Washington, D.C. 20001
john.taladay@bakerbotts.com

Re: *In re Cathode Ray Tube (CRT) Antitrust Litigation* – MDL No. 1917, Master File No. 07-CV-5944-JST

Dear John:

We write regarding your proposal on our call today to begin Mr. Wang's deposition at approximately 4pm Pacific time on August 23, 2022—i.e., in two business days—and to begin Mr. Yan's deposition on Sunday, August 28. We note that this is the first time you have confirmed that these witnesses' depositions will actually go forward, and the first time you have provided dates for the depositions. We further note that these dates are not even certain since you informed us it is possible the witnesses may have to quarantine on arrival in Macau. You also informed us for the first time that you intend to question Irico's witnesses.

Your proposal is unreasonable and displays a lack of consideration for Plaintiffs' counsels' schedules. You and your client have known since the August 11 ruling that the depositions had to go forward by September 9th—30 days later. Yet, you informed us that Irico has done nothing to initiate the process of extending the witnesses' visas. Nor did you inform Plaintiffs of the August 30 visa deadline until two days ago. Now you are using that deadline to attempt to force Plaintiffs to take these depositions on two days' notice or grant you an extension.

As things stand, there is insufficient time to arrange for the Wang deposition to begin on August 23rd. We would like to discuss with you how long it will take to get extensions of the witnesses' visas and then agree upon new dates for the depositions. The October dates you previously proposed are too far out. Assuming we can agree on new dates, we will then stipulate to a short extension of the September 9th deadline with a stipulation reciting the foregoing facts as well as Irico's stipulated concessions should the witnesses fail to appear. Please let us know your earliest availability for a call to discuss.

Very truly yours,

*/s/ R. Alexander Saveri*
R. Alexander Saveri
Lead Counsel for the Direct Purchaser Plaintiffs

*/s/ Lauren C. Capurro*
Lauren C. Capurro
Lead Counsel for the Indirect Purchaser Plaintiffs

Cc: Evan J. Werbel
Thomas E. Carter
Andrew L. Lucarelli
Kaylee Yang
Geoffrey C. Rushing
Matthew D. Heaphy
Mario N. Alioto
Daniel E. Birkhaeuser

# EXHIBIT PP

BAKER BOTTS LLP

700 K STREET, NW
WASHINGTON, D.C.
20001-5736

TEL +1 202.639.7700
FAX +1 202.639.7890
BakerBotts.com

AUSTIN
BRUSSELS
DALLAS
DUBAI
HOUSTON
LONDON
NEW YORK
PALO ALTO
RIYADH
SAN FRANCISCO
**WASHINGTON**

August 19, 2022

VIA E-MAIL (RICK@SAVERI.COM,
LAURENRUSSELL@TATP.COM)

John Taladay
TEL: 202.639.7909
john.taladay@bakerbotts.com

R. Alexander Saveri
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111

Lauren C. Capurro
Trump Alioto Trump & Prescott LLP
2280 Union Street
San Francisco, CA 94123

Re: In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Master File No. 07-CV-944-JST

Dear Rick and Lauren:

We are prepared to discuss an extension to the deposition dates, provided it allows time for and is conditioned upon the receipt of an extension of the Visa dates for Mr. Yan and Mr. Wang. But we would also like to set the record straight.

We agree that the currently proposed dates are less than convenient for counsel, including Irico's counsel. As soon as the Court issued its order, we set about coordinating with Irico (a) to determine if the witnesses would agree to appear, and (b) once they agreed, to evaluate the timing and logistics of the depositions (note that it was Friday in China before we were able to inform them of the Court's decision). We only learned of the witnesses' agreement to appear on Monday of this week. We learned on Tuesday that the witnesses would have to return to China by the August 30, 2022, expiration date of the Macau visas. Recognizing that this would create a tight schedule, we reached out to Plaintiffs immediately to propose an extension and to set up a call for Wednesday, at which time we proposed starting the depositions on October 18, 2022, to allow the witnesses to obtain an extension of the Macau visas. On that call, which Lauren was not able to attend but which was attended by Rick and other counsel for DPPs and IPPs, we informed Plaintiffs that absent an extension, we would have to work on a schedule to *complete* the depositions by August 30. So, Plaintiffs were on constructive notice that the depositions would have to begin next week at that time. Plaintiffs declined that request for an extension by email just yesterday. In light of that decision and having consulted with Irico overnight, we informed you of the precise dates for the depositions this morning. Also, while those dates are soon, we note that you informed the Court in your opposition to our emergency motion that "Plaintiffs' counsel have had to prepare to take the depositions of these witnesses on four separate occasions," and on our call this afternoon Lauren complained that we were informing you of the depositions *too soon* after the Court's ruling. Finally, there was no reason for the Irico

witnesses to obtain an extension of the Macau visas, as you suggest, without an extension to the deposition schedule. As we explained on our call today, it would not have been possible to rely on getting an extension of the Macau visas by August 30 to ensure that we could conduct the depositions by September 9, 2022.

Absent an agreement on an extension between the parties, Irico is under Court Order to conduct the depositions prior to September 9, 2022, and Irico's witnesses are under Government compulsion to return to China by August 30, 2022. Thus, our choices are extremely limited, and the proposed dates are the most reasonable (*i.e.*, only) ones available.

With the background facts clarified, we agree that it makes sense to discuss an extension for the deposition dates. We are available to meet and confer tomorrow or Sunday, so that we can get this issue resolved before the witnesses' scheduled departure for Macau. To advance the thinking, we believe that it would be possible to obtain Visa extensions within about three-to-four weeks. On that basis, we could establish dates in late September for the depositions, conditioned upon the witnesses filing for Visa extensions by August 26, 2022, and obtaining the Visa extensions by September 15, 2022. If for some reason the Visas do not come through by that date, the deposition dates would have to be pushed out by a similar time frame without penalty to Irico, as we do not have any control over the Chinese visa process.

Please let us know as soon as possible your availability for a meet and confer.

Sincerely,

*/s/ John Taladay*
John Taladay

cc: Geoffrey C. Rushing
Matthew D. Heaphy
Mario N. Alioto
Daniel E. Birkhaeuser
Evan J. Werbel
Kaylee Yang
Thomas E. Carter
Andrew L. Lucarelli

# EXHIBIT QQ

**CERTIFICATE OF DEPONENT**

I, YAN YUNLONG, hereby certify that I have read the foregoing pages, numbered 150 through 308, of my deposition of testimony taken in these proceedings on Wednesday, September 28, 2022, and, with the exception of the changes listed on the next page and/or corrections, if any, find them to be a true and accurate transcription thereof.

Signed: ______________________

Name: Yan Yunlong

Date: 2022.11.1

**ERRATA SHEET**

Case Name: In Re Cathode Ray Tube Antitrust Litigation

Witness Name: Yan Yunlong

Date: 09/28/2022

| PAGE | LINE | NOW READS | SHOULD READ | REASON |
|---|---|---|---|---|
| 180 | 23 | IRC-CRT-00000232 | IRI-CRT-00000232 | Transcription error |
| 181 | 13 | IRC-CRT-00000232 | IRI-CRT-00000232 | Transcription error |
| 182 | 11 | IRC-CRT-00000234 | IRI-CRT-00000234 | Transcription error |
| 218 | 6 | substance, if any, advice | substance of any advice | Transcription error |
| 222 | 2 | presenting my advices | presenting my advice | Transcription error |
| 225 | 19 | from the CNEIEC | from CNEIECC | Transcription error |
| 226 | 1 | sales department of CNEIEC | sales department of CNEIECC | Transcription error |
| 230 | 19 | At some point in April | At some point after April | Misspoken |
| 232 | 7 | employees at CNEIEC | employees at CNEIECC | Transcription error |
| 263 | 12 | IRC-CRT-00024837 | IRI-CRT-00024837 | Transcription error |
| 283 | 21 | MR. CARTER | MR. RUSHING | Transcription error |
| 285 | 7 | CNEIEC | CNEIECC | Transcription error |
| 299 | 18 | state-owned Assets Supervision and Administration Commission | State-Owned Assets Supervision and Administration Commission | Transcription error |

Subscribed and sworn to before me this 11 th day of November, 2022.

YAN YUNLONG

# EXHIBIT RR

**SAVERI & SAVERI, INC.**
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

*Trump Alioto Trump & Prescott*
ATTORNEYS LLP
2280 Union Street
San Francisco, California 94123
(415) 563-7200
FAX (415) 346-0679

January 27, 2023

***VIA EMAIL***

John M. Taladay
Evan Werbel
Baker Botts LLP
700 K Street, N.W.
Washington, D.C. 20001

Re: *In re Cathode Ray Tube (CRT) Antitrust Litigation* – MDL No. 1917, Master File No. 07-CV-5944-JST

Dear John and Evan:

We write regarding the Errata to the Yan Yunlong deposition transcript dated September 28, 2022, which was served on Plaintiffs on November 11, 2022.

The erratum to page 230 line 19 purports to change Mr. Yan's testimony from "At some point ***in*** April" to "At some point ***after*** April" (emphases added), on the grounds that Mr. Yan "mis-spoke." In fact, this is an improper attempt to rewrite Mr. Yan's sworn testimony on the question of precisely when Irico knew that Mr. Su Xiaohua planned to retire and would not agree to be deposed. As you know, this testimony is highly relevant to recent and potential future proceedings before Judge Walker. In the Ninth Circuit, Rule 30(e) errata changes are only permitted "for corrective, not contradictory changes and may not be used to rewrite sworn testimony." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2014 WL 12647874, at *2 (N.D. Cal. Dec. 12, 2014) (citing *Hambleton Bros Lumber Co v Balkin Enters, Inc*, 397 F3d 1217, 1226 (9th Cir 2005) (striking Sharp's deposition errata as "not merely corrections of transcription errors but rewriting of sworn testimony").

Plaintiffs therefore request that Irico withdraw Mr. Yan's erratum to page 230, line 19. If Irico refuses to do so, Plaintiffs will seek appropriate relief. We are available to meet and confer next week.

Very truly yours,

*/s/ Lauren C. Capurro*
Lauren C. Capurro
Lead Counsel for the Indirect Purchaser Plaintiffs

John M. Taladay
Evan Werbel
1/27/2023
Page 2

*/s/ R. Alexander Saveri*
R. Alexander Saveri
Lead Counsel for the Direct Purchaser Plaintiffs

Cc: Thomas E. Carter
Andrew L. Lucarelli
Kaylee Yang
Geoffrey C. Rushing
Matthew D. Heaphy
Mario N. Alioto
Daniel E. Birkhaeuser
Alan Plutzik

# EXHIBIT SS

**From:** Werbel, Evan
**To:** Lauren Russell
**Cc:** Taladay, John; Carter, Tom; Lucarelli, Drew; kaylee.yang@nortonrosefulbright.com; Mario Alioto; Dan Birkhaeuser (dbirkhaeuser@bramsonplutzik.com); Alan Plutzik; rick@saveri.com; geoff@saveri.com; Matthew Heaphy (mheaphy@saveri.com); David Hwu (dhwu@saveri.com)
**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litig., 07-cv-5944-JST/Letter dated Jan. 27, 2023
**Date:** Thursday, February 16, 2023 12:55:44 PM

---

Lauren, We have been reviewing the issue that Plaintiffs raise in their 1/27/23 letter regarding the errata to Mr. Yan's deposition transcript. We disagree with Plaintiffs' suggestion that the errata improperly rewrites Mr. Yan's testimony. The purpose of the errata was in fact "corrective" and not meant to be contradictory of his overall testimony given the specific question asked of Mr. Yan and the surrounding questions. We also note that "misspoken" is an appropriate reason for an errata and one that has been used by the Plaintiffs in this case as recently as the DPP errata to Dr. Johnson's deposition last year. We are available next week if Plaintiffs would like to discuss this further.

Thanks,
Evan

**Evan J. Werbel**
Baker Botts L.L.P.
evan.werbel@bakerbotts.com
T - 202.639.1323
M - 202.744.0819

700 K Street, NW
Washington, DC 20001
USA

**From:** Werbel, Evan
**Sent:** Friday, February 10, 2023 2:24 PM
**To:** Lauren Russell <LaurenRussell@tatp.com>
**Cc:** Taladay, John <john.taladay@bakerbotts.com>; Carter, Tom <Tom.Carter@BakerBotts.com>; Lucarelli, Drew <drew.lucarelli@bakerbotts.com>; kaylee.yang@nortonrosefulbright.com; Mario Alioto <MAlioto@tatp.com>; Dan Birkhaeuser (dbirkhaeuser@bramsonplutzik.com) <dbirkhaeuser@bramsonplutzik.com>; Alan Plutzik <aplutzik@bramsonplutzik.com>; rick@saveri.com; geoff@saveri.com; Matthew Heaphy (mheaphy@saveri.com) <mheaphy@saveri.com>; David Hwu (dhwu@saveri.com) <dhwu@saveri.com>
**Subject:** Re: In re Cathode Ray Tube (CRT) Antitrust Litig., 07-cv-5944-JST/Letter dated Jan. 27, 2023

Lauren, We were surprised to receive your letter two and half months after we submitted the errata. We are evaluating the issue you raised and will get back to you next week.

Have a good weekend,
Evan

On Feb 9, 2023, at 8:54 PM, Lauren Russell <LaurenRussell@tatp.com> wrote:


**[EXTERNAL EMAIL]**

John and Evan:

We have not heard back from you regarding the attached letter requesting that Mr. Yan withdraw the erratum to his deposition testimony. Please respond by COB tomorrow so that we may seek appropriate relief, if necessary.

Thank you.

Lauren

Lauren C. Capurro (Russell)
Attorney at Law
Trump, Alioto, Trump & Prescott, LLP
Telephone: (415) 860-5051
E-mail: laurenrussell@tatp.com

This message is sent by a law firm and may contain information that is privileged or confidential.  If you received this transmission in error, please notify the sender by email and delete the message and any attachments.


**From:** Lauren Russell
**Sent:** Friday, January 27, 2023 4:24 PM
**To:** 'Werbel, Evan' <evan.werbel@bakerbotts.com>; John Taladay (john.taladay@bakerbotts.com) <john.taladay@bakerbotts.com>
**Cc:** 'Carter, Tom' <Tom.Carter@BakerBotts.com>; Lucarelli, Drew <drew.lucarelli@bakerbotts.com>; kaylee.yang@nortonrosefulbright.com; Mario Alioto <MAlioto@TATP.com>; Dan Birkhaeuser (dbirkhaeuser@bramsonplutzik.com) <dbirkhaeuser@bramsonplutzik.com>; Alan Plutzik <aplutzik@bramsonplutzik.com>; rick@saveri.com; geoff@saveri.com; David Hwu (dhwu@saveri.com) <dhwu@saveri.com>; Matthew Heaphy (mheaphy@saveri.com) <mheaphy@saveri.com>
**Subject:** In re Cathode Ray Tube (CRT) Antitrust Litig., 07-cv-5944-JST/Letter dated Jan. 27, 2023

Dear John and Evan:

Please see the attached correspondence.

Best,

Lauren

Lauren C. Capurro (Russell)
Attorney at Law
Trump, Alioto, Trump & Prescott, LLP
Telephone: (415) 860-5051
E-mail: laurenrussell@tatp.com

This message is sent by a law firm and may contain information that is privileged or confidential.  If you received this transmission in error, please notify the sender by email and delete the message and any attachments.

<2023-01-27 - Plaintiffs Letter re Yan Yunlong Errata.pdf>

**Confidentiality Notice:**

The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.

# EXHIBIT TT



info@certifiedtranslate.com
www.certifiedtranslate.com

2425 Olympic Blvd., Suite 4000W
Santa Monica, CA 90404

usa 1-888-856-2228
int +1-310-684-3153
fax +1-310-564-1944

A member of the American Translators Association
ATA Member Number: 248719

# CERTIFIED TRANSLATION

*Description of Document(s):*

| |
|---|
| **IRICO GROUP CO., LTD. MEETING MINUTES** |
| **APRIL 7, 2022** |
| **IRI-SU-000137 through IRI-SU-000140** |
| |

| Source Language: **CHINESE** | Target Language: **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:** Sean Kirschenstein, Director **Date:** January 12, 2023

A copy of the translated version(s) is attached to this statement of certification.



Internal

# Irico Group Co., Ltd. Meeting Minutes

**Meeting Minutes for the Secretary's Special Topic Meeting on April 7, 2022**

On April 7, 2022, our Group company convened a secretary's special topic meeting. The attendees included the following: the Party Committee Secretary of the Group, Chairman Si Yun-Cong, the Deputy Party Committee Secretary, Chief Executive Officer Yang Yuan Jiang, Discipline Committee Secretary Bao Yong, and the Department Head of the Human Resources Department Shi Feng. The summary of the meeting minutes is as follows:

**Sensitive Non-Responsive Personnel Matters Redacted**



**Sensitive Non-Responsive Personnel Matters Redacted**



**Sensitive Non-Responsive Personnel Matters Redacted**

**6. Regarding matters related to Su Xiao Hua reaching retirement age and departure**

In accordance with the relevant rules in the "Performance and Evaluation Measures for Managers of Supervisors of Irico Group, Co. Ltd.", Su Xiao Hua, the regional general manager for the Hunan area of Xianyang Irico Industrial Group Co., Ltd., has reached the upper age limit for employment in March 2022, and will leave his position as manager at the end of December to retire and rest. Because he himself submitted a request to leave the position ahead of schedule, after discussion, it has been agreed that Su Xiao Hua may leave the position ahead of schedule after reaching upper age limit for employment. The relevant administrative work regarding Su Xiao Hua leaving the position shall be processed by Irico Industrial based on the relevant rules and stipulations in the "Performance and Evaluation Measures for Managers of Supervisors of Irico Group, Co. Ltd."

**I. Date:** April 7, 2022

**II. Location:** Xianyang office building meeting room 303

**III. Chair:** Si Yin Cong

**IV. Participants:** Yang Yuan Jiang, Bao Yong

**V. Recorded by:** Shi Feng



**VI. Agenda:**

**Sensitive Non-Responsive Personnel Matters Redacted**

6. Regarding matters related to Su Xiao Hua reaching retirement age and departure

| Copy: Relevant leaders of the Group company. | |
|---|---|
| Human Resources Department | Printed and distributed on April 6, 2022 |



内 部

# 彩虹集团有限公司纪要

---

## 2022年4月7日书记专题会纪要

2022年4月7日,集团公司召开书记专题会,集团党委书记、董事长司云聪,党委副书记、总经理阳元江,纪委书记包勇,人力资源部部长石峰参加会议。会议形成纪要如下:

Sensitive Non-Responsive Personnel Matters Redacted

Sensitive Non-Responsive Personnel Matters Redacted

- 2 -

CONFIDENTIAL IRI-SU-000138

Sensitive Non-Responsive Personnel Matters Redacted

**六、关于苏晓华到龄离岗有关事宜**

根据《彩虹集团有限公司经理人管理及绩效考评办法》有关规定，咸阳彩虹集团实业有限公司华南区域总经理苏晓华2022年3月到达任职年龄上限，到12月底退出经理人岗位，离岗休息。因本人提出提前离岗要求，经讨论，同意苏晓华到达任职年龄上限后提前离岗，由彩虹实业参照《彩虹集团有限公司经理人管理及绩效考评办法》有关规定，办理苏晓华离岗手续。

**一、时　间：**2022年4月7日

**二、地　点：**咸阳办公楼303会议室

**三、主　持：**司云聪

**四、参　加：**阳元江、包　勇

**五、记　录：**石　峰

**六、议 题：**

Sensitive Non-Responsive Personnel Matters Redacted

6. 关于苏晓华到龄离岗有关事宜

抄送：集团公司有关领导。

集团人力资源部 2022 年 4 月 8 日印发

- 4 -

CONFIDENTIAL IRI-SU-000140

# EXHIBIT UU



info@certifiedtranslate.com
www.certifiedtranslate.com

2425 Olympic Blvd., Suite 4000W
Santa Monica, CA 90404

usa 1-888-856-2228
int +1-310-684-3153
fax +1-310-564-1944

A member of the American Translators Association
ATA Member Number: 248719

# CERTIFIED TRANSLATION

*Description of Document(s):*

| |
|---|
| **RESIGNATION REPORT** |
| **SU XIAOHUA** |
| **IRI-SU-000141** |
| |

| Source Language: **CHINESE** | Target Language: **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:** Sean Kirschenstein, Director **Date:** March 3, 2023

A copy of the translated version(s) is attached to this statement of certification.



# Resignation Report

To all of the respected leaders:

Good day!

For a long period of time I have always conscientiously performed my job duties at my own post, and I have always been involved in various management tasks in South China with a high sense of responsibility and mission, and I have always done so by welcoming all of the challenges at work. At the same time, I am also very grateful to the leaders of Irico Group and Irico Industrial Company for their cultivation of and care for me.

However, due to the fact that I have been working outside my home for a long period of time, it has been impossible to take care of my elderly parents at home. Last year, my father, who was nearly 90 years old, passed away, and now I have my elderly mother, who is more than 80 years old. She has not had anyone to take care of her for a long time. She has been on my mind, and I am quite worried.

At this time, I have reached the upper limit of the employment age for managers. Due to the above personal reasons, I would like to apply for early resignation from my position as a manager and terminate my employment relationship with the company. Please be advised.

Applicant: *Su Xiaohua [signature]*

Date of Application: 2022 / *[illegible]* / 24

# 辞职报告

尊敬的各位领导：

您们好！

本人长期以来兢兢业业的在自己的岗位上做好本职工作，始终以高度的责任心和使命感，以一往无前的工作精神扎进华南区的各项管理工作中。同时，也非常感谢彩虹集团及彩虹实业领导一直以来对我的栽培和关心。

然而，由于长期在外工作，根本无法照顾家中的老父母。去年近 90 岁的老父亲逝世，现家中还有一位 80 多的老母亲处于长期无人照顾，心中甚是挂念和担心。

目前，本人已达到经理人任职年龄上限，鉴于以上个人原因，现申请提前退出经理人岗位，解除与公司的劳动关系。请知悉。

申请人：苏晓华

申请日期：2022年5月25日

# EXHIBIT VV

**From:** sxh@ch.com.cn
**Sent:** Friday, May 6, 2022 2:42 AM
**To:** zhangwenkai0713
**Subject:** 承诺书和身份证
**Attachments:** 承诺书（苏总）.pdf; 苏总 身份证.pdf

sxh@ch.com.cn

# 中国电子团公出国（境）人员承诺书

根据《中华人民共和国国家安全法》《中华人民共和国反间谍法》《中华人民共和国保守国家秘密法》等相关法律，为保障在出国(境)期间的政治安全，本人郑重承诺：

一是严格遵守政治规矩和纪律，加强请示报告；

二是严格遵守保密制度，严格保守所知悉的国家秘密；

三是严格遵守外事纪律，不出入违法复杂场所；

四是坚定维护国家利益和形象；

五是不发表违背国家政策的言论；

六是不参加民运、法轮功、“疆独”和“藏独”等敌对势力组织的活动；

七是未经批准不得接受境外机构、人员赠送的礼品；

八是未经批准不得接受境外媒体的采访；

九是未经批准不与境外人员私自交往、或参与非公务会面和活动；

十是回国后如实向本单位报告出国(境)期间的情况，不得谎报、瞒报、漏报。

承诺人：[signature]

2022年5月6日



CONFIDENTIAL IRI-SU-000054

# EXHIBIT WW

**SAVERI & SAVERI, INC.**
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

May 27, 2021

***VIA EMAIL***

The Honorable Vaughn R. Walker
Law Office of Vaughn R. Walker
Four Embarcadero Center, Suite 2200
San Francisco, CA 94111
vrw@judgewalker.com

Re: *In re Cathode Ray Tube (CRT) Antitrust Litigation* – MDL No. 1917, Master File No. 07-CV-5944-JST

***CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER***

Dear Judge Walker:

Please find enclosed an index of 103 meetings and other contacts between the Irico Defendants and other defendants Plaintiffs have documented through discovery in this action to date, along with binders containing relevant supporting documents, as the Court requested at the May 13, 2021 hearing. The index lists each meeting or contact by number, contains a brief description of the meeting or contact, and identifies evidence demonstrating the occurrence of the meeting or contact—e.g. meeting notes produced by other defendants, interrogatory responses of other defendants identifying the meeting, deposition testimony confirming the occurrence of the meeting, etc. The binders are organized with numbered tabs corresponding to the index.

The May 13 hearing was the second hearing on DPPs' motion to compel. The motion was filed on February 22, 2021 and fully briefed as of March 8, 2021. The motion was based on Irico's failure to provide responsive information to Interrogatories Nos. 4 and 5 of DPPs' First Set of Interrogatories seeking identification of contacts with competitors (number 5) and agreements with competitors (number 4)—the core issues in the litigation.[1] Despite the fact that there was evidence of scores of meetings/contacts by Irico with its competitors in the discovery record, Irico identified no meetings in its response to Interrogatory No. 5. DPPs had submitted meeting notes and other evidence documenting 26 of these meetings/contacts with their briefing in 2017 in connection with their motion for entry of a default judgment and Irico's motion to lift the default (the "26

[1] Other defendants provided extensive responses. *See, e.g.*, Samsung SDI Defendants' Second Supplemental Responses to DPPs' First Set of Interrogatories, Nos. 4 and 5 (Dep. Ex. 2450), Binder 1, Tab 7 (identifying over 640 meetings and discussions).

Meetings").[2] *See, e.g.,* Saveri Decl. in Support of DPPs' Opp'n to the Irico Defs.' Mot. to Set Aside Default, Ex. 11 (ECF No. 5228-1). DPPs also submitted, among other things, testimony by Irico's corporate representative Wang Zhaojie confirming that Irico often had meetings with its competitors and that he himself had attended "many, many" such meetings. DPPs' Mot. to Compel Responses to Interrogs. from the Irico Defs., at 5 (Feb. 22, 2021) (hereinafter "Motion" or "Mot."); Saveri Decl. in Support of DPPs' Mot. to Compel Responses to Interrogs. from the Irico Defs., Ex. 8 (Feb. 22, 2021).

DPPs argued that, in accordance with the Special Master's previous order on a motion involving Mitsubishi's responses to similar interrogatories, Irico must identify in its responses such documented meetings/contacts, unless it identified evidence providing a reasonable ground to believe that the meeting/contact did not occur. Mot. 9–10 (citing Order re Direct Purchaser Pls.' Mot. to Compel Mitsubishi Disc. re Meetings with Competitors, Sales, Destruction of Evid. & for Evidentiary Sanctions (Aug. 29, 2016) (ECF No. 4802) ("Mitsubishi Order")). In particular, Irico could not rely solely on an inability to recall or confirm attendance at such meetings to avoid identifying them in response to the interrogatories. Mot. 8–10; Reply in Support of Mot. to Compel Responses to Interrogs. from the Irico Defs. ("Reply") (March 8, 2021) at 6–7; Mitsubishi Order at 12 ("The *Noble* principles are applicable here. Mitsubishi's justifications for its inadequate responses to interrogatory No. 5 are insubstantial at best. Mitsubishi cannot rely upon a few of its employees' failure to recall attendance at meetings as the basis to claim that it has no knowledge or evidence of events ordinarily in its possession in the face of documentary evidence that such meetings occurred.")

Irico opposed the motion primarily on the ground that it needed time to complete its investigations before it could respond and that the date it proposed to respond—May 10, 2021—was reasonable. Irico Opp'n to DPPs' Mot. to Compel ("Opp.") (March 1, 2021) at 1–3. It denied that it was refusing to provide information, and it assured the Court that it intended to comply with the Mitsubishi Order. *See, e.g.*, Opp. 2 ("Irico has committed to timely providing meaningful supplementation to its responses to Interrogatories 4 and 5 early in the discovery process, and DPPs' motion is pure gamesmanship"); pp. 4–5 ("Far from 'claiming an ignorance of facts,' Irico is expeditiously conducting exactly the kind of factual investigation Mitsubishi was ordered to undertake and has promised a substantive response to DPPs no later than May 10, 2021, with rolling supplementation as required under Federal Rule 26(e)."); pp. 6–7 ("Irico is using each data point as a potential lead in its ongoing investigation for the very detailed and specific information that DPPs have requested for Interrogatory No. 5, such as the date, location, initiator, participants, subjects of discussion, information provided or received, any actions taken as a result, and all persons with knowledge relating to each and every meeting or communication with a producer of CRTs over a period of thirteen years. Attempting to gather this information to satisfy Irico's discovery obligations under

---

[2] The 26 Meetings are listed chronologically as tab numbers 1–26 in the binders. The additional meeting/contacts are chronologically numbered tabs 27–103.

the Federal Rules is a labor-intensive process, and Irico's proposed response date is reasonable—indeed, ambitious—for accomplishing that task." (Footnote omitted)).

DPPs filed a reply letter brief containing additional factual discussion, among other things. Reply in Support of Mot. to Compel Responses to Interrogs. from the Irico Defs. (March 8, 2021).

At the first hearing on the motion on March 31, 2021, the Irico Defendants repeated these arguments and assurances. The Court took them at their word. It ordered them to provide "complete supplementation" to their responses according to the schedule they had proposed and according to the standards set forth in the Mitsubishi Order:

> The Irico defendants represent that they have heretofore partially responded to these interrogatories and continue to do so on a rolling basis. They commit to complete supplementation of their responses by May 10, 2021 and to do so in adherence to the procedures established by the undersigned herein in ECF No 4802 ("Mitsubishi Order). Hence, the undersigned DIRECTED the parties to continue this process and scheduled a further hearing before the undersigned on May 13, 2021 at twelve noon PDT at which time the status of responses to Interrogatory Nos 4 & 5 will be reviewed along with all other pertinent discovery matters.

DPPs' Notice of Entry of Order by Special Master, p. 5 (ECF No. 5919).

Irico's supplemental responses, however, failed to live up to its assurances or the Court's order. Despite the immense amount of investigation Irico represented it was performing into the details of the many meetings/contacts with its competitors during the class period, Irico specifically identified only four meetings it attended, three of which (Binder Tabs 2, 6, 15) its Corporate Representative Wang Zhaojie had already admitted attending over two years ago. *See* Mot. 5. Irico also admitted generally to attending (apparently numerous) other meetings, but provided no meaningful detail on the grounds that its attendees could not remember the particulars of the meetings they attended, essentially ignoring the evidence of the scores of other meetings/contacts with its competitors presented here. *See* Irico's Third Supp. Objections & Responses to DPPs' First Set of Interrogatories at 7 (May 10, 2021).

As to Interrogatory No. 4, Irico denied any agreements with its competitors based on Wang Zhaojie's testimony that it was his "understanding" that there were no such agreements. Irico Second Supp. Objections & Responses to DPPs' First Set of Interrogs. at 7–8 (May 3, 2021). Again, Irico simply ignores evidence of such agreements. In particular, Irico did not acknowledge the testimony of Chunghwa conspirator Jason Lu and his meeting notes that affirm an agreement to raise prices by Irico, as to which Wang had no personal knowledge. *Id*. *See* Reply at 5–6. In short, like Mitsubishi, Irico has simply ignored evidence of its attendance at scores of documented competitor meetings

and other contacts, as well as agreements with competitors, based entirely on a claim of a failure of recollection.

At the second hearing on May 13, Irico confirmed this position. It also argued, contrary to the Mitsubishi Order, that it need not acknowledge a meeting/contact unless it could specifically confirm its attendance via other evidence originally in its possession, despite the existence of other evidence demonstrating that it occurred.

In response to Irico's arguments, the Court noted that it appeared that an order to compel further responses would be futile, and that it was appropriate to consider an order deeming the meetings identified by Plaintiffs as established for purposes of trial. Plaintiffs agreed that such an order would be appropriate and offered to provide the Special Master and Irico with a list and evidence of Irico's meetings/contacts with competitors that Plaintiffs have identified to date.

An order 1) deeming Irico's attendance at the meetings identified by Plaintiffs as established; and 2) deeming the evidence contained in the binders submitted herewith admissible at trial is appropriate in the circumstances. Such an order is comparable to the order the Special Master recommended in regard to the Mitsubishi Defendants in similar circumstances. *See* Mitsubishi Order at 38–39 (recommending that interrogatory response and meeting notes evidencing attendance at competitor meetings be deemed admissible at trial) and justified for similar reasons.

First, meetings/contacts listed in the index are responsive to Interrogatory No. 5 and the supporting evidence is strong and not materially contradicted. Under the standards of the Mitsubishi Order, Irico was required to identify those meetings in its supplemental responses or identify evidence to the contrary. The same is true of the meeting notes and other evidence (see, e.g., nos. 6, 9, 10, 12, 19, 28, 34, 37, 38) that indicate that Irico made agreements required to be identified in response to Interrogatory No. 4. Irico has failed to do so.

Second, Irico's assertion that it cannot respond to the interrogatories because it lacks information because of the passage of time and loss of evidence is baseless. In fact, Irico has interviewed eight current and former employees who, between them, attended at least ***47*** meetings listed in the index.[3] Irico Corporate Representative and former sales

[3] Irico indicated that it interviewed the following individuals (among others) in connection with its search for documents relating to the 26 Meetings: Guo Mengquan, Deputy Chairman of the Board, Irico Group; Wang Zhaojie, General Manager, Irico Smart Lighting Company; Liang Yuan, former Deputy General Manager of Sales Department, Irico Display; Shen Xiaolin, former Deputy General Manager and General Manager of Sales Department, Irico Display; and Wei Jian-she, former General Manager of Sales, Irico Group. Irico's Third Supp. Objections & Responses to DPPs' First Set of RFPs (Oct. 10, 2018) at 9. Irico's recent supplemental responses to Interrogatory No. 5 also appear to indicate that they interviewed Wang Zhaojie; Su Xiaohua, then the Deputy

manager during the class period Wang Zhaojie attended eighteen meetings (see meeting numbers 2, 4, 5, 6, 7, 11, 12, 13, 15, 27, 28, 30, 31, 38, 42, 46, 48, 55); Irico senior executive Guo Menguan attended at least five meetings (see meeting numbers 22, 76, 78, 81, 91); Liang Yuan attended at least twelve meetings (see meeting numbers 21, 23, 37, 43, 44, 52, 60, 62, 73, 77, 84, 88); Shen Xiaolin attended at least eight meetings (see meeting numbers 23, 24, 25, 72, 75, 81, 83, 85); Wei Jianshe attended at least seven meetings (see meeting numbers 1, 2, 9, 18, 20, 54, 75); Wang Ximin attended at least two meetings (see meeting numbers 23, 102); and Su Xiaohua attended at least one meeting (see meeting number 23).

Moreover, the lack of information of which Irico complains is self-inflicted and culpable. As the Special Master is well aware, Irico absented itself from this litigation for over seven years. The Court has already found that this caused substantial prejudice to Plaintiffs by depriving them of relevant evidence, including that caused by fading memories. Order Setting Aside Default at 15 (ECF No. 5240) ("The DPPs were inarguably prejudiced by the Irico Defendants' decision to disappear from the case for ten years.").

Third, and similarly, as the Court will observe, the meeting notes are rich with content that should have enabled Irico to admit (or deny) its attendance at particular meetings. The notes provide much more than simply the date of the meeting, the names of attendees and the location (city and hotel or facility). The notes also often provide the participants' observations about the market and social conditions (for example, SARS) prevailing at the time. They share the conspirator's detailed data about monthly production, sales, and efforts to *limit* production by shutting down factories in specified locations. Thus, these notes provide numerous opportunities to jog Irico's corporate "memory" and verify that it did or did not attend a specific meeting. Again, the fact that Irico has produced no evidence reasonably supporting a conclusion that they did not attend meetings is telling.

Finally, as explained in DPPs' opening letter brief (Mot. 10) Irico's conduct continues a pattern of discovery abuse.

* * *

Plaintiffs anticipate that Irico will seek to file additional briefing and are willing to meet and confer on an appropriate schedule.

---

General Manager for Planning in the Irico Sales Company; and Wang Ximin. Irico's Third Supp. Objections & Responses to DPPs' First Set of Interrogatories (May 10, 2021) at 7–9.

The Honorable Vaughn R. Walker
5/27/2021
Page 6

Very truly yours,

*s/ R. Alexander Saveri*

R. Alexander Saveri
Lead Counsel for Direct Purchaser Plaintiffs

Cc: Jay Weil (jay.weil@fedarb.com)
John M. Taladay (john.taladay@bakerbotts.com)
Evan J. Werbel (evan.werbel@bakerbotts.com)
Thomas E. Carter (tom.carter@bakerbotts.com)
Andrew L. Lucarelli (drew.lucarelli@bakerbotts.com)
Kaylee Yang (kaylee.yang@bakerbotts.com)
Mario N. Alioto (malioto@tatp.com)
Lauren C. Capurro (laurenrussell@tatp.com)
Daniel E. Birkhaeuser (dbirkhaeuser@bramsonplutzik.com)

***CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER***

# EXHIBIT XX

**Matthew Heaphy**

**From:** Geoff Rushing
**Sent:** Tuesday, October 09, 2018 2:28 PM
**To:** stuart.plunkett@bakerbotts.com; john.taladay@bakerbotts.com
**Cc:** erik.koons@bakerbotts.com; Matthew Heaphy; Lauren Capurro (Russell); CMicheletti@zelle.com; 'Qianwei Fu'; Rick Saveri
**Subject:** Hong Kong Depos -- CRT litigation

Stuart:

In light of your representation that Irico cannot fully comply with Judge Walker's recent orders in time for the new documents, etc. to be used in the depositions scheduled for November 5-9, and the uncertainties created by Irico's objections to those orders, DPPs and IPPs agree that the depositions should be rescheduled. We would like to aim for mid to late January 2019. That would seem to give your clients ample time to do the work required by the orders, and avoid problems with the holidays.

Please let me know your thoughts on this.

Geoff

# EXHIBIT YY

**SAVERI & SAVERI, INC.**
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

February 5, 2019

***VIA EMAIL***

Stuart C. Plunkett
Baker Botts LLP
101 California Street, Suite 3600
San Francisco, California 94111
stuart.plunkett@bakerbotts.com

Re: *In re Cathode Ray Tube (CRT) Antitrust Litigation* – MDL No. 1917, Master File No. 07-CV-5944-JST

Dear Stuart:

This letter addresses several matters related to the Rule 30(b)(1) and 30(b)(6) depositions of Messrs. Wang, Zhang and Guo now scheduled for the week of March 4, 2019 in Hong Kong.

First, Plaintiffs request that your clients review their interrogatory responses to ensure that they are up to date. For example, the Irico Defendants' response to DPPs' First Set of Interrogatories, No. 20 is now incomplete in light of their recent document productions, as is their response to IPPs' Second Set of Interrogatories, No. 4, section (c). Please serve supplemental response(s) and verification(s) sufficiently in advance of the depositions in accordance with Rule 26(e) of the Federal Rules of Civil Procedure. Please let me know as soon as possible if your clients will be unable to do so.

Second, per your suggestion during our meet and confer on January 23, Plaintiffs request that the Irico Defendants' reserve Saturday, March 9 as a potential extra day for the depositions, if necessary. Please let me know if your clients agree to do so; we would need to make the necessary arrangements for court reporters, videographers, and conference space, etc.

Third, please confirm that the witnesses will require interpretation. As set forth in section VII.A of the Court's Order re Discovery and Case Management Protocol, ECF No. 1128 (Apr. 3, 2012), "[t]he Party requesting an interpreter shall bear the expense of providing an interpreter." We can ask the court reporter to make arrangements.

Finally, Plaintiffs will serve amended deposition notices shortly, including revisions of the Rule 30(b)(6) topics to which Irico previously objected. Once Plaintiffs have served the revised 30(b)(6) notice, please confirm which witness will serve as Irico's corporate designee for each topic.

Thank you.

Very truly yours,

*s/ Geoffrey C. Rushing*

Geoffrey C. Rushing

Cc: John Taladay
Erik T. Koons
Thomas E. Carter
Ashley Eickhof
Kaylee Yang
Mario N. Alioto
Lauren C. Capurro
Joseph M. Patane
Christopher T. Micheletti
Qianwei Fu

crt.710

# EXHIBIT ZZ

**Matthew Heaphy**

---

**From:** Tom.Carter@BakerBotts.com
**Sent:** Monday, February 25, 2019 1:31 PM
**To:** stuart.plunkett@bakerbotts.com; LaurenRussell@TATP.com
**Cc:** Matthew Heaphy; john.taladay@bakerbotts.com; erik.koons@bakerbotts.com; kaylee.yang@bakerbotts.com; malioto@tatp.com; jpatane@tatp.com; CMicheletti@zelle.com; QFu@zelle.com; Rick Saveri; Geoff Rushing; Cadio Zirpoli; drew.lucarelli@bakerbotts.com; brian.jacobsmeyer@BakerBotts.com
**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

Counsel:

Irico will designate witnesses for the 30(b)(6) topics originally assigned to Mr. Guo as follows:

- Topic 1: Zhaojie Wang
- Topic 2: Zhaojie Wang
- Topic 7: Wenkai Zhang
- Topic 8: Zhaojie Wang
- Topic 15: Zhaojie Wang
- Topic 16: Wenkai Zhang
- Topic 17: Wenkai Zhang

Thank you,
Tom Carter

**From:** Plunkett, Stuart
**Sent:** Monday, February 25, 2019 2:01 PM
**To:** Lauren Capurro <LaurenRussell@TATP.com>
**Cc:** mheaphy@saveri.com; Taladay, John <john.taladay@bakerbotts.com>; Koons, Erik <erik.koons@bakerbotts.com>; Carter, Tom <Tom.Carter@BakerBotts.com>; Yang, Kaylee <kaylee.yang@bakerbotts.com>; malioto@tatp.com; jpatane@tatp.com; CMicheletti@zelle.com; QFu@zelle.com; Rick@saveri.com; Geoff@saveri.com; cadio@saveri.com; Lucarelli, Drew <drew.lucarelli@bakerbotts.com>; Jacobsmeyer, Brian <brian.jacobsmeyer@BakerBotts.com>
**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

All:

In advance of our call this morning, I wanted to let you know that we just received word that Mr. Guo will be unable to travel to Hong Kong due to health issues. The Rule 30(b)(6) topics that Mr. Guo was preparing for will be reassigned to Mr. Zhang and Mr. Wang. We will send you those details. Mr. Zhang will sit for deposition Monday and Tuesday and Mr. Wang will go Wednesday, Thursday, and Friday.

Regards,

Stuart

**Stuart C. Plunkett**
Partner, San Francisco Office
stuart.plunkett@bakerbotts.com

T +1.415.291.6203
C +1.415.608.8165

---

**From:** Lauren Capurro <LaurenRussell@TATP.com>
**Sent:** Sunday, February 24, 2019 9:52 PM
**To:** Plunkett, Stuart <stuart.plunkett@bakerbotts.com>
**Cc:** mheaphy@saveri.com; Taladay, John <john.taladay@bakerbotts.com>; Koons, Erik <erik.koons@bakerbotts.com>; Carter, Tom <Tom.Carter@BakerBotts.com>; Yang, Kaylee <kaylee.yang@bakerbotts.com>; malioto@tatp.com; jpatane@tatp.com; CMicheletti@zelle.com; QFu@zelle.com; Rick@saveri.com; Geoff@saveri.com; cadio@saveri.com; Lucarelli, Drew <drew.lucarelli@bakerbotts.com>; Jacobsmeyer, Brian <brian.jacobsmeyer@BakerBotts.com>
**Subject:** Re: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

Stuart:

We would like to talk tomorrow regarding the deposition topics. Does 11.30 am Pacific still work for everyone?

If we are unable to resolve this ourselves, we propose contacting Judge Walker tomorrow to request an expedited/modified briefing schedule on our motion to compel. We would propose simultaneous letter briefs to be submitted on Tuesday so that Walker can rule before the depositions.

Regards,

Lauren

Sent from my iPhone

On Feb 22, 2019, at 9:53 AM, <stuart.plunkett@bakerbotts.com> <stuart.plunkett@bakerbotts.com> wrote:

> Lauren,
>
> Please see attached correspondence. We can be available Monday anytime between 11:30 a.m. and 4 p.m. if you want to discuss any of these topics.
>
> Regards,
>
> Stuart
>
> **Stuart C. Plunkett**
> Partner, San Francisco Office
> stuart.plunkett@bakerbotts.com
> T +1.415.291.6203
> C +1.415.608.8165
>
> ---
>
> **From:** Lauren Capurro (Russell) <LaurenRussell@TATP.com>
> **Sent:** Tuesday, February 19, 2019 11:07 AM
> **To:** Plunkett, Stuart <stuart.plunkett@bakerbotts.com>; mheaphy@saveri.com; Taladay, John <john.taladay@bakerbotts.com>; Koons, Erik <erik.koons@bakerbotts.com>; Carter, Tom <Tom.Carter@BakerBotts.com>; Yang, Kaylee <kaylee.yang@bakerbotts.com>; malioto@tatp.com; jpatane@tatp.com; CMicheletti@zelle.com; QFu@zelle.com
> **Cc:** Rick@saveri.com; Geoff@saveri.com; cadio@saveri.com; Lucarelli, Drew <drew.lucarelli@bakerbotts.com>; Jacobsmeyer, Brian <brian.jacobsmeyer@BakerBotts.com>

**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

Stuart,

Please see the attached letter regarding Irico's objections to Plaintiffs' Rule 30(b)(6) topics.

Best,

Lauren

Lauren C. Capurro (Russell)
Attorney at Law
Trump, Alioto, Trump & Prescott, LLP
2280 Union Street
San Francisco, CA 94123
Tel: (415) 563-7200
Direct line: (415) 447-1496
Cell: (415) 860-5051
Fax: (415) 346-0679
E-mail: laurenrussell@tatp.com

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by email and delete the message and any attachments.

---

**From:** stuart.plunkett@bakerbotts.com [mailto:stuart.plunkett@bakerbotts.com]
**Sent:** Tuesday, February 19, 2019 10:40 AM
**To:** mheaphy@saveri.com; john.taladay@bakerbotts.com; erik.koons@bakerbotts.com; Tom.Carter@BakerBotts.com; kaylee.yang@bakerbotts.com; malioto@tatp.com; jpatane@tatp.com; LaurenRussell@TATP.com; CMicheletti@zelle.com; QFu@zelle.com
**Cc:** Rick@saveri.com; Geoff@saveri.com; cadio@saveri.com; drew.lucarelli@bakerbotts.com; brian.jacobsmeyer@BakerBotts.com
**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

Matt,

Thanks for this information. Yes, we will provide an interpreter for the depositions.

Stuart

**Stuart C. Plunkett**
Partner, San Francisco Office
stuart.plunkett@bakerbotts.com
T +1.415.291.6203
C +1.415.608.8165

**From:** Matthew Heaphy <mheaphy@saveri.com>
**Sent:** Tuesday, February 19, 2019 10:15 AM
**To:** Plunkett, Stuart <stuart.plunkett@bakerbotts.com>; Taladay, John <john.taladay@bakerbotts.com>;

Koons, Erik <erik.koons@bakerbotts.com>; Carter, Tom <Tom.Carter@BakerBotts.com>; Yang, Kaylee <kaylee.yang@bakerbotts.com>; malioto@tatp.com; jpatane@tatp.com; LaurenRussell@TATP.com; CMicheletti@zelle.com; QFu@zelle.com
**Cc:** Rick Saveri <Rick@saveri.com>; Geoff Rushing <Geoff@saveri.com>; Cadio Zirpoli <cadio@saveri.com>; Lucarelli, Drew <drew.lucarelli@bakerbotts.com>; Jacobsmeyer, Brian <brian.jacobsmeyer@BakerBotts.com>
**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

Stuart:

Thank you for letting us know about the witnesses' schedules. We will confer internally and determine whether it will be possible for us to extend the depositions after business hours.

Our understanding of the deposition protocol is that Irico is responsible for providing the interpreter and that Plaintiffs may have check interpreters. Please confirm that you will make the arrangements for the interpreter.

The location for the depositions will be:

Kobre & Kim LLP
ICBC Tower, 6th Floor
3 Garden Road
Central, Hong Kong

Best,
Matt

Matthew Heaphy
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111
mheaphy@saveri.com
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

---

**From:** stuart.plunkett@bakerbotts.com [mailto:stuart.plunkett@bakerbotts.com]
**Sent:** Friday, February 15, 2019 5:00 PM
**To:** Matthew Heaphy; john.taladay@bakerbotts.com; erik.koons@bakerbotts.com; Tom.Carter@BakerBotts.com; kaylee.yang@bakerbotts.com; malioto@tatp.com; jpatane@tatp.com; LaurenRussell@TATP.com; CMicheletti@zelle.com; QFu@zelle.com
**Cc:** Rick Saveri; Geoff Rushing; Cadio Zirpoli; drew.lucarelli@bakerbotts.com; brian.jacobsmeyer@BakerBotts.com
**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

Matt,

I write to follow up on a few items we have discussed regarding the upcoming depositions.  I have confirmed that our witnesses will not be able to arrange for flexible travel schedules that

would allow the deposition days to slip and ultimately go into Saturday.  We will need to all work efficiently and potentially go longer on certain days if necessary.  Regarding translators, we discussed that Irico would provide a translator for the deposition and that plaintiffs would have the option of also bringing a check translator.  Is that consistent with your understanding?  Finally, have you secured a location for the depositions?  We are anxious to know the location as it could impact our travel arrangements.

Thanks much,

Stuart

**Stuart C. Plunkett**
Partner, San Francisco Office
stuart.plunkett@bakerbotts.com
T +1.415.291.6203
C +1.415.608.8165

**From:** Matthew Heaphy <mheaphy@saveri.com>
**Sent:** Tuesday, February 5, 2019 1:19 PM
**To:** Taladay, John <john.taladay@bakerbotts.com>; Koons, Erik <erik.koons@bakerbotts.com>; Plunkett, Stuart <stuart.plunkett@bakerbotts.com>; Carter, Tom <Tom.Carter@BakerBotts.com>; Eickhof, Ashley <Ashley.Eickhof@BakerBotts.com>; Yang, Kaylee <kaylee.yang@bakerbotts.com>; malioto@tatp.com; jpatane@tatp.com; LaurenRussell@TATP.com; CMicheletti@zelle.com; QFu@zelle.com
**Cc:** Rick Saveri <Rick@saveri.com>; Geoff Rushing <Geoff@saveri.com>; Cadio Zirpoli <cadio@saveri.com>
**Subject:** In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

Counsel:

Please find attached the deposition notices for the upcoming depositions in Hong Kong:

- AMENDED NOTICE OF DEPOSITION OF DEFENDANTS IRICO GROUP CORPORATION AND IRICO DISPLAY DEVICES CO., LTD. PURSUANT TO FED. R. CIV. P. 30(b)(6);
- AMENDED NOTICE OF DEPOSITION OF MENGQUAN GUO;
- AMENDED NOTICE OF DEPOSITION OF ZHAOJIE WANG;
- AMENDED NOTICE OF DEPOSITION OF WENKAI ZHANG; and
- CERTIFICATE OF SERVICE.

We are working on securing a location and will inform you of it as soon as we have done so.

Best,

Matthew Heaphy
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111
mheaphy@saveri.com
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

**Confidentiality Notice:**

The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.

<3128_001.pdf>