UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MDL No. 1917 |
|  | Case No. 07-cv-05944-JST |
|  | **ORDER ADOPTING SPECIAL MASTER'S RECOMMENDATION FOR TERMINATING SANCTIONS** |
| This order relates to:<br><br>ALL DIRECT PURCHASER ACTIONS<br>ALL INDIRECT PURCHASER ACTIONS | Re: ECF No. 6382 |

The Special Master has issued a report and recommendation on Plaintiffs' motion for terminating sanctions. ECF No. 6382. Defendants Irico Group Corporation and Irico Display Devices, Co., Ltd. (collectively, "Irico" or "Irico Defendants") have filed objections, and the matter has been fully briefed. ECF Nos. 6389, 6405, 6408. The Court held oral argument on September 5, 2024, and will now adopt the Special Master's recommendation to grant Plaintiffs' motion and impose terminating sanctions.

## I.    BACKGROUND

The only claims remaining to be tried in this case are against Irico, against whom default was originally entered and then subsequently set aside. As the Court has previously summarized:

> Plaintiffs allege the Irico Defendants and others conspired to fix prices, allocate market share, and restrict output of products containing cathode ray tubes ("CRT Products") from March 1995 to November 2007. Plaintiffs specifically assert that Irico participated in dozens of meetings during which the conspirators reached agreements on price, output restrictions, and customer and market allocation.
>
> After appearing in the action, accepting service of process, and joining a motion to dismiss filed by other defendants, Irico made the

United States District Court
Northern District of California

decision not to answer the complaints based on Irico's belief that it was immune from suit in the United States.[1]  In July 2016, the Direct Purchaser Plaintiffs ("DPPs") and Indirect Purchaser Plaintiffs ("IPPs") filed for entry of default against the Irico Defendants.  The clerk entered default against Irico in favor of both groups of plaintiffs.  On Irico's motion, on February 1, 2018, the Court set aside the default.

In that order, the Court considered the Irico Defendants' arguments that the Court lacks subject matter jurisdiction over them under the Foreign Sovereign Immunities Act ("FSIA"), which, with some exceptions, provides immunity for foreign states.  The Court found that Irico had failed to show FSIA immunity but recognized the possibility that further proceedings might demonstrate that the FSIA defense applies and the Court lacks jurisdiction. . . .  Accordingly, the Court permitted the parties to undertake jurisdictional discovery.

On March 13, 2019, the Irico Defendants moved to dismiss the claims against them for lack of subject matter jurisdiction under the FSIA.  The Court denied the motions and found that its exercise of jurisdiction over the Irico Defendants is not barred by the Foreign Sovereign Immunities Act.  On November 22, 2019, the Irico Defendants appealed this ruling to the Ninth Circuit and moved to stay proceedings pending appeal.

ECF No. 5682 at 1–2 (quotation marks, alteration marks, and citations omitted).

The Court granted Irico's motion to stay the case pending appeal.  *Id.* at 4.  Approximately 45 days before the scheduled oral argument in the Court of Appeals, Irico voluntarily dismissed its appeal on October 23, 2020.  ECF No. 5861.  The parties then returned to this Court and proceeded with discovery, which the Court had previously referred to a special master.  ECF No. 2272 (order appointing special master for discovery); *see also* ECF No. 5301 (clarifying that the Court must resolve whether any non-jurisdictional discovery should occur, but "the schedule on which that discovery should take place, the relationship between that discovery [by IPPs] and the discovery of the [DPPs], and . . . the specific information to be discovered . . . are all within the purview of the Special Master").

The portion of the litigation involving Irico has been characterized by a large number of pretrial disputes.  As a result, the Special Master has issued multiple reports and recommendations, almost all of which the Court has adopted without modification and without objection by any party.  The December 6, 2022 order adopting the Special Master's report and

---

[1] As discussed in more detail below, it is not clear that this belief was the true reason for Irico's decision not to participate in this litigation.

recommendation on Irico's failure to produce Su Xiaohua for deposition describes in some detail the discovery disputes resolved by the Special Master beginning in March 2018. ECF No. 6115 at 2–6. In a finding the Court adopted without objection, the Special Master observed:

> The litigation against Irico dragged out far beyond that against all other defendants that have long ago resolved. Major contributors to the delays include: (1) Irico's decision not to answer and defend against the claims against it, resulting in many years of delay, entry of default and motion practice to set aside the default; (2) Irico's appeal to the Ninth Circuit of the court's denial of its motion to dismiss for lack of jurisdiction under the FSIA, which Irico dropped weeks before oral argument was to be heard; and (3) numerous discovery skirmishes throughout the staged jurisdictional and merits discovery and many stipulated extensions to court deadlines. Throughout the entire CRT litigation there have been many discovery disputes, but on a per defendant basis, the discovery motions involving the Irico defendants appear notably numerous. Most of the discovery disputes briefed by Irico and the [Plaintiffs] have resulted in orders compelling Irico to respond to discovery requests.

*Id.* at 6–7.

### A. Evidence Preservation

One of the disputes before the Special Master involved Irico's evidence preservation, or lack thereof. On that issue, the Court adopted, without objection, the Special Master's finding "that Plaintiffs have made a preliminary showing of spoliation sufficient to overcome the privilege generally afforded to litigation hold communications." ECF No. 6146 at 6. The Court further adopted, again without objection, the Special Master's findings and conclusions that:

> Despite hiring a reputable United States law firm one month after being served with the complaint on December 25, 2007, Irico waited more than eight months before holding a meeting of the "2008 Litigation Committee" in August 2008 at which "key employees" were charged with providing verbal instructions to other employees to preserve documents related to United States sales of CRT products. Irico's more than eight-month delay before issuing any litigation hold is sufficient to establish a preliminary showing of spoliation. Irico's failure to suspend its automatic email destruction practice as soon as its duty to preserve arose further supports a finding that Irico's document preservation efforts were inadequate. Irico's implementation of an oral litigation hold without documentation further suggests that spoliation occurred.
>
> The inadequacy of Irico's 2008 oral litigation hold is further confirmed by its various discovery responses stating that it conducted a search for documents and information relating to Irico's

sales of CRTs in the United States, as opposed to Irico's sales of CRTs globally. Irico stated that in August 2008, it understood that "the focus of the litigation was on sales of CRTs to the United States," and members of the "2008 Litigation Committee" "were tasked to search for documents and to identify other employees under their supervision and instruct them to search for documents that might relate to the Irico sales in the United States and to preserve such documents, if any existed." Irico "acknowledges that at the time it misunderstood the scope of document preservation in connection with the litigation in the United States and cannot be certain that all documents related to Irico's global sales of CRTs were preserved." This evidences that the narrow scope of Irico's preservation did not address the full scope of relevant documents. Irico's response to Issue No 6, identifying "specific documents and information that might have been preserved if the 'oral instruction' in 2008 had not been limited to the United States," included "documents regarding Irico's global sales of CRTs that are more likely to have existed in the summer of 2008" but would not have been preserved in the archives, such as "sales reports containing general CRT market information; CRT sales contracts with customers; [r]ecent correspondence with customers regarding CRT sales; and [h]andwritten working notes regarding recent internal and customer meetings attended by members of Irico's sales team."

Despite its duty to preserve evidence, Irico recycled computers of departing employees, undoubtedly including the "key employees" who attended competitor meetings during the class period, and "is not aware of whether any of the recycled computers contained: a) any data whatsoever; b) any documents created in the time period 1995 through 2007, or c) any documents relevant or responsive to any of the discovery requests issued to Irico during the course of this litigation." These "key employees" were "appointed to oversee Irico's response to the litigations in the above referenced action (the '2008 Litigation Committee') in June 2008" and have since left the company. Against this backdrop, Irico's failure to produce any emails, any of its weekly sales and marketing reports, and any "documents from the relevant period from any of its employees' files, including those employees who attended price-fixing meetings with Irico's competitors," creates a strong inference that many highly relevant documents existed at the time Irico was served with the complaint in this action and were lost or destroyed due to Irico's inadequate evidence preservation efforts. Hence the undersigned finds that an adequate preliminary showing of spoliation has been made, warranting discovery into Irico's evidence preservation documents including those between Irico and its inside and outside counsel.

Irico contends that its email system had already destroyed all relevant documents before its duty to preserve arose. Irico cites its discovery responses and testimony that through the end of 2007, individual employee email accounts typically allowed for storage of only about 1-2 MB of email, Irico's central email server would overwrite older emails every 3-5 days on average and Irico had a back-end server policy to delete all emails older than 20 days during the relevant period. But Irico presents no information about investigating custodial files of "key employees" who may have

4

1
2
3
4
5
6
7
8
9
10

United States District Court
Northern District of California

> printed relevant emails, forwarded emails to their personal email
> accounts or downloaded emails to their work or personal computers
> or to portable hard-drives.  In contrast, Plaintiffs point to emails
> from an email address ending in @163.com that were authored by
> Liang Yuan, Irico's Head of Overseas Department and sent to
> defendant Chunghwa attaching Irico meeting notes and production
> data in June to July 2007.  Irico had identified Liang Yuan as one of
> the "key employees" who was a member of the "2008 Litigation
> Committee" appointed to oversee Irico's discovery responses to this
> litigation.  According to Plaintiffs, these emails were sent only four
> months before the November 2007 government raids on CRT
> makers and therefore it was unlikely that they and all relevant emails
> in Liang Yuan's and others' files would have been discarded by the
> time the duty to preserve arose.  On balance, it appears highly likely
> that relevant evidence was destroyed or lost due to Irico's long-
> delayed and inadequately implemented litigation hold efforts.
> Irico's position, supported by its Rule 30(b)(6) witness' testimony,
> that weekly sales and marketing reports and notes of competitor
> meetings were not important and not likely to be kept appears
> implausible.

*Id.* at 6–10 (citations and footnotes omitted; alterations in original).  Without objection from Irico, the Court adopted the Special Master's recommendations to allow further discovery regarding Irico's efforts to preserve evidence.  *Id.* at 10–11.

    That discovery revealed communications from Irico's outside counsel that clearly explained Irico's preservation obligations.  Irico does not dispute that it received notice of this litigation in early 2008, "retained the law firm Pillsbury Winthrop Shaw Pittman LLP," and "received three emails from Pillsbury that referenced document retention" in 2008.  ECF No. 6389 at 13.  Irico also received oral instructions from Pillsbury in addition to instructions by email.  ECF No. 6391-1 at 172.  The first email, sent on February 15, 2008, advised: "[I]t is essential that Irico does not destroy or dispose of any potentially relevant documents, whether in paper, electronic or any other form.  We recommend that you issue written instructions to the members of your company to retain all such documents as soon as possible."  *Id.* at 115.

    The second email, sent on June 23, 2008, included a copy of the Court's Pretrial Order No. 1 and advised:

> The court issued its first pretrial order on April 4, 2008, with
> Article 13 being the most critical to Irico, which sets out the court's
> requirements for preservation of evidence (including information in
> electronic form).  As we have discussed with Irico, this is an
> extremely important statutory requirement.  If some potentially
> relevant information is lost or destroyed, this could have very
> serious consequences for Irico.  The pretrial order is attached for

United States District Court
Northern District of California

1  your review.  We have also attached a Chinese translation of Article
   13 for your reference.

2  *Id.* at 18.  Article (paragraph) 13 of Pretrial Order No. 1 required "each party [to] take reasonable

3  steps to preserve all documents, data, and tangible things containing information potentially

4  relevant to the subject matter of this litigation."  ECF No. 230 at 5–6.

5      The third email, sent on August 18, 2008, followed a telephone conversation between

6  Pillsbury and Irico's counsel and attached "a memorandum and notice of information retention

7  from the U.S. Court regarding the preservation of evidence requirements."  ECF No. 6391-1 at

8  207.  The memorandum advised Irico "to distribute forms and documents to employees . . . to

9  remind Irico personnel of the importance of complying with U.S. law requiring the preservation of

10 potentially relevant information."  *Id.* at 210.  Attached to the memorandum was an information

11 retention notice that Pillsbury advised "shall be distributed to all Irico personnel who may

12 reasonably obtain any information and documents described in the Notice."  *Id.*  Pillsbury further

13 advised:

14       [T]his notice shall also be distributed to the appropriate Irico
         personnel responsible for information technology and records
15       management.  The above individuals in charge should be aware of
         the requirements described in this notice and should consider what
16       steps to take to avoid the loss of any potentially relevant information
         in the course of the CRT antitrust litigation.  The retention of all
17       potentially relevant documents is extremely important, and we
         recommend that you provide this notice to an employee if you are in
18       doubt as to whether he or she may have potentially relevant
         documents.  Please contact us if you have any questions or would
19       like to discuss who may have custody of potentially relevant
         documents.

20 *Id.*

21     Irico contends that it did not understand the scope of relevant documents to include

22 information regarding sales outside the United States, but the information retention notice broadly

23 describes what must be preserved: any "document or information created from January 1, 1995 to

24 the present, or relating to or about this period . . . relating to or concerning (a) CRT or (b) semi-

25 finished and finished products containing CRT, such as televisions containing CRT," and "relating

26 to or concerning one or more of" twelve listed subject areas.  *Id.* at 213.  While some of the listed

27 subject areas referred specifically to "CRTs or CRT Products shipped to or sold in the United

28 States," other categories—including "Market research," "Communications, Agreements or

United States District Court
Northern District of California

1     Meetings with Competitors," "Distributor and Buyer Communications," and "Personnel

2     records"—referred to "CRTs or CRT Products in the United States *or worldwide*." *Id.* at 213–14

3     (emphasis added).

4             In addition to these emails, the record includes a memo dated August 7, 2008, from

5     Pillsbury to Irico which "discusses in further detail IRICO's obligations regarding the preservation

6     of documents, email and other electronically stored information" and "provide[s]

7     recommendations as to measures that should be implemented to avoid the inadvertent loss of

8     potentially relevant ESI [electronically stored information]." *Id.* at 230–31. Pillsbury's advice

9     included turning off any automatic deletion features that had not already been suspended. *Id.* at

10    231. Irico's current counsel, Baker Botts, stated that this memo "was found in Pillsbury's internal

11    casefile, and we have no indication it was sent to Irico." *Id.* at 235. However, the Court agrees

12    with the Special Master that this statement is "unreliable" because Irico's failure to preserve

13    evidence "is the likely reason" why counsel can find no indication that the document was sent to

14    Irico. ECF No. 6382 at 22. But even if this memo were an internal Pillsbury draft that was never

15    sent to Irico, Pretrial Order No. 1 referred to electronic and computer information as types of

16    evidence that must be preserved. ECF No. 230 at 5 ("'Documents, data, and tangible things' shall

17    be interpreted broadly to include . . . electronic messages, . . . e-mail, . . . computer and network

18    activity logs, hard drives, backup data, removable computer storage media such as tapes, discs and

19    cards, printouts, document image files, Web pages, databases, spreadsheets, [and] software.").

20    Irico therefore cannot claim that it lacked notice of its requirement to preserve ESI.

21            Despite all of the communications from Pillsbury regarding evidence preservation—

22    including transmittal of the Court's Pretrial Order No. 1 and clear warnings about the importance

23    of complying with all requirements—Irico never broadly disseminated the retention notice drafted

24    by Pillsbury or issued any other written instructions regarding the preservation of evidence.

25    Zhang Wenkai, who worked in Irico's legal affairs department and was designated by Irico as a

26    witness under Rule 30(b)(6) of the Federal Rules of Civil Procedure, testified that Irico was "not

27    aware that [a litigation hold was] something we need to do," but he did recall a meeting—in

28    September 2017, over nine years after Irico first received notice of this litigation—that he attended

United States District Court
Northern District of California

1   with other unspecified Irico employees in which people were asked "to maintain the existing

2   document and cannot amend or modify or delete those documents."  ECF No. 6391-1 at 264–66.

3          Yan Yunlong, a member of Irico's Litigation Committee formed in response to this lawsuit

4   in 2008 and now Irico's head of legal affairs, testified that he spoke with the members of the

5   Litigation Committee regarding preservation of documents relating to U.S. sales, but that he never

6   talked about that topic with anyone outside of the Committee.  *Id.* at 169, 176–79.  He further

7   testified that Zhang, one of his subordinates, was the person "responsible for producing documents

8   to plaintiffs."  *Id.* at 179.  Yan did not know whether, in 2007, Irico's email system had an auto-

9   delete function, and he was "not aware" of "any instruction given to Irico's IT employees to turn

10  off any auto delete function on Irico's email system in 2007 and 2008."  *Id.* at 93.

11         Following his deposition, Yan signed a declaration stating that "the Litigation Committee

12  members did receive copies of and discuss the privileged document from Pillsbury"; that he did

13  "not recall whether the Litigation Committee members discussed the specific categories of

14  documents that each Litigation Committee member would preserve and instruct other employees

15  to preserve"; that it was his "understanding that each Litigation Committee member determined

16  independently which subordinates should be contacted regarding the preservation efforts and what

17  information regarding preservation should be relayed to each employee"; and that he did not recall

18  any further discussion with Litigation Committee members regarding document preservation after

19  the single meeting in 2008.  *Id.* at 387.  This declaration was not signed under penalty of perjury.

20  *Id.* at 385 (stating only, "I, Yan Yunlong, declare as follows").

21         But even if the testimony in the declaration were credited, it stops short of demonstrating

22  that anyone outside the Litigation Committee was ever instructed to preserve evidence, either

23  orally or in writing, let alone given the notices provided by Pillsbury.  That Committee consisted

24  of only seven employees.  *Id.* at 60–62 (listing Tao Kui, Wang Ximin, Shen Xiaolin, Liu Maihai,

25  Liang Yuan, Gao Rongguo, and Yan Yunlong as committee members).  All members other than

26  Yan "have retired or otherwise departed the company," and "[d]espite best efforts, Irico has been

27  unable to identify the specific individuals contacted by" any members of the Litigation

28  Committee.  *Id.* at 63.

As to his own files, Yan testified that he did not search them "for documents to produce in this case" until Irico was "working on the motion for state sovereignty immunity"—i.e., not until 2018. *Id.* at 150–51. Prior to that date, his "computer was already disposed of," but Yan had "kept the hard drive of that computer" and "turned over all the information and files kept on [his] hard drive" at that time. *Id.* at 152.

### B.  Yan Document

The Special Master also resolved a dispute between the parties regarding the so-called Yan Document. At his deposition, Yan testified that he drafted "meeting minutes" after an August 2008 meeting of the Litigation Committee, which he stored "in the files of the legal affairs department." *Id.* at 169–71. However, Plaintiffs' counsel was not aware of the existence of the document until Yan's deposition in 2022. Yan testified that he did not know whether Irico showed the document to its outside counsel because, "[a]t that time, based on our consideration, we believed the document was not relevant to the case." *Id.* at 171. The document "is described as . . . created by Yan Yunlong 'as part of his role on Irico Group's Litigation Committee,' 'after consultation with Irico's outside counsel about anticipated and ongoing U.S. litigation.'" ECF No. 6215 at 2 (footnotes omitted).

After conducting an in camera review of the Yan Document, the Special Master concluded, in a report and recommendation adopted as an order of the Court after no party objected, that the Yan Document was "responsive to Plaintiffs' discovery requests" and instructed Irico to include the document on a privilege log "[t]o the extent Irico asserts a privilege." ECF No. 6172 at 2. Irico subsequently "provided a privilege log for the Yan Document on February 24, 2023," and Plaintiffs moved to compel production of the document. ECF No. 6215 at 1, 3.

In his follow-up report and recommendation, which was again adopted by the Court after no party objected, the Special Master found:

> [T]he Yan Document does not contain information about Irico's contacts with competitors, sales information, other facts during the relevant period or facts regarding evidence preservation. The beginning of the Yan Document discusses legal strategy related to the United States litigation, presumably as conveyed by Irico's outside counsel to Irico. The last paragraph of the Yan Document

United States District Court
Northern District of California

1    reflects the Committee's decision to stop responding to the
     litigation.

2    *Id.* at 10.  He described the Yan Document as "a meeting minute, with a primary purpose of

3    documenting the committee's business decision to give up responding to the litigation."  *Id.* at 8.

4    The Court adopted the Special Master's recommendation "that certain portions of the Yan

5    Document contain attorney-client privileged communications and that the entire Yan Document is

6    entitled to opinion work product protection."  *Id.* at 11.  The Court therefore denied Plaintiffs'

7    motion to compel the Yan Document.  *Id.*

8         In his report and recommendation regarding terminating sanctions, the Special Master

9    recommended "reversing that order pursuant to the court's inherent power in light of the overall

10   review of defendants' discovery misconduct" after finding that:

11
12        (1) by delaying disclosure of this document for years, defendants
          waived their claim to attorney work product; (2) defendants'
13        testimony about this document further waived any attorney work
          product; (3) defendants' assertion that their failure to answer was
14        due to a belief that they were immune from suit put into issue their
          state of mind when abandoning this litigation in 2008, (4) the Yan
15        Document is the only contemporaneous document explaining
          defendants' true reasons for abandoning this litigation and
16        defendants should not benefit from their intentional concealment of
          a relevant document and (5) the portions of the Yan Document
17        relevant to its reasons for abandoning this litigation are not work
          product but only business decisions.

18   ECF No. 6382 at 7; *see also id.* at 67 n.162.

19        **C.  Deposition of Su Xiaohua**

20        Another set of discovery disputes addressed by the Special Master concerns Plaintiffs'

21   attempted deposition of Su Xiaohua.  The Court has already found, when adopting a report and

22   recommendation from the Special Master without objection, that "Su Xiaohua was an Irico Group

23   general manager of purchasing and sales for at least eight years during the class period, has

24   personal knowledge of matters that are highly relevant to this litigation," including of CRT

25   meetings with Irico's competitors, "and is likely the only Irico witness with personal knowledge of

26   key facts and events."  ECF No. 6115 at 10.  In the same order, the Court adopted, again without

27   objection, the Special Master's conclusion that Su's unavailability "is highly detrimental to

28   resolution of this litigation on its merits."  *Id.* at 12.

United States District Court
Northern District of California

The Special Master's interim report and recommendation on Plaintiffs' motion for discovery sanctions, which the Court adopted without objection, sets forth in detail the factual and procedural background of this dispute:

In August 2021, the parties began meeting and conferring about depositions of Irico witnesses. Travel restrictions due to the COVID-19 pandemic hindered progress. On October 12, 2021, Plaintiffs noticed the depositions of nine Irico witnesses for early December 2021 and Irico agreed to produce two current employees for remote deposition via videoconference in Hong Kong but provided no dates.

In discovery, Irico had identified its employee, Su Xiaohua, as one of only two remaining witnesses knowledgeable about Irico's meetings and communications with competitors and more than eight of Irico's affirmative defenses. The Stipulated Order set a March 18, 2022 deadline for the deposition of Su Xiaohua.

On May 25, 2022, the Court issued a Stipulated Order re Case Schedule (ECF No 6016) ("Scheduling Order"), specifying:

. . .[that t]he depositions of Su Xiaohua, Wang Zhaojie, and Yan Yunlong shall be completed by no later than June 30, 2022.

On June 30, 2022, Irico filed its Emergency Motion for Relief from the Scheduling Order requiring Irico employees Wang Zhaojie, Su Xiaohua and Yan Yunlong to appear for deposition by June 30, 2022. In its emergency motion, Irico informed the court that Mr. Su recently resigned, was not willing to travel to Macau for deposition and "resigned from the company rather than endure the required quarantine." Irico stated: "[o]n May 25, 2022, Su Xiaohua submitted his formal resignation to Irico. Zhang Decl. ¶6." Irico acknowledged that the hearing date was after the date scheduled for the depositions, but "based on new information from the witnesses and continuing negotiations with the Plaintiffs, Irico is filing this Motion at the first available opportunity."

On August 11, 2022, the court heard oral argument on Irico's Motion for relief from the Scheduling Order. The court found that the requisite showing of good cause for relief from the scheduling order under Rule 16 had not been made and stated: ["T]he delay in the production of these witnesses unquestionably causes injury to the plaintiffs and also injury and inconvenience to the Court." The court ordered these witnesses to appear for deposition by September 9, 2022 and "[i]f fewer than all of the witnesses identified in these papers testify, then by September 23, 2022, the parties shall either file a document indicating that they are nonetheless dropping their dispute or setting forth their competing positions on what the legal consequence is of that witness' or those witnesses' failure to appear."

On August 22, 2022, the parties filed a Stipulation and Order, stating that Irico witnesses Wang Zhaojie and Yan Yunlong agreed to travel to Macau for depositions and there was insufficient time to apply for and receive new visa for travel to Macau before the September 9 deadline and therefore the September 9, 2022 deadline for Irico witnesses to appear for deposition should be vacated. This Stipulated Order addressed only the two named Irico witnesses and did not mention Su Xiaohua.

On October 26, 2022, the parties filed their Joint Brief re: Legal Consequences of Irico's Failure to Produce Su Xiaohua for Deposition. By order dated November 1, 2022, the court referred this discovery matter to the undersigned.

On December 6, 2022, the court adopted the Special Master's Report & Recommendation on Irico's Failure to Produce Su Xiaohua for Deposition. ECF 6115 ("Su Order"). The Su Order required Irico to produce all documents relating or referring to: Su Xiaohua's deposition, resignation (formal or informal), including any conversations or questions about his intended resignation, Su's current or anticipated employment status, including any requests for recommendation or references from any Irico employee or agent, Irico's efforts to comply with the order to produce Su for deposition, the timing of when any Irico employee or agent first learned of Su's resignation, intent to resign and steps taken in preparation for resignation. The Su Order also stated: "the parties may submit motions for sanctions for any discovery misconduct throughout the history of this case" and a "motion for sanctions for Irico's failure to comply with the court's orders that Su's deposition be taken."

By early July 2023, the briefing on Plaintiffs' Motion for Sanctions was complete.

On July 19, 2023, the undersigned conducted a hearing by videoconference on Plaintiffs' motion for discovery sanctions. . . .

At the hearing, the undersigned asked questions about two Irico documents produced in response to the Su Order that shed light on when Irico first knew about Mr. Su's resignation.

The first is an Irico document dated either March 25, 2022 or May 25, 2022, entitled "Resignation Report" and signed by Su, stating in pertinent part:

> At this time, I have reached the upper limit of the employment age for managers. Due to the above personal reasons [caring for elderly mother], I would like to apply for early resignation from my position as a manager and terminate my employment relationship with the company. Please be advised.

The second document is an Irico Group Meeting Minute, dated April 7, 2022, describing Irico's decision to approve Su's request to leave his position "ahead of schedule," that provides in pertinent part:

Regarding matters related to Su Xiao Hua reaching retirement age and departure * * *

Su Xiao Hua, the regional general manager for the Huanan area of Xianyang Irico Industrial Group Co., Ltd., has reached the upper age limit for employment in March 2022, and will leave his position as manager at the end of December to retire and rest.  Because he himself submitted a request to leave the position ahead of schedule, after discussion, it has been agreed that Su Xiao Hua may leave the position ahead of schedule after reaching upper age limit for employment.

These two documents show that Irico knew before May 25, 2022 that Su had submitted his application for resignation before April 7, 2022 and that Irico's senior management approved Su's resignation on April 7, 2022.  But these documents do not shed light on the actual date of Su's Resignation Report, except that it was "ahead of schedule" nor do these documents show who was involved in determining or deciding Su's last day of employment at Irico.

According to Plaintiffs, these two documents are the only documents produced by Irico dated before June 7, 2022, (the date Irico informed Plaintiffs of Su's resignation) that mention Su's resignation.  Irico does not dispute this fact.  Irico's production of documents in response to the Su Order appears extremely curated, incomplete and inadequate.  There is no indication that Irico produced any documents from its human resources or other departments about Su's resignation and plans for transition.  Nor is there any indication that Irico produced any documents from Su's emails or his computer hard drive regarding his resignation or communications regarding how and with whom Su's last date of employment was determined.

At the July 19, 2023 hearing, Irico's outside counsel, Mr. Werbel, stated that to the best of [Baker Botts'] knowledge, it was their understanding and belief that all documents responsive to the categories in the Su Order had been produced or listed on a privilege log because they had asked Irico for all such documents and it was their understanding that no other documents exist.  Irico's outside counsel, Mr. Taladay, also stated that Irico's in-house counsel, Mr. Zhang, had been communicating with Mr. Su on obtaining his visa to attend his Macau deposition up to May 31, 2022, when Mr. Zhang discovered that Su had resigned and left Irico's employ.  Irico's outside counsel stated that Su had given them every reason to believe he intended to travel to Macau to be deposed since he was cooperating with obtaining his visa, and as a result, his resignation and departure on May 25, 2022, was a "huge surprise."  Yet, Irico later produced a document dated April 7, 2022, of its approval of Su's request for accelerated resignation before December 2022.

Under these circumstances, including Irico's opaque responses about the facts and timing of Su's resignation and end of employment at Irico, his whereabouts, availability and Irico's

United States District Court
Northern District of California

possible influence or ability to make Su available notwithstanding
his resignation, his apparent uniqueness as the sole remaining
individual with knowledge of Irico's participation in competitor
meetings and communications and the paucity of disclosures about
Irico's information and knowledge about Su's deposition and
resignation plans and activities, the undersigned finds that Irico's
discovery responses required by the Su Order are not adequate.
Irico and its counsel are hereby warned that full compliance with
this order and the Su Order is expected. In light of the pending
motion for discovery sanctions, Irico's continuing failure to comply
with discovery orders risks terminating sanctions as well as less
severe sanctions.

ECF No. 6264 at 2–7 (citations, footnotes, and emphasis omitted; some alterations in original).

The Court ordered Irico "to comply fully with the Su Order" and to complete a list of

specific tasks concerning discovery related to Su's resignation. *Id.* at 7–10. Irico failed to comply

with the order's requirement that it "produce Su's laptop to the possession and control of Irico's

lead United States counsel, Baker Botts, for forensic analysis and recovery by September 1,

2023," and the Court adopted the Special Master's recommended further steps without objection.

ECF No. 6324 at 2, 5. The Special Master advised Irico, in a report and recommendation adopted

by the Court, that its "continuing failure to conduct adequate searches for responsive documents

months ago has led to a succession of discovery orders. Irico is again warned that the

consequence of repeatedly violating court orders includes terminating sanctions and lesser but still

severe sanctions." *Id.* at 6. The Court subsequently adopted, without objection once the Special

Master agreed to an extended compliance deadline, the Special Master's recommended search

terms regarding Su's laptop. ECF Nos. 6351, 6357.

After reviewing all of the documents produced by Irico, the Special Master concluded in

his report and recommendation on terminating sanctions that:

Irico's documents produced after multiple court orders and
extensions of time reveal that Su did not resign and terminate all
relationships with Irico on May 25, 2022. Instead, Su continued his
work at Irico with other Irico employees in June and July 2022. It
was not until June 17, 2022, that Irico identified Su's successor and
July 28, 2022, when the Shareholders' Meeting of Irico (Foshan)
Flat Panel Display Co, Ltd resolved "to dismiss Su Xiaohua from
his position as a company director." Thus, it appears that Su
remained in Irico's employ through June and July of 2022. As late
as September 20, 2022, Su received a text from an Irico employee
who sent a "Draft Reply for the South China Region.zip 473.8KB,"
to which Su replied: "Received, thank you!" Later exchanging text
with the same employee, Su texted a document entitled "Situation

14

United States District Court
Northern District of California

Explanation (1).docx 16.3KB *WeChat desktop version" and wrote: "Check if that's okay." Thus, Su was not only employed by Irico past his scheduled deposition date in June of 2022, but he was within Irico's control. Irico's false representations to the contrary demonstrate its flagrant bad faith, its intentional concealment of the truth and its callous disregard for this court and the litigation process.

Irico also stated that "Irico did everything that it could to secure the testimony of Mr. Su and had every expectation that he would appear for a deposition up until the time of his resignation." Irico's evidence of doing everything it could was merely to work with Su to obtain his visa for the Macau deposition up until May 25, 2022. Irico has produced no evidence to support that it did everything it could to secure Su's testimony after his purported resignation on May 25, 2022. There are no documents requesting Su to appear for his deposition or offering any incentives or bonuses for Su to appear for his deposition, such as those Irico offered to its two other witnesses, Wang and Yan, as set forth in Zhang Wenkai's Declaration. Contrary to Irico's representation of surprise, its recently produced internal documents reveal that its top executives, Chairman Si Yun-Cong and General Manager Yang Yuan Jiang, both approved on April 7, 2022, Su's request for early retirement ("ahead of schedule") before December 2022, and also approved the legal department's January 2022 request for Su to travel abroad for his deposition. Thus, it appears that Irico's top executives knew full well that they would allow Su to "resign" early and had no intention of requiring him to be deposed, despite their control over Su throughout his employment, including through June and July of 2022.

ECF No. 6382 at 48–50 (citations and footnotes omitted). He further concluded:

Su continued to work for Irico, as late as September 2022, when he exchanged documents with an Irico employee. Irico's human resources employee considered Su "in-service" despite having "officially retired in July."

Irico continued paying Su well after July 2022. In January 2023, Irico paid Su an annual award and holiday bonus for 2022. In August 2023, Irico paid Su a salary as a business manager and "Mid-Long Term Contract Worker[s]." In August 2023, Su is described as serving as director of Sichuan Century Shuanghong Display Devices Co Ltd, a company that appears related to Irico.

*Id.* at 51–52 (footnotes omitted).

The Special Master summarized his findings regarding the Su deposition as follows:

(1) Irico could have required Su to remain on duty until December 2022, his legally appropriate rest period, but instead facilitated Su's purported "early retirement," by approving his request on April 7, 2022.

15

(2) Irico failed to produce any evidence after May 25, 2022 in support of its claim to have attempted to persuade Su to have his deposition taken in this case.

(3) Irico considered Su "in-service" and continued paying Su through at least August 2023.

(4) By the date of Su's scheduled deposition in June 2022, Su was still employed by Irico and Irico could have required him to appear for his deposition but did not to do so.

(5) Irico intentionally submitted to the court a false sworn declaration that Su formally resigned on May 25, 2022, and attorney representations that Irico had no control over Su due to his resignation from Irico on May 25, 2022.

(6) Irico intentionally failed to comply with its discovery obligations and numerous court orders to delay the litigation, obstruct discovery and hide the true facts regarding its employment of and control over Su at the time of his scheduled deposition in June 2022;

(7) Only after being ordered to have its United States counsel take primary control over and responsibility for a search for responsive documents set forth in the Su Order, did Irico finally produce documents showing that Su continued working for Irico well after May 25, 2022, after his scheduled deposition of June 30, 2022, was never provided any inducements to attend his deposition, and by August 2023, Su appears to have found employment as a director in a company related to Irico.

*Id.* at 52–53.

### D.  Recommendation for Terminating Sanctions

On May 14, 2024, the Special Master issued his report and recommendation on Plaintiffs' motion for terminating sanctions.  ECF No. 6382.  He "found that Irico willfully and in bad faith spoliated ESI and other relevant information, intentionally delayed this litigation by disappearing for eight years, and violated multiple court orders setting deadlines for Mr. Su's deposition."  *Id.* at 70.  He recommended that the Court grant Plaintiffs' motion for terminating sanctions and order that:

1.  Irico be required to pay monetary sanctions to plaintiffs, including attorney's fees and expenses incurred due to Irico's ongoing spoliation of evidence, its disappearance from this litigation and motion to set aside default, its dropped appeal, its repeated failures to produce Mr. Su for deposition and its violations of court orders, including those in which it lost a motion to compel;

2.  If the court approves monetary sanctions, plaintiffs submit their briefs and declarations with supporting evidence of their fees and

costs incurred due to defendants' Rule 37 violations and litigation abuses;

3.  The parties submit their joint proposal for a briefing and hearing on the amount of damages;

4.  After monetary sanctions are imposed and damages determined, Irico's Answer and Defenses be stricken; and

5.  Default judgment be entered against Irico.

*Id.* at 77–78.

## II.     LEGAL STANDARD

The Court reviews the Special Master's rulings "subject to the same procedures as review of orders of a Magistrate Judge." ECF No. 2272 at 4. Because the Special Master has recommended dispositive terminating sanctions, the Court's review of that recommendation is de novo. Fed. R. Civ. P. 72(b)(3); *see also* Civil L.R. 72-3. Neither Plaintiffs nor Irico have filed a motion to augment the record or a motion for an evidentiary hearing, and the Court's review is therefore based on the record of the proceedings before the Special Master. Civil L.R. 72-3(b)–(c).

Plaintiffs seek, and the Special Master has recommended, terminating sanctions under Rules 37(b) and 37(e) of the Federal Rules of Civil Procedure and the Court's inherent authority. Each of these authorities allows for terminating sanctions, and there is some overlap between the three.

First, when a party "fails to obey an order to provide or permit discovery," Rule 37(b) allows a range of sanctions, including "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence," and "rendering a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A). "Instead of or in addition to" the sanctions allowed by Rule 37(b)(2)(A), "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). When considering the propriety of sanctions, a court "look[s] at all incidents of a party's misconduct. A court may consider prior misconduct when weighing a subsequent sanction motion." *Adriana*

1    *Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1411 (9th Cir. 1990).

2         Second, Rule 37(e) governs the failure to preserve ESI:

3              If electronically stored information that should have been preserved
             in the anticipation or conduct of litigation is lost because a party
4              failed to take reasonable steps to preserve it, and it cannot be
             restored or replaced through additional discovery, the court:
5
              (1) upon finding prejudice to another party from loss of the
6              information, may order measures no greater than necessary to cure
             the prejudice; or
7
              (2) only upon finding that the party acted with the intent to deprive
8              another party of the information's use in the litigation may:

9                   (A) presume that the lost information was unfavorable to the
                  party;
10
                   (B) instruct the jury that it may or must presume the
11                  information was unfavorable to the party; or

12                   (C) dismiss the action or enter a default judgment.

13   Fed. R. Civ. P. 37(e).  "To dismiss a case under Rule 37(e)(2), a district court need only find that

14   the Rule 37(e) prerequisites are met, the spoliating party acted with the intent required under Rule

15   37(e)(2), and lesser sanctions are insufficient to address the loss of the ESI."  *Jones v. Riot Hosp.*

16   *Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024).  A showing of prejudice is not required.  *Id.*; *see also*

17   Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment ("[T]he finding of intent

18   required by the subdivision can support not only an inference that the lost information was

19   unfavorable to the party that intentionally destroyed it, but also an inference that the opposing

20   party was prejudiced by the loss of information that would have favored its position.").

21              Rule 37(e) does not define "intent," but in context, the word is most
             naturally understood as involving the willful destruction of evidence
22              with the purpose of avoiding its discovery by an adverse party.
             Because intent can rarely be shown directly, a district court may
23              consider circumstantial evidence in determining whether a party
             acted with the intent required for Rule 37(e)(2) sanctions.  Relevant
24              considerations include the timing of destruction, affirmative steps
             taken to delete evidence, and selective preservation.
25

26   *Jones*, 95 F.4th at 735 (citations omitted).

27         Finally, although courts "ordinarily should rely on the Rules rather than the inherent

28   power" when bad-faith conduct "could be adequately sanctioned" under the Federal Rules of Civil

18

United States District Court
Northern District of California

1   Procedure, "the court may safely rely on its inherent power" if, in its "informed discretion," the

2   Rules are not "up to the task." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991). "[C]ourts have

3   inherent power to dismiss an action when a party has willfully deceived the court and engaged in

4   conduct utterly inconsistent with the orderly administration of justice." *Anheuser-Busch, Inc. v.*

5   *Nat. Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995) (quoting *Wyle v. R.J. Reynolds Indus.,*

6   *Inc.*, 709 F.2d 585, 589 (9th Cir.1983)).

7        Before dismissing a case under either Rule 37(b) or its inherent power, the court "must

8   weigh several factors: (1) the public's interest in expeditious resolution of litigation; (2) the

9   court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the

10  public policy favoring disposition of cases on their merits; and (5) the availability of less drastic

11  sanctions." *Id.* (quoting *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 948 (9th Cir. 1993)) (applying

12  test under court's inherent power); *Adriana Int'l*, 913 F.2d at 1412 (applying test under Rule

13  37(b)). "Where a court order is violated, the first two factors support sanctions and the fourth

14  factor cuts against a default. Therefore, it is the third and fifth factors that are decisive." *Adriana*

15  *Int'l*, 913 F.2d at 1412.

16       A party suffers prejudice if the opposing party's "concealment of the [evidence] clearly

17  impaired [the party's] ability to go to trial and *threatened* to interfere with the rightful decision of

18  the case." *Anheuser-Busch*, 69 F.3d at 354 (emphasis in original). The test is not whether the

19  evidence "would have changed the outcome of the trial." *Id.* "The most critical factor to be

20  considered in case-dispositive sanctions is whether 'a party's discovery violations make it

21  impossible for a court to be confident that the parties will ever have access to the true facts.'"

22  *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007)

23  (quoting *Valley Eng'rs v. Electric Eng'g Co.*, 158 F.3d 1051, 1058 (9th Cir. 1998)). "Dismissal is

24  appropriate where a 'pattern of deception and discovery abuse [makes] it impossible' for the

25  district court to conduct a trial 'with any reasonable assurance that the truth would be available.'"

26  *Valley Eng'rs*, 158 F.3d at 1057 (quoting *Anheuser-Busch*, 69 F.3d at 352).

27       Courts "need not make explicit findings regarding each of" the five factors listed above,

28  but they must, at a minimum, make "a finding of 'willfulness, fault, or bad faith'" and "consider

19

1    'less severe alternatives' than outright dismissal." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th

2    Cir. 2006) (first quoting *Anheuser-Busch*, 69 F.3d at 348, and then quoting *United States ex rel.*

3    *Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 604 (9th Cir. 1988)).  "Disobedient

4    conduct not shown to be outside the control of the litigant is sufficient to demonstrate willfulness,

5    bad faith, or fault." *Jorgensen v. Cassiday*, 320 F.3d 906, 912 (9th Cir. 2003) (quoting *Hyde &*

6    *Drath v. Baker*, 24 F.3d 1162, 1167 (9th Cir. 1994)).  When considering "whether a district court

7    has properly considered the adequacy of less drastic sanctions," the Ninth Circuit considers three

8    questions: "(1) did the court explicitly discuss the feasibility of less drastic sanctions and explain

9    why alternative sanctions would be inappropriate, (2) did the court implement alternative

10   sanctions before ordering dismissal, and (3) did the court warn the party of the possibility of

11   dismissal before actually ordering dismissal?" *Adriana Int'l*, 913 F.2d at 1412–13.  Discussion of

12   alternatives "is unnecessary (although still helpful)" in "egregious circumstances," such as where a

13   party "has purposefully and defiantly violated a court order."  *Malone v. U.S. Postal Serv.*, 833

14   F.2d 128, 132 (9th Cir. 1987).

15          In its reply brief, Irico argues that "terminating sanctions require 'clear and convincing

16   evidence' of bad-faith conduct."  ECF No. 6408 at 20.  However, the single case it cites in support

17   of that proposition is *Garcia v. Vitus Energy, LLC*, 600 F. Supp. 3d 975, 983 (D. Alaska 2002).

18   *Id.  Garcia*, in turn, cites *Soule v. P.F. Chang's China Bistro, Inc.*, No. 2:18-cv-02239-GMN-EJY,

19   2020 WL 959245, at *4 (D. Nev. Feb. 26, 2020) (quoting *Micron Tech., Inc. v. Rambus, Inc.*, 645

20   F.3d 1311, 1328–29 (Fed. Cir. 2011)).  *Garcia*, 600 F. Supp. 3d at 983 n.47.  As another court in

21   this district has explained, district courts in the Ninth Circuit "have split on the question, and the

22   Ninth Circuit has not ruled on it."  *WeRide Corp. v. Kun Huang*, No. 5:18-cv-07233-EJD, 2020

23   WL 1967209, at *9 (N.D. Cal. Apr. 24, 2020) (considering *Micron Tech.*, among other cases).  For

24   the reasons explained by the *WeRide* court, this Court finds preponderance of the evidence to be

25   the appropriate standard.  *Id.* (noting, for example, that "[i]n civil litigation, exceptions to the

26   preponderance standard are uncommon, examples of which include the termination of parental

27   rights, involuntary commitment, deportation, and denaturalization," and agreeing with the Seventh

28   Circuit's conclusion that "[t]he interests implicated by the dismissal of a suit as a sanction for

United States District Court
Northern District of California

United States District Court
Northern District of California

misconduct occurring in civil litigation (including discovery) are not so important as to demand that the facts underlying the dismissal be established by clear and convincing evidence" (quoting *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 778 (7th Cir. 2016)). However, the burden of proof is not dispositive because the Court would reach the same conclusions below under either the preponderance of the evidence or the clear and convincing standard.

## III.    DISCUSSION

### A. Irico's Failure To Implement Litigation Hold

Irico did not produce evidence regarding its failure to preserve evidence until the Court—adopting a report and recommendation as to which Irico made no objection—found a preliminary showing of spoliation. With the benefit of the evidence Irico produced in response to the Court's orders, the fact that Irico failed to implement a litigation hold notwithstanding advice of counsel is now not in dispute. Irico received multiple communications, both oral and written, from its outside counsel regarding the importance of preserving documents. These communications included transmittal of a court order requiring document preservation, as well as counsel's specific advice—which Irico did not follow—to provide employees with written notice regarding what evidence needed to be preserved. To the extent Irico asserts it was unfamiliar with litigation in the United States, the evidence demonstrates that Pillsbury provided specific, clear instructions regarding Irico's obligations.[2] As the Special Master correctly explained:

> The Pillsbury communications revealed that Irico had no basis for claiming that from 2008 onward, it misunderstood its duty to preserve potentially relevant documents because from February 15, 2008 through August 18, 2008, Pillsbury provided verbal and detailed written instructions, including a copy of the court's Pre-Trial Order No 1, a comprehensive litigation hold document and instruction that potentially relevant documents included information regarding Irico's global sales of CRTs. The Pillsbury communications also revealed that Irico's representations to the court and in written interrogatory responses claims that it misunderstood its discovery obligations by not issuing a written litigation hold and by not preserving potentially relevant documents from February 15, 2008 onward, were false.

---

[2] The record also includes evidence that, contrary to Irico's assertions that it "was wholly unfamiliar with U.S. litigation in 2008," ECF No. 6391-1 at 1093, Irico was not a stranger to litigation in the United States. In 2001, for example, Irico consulted with Morrison and Foerster regarding a lawsuit it was considering filing in the United States. ECF No. 6391-2 at 513–29.

United States District Court
Northern District of California

1  ECF No. 6382 at 29–30.

2      The Special Master also accurately summarized, in findings that Irico does not dispute in

3  its objections, that:

> Irico made no efforts to preserve any potentially relevant evidence
> including ESI from 2008 to the present, failed to search key
> employees' offices or computers for potentially relevant emails or
> other ESI, recycled or wiped computers of key departing employees
> while this litigation was pending and allowed the loss or destruction
> of ESI that Irico concedes likely existed in 2008.

8  ECF No. 6382 at 32–33.  Without question, Irico's conduct resulted in the loss of relevant

9  evidence.

10      Irico contends that "no documents relevant to the sales of CRTs by Irico to the United

11  States were identified" as a result of any efforts by the Litigation Committee formed in 2008, but

12  it "acknowledges that at the time it misunderstood the scope of document preservation in

13  connection with the litigation in the United States and cannot be certain that all documents related

14  to Irico's global sales of CRTs were preserved."  ECF No. 6391-1 at 63.  After Irico returned to

15  the litigation and discovery was underway, Irico explained, in interrogatory responses served on

16  January 21, 2022, the impact of its failure to implement a litigation hold:

> Nearly all of the employees knowledgeable about what types of
> documents related to Irico's sales of CRTs were created and/or
> maintained during the relevant time period are no longer employed
> by, and are not available to, Irico.  Identifying such specific
> documents that existed in 2008 is nearly impossible given the time
> that has elapsed and the lack of employees with knowledge of these
> issues.  As discussed, Irico regularly preserved documents and
> information in its archives pursuant to Chinese law and its internal
> practices so extensive information regarding Irico's global sales of
> CRTs was preserved regardless of the oral instruction provided in
> 2008.  These categories of preserved documents are detailed in
> Irico's Response to Issue Nos. 7 and 11 and include several
> categories of documents related to sales of CRTs, including but not
> limited to accounting records, invoices, planning documents, some
> production and sales reports, and travel and entertainment
> reimbursements.  In terms of documents that would not have been
> preserved in the archives, Irico identifies the following types of
> documents regarding Irico's global sales of CRTs that are more
> likely to have existed in the summer of 2008:
>
> - Sales reports containing general CRT market information;
> - CRT sales contracts with customers;

- Recent correspondence with customers regarding CRT sales; and,
- Handwritten working notes regarding recent internal and customer meetings attended by members of Irico's sales team.

Irico has not been able to verify that specific documents in these categories existed in summer of 2008. As noted above, there may have been other categories of documents that existed at the time of the oral litigation hold in 2008, but Irico cannot identify those documents at this time.

*Id.* at 64–65.

Irico later supplemented its discovery responses to "no longer contend[] that its initial efforts to preserve documents in August 2008 were limited solely to documents regarding sales of CRTs to the United States," *id.*. at 415, 416, but the Court agrees with the Special Master that Irico's belated attempt to change its story is not credible.  ECF No. 6382 at 30.  In any event, Irico has presented no evidence to support any contention that it searched for documents related to global sales at the outset of this litigation, and it is beyond the pale to suggest that no such documents, except those archived as required by Chinese law, existed within a large, ongoing business concern.

Moreover, some documentary evidence generated by Irico—including evidence related to Irico products sold in the United States—survived because it was shared with and produced to Plaintiffs by other Defendants.  For example, the record contains documents titled "Information Weekly," including "Sales Company 70th Issue July 8-15, 2005,"  ECF No. 6391-1 at 934; "Sales Company Issue No. 74 05.8.06.–8.12," *id.* at 944; and "Marketing Department Issue 109 2006.5.8 – 2006.5.14," *id.* at 952.  These documents were authored by Irico but produced by Defendant Chunghwa Picture Tubes, Ltd., *id.* at 46–47, 815–16, and discuss sales of Irico products to the United States, *e.g.*, *id.* at 935–36, 945, 952—thereby belying any contention by Irico that it was contemporaneously unaware of sales of Irico products to customers in the United States.  The Court agrees with Plaintiffs that the existence of these three self-titled weekly reports, which Chunghwa happened to have copies of and produced as part of its own discovery obligations, as well as the manner in which they were titled and numbered, indicates that Irico authored regular reports concerning sales that have never been produced to Plaintiffs and, as a result of Irico's

failure to implement a litigation hold, no longer exist.[3]

Irico also acknowledges that its sales department prepared "weekly- and monthly-summaries of information collected by its employees," and that these reports "generally included information regarding customers, competitors and general market information."  ECF No. 6391-1 at 403.  In response to an interrogatory asking about documents generated by Irico between 1997 and 2007, Irico stated that it "has been unable to determine whether such reports were created during the period 1997 to 2004," *id.*, which implies that such documents did exist for the period 2004 (or 2005) to 2007.  *See also id.* at 833–49 (Irico report, titled "Regular Marketing Meeting June" and dated June 13, 2005, that was produced during discovery by Chunghwa); *id.* at 868–91 (Irico report, titled "Regular Sales and Marketing Meeting," dated May 15, 2005, that was produced by Chunghwa).

At oral argument, Irico's counsel argued that "tens of thousands of records that were invoice records," which included pricing information, customer information, and shipping location, had been shared with Plaintiffs, and that DPPs had used that information to inform their expert report.  ECF No. 6416 at 35–36.  However, Irico did not refute DPPs' counsel's representation that those records existed only because they had been sent to another Defendant, which produced them during discovery, or, more importantly, that the records were sales receipts that revealed no information about how pricing was determined.

As the foregoing demonstrates, Irico's failure to comply with its discovery obligations has unquestionably resulted in the loss of relevant documentary evidence.

The Court concludes that Irico's conduct has also resulted in the loss of ESI.  Irico argues that, during the relevant time period, its servers would automatically overwrite older emails periodically, such that they would not have contained any relevant documents prior to the time when Irico's duty to preserve arose.  However, this ignores that there may have been emails from 2008 that discussed relevant conduct even though the alleged price-fixing period ended a few months earlier.  Also, although Yan Yunlong testified that "in 2008, email was quite a new

---

[3] Of course, if they do exist, Irico would face a different problem: failure to produce responsive documents in its possession.

communication tool and people were not used to using it, so email communication would be rare," ECF No. 6391-1 at 1095; ECF No. 6389-2 at 108, he also testified that he "probably had email exchanges" with at least some members of the Litigation Committee, at least to forward documents sent to Yan from Pillsbury. ECF No. 6391-1 at 166–67. The record further demonstrates that Irico employees used email to send documents to other Defendants. For example, an Irico employee used @163.com email addresses to forward minutes of two separate meetings to Chunghwa—one from a "January 23, 2007 CPT Industry General Manager (Xi'an) Meeting," and a second from a November 21, 2006 "Color Tube Industry Presidents' Meeting." ECF No. 6391-1 at 44–45, 735–71, 778–800. The @163.com email addresses were "not issued or managed by Irico," *id.* at 290–91, which indicates that they were personal accounts. This makes it even more likely that Irico, had it bothered to comply with its obligations, would have found responsive electronic documents on individual devices and not only on its own servers.

Instead, as Irico does not dispute, it wiped clean the computers of departing employees, thereby deleting any ESI that might have been stored on individual computers and not Irico's central servers. Nor has Irico presented any evidence that it searched employees' individual devices or asked employees to do the same. Had it done so, it would have undoubtedly uncovered at least some relevant evidence, as demonstrated by the evidence uncovered when Irico—years later—searched Yan's and Su's devices.

Irico argues that Plaintiffs must bear some responsibility for any evidence that was lost because they delayed moving for entry of default against Irico, though Irico does not contend "that the whole motion ought to be denied because [Plaintiffs] sat on their hands." ECF No. 6416 at 36. When the Court granted Irico's motion to set aside default, the Court concluded that DPPs "must law some blame at their own feet" for the delay because they:

> knew that the Irico Defendants were in default by April 29, 2010, when the deadline to file an answer passed. But the DPPs did not move for entry of default against the Irico Defendants until over six years later, on July 18, 2016. And it is not clear that the DPPs would have moved for default at all but for the Court's prompting to do so on June 28, 2016.

ECF No. 5240 at 15–16 (citations omitted). However, in that same order, the Court concluded:

> The DPPs were inarguably prejudiced by the Irico Defendants' decision to disappear from the case for ten years. The Irico Defendants could have raised their FSIA defense at the outset, and the Court would have then assessed whether it had jurisdiction over the case. Instead, by refusing to appear and litigate the case, the Irico Defendants have delayed resolution of the jurisdictional question for ten years[.] After the passage of so much time, it is likely that documents and data have been lost, that witnesses have become unavailable, or that important details have been forgotten.

*Id.* at 15. The same continues to be true today. Responsibility for the loss of evidence lies primarily with Irico. While it is possible that some documents or ESI might not have been destroyed had Plaintiffs moved for entry of default sooner, that is far from a foregone conclusion. Irico argues that it cannot confirm whether any relevant evidence existed in 2008. Nor did Irico follow clear instructions from counsel in 2008 regarding what evidence to search for and preserve. Even if Plaintiffs had moved for entry of default in 2010, it is not clear when Irico might have started to search for documents, or if or when Irico might have complied with counsel's advice—and this Court's Pretrial Order No. 1—to preserve evidence. Additionally, because Irico failed to implement a litigation hold when it was required to do so, it will never be known when the categories of documents that Irico contends were more likely to have existed in the summer of 2008 would have been destroyed, or when electronic files that may have existed in 2007 or 2008 were deleted. In any event, it is beyond any doubt that Irico's actions and failures to act when it first received notice of this lawsuit caused the loss of ESI and other evidence, to the significant prejudice of Plaintiffs.

## B. Yan Document and Irico's Failure To Defend Suit

At the Special Master's recommendation, and without objection from any party, the Court ruled that the Yan Document is protected from disclosure by the work-product doctrine. Although the Special Master now recommends reversing that order, ECF No. 6382 at 7, the Court declines to adopt that portion of the Special Master's report and recommendation.[4]

As an initial matter, the Court would not revisit its prior order finding the Yan Document to be protected without, at a minimum, inviting the parties to brief any potential waiver of

---

[4] The Court makes clear for the record that it has not reviewed the Yan Document.

United States District Court
Northern District of California

1  protection under the work-product doctrine. However, because consideration of the Yan

2  Document would not affect the Court's ruling on Plaintiffs' motion for terminating sanctions,

3  allowing such briefing is unnecessary.

4      The crux of the dispute over the Yan Document is how it might impact Irico's claim that

5  Irico initially abandoned this litigation because it believed it had a valid immunity defense. But

6  the reason for Irico's decision not to defend this suit in 2008 is not a significant factor in the

7  Court's analysis. The dispositive fact is that Irico's intentional conduct resulted in the loss of

8  significant evidence. Even if Irico believed in 2008 that it had a valid immunity defense and did

9  not abandon the cases for other reasons—for example, as Yan testified, because Irico "believed

10  that we have not done anything to violate the antitrust law in the U.S.," did not want to "join and

11  form the defendants group" as Pillsbury had advised, and "we were waiting for the plaintiffs to file

12  an independent, separate lawsuit against Irico, and we wanted to wait until that time before we

13  conducted any relevant investigation," ECF No. 6391-1 at 158–59—it was aware of, and remained

14  subject to, the obligation to preserve evidence, at least until after that immunity question had been

15  decided. Irico has cited no authority, and the Court is aware of none, that a party's belief that it is

16  immune from suit excuses it from complying with court orders, or its obligations under Rule 37,

17  while the party's immunity is an open question. As the Special Master aptly summarized:

18          Advised by able and experienced counsel, Irico knew at the outset of
19          the litigation of its right to challenge the jurisdiction of the court to
            proceed with the case. Rather than raise that defense and give the
20          court the opportunity to consider that issue and Irico's possible
            liability while evidence and witnesses were still available, Irico
21          abandoned the litigation. In doing so, Irico evinced not only
            contempt for this court, but also defied the basic responsibilities of a
22          civil litigant in the United States. The evidence establishes that Irico
            knew within months of being named a defendant that it had a right
23          to complete its defense in a timely manner. Instead, Irico instructed
            its attorneys to abandon responding to the lawsuit.

24  ECF No. 6382 at 3.

25      In addition, the manner in which the Yan Document came to light and Irico's failure to

26  produce it earlier reflect Irico's cavalier approach to its obligation to search for and preserve

27  relevant evidence. The Special Master correctly concluded that "Irico concealed for many years in

28  Yan Yunlong's office files the existence of the Yan Document, despite making inconsistent

statements to the court in 2017 regarding its reasons for abandoning the lawsuit," and "Yan

Yunlong's testimony that although he drafted the Yan Document and stored it in his office files

since its creation in October 2008, he did not believe the Yan Document was relevant, reveals

Irico's blatant disregard for its discovery obligations." *Id.* at 67. Irico does not dispute that the

Court "found that the Yan Document was responsive to two different discovery requests, despite

Irico's assertions to the contrary," *id.*, and Irico provides no justification as to why the document

was not made known to Plaintiffs, even if on a privilege log, before it came to light during Yan's

deposition in 2022. Moreover, it is telling that Yan, a member of the Litigation Committee Irico

formed in 2008 to respond to this litigation, stated that he did not search his own files for

potentially responsive documents until Irico was "working on the motion for state sovereignty

immunity," ECF No. 6391-1 at 150—i.e., approximately a decade after Irico's evidence-

preservation obligations first arose.

### C.  Irico's Failure To Produce Su Xiaohua for Deposition

As with discovery related to Irico's failure to preserve evidence, Irico was also not

forthcoming with discovery regarding Plaintiffs' attempts to depose Su Xiaohua. On the Special

Master's recommendation, and without objection from the parties, the Court ordered "Irico to

produce targeted discovery of all documents (hard copy or electronic) relating or referring to"

seven categories related to Su's deposition, resignation, and relationships with Irico entities. ECF

No. 6115 at 12–13. In response, Irico produced 32 documents totaling 141 pages. ECF No.

6401-3 at 91. The Special Master subsequently reported, and Irico did not object, that Irico's

outside counsel represented in July 2023 that "it was their understanding and belief that all

documents responsive to the categories in the Su Order had been produced or listed on a privilege

log because they had asked Irico for all such documents and it was their understanding that no

other documents exist." ECF No. 6264 at 7. However, after being ordered to comply fully with

the Su Order, Irico produced another 619 documents totaling 1,404 pages in October 2023, ECF

No. 6401-3 at 91, and the Special Master has represented without objection that Irico produced

additional documents on March 25, 2024, ECF No. 6382 at 47. The Court agrees with the Special

Master's findings "that Irico intentionally flouted the court's Su Order by producing only a few

curated documents[,] and the First Interim Order directing it to provide physical possession of all of Su's electronic devices used during his employment to its United States counsel," and that Irico therefore "intentionally caused further delays in the production of relevant documents that should have been produced months [earlier]."  ECF No. 6382 at 46.

"The moment [Irico] became aware [Su] was planning to leave the company, it was incumbent on [Irico] to alert [Plaintiffs] or the Court in a timely manner to [Su's] intention to resign from [Irico]."  *Beijing Choice Elec. Tech. Co. v. Contec Med. Sys. USA Inc.*, No. 18-cv-0825, 2021 WL 9184385, at *3 (N.D. Ill. Dec. 17, 2021), *report and recommendation adopted*, 2022 WL 3053550 (N.D. Ill. May 12, 2022).  However, the documents that Irico ultimately produced establish that Irico facilitated Su's early retirement at least several weeks before Irico's counsel informed Plaintiffs' counsel of Su's resignation, and Irico's contrary representations to the Court—for example, that "Irico did not know Mr. Su intended to resign before it happened," ECF No. 6101 at 11—were demonstrably false.  The Court previously adopted the following recitation by the Special Master without objection from the parties:

> Irico asserts that it "did not know Mr. Su intended to resign before it happened" and that "Irico only learned of Mr. Su's decision to depart on May 31, 2022, six days after the May 25th Order".  In support, Irico cites the July 21, 2022 declaration of its Deputy General Counsel, Zhang Wenkai, which states: "Although Su Xiaohua formally resigned from Irico Foshan Flat Panel Display Co, Ltd., the Irico subsidiary who most recently employed him, on May 25, 2022, I did not learn of Mr. Su's resignation until May 31, 2022."  The Zhang Wenkai declaration speaks only to his personal knowledge, not Irico's.  If Su Xiaohua "formally resigned" on May 25, 2022, he must have taken some actions and submitted written notice of his "formal resignation" to others at Irico.  Also, Zhang Wenkai's declaration fails to state when others at Irico first learned of Su Xiaohua's informal resignation, his intent to resign and his decision to resign rather than be deposed.  Contrary to Irico's argument, this Zhang declaration cannot be considered "reliable evidence" that "Irico only learned of Mr. Su's decision to depart on May 31, 2022."

ECF No. 6115 at 9 (citations omitted).

Even if Zhang did not personally know of Su's resignation prior to May 31, 2022, that does not mean that Irico lacked knowledge.  To the contrary, the record establishes that Irico approved Su's request for an early departure on April 7, 2022.  ECF No. 6401-3 at 189.  On April

13, 2022, Shi Feng, an HR director at Irico, ECF No. 6391-3 at 11, indicated that Su needed to "formally submit[] his early departure application to IRICO Industrial," after which "IRICO Industrial shall submit an instruction request report, and then the matter will be studied at the party committee meeting," *id.* at 214. Citing "personal reasons," Su submitted a written request "for early departure" on May 5, 2022, even though he would not typically go into "off-duty" status until December 2022 under Irico's age provisions for managers. *Id.* at 172–76.

Plaintiffs correctly argue that "[n]owhere does Irico explain why its top executives granted Mr. Su permission to enter an 'off-duty and rest' program for which he was not eligible while Irico was under a Court Order to produce him for deposition." ECF No. 6405 at 28. Irico acknowledges that "a committee did approve Mr. Su's resignation two months after giving routine approval to his deposition travel," but argues that "meeting minutes confirm that the committee was unaware of any connection between the two." ECF No. 6408 at 20. However, simply because the cited meeting minutes granting approval for Su's early retirement do not mention Su's upcoming deposition, ECF No. 6401-3 at 186–94, does not establish that the committee lacked knowledge. Moreover, as Irico acknowledges, it was the same committee that gave approval both for Su's travel for deposition and Su's early retirement. *See also* ECF No. 6401-2 at 536–41.

Irico also falsely represented to the Special Master that, at the time of his resignation, Su "terminated all relationships with Irico." ECF No. 6391-1 at 1107. But one of Irico's own records indicate that "Su Xiaohua left his post on June 17, 2022." ECF No. 6401-3 at 221. And other records make clear that June 17, 2022, was only the date on which Su's recommended successor was identified, and that Su was not "dismiss[ed] . . . from his positions as the company's manager and legal representative" until July 28, 2022. *Id.* at 361–67. Thus, at least until that date, Su was indisputably still serving as an Irico employee.

Irico's records further indicate that Su both sent and received Irico documents by chat on September 20, 2022, *id.* at 248–52 (Su receiving a zip file entitled "Draft Reply for the South China Region" and sending a document entitled "Situation Explanation (1)"). In addition, as of February 2023, Irico considered Su to be "off-duty" but still "in service." *Id.* at 197. And in August 2023, Irico paid Su, including amounts listed as "salary," as reflected in a document titled

"Managers and Business Managers of the Comprehensive Department II and Finance Staff, South China Region – Mid-Long Term Contract Workers Salary Sheet 1 for August 2023."[5]  *Id.* at 227; ECF No. 6398-6 at 227 (sealed version showing Su's name and payment amounts).  Additionally, Irico does not dispute that, as of August 2023, Su was serving as director of a company owned at least in part by Irico.  ECF No. 6401-3 at 267–70; ECF No. 6382 at 52 n.144.  Given all of the above, the Court finds correct the Special Master's conclusion that Irico maintained control over Su even after the May 25, 2022 date on which Irico contends Su resigned.

While some of the delay in conducting depositions in this case is attributable to pandemic-related travel restrictions, Irico also bears responsibility for failing to comply with the Court's orders regarding Su's deposition, as well as for failing to comply with the Court's orders regarding discovery as to Irico's failure to produce Su for deposition.  Irico approved early retirement for Su while it knew it was under obligation to produce him for deposition, and it did nothing to attempt to persuade him to appear for deposition prior to his formal dismissal, while he continued to receive payments from Irico, or while he was working for Irico or a related entity.  Irico also made multiple misrepresentations to the Court and to the Special Master in apparent attempts to conceal the truth.  As the Special Master correctly concluded:

> [D]efendants failed to inform the court of their own executives' April 7, 2022 approval of Su's request for early retirement ahead of schedule, while leaving the court with the misimpression that defendants would continue trying to produce Su for his deposition. . . . Irico misrepresented that Su had resigned on May 25, 2022 and had terminated all relationship with Irico, when in fact, Su continued to work for Irico through at least the end of July 2022 and later.  These misrepresentations reveal Irico's egregious bad faith and willful non-compliance with court orders.

ECF No. 6382 at 69.

Irico continues to argue that Su's testimony would not have been valuable, but the Court

---

[5] Even if Irico is correct that these funds were paid because "[p]ursuant to standard Irico personnel policies and Chinese government regulations, Mr. Su was entitled to receive a set monthly living expense allowance until reaching age 60 as well as certain social insurance benefits," ECF No. 6389 at 18, that says nothing about Irico's decision to approve Su to qualify for such benefits prior to his standard eligibility date.  Nor has Irico introduced any evidence to demonstrate that all managers who reached the upper age limit are considered "in service" or are paid a "salary" until they reach the age of 60.

has already ruled—again, by adopting a report and recommendation from the Special Master to which Irico did not object—that Su "is likely the only Irico witness with personal knowledge of key facts and events," and that his unavailability "is highly detrimental to resolution of this litigation on its merits."  ECF No. 6115 at 10, 12.

### D.  Remedy

Based on all of the above conduct, the Court concludes for the reasons discussed below that terminating sanctions are appropriate under both Rules 37(b) and 37(e) of the Federal Rules of Civil Procedure.  Because the Court finds that these rules provide sufficient support for terminating sanctions, it does not impose sanctions under its inherent authority.  *See Chambers*, 501 U.S. at 50 ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the [Federal Rules of Civil Procedure], the court ordinarily should rely on the Rules rather than the inherent power.").  However, to the extent that any reviewing court determines that the Rules are not "up to the task" of imposing terminating sanctions, *id.*, sanctions under the Court's inherent authority would be proper because Irico "has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings," *Anheuser-Busch*, 69 F.3d at 348.

Although there is no evidence that Irico specifically deleted any individual documents for the purpose of avoiding discovery by Plaintiffs in this case—nor could there be, in light of Irico's wholesale failure to comply with its discovery obligations, which makes identifying individual documents impossible—the Court has no difficulty concluding that Irico "acted with the intent to deprive another party of the information's use in the litigation,"  Fed. R. Civ. P. 37(e)(2), or that Irico's conduct was within its control and therefore "is sufficient to demonstrate willfulness, bad faith, or fault," as required to impose a sanction that "results in default." *Jorgensen*, 320 F.3d at 912 (first quoting *Hyde & Drath*, 24 F.3d at 1167).  Irico was not only ordered by the Court to preserve evidence, but it was given detailed instructions, as well as admonitions, by its own counsel regarding its obligations.  Irico has never argued that it was incapable of complying with those obligations, or that anything it was required to do was outside its control.  But, rather than follow advice of counsel, Irico instead intentionally chose not to preserve any evidence relevant to

this litigation—including by recycling computers of departing employees without preserving their contents—aside from documents that were required to be preserved under Chinese law.  As the Special Master correctly observed, "Chinese law does not displace the requirements of United States law regarding preservation of evidence in this litigation."  ECF No. 6382 at 31.  Irico's "destruction of evidence qualifies as willful spoliation [because it had] 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'"  *Leon*, 464 F.3d at 959 (quoting *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir.2002)) (emphasis omitted).

Because Irico has violated court orders regarding preservation of evidence and discovery, "the public's interest in expeditious resolution of litigation" and "the court's need to manage its docket" support sanctions, while "the public policy favoring disposition of cases on their merits" weighs against default.  *Adriana Int'l*, 913 F.2d at 1412 (quoting *Malone*, 833 F.2d at 128).  The "decisive" factors for the court to consider are the risk of prejudice to Plaintiffs and "the availability of less drastic sanctions."  *Id.* (quoting *Malone*, 833 F.2d at 128).  Both factors support terminating sanctions in this case.

First, Plaintiffs have been highly prejudiced by Irico's failure to preserve evidence and its failure to produce Su for deposition.  Following its independent review of the record, the Court agrees with the Special Master's conclusions that:

> Irico has frustrated plaintiffs' efforts to obtain testimony from Irico's own employees and thus the first-hand witnesses to Irico's conduct.  These witnesses are now unavailable for testimony to answer the allegations against Irico which secured this unavailability willfully.  [Aside from limited evidence required to be archived by Chinese law,] Irico has destroyed most, nay perhaps all, of its own documents that bear on its conduct during the relevant time period.  This destruction was undertaken knowingly.  From [the] outset, Irico has had the benefit of the advice and counsel of highly experienced and able counsel who provided Irico appropriate advice on Irico's legal obligations as a defendant in litigation under the Federal Rules.  Irico flouted and ignored this counsel.

> Irico's spoliation of ESI and other information from the beginning of this case forward has led to wide-scale loss of documents pertaining to Irico's sales of CRTs globally, Irico's production levels of CRTs and its participation in competitor meetings throughout the class period.  These types of documents are critical to

the claims in this case.  While relevant documents reflecting Irico's participation in meetings with other CRT manufacturers were produced by other defendants who have long since settled, such documents are far less compelling than if they had come from Irico's files with Irico's witnesses able to testify regarding them. Irico's ongoing failures to preserve, destruction of documents and meager document productions have substantially impaired plaintiffs' ability to prove their case and interfere with the rightful decision of this case.

For eight years, Irico departed the litigation.  It returned only after the court found Irico in default. When Irico returned to the litigation, it had the benefit of other experienced counsel.  Yet Irico has made discovery and pretrial preparation in the normal course impossible. The Court already found inarguable prejudice resulting from Irico's decision to disappear from the case for eight years.

ECF No. 6382 at 72–73 (quotation marks, alteration marks, and footnote omitted).

"Where emails and documents are missing entirely due to a party's failure to preserve and their relevance cannot be directly ascertained, a party can hardly assert any presumption of irrelevance to the destroyed documents." *Perez v. U.S. Postal Serv.*, No. C12-00315 RSM, 2014 WL 10726125, at *3 (W.D. Wash. July 30, 2014) (quotation marks and citation omitted). Moreover, the relevance of some of the missing documents *is* known:  Irico sent a handful of weekly reports, monthly reports, and meeting notes to other Defendants, who properly preserved them and produced them to Plaintiffs during discovery.  These documents are relevant, and it is implausible that they are the only documents of their kind that Irico ever created.  This means that Irico's conduct, without question, resulted in the destruction of relevant evidence.  Additionally, because Irico did not maintain the computers of departing employees—and almost all key employees have now departed, in part because Irico chose to disappear from this litigation instead of raise its immunity defense early in the case—it is impossible to know when ESI was deleted or the extent to which the missing information would impact the outcome of this case.  As Irico itself acknowledges, it has no idea "whether any of the recycled computers contained: a) any data whatsoever; b) any documents created in the time period 1995 through 2007[;] or c) any documents relevant or responsive to any of the discovery requests issued to Irico during the course of this litigation."  ECF No. 6391-1 at 688–89.  Beyond that, given that Irico was not forthcoming about the Yan Document or production of discovery regarding Su's deposition, it is also "a reasonable inference that if there was other discoverable material harmful to its case that its

34

1  adversaries did not know about, it would be hidden forever." *Valley Eng'rs*, 158 F.3d at 1058.

2  Put most simply, Irico's "discovery violations make it impossible for a court to be confident that

3  the parties will ever have access to the true facts." *Id.* This "most critical factor to be considered

4  in case-dispositive sanctions" therefore weighs in favor of such sanctions. *Conn. Gen. Life Ins.*,

5  482 F.3d at 1097.

6       Second, this is a case with "egregious circumstances," where "Irico has purposefully and

7  defiantly violated . . . court order[s]," so "it is unnecessary (although still helpful) for a district

8  court to discuss why alternatives to dismissal are infeasible." *Malone*, 833 F.2d at 132 (9th Cir.

9  1987). The Court has considered various alternatives, none of which is adequate. Admitting at

10  trial documents produced by other Defendants, including documents authored by Irico, would be

11  insufficient due to the vast amount of evidence that Irico destroyed. Having a handful of weekly

12  or monthly reports, or notes from only two meetings, would not allow the finder of fact to evaluate

13  Irico's liability, or the extent to which Irico's conduct harmed Plaintiffs. In addition, although

14  Irico argued in its motion that barring Su as a witness would be a sufficient alternative remedy,

15  ECF No. 6389 at 40, Irico acknowledged at the hearing that it "understand[s] that simply saying

16  we can't call [Su] as a witness would not necessarily cure the prejudice because he's refused—he

17  refused to go to Macau, so presumably he's never going to come here anyway." ECF No. 6416 at

18  19. Nor would it be sufficient to provide an adverse inference instruction to the jury. As in

19  *WeRide*, the "destruction of evidence [in this case] was so sweeping that this case cannot be

20  resolved on its merits," and "any jury instruction or exclusion of evidence would be inappropriate

21  here because the spoliation occurred on such a massive scale." 2020 WL 1967209, at *11; *see*

22  *also Facebook, Inc. v. OnlineNIC Inc.*, No. 19-cv-07071-SI, 2022 WL 17371092, at *8 (N.D. Cal.

23  Oct. 17, 2022) (adopting report and recommendation for terminating sanctions "where plaintiffs

24  and the Court have no way of knowing what evidence was destroyed that would support plaintiffs'

25  case").

26       Irico relies heavily on *In re Google Play Store Antitrust Litigation*, in which the district

27  court concluded that "Google intended to subvert the discovery process" by deleting messages

28  "exchanged internally on its Chat message system" but declined to order terminating sanctions.

United States District Court
Northern District of California

664 F. Supp. 3d 981, 981, 993–94 (N.D. Cal. 2023).  However, in that case, unlike here, Google properly implemented a litigation hold for approximately 360 individuals, "about 40 of whom have been designated custodians." *Id.* at 986.  And, although Google deleted all Chat messages, it had preserved all email, as well as "Google Workspace files, which includes Docs, Sheets, Slides; and also Google Drive content, which can include other file types." *Id.* (citation omitted).  In addition, Google stopped deleting Chat history during the pendency of the case. *Id.* at 991.  Thus, unlike in this case, the plaintiffs in *Google Play* had access to far more evidence, and the deleted ESI was only a small part of the overall discovery.  The *Google Play* court also did not express any lack of confidence that the true facts could never be known, and the same is true of other cases on which Irico relies.  For example, the *Beijing Choice* court noted that, although the plaintiff was prejudiced by the defendant's failure to produce a witness for deposition and failure to inform the plaintiff that the witness planned to resign, the plaintiff "may still be able to adequately prove its damages through documentary evidence and testimony from [the defendant's] designated 30(b)(6) witness." 2021 WL 9184385, at *3–5.  Similarly, in *Nursing Home Pension Fund v. Oracle Corp.*, the court concluded "that plaintiffs have not demonstrated the degree of prejudice necessary to warrant terminating sanctions, primarily because plaintiffs have received a large quantity of materials through the discovery process." 254 F.R.D. 559, 564 (N.D. Cal. 2008) (citation omitted).  The court did not "find that default sanctions are appropriate because the actions alleged to have been taken by defendants 'do not eclipse entirely the possibility of a just result.'" *Id.* (quoting *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1071 (N.D. Cal. 2006)).  Those are not the circumstances of this case, in which the Court has concluded that Irico's discovery misconduct has deprived Plaintiffs and any factfinder of ever knowing the true facts.

Irico argues that none of what the Court has found to be misconduct affects the defenses it seeks to present, and that it should therefore be allowed to proceed to trial on those defenses.  However, Irico listed Su as one of only two witnesses with knowledge regarding several of Irico's defenses, including that the alleged conduct "either occurred outside the jurisdiction of the Court or was neither directed to nor affected persons, entities, trade or commerce in the United States or both"; that it "was caused by, due to, based upon, or in response to directives, laws, regulations,

United States District Court
Northern District of California

policies, and/or acts of governments, governmental agencies and entities, and/or regulatory agencies"; and that it "was caused by or in response to duly enacted laws and/or regulations of the People's Republic of China and is therefore protected under the foreign sovereign compulsion doctrine, the act of state doctrine, and international comity." ECF No. 6391-1 at 301–02, 309–12. The other identified witness was Wang Zhaojie, *id.*, and Irico does not dispute the Special Master's characterization that Wang "was extremely evasive during his deposition and repeatedly claimed that he did not remember or did not know many facts, even that he had attended meetings with Chunghwa, a topic that he had discussed in his prior deposition," ECF No. 6382 at 53. Thus, Irico's misconduct in failing to produce Su for deposition has significantly prejudiced Plaintiffs' ability to test Irico's defenses, including those relating to due process and international comity. Likewise, Irico has produced no evidence regarding how it determined its products' pricing, or evidence regarding communications it had with customers or potential customers in the United States or that sold products containing Irico components to the United States. And its failure to preserve evidence has prevented Plaintiffs from testing the credibility of any witnesses, including Wang, with potentially impeaching documents or determining whether other relevant witnesses exist. In short, Irico's conduct has made it impossible for the true facts surrounding Irico's defenses to ever be known, thus making case-dispositive sanctions appropriate not only on Plaintiffs' case in chief, but also on Irico's affirmative defenses.

Finally, under Rule 37(b), "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). Fees may also be awarded under the Court's inherent authority upon a finding of bad faith, *Leon*, 464 F.3d at 961, which the Court has found here. Irico does not object to an award of costs and fees and, to the contrary, suggests such an award as a sufficient alternative sanction. ECF No. 6389 at 41. As the Special Master correctly concluded, "Imposing a sanction of attorney fees and costs would be appropriate but it alone would not put the class plaintiffs where they would have been had Irico not spoliated evidence, delayed for almost a decade and repeatedly flouted discovery orders, requiring repeated court

1  intervention and ordering of further searches and productions." ECF No. 6382 at 76.  Other courts

2  have awarded both terminating sanctions and reasonable fees and costs, *e.g.*, *WeRide*, 2020 WL

3  1967209, at *6, and the Ninth Circuit has affirmed such orders, *e.g.*, *Leon*, 464 F.3d at 963.  The

4  Court finds a fee award against Irico to be warranted here.

### CONCLUSION

6  For all of the above reasons, the Court adopts the Special Master's recommendation to

7  grant Plaintiffs' motion for terminating sanctions based on Irico's discovery misconduct.  It is

8  hereby ordered that:

9  1.  The Irico Defendants' answers, including affirmative defenses, are stricken.

10  2.  The Clerk shall enter default against both Irico Group Corporation and Irico Display

11  Devices, Co., Ltd.

12  3.  All remaining pretrial and trial dates are vacated, as is Irico's pending motion for

13  summary judgment, ECF No. 6377.

14  4.  Irico shall pay Plaintiffs' reasonable attorney's fees and costs incurred as a result of

15  Irico's spoliation of evidence and failure to produce Su for deposition.  This includes, at a

16  minimum, fees and costs in connection with Plaintiffs' motion for sanctions, including all related

17  discovery disputes.  This matter is referred to the Special Master for resolution.

18  5.  After meeting and conferring, the parties shall file a statement with their joint or

19  competing proposals regarding how to determine damages.  This joint statement shall be filed

20  within 28 days of the date of this order, but the Court will entertain reasonable requests to extend

21  that deadline, particularly if the parties are engaged in settlement discussions.  *See* ECF No. 6416

22  at 46–48 (discussing mediation efforts between DPPs and Irico).  The Court advises that it does

23  not find a jury trial on damages to be required following the entry of default, *Adriana Int'l*, 913

24  F.2d at 1414, and that it might refer any motion for default judgment to the Special Master.

25  **IT IS SO ORDERED.**

26  Dated:  November 15, 2024



JON S. TIGAR
United States District Judge