**NORTON ROSE FULBRIGHT US LLP**
JEFFREY MARGULIES (BAR NO. 126002)
KAYLEE YANG (BAR NO. 303464)
One Embarcadero Center, Suite 1050
San Francisco, California 94111
Telephone:    (213) 892-9200
Facsimile:    (213) 892-9494
jeff.margulies@nortonrosefulbright.com
kaylee.yang@nortonrosefulbright.com

**NORTON ROSE FULBRIGHT US LLP**
GERALDINE YOUNG (admitted *pro hac vice*)
1550 Lamar Street, Suite 2000
Houston, Texas 77010
Telephone:    (713) 651-5151
Facsimile:    (213) 651-5246
geraldine.young@nortonrosefulbright.com

Attorneys for Defendants
IRICO GROUP CORP. AND
IRICO DISPLAY DEVICES CO., LTD

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No.: 07-cv-05944 JST |
| | MDL No. 1917 |
| This document relates to: | **DEFENDANTS IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD.'S TRIAL BRIEF ON DAMAGES** |
| *ALL INDIRECT PURCHASER ACTIONS* | |
| *ALL DIRECT PURCHASER ACTIONS* | Date:         May 19–21, 2025 |
| | Time:         8:30 a.m. to 1:30 p.m. |
| | Judge:        Honorable Jon S. Tigar |
| | Courtroom:  6, 2nd Floor |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. iv

INDEX OF EXHIBITS.................................................................................................... viii

INTRODUCTION ................................................................................................................1

STATEMENT OF ISSUES TO BE DECIDED .................................................................2

STATEMENT OF RELEVANT FACTS AND BACKGROUND ...................................3

I.      The two types of CRT products at issue, CDTs and CPTs, were subject to declining prices and competition from newer technologies from 1995 to 2007. ...............................3

II.     The Plaintiffs' factual allegations as to the Irico Defendants start in 1998 and not before. ...................................................................................................................................4

III.    DPPs' and IPPs' experts rely on different models and arrive at different overcharges for the same products from the same alleged conspiracy. .................................................6

LEGAL STANDARD............................................................................................................8

ARGUMENT ........................................................................................................................9

I.      The DPPs and IPPs cannot recover pre-1998 damages from the Irico Defendants.............9

        A.      The DPPs and IPPs plead that Irico joined the alleged conspiracy in 1998, with no factual allegations of any Irico participation or knowledge before 1998................................................................................................................................11

        B.      Plaintiffs cannot authenticate and admit, and the Court should not consider, outside documents to change Plaintiffs' pleaded 1998 start-date. .........................13

II.     Additionally, for independent reasons, the IPPs cannot recover damages or trebled damages for certain state law claims for earlier time periods.............................................14

III.    For the DPP damages, the Court should apply corrections to the DPPs' overcharge model and volume of purchases that reflect market realties and best-available data. .......16

        A.      DPP expert Johnson's overcharge model should be corrected to reflect differences between CPTs and CDTs and variability in overcharges over time. ...................................................................................................................17

                1.      DPP Error 1: Johnson's model should be corrected to estimate separate regressions for CPTs and CDTs.................................................18

                2.      DPP Error 2: Johnson's model should be corrected to reflect the reality of variation in alleged conspiracy effects over time. ......................................20

B.      The Court should exclude certain sales from the DPPs' damages calculation because they are refuted by the available data and overstate damages.................22

        1.      DPP Error 3: Johnson now concedes that he cannot treat 100% of sales without customer information as DPP sales and that known proportions from sales with customer information should be applied instead...................22

        2.      DPP Error 4: Now undisputed, Johnson did not use best available data to calculate SDI's CRT sales to DPPs. ...............................................23

        3.      DPP Error 5: Johnson should have used, and the Court should rely on, other firm-specific data to fill gaps of missing sales information. .................24

C.      The Court should apply corrections for DPP Errors 1 to 5, resulting in well-founded reductions in any DPP damages.................................................26

IV.  For IPP damages, the Court should apply corrections to the IPPs' overcharge model that reflect market realities and should deny duplicative damages...................27

A.      The issue of duplicative damages is relevant to and should factor into the determination of IPP damages and total damages given the due process and state law concerns raised by IPPs' seeking overlapping overcharges with DPPs.................................................................................................28

        1.      The IPPs and DPPs seek overlapping damages, meaning the total IPP and DPP damages sought exceeds 100% of the alleged overcharge. .............28

        2.      Awarding IPPs and DPPs overlapping, trebled class damages would violate due process. ...........................................................................29

        3.      Applicable state laws recognize the need for apportionment and avoidance of duplicative damages. .................................................31

B.      IPP expert Netz's overcharge model should be corrected to account for price variability over time and important changes in market conditions.......................34

        1.      IPP Error 1: Netz's model should be corrected to include more control variables for significant CRT demand changes and to track changes in costs associated with producing CRTs. ............................................35

        2.      IPP Error 2: Netz's model should be corrected to remove "overcharges" that likely measure non-conspiratorial changes in market conditions and predate Irico's alleged involvement in the conspiracy. ...................38

C.      The Court should apply corrections for IPP Errors 1 and 2, resulting in well-founded reductions in any IPP damages. ..........................................39

V.  The Court should apply further corrections for the conflicting and overstated overcharge percentages and duplicative damages by applying consistent, lower-

bound overcharge percentages and reducing IPP damages by overlapping DPP damages...................................................................................................................40

VI.  Further supporting corrections to the Plaintiffs' models and calculations, other evidence demonstrates that the alleged conspiracy was not effective in raising CRT prices. ...............................................................................................................42

VII.  After the Court determines damages, the Court should refuse to treble IPP damages under certain state laws and should offset past settlements from DPP and IPP damages...................................................................................................................45

     A.  Based on the IPPs' pleadings and the applicable statutes, the IPPs are not entitled to treble damages for certain state law claims. ...........................45

     B.  The Court must apply offsets for the past class action settlements. .....................49

CONCLUSION.........................................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Marin v. England*,
    352 F.2d 186 (9th Cir. 1965), *rev'd on other grounds*, 385 U.S. 99 (1966)............................29

*Bateman v. Am. Multi-Cinema, Inc.*,
    623 F.3d 708 (9th Cir. 2010) ....................................................................................30

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................................................10, 11

*BMW of North America, Inc. v. Gore*,
    517 U.S. 559 (1996)...................................................................................................30

*Bunker's Glass Co. v. Pilkington PLC*,
    75 P.3d 99 (Ariz. 2003)..............................................................................................31

*Caraang v. PNC Mortg.*,
    795 F. Supp. 2d 1098 (D. Hawai'i 2011) ..................................................................10

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    2013 WL 5428139 (N.D. Cal. June 20, 2013) ..............................................................8

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    738 F. Supp. 2d 1011 (N.D. Cal. 2010) ....................................................................15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    911 F. Supp. 2d 857 (N.D. Cal. 2012) ......................................................................30

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    No. C-07-5944, 2013 WL 4505701 (N.D. Cal. Aug. 21, 2013) ................................15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    No. MDL 1917, 2016 WL 7800819 (N.D. Cal. Nov. 15, 2016)................................31

*Cities Serv. Co. v. McGrath*,
    342 U.S. 330 (1952).....................................................................................................29

*Clayworth v. Pfizer, Inc.*,
    49 Cal. 4th 758 (2010) ................................................................................................31

*Comes v. Microsoft Corp.*,
    646 N.W.2d 440 (Iowa 2002) .....................................................................................32

*In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*,
    691 F.2d 1335 (9th Cir. 1982) ....................................................................................29

*Elektra Entm't Group, Inc. v. Bryant*,
   No. CV 03-6381, 2004 WL 783123 (C.D. Cal. Feb. 13, 2004)................................8

*Freeman Indus., LLC v. Eastman Chem. Co.*,
   172 S.W.3d 512 (Tenn. 2005)................................33

*Geddes v. Un. Fin. Grp.*,
   559 F.2d 557 (9th Cir. 1977) ................................8, 9, 11

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) ................................8, 22

*GreenCycle Paint, Inc. v. Paintcare, Inc.*,
   No. 15-cv-04059, 2016 WL 1402845 (N.D. Cal. Apr. 8, 2016)................................10, 11

*Harris v. Balk*,
   198 U.S. 215 (1905)................................29

*Henry v. Oluwole*,
   108 F.4th 45 (2d Cir. 2024) ................................13

*Heyward v. Cal. Highway Patrol*,
   No. C-14-03583, 2014 WL 4771567 (N.D. Cal. Sept. 24, 2014)................................10

*Humana Inc. v. Bausch Health Companies Inc.*,
   2023 WL 4552005 (Cal. Super. July 5, 2023) ................................31, 34

*ILC Peripherals Leasing Corp. v. IBM*,
   458 F. Supp. 423 (N.D. Cal. 1978), *aff'd per curiam sub nom. Memorex Corp v.
   IBM*, 636 F.2d 1188 (9th Cir. 1980) ................................18

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)................................ *passim*

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
   791 F.2d 1356 (9th Cir. 1986) ................................29

*Mack v. Bristol-Myers Squibb Co.*,
   673 So.2d 100 (Fla. Dist. Ct. App. 1996) ................................32

*Mattel, Inc. v. MGA Ent., Inc.*,
   2010 WL 11463911 (C.D. Cal. Sept. 3, 2010) ................................9

*Mitsui OSK Lines Ltd v Seamaster Logistics Inc.*,
   No. 11-cv-02861, 2013 WL 2386635 (N.D. Cal. May 30, 2013)................................9

*One Hour Air Conditioning Franchising SPE LLC v. Bigham Servs., Inc.*,
   No. 21-CV-07891, 2022 WL 3132424 (N.D. Cal. Aug. 5, 2022)................................17

*In re Optical Disk Drive Antitrust Litig.*,
  303 F.R.D. 311 (N.D. Cal. 2014) ............................................................................8

*Orshan v. Apple Inc.*,
  No. 5:14-CV-05659, 2024 WL 4353034 (N.D. Cal. Sept. 30, 2024) .....................40

*Ramirez v. TransUnion LLC*,
  951 F.3d 1008 (9th Cir. 2020), *rev'd and remanded on other grounds*, 594 U.S.
  413 (2021) ............................................................................................................30

*Southern Union Co. v. Irvin*,
  563 F.3d 788 (9th Cir 2009) ...................................................................................30

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
  538 U.S. 408 (2003) ...............................................................................................30

*Talon, Inc. v. Union Slide Fastener, Inc.*,
  266 F.2d 731 (9th Cir. 1959) ...................................................................................8

*In re TFT-LCD Antitrust Litig.*,
  Nos. M 07-1827 C 10–4945, 2013 WL 1891367 (N.D. Cal. May 6, 2013) ...........10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  820 F. Supp. 2d 1055 (N.D. Cal. 2011) ..............................................................9, 34

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. C 10-4945, 2011 WL 3738985 (N.D. Cal. Aug. 24, 2011)...............................15

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
  M 07-1827, 2012 WL 6709621 (N.D. Cal. Dec. 26, 2012), *aff'd*, 637 F. App'x
  981 (9th Cir. 2016) .............................................................................................32, 34

*United States v. Lothian*,
  976 F.2d 1257 (9th Cir. 1992) ..................................................................................9

*In re Vitamins Antitrust Litig.*,
  No. 99-197 1285, 2000 WL 1511376 (D.D.C. Oct. 6, 2000) ............................15, 32

*In re Vitamins Antitrust Litigation*,
  259 F. Supp. 2d 1 (D.D.C. 2003) .........................................................................31, 32

*W. Union Tel. Co v. Commonwealth of Penn.*,
  368 U.S. 71 (1961).................................................................................................29

*William Inglis & Sons Baking Co. v. Cont'l Baking Co.*,
  981 F.2d 1023 (9th Cir. 1992) ................................................................................49

*Wolfe v. Nat'l Lead Co.*,
  225 F.2d 427 (9th Cir. 1955) ..................................................................................17

**Statutes**

Ariz. Rev. Stat. § 44-1408(B) ................................................................48

California Business and Professions Code § 16750(a) ..............................48

Code § 51-08.1-08(3) ..............................................................................48

D.C. Code § 28-4509(b) ......................................................................31, 32

Fla. Stat. Ann. § 501.211(2) ....................................................................46

Haw. Rev. Stat. § 480-13(c)(5) ................................................................32

Iowa Code Ann. § 553.12(3) ....................................................................48

Kan. Stat. Ann. § 50-161(b) ....................................................................49

Michigan Antitrust Reform Act § 445.778(2) ..........................................48

Minn. Stat. § 325D.57 ..............................................................................32

Miss. Code. Ann. § 75-21-9 ......................................................................46

N.D.C.C. § 51-08.1-08(5) ........................................................................33

N.M. Stat. Ann. § 57-1-3 ..........................................................................32

N.Y. Gen. Bus. Law § 340(6) ..................................................................32

N.Y. Gen. Bus. Law § 349 (h) ..................................................................16

Neb. Rev. Stat. § 59-821(2) ......................................................................32

Neb. Rev. Stat. § 59-1609 ........................................................................46

Nebraska Rev. Stat. § 59-821 ..................................................................46

New Mexico Stat. Ann. § 57-1-3(A) ........................................................49

New Mexico Stat. § 57-12-10(B) ..............................................................48

Sherman Antitrust Act, 15 U.S.C. § 2 ......................................................10

Tennessee Code Ann. § 47-25-106(a) ......................................................47

Vermont Stat. Ann. 9 § 2465(a) ..........................................................48, 49

Vt. Stat. Ann. § 2465(b) ............................................................................33

# INDEX OF EXHIBITS

| Exhibit No.[1] | Description |
|---|---|
| 400 | Declaration of Margaret Guerin-Calvert ("Guerin-Calvert Decl.") |
| 401 | Declaration of Geraldine Young |
| 402 | Janet S. Netz, Ph.D. Rebuttal to Supplemental Expert Report of Margaret E. Guerin-Calvert and Expert Report of Donald Clarke, April 27, 2022 ("April 27, 2022 Netz Rebuttal") |
| 403 | Expert Report of Margaret Guerin-Calvert, July 21, 2023 ("Jul. 21, 2023 Guerin-Calvert Rep.") |
| 404 | Expert Rebuttal Report of Phillip M. Johnson, Ph.D., September 1, 2023 ("Sept. 1, 2023 Johnson Rebuttal") |
| 405 | Expert Report of Phillip M. Johnson, Ph.D., November 19, 2021 ("Nov. 19, 2021 Johnson Rep.") |
| 406 | Deposition of Janet S. Netz, Ph.D., June 9, 2022 ("Jun. 9, 2022 Netz Dep.") |
| 407 | Expert Report of Janet S. Netz, Ph.D., April 15, 2014 ("Apr. 15, 2014 Netz Rep.") |
| 408 | Rebuttal Expert Report of Janet S. Netz, Ph.D., September 26, 2014 ("Sept. 26, 2014 Netz Rebuttal") |
| 409 | Expert Report of Margaret E. Guerin-Calvert, August 5, 2014 ("Aug. 5, 2014 Guerin-Calvert Rep.") |
| 410 | Expert Report of Phillip M. Johnson, Ph.D., May 26, 2023 ("May 26, 2023 Johnson Rep.") |
| 411 | Deposition of Phillip M. Johnson, Ph.D., July 7, 2023 ("Jul. 19, 2023 Johnson Dep.") |
| 412 | Errata to the Expert Report of Janet S. Netz, Ph.D., July 3, 2014) ("Jul. 3, 2014 Netz Errata") |
| 413 | Reporter's Transcript of Zoom Webinar Proceedings re Further Case Management Conference, February 5, 2025 ("Feb 5, 2025 CMC Tr.") |
| 414 | Deposition of Phillip M. Johnson, Ph.D., October 3, 2023 ("Oct. 3, 2023 Johnson Dep.") |

---

[1] The Parties have agreed, consistent with the Court' standing order for bench trials, that they will coordinate and consecutively number their trial brief and hearing exhibits, such that IPPs' exhibits will be Ex. Nos. 1-199, DPPs' exhibits will be Ex. Nos. 200-399, and Irico's exhibits will be Ex. Nos. 400-599. Pursuant to this agreement, Irico's trial brief exhibits begin with Exhibit 400.

| 415 | Expert Report of Robert D. Willig, August 5, 2014 ("Aug. 5, 2014 Willig Rep.") |
|-----|-------------------------------------------------------------------------------|
| 416 | Deposition of Janet S. Netz, Ph.D., October 31, 2014 ("Oct. 31, 2014 Netz Dep.") |
| 417 | Supplemental Expert Report of Margaret E. Guerin-Calvert, March 16, 2022 ("Mar. 16, 2022 Guerin-Calvert Rep.") |
| 418 | Errata to the Supplemental Expert Report of Margaret E. Guerin-Calvert, March 21, 2022 ("Mar. 21, 2022 Guerin-Calvert Errata") |
| 419 | Deposition of Duck-Yun Kim, Volume 1, March 27, 2013, (Mar. 27, 2013 D. Kim Dep. (Vol. 1)") |

1   Defendants Irico Group Corporation ("Irico Group") and Irico Display Devices Co., Ltd.

2   ("Irico Display") (collectively, "Irico" or the "Irico Defendants") submit this trial brief on damages.

3                                    **INTRODUCTION**

4        The Court's ordered default against the Irico Defendants established only liability based on

5   the factual allegations of Plaintiffs' complaints,[2] leaving for the Parties to argue and present evidence

6   on and for the Court to decide issues relating to the amount of damages.  *See Geddes v. Un. Fin.*

7   *Grp.*, 559 F.2d 557, 560 (9th Cir. 1977).  As the parties bearing the burden of proof on damages, the

8   Direct Purchaser Plaintiffs ("DPPs") and Indirect Purchaser Plaintiffs ("IPPs") present competing

9   overcharge damages models.  Their models purport to estimate the same thing: overcharges for the

10  cathode ray tube ("CRT") products at issue (CDTs and CPTs), which their experts then convert and

11  multiply by the classes' estimated respective volumes of purchases to reach proposed damages

12  amounts.  As Irico shows below, because the DPPs' and IPPs' models attempt to estimate the same

13  overcharges but arrive at different estimates, the Court should choose one overcharge estimate for

14  the CDT and CPT products at issue to avoid conflicting overcharge estimates.

15       To decide which overcharge estimates to apply, even if the Court goes with both competing

16  models, the Court must evaluate and decide several key issues.  As a threshold issue impacting both

17  the DPPs' and IPPs' damages claims, the DPPs and IPPs cannot recover damages for the class period

18  years, 1995 to 1997, before 1998 because 1998 is the first year they factually allege Irico's

19  involvement and any knowledge of the alleged conspiracy.  In addition to that correction, drilling

20  down on each overcharge model, as Irico's expert did and Irico sets forth below, reveals fundamental

21  errors with each model that can be mitigated with minor and conservative corrections.  Both the DPP

22  and IPP models do not account for key variability over time, instead predetermining uniform

23  overcharges over long stretches of time—contrary to the undisputed history of fluctuating prices,

24

25  [2] Irico continues to dispute—and reserve and preserve, without any waiver, all rights to challenge
    and appeal—the entry of default, the Court's orders related to the default and a default judgment,
26  and all issues related to liability, class certification, and Irico-specific issues, including those related
    to Chinese law and price floors, that the Court has barred from the current damages stage and
27  proceedings.  This brief and the arguments asserted herein are not intended to admit any issues of
    liability or that any damages should be awarded to DPPs and IPPs.
28

demand, costs, and other market forces impacting CDTs and CPTs from the 1990s to the 2000s, which eventually rendered both products obsolete. Simply allowing, but not forcing, the estimated conspiracy effects to vary over time, as well as adding other essential variables and adjustments outlined below, results in more accurate overcharge estimates. Corrections to the DPPs' volume of purchases used in their model are also required to reflect the best available data. In fact, the DPPs' expert conceded two of the three corrections already. As for the IPPs, to comply with due process and the applicable state laws, any damages awarded to them must be further corrected to remove any damages that are duplicative of those awarded to the DPPs. That is, as explained below, the IPPs and DPPs seek to recover the same overcharges for the same CRT products on a portion of their purchases, making them duplicative. Due process requires the Court to remove that duplication from IPP damages, which it can do using the method outlined herein. Based on the governing state laws, the IPPs are also barred from recovering treble damages for certain state law claims, entirely or for certain years.

Although the Irico Defendants take the position that zero or *de minimis* damages are most appropriate and within the Court's discretion to award, as set forth below, the Court should apply the corrections identified by Irico's expert to the DPPs' and IPPs' overcharge estimates and the DPPs' volume of purchases, as well as choose consistent, lower-bound overcharge estimates to apply across both classes and account for duplicative damages.

## STATEMENT OF ISSUES TO BE DECIDED

1. **The time period for DPP and IPP damages:** The appropriate start-date for calculating damages based on Irico's temporally limited involvement in the alleged conspiracy, which the Court has already ordered will "depend on what is contained in the pleadings" with no evidence "required" on this issue (ECF No. 6459 at 1-2).

2. **Corrections to the Plaintiffs' overcharge models, market factors, and data used**, where the DPPs and IPPs present conflicting models and overcharges and which includes the following sub-issues (*see id.*): (a) whether overcharges paid by Plaintiffs on CRT products are best determined by analyzing the CPT (color picture tubes, used in televisions) and CDT (color display

tubes, used in computer monitors) markets separately; (b) the extent to which overcharges paid by Plaintiffs for CRT products varied over time; (c) the impact of competition CRT products faced from LCD and plasma technology, as well as the impact of other constraints on alleged conspiracy effects, on CRT prices in the but-for world; (d) whether certain claimed DPP sales should be excluded from the volume of DPP sales that underlie the overcharge calculations; and (e) the effectiveness of the alleged CRT cartel in substantially and consistently elevating CRT prices as relevant to determining the best estimate overcharges paid by Plaintiffs.

> **3.    Avoidance of duplicative damages:** Because the DPPs and IPPs seek overlapping, duplicative damages (*i.e.*, the IPPs claim direct purchasers passed-on 100% of the overcharges to the IPPs), the appropriate apportionment of duplicative damages between DPPs and IPPs.

> 4.    **IPP recovery of treble damages for certain state classes:** whether the applicable statutes and/or Plaintiffs' pleadings permit IPPs to recover treble damages for certain state claims.

> 5.    **The appropriate amount of damages to award the DPPs and IPPs, if any, taking all of the above and other relevant factors into consideration.**

## STATEMENT OF RELEVANT FACTS AND BACKGROUND

**I.    The two types of CRT products at issue, CDTs and CPTs, were subject to declining prices and competition from newer technologies from 1995 to 2007.**

As the Parties have stipulated, two types of CRTs are at issue in this case: (1) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors and similar devices; and (2) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions and related devices. *See* ECF No. 6460 at 1 ¶ 1 (citing ECF No. 1526 ("IPP Compl.") ¶ 14; ECF No. 436 ("DPP Compl.") ¶¶ 1, 103). As both sides' experts recognize, within those two CRT product types:

- CRTs are often not interchangeable because they can differ along multiple dimensions, including size, shape, finish, type of mask, and dot pitch. *See* Ex. 402, April 27, 2022 Netz Rebuttal at 9; Ex. 403, July 21, 2023 Guerin-Calvert Rep. ¶ 27.

- The prices of CPTs and CDTs are affected by different market conditions. *See* Ex. 404, Sept. 1, 2023 Johnson Rebuttal ¶ 108; Ex. 403, July 21, 2023 Guerin-Calvert Rep. ¶ 14.

- CRT prices are not uniform and can vary between different CRT products and customers. *See* Ex. 403, July 21, 2023 Guerin-Calvert Rep. ¶28; Ex. 405, Nov. 19, 2021 Johnson Rep. ¶¶ 26-29; Ex. 402, April 27, 2022 Netz Rebuttal at 9; Ex. 406, Jun. 9, 2022 Netz Dep. at 37, 40-41).

- The impact of market factors is not uniform across CDTs and CPTs. *See* Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. at ¶84.

Despite non-uniform prices and market impacts, one trend is apparent over the time period of 1995 to 2007: the steady overall decline of CDT and CPT prices, coupled with the rise of competing technologies, including LCDs (or flat panel display) and plasma technologies, that would ultimately render CDTs and CPTs obsolete. *See* ECF No. 4712 at 19; Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. ¶ 23, ¶ 26, 19 Figure 3, 20 Figure 4 (documenting CRT price decline in part in response to LCD competition); Ex. 407, Apr. 15, 2014 Netz Rep. at 20-21 (recognizing CRT competition with LCDs and plasma technologies); Ex. 408, Sept. 26, 2014 Netz Rebuttal at 20 (same); Ex. 405, Nov. 19, 2021 Johnson Rep. ¶¶18-21 (same). For example, CDT prices declined faster from the second quarter of 1995 to the fourth quarter of 2007 than they did from either the first quarter of 1993 to the first quarter of 1995, or from the first quarter of 2008 to the fourth quarter of 2008. Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. at 15, Figure 2; Ex. 409, Aug. 5, 2014 Guerin-Calvert Rep. ¶ 55.

## II.    The Plaintiffs' factual allegations as to the Irico Defendants start in 1998 and not before.

In 2007, the Plaintiffs sued thirteen groups of CRT manufacturers and related entities that the Plaintiffs allege participated in a CRT price-fixing conspiracy. The named defendants included well-known household brands in the United States, such as Toshiba, Samsung, Philips, Panasonic, Hitachi, and LG Electronics. *See* ECF. No. 1 ¶¶ 10-13, 17-20, 24-26, 27-29; 32. Both sets of Plaintiffs have amended their pleadings since their original filing.

In class action settlements approved by the Court, both DPPs and IPPs have settled and recovered from all named Defendants in this case, other than Irico. The DPPs settled with all other Defendants for a total of $212.2 million.[3] *See* ECF No. 5168; ECF No. 5116. The IPPs settled with all other Defendants for a total of $580.75 million. *See* ECF No. 6335; ECF No. 6192.

---

[3] The DPPs "have identified 1,816 valid claim forms submitted by settlement class members for the direct purchase of CRTs, Televisions or Monitors in the United States. Of the 1,816 valid claim forms, 334 identified purchases of CRTs, 1,549 identified purchases of Televisions, and 992 identified purchases of Monitors." ECF No. 6378-1 at 422.

Irico Group and Irico Display are the only remaining defendants in the case.[4]  They are both Chinese companies, located and headquartered in China.  DPP Compl. ¶¶ 37, 39; IPP Compl. ¶¶ 95-96    While affiliated, the two Irico Defendants are distinct entities:  As the Court has concluded, Irico Group was and remains an "agency or instrumentality" of the Chinese State because 100% of its shares are directly owned by the State Council of China.  ECF No. 5637 at 7.  Irico Display is, in turn, a partially owned subsidiary of Irico Group.  As the Plaintiffs allege, Irico Group controlled Irico Display's CRT sales.  *See* DPP Compl. ¶ 39.  Unlike some of the other defendants and as Plaintiffs' experts confirm, Irico Group and Irico Display were small players in the global CRT market—and nearly non-existent players in the CDT market, with Irico Display never producing CDTs and Irico Group ceasing CDT production in 2002.[5]  *See* Ex. 410, May 26, 2023 Johnson Rep. ¶ 58 ("During the Class Period, CDTs accounted for just 2 percent of Irico's CRT sales. In 2002, Irico apparently discontinued its CDT production. Irico's CDT sales, prior to discontinuing them, accounted for less than 1 percent of global CDT sales.").  They also sold most of their products in China with no direct sales to the United States.  *See id.* ¶ 60 ("Irico's sales data confirms that it sold most of its CRTs in China.").  Moreover, the Irico Defendants did not manufacture the final TV and computer products sold in the United States and elsewhere, and their CRT products were low quality, resulting in incompatibility with U.S. standards and lost sales and making them not competitive with CRTs manufactured elsewhere; Irico's CRTs were also sold at low prices based on Irico's costs resulting in anti-dumping and other complaints by other CRT manufacturers.  *See* Ex. 407, Apr. 15, 2014 Netz Rep. at 16 n.56 ("IRICO had problems with the varnish it used to hold its deflection yokes in place; the varnish was melting. This resulted in many CRT returns and IRICO had difficulties gaining sales thereafter.").[6]

---

[4] This paragraph provides general background regarding the Irico Defendants but is not intended to present or argue any Irico-specific evidence that is implicated by the Court's sanctions order.

[5] Irico takes and preserves the position that its liability with respect to CDTs ended in 2002, when it ceased CDT production, and its argument that it is unfair and improper to attribute CDT damages to Irico Group after 2002 and Irico Display at all given that Display did not produce CDTs.

[6] *See also* ECF No. 5228-2 at 58-59, CHU00029050E at 50-51E (June 22, 1999) ("*IRICO* … They frankly admitted that their pricing is based on their real cost and that they seldom refer to the price

As to the Irico Defendants, Plaintiffs' factual allegations do not start until 1998. The DPPs allege that "Irico . . . participated in multiple illegal bilateral and at least several dozen illegal group meetings *from 1998* to 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products occurred." DPP. Compl. ¶ 159 (emphasis added). The IPPs likewise allege that "[b]etween at least *1998* and 2007, Defendant IRICO . . . participated in multiple Glass Meetings." IPP Compl. ¶ 185 (emphasis added). Accordingly, Plaintiffs' live pleadings do not contain any factual allegations that the Irico Defendants participated in or had knowledge of any alleged conspiracy meetings before 1998. That is consistent with Plaintiffs' other allegations that other Defendants, not including Irico, initiated the conspiracy. *See* IPP Compl. ¶ 143 ("In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis. During this period, representatives from Defendants LG, Samsung and Daewoo visited the other Defendant and co-conspirator manufacturers including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba, Mitsubishi and Panasonic to discuss increasing prices for CRT Products in general and to specific customers.").

## II. DPPs' and IPPs' experts rely on different models and arrive at different overcharges for the same products from the same alleged conspiracy.

The Plaintiffs have designated two different experts to calculate the "overcharge damages" that Plaintiffs claim the DPP and IPP classes incurred as a result of the alleged conspiracy. The DPPs have designated Dr. Phillip Johnson ("Johnson"), while the IPPs have designated Dr. Janet Netz ("Netz"). DPP expert Johnson uses a dynamic regression model of CRT prices based on the "before/after" approach, pooling CPTs and CDTs into a single regression and utilizing "the periods before 1995Q2 and after 2007Q1 as benchmark periods." Ex. 410, May 26, 2023 Johnson Rep. ¶¶ 50-51; Ex. 411, Jul. 7, 2023 Johnson Dep. at 80:15-80:20. On the other hand, IPP expert Netz did not pool CPTs and CDTs into a single regression, nor did she use a dynamic model. She employed a "reduced-form price equation model," which also uses before/after benchmarks but which relies

---

of the industry. They also claimed that the reason they sold to Turkey *VESTEL* at such a low price was because *SDD* (Shenzhen) was competing for the orders."). For instance, Phillips accused Irico of dumping (or selling at below cost) CPTs in Europe. *See* ECF No. 5191-2 at 306.

on different market controls and granularity of data when compared to Johnson's model. *See* Ex. 407, Apr. 15, 2014 Netz Rep. at 98-99; *see* ECF No. 5906 (IPPs' opting to rely on Netz 2014 report and errata). Netz further opines that the alleged conspiracy caused direct purchasers (including the DPPs) to pay the estimated overcharges, of which at least 100% were then passed-through to indirect purchasers or the IPPs. Ex. 407, Apr. 15, 2014 Netz Rep. at 118.

Despite employing different models, Johnson and Netz purport to measure CPT and CDT overcharges that stem from the same alleged conspiracy. *See infra* at 40; Ex. 410, May 26, 2023 Johnson Rep. at 1-2. Yet Johnson and Netz calculate different overcharge amounts for the same products:

|  | **DPP Johnson-Calculated Overcharge**[7] | **IPP Netz-Calculated Overcharge**[8] |
|---|---|---|
| **CDTs** | 9.9% in 1995<br>**11.1% from 1996 to 2005**<br>8.7% in 2006<br>1.6% in 2007 | **28.2% from 1995 to 2006**<br><br>12.9% in 2007 |
| **CPTs** | 5.6% in 1995<br>**6.3% from 1996 to 2005**<br>7.4% in 2006<br>2.6% in 2007 | **9.9% from 1995 to 2006**<br><br>3.2% in 2007 |

In response to both Johnson's and Netz's reports and opinions, the Irico Defendants designated Margaret Guerin-Calvert, who disclosed reports and opinions in both the DPP and IPP actions. Guerin-Calvert's reports and related declaration are attached as exhibits hereto, with her applicable analysis and calculations discussed below as they relate to the DPP and IPP damages. After making necessary corrections to each of Johnson's and Netz's overcharge models, Guerin-

---

[7] Ex. 410, May 26, 2023 Johnson Rep. at 56 Figure 19.

[8] Ex. 412, July 3, 2014 Netz Errata at 1. Johnson reported his overcharge estimates as a percentage of *but-for* CRT prices, whereas Netz reported her overcharge estimates as a percentage of *actual* prices. Ex. 400, Guerin-Calvert Decl. ¶ 19. In this table, Netz's overcharge estimates have been converted to be expressed as a percentage of <u>but-for</u> prices in order to facilitate an apples-to-apples comparison with Johnson's estimates. *Id.* This was done by dividing each of Netz's overcharge estimates by one minus that overcharge estimate. *Id.* This adjustment does not reflect new data, but merely a conversion of prior figures, and only affects how the percentage overcharge estimates are expressed; it does not affect the damages estimates. *Id.*

Calvert calculated the following average overcharges for the class periods, as a percentage of but-for CRT prices:

|  | **Guerin-Calvert Corrections to DPP Johnson-Calculated Overcharge** | **Guerin-Calvert Corrections to IPP Netz-Calculated Overcharge** |
|---|---|---|
| **CDTs** | 7.0% | 1.6% |
| **CPTs** | 1.5% | 2.3% |

## **LEGAL STANDARD**

Upon default, only those "factual allegations of the complaint, except those relating to the amount of damages, will be taken as true" because a default "establishe[s] … liabilities, but not the extent of the damages to the plaintiff class." *Geddes v. Un. Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977); *see also Elektra Entm't Group, Inc. v. Bryant*, No. CV 03-6381, 2004 WL 783123, at *2 (C.D. Cal. Feb. 13, 2004) ("if the facts necessary to determine damages are not contained in the complaint, or are legally insufficient, they will not be established by default.").

With respect specifically to antitrust claims, "[i]n addition to establishing that [a defendant] has violated the anti-trust laws, [the plaintiff] before being entitled to award of damages must establish that [the defendant]'s violations of the anti-trust laws were a proximate cause of injury to it, and must also prove the extent of that injury." *Talon, Inc. v. Union Slide Fastener, Inc.*, 266 F.2d 731, 736 (9th Cir. 1959). Indirect and direct purchaser plaintiffs both "must demonstrate that they paid a higher price for [the products at issue] than they would otherwise have paid absent a conspiracy[,]" with that difference between the paid and but-for prices often referred to as the "overcharge." *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 499 (N.D. Cal. 2008). Moreover, the IPPs or indirect purchasers must meet an additional burden, as their "burden is two-fold. Not only must they show that all or nearly all of the original *direct* purchasers of [the relevant products] bought at inflated prices, they must also show those overcharges were passed through all stages of the distribution chain" to the IPPs. *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 324 (N.D. Cal. 2014); *see also In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 499 (N.D. Cal. 2008) ("Here, indirect-purchaser plaintiffs must demonstrate that defendants overcharged their direct purchasers . . . and that those direct purchasers passed on the overcharges to plaintiffs."); *In re Cathode Ray Tube (CRT)*

*Antitrust Litig.*, 2013 WL 5428139, at *1 (N.D. Cal. June 20, 2013), *report and recommendation adopted*, No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) (same).

## ARGUMENT

As shown below, overarching issues related to the damages start date, conflicting models purporting to measure the same overcharges, and the ineffectiveness of the alleged conspiracy impact both the DPPs' and IPPs' recovery of any damages against the Irico Defendants.  On top of those, specific issues and corrections must also be addressed as to each Plaintiff class's overcharge model and total damages calculation.

## I.    The DPPs and IPPs cannot recover pre-1998 damages from the Irico Defendants.

As previewed already for the Court, the law upon default and the Plaintiffs' pleadings all support a finding and conclusion that the DPPs and IPPs cannot recover any damages from Irico before 1998.  That is because the Plaintiffs have not factually pleaded in their live complaints that the *Irico Defendants* participated in or had knowledge of the alleged conspiracy before 1998.  Corrections reflecting a 1998 start-date for both DPP and IPP damages are set forth below.  Despite the applicable legal standard and the Court's order stating that this issue "depend[s] on what is contained in the pleadings" (ECF No. 6459 at 2), Plaintiffs have indicated that they may nonetheless attempt to introduce Irico-specific documents and arguments outside of their complaints to alter the pleaded 1998 start-date to an earlier date.  As shown below, the Court should reject those attempts and hold Plaintiffs to their pleaded 1998 start-date as to the Irico Defendants.

Recognized by the Ninth Circuit and this Court, the liability established by default is limited to the "factual allegations" of the plaintiffs' complaint.  *Geddes*, 559 F.2d at 560; *see also* Ex. 413, Feb 5, 2025 CMC Tr. 23:9-14; *id.* at 31:18-23.  With respect to antitrust liability, "a defendant cannot be held liable for substantive offenses committed before joining or after withdrawing from a conspiracy." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 820 F. Supp. 2d 1055, 1059 (N.D. Cal. 2011) (quoting *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992)); *see also Mattel, Inc. v. MGA Ent., Inc.*, No. CV 04-9049, 2010 WL 11463911, at *3 (C.D. Cal. Sept. 3, 2010) (applying *Lothian* and holding that "one logically cannot contemplate acts committed in furtherance of a conspiracy into which [it] has not yet entered."); *Mitsui OSK Lines Ltd v Seamaster Logistics Inc.*,

No. 11-cv-02861, 2013 WL 2386635 at *4, *6 (N.D. Cal. May 30, 2013) (refusing to "hold[] [a defendant] jointly and severally liable for acts committed before it joined the conspiracy").

As for "factual allegations," those "require[] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In cases involving multiple defendants, mere recitations about "Defendants," without specific identification of individual defendants, do not constitute factual allegations as to any individual defendants. *See*, *e.g.*, *GreenCycle Paint, Inc. v. Paintcare, Inc.*, No. 15-cv-04059, 2016 WL 1402845, at *10 (N.D. Cal. Apr. 8, 2016) (granting motion to dismiss plaintiff's Unfair Competition Law claim because, in part, "[t]he problem with these allegations, however, is that they are conclusory and do not clarify which Defendant did what"); *In re TFT-LCD Antitrust Litig.*, Nos. M 07-1827 C 10–4945, 2013 WL 1891367, at *4 (N.D. Cal. May 6, 2013) (denying plaintiffs' motion to reconsider court's dismissal of plaintiffs' Cartwright Act claims where prior plea agreements did "not indicate which Defendant carried out which act, and thus cannot satisfy the Ninth Circuit's express instructions to conduct a defendant-by-defendant analysis with respect to conspiratorial conduct"); *Heyward v. Cal. Highway Patrol*, No. C-14-03583, 2014 WL 4771567, at *2 (N.D. Cal. Sept. 24, 2014) (dismissing plaintiff's first amended complaint because "Plaintiff has failed to allege any conspiratorial conduct other than the conclusory allegation that 'these defendants conspired to deprive[ ] me of my legally protected rights,' without specifying which defendants and what rights"); *Caraang v. PNC Mortg.*, 795 F. Supp. 2d 1098, 1124-25 (D. Hawai'i 2011) (internal citations omitted) (dismissing plaintiffs' Sherman Act claims, noting that "Count XVIII alleges that 'Defendant', without specifying which one, violated the Sherman Antitrust Act, 15 U.S.C. § 2"); *A.B. v. Hilton Worldwide Holdings*, F. Supp. 3d 921, 943 (D. Or. 2020) (citations omitted) ("Another type of 'shotgun' pleading is a complaint that asserts claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions").

Accordingly, as to the issue of the start-date of Irico's involvement in the alleged conspiracy (a liability issue that informs the calculation of damages for both the DPP and IPP classes), the Court has appropriately ordered that the issue "may be argued but depend[s] on what is contained in the

pleadings." ECF No. 6459 at 2. That is consistent with not only the law upon default but also the Court's further ruling barring Irico-specific evidence at this damages stage. *See id.* at 1.

**A.   The DPPs and IPPs plead that Irico joined the alleged conspiracy in 1998, with no factual allegations of any Irico participation or knowledge before 1998.**

The DPPs' and IPPs' live pleadings in this case affirmatively identify the same year for Irico's first participation in the alleged conspiracy meetings – **1998**:

| **DPPs** (ECF No. 436) | **IPPs** (ECF No. 5589) |
|---|---|
| 159. Irico, through IGC, IGE, and IDDC, participated in multiple illegal bilateral and at least several dozen illegal group meetings from **1998** to 2006 in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and market allocation of CRT Products occurred. These meetings took place in China. … (emphasis added) | 185. Between at least **1998** and 2007, Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple Glass Meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRT Products. … (emphasis added) |

There are no specific allegations that the Irico Defendants participated in any alleged conspiracy meetings before 1998. Plaintiffs' pleadings also contain no allegations that the Irico Defendants had knowledge of the alleged conspiracy before 1998, or that when Irico joined the alleged conspiracy, Irico had knowledge that it was joining an ongoing, pre-1998 conspiracy. Plaintiffs cannot identify any such factual allegations because they do not exist. Instead, the DPPs and IPPs have previewed that they will try to rely on their conclusory allegations as to the amorphous "Defendants" and/or they will ask the Court to infer, in the absence of any actual allegation, that Irico knew it was joining a pre-1998 conspiracy and should be liable for damages based on that inference. As a matter of law, Plaintiffs' conclusory allegations are insufficient and requested inferences are impermissible to expand the pleaded scope of liability upon default. *See Geddes*, 559 F.2d at 560; *Twombly*, 550 U.S. at 555; *GreenCycle*, 2016 WL 1402845, at *10.

The IPPs' use of the phrase "at least 1998" also does not make sense as it does not modify a quantity (compare with "at least several dozen" meetings, as DPPs allege). In any event, "at least 1998" is also not a sufficient factual allegation that expands IPPs' pleaded timeframe. For other defendants, the IPPs pleaded that those defendants participated as of "at least 1995" but the IPPs

would similarly have no ground to argue that those defendants' participation began before 1995.  *See* IPP Compl. ¶¶ 167-190 ("167. Between at least 1995 and 2007, Defendant Samsung … participated in at least 200 Glass Meetings at all levels. … 190. Between at least 1995 and 2005, co-conspirator Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors.").

Moreover, both sets of Plaintiffs specifically allege that *other* defendants actively and knowingly participated in conspiracy meetings before 1998—showing that Plaintiffs were capable of making but chose not to make similar allegations as to the Irico Defendants and dispelling Plaintiffs' attempts to tie and infer vague "Defendants" references elsewhere to Irico.  *See* DPP Compl. ¶¶ 155-172 ("155. Chunghwa … participated in hundreds of illegal bilateral and group meetings from 1995 to 2007 …. 157. Hitachi … participated in over a dozen illegal bilateral and group meetings from 1996 through at least 2001 …. 160. LG Electronics participated … in more than a dozen illegal bilateral and more than a hundred illegal group meetings from 1995 to 2006 …."); IPP Compl. ¶¶ 143-145 ("143. The CRT conspiracy was effectuated through a combination of group and bilateral meetings. In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis. During this period, representatives from Defendants LG, Samsung and Daewoo visited the other Defendant and co-conspirator manufacturers including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba, Mitsubishi and Panasonic to discuss increasing prices for CRT Products in general and to specific customers. These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore. 144. Defendants Samsung, Chunghwa, LG, Mitsubishi and Daewoo also attended several ad hoc group meetings during this period.… 145. As more manufacturers formally entered the conspiracy, group meetings became more prevalent…."); *id.* ¶¶ 167-190 ("167. Between at least 1995 and 2007, Defendant Samsung … participated in at least 200 Glass Meetings at all levels. … 190. Between at least 1995 and 2005, co-conspirator Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors.").

Because, at this stage, liability is established by the "factual allegations" of the Plaintiffs' complaints—which uniformly plead 1998 as the start date for Irico's participation in the alleged conspiracy meetings—the Court's assessment of DPP and IPP damages must also start in 1998.

### B. Plaintiffs cannot authenticate and admit, and the Court should not consider, outside documents to change Plaintiffs' pleaded 1998 start-date.

During the parties' exchanges regarding the stipulation of undisputed facts, Plaintiffs indicated that they intend to rely on Irico-specific documents outside of their complaints to argue that Irico joined the alleged conspiracy prior to 1998. If Plaintiffs do so in their briefs and at the hearing, that would be contrary to the law upon default, which establishes liability based on the factual allegations in Plaintiffs' complaints. For that reason, the Court has already advised the parties that the start-date issue will "depend on what is contained in the pleadings." ECF No. 6459 at 2.

Plaintiffs' attempt to argue outside documents on the start-date issue would also raise an impermissible sword-shield situation. The Court has ordered that, at the damages hearing and at this stage, "Irico should not be allowed to present evidence on issues that Irico's misconduct prevented Plaintiffs from fully investigating." ECF No. 6459 at 1. Accordingly, as Irico represented to the Court at the February 5, 2025 case management conference (and while preserving its rights to challenge liability and Irico-specific issues on appeal), Irico does not intend to submit Irico-specific evidence at the damages stage pursuant to the Court's orders. Indeed, if Irico were to submit documents and arguments outside of the pleadings, that show it did not join or know of the alleged conspiracy before 1998, Plaintiffs would call foul. Plaintiffs cannot be allowed to do so either; liability upon default in their favor has already been established based on their pleadings, but there is no one-sided right for them to present extraneous evidence while barring Irico from presenting evidence on the same issue. *See Henry v. Oluwole*, 108 F.4th 45, 55 n.5 (2d Cir. 2024) ("[A] plaintiff can obtain from a default judgment equivalent relief to but not greater than that it would obtain in a contested proceeding assuming it prevailed on all of its factual allegations."); Ex. 413, Feb 5, 2025 CMC Tr. 19:13-22 ("So when I look at these issues that Irico has listed, the first thing I ask myself is, do I think that plaintiffs' inability to get full information would have prevented them from having a complete and accurate understanding of this issue. And if I think that they would, that -- that it would have had that preventive effect, then presumptively I'm not going to hear argument or evidence on that issue because to do otherwise would undermine the effect of the Court's sanctions order."). If Plaintiffs do present documents and arguments, outside of their pleadings, on the start-

date issue, Irico reserves the right to object, move to strike, and present counter-evidence at the damages hearing and in its post-hearing briefing.  *See* ECF No. 6377 at 14, 30 (Irico's prior arguments and evidence related to the start-date issue).

Finally, Plaintiffs cannot authenticate and admit into evidence the Irico-specific documents they have previously identified to Irico.  In their statements to the Court, both in writing and at the case management conference, the IPPs and DPPs represented that they intend to rely only on the live testimony of their damages experts and on documentary evidence in the form of "previously disclosed damages reports of their respective expert economists, as well as relevant exhibits cited therein and excerpts of their experts' deposition testimony."  *See* ECF No. 6445 at 20.  Citing admissibility requirements, the Court rightly cautioned the parties against using documents cited by experts for purposes other than testing the credibility of expert testimony, such as "some separate substantive channel that wouldn't otherwise exist … because I doubt very much that these expert witnesses are in a position to authenticate the documents, sponsor them in any kind of meaningful way."  Ex. 413, Feb 5, 2025 CMC Tr. 11:10-12:14.  That is, Plaintiffs' experts can neither authenticate nor sponsor any documents produced by Irico and other defendants pre- or post-1998—providing further ground for the Court to reject any attempt by Plaintiffs to inject documents outside of their pleadings into the start-date issue.

In sum, both the DPPs and IPPs plead that Irico joined the alleged conspiracy in 1998, three years after the start of the class period in 1995, and have not pled that Irico joined earlier than 1998 or had the requisite knowledge when it joined.  Plaintiffs cannot now try to inject unpled and inadmissible documents to change that date, while barring Irico from doing so.  Under the law of default and antitrust, the Court's assessment of damages must therefore begin in 1998.  Because both the DPPs' and IPPs' experts calculate average overcharges based on CRT sales from 1995 to 2006, those calculations must be modified, among other corrections discussed below.

## II.    Additionally, for independent reasons, the IPPs cannot recover damages or trebled damages for certain state law claims for earlier time periods.

Because indirect purchasers cannot recover damages under the federal antitrust laws, the IPPs can only recover damages under state "repealer" laws.  *See Illinois Brick Co. v. Illinois*, 431

U.S. 720, 737-48 (1977).  For the IPPs' Hawaii, Nebraska, and Nevada claims, it is undisputed that the class periods for those states begin from June 25, 2002, July 20, 2002, and February 4, 1999, respectively—and thus, the IPPs cannot recover damages for those state law claims before those dates.  ECF No. 1742 at 2 n.2 ("The applicable class period for Hawaii, Nebraska, and Nevada begins from June 25, 2002, July 20, 2002, and February 4, 1999, respectively."); ECF No. 1950 (adopting ECF No. 1742); *see also* Ex. 407, Apr. 15, 2014 Netz Rep. at 2 (IPPs' expert confirming the same); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1025 (N.D. Cal. 2010) ("The Court … DISMISSES the claims under Nebraska law based on sales made prior to July 20, 2002; the claims under Nevada law based on sales made prior to 1999 ….").

The IPPs also cannot recover trebling of damages on their New York claims before December 23, 1998, for the same reason.  The IPPs have previously disputed this issue.  New York's antitrust repealer law, the Donnelly Act, was enacted on December 23, 1998.[9]  Courts, including in this case, have recognized that indirect purchasers cannot retroactively bring and recover on New York antitrust claims before December 23, 1998.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944, 2013 WL 4505701, at *13 (N.D. Cal. Aug. 21, 2013) ("The DAPs concede that they lack standing under New York law based on purchases prior to December 3, 1998 … The Court … DISMISSES the DAPs' New York claims based on pre-December 3, 1998 purchases with prejudice.");[10] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 10-4945 SI, 2011 WL 3738985, at *3 (N.D. Cal. Aug. 24, 2011)  (dismissing the indirect purchaser plaintiff's New York antitrust claims "to the extent they arose before December 23, 1998"); *In re Vitamins*, No. 99-197 1285, 2000 WL 1511376, at *6 (D.D.C. Oct. 6, 2000) (same).  Although the IPPs have also brought a claim under the New York Deceptive Practices Act, they do not seek treble damages for that claim.  IPP Compl. ¶ 286.m ("the New York Plaintiffs and members of the New York Indirect Purchaser Class

---

[9] *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 10-4945, 2011 WL 3738985, at *3 (N.D. Cal. Aug. 24, 2011) ("New York's legislature amended the Donnelly Act to permit claims by indirect purchasers on December 23, 1998."); *In re Vitamins Antitrust Litig.*, No. 99-197 1285, 2000 WL 1511376, at *1 (D.D.C. Oct. 6, 2000) ("On December 23, 1998, section 340(6) was enacted.").

[10] This opinion identifies a "December 3, 1998" date, which appears to be a typo, as other sources cite the enactment date as December 23, 1998.  In any event, that difference is *de minimis*.

do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349 (h).").

Thus, under the law of this case, the IPPs cannot recover trebling of damages before December 23, 1998 for their New York claims.

Because the Court will need to calculate different damages start dates for IPPs in Hawaii, Nebraska, and Nevada, as well as a different trebling start date for IPPs in New York, the issue of "the proportion of damages suffered by the Indirect Purchaser Plaintiffs in each State for which IPPs allege damages" is relevant and necessary to resolve. *See* ECF No. 6459 at 1. Furthermore, as shown below in Section VII.A, the issue is also relevant because damages cannot be trebled under some states' laws, while they can under others, requiring too that damages be apportioned among the IPP states to allow the Court to correctly apply or not apply trebling.

### III.    For the DPP damages, the Court should apply corrections to the DPPs' overcharge model and volume of purchases that reflect market realties and best-available data.

The DPPs and their expert Johnson assert an "overcharge" theory of damages: that the alleged conspiracy elevated CPT and CDT prices globally, which caused the DPPs—who directly purchased CRTs or CRT finished products (TVs and monitors) in the United States from a Defendant or subsidiary or affiliate thereof—to pay "overcharges" that they now seek to recover as damages. *See* Ex. 410, May 26, 2023 Johnson Rep. at 1-2. Notably, DPPs do not claim any direct purchases in the U.S. from Irico. *See* ECF No. 6378-1 at 422. At a high level, DPPs' expert Johnson calculates the DPP estimated damages in two steps: (1) he first estimates CPT and CDT overcharge percentages from a single regression analysis; and (2) he determines the volume of DPP class CRT and CRT finished product purchases based on the alleged conspirators' sales data, as well as industry data, to which he then applies the overcharge percentages for CRTs from step 1 and further-calculated, per-unit dollar overcharges for CRT finished products. *See* Ex. 410, May 26, 2023 Johnson Rep. ¶ 85; Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. ¶ 111.

As shown below and by Irico's expert, while multiple errors are present in Johnson's calculations, Irico identifies five primary errors below that impact the DPPs' proposed damages and that can be corrected with minor modifications to reflect market realities and the best-available data:

A. **Overcharge errors:**

1. **DPP Error 1:** Johnson's model uses a single regression to measure CPT and CDT overcharges and should be corrected to estimate two separate regressions.

2. **DPP Error 2:** Johnson estimates a single overcharge over an aggregate 10-plus year period and should be corrected to allow variation over time, by year.

B. **Volume errors:**

3. **DPP Error 3:** Johnson treats 100% of sales without customer information as DPP sales; as Johnson later conceded, known proportions from sales with customer information should be used.

4. **DPP Error 4:** Johnson did not use available SDI (Samsung) data to calculate SDI's CRT sales to DPPs, which, as Johnson later conceded, should be corrected to rely on best available data.

5. **DPP Error 5:** Faced with gaps in certain firms' sales data, Johnson opted to use non-firm-specific data, where he should have used available firm-specific data.

Also, as shown above, Johnson's pre-1998 damages calculations must be removed because the DPPs have not pleaded Irico's liability before 1998 and cannot recover damages before 1998.

**A. DPP expert Johnson's overcharge model should be corrected to reflect differences between CPTs and CDTs and variability in overcharges over time.**

Johnson's estimated CPT and CDT overcharges do not reflect all essential economic factors and thus do not accurately measure the alleged conspiracy's actual impact on CPT and CDT prices. In particular, there are two critical errors in Johnson's calculations. First, Johnson incorrectly assumes (with one limited exception) that market forces had *identical* impacts on CPT and CDT prices. Second, in cases that span two decades and undisputed CRT market changes and fluctuations, Johnson's model is incapable of estimating alleged conspiracy effects that vary over time.

As courts in this Circuit have recognized, plaintiffs and the court cannot assume identical impacts and market conditions across product types and/or multiple years; alternatives should be considered, and further proof and testing is required. *See*, *e.g.*, *Wolfe v. Nat'l Lead Co.*, 225 F.2d 427, 432 (9th Cir. 1955) (affirming dismissal of price-fixing case and explaining that the plaintiffs were incorrect to "assume, without proof, that the conditions of supply and demand in titanium pigments were the same in 1949 as in preceding years; and . . . that the market conditions for paints were the same"); *One Hour Air Conditioning Franchising SPE LLC v. Bigham Servs., Inc.*, No. 21-CV-07891, 2022 WL 3132424, at *1 (N.D. Cal. Aug. 5, 2022) ("The Court cannot assume that the

average net sales over the thirteen-month period immediately preceding the breach reasonably represents the net sales Bigham Services would accrue for the entire eight years of the contracts' term that remained after the breach."); *ILC Peripherals Leasing Corp. v. IBM*, 458 F. Supp. 423, 434-36 (N.D. Cal. 1978), *aff'd per curiam sub nom. Memorex Corp v. IBM*, 636 F.2d 1188 (9th Cir. 1980) (directing verdict for defendant, in part, where despite the plaintiff experts' claimed inability "to isolate" damages, "there were alternatives to [plaintiff's] lump sum figures").

Applying necessary corrections to Johnson's model results in reduced average overcharges of: 7.0% for CDTs and 1.5% for CPTs.  Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. at ¶ 11(g).

### 1.    DPP Error 1: Johnson's model should be corrected to estimate separate regressions for CPTs and CDTs.

The DPPs and their expert Johnson acknowledge the distinction between the two CRT products at issue: CDTs used in computer monitors and CPTs used in color televisions.  *See* DPP Compl. ¶¶ 1, 103; Ex. 410, May 26, 2023 Johnson Rep. at 10-11 ¶ 21.  In several aspects of his analyses, Johnson himself analyzed CPTs and CDTs separately.  *See* Ex. 405, Nov. 19, 2021 Johnson Rep. at 16 ¶ 27 & n.43; Ex. 410, May 26, 2023 Johnson Rep. at 7-8 ¶ 17 & Figures 1-2.  Yet, with respect to calculating the overcharge percentages that underlie his DPP damages calculations, Johnson opts to use a single regression that pools CPTs and CDTs.  *See* Ex. 410, May 26, 2023 Johnson Rep. at 29-31 ¶ 50 & Figure 3.  Notably, the end product of his single, aggregated regression is separate estimated overcharges for CDTs and CPTs, reflecting (as elsewhere in Johnson's analyses) that those products should be treated separately.  But Johnson's model, absent one limited exception, does not allow him to adjust for market forces that may have different impacts on CDTs vs. CPTs.  *See* Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. at 61 ¶ 83.[11]  Johnson could not identify any tests he performed to support his decision to pool CDTs and CPTs in his regression.  Ex 411, Jul. 7, 2023 Johnson Dep. at 90:8-18.

---

[11] Specifically, Johnson's model does not test different effects on CPTs and CDTs for (1) G7 unemployment rate, (2) G7 industrial production growth rate, (3) U.S. Producer Price Index ("PPI") of specialty glass, (4) PPI of specialty glass in Korea, (5) lagged CRT price, (6) lagged CRT quantity, (7) a time trend, or (8) a time trend-squared.  *See* Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. at 61 ¶ 84 & n.160.

Irico's expert Guerin-Calvert conducted the testing that Johnson did not do. First, Guerin-Calvert modified Johnson's model to allow for the possibility that the market forces in Johnson's model could have different effects on CPT prices than on CDT prices. That standard statistical test produced a statistically significant result showing that Johnson's market forces did in fact influence CPT and CDT prices differently—a possibility excluded at the outset by the mere structure of Johnson's model. Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. at 61 ¶ 84 & n.160. Then, Guerin-Calvert separated Johnson's single regression into two separate regressions, one for CPTs and one for CDTs, while maintaining all of the market forces Johnson had included in his model and allowing for the possibility that those market forces could impact CPT and CDT prices differently. *Id.* at 67-68 ¶ 93. As Guerin-Calvert's initial testing predicted with statistical significance, the impact of the relevant market forces varied between the two CPT and CDT products. Coupled with modifications to account for variation between the years (discussed below), accounting for the possibility of variation between the two products resulted in modified average overcharge estimates across the entire class period: 1.5% for CPTs, compared with Johnson's 6.3%, and 7.0% for CDT, compared with Johnson's 10.9%. *Id.* ¶ 97. These modified overcharge estimates likely are conservative and thus likely still overstate the actual overcharge, given relevant U.S. CRT market conditions at the time. *Id.* ¶¶ 98-99.

Johnson's response that "it is not necessary" and "imposes a higher burden" to estimate variables separately for CDTs and CPTs is belied by his failure to define or quantify any "burden" or explain why his regression analysis, which has over 28,000 data points, cannot benefit from another 11 parameters. *See* Ex. 404, Sept. 1, 2023 Johnson Rebuttal ¶¶ 91-95. Johnson also misapplies Guerin-Calvert's corrections. While Guerin-Calvert jointly tested whether the 11 parameters in Johnson's model had different effects on CPT prices than on CDT prices (Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. at 61 n.160), Johnson separated them into 11 separate tests with no bases. Furthermore, as Johnson notes, pooling CPTs and CDTs as Johnson does actually decreases overcharges. Ex. 404, Sept. 1, 2023 Johnson Rebuttal ¶ 95.

1

2

### 2.    DPP Error 2: Johnson's model should be corrected to reflect the reality of variation in alleged conspiracy effects over time.

In addition to pooling CDTs and CPTs, DPP expert Johnson also blurs time.  Johnson estimates uniform CDT and CPT overcharges for the vast majority of the class period, from 1996 to 2005.  Ex. 410, May 26, 2023 Johnson Rep. at 56, Figure 19.  That is, under Johnson's model, the same overcharge percentage applies for CDTs and CPTs in *every* year in that ten-year period.  As shown below, statistical testing and evidence of evolving market conditions over time illustrate the inflexibility of Johnson's model and necessitate modifications to allow the possibility of variation over time.  Moreover, the DPPs' inability to recover damages before 1998, based on their pleadings and the law of default (set forth above), also necessitates disaggregating Johnson's uniform 1996-2005 overcharge calculation.

For the twelve-year class period, Johnson's price analysis is divided into only two time periods: (1) Q2 1995 through Q2 2006; and (2) Q3 2006 through Q1 2007.  Ex. 410, May 26, 2023 Johnson Rep. at 31, Figure 3 & n.2a, 2b.  As structured, Johnson's model estimates only one cartel impact parameter for each period and application (CDT/CPT).  *Id*. at 31, Figure 3.  By limiting his model to one variable that estimates price impacts from 1995 to 2006, Johnson rendered his model incapable of accounting for changes that would have affected alleged conspiracy impacts.  *See* Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. at 52 ¶ 86 & n.162.  This built-in limitation conflicts with the available data and industry sources that show that the CDT and CPT markets changed dramatically between 1995 and 2006 making uniform conspiracy impacts over a 10-year period highly unlikely. *See id.* at 64-67 ¶ 90 & n.174.

For example, demand for CDTs grew in the mid-1990s due to increasing computer sales, reflecting a market condition unrelated to the alleged conspiracy. *See id.* at 64-67 ¶ 90 & n.174 (citing trade press articles reflecting the growing demand for computer monitors in 1995 and 1996 due, in part, to "the introduction of Windows95 and the expanding functionality and performance of desktop computer hardware and software"). While Johnson's other market force variables capture changes in industrial production growth rate and unemployment rate, they do not capture any of the specific shift in demand to CDTs in 1995 and 1996. *Id.* at 64-67 ¶ 90 & n.175. Therefore, Johnson's

model for 1995 and 1996 does not reflect a reliable overcharge estimation where he did not account for the change in CDT demand in 1995 and 1996.

In line with economic principles in estimating antitrust damages, Irico's expert Guerin-Calvert again first engaged in statistical testing. *See Id.* at 63 ¶ 88 & n.167 (citing ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES 230 fn. 30 (3d ed. 2017)). She tested Johnson's model with a more flexible version that allows for the measurement of any variation within the 1995 to 2006 time period. Specifically, Guerin-Calvert modified Johnson's model to incorporate an annual conspiracy dummy variable instead of using one conspiracy variable for the entire period of 1995 through 2006. *Id.* at 63 ¶ 88 & n.167. Her testing found that the model, as modified, provided substantially different overcharge estimates between Q2 1995 and Q2 2006 for both CPTs and CDTs. *Id.* ¶ 88. Her testing also indicated that Johnson's constraints on his model, which imposed uniform overcharges, were false with a probability of at least 99% or rejection at a 1% level of statistical significance. *Id.*

After her statistical testing, Guerin-Calvert then made modifications to Johnson's model to remove the restrictions imposing uniform overcharges over time and to include "a separate indicator variable for each calendar year from 1995 to 2006" (Q2 to 4 of 1995 and Q1 to 2 of 2006)—which allowed for, but did not predetermine, the possibility of overcharge variance from year to year. *Id.* at 68-69 ¶ 94 & nn.177-78. Guerin-Calvert's corrections were based on standard econometric practices, data sufficient to support estimating annual overcharges and varying price differentials (between actual and target CRT prices) year to year, and the fact that Johnson himself acknowledges market changes by quarter. *Id.*; *see also* Ex. 405, Nov. 19, 2021 Johnson Rep. at 16 ¶ 27 & n.43.

While Johnson claims that Guerin-Calvert's annual variability of estimated overcharges "burdens" the data, Ex. 404, Sept. 1, 2023 Johnson Rebuttal ¶ 113, he does not establish that the more than 28,000 data points used in his model would be insufficient to calculate annual overcharges for 13 years. Ex. 410, May 26, 2023 Johnson Rep. at 31, Figure 3. Indeed, Johnson himself imposed a greater "burden" on his data by estimating a separate overcharge for the Q3 2006 to Q1 2007 sub-period of the class period. For nearly every year of the relevant class period, there are more data points (observations) than for the Q3 2006 to Q1 2007 period for CDTs. Ex. 403, Jul. 21, 2023

Guerin-Calvert Rep. at 72 n.181. If there is sufficient data to reliably estimate overcharges for the Q3 2006 to Q1 2007 period for CDTs as Johnson maintains, then there is sufficient data to reliably estimate overcharges for nearly all years. As courts recognize in antitrust class actions, if there is "change over time, it would be improper to use … models that do not reflect these variations over time." *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 496 (N.D. Cal. 2008) (quoting ABA SECTION OF ANTITRUST LAW, ECONOMETRICS: LEGAL, PRACTICAL, AND TECHNICAL ISSUES 224 (2005)).   Guerin-Calvert did not correct Johnson's model to calculate over three-thousand daily overcharges. She corrected Johnson's model to allow for annual variability during a 13-year period instead of measuring just <u>two</u> cartel effect variables during a 13-year period.

In sum, Johnson's DPP damages model should be corrected to allow estimated overcharges to vary by year (DPP Error 2), along with the corrections for separate regressions for CPTs and CDTs (DPP Error 1) and exclusion of pre-1998 overcharges and sales (Section I).   Section III.C below sets forth a table showing these overcharge corrections, along with the following corrections to Johnson's volume of purchases.

### B. The Court should exclude certain sales from the DPPs' damages calculation because they are refuted by the available data and overstate damages.

In addition to the two major errors in his overcharge calculations, DPP expert Johnson made three errors that impacted the second step of his calculations or other half of the equation, where he purported to measure the volume of DPP sales.  In rebuttal, Johnson conceded the first two errors, so those corrections are now undisputed.  As outlined below, Johnson's errors in this stage of his analyses result in overestimations of the number of relevant sales, with which the overcharge percentages would be multiplied. Correcting these errors reduces DPP damages by $124.9 million.

### 1. DPP Error 3: Johnson now concedes that he cannot treat 100% of sales without customer information as DPP sales and that known proportions from sales with customer information should be applied instead.

Recognizing that DPP damages are limited to the alleged overcharges actually paid by the DPPs, Johnson used CRT and CRT finished product sales data from the alleged conspirators and their affiliates to estimate the DPPs' U.S. Purchases of CRTs and CRT finished products. Ex. 410, May 26, 2023 Johnson Rep. at 56 Figure 19, 58 Figure 20.  Based on customer name fields, Johnson

distinguished sales to DPPs from sales excluded from the class (i.e., sales to alleged conspirators and class opt-outs). Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. ¶ 113.  However, Johnson then took a leap, assuming that all sales lacking customer names were sales to DPPs—that he then included 100% of in his original calculations.  Ex. 411, Jul. 7, 2023 Johnson Dep. at 118:1-119:6.  Offering no bases or reason, he made this assumption despite that, with respect to product sales with customer name information, only 49% of the alleged conspirators' CRT sales and 67% of their CRT finished product sales were made to DPPs. Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. at 80 ¶ 113.

Irico's expert Guerin-Calvert corrected Johnson's unsupported assumption by applying the known DPP sales proportions for sales with customer information (49% of CRTs and 67% of CRT finished products) to the sales without customer information under the more economically sound assumption that sales lacking customer information were to DPPs as often as sales that had customer information.  *Id.* ¶ 114.

In rebuttal, Johnson conceded, "I agree that it is reasonable to make such an adjustment. I adjust my calculations accordingly," resulting in an approximately $24 million reduction.  Ex. 404, Sept. 1, 2023 Johnson Rebuttal at 61-62 ¶ 122.  This correction is undisputed and should be applied.

### 2.    DPP Error 4: Now undisputed, Johnson did not use best available data to calculate SDI's CRT sales to DPPs.

With respect to sales with customer name information, because the DPPs are by definition those who purchased CRTs and CRT finished products in the United States, Johnson generally assumes that every DPP purchase of a CRT or CRT finished product from an alleged conspirator is a class purchase if either the billing or shipping address is in the United States.  Ex. 410, May 26, 2023 Johnson Rep. ¶ 86.  Johnson, however, deviated from this assumption with respect to his calculations regarding one defendant, SDI (Samsung), based on the later-debunked premise that SDI's global CRT sales data do not identify billing or shipping information.  *Id.* ¶ 90. Johnson first used customer names to infer which of SDI's sales could have been made in the United States.  *Id.* at 54 n.164.  For those customers without names, Johnson used an estimate of the U.S.-to-global sales ratio, drawn from other CRT manufacturers based on third party sources, to generate an estimate of SDI sales in the United States to the nameless customers.  *Id.*  ¶¶ 87-88.

As it would turn out, the SDI U.S. customer data was available all along, as SDI had separately produced all of its CRT sales data containing either a U.S. billing or shipping address. Using the available SDI U.S. customer data, Irico's expert Guerin-Calvert applied the same method Johnson had applied to other defendants' data, *i.e.*, attributing U.S. sales based on customer billing or shipping address.  Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. ¶ 116.   Under this consistent methodology using the best data available, Guerin-Calvert calculated significantly reduced SDI U.S. CPT and CDT sales than Johnson had calculated based on his indirect, inferential, and internally inconsistent method.  *Id.*

In rebuttal, Johnson again conceded that Guerin-Calvert was correct, resulting in an additional approximately $50 million reduction. Ex. 404, Sept. 1, 2023 Johnson Rebuttal at 62 ¶ 123. This correction is also undisputed and should be applied.

### 3.    DPP Error 5: Johnson should have used, and the Court should rely on, other firm-specific data to fill gaps of missing sales information.

In determining U.S. DPP CRT and CRT finished product sales, Johnson did not have data for all years from all of the alleged conspirators, reflected in figures from his opening report (which also reflect no gaps from Irico, which produced sales data for all years and products).  Ex. 410, May 26, 2023 Johnson Rep. at 53-59 ¶¶ 89, 97 & Figures 18 and 21.

Johnson faced two types of missing data: (1) missing CRT and finished product sales data from an alleged conspirator for the entire class period; and (2) missing CRT and finished product sales data only for certain years, for Thomson, Samsung, and Mitsubishi.  *Id.*  Johnson dealt with both types of missing data the same way: (a) he estimated global sales by the alleged conspirator using industry data, (b) he assumed that the global-to-U.S. ratio of sales applicable to the missing sales data was equal to his estimate of an industry average ratio, and (c) he assumed that DPP class share (i.e., the share of its U.S. sales that was not made to optouts or alleged conspirators) applicable to the missing sales data was equal to the DPP class share in the sales data that were available.  *See id.* ¶¶ 88-90, 96-97; Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. at 82-83 ¶ 117.

For the second category of missing data—missing data from Thomson, Samsung, and Mitsubishi for only certain years—however, Johnson had firm-specific data from those firms for

other years.  Accordingly, as Irico's expert Guerin-Calvert explained, when data for an alleged conspirator is missing for only certain years, "it makes more sense to use the estimated DPP class share and U.S-to-global CRT sales ratio from the *same* alleged cartel member's own sales data for the other years in the class period than to use estimates based on *all* alleged cartel members (and in some case from industry sources that are themselves only estimates)."  Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. at 83 ¶ 118.  Like the corrections above that Johnson adopted, it again comes down to an issue of using the best available data.  That is, when firm-specific information exists from other years, that data should be used when calculating estimates for *that firm*.  That is what Guerin-Calvert did.  She calculated alternative sales estimates for the alleged conspirators who are missing data in only some years (Thomson, Samsung/SDI, and Mitsubishi) by using firm-specific information: each defendant's own sales data from other years, to estimate the DPP class share and U.S.-to-global CRT sales ratio instead of using global industry data and estimates derived from all alleged conspirators' sales data.  *Id.* at 83-84 ¶¶ 118-119 & n.215.  Employing that firm-specific information lowered each relevant alleged conspirator's estimated U.S. sales of CRTs or CRT finished products to the DPPs— demonstrating that Johnson's estimates, based on non-firm-specific information, overstated those same figures.  *Id.* at 84 ¶ 119.

Claiming that Guerin-Calvert's using firm-specific data from other years would somehow skew estimates of class purchases, Johnson contests this correction.  Ex. 404, Sept. 1, 2023 Johnson Rebuttal at 62 ¶ 125.  That is, for firms with some years of missing data, he insists on continuing to use all-firm industry ratios instead of available firm-specific data from other years to estimate the firm's U.S-to-global CRT sales ratio for years with missing information and to estimate the firm's DPP class share.  Ex. 404, Sept. 1, 2023 Johnson Rebuttal at 63 ¶ 126; Ex. 414, Oct. 3, 2023 Johnson Dep. at 94:2-94:12. However, when he had firm-specific data for other defendants and/or other years, Johnson himself ***used firm-specific data***. Ex. 414, Oct. 3, 2023 Johnson Dep. at 101:7-101:11 ("Q. … So when you had defendant-specific data for a particular year, you used that data, but where there were gaps, you used the industrywide average; is that right? A. Yes.");  *Id* at 102:20-102:25 ("Q. So for the share of sales that were to DPP class members, did you also rely on the specific defendant data when you had it? A. I think that's -- that's correct, yes.").  Thus, not only does it make common

sense to use firm-specific data over non-firm-specific data, but Johnson's own methodology as to other defendants and other years conflicts with his reliance on non-firm-specific data in this instance.

Regarding DPP class share, Johnson did not have an industrywide estimate for the DPP class share to begin with. Instead, Johnson assumed that the DPP class share for the manufacturers for which he was missing data (for some or all years) was equal to the DPP class share across all manufacturers for which he had data. *Id.* at 101:12-102:3 ("I don't think we have global data for class sales. We only have data for those other defendants."); Ex. 410, May 26, 2023 Johnson Rep. ¶ 90. By Johnson's own logic, his methodology would skew his estimates if the DPP class share for the alleged conspirators for which he had data differed from the DPP class share for the alleged conspirators for which he was missing data. Guerin-Calvert's methodology thus reduces the skew in Johnson's methodology by using firm-specific DPP class shares for a larger share of the data than Johnson did.

As the foregoing shows, Guerin-Calvert's corrections to Johnson's methodology for calculating U.S-to-global CRT sales ratio and DPP class purchases clearly improves the estimates by using firm-specific data.

### C. The Court should apply corrections for DPP Errors 1 to 5, resulting in well-founded reductions in any DPP damages.

Although Irico takes the position that zero or *de minimis* damages are most appropriate, the following chart summarizes the resulting modified DPP damages amount if the above-explained errors are corrected—which, as outlined in Section V below, should be further adjusted to account for the conflicting overcharge percentages between the DPP and IPP models:

**Figure 19R - Revised Damages Estimates when Excluding Pre-1998 Damages**

| Modification | Adjustment to Dr. Johnson's Estimate of DPPs' CRT and CRT Finished Product Purchases | Resulting Damages Estimates (in millions) | | | | | |
|---|---|---|---|---|---|---|---|
| | | Using Dr. Johnson's Overcharge Estimate | | | Using Modified Overcharge Estimate (DPP Errors 1, 2) | | |
| | | CPT/ TV | CDT/ Monitor | Total | CPT/ TV | CDT/ Monitor | Total |
| Original | Dr. Johnsons' Estimate | $695.3 | $389.2 | **$1,084.6** | $182.1 | $259.6 | **$441.7** |
| Original | After correcting Dr. Johnson's methodological errors: **DPP Errors 3, 4** | $629.5 | $381.9 | **$1,011.5** | $169.0 | $253.7 | **$422.7** |
| Original | After correcting Dr. Johnson's methodological errors: **DPP Errors 3, 4, 5** | $616.6 | $343.0 | **$959.7** | $164.2 | $226.4 | **$390.5** |
| excluding pre-1998 | Dr. Johnsons' Estimate | $505.4 | $162.2 | **$667.7** | $94.3 | $107.6 | **$201.9** |
| excluding pre-1998 | After correcting Dr. Johnson's methodological errors: **DPP Errors 3, 4** | $447.9 | $156.2 | **$604.1** | $83.6 | $102.5 | **$186.0** |
| excluding pre-1998 | After correcting Dr. Johnson's methodological errors: **DPP Errors 3, 4, 5** | $444.3 | $157.5 | **$601.7** | $83.4 | $102.5 | **$185.8** |

*See* Ex. 400, Guerin-Calvert Decl. ¶ 18. The total corrected damages estimate for CPTs and CDTs, excluding pre-1998 damages and correcting for DPP Errors 1 to 5, is $185.8 million.

**IV.    For IPP damages, the Court should apply corrections to the IPPs' overcharge model that reflect market realities and should deny duplicative damages.**

The IPPs and their expert Netz assert that the alleged conspiracy raised the prices that direct purchasers of the alleged conspirators paid for CRT and CRT finished products and those direct purchasers elevated their prices in turn, "passing" all of the "overcharges" they paid to IPP class members. Ex. 407, Apr. 15, 2014 Netz Rep. at 82-91. At a high level, IPPs and Netz calculate damages the same way DPPs and Johnson calculate damages. First, Netz estimates overcharge percentages direct purchasers allegedly paid for CDTs and CPTs. Then Netz opines that 100% of those overcharges were passed onto indirect purchasers and multiplies the alleged overcharge paid by direct purchasers with her estimate of all revenues paid by class members on CRT products. *See*

1    Ex. 407, Apr. 15, 2014 Netz Rep. at 6.  While Netz purports to calculate the same overcharges as

2    Johnson (that is, overcharges paid by direct purchasers for CRTs), Netz arrives at different

3    overcharge estimates than Johnson, using a different model that also does not reflect market realities.

4    As shown below and by Irico's expert, corrections to Netz's overcharge calculations more accurately

5    account for and reflect market conditions and standard economic principles.  And, before awarding

6    any damages to the IPPs, the Court must account for and apportion all duplicative damages.

A.    **The issue of duplicative damages is relevant to and should factor into the determination of IPP damages and total damages given the due process and state law concerns raised by IPPs' seeking overlapping overcharges with DPPs.**

Given past discussions with the Court, Irico first addresses the duplicative damages issue as to the IPPs.  In the parties' prior statements, Irico raised the issue of "duplicative damages between DPPs and IPPs" as being within scope of the damages issues currently pending before the Court but did not at that time fully brief the issue.  *See* ECF No. 6459 at 2.  On that incomplete record, the Court commented that it was not clear how the issue "implicate[d] the total amount of damages Irico might be ordered to pay" but determined that Irico could still present evidence on the issue.  *Id.*

The issue of duplicative damages between the DPPs and IPPs implicates the total amount of damages that can be assessed against Irico in several, related ways.

1.    **The IPPs and DPPs seek overlapping damages, meaning the total IPP and DPP damages sought exceeds 100% of the alleged overcharge.**

As is made clear in their expert reports, the IPPs and DPPs both proffer models to measure, and seek to recover, CPT and CDT overcharges paid by direct purchasers.  The DPPs' expert Johnson calculates the purported overcharge paid for by direct purchasers of CRTs and CRT products in the United States from any defendants or subsidiaries and affiliates thereof.  Ex. 410, May 26, 2023 Johnson Rep. at 1-2.  Consistent with IPPs' damages burden (*see supra* at 8-9), the IPPs' expert Netz attempts to do the same: first calculate the overcharge paid for by direct purchasers (as the IPPs are defined as those who indirectly purchased from any defendant or subsidiary and affiliate thereof) and then the amount of that overcharge passed through from direct to indirect purchasers, with Netz concluding that direct purchasers passed on 100% of the overcharge to indirect purchasers.  Ex. 407, Apr. 15, 2014 Netz Rep. at 6, 26.  As detailed in Section V below and the

accompanying declaration, data indicate that IPPs were the end customers for a substantial fraction of CRTs and CRT finished products purchased directly by DPPs in the United States.  Thus, the IPPs' and DPPs' damages models measure and seek to recover overlapping overcharges.  If both classes are awarded damages under their respective models, then the total damages would exceed 100% of any actual overcharge and amount to duplicative recoveries against Irico.

Indeed, the known risk of duplicative damages between IPPs and DPPs led in part to the *Illinois Brick* doctrine, barring IPPs from bringing federal antitrust claims.  *See In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1339, 1342 (9th Cir. 1982) ("In *Illinois Brick* … the Court noted the possibility of duplicative recovery if both direct and indirect purchasers could claim damages resulting from a single overcharge by an antitrust defendant … [and] the Court expressly found unacceptable the risk of duplicative recovery created by allowing direct and indirect purchasers to claim damages resulting from a single transaction that violated the antitrust laws.").  The Ninth Circuit has also advised, in an instance of double antitrust recovery to a single plaintiff, that "it is beyond dispute that the Sherman Act was not intended to provide recoveries, before trebling, in excess of the injuries that were actually caused by an antitrust violation," and any "double recovery must be corrected before trebling; to do otherwise would in effect treble an incorrect measure of relief."  *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1374-75 (9th Cir. 1986).

### 2.    Awarding IPPs and DPPs overlapping, trebled class damages would violate due process.

A damages award in this case where total damages exceed 100% of the actual overcharge would violate due process.  *See W. Union Tel. Co v. Commonwealth of Penn.*, 368 U.S. 71, 76-77 (1961) (holding that forcing a defendant "to pay a single debt more than once" is a taking of property "without due process of law"). In the Ninth Circuit, "[t]here is a strong Constitutional policy against requiring the double payment of the same debt," under the Due Process clause of the Fifth Amendment. *Bank of Marin v. England*, 352 F.2d 186, 192-93 (9th Cir. 1965), *rev'd on other grounds*, 385 U.S. 99 (1966); *see also Harris v. Balk*, 198 U.S. 215, 226 (1905) ("It ought to be and it is the object of courts to prevent the payment of any debt twice over"); *Cities Serv. Co. v. McGrath*,

342 U.S. 330, 334-35 (1952) (noting that double recovery is a 'taking' of property within the meaning of the Takings Clause). Awarding damages for CPT and CDT overcharges to both IPPs and DPPs, without apportionment, would force Irico to pay the same debt twice, once to the DPPs, and again to the IPPs, in violation of due process.

Furthermore, permitting multiple **trebled** recoveries of the same alleged overcharges, once under federal antitrust law and then again under certain state laws, would subject Irico to excessive punitive damages—also in violation of due process. *See State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 429 (2003) (holding that excessive punitive damages awards violate a defendant's due process rights). As the Court in this case has recognized in discussing the *Illinois Brick* doctrine, "the Ninth Circuit has explained that 'allowing every person along a chain of distribution to claim damages arising from a single violation of the antitrust laws would create a risk of duplicative recovery against the violator unintended by Congress.' This risk is especially severe in light of the availability of treble damages." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857, 864–65 (N.D. Cal. 2012) (quoting *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1212 (9th Cir. 1984)) (internal citations omitted).

Due process sets the outer limits of punitive damage awards, and as recognized by the Ninth Circuit, trebled antitrust damages are punitive in nature. *See Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 715 (9th Cir. 2010) ("[T]he treble damages provisions in the Clayton and Sherman Acts act as statutory punitive measures in which two thirds of the recovery is not remedial and inevitably presupposes a punitive purpose." (internal quotations omitted)). While assessed on a case-by-case basis, punitive damage awards that are more than four times the amount of harm caused, with harm typically measured by compensatory damages, likely violate due process. *Ramirez v. TransUnion LLC,* 951 F.3d 1008, 1036-38 (9th Cir. 2020), *rev'd and remanded on other grounds*, 594 U.S. 413 (2021). Moreover, punitive damage awards are more likely to violate due process when the harm done is "purely economic"—like the overcharge damages sought by the IPPs and DPPs in this case. *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 576 (1996); *see also Southern Union Co. v. Irvin*, 563 F.3d 788, 791-92 (9th Cir 2009) (high punitive damage award more likely to violate due process if the defendant neither physically harmed the plaintiff nor recklessly

disregarded the safety of others). The class nature of the sought damages further compounds the due process concerns. In *Wakefield v. ViSalus*, a class action brought under the Telephone Consumer Protection Act, the Ninth Circuit held that statutory damage awards of $500 per violation (not trebled), even when constitutional on their own, will violate due process when, on a class-wide basis, the aggregated "penalty prescribed is so severe and oppressive as to be wholly disproportionate to the offense and obviously unreasonable." 51 F.4th 1109, 1121, 1123, 1125 (9th Cir. 2022).

In sum, under multiple, independent due process grounds—barring duplicative actual and trebled damages, as well as excessive class damages—the total damages awarded the IPPs and DPPs should not exceed 100% of the determined overcharge and should not be doubly trebled.

### 3. Applicable state laws recognize the need for apportionment and avoidance of duplicative damages.

While federal law does not permit reducing *DPP* damages to account for double recoveries under the *Illinois Brick* doctrine,[12] the state laws under which the *IPPs* bring their antitrust claims recognize that courts can and should apportion IPP damages to protect against duplicative damages. That is, in addition to mandatory due process principles, the applicable state laws and cases applying them also provide grounds for the Court to reduce the IPPs' damages to avoid duplicative damages:

- **Arizona**: *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 108 (Ariz. 2003) ("The risk of multiple liability for Defendants…is a legitimate concern. It is not, however, a problem that our trials courts are incompetent to handle. Indeed, most of the *Illinois Brick* repealer states leave the solution to the double recovery problem to the courts.").

- **California**: "In instances where multiple levels of purchasers have sued, … defendants may assert a pass-on defense as needed to avoid duplication in the recovery of damages." *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787 (2010); *see also Humana Inc. v. Bausch Health Companies Inc.*, 2023 WL 4552005, at *7 (Cal. Super. July 5, 2023) ("if multiple levels of a distribution chain are plaintiffs, actual damages (as distinct from treble damages) should be apportioned. . . . There is no reason why this should change if, as here, the direct purchasers are in federal court and the indirect purchasers in state court[.]").

- **District of Columbia**: "In actions where both direct and indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for damages that the illegal overcharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of damages." D.C. Code § 28-4509(b); *In re Vitamins*

---

[12] Recognizing that this Court has previously addressed and excluded pass-on evidence in the context of Direct Action Purchasers, who were direct purchasers, Irico does not seek to assert a pass-on defense as to DPPs. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. MDL 1917, 2016 WL 7800819 (N.D. Cal. Nov. 15, 2016).

*Antitrust Litigation*, 259 F. Supp. 2d 1, 3–4, 9 (D.D.C. 2003) (denying plaintiff's motion to exclude evidence of pass through of defendants' overcharges, in part, because twelve *Illinois Brick* repealers, including D.C. Code § 28-4509(b), either allow for pass through defenses or prohibit double recovery).

- **Florida**: *Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100, 108 (Fla. Dist. Ct. App. 1996) (acknowledging that the "possibility of multiple liability for defendants, and the prospects of inconsistent and duplicative federal and state judgments" are "valid policy considerations under state antitrust or deceptive trade practices").

- **Hawaii**: "In any lawsuit or lawsuits in which claims are asserted by both direct purchasers and indirect purchasers, the court is authorized to exercise its discretion in the apportionment of damages, and in the transfer and consolidation of cases to avoid the duplication of the recovery of damages and the multiplicity of suits, and in other respects to obtain substantial fairness" Haw. Rev. Stat. § 480-13(c)(5).

- **Iowa:** "[D]istrict courts are fully capable of ensuring antitrust defendants are not forced to pay more in damages than amounts to which the injured parties are entitled." *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449-50 (Iowa 2002).

- **Michigan**: "[T]he Court is persuaded that Michigan law only permits the recovery of 'actual damages' for antitrust claims. As such, … the Court finds that defendants can challenge plaintiff's damage estimates with a pass through defense." *In re Vitamins Antitrust Litigation*, 259 F. Supp. 2d 1, 8–9 (D.D.C. 2003); *In re TFT-LCD (Flat Panel) Antitrust Litigation*, M 07-1827, 2012 WL 6709621, at *4 (N.D. Cal. Dec. 26, 2012), *aff'd*, 637 F. App'x 981 (9th Cir. 2016) ("The Court agrees with Judge Hogan's reasoning [construing Michigan antitrust law in *In re Vitamins*], and holds that defendants may present evidence of downstream pass-on.").

- **Minnesota**: "In any subsequent action arising from the same conduct, the court may take any steps necessary to avoid duplicative recovery against a defendant." Minn. Stat. § 325D.57  *In re TFT-LCD*, 2012 WL 6709621 at *2 (internal quotations omitted) ("The Court concludes that allowing a pass-on defense is consistent with the Minnesota Antitrust Act because plaintiffs will recover their 'actual damages sustained.' The statute expressly permits the court to 'take any steps necessary to avoid duplicative recovery against a defendant.' Here, where multiple levels of purchasers have sued defendants alleging identical and/or overlapping claims, consideration of pass-on is necessary to avoid duplicative recovery.").

- **Nebraska**: "The court may transfer and consolidate such claims, apportion damages, and delay disbursement of damages to avoid multiplicity of suits and duplication of recovery of damages and to obtain substantial fairness" Neb. Rev. Stat. § 59-821(2).

- **New Mexico**: "In any action under this section, any defendant, as a partial or complete defense against a damage claim, may, in order to avoid duplicative liability, be entitled to prove that the plaintiff purchaser or seller in the chain of manufacture, production, or distribution who paid any overcharge or received any underpayment, passed on all or any part of such overcharge or underpayment to another purchaser or seller in such chain." N.M. Stat. Ann. § 57-1-3.

- **New York**: "[I]n any action in which claims are asserted against a defendant by both direct and indirect purchasers, the court shall take all steps necessary to avoid duplicate liability[.]" N.Y. Gen. Bus. Law § 340(6).

- **North Dakota**: "In any action for damages under this section, any defendant, as a partial or complete defense against a claim for damages, is entitled to prove that the plaintiff purchaser,

or seller in the chain of manufacture, production, or distribution, who paid any overcharge or received any underpayment passed on all or any part of the overcharge or underpayment to another purchaser or seller in that action." N.D.C.C. § 51-08.1-08(5).

- **Tennessee:** *Freeman Indus., LLC v. Eastman Chem. Co*., 172 S.W.3d 512, 517 (Tenn. 2005) (noting that "[o]ur trial courts . . . are capable to handle such a problem [of multiple liability[,]" in part, because "many *Illinois Brick Co.* repealer statutes leave the risk of multiple liability to the trial courts.").

- **Vermont**: The court shall take all necessary steps to avoid duplicate liability. 9 Vt. Stat. Ann. § 2465(b).

- No statute or caselaw were found addressing how courts applying Kansas, Mississippi, Nevada, or West Virginia state antitrust laws should address the risk of duplicative damages. But awarding duplicative damages to IPP classes with claims under these states' laws would still independently violate Irico's right to due process.

By contrast, other authorities do not support allowing the IPPs to recover duplicative damages against Irico. For instance, in *In re HIV Antitrust Litigation*, where the court granted motions to *limine* the defendants' pass-on and duplicative-recovery defenses, the court acknowledged that its decision did not decide the due process issues—"*i.e.*, that there could be a due process violation if Defendants were subject to treble damages under federal law for the direct purchasers' claims and then treble damages under state law for the indirect purchasers' claims"— because the defendants had not timely raised that argument. No. 19-CV-02573, 2023 WL 3011624, at *4 (N.D. Cal. Apr. 18, 2023).[13] *HIV* thus does not resolve the due process issues that preclude the award of duplicative damages in this case. As other courts have recognized, the *HIV* court's analysis is also neither controlling nor correct. A California court outrightly rejected the *HIV* court's analysis, holding that a defendant cannot "be required to pay duplicative actual damages;" otherwise, under *HIV*'s "theory, others, representing multiple layers of intermediaries [in addition to IPPs and DPPs], could also collect the entirety of the overcharge," which is clearly contrary to controlling California

---

[13] The products and transactions in that case also meaningfully differed in nature: the IPPs in that case were third-party payors who had paid for prescription drugs and the pass-on issue was "whether an antitrust defendant can claim a pass-on of an overcharge via a premium." 2023 WL 3011624, at *1. Unlike the claimed passed-on overcharges in this case, the court agreed with other courts that "insurance premiums are not a pass on of alleged overcharges because premiums are set by anticipating future projected costs, not to recover money that insurers paid in the past." *Id.* (quoting *In re Asacol Antitrust Litig.*, No. 15-12730, 2017 53695 (D. Mass. Jan. 4, 2017)).

law, under which IPPs also bring a claim here. *Humana Inc. v. Bausch Health Companies Inc.*, No. HG21087971, 2023 WL 4552005, at *7 (Cal. Super. July 05, 2023).

This case is, instead, much closer to *In re TFT-LCD (Flat Panel) Antitrust Litigation*. Factually, the two cases are comparable; both deal with the alleged price fixing of electronic components. In *In re TFT-LCD*, the court permitted the defendants to assert a pass-on defense against IPPs seeking antitrust damages under California state law given the "very real prospect of duplicative recovery because defendants have been sued by multiple levels of purchasers alleging overlapping and/or identical claims. . . . For example, Dell has sued defendants alleging direct purchaser claims over its purchases of LCD panels that Dell incorporated into notebook computers; Best Buy alleges indirect purchaser claims against defendants regarding its purchases of notebook computers from Dell." *TFT-LCD*, 2012 WL 67096212 at *2 & *2 fn. 3.

Here, due process and the applicable state laws require reducing IPP damages by all amounts that overlap with the DPP damages. After setting forth necessary corrections to the IPP damages model below (in addition to the corrections above to the DPP model and volume of sales), Section V below provides the Court with well-reasoned and feasible methods for choosing between the models and accounting for duplicative damages.

### B. IPP expert Netz's overcharge model should be corrected to account for price variability over time and important changes in market conditions.

As for the IPPs' overcharge model, their expert Netz calculated overcharge estimates using a "reduced-form price equation model," which incorporates a "single equation that relates prices to supply factors, consumer demand, and the competitiveness of the marketplace." Ex. 407, Apr. 15, 2014 Netz Rep. at 98. While Netz's model relies on multiple, flawed assumptions and Irico takes the position that zero or *de minimis* damages are most appropriate as to the IPPs, Irico identifies below two fixable errors that must be corrected as to Netz's calculated overcharges:

1. **IPP Error 1**: Netz's model should be corrected to include control variables for significant changes in CRT demand during the relevant time period and more control variables to track changes in costs associated with producing CRTs.

2. **IPP Error 2**: Netz's model should be corrected to reflect the reality that any overcharge varied over time.

Additionally, as shown above, Netz's pre-1998 damages calculations must be removed because the IPPs have not pleaded Irico's liability before 1998 and thus cannot recover damages before 1998. *See supra* at 9-14.

> **1.    IPP Error 1: Netz's model should be corrected to include more control variables for significant CRT demand changes and to track changes in costs associated with producing CRTs.**

Netz's model purports to calculate the "but-for" price that CRT direct and then indirect purchasers would have paid absent the alleged conspiracy. Netz's model, however, is incapable of calculating an accurate "but-for" price because it does not properly account for key determinants of CPT and CDT prices such as changes in demand for the products and changes in production costs. The only variables Netz uses in her model measure: (1) the price charged for CRT models, (2) the price of CRT glass, (3) Organisation for Economic Co-operation and Development (OECD) output rates, (4) OECD unemployment rates, (5) the revenue from the sale of LCD finished TVs or monitors as a share of total revenues from the sale of finished TVs or monitors, (6) time variables, (7) screen sizes, and (8) identity of model manufacturers. *See* Ex. 407, Apr. 15, 2014 Netz Rep. at 104.

First, Netz's model does not account for all statistically significant changes in demand. While the variables for OECD GDP (variable 3) and OECD unemployment rate (variable 4) ostensibly track demand, they reflect changes in global demand, not changes in demand specific to CRTs, CPTs or CDTs. *See* Ex. 409, Aug. 5, 2014 Guerin-Calvert Rep. ¶ 124. The lack of demand variables specific to CPTs and CDTs is significant because the market for those products changed significantly from 1995 to 2011.[14] For example, LCD products increasingly displaced CRT products throughout the relevant time period, with differing impacts from year to year. *See* Ex. 407, Apr. 15, 2014 Netz Rep. at 35, Exhibit 13, Exhibit 14. Even for the market factors that Netz attempts to control for, her model incorrectly assumes a stable relationship with prices over the years. *See* Ex. 415, Aug. 5, 2014 Willig Rep. ¶ 84. For instance, with the variables for OECD GDP (variable 3) and OECD unemployment rate (variable 4), Netz's model assumes that consumers responded similarly in their CPT TV purchases in 2000 as they did in 2008; yet, "the impact of the Great

---

[14] While Netz does not calculate overcharges after 2007, Netz's model incorporates two benchmarks, the latter of which spans from 2008 to 2011. Ex. 415, Aug. 5, 2014 Willig Rep. ¶ 77.

Recession in 2008-09 (after the alleged cartel ended) on CPT demand and prices is not likely to be the same as the impact of the recession in 2000 (during the alleged cartel), not just because of the greater magnitude of the 2008 recession but also because by 2008 CRT TVs had largely been displaced by LCD and plasma TVs." *Id.* ¶ 85.

The same is true regarding CDTs. The failure to incorporate variables that track changes in CDT demand (versus global demand) is particularly significant, given that increased demand for CDT desktop computers dramatically changed the market for CDTs in 1995 and 1996. *See e.g.,* Ex. 409, Aug. 5, 2014 Guerin-Calvert Rep. at 33-34 ¶¶ 61-62 & Figure 14; *supra* at 20-22. Netz herself acknowledges that there was a demand spike in the mid-90s despite not using a single variable to control for it. Ex. 408, Sept. 26, 2014 Netz Rebuttal at 50 ("[F]or a time at least, demand for CDTs surged as computer sales soared in the mid-1990s"); Ex. 416, Oct. 31, 2014 Netz Dep. at 84:4-84:15 ("Q. Are you familiar with the fact that Windows 95 was a product that significantly stimulated the purchase of computers and, therefore, computer monitors? A. That is my belief, yes, or that's my understanding of what happened. Q. And all other things equal, you agree that if Windows 95 stimulated the demand for computers and computer monitors, everything else equal, that would tend to lead to an increase in monitor prices; is that correct? A. All else equal, yes, that's correct").

After identifying this error in Netz's model, Guerin-Calvert adjusted Netz's model to add a variable to measure worldwide quarterly shipments of desktop computers when measuring CDT overcharges and found that the variable was statistically significant. Ex. 409, Aug. 5, 2014 Guerin-Calvert Rep. ¶ 124. To further account for CDT capacity constraints in 1995-96 (another market factor not accounted for by Netz), Guerin-Calvert added indicator variables for those two years. *Id.* ¶ 126. Similarly, for CPTs, prior expert Robert Willig (whose opinions were independently verified and adopted by Guerin-Calvert) adjusted Netz's model to add a variable to measure sales in U.S. electronics retail stores as an approximation for consumer demand for TVs and found that the variable was statistically significant. Ex. 415, Aug. 5, 2014 Willig Rep. ¶ 100; Ex. 417, Mar. 16, 2022 Guerin-Calvert Rep. at ¶ 14.

Second, Netz used only a single cost estimate in her model, the price of CRT glass in Korea (variable 2). Guerin-Calvert and Willig again adjusted Netz's model when calculating CRT

overcharges by adding additional controls related to obvious costs: the cost of shipping, an index of labor cost in Korea, and a variable for the Korean Won-US dollar exchange rate. Ex. 409, Aug. 5, 2014 Guerin-Calvert Rep. ¶ 125; Ex. 415, Aug. 5, 2014 Willig Rep. ¶ 100. Guerin-Calvert found that every variable was statistically significant except the Korean labor cost variable when used to calculate CDT overcharges, while Willig found that every variable was statistically significant when used to calculate CPT overcharges. Ex. 409, Aug. 5, 2014 Guerin-Calvert Rep. ¶ 125; Ex. 415, Aug. 5, 2014 Willig Rep. ¶ 100.  In both cases, adding cost variables allowed Netz's model to better measure changes in costs for CRT products and demonstrated that Netz's original model overstated overcharges. Specifically, Willig determined that adding the new cost and demand variables changes the CPT overcharge for 1995-2006 calculated by Netz's model from 9.9% to 2.4%. Ex. 415, Aug. 5, 2014 Willig Rep. ¶ 101.[15]

While Willig's and Guerin-Calvert's corrections improve Netz's model, they likely still result in inflated damages.  For example, Netz's model attempts to control for market share loss to LCDs (variable 5), but it does not have any way of tracking manufacturers' changing the characteristics of their products in response to that competition.  Some manufacturers switched production from curved CPTs to flat CPTs, which had higher prices than curved CPTs and thus would impact the overcharge analysis. Ex. 415, Aug. 5, 2014 Willig Rep. ¶¶ 24, 79, 82.  Because none of Netz's variables controls for manufacturers' changing curved CPTs to higher-priced flat CPTs, those higher prices associated with flat CPTs would under Netz's model be mistakenly attributed to the alleged conspiracy. *See* Ex. 415, Aug. 5, 2014 Willig Rep. ¶ 82. Thus, Willig's correction to Netz's model resulting in a modified 2.4% overcharge for CPTs is still conservative in IPPs' favor.

With respect to CDTs, as shown below, Guerin-Calvert incorporated her additional demand and cost variables into her analysis at the same time she adjusted variables for the conspiracy period.

---

[15] As above (*supra* at n.8), Netz's and Willig's reported IPP percentage overcharge estimates have been converted (from 9.0% and 2.3%, respectively) to be expressed as a percentage of but-for prices instead of as a percentage of actual prices (the damages estimates are unchanged). This was done to facilitate comparison with the DPP percentage overcharge estimates. Ex. 400, Guerin-Calvert Decl. ¶ 19.

1

2

      **2.**     **IPP Error 2: Netz's model should be corrected to remove "overcharges" that likely measure non-conspiratorial changes in market conditions and predate Irico's alleged involvement in the conspiracy.**

3

      Similar to DPP expert Johnson's approach, Netz's limited variables exacerbate another

4

serious error: Netz calculates only two overcharges over a 13-year period (and one overcharge over

5

12 years): (1) overcharges from 1995 through 2006 and (2) overcharges in 2007. *See* Ex. 412, Jul.

6

3, 2014 Netz Errata.  Despite being able to calculate a distinct overcharge for the one year of 2007,

7

Netz opts to use the same overcharge every year from 1995 to 2006.  As discussed above, CRT

8

markets went through significant changes in demand from 1995 to 2006.  In particular, demand for

9

CDTs increased dramatically in 1995 and 1996 because of increased demand for desktop computers,

10

which Netz herself acknowledges. *See supra* at 36. Netz, however, does not use any variables to

11

adjust for temporal (or other changes) in the demand for computer monitors.  *See supra* at 17-18

12

(citing case law, under which plaintiffs and the court cannot assume "lump sum" identical impacts

13

and market conditions across multiple years).  Calculating only one overcharge during an 11-year

14

period, including the years 1995 and 1996, therefore results in inflating overcharges for the entire

15

alleged conspiracy period instead of just the years when those spikes in demand occurred.  *See* Ex.

16

409, Aug. 5, 2014 Guerin-Calvert Rep. ¶ 121.

17

      Furthermore, Netz's model cannot measure damages as to Irico because, as shown above,

18

IPPs pleaded Irico's involvement in the alleged conspiracy starting only in 1998 and Netz's model

19

did not separate overcharges attributable to the beginning of the alleged conspiracy period from

20

overcharges attributable to the rest of the alleged conspiracy period.  *Id.*  ¶¶ 110-111. Modifying

21

Netz's model reveals that the years prior to 1998 had the highest overcharges, which further

22

necessitates applying corrections before determining any IPP damages against Irico.  *See id.* ¶¶ 112-

23

114. Indeed, Willig tested Netz's model on CPT prices and found that "Dr. Netz's model estimates

24

that CPT overcharges occurred during the first three years of the alleged cartel but not thereafter."

25

Ex. 415, Aug. 5, 2014 Willig Rep. ¶ 93. Guerin-Calvert likewise tested Netz's model on CDT prices

26

and found that calculating a separate overcharge for the period between 1995 to 1996 changed the

27

overcharge on CDTs from 1997 to 2006 to be not statistically significant.  Ex. 409, Aug. 5, 2014

28

Guerin-Calvert Rep. ¶ 114.  In other words, when the first few years of the alleged conspiracy are

broken out from the rest of the alleged conspiracy period, the IPPs' and Netz's model shows that **all** the overcharges IPPs seek against Irico are based on price changes that **predate** Irico's purported participation in the conspiracy.   Therefore, taking Netz's model and then accounting and correcting for the relevant temporal and other variables supported by statistical testing and analysis, the IPP damages against Irico for 1998 to 2006 is **zero dollars**.

Even if there were positive overcharges from 1998 to 2006, which the corrected data does not support, the IPPs are not due the full amount for CPTs and CDTs they seek and Netz estimates.

For CDTs, separate overcharges must be, and were by Guerin-Calvert, measured for: (1) 1995, (2) 1996, and (3) 1997-2006, while also incorporating the additional demand and cost variables described above. Ex. 409, Aug. 5, 2014 Guerin-Calvert Rep. ¶ 130.   These corrections result in overcharges from 1997 to 2006 of 1.6%, compared to the 28.2% estimated by Netz.[16]   For CPTs, Guerin-Calvert analyzed and adopted Willig's corrections to Netz's model, as discussed above, which calculated CPT overcharges of 2.4%, compared to the 9.9% estimated by Netz. Ex. 417, Mar. 16, 2022 Guerin-Calvert Rep. ¶ 14(f).   Again, the CPT calculations by Willig and now Guerin-Calvert are still inflated in IPPs' favor because they do not adjust for changes in overcharges over time. Ex. 415, Aug. 5, 2014 Willig Rep. ¶ 101.

### C. The Court should apply corrections for IPP Errors 1 and 2, resulting in well-founded reductions in any IPP damages.

Although Irico takes the position that zero or *de minimis* damages are most appropriate, the following chart summarizes the errors requiring correction and the resulting modified IPP damages amount, which, as set forth in Section V, should be further reduced to account for the inconsistent overcharge percentages and for duplicative damages:

---

[16] As above (*supra* at n.8), Netz's and Guerin-Calvert's reported IPP percentage overcharge estimates have been converted (from 22.0% and 1.6%%, respectively) to be expressed as a percentage of but-for prices instead of as a percentage of actual prices. Ex. 400, Guerin-Calvert Decl. ¶ 19.

**Summary of IPP Damages Estimates (in millions)**

| Time Period | Dr. Netz's Overcharge Model | | | Overcharge Estimates when Making Economically Appropriate Corrections to Dr. Netz's Overcharge Model (IPP Errors 1, 2) | | |
|---|---|---|---|---|---|---|
| | CDT | CPT | Total | CDT | CPT | Total |
| Original | $2,026.0 | $742.6 | $2,768.6 | $143.0 | $188.5 | $331.4 |
| Excluding Pre-1998 | $1,245.7 | $528.4 | $1,774.2 | $87.9 | $133.9 | $221.7 |

*See* Ex. 400, Guerin-Calvert Decl. ¶ 22. The total corrected damages estimate for CPTs and CDTs, excluding pre-1998 damages and correcting for IPP Errors 1 and 2, is $221.7 million.

**V.    The Court should apply further corrections for the conflicting and overstated overcharge percentages and duplicative damages by applying consistent, lower-bound overcharge percentages and reducing IPP damages by overlapping DPP damages.**

As outlined above, there are two aspects of both the IPPs' and DPPs' damages models: (1) the overcharge percentage and (2) the volume of purchases or commerce. Both aspects are duplicative in nature between the IPPs and DPPs, but in differing ways that should both be accounted for in the Court's determination of damages.

As for the first half of the equation—the overcharge percentages—the IPPs and DPPs purport to estimate the same CPT and CDT overcharges, but they arrive at different estimates as a result of different models and inputs. *See supra* at 6-7. As courts have recognized, while there may be competing damages models on the plaintiffs' side, "when two models [presented by plaintiffs' expert] produce different results, the question of which model is more accurate falls to the factfinder as part of a classic battle of the experts." *Orshan v. Apple Inc*., No. 5:14-CV-05659, 2024 WL 4353034, at *5 (N.D. Cal. Sept. 30, 2024). Because they purport to estimate the same overcharges, the Court should choose between the DPP and IPP estimates and also consider and apply the corrections set forth by Irico and Guerin-Calvert. Guerin-Calvert's corrections to each model also arrive at different corrected overcharges for CPTs and CDTs for DPPs and IPPs because they adjust different models. And, as explained above, while Guerin-Calvert's corrections to both the DPP and IPP models result in more realistic overcharge percentages, they do not correct for all errors, likely are conservative, and thus likely still overstate any actual overcharge. *See supra* at 19, 37. Because

her estimates likely are conservative and because it would be inconsistent to apply different overcharge percentages to measure the same CDT and CPT overcharges, the Court should therefore apply the lower-bound of Guerin-Calvert's overcharge percentages for CDTs and CPTs, highlighted below, when calculating both the DPP and IPP damages:

| Guerin-Calvert corrected overcharge percentages | DPPs | IPPs |
|---|---|---|
| CDTs | 7.0% | **1.6%** |
| CPTs | **1.5%** | 2.4% |

The second half of the equation—the volume of purchases—is directly impacted by the duplicative damages issue discussed above, where the IPPs and DPPs seek overlapping overcharge damages for the same purchases. *See supra* at Section IV.A. The Court can apportion IPP damages to avoid duplicative damages in accord with due process and the applicable state laws, by deducting all overlapping DPP damages from IPP damages. Irico's expert Guerin-Calvert has provided a methodology, based on public data, that can be used to estimate the magnitude of overlapping DPP and IPP damages. Ex. 400, Guerin-Calvert Decl. ¶¶ 9-15. This methodology includes two steps. IPPs are not claiming damages on exported CRTs, and on this basis there would be no overlap for such products. Thus, in the first step, Guerin-Calvert relies on Census data[17] to estimate the share of CRTs purchased directly in the U.S. by DPPs that were ultimately sold to consumers **outside** the U.S. (*i.e.*, exported). This step yields estimates that at most 34.4% of CDTs and CRT monitors and at most 7.2% of CPTs and CRT TVs that were purchased directly in the U.S. by DPPs were exported. This results in estimates that at least 65.6% of CDTs and CRT monitors and at least 92.8% of CPTs and CRT TVs purchased directly in the U.S. by DPPs were ultimately sold **inside** the U.S. Some of these CRTs (including in finished products) may not have been ultimately sold to IPPs. Thus, in the second step, Guerin-Calvert estimates the share of such CRTs that *were* ultimately sold to IPPs using share estimates prepared by IPP expert Netz. This estimate is 42%. These share estimates can be combined to yield the following baseline general formulas for the estimated duplicative damages.

---

[17] As part of the Parties' Stipulated Undisputed Facts regarding Damages Hearing, the Parties have stipulated to data from the Census Bureau and U.S. Bureau of Economic Analysis. ECF No. 6460 ¶¶ 2-3.

$$CDTs: Estimated\ Duplicative\ Damages\ = 27.6\% * DPP\ Damages$$

$$CPTs: Estimated\ Duplicative\ Damages\ = 39.0\% * DPP\ Damages$$

Ex. 400, Guerin-Calvert Decl. ¶ 14. Alternatively, if the Court applies *higher* percentage overcharges on CDTs and CPTs for DPPs than IPPs, the methodology and estimates can be stated in the following modified general formulas for estimating overlap and adjustments for overlap or duplicative damages (when the estimated overcharge percentages are expressed as a share of but-for prices):

$$CDTs: Estimated\ Duplicative\ Damages$$
$$= 27.6\% * DPP\ Damages * \left(\frac{IPP\ Overcharge\ \%}{DPP\ Overcharge\ \%}\right) * \left(\frac{1 + DPP\ Overcharge\ \%}{1 + IPP\ Overcharge\ \%}\right)$$

$$CPTs: Estimated\ Duplicative\ Damages$$
$$= 39.0\% * DPP\ Damages * \left(\frac{IPP\ Overcharge\ \%}{DPP\ Overcharge\ \%}\right) * \left(\frac{1 + DPP\ Overcharge\ \%}{1 + IPP\ Overcharge\ \%}\right)$$

*Id.* ¶ 15. Pursuant to due process and the applicable state laws, any estimated duplicative damages should then be deducted from any IPP damages, before any trebling.

## VI. Further supporting corrections to the Plaintiffs' models and calculations, other evidence demonstrates that the alleged conspiracy was not effective in raising CRT prices.

As memorialized by the Court, the DPPs, IPPs, and Irico all agree that the following is within scope of the pending damages issues: "the effectiveness of the alleged CRT cartel in substantially and consistently elevating CRT prices as relevant to determining the best estimate overcharges paid by Plaintiffs." ECF No. 6459 at 2. While both the DPPs' and IPPs' experts spend many pages on this issue (the effectiveness of the alleged conspiracy) in their reports, it does not result in concrete increases in their claimed damages. Irico submits this evidence to show that the ineffectiveness of the alleged conspiracy provides further support (in addition to all of the other evidence and arguments above) for the corrections and reductions in damages, set forth by Irico above and in its expert reports. That is, the available evidence analyzed by Irico's expert shows that the alleged conspiracy was likely ineffective in raising CPT and CDT prices and that the lower overcharges calculated by Irico's expert Guerin-Calvert, while still conservative, better measure any damages.

Specifically, the evidence shows that the CPT and CDT markets were not conducive for an effective conspiracy because:

(a) **CRT prices were constrained by LCD and plasma technologies**, which were rapidly replacing CRTs during the relevant time period. IPP Compl. ¶¶ 134, 160; DPP Compl. ¶¶ 107, 109. Competition from close substitutes constrains an alleged conspiracy's ability to maintain price increases on that product. Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. at 17 n.41. That effect played out in the CRT markets, where CDT prices declined faster than CPT prices after LCD computer products became more competitive in 2000, *id.* ¶ 23, and the prices of large CPT products declined faster than the prices of smaller CPTs after LCD and plasma TV products became more price competitive in 2002. *Id* ¶ 24.

(b) **CPTs and CDTs are heterogeneous products with opaque pricing.** CPTs and CDTs, and even within those product groupings, differ along many dimensions including size, shape, finish, type of mask, and dot pitch. *See* Ex. 402, April 27, 2022 Netz Rebuttal at 9; Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. ¶ 27. Differentiated products are harder for conspirators to monitor to ensure that their co-conspirators are following price increases. *See, e.g.*, DENNIS W. CARLTON & JEFFREY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION 159 (4th ed. 2015) ("Firms have more difficulty agreeing on relative prices when each firm's product has different qualities or properties. Each time a product is modified, a new relative price must be established. It is easier for a cartel to spot cheating when all it has to do is examine a single price. It is relatively difficult to detect price cutting that is achieved by an increase in quality; a firm could increase its quality and hold its price constant if it wanted to increase sales without explicitly violating the pricing agreement"). That difficulty is exacerbated by the fact that CRT pricing is determined by complicated formulas and different CRT customers require different payment terms. *See* Ex. 419, Mar. 27, 2013 D. Kim Dep. (Vol. 1) at 25-29.

(c) **The CRT industries were relatively unconcentrated.** Antitrust and economic literature recognize that conspiracies are more likely to be effective at raising prices in markets that are concentrated and less likely to be effective at raising prices in markets that are unconcentrated. *See* JOHN M. CONNOR, GLOBAL PRICE FIXING 34 (2d ed. 2008) ("Assuming that there are barriers to entry, the Stigler model and virtually all others predict that the expected market price under collusion will be positively correlated with the degree of seller market concentration."); LUIS CABRAL, INTRODUCTION TO INDUSTRIAL ORGANIZATION 137-138 (2000) ("[C]ollusion is more likely in concentrated industries than in fragmented ones. First, it is easier to establish a collusive agreement when there are few competitors than when there are many competitors...Moreover, it is easier to maintain a collusive agreement with few competitors."). Here, the DPPs and IPPs allege a large number of co-conspirators, spread around the globe. Indeed, in measuring market concentration for CPTs and CDTs separately, independent of the alleged conspiracy, DPPs' expert Johnson confirmed that both the CPT and CDT markets are relatively unconcentrated. Ex. 410, May 26, 2023 Johnson Rep. at 7 ¶ 17; *see also* Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. ¶ 31.

(d) **The dynamic nature of the CPT and CDT markets.** Under economic theory and as shown above with reduced overcharges when CPT and CDT market conditions are accounted for, alleged conspiracies are less likely to be effective in dynamic, evolving industries. *See e.g.,* Margaret C. Levenstein & Valerie Y. Suslow, *Breaking Up is Hard to Do: Determinants of Cartel Duration*, 54 J. L. & ECON. 455, 456 (2011) (stating that "[e]conomic theory identifies uncertainty as the primary cause of cartel instability"); Margaret C. Levenstein & Valerie Y. Suslow, *What Determines Cartel Success?* 64 J. ECON. LIT. 43, 48 (stating that "[b]ounded rationality and uncertainty may also make collusion difficult, particularly in a changing economic environment, because of increased complexity in formulating and monitoring any 'contract.'"). There is abundant evidence that the CRT industry, and CPT and CDT markets, were highly dynamic year-in and year-out—with peaks before and only during the early years of the class period, before being replaced by emerging technologies and becoming nearly obsolete by the end of the class period. *See supra* at 20-22.

(e) **CRT Suppliers differed in their level of vertical integration.** Economic literature states that collusion between firms with different levels of vertical integration is less feasible than

collusion between firms that are similarly integrated because it may be more difficult to detect at which point in the distribution chain cheating occurs. *See e.g.*, DENNIS W. CARLTON & JEFFREY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION 163 (4th ed. 2015) ("If some firms are vertically integrated . . . it may be difficult for the cartel to determine at what point in the distribution chain cheating occurs.") During the relevant time period, several large manufacturers including Hitachi, Mitsubishi, and Thomson were integrated with TV and/or monitor manufacturers while others like Chunghwa and Irico were not. Ex. #, Guerin-Calvert 7.21.2023 Report ¶ 33.

In addition to the above market conditions, the alleged conspiracy's actual pricing conduct was inconsistent with an effective conspiracy.  In particular, while the DPPs and IPPs allege that Defendants colluded in part by setting target prices, most CDTs and CPTs sold during the relevant time period were not subject to target prices.[18] Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. ¶ 37.  That is true across the DPPs' and IPPs' data. Using the DPPs' and Johnson's data of alleged target prices for manufacturer, application, size, quarter, and finish, Guerin-Calvert found that only 33.4% of global CDT revenue and 13% of global CPT revenue were subject to these target prices.  *Id.*  IPP expert Netz alleged that target prices she identified corresponded to 39% of CDT sales and 29.7% of CPT sales, Ex. 407, Apr. 15, 2014 Netz Rep. at 63, but Guerin-Calvert and Willig found that even these numbers were exaggerated. *See* Ex. 409, Aug. 5, 2014 Guerin-Calvert Rep. ¶ 68, Table 2 (adjusting Netz's target prices by month (instead of quarter) and shape alone reduces the share of CDT target prices identified by Netz to 16.4% of CDTs sold during the class period); Ex. 415, Aug. 5, 2014 Willig Rep. ¶ 33 (excluding instances when an allegedly matching target price is for a different manufacturer, month, or products reduces the share of CPT target prices identified by Netz to 17.4% of CPTs sold during the class period).

---

[18] Johnson and Netz attempt, but fail, to connect target prices with non-target CRTs by asserting that CRT prices exhibit a "price structure" and were correlated. *See* Ex. 405, Nov. 19, 2021 Johnson Rep. at ¶¶ 57, 62.  For example, Johnson's correlation analysis focuses on <u>average</u> prices across the many diverse types of CRT products, *see* Ex. 405, Nov. 19, 2021 Johnson Rep., Figures 9 and 13, and does not control for market factors that would affect the prices of all CDTs and CPTs. His analysis, thus, does little other than reinforce what Plaintiffs alleged in their complaints, that the prices of most CRT products generally declined during the relevant time period. On the other hand, Guerin-Calvert tested the effect of target prices on non-target prices by examining whether target prices were reliable predictors for the prices that individual customers paid for individual non-targeted CRT models. Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. ¶ 67. She found that using the prices of targeted CRTs to predict the prices of non-targeted CRTs had statistically significant chances of creating errors greater than 5%, 10%, and 15%. Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep. ¶ 69, Figure 13.

1    Moreover, the record also contains ample evidence that even when a target price was set for

2    a given type of CRT, manufacturers frequently priced below that target.  Irico's experts analyzed the

3    target prices identified by Johnson and Netz to determine how often Defendants set prices for

4    products lower than the target prices.  *See* Ex. 403, Jul. 21, 2023 Guerin-Calvert Rep., Figure 8

5    (54.5% of the CPT sales and 83.1% of the CDT sales with target prices identified by Johnson were

6    priced ***below*** the alleged target price during the quarter that Johnson identified the target price); Ex.

7    409, Aug. 5, 2014 Guerin-Calvert Rep. ¶ 70 (approximately 80% of CDTs for which Netz identified

8    a target price were sold below that target price); Ex. 415, Aug. 5, 2014 Willig Rep. ¶ 35 (60.4% of

9    CPT sales for which Netz identified a target price were priced below that target price).

10    Industry and documentary evidence in this case, identified and analyzed by Irico's expert,

11    are also inconsistent with an effective CPT and CDT conspiracy.  Indeed, the record contains

12    numerous examples of Defendants complaining about their alleged co-conspirators (notably, Irico

13    in multiple instances) pricing low and undercutting one another throughout the relevant time period.

14    *See supra* at n.6.  Overall, despite the number of alleged conspiracy meetings, the alleged conspiracy

15    was not effective at actual price-fixing or raising of CPT and CDT prices paid by direct and indirect

16    purchasers—providing additional bases for the Court's application of corrections and reductions to

17    the DPPs' and IPPs' damages models.

18    **VII.    After the Court determines damages, the Court should refuse to treble IPP damages under certain state laws and should offset past settlements from DPP and IPP damages.**

19

20    After determining actual damages, if any, the Court must also (a) determine whether IPP

21    damages can be trebled under the applicable state laws and based on the IPPs' pleadings; and (b)

22    offset past defendant settlements from DPP and IPP damages, after any trebling.

23    **A. Based on the IPPs' pleadings and the applicable statutes, the IPPs are not entitled to treble damages for certain state law claims.**

24    Not all state laws provide for automatic trebling of actual damages.  Instead, some laws

25    either: (a) do not provide for treble damages at all; (b) require an additional fact-finding of "flagrant"

26    and/or "willful" conduct for treble damages; or (c) leave it to the discretion of the court or factfinder.

27

28

On the first category, the following four states do not provide for treble damages or limit punitive damages:

- **Florida:** "In any action brought by a person who has suffered a loss … such person may recover actual damages, plus attorney's fees and court costs," with no provision for trebled, exemplary or punitive damages. Fla. Stat. Ann. § 501.211(2).[19]

- **Mississippi:** "Any person … may recover all damages of every kind sustained by him and in addition **a penalty of five hundred dollars** . . . such penalty may be recovered in each instance of injury." Miss. Code. Ann. §75-21-9 (emphasis added).

- **Nebraska:** "Any person … shall recover actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained … including a reasonable attorney's fee," with no provision for trebled, exemplary or punitive damages. Nebraska Rev. Stat. § 59-821; *see also* Neb. Rev. Stat. §59-1609 ("any person who is injured … may bring a civil action … to recover the actual damages … costs of the suit, including a reasonable attorney's fee, and the court may in its discretion, increase the award of damages to an amount which bears a reasonable relation to the actual damages … except that such increased award … **shall not exceed one thousand dollars.**" (emphasis added)).

- **Tennessee:** "Any person who is injured by any such arrangement, contract, agreement, trust … may sue for and recover … the full consideration of sum paid by the person for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust," with no provision for trebled, exemplary or punitive damages for private causes of action.  Tennessee Code Ann. §47-25-106(a).

On the second category, the Court has already found that, upon default and the Court's bar of evidence implicated by the Court's ordered sanctions, the issue of "whether Irico's conduct was flagrant and/or willful, as relevant to the award of non-automatic trebled damages under certain state laws underlying the IPPs' claims … may be argued but ***depend[s] on what is contained in the pleadings***." ECF No. 6459 at 2 (emphasis added); *see also* Ex. 413, Feb 5, 2025 CMC Tr. at 28:9-16 ("On the -- on the willful and flagrant, I believe the complaint alleges willful but doesn't allege flagrant. … THE COURT: Okay. And that's an allegations of the complaint issue. That's not an evidentiary issue."); *id.* at 35:20-36:5 ("Based on Mr. Margulies's comments, this seems to me to be a very simple -- perhaps consequential but nonetheless simple question for the Court, and that is, I read the complaint, and I -- and I look again at the legal standard in a default proceeding, and I decide whether your complaint satisfies that standard. And if Mr. Margulies wants to say, no, it doesn't,

---

[19] The IPPs only bring a claim under Florida's consumer protection statute and do not bring a Florida antitrust claim. *See* ECF No. 5589 at ¶ 282.

and you want to -- you know, that seems to me not to be in any way implicated by whatever the sanction order was. MR. ALIOTO: I agree with that analysis, Your Honor. It's certainly not an expert issue.").

Under that standard, to recover treble damages, the IPPs must have pleaded that the Irico Defendants' conduct was "willful" or "flagrant" under the following five state laws.[20]  As shown below, the IPPs in all of the below states **have not** so alleged and, thus, cannot be awarded treble damages for those claims.  *See* IPP Compl. ¶¶ 258 (Arizona), 262 (Iowa), 265 (Michigan), 285 (New Mexico), 273 (North Dakota).  In fact, the term "flagrant" does not appear at all in the IPPs' live complaint and "willful" appears twice, but for claims that do not require such finding[21]—showing that the IPPs could have but failed to make that allegation for claims that require it.

| IPP State | Relevant Statute | "Willful" or "Flagrant" Pleaded? |
|---|---|---|
| Arizona | "If the trier of fact finds that the violation is flagrant, it shall increase recovery to an amount not in excess of three times the damages sustained." Ariz. Rev. Stat. §44-1408(B). | NO |
| Iowa | "A person who is injured may bring suit to … recover, at the court's discretion, exemplary damages which do not exceed twice the actual damages … if all of the following apply: a) the trier of fact determines that the prohibited conduct is willful or flagrant. b) the person bringing suit is not the state …." Iowa Code Ann. §553.12(3). | NO |
| Michigan | "If the trier of fact finds that the violation is flagrant, it may increase recovery to an amount not in excess of 3 times the actual damages." Michigan Antitrust Reform Act §445.778(2). | NO |

---

[20] Notably, Arizona is the only state listed that mandates treble damages upon an additional "flagrant" finding; all of the other states provide that treble damages remain optional and discretionary, even after the additional finding.

[21] The IPPs allege "willful" conduct for only their claims under New York (IPP Compl. ¶ 286(m)) and Vermont (IPP Compl. ¶ 288(e)) laws.  But Vermont does not require a willful showing, instead leaving it to the court's discretion.  Vermont Stat. Ann. 9 § 2465(a).  The New York antitrust statute likewise does not have that requirement and the IPPs do not seek treble damages under New York's consumer protection statute, which does require a "willful" finding. IPP Compl. ¶ 286(m).

| IPP State | Relevant Statute | "Willful" or "Flagrant" Pleaded? |
|---|---|---|
| New Mexico[22] | "Any person who suffers any loss … may bring an action to recover actual damages or the sum of one hundred dollars ($100), whichever is greater. Where the trier of fact finds that the party charged … has willfully engaged in the trade practice, the court may award up to three times actual damages or three hundred dollars ($300), whichever is greater." New Mexico Stat. § 57-12-10(B). | NO |
| North Dakota | "If the trier of fact finds that the violation is flagrant, it may increase recovery to an amount not in excess of three times the damages sustained." North Dakota Cent. Code §51-08.1-08(3). | NO |

On the last category, treble damages "may" but are not required to be awarded under the following four state laws:

- **California**: "Any person … may sue … to recover three times the damages sustained by him or her, interest on his or her actual damages … and shall be awarded a reasonable attorneys fee together with the costs of the suit."  California Business and Professions Code § 16750(a).

- **Kansas**: "[P]laintiff in any action … may sue for and recover treble the actual damages sustained … the plaintiff may be allowed reasonable attorney fees and costs." Kan. Stat. Ann. §50-161(b).

- **New Mexico**: "[A]ny person … may bring an action for … up to threefold the damages sustained and costs and reasonable attorneys' fees. If the trier of fact finds that the facts so justify, damages may be awarded in an amount less than requested, but not less than the damages actually sustained."  New Mexico Stat. Ann. § 57-1-3(A).

- **Vermont:** "Any person who sustains damages or injury … may sue and recover … the amount of his or her damages … reasonable attorney's fees, and exemplary damages, not exceeding three times the value of the consideration given or damages sustained by the aggrieved person."  Vermont Stat. Ann. 9 § 2465(a).

Based on the IPPs' pleadings— which do not allege willful or flagrant conduct by Irico as to these states either and which instead allege Irico's late entry (3 years after the alleged conspiracy began) and minor role in the alleged conspiracy—discretionary treble damages are not warranted. The expert reports also confirm the Irico Defendants' minimal CPT and CDT market shares, in both markets but particularly the CDT market where Irico Group ceased production in 2002 and Irico

---

[22] In addition to this consumer protection claim, the IPPs have also brought a claim under New Mexico's state antitrust statute, which leaves the award of treble damages to the court's discretion, as cited below.

1    Display had no production, and the Irico Defendants' minimal participation in the alleged conspiracy

2    meetings where issues of Irico's low quality and low prices were discussed. *See supra* at 5-6.

3    Moreover, the duplicative trebled damages concerns, which would violate due process, likewise

4    warrant no trebling of these state law claims. *See supra* at 29-31.

5        In sum, no trebled damages should be awarded the IPPs for certain state law claims of: (a)

6    Florida, Mississippi, Nebraska, and Tennessee, based on no treble damages provided for by the

7    relevant statutes; (b) Arizona, Iowa, Michigan, New Mexico, and North Dakota, based on their

8    statutory requirements and the IPPs' failure to plead "willful" or "flagrant;" and (c) California,

9    Kansas, New Mexico, and Vermont, which do not mandate treble damages.

10        Because the IPPs bear the burden to but have not yet presented a method for apportioning

11    IPP damages, if any, among the IPP states, Irico reserves the right to object to, challenge, and assert

12    any arguments in response to any such presented method in addition to those asserted here.

13        **B. The Court must apply offsets for the past class action settlements.**

14        It is well-settled that, in antitrust conspiracy cases, other alleged conspirator and defendant

15    "settlement payments should be deducted from the damages after they have been trebled." *William*

16    *Inglis & Sons Baking Co. v. Cont'l Baking Co.*, 981 F.2d 1023, 1024 (9th Cir. 1992). Here, $212.2

17    million must be deducted from DPP trebled damages, and $580.75 million must be deducted from

18    IPP damages, after any trebling. *See supra* at 4 (citing ECF Nos. 5168, 5116, 6335, 6192).

19                                    **<u>CONCLUSION</u>**

20        For all the foregoing reasons, the Irico Defendants respectfully request that the Court adopt

21    their arguments and corrections, as well as their proposed findings of fact and conclusions of law.

22

23

24

25

26

27

28

1    Dated: April 28, 2025                    Respectfully submitted,

2

3                                            /s/ *Jeffrey B. Margulies*
                                            JEFFREY B. MARGULIES (Bar No. 126002)
4                                            KAYLEE YANG (BAR NO. 303464)
                                            Norton Rose Fulbright US LLP
5                                            One Embarcadero Center, Suite 1050
                                            San Francisco, California 94111
6                                            Telephone: (213) 892-9200
                                            Facsimile: (213) 892-9494
7                                            jeff.margulies@nortonrosefulbright.com
                                            kaylee.yang@nortonrosefulbright.com
8
                                            GERALDINE YOUNG (admitted *pro hac vice*)
9                                            1550 Lamar Street, Suite 2000
                                            Houston, Texas 77010
10                                           Telephone: (713) 651-5151
                                            Facsimile: (213) 651-5246
11                                           geraldine.young@nortonrosefulbright.com

12                                           *Attorneys for Defendants Irico Group Corp. and*
                                            *Irico Display Devices Co., Ltd.*
13

14

15                        **CERTIFICATE OF SERVICE**

16          I hereby certify that a true copy of the foregoing document was filed via CM/ECF on April

17    28, 2025, and as a result has been served on all counsel of record via transmission of Notices of

18    Electronic Filing generated by CM/ECF.

19

20                                           By: *Jeffrey B. Margulies*
                                            Jeffrey Margulies
21

22

23

24

25

26

27

28