R. Alexander Saveri (173102)
Geoffrey C. Rushing (126910)
Matthew D. Heaphy (227224)
David Y. Hwu (281780)
SAVERI & SAVERI, INC.
1016 Lincoln Boulevard, Suite 306
San Francisco, CA 94129
Telephone: (415) 217-6810
Email: rick@saveri.com
        grushing@saveri.com
        mheaphy@saveri.com
        dhwu@saveri.com

*Lead Counsel for Direct Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-CV-5944-JST |
| | MDL No. 1917 |
| This Document Relates to: | **DIRECT PURCHASER PLAINTIFFS' TRIAL BRIEF FOR DAMAGES HEARING** |
| *ALL DIRECT PURCHASER ACTIONS* | Date: May 19–21, 2025 |
| | Time: 8:30 a.m. to 1:30 p.m. |
| | Judge: Hon. Jon S. Tigar |
| | Ctrm: 6, 2nd Floor |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES ...................................................................................... iii

I.    INTRODUCTION ............................................................................................... 1

II.   PROCEDURAL HISTORY ................................................................................ 2

III.  LEGAL STANDARDS AFTER DEFAULT ..................................................... 3

    A. Identification of the "Well-Pleaded" Allegations of the Complaint Is Determined According to the Rules of Pleading Applicable on a Motion to Dismiss ................................................................ 4

    B. The Standard of Proof for Damages After Default Is Lenient ............................................. 5

    C. The Standard of Proof for Antitrust Damages Is Also Relaxed ............................................. 5

IV.   THE JOHNSON REPORT DEMONSTRATES TOTAL CLASS DAMAGES OF $1.011 BILLION ...................................................................................... 6

    A. The Court Has Previously Found Dr. Johnson's Work Is Methodologically Sound And Can Support an Award of Damages ........................................................ 6

    B. The Default Establishes the Core Facts Supporting Dr. Johnson's Opinions ....................... 7

    C. Dr. Johnson's Work Is Compelling Evidence of Damages ................................................. 8

    D. Ms. Guerin-Calvert's Report Does Not Cast Doubt On Dr. Johnson's Work In Any Material Way ............................................................................ 9

        1. Ms. Guerin-Calvert's Critiques of Dr. Johnson's Damages Model and Methodology Lack Merit ..................................................................... 10

            a. Ms. Guerin-Calvert's Assertion That CDT and CPT Overcharges Should Be Estimated Using Separate Datasets Is Unfounded ............................ 11

            b. Ms. Guerin-Calvert's Assertion that Dr. Johnson's Model Should Be Modified to Add 26 Conduct Variables Is Unfounded ............................. 11

        2. Ms. Guerin-Calvert's Modified Model Is Unreliable ................................................ 14

        3. Ms. Guerin-Calvert's Modified Model Does Not Support Her Proposed Reductions to Dr. Johnson's Damage Estimate ....................................... 16

    E. Dr. Johnson Accepted Two of Ms. Guerin-Calvert's Proposed Adjustments to His Computation of Class Sales ....................................................... 19

V.    IRICO'S CONTENTION THAT DPPS MUST OFFER PROOF OF ITS PARTICIPATION IN THE CRT CONSPIRACY PRIOR TO 1998 LACKS MERIT ......................................... 20

    A. The Court Has Already Held that the DPPCAC Adequately Pleads Irico's Participation in the Alleged Conspiracy from 1995 Through 2007 .................................... 21

i

B.  The DPPCAC Expressly Pleads Irico's Participation in the Conspiracy From its Beginning in March 1995 ............................................................................................ 23

C.  Irico's Assertion that the DPPCAC Fails to Plead that It Joined the Conspiracy in 1995 Is Baseless. ........................................................................................................... 25

D.  The DPPCAC Pleads Irico's Knowledge that it Was Joining a Pre-Existing Conspiracy to the Extent it Joined in 1998. ........................................................................... 27

E.  The Court Struck Irico's Affirmative Defense of Withdrawal; it also Lacks Merit. ........... 29

F.  The Evidence Demonstrates That Irico Participated In the Conspiracy from its Outset in 1995. ........................................................................................................... 29

VI.   CONCLUSION ........................................................................................... 30

DIRECT PURCHASER PLAINTIFFS' TRIAL BRIEF FOR DAMAGES HEARING;
Master File No. 07-CV-5944-JST

1

## **TABLE OF AUTHORITIES**

2

### **CASES**

3

*Adriana Int'l Corp. v. Thoeren*,
4     913 F.2d 1406, 1414 (9th Cir. 1990) ........................................................ 3, 6

5 *Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................. 22

6 *Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................... 22, 26
7

8 *Bigelow v. RKO Radio Pictures*,
    327 U.S. 251 (1946) .................................................................................... 6

9 *California v. ARC Am. Corp.*,
    490 U.S. 93 (1989) .................................................................................... 19

10 *Danning v. Lavine*,
11     572 F.2d 1386 (9th Cir. 1978) ............................................................... 3, 4

12 *Domanus v. Lewicki*,
    742 F.3d 290 (7th Cir. 2014) .................................................................. 5, 8

13 *Elektra Entm't Grp., Inc. v. Bryant*,
    No. CV 03-6381GAF (JTLX), 2004 WL 783123 (C.D. Cal. Feb. 13, 2004) ........................ 4, 5
14

15 *Fair Hous. of Marin v. Combs*,
    285 F.3d 899, 906 (9th Cir. 2002) ............................................................. 3

16 *Freeman v. Giuliani*,
    No. CV 21-3354 (BAH), 2023 WL 8472723 (D.D.C. Dec. 7, 2023) .................... 5, 27

17

18 *Geddes v. United Fin. Grp.*,
    559 F.2d 557, 560 (9th Cir. 1977) ...................................................... 3, 4, 23

19 *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481, 494 (1968) ........................................................................ 19

20 *Heber v. Toyota Motor Sales, U.S.A., Inc.*,
    823 F. App'x 512 (9th Cir. 2020) ............................................................ 25

21

22 *Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ................................................................................ 19

23 *In re Capacitors Antitrust*,
    No. 14-CV-03264-JD, 2016 WL 5724960 (N.D. Cal. Sept. 30, 2016), *supplemented sub
24     nom. In re Capacitors Antitrust Litig.*, No. 14-CV-03264-JD, 2018 WL 4558265 (N.D.
    Cal. Sept. 20, 2018) ................................................................................. 20
25

26 *In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    308 F.R.D. 606 (N.D. Cal. 2015) ........................................................... 7, 29

27 *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    546 F.3d 981 (2008) ................................................................................ 20

28

*In re HIV Antitrust Litig.*,
No. 19-CV-02573-EMC, 2023 WL 3011624 (N.D. Cal. Apr. 18, 2023)................................. 19

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
No. 07-MD-01819 CW, 2010 WL 5477313 (N.D. Cal. Dec. 31, 2010) .................................. 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. C 11-5765, 2013 WL 257148 (N.D. Cal. Jan. 23, 2013).................................................. 19

*Indus. Bldg. Materials, Inc. v. Interchemical Corp.*,
437 F.2d 1336 (9th Cir. 1970) .......................................................................................... 21, 27

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) .................................................................................................................. 5

*Rearden LLC v. TWDC Enters. 18 Corp.*,
722 F. Supp. 3d 1011 (N.D. Cal. 2024) (Tigar, J.)................................................................. 26

*Reid Bros. Logging Co. v. Ketchikan Pulp Co.*,
699 F.2d 1292 (9th Cir. 1983) ................................................................................................... 5

*Reisman v. United States*,
409 F.2d 789 (9th Cir. 1969) ................................................................................................... 29

*Sec. & Exch. Comm'n v. Shaohua Yin*,
No. 17-CV-972 (JPO), 2020 WL 6801915 (S.D.N.Y. Nov. 19, 2020) ..................................... 5

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ................................................................................................. 22

*United States v. Hui Hsiung*,
778 F.3d 738 (9th Cir. 2015) ................................................................................................... 20

*Vanngo v. Beauty Advisor, LLC*,
No. 21CV07035JSTAGT, 2022 WL 2289066, at *3 (N.D. Cal. Mar. 21, 2022), *report
and recommendation adopted*, No. 21-CV-07035-JST, 2022 WL 21768596 (N.D. Cal.
July 21, 2022) ............................................................................................................................ 5

*Yang v. Hardin*,
37 F.3d 282 (7th Cir. 1994) ................................................................................................. 4, 27

**RULES**

Rule 8(d), Federal Rules of Civil Procedure ............................................................................ 4, 23

**STATUTES**

Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a ........................................... 20

I.      **INTRODUCTION.**

Direct Purchaser Plaintiffs ("DPPs") submit this brief in support of their request for a damage award of $1.011 billion against Defendants Irico Group Corporation ("Group") and Irico Display Devices Co., Ltd. ("Display") (together, the "Irico Defendants" or "Irico").[1] Per the Court's order (ECF No. 6459), there are two main issues before the Court in the DPP case: 1) the amount of overcharges paid by the DPP class; and 2) "the appropriate start-date" of Irico's participation in the alleged conspiracy—i.e., whether DPPs' complaint pleads Irico's membership in the alleged conspiracy from its outset on March 1, 1995.[2]

As to the first issue, DPPs rely on the opinion of their expert economist Dr. Philip Johnson. Dr. Johnson is a well-qualified and experienced economist and his work (and the similar work of his predecessor Dr. Jeffrey Leitzinger) has already survived two rounds of attack by defendants (including Irico). In each case, the Court rejected Defendants' criticisms and found that Dr. Johnson's (and Dr. Leitzinger's) work could support a verdict. Dr. Johnson arrives at his damages estimate through conscientious application of the well-established "before and after" methodology informed by his extensive economic analysis of the record. There is no question but that his damage estimate of $1.011 billion is reasonable and well-supported by the evidence.

The work of Irico's expert witness, Margaret Guerin-Calvert, provides no basis to doubt Dr. Johnson's damage estimate. Ms. Guerin-Calvert asserts that Dr. Johnson's model fails to account for "omitted market factors" which she claims would have reduced the conspiracy's ability to maintain supra-competitive prices and would have caused the effectiveness of the conspiracy to vary substantially over time. Ms. Guerin-Calvert purports to modify Dr. Johnson's model to account for these "omitted factors" and, therefore, to more reliably estimate overcharges. On this basis, she asserts that $442 million is a more reasonable overcharge estimate.

However, as Dr. Johnson explains, none of the changes to his model made by Ms. Guerin-

---

[1] This brief is supported by the Declaration of R. Alexander Saveri Declaration in Support of DPPs' Trial Brief for Damages Hearing ("Saveri Decl.").

[2] Irico may also contend it withdrew from the conspiracy, but withdrawal is an affirmative defense which the Court has stricken.

Calvert are methodologically sound or supported by the evidence. She fails to provide evidentiary support for her claimed "omitted market factors." And the 34 additional variables Ms. Guerin-Calvert's modifications introduce into Dr. Johnson's model serve only to overburden the data and render the results of the Modified Model so unreliable that they cannot reasonably support any reduction of his overcharge estimate. In fact, the Modified Model produces "nonsensical" ***negative overcharge estimates*** for nine years (six for CPTs and three for CDTs)—i.e., indicating that the conspiracy caused prices to be ***lower*** than the competitive level. Even Ms. Guerin-Calvert concedes such estimates are "implausible," "unlikely" and in need of "correction". Nonetheless, she relies on these negative overcharges to arbitrarily "***zero[] out***" approximately $466 million in damages estimated by Dr. Johnson for those nine periods. In short, Ms. Guerin-Calvert's opinions provide no reasonable basis to lower Dr. Johnson's overcharge estimate in any amount.

Second, Irico asserts that its membership in the alleged conspiracy from its outset is not adequately pleaded, and, therefore, to obtain damages caused by the conspiracy before 1998, DPPs must prove Irico's participation before that time. This argument also fails. As the Court has already determined in its order denying Defendants' motion to dismiss, DPPs' complaint clearly alleges Irico's participation in the alleged conspiracy from its outset in March 1995. And even if Irico did not join until 1998, reasonable inferences from the complaint demonstrate that it knew it was joining an existing conspiracy, which also establishes its liability for the whole Class Period.

## II.        PROCEDURAL HISTORY.

On November 15, 2024, the Court adopted the Special Master's recommendation to grant "terminating sanctions based on Irico's discovery misconduct." ECF No. 6423 ("Sanctions Order") at 38. The Court found, *inter alia*, that "Irico's discovery misconduct has deprived Plaintiffs and any factfinder of ever knowing the true facts," struck Irico's answers and affirmative defenses, instructed the Clerk to enter Irico's default, and requested proposals "regarding how to determine damages." *Id.* at 36, 38. Irico and DPPs agreed that each party's disclosed expert reports regarding damages[3]

---

[3] The Expert Report of Phillip M. Johnson, Ph.D., dated November 19, 2021 (Saveri Decl., Ex. 200) ("Johnson Class Report"); the Reply Expert Report of Phillip M. Johnson, Ph.D., dated March 4, 2022 (*id.*, Ex. 201) ("Johnson Class Reply"); the Expert Report of Phillip M. Johnson, Ph.D., dated May 26, 2023 (*id.*, Ex. 202) ("Johnson Merits Report"); the Expert Rebuttal Report of Phillip M.

may be admitted into evidence, ECF No. 6465, but did not agree on the scope of the hearing. After

briefing and hearings, the Court ruled that Irico was limited to raising the following issues:

- The appropriate start-date and stop-date for calculating damages based on Irico's temporally limited involvement in the alleged conspiracy;

- The effectiveness of the alleged CRT cartel in substantially and consistently elevating CRT prices as relevant to determining the best estimate overcharges paid by Plaintiffs;

- Whether overcharges paid by Plaintiffs on CRT products are best determined by analyzing the CPT (color picture tubes, used in televisions) and CDT (color display tubes, used in computer monitors) markets separately;

- The extent to which overcharges paid by Plaintiffs for CRT products varied over time; and

- The impact of competition CRT products faced from LCD and plasma technology on CRT prices in the but-for world.

ECF No. 6459. The first issue is to be decided solely on the pleadings. *Id.* at 2.[4]

## III.    LEGAL STANDARDS AFTER DEFAULT.

The rules for determining damages after a default are well-established. Consistent with the

Sanctions Order, the default conclusively establishes both the liability of the defaulting defendant

and the factual allegations of the complaint supporting that liability, but not the amount of damages.

> Upon entry of a default judgment, facts alleged to establish liability are binding upon the defaulting party, and those matters may not be relitigated on appeal. However, it follows from this that facts which are not established by the pleadings of the prevailing party, or claims which are not well-pleaded, are not binding and cannot support the judgment.

*Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978) (citations omitted); *see also Adriana Int'l*

*Corp. v. Thoeren*, 913 F.2d 1406, 1414 (9th Cir. 1990) (default "conclusively establishes" liability);

*Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002) (general rule "is that well-pled

allegations in the complaint regarding liability are deemed true"). Allegations relating to the amount

of damages are not established. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977).

Johnson, Ph.D., dated September 1, 2023 (*id.*, Ex. 203) ("Johnson Merits Rebuttal"); the Expert Report of Margaret E. Guerin-Calvert, dated July 21, 2023 (Direct Purchaser Actions) (*id.*, Ex. 204) ("Guerin-Calvert DPP Report"); and the Errata to the Expert Report of Margaret E. Guerin-Calvert, dated August 2, 2023 (*id.*, Ex. 205).

[4] DPPs understand that the "appropriate apportionment of duplicative damages between DPPs and IPPs" is not an issue in the DPP case. *See infra* note 17.

3

**A.  Identification of the "Well-Pleaded" Allegations of the Complaint Is Determined According to the Rules of Pleading Applicable on a Motion to Dismiss.**

An attack on the sufficiency of the pleadings in the default context is governed by ordinary rules of pleading under the Federal Rules. *See Danning*, 572 F.2d at 1388–89 ("Pleadings under the Federal Rules should be liberally construed, and 'a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim.'"); *see also id.* at 1388 (pleadings governed by Rule 8). In *Geddes*, the Court explained that the "general rule" that "well-pleaded" allegations are deemed true is based on Rule 8(d): "Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading." 559 F.2d at 560 (quoting Rule 8(d)). A "well-pleaded" allegation is thus one that the Defendant must admit or deny under Rule 8(d). *See Geddes*, 559 F.2d at 560.

In *Danning*, the court rejected the defaulter's challenge to the complaint despite the fact that it pleaded the essential fact of insolvency "only in general terms." *Danning*, 572 F.2d at 1188–89 (pleading "ultimate fact" of insolvency suffices). Similarly, in *Yang v. Hardin*, 37 F.3d 282, 286 (7th Cir. 1994)—a 43 U.S.C. § 1983 civil rights action—the court held that it was error to allow the defaulting defendant to challenge liability by offering proof that he had no opportunity to intervene on the plaintiff's behalf, where it could be reasonably inferred from the allegations of the complaint. *See id.* at 285 ("Although Yang's complaint fails to *explicitly* specify the existence of an opportunity for Officer Hardin to have intervened, the facts demonstrate several opportunities during which Hardin could have acted.") (emphasis in original). The court explained:

> If Hardin had not defaulted, he could have offered evidence either that there was no reasonable opportunity for intervention or no reasonable method by which to intervene. However, absent such evidence, the existence of a reasonable time for intervention and a reasonable probability of success, which flows from the facts set out in the complaint, will be presumed true. Accordingly, the district court erred by making factual findings contrary to the uncontested facts.

*Id.* at 286. *See also Elektra Entm't Grp., Inc. v. Bryant*, No. CV 03-6381GAF (JTLX), 2004 WL 783123, at *2 (C.D. Cal. Feb. 13, 2004) ("If proximate cause is properly alleged in the complaint, it is admitted upon default. Injury is established and plaintiff need prove only that the compensation

sought relates to the damages that naturally flow from the injuries pled.") (citation omitted).

Finally, courts have held that where, as here, the court has previously determined that the complaint states a cause of action, that order disposes of challenges to the sufficiency of the complaint at the default stage. *See, e.g., Sec. & Exch. Comm'n v. Shaohua Yin*, No. 17-CV-972 (JPO), 2020 WL 6801915, at *3 (S.D.N.Y. Nov. 19, 2020) (relying on previous order because "abundant authority establishing that the legal sufficiency of a complaint is reviewed under the same standard whether on a motion to dismiss or a motion for default judgment"); *Freeman v. Giuliani*, No. CV 21-3354 (BAH), 2023 WL 8472723, at *3 (D.D.C. Dec. 7, 2023) (previous order).

### B.  The Standard of Proof for Damages After Default Is Lenient.

Following default, "Plaintiff's burden in 'proving up' damages is relatively lenient." *Elektra Entm't*, 2004 WL 783123, at *2. Even "speculation has its place in estimating damages" where defendant's "conduct impedes quantification." *Domanus v. Lewicki*, 742 F.3d 290, 302–03 (7th Cir. 2014) ($413 million default judgment after terminating sanction for discovery misconduct in RICO action). *See also Vanngo v. Beauty Advisor, LLC*, No. 21CV07035JSTAGT, 2022 WL 2289066, at *3 (N.D. Cal. Mar. 21, 2022), *report and recommendation adopted*, No. 21-CV-07035-JST, 2022 WL 21768596 (N.D. Cal. July 21, 2022) (plaintiff had "done enough to prove up" compensatory damages by submitting invoice provided to non-party for similar services).

### C.  The Standard of Proof for Antitrust Damages Is Also Relaxed.

In addition, a "lightened burden of proof is imposed on a plaintiff seeking to prove antitrust damages once violations of the law have been established." *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1299 (9th Cir. 1983) (collecting cases). The Supreme Court's "willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages" given that the "vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation" and "that it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67 (1981). Thus, reasonable estimates and inferences based on relevant data are permissible; speculation and guesswork are not. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264

5

(1946) ("Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain.").

## IV.    THE JOHNSON REPORT DEMONSTRATES TOTAL CLASS DAMAGES OF $1.011 BILLION.

The Johnson Reports provide compelling evidence that the class suffered total damages in the amount of $1.011 billion. Johnson Merits Rebuttal ¶ 127. There can be no question that Dr. Johnson's opinion well exceeds the low standards of proof applicable to a damages proceeding following a default, as well as to antitrust damages in general. First, the Court has already ruled that Dr. Johnson's opinions (as well as Dr. Leitzinger's reports) were sufficient to support a verdict in a full-blown merits trial. ECF No. 6042 ("Irico Class Order") at 11–12.

Second, it is clear that his damages estimate is overwhelmingly supported by the evidence and compels a damages award consistent therewith. Indeed, because Irico has defaulted, the facts supporting Dr. Johnson's work are "conclusively established" and the lowered standard of proof discussed above applies. *See Adriana Int'l*, 913 F.2d at 1414.

In these circumstances, it is inarguable that Dr. Johnson's report is more than sufficient to support an award of $1.011 billion.

### A.  The Court Has Previously Found Dr. Johnson's Work Is Methodologically Sound And Can Support an Award of Damages.

At class certification, the Court expressly found that Dr. Johnson's report and methodology are sufficient to support a verdict. Irico Class Order at 8 ("the Court agrees with DPPs that Johnson's expert analysis is capable of demonstrating antitrust impact and damages on a classwide basis"). As to Dr. Johnson's damages methodology, the Court stated:

> As the Court previously concluded when considering Leitzinger's damages model, which is substantially similar to Johnson's, *compare id.* ¶¶ 72-80 (Johnson) *with* ECF No. 5191-2 at 164-71 (¶¶ 64-72) (Leitzinger), the Court "is satisfied that DPPs have shown by a preponderance of the evidence that there is a viable methodology DPPs could present at trial to show damages (irrespective of whether such a methodology would ultimately succeed)." *In re: CRT*, 308 F.R.D. at 629-30.

*Id.* at 11–12. The Court rejected Irico's objections to Dr. Johnson's damages analysis—that it included products not affected by the conspiracy, did not account for purported Chinese price floors,

and that it included damages for the time period Irico claims it did not participate in the conspiracy (i.e., pre-1998). *See id.* at 11–12 ("None of Irico's arguments regarding damages is persuasive.")[5]

Similarly, as the Court noted, Judge Conti also found that the Leitzinger Reports were sufficient to support findings of damages and impact at trial. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 624 & n.33 (N.D. Cal. 2015) ("Mitsubishi Class Order").[6]

**B. The Default Establishes the Core Facts Supporting Dr. Johnson's Opinions.**

While Dr. Johnson's work is well-supported by the evidence, the "general rule" applicable to default also establishes the core factual basis of the Johnson Reports. As explained above, liability, the "well-pleaded" factual allegations in the Direct Purchaser Plaintiffs' Consolidated Amended Complaint (ECF No. 436) ("DPPCAC") supporting that liability, and all reasonable inferences therefrom are now "conclusively established" against Irico.

These facts include: the existence and effective operation of the CRT conspiracy for over 12 years (*see, e.g.*, DPPCAC ¶¶ 3–6, 134–153); Irico's participation in the conspiracy from its outset in March 1995 (discussed in detail below) (*id.* ¶¶ 3–6, 134, 135, 214); the operation of the conspiracy via over 500 group and bilateral meetings between 1995 and 2007 (*id.* ¶ 134); that the conspiracy regularly collected and exchanged extensive confidential information regarding past and future pricing, sales, production, production capacity, and customers (*id.* ¶¶ 5, 138, 142); that the

---

[5] The Court also rejected Irico's attacks on Dr. Johnson's analysis demonstrating antitrust impact—i.e., that the conspiracy was effective and raised prices to all class members. *See, e.g., id.* at 8 (Irico's assertion (relying on the Willig report) that Dr. Johnson's conclusion that 94% of products subject to the conspiracy were the subject of "target prices" overstates the number of target prices is "unpersuasive"); 9 (rejecting attacks on Dr. Johnson's "regression analyses"); 9 (rejecting attacks on correlation analysis); 9–10 (rejecting Irico's assertion that "Johnson failed to account for differentiations between CRT products, including the different demand that results from products that are not interchangeable, and the difficulty with changing production lines from one product to another."); 10–11 (rejecting Irico's assertion Dr. Johnson improperly used averages to obscure variability in CRT pricing). *See also id.* at 10 (Irico's "criticisms go to the weight of the testimony and not to whether DPPs have put forth evidence that is capable of demonstrating classwide impact of the alleged conspiracy").

[6] Judge Conti thoroughly and painstakingly reviewed the Leitzinger Reports, and rejected all of Mitsubishi's myriad attacks on them. *Id.* at 617–30. *See also id.* at 628 ("The Court finds that the DPPs have presented a functioning model tailored to the facts of the case, using aggregate data to produce a coherent, efficient model based on the available data, and avoiding the risk of using overly granular data sets that would have produced unreliable or statistically meaningless data.").

conspirators regularly made agreements regarding price, production, and customer allocation (*id.* ¶¶ 3–5, 144–146); and that the conspirators regularly monitored and enforced those agreements. *Id.* ¶¶ 5, 146, 153. The fact that the conspiracy actually raised prices—i.e., antitrust impact—is also "conclusively established." The DPPCAC contains almost continuous allegations (or reasonable inferences therefrom) that throughout the Class Period the conspiracy caused prices for CRT Products to be substantially higher than competitive prices. *See, e.g., id.* ¶¶ 139, 197–199, 218. The DPPCAC also alleges facts supporting Dr. Johnson's opinions that the structure of the CRT industry was conducive to effective price fixing. *See, e.g., id.* at ¶¶ 112–121 (market concentration, relationships between manufacturers).[7]

These established facts preclude evidentiary challenge by Irico and invalidate any opinions by Irico's expert witness, Ms. Guerin-Calvert, that are based on a contrary view of the facts. *See Domanus*, 742 F.3d at 303 (precluding after default attacks on factual basis for plaintiff expert witness's damage estimate where facts established by pleadings).

### C. Dr. Johnson's Work Is Compelling Evidence of Damages.

It is also clear, consistent with the Court's previous observations, that Dr. Johnson's Reports and damages estimate provides more than sufficient evidence for a damage award of $1.011 billion.

Dr. Johnson's damage model determines the difference between the prices actually charged for CRTs during the class period and prices in a "but for" world absent the conspiracy. It is therefore tied closely to the DPPs' theory of liability. Johnson Class Report ¶¶ 72–80; Johnson Merits Report ¶¶ 50–56. Dr. Johnson uses well-established econometric techniques—a reduced form regression analysis "widely employed by economists" (Johnson Class Report ¶¶ 72–73)—to compare prices during the conspiracy period with prices from "before" and "after" while controlling for material changes in the market. Johnson Class Report ¶¶ 72–80; Johnson Merits Report ¶¶ 50–56.

Dr. Johnson's model is designed to measure the importance of past prices in determining future prices, as well as the direct effect on prices of an active conspiracy. Johnson Class Report

---

[7] The Court has also twice found by a "preponderance of the evidence" that the conspiracy exists. Mitsubishi Class Order, 308 F.R.D. at 625; Special Master's Report & Recommendation Re: Admissibility of Coconspirator Documents and Statements. ECF No. 6074, attachment at 10–12; adopted by the Court at ECF No. 6093.

¶¶ 77–79, figs.16–18; Johnson Merits Report ¶¶ 50–56. Dr. Johnson's model includes variables to account for the pricing effects of relevant aspects of the CRT markets: 1) the cost of glass for CRT manufacturing; 2) the previous period CRT quantity of sales; 3) the LCD share of total LCD-CRT sales; 4) the G7 Industrial Production Growth and G7 Unemployment Rate; 5) technological and other trend-inducing market factors; and 6) the type of CRT product. Johnson Merits Report ¶ 52. Dr. Johnson's model estimates average overcharges for CDTs of 10.7% and for CPTs of 6.1%. *Id.* ¶ 54. Dr. Johnson computes damages to the class totaling $1.011 billion based on these overcharge estimates. Johnson Merits Rebuttal ¶ 127.[8]

Dr. Johnson's damage estimate is supported by his examination of the evidence relating to the structure of the CRT market and the effective operation of the conspiracy, including statistical analysis, demonstrating common impact. Dr. Johnson has demonstrated several reasons why the conspiracy would have been effective—i.e., would have raised prices substantially to class members throughout the Class Period. Johnson Merits Report ¶¶ 47–48. These include: 1) the structure of the CRT industry and the conspirators' activities; 2) the fact that the Defendants' collusive activities would only make economic sense if they raised prices and profits given legal risks; 3) documentary evidence showing that the conspirators' conduct was intended to raise prices and that the conspirators' recognized that their conduct was having such an effect; and 4) Dr. Johnson's target price analysis showing that Defendants' price fixing agreements raised prices. *Id.*[9]

There can be no question that Dr. Johnson's damage estimate is reasonable and well-supported by the facts established by default and the evidence.

**D. Ms. Guerin-Calvert's Report Does Not Cast Doubt On Dr. Johnson's Work In Any Material Way.**

Ms. Guerin-Calvert's report and opinions do not undermine or cast doubt on Dr. Johnson's conclusions. First, Ms. Guerin-Calvert's critiques of Dr. Johnson's conclusions and methodology

---

[8] Dr. Johnson's damage estimate is decreased from $1.085 billion because he made two adjustments in response to the Guerin-Calvert DPP Report. *See* Johnson Merits Rebuttal ¶¶ 127.

[9] Other economic evidence also demonstrates impact to DPP class members. *Id.* ¶ 48 (conspiracy was global and the United States was one of largest CRT consumers in world; close relationship between CRT prices in North America, China and the rest of world; target price analysis shows impact on North American prices).

DIRECT PURCHASER PLAINTIFFS' TRIAL BRIEF FOR DAMAGES HEARING;
Master File No. 07-CV-5944-JST

lack all merit, as he explains in his Rebuttal Report. Ms. Guerin-Calvert's opinions are contrary to the evidence in this case and her claims are methodologically unsound. As noted, Ms. Guerin-Calvert admits that her proposed modifications to Dr. Johnson's model (hereinafter, her "Modified Model") produce "implausible" negative overcharges. Fully half of her results for CPTs—i.e., six years—are negative; three years of CDT estimates are negative. Dr. Johnson explains that these "nonsensical results" alone are sufficient to disregard the results of her Modified Model. *See, e.g.,* Johnson Merits Rebuttal ¶ 111 ("nonsensical" estimates), 116 (same), 118 ("nonsensical results").

Second, despite the demonstrated unreliability of her Modified Model, she nonetheless offers it as a basis for awarding damages. While Ms. Guerin-Calvert concedes via her Modified Model that the class suffered $442 million in overcharges based on class purchases identified by Dr. Johnson, her model provides no reasonable basis to reduce Dr. Johnson's estimates in any amount. Indeed, she admits that she achieves the great bulk of her reduction of Dr. Johnson's estimate by simply and arbitrarily "zeroing out" damages for the years her model finds negative overcharges. Dr. Johnson's model estimates $466 million in damages for those periods

### 1. Ms. Guerin-Calvert's Critiques of Dr. Johnson's Damages Model and Methodology Lack Merit.

Ms. Guerin-Calvert's primary contention is that Dr. Johnson's damages model does not "account for important market conditions or factors and are inconsistent with key aspects of the relevant market." Guerin-Calvert DPP Report ¶ 79. She contends that market forces affected CDTs and CPTs in different ways and therefore that—although Dr. Johnson's model allows for and in fact produces different overcharge estimates for CDTs and CPTs—Dr. Johnson improperly pools data for CPTs and CDTs. In addition to supposed different market forces—principally the effect of competition from LCDs technology—she asserts that the similar yearly overcharges Dr. Johnson's model produces for each product are "implausible." She therefore modifies Dr. Johnson's model in various methodologically incorrect ways to produce a model that she claims "can provide more reliable estimates of overcharges." *Id.* at ¶¶ 92–94; *see* Johnson Merits Rebuttal ¶¶ 89, 91, 92–118.

Dr. Johnson explains that Ms. Guerin-Calvert's assertions are incorrect and unsupported by the evidence, and that the modifications she proposes are both unnecessary and result in a much

weaker model because they impose excessive burdens on the data—i.e., 34 additional variables—and, as a result, produce unreliable results. *See, e.g., id.* ¶¶ 111, 116, 118.

### a. Ms. Guerin-Calvert's Assertion That CDT and CPT Overcharges Should Be Estimated Using Separate Datasets Is Unfounded.

First, Dr. Johnson explains that it "is not necessary to estimate separate CDT and CPT variables for all controls." *Id.* ¶ 93. Doing so, as Ms. Guerin-Calvert suggests, introduces "an additional 11 variables into the regression for each product type," which places a higher burden on the data without necessarily improving the accuracy of the model. *Id.* ¶ 94.[10] Moreover, modifying Dr. Johnson's model in this fashion—while possible—still produces substantial overcharges for both CDTs and CPTs. Indeed, they are materially higher than Dr. Johnson's unmodified model: 17.3% as opposed to 10.7% for CDTs; 6.5% as opposed to 6.1% for CPTs. *Id.* ¶ 95, fig.10. Despite the higher overcharge estimates, Dr. Johnson declines to adopt this modification because, in his opinion, the results are less reliable. *See id.* ¶¶ 91(a), 95.

### b. Ms. Guerin-Calvert's Assertion that Dr. Johnson's Model Should Be Modified to Add 26 Conduct Variables Is Unfounded.

Ms. Guerin-Calvert's assertion that Dr. Johnson's model should be further modified by the addition of 26 conduct variables is also incorrect. Again, as Dr. Johnson explains, Ms. Guerin-Calvert's reasoning is methodologically incorrect and the additional variables substantially weaken the model by overburdening the data. *Id.* ¶¶ 91, 96–111.

First, Ms. Guerin-Calvert misperceives the purpose of Dr. Johnson's model, which is to provide a reliable estimate of total class-wide damages, not to "generate separate estimates of the alleged cartel's impact at each point in time, regardless of the reliability of those estimates." *Id.* ¶¶ 98, 99. Separate estimates have no utility unless tied to the evidence, and, as discussed below, Dr. Johnson's model includes a separate period where the evidence supports a period of lessened effectiveness. *See id.*

Second, Ms. Guerin-Calvert's claim that "material changes in market conditions during this

---

[10] Dr. Johnson also notes that 7 of the 11 introduced variables fail to produce statistically significant results which suggests that they do not affect CDTs and CPTs differently as Ms. Guerin-Calvert asserts. *Id.* ¶ 94.

period call into question the plausibility that the cartel impact remained constant for the first eleven years of the class period" is unsupported by evidence. She provides no **evidence** supporting her repeated claims of frequent changes in cartel effectiveness or the "material changes in market conditions" she claims cause them. And her claim that estimates produced by Dr. Johnson's model do not reflect periods of lessened conspiratorial effects is also wrong, as Dr. Johnson explains:

> My model does account for a gradual onset and end of the impact of the cartel due to the persistence of CRT prices, and does allow for the possibility that the alleged conspiracy had a diminished impact in the last few quarters, because there was evidence that suggested that the effectiveness of the alleged conspiracy may have decreased after Q1 2006.

*Id.* ¶ 99. Further, Dr. Johnson does not claim that the conspiracy had a uniform impact on prices throughout the conspiracy period, and, to the extent there was a period of lessened conspiratorial effectiveness, the lower overcharge estimates would be reflected in the overcharges identified by his model. *See id.* ¶ 98–99. As Dr. Johnson concludes:

> Ms. Guerin-Calvert has not provided any documentary or empirical evidence in support of the drastic year-by-year disaggregation that she performs. Her analysis is, therefore, unsupported and inappropriate.

*Id.* ¶ 99.

Ms. Guerin-Calvert's claim that her comparison of target prices to actual prices achieved by the conspiracy shows variation in the conspiracy's effectiveness is also incorrect. *Id.* ¶ 100. First, it does not address all of the ways in which the conspiracy's activity affected prices. In addition to pricing agreements, the conspiracy also involved information exchange, output restraints and shutdowns, among other things. *Id.*[11] Second, Ms. Guerin-Calvert "fails to recognize that the data she uses are not appropriate for her task" because the rate of growth of CRT prices changed over time and because of a mismatch in the comparison between the target prices and the average quarterly prices—i.e., target prices were set for the beginning of a quarter while the average quarterly price includes prices later in the quarter. *Id.* ¶ 101. The failure to account for the evolution

---

[11] For example, as Dr. Johnson shows, production restraints—including shutdowns—were an important component of the conspiracy throughout its existence. *See e.g.,* Johnson Class Report, ¶¶ 44–49, fig.8; *id.*, app. B (listing 186 communications regarding production levels from 1995 through 2006).

of actual transaction prices over the quarter means that her "observation of variability in actual vs target prices are irrelevant and misleading." *Id.* ¶¶ 101–104.

The only other specific factor Ms. Guerin-Calvert identifies to support her claim of "changing market conditions" that Dr. Johnson's model does not account for is "the introduction of Windows95 and the expanding functionality and performance of desktop computer hardware and software." Guerin-Calvert DPP Report ¶ 90. Again, however, she is wrong. She offers this explanation attempting to explain why her Modified Model estimates substantial *negative* CDT overcharges for 1997 and 1998. *Id.* ¶ 89. She asserts (misleadingly attributing the negative estimates to "Dr. Johnson's model"):

> A closer look at this modified model and its annual overcharge estimates reveals a further problem in Dr. Johnson's original model: Dr. Johnson's model does not adequately control for changing market conditions to differentiate factors other than alleged conduct that influence price. This is revealed by the ***implausible estimates it produces for 1997 and 1998***, for example. For these years, Dr. Johnson's model estimates that CDT prices were on average (7.5% and 10.6% lower than their but-for level in 1997 and 1998, all else equal. ***It is unlikely that a cartel would lower prices below the competitive level for a sustained period of time.*** Instead, the more plausible explanation is that Dr. Johnson's model does not adequately control for changing conditions in the CDT marketplace. In particular, it is likely that CDT prices declined rapidly in 1997 and 1998 due to reductions in CDT demand and cost that are not controlled for in Dr. Johnson's overcharge model and are thus mistakenly attributed to the alleged cartel.

*Id.* (footnotes omitted) (emphases added). Dr. Johnson explains that these purported "negative overcharges" and Ms. Guerin-Calvert's attribution of them to his model's failure to control for "reductions in CDT demand and cost" are nonsense. While Dr. Johnson agrees with Ms. Guerin-Calvert that her negative overcharges are "implausible" and that it is unlikely that a cartel would lower prices below the competitive level for a sustained period of time, he does not agree that they are attributable to flaws in his model. S*ee* Johnson Merits Rebuttal ¶¶ 105, 106, 110, 115. Rather, they are the result of Ms. Guerin-Calvert "overburdening the model by disaggregating the conduct variable by year." *See id.* ¶¶ 111–116.

First, Ms. Guerin-Calvert's assertions that his model does not control for CDT demand is simply wrong, particularly as it relates to competition from LCDs. *See id.* ¶¶ 7; 106–07 ("My model includes lagged CRT quantity, LCD share, glass prices, and a quadratic trend variable which control

13

declining CDT demand and costs."). Further, Ms. Guerin-Calvert identifies no additional variables she believes should be added to Dr. Johnson's model to control for omitted market factors. *Id.* ¶ 106. Indeed, "[i]n her deposition, she could not recommend a single market factor to be included as an additional control." *Id.*

Second, to further analyze Ms. Guerin-Calvert's "hypothesized omitted controls," Dr. Johnson performed additional tests. Each confirmed that her speculative critiques of his model were unfounded. Dr. Johnson added a variable for worldwide desktop shipments to test whether his model failed to account for any "demand shock" due to the introduction of Windows95, as claimed by Ms. Guerin-Calvert. Including this variable did not substantially affect estimated overcharges. Indeed, it produced slightly higher overcharges. *Id.* ¶ 108. "Therefore, Ms. Guerin-Calvert's speculation that my model attributes CDT demand shocks to overcharges is false." *Id.*

Dr. Johnson also tested Ms. Guerin-Calvert's claim that his model was flawed because it "track[ed] sales at a model level instead of aggregate CRT sales." *Id.* ¶ 109. Again, "Ms. Guerin-Calvert's claim was unsupported and my additional sensitivity analyses dispenses with her hypothesized justification." *Id.* Finally, Dr. Johnson performed a sensitivity regression using variables previously suggested by Ms. Guerin-Calvert. Again, this analysis rejected her claims, and, again, found slightly higher overcharges. *Id.* ¶ 110. In short, Ms. Guerin-Calvert's criticisms of Dr. Johnson's model are baseless:

> Therefore Ms. Guerin-Calvert's speculation that my model does not adequately control for changing market conditions was false and is not a valid justification for overburdening the model by disaggregating the conduct variable by year (such that it produces estimates Ms. Guerin-Calvert and I agree are implausible and nonsensical).

*Id.* ¶ 111, fig.13.

## 2.   Ms. Guerin-Calvert's Modified Model Is Unreliable.

Ms. Guerin-Calvert's claims that her modifications to Dr. Johnson's model are "minor" and serve only to build "flexibility" into the model are not as innocuous as they sound. In fact, "by splitting the conduct variable for 13 periods for each product [CDTs and CPTs] she introduces 26 conspiracy indicator variables that the regression must estimate compared with the four variables in [Dr. Johnson's] original model." *Id.* ¶ 112. In addition, by evaluating CDTs and CPTs separately,

14

she introduces additional controls, and also substantially reduces the data for each by splitting it, further burdening the data. *Id.* ¶ 91(a). *See also id.* ¶ 94.

As shown above, none of these modifications are methodologically sound or justified by the evidence. They result in a model—as shown by its nonsensical results—which is so unreliable as to provide no basis to reduce Dr. Johnson's damage estimates in any amount. As Dr. Johnson explains:

> . . . the detrimental effect of such excessive disaggregation is that it imposes an unnecessarily high burden on the model and reduce[s] the reliability of the class-wide impact estimate for the alleged conspiracy. This means the model has to evaluate an indicator for each year and product (26 indicators) against the average prices in the benchmark period (before and after the conspiracy period), while also controlling for multiple variables in the model. This makes each estimated overcharge effect more error prone. When evaluating 26 conspiracy indicators, there is less precision and a substantially greater chance that the regression model will produce erroneous estimates for those indicators – not because the conspiracy was ineffective but because the estimate is associated with substantial imprecision.

*Id.* ¶ 113.[12]

Ms. Guerin-Calvert nowhere presents a fair and complete explanation of the patently unreliable results of her "Modified Model." While she admits that her model finds "implausible" negative overcharges for CDTs in 1997 and 1998, in fact her model finds negative overcharges for nine years—more than a third of her model's 26 yearly estimates. *See id.* ¶ 116. Thus, for CPTs, her Modified Model finds negative overcharges in six years (1997, 1998, 2002, 2003, 2004 and 2005)—i.e., half of the Class Period. *See id.* (six CPT estimates negative). For CDTs, the Modified Model estimates negative overcharges for three years (1997, 1998 and 2003). *See id.*[13]

The sheer number of "nonsensical" negative overcharges and the lack of any evidence supporting them establishes that Ms. Guerin-Calvert's Modified Model is not reliable in any respect. *See id.* ¶¶ 115–118.

In addition, Dr. Johnson explains that the Modified Model's wide confidence intervals

---

[12] Ms. Guerin-Calvert's annual indicators are also collinear with other variables in the model. This means that the independent effects of each variable cannot be reliably estimated. *Id.* ¶ 114.

[13] While Ms. Guerin-Calvert does not provide a full explanation of the results of her "modified model" in her report, she does include in her backup data sufficient information—i.e., the computer code and the (log) file—from which its estimates for each year and product can be derived. *See id.* at ¶ 116 n.180.

confirm that it is less precise than his model and does not reject his estimates:

> The regression model produces standard errors of the estimates, which is a measure of the precision of estimates. These standard errors are used to calculated confidence intervals, which show the range of plausible values for the estimate and depends on the statistical precision of the estimates. The wider the confidence interval, the less precise (and therefore, less reliable) the estimate.

*Id.* ¶ 116. Dr. Johnson finds that all but one of the 95% confidence intervals (23 out of 24 estimates) for the Modified Model are substantially wider than his observations, confirming that the Modified Model is less reliable. *Id.* In addition, 11 of 12 of the Modified Model's 95% confidence intervals for its CDT estimates contain Dr. Johnson's overcharge estimate. This means that conventional hypothesis tests would not reject Dr. Johnson's estimate as the true value. *Id.*

Similarly, apart from its nonsensical negative estimates, all of Ms. Guerin-Calvert's Modified Model's 95% confidence intervals for CPTs contain Dr. Johnson's estimates and therefore fail to reject Dr. Johnson's estimates. *See id.* Further, her negative estimates contradict her previous analysis of target prices. *Id.* ¶ 117. Dr. Johnson also shows that Ms. Guerin-Calvert's claim that the conspiracy affected large sizes of CPTs differently than smaller sizes is unfounded. *Id.* ¶ 119–20.

### 3. Ms. Guerin-Calvert's Modified Model Does Not Support Her Proposed Reductions to Dr. Johnson's Damage Estimate.

Ms. Guerin-Calvert presents the results of her Modified Model as an alternate basis for a damages award. *See id.* ¶ 97 (citing to app. D summarizing reductions to Dr. Johnson's damages estimate). She avers that her "modified model is more consistent with market facts, and better able to account for market factors and thus more reliably estimate overcharges" and reports that her superior Modified Model returns estimates of a 7.0% average overcharge for CDTs and a 1.5% overcharge for CPTs "across the entire class period" as compared to Dr. Johnson's estimates of 10.7% and 6.1%, respectively. *Id.* She therefore asserts that her "modified model" indicates a damages award of $442 million. *Id.*

While her concession that the conspiracy resulted in at least $442 million in overcharges during the class period is substantial, her Modified Model provides no reasonable basis for her proposed slashing of Dr. Johnson's estimate. To the contrary, the results of her Modified Model are obviously unreliable—as she essentially concedes. First, as explained above, Ms. Guerin-Calvert's

Modified Model returns negative overcharge estimates for nine years. The suggestion that Defendants' incredibly active and well-organized conspiracy resulted in the opposite of its intended effect and actually **reduced CRT prices** is "nonsensical," as explained above.

Ms. Guerin-Calvert's negative overcharges contradict virtually all of the evidence, not just Dr. Johnson's substantial overcharge estimates for those years. As noted, the evidence of the existence and effectiveness of the CRT conspiracy is overwhelming and the attributes of the conspiracy made it likely to be effective in raising prices. Johnson Merits Report ¶¶ 10, 29–44. It involved "frequent, structured, hierarchical meetings;" "explicit coordination" on prices and output; extensive information exchange; and extensive monitoring and enforcement of pricing and production agreements. *See id.* In addition, the conspiracy existed in an environment conducive to effective conspiracy. *Id.* at ¶¶ 9 (e.g., high entry barriers, high market concentration controlled by conspirators; multi-market contacts of conspirators; standardized products; and economic relationships between conspirators); 14–24.

There is also extensive documentary proof of the success of the conspiracy in raising and maintaining CRT prices above competitive levels. The conspirators reported in real time that their pricing agreements and production restraints were succeeding. *Id.* at ¶¶ 25–28; Johnson Merits Rebuttal ¶¶ 67–74. The long duration of the conspiracy and the conspirators' recognition of its legal risks compel the conclusion that they believed it was effective in raising prices. Johnson Merits Report ¶¶ 25–28. As Dr. Johnson explains:

> Economists have recognized that in order for firms to choose to engage in collusion, the returns must outweigh the costs associated with the risk of legal liability. Thus, as an economic matter, it would not have made sense for the alleged conspirators to expend resources and effort on risky illegal activities, over the course of many years, if they did not think that the activities were having the intended result of elevating prices and profits. Otherwise, they would not have continued their activities and the conspiracy would have fallen apart.

*Id.* ¶ 28; Johnson Merits Rebuttal ¶¶ 72, 73 (claim that conspiracy price increases were "sporadic, temporary and small" is "contradicted by the extensive evidence in this case and economic logic").[14]

---

[14] Dr. Johnson's extensive statistical analysis demonstrating impact also contradicts Ms. Guerin-Calvert's negative estimates. For example, Dr. Johnson explains that Ms. Guerin-Calvert's analysis of conspiratorial price targets is flawed and misleading. *Id.* at ¶¶ 35–66. He explains that her

17

1    Ms. Guerin-Calvert appears to agree. As noted, she concedes that estimates of negative

2    overcharges are "implausible" because "[i]t is unlikely that a cartel would lower prices below the

3    competitive level for a sustained period of time." *Id.* ¶ 72; Guerin-Calvert DPP Report ¶ 89. Further,

4    she admits that—at least with regard to CDTs in 1997 and 1998—her model requires "corrections"

5    to reduce "but-for" prices and, therefore, it is entirely possible that there were positive overcharges.

6    *See id.* ¶ 89 n.170.[15] And she declines to rely on her negative estimates—as explained below—for

7    her "more reliable" overcharge estimates (7.0% (CDTs) and 1.5% (CPTs)) or for her

8    recommendation that the Court find overcharges of $442 million. If she used her negative estimates,

9    both numbers would be significantly lower. *See, e.g., id.*, ¶ 11(g), n.26 (overcharge percentages of

10    5.7 (CDTs) and 0.5 (CPTs)), n.27 (total overcharges of $259 million).

11    The patent unreliability of these negative overcharge estimates compels the conclusion that

12    the Modified Model and its negative overcharge estimates should be discarded entirely. But Ms.

13    Guerin-Calvert does no such thing. Instead, she accomplishes the substantial majority of her

14    reduction in damages by simply and arbitrarily "zeroing out" all overcharges for those years in

15    which her model produces negative overcharges:

16    I estimate the annual 'overcharge' for each year in the class period (separately for
       CPTs/CDTs) by calculating the estimated overcharge for each quarter of that year
17    (using the modified overcharge model), averaging the overcharge across the quarters
       in that year, using the quarterly unit sales as weights, ***and zeroing-out negative***
18    ***overcharges***.

19    Guerin-Calvert DPP Report ¶ 97 n.183 (emphasis added); *see also id.* ¶ 11(g) n.26. Dr. Johnson's

20    model estimates $466 in damages for those years.[16] Nowhere does Ms. Guerin-Calvert explain why

21    _____

22    criticisms of his price-target analysis lack merit. *Id.* at ¶¶ 16–34. He explains that his claim that
       competition from LCDs precluded conspiratorial price increases is incorrect and misleading. *Id.* at
23    ¶¶ 5–7.

24    [15] Ms. Guerin-Calvert states: "If the model were corrected for the omitted market factors, the but-for
       prices would be lower in 1997 and 1998, which could cause the corrected model to estimate positive
25    overcharges for the same years. However, that does not imply that the corrections would necessarily
       increase overcharges estimated for the entire class period since the same corrections would likely
26    reduce estimated overcharges for other years . . . ." *Id.* Ms. Guerin-Calvert, however, presents no
       such "corrected model" to prove her speculations. Her admission that her Modified Model requires
27    "corrections" is yet more confirmation of its unreliability.

28    [16] *See* Johnson Merits Report, figs.19 (CRTs) and 22 (Finished Products) showing overcharges for
       CDTs in 1997, 1998, 2003 and for CPTs in 1997, 1998, and 2002–2005.

18

substituting the negative overcharges produced by her model with a 0% overcharge is reasonable. *See id.; see also id.* ¶ 11(g) nn.26, 27.

The balance of Ms. Guerin-Calvert's proposed reduction in overcharge estimates results from her lower estimates for CPTs (in the years she finds positive overcharges). Again, however, the demonstrated unreliability of the Modified Model simply provides no basis for the Court to adopt any of its results to lower Dr. Johnson's estimates.

**E.  Dr. Johnson Accepted Two of Ms. Guerin-Calvert's Proposed Adjustments to His Computation of Class Sales.[17]**

Dr. Johnson' damages methodology requires him to apply the overcharge percentages his damages model estimates to total sales to the class. Johnson Merits Report ¶¶ 85–99.

Ms. Guerin-Calvert evaluated the assumptions and methodologies used by Dr. Johnson for derivation of his volume of commerce estimates and proposed certain adjustments. Guerin-Calvert DPP Report ¶ 10(f). First, she proposes adjusting sales with missing customer information for potential sales to opt-out and other alleged conspirators. Johnson Merits Rebuttal ¶ 122. Second, she proposes utilizing an additional dataset of its sales to the United States provided by Defendant Samsung SDI. *Id.* ¶ 123. Dr. Johnson agrees that these proposals are reasonable and adjusts his determination of total sales to the class as Ms. Guerin-Calvert proposes. *Id.* This results in reduction of his damages estimate from $1.085 billion to $1.011 billion. *Id.* ¶¶ 122, 123.[18]

---

[17] The Court has allowed Irico to raise the issue of "the appropriate apportionment of duplicative damages between DPPs and IPPs." ECF No. 6459 at 2. DPPs understand that this is not in issue in the DPP case. Under clear Supreme Court precedent, direct purchasers are entitled to recover the full overcharge they paid, and no pass-on defense is available to reduce their damages. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977). Moreover, federal antitrust laws do not prevent indirect purchasers from recovering under state law. *California v. ARC Am. Corp.*, 490 U.S. 93, 105–06 (1989). Courts in this District regularly recognize that direct purchasers are entitled to full recovery under *Hanover Shoe* and *Illinois Brick*, and reject a duplicative recovery defense. *See, e.g., In re HIV Antitrust Litig.*, No. 19-CV-02573-EMC, 2023 WL 3011624, at *4, *10 (N.D. Cal. Apr. 18, 2023); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 11-5765, 2013 WL 257148, at *1 (N.D. Cal. Jan. 23, 2013). Accordingly, DPPs' recovery may not be reduced by any recovery by IPPs under state laws.

[18] Ms. Guerin-Calvert raises two additional issues which are outside the scope of this proceeding. First, Ms. Guerin-Calvert proposes to reduce the damage estimate by a further $51 million by using firm-specific shares of U.S.-to-global sales in the process of estimating sales to U.S. for data with missing information. Dr. Johnson rejects this proposal because it underestimates class damages. *Id.* ¶¶ 124–126; Guerin-Calvert DPP Report, app. D at 1:4. Second, Ms. Guerin-Calvert also improperly

19

1

## V.    IRICO'S CONTENTION THAT DPPS MUST OFFER PROOF OF ITS PARTICIPATION IN THE CRT CONSPIRACY PRIOR TO 1998 LACKS MERIT

2

3       Irico maintains that the DPPCAC fails to plead "facts" showing its participation in the

4   conspiracy before 1998 and/or its knowledge of the conspiracy's ongoing nature when it did join in

5   1998. For this reason, Irico argues that its liability for the pre-1998 activities of the conspiracy

6   remains in dispute. Irico's assertions lack merit. Irico misreads the DPPCAC, misstates the law, and

7   continues to attempt to profit from its widespread destruction of evidence and other misconduct.

8       Irico's assertion that it may contest the "start-date" for its participation in the conspiracy fails

9   for at least three reasons. First, the Court's order on the motion to dismiss filed by Irico and the

10  other Defendants precludes any argument that Irico did not participate in the conspiracy until 1998.

11  That order held that DPPs' price-fixing conspiracy claim was properly pleaded, including

specifically as to the alleged "time period"—i.e., March 1995 through November 2007—it existed.

12      Second, the DPPCAC clearly, properly and expressly pleads Irico's participation in the

13  conspiracy from March 1995 through the end of the conspiracy in 2007. Irico's argument that the

14  complaint fails to plead, or indeed affirmatively pleads that it did not join until 1998, is contrary to

15  the clear language of the DPPCAC and applicable pleading rules.

16  _____

17  proposes reducing DPPs' total estimated damages a further $146 million apparently on the grounds
    that the sales they are based on are barred by the Foreign Trade Antitrust Improvements Act of
18  1982, 15 U.S.C. § 6a (the "FTAIA"). Her assertion that class purchases must be ***both*** billed to ***and***
    shipped to the U.S. to support a damages award is incorrect. First, products shipped to the U.S.—
19  even when they are invoiced to a foreign purchaser—are "import commerce" and thus are excluded
    from the FTAIA. *In re Capacitors Antitrust*, No. 14-CV-03264-JD, 2016 WL 5724960, at *3–4
20  (N.D. Cal. Sept. 30, 2016), *supplemented sub nom. In re Capacitors Antitrust Litig.*, No. 14-CV-
    03264-JD, 2018 WL 4558265 (N.D. Cal. Sept. 20, 2018) ("'Import trade or import commerce' with
21  foreign nations falls squarely within the scope of the Sherman Act and is excluded from the FTAIA
    altogether.") (citing *United States v. Hui Hsiung*, 778 F.3d 738, 751 (9th Cir. 2015)). Thus, all
22  "shipped to" transactions are properly in the case. Second, products billed to the U.S. but shipped
    elsewhere are subject to the FTAIA but may be included as class purchases if its "domestic effects
23  exception" applies. *Id.* Courts find the domestic effects exception satisfied for "billed to"
    transactions in cases involving price-fixing conspiracies directed at the U.S. market. *See, e.g., In re
24  Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-MD-01819 CW, 2010 WL 5477313,
    at *2 (N.D. Cal. Dec. 31, 2010) (citing *In re Dynamic Random Access Memory (DRAM) Antitrust
25  Litig.*, 546 F.3d 981, 985 (2008). This Court has previously concluded "that the DPPs have
    sufficiently alleged facts showing that the anticompetitive behavior of the Irico Defendants, as part
26  of the broader conspiracy, had a direct effect on prices of CRTs in the United States." ECF No. 5240
    ("Default Order") at 11. As these alleged facts are now established, they resolve the issue.
27

28

Third, the DPPCAC pleads—to the extent Irico joined in 1998—by reasonable inference that Irico knew that it was joining an existing and continuing conspiracy at that time. The DPPCAC clearly pleads that the CRT conspiracy and the meetings Irico attended from 1998 and after were highly organized, attended by many other Defendants, involved extensive information collection and exchange from all participants, and included reviews of the conspirators' compliance with previous agreements regarding prices and production. These allegations compel the conclusion that Irico knew it was joining in an established and ongoing conspiracy which also establishes Irico's joint and several liability for damages caused by the conspiracy from its outset. *Indus. Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970) ("One who enters a conspiracy late, with knowledge of what has gone before, and with the intent to pursue the same objective, may be charged with preceding acts in furtherance of the conspiracy.").

Fourth, Irico's clam that it withdrew from the conspiracy also amounts to an improper attempt to challenge its liability which the "general rule" of defaults precludes. In addition, it is an affirmative defense, which the Court struck in the Sanctions Order.

Finally, while the Court indicated that it will resolve the questions of whether Irico may contest the "appropriate start-date and stop-date for calculating damages" based only on the pleadings, DPPs respectfully request that the Court allow them to respond, if necessary, to any evidentiary claims made by Irico. Evidence of Irico's liability for pre-1998 damages exists despite Irico's widespread destruction of evidence and other misconduct and is sufficient to show that Irico participated in the conspiracy from its outset.

### A. The Court Has Already Held that the DPPCAC Adequately Pleads Irico's Participation in the Alleged Conspiracy from 1995 Through 2007.

The Court has already found that DPPs' complaint properly alleges Irico's participation in the CRT conspiracy from March 1, 1995 through November 2007. The Court adopted in full the Special Master's Report & Recommendation that the Defendants' Joint Motion to Dismiss—in which Irico joined—be denied in all respects as to the DPPCAC. ECF No. 597 ("MTD R&R") at 33–34; ECF No. 665 ("MTD Order") at 1 (approving and adopting MTD R&R), 24–25 (denying MTD in all respects as to DPPs). The Court therefore found that the DPPCAC pleaded a plausible

conspiracy against all Defendants in all respects.

Irico's and the other Defendants' motion specifically asserted that the DPPCAC failed to adequately plead a plausible conspiracy against them. The Court rejected this contention in its entirety, including the alleged "time period" in which all Defendants participated in the conspiracy. In accordance with the Ninth Circuit's interpretation of the Supreme Court's holdings in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court found the DPPCAC satisfied both Rule 8's notice requirements as well as the "plausibility" requirements of *Twombly* and *Iqbal*. MTD R&R at 7–11; MTD Order at 5–9.[19]

The Court specifically noted that the DPPCAC alleged "that the conspiracy was effectuated through agreements and common understandings reached in at least 500 meeting between 1995 and 2007." MTD Order at 6; *see also id.* at 8 (complaints allege "hundreds of meetings between 1995 and 2007"). Further, Judge Legge's MTD R&R, adopted by the Court, emphasized that the complaint adequately pleaded the ***"time period"***—i.e., March 1995 through November 2007—of the conspiracy, such that Defendants could respond (and were required to respond) to those allegations:

> One cannot read the DC [direct purchaser complaint] without concluding that each defendant, or at least each defendant group and many of the individual companies within each group, has adequate knowledge that it is being charged with: fixing prices, ***during a certain time period***, of certain products, by virtue of meetings, which it allegedly attended, and by communications in which it allegedly participated, and by agreements it allegedly made with other defendants (many of whom are specifically named). There is certainly adequate information for each defendant to examine its personnel, and to search its documents and databases. ***And each defendant would then know enough to be able to plead, to assert a denial, to allege affirmative defenses, and to prepare for motions if appropriate.***

MTD R&R at 16 (emphasis added). *Id.* at 14 ("[E]ach of the moving defendants has more than adequate <u>notice</u> of what that defendant is charged with. . . . [F]or pleading purposes, each defendant has notice of . . . time frames" and other aspects of alleged conspiracy.); 14–15 ("If any defendant

---

[19] In *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011), the Ninth Circuit explained that the Supreme Court's decisions in *Twombly* and *Iqbal* impose two fundamental pleading requirements. First, notice: a complaint "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." Second, to justify the burden of discovery, the complaint must contain factual allegations sufficient to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.*

1    claims that it was <u>not</u> a member of the conspiracy, it can do so by a denial, and then after some

2    factual development make an appropriate motion.") (emphases in original).

3            In these circumstances, it is plain that the Court determined in its MTD Order that Irico and

4    the other Defendants must respond to all of the DPPCAC's allegations, including specifically the

5    "time period" of each defendant's alleged participation in the alleged conspiracy, and that this

6    determination requires the conclusion that these allegations must be regarded as "well-pleaded" on

7    default. It is beyond argument that the Court's order required Irico to admit or deny the DPPCAC's

8    allegations regarding its participation in the alleged conspiracy, including that all defendants

9    participated from March 1995. MTD Order at 26 (requiring answers in 30 days); Fed. R. Civ. P.

10   8(d); *Geddes*, 559 F.2d at 560 (citing Rule 8(d)).

11           As the authorities cited above establish, the same rules determine construal of the DPPCAC

12   on default as well as on a Motion to Dismiss, so the same result should follow here.[20]

13   **B. The DPPCAC Expressly Pleads Irico's Participation in the Conspiracy From its Beginning in March 1995.**

14   

15           Throughout its substantial length, the DPP complaint expressly, repeatedly and

16   unambiguously alleges that all Defendants, including the Irico Defendants, were members of the

17   conspiracy from its outset in March 1995. Thus, at paragraph 6, it states: "The conspiracy

18   concerning CRT Products commenced with bilateral meetings that began in at least March of 1995

19   and continued throughout the Class Period." Paragraphs 3 through 6 make clear that these

20   allegations apply to all Defendants. Similarly, at paragraph 214, after 45 pages of painstakingly

21   detailed description of Defendants' conspiratorial activities, the complaint again clearly and

22   expressly alleges the participation of all Defendants from the outset: "From March 1, 1995, the exact

23   date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants

24   

25   _____

[20] The Court's subsequent descriptions of Plaintiffs' allegations are consistent with this reading of its

26   MTD Order. *See* Irico Class Order at 1 ("In brief, Plaintiffs allege that Irico and others conspired to fix prices, allocate market share, and restrict output of products containing cathode ray tubes

27   ("CRTs") from March 1995 to November 2007."); Default Order at 17 (describing question as going to "the scope of . . . liability" and as "a defense as to the scope of [Irico's] participation in the

28   conspiracy."

DIRECT PURCHASER PLAINTIFFS' TRIAL BRIEF FOR DAMAGES HEARING;
Master File No. 07-CV-5944-JST

and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce . . . ."

In between these clear allegations, the complaint also contains copious detailed allegations of conspiracy's operation, again making clear that DPPs allege the participation of all Defendants from the outset. Thus, paragraph 134, relied on by the Court in the MTD Order (at 6), alleges:

> The antitrust conspiracy involving CRT Products went on for over twelve years (1995-2007), involved the various Defendant companies, and was effectuated through agreements and common understandings reached in at least 500 bilateral or multilateral meetings that occurred in Taiwan, South Korea, Singapore, Malaysia, China, the U.K. and Europe.

The class is also defined congruently with the alleged conspiracy—i.e., involving all Defendants from March 1, 1995, and there are descriptions of the conspiratorial conduct of all Defendants alleged to have occurred during the "Class Period." DPPCAC ¶¶ 1 (defining class); 85 (same). For example, the relief sought by DPPs is based on the conduct of all defendants during the "Class Period." DPPCAC ¶ 222 ("During the Class Period, Plaintiffs and the other members of the class purchased CRT Products directly from Defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of the antitrust violations herein alleged, paid more for such products than they would have paid in the absence of such antitrust violations.").[21]

The DPPCAC also details how, in 1995, the CRT conspiracy grew out of pre-existing contacts and relationships and then evolved into a highly organized operation involving regular "Glass" or group meetings with elaborate established procedures. Paragraph 135 explains:

> Bilateral contacts and communications among defendants commenced in the late 1980s-early 1990s on an *ad hoc* basis. Competitively sensitive information on pricing, production capacity, product mix and customer information was exchanged. In 1995, these bilateral meetings began to increase in frequency. There were more than a dozen such meetings in 1995 and several dozen such meetings in 1996 alone. The meetings continued throughout the Class Period. Bilateral contacts and communications were conducted in person, by telephone or by email.

---

[21] *See also, e.g.,* DPPCAC ¶¶ 37 ("***During the Class Period***, Irico Group Corporation manufactured, sold, and distributed CRT Products either directly through its subsidiaries or affiliates throughout the United States."); 39 ("***During the Class Period***, [Display] manufactured, distributed, and sold CRT Products either directly or through its subsidiaries or affiliates or through other Defendants in the United States. Defendant [Group] dominated and controlled the finances, policies and affairs of [Display] ***relating to the antitrust violations alleged in this complaint***.") (emphases added).

Group meetings also began between "certain of the Defendants" in 1995–96, DPPCAC ¶ 136, and by 1997, those were a primary means by which the conspiracy operated. *See, e.g.,* DPPCAC ¶¶ 137–141. The DPPCAC also alleges that Irico "participated in multiple illegal bilateral and at least several dozen illegal group meetings from 1998 to 2006," but does not suggest that its participation was limited to this time frame. DPPCAC ¶ 159.

### C. Irico's Assertion that the DPPCAC Fails to Plead that It Joined the Conspiracy in 1995 Is Baseless.

In this context, Irico's assertion that the DPPCAC fails to allege facts showing its participation in the CRT conspiracy from 1995 is baseless. It requires the Court to ignore the express, clear and repeated allegations that Irico was a member of the conspiracy from the outset. Irico has offered no valid legal basis for the Court to do so.

First, and foremost, Irico cannot and has not taken issue with the plain meaning of the DPPCAC's allegations that all Defendants—including Irico—were members of the conspiracy from its outset in March, 1995. *See, e.g.*, DPPCAC ¶¶ 3–6, 134–135, 214. There can be no question that these allegations provide precise notice (as the Court has already found) of critical facts about the alleged conspiracy—namely its time period and Irico's membership—as the Court has held. *See, e.g.*, MTD R&R at 14 ("notice of . . . time frames"). Irico's assertion that these allegations are somehow not "factual" is simply wrong. *See* Further Joint Statement Regarding Proposals to Determine Damages (ECF No. 6445) ("Further Joint Statement") at 14:1–2. Its assertion that— without any supporting authority—the Court should simply disregard these allegations as "conclusory" is absurd. *See* Further Joint Statement at 13:4–5. These allegations contain meaningful facts, and are supported by myriad other facts alleged in the complaint, including the manner in which the conspiracy began. *See, e.g.*, DPPCAC ¶¶ 134–38; *see also* MTD Order at 5–7. Plaintiffs' detailed allegations about the formation of the conspiracy, its operation, its various members, and the "time period" of the conspiracy are the opposite of "conclusory." To simply disregard them as Irico suggests would violate well-established rules of pleading that require that the complaint be construed liberally in DPPs' favor. *See, e.g., Heber v. Toyota Motor Sales, U.S.A., Inc.*, 823 F. App'x 512, 514 (9th Cir. 2020) ("The complaint's factual allegations and reasonable inferences

25

therefrom are taken as true and construed in the light most favorable to the non-moving party.").

Second, any attempt to construe the DPPCAC as affirmatively alleging that Irico did not join the conspiracy until 1998 is a fantasy. Irico's restrictive reading of paragraph 159—alleging that Irico "participated in multiple illegal bilateral and at least several dozen illegal group meetings from 1998 to 2006"—to limit its participation in that time period is, again, plainly wrong. Nowhere does paragraph 159 (or the DPPCAC generally) state or even suggest that the meetings referred to therein were the "first" or "only" meetings that Irico attended, or that its participation began in 1998. *See* DPPCAC ¶ 159. Irico's assertion—citing DPPCAC ¶ 136—that DPPs allege that "different 'Defendants' joined the conspiracy at different times" is simply false. Further Joint Statement at 13:6–7. That paragraph alleges that "***group meetings***" of "certain of Defendants" began in 1995–1996. It does not remotely suggest that different Defendants joined the conspiracy at different times.

Moreover, Irico's restrictive and implausible reading of paragraph 159 ignores that DPPs plead the beginning of the conspiracy on information and belief. *See, e.g.*, DPPCAC ¶¶ 3 (information and belief), 4–6 (describing conspiracy), 214. Paragraph 214 expressly pleads that the first meetings attended by Defendants—including Irico—are known to Defendants ***but not DPPs***. In other words, the DPPCAC pleads that Defendants attended additional meetings not identified in the DPPCAC. These allegations preclude any reading of paragraph 159 to limit Irico's participation in the conspiracy to between 1998 and 2006. Such pleading on information and belief is also undeniably proper. *See, e.g., Rearden LLC v. TWDC Enters. 18 Corp.*, 722 F. Supp. 3d 1011, 1017 (N.D. Cal. 2024) (Tigar, J.) ("a plaintiff may 'plead[ ] facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.'").

Third, Irico's assertion that the DPPCAC must include detailed evidentiary allegations regarding when and how it joined the conspiracy is, again, simply wrong. *See* Further Joint Statement at 13 (allegations of DPPCAC lacks allegations "identifying Irico by name and not specifically alleging that Irico joined any conspiracy in 1995"). The Supreme Court has emphasized that complaints need not contain such "detailed factual allegations." *See, e.g., Twombly*, 550 U.S. at 555 ("a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations"). And this Court specifically so held. MTD Order at 5 ("[s]pecific facts" not required where "fair notice"), 9 ("detailed, defendant by defendant allegations" not required).

Finally, Irico's hyper-technical and unsupported arguments seek to subvert this Court's Sanctions Order. Irico's demand that DPPs prove its participation in the conspiracy from 1995 given its destruction of evidence and other misconduct is plainly unjust and seeks to capitalize on the prejudice its dishonest conduct created, and is contrary to the well-established rules on default. Construing DPPs' complaint as Irico suggests not only violates well-established pleading rules, it would also encourage dishonest defendants to destroy evidence and refuse discovery. As one court has explained, allowing a defendant to benefit from default sanctions, incentivizes bad behavior:

> Otherwise, default judgment sanctions to ensure compliance with discovery procedural rules would instead provide an incentive for defendants to ignore their discovery obligations as a tactic to limit plaintiffs to what they know at the time of filing their complaint, before any discovery has been had, to prove the extent of damages. Such scheming defendants may calculate that engaging in discovery may only help plaintiffs on the damages front, so better to cut off meaningful discovery as a damages mitigation tactic.

*Giuliani*, 2023 WL 8472723, at *4.

In short, there is no basis for the Court to ignore the plain meaning of Plaintiffs' allegations and to do so would violate the rules of pleading requiring that they be liberally construed.

### D. The DPPCAC Pleads Irico's Knowledge that it Was Joining a Pre-Existing Conspiracy to the Extent it Joined in 1998.

The DPPCAC also alleges facts that demonstrate Irico's knowledge of the ongoing nature of the CRT conspiracy even if, as it contends, it did not join the conspiracy until 1998. It is well-established that a conspirator who knowingly joins an ongoing conspiracy is liable for damages predating its joinder; therefore the Sanctions Order establishes Irico's liability for all of the caused by the conspiracy on this ground as well. *Indus. Bldg. Materials*, 437 F.2d at 1343.

It is beyond argument that DPPs are entitled to all reasonable inferences from the facts pleaded in the DPPCAC. *See, e.g., Yang*, 37 F.3d at 286 (fact "which flows from the facts set out in the complaint, will be presumed true"). As explained above, the DPPCAC alleges that by 1997, the CRT conspiracy had become highly structured and extraordinarily organized. There were monthly group "Management Meetings" attended by high-level sales executives, approximately quarterly

27

group "Top Meetings" of the conspirators' highest executives, and group "working level" meetings of lower level sales employees. DPPCAC ¶ 141. Group "Green Meetings" were held on golf courses. *Id.; id.* ¶ 137 ("Beginning in 1997, CRT makers started to meet in a more organized, systematic fashion"). To facilitate and inform discussions, confidential information including each Defendant's sales, inventories, and production was collected and exchanged. *Id.* ¶¶ 142 (information regarding "inventories, production, sales and exports" collected and shared before and during meetings); 151 (exchange of "sales, shipment, and price information"); 147 ("Each attending Defendant at Glass Meetings gave a report with price and projected future output.").

Each meeting followed a typical agenda, including a detailed review of coconspirator sales and production intended to enforce previous conspiratorial agreements. *See, e.g., id.* ¶¶ 138 (agreements to "expose cheating"); 147 ("monitoring of the conspiracy"); 153 (agreements to "expose and eliminate any cheating on the agreements reached"). In addition, at each meeting the attendees discussed and agreed upon pricing and production levels, market shares and allocation, anticipated future demand, pretexts for public statements about pricing and market conditions. *See, e.g., id.* ¶¶ 5 (fix prices, expose cheating, etc.), 138 (same), 143 ("typical pattern"; "pricing and anticipated future demand"), 144 (price agreements), 145 (market share), 146 (output restrictions); 148 (pretexts for price changes). Attendees were also delegated to communicate with conspirators who did not attend a meeting and inform them of the results of the meeting. *See, e.g., id.* ¶ 152.

These facts plainly support an inference that Irico—even if it did not join the conspiracy until 1998—would have been aware that it was joining an ongoing conspiracy. Indeed, the notion that Irico could have believed—given the highly organized nature of the conspiracy meetings as well as the specific discussion of prior conspiratorial agreements at each meeting—that the conspiracy had only just begun is ridiculous. Similarly, the notion that Irico could have continued to participate in the conspiracy for over nine years without knowing that it was a latecomer is also implausible. The DPPCAC therefore also pleads facts demonstrating Irico's knowledge of the conspiracy even assuming it did not join until 1998.

28

**E.  The Court Struck Irico's Affirmative Defense of Withdrawal; it also Lacks Merit.**

As DPPs have noted (see Further Joint Statement at 8), Irico's assertion that the "stop-date" for its "temporally limited involvement in the alleged conspiracy" remains in issue apparently means that it intends to attempt to prove that it withdrew from the CRT conspiracy by ceasing the manufacture and sale of CDTs. However, Irico's claim is: 1) an affirmative defense stricken by the Sanctions Order; 2) a liability issue conclusively determined against it; and 3) wrong on the merits.

First, this Court has already held that withdrawal is an affirmative defense. MTD R&R at 25 ("It is clear that the withdrawal from a conspiracy is an affirmative defense, with the burden of proof being on the claimed withdrawing party.").

Second, the DPPCAC alleges that Irico participated in a single conspiracy embracing all CRT Products—i.e., including both CPTs and CDTs—that existed from March 1995 through November 2007. *See, e.g.*, DPPCAC ¶¶ 3–5 (conspiracy relating to CRT Products); 138 (CRT Products). *See also* Mitsubishi Class Order, 308 F.R.D. at 615 n.17 ("evidence supports so much of the market being controlled or impacted by a single CRT conspiracy"); Default Order at 16 ("there is evidence of the Irico Defendants' participation in 'a single, overarching conspiracy'"). It also alleges that Irico never withdrew from the conspiracy. DPPCAC ¶ 159. These facts are "conclusively established" by Irico's default and preclude its claims of withdrawal.

Third, Irico's claim fails on the merits. Its continued participation in the conspiracy with regard to CPTs is fatal to any claim of withdrawal. *See, e.g., Reisman v. United States*, 409 F.2d 789, 792–93 (9th Cir. 1969).

**F.  The Evidence Demonstrates That Irico Participated In the Conspiracy from its Outset in 1995.**

Despite Irico's destruction of evidence, there is evidence showing that it participated in the conspiracy from its outset.[22] Among other things, documentary evidence demonstrates that Irico communicated with co-conspirators before 1998 and attended trade association meetings (the CRT

---

[22] Irico incorrectly claims that DPPs admitted they had no evidence of Irico's pre-1998 conspiratorial activity by failing to include it in discovery responses. ECF No. 6377 at 22. DPPs identified such evidence in their February 23, 2022 responses to Irico's Second Set of Interrogatories (Saveri Decl. ¶ 9, Ex. 206), Nos. 2 and 3, *see id.* at 33–36. These responses were incorporated by reference in DPPs' response to Irico's RFA No. 11. *See id.* at 26–27.

Industry Association) with the Chinese subsidiaries of the other conspirators.[23] This evidence also shows that by 1998 it would have had knowledge of the conspiracy even assuming it did not formally join until that time. While DPPs understand that the Court will decide this issue on the pleadings, *see* ECF No. 6459 at 2:15–17, DPPs respectfully request that Court allow them to respond, if necessary, to any evidentiary claims made by Irico.

## VI.     CONCLUSION

For the foregoing reasons, DPPs respectfully submit that a damage award of $1.011 billion is supported, and indeed required, by the evidence.

Dated: April 28, 2025

Respectfully submitted,

*/s/ R. Alexander Saveri*
R. Alexander Saveri (173102)
Geoffrey C. Rushing (126910)
Matthew D. Heaphy (227224)
David Y. Hwu (281780)
SAVERI & SAVERI, INC.
1016 Lincoln Boulevard, Suite 306
San Francisco, CA 94111
Telephone: (415) 217-6810

*Lead Counsel for Direct Purchaser Plaintiffs*

---

[23] *See, e.g.*, Saveri Decl., Ex. 207 (IRI-CRT-00004769E–73E (Dep. Ex. 8557) at 70E: April 28, 1995 memo re: meeting with Toshiba); Ex. 208 (IRI-CRT-00004817–23E (Dep. Ex. 8558) at 21E: July 10, 1995 memo regarding CRT Industry Association meetings); Ex. 209 (BMCC-CRT000113389–91E (Dep. Ex. 8559): Irico Group Sales Company document with confidential data transmitted to BMCC for December 1995 CRT Industry Association meeting); Ex. 210 (BMCC-CRT000113384–88E at 88E: January 1996 CRT Industry Association meeting – "no price reduction for CPT"); Ex. 211 (IRI-CRT-00008236–39E (Dep. Ex. 8561) at 36E: documenting agreement to set the price of 21" CPTs at RMB620 at December 1997 CRT Industry Association meeting); Ex. 212 (IRI-CRT-00008205–08E at 06–07E: August 12, 1997 notes documenting Irico meeting with Chunghwa); Ex. 213 (IRI-CRT-00008241–45E (Dep. Ex. 8562) at 42E: January 1998 "industry meeting"); Ex. 214 (IRI-CRT-00008248, IRI-CRT-00008316–32E: May 15, 1998 notes documenting Irico meeting with Chunghwa).