1  MARIO N. ALIOTO, ESQ. (56433)
   LAUREN C. CAPURRO, ESQ. (241151)
2  TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
3  2001 Union Street, Suite 482
   San Francisco, CA 94123
4  Telephone: (415) 563-7200
   Facsimile:  (415) 346-0679
5  E-mail:     malioto@tatp.com
               laurenrussell@tatp.com
6
7  *Lead Counsel for the Indirect-Purchaser Plaintiffs*

8

9

10              **UNITED STATES DISTRICT COURT**

11             **NORTHERN DISTRICT OF CALIFORNIA**

12                   **OAKLAND DIVISION**

13  IN RE: CATHODE RAY TUBE (CRT)      )    MDL NO. 1917
    ANTITRUST LITIGATION              )
14                                    )    Case No. 07-cv-5944-JST
    _____ )
15                                    )
    This Document Relates to:         )    **INDIRECT PURCHASER PLAINTIFFS'**
16                                    )    **TRIAL BRIEF**
    *ALL INDIRECT PURCHASER ACTIONS*  )
17                                    )    Hearing Date: May 19-21, 2025
                                      )    Courtroom: 6, 2nd Floor
18                                    )
19                                    )    The Honorable Jon S. Tigar
                                      )
20  _____ )

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................1

II.  LEGAL STANDARDS ...................................................................................2

    A.  Reasonable Damage Estimates Satisfy Antitrust Plaintiffs' Burden ...........................3

    B.  Plaintiffs' Burden Is "Lenient" After Default and They Are Entitled to All Reasonable Inferences from the Complaint and Evidence Presented...........................3

    C.  Irico Is Jointly and Severally Liable for the Acts of Its Co-Conspirators and All Damages Caused by the Conspiracy..................................................................4

III.  DR. NETZ'S CALCULATION OF THE DAMAGES TO THE 22 INDIRECT PURCHASER STATE CLASSES IS REASONABLE .......................................5

    A.  The Cartel Conduct Raised the Prices of all CRTs Above Competitive Levels...........5

    B.  Dr. Netz Estimates Overcharges on CDTs at 22% for 1995-2006 and 11.4% for 2007, and on CPTs at 9% for 1995-2006 and 3.1% For 2007 ...............................8

    C.  Pass-through of the Overcharges to Indirect Purchasers ...............................9

    D.  Dr. Netz Calculated Damages to IPPs at $2,697,957,236 ...........................10

IV.  IRICO'S CRITICISMS OF DR. NETZ'S DAMAGES ANALYSES LACK MERIT ........12

    A.  Irico's Experts' Criticisms Do Not Negate Dr. Netz's Finding That the CRT Cartel Increased Prices Above Competitive Levels For All CRTs ...........................12

    B.  Dr. Netz's Overcharge Model Provides a Reliable Estimate of the Aggregate Class-wide Damages to During the Relevant Period...........................................19

V.  IRICO'S OTHER ATTEMPTS TO LIMIT ITS LIABILITY ALSO LACK MERIT ........22

    A.  The Appropriate Period for Calculating Damages is March 1, 1995 Through November 25, 2007, as Alleged in IPPs' Complaint ...................................22

    B.  Aggregate Damages, Apportioned by State, Are Appropriate ...................26

    C.  Apportionment of Damages Between DPPs and IPPs Is Not Necessary...................27

    D.  Irico's Conduct Was Willful and Flagrant Justifying Enhanced Damages ...............28

VI.  CONCLUSION............................................................................................30

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

<u>**Cases**</u>

4

*AirDoctor, LLC v. Xiamen Qichuang Trade Co.*,

5

__ F.4th __, 2025 WL 1086045 (9th Cir. Apr. 11, 2025) ................... 4

6

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
620 F.2d 1360 (9th Cir. 1980) ..................... 4, 26

7

*Bigelow v. RKO Radio Pictures*,

8

327 U.S. 251 (1946) ..................... 2

9

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. 07-cv-5944-JST, 2024 WL 4823938 (N.D. Cal. Nov. 15, 2024) ................... 1

10

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,

11

No. 07-cv-5944-JST, 2016 WL 5725008 (N.D. Cal. Sept. 30, 2016) ................... 27

12

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,

13

No. 07-cv-5944-JST, 2018 WL 659084 (Feb. 1, 2018) ................... 26

14

*In re Consol. Pretrial Proc. in Air W. Sec. Litig.*,
436 F. Supp. 1281 (N.D. Cal. 1977) ................... 3

15

*Domanus v. Lewicki*,

16

742 F.3d 290 (7th Cir. 2014) ................... 2, 3

17

*In re Elec. Books Antitrust Litig.*,

18

No. 11 MD 2293 (DLC), 2014 WL 253511 (S.D.N.Y. June 5, 2014) ................... 29

19

*Elektra Entm't Group, Inc. v. Bryant*,
No. 03-cv-6381-GAF(JTLx), 2004 WL 783123 (C.D. Cal. Feb. 13, 2004) ............... 3

20

*Fair Housing of Marin v. Combs*,

21

285 F.3d 899 (9th Cir. 2002) ................... 13, 22

22

*Flynn v. Extreme Granite, Inc.*,

23

671 F. Supp. 2d 157 (D.D.C. 2009) ................... 3

24

*Freeman v. Giuliani*,
732 F. Supp. 3d 30 (D.D.C. 2024) ................... 3, 23

25

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,

26

No. 19-md-02918-MMC, 2025 WL 71988 (N.D. Cal. Jan. 10, 2025) ................... 26

27

28

*In re High-Tech Emp. Antitrust Litig.*,
    No. 11-CV-02509-LHK, 2014 WL 1351040 (Apr. 4, 2014).................................................5, 26

*In re HIV Antitrust Litig.*,
    No. 19-cv-02573-EMC, 2023 WL 3011624 (N.D. Cal. Apr. 18, 2023)...................................27

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
    451 U.S. 557 (1981)...........................................................................................................................2

*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004) ..............................................................................................26

*Loeb Indus. Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ..........................................................................................................2

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    710 F. Supp. 152 (E.D. Pa. 1989) ................................................................................................26

*Pfiffner v. Roth*,
    379 N.W.2d 357 (1985)....................................................................................................................28

*In re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litig.*,
    335 F.R.D. 1 (E.D.N.Y. 2020) ...............................................................................................3, 26

*SEC v. Pedras*,
    No. 13-cv-7932 GAF, 2014 WL 12597332 (C.D. Cal. Apr. 16, 2014) ...................................3

*In re TFT-LCD (Flat panel) Antitrust Litig.*,
    No. M 07-1827 SI, 2010 WL 2836955, (July 19, 2010)............................................................4

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. 07-md-1827-SI, 2012 WL 253298 (N.D. Cal. Jan. 26, 2012) .........................................27

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. 07-md-1827-SI, 2013 WL 257148 1 (N.D. Cal. Jan. 23, 2013) .......................................27

*In re Turkey Antitrust Litig.*,
    2025 WL 264021 (N.D. Ill. Jan. 22, 2025).................................................................................27

*Vanngo v. Beauty Advisor, LLC*,
    No. 21-cv-07035-JST(AGT), 2022 WL 2289066 (N.D. Cal. Mar. 21, 2022)..........................3

*Verizon Communications, Inc. v. Trinko*,
    540 U.S. 398 (2004)...........................................................................................................................1

*Western Waste Serv. Sys. v. Superior Court*,
    120 Ariz. 90 (1978) .........................................................................................................................28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*William Inglis & Sons Baking Co. v. Itt Cont'l Baking Co.,*
   668 F.2d 1014 (9th Cir. 1981) ................................................................................. 4

*Xiamen Zhaozhao Trading Co. v. Ningbo Jiangbei Shangyu Trading Co.,*
   No. 22-cv-04944-BLF, 2024 WL 3432012 (N.D. Cal. July 16, 2024) ...................... 4

## **Statutes and Rules**

Ariz. Rev. Stat. Ann. § 44-14082 ...................................................................................... 28

Iowa Code Ann. § 553.12 .................................................................................................. 28

Mich. Comp. Laws Ann. § 445.778(2) .............................................................................. 29

N.D. Cent. Code Ann. § 51-08.1-08 ................................................................................. 29

## **Other Authorities**

II.A. Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their
   Application (2024) ....................................................................................................... 2

INDIRECT PURCHASER PLAINTIFFS' TRIAL BRIEF
MDL No. 1917; Case No. 07-cv-5944-JST

1

**GLOSSARY OF TERMS**

2

| | |
|---|---|
| BMCC | Beijing-Matsushita Color CRT Company, Ltd. |
| CAC | Indirect Purchaser Plaintiffs' Fifth Consolidated Amended Complaint, ECF No. 5589 |
| Chunghwa | Chunghwa Picture Tubes Ltd. and Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., collectively |
| CDT | Color Display Tube (used in monitors) |
| CRT | Cathode Ray Tube |
| CPT | Color Picture Tube (used in televisions) |
| Daewoo/Orion | Daewoo Electronics Company, Ltd., Orion Electric Company, and Daewoo-Orion Société Anonyme, collectively |
| FOF | Findings of Fact |
| Guerin-Calvert Rpt. | Expert Report of Margaret E. Guerin-Calvert, dated August 5, 2014 (Indirect Purchaser Actions) |
| Guerin-Calvert Surrebuttal | Expert Surrebuttal Report of Margaret E. Guerin-Calvert, dated November 6, 2014 (Indirect Purchaser Actions) |
| Guerin-Calvert Suppl. Rpt. | Supplemental Expert Report of Margaret E. Guerin-Calvert, dated March 16, 2022 (Indirect Purchaser Actions) |
| Guerin-Calvert Daubert Decl. | Declaration of Margaret E. Guerin-Calvert in Support of Motion by Irico Group Corp. and Irico Display Devices Co., Ltd. to Exclude Testimony of Dr. Janet Netz, dated February 15, 2023 (Indirect Purchaser Actions). |
| Guerin-Calvert Daubert Reply | Declaration of Margaret E. Guerin-Calvert in response to Declaration of Dr. Janet Netz Opposing Motion to Partially Exclude the Testimony of Dr. Netz, dated April 5, 2023 (Indirect Purchaser Actions). |
| Hitachi | Hitachi, Ltd., Hitachi Displays, Ltd., Hitachi Electronics Devices (USA), Inc., Hitachi America, Ltd., Hitachi Asia, Ltd., Shenzhen SEG Hitachi Color Display Devices, Ltd., collectively |
| IPPs | Indirect Purchaser Plaintiffs |
| Irico | Irico Group Corporation, Irico Display Devices Co., Ltd., Irico Group Electronics Co., Ltd., collectively |
| LG Electronics/LG | LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG Electronics Taiwan Taipei Co., Ltd., collectively |
| LP Displays/LPD | LP Displays International, Ltd. (f/k/a LG Philips Displays) |
| MTPD | MT Picture Display Co., Ltd. |

| | |
|---|---|
| Mitsubishi | Mitsubishi Electric Corporation, Mitsubishi Electric & Electronics USA, Inc., and Mitsubishi Digital Electronics Americas, Inc., collectively |
| Netz Class Rpt. | Decl. of Janet S. Netz, Ph. D In Support of Motion of Indirect Purchaser Plaintiffs for Class Certification, dated Oct. 1, 2012, ECF No. 1386 |
| Netz Class Errata | Errata to the Decl. of Janet S. Netz, Ph. D In Support of Motion of Indirect Purchaser Plaintiffs for Class Certification, dated Oct. 9, 2012 (ECF No. 1401) |
| Netz Class Rebuttal | Rebuttal Decl. of Janet S. Netz, Ph. D In Support of Motion of Indirect Purchaser Plaintiffs for Class Certification, dated Feb. 15, 2013 (ECF No. 1571). |
| Netz Rpt. | Expert Report of Janet S. Netz, Ph.D., dated April 15, 2014, ECF Nos. 3281-9 & 3281-10 |
| Netz Errata | Errata to the Expert Report of Janet S. Netz, Ph.D., dated July 3, 2014 |
| Netz Rebuttal | Rebuttal Expert Report of Janet S. Netz, Ph.D. dated September 26, 2014 |
| Netz Suppl. Rpt. | Janet S. Netz, Ph. D, Rebuttal to Supplemental Expert Report of Margaret E. Guerin-Calvert and Expert Report of Donald Clarke, dated Apr. 27, 2022, ECF No. 6306-6. |
| Netz Daubert Decl. | Declaration of Janet S. Netz, Ph.D. in Response to Irico Defendants' Motion to Partially Exclude Testimony, dated March 20, 2023, ECF No. 6181-2 |
| Panasonic | Panasonic Corporation (f/k/a Matsushita Electric Industrial Co., Ltd.), Panasonic Corporation of North America, and Matsushita Electronic Corporation (Malaysia) Sdn Bhd., collectively |
| Philips | Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V., Philips Electronics North America Corporation, Philips Electronics Industries (Taiwan), Ltd., and Philips da Amazonia Industria Electronica Ltda., collectively |
| Samsung | Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung SDI Co., Ltd. (f/k/a Samsung Display Device Co., Ltd.), Samsung SDI America, Inc., Samsung SDI Mexico S.A. de C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung SDI Co., Ltd., Tianjin Samsung SDI Co., Ltd., and Samsung SDI (Malaysia) Sdn. Bhd., collectively |
| Samtel | Samtel Color, Ltd. |
| Tatung | Tatung Company of America, Inc. |
| Thai CRT | Thai CRT Company, Ltd. |

| Thomson | Thomson SA (n/k/a Technicolor SA) and Thomson Consumer Electronics, Inc. (n/k/a Technicolor USA, Inc.), collectively |
|---------|----------------------------------------------------------------------------------------------------------------------|
| Toshiba | Toshiba Corporation, Toshiba America, Inc., Toshiba America Consumer Products, LLC, Toshiba America Information Systems, Inc., Toshiba America Electronics Components, Inc., and Toshiba Display Devices (Thailand) Company, Ltd., and P.T. Tosummit Electronic Devices Indonesia, collectively |
| Videocon | Videocon Industries, Ltd. |
| Willig Class Rpt. | Expert Report of Robert D. Willig, dated December 17, 2012 (Indirect Purchaser Actions), |
| Willig Class Errata | Willig Errata dated January 18, 2013, and the Errata dated January 21, 2013. |
| Willig Class Rebuttal | Rebuttal Declaration of Robert D. Willig In Support of Defendants' Motion to Strike The Proposed Testimony of Dr. Janet S. Netz, dated March 25, 2013 (Indirect Purchaser Actions). |
| Willig Rpt. | Expert Report of Robert D. Willig, dated August 5, 2014 (Indirect Purchaser Actions) |
| Willig Surrebuttal | Expert Surrebuttal Report of Robert D. Willig, dated November 6, 2014 (Indirect Purchaser Actions). |

## I.   INTRODUCTION

The Indirect Purchaser Plaintiffs' ("IPPs") operative complaint (ECF No. 5589, "CAC") alleges that during the period from March 1, 1995 through November 25, 2007 (the "Class Period"), Defendants Irico Group Corporation ("Group") and Irico Display Devices Co., Ltd. ("Display") (collectively, "Irico") participated in a massive global cartel to fix prices, control output and allocate market shares and customers of cathode ray tubes (CRTs), including both color picture tubes ("CPTs") used in manufacturing televisions, and color display tubes ("CDTs") used in computer monitors.[1] The complaint alleges that Defendants' cartel raised the prices of CPTs and CDTs above competitive levels (*id.* ¶¶ 142, 195-200), and that the overcharges were passed through to indirect purchaser class members in the form of higher prices for CRT televisions and monitors. *Id.* ¶¶ 225-242. IPPs' claims against the dozens of Defendants named in the complaint, other than Irico, were long ago resolved. Only the claims against Irico remain.

Because the Court has entered terminating sanctions against Irico for its willful failure to search for and preserve relevant evidence and its abuses of the discovery process,[2] no issues of liability remain. The issues of whether there was a CRT cartel, whether Irico participated, whether the cartel successfully raised CRT prices above competitive levels, and whether the overcharges were passed through to indirect purchasers are resolved against Irico. Irico's answers, including its affirmative defenses, have been stricken, and its default has been entered. *Id.* Irico is thus jointly and severally liable for the harm inflicted on the indirect purchaser classes by the CRT cartel.

The only remaining issue is to quantify the amount of harm inflicted by the cartel. *Id.* IPPs submit this Trial Brief and the Expert Reports of IPPs' expert economist Dr. Janet S. Netz, Ph.D. to aid the Court in making that determination.[3] Based on her extensive investigation of the CRT

---

[1] *Id.* ¶¶ 1-3, 125-126, 142-166, 248, 254, 258-288.

[2] *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-5944-JST, 2024 WL 4823938, at *23 (N.D. Cal. Nov. 15, 2024).

[3] *See* Decl. of Mario N. Alioto ISO IPPs' Trial Brief ("Alioto Decl."), Exs. 1-7 (Dr. Netz's seven Reports and Errata), Exs. 8-16 (Irico's Expert Reports and Errata). All expert reports are admitted into evidence for this proceeding. *See* ECF No. 6465.

industry, the evidence in this case, and multiple, robust statistical analyses, Dr. Netz estimates the aggregate class-wide damages caused by the CRT cartel to the 22 Indirect Purchaser State Classes (the "22 States") to be $2,697,957,236.[4]

Price-fixing is the "supreme evil of antitrust," *Verizon Communications, Inc. v. Trinko*, 540 U.S. 398, 408 (2004). As the DOJ stated, the CRT "conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices."[5] To date, Irico has avoided paying any damages or fines for its unlawful conduct. Irico should be held accountable for its participation in this illegal conspiracy and the injury to American consumers that it caused.

## II.    LEGAL STANDARDS

IPPs have a relaxed burden for proving damages in this proceeding for two separate and independent reasons. First, courts employ a relaxed standard in determining damages in antitrust actions. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) (explaining that a relaxed standard applies in antitrust cases because "the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created").[6] Second, where, as here, proceedings are by way of default, courts permit "'broad latitude' in quantifying damages, 'especially when the defendant's own conduct impedes quantification[.]'" *Domanus v. Lewicki*, 742 F.3d 290, 303 (7th Cir. 2014) (citation omitted).

---

[4] The total damages have been adjusted downward from the damages reported in Dr. Netz's Reports to account for the shortened class periods for Hawaii, Nebraska and Nevada, whose antitrust statutes were enacted after the cartel was formed. CAC ¶ 245. The shortened class periods reduce the estimated CRT revenue attributable to purchasers in those states, resulting in a lower damages estimate than what was reported by Dr. Netz. The lower revenue and damages figures are used in this brief and IPPs' Findings of Fact and Conclusions of Law.

[5] Alioto Decl., Ex. 17 (DOJ Press Release Re: Indictment of Chunghwa's C.Y. Lin, Feb. 10, 2009).

[6] *Accord* II.A. Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application (2024), ¶ 392a ("[S]ince the defendant created the need for damage estimation by violating the antitrust laws, it should bear the burden of uncertainty in proving the consequent damages.").

## A.    Reasonable Damage Estimates Satisfy Antitrust Plaintiffs' Burden

In antitrust actions, the Supreme Court has long emphasized that reasonable damages estimates will suffice. *See J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565-66 (1981) ("'The Court has repeatedly held that in the absence of more precise proof, the factfinder may conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business . . . that defendants' wrongful acts had caused damage to the plaintiffs.'") (citation omitted); *see also Loeb Indus. Inc. v. Sumitomo Corp.*, 306 F.3d 469, 493 (7th Cir. 2002) ("it has [long] been established that in complicated antitrust cases plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages."); *In re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 32 (E.D.N.Y. 2020) ("Courts recognize that, 'given the inherent difficulty of identifying a 'but-for world,' antitrust damages need not 'be measured with certainty.'")  (citation omitted).

While a relaxed standard of proof of damages applies in all antitrust cases, it is amplified where, as here, the wrongdoer has also defaulted on its discovery obligations. As Areeda observes, the beginning point for assessing antitrust damages is the defendant's business records (Areeda ¶ 392a at 377-78)—precisely the data IPPs have been denied.

## B.    Plaintiffs' Burden Is "Lenient" After Default and They Are Entitled to All Reasonable Inferences from the Complaint and Evidence Presented

Upon default, a "[p]laintiff's burden in 'proving up' damages is relatively lenient. If proximate cause is properly alleged in the complaint, it is admitted upon default." *Elektra Ent. Grp., Inc. v. Bryant*, No. 03-cv-6381-GAF(JTLx), 2004 WL 783123, at *2 (C.D. Cal. Feb. 13, 2004) (citation omitted). "Injury is established, and plaintiff need prove only that the compensation sought relates to the damages that naturally flow from the injuries pled." *Id.* (citation omitted); *see also Domanus*, 742 F.3d at 303 (courts have "'broad latitude' in quantifying damages"); *Vanngo v. Beauty Advisor, LLC*, No. 21-cv-07035-JST(AGT), 2022 WL 2289066, at *3 (N.D. Cal. Mar. 21, 2022) (holding plaintiffs had sufficiently proven damages and citing *Elektra* and *Domanus*), *R. & R. adopted*, 2022 WL 21768596 (N.D. Cal. July 21, 2022) (Tigar, J.). Plaintiffs may recover

1    damages based on a "reasonable" estimate (*Flynn v. Extreme Granite, Inc.*, 671 F. Supp. 2d 157,

2    162 (D.D.C. 2009)), that is not "clearly erroneous" and has "some basis in declarations, testimony,

3    deposition transcripts, or other material evidence." *SEC v. Pedras*, No. 13-cv-7932 GAF (MRWx),

4    2014 WL 12597332, at *8 (C.D. Cal. Apr. 16, 2014) (citation omitted).

5        Particularly where, as here, a defendant's failure to preserve and produce evidence prevents

6    plaintiffs from developing their claims, plaintiffs are entitled to all reasonable inferences that can

7    be drawn from the complaint and the evidence. *See Freeman v. Giuliani*, 732 F. Supp. 3d 30, 37

8    (D.D.C. 2024) (stating that due to default judgment, "the well-pled allegations ... and all inferences

9    that may reasonably be drawn from those allegations [are] deemed to be true") (citation omitted);

10   *In re Consol. Pretrial Proc. in Air W. Sec. Litig.*, 436 F. Supp. 1281, 1286 (N.D. Cal. 1977) (same).

11       Fed. R. Civ. P. 54(c) "presents no bar to awarding actual damages in a default judgment

12   where the complaint sought those damages in an amount to be proven at trial." *AirDoctor, LLC v.*

13   *Xiamen Qichuang Trade Co.*, __ F.4th __, 2025 WL 1086045, at *3 (9th Cir. Apr. 11, 2025). *See*

14   *also Xiamen Zhaozhao Trading Co. v. Ningbo Jiangbei Shangyu Trading Co.*, No. 22-cv-04944-

15   BLF, 2024 WL 3432012, at *1 (N.D. Cal. July 16, 2024) ("'General allegations of damages in a

16   prayer for relief are sufficient to support a default judgment under Rule 54(c), as long as the

17   defendant is given reasonable notice thereby of the potential amount at stake.'") (citation omitted).

18   **C.    Irico Is Jointly and Severally Liable for the Acts of Its Co-Conspirators and**
19         **All Damages Caused by the Conspiracy**

20       Irico is jointly liable for the acts of all members of the CRT cartel. *Beltz Travel Serv., Inc.*

21   *v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) (the "action of any of the

22   conspirators to restrain or monopolize trade is, in law, the action of all," and "[a]ll conspirators are

23   jointly liable for the acts of their co-conspirators."). Once a conspiracy is established, defendants

24   "will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy,

25   regardless of the nature of [defendants'] own actions." *Id*.

26       The same rule applies to damages. Each member of the conspiracy is jointly and severally

27   liable for all the harm that the conspiracy caused. *See William Inglis & Sons Baking Co. v. Itt*

28

1   *Cont'l Baking Co.,* 668 F.2d 1014, 1053 (9th Cir. 1981) ("antitrust coconspirators are jointly and

2   severally liable for all damages caused by the conspiracy."); *In re TFT-LCD (Flat panel) Antitrust*

3   *Litig.*, No. M 07-1827 SI, 2010 WL 2836955, at *3 (N.D. Cal. July 19, 2010) (same).

4   **III.    DR. NETZ'S CALCULATION OF THE DAMAGES TO THE 22 INDIRECT PURCHASER STATE CLASSES IS REASONABLE**

5          IPPs' expert economist, Dr. Janet S. Netz, has over 30 years' experience in applied

6   economics, with a focus on analyzing competitive interactions of firms and relevant antitrust issues

7   in cases like this. Netz Rpt. at 1 & Ex. A. Dr. Netz has authored seven reports analyzing the

8   damages caused by the CRT cartel to class members. *See* Alioto Decl. Exs. 1-7. To assess the

9   cartel's impact and quantify the harm to class members, Dr. Netz relied upon the economic facts

10  of this case, economic theory, and empirical analyses examining the data. Her methodologies and

11  regression models are reasonable and widely accepted in antitrust cases and economic literature.[7]

12         Dr. Netz's analyses and opinions are summarized as follows. First, Dr. Netz assessed the

13  cartel's impact on CRT prices. She concluded, based on economic theory and the recognition of

14  cartel participants at the time, and confirmed by multiple statistical analyses, that the cartel raised

15  all CRT prices to direct customers above competitive levels. Second, Dr. Netz specified a multiple

16  regression overcharge model to quantify the direct overcharge. Third, Dr. Netz determined, again

17  based on economic theory, observations of cartel participants and confirmed by statistical analyses,

18  that the overcharges were passed through at least 100% to indirect-purchaser class members.

19  Finally, Dr. Netz calculated the aggregate class-wide damages by multiplying the cartel's revenues

20  from CRT sales applicable to class members by the overcharge and pass-through rates.

21         **A.    The Cartel Conduct Raised the Prices of all CRTs Above Competitive Levels**

22         Dr. Netz identified three bases for her opinion that prices for all CRTs were raised above

23  competitive levels: (1) economic theory, (2) the contemporaneous statements and

---

[7] *See, e.g., In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 1351040, at *14 (N.D. Cal. Apr. 4, 2014) ("[R]egression analysis is generally a reliable method for determining damages in antitrust cases and is a mainstream tool in economic study") (citations and internal quotation marks omitted).

1    acknowledgements of market participants, and (3) statistical analyses. Economic theory confirms

2    that the following characteristics will provide a firm or combination of firms in the market with

3    the ability and hence the incentive to raise and maintain prices above competitive levels: (1) market

4    power, (2) barriers to entry, and (3) no close substitutes. Netz Rpt. at 32-41. Dr. Netz found that

5    the cartel members, with approximately 89% of production capacity, had market power. The length

6    of time and large capital investment needed to build production facilities, together with the

7    necessary technical expertise for production, created sufficient barriers to entry—confirmed by no

8    real entry during the relevant period. Finally, Dr. Netz found there were no close economic

9    substitutes for the CRTs produced by the cartel, thereby insulating the cartel's supra-competitive

10   prices from competition. *Id*. Dr. Netz also found that the CRT industry suffered from falling

11   demand and persistent excess capacity (often -called a "sick industry") throughout the damages

12   period. *Id.* at 18-21. She opined that this characteristic gave market participants an added incentive

13   to raise and maintain the prices of CPTs and CDTs above competitive levels. *Id.* at 26-32.

14   Next, Dr. Netz evaluated the evidence and the economic characteristics of the cartel and

15   found that the cartel had the purpose and means to raise the prices of all CRTs above competitive

16   levels. The cartel implemented a comprehensive plan to ensure success in keeping prices above a

17   competitive level, including establishing a sophisticated, hierarchical system of meetings and a

18   web of other types of communications to set target prices, impose output and capacity restrictions,

19   allocate markets and customers, and share sensitive information. *Id.* at 41-62. Dr. Netz concluded

20   that these characteristics contributed to the cartel's success in increasing all CRT prices above the

21   competitive levels. *Id*. at 63-81; *see also* Netz Rebuttal at 32-34.

22   Dr. Netz determined that while there were different types, sizes and shapes of CRTs,

23   pricing was determined by relatively few characteristics, supporting her opinion that there was a

24   "structure" to pricing based on recognized price differentials among CRTs.[8] This price structure

25

26   _____

     [8] Structure to pricing is well-recognized by economists as a characteristic facilitating the successful
27   exercise of market power. *See* Netz Merits Rpt. at n.211 (citing Stigler, George J., February 1964,
     A Theory of Oligopoly, The Journal of Political Economy, Vol. 72, No. 1, 44 - 61, at 45).

28

1    meant that "targeting" a particular CRT for a price fix necessarily affected other CRTs, elevating

2    their prices above competitive levels. Netz Rpt. at 67. Dr. Netz opined that economic theory

3    supported the presence of such a pricing structure in this industry because if the cartel members

4    raised the price of only one type/size/shape of tube, customers would migrate to lower cost CRTs.

5    *Id.* at 66-68. This was confirmed by cartel members' contemporaneous documents and testimony

6    recognizing this pricing structure and its effect of raising prices of all CRTs. *Id.* at 69-70. Thus,

7    when Chunghwa's Vice President of Sales, C.C. Liu, was asked whether it made sense to raise the

8    price of only one type of CRT, he testified:

9
10           This question is not difficult. We are professionals in this industry. . . . How
             could we only change the price of 15 inches tubes without changing the
             prices of 17 inches tubes? . . . We would not raise the price for 15 inches
11           without raising the prices for all other items . . . ."

12    *Id*. at 70-71, n. 220 & 221. Dr. Netz also found that cartel members' conduct, testimony, and

13    contemporaneous business documents show that they recognized they were successful in raising

14    prices of both CPTs and CDTs. *Id*. at 27-30. *See also id.* at 5-6; Netz Rebuttal at 18-24.

15           Finally, Dr. Netz conducted multiple empirical analyses of the effect of the cartel's conduct

16    on actual prices and confirmed that the cartel's conduct impacted all CRTs. Dr. Netz performed

17    hedonic regressions, which confirmed that the relationships of different CRT prices were

18    predictable and determined by a handful of product characteristics. Netz Rpt. at 68-69. Dr. Netz

19    then performed a series of Granger Causality regressions separately for CDTs and CPTs to confirm

20    the causal relationship between target prices and actual prices of the targeted CRTs. *Id.* at 63-65;

21    Netz Rebuttal at 45. Finally, she ran a similar regression incorporating the actual prices of CRTs

22    not specifically targeted. Netz Rpt. at 71. The results of these regressions show the cartel's

23    collusive target prices raised the prices of *all* CRTs above the competitive level. *Id.* at 65, 71, Exs.

24    37-38, 44-45; *see also* Netz Rebuttal at 48-49.

25           In sum, Dr. Netz shows how economic theory, the observations of cartel members in their

26    contemporaneous documents and their testimony, and multiple statistical analyses all support her

27    opinion that the cartel was successful in raising the prices of all CRTs above competitive levels.

28

**B.     Dr. Netz Estimates Overcharges on CDTs at 22% for 1995-2006 and 11.4% for 2007, and on CPTs at 9% for 1995-2006 and 3.1% For 2007**

Dr. Netz's first step in quantifying the harm to class members was to determine the overcharge to direct purchasers of CRTs caused by the cartel. To estimate the amount of this overcharge, Dr. Netz employed a multiple regression model that fits the facts of the case. Multiple regression models, including the model that Dr. Netz chose here, are widely accepted for determining whether and to what extent there are supra-competitive prices. Netz Rpt. at 97, 99. Dr. Netz's model is an algebraic equation that relates the item of interest (actual prices charged for CRTs) to factors that economic theory and market investigation predict should explain the prices of interest—*i.e.*, supply and demand and relevant market structure factors that would influence competitiveness. *Id*. at 98-99. Among these factors, Dr. Netz included two indicator variables (sometimes referred to as "dummy" variables) to quantify the extent, if any, of any supra-competitive prices caused by the cartel during the conspiracy period as alleged in the complaint, 1995-2007. The two indicator variables allowed the overcharge to vary between the 1995-2006 period and the 2007 period. Dr. Netz did this because she determined that the public disclosure of government investigations into LCD price fixing may have altered the behavior of those CRT cartel members who were also members of the LCD cartel. *Id.* at 99-100. Dr. Netz conducted separate CDT and CPT regressions because she determined that CDTs and CPTs may respond to market conditions differently. *Id.* at 104-05; Netz Rebuttal at 7.

To account for major non-cartel-related market forces, Dr. Netz's overcharge model controlled for reasonable cost and demand factors based on her extensive investigation into case evidence and industry facts. To control for costs, Dr. Netz used the price of the particular type of glass used in producing CRTs, a major component in CRT manufacturing. To control for demand, Dr. Netz used statistical representations of OECD[9] gross domestic product and unemployment—

---

[9] The Organization for Economic Co-operation and Development (OECD) is made up of 38 of the largest economies in the world, including the United States, European Union countries, Mexico and Canada, among others.  Netz Rpt. at 103, n. 301.

two well-recognized drivers of demand for goods like CRTs. Dr. Netz also used a representation of LCD demand because she determined that LCD demand could affect the prices of TVs and computers at some points during the conspiracy period. Netz Rpt. at 102-04. The model also included time trend variables to control for CRT price trends over time that might not otherwise be captured by the model's supply and demand variables, and a variable to control for seasonal effects on prices. *Id.* Dr. Netz's model estimated that competitive CDT prices for 1995-2006 would have been 22.0% lower than the actual prices and for 2007 11.4% lower, and the competitive CPT prices for 1995-2006 would have been 9.0% lower than the actual prices and for 2007 3.1% lower. *Id.* at 106; Netz Errata at 1 and n.2. Dr. Netz subjected these results to multiple sensitivity tests that confirmed the robustness of the models. Netz Rpt. at 105-06.

### C.    Pass-through of the Overcharges to Indirect Purchasers

To determine whether the overcharges on CRTs sold to direct purchasers were passed through to indirect purchasers via the prices of CRT monitors and TVs, Dr. Netz examined three categories of evidence: (1) well-accepted economic theory applied to the distribution channels at issue; (2) contemporaneous observations of market participants and observers in documentary evidence; and (3) multiple statistical tests commonly used to measure pass-through. All the evidence supports Dr. Netz's conclusion that at least 100% of the overcharge was passed through to class members.

Dr. Netz first reviewed the economic theory of pass-through, which establishes that an industry-wide and durable cost increase, such as the increases here, leads to an increase in the downstream CRT product price. *Id.* at 82-91. Economic theory predicts that pass-through of the cartel's overcharge will be close to or more than 100% because there is a high degree of competition throughout the entire distribution channel for CRT products. *Id.* at 91-94, Ex. 54.

The documentary and testimonial evidence in this case is consistent with economic theory. Specifically, Defendants and other market participants acknowledged that distributors, manufacturers, and resellers of CRT products pass through cost changes to their customers

throughout the entire distribution channel. *Id.* at 94-95, Exs. 57-61. Based on economic theory and ample documentary and testimonial evidence, Dr. Netz concluded that the cartel's price increase to direct customers was passed through likely at 100% or more. *Id.* at 95.

This conclusion is further supported by the 63 statistical pass-through studies that Dr. Netz conducted. *Id.* at 106-118; Netz Rebuttal at 74. Dr. Netz's statistical pass-through studies included sales for all types of at-issue CRT products, by all types of resellers operating at all levels of the distribution chain, covering the entire damages period. Netz Rpt. at 106-107; Netz Rebuttal at 74, Exs. RR-75-RR-76. Among the 63 econometric pass-through studies, 52 studies yield a pass-through rate statistically greater than 100% and 11 yield a pass-through rate that is not significantly different from 100%. *Id.* at 76, Ex. RR-62. In short, the overcharges to the direct purchasers were passed through to the class members at a common rate of at least 100%. Netz Rpt. at 118; Netz Rebuttal at 74, Ex. RR-62. Irico's expert, Ms. Guerin Calvert, has not criticized Dr. Netz's pass-through analyses or conclusions.

### D. Dr. Netz Calculated Damages to IPPs at $2,697,957,236[10]

To calculate the damages that indirect purchaser class members suffered as a result of the cartel's supra-competitive overcharges, Dr. Netz multiplied the (1) revenues received by the cartel from CRT sales to class members by (2) the overcharge and (3) pass-through rates. Netz Rpt. at 119-123. Using a conservative pass-through rate of 100%, Dr. Netz's estimates that the total damages to class members is $2,697,957,236. *Id.* at 123; Netz Errata at 1. Dr. Netz undertook the following steps.

*Global CRT Revenues.* Because Defendants' sales data were insufficient to allow Dr. Netz to calculate global CRT revenues, she used public sources of sales revenue information. Dr. Netz began by estimating total global CRT revenues of all manufacturers by obtaining estimates of global CRT unit shipments from market research firms, which she then multiplied by average

---

[10] This lower damages estimate is because the CRT revenue attributable to the 22 States is now $17.1 billion instead of $17.5 billion due to the shorter class periods for three states. All other elements for calculating the total damages remain the same.

1    wholesale CRT prices based on Defendants' data. Dr. Netz estimated global CRT revenues

2    separately for different sizes of CPTs and CDTs. Netz Rpt. at 119-120. She also adjusted the global

3    CPT and CDT revenue estimates to reflect only sales during the class period (March 1, 1995

4    through November 25, 2007). *Id.* at 120.

5        *Cartel's Global CRT Revenues.* To estimate the cartel's share of global CRT revenues, Dr.

6    Netz calculated annual global market shares by manufacturer, and then multiplied the market

7    shares by annual global revenues during the class period to estimate global revenues for each

8    Defendant and Co-conspirator named in the complaint. Dr. Netz used the same data sources that

9    she used to estimate global CRT shipments and wholesale CRT prices. *Id.* at 120-121.

10        *U.S. Share of the Cartel's Global CRT Revenues.* Next, Dr. Netz estimated the U.S. share

11    of the cartel's global CRT revenues. Dr. Netz did this by estimating the sales of CRT products

12    (TVs and computer monitors) in the U.S.  Almost all available data on geographic shares of global

13    CRT product sales revenue do not identify sales to the U.S. directly but rather present data on sales

14    revenues to "NAFTA" or "North America." To isolate U.S. consumption from these broader

15    numbers, Dr. Netz estimated the share of CPT and CDT products consumed in the U.S. and Canada

16    by estimating consumption when data were missing and excluding consumption in Mexico. She

17    then excluded consumption in Canada to estimate the share of CRTs consumed in the U.S., and

18    hence revenue to the cartel members from sales in the U.S. *Id.* at 121-122.

19        *Exclusion of Government Purchases.* Because the class does not include government

20    entities, Dr. Netz excluded U.S. CRT product revenues derived from government purchases by

21    using data breaking down computer sales between government and private entities, which are

22    available from the U.S. Bureau of Economic Analysis (BEA, part of the Department of

23    Commerce). She assigned this ratio to both computers and TVs and applied the ratio to the U.S.

24    share of the cartel's global CRT revenue.

25        *Class Revenues.* To calculate the share of the cartel's non-governmental U.S. revenue that

26    accrued from sales in the 22 States, Dr. Netz assumed that CRT product sales in the U.S. were

27    distributed across states according to population shares. Dr. Netz therefore allocated the total non-

28

governmental U.S. revenues to class states based on population shares. *Id.* at 123. Using this process, Dr. Netz estimated that, during the class period, 8.4% of the cartel's worldwide CRT revenue is attributable to indirect purchasers by class members. This amounts to an aggregate total of $17.1 billion in revenue to the CRT cartel members attributable to purchases by class members during the relevant period. *Id.* at 123; *see also* fn. 10, *supra*.

*Total Damages.* Dr. Netz then multiplied the $17.1 billion in CRT revenues attributable to the 22 States by the annual overcharge percentages for CPTs and CDTs. She then multiplied the direct purchaser overcharges by a conservative pass-through rate of 100%. The total damages estimate is $2,697,957,236. *Id.* at 123; Netz Errata at 1. Dr. Netz's methodology and the data she used will allow the damages to the 22 Class States to be disaggregated post-trial.

## IV.    IRICO'S CRITICISMS OF DR. NETZ'S DAMAGES ANALYSES LACK MERIT

### A.    Irico's Experts' Criticisms Do Not Negate Dr. Netz's Finding That the CRT Cartel Increased Prices Above Competitive Levels For All CRTs

Overwhelming evidence shows that CRT cartel members attended meetings with their competitors all over the world on at least a monthly basis for the more than twelve-year class period, risking criminal prosecution to form what the European Commission described as "among the most organised cartels that the Commission has investigated." Alioto Decl. Ex. 18 (EC Press Release dated Dec. 5, 2012, levying record fines of €1.47 billion against the conspirators). The conspirators themselves often touted the success of the cartel,[11] and were well aware that higher CRT prices were passed on to consumers—including consumers in the United States—in the form

---

[11] *See* Netz Rpt. at 27-31. *See also, e.g.*, Alioto Decl. Ex. 19 (("the price increase for CDT (0.39/0.28) was implemented in the middle of May [1995] with a US$7.00 increase; moreover, all customers have accepted."); Ex. 20 ("because of the success of the Glass Meeting, everybody has been Enjoying Business [sic] this year"); Ex. 21 ("all attendees believe that the price increase [for 14"/20" CPTs] has been a full success."); Ex. 22 ("Price-up trend in European & American market thanks to capacity reduction in Asia"); Ex. 23 (Chunghwa's Vice President of Sales, Chih Chun (C.C.) Liu testified that the cartel successfully raised CRT prices above competitive levels).

1   of higher prices for CRT televisions and computer monitors.[12] Defendants spent significant time

2   and resources on the conspiracy and risked serious legal liability, huge fines, and jail-time. It makes

3   no economic sense that Defendants would continue their conduct for over twelve years if the cartel

4   was unable to raise prices above competitive levels. Netz Rebuttal at 31.

5       Downplaying this overwhelming evidence as "informational exchanges" that were not

6   anticompetitive, Irico's expert, Margaret E. Guerin-Calvert, claims that the CRT cartel was

7   ineffective at raising prices. Guerin-Calvert Rpt. at ¶ 54; Willig Rpt. at ¶ 57.[13] She also speculates

8   that Defendants' production shutdowns were not collusive. Guerin-Calvert Rpt. at ¶¶ 87-98. These

9   claims are contrary to the allegations of the complaint (CAC ¶¶ 123-224), which must be accepted

10  as true given Irico's default. *Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002);

11  *see also Domanus*, 742 F.3d at 303 (rejecting attacks on factual basis for Plaintiff's expert's

12  damage estimate after default because facts established by pleadings). Moreover, the complaint's

13  allegations are confirmed by the evidence showing Defendants' agreements to fix prices, restrict

14  output, and allocate customers and market shares, and their acknowledgment that their information

15  exchanges were anticompetitive. Netz Rebuttal at 34-36.

16      Ms. Guerin-Calvert also speculates that the complexity and heterogeneity of the CDT and

17  CPT markets "may have" made it more difficult for the cartel to raise CRT prices. Guerin-Calvert

18

19  _____

20  [12] *See* Netz Rpt. Ex. 57. *See also, e.g.*, Alioto Decl. Ex. 24 ("Mr. Jerry [from Philips] claimed that
    he had already expressed to PH [Philips] BU . . . that the price of 17" would be increased starting

21  in April. PH BU has also conveyed the price increase information to Dell. Mr. Ha [SDI] also
    claimed that its headquarters had conveyed the price increase information to SEC. SEC has also

22  informed its customers that the sales price would be increased again."); Ex. 25 ("[R]aising the
    price on 15" not only benefits 15" CDT makers, but also gives Monitor makers the opportunity to

23  adjust the price to create some profit margin for their no-profit-base business . . .."); Ex. 26 ("Price
    Hike": "[W]e should also inform the customers of a possible second stage of price hike, so that

24  they can take time to pass on to OEM customers.").

25  [13] Defendants hired Ms. Guerin Calvert to analyze the CDT market and Dr. Robert Willig for
    CPTs. Dr. Willig has died. Ms. Guerin Calvert has "adopted" Dr. Willig's analyses and opinions

26  for purposes of these proceedings. Guerin-Calvert Suppl. Rpt. ¶14. Since Ms. Guerin-Calvert is
    sponsoring Dr. Willig's analyses and opinions, IPPs refer solely to Ms. Guerin Calvert as

27  sponsoring opinions and analyses unless the context requires separate identification.

28

1  Rpt. ¶¶ 21-54; Willig Rpt. at ¶¶ 16-30. Her opinions are based on mischaracterizations of Dr.

2  Netz's analyses, the CDT and CPT markets, and the evidence. As Dr. Netz points out, "whether

3  the cartel had 'more or less difficulty' in operating is not the point. The relevant questions are

4  whether a cartel existed, whether the cartel was able to increase price above the competitive level,

5  and if it could, to quantify the overcharge." Netz Rebuttal at 18.

6          Moreover, none of the industry characteristics referenced by Ms. Guerin Calvert creates an

7  insurmountable burden to a successful cartel. *Id*. at 3. Ms. Guerin-Calvert's sources recognize that,

8  "[c]artels that develop organizational structures that allow them the flexibility to respond to these

9  changing conditions are more likely to survive. . . . Sophisticated cartels are also able to develop

10  multipronged strategies to monitor one another to deter cheating and a variety of interventions to

11  increase barriers to entry." Guerin-Calvert Rpt. at 8 n. 18 (citing Levenstein, Margaret C. and

12  Valerie Suslow, "What Determines Cartel Success?" Journal of Economic Literature, Vol. 44(1),

13  March 2006, at 43).

14          Dr. Netz demonstrates that the CRT cartel was a "sophisticated" cartel that developed

15  "organizational structures" to respond to changing economic conditions and implemented

16  "multipronged strategies" to monitor cheating and hence promote success in raising prices above

17  competitive levels.[14] These included a four-level hierarchy of multi-lateral meetings, frequent

18

19

20

---

21  [14] Numerous meeting reports evidence the cartel's efforts to monitor pricing and production levels
and prevent cheating. *See* Netz Rpt. at 55-58; *see also, e.g.*, Alioto Decl. Ex. 27 ("[A]fter the *Top*
22  *Level* reached a conclusion regarding the price issue, the *Working Level* personnel should actually
*Review* the market price situation at each meeting, and if abnormality appears, then they should
23  find out the real price. The saboteur will be questioned thoroughly. The matter will then be
reviewed at the *Top* meeting to seek a solution."); Ex. 28 (Irico entered a written agreement to
24  reduce production and fix prices for CPTs, "guaranteed by the general manager's personality and
credibility. Any company that violates the agreement will face disciplinary actions by the
25  Association"; a detailed penalty plan, provided for a "hot-line" to report violation of the agreement,
and an "inspection team" to implement the agreement); Ex. 29 ("Penalty if company cheat price:
26  1) person in charge and manager will be dispelled; 2) other 2 company will attack trouble maker's
27  major customer."). *See also id*., Exs. 30 – 32.

28

bilateral meetings and communications,[15] coordinated price setting (including setting target prices and price differentials for different types of CRTs), agreeing to output and capacity restrictions, market share and customer allocations, monitoring each other's prices, output, and capacity, and exchanging sensitive price and other information. Netz Rebuttal at 6 (citing Netz Rpt., at 2-4, 41-72, and Exs. 1, 27, 28, 29, 39). Dr. Netz further demonstrates that cheating is not inconsistent with an effective conspiracy. *Id.* at 4, 36-41.

Ms. Guerin Calvert's characterization of the markets and products as complex and heterogeneous is also overblown. *See* Netz Rebuttal at 24-28. In addition, her reliance on economic theory and literature is misplaced because her sources are ambiguous as to whether the claimed characteristics of the CRT industry hinder or facilitate a cartel, and there are real-world cartels that have these characteristics. *Id.* at 21-24. In any event, the CRT industry had the only characteristics "that are necessary for a cartel to be able to increase price above the competitive level—the existence of barriers to entry and the absence of close substitutes." *Id.* at 20 (citing Netz Rpt. at 33-41). Ms. Guerin-Calvert does not dispute that there was no meaningful entry into the CRT industry during the damages period. *Id.; see also* Netz Rpt. at 34-35.

Ms. Guerin Calvert's arguments regarding LCD and plasma technologies' impact on the cartel are likewise unfounded. Guerin-Calvert Rpt. at ¶¶ 18, 29, 37; Willig Rpt. at 8-11. Dr. Netz evaluated the strength of substitution from these technologies, and concluded that while LCD products were functional substitutes for CRT products, they were not economic substitutes because "the CRT overcharge did little to change the relative price of LCD and CRT products,"[16] and "an implausibly large number of consumers would need to switch from CRT to LCD in order for LCDs to eliminate the ability of the cartel to increase CRT prices above the competitive level." Netz Rebuttal at 20-21; *see also* Netz Rpt. at 35-41 & Exs. 25-26. Dr. Netz reasonably concluded that a

---

[15] *See id.* Ex. 33 (C.C. Liu testimony regarding tiered system of group and bilateral meetings). *See also id.,* Exs. 34 -37 (meeting reports evidencing the different levels of meetings).

[16] LCD products were at least twice, and sometimes four times, more expensive than CRT products until 2005 and remained about 50% more as of 2007. Netz Rpt. at 38-39, Exs. 17-22.

1   $10 overcharge on a CRT television or monitor would not have induced consumers to switch to a

2   much higher-priced LCD product. Thus, LCDs did not prevent CRT manufacturers from charging

3   supra-competitive prices. Netz Rebuttal at 20-21. In any event, Dr. Netz includes a variable in her

4   overcharge model that captures the market penetration of LCD and other display technologies. *Id*.

5   at 21; *see also* Netz Rpt. at 103.

6       Ms. Guerin-Calvert agrees that whether the cartel raised prices above a competitive level

7   (and if so, to what extent) is largely an empirical question with an empirical answer. Guerin-

8   Calvert Rpt. at ¶ 21; Willig Rpt. at 15. All four economists in the direct and indirect cases specify

9   statistical models to determine if the cartel raised prices above competitive levels. All four

10  economists' models answer yes to that inquiry and show overcharges.[17]

11      Ms. Guerin-Calvert criticizes Dr. Netz's empirical analysis of CRT target prices versus

12  actual prices. Guerin-Calvert Rpt. at ¶¶ 65-87; Willig Rpt. at ¶¶ 32-56. First, she claims there are

13  no matched target prices for a large fraction of CDT and CPT sales, including fewer target prices

14  for large CPTs than small CPTs, and very few target prices in 1995 and 1996. Guerin-Calvert Rpt.

15  at ¶¶ 65-69; Willig Rpt. at ¶¶ 32-34. From this, she infers that (1) the conspiracy only impacted

16  those CRTs for which a target price has been identified, (2) the conspiracy was not effective in

17  1995 and 1996, and (3) the conspiracy did not impact large CPTs, which were predominant in the

18  U.S. market. *Id.*

19      Dr. Netz rebuts these criticisms by showing that Defendants had strong incentives to raise

20  the prices of *all* CRTs and the market power to do so. It also makes no economic sense that the

21  cartel would only attempt to raise the prices of some CRTs and not others. Raising the prices of

22  only some CRTs would be ineffective because consumers would substitute to competitively priced

23  CRTs. Netz Rebuttal at 29-30. The contemporaneous documents and testimony are in accord.[18]

24

25  ---

[17]  Netz Rpt. at 96-99 & Netz Errata at 1; Guerin-Calvert Rpt. at 78, 81; Willig Report at 52; Expert

26  Report of Phillip M. Johnson, Ph.D., dated May 26, 2023, at 27-34.

[18]  *Id.* at 30; *see also* Netz Merits Rpt. at 68-71 (listing Defendants' documents showing that the
27  market participants recognized the relationship between prices of different CRTs).

28

1    This evidence is also consistent with Dr. Netz's statistical findings (based on hedonic regression

2    analyses) that prices of different types of CRTs are related to each other via product characteristics,

3    and therefore setting a target price increase for one type of CRT implies a price increase for others.

4    *Id.* at 31 (citing Netz Rpt. at 68-69). Because of this price structure, the cartel did not need to set

5    target prices for every model of CRT. *Id.*

6          In addition, Ms. Guerin-Calvert concedes that setting target prices was only one of the

7    many mechanisms the CRT cartel used to raise and maintain prices. *Id.* at 9-10, 34. Thus, there

8    may be some CRTs for which there are no target prices because Defendants sought to increase

9    their prices using these other mechanisms. *Id.* at 34. The lack of evidence of target prices for certain

10   time periods or certain types of CRTs does not mean that the cartel did not set them; it merely

11   means that no evidence has been found.[19] Given Irico's destruction of evidence, it should not be

12   permitted to infer from lack of evidence that the conspiracy did not impact all CRTs.

13         Second, Ms. Guerin-Calvert accuses Dr. Netz of employing a "flawed methodology" for

14   matching target prices to actual prices. Guerin-Calvert Rpt. at ¶¶ 65-69; Willig Rpt. at ¶¶ 33-34.

15   Ms. Guerin Calvert adjusts the methodology, resulting in lower target price coverage. *Id.* Dr. Netz

16   shows that Ms. Guerin Calvert's adjustments are flawed and unreliable because (1) the evidence

17   shows that agreements reached at the meetings were communicated to non-attending Defendants

18   such that it is appropriate to match target prices to non-attending Defendants' actual prices; (2)

19

20

21

22

---

23   [19] This lack of evidence could be because Defendants did not document all target prices, or the
     evidence was destroyed. Netz Rebuttal at 8, 34. Defendants knew their conduct was illegal and

24   attempted to hide it. *Id.* at 8, 35. Many documents instructed recipients to "destroy after reading,"
     and meeting attendees were instructed to not take notes. *Id.*; *see also* Netz Rpt. at 63-64, n. 205.

25   Moreover, despite less evidence of target prices in 1995-1996, Defendants certainly met and
     conspired to fix prices during those years. Netz Rebuttal at 57 & Ex. RR-85; *see also* fn. 22, *infra*.

26   There is also substantial evidence the cartel raised prices of CRTs sold in the U.S., including large
     CPTs. Netz Rebuttal at 13-15, 32-34, 48-49; Netz Rpt. at 72-81.

27

28

1    CRT prices were set on a quarterly, not a monthly basis[20]; and (3) most of the data failed to identify

2    the CRT shape. Netz Rebuttal at 10-13.

3        Third, Ms. Guerin-Calvert asserts that the cartel was ineffective because actual CRT prices

4    were sometimes below the alleged target price. Guerin-Calvert Rpt. at ¶¶ 70-74; Willig Rpt. at ¶¶

5    35-41. The fact that some actual prices were below target prices does not mean that those actual

6    prices were at a competitive level; it only indicates that Defendants did not raise prices as high as

7    they wanted. Netz Rebuttal at 42. To measure the effectiveness of target prices, it is necessary to

8    hold "all else equal," which Dr. Netz does with her target price regression analyses.

9        Fourth, Ms. Guerin-Calvert criticizes Dr. Netz's target price regression analyses and

10   performs alternate analyses. Guerin-Calvert Rpt. at ¶¶ 75-85; Willig Rpt. at ¶¶ 42-45. But Ms.

11   Guerin-Calvert's regressions are run in first-differences (quarterly changes in prices) as opposed

12   to levels, as Dr. Netz did.  Ms. Guerin Calvert's first difference methodology biases the results

13   toward finding no relationship between target and actual prices. Netz Rebuttal at 43-36. Dr. Netz

14   explains that running the analysis in first-differences is improper because Defendants set target

15   prices and actual prices in dollar levels and any direct test of their relationship should be conducted

16   in levels. *Id*. at 44-46. Ms. Guerin Calvert's approach also exacerbates econometric problems

17   related to noise in the data. *Id*. at 45-46, Exs. RR-94 & RR-95. In any event, Irico's improper

18   regressions confirm that changes in target prices predict changes in actual prices, although at an

19   improperly reduced level. *Id*. at 43-44.

20       Fifth, Ms. Guerin-Calvert points to falling CRT prices, increasing output and capacity and

21   changing market shares as inconsistent with successful collusion. Guerin-Calvert Rpt. at ¶¶ 87-

22   109; Willig Rpt. at ¶¶ 62-67. But falling prices and increasing production or capacity are not

23   competitive prices or competitive capacity or production. A correct analysis must control for other

---

[20] Matching target prices on a monthly rather than quarterly basis is the only adjustment that makes a meaningful difference to the share of Defendants' sales covered by target prices. Netz Rebuttal at 10-11. The evidence indicates that CRT prices were set on a quarterly basis. *Id.* at 10 & Ex. RR-89. Irico's experts provide no basis for applying target prices on a monthly basis. *Id.*

market factors and compare them to what would have happened in the but for world, as Dr. Netz did. Netz Rebuttal at 49-52. There is no economic basis to conclude from these trends that Defendants were unsuccessful in restricting output and raising prices above the competitive level. *Id.* Finally, Ms. Guerin-Calvert's claims that declining profit margins are indicative of an ineffective cartel are likewise flawed. Declining profit margins do not reflect economic margins and Ms. Guerin-Calvert fails to compare profit margins to what they would have been in the but-for world. *Id.* at 52. "Falling margins are not only consistent with an effective cartel, they can be an incentive to form a cartel." *Id.*

In sum, Ms. Guerin Calvert's criticisms of Dr. Netz's opinion are all refuted by Dr. Netz. Dr. Netz's opinion that the cartel raised all CRT prices during the relevant period above competitive levels is well-founded and reasonable and should be credited.

**B.    Dr. Netz's Overcharge Model Provides a Reliable Estimate of the Aggregate Class-wide Damages to During the Relevant Period[21]**

Ms. Guerin-Calvert levels several criticisms of Dr. Netz's multiple regression overcharge model. Dr. Netz answers every one of the criticisms. Ms. Guerin-Calvert mischaracterizes the results of Dr. Netz's 1995-2006 overcharge or conspiracy indicator (dummy) variable as showing an implausible identical overcharge for all customers and all products over all times. From this mischaracterization, she opines that Dr. Netz's model is unreliable. Guerin-Calvert Rpt. ¶ 15; Guerin-Calvert Daubert Reply ¶ 55.

Ms. Guerin-Calvert's characterization of the output of the conspiracy indicator variable is wrong. By definition, an indicator variable is designed to produce a single output. But that single output number does not purport to reflect a finding as to every data point on which the model is run; rather that number reflects an average of all the data points. This average overcharge is

---

[21] Irico claims that for an overcharge estimate to be reliable, CPTs must be analyzed separately from CDTs. *See* ECF No. 6445 at 17 (Irico Issue No. 7). This is what Dr. Netz did. As discussed above, Dr. Netz ran separate models for CPTs and CDTs.

appropriate because Dr.Netz designed her model to estimate the *aggregate* class-wide damages over the relevant period. Netz Daubert Decl. at 3.

It is also incorrect to characterize Dr. Netz's models as imposing a single average overcharge. Before developing her model, Dr. Netz analyzed the market's economics, examined evidence of the cartel's conduct, and assessed the available data. Dr. Netz specified her models to allow differentiation of the overcharge where her investigation of the markets and products suggested differentiation was appropriate. Thus, she ran separate models (and obtained different average overcharges) for CDTs and CPTs. Within the models, she allowed for separate average overcharges for 2007 versus 1995-2006 and again obtained different average overcharges. *See* Section III, *supra*.

Attempting to undermine Dr. Netz's overcharge models, Ms. Guerin-Calvert arbitrarily segmented the duration of the 1995-2006 conspiracy indicator variable into smaller segments, without any economic justification. Segmenting the conspiracy dummy variable requires the model to distinguish the effects of arbitrary additional variables with already limited data and introduces unacceptable multicollinearity, leading to implausible and unreliable results. Netz Daubert Decl. at 10-11. This multicollinearity confounds the impact of the overcharge and time trend variables such that their effects cannot be separately identified. *Id.* The more periods into which the cartel indicator is segmented, the greater the multicollinearity, making it more difficult for the model to separate non-collusive market effects from conspiracy effects. These econometric defects render the results of Ms. Guerin-Calvert's model unreliable. *Id.*

For example, Ms. Guerin-Calvert first segmented the conspiracy dummy variable into twelve annual periods. Ms. Guerin-Calvert's results showed overcharges for 1995 and 1996 only, and implausible negative overcharges for all but three of the 11 years from 1997-2007. Guerin-Calvert Rpt. ¶¶ 113-114, 131 (showing Table 8). Alternatively, Ms. Guerin Calvert segmented Dr. Netz's 1995-2006 conspiracy variable into three periods – 1995, 1996 and 1997-2006, and added other variables. Her results show overcharges of 16.1% in 1995, 23.5% in 1996, and 1.6% for 1997-2006. *Id.* Again, a 1.6% overcharge on CDTs is implausible. Further, Ms. Guerin Calvert

1    reports these results as a 1.6% overcharge *for the entire class period* by ignoring her own model's

2    results for 1995 and 1996. Guerin-Calvert Rpt. ¶¶ 130-31. She claims that disregarding the large

3    overcharges for 1995 and 1996 is justified because there was little collusive activity in those years,

4    and industry conditions elevated prices rather than cartel activity. Guerin-Calvert Rpt. ¶ 116; *see*

5    *also* Willig Rpt. ¶ 75. But Ms. Guerin Calvert's characterization of cartel activity in 1995 and 1996

6    is contrary to the allegations of the complaint and the evidence. Netz Rpt. at 99.[22]

7        In addition, Dr. Netz's overcharge model already accounted for CRT supply and demand

8    factors to capture relevant changes in competitive conditions. Netz Rpt. at 104; Netz Rebuttal at

9    57. For example, Dr. Netz's model controls for changes in CRT glass prices for each year,

10   including 1995 and 1996, to isolate the cartel price effect from changes in glass prices. *Id.* at 58.

11   Dr. Netz's control variables explain over 95% of CDT price variation and over 98% of CPT price

12   variation, reinforcing the robustness of her model. *Id.* at 61, Ex. RR-99; *see also* Netz Daubert

13   Decl. at 5-6 (describing variables used in her models). Contrary to Ms. Guerin-Calvert's claims,

14   changing industry conditions provided opportunities for the cartel to slow down price declines and

15   enable faster price hikes through competitor meetings. Netz Rebuttal at 57-58.

16       Ms. Guerin-Calvert also specified three other alternative models imposing annual, two-

17   year, and three-year overcharge variables. Guerin-Calvert *Daubert* Decl., ¶¶ 25, 31 (Tables 3 &

18   4). Ms. Guerin-Calvert disavows treating these "sub-periods" as "economically relevant periods."

19   Guerin-Calvert Daubert Decl., ¶ 30 n.54. Again, there is no economic justification for segmenting

20

21   [22] Dr. Netz highlighted the extensive records of cartel meetings and communications during 1995-
     1996—over 70 instances in total—including the early 1995 meeting notes showing cartel members
22   agreed to fix CRT prices and limit production levels. *See* Netz Rebuttal at 57, Ex. RR-85. *See also,*
     *e.g.*, Alioto Decl. Ex. 19 (May 29, 1995 meeting report, Chunghwa reports that "all customers
23   have accepted" a $7 CDT price increase, and "[t]he price for CPT will be increased on June 1";
     they also discuss other meetings regarding price increases, and that other manufacturers had
24   already increased CDT and CPT prices); Ex. 38 (at a Sept. 18, 1995 meeting, the participants
     "reached a common understanding with regard to [CDT] supply exceeding demand starting in the
25   second half of 1996," and discussed a successful CDT price increase on September 1); Ex. 39
     (Nov. 23, 1996 meeting at which the participants agreed to "reduce production and temporarily
26   slow down or postpone line expansion plans"; they also agreed to price differentials for different
     CDTs, and discussed maintaining specific prices for CDTs). *See further* Alioto Decl. Exs. 40 - 44.

27

28

INDIRECT PURCHASER PLAINTIFFS' TRIAL BRIEF
MDL No. 1917; Case No. 07-cv-5944-JST

the conspiracy dummy variable into these periods, and it introduces multicollinearity between the overcharge and time-trend variables. Netz Daubert Decl. at 10-11. Ms. Guerin-Calvert's back-up code reveals that she also created dummy variables based on six-year sub-periods, but she omitted reporting the results of that analyses. *Id*. at 11. She also failed to test a 4-year overcharge period. *Id.* Both the 6-year periods and the 4-year periods provide CPT and CDT overcharges that closely align with those of Dr. Netz. *Id.* Dr. Netz also performed additional sensitivity tests and broke the cartel period into three time periods that match economic events rather than arbitrary calendar year divisions. The results of these analyses are similar to those in Dr. Netz's original Report. *Id.* at 9.

In sum, Dr. Netz's overcharge model reliably estimates class-wide overcharges while accounting for market conditions and cartel behavior, while Ms. Guerin Calvert's analyses rely on arbitrary segmentation and selective data adjustments that lack sound economic basis. Ms. Guerin Calvert's criticisms should be rejected.

## V.    IRICO'S OTHER ATTEMPTS TO LIMIT ITS LIABILITY ALSO LACK MERIT

### A.    The Appropriate Period for Calculating Damages is March 1, 1995 Through November 25, 2007, as Alleged in IPPs' Complaint

In a futile attempt to argue that it should not be liable for the full amount of damages caused by the cartel, Irico claims that IPPs' complaint does not allege that Irico participated in or had knowledge of the CRT conspiracy prior to 1998. ECF No. 6445 at 13.[23] Not so. The well-pled allegations of the complaint—which must be accepted as true given Irico's default (*Fair Hous. v. Combs*, 285 F.3d at 906)—allege that Irico participated in the CRT cartel prior to 1998.

Paragraph 2 of IPPs' complaint alleges that Samsung, Chunghwa and other CRT makers began their cartel meetings and communications "in at least 1995," and that "over time" they contacted other manufacturers, "including . . . ***IRICO*** . . . , who then also met or talked with their

---

[23] Irico has also stated that it intends to challenge the "stop-date" for calculating damages based on its defense that it withdrew from the conspiracy prior to 2007. *Id*. Irico's withdrawal defense is an affirmative defense that has been stricken. In addition, this contention is contrary to the complaint allegations. Finally, Irico should not be permitted "to present evidence on issues that Irico's misconduct prevented Plaintiffs from fully investigating." ECF No. 6459 at 1. IPPs will therefore not address the "stop-date" for calculating damages.

competitors for the purpose of fixing the prices of CRT Products. ***By 1997***, a formal system of multilateral and bilateral meetings was in place, involving the highest levels of ***the Defendant corporations***, ***all with the sole purpose of fixing the prices of CRT Products*** at supracompetitive levels." ECF No. 5589 ¶ 2 (emphasis added). Likewise, paragraph 145 alleges that, "***Beginning in 1997***, the Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place." *Id.* ¶ 145 (emphasis added).

Fairly read, these paragraphs allege that Irico communicated with its competitors for the purpose of fixing CRT prices ***before 1997, i.e.***, in 1995 and/or 1996, and that ***by 1997***, a system of meetings was established involving all Defendants, including Irico. Irico ignores these allegations.

IPPs also allege that "Defendants and their co-conspirators"—including Irico—participated in the conspiracy "from at least March 1, 1995 through at least November 25, 2007." *Id.* ¶¶ 1, 3, 142, 248. Irico dismisses these allegations as "conclusory," pointing solely to the allegation in paragraph 185 that, "[b]etween at least 1998 and 2007," Irico "participated in multiple Glass Meetings." *Id.* ¶ 185. But paragraph 185 does not negate the allegations of Irico's participation in the cartel meetings prior to 1998. Further, Irico ignores the complaints' well-pled allegations that Glass Meetings were only one type of meeting in the CRT cartel's arsenal. *Id.* ¶ 2, 142-166 (describing group and bilateral meetings and communications, and "Green meetings," which took place on a golf course). The next sentence of paragraph 185 alleges—without temporal limitation—that "Irico also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers." *Id.* ¶ 185. This allegation is consistent with the earlier allegations alleging that Irico met bilaterally with its competitors and conspired to raise CRT prices long before 1998.

In sum, Irico ignores the complaint's allegations that Irico, like the other cartel members, participated in the cartel from as early as 1995. As a result of Irico's default, these "well-pled allegations . . . and all inferences that may reasonably be drawn from those allegations [are] deemed to be true." *Freeman v. Giuliani*, 732 F. Supp. 3d at 37 (citation omitted). Accepting Irico's incorrect reading of IPPs' complaint would contravene this bedrock principle.

1    Irico's assertion that it did not participate in the cartel prior to 1998 is also inconsistent

2  with extensive evidence. Indeed, despite Irico's deliberate and wholesale destruction of evidence,

3  there is ample evidence that Irico's participated in the CRT conspiracy prior to 1998, which may

4  be considered. *Id.* at 48 (plaintiffs were not limited to proving damages based only on specific

5  defamatory statements in plaintiffs' complaint). For example, Irico began attending monthly

6  meetings with its Chinese CRT competitors in July 1995 under the auspices of the CRT Industry

7  Association, a trade association of Chinese CPT manufacturers,[24] which held a "preparatory

8  meeting in Beijing on July 17" 1995 and its "founding meeting" in early August 1995. Alioto Decl.

9  Ex. 50.[25] A November 30, 1995 document entitled "December CRT Industry Meeting Exchange,"

10  signs off with "Irico Group Sales Company." *Id.,* Ex. 52. The document contains Irico's CPT

11  production, sales, and inventory for 1995, as well as Irico's *projected production* for 1996 and its

12  planned export volumes. *Id.* The last paragraph states, "we hope our CRT industry peers will unite,

13  act in concert, and face our foreign enemies together." *Id.* at '91E.

14    Irico also attended a January 4, 1996 CRT Industry Association meeting at which the

15  competitors agreed to hold their prices for 21" CPTs despite pressure from customers to reduce

16

17

18

19

---

[24] The CRT Industry Association was also referred to as the "China CPT Industry Association." *See* Alioto Decl. Ex. 45 (Irico's interrogatory responses admitting that Irico employees attended "China CPT Industry Association" meetings). It was also referred to as the "Color Tube Industry Association" and "Eight Major Color Tube Industry Association." *See, e.g., id.* Ex. 46 (Jan. 23, 2007 "Color Tube Industry Association Presidents' Meeting" notice from the "Eight Major Color Tube Industry Association"); Ex. 47 (May 9, 2003 fax from "Secretary-General of the Eight Major Color Tube Industry Association," to member companies, including Irico). Numerous documents confirm the anticompetitive purpose of this trade association. *See, e.g., id.* Ex. 48 (minutes of the "2006 Color Tube Industry President's Meeting" on Nov. 21, 2006 show the attendees, including Irico, agreed to limit production "to protect prices."); Ex. 49 (January 23, 2007 meeting minutes report that Irico limited production as agreed at the November 2006 meeting; "The policy of this meeting: limit production, reduce inventory, and keep price."); Ex. 47 (fax admonishing members to "strictly control inventory volumes").

[25] *See also id.* Ex. 51 (noting the CRT Industry Meetings were held once a month).

1    prices: "Before April 1, there will be no price reduction for CPT." *Id.*, Ex. 53.[26] Irico and its

2    competitors again shared confidential future CPT production. *Id.* Similarly, on December 11, 1997,

3    Irico reported: "An industry meeting was held last week, and all tube makers set the price of 21"

4    [CPTs] at RMB620." *Id.*, Ex. 55. Nothing suggests that this meeting was a new experience for

5    Irico or expresses surprise at the collusion.

6         Irico also had other contacts with its CRT competitors prior to 1998. An August 12, 1997

7    document reports an Irico visit to Taiwan to visit five companies, including its competitor

8    Chunghwa—one of the founders of the CRT cartel. *Id.*, Ex. 56 (". . .Taiwan can be a good

9    cooperation partner."). A May 15, 1998 document reports Irico's meeting with Chunghwa at its

10   new Fuzhuo factory during which representatives gathered confidential information regarding

11   Chunghwa's CDT capacity and production. *Id.*, Ex. 57. Irico was also in regular contact with

12   defendant Toshiba Corporation during this period.[27]  The lack of detail as to what was said and

13   done at these meetings by Irico is, of course, the result of Irico's wholesale destruction of evidence

14   and failure to comply with its discovery obligations.

15        This evidence of Irico's contacts with competitors prior to August 1998, together with

16   Irico's attendance at monthly meetings of the China CRT Industry Association—most of whose

17   members were subsidiaries of the Glass Meeting attendees[28]—demonstrate that Irico would have

18   been well-versed in the operation of the CRT conspiracy prior to 1998. Thus, even if Irico could

19

20   ───────────────

     [26] Irico is referred to as "Xianyang 4400", which is how Irico referred to its CRT plant. *See id.*,

21   Ex. 54. Irico also states, "it is definitely impossible to reduce the price of 21", at least not for now."
     *Id.*, Ex. 53 at '87E.

22
     [27] *See, e.g., id.,* Ex. 58 (April 5, 1995 document discusses a planned trip by Irico executives to

23   Japan to meet Toshiba to discuss a CRT television joint venture); Ex. 59 (April 28, 1995 document

24   reports that Irico signed two agreements with Toshiba relating to TVs and CRTs, and that, "Toshiba
     indeed wants to cooperate with Caihong [Irico] and thinks highly of Caihong").

25   [28] *See id.*, Exs. 46-47 (listing CRT Industry Association members). Panasonic and later MTPD
     owned a 50% share in BMCC. *Id.*, Ex. 60. Philips owned 55% of Nanjing Huafei. *Id.*, Ex. 61.

26   Samsung SDI had two Chinese subsidiaries in Shenzhen and Tianjin. *Id.*, Ex. 62. LG Electronics
     owned a 50% share in LG Changsha. *Id.,* Ex. 63. Thomson Guangdong was a subsidiary of

27   Thomson S.A. *Id.,* Ex. 64.

28

sustain its contention that it did not formally join the conspiracy until 1998 (which is contrary to the allegations of the complaint and the afore-referenced evidence), it should still be held liable for the damages caused by its co-conspirators prior to joining because it would have joined the conspiracy with "'knowledge of what has gone before'" and "'the intent to pursue the same objective.'" *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-5944-JST, 2018 WL 659084, at *9 (N.D. Cal. Feb. 1, 2018) (quoting *Indus. Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970)); *see also In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538-39 (D.N.J. 2004) ("[A] co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy."); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 710 F. Supp. 152, 153 (E.D. Pa. 1989) (accepting the "general rule that one who joins an existing conspiracy is equally liable with the other conspirators for all damages occasioned by the conspiracy, including damages caused before joinder"). Moreover, a "co-conspirator need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) (citing *Beltz Travel Serv., Inc. v. Int'l Air Transp. Asso.*, 620 F.2d at 1367).

Given the elaborate structure of this cartel, with multiple levels of meetings and mechanisms for monitoring and punishing "cheating," which were well-established prior to 1998, it is implausible that a new entrant to the cartel would have been unaware that the cartel had been operating successfully for a significant period. Irico should be held jointly and severally liable for all damages caused by the CRT cartel from March 1, 1995 through November 25, 2007.

**B.     Aggregate Damages, Apportioned by State, Are Appropriate**

Courts routinely approve aggregate damages in class actions, particularly in antitrust cases, as a "well-established" and efficient method for quantifying economic harm on a class-wide basis. *See In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, No. 19-md-02918-MMC, 2025 WL 71988, at *22 (N.D. Cal. Jan. 10, 2025) (aggregate damages are "implied by the very existence of the class action mechanism itself.") (quoting *In re Pharm. Indus. Average Wholesale Price*

*Litig.*, 582 F.3d 156, 197 (1st Cir. 2009)); *see also In re Restasis*, 335 F.R.D. at 32 (aggregate damages models are "especially appropriate" in antitrust cases, "where it is impossible to measure the true harm caused by [the defendant's] alleged conduct."). Plaintiffs need not calculate damages on an individual basis, so long as the aggregate figures reasonably reflect the harm suffered and can be distributed during claims administration. *See In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-5944-JST, 2016 WL 5725008, at *6 (N.D. Cal. Sept. 30, 2016) (Tigar, J.). While the proportion of damages suffered by indirect purchasers in each Class State does not implicate the total amount of damages Irico may be ordered to pay (ECF No. 6459 at 2), the same population shares can be used to calculate damages for each Class State based on the relevant state statutes.[29] These calculations are done post-trial.

**C.    Apportionment of Damages Between DPPs and IPPs Is Not Necessary**

There is no reason to apportion claimed "duplicative" damages between DPPs and IPPs. While some state statutes provide for apportionment of damages between direct and indirect purchasers, these provisions apply only where direct and indirect purchasers both assert state law claims. They do not apply where, as here, direct purchasers bring federal claims. *See In re HIV Antitrust Litig.*, No. 19-cv-02573-EMC, 2023 WL 3011624, at *2-3, 10 (N.D. Cal. Apr. 18, 2023) (holding defendants could not assert a duplicative recovery defense); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-1827-SI, 2013 WL 257148, at *1 (N.D. Cal. Jan. 23, 2013) (same).

In *HIV*, the court analyzed duplicative recovery provisions under the laws of the states at issue here and found none applied when direct purchasers asserted federal claims. 2023 WL 3011624, at *2-9. The court explained that if the state law duplicative recovery provisions applied where direct purchasers asserted claims under federal law (under which they can obtain the full overcharge regardless of pass on), indirect purchasers could never recover under state law. *Id.* at

---

[29] While many state statutes require trebling, some states allow but do not require treble damages; some provide for treble damages if the violation was flagrant or willful; and others do not allow for enhanced damages. *See* Appendix A, filed herewith. A damages figure can be calculated for each of the 22 States using Dr. Netz's methodology and data and enhanced as appropriate. *See In re Turkey Antitrust Litig.*, No. 19-cv-8318, 2025 WL 264021, at *28 (N.D. Ill. Jan. 22, 2025).

1    *2-3. Such an interpretation would be contrary to the purpose of the statutes to create a remedy for

2    indirect purchasers. *Id.* In any event, these issues do not implicate the quantification of the harm

3    caused by the CRT cartel's conduct, and may be addressed after the damages hearing.

4        **D.    Irico's Conduct Was Willful and Flagrant Justifying Enhanced Damages**

5        In Arizona, Iowa, Michigan and North Dakota, treble damages are recoverable only against

6    defendants whose challenged conduct was "flagrant" and/or "willful."[30] Irico's conduct was both

7    "flagrant" and "willful," warranting treble damages under those states' laws.

8        In *Western Waste Serv. Sys. v. Superior Court*, 120 Ariz. 90 (1978), the Court interpreted

9    the very Arizona antitrust statute at issue here, and defined "flagrant" as "glaring, rank, shocking

10   or outrageous." *Id.* at 92. The Merriam-Webster online dictionary, www.merriam-webster.com,

11   defines "flagrant" as "conspicuously offensive" or "so obviously inconsistent with what is right or

12   proper as to appear to be a flouting of law or morality," and "willful" as "1.  obstinately and often

13   perversely self-willed, … 2.  done deliberately: intentional." Whatever definitions are adopted,

14   intentional conduct to accomplish an anticompetitive purpose and effect meets the standard of

15   "flagrancy" and "willfulness." *See, e.g., Pfiffner v. Roth*, 379 N.W.2d 357, 361 (1985) (affirming

16   finding that a city's conduct was "wilful [sic] and flagrant" under Iowa Code Ann. § 553.12 where

17   it had known it was acting to create and preserve a monopoly and "the injurious consequences to

18   the Plaintiffs would be obvious."); *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 (DLC), 2014

19   WL 2535112, *5-6, (S.D.N.Y. June 5, 2014) (defendant's participation in a price-fixing conspiracy

20   found to be "willful or flagrant").

21       Here, IPPs' well-pleaded allegations readily support a finding that Irico acted "flagrantly"

22   and "willfully." *See* Appendix B (list of supporting allegations). They establish that Irico conspired

23

24   _____

     [30] Ariz. Rev. Stat. Ann. § 44-1408 (treble damages mandatory if violation is flagrant); Iowa Code

25   Ann. § 553.12 (may recover "at the court's discretion, exemplary damages which do not exceed
     twice the actual damages awarded" if the conduct is "willful or flagrant"); Mich. Comp. Laws

26   Ann. § 445.778(2) ("may increase recovery to an amount not in excess of 3 times the actual
     damages" if the violation is flagrant); N.D. Cent. Code Ann. § 51-08.1-08 ("may increase recovery

27   to an amount not in excess of three times the damages sustained" if the violation is flagrant).

28

to fix prices, restrict output and allocate customers and markets for CRTs sold in the U.S. over a twelve-year period. *Id.* ¶¶ 1, 142, 249-251. The conspiracy adversely affected every TV and computer monitor customer nationwide, including the class members from the four states in question, by raising prices to supra-competitive levels. *Id.* ¶¶ 10, 11, 242, 253, 258 [Arizona], 262 [Iowa], 265 [Michigan] and 273 [North Dakota]). Moreover, Irico and the other Defendants ***knew*** and ***intended*** that it would have that effect. *Id.* ¶¶ 12, 157, 226, 240. To effectuate the conspiracy, Irico and other Defendants repeatedly met with each other, exchanged sensitive internal information and entered into anticompetitive agreements. *Id.* ¶¶ 2, 150, 154, 158, 185, 249-252. Because the Court must accept these factual allegations as true, there is no need to consider ***any*** testimonial and documentary evidence.

Nevertheless, abundant evidence confirms the complaint's allegations, including, for example, the minutes of multiple group and bilateral meetings attended by Irico representatives at which the participants agreed to raise or maintain prices of CRTs and/or control output.[31] The deposition testimony is similarly damning.[32]

In sum, the evidence of Irico's conduct and that of its co-conspirators confirms IPPs' allegations that the conspirators deliberately, knowingly and intentionally—in other words,

---

[31] *See* Alioto Decl. Ex. 65 (Irico agreed in Oct. 1998 to increase CDT prices and limit output, and to exercise "utmost caution" because "MONITOR customers (especially IN USA) are quite sensitive to price monopolies."); Ex. 66 (Nov. 1998 meeting hosted by Irico at which the co-conspirators agreed to fix CDT prices); Ex. 67 (Irico told its competitors it was "willing to cooperate with the move to increase the price" of 14" CPTs in June 1999 meeting); Ex. 68 (Irico agreed on Chinese domestic and export prices in July 1999 meeting); Ex. 28 (Irico entered into written agreement to fix CPT prices and limit production, and agreed to detailed penalty plan at Aug. 2001 meeting); Ex. 48 (Irico agreed to a concerted production shutdown in Nov. 2006 "to protect prices" of CPTs); Ex. 69 (Irico recommended a concerted increase in prices and limitation of production in July 2007).

[32] For example, Chunghwa employee, Jing Song Lu, testified that agreements were reached at almost every China CDT meeting he attended, and that Irico attended meetings with him and agreed to raise prices. Alioto Decl. Ex. 70. Chunghwa's C.C. Liu also testified that in sending representatives to such meetings, the conspirators intended to and did fix prices. *Id.*, Ex. 71. Again, this testimony comes from other cartel members. IPPs do not have testimony from Irico because of Irico's persistent discovery abuses.

1    "flagrantly" and "willfully"—fixed prices, limited production and allocated markets and

2    customers with the intention of causing consumers in the United States to pay supracompetitive

3    prices. Accordingly, the damages award to indirect purchasers in Arizona, Michigan and North

4    Dakota should be trebled, and an award of exemplary damages equal to double the Iowa class's

5    actual damages should be awarded to Iowa indirect purchasers (thus entitling them to a total award

6    equal to three times their actual damages). *See* fn. 30, *supra*.

7    **VI.    CONCLUSION**

8         Based on the applicable law, the well-pled allegations of IPPs' complaint, and the record

9    evidence, IPPs respectfully request that the Court (1) credit the analyses and opinions of IPPs'

10   expert, Dr. Janet Netz, regarding the amount of damages caused by the CRT cartel and reject the

11   criticisms of Irico's expert, Ms. Margaret Guerin-Calvert; (2) enter IPPs' findings of fact and

12   conclusions of law, finding that the 22 Indirect Purchaser State Classes have been harmed by the

13   conduct of the CRT cartel in the aggregate amount of **$2,697,957,236** and that the Irico Defendants

14   are jointly and severally liable for all of that harm; and (3) schedule a post-hearing status

15   conference to address allocation of the aggregate damages award to the 22 State Classes and

16   trebling where appropriate, and all other post-trial issues and proceedings.

17

18   Dated: April 28, 2025                    By:  */s/ Mario N. Alioto*

19                                            Mario N. Alioto (56433)
                                             Lauren C. Capurro (241151)
20                                           TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
                                             2001 Union Street, Suite 482
21                                           San Francisco, CA 94123
                                             Telephone: (415) 563-7200
22                                           Facsimile:  (415) 346-0679
23                                           Email:     malioto@tatp.com
                                                        laurenrussell@tatp.com
24
25                                           *Lead Counsel for Indirect Purchaser Plaintiffs*
26   //
27
28

ON THE BRIEF:

Joseph Goldberg
FREEDMAN BOYD HOLLANDER &
GOLDBERG, P.A.
PO Box 25326,
Albuquerque, NM  87125
jg@fbdlaw.com

Gerard Dever
Jessica Khan
FINE, KAPLAN & BLACK, R.P.C.
One South Broad Street, Suite 2300
Philadelphia, Pennsylvania 19107
gdever@finekaplan.com
jkhan@finekaplan.com

Christopher Micheletti
Qianwei Fu
ZELLE LLP
555 12th Street, Suite 1230
Oakland, CA 94607
cmicheletti@zellelaw.com
qfu@zellelaw.com

Daniel E. Birkhaeuser
Alan R. Plutzik
BRAMSON, PLUTZIK, MAHLER &
BIRKHAEUSER, LLP
2125 Oak Grove Rd., Suite 125
Walnut Creek, CA 94598
dbirkhaeuser@bramsomplutzik.com
aplutzik@bramsonplutzik.com

*Counsel for the Indirect Purchaser Plaintiffs*

INDIRECT PURCHASER PLAINTIFFS' TRIAL BRIEF
MDL No. 1917; Case No. 07-cv-5944-JST

**APPENDIX A**

**ENHANCED DAMAGES PROVISIONS**

| State | Enhanced Damages | Statutory Provision |
|-------|------------------|---------------------|
| Arizona | Up to three times the damages sustained, if the violation is flagrant | "If the trier of fact finds that the violation is flagrant, it shall increase recovery to an amount not in excess of three times the damages sustained." Ariz. Rev. Stat. Ann. § 44-1408. |
| California | Automatic treble damages | "Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor . . . to recover three times the damages sustained by him or her . . . ." Cal. Bus. & Prof. Code § 16750(a). |
| District of Columbia | Automatic treble damages | Any person who is injured in that person's business or property by reason of anything forbidden by this chapter may bring a civil action for damages, . . . . In such an action, . . . the court shall award as monetary relief: (1) threefold the total damage sustained by such person; and (2) as determined by the court, the costs of suit including reasonable attorney's fees." D.C. Code Ann. § 28-4508(a). |
| Florida | Not available | |
| Hawaii | Not available | |

1

**APPENDIX A**

**ENHANCED DAMAGES PROVISIONS**

| State | Enhanced Damages | Statutory Provision |
|-------|------------------|---------------------|
| Iowa | Up to treble damages if violation is willful or flagrant | Plaintiff may "[r]ecover actual damages." § 553.12(2). In addition, Plaintiff may "[r]ecover, at the court's discretion, exemplary damages which do not exceed twice the actual damages awarded under subsection 2 . . ., if all of the following apply:<br>a. The trier of fact determines that the prohibited conduct is willful or flagrant.<br>b. The person bringing suit is not the state."<br>Iowa Code Ann. § 553.12(3). |
| Kansas | Automatic treble damages | "The plaintiff in any action commenced hereunder . . . may sue for and recover treble the actual damages sustained." Kan. Stat. Ann. § 50-161(b). |
| Maine | Automatic treble damages | "If the court finds for the plaintiff, the plaintiff is entitled to recover 3 times the amount of the damages sustained . . . ." Me. Rev. Stat. Ann. tit. 10, § 1104(1). |
| Michigan | Up to three times actual damages if the violation is flagrant | "If the trier of fact finds that the violation is flagrant, it may increase recovery to an amount not in excess of 3 times the actual damages sustained by reason of a violation of this act." Mich. Comp. Laws Ann. § 445.778(a). |
| Minnesota | Automatic treble damages | "Any person . . . injured directly or indirectly by a violation of sections 325D.49 to 325D.66, shall recover three times the actual damages sustained . . . ." Minn. Stat. Ann. § 325D.57. |
| Mississippi | Not available | |
| Nebraska | Not available | |

**APPENDIX A**

**ENHANCED DAMAGES PROVISIONS**

| State | Enhanced Damages | Statutory Provision |
|---|---|---|
| Nevada | Automatic treble damages | Any person injured or damaged directly or indirectly in his or her business or property by reason of a violation of the provisions of this chapter may institute a civil action and shall recover treble damages . . . ." Nev. Rev. Stat. Ann. § 598A.210(2). |
| New Mexico | Up to three times actual damages | "[A]ny person threatened with injury or injured in his business or property, directly or indirectly, by a violation of Section 57-1-1 or 57-1-2 NMSA 1978 may bring an action for appropriate injunctive relief, up to threefold the damages sustained and costs and reasonable attorneys' fees. If the trier of fact finds that the facts so justify, damages may be awarded in an amount less than that requested, but not less than the damages actually sustained." N.M. Stat. Ann. § 57-1-3(A). |
| New York<br><br>Donnelly Act | Automatic treble damages | "[A]ny person who shall sustain damages by reason of any violation of this section, shall recover three-fold the actual damages sustained thereby . . . ." N.Y. Gen. Bus. Law § 340(5). |
| New York<br><br>Deceptive Practices Act | Although the statute allows for treble damages for willful or knowing violations, N.Y. Gen. Bus. Law § 349(h), IPPs do not seek treble damages in this action. *See* ECF No. 5589 (IPPs' Fifth Consolidated Am. Compl., ¶ 286(m)). | |

**APPENDIX A**

**ENHANCED DAMAGES PROVISIONS**

| State | Enhanced Damages | Statutory Provision |
|---|---|---|
| North Carolina | Automatic treble damages | "If any person shall be injured . . . by reason of any act or thing done . . . in violation of the provisions of this Chapter, such person . . .so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict." N.C. Gen. Stat. Ann. § 75-16. |
| North Dakota | Up to three times damages if the violation is flagrant | "If the trier of fact finds that the violation is flagrant, it may increase recovery to an amount not in excess of three times the damages sustained." N.D. Cent. Code Ann. § 51-08.1-08(3). |
| South Dakota | Automatic treble damages | "The trier of facts shall increase recovery under this section to three times the damages sustained." S.D. Codified Laws § 37-1-14.3. |
| Tennessee | Not available | |
| Vermont | Up to three times actual damages | Any person who sustains damages or injury as a result of any violation of State antitrust laws. . . may sue and recover from the violator the amount of his or her damages  . . . and exemplary damages, not exceeding three times the . . . damages sustained by the aggrieved person." Vt. Stat. Ann. tit. 9, § 2465(a). |

4

**APPENDIX A**

**ENHANCED DAMAGES PROVISIONS**

| State | Enhanced Damages | Statutory Provision |
|---|---|---|
| West Virginia | Automatic treble damages | "Any person who shall be injured in his business or property by reason of a violation of the provisions of this article may bring an action therefor and shall recover threefold the damages sustained by him . . . ." W. Va. Code Ann. § 47-18-9. |
| Wisconsin | Automatic treble damages | "[A]ny person injured, directly or indirectly, by reason of anything prohibited by this chapter may sue therefor and shall recover threefold the damages sustained by the person . . . ." Wis. Stat. Ann. § 133.18(1)(a). |

## APPENDIX B

## ALLEGATIONS FROM THE FIFTH AMENDED COMPLAINT SUPPORTING THE CONCLUSION THAT IRICO'S CONDUCT WAS "FLAGRANT" AND "WILLFUL"

**Paragraph 1**:

… [D]uring the Class Period the Defendants conspired to fix, raise, maintain and/or stabilize prices of CRT Products sold in the United States. Because of Defendants' unlawful conduct, Plaintiffs and other Class Members paid artificially inflated prices for CRT Products and have suffered antitrust injury to their business or property.

**Paragraph 2:**

IRICO, Thomson, Mitsubishi, Thai CRT and Samtel … met or talked with their competitors for the purpose of fixing the prices of CRT Products.…

**Paragraph 10:**

As a result of the activities described herein, Defendants:

    a.  Caused damage to the residents of the states identified herein;

    b.  Caused damage in each of the states identified herein …; and

    c.  Committed acts or omissions that they knew or should have known would cause damage (and, in fact, did cause damage) in each such state ….

**Paragraphs 11 and 12:**

11. The conspiracy described herein adversely affected every person nationwide, and more particularly, consumers in each of the states identified in this Complaint, who indirectly purchased Defendants' and their co-conspirators' CRT Products. Defendants' conspiracy has resulted in an adverse monetary effect on indirect purchasers in each state identified herein.

12. Prices of CRT Products in each state identified in this Complaint were raised to supracompetitive levels by the Defendants and their co-conspirators. Defendants knew that commerce in CRT Products in each of the states identified herein would be adversely affecting by implementing their conspiracy.

**Paragraph 142:**

142. … Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRT Products to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

**Paragraph 150:**

150.  a.  The Chinese Glass Meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent Glass Meeting to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO …

b.  Glass Meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants which had subsidiaries and/or manufacturing facilities located in Europe, including … IRICO….

**Paragraph 154:**

The Glass Meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends, and forecasts of sales volumes for coming months. … The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter. They discussed and agreed upon target prices, price increases, so-called "bottom" prices, and price ranges for CRTs. They also discussed and agreed upon prices of CRTs that were sold to specific customers …. [P]articipants would also discuss and agree upon production cutbacks.

**Paragraph 157:**

Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.…

**Paragraph 158:**

The agreements reached at the Glass Meetings included:

a. agreements on CRT Product prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines; …

d. agreements as to what to tell customers about the reason for a price increase;

e. agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f. agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g. agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h. agreements to coordinate uniform public statements regarding available capacity and supply;

i. agreements to allocate both overall market shares and share of a particular customer's purchases;

j. agreements to allocate customers;

k. agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l. agreements to keep their meetings secret.

**Paragraph 185:**

Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple Glass Meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRT Products. None of IRICO's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

**Paragraph 226:**

… The Defendants concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers (for e.g., retailers and computer OEMs). In this way, Defendants assured that 100% of the supracompetitive overcharges for CRT Products were passed on to indirect purchaser consumers.

**Paragraph 240:**

The purpose of Defendants' conspiratorial conduct was to fix, raise, maintain and stabilize the price of CRTs and, as a direct and foreseeable result, CRT Products. … Defendants not only knew, but expressly contemplated that prices of CRT Products would increase as a direct result of their increasing the prices of CRTs.

**Paragraph 242:**

As a direct and proximate result of Defendants' illegal conduct, Plaintiffs and other indirect purchasers have been forced to pay supra-competitive prices for CRT Products. These inflated prices have been passed on to them by direct purchaser manufacturers, distributors and retailers.

**Paragraphs 249-254:**

249. … Defendants have combined and conspired to fix, raise, maintain or stabilize the prices of CRT Products sold in the United States.

250. Defendants, by their unlawful conspiracy, artificially raised, inflated and maintained the market prices of CRT Products as herein alleged.

251. The contract, combination or conspiracy consisted of a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of CRT Products they sold in the United States and elsewhere.

252. In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

   a. Participated in meetings and conversations to discuss the prices and supply of CRT Products in the United States and elsewhere;

   b. Agreed to manipulate prices and limit supply of CRT Products sold in the United States and elsewhere in a manner that deprived direct and indirect purchasers of CRT Products of free and open competition;

   c. Issued price announcements and price quotations in accordance with the agreements reached;

   d. Sold CRT Products to customers in the United States at non-competitive prices; and

   e. Invoiced customers in the United States at the agreed-upon, fixed prices for CRT Products and transmitting such invoices via U.S. mail and other interstate means of delivery.

253. The combination and conspiracy alleged herein has had the following effects, among others:

   a. Price competition in the sale of CRT Products has been restrained, suppressed and/or eliminated in the United States;

   b. Prices for CRT Products sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

   c. Those who purchased CRT Products directly or indirectly from Defendants have been deprived the benefits of free and open competition.

**Paragraph 258:**

258. Plaintiff Brian Luscher ("Arizona Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in Arizona.

b. Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Arizona; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) the Arizona Plaintiff and members of the Arizona Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, the Arizona Plaintiff and members of the Arizona Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§44-1401, *et seq*. …

**Paragraph 262:**

262. Plaintiff Travis Burau ("Iowa Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in Iowa.

b. Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout the Iowa; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the Iowa; (3) the Iowa Plaintiff and the members of the Iowa Indirect Purchaser Class

paid supracompetitive, artificially inflated prices for CRT Products.

c. During the Class Period, Defendants' illegal conduct substantially  affected Iowa commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, the Iowa Plaintiff and members of the Iowa Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1 *et seq*. …

**Paragraph 265:**

265. Plaintiff Lisa Reynolds ("Michigan Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in Michigan.

b. Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Michigan; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) the Michigan Plaintiff and members of the Michigan Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, the Michigan Plaintiff and members of the Michigan Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771 *et seq*.

**Paragraph 273:**

273. Plaintiff Gary Hanson ("North Dakota Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in North Dakota.

b. Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) the North Dakota Plaintiff and members of the North Dakota Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c. During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, the North Dakota Plaintiff and members of the North Dakota Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq*. ...