R. Alexander Saveri (173102)
Geoffrey C. Rushing (126910)
Matthew D. Heaphy (227224)
David Y. Hwu (281780)
SAVERI & SAVERI, INC.
1016 Lincoln Boulevard, Suite 306
San Francisco, CA 94129
Telephone: (415) 217-6810
Email: rick@saveri.com
grushing@saveri.com
mheaphy@saveri.com
dhwu@saveri.com

*Lead Counsel for Direct Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>*ALL DIRECT PURCHASER ACTIONS* | Master File No. 07-CV-5944-JST<br><br>MDL No. 1917<br><br>**DIRECT PURCHASER PLAINTIFFS' UPDATED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DAMAGES**<br><br>Judge: Hon. Jon S. Tigar |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................................ ii

    I.   PROCEDURAL HISTORY ................................................................................. 1

    II.  THE STANDARD OF REVIEW FOR DETERMINING DAMAGES ................. 2

PROPOSED FINDINGS OF FACT .............................................................................................. 3

PROPOSED CONCLUSIONS OF LAW ...................................................................................... 6

    I.   DR. JOHNSON'S EXPERT REPORTS SUPPORT CLASSWIDE DAMAGES ................. 6

    II.  IRICO IS LIABLE FOR PRE-1998 CONDUCT ............................................... 10

    III. WITHDRAWAL ................................................................................................ 11

    IV. DR. JOHNSON'S DETERMINATION OF SALES IS REASONABLE ........... 11

    V.  CONCLUSION .................................................................................................. 14

i

DIRECT PURCHASER PLAINTIFFS' UPDATED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DAMAGES; Master File No. 07-CV-5944-JST

# TABLE OF AUTHORITIES

**CASES**

*Adriana Int'l Corp. v. Thoeren*,
　913 F.2d 1406, 1414 (9th Cir. 1990) .................................................................................. 2, 11

*Bigelow v. RKO Radio Pictures*,
　327 U.S. 251 (1946) ............................................................................................................ 3, 6

*California v. ARC Am. Corp.*,
　490 U.S. 93 (1989) ................................................................................................................ 13

*Danning v. Lavine*,
　572 F.2d 1386 (9th Cir. 1978) ................................................................................................ 2

*Domanus v. Lewicki*,
　742 F.3d 290 (7th Cir. 2014) ................................................................................... 2, 6, 8, 13

*Elektra Entm't Grp., Inc. v. Bryant*,
　No. CV 03-6381GAF (JTLX), 2004 WL 783123, at *2 (C.D. Cal. Feb. 13, 2004) .......... 2, 6, 13

*Fair Hous. of Marin v. Combs*,
　285 F.3d 899, 906 (9th Cir. 2002) .......................................................................................... 2

*Geddes v. United Fin. Grp.*,
　559 F.2d 557, 560 (9th Cir. 1977) .......................................................................................... 2

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
　392 U.S. 481, 494 (1968) ...................................................................................................... 13

*Illinois Brick Co. v. Illinois*,
　431 U.S. 720 (1977) ......................................................................................................... 13, 14

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
　308 F.R.D. 606 (N.D. Cal. 2015) ................................................................................. 7, 8, 11

*In re HIV Antitrust Litig.*,
　No. 19-CV-02573-EMC, 2023 WL 3011624 (N.D. Cal. Apr. 18, 2023) ............................... 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
　No. C 11-5765, 2013 WL 257148 (N.D. Cal. Jan. 23, 2013) ................................................ 13

*Indus. Bldg. Materials, Inc. v. Interchemical Corp.*,
　437 F.2d 1336 (9th Cir. 1970) .............................................................................................. 11

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
　451 U.S. 557 (1981) ................................................................................................................ 3

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
　281 F.3d 629 (7th Cir. 2002) ................................................................................................ 14

*Reid Bros. Logging Co. v. Ketchikan Pulp Co.*,
　699 F.2d 1292 (9th Cir. 1983) ............................................................................................. 2, 6

*Reisman v. United States*,
　409 F.2d 789 (9th Cir. 1969) ................................................................................................ 11

ii

DIRECT PURCHASER PLAINTIFFS' UPDATED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF
LAW RE: DAMAGES; Master File No. 07-CV-5944-JST

*Vanngo v. Beauty Advisor, LLC*,
  No. 21CV07035JSTAGT, 2022 WL 2289066, at *3 (N.D. Cal. Mar. 21, 2022), *report and recommendation adopted*, No. 21-CV-07035-JST, 2022 WL 21768596 (N.D. Cal. July 21, 2022) .................................................................................................................. 2

**STATUTES**

15 U.S.C. § 15 ........................................................................................................... 3, 6, 14

15 U.S.C. § 22 ................................................................................................................ 3, 6

28 U.S.C. § 1331 ............................................................................................................ 3, 6

28 U.S.C. § 1337(a) ........................................................................................................ 3, 6

28 U.S.C. § 1367 ............................................................................................................ 3, 6

28 U.S.C. § 1391 ............................................................................................................ 3, 6

Pursuant to the Court's Order re: Damages Hearing (ECF No. 6459) with respect to Defendants Irico Group Corporation ("Group") and Irico Display Devices Co., Ltd. ("Display") (together, the "Irico Defendants" or "Irico"), Direct Purchaser Plaintiffs ("DPPs") hereby submit their updated proposed findings of facts and conclusions of law:

## I. PROCEDURAL HISTORY

On November 15, 2024, the Court entered its order adopting the Special Master's recommendation to grant "terminating sanctions based on Irico's discovery misconduct" ECF No. 6423 ("Sanctions Order") at 38, and found that, "Irico's conduct has made it impossible for the true facts surrounding Irico's defenses to ever be known, thus making case-dispositive sanctions appropriate not only on Plaintiffs' case in chief, but also on Irico's affirmative defenses." *Id.* at 37. The Court struck Irico's answers and affirmative defenses, instructed the Clerk to enter Irico's default, and requested the parties' proposals "regarding how to determine damages." *Id.* at 38. The Court made clear that the only remaining issue was the amount of damages, and that Irico could not contest liability. *Id.* at 37.

On November 25, 2024, the Clerk of the Court entered Default against the Irico Defendants. ECF No. 6431.

On March 5, 2025, after briefing and hearings on the scope of the proceedings to determine the amount of damages incurred by the DPP Class, the Court ruled that Irico could raise the following issues:

- The appropriate start-date and stop-date for calculating damages based on Irico's temporally limited involvement in the alleged conspiracy;
- The appropriate apportionment of duplicative damages between DPPs and IPPs;
- The effectiveness of the alleged CRT cartel in substantially and consistently elevating CRT prices as relevant to determining the best estimate overcharges paid by Plaintiffs;
- Whether overcharges paid by Plaintiffs on CRT products are best determined by analyzing the CPT (color picture tubes, used in televisions) and CDT (color display tubes, used in computer monitors) markets separately;
- The extent to which overcharges paid by Plaintiffs for CRT products varied over time; and

1
DIRECT PURCHASER PLAINTIFFS' UPDATED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DAMAGES; Master File No. 07-CV-5944-JST

- The impact of competition CRT products faced from LCD and plasma technology on CRT prices in the but-for world.

ECF No. 6459. The first issue was decided by the Court prior to the Damages Hearing based on the pleadings. ECF No. 6482.

## II. THE STANDARD OF REVIEW FOR DETERMINING DAMAGES

The rules for determining damages after a default are well-established. Consistent with the Sanctions Order, the default conclusively establishes both the liability of the defaulting defendant and the factual allegations of the complaint supporting that liability, but not the amount of damages.

> Upon entry of a default judgment, facts alleged to establish liability are binding upon the defaulting party, and those matters may not be relitigated on appeal. However, it follows from this that facts which are not established by the pleadings of the prevailing party, or claims which are not well-pleaded, are not binding and cannot support the judgment.

*Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978) (citations omitted); *see also Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1414 (9th Cir. 1990) (default "conclusively establishes" liability); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002) (general rule "is that well-pled allegations in the complaint regarding liability are deemed true"). Allegations relating to the amount of damages are not established. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977).

Following default, "Plaintiff's burden in 'proving up' damages is relatively lenient." *Elektra Entm't Grp., Inc. v. Bryant*, No. CV 03-6381GAF (JTLX), 2004 WL 783123, at *2 (C.D. Cal. Feb. 13, 2004). Even "speculation has its place in estimating damages" where defendant's "conduct impedes quantification." *Domanus v. Lewicki*, 742 F.3d 290, 302–03 (7th Cir. 2014) ($413 million default judgment after terminating sanction for discovery misconduct in RICO action). *See also Vanngo v. Beauty Advisor, LLC*, No. 21CV07035JSTAGT, 2022 WL 2289066, at *3 (N.D. Cal. Mar. 21, 2022), *report and recommendation adopted*, No. 21-CV-07035-JST, 2022 WL 21768596 (N.D. Cal. July 21, 2022) (plaintiff had "done enough to prove up" compensatory damages by submitting invoice provided to non-party for similar services).

In addition, a "lightened burden of proof is imposed on a plaintiff seeking to prove antitrust damages once violations of the law have been established." *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1299 (9th Cir. 1983) (collecting cases). The Supreme Court's "willingness

to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages" given that the "vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation" and "that it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67 (1981). Thus, reasonable estimates and inferences based on relevant data are permissible; speculation and guesswork are not. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) ("Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain.").

The DPPs and Irico stipulated, and the Court ordered, that the expert reports regarding damages are admitted into evidence for the purposes of determining damages. ECF No. 6465. These reports are: 1) The Expert Report of Phillip M. Johnson, Ph.D., dated November 19, 2021 (Ex. 200[1]) ("Johnson Class Report"); 2) the Reply Expert Report of Phillip M. Johnson, Ph.D., dated March 4, 2022 (Ex. 201) ("Johnson Class Reply"); 3) the Expert Report of Phillip M. Johnson, Ph.D., dated May 26, 2023 (Ex. 202) ("Johnson Merits Report"); 4) the Expert Rebuttal Report of Phillip M. Johnson, Ph.D., dated September 1, 2023 (Ex. 203) ("Johnson Merits Rebuttal"); 5) the Expert Report of Margaret E. Guerin-Calvert, dated July 21, 2023 (Direct Purchaser Actions) (Ex. 204) ("Guerin-Calvert DPP Report"); and 6) the Errata to the Expert Report of Margaret E. Guerin-Calvert, dated August 2, 2023 (Ex. 205).

**PROPOSED FINDINGS OF FACT**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367.

2. Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that at least one of the Defendants resides in this judicial district, is

---

[1] Numbered exhibits ("Ex. __") refer to the documents and corresponding exhibit numbers listed in the Joint Stipulation and Order Re: Pre-Admission of Exhibits (ECF No. 6488). Numbers following the abbreviation "Tr." refer to page and line numbers of the transcripts of the evidentiary hearing on damages held on May 19–21, 2025, filed at ECF Nos. 6492, 6493, 6494.

licensed to do business or is doing business in this judicial district.

3. On June 3, 2008, DPPs served their complaint and summons on Defendants Irico Group Corporation and Irico Display Devices Co., Ltd. ECF No. 336.

4. There are two types of Cathode Ray Tubes ("CRTs"): color display tubes ("CDTs") and color picture tubes ("CPTs"). CDTs are CRTs used primarily in color computer monitors and similar devices. CPTs are CRTs used primarily in color televisions and related devices. DPPCAC ¶¶ 1, 103.

5. The CRT conspiracy existed and operated for over 12 years. DPPCAC ¶¶ 3–6, 134–153.

6. Irico participated in the conspiracy from its outset on March 1, 1995. DPPCAC ¶¶ 3–6, 134, 135, 214.

7. The conspiracy operated via over 500 group and bilateral meetings between 1995 and 2007. DPPCAC ¶ 134.

8. The Defendants, including Irico, regularly collected and exchanged extensive confidential information regarding past and future pricing, sales, production, production capacity, and customers. DPPCAC ¶¶ 5, 138, 142.

9. The Defendants, including Irico, regularly entered into agreements regarding price, production, and customer allocation at these meetings. DPPCAC ¶¶ 3–5, 144–146.

10. The Defendants, including Irico, regularly monitored and enforced those agreements reached previously at these meetings. DPPCAC ¶¶ 5, 146, 153.

11. The conspiracy raised CRT prices to the DPP Class. Throughout the Class Period, the conspiracy caused prices for CRT Products to be substantially higher than the competitive prices that would have otherwise prevailed. DPPCAC ¶¶ 139, 197–199, 218.

12. Throughout the Class Period, the Defendants had market power which allowed them to effectively and substantially raise prices to the DPP Class. DPPCAC ¶¶ 112–121 (market concentration, relationships between manufacturers).

13. The conspiracy involved "frequent, structured, hierarchical meetings"; "explicit coordination" on prices and output; extensive information exchange; and extensive monitoring and

enforcement of pricing and production agreements. Johnson Merits Report ¶ 30; Tr. 137:18–139:7.

14. These attributes of the conspiracy made it likely to be effective in raising prices. Johnson Merits Report ¶¶ 10, 29–44; Tr. 139:9–25.

15. The CRT market consisted of high entry barriers, high market concentration controlled by conspirators; multi-market contacts of conspirators; standardized products; and economic relationships between conspirators. Johnson Merits Report ¶¶ 14–24; Tr. 139:9–25.

16. The conspiracy existed in an environment conducive to effective conspiracy. Johnson Merits Report ¶ 9; Tr. 139:9–25.

17. The conspirators reported in real time that their pricing agreements and production restraints were succeeding in raising CRT prices. Johnson Merits Report ¶¶ 25–28; Tr. 137:11–17.

18. The long duration of the conspiracy and the conspirators' recognition of its legal risks compel the conclusion that they believed it was effective in raising prices. Johnson Merits Report ¶ 25–28; Tr. 136:25–137:10.

19. Irico did not effectively withdraw from the conspiracy. DPPCAC ¶ 159.

20. On August 1, 2022, the Court certified a Direct Purchaser Class defined as:

> All persons and entities who, between March 1, 1995 and November 25, 2007, directly purchased a CRT Product in the United [S]tates from any Defendant or any subsidiary or affiliate thereof, or any co-conspirator or any subsidiary or affiliate thereof. Excluded from the class are defendants, their parent companies, subsidiaries or affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

ECF No. 6042 at 1, 12.

21. On January 10, 2023, Notice was sent to the class informing them of their rights and providing members of the class an opportunity to opt-out of the class. ECF No. 6175.

22. The following entities opted out of the certified class: Amsurg Corporation (HOS); Dell Computer Corp; Tamura Superette; Jack Wada Electronics; EMC Corporation; and Smithsonian Institution. ECF No. 6175, Ex. D.

23. Dr. Johnson's damage model determines the difference between the prices actually charged for CRTs during the class period and prices in a "but for" world absent the conspiracy. It is therefore tied closely to the DPPs' theory of liability. Johnson Class Report ¶¶ 72–80; Johnson

5

DIRECT PURCHASER PLAINTIFFS' UPDATED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DAMAGES; Master File No. 07-CV-5944-JST

Merits Report ¶¶ 50–56. Dr. Johnson uses well-established econometric techniques—a reduced form regression analysis "widely employed by economists" (Johnson Class Report ¶¶ 72–73)—to compare prices during the conspiracy period with prices from "before" and "after" the conspiracy, while controlling for material changes in the market. Johnson Class Report ¶¶ 72–80; Johnson Merits Report ¶¶ 50–56; Tr. 111:3–15, 117:21–124:6, 140:2–15.

24. Based on the expert analysis, reports and testimony of Dr. Phillip M. Johnson, Ph.D., DPPs' estimated total class damages is $1.011 billion. Johnson Merits Rebuttal ¶ 127; Tr. 108:12–114:12, 140:2–15.

## PROPOSED CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367.

2. Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that at least one of the Defendants resides in this judicial district, is licensed to do business or is doing business in this judicial district.

### I. DR. JOHNSON'S EXPERT REPORTS SUPPORT CLASSWIDE DAMAGES

3. Dr. Johnson's Reports provide compelling evidence that the class suffered total damages in the amount of $1.011 billion. Johnson Merits Rebuttal ¶ 127; *see also* Tr. 108:12–114:12, 140:2–15. There can be no question that Dr. Johnson's opinion well exceeds the standards of proof applicable to a damages proceeding following a default, as well as to antitrust damages in general. *Bigelow*, 327 U.S. at 264. *See also Reid Bros. Logging*, 699 F.2d at 1299 (9th Cir. 1983) (a "lightened burden of proof is imposed on a plaintiff seeking to prove antitrust damages once violations of the law have been established").

4. Based on the pleadings in this matter, DPPs' damages "naturally flow" from the Irico Defendants' conduct alleged in the DPPCAC. *See Elektra Entm't*, 2004 WL 783123, at *2; *Domanus*, 742 F.3d at 303 (7th Cir. 2014).

5. At class certification, the Court expressly found that Dr. Johnson's report and methodology are sufficient to support a verdict. ECF No. 6042 ("Irico Class Order") at 8 ("the Court agrees with DPPs that Johnson's expert analysis is capable of demonstrating antitrust impact and

damages on a classwide basis"). As to Dr. Johnson's damages methodology, the Court stated:

> As the Court previously concluded when considering Leitzinger's damages model, which is substantially similar to Johnson's, *compare id.* ¶¶ 72-80 (Johnson) *with* ECF No. 5191-2 at 164-71 (¶¶ 64-72) (Leitzinger), the Court "is satisfied that DPPs have shown by a preponderance of the evidence that there is a viable methodology DPPs could present at trial to show damages (irrespective of whether such a methodology would ultimately succeed)." *In re: CRT*, 308 F.R.D. at 629-30.

*Id.* at 11–12. The Court rejected Irico's objections to Dr. Johnson's damages analysis—that it included products not affected by the conspiracy, did not account for purported Chinese price floors, and that it included damages for the time period Irico claims it did not participate in the conspiracy (i.e., pre-1998). *See id.* at 11–12 ("None of Irico's arguments regarding damages is persuasive.").

6. The Court also rejected Irico's attacks on Dr. Johnson's analysis demonstrating antitrust impact—i.e., that the conspiracy was effective and raised prices to all class members. *See, e.g., id.* at 8 (Irico's assertion (relying on the Willig report) that Dr. Johnson's conclusion that 94% of products subject to the conspiracy were the subject of "target prices" overstates the number of target prices is "unpersuasive"); 9 (rejecting attacks on Dr. Johnson's "regression analyses"); 9 (rejecting attacks on correlation analysis); 9–10 (rejecting Irico's assertion that "Johnson failed to account for differentiations between CRT products, including the different demand that results from products that are not interchangeable, and the difficulty with changing production lines from one product to another."); 10–11 (rejecting Irico's assertion Dr. Johnson improperly used averages to obscure variability in CRT pricing). *See also id.* at 10 (Irico's "criticisms go to the weight of the testimony and not to whether DPPs have put forth evidence that is capable of demonstrating classwide impact of the alleged conspiracy").

7. Similarly, as the Court has noted, Irico Class Order at 11–12, Judge Conti also found that the substantially similar Leitzinger Reports were sufficient to support findings of damages and impact at trial. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 624 & n.33 (N.D. Cal. 2015) ("Mitsubishi Class Order"). Judge Conti thoroughly and painstakingly reviewed the Leitzinger Reports, and rejected all of Mitsubishi's myriad attacks on them. *Id.* at 617–30.

8. The facts set forth in the DPPCAC are conclusively established for Irico. They include: the existence and operation of the CRT conspiracy for over 12 years (*see, e.g.*, DPPCAC

7

¶¶ 3–6, 134–153); Irico's participation in the conspiracy from its outset in March 1995 (DPPCAC ¶¶ 3–6, 134, 135, 214); the operation of the conspiracy via over 500 group and bilateral meetings between 1995 and 2007 (DPPCAC ¶ 134); that the conspiracy regularly collected and exchanged extensive confidential information regarding past and future pricing, sales, production, production capacity, and customers (DPPCAC ¶¶ 5, 138, 142); that the conspirators regularly entered into agreements regarding price, production, and customer allocation at these meetings (DPPCAC ¶¶ 3–5, 144–146); and that the conspirators regularly monitored and enforced those agreements at these meetings. DPPCAC ¶¶ 5, 146, 153. The fact that the conspiracy actually raised prices—i.e., antitrust impact—is also "conclusively established." The DPPCAC contains almost continuous allegations (or reasonable inferences therefrom) that throughout the Class Period the conspiracy caused prices for CRT Products to be substantially higher than the competitive prices that would have otherwise prevailed. *See, e.g.*, DPPCAC ¶¶ 139, 197–199, 218.

9. Facts demonstrating that the conspiracy's market power and effectiveness to substantially raise prices are alleged and therefore also conclusively established against Irico. *See, e.g.*, DPPCAC ¶¶ 112–121 (market concentration, relationships between manufacturers).

10. These established facts conclusively preclude any evidentiary challenge by Irico and invalidate any opinions by Irico's expert witness, Ms. Guerin-Calvert, that are based on a contrary view of the facts. *See Domanus*, 742 F.3d at 303 (precluding after default attacks on factual basis for plaintiff expert witness's damage estimate where facts established by pleadings).

11. It is also clear, consistent with the Court's previous observations, that Dr. Johnson's Reports and damages estimate provides sufficient—indeed compelling—evidence for a damage award of $1.011 billion. *See, e.g.*, Mitsubishi Class Order, 308 F.R.D. at 628 ("The Court finds that the DPPs have presented a functioning model tailored to the facts of the case, using aggregate data to produce a coherent, efficient model based on the available data, and avoiding the risk of using overly granular data sets that would have produced unreliable or statistically meaningless data.").

12. Dr. Johnson's damage model determines the difference between the prices actually charged for CRTs during the Class Period and prices in a "but for" world absent the conspiracy. It is therefore tied closely to the DPPs' theory of liability. Johnson Class Report ¶¶ 72–80; Johnson

Merits Report ¶¶ 50–56. Dr. Johnson uses well-established econometric techniques—a reduced form regression analysis "widely employed by economists" (Johnson Class Report ¶¶ 72–73)—to compare prices during the conspiracy period with prices from "before" and "after" the conspiracy, while controlling for material changes in the market. Johnson Class Report ¶¶ 72–80; Johnson Merits Report ¶¶ 50–56; Tr. 111:3–15, 117:21–124:6, 140:2–15.

13. Dr. Johnson's model is designed to measure the importance of past prices in determining future prices, as well as the direct effect on prices of an active conspiracy. Johnson Class Report ¶¶ 77–79, figs.16–18; Johnson Merits Report ¶ 50–56. Dr. Johnson's model includes variables to account for the pricing effects of relevant aspects of the CRT markets: 1) the cost of glass for CRT manufacturing; 2) the previous period CRT quantity of sales; 3) the LCD share of total LCD-CRT sales; 4) the G7 Industrial Production Growth and G7 Unemployment Rate; 5) technological and other trend-inducing market factors; and 5) the type of CRT product. Johnson Merits Report ¶ 52; Tr. 122:23–123:9, 127:5–128:11. Dr. Johnson's model determines average overcharge percentages for CDTs of 10.7% and for CPTs of 6.1%. Johnson Merits Report ¶ 54. Dr. Johnson computes damages to the class totaling $1.011 billion based on these overcharge estimates. Johnson Merits Rebuttal ¶ 127. Dr. Johnson's damage estimate is reduced from $1.085 billion because he made two adjustments in response to the Guerin-Calvert DPP Report. *See* Johnson Merits Rebuttal ¶¶ 127; Tr. 114:14–116:7, 117:17–20.

14. Dr. Johnson's damage estimate is also supported by his examination of the evidence relating to the structure of the CRT market and the effective operation of the conspiracy, including statistical analysis, demonstrating common impact. Dr. Johnson has demonstrated several reasons why the conspiracy would have been effective—i.e., would have raised prices substantially to class members throughout the Class Period. Johnson Merits Report ¶¶ 47–48. These include: 1) the structure of the CRT industry and the conspirators' activities; 2) the fact that the Defendants' collusive activities would only make economic sense if they raised prices and profits given legal risks; 3) documentary evidence showing that the conspirators' conduct was intended to raise prices and that the conspirators' recognized that their conduct was having such an effect; and 4) Dr. Johnson's target price analysis showing that Defendants' price fixing agreements raised prices. *Id.*;

9

Tr. 136:15–139:25. Other economic evidence also demonstrates impact to DPP class members. Johnson Merits Report ¶ 48

15. Dr. Johnson's damage estimate is reasonable and well-supported by the facts established by default and the evidence.

16. Ms. Guerin-Calvert's report provides no basis to reduce Dr. Johnson's estimate of classwide damages. In his Merits Rebuttal Report, Dr. Johnson persuasively explains that the modifications to his model she proposes are methodologically unsound, unsupported by the evidence, and overburden the available data such that her model is unreliable, and, indeed, produces "nonsensical" negative overcharges for much of the Class Period. *See also* Tr. 123:11–136:11.

## II. IRICO IS LIABLE FOR PRE-1998 CONDUCT

17. Irico argued that it is not liable for damages resulting from the operation of the conspiracy before 1998. This contention is incorrect, and the Court has rejected it. ECF No. 6482 (setting start date of March 1, 1995 for damages).

18. First, the Court previously held that the DPPCAC adequately pleads Irico's participation in the alleged conspiracy from 1995 to 2007. ECF No. 597 ("MTD R&R") at 33–34; ECF No. 665 ("MTD Order") at 1 (approving and adopting MTD R&R), 24–25. The DPPCAC expressly pleads Irico's participation in the conspiracy from its beginning in March 1995, including providing fair notice of the "time period"—i.e., March 1995 through November 2007. MTD R&R at 7–16; MTD Order at 5–9. Irico is thereby precluded from challenging the sufficiency of the pleadings.

19. Second, the DPPCAC expressly, repeatedly and unambiguously alleges that all Defendants, including the Irico Defendants, were members of the conspiracy from its outset in March 1995. *See, e.g.*, DPPCAC ¶¶ 3–6, 134–35, 214.

20. Alternatively, should the Court have found that Irico joined in 1998, the DPPCAC adequately pleads Irico's knowledge that it was joining a pre-existing conspiracy to the extent it joined in 1998. *See, e.g.*, DPPCAC ¶¶ 138, 143–48, 152–53. The well-pled allegations of the DPPCAC establish Irico's joint and several liability for damages caused by the conspiracy from its outset, even if it did not join until 1998. *Indus. Bldg. Materials, Inc. v. Interchemical Corp.*, 437

10

F.2d 1336, 1343 (9th Cir. 1970) ("One who enters a conspiracy late, with knowledge of what has gone before, and with the intent to pursue the same objective, may be charged with preceding acts in furtherance of the conspiracy.").

21. As a result of Irico's default, these allegations are conclusively established against it. Therefore, it is liable for the damages caused by the entire conspiracy. *Adriana Int'l*, 913 F.2d at 1414.

## III. WITHDRAWAL

22. The Court has already held that withdrawal is an affirmative defense. MTD R&R at 25 (approved and adopted by MTD Order at 1). Therefore, it has been stricken by the Sanctions Order.[2]

23. The DPPCAC alleges that Irico participated in a single conspiracy embracing all CRT Products—i.e., including both CPTs and CDTs—that existed from March 1995 through November 2007. *See, e.g.*, DPPCAC ¶¶ 3–5 (conspiracy relating to CRT Products); 138 (CRT Products). *See also* Mitsubishi Class Order, 308 F.R.D. at 615 n.17 ("evidence supports so much of the market being controlled or impacted by a single CRT conspiracy"); ECF No. 5240 ("Default Order") at 16 ("there is evidence of the Irico Defendants' participation in 'a single, overarching conspiracy'"). It also alleges that Irico never withdrew from the conspiracy. DPPCAC ¶ 159. These facts are "conclusively established" by Irico's default and also preclude its claims of withdrawal.

24. In addition, Irico's continued participation in the conspiracy with regard to CPTs is fatal to any claim of withdrawal. *See, e.g., Reisman v. United States*, 409 F.2d 789, 792–93 (9th Cir. 1969).

## IV. DR. JOHNSON'S DETERMINATION OF SALES IS REASONABLE

25. Dr. Johnson' damages methodology requires him to apply the overcharge percentages his damages model estimates to total sales to the class. Johnson Merits Report ¶¶ 85–99; *see also* Tr. 111:3–114:12.

26. Dr. Johnson determines the amount of class sales for CRT Products by using the

---

[2] Irico did not address this issue in its Trial Brief or at the Evidentiary Hearing.

alleged conspirators' sales data to identify sales that were either billed to or shipped to U.S. based on the "billed-to" and "shipped-to" information provided in the data. In doing so, he treated sales with both non-U.S. bill-to and ship-to locations as non-Class sales. From each manufacturer's data, he excluded internal sales to its subsidiaries, sales to other alleged conspirators, and sales to purchasers who have opted out of the Class. For periods where manufacturers' data were missing, Dr. Johnson used industry sources to calculate the value of global CRT sales for each manufacturer for the periods with missing records and then adjusted these global sales for the U.S. share and for sales to non-Class entities (i.e., eliminating internal sales, intra-conspirator sales, and sales to opt-outs) using the share of sales to those entities in the transactional data. Johnson Merits Report ¶¶ 86–91 & figs.16–19; Tr. 108:12–110:23.

27. Ms. Guerin-Calvert evaluated the assumptions and methodologies used by Dr. Johnson for derivation of his volume of commerce estimates and proposed certain adjustments. Guerin-Calvert DPP Report ¶ 10(f). First, she proposes adjusting sales with missing customer information for potential sales to opt-out and other alleged conspirators. Johnson Merits Rebuttal ¶ 122. Second, she proposes utilizing an additional dataset of its sales to the United States provided by Defendant Samsung SDI. *Id.* ¶ 123. Dr. Johnson agrees that these proposals are reasonable and adjusts his determination of total sales to the class as Ms. Guerin-Calvert proposes. *Id.*; Tr. 114:14–116:7. This results in a reduction of his damages estimate from $1.085 billion to $1.011 billion. Johnson Merits Rebuttal ¶¶ 122, 123; Tr. 117:17–20.

28. Dr. Johnson uses publicly available data—i.e., the industry-wide U.S.-to-global sales ratio—to estimate sales for certain defendants for time periods they did not produce data. Guerin-Calvert DPP Report ¶ 118; Johnson Merits Rebuttal ¶ 124; Tr. 116:8–117:16. Ms. Guerin-Calvert argues that it "makes more sense" to use data produced by the same defendant for other years. Guerin-Calvert DPP Report ¶¶ 118, 119 & n.215. Dr. Johnson, however, argues that her proposed method is less reasonable because it cannot be applied to all defendants with missing data because some defendants produced no data and is inconsistent with Ms. Guerin-Calvert's proposed alternative method to estimate class sales for transactions without customer names which applies the share of such sales to identified customers derived from Dr. Johnson's analysis. Johnson Merits

12

Rebuttal ¶¶ 113–114, 125. Ms. Guerin-Calvert's proposal—which Dr. Johnson adopted—relies on Dr. Johnson's use of public industry data for periods in which individual defendants did not produce data. *See id.* Johnson Merits Rebuttal ¶ 122; Guerin-Calvert DPP Report ¶ 113 n.203 (noting that Dr. Johnson also relies on external data sources to estimate the DPPs' CRT and CRT finished product purchases); Johnson Merits Report ¶¶ 95, 96; Tr. 116:8–117:20. The Court finds that Dr. Johnson's methodology is reasonable.

29. Irico also raises the issue of "the appropriate apportionment of duplicative damages between DPPs and IPPs." ECF No. 6459 at 2. This is not an issue in the DPP case. Under clear Supreme Court precedent, direct purchasers are entitled to recover the full overcharge they paid, and no pass-on defense is available to reduce their damages. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977). Moreover, federal antitrust laws do not prevent indirect purchasers from recovering under state law. *California v. ARC Am. Corp.*, 490 U.S. 93, 105–06 (1989). Courts in this District regularly recognize that direct purchasers are entitled to full recovery under *Hanover Shoe* and *Illinois Brick*, and reject a duplicative recovery defense. *See, e.g., In re HIV Antitrust Litig.*, No. 19-CV-02573-EMC, 2023 WL 3011624, at *4, *10 (N.D. Cal. Apr. 18, 2023); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 11-5765, 2013 WL 257148, at *1 (N.D. Cal. Jan. 23, 2013). Accordingly, DPPs' recovery may not be reduced by any recovery by IPPs under state laws.

30. Based on the pleadings in this matter, DPPs' damages "naturally flow" from the Irico Defendants' conduct in the conspiracy alleged in the DPPCAC. *See Elektra Entm't*, 2004 WL 783123, at *2; *Domanus*, 742 F.3d at 303.

31. DPPs are entitled damages in the amount of $1.011 billion, on behalf of the Class previously certified by the Court in its August 1, 2022 Order and defined as:

> All persons and entities who, between March 1, 1995 and November 25, 2007, directly purchased a CRT Product in the United [S]tates from any Defendant or any subsidiary or affiliate thereof, or any co-conspirator or any subsidiary or affiliate thereof. Excluded from the class are defendants, their parent companies, subsidiaries or affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

ECF No. 6042 at 1, 12.

32. The Irico Defendants are jointly and severally liable for the damages caused by the entire conspiracy. ECF No. 6042 at 5 ("[n]othing in *Illinois Brick* displaces the rule of joint and several liability, under which each member of a conspiracy is liable for all damages caused by the conspiracy's entire output") (quoting *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002)).

V.  CONCLUSION

33. For the foregoing reasons, DPPs are entitled damages in the amount of $1.011 billion.

34. The damages awarded to the DPPs shall be trebled pursuant to federal antitrust laws. 15 U.S.C. § 15(a) ("any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained").

35. DPPs are entitled to an award of attorneys' fees and costs, *id.*, to be determined in subsequent proceedings.

36. DPPs also contend that they are also entitled to an award of prejudgment interest pursuant to 15 U.S.C. § 15(a). DPPs shall filed their motion for such an award at a date to be set by the Court.

Dated: June 4, 2025

Respectfully submitted,

*/s/ R. Alexander Saveri*
R. Alexander Saveri (173102)
Geoffrey C. Rushing (126910)
Matthew D. Heaphy (227224)
David Y. Hwu (281780)
SAVERI & SAVERI, INC.
1016 Lincoln Boulevard, Suite 306
San Francisco, CA 94111
Telephone: (415) 217-6810

*Lead Counsel for Direct Purchaser Plaintiffs*

Joseph W. Cotchett
Adam J. Zapala
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Counsel for Direct Purchaser Plaintiffs*