UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MDL No. 1917<br><br>Case No. 07-cv-05944-JST<br><br>**ORDER ADOPTING DAMAGES MODEL** |
| This order relates to:<br><br>ALL DIRECT PURCHASER ACTIONS<br>ALL INDIRECT PURCHASER ACTIONS | |

The only remaining defendants in this cathode ray tube ("CRT") price-fixing case are Irico Group Corporation and Irico Display Devices Co., Ltd. (collectively, "Irico"). After adopting the Special Master's recommendation to grant terminating sanctions based on Irico's discovery misconduct, the Court ordered that Irico's answers, including affirmative defenses, be stricken and that default be entered against Irico. ECF No. 6423. The Court held a three-day evidentiary hearing on the appropriate amount of damages. For the reasons discussed below, the Court will adopt a modified version of the damages model presented by Dr. Phillip M. Johnson; apply that model to both direct and indirect purchasers; and order the parties to meet and confer regarding further proceedings.

I.   **LEGAL STANDARD**

Entry of "default conclusively establishes the liability" of the defendants. *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1414 (9th Cir. 1990). "The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam).

"A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). This rule "does not prohibit awarding actual damages in a default judgment to a party that sought in its pleadings actual damages in an amount to be determined at trial." *AirDoctor, LLC v. Xiamen Qichuang Trade Co.*, 134 F.4th 552, 553 (9th Cir. 2025) (per curiam).

The Supreme Court has repeatedly held "that a lightened burden of proof is imposed on a plaintiff seeking to prove antitrust damages once violations of the law have been established." *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1299 (9th Cir. 1983). Determining the amount of damages in an antitrust case must not be based on "speculation or guesswork." *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1510 (9th Cir. 1985) (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)). But defendants "should not benefit because their wrongdoing makes it more difficult for the plaintiff to establish the precise amount of its injury"; thus, the finder of fact "is allowed to act on probable and inferential proof in determining the amount of damages even though such an award may be an approximation." *Id.* at 1511. "An antitrust plaintiff must simply provide evidence to support a just and reasonable estimate of the damage." *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir. 1984) (citation modified).

## II. BACKGROUND

Dr. Janet S. Netz, Dr. Phillip M. Johnson, and Ms. Margaret E. Guerin-Calvert testified as expert witnesses for indirect purchaser plaintiffs ("IPPs"), direct purchaser plaintiffs ("DPPs"), and Irico, respectively. The parties do not challenge the qualifications of each other's witnesses to serve as experts, and the Court concludes that all three are qualified experts.

Netz and Johnson each presented their own multiple regression model to estimate damages to the respective classes. "In antitrust cases, regression models have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677 (9th Cir. 2022) (en banc). Both models calculate overcharges, or the difference between actual

2

prices charged for CRTs during the class period and but-for prices that would have been charged absent the conspiracy. Guerin-Calvert did not present an independent model but suggested separate modifications for each of Netz's and Johnson's models that, in her view, would make the models more accurate.

The parties agree that both the IPP and DPP class periods run through November 25, 2007. The Court previously determined, over Irico's objection, "that Plaintiffs may recover damages from Irico dating back to March 1, 1995, the alleged latest start date of the conspiracy." ECF No. 6482 at 1. Thus, the relevant damages period is March 1, 1995, through November 25, 2007.

The parties have also stipulated that "[t]here are two types of CRTs: color display tubes ('CDTs') and color picture tubes ('CPTs'). CDTs are CRTs used primarily in color computer monitors and similar devices. CPTs are CRTs used primarily in color televisions and related devices." ECF No. 6460 at 2.

**A. Netz Model**

Netz developed a static regression model to estimate overcharges for CRTs. She ran the model separately for CPTs and CDTs and estimated that, but for the conspiracy, the prices paid by DPPs for CDTs, on average, "would have been 22 percent lower than the actual prices paid from 1995 to 2006 and would have been 11.4 percent lower than the actual price in 2007," and that prices for CPTs "would have been 9.0 percent lower than actual prices paid during 1995 to 2006 and would have been 3.1 percent lower than actual prices paid in 2007." May 19, 2025 Hr'g Tr. at 15:6–14 (ECF No. 6492). She concluded that all of the overcharges were passed on to IPPs—a conclusion that Irico does not oppose. Netz originally calculated damages to the IPP class to be $2,768,613,903, but she later adjusted that figure downward to $2,697,957,236, "to account for the shortened class periods for Hawaii, Nebraska and Nevada, whose antitrust statutes were enacted after the cartel was formed." ECF No. 6476 at 4.

Netz separated the conspiracy into two periods—1995 to 2006, and 2007—because "[a]t the end of 2006, it became public that [competition agencies in] the United States, Japan, and South Korea . . . were all investigating collusion into the LCD market," and she hypothesized that cartel members who knew of these investigations might think "the government agencies will be

3

looking at us next, given that some of us are the same participants and it's a similar use at the end level." May 19, 2025 Hr'g Tr. at 36:8–20. Her model confirmed "significantly different and lower overcharges for 2007 than for 1995 through 2006." *Id.* at 36:24–25.

      Netz's model included the following supply and demand factors: three separate variables for the cost of display glass, which was "the single most important cost input" for CRTs, *id.* at 37:12–13; three variables—GDP and unemployment from the Organisation for Economic Co-operation and Development ("OECD"), and unemployment squared—"to indicate the general macroeconomic condition under which consumers were choosing to buy CRT TVs and monitors, with the idea that they will buy more of these products the better the economy is doing overall," *id.* at 40:18–24; variables to capture the "market share of LCDs for monitors and the market share for LCDs for TVs" to "control[] for the influence of the growth of LCDs in the market to have an impact on the prices of CRTs," *id.* at 41:21–42:15; variables relating to time, to "allow[] for the time trend to be . . . non-linear" and "to account for seasonal variability" based on time of year, such as "higher demand for monitors for back to school [and] higher demand for TVs during December," *id.* at 43:1–11; and a variable "to capture any supply or demand effects that are specific to the particular manufacturer of the tube, perhaps because of different qualities or different efficiencies at production," with another "interacted with size to account for the fact that the makers may be better or worse at making specific sizes of CRTs," *id.* at 43:14–19; *see also* Ex. 3 at 104 (Apr. 15, 2014 Netz Expert Report).

      Guerin-Calvert proposed two sets of modifications to Netz's model, neither of which Netz accepted.[1] First, Guerin-Calvert proposed adding several supply and demand variables to the model, including: shipping costs, using the Baltic Dry Index as a proxy; an index of labor costs in Korea; the Korean Won-U.S. Dollar exchange rate; for CDTs, worldwide quarterly shipments of desktop computers; and, for CPTs, sales in United States electronics retail stores as an approximation for consumer demand for TVs. Second, she argued that Netz's model did not sufficiently account for the increased demand for desktop computers in 1995 and 1996 due to the

---

[1] Some of these modifications were proposed by Irico's prior expert, Dr. Robert Willig, whose opinions Guerin-Calvert adopted.

4

introduction of Window 95.  She proposed calculating separate overcharges for 1995 and 1996, instead of a single average overcharge for 1995 through 2006.  Having done so, she determined that it was "more economically appropriate to use the overcharge that the adjusted Netz model estimates for the years 1997-2006 as the estimate for 1995 and 1996 as well," based on her conclusion that "the evidence indicates that the estimated effects for 1995 and 1996 likely were caused primarily by underlying economic conditions unrelated to the alleged conspiracy."  Ex. 11 ¶ 122 (Aug. 5, 2014 Guerin-Calvert Expert Report).

Guerin-Calvert testified at the hearing that she viewed her role as "to help inform [the Court] with a . . . reasonable estimate of the damages should be X."  May 20, 2025 Hr'g Tr. at 202:9–10 (ECF No. 6493).  After incorporating all of her proposed modifications to Netz's model, her reasonable estimate of damages to the IPP class was $331,419,707,[2] based on estimated overcharges of 1.6 percent for CDTs and 2.3 percent for CPTs for 1995 to 2006, and 0 percent for both product types for 2007.  Ex. 400 ¶¶ 20, 22 (Apr. 28, 2025 Guerin-Calvert Decl.)

**B.  Johnson Model**

Unlike Netz, Johnson created a single regression model for both CPTs and CDTs.  Also unlike Netz, Johnson created a dynamic rather than static model, which means that his model "recognizes that there can be persistence in prices, and so it includes a control to incorporate the effect of past prices on current prices," namely "the CRT price in the previous quarter as an explanatory variable."  May 19, 2025 Hr'g Tr. at 111:12–15; Ex. 202 ¶ 52 (May 26, 2023 Johnson Expert Report).

His model "included variables to control for certain supply and demand effects, for differences in the CRT products, depending upon their application, CDT or CPT, size, manufacturer, model code," and "variables to control for trends that were not captured by the other variables."  May 19, 2025 Hr'g Tr. at 117:25–118:4.  These variables included: estimates for the cost of glass for CRT manufacturing; quantity of CRT sales in the previous period; separate

---

[2] In its proposed findings of fact and conclusions of law, Irico states that this figure is "overstated because the volume of commerce should be modified to account for the fact that the class periods [for] Hawaii, Nebraska, and Nevada begin June 25, 2002, July 20, 2002, and February 4, 1999, respectively."  ECF No. 6502 ¶ 59.

5

variables for CPTs and CDTs "to estimate the effect of substitution for LCDs"; and G7 industrial production growth and G7 unemployment rate as proxies "for economic activity generally." *Id.* at 152:20–154:5; *see also* Ex. 202 ¶ 52 & Fig. 3.

Johnson calculated cartel effects during two time periods. He used Q3 2006 as the start of the second period because, "when looking at the conspiracy data, it seemed like . . . in 2006, there had been a change in the conduct. The meetings frequency had changed or had sort of ceased. So it raised the possibility that there was a change in the conduct effect for that period." May 19, 2025 Hr'g Tr. at 123:13–124:6. He "estimate[d] that, during the Class Period, CDT prices were elevated on average by 10.7 percent and CPT prices were elevated by 6.1 percent." Ex. 202 ¶ 54. After determining the volume of sales to the DPP class, he calculated class damages to be $1.085 billion. *Id.* ¶ 100.

Guerin-Calvert criticized Johnson's model for using a single regression instead of separate regressions to estimate overcharges for CPTs and CDTs, and for breaking the class period into two periods instead of by calendar year. Johnson rejected both criticisms. Applying Guerin-Calvert's proposed modifications would "yield[] an average [CPT] overcharge estimate of 1.5% across the entire class period (as compared to Dr. Johnson's estimate of 6.3%)," and "an average CDT overcharge estimate of 7.0% across the entire class period (as compared to Dr. Johnson's estimate of 10.9%)."[3] Ex. 204 ¶ 97 (July 21, 2023 Guerin-Calvert Expert Report). Using Johnson's calculations for volume of sales, this would reduce the damages from $1.085 billion to $441.7 million. Ex. 400 ¶ 18.

Guerin-Calvert also criticized Johnson's method for determining the volume of sales. Johnson accepted two of these criticisms. First, rather than assuming that sales lacking customer information were made to DPP class members, Johnson agreed that it would be "more reasonable . . . to assume that the share of sales to DPPs ('the DPP class share') among sales for which the data do not identify the customer was the same as among sales for which the data do identify the

---

[3] Guerin-Calvert explained that these numbers "differ slightly from the average overcharge estimates that [Dr. Johnson] presents in his report (6.1% vs. 6.3% for CPTs and 10.7% vs. 10.9% for CDTs). This is because Dr. Johnson uses the annual CPT and CDT quantities in his overcharge model as weights when calculating the average overcharge estimates that he reports, whereas I use the annual CPT and CDT volume of commerce instead." Ex. 204 ¶ 97 n.183.

6

customer, i.e., 49% and 67% for CRTs and CRT finished products, respectively." Ex. 204 ¶¶ 113–14; Ex. 203 ¶ 122 (Sept. 1, 2023 Johnson Expert Rebuttal Report). Second, he agreed that it would be reasonable to use "a separate dataset provided by SDI [one of the cartel members], which contains SDI's sales to U.S.," instead of "attempt[ing] to infer which sales might have been made in the U.S. from customers' names." Ex. 204 ¶¶ 115–16; Ex. 203 ¶ 123. Incorporating these two modifications reduced Johnson's damages estimate to $1.011 billion. Ex. 203 ¶ 123. Adopting these two changes but using Guerin-Calvert's modified model to estimate the overcharge percentages would result in a damages estimate of $422.7 million. Ex. 400 ¶ 18.

Johnson did not adopt Guerin-Calvert's suggestion that "where there had been missing sales data, rather than using the information from the same year to allocate the sales to U.S. versus non-U.S. sales, that I use their sales in a different year." May 19, 2025 Hr'g Tr. at 116:10–14. For example, "SDI produced sales data that make it possible to identify precisely SDI's U.S. CRT sales to DPPs from 1998-2007." Ex. 204 ¶ 118. Guerin-Calvert would use that information to estimate SDI's sales volume to the class in 1995 to 1997, rather than using "estimates of the DPP class share and the U.S.-to-global CRT sales ratio that are based on global CRT sales by *all* alleged cartel members" for those years. *Id.* (emphasis in original). If this change were adopted using Johnson's overcharge model, the damages would be reduced to $959.7 million. Ex. 400 ¶ 18. Applying all of Guerin-Calvert's proposed modifications to Johnson's model and calculations would result in a damages estimate of $390.5 million. *Id.*

### III. DISCUSSION

Determining damages to the DPP class requires two steps: first, determining a reasonable estimate of the overcharges to direct purchasers caused by the conspiracy and, second, applying those overcharges to the volume of commerce for the class. Calculating damages to the IPP class requires the same two steps plus an intermediate one: determining the percentage of the overcharges caused by the conspiracy that was passed on from direct purchasers to indirect purchasers. The parties do not dispute that, in this case, it is reasonable to conclude that 100 percent of the overcharges were passed on from direct purchasers to indirect purchasers. Thus, for both the DPP and IPP classes, the Court must estimate the overcharges to direct purchasers caused

7

by the conspiracy and then apply those overcharges to the volume of commerce for each class.

DPPs and IPPs presented two different models for estimating these overcharges. The expert reports proceeded down parallel tracks, with one set of reports based on Johnson's model for the DPPs and the other set based on Netz's model for the IPPs. Guerin-Calvert identified modifications that she thought should be made to each of the models, but she did not compare either Netz's and Johnson's original models or her modifications thereto. For example, she did not opine on whether it would be more reasonable to conclude that the conspiracy resulted in 1.6 percent overcharges for CDTs and 2.3 percent for CPTs, as she suggests based on her modifications to Netz's model, or if it resulted in 7.0 percent for CDTs and 1.5 percent for CPTs, as she suggests based on her modifications to Johnson's model. Nor did she present any testimony as to why a finder of fact might conclude it would be reasonable to apply two different estimates of the same overcharges when calculating damages.

The Court indicated at the evidentiary hearing that it was contemplating adopting a single model for estimating the overcharges because it would not make sense to determine that one set of overcharges was the most reasonable estimate for the DPP class but a completely different set was the most reasonable estimate of the same overcharges for the IPP class. No party has argued that adopting a single model would be improper, and the case law supports it. When "models produce different results, the question of which model is more accurate falls to the factfinder as part of a classic battle of the experts. After hearing each expert's thoughts about why one model is better than the other, the factfinder then weighs the experts' testimony and decides which model she trusts more." *Orshan v. Apple Inc.*, No. 5:14-cv-05659-EJD, 2024 WL 4353034, at *5 (N.D. Cal. Sept. 30, 2024). This is true even if one expert offers two competing models and refuses to pick between them. *Id.* In addition, the factfinder " need not accept the views of one side's expert or the other's, but may make their own reasonable judgment on the evidence, accepting part, all, or none of any witness's testimony." *In re Exxon Valdez*, 270 F.3d 1215, 1248 (9th Cir. 2001). The Court thus considers all three experts' testimony together to determine a reasonable estimate of overcharges caused by the conspiracy.

Neither Netz nor Johnson opined on each other's models. Perhaps because of the order of

testimony, with Netz testifying first, Netz was not asked at the hearing about how a factfinder might go about choosing among the competing models offered by the experts in this case. When Johnson was asked, he responded that it would be inappropriate for him to opine on that question because he never looked at Netz's model and only considered Guerin-Calvert's critiques of his own model.

Guerin-Calvert testified that if asked to choose a single model, she would choose the modified Netz model because "it was more straightforward to modify [Dr. Netz's] model and to take into account those market factors and to separate out '97 and '96," and "doing the changes to Dr. Johnson's model, which is very complex, probably does not account, particularly in the CDT model, for what is really going on with the demand. With the time I had, I did not have additional adjustments that I can think of, but I think it's very highly conservative." May 20, 2025 Hr'g Tr. at 285:11–23.

The Court does not find Guerin-Calvert's testimony on this question to be persuasive. First, whether a model is easier or more straightforward to modify has no bearing on the model's reliability. Second, Guerin-Calvert's conclusion that her modifications to Johnson's model "probably" do not reflect "what is really going on with the demand," *id.*, is undermined by her testimony that she "could have added other variables" to Johnson's model, but that she believed the two modifications she made—to separate out CDTs and CPTs and to add annual conduct variables—"were sufficient," May 21, 2025 Hr'g Tr. at 360:6–11 (ECF No. 6494), and that she believed that the modifications she made to Johnson's model allowed her "to come up with a reliable estimate" of damages, *id.* at 348:20–23.

### A. Differences Between Netz's and Johnson's Models

In the absence of meaningful expert testimony comparing Netz's and Johnson's approaches, the Court looks to the models themselves and considers the two main differences between them: whether the model should be static or dynamic and whether a single or separate regressions should be run for CDTs and CPTs.

#### 1. Static or Dynamic

First, Netz developed a static model, while Johnson created a dynamic one. The parties

1 provided little guidance on why the Court might choose one type of model over the other. At the
2 hearing, Johnson explained the difference between the two types of models as follows:

> [T]he dynamic regression has one extra variable. It has the lagged dependent variable, the lagged CRT price. That affects how you calculate the overcharge per period, but it doesn't affect how you approach controlling for other factors. [It] just takes into consideration the persistence of prices in calculating that overcharge effect.
>
> If you were to just drop that lagged price variable from my regression, you'd have a static regression.

May 21, 2025 Hr'g Tr. at 416:14–23. He also explained that having a dynamic model means "think[ing] of the price in a current period as being a combination of the current period effects and the previous period effects." May 19, 2025 Hr'g Tr. at 156:14–17. In his expert report, he concluded, based on the evidence he reviewed, that a dynamic model was appropriate because:

> 1) conspirators often set prices, not for a specific month but for a quarter or several quarters in advance, 2) price targets were often set in relation to prior actual or target prices, and 3) there was a persistent effect on CRT prices such that elevation of CRT prices in one period would continue to impact CRT prices afterwards.

Ex. 201 ¶ 13 (footnotes omitted) (Mar. 4, 2022 Johnson Reply Expert Report). No party presented any evidence to the contrary—i.e., that conspirators did not set prices for more than one quarter at a time, or that price targets were not set in relation to prices in earlier periods. Nor did Netz or Guerin-Calvert provide any reasons as to why a static model would be superior to a dynamic one based on the facts of this case.

Johnson also explained that his "target price regression analysis confirms that the influence of target prices on actual prices went beyond the immediate quarter," and "the estimated impact is substantial enough to remain statistically significant even two quarters beyond the initially effective quarter." *Id.* ¶ 14. Guerin-Calvert argued that Johnson's analysis was incorrect because it was "largely driven by his pooling together of CPT and CDT (actual and target) prices in a single regression," and there was "no statistically significant association between actual prices and alleged target prices" in future quarters when the regressions were performed separately. Ex. 204 ¶ 37 n.73. She did not, however, propose removing the lagged price variable from Johnson's model. Moreover, Johnson explained in rebuttal that, even using Guerin-Calvert's modifications,

including her running two separate regressions for CPTs and CDTs, "[t]he coefficients on the effect of target price in the first and second quarter after the immediate quarter [for CPTs] is statistically significant at the 10% level, which is . . . a conventional level used to indicate statistical significance." Ex. 203 ¶ 27. For CDTs, the impact in the next quarter was statistically significant at an even higher level—1 percent—and "the coefficient on the effect two quarters beyond still has a positive value and close to [his] estimate (0.03 vs 0.04)." *Id.* ¶ 27 & Fig. 1. He attributed the "decrease in the level of statistical precision" in the latter figure "to the decrease in the number of effective data points used to calculate[] the standard errors and t-statistics." *Id.* ¶ 27.

Having reviewed the evidence, including the experts' testimony, the Court concludes, as Johnson did, "that the effect of target prices went beyond the immediate quarter." *Id.* ¶ 29. No testimony was presented regarding why a lagged price variable should not be included, or that a static model should be adopted over a dynamic one. The Court therefore find it appropriate to adopt a dynamic model to estimate the overcharge effects in this case.

### 2. Single or Separate Regressions for CDTs and CPTs

A second principal difference between Netz's and Johnson's model is that Netz performed separate regressions for CDTs and CPTs, while Johnson ran a single regression. Guerin-Calvert agreed with Netz that the regressions should be run separately.

Johnson testified in favor of a single regression because both CDTs and CPTs are "part of the same industry." May 19, 2025 Hr'g Tr. 111:20–21. He "recognize[d] that the impact of LCDs on the two different product types . . . was different depending on how they came into the market," and therefore built into his model "different effect[s] for CDTs and CPTs from LCDs' impact." *Id.* at 120:19–23.

However, as Guerin-Calvert persuasively explained:

> [T]he fact that they're in the same industry does not really address the fundamental differences within that industry, different production lines, different customers, different product characteristics, to some extent some different suppliers and, particularly, different cost and other factors and demand factors that affect those that are not picked up in the variables that [Johnson] does but that . . . are better reflected in individual regressions.

11

May 20, 2025 Hr'g Tr. at 236:24–237:6.  Similarly, Netz testified that the two product lines have differences on both the supply and demand side—for example, "that a significant amount of demand for monitors came from businesses, and that would be less true for TVs," and that "the particular product characteristics that are important for monitors versus for TVs are different, so there may be some cost differences."  May 19, 2025 Hr'g Tr. at 44:8–16.  Netz also testified that CDTs "are not substitutes" for CPTs "[f]or the most part. . . .  There is some substitution in production in that some lines can switch between the two, but you can't switch between them for demand, and . . . the supply substitution was limited."  *Id.* at 75:2–7.

        Guerin-Calvert tested Johnson's model to "allow[] for the possibility that the market forces in his model had different effects on CPT prices than on CDT prices.  This test revealed that the influence of these market forces on CPT prices was different from their influence on CDT prices, and this result was statistically significant."  Ex. 204 ¶ 84.  Johnson did "not assume that all demand and supply factors would have an identical effect on CDTs and CPTs" but argued that Guerin-Calvert's modification "will not *necessarily* improve the accuracy of the estimated conspiracy effect," and that "the statistical evidence for distinct effects is *not as clear as* Ms. Guerin-Calvert suggests."  Ex. 203 ¶ 94 (emphases added).  This stops short of arguing that the proposed modification would not improve the model's accuracy, and Johnson himself acknowledged that four of the market variables had statistically significant different impacts on CDTs and CPTs.  *Id.*

        Additionally, Johnson's own work revealed differences between CDTs and CPTs.  When testing the hypothesis that the conspiracy effect was the same both before and after the end of the second quarter of 2006, he rejected the hypothesis that the effect was the same for CDTs but did not reject the hypothesis that the effect was the same for CPTs.  He opted to "retain the specification with separate conspiracy indicators for [his] base model for consistency with the alleged conduct, consistency between the approach for CDT and CPT, and for conservativeness."[4]  Ex. 202 ¶ 55.  But these reasons are not grounded in economic principles, nor do they undermine

---

[4] Modifying Johnson's model to estimate a single conspiracy effect for CPTs and separate effects for CDTs resulted in an estimated classwide overcharge of 7.7 percent for CPTs, compared to the more conservative 6.1 percent from his base model.

12

1   the conclusion that the markets for CDTs and CPTs behaved differently enough to warrant
2   running separate regressions.
3       Considering all of the above, the Court is not persuaded that Johnson's use of a single
4   regression with different effects for CDTs and CPTs from LCDs is sufficient to model the
5   behavior of the two different product types. Instead, it concludes that the overcharge model
6   should include separate regressions for CDTs and CPTs.

### B. Choosing a Modification of Johnson's Model as a Starting Point

Having concluded that the overcharge model should be dynamic and that separate regressions should be run for CDTs and CPTs, the Court must consider which model best satisfies both criteria. No one proposed modifying Netz's model to include a lagged price variable or explained why it would otherwise account for the changes supporting the adoption of a dynamic model. The Court therefore chooses as its starting point Johnson's model, as modified by Guerin-Calvert's first proposed modification to run separate regressions for CDTs and CPTs.

### C. Guerin-Calvert's Remaining Criticisms of Johnson's Model

The Court now considers Guerin-Calverts remaining proposed modifications to Johnson's model.

#### 1. Annual Variables

Guerin-Calvert proposed adding annual conduct variables instead of dividing the conspiracy period into only two periods. She testified, "A lot of empirical analyses that use dummy variables for things and look at them on a time basis oftentimes will use, as a standard approach, an annual, more typically than not, a calendar-year basis." May 20, 2025 Hr'g Tr. at 266:9–12.

The Court is not persuaded that it should adopt that approach here. As Netz and Johnson both agreed, there is no economic justification for doing so. For example, Netz "carved out [2007] for a specific change in the legal environment that was not elsewhere reflected, and [she was] not aware of any other similar change." May 19, 2025 Hr'g Tr. at .56:18–20. Likewise, Johnson used two different conspiracy periods because, "when looking at the conspiracy data, it seemed like . . . in 2006, there had been a change in the conduct. The meetings frequency had changed or had sort

of ceased. So it raised the possibility that there was a change in the conduct effect for that period." *Id.* at 123:14–18. He did not see any "factual support" for "estimat[ing] the conduct effect separately for 12 calendar years to capture variability"; he did not, for example, see anything "in the conspiracy evidence that suggests that there was a period in which the conspiracy broke down and there would have been no impact." *Id.* at 124:8–15. Put more simply, Johnson explained that disaggregating the conspiracy effect by calendar year, as Guerin-Calvert proposed, would be "an arbitrary choice" because there is "nothing special" about calendar years "from the conspiracy perspective." *Id.* at 124:16, 125:13–15.

The Court also finds persuasive Johnson's testimony that adding annual variables "makes the estimation of the conduct effect imprecise and unreliable." *Id.* at 124:25–125:1. Although Guerin-Calvert proposed adding separate variables for various market factors to Netz's model, she did not propose doing the same to Johnson's and instead only suggested including annual conduct variables. However, she testified that her suggested annual variables "are accounting for" both "the overcharge effect" and what she considered to be "the unincluded market factors" in Johnson's model, and she agreed that she could not tell "what portion of [her annual variable] coefficient is attributable to the anticompetitive conduct." May 21, 2025 Hr'g Tr. at 379:16–17, 394:4–14. In other words, the annual variables she proposed adding to Johnson's model do not estimate what the model is trying to measure: overcharges caused by the conspiracy. As Johnson persuasively explained at the hearing, "when we talk about controlling for different factors to estimate the conduct effect, we're controlling to eliminate them from the conduct effect so that we have an estimate of the conduct effect. Disaggregating [into annual conduct variables] confounds the estimation of the conduct effect" and does not act as "a control for other market factors." *Id.* at 415:14–21.

The Court is further persuaded to reject the addition of annual conduct variables by the fact that Guerin-Calvert's modifications would result in eight negative annual overcharges. Although Guerin-Calvert did not agree that these overcharges are necessarily implausible, she nonetheless zeroed them out in her final estimates to be conservative—thus indicating that she herself does not believe they present the best estimates of the effects of the conspiracy. Johnson's testimony

14

supports that conclusion. He explained that, while price wars—"where competitors can undertake activity to try to drive each other out of business or do very harmful activity to each other"—might explain a negative coefficient, there was no evidence of price wars "in the extensive conspiracy documentation" in this case. May 19, 2025 Hr'g Tr. at 132:23–133:16. Guerin-Calvert did not disagree that there was no evidence of price wars, but she asserted that the negative coefficients "are economically plausible as reflecting demand, cost, and other factors that are omitted from Dr. Johnson's model." May 21, 2025 Hr'g Tr. at 370:21–23. But, as Johnson testified on rebuttal, "We don't know what effect omitted variables have because they're not there and they haven't been tested other than the tests that I did on sensitivities." *Id.* at 418:16–18. More significantly, as explained above, Guerin-Calvert herself cannot estimate what portion of her annual coefficients are attributable to conduct effects as opposed to what she contends are omitted effects. As Johnson summarized: "[D]o [the omitted effects] make the conduct effects seem larger? Do they make them seem smaller? We don't know. Or is there really no meaningful omitted variable at all. . . ." *Id.* at 418:25–419:3. In addition, Johnson performed sensitivity analyses to test his model against the few variables identified by Guerin-Calvert as possibly omitted, and those tests confirmed the reliability of his model. Ex. 203 ¶¶ 105–11.

For all of the above reasons, the Court rejects Guerin-Calvert's proposal to add annual conduct variables to Johnson's model.

### 2. Volume of Commerce Calculation

Guerin-Calvert proposed three adjustments to Johnson's damages calculations, two of which Johnson accepted. The outstanding dispute is how to estimate missing sales data for three producers—Thomson, Samsung (SDI), and Mitsubishi—for which sales data exists for some years of the conspiracy period but not others. Johnson would estimate the missing sales based on data from all alleged cartel members for the missing years, whereas Guerin-Calvert would use sales data from the same producer for different years.

Johnson argued against Guerin-Calvert's proposal:

> because the adjustment cannot be applied to all manufacturers [since there are some manufacturers with missing data for the entire conspiracy period], and applying to just those for which it is feasible

15

will skew the Class Damages calculation up or down, depending on whether the share of U.S.-to-global sales in their data is above or below (respectively) the industry average. If the selected firms have a below-average U.S[.]-to-global ratio, it will skew the overall Class Damages towards that firms' low average U.S. sales. For example, SDI (one of the firms for which the adjustment is proposed) has a share of U.S.-to-global sales in their data that is a lower than average, so using SDI's share for calculating the portion of damages associated with its sales would mean using a too-low ratio for other firms.

Ex. 203 ¶ 125 (footnote omitted). However, Guerin-Calvert did not propose applying the SDI ratio, for example, to other manufacturers. Instead, she suggested that SDI's lower-than-average ratio should be applied to SDI's own sales. It might be that there are year-to-year differences in the U.S.-to-global CRT sales ratio that should also be taken into account. Guerin-Calvert, for instance, applied "SDI's own DPP class share and U.S.-to-global CRT sales ratio from 1998-2007" to estimate those figures for 1995 to 1997, Ex. 204 ¶ 118, and it may be that there were other trends between those periods that would make relying on the later period inappropriate to estimate sales data in the earlier period. But the parties did not present evidence on that question. Given the choice between relying on firm-specific data from different years or industry-wide data from the same years, the Court chooses the former. As Johnson himself recognized, some firms had shares of U.S.-to-global sales that were above or below the industry average. The Court finds it appropriate to use that firm-specific information where possible because doing so would provide a better estimate of the missing sales data.

## CONCLUSION

For the reasons discussed above, the Court finds that a modification of Johnson's dynamic model that includes separate regressions for CPTs and CDTs presents the most reasonable estimate of the overcharges in this case, and that this estimate should apply to both the DPP and IPP classes. The Court rejects Guerin-Calvert's suggestion that annual conduct variables be added, but it adopts her three proposed modifications, two of which Johnson accepted, regarding the volume of commerce calculations as to the DPP class.

The parties shall meet and confer to attempt to reach agreement on a final damages calculation for each class, as well as the two issues that IPPs and Irico agreed to defer: whether damages should be apportioned between IPPs and DPPs and whether treble damages are

appropriate. ECF No. 6476 at 3. If the calculations adopted by this order result in damages to the DPP class greater than the $1.011 billion DPPs have requested and DPPs seek the higher amount, then DPPs and Irico shall meet and confer regarding whether DPPs are limited to a damages award of $1.011 billion.[5]

Within 35 days of the date of this order, the parties shall file a joint case management statement setting forth their agreed or respective proposals regarding any necessary further proceedings, which may, if the parties agree, include referral to a magistrate judge for settlement.

**IT IS SO ORDERED.**

Dated: March 11, 2026



JON S. TIGAR
United States District Judge

---

[5] Relying on Rule 54(c), Irico argued in its post-hearing brief that DPPs and IPPs "should not be awarded damages above what they each claim in their respective expert reports." ECF No. 6501 at 14. Plaintiffs did not address this question, but it is not clear from the language of the rule that Irico's proposed limitation applies. Rule 54(c) states that a default judgment must not exceed the amount "demanded in the *pleadings*," Fed. R. Civ. P. 54(c) (emphasis added), and Irico has cited no authority that an expert report qualifies as a pleading under this rule. *See also* Fed. R. Civ. P. 7(a) (listing as allowable "pleadings" complaints, answers, and, "if the court orders one, a reply to an answer"). However, the Court does not resolve this question on the limited briefing before it and will require supplemental briefing if the parties do not reach agreement.