# IRICO
# EXHIBIT 400

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No.: 07-cv-05944 JST<br><br>MDL No. 1917 |
| This document relates to:<br><br>*ALL INDIRECT PURCHASER ACTIONS*<br><br>*ALL DIRECT PURCHASER ACTIONS* | **DECLARATION OF MARGARET E. GUERIN-CALVERT IN SUPPORT OF DEFENDANTS IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD.'S TRIAL BRIEF ON DAMAGES**<br><br>Date:　　　May 19–21, 2025<br>Time:　　　8:30 a.m. to 1:30 p.m.<br>Judge:　　　Honorable Jon S. Tigar<br>Courtroom:　6, 2nd Floor |

I, Margaret E. Guerin-Calvert, declare as follows:

1.     I am Margaret E. Guerin-Calvert, President and Senior Managing Director of FTI Consulting, Inc. Center for Healthcare Economics and Policy, a business unit that specializes in healthcare economics and applied microeconomics. I make this Declaration in support of Defendant Irico Group Corporation and Irico Display Devices Co., Ltd.'s Trial Brief on Damages in advance of the May 19 to 21, 2025 evidentiary hearing on damages. If called as a witness, I could and would testify to the matters set forth in this declaration of my own personal knowledge.

2.     I have been retained and designated as a testifying expert in the above-styled actions for Defendants Irico Group Corporation ("Irico Group") and Irico Display Devices Co., Ltd. ("Irico Display," collectively, "Irico" or the "Irico Defendants").

**Previous Reports**

3.     I have previously prepared and disclosed expert reports in the above-styled actions, which set forth my qualifications to testify as an expert in these actions and which are incorporated herein by reference.  I have also assessed independently the underlying analysis presented in the expert reports that Professor Robert D. Willig previously submitted in the IPP action.

4.     Attached hereto as Exhibit 403 to Irico's Trial Brief on Damages is a true and correct copy of the Expert Report of Margaret Guerin-Calvert, July 21, 2023 ("Jul. 21, 2023 Guerin-Calvert Rep.").

5.     Attached hereto as Exhibit 409 to Irico's Trial Brief on Damages is a true and correct copy of the Expert Report of Margaret E. Guerin-Calvert, August 5, 2014 ("Aug. 5, 2014, Guerin-Calvert Rep.").

6.     Attached hereto as Exhibit 415 to Irico's Trial Brief on Damages is a true and correct copy of the Expert Report of Robert D. Willig, August 5, 2014 ("Aug. 5, 2014, Willig Rep.").

7.     Attached hereto as Exhibit 417 to Irico's Trial Brief on Damages is a true and correct copy of the Supplemental Expert Report of Margaret E. Guerin-Calvert, March 16, 2022 ("Mar. 16, 2022, Guerin-Calvert Supplemental Rep.").

GUERIN-CALVERT DECL. ISO IRICO TRIAL BRIEF ON DAMAGES          MASTER FILE NO. 07-CV-05944-JS
MDL NO. 1917

1

8.    Attached hereto as Exhibit 418 to Irico's Trial Brief on Damages is a true and correct copy of the Errata to the Supplemental Expert Report of Margaret E. Guerin-Calvert, March 21, 2022 ("Mar. 21, 2022, Guerin-Calvert Errata to Supplemental Rep.").

**Duplicative Damages between the Direct and Indirect Purchaser Plaintiffs**

9.    I understand there are legal questions as to whether the indirect purchaser plaintiff class ("IPPs") may be entitled to duplicative damages – that is, those stemming from the same alleged overcharge on the "same CRT" as the direct purchaser plaintiff class ("DPPs"). Counsel from Norton Rose Fulbright, who is representing Irico, have asked me to identify a general methodology that could be used to develop parameters for adjusting IPPs' damages estimate to account for any such "overlapping" or duplicative overcharges to assist the Court.

10.    In developing such a methodology and the estimates, a relevant starting point for the exercise in the instant actions is that DPPs are claiming damages equal to 100% of any overcharges for their direct purchases of CRTs (including in CRT finished products) in the U.S., and IPPs are claiming that 100% of any overcharges were passed on to end customers in the U.S. As a result, in theory, any damages awarded to DPPs and IPPs involving purchases of the "same CRT" (including in a CRT finished product) would be overlapping or duplicative in the sense that each class would be seeking damages equal to 100% of the same overcharge.[1] Thus, in what follows, I sought to identify a methodology for estimating the overall share of CRTs that was directly purchased in the U.S. by DPPs that was ultimately purchased by IPPs.

11.    There is insufficient data available in these matters to trace specific CRTs (including in finished products) purchased directly in the U.S. by DPPs to their eventual end customers. Instead, to develop estimates of the overlap, I turn to industry data from the U.S. Census and to shares

---

[1] This statement assumes the Court applies the same percentage overcharge for IPPs as for DPPs. If the Court were to apply a different percentage overcharge for the two classes, I have been asked to assume for purposes of identifying a methodology that the lesser of these two amounts is duplicative. As a hypothetical example, if the Court applies a 3% overcharge for CDTs in the DPP case and a 2% overcharge for CDTs in the IPP case, I have been asked to assume that the estimate of overlapping or duplicative damages would be 2%.

GUERIN-CALVERT DECL. ISO IRICO TRIAL BRIEF ON DAMAGES    MASTER FILE NO. 07-cv-05944-JS
MDL NO. 1917

estimated by IPPs' damages expert, Dr. Janet Netz, as data to use in identifying the methodology and for estimating the overall share of CRTs purchased directly in the U.S. by DPPs that were then ultimately purchased by IPPs. The methodology includes two steps.

    a.    The first step is to estimate a share of CRTs purchased directly in the U.S. by DPPs that was ultimately sold to consumers *outside* the U.S. (i.e., exported); to develop this estimate, I use U.S. Census data. IPPs are not claiming damages on exported CRTs, and on this basis there would be no overlap for such products.

    b.    Second, among the CRTs purchased directly in the U.S. by DPPs that were ultimately sold to consumers *inside* the U.S., I estimate a share that was ultimately sold to IPPs. This second step in the methodology is conducted using data and share estimates prepared by Dr. Netz as identified below.

12. Turning to the first step, which is to estimate the share of DPPs' purchases of CRTs and CRT finished products that was exported outside the U.S., I use U.S. Census data. Based on these data, I estimate in the first step that at most 34.4% of CDTs and CRT monitors and at most 7.2% of CPTs and CRT TVs that were purchased directly in the U.S. by DPPs were exported.[2]

[2] Specifically, to estimate these shares, I rely on data on imports, exports, and domestic production on TVs and CRT monitors from the U.S. Census (Current Industrial Reports - Consumer Electronics, Series MA36M (1995-2000) and MA334M (2001-2006); Current Industrial Reports – Computers and Office and Accounting Machines, Series MA35R (1995-2000) and MA334R (2001-2004)) that are in the record. For CRT monitors, I calculate the average export share (exports divided by domestic production), weighted by monitor value, for the years 1995 and 1997 to 2002. Similar data are not available for 2003, 2005, and 2006. I exclude the 1996 data because the reported exports seem implausibly low (the reported exports for 1996 are equal to 3.2% of domestic shipments as compared to at least 27% in every other year for which data are available) and the 2004 data because the implied export share is greater than 100%. The TV data were not limited to CRT TVs. Because the import share for LCD and plasma TVs may have been different from CRT TVs, I calculate the average export share for TVs, weighted by TV value, using data from the period of 1996 through 2002 only, during which time period LCD and plasma TVs still accounted for less than 1% of North American TV purchases (import share data are not available for 1995). (Television Systems Market Tracker Q4 2003, iSuppli Corporation; Supplemental Expert Report of Margaret E. Guerin-Calvert, March 16, 2022, Appendix H)) Using any year later than 2002 as a cutoff would have resulted in a lower average export share for TVs, and thus fewer purchases excluded from an estimate of overlapping or duplicative damages.

The formula for estimating export shares (exports divided by domestic production) is likely conservative in that it tends to overstate export shares, particularly for CDTs and CRT monitors, for

Conversely, this results in estimates that the remaining 65.6% of CDTs and CRT monitors and 92.8% of CPTs and CRT TVs purchased directly in the U.S. by DPPs were ultimately sold to end consumers in the U.S. This estimate is likely conservative, particularly for CDTs and CRT monitors.[3]

13.    Not all CRT finished products that were sold to end customers in the U.S. were purchased by IPPs. Estimating IPPs' purchases of such products is the second step of the methodology for estimating overlap and adjustments. Dr. Netz estimated that 93.2% of end purchases of CRT monitors and TVs in the U.S. were made by non-government entities (government entities are not members of the IPP class).[4] She also estimated that 45.1% of CRT monitor and TV end purchases in the U.S. were made in states in which IPPs are seeking damages.[5] Using both estimates, together, implies that 93.2% * 45.1% = 42.0% of CRT monitors and TVs purchased in the U.S. were purchased by IPPs. If Dr. Netz's estimates are correct, it is reasonable to assume as an estimate 42.0% of all direct purchases of CRTs and CRT finished products purchased directly in the U.S. by DPPs that were sold to end customers in the U.S. were sold to IPPs. This provides an estimate of the overlap where both DPPs and IPPs seek damages for the entirety of any overcharges for such CRTs.

14.    Using the above methodology and data for estimating the parameters and shares results in an estimate that (at least) 65.6% of CDTs and CRT monitors purchased directly in the U.S. by DPPs were ultimately sold to end consumers in the U.S. (the rest were exported), and 42.0% of such products were purchased by IPPs. This application of the methodology results in an estimate

two reasons. First, by using exports as the numerator, it assumes that all CRT finished product exports were directly purchased in the U.S. The Census data indicate that 91.1% of CRT monitors and 56.4% of TVs purchased in the U.S. were imported, and it is likely some of these products were subsequently exported. If so, the numerator in the formula used in the estimation is too high, which would cause the formula to overstate the export share. Second, by using domestic production as the denominator, it assumes that all CRT finished products purchased directly in the U.S. were manufactured in the U.S. even though, as noted above, the majority of CRT finished products sold in the U.S. were imported. If some CRT finished products purchased directly in the U.S. were imported, the denominator in the formula is too low, which would cause the formula to overstate the export share.

[3] *Ibid.*

[4] Expert Report of Janet S. Netz, Ph.D., April 15, 2014, p. 122 and Exhibit 79.

[5] *Id.*, p. 123 and Exhibit 79.

GUERIN-CALVERT DECL. ISO IRICO TRIAL BRIEF ON DAMAGES       MASTER FILE NO. 07-CV-05944-JS
                                                                                                        MDL NO. 1917

that at least 65.6% * 42.0% = 27.6% of any damages awarded to DPPs for purchases of CDTs and CRT monitors as involving overlap as defined above, and, similarly, at least 92.8% * 42.0% = 39.0% of any damages awarded to DPPs for purchases of CPTs and CRT TVs as involving overlap as defined above. More generally, the methodology and estimates can be stated in the following baseline general formulas for estimating overlap and adjustments for overlap or duplicative damages:[6]

$$CDTs: Estimated\ Duplicative\ Damages = 27.6\% * DPP\ Damages$$

$$CPTs: Estimated\ Duplicative\ Damages = 39.0\% * DPP\ Damages$$

15.    The foregoing considers the case in which the Court applies the same percentage overcharges (if any) on CDTs and CPTs for DPPs and IPPs. The above formulas and estimated parameters can also be used if the Court applies lower percentage overcharges on CDTs and CPTs for DPPs than for IPPs. If, alternatively, the Court applies *higher* percentage overcharges on CDTs and CPTs for DPPs than for IPPs, the above formulas and estimated parameters for estimating overlap and to provide estimated duplicative damages would need to be adjusted such that only the lesser of these two overcharge percentages is treated as overlapping or duplicative. Specifically, if the Court applies *higher* percentage overcharges on CDTs and CPTs for DPPs than IPPs, the methodology and estimates can be stated in the following modified general formulas for estimating overlap and adjustments for overlap or duplicative damages (when the estimated overcharge percentages are expressed as a share of but-for prices, as discussed in the next section below):[7, 8]

---

[6] The methodology and baseline general formulas are a conceptual framework and use the estimated shares to illustrate the "Estimated Duplicative Damages" or adjusted estimates and do not purport to provide a legal opinion on duplicative damages.

[7] Ibid. These modified general formulas similarly are a conceptual framework and effectively replace the DPP percentage overcharge in the original formulas with the IPP percentage overcharge, thereby treating only the (smaller) IPP percentage overcharge as duplicative.

[8] If the Court were to choose to apply percentage overcharges that vary by year and also differ for DPPs and IPPs, an assessment of which overcharge estimate is higher (DPP or IPP) would potentially be considered on an annual basis (and separately for CDTs and CPTs).

$$CDTs: Estimated\ Duplicative\ Damages$$
$$= 27.6\% * DPP\ Damages * \left(\frac{IPP\ Overcharge\ \%}{DPP\ Overcharge\ \%}\right) * \left(\frac{1 + DPP\ Overcharge\ \%}{1 + IPP\ Overcharge\ \%}\right)$$

$$CPTs: Estimated\ Duplicative\ Damages$$
$$= 39.0\% * DPP\ Damages * \left(\frac{IPP\ Overcharge\ \%}{DPP\ Overcharge\ \%}\right) * \left(\frac{1 + DPP\ Overcharge\ \%}{1 + IPP\ Overcharge\ \%}\right)$$

**Converted Overcharge Percentage and Revised Damages Tables**

16.    I have also been asked by counsel for Irico to prepare several minor modifications to figures and tables that were included in my previous reports in these actions to reflect updates related to the upcoming evidentiary hearing.

17.    In my July 21, 2023 report, I reported the weighted average overcharge estimates that result when modifying Dr. Johnson's overcharge model to better control for CRT industry conditions.[9] I also reported the resulting damages estimates when using these overcharge estimates and after making three corrections to Dr. Johnson's methodology for estimating DPPs' volume of commerce,[10] two of which he has since conceded.[11] I have been asked to report the annual percentage overcharge estimates and damages estimates underlying these reported aggregated overcharge and damages estimates. These annual estimates, which were included in the backup to my July 21, 2023 report, are presented in the table below.

---

[9] Expert Report of Margaret E. Guerin-Calvert, July 21, 2023 ("Guerin-Calvert 7-21-2023 Report"), ¶ 97.

[10] Guerin-Calvert 7-21-2023 Report, Figure 19.

[11] Expert Rebuttal Report of Phillip M. Johnson, Ph.D., September 1, 2023 ("Johnson 9-1-2023 Report"), ¶¶ 121–123.

GUERIN-CALVERT DECL. ISO IRICO TRIAL BRIEF ON DAMAGES        MASTER FILE NO. 07-CV-05944-JS
                                                                                    MDL NO. 1917

**DPP Damages Estimates for 1995 to 2007 when Making Economically Appropriate Corrections to Dr. Johnson's Overcharge Model and Correcting Errors in Dr. Johnson's Methodology for Estimating DPPs' Volume of Commerce[12]**

| Year | CDT | | CPT | |
|------|-----------|------------|------------|------------|
| | Overcharge | Damages | Overcharge | Damages |
| 1995 | 11.7% | $57,865,734 | 6.7% | $56,876,230 |
| 1996 | 9.3% | $66,031,703 | 2.2% | $23,930,996 |
| 1997 | 0.0% | $0 | 0.0% | $0 |
| 1998 | 0.0% | $0 | 0.0% | $0 |
| 1999 | 12.5% | $30,928,442 | 0.6% | $7,271,416 |
| 2000 | 16.7% | $39,941,848 | 2.5% | $28,491,434 |
| 2001 | 13.0% | $25,174,676 | 3.8% | $38,304,806 |
| 2002 | 2.3% | $3,005,464 | 0.0% | $0 |
| 2003 | 0.1% | $33,550 | 0.0% | $0 |
| 2004 | 2.5% | $1,871,741 | 0.0% | $0 |
| 2005 | 4.6% | $1,045,549 | 0.0% | $0 |
| 2006 | 5.6% | $426,830 | 3.0% | $7,929,108 |
| 2007 | 1.9% | $42,467 | 1.3% | $1,357,213 |
| **Total** | | **$226,368,003** | | **$164,161,202** |

18.    I have also been asked to update Figure 19 from my July 21, 2023 report with two minor modifications. First, the original table contained two rows that reported DPP damages estimates if damages from before August 1998 were excluded. I have been asked to instead report the DPP damages estimates if damages from before January 1998 are excluded.[13] Second, the original table contained reported damages estimates based on Dr. Johnson's original estimates of DPPs' volume of commerce and based on corrections to three errors in his methodology for estimating DPPs' volume of commerce. I have been asked to also report the damages estimates if

---

[12] Backup to Guerin-Calvert 7-21-2023 Report, Figure 19, and by reference the discussion in Guerin-Calvert 7-21-23 Report about Figure 19, economically appropriate modifications to Dr. Johnson's overcharge model, and correcting errors in Dr. Johnson's methodology for estimating DPPs' volume of commerce.

[13] These calculations appear in the fourth and sixth rows of Figure 19R below. They replace the third and fourth rows from the original Figure 19.

GUERIN-CALVERT DECL. ISO IRICO TRIAL BRIEF ON DAMAGES        MASTER FILE NO. 07-CV-05944-JS
MDL NO. 1917

7

only the two methodological errors that Johnson conceded in his September 1, 2023 rebuttal report are corrected.[14] The table below includes these two modifications.[15]

**Figure 19R - Revised Damages Estimates when Excluding Pre-1998 Damages[16]**

| Modification | Adjustment to Dr. Johnson's Estimate of DPPs' CRT and CRT Finished Product Purchases | Resulting Damages Estimates ($ Millions) | | | | | |
|---|---|---|---|---|---|---|---|
| | | Using Dr. Johnson's Overcharge Estimate | | | Using Modified Overcharge Estimate | | |
| | | CPT/TV | CDT/Monitor | Total | CPT/TV | CDT/Monitor | Total |
| Original | Dr. Johnsons' Estimate | $695.3 | $389.2 | **$1,084.6** | $182.1 | $259.6 | **$441.7** |
| Rebuttal | Dr. Johnsons' Estimate correcting A, B (DPP Errors 3, 4), as conceded in his Rebuttal Report | $629.5 | $381.9 | **$1,011.5** | $169.0 | $253.7 | **$422.7** |
| Original | After correcting Dr. Johnson's methodological errors discussed in Section VI. A-C. | $616.6 | $343.0 | **$959.7** | $164.2 | $226.4 | **$390.5** |
| excluding pre-1998 | Dr. Johnsons' Estimate | $505.4 | $162.2 | **$667.7** | $94.3 | $107.6 | **$201.9** |
| excluding pre-1998 | Dr. Johnsons' Estimate correcting A, B (DPP Errors 3, 4), as conceded in his Rebuttal Report | $447.9 | $156.2 | **$604.1** | $83.6 | $102.5 | **$186.0** |
| excluding pre-1998 | After correcting Dr. Johnson's methodological errors discussed in Section VI. A-C. | $444.3 | $157.5 | **$601.7** | $83.4 | $102.5 | **$185.8** |

19.    I have also been asked to convert the percentage overcharge estimates reported in the IPP case so that they are expressed in the same terms as the percentage overcharge estimates in the DPP case so that they can be compared across cases – e.g., on a common percentage basis. The logic of the conversion is this: Dr. Netz presented and expressed her IPP overcharge estimates as a percentage of *actual* prices, while Dr. Johnson presented and expressed his DPP overcharge estimates as a percentage of *but-for* prices. As an illustrative example, suppose, hypothetically, that the actual price was $125, and Dr. Netz estimated that the but-for price was $100, meaning that her

---

[14] These calculations appear in the second and fifth rows of Figure 19R below.

[15] In Figure 19R, "Original" refers to the inclusion of damages for the entire class period.

[16] Backup to the Expert Report of Phillip M. Johnson, Ph.D., May 26, 2023 ("Johnson 5-26-2023 Report"); backup to Johnson 9-1-2023 Report.

estimate of the overcharge was $25. Dr. Netz would have reported that the overcharge was $25 / $125 = 20% (using the *actual* price of $125 in the denominator). In contrast, if Dr. Johnson had estimated the same but-for price and overcharge, he would have reported that the overcharge was $25 / $100 = 25% (using the *but-for* price of $100 in the denominator). These two calculations would reflect the same actual price, but-for price, and overcharge in dollar terms, but the overcharge would be expressed in different percentage terms.[17] In responding to Dr. Netz, I expressed any modified overcharge estimates in the same terms as Dr. Netz for purposes of comparison, i.e., as a percentage of *actual* prices. Similarly, in responding to Dr. Johnson, I expressed any modified overcharge estimates in the same terms as Dr. Johnson, i.e., as a percentage of *but-for* prices. In order to facilitate an apples-to-apples comparison of the IPP and DPP overcharge estimates at the upcoming hearing, I was asked to convert Dr. Netz's reported overcharge estimates, and my modified overcharge estimates presented in response to Dr. Netz, so that they are expressed in the same terms as Dr. Johnson's overcharge estimates, i.e., as a percentage of *but-for* prices. The formula for this conversion is:

$$But\text{-}For\ Overcharge\ \%\ (Johnson) = \frac{Actual\ Overcharge\ \%\ (Netz)}{1 - Actual\ Overcharge\ \%\ (Netz)}$$

20.    The first table below shows the percentage overcharge estimates as originally reported, and the second table shows the original table yet with the converted percentage overcharge estimates (i.e., as a percentage of *but-for* prices).

---

[17] To be clear, Dr. Netz and Dr. Johnson did not in fact estimate the same overcharge in dollar terms.

GUERIN-CALVERT DECL. ISO IRICO TRIAL BRIEF ON DAMAGES        MASTER FILE NO. 07-CV-05944-JS
MDL NO. 1917

**IPP Overcharge Estimates Expressed as a Percentage of *Actual* Prices (Original)[18]**

| Time Period | Dr. Netz's Overcharge Model | | Overcharge Estimates when Making Economically Appropriate Corrections to Dr. Netz's Overcharge Model | |
|---|---|---|---|---|
| | CDT | CPT | CDT | CPT |
| 1995-2006 | 22.0% | 9.0% | 1.6% | 2.3% |
| 2007 | 11.4% | 3.1% | 0.0% | 0.0% |
| Total | 22.0% | 8.9% | 1.6% | 2.3% |

**IPP Overcharge Estimates Expressed as a Percentage of *But-For* Prices (Converted)**

| Time Period | Dr. Netz's Overcharge Model | | Overcharge Estimates when Making Economically Appropriate Corrections to Dr. Netz's Overcharge Model | |
|---|---|---|---|---|
| | CDT | CPT | CDT | CPT |
| 1995-2006 | 28.2% | 9.9% | 1.6% | 2.4% |
| 2007 | 12.9% | 3.2% | 0.0% | 0.0% |
| Total | 28.2% | 9.8% | 1.6% | 2.3% |

21.    Next, I have been asked to update Tables F-2 and F-4 from my March 16, 2023 report with two minor modifications. First, the original tables reported annual IPP damages estimates if damages from before August 1998 were excluded. I have been asked to instead report annual IPP damages estimates if damages from before January 1998 are excluded. Second, the original tables contained the overcharge estimates expressed as a percentage of *actual* prices. I have been asked to convert those estimates so that they are expressed as a percentage of *but-for* prices. Note that changing the terms in which the percentage overcharge is expressed does not alter the damages estimates because, as was shown in the hypothetical example discussed above, the amount of dollar

---

[18] Supplemental Expert Report of Margaret E. Guerin-Calvert, March 16, 2022 ("Guerin-Calvert 3-16-2022 Report"), Tables F-1 and F-3.

overcharges is the same regardless of how the percentage overcharge is expressed.[19] The two tables below report the results after making these modifications.

**Table F-2RR – Dr. Netz's IPP Damages Estimates for January 1, 1998 to November 25, 2007 with Overcharge Estimates Expressed as a Percentage of But-For Prices (Converted)[20]**

| Year | CDT | | | CPT | | |
|---|---|---|---|---|---|---|
| | Volume of Commerce | Overcharge | Damages | Volume of Commerce | Overcharge | Damages |
| 1995 | $0 | 28.2% | $0 | $0 | 9.9% | $0 |
| 1996 | $0 | 28.2% | $0 | $0 | 9.9% | $0 |
| 1997 | $0 | 28.2% | $0 | $0 | 9.9% | $0 |
| 1998 | $979,057,154 | 28.2% | $215,573,480 | $821,166,215 | 9.9% | $74,005,257 |
| 1999 | $1,199,474,354 | 28.2% | $264,105,991 | $797,915,860 | 9.9% | $71,909,885 |
| 2000 | $1,315,079,864 | 28.2% | $289,560,564 | $815,569,045 | 9.9% | $73,500,828 |
| 2001 | $698,437,830 | 28.2% | $153,785,377 | $691,212,798 | 9.9% | $62,293,577 |
| 2002 | $585,233,722 | 28.2% | $128,859,556 | $626,420,387 | 9.9% | $56,454,346 |
| 2003 | $339,742,118 | 28.2% | $74,806,042 | $618,275,442 | 9.9% | $55,720,306 |
| 2004 | $322,914,610 | 28.2% | $71,100,881 | $639,125,159 | 9.9% | $57,599,327 |
| 2005 | $153,611,074 | 28.2% | $33,822,820 | $484,044,628 | 9.9% | $43,623,138 |
| 2006 | $56,079,170 | 28.2% | $12,347,779 | $334,449,470 | 9.9% | $30,141,302 |
| 2007 | $15,622,368 | 12.9% | $1,780,923 | $102,641,804 | 3.2% | $3,179,262 |
| **Total** | **$5,665,252,264** | **28.2%** | **$1,245,743,413** | **$5,930,820,808** | **9.8%** | **$528,427,226** |

---

[19] When the overcharge is expressed as a percentage of the *but-for* price, the formula for the resulting damages estimate is given below. This is the formula currently used by Dr. Johnson, e.g., in the backup to Figure 19 of the Johnson 5-26-2023 Report.

$$Damages = Volume\ of\ Commerce * \frac{ButFor\ Overcharge\ \%}{1 + ButFor\ Overcharge\ \%}$$

[20] Guerin-Calvert 3-16-2022 Report, Table F-1, and by reference the discussion of economically appropriate modifications of Dr. Netz's model.

GUERIN-CALVERT DECL. ISO IRICO TRIAL BRIEF ON DAMAGES        MASTER FILE NO. 07-CV-05944-JS
MDL NO. 1917

**Table F-4RR - IPP Damages Estimates for January 1, 1998 to November 25, 2007 when Making Economically Appropriate Corrections to Dr. Netz's Overcharge Model with Overcharge Estimates Expressed as a Percentage of But-For Prices (Converted)[21]**

| Year | CDT | | | CPT | | |
|------|-----|--|--|-----|--|--|
| | Volume of Commerce | Overcharge | Damages | Volume of Commerce | Overcharge | Damages |
| 1995 | $0 | 1.6% | $0 | $0 | 2.4% | $0 |
| 1996 | $0 | 1.6% | $0 | $0 | 2.4% | $0 |
| 1997 | $0 | 1.6% | $0 | $0 | 2.4% | $0 |
| 1998 | $979,057,154 | 1.6% | $15,224,874 | $821,166,215 | 2.4% | $18,861,383 |
| 1999 | $1,199,474,354 | 1.6% | $18,652,482 | $797,915,860 | 2.4% | $18,327,345 |
| 2000 | $1,315,079,864 | 1.6% | $20,450,211 | $815,569,045 | 2.4% | $18,732,822 |
| 2001 | $698,437,830 | 1.6% | $10,861,090 | $691,212,798 | 2.4% | $15,876,481 |
| 2002 | $585,233,722 | 1.6% | $9,100,704 | $626,420,387 | 2.4% | $14,388,262 |
| 2003 | $339,742,118 | 1.6% | $5,283,176 | $618,275,442 | 2.4% | $14,201,181 |
| 2004 | $322,914,610 | 1.6% | $5,021,499 | $639,125,159 | 2.4% | $14,680,079 |
| 2005 | $153,611,074 | 1.6% | $2,388,736 | $484,044,628 | 2.4% | $11,118,031 |
| 2006 | $56,079,170 | 1.6% | $872,062 | $334,449,470 | 2.4% | $7,681,977 |
| 2007 | $15,622,368 | 0.0% | $0 | $102,641,804 | 0.0% | $0 |
| **Total** | **$5,665,252,264** | **1.6%** | **$87,854,835** | **$5,930,820,808** | **2.3%** | **$133,867,560** |

22. Lastly, I have been asked to report in one table Dr. Netz's damages, the revised damages estimates that are obtained after making economically appropriate corrections to Dr. Netz's overcharge model, and the reductions to these two sets of damages estimates that result if damages from prior to 1998 are excluded. All of these damages estimates appear in a report that was previously submitted in this matter by Dr. Netz or me or in Tables F-2RR or F-4RR above.

**Summary of IPP Damages Estimates[22]**

| Time Period | Dr. Netz's Overcharge Model | | | Overcharge Estimates when Making Economically Appropriate Corrections to Dr. Netz's Overcharge Model | | |
|-------------|------|------|-------|------|------|-------|
| | CDT | CPT | Total | CDT | CPT | Total |
| Original | $2,025,984,173 | $742,629,729 | $2,768,613,902 | $142,959,329 | $188,460,378 | $331,419,707 |
| Excluding Pre-1998 | $1,245,743,413 | $528,427,226 | $1,774,170,639 | $87,854,835 | $133,867,560 | $221,722,395 |

---

[21] Guerin-Calvert 3-16-2022 Report, Table F-3.

[22] Errata to the Expert Report of Janet S. Netz, Ph.D, July 3, 2014. Exhibit ER-81; Guerin-Calvert 3-16-2022 Report, Table F-3; Tables F-2RR and F-4RR above.

GUERIN-CALVERT DECL. ISO IRICO TRIAL BRIEF ON DAMAGES    MASTER FILE NO. 07-CV-05944-JS
MDL NO. 1917

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington DC on April 28, 2025.

_____
Margaret E. Guerin-Calvert

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **Declaration of Margaret E. Guerin-Calvert** was filed via CM/ECF on April 28, 2025, and as a result has been served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: *Jeffrey Margulies*
Jeffrey Margulies